Nourse & Bowles, LLP
Attorneys for Plaintiff
Lawrence J. Bowles, Esq. (LB 5950)
One Exchange Plaza
New York, New York 10006
(212) 952-6200
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------X

AMERICAN STEAMSHIP OWNERS
MUTUAL PROTECTION AND
INDEMNITY ASSOCIATION, INC.,

                         Plaintiff,

        - against -

Alcoa Steamship Co., Inc.
and the Other Entities Listed on Exhibit A
hereto,

                         Defendants.

----------------------------------------------------X

04 Civ. 04309 (LAK)

AFFIDAVIT IN SUPPORT OF
PLAINTIFF'S OPPOSITION
TO THE INTERVENTION
MOTION OF THE MARITIME
CLAIMANTS

STATE OF NEW YORK        )
                         )    ss.:
COUNTY OF NEW YORK       )

LAWRENCE J. BOWLES, being duly sworn, deposes and says:

1.      I am a partner in the firm of Nourse & Bowles, LLP, attorneys for

plaintiff, The American Steamship Owners Mutual Protection and Indemnity

Association, Inc. (the "American Club" or "Club"); and I am fully familiar with the captioned matter.

2.     The documents attached hereto as exhibits, are true copies of documents in my firm's files which were received or prepared during the course of this matter or related litigation.

Lawrence J. Bowles

Sworn to before me this
4th day of October, 2004.

Notary Public

Karlene S. Jackson, Notary Public
State of New York, #01JA5083169
Qualified in Kings County
Commission Expires August 4, 2005

## LIST OF EXHIBITS TO MR. BOWLES' AFFIDAVIT

**Exhibit No.**                                    **Description**

1        Plaintiff's Second Amended Complaint in the captioned action

2        Specimen copy of fully assessable marine indemnity insurance
         policies issued by the American Club to defendants

3        Lists of defendants in this action who have either answered the
         Second Amended Complaint or stated an intention to do so, along
         with lists of their various attorneys

4        Judge Weiner's decision in <u>In Re: Asbestos Products Liability
         Litigation</u> (No. VI) dated May 2, 1996 Civil Action No. 2 MDL
         875 (Maritime Actions) (1996 U.S. Dist. LEXIS 6199) (E.D. Pa.
         1996)

5        Judge Weiner's Order dated May 2, 1996 in the action mentioned
         above.

6        Letter from Nourse & Bowles, LLP dated June 8, 2004 to Judge
         Weiner confirming the American Club's position on several matters
         including the American Club's time bar defense.

7        Letter from Nourse & Bowles LLP dated September 14, 2004 to
         Judge Gonzalez responding to MALC's letter dated September 10th
         outlining the American Club's position on the issues including time
         bar.

# *Exhibit 1*
# *to LJB Affidavit*

Nourse & Bowles, LLP
Attorneys for Plaintiff
Lawrence J. Bowles, Esq. (LB 5950)
One Exchange Plaza
New York, New York 10006
(212) 952-6200
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------X

AMERICAN STEAMSHIP OWNERS
MUTUAL PROTECTION AND
INDEMNITY ASSOCIATION, INC.,

                    Plaintiff,

     - against -

Alcoa Steamship Co., Inc.
and the Other Entities Listed on Exhibit A
hereto,

                  Defendants.

--------------------------------------------------X

04 CIV. 04309 (LAK)

SECOND AMENDED
COMPLAINT

RECEIVED JUL 06 2004 U.S.D.C. S.D.N.Y. CASHIERS

     Plaintiff American Steamship Owners Mutual Protection and Indemnity

Association, Inc. ("American Club" or "Club" or "Association" or "Corporation")

by and through its attorneys, Nourse & Bowles, LLP, as and for its complaint

against defendant Alcoa Steamship Co., Inc. and the other entities listed on Exhibit

A hereto, who were members of the American Club before February 20, 1989 (collectively "Defendants"), alleges on information and belief as follows:

## Introduction and Background

1.    This is an action brought by the American Club, a non-profit mutual indemnity insurance association, pursuant to 28 U.S.C. §2201 for a Declaratory Judgment that as those Defendants who were members of the Club before the Insurance Year that commenced on February 20, 1977 and for the Insurance Year that began on February 20, 1978 did not pay any amounts in premiums or assessments to the Club with respect to claims for incurred but not reported occupational diseases of seamen and others (hereinafter "IBNR") during those years, and as those Defendants who were members of the American Club in the Insurance Year that commenced on February 20, 1977 and in the Insurance Years between February 20, 1979 and February 20, 1989 paid assessments to the Club for IBNR which they knew or should have known might be inadequate to cover such claims and which now have proved to be inadequate, they are not entitled to any further indemnifications from the Club with respect to their payments to seamen and others regarding IBNR occupational disease claims or regarding any other claims arising in the Insurance Years before February 20, 1989.

2

2.     The above relief is necessary to restore and preserve the requisite mutuality under the Club's By-Laws and applicable New York law between and among the members of the Club before February 20, 1989 and the members thereafter.

3.     The fundamental requirement underpinning a non-profit mutual indemnity insurance association such as the American Club is that its members operate the Club for their own exclusive benefit to provide indemnity insurance to each other at cost. They do this by paying premiums and assessments to the Club, under the members' fully assessable indemnity insurance policies sufficient to provide the funds necessary to indemnify or reimburse each other with regard to reported occurrences which give rise to claims against the members in each separate Insurance Year. That is, when claims against members are reported to the Club, the members must contribute to the Club the funds needed to pay such claims. In most instances, the reported claims are not paid during the Insurance Year in which the alleged injuries occurred. Accordingly, specific reserves are established to indemnify the members with respect to each reported claim (hereinafter "case" reserves), after they resolve and pay those claims.

4.     When the costs of insurance in each Insurance Year have been determined on the basis of known claims, the Year's members are assessed a final

3

amount to cover or reserve against each reported claim, or may be given a refund of any amounts collected in excess of the amount needed to pay or reserve against such claims and this process is generally referred to as "closing" a year.

5.      In connection with the closing of the Insurance Years between 1946 and 1976, the Defendants received refunds of assessments of more than $16 million.

6.      After "closing" an Insurance Year, the Club has no right to seek further assessments from the members for that Year and correlatively those members have no right to obtain further funds from the Club to the extent not covered by the case reserves established for that Year.

7.      After an Insurance Year is closed the Club's reserves, including the case reserves, become the property of the members of the Club in the open years and those members have an obligation to indemnify the closed years' members for their payments of reported claims from the case reserves.  In view of the requirement for mutuality, the members in the open years have no legal obligation to indemnify members in closed years for any unreserved or inadequately reserved IBNR claims that may be made against them.

4

8.     In about the early 1980s, seamen and others working on or about the members' vessels began to assert they had been injured by exposure to asbestos many years earlier, in some cases going back to the 1940s, and by the mid 1980s the assertion of such claims was accelerating, and was expected to continue.

9.     Despite the fact that in the Insurance Years before 1977 the Defendants did not report any such IBNR claims or pay any premiums or assessments to the Club to establish any case or IBNR reserves to cover for amounts they might pay to seamen and others with respect to IBNR claims arising in those long closed years, in about 1980, those Defendants, who were largely the same members of the Club as those in the 1940s and thereafter, developed a practice (which is discretionary, in that it is not provided for in the Club's Charter, By-Laws or insurance policies or in the principle of full mutuality under New York law), of indemnifying each other for IBNR claims from the Club's general reserves. They did so notwithstanding that such reserves were not the property of the members in the closed Years. This discretionary practice included allocating each seaman's or other's claim over the years in which he worked on or about the members' vessels, applying the members' deductibles for each of those years, and indemnifying each other for the balance, if any (the "Discretionary Practice"). At the same time, the Defendants did not assess each other any amounts to establish

any reserves for their continued indemnifications regarding such IBNR claims arising before the Insurance Year that commenced on February 20, 1977.

10.    In 1988, with the closing of the Insurance Year that commenced on February 20, 1977, the Club's directors decided to assess that Year's members the sum of $100,000 for IBNR claims arising in that Year and to make the same assessments in future Years (except for the 1978 Year which had previously been closed).

11.    Through December 31, 2003 the Club's reimbursements to its members regarding occupational disease claims attributable to alleged exposure as far back as the 1940s totaled almost $6 million, while the members' actual contributions to the IBNR reserves have been only $2.2 million.

12.    Thousands of claims by seamen and others are still pending in the Courts; and new claims are being filed and the Club's current members, who, as such, have no obligations to indemnify the Defendants in respect of unreserved or inadequately reserved IBNR claims that arose from occurrences before February 20, 1989, have been inequitably prejudiced by the Discretionary Practice the Defendants developed in about 1980 of indemnifying each other from the Club's general reserves for such claims.  The Discretionary Practice has now become

6

unsustainable and the Club's current members will be further inequitably prejudiced if this Discretionary Practice continues, which it should not.

13.    The Club has informed the Defendants that it has terminated this Discretionary Practice and will no longer indemnify them with respect to IBNR claims arising before February 20, 1989.   To date several Defendants have objected to the Club's position and threatened litigation, and other Defendants may do the same.  Several Defendants also object to that part of the Discretionary Practice involving allocation of claims to the Years the seamen worked on the members' vessels and requiring the members to absorb multiple deductibles. Several have commenced or have threatened to commence litigation regarding the Club's position on this also.  Accordingly, actual justiciable controversies exist.

### The Parties

14.    The American Club is a non-profit mutual indemnity insurance association of shipowners organized and existing under laws of the State of New York with its principal place of business in New York, New York.

15.    The Defendants listed on Exhibit A hereto are corporations or other business entities organized and existing under the laws of various states. Defendants were members of the Club at various times between about 1940 and February 20, 1989.

7

## Jurisdiction and Venue

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1333(1) because it is an admiralty or maritime claim (involving marine insurance contracts) within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.  In addition, the Court has supplemental jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1367(a).

17.     Venue in this judicial district is proper because: (a) at all relevant times, Defendants were and are doing business in this judicial district; (b) the policies were negotiated and delivered in this judicial district; and (c) some of the policies issued to the Defendants specifically require the application of New York law.

## Managing the Club

18.     Pursuant to its Charter and By-Laws, the business of the American Club is conducted by its Board of Directors.

19.     A majority of the Board members must be either members of the Club or officers of members.  Board members may have equity interests in their shipowning/operating companies and/or hold senior executive positions therein. Directors are elected by the membership each year at the Club's annual meeting.

8

20.    The Chairman of the Board of Directors, who must be a member or an officer of a member, is elected at each annual meeting of the members. He is the chief executive officer of the Club. He presides at all meetings of the members and directors and has general charge and oversight of the business of the Club and its affairs.

21.    To assist the Chairman and the Board of Directors in carrying out their duties, the Board of Directors appoints a Finance Committee of its members. The Finance Committee functions as an executive committee and makes recommendations to the Chairman and the Board of Directors.

22.    The American Club's day to day affairs are managed by Shipowners Claims Bureau, Inc., (the "Managers" or "SCB"). The Managers provide underwriting, claims handling, accounting and related services to the Club.

23.    The Managers, who are appointed by the Board of Directors and paid by the Club's members, are subject to the direction and control of the members through the Board of Directors.

9

**Insurance Policies**

24.    The American Club issues one-year fully assessable marine protection and indemnity insurance policies (covering defined marine risks) to each of that Insurance Year's participating members (the "Policies").

**Mutuality – Contingent Liability for Assessment of All Insurance Costs**

25.    The members of the American Club, through their payments to the Club under their fully assessable Policies, collectively and mutually indemnify each other for all known and reserved claims occurring in each Insurance Year, except for catastrophic claims which are covered by reinsurance collectively purchased by those members.

26.    Each Policy issued prior to February 20, 1989 contained substantially the following provision:

> ASSESSABILITY.  <u>The Assured are subject to a contingent liability hereunder for assessment without limit of amount for their proportionate share of any deficiency or impairment as provided by law and fixed in accordance with the By-Laws of the Association;</u> provided, however, that any such assessment shall be for the exclusive benefit of holders of policies which provide for such a contingent liability, and the holders of policies subject to assessment shall not be liable to assessment in the amount greater in proportion to the total deficiency than the ratio that the deficiency attributable to the assessable business bears to the total deficiency. (Emphasis added)

10

27.    Under New York law and pursuant to the American Club's By-Laws, members (who are both insurers and insureds) remain members while the Policies are effective to insure risks.  They are entitled and required to be treated by, and to treat, the Club on a mutually fair and equitable basis so that (a) all members for an Insurance Year pay their fair share of the liabilities incurred in that Insurance Year, (b) no member for any Insurance Year receives inequitably different treatment than any other member for that Insurance Year, and (c) the members individually and as a whole for any Insurance Year do not receive inequitably different treatment than the members individually and as a whole for any other Insurance Year.

28.    Prior to the commencement of each Insurance Year, the American Club, through its Managers, and in conjunction with each member, estimates the estimated total cost ("ETC") of insurance for each member for the forthcoming Insurance Year.  The ETC is based principally upon the member's historical loss experience as reported by each member or prospective member.  Each member's ETC represents its share of the Club's aggregate ETC for that policy year and is charged to them in the form of an advance call and subsequent assessments.  The ratio of each member's ETC to the aggregate ETC determines that member's proportion of the aggregate ETC, advance call, and subsequent assessments.  Accordingly, the higher any member's ETC is, the higher will be its proportion of the aggregate Club ETC, advance calls, and assessments.  Since each member's

11

liability for and proportion of the ETC, advance calls and assessments is based

principally on that member's reported loss experience, it is fundamental to the

requisite mutuality that such loss experience, including all claims which may result

in loss, etc., for which the Club may become liable, be promptly reported to the

Club to permit proper evaluation and the determination of the appropriate ETC for

each relevant Insurance Year.

## Other Relevant Policy Provisions

29.    Each Policy contained substantially the following additional

provisions:

> Prompt Notice of Claim.
>
> In the event of any happening which may result in loss, damage or expense for which the Association may become liable, prompt notice thereof, on being known to the Assured, shall be given by the Assured to the Association.
>
> Time Bar.
>
> (a) The Association shall not be liable for any claim not presented to the Association with proper proofs of loss within one year after payment by the Assured.
>
> (b) In no event shall suit on any claim be maintainable against the Association unless commenced within two yeas after the loss, damage or expense resulting from liabilities, risks, events, occurrences and expenditures specified under this policy shall have been paid by the Assured.

12

30.    Each Policy also contained endorsements stating the sum insured or policy limit as well as the amount of the "deductions" or deductibles or self insured retentions for different classes of claims.  (The higher the deductibles, the lower the member's ETC.)

31.    Until 1972, the policies were issued for a calendar year or part thereof. In 1972 and thereafter, the policy years commenced at 1201 GMT on February 20th, running to 1200 GMT February 20th the following year (the "Insurance Year" or "Policy Year").

32.    By accepting membership in the Club, members agree to be bound by all of the terms and conditions of the Policies, the Club's Charter, its By-Laws, and applicable New York law.

### Regulating the Club

33.    The American Club is regulated by the Insurance Department of the State of New York and must comply with all relevant provisions of New York law, including, without limitation, Insurance Law Sections 1211 and 4111.

34.    Insurance Law Section 1211 states in material part:

(a)  Every domestic mutual insurance corporation shall be organized, maintained and operated for the benefit of its members as a non-stock corporation.  Every policy

13

holder shall be a member of such corporation and shall
... be entitled to vote at any regular or special meeting of
such corporation, to notice thereof pursuant to the By-
Laws and to share equitably in dividends declared by the
Board of Directors.

35.    Insurance Law Section 4111 states in material part:

(a)... every domestic mutual property/casualty insurance
company shall in its by-laws and policies prescribe the
contingent mutual liability of its members for the
payment of assessments, in such a way that each member
shall be liable to pay the member's proportionate share
... of the amount of any assessment or assessments
permitted for any purpose under any provisions of this
chapter ... or necessary to make good any impairment of
the minimum surplus of such company.

36.    The Club's By-Laws, as required by New York law, contain the

following provisions:

Article V.   Policies, Dividends and Assessments

SECTION 1.  All policies issued by the Corporation shall
either be assessable or non-assessable, and every policy
shall clearly state whether or not the holder of such
policy is subject to a liability for assessment.   The
policies which are subject to a liability for assessment
shall contain a clear statement of the liability of the
policy-holder for the payment of his proportionate share
of any deficiency or impairment as provided by law
within the limit provided by the policy, and shall further
state that any assessment shall be for the exclusive
benefit of holders of policies which provide for such a
contingent liability, and the holders of policies subject to
assessment shall not be liable to assessment in an amount
greater in proportion to the total deficiency than the ratio

14

that the deficiency attributable to the assessable business bears to the total deficiency. ***

SECTION 2.  The assessable policies of the Corporation may be issued without any maximum or limit of the Corporation's total liability thereunder to the member. ***

SECTION 3.  For the purposes of declaring dividends and making assessments the business of the Corporation shall be divided into insurance years ... and the financial results of the insurance years shall be segregated as to business under assessable policies and business under non-assessable policies.

37.    Each Insurance Year is thus a separate accounting unit which typically involves different members and/or members with different proportionate shares of the total ETC premiums and assessments paid that year.

## Notification of Claims

38.    As noted above, in the event of any happening which may result in loss, damage or expense for which the Club may become liable under the Policy terms, each member is obligated to give prompt notice thereof to the American Club.

39.    Claims against shipowner members of the Club by seamen and other claims by other persons or entities frequently are first asserted after the termination of the Insurance Year(s) in which the alleged injury or illness or incident occurred. If the Insurance Year is "open", a reserve for each such claim must be established,

15

and the members in that Insurance Year must be assessed to provide such reserve,

i.e. case reserves.   Each such claim will also be included in the member's loss

record and considered in determining his ETC premiums and assessments in future

Insurance Years.

### "Closing" Insurance Years

40.    The Club's By-Laws contain the following or substantially similar

provisions regarding "closing" Insurance Years:

> Article V.   Policies, Dividends and Assessments
>
> SECTION 4.  From time to time after the termination of each insurance year, when the Manager shall determine that it is practicable to estimate with a reasonable degree of certainty the minimum, probable or final surplus or deficiency resulting from all of the Corporation's insurances in effect during such insurance year, the Manager shall place before the Board of Directors a statement of such financial results of such insurances, segregated between assessable and non-assessable business.  After receipt of any such statement, the Board of Directors from time to time may (a) fix and determine an amount to be declared and paid as a partial or final dividend, after retaining such sums as they may deem necessary to meet outstanding policy obligations or for the maintenance of reserves and surplus of the Corporation, or (b) order an interim or the final assessment to be made against the holders of assessable policies, fix the due date of such assessment, determine the rate of interest that shall be added to and become a part of any delinquent assessment, and otherwise provide for enforcement or collection thereof.   Any dividend declared or any assessment levied shall be based solely

16

on such surplus or such deficiency, respectively, resulting from the assessable business for the insurance year. All dividends declared and all assessments levied shall be distributed or spread in the ratio that the net premiums paid by the holder of an assessable policy bear to the net premiums paid by all holders of assessable policies for the insurance year. ... In any case, however, all actions of the Board of Directors in respect of dividends or assessments shall conform with the Law and with the Charter and By-Laws of the Corporation.

41.    The process described in Article V, Section 4 of the Club's By-Laws is generally referred to as "closing" a Policy or Insurance Year.

42.    After "retaining such sums as" the Board "deems necessary to meet outstanding policy obligations", i.e., obligations regarding known claims for a designated Insurance Year or "case" reserves, "or for the maintenance of reserves and surplus" of the Club, the Board may declare a "dividend" to be returned to the members, or an "assessment" to be "made" or levied upon them.

43.    Until about 1989, Insurance Years were typically "closed" up to about 10 years after their terminations.

44.    Between Insurance Years 1946 and 1976, the members in those years received refunds of assessments or dividends from the Club of more than $16 million, and the only case reserves were those established for reported claims - no IBNR reserves were established.

17

## Assertion of Late Manifesting Occupational Injury Claims

45.    Asbestos disease claims of seamen, and others based on alleged exposure to asbestos while employed on or about members' vessels first came to the Club's attention in about the early 1980s.

46.    Those claims usually involved more than one Insurance Year and frequently involved alleged exposure to asbestos during the seaman's employment on members' vessels many years earlier, in the 1940s, 50s and 60s.  By the mid 1980s, thousands of such cases had been filed in the courts, including many against the Club's shipowner members.

## The Club's Discretionary Practices

47.    Notwithstanding that no case or IBNR reserves had been established to indemnify the members regarding payments to seamen and others for occupational disease claims allegedly resulting from exposures during closed Insurance Years, the Club's membership, which had changed relatively little since the 1940s, requested indemnifications for their costs of resolving these claims.  In about 1980 the Discretionary Practice was developed to indemnify the members from the Club's general reserves including  (a) allocating the amounts paid by the members to each seaman proportionately over the Insurance Years during which the seaman worked on the members' vessel(s), based upon the seaman's sea

18

service each year, (b) applying to each year's proportion of the claim the applicable deductible for each such Insurance Year, and (c) reimbursing or indemnifying the member for the amounts it paid to the seaman and for legal expenses, less the deductibles as thus applied.

48.     After the potential seriousness of these late manifesting claims began to become known, in about the mid 1980s, proposals were made by the Managers and Board members to set aside funds as each open Insurance Year was closed to provide reserves for such Years to cover these newly discovered IBNR claims that they expected would be asserted in future years.

49.     In connection with the closing of Insurance Year 1977, the Board of Directors ordered that a reserve of $100,000 per year be established to cover possible IBNR occupational disease claims arising in that Year.  The Managers, who had recommended a larger yearly reserve, also recommended that the amount be reconsidered periodically for adequacy.

50.     When the decision to reserve $100,000 for IBNR per closed Insurance Year was made, the 1978 Insurance Year had already been closed and no IBNR reserve had been established for that year.  The same assessment has been made as each Insurance Year from 1979 through February 20, 1999 has been closed.  No

19

effort was made to assess members to establish IBNR reserves for previously closed Insurance Years.

51.    For exposures to seamen allegedly occurring entirely after February 20, 1989, the Board, in late 1989, also decided that the allocation and multiple deductible parts of the Discretionary Practice would no longer apply, as the American Club had joined the International Group of P&I Clubs, effective that date, and by doing so, the American Club obtained access to reinsurance for its members on more favorable terms than were previously available.  However, as the International Group is also a mutual insurance association of P&I Clubs, the Club was required to conform to the International Group's practice in dealing with members' claims resulting from settling the occupational injury claims of seamen.

52.    The International Group's practice was, and is, to apply the single deductible from the most recent indemnity policy held by the shipowner member, even if the alleged exposure overlapped more than one Insurance Year.  As deductibles have generally increased over time, the most recent deductible was likely to be the largest deductible in any indemnity policy held by a Club's member.

**Continued Indemnifications to Defendants
Under the Discretionary Practice for Insurance Years
Before February 20, 1989 Will Inequitably Reduce
the Club's General Reserves in an Unsustainable Amount**

53.    Since about 1980, Defendants have sought and received

indemnifications from the American Club regarding their resolutions of the IBNR

claims of hundreds of seamen who worked on their vessels since about 1940.

Those reimbursements, as of December 31, 2003, totaled almost $6 million.  The

bulk of that sum relates to alleged exposures of seamen to asbestos on members'

vessels prior to Insurance Year 1977.  Meanwhile, for the closed Insurance Years

through February 20, 2000, the members contributed only $2.2 million to the

Club's reserve for IBNR.

54.    Over 6,000 seamen's asbestos cases are pending in the courts in

Cleveland and Detroit, alone.  Many other such cases are pending in other courts

around the United States and additional cases are anticipated.  Other forms of

occupational disease claims have been asserted by seamen and others and will

likely continue to be asserted in the future for occupational diseases/injuries

allegedly occurring in closed Insurance Years, including claims for (a) alleged

hearing losses (b) leukemia arising from alleged exposure to benzene, (c) other

diseases related to exposures to other chemical products, (d) exposures to lead,

21

sandblasting grit and fumes from welding operations, and (e) other types presently unknown.

55.    It is unknown how many more seamen and others will succeed on previously filed or new claims against the American Club's members in the Insurance Years prior to February 20, 1989; and as no case or IBNR reserves were established for the Insurance Years prior to 1977 and the limited reserves established for IBNR claims for the Insurance Year 1977 and the Insurance Years 1979 through February 20, 1989 are now known to be plainly inadequate, it is obvious that if the current drain on the Club's general reserves continues, the Club's general reserves, at least those accumulated before February 20, 1989, will continue to decrease and could be depleted.  Such drain is inequitably prejudicing the Club's members in the currently open Insurance Years and will continue to do so in future Insurance Years.   Such members who are largely different entities from those in the Insurance Years before February 20, 1989, had and have no legal or other obligation to indemnify or reimburse the Defendants for unreserved or inadequately reserved IBNR occupational disease claims attributable to the closed Insurance Years prior to February 20, 1989.

56.    Not only are there no provisions for the Discretionary Practice in the Club's Charter, By-Laws, Policies or New York law, such practice if further

22

continued would be contrary to the applicable provisions of the By-Laws and New York law as outlined above.

57.    On May 25, 2004 the Board of Directors resolved that the Club would terminate the Discretionary Practice, effective immediately, and will no longer indemnify Defendants with respect to IBNR claims for occupational diseases arising in closed Insurance Years before February 20, 1989.  This will ameliorate the prior inequitable situation and fairly avoid the further inequitable drain created thereby upon the Club's general reserves.  The Defendants were promptly informed of the Club's decision and, to date several have objected thereto.

## Other Issues in Dispute

58.    In the meantime, several of the Defendants, including Keystone Shipping Company and its related entities ("Keystone") and other defendants have demanded a retroactive partial modification of the Discretionary Practice in that instead of allocating the seamen's claims over the years in which they worked on the members' vessels, applying the members' deductibles for those years and then reimbursing the members for the balance, if any, they have demanded the right to designate one Insurance Year's policy to cover each seaman's entire claim and absorb only one deductible (presumably an Insurance Year with the lowest deductible) and be reimbursed in respect of the deductibles in excess of one which

23

they have applied with respect to each of numerous such claims resolved to date and also apply this approach with regard to future seamen's claims. Keystone has sued the Club with respect to this part of the Discretionary Practice and other former members have threatened litigation also.

59.     If the Court approves the termination of the Discretionary Practice, as it should, the Club will have no obligation to indemnify the Defendants for any parts of such claims, and the demands of those Defendants seeking the retroactive and future partial modifications of the Discretionary Practice described above will become moot.

60.     If the Court holds that the Discretionary Practice must continue, which it should not, the Club should be permitted to continue that part thereof regarding allocation of claims and application of multiple deductibles, as that part of the Discretionary Practice is consistent with New York law. See, e.g., Consolidated Edison Co. of NY v. Allstate Insurance Company, et al., 746 NYS 2d 622 (NY 2002).

61.     In any event, the retroactive partial modification of the Discretionary Practice demanded by some Defendants is barred in whole or in part by the applicable statute of limitations and/or by the doctrines of laches and/or waiver.

24

## FIRST CAUSE OF ACTION

### Declaratory Judgment

### (The Club is Entitled to Terminate
### The Discretionary Practice)

62.    The American Club repeats and realleges the allegations contained in

paragraphs 1 through 57 as if fully set forth herein.

63.    As a result of the foregoing and the objections of some of the

Defendants with respect thereto, an actual and justiciable controversy exists

between the American Club and Defendants with respect to the termination of the

Discretionary Practice.

64.    The American Club seeks a judicial declaration by this Court that it is

entitled to terminate the Discretionary Practice with respect to IBNR claims arising

in closed Insurance Years before February 20, 1989 to restore and preserve the

mutuality between its members before that date and thereafter as required by the

Club's By-Laws and New York law.

WHEREFORE, the American Club requests that this Court (a) declare that it

is entitled to terminate the Discretionary Practice as to IBNR claims arising in

closed Insurance Years prior to February 20, 1989 for the reasons as described

above, and (b) award the Club its attorneys' fees and costs expended in connection

with this action and such other and further relief as this Court deems just and proper.

## SECOND CAUSE OF ACTION

### (Alternative Declaratory Judgment)

### (Action to Restore Mutuality)

65.     The American Club repeats and realleges the allegations contained in paragraphs 1 through 57 as if fully set forth herein.

66.     If, hypothetically, Defendants are held entitled to any further indemnifications with respect to alleged IBNR occurring during the Insurance Years before February 20, 1989, which should be denied, there would result gross inequities between the members of the Club before that date and after that date unless the Club may take appropriate steps to restore the requisite mutuality among all of its members in all Insurance Years as its Board of Directors may reasonably determine.  Such steps, *inter alia*, would in substance include ordering "closed" Insurance Years "reopened" for the limited purpose of achieving equitable reimbursement as to each Defendant's claim for indemnification for IBNR claims arising before February 20, 1989 by calculating the amounts in which each relevant Insurance Year should respond to such Defendant's claim, levying the appropriate assessments against each member for that Year (including such Defendant),

collecting those assessments to the extent reasonably possible, and reimbursing such Defendant from such collections, less a debit against such Defendant in the amount of the assessment against it plus the administrative cost to the Club of the process.

67.    As a result of the foregoing, an actual and justiciable controversy exists between the American Club and Defendants with respect to the rights and obligations of each.

68.    The American Club seeks a judicial declaration by this Court that if, hypothetically, Defendants are held entitled to any further indemnifications with respect to alleged IBNR occurring during the Insurance Years before February 20, 1989, which should be denied, then the American Club is entitled and required to restore the requisite mutuality and equities between and among all of its members in all Insurance Years in the manner outlined above.

WHEREFORE, the American Club requests that this Court (a) declare that if Defendants are held entitled to any further indemnifications with respect to alleged IBNR occurring during the insurance years before February 20, 1989, that the American Club is entitled and required to restore the requisite mutuality and equities in the manner outlined above and (b) award the American Club its

27

attorneys' fees and costs expended in connection with this action and such other

and further relief as this Court deems just and proper.

## THIRD CAUSE OF ACTION

### (Further Alternative Declaratory Judgment)

### (Allocation of Claims and Application of Multiple Deductibles)

69.    The American Club repeats and realleges the allegations contained in

paragraphs 1 through 61 as if fully set forth herein.

70.    If, hypothetically, Defendants are held entitled to any further

indemnifications with respect to alleged IBNR occurring during the Insurance

Years before February 20, 1989, which should be denied, the Club should also be

held entitled to continue its current Discretionary Practice, as more fully described

above, of allocating each seaman's or other's claim over the years he worked on or

about the members' vessels, applying the members' deductibles for each of those

years and indemnifying the members for the balance, if any.

71.    As a result of the foregoing, and the objections and actions of some of

the Defendants with respect thereto, an actual and justiciable controversy exists

between the American Club and some of the Defendants with respect to the rights

and obligations of each.

28

WHEREFORE, the American Club requests that this Court (a) declare that if Defendants are held entitled to any further indemnifications with respect to alleged IBNR occurring during the Insurance Years before February 20, 1989, that the American Club is also entitled to continue its current Discretionary Practice in the manner outlined above and (b) award the American Club its attorneys' fees and costs expended in connection with this action and such and other further relief as this Court deems just and proper.

Dated:      New York, New York
            July 8, 2004

                              NOURSE & BOWLES, LLP
                              Attorneys for Plaintiff


                        By: _____
                              Lawrence J. Bowles, Esq. (LB 5950)
                              One Exchange Plaza
                              New York, New York 10006
                              (212) 952-6200


TO:   Defendants Listed on
      Exhibit "A" Hereto


29

EXHIBIT "A"


        To the following Defendants and each of their predecessors and related
companies who were members of the American Steamship Owners Mutual Protection
and Indemnity Association, Inc. between 1946 and February 20, 1989:

Academy Tankers Inc.
Canterbury Shipping Corp.
National Oil Transport Co.
c/o Secretary of State
Townsend Building
Dover, DE  19901

Alcoa Steamship Co., Inc. as Successor to
Lib-Ore Steamship Company, Inc.
Pan-Ore Transportation, Inc.
Reynolds Metals Company
201 Isabella Street
Pittsburgh, PA  15212

Amerada Hess as Successor to
Hess Oil and Chemical Corp.
1185 Avenue of the Americas
New York, NY  10036

American Maritime Holdings Inc.
39 Broadway
New York, New York  10006

American Maritime Holdings Inc.
Sea Mobility Inc.
World Wide Tankers Inc.
c/o US Corporation Company
2711 Centerville Road, Suite 400
Wilmington, DE  19808

APL, Ltd. as Successor to
American Mail Line
American President Lines, Inc.
1111 Broadway Street, 6th floor
Oakland, CA  94607

American Steamship Company
500 Essjay Road
Williamsville, NY 14221

Apex Oil Co., Inc.
8182 Maryland Avenue
St. Louis, MO  63105

Apex Oil Co., Inc.
3314 River Road
P.O. Box 3127
Wilmington, NC  28403

Aremar C.I.F.S.A
Viamonte 494
9 Piso
1053 Buenos Aires, Argentina

Argosy Offshore Ltd.
1010 Milam
Houston, TX  77002

Argosy Offshore Ltd.
c/o CT Corporation System
8550 United Plaza Blvd.
Baton Rouge, LA  70809

Arpez S.A.
Calle Venezuela 110
1095 Buenos Aires, Argentina

Astra Compania Argentina de Petroleo S.A.
Tucuman 744
11th floor
1049 Buenos Aires, Argentina

Atlantic Richfield Company
515 South Flower Street
P.O. Box 2679
Los Angeles, CA  90071

Atlantic Richfield Indonesia Inc.
Landmark Center Tower B
Jl. Jenderal Sudirman Kav. 70A
P.O. Box 1063
12910 Jakarta Java, Indonesia

Avila y Pizarro Compania Ltda.
Agents for Van Gogh Inversiones SA
Blanco 570
Valparaiso Chile

Avon Steamship Co. Inc.
Agents for Amherst Shipping Inc.
410 Lakeville Road, Rm. 201
Lake Success, NY  11040

Barber Asphalt Corp.
c/o CT Corporation System
277 Park Avenue
New York, NY  10017

Barge Transport Company
P.O. Box 2569
1812 Durham Drive
Houston, TX  77252-2569

Bermuda Atlantic Line Ltd.
P.O. Box 1198
Hamilton 5, Bermuda

Bermuda Atlantic Line Ltd.
760 N.E. 7th Avenue
Dania, FL  33004

Bessemer Trust Co. as Successor to
Howard Phipps, Ogden Phipps,
David Layman, Jr., Bessemer Trust Co.,
Bessemer Securities Corp.
Grosvenor-Dale Co., Inc.
630 Fifth Avenue
New York, New York 10111-0333

BP as Successor to
American Oil Company
Standard Oil Company
Sohio Alaskan Petroleum Co. and
SPC Shipping Inc.
28100 Torch Parkway
Warrenville, IL 60555

Bridgeport & Port Jefferson Steamboat Co.
102 West Broadway
Port Jefferson, NY  11777

Brokerage & Management Corp.
90 Broad Street, 24th floor
New York, NY  10004

Caribbean Steamship Co. S.A.
P.O. Box 2568
Corpus Christi, TX  78403

Central Gulf Lines as Successor to
Central Gulf Lighters
Poydras Center
650 Poydras Street, Suite 1700
P.O. Box 53366
New Orleans, LA  70153

ChevronTexaco Corporation as Successor to
California Oil Company
6001 Bollinger Canyon Rd.
San Ramon, CA 94583

Cleveland-Cliffs, Inc. as Successor to
Cleveland-Cliffs Steamship Company
1100 Superior Avenue
Cleveland, OH  44114

Coal Logistics Corporation
30 Skyline Drive
Lake Mary, FL  32795

Coastal Carriers Inc.
1607 Belle Chasse Highway
Belle Chasse, LA  70037

Coastal Carriers Inc.
c/o Clayton Ragas
216 Ft. Jackson Street
Belle Chasse, LA 70037

Companhia de Navegacao Maritima Netumar
Avenida Presidente Vargas 482
22 Andar
Rio de Janeiro, 2000RJ Brazil

Crest Tankers Inc.
8182 Maryland Avenue
St. Louis, MO  63105

Dillingham Construction World Headquarters
1020 Serpentine Lane Suite 110
Pleasanton, CA  94566

Dillingham Construction Corporation
5960 Inglewood Drive
P.O. Box 1089
Pleasanton, CA  94566

The Dow Chemical Company
2030 Dow Center
Midland, MI  48674

Carolyn S. Schwartz, Esq.
Office of United States Trustee
Of Enron Corporation
33 Whitehall Street
21st Floor
New York, N. Y. 10004

Empresa de Navegacion El Faro
Calle Lavalle 388
1047 Buenos Aires, Argentina

Equistar Chemicals, LP as Successor to
Cuba Distilling  Company
National Distillers Products Corp.
300 Doremus Avenue
Newark, NJ 07105

Euro Gulf International
c/o Diamond State Corp. Agents Inc.
1200 North Broom Street
Wilmington, DE  19806

Federal Transport Company, Inc.
c/o Del Monte Fresh Produce Company
P.O. Box 149222
Coral Gables, FL 33114

Foss Maritime Company
c/o Saltchuk Resources, Inc.
660 West Ewing St.
Seattle, WA 98119

Georgia-Pacific Corporation
133 Peachtree Street, NE
Atlanta, GA  30303

Georgia-Pacific Corp.
P.O. Box 105605
Atlanta. GA  30348

Global Bulk Transport Inc.
280 Park Avenue
New York, New York  10017

Grace Lines, Inc./Prudential Lines, Inc.
c/o PLI Disbursement Trustee
Lee J. DiCola, Esq.
2800 Carrington Street NW
North Canton, OH 44720

Gulf International Marine Inc.
c/o Gil Anthony Hebert
437 Menard Road
Houma, LA  70360

Hendry Corporation
P.O. Box 13228
Tampa, Florida 33681-3228

Inland Lakes Management Inc.
112 West Chisolm
P.O. Box 646
Alpena, MI  49707

Ispat Inland Inc.
3210 Watling Street
East Chicago, IN  46312

Keyspan Corporation as Successor to
Eastern Gas and Fuel Associates and
1 Metrotech Center
Brooklyn, NY  11201

Keystone Shipping Co.
1 Bala Plaza East, Suite 600
Bala Cynwyd, PA  19004

    Baldbutte Shipping Company
    1 Bala Plaza East, Suite 600
    Bala Cynwyd, PA  19004

    Calendar Navigation Corp.
    1 Bala Plaza East, Suite 600
    Bala Cynwyd, PA  19004

    Chas. Kurz & Co., Inc.
    1 Bala Plaza East, Suite 600
    Bala Cynwyd, PA  19004

    Chestnut Shipping Corp.
    1 Bala Plaza East, Suite 600
    Bala Cynwyd, PA  19004

    Chilbar Shipping Co.
    1 Bala Plaza East, Suite 600
    Bala Cynwyd, PA  19004

    Fredericksburg Shipping Co.
    1 Bala Plaza East, Suite 600
    Bala Cynwyd, PA  19004

    Keystone Tankship Corporation
    1 Bala Plaza East, Suite 600
    Bala Cynwyd, PA  19004

    Margate Shipping Co.
    1 Bala Plaza East, Suite 600
    Bala Cynwyd, PA  19004

    New England Collier Co.
    1 Bala Plaza East, Suite 600
    Bala Cynwyd, PA  19004

    Paco Tankers Inc.
    1 Bala Plaza East, Suite 600
    Bala Cynwyd, PA 19004

Timbo Shipping Ltd.
1 Bala Plaza East, Suite 600
Bala Cynwyd, PA  19004

Kimberly-Clark Corporation as Successor to
Scott Paper Company
Dept. INT
P.O. Box 2020
Neenah, WI 54957-2020

Kirby Inland Marine, Inc. as Successor to
Hollywood Marine, Inc.
55 Waugh Drive, Suite 1000
Houston, TX  77007

Lafarge North America Inc. as Successor to
Huron Transportation, Inc.
12950 Worldgate Drive, Suite 600
Herndon, Virginia 20170

Marifran International S.A.
Calle Paraguay 577
4 Piso
Buenos Aires, 1057 Argentina

Marifran International S.A.
Avenida 25 de Mayo 401
1002 Buenos Aires, Argentina

Marine Transport Lines, Inc.
Managers for Marine Interests Corp. and
Union Marine Transport Co.
Agents for Marine Chemical Navigation Corp.,
Marine Sulphur Shipping Corp. and Oswego
Tanker Corp.
1200 Harbor Blvd., C-901
Weehawken, NJ  0708

Mathiasen's Tanker Industry Inc.
8182 Maryland Avenue
St. Louis, MO  63105

McAllister Brothers Inc. as Successor to
Outreach Marine Corporation
17 Battery Place, 15th floor
New York, NY  10004

Mu-Petco Shipping Co. Inc.
New Jersey Barging Corp. (Del.)
Texas City Refining Inc.
c/o The Corporation Trust Co.
Corporation Trust Center
1209 Orange Street
Wilmington, DE  19801

National Gypsum Co.
2001 Rexford Rd.
Charlotte, NC 28211

Nedbarges Sublift BV
Westmolenstraat 1
Lange Haven, 3111 BS Schiedam
Netherlands

Nicor Inc. as Successor to
National Marine Service Inc.
Lake Tankers Corporation
1209 Orange Street
Wilmington, DE 19801

Companhia de Navegacao Maritima Netumar
d/b/a Netumar Lines
c/o Stacey L. Meisel, Esq.
Trustee in Bankruptcy
Becker Meisel LLC
Eisenhower Plaza II
345 Eisenhower Parkway
Suite 2800
Livingston, NJ 07039

Offshore Express Inc.
438 Menard Road
P.O. Box 2666
Houma, LA  70361

Oglebay Norton as Successor to
Columbia Steamship Company Inc.
North Point Tower
1001 Lakeside Avenue, 15th Floor
Cleveland, OH 44114

Ormet Corporation
1233 Main Street, Suite 4000
Wheeling, WV  26003

Oscar Transportation Group
97, Akti Miaouli
185 38 Piraeus, Greece

Puerto Rico Maritime Shipping Authority
Building No. 123
Fleet and Bombay Streets
Elizabeth, NJ  07208

Resolve Maritime Corporation
436 SW 8th Street, Suite 206
Miami, FL  33130

Resolve Maritime Corporation
c/o Charles Lea Hume
25 W. Flagler Street
5th fl., City National Bank Building
Miami, FL  33130
Royal P&O Nedlloyd N.V. as Successor to
Farrell Lines Inc.
Farrell Lines (Lighters)
One Meadowlands Parkway
East Rutherford, NJ 07073

S.C. Loveland Co., Inc.
P.O. Box 368
Supawna Road
Pennsville, NJ  08070

Sabine Towing & Transportation Co., Inc.
7200 Highway 87 East
Port Arthur, TX  77642

SEI II Equipment Inc.
(f/k/a Shearson Equipment Management)
745 7th Avenue
New York, New York  10019

Seaport Harbor Cruise Lines, Inc.
17 Battery Place
New York, NY  10004

Tecomar S.A.
Avenida 39 Ote. No. 1204A
Col Anzures
Puebla, 72530 Mexico

Tecomar S.A.
Benjamin Franklin 232
Mexico DF 11800

Texas City Refining Inc.
P.O. Box 1271
Texas City, TX  77592-1271

Trade & Transport Inc.
61-65, Filonos Street
P.O. Box 104
Piraeus Greece

Trafluen Compania Armadora SA
7° Piso, Oficina 52
San Martin 50
1004 Buenos Aires
Argentina

Transfrimar SA
6° Piso
Colon 602
Guayaquil, Ecuador

Trinidad Corporation
8182 Maryland Avenue
St. Louis, MO  63105

Tropigas Inc.
2151 LeJune Road
Coral Gables, FL 33134

Union Carbide Corporation,
A Subsidiary of The Dow Chemical Company
P.O. Box 4393
Houston, Texas 77210

Union Carbide Corp.
100 Lighting Way, Suire 402
Secaucus, NJ  07094

United States Maritime Administration
U.S. Department of Transportation
400 7th Street, SW
Washington, D.C. 20590

John T. Paulyson, Trustee
United States Lines, Inc. &
United States Lines (S.A.) Inc.
184-186 North Avenue East, Suite 103
Cranford, NJ 07015-2488

Verizon Communications as Successor to
New York Telephone
1095 Avenue of the Americas,
New York, New York  10036

Waterman Steamship Corp.
One Whitehall Street
New York, NY  10004

Weeks Marine Inc. as Successor to
American Dredging Company
4 Commerce Drive
Cranford, NJ 07016

West India Shipping Co., Inc.
Agents for West India Industries, Inc.
18th fl., Great Southwest Building
1314 Texas Street
Houston, TX  77002

# *Exhibit 2*
# *to LJB Affidavit*

Assessable—1963

# SPECIMEN

**Policy No.**

## AMERICAN STEAMSHIP OWNERS
## MUTUAL PROTECTION AND INDEMNITY ASSOCIATION, INC.

### NEW YORK, N. Y.

(Herein called the Association)

IN CONSIDERATION OF THE STIPULATIONS HEREIN NAMED

and of

Dollars being Premium at the rate of

per gross registered ton

DOES INSURE

, Policyholder

and

, Additional Assured

(Herein called collectively the Assured)

who in accepting this policy agree that the party described above as "Policyholder" shall exclusively be entitled to the rights of a policyholder and member as set forth in the charter and by-laws of the Association;

LOSS, IF ANY, PAYABLE TO

IN THE INSURED SUM OF                                                                                    DOLLARS

at and from the            day of                    19     , at                                              time
until the                  day of                    19     , at                                              time

against the risks and subject to the terms and conditions hereunder set forth in respect of the vessel called the
                                                                    of              gross registered tons or by
whatsoever other names the said vessel is or shall be named or called.

ASSESSABILITY. The Assured are subject to a contingent liability hereunder for assessment without limit of amount for their proportionate share of any deficiency or impairment as provided by law and fixed in accordance with the by-laws of the Association; provided, however, that any such assessment shall be for the exclusive benefit of holders of policies which provide for such a contingent liability, and the holders of policies subject to assessment shall not be liable to assessment in an amount greater in proportion to the total deficiency than the ratio that the deficiency attributable to the assessable business bears to the total deficiency.

THE ASSOCIATION AGREES TO INDEMNIFY THE ASSURED AGAINST ANY LOSS, DAMAGE OR EXPENSE WHICH THE ASSURED SHALL BECOME LIABLE TO PAY AND SHALL PAY BY REASON OF THE FACT THAT THE ASSURED IS THE OWNER (OR OPERATOR, MANAGER, CHARTERER, MORTGAGEE, TRUSTEE, RECEIVER OR AGENT, AS THE CASE MAY BE) OF THE INSURED VESSEL AND WHICH SHALL RESULT FROM THE FOLLOWING LIABILITIES, RISKS, EVENTS, OCCURRENCES AND EXPENDITURES:

(1) LIABILITY FOR LIFE SALVAGE, LOSS OF LIFE OF, OR PERSONAL INJURY TO, OR ILLNESS OF ANY PERSON, NOT INCLUDING, HOWEVER, UNLESS OTHERWISE AGREED BY ENDORSEMENT HEREON, LIABILITY TO AN EMPLOYEE (OTHER THAN HEREAFTER EXCEPTED) OF THE ASSURED, OR IN CASE OF HIS DEATH TO HIS BENEFICIARIES, UNDER ANY COMPENSATION ACT. LIABILITY HEREUNDER WITH RESPECT TO A MEMBER OF THE CREW SHALL INCLUDE LIABILITY ARISING ASHORE OR AFLOAT. LIABILITY HEREUNDER SHALL ALSO INCLUDE BURIAL EXPENSES NOT EXCEEDING $500., WHERE REASONABLY INCURRED BY THE ASSURED FOR THE BURIAL OF ANY SEAMAN.                                    **LOSS OF LIFE, INJURY AND ILLNESS.**

(a) Liability hereunder shall include the liability of the Assured for claims under any Compensation Act (other than hereafter excepted), in respect of an employee (i) who is a member of the crew of the insured vessel, or (ii) who is on board the insured vessel with the intention of becoming a member of her crew, or (iii) who, in the event of the vessel being laid up and out of commission, is engaged in the upkeep, maintenance or watching of the insured vessel, or (iv) who is engaged by the insured vessel or its Master to perform stevedoring work in connection with the vessel's cargo at ports in Alaska and ports outside the Continental United States where contract stevedores are not readily available. This insurance, however, shall not be considered as a qualification under any Compensation Act, but, without diminishing in any way the liability of the Association under this policy, the Assured may have in effect policies covering such liabilities. All claims under such Compensation Acts for which the Association is liable under the terms of this policy are to be paid without regard to such other policies.

(b) Liability hereunder shall not cover any liability under the provisions of the Act of Congress approved September 7th, 1916 and as amended, Public Act No. 267, Sixty-fourth Congress, known as the U. S. Employees Compensation Act.

(c) Liability hereunder in connection with the handling of cargo for the insured vessel shall commence from the time of receipt by the Assured of the cargo on dock or wharf, or on craft alongside for loading, and shall continue until due delivery thereof from dock or wharf of discharge or until discharge from the insured vessel on to a craft alongside.

(d) Liability hereunder may, by endorsement hereon, be made payable to an employee of the Assured or in the event of his death to his beneficiaries or estate.

(e) Claims hereunder, other than for burial expenses, are subject to a deduction of $                    with respect to each accident or occurrence.

(2) LIABILITY FOR EXPENSES REASONABLY INCURRED IN NECESSARILY REPATRIATING ANY MEMBER OF THE CREW OR ANY OTHER PERSON EMPLOYED ON BOARD THE INSURED VESSEL; PROVIDED, HOWEVER, THAT THE ASSURED SHALL NOT BE ENTITLED TO RECOVER ANY SUCH EXPENSES INCURRED BY REASON OF THE EXPIRATION OF THE SHIPPING AGREEMENT, OTHER THAN BY SEA PERILS, OR BY THE VOLUNTARY TERMINATION OF THE AGREEMENT. WAGES SHALL BE RECOVERABLE HEREUNDER ONLY WHEN PAYABLE UNDER STATUTORY OBLIGATION DURING UNEMPLOYMENT DUE TO THE WRECK OR LOSS OF THE INSURED VESSEL.                                                                              REPATRIATION EXPENSES.

(a) Claims hereunder are subject to a deduction of $                    with respect to each accident or occurrence.

(3) LIABILITY FOR LOSS OR DAMAGE ARISING FROM COLLISION OF THE INSURED VESSEL WITH ANOTHER SHIP OR VESSEL WHERE THE LIABILITY IS OF A TYPE, CHARACTER, OR KIND WHICH WOULD NOT BE COVERED IN ANY RESPECT BY THE FOLLOWING PORTIONS OF THE FOUR-FOURTHS COLLISION CLAUSE IN THE AMERICAN INSTITUTE HULL CLAUSES (JUNE 2, 1977) FORM.                                                                              COLLISION.

"And it is further agreed that:

(a) if the Vessel shall come into collision with any other ship or vessel, and the Assured or the Surety in consequence of the Vessel being at fault shall become liable to pay and shall pay by way of damages to any other person or persons any sum or sums in respect of such collision, the Underwriters will pay the Assured or the Surety, whichever shall have paid, such proportion of such sum or sums so paid as their respective subscriptions hereto bear to the Agreed Value, provided always that their liability in respect to any one such collision shall not exceed their proportionate part of the Agreed Value;

(b) in cases where, with the consent in writing of a majority (in amount) of Hull Underwriters, the liability of the Vessel has been contested, or proceedings have been taken to limit liability, the Underwriters will also pay a like proportion of the costs which the Assured shall thereby incur or be compelled to pay.

When both vessels are to blame, then, unless the liability of the owners or charterers of one or both such vessels becomes limited by law, claims under the Collision Liability clause shall be settled on the principle of Cross-Liabilities as if the owners or charterers of each vessel had been compelled to pay to the owners or charterers of the other of such vessels such one-half or other proportion of the latter's damages as may have been properly allowed in ascertaining the balance or sum payable by or to the Assured in consequence of such collision.

The principles involved in this clause shall apply to the case where both vessels are the property, in part or in whole, of the same owners or charterers, all questions of responsibility and amount of liability as between the two vessels being left to the decision of a single Arbitrator, if the parties can agree upon a single Arbitrator, or failing such agreement, to the decision of Arbitrators, one to be appointed by the Assured and one to be appointed by the majority (in amount) of Hull Underwriters interested; two Arbitrators chosen to choose a third Arbitrator before entering upon the reference, and the decision of such single Arbitrator, or of any two of such three Arbitrators, appointed as above, to be final and binding.

Provided that this clause shall in no case extend to any sum which the Assured or the Surety may become liable to pay or shall pay in consequence of, or with respect to:

(a) removal or disposal of obstructions, wrecks or their cargoes under statutory powers or otherwise pursuant to law;

(b) injury to real or personal property of every description;

(c) the discharge, spillage, emission or leakage of oil, petroleum products, chemicals or other substances of any kind or description whatsoever;

(d) cargo or other property on or the engagements of the Vessel;

(e) loss of life, personal injury or illness.

Provided further that exclusions (b) and (c) above shall not apply to injury to other vessels or property thereon except to the extent that such injury arises out of any action taken to avoid, minimize or remove any discharge, spillage, emission or leakage described in (c) above."

PROVIDED, HOWEVER, THAT INSURANCE HEREUNDER SHALL NOT EXTEND TO ANY LIABILITY, WHETHER DIRECT OR INDIRECT, IN RESPECT OF THE ENGAGEMENTS OF OR THE DETENTION OR LOSS OF TIME OF THE INSURED VESSEL.

(a) Claims hereunder shall be settled on the principles of Cross-Liabilities to the same extent only as provided in the four-fourths Collision Clause above mentioned.

(b) Where both vessels are the property, in part or in whole, of the same Owners or Charterers, claims hereunder shall be settled on the basis of the principles set forth in the four-fourths Collision Clause above mentioned.

(c) Claims hereunder shall be separated among and take the identity of the several classes of liability for loss, damage, and expense enumerated in this policy and each class shall be subject to the deductions, inclusions, exclusions and special conditions applicable in respect to such class.

(d) Notwithstanding the foregoing, the Association shall not be liable for any claims hereunder where the various liabilities resulting from such collision, or any of them, have been compromised, settled or adjusted without the written consent of the Association.

(4) LIABILITY FOR LOSS OF OR DAMAGE TO ANY OTHER VESSEL OR CRAFT, OR TO PROPERTY ON BOARD SUCH OTHER VESSEL OR CRAFT, CAUSED OTHERWISE THAN BY COLLISION OF THE INSURED VESSEL WITH ANOTHER VESSEL OR CRAFT. **DAMAGE CAUSED OTHERWISE THAN BY COLLISION.**

(a) Where such other vessel or craft or property on board such other vessel or craft belongs to the Assured, claims hereunder shall be adjusted as if it belonged to a third person; provided, however, that if such vessel, craft or property be insured, the Association shall be liable hereunder only in so far as the loss or damage, but for the insurance herein provided, is not or would not be recoverable by the Assured under such other insurance.

(b) Claims hereunder are subject to a deduction of $                    with respect to each accident or occurrence.

(5) LIABILITY FOR DAMAGE TO ANY DOCK, PIER, JETTY, BRIDGE, HARBOR, BREAKWATER, STRUCTURE, BEACON, BUOY, LIGHTHOUSE, CABLE, OR TO ANY FIXED OR MOVABLE OBJECT OR PROPERTY WHATSOEVER, EXCEPT ANOTHER VESSEL OR CRAFT OR PROPERTY ON AN-OTHER VESSEL OR CRAFT, OR TO PROPERTY ON THE INSURED VESSEL UNLESS PROPERTY ON THE INSURED VESSEL IS ELSEWHERE COVERED HEREIN. **DAMAGE TO DOCKS, BUOYS, ETC.**
(a) Where any such object or property belongs to the Assured, claims hereunder shall be adjusted as if it belonged to a third person; provided, however, that if such object or property be insured, the Association shall be liable hereunder only in so far as the damage, but for the insurance herein provided, is not or would not be recover-able by the Assured under such other insurance.

(b) Claims hereunder are subject to a deduction of $                    with respect to each accident or occurrence.

(6) LIABILITY FOR COSTS OR EXPENSES OF OR INCIDENTAL TO THE REMOVAL OF THE WRECK OF THE INSURED VESSEL; PROVIDED, HOWEVER, THAT: **WRECK REMOVAL.**

(a) From such costs and expenses shall be deducted the value of any salvage from or which might have been recovered from the wreck inuring, or which might have inured, to the benefit of the Assured;

(b) The Association shall not be liable for any costs or expenses of a type, character or kind which would be payable under the terms of a policy written on the American Institute Hull Clauses (June 2, 1977) Form and a policy written on the American Institute Increased Value and Excess Liabilities Clauses (November 3, 1977) Form;

(c) In the event that the wreck of the insured vessel is upon property owned, leased, rented, or otherwise occupied by the Assured, the Association shall be liable for any liability for removal of the wreck which would be imposed upon the Assured by law in the absence of contract if the wreck had been upon the property belonging to another, but only for the excess over any amount recoverable under any other insur-ance applicable thereto;

(d) Each claim hereunder is subject to a deduction of $

(7) LIABILITY FOR LOSS OF OR DAMAGE TO OR IN CONNECTION WITH CARGO OR OTHER PROPERTY (EXCEPT MAIL OR PARCELS POST), INCLUDING BAGGAGE AND PERSONAL EFFECTS OF PASSENGERS, TO BE CARRIED, CARRIED OR WHICH HAS BEEN CARRIED ON BOARD THE INSURED VESSEL; PROVIDED, HOWEVER, THAT NO LIABILITY SHALL EXIST HEREUNDER FOR: **CARGO.**

(a) Loss, damage or expense incurred in connection with the custody, carriage or de-livery of specie, bullion, precious metals, precious stones, jewelry, silks, furs, currency, bonds or other negotiable documents, or similar valuable property, unless specially agreed to and accepted for transportation under a form of contract approved, in writing, by the Association; **SPECIE, BULLION, JEWELRY, ETC.**

(b) Loss, damage or expense arising out of or in connection with the care, custody, carriage or delivery of cargo requiring refrigeration, unless the spaces, apparatus and means used for the care, custody and carriage thereof have been surveyed by a classification or other competent disinterested surveyor under working conditions before the commencement of each round voyage and found in all respects fit, and unless the Association has approved in writing the form of contract under which such cargo is accepted for transportation; **REFRIGERATION.**

(c) Loss or damage to any passenger's baggage or personal effects, unless the form of ticket issued to the passenger shall have been approved, in writing, by the Association; **PASSENGERS' EFFECTS.**

(d) Loss, damage or expense arising from any deviation in breach of the Assured's obligation to cargo, known to the Assured in time to enable him specifically to insure his liability therefor, unless notice thereof has been given the Association, and the Association has agreed, in writing, that such insurance was unnecessary; **DEVIATION.**

(e) Loss, damage or expense arising from stowage of under deck cargo on deck, or stowage of cargo in spaces not suitable for its carriage, unless the Assured shall show that every reasonable precaution has been taken by him to prevent such improper stowage; **STOWAGE IN IMPROPER SPACES.**

(f) Loss, damage or expense arising from issuance of clean bills of lading for goods known to be missing, unsound or damaged; **BILLS OF LADING.**

(g) Loss, damage or expense arising from the intentional issuance of bills of lading prior to receipt of the goods described therein, or covering goods not received at all;

(h) Loss, damage or expense arising from delivery of cargo without surrender of bills of lading;

(i) Freight on cargo short-delivered, whether or not prepaid, or whether or not included in the claim and paid by the Assured; **FREIGHT.**

AND PROVIDED FURTHER THAT:

(j) Liability hereunder shall in no event exceed that which would be imposed by law in the absence of contract;

(k) Liability hereunder shall be limited to such as would exist if the charter party, bill of lading or contract of affreightment contained (A) a negligence general average clause in the form hereinafter specified under Paragraph (12); (B) a clause providing that any provision of the charter party, bill of lading or contract of affreightment to the contrary notwithstanding, the Assured and the insured vessel shall have the benefit of all limitations of and exemptions from liability accorded to the owner or chartered owner of vessels by any statute or rule of law for the time being in force; (C) such clauses, if any, as are required by law to be stated therein; (D) and such other protective clauses as are commonly in use in the particular trade; **PROTECTIVE CLAUSES REQUIRED IN CONTRACT OF AFFREIGHTMENT.**

(l) When cargo carried by the insured vessel is under a bill of lading or similar document of title subject or made subject to the Carriage of Goods by Sea Act of the United States or a law of any other country of similar import, liability hereunder shall be limited to such as is imposed by said Act or law, and if the Assured or the insured vessel assumes any greater liability or obligation, either in respect of the valuation of the cargo or in any other respect, than the minimum liabilities and obligations imposed by said Act or law, such greater liability or obligation shall not be covered hereunder; **CARRIAGE OF GOODS BY SEA ACT.**

(m) When cargo carried by the insured vessel is under a charter party, bill of lading or contract of affreightment not subject or made subject to the Carriage of Goods by Sea Act of the United States or a law of any other country of similar import, liability **LIMIT OF $500. PER PACKAGE.**

hereunder shall be limited to such as would exist if said charter party, bill of lading or contract of affreightment contained a clause exempting the Assured and the insured vessel from liability for losses arising from unseaworthiness provided that due diligence shall have been exercised to make said vessel seaworthy and properly manned, equipped and supplied, and a clause effectively limiting the Assured's liability for total loss or damage to goods shipped to $500. per package, or in case of goods not shipped in packages, per customary freight unit, and providing for pro rata adjustment on such basis for partial loss or damage;

(n) In the event cargo is carried under an arrangement not reduced to writing, the Association's liability hereunder shall be no greater than if such cargo had been carried under a charter party, bill of lading or contract of affreightment containing the clauses referred to herein;

**ORAL CONTRACT.**

(o) Where cargo on board the insured vessel is the property of the Assured, such cargo shall be deemed to be carried under a contract containing the protective clauses described in clauses (k), (l), and (m) herein; and such cargo shall be deemed to be fully insured under the usual form of cargo policy, and in case of loss of or damage to such cargo the Assured shall be insured hereunder in respect of such loss or damage only to the extent that he would have been if the cargo had belonged to another, but only in the event and to the extent that the loss or damage would not be recoverable from marine insurers under a cargo policy as above specified;

**ASSURED'S OWN CARGO.**

(p) No liability shall exist hereunder for any loss, damage or expense in respect of cargo, or baggage and personal effects of passengers being transported on land or while on another vessel or craft unless such loss, damage or expense is caused directly by the insured vessel, her master, officers or crew;

**TRANSPORTATION ON LAND OR OTHER CRAFT.**

(q) No liability shall exist hereunder for any loss, damage or expense in respect of cargo, or baggage and personal effects of passengers before loading on or after discharge from the insured vessel caused by flood, tide, windstorm, earthquake, fire, explosion, heat, cold, deterioration, collapse of wharf, leaky shed, theft or pilferage unless such loss, damage or expense is caused directly by the insured vessel, her master, officers or crew;

**CARGO ON DOCK.**

(r) A deduction of $           shall be made from any claim or claims with respect to each cargo carried, including passengers' baggage and personal effects.

(8) LIABILITY FOR FINES AND PENALTIES FOR THE VIOLATION OF ANY LAWS OF THE UNITED STATES, OR OF ANY STATE THEREOF, OR OF ANY FOREIGN COUNTRY: PROVIDED, HOW- EVER, THAT THE ASSOCIATION SHALL NOT BE LIABLE TO INDEMNIFY THE ASSURED AGAINST ANY SUCH FINES OR PENALTIES RESULTING DIRECTLY OR INDIRECTLY FROM THE FAILURE, NEGLECT OR FAULT OF THE ASSURED OR ITS MANAGING OFFICERS TO EXERCISE THE HIGHEST DEGREE OF DILIGENCE TO PREVENT A VIOLATION OF ANY SUCH LAWS.

**FINES AND PENALTIES.**

(a) Claims hereunder are subject to a deduction of $           with respect to each fine or penalty.

(9) LIABILITY FOR EXPENSES INCURRED IN RESISTING ANY UNFOUNDED CLAIM BY A SEAMAN OR OTHER PERSON EMPLOYED ON BOARD THE INSURED VESSEL, OR IN PROSECUTING SUCH PERSON OR PERSONS IN CASE OF MUTINY OR OTHER MISCONDUCT; NOT INCLUD- ING, HOWEVER, COSTS OF SUCCESSFULLY DEFENDING CLAIMS ELSEWHERE PROTECTED IN THIS POLICY.

**MUTINY, MISCONDUCT.**

(a) Claims hereunder are subject to a deduction of $           with respect to each occurrence.

(10) LIABILITY FOR EXTRAORDINARY EXPENSES, INCURRED IN CONSEQUENCE OF THE OUT-BREAK OF PLAGUE OR OTHER DISEASE ON THE INSURED VESSEL, FOR DISINFECTION OF THE VESSEL OR OF PERSONS ON BOARD, OR FOR QUARANTINE EXPENSES, NOT BEING THE ORDINARY EXPENSES OF LOADING OR DISCHARGING, NOR THE ORDINARY WAGES OR PROVISIONS OF CREW OR PASSENGERS; PROVIDED, HOWEVER, THAT NO LIABILITY SHALL EXIST HEREUNDER IF THE VESSEL BE ORDERED TO PROCEED TO A PORT WHERE IT IS KNOWN THAT SHE WILL BE SUBJECTED TO QUARANTINE.    **QUARANTINE EXPENSES.**

(a) Each claim hereunder is subject to a deduction of $

(11) LIABILITY FOR PORT CHARGES INCURRED SOLELY FOR THE PURPOSE OF PUTTING IN TO LAND AN INJURED OR SICK SEAMAN OR PASSENGER, AND THE NET LOSS TO THE ASSURED IN RESPECT OF BUNKERS, INSURANCE, STORES AND PROVISIONS AS THE RESULT OF THE DEVIATION.    **PUTTING IN EXPENSES.**

(12) LIABILITY FOR CARGO'S PROPORTION OF GENERAL AVERAGE, INCLUDING SPECIAL CHARGES, SO FAR AS THE ASSURED IS NOT ENTITLED TO RECOVER THE SAME FROM ANY OTHER SOURCE; PROVIDED, HOWEVER, THAT IF THE CHARTER PARTY, BILL OF LADING OR CONTRACT OF AFFREIGHTMENT DOES NOT CONTAIN THE NEGLIGENCE GENERAL AVER-AGE CLAUSE QUOTED BELOW, THE ASSOCIATION'S LIABILITY HEREUNDER SHALL BE LIMITED TO SUCH AS WOULD EXIST IF SUCH CLAUSE WERE CONTAINED THEREIN: VIZ.,    **CARGO'S PROPN. G/A.**

"In the event of accident, danger, damage or disaster, before or after commence-ment of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Carrier is not responsible, by statute, contract, or otherwise, the goods, the shipper and the consignee shall con-tribute with the Carrier in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the goods. If a salving ship is owned or operated by the Carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or ships belonged to strangers."    **NEGLIGENCE G/A CLAUSE.**

(a) Claims hereunder are subject to a deduction of $                          with respect to each accident or occurrence.

(13) LIABILITY FOR EXPENSES ARISING OUT OF ACTION TAKEN IN COMPLIANCE WITH THE LAWS OF THE UNITED STATES OR ANY STATE OR SUBDIVISION THEREOF OR OF ANY COUNTRY TO AVOID DAMAGE FROM, OR TO MINIMIZE OR REMOVE, ANY DISCHARGE, SPILLAGE, EMISSION OR LEAKAGE OF OIL, PETROLEUM PRODUCTS, CHEMICALS OR OTHER SUBSTANCES.    **DISCHARGE OF OIL OR OTHER SUBSTANCE.**

(a) Claims hereunder are subject to a deduction of $                          with respect to each accident or occurrence.

(14) LIABILITY FOR COSTS, CHARGES AND EXPENSES REASONABLY INCURRED AND PAID BY THE ASSURED IN CONNECTION WITH ANY LIABILITY INSURED UNDER THIS POLICY, SUB-JECT, HOWEVER, TO THE SAME DEDUCTION THAT WOULD BE APPLICABLE UNDER THIS POL-ICY TO THE LIABILITY DEFENDED; PROVIDED THAT IF ANY LIABILITY IS INCURRED AND PAID BY THE ASSURED AS AFORESAID, THE DEDUCTION SHALL BE APPLIED TO THE AGGREGATE OF THE CLAIM AND EXPENSES; AND PROVIDED FURTHER THAT THE ASSURED SHALL NOT BE ENTITLED TO INDEMNITY FOR EXPENSES UNLESS THEY WERE INCURRED WITH THE APPROVAL IN WRITING OF THE ASSOCIATION, OR THE ASSOCIATION SHALL BE SATISFIED THAT SUCH APPROVAL COULD NOT HAVE BEEN OBTAINED UNDER THE CIRCUMSTANCES WITHOUT UNREASONABLE DELAY, OR THAT THE EXPENSES WERE REASONABLY AND PROP-ERLY INCURRED; AND PROVIDED FURTHER THAT ANY SUGGESTION OR APPROVAL OF COUNSEL, OR INCURRING OF EXPENSES IN CONNECTION WITH LIABILITIES NOT INSURED UNDER THIS POLICY, SHALL NOT BE DEEMED AN ADMISSION OF THE ASSOCIATION'S LIABILITY.    **EXPENSES OF INVESTIGATION AND DEFENSE.**

(a) It is understood and agreed that the Association may undertake the investigation of any occurrence which might develop into a claim against the Assured, and may undertake the investigation and defense of any claim made against the Assured with respect to which the Assured shall be or may claim to be insured by the Association, and that during such investigation and/or defense the Association may incur expenses, which expenses shall be for the account of the Assured, and such investigation and/or defense shall not be considered as an admission of the Association's liability for such claim or expenses, and the liability of the Association to the Assured for any loss, damage or expense shall not be affected by any acts of the Association prior to formal presentation to the Association of the Assured's claim for reimbursement or indemnity.

(15) EXPENSES WHICH THE ASSURED MAY INCUR UNDER AUTHORIZATION OF THE ASSOCIATION IN THE INTEREST OF THE ASSOCIATION.

(16) LIABILITY FOR COSTS AND EXPENSES NOT EXPRESSLY EXCLUDED ELSEWHERE IN THIS POLICY, INCIDENTAL TO THE BUSINESS OF OWNING, OPERATING OR MANAGING SHIPS WHICH THE BOARD OF DIRECTORS, IN ITS SOLE DISCRETION, SHALL CONSIDER TO FALL WITHIN THE SCOPE OF THE POLICY.  **OMNIBUS CLAUSE.**

## GENERAL CONDITIONS AND LIMITATIONS

(17) In the event of any happening which may result in loss, damage or expense for which the Association may become liable, prompt notice thereof, on being known to the Assured, shall be given by the Assured to the Association.  **PROMPT NOTICE OF CLAIM.**

(18) The Association shall not be liable for any claim not presented to the Association with proper proofs of loss within one year after payment by the Assured.

(19) In no event shall suit on any claim be maintainable against the Association unless commenced within two years after the loss, damage or expense resulting from liabilities, risks, events, occurrences and expenditures specified under this policy shall have been paid by the Assured.  **TIME FOR SUIT.**

(20) If the Assured shall fail or refuse to settle any claim as authorized or directed by the Association, the liability of the Association to the Assured shall be limited to the amount for which settlement could have been made, or, if the amount is unknown, to the amount which the Association authorized.  **ASSURED'S FAILURE TO SETTLE CLAIMS.**

(21) Whenever required by the Association, the Assured shall aid in securing information and evidence and in obtaining witnesses and shall cooperate with the Association in the defense of any claim or suit or in the appeal from any judgment, in respect of any occurrence as hereinbefore provided.  **DEFENSE OF CLAIMS.**

(22) Unless otherwise agreed by endorsement hereon, the Association's liability shall in no event exceed that which would be imposed on the Assured by law in the absence of contract; provided, however, that the Assured's right of indemnity from the Association shall include any loss, damage or expense covered under the provisions of this policy arising as a result of any contract for the employment of tugs where such contract is one which is substantially similar to those customarily in use or in force during the currency of this policy. The Assured's right of indemnity hereunder shall not include any liability for loss, damage or expense arising from collision between the insured vessel and another vessel or craft, other than liability consequent on such collision, (a) for removal of obstructions under statutory powers, (b) for damage to any dock, pier, jetty, harbor, breakwater, structure, beacon, buoy, lighthouse, cable or similar structures, (c) in respect of the cargo of the insured vessel and (d) for loss of life, personal injury and illness.  **ASSUMED CONTRACTUAL LIABILITY.**

(23) No claim or demand against the Association shall be assigned or transferred without the written consent of the Association, and unless otherwise specifically agreed by endorsement hereon no person other than the Assured or Loss Payee named herein, or a receiver of the property or estate thereof, shall acquire any right against the Association hereunder.  **ASSIGNMENT.**

(24) The Association shall be subrogated to all the rights which the Assured may have against any other person or entity, in respect of any payment made under this policy, to the extent of such payment, and the Assured shall, upon the request of the Association, execute all documents necessary to secure to the Association such rights. **SUBROGATION.**

(25) Unless otherwise agreed in writing between the Assured and the Association the following conditions are terms of the insurance of every insured vessel: **CLASSIFICATION SOCIETY.**

(a)  The ship must be and remain throughout the period of insurance classed with a Classification Society approved by the Managers.

(b) Any incident or condition in respect of which that Classification Society might make recommendations as to repairs or other action to be taken by the Assured must be promptly reported to that Classification Society.

(c) The Assured must comply with all the Rules, recommendations and requirements of the Classification Society relating to the entered ship within the time or times specified by the Society.

(d)  The Assured authorizes the Association to inspect any documents and obtain any information relating to the maintenance of class of the entered ship in the possession of any Classification Society with which the vessel is or at any time has been classed and will, where necessary, authorize such Classification Society or Societies to disclose and make available such documents and information to the Association upon request by the Association and for whatsoever purposes the Association may consider necessary.

Unless and to the extent that the Board of Directors otherwise decides the Assured shall not be entitled to any recovery from the Association in respect of any claim arising during a period which the Assured is not fulfilling or has not fulfilled any condition referred to in this paragraph.

(26) The Association shall not be liable for any loss, damage or expense against which, but for the insurance herein provided, the Assured is or would be insured under existing insurance. **OTHER INSURANCE.**

(27) If and when the Assured under this policy has any interest other than as an owner or bareboat charterer of the insured vessel, in no event shall the Association be liable hereunder to any greater extent than if such Assured were the owner or bareboat charterer and were entitled to all the rights of limitation to which a shipowner is entitled. **LIMITATION OF LIABILITY.**

(28) If an insured vessel shall be and remain in any safe port without cargo on board for a period of thirty (30) or more consecutive days after finally mooring there (such period being computed from the day of arrival to the day of departure, one only being included) the Association is to return                per cent of the initial annual premium prorated daily, for the period the insured vessel shall be laid up without crew (other than a skeleton crew) and to return                per cent of the initial annual premium for the period the insured vessel shall be laid up with crew on board, provided the Assured give written notice to the Association as soon as practicable after the commencement and termination of such lay-up period. The Association shall have absolute discretion to determine whether a port is safe and how many crew members constitute a skeleton crew within the meaning of this paragraph. **LAY-UP RETURNS.**

(29) Liability hereunder in respect of any one accident or occurrence is limited to the amount hereby insured. **LIMIT OF AMOUNT INSURED.**

CANCELLATION PROVISIONS:

(30) (a)  If the insured vessel should be sold or requisitioned, the Association shall have the option to cancel insurance hereunder with respect to the insured vessel, the Association to allow a pro-rata daily return of premium for the unexpired term of the insurance with respect to said vessel after deduction of                per cent as an allowance for non-refundable fixed expenses. **CANCELLATION.**

If the entire management, control and possession of the insured vessel be transferred whether by demise charter or by change in corporate ownership or control of the insured owner, the Association shall have the option to cancel insurance hereunder with respect to the insured vessel, the Association to allow a pro-rata daily return of premium for the unexpired term of the insurance with respect to said vessel after deduction of                    per cent as an allowance for non-refundable fixed expenses. Cancellation shall not relieve the Assured from liability for premiums under this policy and for assessments levied and to be levied for deficiencies and impairments in respect of the insurance year for which the policy was originally written.

(b) (i) In the event of non-payment of the full premium within sixty (60) days after attachment, or, if installment payment of the premium has been arranged, in the event of non-payment of any installment thereof within twenty (20) days after it is due, this policy may be cancelled by the Association upon five (5) days' written notice being given the Assured. Should this policy be cancelled under the provisions of this clause the Association shall not be liable for any claims whatsoever under this policy unless within sixty (60) days from the date/time of such cancellation; there are paid to the Association by or on behalf of the Assured all premiums due for the period from commencement until cancellation of the policy; and the payment of all possible assessments for such period is unconditionally guaranteed by a responsible surety, in which case the Association shall be liable only for claims arising during such period.

(ii) Should the Assured fail to pay any assessment installment within twenty (20) days after it is due, the Association may give written notice that the Association shall not be liable for any claims whatsoever under this policy unless within ten (10) days from the date/time specified in such notice there are paid to the Association by or on behalf of the Assured all assessments with interest due thereon and the payment of all possible future assessments is unconditionally guaranteed by a responsible surety.

(iii) Should the Assured or any of them become insolvent or bankrupt or assign its property for the benefit of creditors or suffer the appointment of a receiver for its property or any part thereof or the institution of dissolution proceedings by or against it, the Association shall not be liable for any claims whatsoever under this policy unless within sixty (60) days from the date of the occurrence of such insolvency, bankruptcy, assignment, receivership or dissolution proceedings, there are paid to the Association by or on behalf of the Assured all premiums and/or assessments due, and the payment of any premiums to become due and all possible assessments is unconditionally guaranteed by a responsible surety.

(c) In the event that Sections 182 to 189, both inclusive, of U.S. Code, Title 46, or any other existing law or laws determining or limiting liability of shipowners and carriers, or any of them, shall, while this policy is in force, be modified, amended or repealed, or the liabilities of shipowners or carriers be increased in any respect by legislative enactment, the Association shall have the right to cancel said insurance upon giving thirty (30) days' written notice of their intention so to do, and in the event of such cancellation, make a return of premium upon a pro-rata daily basis.

(31) NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS POLICY, THE ASSOCIATION SHALL **RISKS** NOT BE LIABLE FOR ANY LOSS, DAMAGE OR EXPENSE SUSTAINED, DIRECTLY OR INDIRECTLY, BY REASON OF: **EXCLUDED.**

(a) Loss, damage or expense to hull, machinery, equipment or fittings of the insured vessel, including refrigerating apparatus and wireless equipment, whether or not owned by the Assured;

(b) Cancelment or breach of any charter or contract, detention of the vessel, bad debts, insolvency, fraud of agents, loss of freight, passage money, hire, demurrage or any other loss of revenue;

(c) Any loss, damage, sacrifice or expense of a type, character or kind which would be payable under the terms of a policy written on the American Institute Hull Clauses (June 2, 1977) Form and a policy written on the American Institute Increased Value and Excess Liabilities Clauses (November 3, 1977) Form whether or not the insured vessel is fully covered under those policies by insurance and excess insurance sufficient in amount to pay in full and without limit all such loss, damage, sacrifice or expense;

(d) The insured vessel towing any other vessel or craft, unless such towage was to assist such other vessel or craft in distress to a port or place of safety; provided, however, that this exception shall not apply to claims covered under Paragraph (1) of this policy;

(e)  For any claim for loss of life, personal injury or illness in relation to the handling of cargo where such claim arises under a contract of indemnity between the Assured and his sub-contractor.

(f)  Ionizing radiations from or contamination by radioactivity from any nuclear fuel or from any nuclear waste or from the combustion of nuclear fuel;

The radioactive, toxic, explosive or other hazardous or contaminating properties of any nuclear installation, reactor or other nuclear assembly or nuclear component thereof;

Any weapon of war employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter;

PROVIDED ALWAYS that this exclusion shall not apply to liabilities, losses, costs or expenses arising out of or in consequence of the emission of ionizing radiations from, or the toxic, explosive or other hazardous properties of:

(i)  Isotopes prepared for use for industrial, commercial, agricultural, medical or scientific purposes;

(ii)  natural uranium; or

(iii)  depleted uranium,

being carried as cargo in an insured vessel, and such further exceptions as the Board of Directors of the Association may approve.

(32)  In every case where this policy insures tugs, Clause (b) of Paragraph (6) and Clause (c) of Paragraph (31) shall be deemed to refer to the American Institute Tug Form, August 1, 1976 instead of the American Institute Hull Clauses (June 2, 1977) Form and Paragraph (3) shall be deemed to incorporate the Collision Clause contained in said policy (American Institute Tug Form, August 1, 1976) instead of the Collision Clause quoted in said Paragraph (3) and the following clause shall be substituted for and supersede Clause (d) of Paragraph (31) namely **TUGS.**

"Loss of or damage to any vessel or vessels in tow and/or their cargoes, whether such loss or damage occurs before, during or after actual towage; provided, that this exception shall not apply to claims under Paragraph (1) of this policy."

(33)  Notwithstanding anything to the contrary contained in this policy, the Association shall not be liable for or in respect of any loss, damage or expense sustained by reason of capture, seizure, arrest, restraint or detainment, or the consequences thereof or of any attempt thereat; or sustained in consequence of military, naval or air action by force of arms, including mines and torpedoes or other missiles or engines of war, whether of enemy or friendly origin; or sustained in consequence of placing the vessel in jeopardy as an act or measure of war taken in the actual process of a military engagement, including embarking or disembarking troops or material of war in the immediate zone of such engagement; and any such loss, damage or expense shall be excluded from this policy without regard to whether the Assured's liability therefor is based on negligence or otherwise, and whether before or after a declaration of war. **WAR RISKS.**

IN WITNESS WHEREOF the Association has caused this Policy to be signed in its behalf this . . . . . . . . . . . . . day of . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . , 19 . . . . . . .

AMERICAN STEAMSHIP OWNERS MUTUAL
PROTECTION AND INDEMNITY ASSOCIATION, INC.

By Shipowners Claims Bureau, Inc., Manager.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
Authorized Signature

# *Exhibit 3*
# *to LJB Affidavit*

| | PARTY | REPRESENTATION |
|---|---|---|
| 1 | Amerada Hess a/s/t Hess Oil and Chemical Corp. | Proskauer Rose LLP |
| 2 | American Atlantic Co. a/s/t American Dredging Company | Barry L. Doney – Vice President ** |
| 3 | American President Lines, Ltd. and American President Lines, Ltd. a/s/t American Mail Line | Holland & Knight LLP |
| 4 | American Steamship Company | Marland O. Webb, Esq. ** <br> GATX Corporation – Law Dept. |
| 5 | Bessemer Securities Corporation a/s/t Grosvenor-Dale Corp. | Chadbourne & Parke, LLP |
| 6 | BP a/s/t American Oil Company, Standard Oil Company | Proskauer Rose LLP |
| 7 | Bridgeport & Port Jefferson Steamboat Co. | Tisdale & Lennon LLC |
| 8 | Brokerage & Management Corp. | Tisdale & Lennon LLC |
| 9 | Central Gulf Lines a/s/t Central Gulf Lighters | O'Hare Parnagian LLP |
| 10 | Cleveland-Cliffs, Inc. a/s/t Cleveland-Cliffs Steamship Company | Ray, Robinson, Carle & Davies, PLL |
| 11 | Foss Maritime Company <br> c/o Saltchuk Resources, Inc. | Garvey Schubert Barer |
| 12 | Georgia-Pacific Corporation; <br> Georgia-Pacific Corp. | Fields, Howell, Athans & McLaughlin, LLP |
| 13 | Grace Lines, Inc./Prudential Lines, Inc. <br> c/o PLI Disbursement Trustee | Jaspan Schlesinger Hoffman LLP |
| 14 | Hendry Corporation | Fowler White Boggs Banker |
| 15 | Inland Lakes Management Inc. | Warner, Norcross & Judd, LLP |
| 16 | Ispat Inland Inc. | Matthew S. Schersel, Esq.  ** <br> Ispat Inland Inc. |
| 17 | Keyspan Corporation a/s/t Eastern Gas and Fuel Associates | Dickstein Shapiro Morin & Oshinsky LLP |
| 18 | Keystone Shipping Co. | Proskauer Rose LLP |
| 19 | Baldbutte Shipping Company | Proskauer Rose LLP |
| 20 | Calendar Navigation Corp. | Proskauer Rose LLP |
| 21 | Chas, Kurz & Co., Inc. | Proskauer Rose LLP |
| 22 | Chestnut Shipping Corp. | Proskauer Rose LLP |

| | PARTY | REPRESENTATION |
|---|---|---|
| 23 | Chilbar Shipping Co. | Proskauer Rose LLP |
| 24 | Fredericksburg Shipping Co. | Proskauer Rose LLP |
| 25 | Keystone Tankship Corporation | Proskauer Rose LLP |
| 26 | Margate Shipping Co. | Proskauer Rose LLP |
| 27 | New England Collier Co. | Proskauer Rose LLP |
| 28 | Paco Tankers Inc. | Proskauer Rose LLP |
| 29 | Timbo Shipping Ltd. | Proskauer Rose LLP |
| 30 | Kimberly-Clark Corporation a/s/t Scott Paper Company | Morgan Lewis & Bockius LLP |
| 31 | Lafarge North America Inc. a/s/t Huron Transportation, Inc. | Warner, Norcross & Judd, LLP |
| 32 | Marine Sulfur Shipping Corp. | Proskauer Rose LLP |
| 33 | Marine Transport Lines, Inc. | Proskauer Rose LLP |
| 34 | Marine Interests Corp. | Proskauer Rose LLP |
| 35 | Union Marine Transport Co. | Proskauer Rose LLP |
| 36 | Marine Chemical Navigation Corp. | Proskauer Rose LLP |
| 37 | Oswego Tanker Corp. | Proskauer Rose LLP |
| 38 | McAllister Brothers Inc. a/s/t Outreach Marine Corporation | Tisdale & Lennon LLC |
| 39 | Oglebay Norton a/s/t Columbia Steamship Company Inc. | Covington & Burling |
| 40 | Royal P&O Nedlloyd N.V. a/s/t Farrell Lines Inc., Farrell Lines (Lighters) | Brown Rudnick Berlack Israels |
| 41 | S.C. Loveland Co., Inc. | Holstein Keating Cattell Johnson & Goldstein, P.C. |
| 42 | Trade & Transport Inc. | Tisdale & Lennon LLC |
| 43 | Union Carbide Corporation, A subsidiary of The Dow Chemical Company | Mahoney & Keane, Esqs. |
| 44 | United States Maritime Administration U.S. Dept. of Transportation | James Cott, Esq. U.S. Attorney for the Southern District of New York U.S. Dept. of Justice |
| 45 | United States Lines (S.A.), Inc. Reorganization Trust c/o John T. Paulyson, Trustee | Nagel Rice & Mazie, LLP |
| 46 | Verizon Commuincations a/s/t New York Telephone | Ledy-Gurren & Blumenstock |
| 47 | Waterman Steamship Co. | O'Hare Parnagian LLP |

# Exhibit 4
# to LJB Affidavit

Service: Get by LEXSEE®
Citation: 1996 US Dist. Lexis 6199

*1996 U.S. Dist. LEXIS 6199, \**

IN RE: ASBESTOS PRODUCTS LIABILITY LITIGATION (No. VI); This Document Relates To:
ALL ACTIONS

CIVIL ACTION NO. 2 MDL 875 (Maritime Actions)

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

1996 U.S. Dist. LEXIS 6199

May 1, 1996, Decided
May 2, 1996, FILED, ENTERED

**DISPOSITION:** **[\*1]** Defendants motion granted.

**CORE TERMS:** discovery, exposure, asbestos, asbestos-related, settlement, disease, ship, manufacturer, compensable injury, cause of action, defense counsel, malignancy, reinstated, disclose, package, block, boxes, Jones Act, tort law, contracting, transferee, diagnosed, latency, pleural, exposed, answers to interrogatories, personal injury, physical injury, social security, growing number

**COUNSEL:** For IN RE: ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI), This Document Relates To: All Maritime Actions: LEONARD C. JAQUES, THE MARITIME ASBESTOSIS LEGAL CLINIC, DETROIT, MI USA. RICHARD C. BINZLEY, THOMPSON, HINE AND FLORY, CLEVELAND, OH USA.

For BABCOCK AND WILCOX, DIAMOND POWER SPECIALTY COMPANY, MOVANTS: RONALD S. KOPP, ROETZEL & ANDRESS, AKRON, OH USA. For CERTAIN SHIPOWNER, MOVANT: GENE B. GEORGE, RAY, ROBINSON, CARLE, DAVIES & SNYDER, CLEVELAND, OH USA. CHRISTOPHER C. KOEHLER, THOMPSON, HINE & FLORY, CLEVELAND, OH USA. RICHARD C. BINZLEY, THOMPSON, HINE AND FLORY, CLEVELAND, OH USA. For BETHLEHEM STEEL CORPORATION, MOVANT: JILL G. OKUN, SQUIRE, SANDERS & DEMPSEY, CLEVELAND, OH USA. For USX CORPORATION, MOVANT: JAMES A. BYRNE, BAUGHMAN & ASSOCIATES CO., L.P.A., CLEVELAND, OH USA. For DEFENDANTS, MOVANT: RICHARD C. BINZLEY, THOMPSON, HINE AND FLORY, CLEVELAND, OH USA. For TEXACO INC., MOVANT: MARK E. FUHRMANN, TEN STAMFORD FORUM, STAMFORD, CT USA. For KEENE CORPORATION, MOVANT: GITA F. ROTHSCHILD, MC CARTER & ENGLISH, NEWARK, NJ USA. BRUCE A. WAGMAN, MORGENSTEIN & JUBELIERER, SAN FRANCISCO, CA USA. ELLIOT JUBELIERER, MORGENSTEIN AND JUBELIERER, **[\*2]** SAN FRANCISCO, CA USA. For KAISER ALUMINUM & CHEMICAL CORPORATION, KAISER REFRACTORIES, MOVANTS: DAVID A. NASH, HOUGE, HILL, JONES, NASH & LYNCH, WILMINGTON, NC USA. For JOHN CRANE, INC., MOVANT: JAMES R. STOKES, TOLLEY, FISHER & VERWYS, P.C., GRAND RAPIDS, MI USA. For ALASKA, ALASKA MARITIME ASBESTOS PLAINTIFFS, MOVANT: LEONARD C. JAQUES, THE MARITIME ASBESTOSIS LEGAL CLINIC, DETROIT, MI USA. ROBERT J. ALLEN, DETROIT, MI USA. For OWENS-ILLINOIS, INC., MOVANT: BRUCE A. WAGMAN, MORGENSTEIN & JUBELIERER, SAN FRANCISCO, CA USA. ELLIOT JUBELIERER, MORGENSTEIN AND JUBELIERER, SAN FRANCISCO, CA USA. JOHN S. STEWART, BUNDA, STUTZ AND DE WITT, TOLEDO, OH USA. For ACANDS, INC., MOVANT: DOUGLAS C. PERKINS, HARTIG, RHODES, NORMAN, MAHONEY & EDWARDS, ANCHORAGE, AK USA. For ALLIED-SIGNAL, INC., MOVANT: THOMAS G. HERMANN, SQUIRE, SANDERS & DEMPSEY, CLEVELAND, OH USA. For PLFFS-NORTHERN DISTRICT OF OHIO, EASTERN DIVISION, MOVANT: ROBERT E. SWICKLE, MARITIME

ASBESTOSIS LEGAL CLINIC, DETROIT, MI USA. LEONARD C. JAQUES, THE MARITIME ASBESTOSIS LEGAL CLINIC, DETROIT, MI USA. JUDITH A. SCHORNACK-SMITH, THE JAQUES ADMIRALTY LAW FIRM, DETROIT, MI USA. For PLFFS-TERRITORIAL COURT OF THE VIRGIN ISLANDS DIVISION OF ST. **[\*3]** CROIX, MARITIME ASBESTOS INJURY LITIGANTS, MOVANTS: LEONARD C. JAQUES, THE MARITIME ASBESTOSIS LEGAL CLINIC, DETROIT, MI USA. For FIBREBOARD CORPORATION, MOVANT: JOAN F. BRAULT, TYDINGS & ROSENBERG, BALTIMORE, MD USA. KELLY WOOSTER, BROBECK, PHLEGER AND HARRISON, SAN FRANCISCO, CA USA. For AMOCO SHIPPING COMPANY, MOVANT: DAVID G. DAVIES, RAY, ROBINSON, CARLE, DAVIES & SNYDER, CLEVELAND, OH USA. For MARITIME OVERSEAS CORP., MOVANT: FAUSTINO MATTIONI, PHILADELPHIA, PA USA. DAVID G. DAVIES, RAY, ROBINSON, CARLE, DAVIES & SNYDER, CLEVELAND, OH USA. For GENERAL ELECTRIC, MOVANT: REGINALD S. KRAMER, BUCKINGHAM, DOOLITTLE & BURROUGHS, AKRON, OH USA. For COMBUSTION ENGINEERING, INC., AND SKINNER CORPORATION, SUCCESSOR TO ALASKA STEAMSHIP COMPANY, MOVANT: JOAN M. ENGLUND, ARTER AND HADDEN, CLEVELAND, OH USA. For CCR DEFENDANTS, MOVANT: DAVID M. BATTAN, SHEA AND GARDNER, WASHINGTON, DC USA. For ARGO INTERNATIONAL CORPORATION, MOVANT: MARIA A. KORTAN, WESTON, HURD, FALLON, PAISLEY AND HOWLEY, CLEVELAND, OH USA. For THE AMERICAN SHIP BUILDING COMPANY, MOVANT: SCOTT A. STICHTER, STICHTER, RIEDEL, BLAIN AND PROSSER, P.A., TAMPA, FL USA. For IMO INDUSTRIES, INC., IMO INDUSTRIES, INC., and WARREN PUMPS, INC., **[\*4]** MOVANTS: JAMES T. MILLICAN, BERTSCH, MILLICAN AND WINSLOW, CLEVELAND, OH USA. For CERTAIN PERIPHERAL DEFENDANTS -- A.B. BOYD CO., ARGO INTERNATIONAL CORPORATION, AUBURN MANUFACTURING CO., BRYAN STEAM, CHAMPION INTERNATIONAL CORPORATION, COFFIN TURBO PUMP, INC. MISNAMED AS COOFIN PUMP, INC., CROWN CORK & SEAL, EVERLASTING VALVE COMPANY, FEDERAL-MOGUL CORPORATION, FEL-PRO INCORPORATED FELT PRODUCTS MFG CO., GATKE CORPORATION, GOODALL RUBBER, GOULDS PUMPS, INC., HAJOCA CORPORATION, INGERSOLL DRESSER PUMP, INGERSOLL RAND CO., JANOS INDUSTRIAL CO., MAU-SHERWOOD SUPPLY CO., MORRISON BROTHERS, NOLAND COMPANY, PHOENIX SPECIALTY, QUAKER CONSTRUCTION PRODUCTS, INC. SELBY BATTERSBY & CO., SKINNER ENGINE CO., USX CORPORATION, W.S. TYLER AND ZIMMERMAN PACKING CO., MOVANT: GREGG L. SPYRIDON, HOFFMAN, SUTTERFIELD, ENSENAT AND BANKSTON, NEW ORLEANS, LA USA. For MANUFACTURER DEFENDANTS, CO-LEAD DEFENSE COUNSEL, MOVANT: PHILIP S. MC WEENY, OWENS ILLINOIS, INC., TOLEDO, OH USA. For PERIPHERAL DEFENDANTS, CO-LEAD DEFENSE COUNSEL DAVID CRAIG LANDIN aka DAVID CRAIG LANDIN, MOVANT: DAVID C. LANDIN, MC GUIRE, WOODS, BATTLE & BOOTHE, RICHMOND, VA USA. For CROSBY VALVE & GAGE, MOVANT: JOHN S. STEWART, BUNDA, **[\*5]** STUTZ AND DE WITT, TOLEDO, OH USA. For OWENS CORNING FIBERGLAS CORPORATION, MOVANT: CATHERINE N. JASONS, KELLEY, JASONS, MC GUIRE & SPINELLI, PHILADELPHIA, PA USA. For LYKES BROTHERS STEAMSHIP COMPANY, INC., MOVANT: PAMELA ZARLINGO, THOMPSON, HINE AND FLORY, CLEVELAND, OH USA. For ACORN IRON AND SUPPLY COMPANY, MOVANT: PAUL R. ROSEN, SPECTOR, GADON & ROSEN, P.C., PHILA, PA USA. GEORGE M. VINCI, JR., SPECTOR, GADON & ROSEN, PHILADELPHIA, PA USA. G. DANIEL BRUCH, JR., SWARTZ, CAMPBELL & DETWEILER, PHILADELPHIA, PA USA. For GOULDS PUMPS, INC., MOVANT: DANIEL J. RYAN, JR., MARSHALL, DENNEHEY, WARNER, COLEMAN AND GOGGIN, PHILA, PA USA. For INTERCONTINENTAL CARRIER CORPORATION, OVERSEAS BULKTANK CORPORATION, VALDEZ TANKSHIP CORPORATION, FIRST SHIPMOR ASSOCIATES, INTERCONTINENTAL BULKTANK CORPORATION, VIVIAN TANKSHIP CORPORATION, NATALIE TANKSHIP CORPORATION, MOVANT: FAUSTINO MATTIONI, PHILADELPHIA, PA USA.

**JUDGES:** Charles R. Weiner, Judge

**OPINIONBY:** Charles R. Weiner

**OPINION: MEMORANDUM OPINION AND ORDER**

Get a Document - by Citation - 1996 U.S. Dist. LEXIS 6199    Page 3 of 10

Case 2:04-cv-04309-LAK-JCF   Document 79-5   Filed 10/04/2004   Page 4 of 11

In response to a discovery request of defense counsel, and after several telephone conferences, this Court, on July 18, 1995, entered Pretrial Order No. 6 (MARDOC) directing Plaintiffs' counsel **[*6]** to produce materials in 262 Mardoc cases. Despite being granted several extensions of time to comply with the directives of the July 18, 1995 order, plaintiffs' counsel failed to do so. As a result, defendants moved to dismiss plaintiffs' cases. Following the entry of Show Cause Orders, the Court held a hearing on February 28, 1996 and heard argument and statements of all counsel. The parties have further supplemented their positions with additional written statements. The Court, having considered all of the material presented, will grant the motion of the defendants as modified by the attached order.

Background of Action

On July 29, 1991, the Judicial Panel On Multidistrict Litigation entered an order establishing MDL 875 and consolidating before this Court 26,639 civil asbestos personal-injury lawsuits, pending in 87 federal districts. At that time 4,022 of the actions transferred were in the Northern District of Ohio. The Panel Order provided for the transfer of overlooked cases and newly filed cases as "tag-along actions" n1. The size of MDL 875 has now grown from 26,639 to 58,478, or an increase of 119.5%. During this same period, the number of cases in MDL 875 from the **[*7]** Northern District of Ohio has risen from 4,022 to 23,154, or an increase of 475.7%. At the same time, this Court has supervised the termination of 4,223 cases in the Northern District of Ohio jurisdiction, primarily traditional, land-based cases. The remaining 18,209 cases are predominantly Mardoc actions. The Panel statistics disclose that this Court has now disposed of more than 20,000 cases n2. With only 37,000 cases remaining, approximately 50% are the Mardoc actions.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -


n1 Rule 12, Rules of Judicial Panel On Multidistrict Litigation.


n2 Although the Panel statistics show 20,560, this Court is aware of substantially more cases that are settled among the parties without the completion of terminating paperwork. Excluding Mardoc actions, this Court believes that the number of remaining cases is between 10,000 and 15,000.


- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

This Court has, in the conduct of its proceedings, taken very seriously all of the objectives of the Panel n3 while engaging in its pretrial activities. Where the parties and their counsel **[*8]** have been cooperative and reasonable, the Court has been able to effectuate settlements. A major obstacle occurs, however, when either side displays a lack of trust or credibility, or becomes entrenched and confrontational, such as when the parties refuse to cooperate in the disclosure of basic information which informs all parties of the nature of the claims.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -


n3 Judicial Panel On Multidistrict Litigation, Docket No. 875, Order dated July 29, 1991, pages 9-12.


- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Get a Document - by Citation - 1996 U.S. Dist. LEXIS 6199                    Page 4 of 10

Case 2:04-cv-04309-LAK-JCF · Document 79-5    Filed 10/04/2004    Page 5 of 11

Facts

In the Mardoc cases, there is routinely filed with each action an IDF (Initial Data Form) as required by the standing asbestos orders for the Northern District of Ohio. The information contained on this form is not authenticated, and, except for naming ships that the plaintiff may have sailed on, it provides no real medical or exposure history for the plaintiff. Until recently the parties have been at a standoff; Plaintiffs seek settlements and defendants have demanded proof of an asbestos-related medical condition and exposure to their product.

 [*9]  n4 The defendants complain that Plaintiffs have not provided them with the materials they need to make a settlement offer or proceed to trial. Both sides seek assistance of the Court. After several conferences with the parties, the Court entered, on July 18, 1995, Pretrial Order No. 6 (MARDOC), requiring Plaintiffs' counsel to provide to defense counsel the necessary materials n5 in 262 randomly selected cases in order that they could be evaluated for medical and exposure criteria and for settlement. At this Court's scheduled conference on August 18, 1995, Plaintiffs' counsel advised the Court that he could complete the disclosure of the required information in 30 days. The Court ordered that this discovery be produced by plaintiffs to the defendants no later than September 21, 1995. Plaintiffs failed to produce the discovery by the discovery deadline, and after several more telephone conferences, defense counsel moved to dismiss the 261 n6 cases. This Court issued Show Cause orders on November 15, 1995, and a subsequent Notice of Hearing on February 1, 1996.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n4 This has always been the starting position of the parties; however, in the land cases, the Plaintiffs have learned to supply defendants with medical records, test results, and at least one expert report, together with an affidavit of exposure. In most instances the affidavit of exposure suffices because the worksite of the plaintiff has been subject to thorough discovery and the credibility gap has been narrowed. The defendants then treat the action in the form of a claim and make an offer based upon the historical averages achieved between the plaintiff's attorney and the defendant for the location. [*10]

n5 The order specifically sets forth the materials to be provided:

> "copies of all medical records and reports, expert reports, x-ray records and reports, pathology reports, pulmonary function test results and reports, autopsy results and death certificates as applicable, work history and work records, social security records, answers to interrogatories, and evidence of specific exposure to each named defendant in each plaintiff's case.

n6 After the process began, it was discovered that one of the 262 numbers was in error and the parties proceeded with the remaining 261.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

More than 7 months have passed since the Court issued its order of July 18, 1995, and by all rational standards plaintiffs' counsel has had adequate time and opportunity to comply with discovery in these matters. In fact, Plaintiffs have advised the Court that they have produced

all of the discovery materials required. At the hearing on February 28, 1996, defendants produced two legal record boxes (approximately 12"H x 14"W x 24"L) which they identified as the total discovery received. Included in the boxes [*11] was 261 file folders, many with IDF forms, and many with recent letters from a "B" reader radiologist. It has been this Court's experience that one medical case could easily fill two legal record boxes. The parties agreed that the discovery produced included no documentation or evidence relating to plaintiffs' exposure to specific products. The Court also repeatedly asked Plaintiffs if they had any malignancy cases ready for trial and Plaintiffs did not identify any such cases.

Discussion

The Judicial Panel on Multidistrict Litigation, convinced that the administration of justice in the federal court system was threatened by burgeoning numbers nationally of asbestos related personal-injury lawsuits, sought to relieve the burden, to provide for uniform case management, and to reduce the transaction costs by transferring these cases to a multidistrict jurisdiction. This Court has remained mindful of the Panel's priorities as set forth in the Panel order of July 29, 1991, and has initiated case management policies in conjunction with counsel representing all parties to achieve these goals.

Plaintiffs' counsel has taken the position that these 261 cases adequately reflect the nature [*12] of all of his filings, and that the "package" n7 is now ripe for settlement. Defense counsel, although it was their expert who devised the method for selecting the 261 "random" cases, are more reluctant to characterize the 261 cases as a representative of the whole in all respects, but rather they urge the Court to find that the discovery provided is representative of the whole. Defense counsel urge the Court to dismiss with prejudice the 261 cases due to plaintiffs' counsel's lack of compliance with this Court's orders. Defense counsel also argue that even in the cases where some discovery has been provided, it is insufficient for the cases to proceed to settlement or trial.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n7 Counsel in the asbestos litigation are prone to describe a group of cases, whether it is 5 or 5,000 in number, as a "package".

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

The judicial system has been faced with an onslaught of personal injury, asbestos cases for more than twenty years. Plaintiffs have sought damages against a multitude of defendants. The courts have found that [*13] asbestos fibers are potentially hazardous to one's health. Sufficiency of exposure remains an unknown, however, and many plaintiffs initiated litigation without injury, but rather with knowledge of exposure. The reasoning supporting this litigation has been the concern for the running of tolling statutes which may begin when the party becomes aware of an injury. Injury can and has been defined in many ways resulting in inconsistent case law and approaches to this type of litigation among the states.

This Court is guided by the principles set forth by Judge Ginsberg in In Re Korean Air Lines Disaster of September 1, 1983, 265 U.S. App. D.C. 39, 829 F.2d 1171 (D.C.Cir. 1987). She concludes that a transferee court's responsibility in the context of a 28 U.S.C. § 1407 transfer is to follow the law of the transferee circuit, although the law of the transferor jurisdiction merits consideration. In the matter before us, the Court feels that the law of the United States Court of Appeals for the Third Circuit is clear and that the United States Court of Appeals for the Sixth Circuit would draw a similar analysis to this problem.

Pennsylvania has recently joined a growing number of states which have analyzed [*14]

Get a Document - by Citation - 1996 U.S. Dist. LEXIS 6189

Case 2:04-cv-04309-LAK-JCF   Document 79-3   Filed 10/04/2004   Page 7 of 11

Page 6 of 10

this problem.

Four years ago Pennsylvania was a "one-injury" state. That is, if an exposed party sought damages as a result of his or her pleural disease which was causing some restriction in lung capacity, the party would also seek damages for fear of contracting other asbestos-related cancers, and for the increased risk in contracting such malignancies which have longer latency periods. The combination of longer latency periods and separate but multiple diseases flowing from the same exposure caused the Pennsylvania courts to review the course of the products liability law. In 1992, Pennsylvania became a "two injury" state and joined a growing number of states by holding that in asbestos cases, the plaintiff is entitled to bring a second action for a subsequently diagnosed malignancy, thereby eliminating claims for risk and fear, and reducing the potential for speculative damages being awarded for an injury that may not occur. Marinari v. Asbestos Corporation, Ltd., 417 Pa. Super. 440, 612 A.2d 1021 (1992) n8

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n8 New York, New Jersey, Maryland, Delaware, Indiana, Illinois, California and Hawaii also follow the two-disease rule.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*15]**

Ohio is also among the many states which has adopted this rule. In Quick v. Sun Oil Co., et al., (No. 82-0292, Ct. Comm. Pleas, Lucas Co., Ohio, 10/84), Judge Sumner E. Walters found that the discovery of one asbestos-related disease does not trigger the statute of limitations for other separate and distinct, later discovered asbestos diseases.

More recently, the issue of injury in an asbestos-related action was tested before the Pennsylvania Supreme Court in Giffear v. Johns-Manville Corporation, et al., 1996 U.S. Pa. LEXIS 587 (No.J-157-1995, Pa., April 4, 1996) The Giffear Court focused on the distinction between "injury" and "harm", and determined that a physical injury sufficient to maintain a tort action must be accompanied by harm. The Court concluded that asymptomatic pleural thickening or scarring is not a compensable injury which gives rise to a cause of action for damages for a physical injury or for emotional distress. (Supra, pg 10,11,14)

If the action is brought under the Jones Act or the F.E.L.A. statutes, the plaintiff is not relieved from his burden of proof relating to injury. These laws protect the railroad workers and mariners who might otherwise have a problem in proving **[*16]** responsibility for an injury sustained by providing them with a federal cause of action for the same injury against their employer in addition to their tort claims against negligent manufacturers or distributors. While the plaintiff's burden to establish liability may be eased, a compensable injury remains a requirement for recovery. In holding that an action for an asbestos-related injury does not exist in a F.E.L.A. case, Circuit Judge Seitz of the United States Court of Appeals for the Third Circuit Court stated: "We believe, however, that subclinical injury resulting from exposure to asbestos is insufficient to constitute the actual loss or damage to a plaintiff's interest required to sustain a cause of action under generally applicable principles of tort law.... Requiring manifest injury as a necessary element of an asbestos-related tort action avoids these problems and best serves the underlying purpose of tort law: the compensation of victims who have suffered." Schweitzer v. Consolidated Rail Corp. (Conrail), 758 F.2d 936, 942 (3d Cir.1985).

Many states have created administrative vehicles to hold in abeyance these asymptomatic cases until counsel finds that the plaintiff **[*17]** is actually suffering from an impairment. Before an action is activated, certain criteria must be met. This Court has found that the use

Get a Document - by Citation - 1996 U.S. Dist. LEXIS 6199    Page 7 of 10

Case 2:04-cv-04309-LAK-JCF   Document 79-5   Filed 10/04/2004   Page 8 of 11

such an administrative device can reduce the Clerk's burden and still provide an atmosphere for settlement between the parties. Illinois, Maryland, Connecticut, Arizona and Hawaii utilize this procedure.

This is the atmosphere that exists today where every plaintiff's counsel has a working agreement with all or most of the principal defendants and the cases are submitted as claims. Criteria has been established and agreed to and this has resulted in large block settlements of cases or trials where there has been a good faith difference of opinion.

Soon after the multidistrict cases were sent to this Court, the Court convened counsel from the New England states and block settlements were achieved and agreements to treat future cases as claims resulted. This procedure has proved effective in many places in the nation and, as a result, there are no real blocks of cases unsettled n9 except for these Mardoc actions. In the Mardoc actions, none of the defendants have settled and plaintiffs have claims against an average of more than 80 defendants.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n9 In several instances, plaintiffs may still have remaining in their cases some of the peripheral defendants whose presence represents a very small percentage of the value of the case. In other circumstances, plaintiffs may have settled with all but one primary defendant and these situations are being addressed.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*18]**

Although this Court retains a vigilant concern for all parties to the litigation, the Court has prioritized from the onset the victims of asbestos related disease, and in particular, those who suffer with malignant conditions as well as their families. The Court's focus is to administer these cases as it has all the others by seeing that they are resolved in an equitable and expeditious manner either by settlement or by trial while making certain there will be sufficient resources available to compensate those who are deserving.

Findings

The Court, having spent many hours in conference with all counsel and after a hearing makes the following determinations:

Plaintiffs' counsel has failed to comply with this Court's order of July 18, 1995. Plaintiffs' counsel has admitted that no details relating to exposure have been supplied and most of the documentation is described as new radiologist's reports and IDFs. The defendants claim that **all** medical records, work records, social security records, answers to interrogatories, etc., as required by the court order, have not been received by them. Plaintiffs' counsel has supplemented his argument presented at the hearing by **[*19]** submitting a copy of the "medicals" from one of the 261 cases n10. It contains nine pages, none of which are dated earlier than September, 1995.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n10 Pablo E. Hernandez v. American Ship, et al., Civil Action No. 90-0000, Northern District of Ohio

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

The second determination of the Court is that Plaintiffs' counsel has not provided critical material necessary for defendants either to evaluate the cases so that a meaningful dialogue can take place or for the cases to be prepared for trial if that fails. Plaintiffs' counsel categorizes his proof of exposure as follows n11:

> 1) Everyone knows that the products of this manufacturer were all over the ships and could be found upon almost every ship;
>
> 2) This manufacturer advertised asbestos products in a marine catalogue and therefore it must have made and sold products to which the plaintiff was exposed, and;
>
> 3) Counsel has assured the Court that he can and will obtain statements from numerous Chief Engineers that these products were in use all [*20] over the ships.

Plaintiffs' counsel takes the position that this specific evidence and discovery can await trial preparation and is not necessary for the filing of a case or for the settlement process.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n11 In this instance the Court is discussing the "manufacturer" defendants, as each plaintiff's sailing record will disclose the vessels upon which he sailed.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Plaintiffs' counsel has presented, as part of the discovery package, doctor's reports that state that a significant number of the plaintiffs have no asbestos related injury. Defense counsel have advised the Court that the medicals received pursuant to this Court's order of July 18, 1995, infra, consist of a scant number of documents and only recent "medical" reports prepared in November, 1995, after this Court's order of July 18, 1995. The statements made to the Court disclose that only a fraction of the recently diagnosed plaintiffs have an asbestos-related condition, and many of these may be open to question. Numerous cases have either no [*21] diagnosis of an asbestos-related condition, or there is scant credible medical evidence. Further, the Court is informed that few, if any, of these plaintiffs have provided any evidence of a compensable injury sufficient to sustain a cause of action.

The Court believes that it is the responsibility of counsel to only file those cases which are ripe and ready to proceed. To file cases by the thousands and expect the Court to sort out the actionable claims is improper and a waste of the Court's time. Other victims suffer while the Court is clogged with such filings.

The Court enters its orders accordingly.

Order

THE COURT HEREBY ORDERS that the cases filed in the Northern District of Ohio by the Plaintiffs assigned to the Mardoc portion of MDL 875, ARE ADMINISTRATIVELY DISMISSED WITHOUT PREJUDICE AND WITH ALL STATUTES OF LIMITATION TOLLED. The Court is specifically preserving the rights of the named plaintiffs to maintain an action should their

circumstances warrant the furtherance of their case. Counsel is advised that this Court shall maintain jurisdiction, and that these cases may be individually reinstated upon application to the Court with the following showing:

> 1. **[*22]** Each plaintiff requesting reinstatement must provide to this Court satisfactory evidence that the plaintiff has an asbestos-related personal injury compensable under the law.

> 2. For each defendant which the plaintiff desires to pursue, the plaintiff must provide probative evidence of exposure to products connected to, or supplied, manufactured or installed by said defendant, or, if the defendant is a shipowner, evidence of service upon the defendant's ship(s).

THE COURT FURTHER ORDERS that each case to be reinstated shall be accompanied with the payment of a filing fee, unless such case, both in its present form and in its earlier submissions, contained Jones Act claims ONLY n12. Counsel shall further be entitled to amend his pleadings as necessary to set forth proper claims, substitute parties and name defendants at the time of reinstatement; PROVIDING HOWEVER, defendants may insert any and all defenses to which they may be entitled. The Court will issue shortly hereafter a list of the affected actions in the Northern District of Ohio. All pending motions in these cases are hereby denied without prejudice and with leave to resubmit with the original filing date remaining **[*23]** in effect should the case be reinstated.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n12 The Court has examined the prior policy of allowing these cases to be filed en mass without filing fees and finds that it is inappropriate to continue. This policy issue has been assigned by Chief Judge George W. White of the Northern District of Ohio to the MDL. Specifically, the Court notes that 28 U.S.C. 1916 provides that certain seamen's suits may proceed without prepayment of costs, but that common law tort actions are not included therein. Plaintiffs' counsel, without payment of any fees, has filed more than 17,000 cases. The costs applicable to these filings are great and the burden and cost to the court system has been considerable.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

For the purposes of appeal, THIS IS NOT A FINAL ORDER.

BY THE COURT

Charles R. Weiner, Judge

Date: 5/2/96

Service: **Get by LEXSEE®**
Citation: **1996 US Dist. Lexis 6199**
View: Full
Date/Time: Saturday, April 10, 2004 - 7:36 AM EDT

* Signal Legend:
● -  Warning: Negative treatment is indicated

Get a Document - by Citation - 1996 U.S. Dist. LEXIS 6199

Case 2:04-cv-04309-LAK-JCF    Document 79-3    Filed 10/04/2004    Page 11 of 11

Page 10 of 10

- Caution: Possible negative treatment
- Positive treatment is indicated
A - Citing Refs. With Analysis Available
i - Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

# *Exhibit 5*
# *to LJB Affidavit*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

≠ 113

IN RE:  ASBESTOS PRODUCTS          :

LIABILITY LITIGATION (No. VI)      :

————————————————————x

    This Document Relates To:      :

                          :

    ALL ACTIONS                    :

-----------------------------------x

CIVIL ACTION NO. 2 MDL 875

(Maritime Actions)

## Order

THE COURT HEREBY ORDERS that the cases filed in the Northern District of Ohio by the Plaintiffs assigned to the Mardoc portion of MDL 875, ARE ADMINISTRATIVELY DISMISSED WITHOUT PREJUDICE AND WITH ALL STATUTES OF LIMITATION TOLLED. The Court is specifically preserving the rights of the named plaintiffs to maintain an action should their circumstances warrant the furtherance of their case. <u>Counsel is advised that this Court shall maintain jurisdiction, and that these cases may be individually reinstated upon application to the Court with the following showing:</u>

14

1.   Each plaintiff requesting reinstatement must provide to this Court satisfactory evidence that the plaintiff has an asbestos-related personal injury compensable under the law.

2.   For each defendant which the plaintiff desires to pursue, the plaintiff must provide probative evidence of exposure to products connected to, or supplied, manufactured or installed by said defendant, or, if the defendant is a shipowner, evidence of service upon the defendant's ship(s).

THE COURT FURTHER ORDERS that each case to be reinstated shall be accompanied with the payment of a filing fee, unless such case, both in its present form and in its earlier submissions, contained Jones Act claims ONLY[12]. Counsel shall further be entitled to amend his pleadings as necessary to set forth proper claims, substitute parties and name defendants at the time of reinstatement; PROVIDING HOWEVER, defendants may insert any and all defenses to which they may be entitled. The Court will issue shortly hereafter a list of the affected actions in the Northern

---

12.   The Court has examined the prior policy of allowing these cases to be filed en mass without filing fees and finds that it is inappropriate to continue. This policy issue has been assigned by Chief Judge George W. White of the Northern District of Ohio to the MDL. Specifically, the Court notes that 28, U.S.C. §1916 provides that certain seamen's suits may proceed without prepayment of costs, but that common law tort actions are not included therein. Plaintiffs' counsel, without payment of any fees, has filed more than 17,000 cases. The costs applicable to these filings are great and the burden and cost to the court system has been considerable.

15

District of Ohio.  All pending motions in these cases are hereby denied without prejudice and with leave to resubmit with the original filing date remaining in effect should the case be reinstated.

For the purposes of appeal, THIS IS NOT A FINAL ORDER.

BY THE COURT

Date: 5/2/96

Charles R. Weiner, Judge

ENTERED: 5/2/96

CLERK OF COURT

16

# *Exhibit 6*
# *to LJB Affidavit*

# NOURSE & BOWLES, LLP
## One Exchange Plaza
### at 55 Broadway
### New York, NY 10006-3030
Telephone: (212) 952-6200
Facsimile: (212) 952-0345
Direct Dial: (212) 952-6213
E-Mail: lbowles@nb-ny.com
Web site: www.nb-ny.com

**Nourse & Bowles, LLP**
115 Mason Street
Greenwich, Connecticut

**Nourse & Bowles**
75 Main Street, Suite 205
Millburn, New Jersey

June 8, 2004

Honorable Charles Weiner                                    215-580-2151
United States District Judge
United States District Court
Eastern District of Pennsylvania
601 Market Street
Philadelphia, PA 19106

Re:    Asbestos Products Liability Litigation
       Civil Action No. 2 MDL 875
       Re: Joint Motion of Asbestos Claimants and
       PLI Disbursement Trustee

Dear Judge Weiner,

Further to the conference on Friday, June 4, 2004, we write to confirm the American Club's position on several matters.

The first matter is that the Court questioned its jurisdiction, given the involvement of the Bankruptcy Court. We think the Court can certainly interpret its own Orders, especially those preserving the Trust's defenses.

As to the Trust's defenses Mr. Kellman and/or the Trustee suggested that the Trust has a right to waive its time bar defense as to the MALC claimants and, if so, that the only penalty would be the loss of certain rights under paragraph 2 of the so-called "Procedures Memorandum" (Exhibit 17 to the Club's Opposition to the Joint Motion). This suggestion is not correct, as it overlooks the terms of the insurance policies/contracts in question.

The Trust which stands in the position of the shipowner, Prudential Lines Inc., is entitled to seek indemnification from the Club under those insurance policies/contracts only with respect to claims for which it "shall become liable to pay" (Exhibit 17A to the Club's Opposition to the Joint Motion, page 2). The Trust is not entitled to seek indemnification for claims which it is not legally liable to pay. Accordingly, if the Trust pays any time barred claims or pays claims on the basis of the CRMC's evaluations, the Trust will not be entitled to any indemnification from the Club with respect to any such payments. As the trust is not legally liable to make such payments, they are simply not covered by the insurance contracts.

The Club's position under the insurance policies/contracts is spelled out in its letter to the Trustee dated October 12, 1995 (Exhibit 17B to the Club's Opposition to the Joint Motion).

Another matter to be addressed is MALC's erroneous argument that the Trust's time bar defense was ruled upon adversely in this Court's order entered on December 29, 1998. Again, this is not correct. The time bar issue arose in October 1998 after the Bankruptcy Court issued its Lift Stay Order dated February 6, 1998 after MALC belatedly (eight months late) filed its motion to file a Master Complaint to add the Trust as a defendant in the many pending actions against other defendants. The Club's opposition, which was served and filed on or about December 18, 1998 (Exhibit 23 attached to the Club's Sur-Reply Opposition Memorandum), pointed out that most, if not all, of MALC's claims were then time barred for violation of 11 U.S.C. §108(c). (No "coverage" issues were implicated in connection with opposing MALC's motion.)

MALC's latest argument misquotes the "NOW THEREFORE" paragraph of this Court's Order entered December 29, 1998 (Exhibit 13 to the Club's Opposition to the Joint Motion). That paragraph actually states:

> NOW, THEREFORE, having considered the papers, argument and agreement of the parties including their respective views with regard to the February 6, 1998 lift stay Order of the Honorable Arthur J. Gonzalez, Bankruptcy Judge of the United States Bankruptcy Court, Southern District of New York and the timeliness of the Motion under consideration and the Court being more fully advised in the premises.

The "NOW THEREFORE" paragraph plainly did not decide any issues, it merely recited the issues then under consideration and, while MALC's motion was granted, MALC overlooks the final decretal paragraph of the December 29, 1998 Order, which was intended to preserve the Trust's defenses including its time bar defense.

That paragraph states:

2

> IT IS FURTHER ORDERED that these claims/causes are
> subject to all existing case management orders and that the
> American Steamship Owners Mutual Protection and
> Indemnity Association, Inc., acting in behalf of the PLI
> Disbursement Trust retains its defenses.

To the extent there may be any ambiguity in the final decretal paragraph of this Court's order dated December 29, 1998 (the draft of which was not circulated to the parties before entry), that ambiguity was removed, with Mr. Kellman's consent, by this Court's order dated August 26, 1999 (Exhibit 14 to the American Club's Opposition to the Joint Motion).

After MALC, in August 1999, filed its motion for an Order Supplementing, Amending and Clarifying the December 29, 1998 Order, Mr. Brown and Mr. Kellman conferred and agreed on the terms of this Court's order dated August 26, 1999. The final decretal paragraph of that order, as agreed by Mr. Kellman and as approved of by the Court clarified that it was the Trust's defenses that were preserved in the December 29, 1998 Order. It states:

> IT IS FURTHER ORDERED that all claims/causes which
> have been, are hereby, or will be transferred are subject to all
> existing case management orders and that, <u>with respect to all
> such claims/causes, PLI Disbursement Trust and American
> Steamship Owners Mutual Protection and Indemnity
> Association, Inc., acting in behalf of the PLI Disbursement
> Trust, retain the PLI Disbursement Trust's Defenses.</u>

(Exhibit 14)                                              (Emphasis added)

To the extent needed, this paragraph clarifies the meaning of the final decretal paragraph of the December 29, 1998 order. Mr. Kellman certainly knew in August 1999 that he had agreed that the trust's defenses were preserved, not the Club's, and there is simply no basis for his new argument that the December 29, 1998 Order merely preserved the Club's defenses not the Trust's. The Club's defenses were not an issue in its opposition to MALC's motion to file a Master Complaint.

In December 1998 and again in August 1999 this Court preserved all rights and defenses of the Trust because, we respectfully submit, the time was not then ripe to consider individual claims. Mr. Kellman made clear on June 4th that he still does not wish to move to reinstate individual claims. The time is still not yet ripe to consider individual claims. Accordingly, we have asked that all of the Trust's defenses continue to be preserved as to the MALC claimants.

3

We note that any suggestion by Mr. Kellman and/or the Trustee that the Trust may now waive its time bar defense implicitly acknowledges that the Trust is still possessed of that defense, as indeed the Trust is.

If the Court decides it has any jurisdiction over the merits, we have also noted that there is no legal basis on which the Club can be forced, without its consent, to agree to or to pay the proposed settlements between MALC and the Trustee. Those proposed settlements are based only upon the CRMC's alleged "evaluations" of MALC's claims; and those evaluations are based only upon the scantiest of alleged medical reports, which even the CRMC recognizes "fall short" of normal standards for medical diagnoses. (CRMC letter dated June 1, 2004, page 4.) In these circumstances, the Court should decline to approve of such settlements.

If the Court holds that MALC and the Trustee may agree to settlements between themselves on the basis of the CRMC's evaluations, we have asked the Court to also make clear that the Trust's time bar defense and all of the Club's defenses are still preserved. As we have noted, the Bankruptcy Court has held that the Club is not *ipso facto* bound by the CRMC's evaluations. (Exhibit 16 to the Club's Opposition to the Joint Motion). This Court should rule the same.

The Club asks that the Court rule in its favor on all points raised in its Opposition and Sur-Reply Opposition Memoranda. The Club reserves all of its rights and defenses, none of which have been waived.

Thank you for your consideration.

Respectfully submitted,

NOURSE & BOWLES, LLP
Attorneys for The American Steamship
Owners Mutual Protection and Indemnity
Association Inc.

By: *[signature]*
Lawrence J. Bowles

LJB/jtc
Encl.
cc:  Bruce Lassman, Esq.                215-580-2151
     Alan Kellman, Esq.                 313-961-1819
     Mr. Lee J. DiCola                  330-966-2147

4

# *Exhibit 7*
# *to LJB Affidavit*

# NOURSE & BOWLES, LLP

One Exchange Plaza
at 55 Broadway
New York, NY 10006-3030
Telephone: (212) 952-6200

Facsimile: (212) 952-0345
E-Mail: reception@nb-ny.com
Web site: www.nb-ny.com

Nourse & Bowles, LLP
115 Mason Street
Greenwich, CT 06830-6630
Telephone: (203) 869-7887
Facsimile: (203) 869-4535

Nourse & Bowles
75 Main Street, Suite 205
Millburn, NJ 07041-1322
Telephone: (973) 258-9811
Facsimile: (973) 258-1480

September 14, 2004

**BY HAND**

Honorable Arthur J. Gonzalez
United States Bankruptcy Judge
United States Bankruptcy Court
The Alexander Hamilton Custom House
One Bowling Green, 5th Floor
New York, NY 10004-1408

RE:    In re Prudential Lines, Inc.
       86 B 11773 (AJG) (Chapter 11)

Dear Judge Gonzalez,

We refer to Mr. Kellman's letter dated September 10, 2004 in which he continues to take one small part of Section 4.05.07(a)(iv) of the Plan out of context and, baselessly ignoring the remainder of the Plan and the applicable law, including the decisions and orders of this court, the District Court and the Second Circuit Court of Appeals, attempts to create new rights for the claimants, while attempting to destroy the contract and other established legal rights of the American Club[*].

The American Club's position is outlined in detail in its Memorandum and Sur-Reply Memorandum, both in Support of its Objections to the Proposed Order, respectively filed on or about April 30 and June 25, 2004.   The Club's position was partially discussed during the conference on July 21, 2004 and was further partially commented upon in our letter dated August 2, 2004.

As outlined in the materials mentioned above:

---

[*] The American Club which here responds to Movants' arguments in support of their Joint Motion concerning set off, etc. reserves all of the rights and defenses it has or may have under the policies and applicable New York law.

Page 2

(i)      the Plan does not provide the Trust with any greater rights under the
         indemnity insurance policies than PLI or any other Club member had or
         could have;

(ii)     the Trustee is obligated by the explicit terms of the insurance policies to
         establish that it has become liable to pay and has actually, and in good faith,
         paid each claim for which indemnity is sought;

(iii)    the American Club is entitled to its set off rights against PLI and the Trust;

(iv)     the law of this case prohibits direct actions against the Club;

(v)      the Joint Motion contravenes both the Plan and the law of this case;

(vi)     MALC's claims were administratively dismissed by Judge Weiner and
         MALC has not moved for reinstatement;

(vii)    most if not all of MALC's claims are time barred; and

(viii)   the Club is not bound by any agreements between the Trust and MALC.

The Trust's Available Cash is less than $300,000 while the Club's off set is
$1,270,980.

The Trust has not established, and given the fact that MALC's claims have been
dismissed and are time barred cannot establish, that it is legally liable to pay any of
MALC's claims. But if it could, and if it actually paid any such claims, which it has not,
the Trust could not seek indemnity from the Club until it had paid out more than
$1,270,980. However, as the Trust's assets are less than $300,000, it simply cannot reach
the threshold for seeking any indemnity from the Club.

MALC has not and cannot reconcile its new arguments with all of the above. It is
also obvious that MALC's latest scheme cannot possibly succeed, unless the Trust can
somehow either recycle its limited cash or force the American Club to make direct
payments to the claimants. But both of those tactics, as MALC concedes, are
impermissible under the law of this case. MALC's new interpretation of one small part
of Section 4.05.07(a)(iv) of the Plan, baselessly attempts to do indirectly what MALC
concedes the Trust cannot legally do directly.

Indeed, granting the Joint Motion would require this Honorable Court to rewrite
the Club's indemnity insurance policies and the Plan as well as overrule its own prior

Page 3

decisions and orders and those of the District Court and the Court of Appeals, none of which is legally permissible.

As the Joint Motion is meritless, it should be denied.

Thank you for your consideration.

Respectfully submitted,

Lawrence J. Bowles

LJB/jtc

cc:   <u>Via Facsimile</u>
      Alan Kellman, Esq.                              1-313-961-1819
      The Jaques Admiralty Law Firm, P.C.
      Adam Wofse, Esq.                                1-516-393-8282
      Jaspan Schlesinger Hoffman LLP
      Lee J. DiCola, Trustee                          1-330-966-2147