Nourse & Bowles, LLP
Attorneys for Plaintiff
Lawrence J. Bowles (LB 5950)
One Exchange Plaza
New York, New York 10006
(212) 952-6200
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------X

|  |  |  |
|---|---|---|
| | : | |
| | : | |
| AMERICAN STEAMSHIP OWNERS | : | 04 Civ. 04309 (LAK) |
| MUTUAL PROTECTION AND | : | |
| INDEMNITY ASSOCIATION, INC., | : | |
| | : | |
| Plaintiff, | : | MASTER REPLY TO |
| | : | ALL COUNTERCLAIMS |
| - against - | : | OF ALL DEFENDANTS |
| | : | |
| Alcoa Steamship Co., Inc. | : | |
| and the Other Entities Listed on Exhibit A | : | |
| to Second Amended Complaint | : | |
| | : | |
| Defendants. | : | |
| | : | |

----------------------------------------------------X

Plaintiff, American Steamship Owners Mutual Protection and Indemnity

Association, Inc. (the "Plaintiff", or "American Club" or "Club" or "Association"),

on behalf of its current members, by and through its attorneys, Nourse & Bowles,

LLP, as and for its reply to the counterclaims of Keystone Shipping Co.

("Keystone") and of each of the other Defendants who have asserted or may assert

counterclaims against the American Club (collectively the "Defendants"), alleges

on information and belief as follows.

**AFFIRMATIVE DEFENSES TO ALL COUNTERCLAIMS**

**I**

**FAILURE OF CONDITION PRECEDENT**

**THE CLUB AND ITS CURRENT MEMBERS HAVE
NO LEGAL OBLIGATION TO PROVIDE THE
MUTUAL INDEMNITY INSURANCE DEFENDANTS SEEK.
ANY OBLIGATION THEY MIGHT OTHERWISE HAVE
HAD TO DEFENDANTS IS EXCUSED
BY DEFENDANTS' REFUSAL TO PAY THEIR AGREED
PRO RATA SHARES OF THE COSTS OF THE
INDEMNITIES FOR THE YEARS IN QUESTION**

**Preliminary Statement**

1.    Each of the mutual indemnity insurance policies under which some or

all Defendants now seek coverage for incurred but not reported occupational

disease claims ("IBNR") arising in the insurance years before February 20, 1989

provide as a condition precedent to any such coverage that each Defendant first be

assessed to pay and pay his proper pro rata share of the cost thereof.  That is the

essence of mutual indemnity insurance.  As Defendants have not paid and have

refused to pay their shares thereof, the Club and its current members have no legal

obligation to provide any indemnities to the Defendants for any occupational

disease claims arising in the insurance years before February 20, 1989 which they have asserted or may in the future assert.

2.     As more fully set forth below, beginning in about the mid 1980s, the Defendants began receiving IBNR claims from seamen and others who had allegedly worked on or about their vessels between about the 1940s and about the mid 1970s. Acting by and through their own senior executives, who were also then the controlling directors of the Club, the Defendants knowingly declined to reopen the previously closed insurance years or assess themselves and the other Defendants in any amounts to cover their liabilities for the belatedly asserted IBNR claims arising from those closed years. Thereafter, in connection with closing further years, Defendants, against the recommendation of the Club's Manager, and others, knowingly under reserved for additional IBNR claims that had been or foreseeably would be asserted against them arising from the insurance years of the mid 1970s through 1988. Instead of reopening the closed years or otherwise establishing proper reserves for their liabilities as additional years were about to be closed, Defendants made discretionary payments to themselves from the Club's general reserves (the "Discretionary Practice"). Defendants compounded their errors by refunding to themselves as "dividends" allegedly "excess" assessments previously made against them to cover their reported and properly reserved for non-IBNR liabilities in the closed or about to be closed years. Defendants' refusal

3

to acknowledge their sole responsibility for their IBNR liabilities arising in the insurance years before 1989 and their refusal to contribute to the costs thereof by assessment or otherwise continues to date and constitutes a failure of condition precedent which excuses the Club and its current members from any future performance.

3.    Defendants claim they have a right to indemnities for their liabilities for IBNR claims in unlimited amount from the Club at the expense of the Club's current members, without any contributions on their part. Defendants' claims ignore the core principle of mutuality to which they agreed when they joined the Club, i.e., they ignore the fact that each of the policies under which the Defendants now claim a right to such indemnities, as insureds, is a mutual, fully assessable one year policy, pursuant to which each Defendant, as an insurer, agreed to contribute his proportionate share of the costs of all such indemnities to all members each year for claims arising in each separate year of his membership.

4.    Defendants also ignore the fact that each of the insurance or policy years in question was closed with a final statement of account which constituted a mutual release between himself and the Club, such that no unreserved for or intentionally under reserved for claims arising in those years may be presented to

4

the Club for indemnity as of right and, conversely, no further assessments may be levied by the Club upon that year's members to provide those indemnities.

5.    Defendants further ignore the point that closed insurance years may be reopened in the event of fraud, mutual mistake or other good cause, and that mutual mistake and other good cause for reopening previously closed insurance years clearly exist in this case.

6.    Defendants' contention that the closing of an insurance year is not a final accounting or a mutual release between them and the Club for the benefit of the Club's current members, and that Defendants are entitled to unlimited indemnities for their IBNR liabilities they may pay, at the expense of the Club's current members, all without any corresponding obligation to pay any assessments and/or pro rata contributions to the Club on Defendants' part, is unfounded in law, without consideration and is, in fact, antithetical to the core concepts of mutuality on which a non-profit, mutual indemnity insurance association such as the Club is based.

7.    To obtain the benefits of the mutual indemnity insurance they seek, the insurance years in which new IBNR claims are asserted (sometimes called the "affected years") must be reopened and the Defendants who were members in those years must be assessed to pay and pay their proper pro rata shares of all

5

indemnities each Defendant may in the future seek (and reopening those years is an alternative part of the relief Plaintiff, on behalf of its current members, seeks in this action). Otherwise the costs of the indemnities the Defendants seek would be improperly shifted to the Club's current members without their consent and contrary to all applicable legal and equitable principles. The Club's current members have not consented to pay and do not consent to pay assessments to the Club to pay Defendants' closed year liabilities arising in the insurance years before February 20, 1989.

**The Club and its Mode of Operations**

8.     The American Club is a non-profit mutual indemnity insurance association of shipowners organized and existing under the laws of the State of New York with its principal place of business in New York, New York; Defendants were members thereof in various years before February 20, 1989. Many of the Defendants continued as members in years thereafter.

9.     The American Club is composed of its members in any open years and is operated by those members for their own mutual benefit to provide indemnity insurance to the members, at cost. The American Club does not seek to amass profits. The guiding principle of mutual insurance of the type in question is "mutuality" not "profit".

10.    Each year, the members of the American Club appoint a Board of Directors from their own memberships whose duty it is to operate the Club. Typically, the members of the Club's Board of Directors are senior executives of and/or hold equity interests in the shipowner members of the Club. At various times, many of the Defendants placed one or more of their senior executives on the Club's Board of Directors; and many of those directors served as either Chairman or Vice-Chairman of the Club's Board of Directors and/or in many cases, also served on and/or chaired the Board's Finance Committee, which functions as an Executive Committee.

11.    By way of example, Defendant, Keystone was a member of the Club between the 1930s and 1997. Its founder and original chief executive officer, Charles Kurz, was Chairman of the Club's Board of Directors for many years. His son, Adolph Kurz, was Chairman of the Club's Board between 1956 and 1970 and Vice Chairman for many years thereafter. Charles Kurz, II, one of Adolph Kurz' sons, served on the Club's Board of Directors between 1975 and 1997. He was Chairman of the Finance Committee and Deputy Chairman of the Board for several years and then Chairman of the Board between 1994 and 1997. Between 1975 and about 1992 both Adolph Kurz and Charles Kurz, II served together on both the Board and on its Finance Committee. On information and belief, Charles Kurz, Adolph Kurz and Charles Kurz, II each held significant equity interests in

7

Keystone. Other members, at times, had multiple executives on the Club's Board of Directors and Finance Committee including Farrell Lines. Its senior executives, Thomas Smith, George Lowman and Richard Gronda all served on the Board together in the 1980s; and on information and belief, those directors held significant equity interests in Farrell Lines.

12.    Pursuant to the Club's Charter and By-Laws, the Club's Board of Directors conducts all of the Club's operations and is responsible for every decision and action of the Club.

13.    To assist the Board in carrying out its functions, it appoints a Manager. Since 1927, the Shipowners Claims Bureau, Inc., (the "Manager" or "SCB") has been periodically appointed or reappointed as Manager. It has provided underwriting, claims handling, accounting and related services to the Club.

14.    The Manager is paid by the Club's members through their premiums and assessments and the Manager is subject to the direction and control of the Club's members acting through the Boards of Directors they appointed in each insurance year.

15.    In the 1980s, the Club had only about 30 members and about half of those members had one or more representatives on the Board. This small collegial

group of directors exercised complete control of the Club and, as will be demonstrated herein and at trial, insofar as the occupational disease claims at issue are concerned, ran it more for their own companies' benefit than for the mutual benefit of all the Club's members, and without regard to the interests of the Club's future members, including particularly the current members. Defendants are responsible for their actions.

**The Assessable Insurance Policies: Defendants' Express Promises to Pay**
**Their Pro Rata Shares of All Indemnities to Members in Each Insurance Year**

16.    In order to provide indemnity insurance to the members at cost, the Club issued to each member in each insurance year, a fully assessable mutual indemnity insurance policy under which the members in each year, through the Club, collectively and mutually agreed to indemnify each other for all insured claims, without limit, occurring in each such insurance year. Thus, each member of the Club is both an insurer and an insured; and in order to obtain the benefits of the mutual insurance provided by the assessable policies in question, i.e., the right to be indemnified with respect to the covered claims they paid, each member undertook to pay his pro rata share of the cost of the indemnity insurance provided through the Club to itself and all other members of that insurance year. Each member's agreement, willingness, ability to perform and actual performance of that undertaking are pre-conditions of coverage, as is the member's payment of the

underlying seamen's claims, etc. in the first instance, prior to seeking any indemnity. The cost of such insurance each year also includes the fees of the Manager as well as all other expenses of operating the Club, such as reinsurance.

17.     Under the Club's Charter, By-Laws and applicable New York law, the members in any one insurance year, in that capacity, are responsible through the Club only with respect to claims arising or occurring in that one year and, without their consent, they have no responsibility whatsoever for any claims arising in any prior or later insurance years. Each insurance year is a separate accounting unit which must stand on its own feet and pay for itself. In each insurance year the Club's overall membership is different, as old members may leave, new members may join and/or continuing members' proportionate shares may change based upon changes in their loss records and/or the number of ships they entered in the Club among other factors. Accordingly, the members' pro rata shares of the full costs of insurance each year also change. For all accounting and practical purposes, the Club is thus an entirely different entity in each insurance year.

18.     The costs of all indemnifications to members for insured claims they pay in each and every insurance year are paid for by that year's members' through their premiums, or "advance calls", and subsequent assessments as the claims against the members in each separate insurance year develop and mature.

19.    The cost of each member's insurance each year is based upon his historical loss record.  The higher his loss record in prior insurance years, the higher the estimated total cost or "ETC" of his insurance in subsequent years.  The ETC of each member each year is charged to him as an initial premium or advance call.  All assessments for each separate year are based upon the ratio of each individual member's ETC that year to the aggregate total of all members' ETC's that year.

## Closing Insurance Years

20.    At a point generally about seven to ten years after the calendar termination of the insurance year in question, when the Board of Directors deems it practicable to estimate with a reasonable degree of certainty the minimum, probable or final surplus or deficiency resulting from all of the Club's mutual insurances in effect for the year in question, under the Club's By-Laws and applicable New York law, the Board of Directors, from time to time, may (a) fix and determine an amount to be declared and paid to the members as a partial or final dividend after retaining such sums as they may deem necessary to meet outstanding policy obligations that year or for the maintenance of reserves and surplus of the Club; or if it appears that claims and expenses for that year have exceeded or will exceed all sums previously collected for that year (b) order an interim or final assessment to be made against the members of that year.  This

11

process, described very generally above, is called "closing" an insurance year. The cost of insurance each year directly affects each member company's profits that year. Thus, the larger the dividends each year, the larger each member company's overall operating profit, and the larger the assessments the lower each member company's overall operating profit.

21.    The corollary to the members' obligation to share *pro rata* the overall cost of all indemnities provided to members or to be provided in any given insurance year is that, at the time a year is closed, the Club is under a legal duty to refund to the members all sums collected by way of assessments above and beyond amounts the Board deems necessary to meet that year's members' reported and reserved for liabilities, or for the maintenance of reserves and surplus of the Club required by New York State. This excess amount is termed the "credit balance".

22.    Prior to the closing of each insurance year, each of that year's members must contribute his share of the reserves to be established for that year to provide future indemnities for all unresolved pending claims known and reported to the Club by that year's members. To preserve mutuality, if a member fails to report a claim, and no reserve is collected from the members that year covering future indemnification(s) for such unreported claim(s), that member has no legal "right" to obtain any indemnity for that claim.

23.    Between insurance years 1946 and 1976, the members in those years received refunds of assessments or "final" dividends from the Club from each insurance year's respective yearly credit balances totaling almost $15 million.  For example in connection with the closing of the 1975 year, in 1985, the Defendants, at their insistence, received their full credit balance of over $850,000 as "final" dividends, and in connection the closing of the 1977 year (in 1988) the Defendants who were members in all of the 1977 year, at their insistence, received over $1.4 million as "final" dividends from that year's credit balance of over $1.5 million. The members in the pre-1989 years also received substantial additional sums as "partial" dividends.

**Final Statements of Account – Mutual Release**

24.    The words in the Club's By-Laws regarding "final" dividends and "final" assessments mean exactly that.  Thus, the closing of an insurance year with a "final" dividend or assessment is, in every respect, a final statement of account between and among the Club and the Club's members in that insurance year, and constitutes a mutual release between the closed year's members and the Club for the benefit of the open years' members and future members.

25.    Upon the closing of any insurance year, ownership of the Club's reserves remaining after distribution of dividends, such as above, pass to the Club,

as representative of the members in the current open years (excluding any member who may leave the Club during those open years).

26.    Under New York mutual indemnity insurance association law, a closed insurance year may not be reopened absent fraud, mutual mistake or other good cause shown.

27.    The Club, as representative of the members in the open years, has no legal obligation to the closed years' members except to provide indemnities to them to the extent the closed years members contributed to establishing proper reserves for their reported, but unresolved, claims arising in the applicable closed year(s).

28.    After an insurance year is "finally" closed and unless and until it is declared reopened, the members of the closed insurance year have no legal "right" to demand any further dividends regarding such year in the form of any indemnities for any unreported, unreserved or negligently or intentionally underreserved for claims arising in such year or for any other purpose for the simple reason that no consideration exists for providing further dividends to pay such claims, as proper reserves had not been collected from the members of that year to cover any such indemnities, at the time the year was closed with a "final" dividend or assessment.    New indemnity claims asserted by members of a

14

previously closed year may be paid as of right only if that year is reopened (for one of the reasons noted above) and all members of that year are assessed to pay and pay their proper *pro rata* shares of such indemnities for the newly asserted claims. Any such indemnity payments may not exceed the amount, if any, actually collected from that year's members (after allowing for the Club's reasonable costs of such assessments).

**Defendants' Mutual Mistakes and/or Intentional Conduct
Benefiting Themselves in Closing Insurance Years Before 1989
<u>Justifies Reopening Each of the Affected Insurance Years</u>**

29.    Until about the early 1980s, as the insurance years of the 1940s, 1950s, 1960s and early 1970s came to be closed, the members in each such insurance year, Plaintiff understands, had no reason to believe or expect that many years later, seamen and others who worked on or about their vessels in those early years would later make and recover on claims against them for injuries allegedly due to exposure to asbestos and/or other products allegedly causing occupational diseases. Based upon what was known as those years came to be closed, it was not unreasonable for the members in those years not to provide reserves for unknown and wholly unexpected claims. Their failure to do so was based on a mutual mistake of fact, i.e., that the then unknown and unreserved for claims of seamen and others would much later be asserted.

30.    Beginning in or about the early 1980s, however, seamen and others who had worked on or about Defendants' vessels in the previously closed years began asserting occupational disease claims, and the number of such claims increased each year thereafter.   In these circumstances, as each further open insurance year from the mid 1970s to 1988 came to be closed (i.e., between the mid 1980s to 1993), the Defendants had the obligation and opportunity to make proper assessments upon each years' members to establish the necessary and proper reserves to cover these members' liabilities for those insurance years.  But Defendants intentionally chose not to do so solely for their own immediate financial benefit.

31.    The Defendants first considered whether to provide some reserves for asbestos and other occupational disease claims when the 1977 insurance year came to be closed in 1988, after ignoring their growing IBNR liabilities for several years.

32.    As noted above, the credit balance for the 1977 year or excess of assessments needed to pay known pending claims (other than IBNR occupational disease claims) for that year was over $1.5 million.   In 1988, the Manager recommended that the entire amount be placed in reserve for the members' emerging IBNR liabilities.  The majority of the Defendants refused, demanding that the entire credit balance be refunded to them for their immediate benefit.

16

Despite the advice of the Manager, Club counsel and others that such amount would not likely be sufficient to cover the actual cost of Defendants' liabilities for IBNR claims that year, as a compromise, the Defendants reluctantly agreed to reserve only $100,000 for the 1977 year. In reserving this small amount, which they were warned would be inadequate, Defendants expressly and/or impliedly promised to make up any shortfall thereon as and when required.

33. After reserving only $100,000 for IBNR for the 1977 year, Defendants distributed to the members that year, including themselves, over $1.4 million in "final" dividends as alleged "excess" of assessments needed to cover that year's liabilities. By doing so, they increased their individual corporate profits by that amount, but they knowingly stripped the Club of funds from the 1977 year that, as the Manager and others had recommended, should have been retained to help cover the indemnities Defendants would later and foreseeably seek for their IBNR liabilities.

34. In 1988 the Defendants also decided that in the future they would also reserve only $100,000 as each year after 1977 came to be closed (except for the 1978 year which had previously been closed without any reserve for IBNR). In 1988 the Club's Manager also recommended that the adequacy of the $100,000 yearly reserve be reviewed in five years' time, but Defendants never did so.

35.    The Defendants' conduct amounted to their taking a substantial, knowing risk that the yearly reserves they established for their IBNR liabilities arising in the 1977 and later insurance years would not be adequate to cover the future indemnities they would later seek from the Club with respect to their IBNR liabilities.    In fact, as foreseen in 1988, $100,000 per year has proven to be inadequate to provide the indemnities Defendants have obtained to date and the deficit will only increase as new claims are presented, all as projected in 1988. Indeed, since the mid 1980s, the Defendants have distributed discretionary payments to themselves of about $6 million in indemnities for their IBNR liabilities and Defendants' additional future claims arising in the closed insurance years before 1989, it is estimated, may exceed another $6 million.    Meanwhile, at a reserve of only $100,000 per year between insurance year 1977 and 1988, (except for 1978) the Defendants have contributed only $1.1 million to the Club's reserves for Defendants' own IBNR liabilities.

36.    In the mid 1980s Defendants also intentionally chose not to reopen any of the previously closed insurance years because that step would have required Defendants to pay, through retroactive assessments against themselves, all of the costs of their IBNR claims arising from such reopened years to the extent they were unfunded, and as outlined above they thus intentionally took the risks that the 1977 and later years were underfunded.    In both cases, Defendants were

18

maximizing their own immediate corporate profits, at the expense of contributing their proper shares to the reserves reasonably required by for the Club to provide indemnities to Defendants regarding their known and/or foreseeable IBNR liabilities. Defendants' mutual mistakes and intentional risk takings amply justify reopening each and every insurance year before February 20, 1989, and assessing the Defendants to cover any future indemnity claims any of them may make with respect to their IBNR claims arising in those years.

## Defendants Created the Discretionary Practice Solely for Their Own Benefit

37.    Rather than reopening the earlier insurance years or properly reserving for the insurance years of 1977 and thereafter, in about the mid-1980s, the Defendants created the Discretionary Practice of reimbursing or indemnifying themselves for their unfunded and intentionally underfunded claims by drawing down upon the Club's general reserves. As Defendants then knew, have always known, and know now, they had and have no legal or equitable right to any such benefits under the Club's Charter, By-Laws, insurance policies or under New York law.

## The Benefits to Defendants of the Discretionary Practice

38.    The Discretionary Practice they created has provided at least three significant financial benefits to the Defendants. First, Defendants, through the Club, which they then controlled, awarded themselves substantial dividends from

19

the Club's general reserves (and in the process, again, minimized their companies' insurance costs while maximizing their own yearly profits).  Since about the mid-1980's, they obtained the financial benefit of about $6 million in indemnity payments while avoiding their proper burden of pro rata assessments which are the concomitant necessity, indeed the condition precedent, for receiving any benefits under the insurance policies in question under the law and the principles of mutuality which govern each of these contracts. The great bulk of these payments were in respect of claims arising in insurance years prior to 1977, for which, to date Defendants have provided no reserves at all.

39.    Second, because the Defendants were never assessed to cover any of the indemnity payments they received, the underlying seamen's claims have never appeared on their individual loss records. (The lower a member's loss record, the lower his share of the future cost of his mutual indemnity insurance.)  Accordingly, the Defendants' loss records since the 1980s have appeared to be substantially lower than they really are, directly resulting in further savings in insurance costs to Defendants in later insurance years (again maximizing Defendants' corporate profits).

40.    Third, the Discretionary Practice has shifted the cost of the Defendants' liabilities to the Club's current members, without their knowledge or

consent, which is contrary to the principles of mutuality and equity under which the Club operates and contrary to New York law.

41.    Defendants now argue that each of the fully assessable mutual indemnity insurance contracts they entered into through the Club with each year's members, before February 20, 1989 became, as a result of the closing of each such insurance year, transformed into an unlimited liability policy, the cost of which must now be covered by the Club's current members, without any contributions from themselves.  To award them the coverage they now demand would amount to major modifications of each of the insurance contracts in question.  There is no consideration to support such windfall benefits to Defendants.

42.    Defendants' position is antithetical to the core concepts of mutuality and equity under New York law under which the Club exists, and wholly ignores the bases under which each of the pre-1989 insurance years was "finally" closed, all as outlined above.

**Failure of Condition Precedent**

43.    As the Defendants have not complied with the conditions precedent of each of their insurance contracts under which they seek benefits, the Club and its current members have no legal obligation to continue the Discretionary Practice, and Defendants are not entitled to any indemnity from the Club for any future pre-

1989 IBNR claims. If the closed insurance years before February 20, 1989 are reopened and Defendants are assessed to pay and pay their agreed proportionate shares of the indemnities sought by the members of each such year, the Defendants seeking such indemnities will be entitled to the benefits thereof, less the Club's reasonable costs of these assessments.

## II

## FAILURE OF CONSIDERATION

44.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 43 as if set forth at length.

45.    By reason of the matters set forth above, Defendants are not entitled to the insurance coverage they seek due to failure of consideration.

## III

## MUTUAL MISTAKE

46.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 45 as if set forth at length.

47.    The insurance years of the 1940s, 1950s, 1960s and early 1970s which were closed prior to about the early 1980s were closed on the basis of a mutual mistake of fact – no one knew or expected that the asbestos etc. claims would later

22

be asserted. Accordingly, the Club and its current members have no liability under the policies in question.   The Defendants' mutual mistake of fact in connection with their "final" closings of all insurance years before the mid 1970s and before Defendants learned of their IBNR liabilities, justifies the reopening of each affected insurance year. If the years in question are reopened and the members of each of those years are assessed to pay and pay their proper *pro rata* shares thereof, the Defendants will be entitled to the benefits thereof as outlined above.

## IV

### INTENTIONAL ASSUMPTION OF RISK

48.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 though 47 as if set forth at length.

49.    As to all insurance years after about the mid 1970s, closed by Defendants in about the mid 1980s and thereafter, after they had knowledge of the assertion of occupational disease claims against them, the Defendants intentionally failed to establish either any reserves or the proper reserves to cover their liabilities arising in those newly closed insurance years.  The Defendants' intentional assumption of the foreseeable risks in connection with their closings of the insurance years between the mid 1970s and 1989, after Defendants learned of their IBNR liabilities, and/or their express or implied promises to make up the

23

foreseeable short fall of the nominal reserve of only $100,000 per year they

established for the 1977 and 1979 – 1988 insurance years, justifies the reopening

of each affected insurance year.  As defendants intentionally assumed the risk that

such reserves would not be adequate to indemnify them for their foreseeable IBNR

liabilities, they are not entitled to any indemnities from the Club or its current

members with respect to those liabilities.  If the years in question are reopened and

the members of each such year are assessed to pay and pay their proper *pro rata*

shares thereof, the Defendants will be entitled to the benefits thereof, as outlined

above.

**V**

**<u>FINAL STATEMENT OF ACCOUNT AND MUTUAL RELEASE</u>**

50.    Plaintiff repeats and realleges the allegations contained in paragraphs

1 through 49 as if set forth at length.

51.    The closing of each of the insurance years in question before 1989

with a "final" dividend or assessment constituted a final statement of account and a

mutual release as between Plaintiff and the Defendants for each of those years for

the benefit of the Club's then future and current members.  The Club and its

current members have no obligations to indemnify the Defendants in respect of any

future pre-1989 IBNR occupational disease claims known or unknown and not

24

reserved for or inadequately reserved for to date. If the affected insurance years are reopened and the members thereof are assessed to pay and pay their proper *pro rata* shares thereof, the Defendants will be entitled to the benefits thereof, as outlined above.

**VI**

**THE PLAINTIFF'S ACTIONS HAVE NOT RESULTED
IN AFFIRMATION OF OR MODIFICATION TO
THE DEFENDANTS' INSURANCE CONTRACTS OR ANY WAIVER
OF THE RIGHTS OF THE CLUB'S CURRENT MEMBERS
BECAUSE THE CLUB'S CURRENT MEMBERS WERE NOT
AWARE OF THE GENESIS OF THE DISCRETIONARY
PRACTICE AND DID NOT KNOWINGLY CONSENT TO
<u>ITS IMPROPER EFFECTS UPON THEM</u>**

52.    Since 1988 the Club's membership and the membership of the Board of Directors have changed substantially, as has the staff of the Managers. For example, in 1988 the Club had about 30 members, all American shipowners. At present, the Club has 405 members, worldwide. Only two of the members in 1988 are still members today, and only one of them, Farrell Lines, had knowledge of and benefited from the Discretionary Practice. None of the directors in 1988 are still directors in 2004. Few of SCB's staff in 1988 remain.

53.    Until about May 2004, except for the director appointed by Farrell Lines, none of the remaining directors or members had any knowledge of the genesis of the Discretionary Practice created by Defendants or its improper effect

upon the current members, i.e. shifting Defendants' liabilities to them.  Until about May 2004 when the genesis of the Discretionary Practice and its improper effects upon them were disclosed to them, all current members and directors, except Defendant Farrell Lines, mistakenly believed the indemnities paid to Defendants were legally required (and Farrell Lines knew from the beginning that the Discretionary Practice was purely discretionary).

54.    The Defendants never disclosed to any new Club member either the genesis of the Discretionary Practice or its negative effects upon them.  In fact some new members were specifically told that they would not be required to pay any part of the Defendants' liabilities for asbestos and other occupational disease claims.

55.    As soon as the Club's current members were informed of the genesis of the Discretionary Practice and learned of its improper effect upon them, on or about May 25, 2004, they immediately and rightfully objected to its continuation because it is inequitable and otherwise wrong as to them.  At a special Board of Directors' meeting called to consider the issue on May 25, 2004, in their discretion, all but one of the current directors voted to terminate the Discretionary Practice.  The only member of the Board who voted to continue the Discretionary Practice was the representative of Farrell Lines' successor, a member/Defendant

which has since the mid 1980s benefited very substantially from both the Discretionary Practice and Defendants' previous intentional failures to reopen any previously closed years or to provide proper reserves as the 1977 and later insurance years came to be closed.

56.    Accordingly, as the Club's current members (other than Farrell Lines) did not knowingly or intentionally relinquish any known rights with respect to or knowingly consent to the continuance of the Discretionary Practice, their rights were not waived and the current Club members are not estopped to terminate the Discretionary Practice.

57.    In these circumstances, (1) the court should affirm the right of the Club, on behalf of its current members to terminate the Discretionary Practice and (2) hold that if the Defendants wish the benefits of the only insurance contracts that exist, i.e., the fully assessable mutual indemnity policies they entered into for each relevant insurance year before February 20, 1989, each of the insurance years in question should be reopened and the members of those years should be assessed to pay and be required to pay the costs of indemnifying the Defendants with respect to any future IBNR claims any of the Defendants may submit.    The Defendants would be entitled to the benefits of those assessments less the Club's reasonable costs in connection therewith.    These steps would restore the mutuality required

27

between the members before 1989 and those thereafter pursuant to the Club's Charter, By-Laws insurance policies and applicable New York law.

## VII

## <u>ESTOPPEL</u>

58.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 57 as if set forth at length.

59.    At all relevant times all Defendants knew that the practice of reimbursing themselves in respect of their IBNR obligations from the Club's general reserves without any contribution on their part was, in fact and law, purely discretionary and not consistent either the "final" statements of account on the closing of each year or with the core concepts of mutuality and equity expressed and implied in the insurance policies at issue, the Club's Charter, By-Laws or New York law, and was thus subject to termination at any time in the discretion of the Club's Board of Directors, and Defendants are now estopped to deny that fact.

## VIII

## <u>WAIVER</u>

60.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 59 as if set forth at length.

61.    By Defendants' own actions taken for their own benefit in failing to reopen the closed insurance years in question commencing in about the early 1980s so as to assess each Defendant/member of each such insurance year his *pro rata* share of the indemnity for IBNR claims, and in Defendants' intentional and knowing failure in the 1980s to establish proper reserves in the 1977 and later insurance years to cover the indemnities for their liabilities they have sought and continue to seek from the Club, the Defendants waived any right they may have had to demand indemnity for such claims then and in the future for so long as the affected insurance years remain closed.

## IX

## FAILURE TO STATE A CLAIM

62.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 61 as if set forth at length.

63.    Defendants' counterclaims fail to state claims upon which relief can be granted.

29

## X

## THE PRUDENTIAL LINES CASE HAS NO *RES JUDICATA* EFFECT: BY DEFENDANTS' CHOICE THE ISSUES IN THE PRESENT CASE WERE NOT LITIGATED OR RESOLVED IN PRUDENTIAL

64.    In or about 1986, Prudential Lines, Inc., ("PLI") the successor of Grace Lines, Inc., a long-term Club member, went into bankruptcy, and the PLI Trust was formed.  The Prudential trustee in bankruptcy, Mr. DiCola, sued the Club shortly thereafter seeking coverage for asbestos claims asserted against the Trust by seamen who had worked on Grace Lines and PLI vessels many years earlier.

65.    Prior to filing in bankruptcy, Prudential Lines and Grace Lines were always represented on the Club's Board of Directors and, over the years, participated in closing the insurance years of the 1940s to mid 1970s and benefited from the substantial "final" dividends or refunds of assessments to their companies obtained thereby, all as set forth above.

66.    After Prudential Lines' Trustee sued the Club, and at a time when the Defendants still controlled the Club, the Defendants were faced with a choice:

(a)    Terminate the Discretionary Practice and move to reopen all affected closed insurance years on the grounds of their mutual

30

mistakes of fact or their intentionally taken risks regarding closing the affected years and cause the Defendants/members of each of those affected insurance years to be assessed to pay and pay their proper *pro rata* shares of their liabilities (which is what the Club's current members contend was the only proper thing that the Defendants should have done). However, taking that choice would have meant that the Defendants would then have had to retroactively pay assessments for their own *pro rata* shares of all future indemnities regarding pre 1989 IBNR claims the Defendants sought or would seek from the Club (thus significantly increasing their own insurance costs and thus reducing their current corporate profits).

(b)   Continue the Discretionary Practice, taking the risk that Prudential Lines and other bankrupt former members might benefit from it. Taking this choice would mean that Defendants could attempt to continue to obtain the benefits of the Discretionary Practice, i.e., continue awarding themselves dividends from the Club's general reserves without contributing their agreed shares to the indemnities for their liabilities for IBNR claims.

67.    Defendants chose not to terminate or otherwise challenge the Discretionary Practice in connection with the Prudential Lines case – again choosing to immediately benefit themselves at the actual and/or potential expense of future members of the Club. And as to Prudential Lines, they simply asserted other available policy defenses.

68.    In these circumstances, Defendants' own decisions taken for their own benefit not to contest the Discretionary Practice in the <u>Prudential Lines</u> case prevents any *res judicata* effect on that issue in this litigation.

## XI

**PRUDENTIAL LINES HAS NO *RES JUDICATA* EFFECT ON THE ISSUE OF SINGLE VERSUS MULTIPLE DEDUCTIBLES, EITHER BECAUSE THAT DECISION IS LIMITED TO ITS FACTS, OR BECAUSE THAT DECISION IS BASED ON A MISTAKEN PREDICTION OF NEW YORK LAW, WHICH HAS SINCE DEVELOPED IN A MANNER INCONSISTENT WITH <u>PRUDENTIAL</u> AND <u>PRUDENTIAL</u> IS, THEREFORE, <u>NOT GOOD AUTHORITY FOR DEFENDANTS' ARGUMENTS</u>**

69.    In the Prudential Lines case, the Defendants, who then controlled the Club, sought to bind Prudential to that part of the Discretionary Practice which required that each seaman's claim against each member be allocated among the policy years of that seaman's service on the members' vessels, that the deductible applicable to each such policy/year be applied, and that each member pay the balance before they could seek indemnity from the Club.

32

70.    Based upon the facts in the Prudential case, the Courts found, as a fact, that Prudential Lines itself had not "acquiesced" in the Club's practice of claim allocation and application of multiple deductibles, a fact specific holding that does not apply to most of the Defendants.    Indeed, all Defendants who were members of the Club between about the mid 1980s and the present repeatedly acquiesced in that part of the Discretionary Practice regarding deductibles until the decision in the Prudential Lines case and many, including Farrell Lines, continued to so acquiesce thereafter.

71.    More importantly, in Prudential, the Second Circuit mispredicted how the Courts of the State of New York would ultimately resolve the issues of allocation of claims over multiple policy years and application of all relevant deductibles.    Mispredicting New York law, the Second Circuit erroneously held that Prudential Lines' Trustee could designate any one of the affected indemnity insurance policies to respond in full, and thus pay or absorb only one deductible per seaman's claim no matter how many years the seaman was allegedly exposed to asbestos while working on Prudential/Grace Lines' vessels (the "Prudential approach").

72.    Since the decision in Prudential Lines, the Courts in New York and elsewhere have firmly rejected as erroneous the concept that all liabilities allegedly

arising from injuries continuously occurring over a span of time, and thus over the span of multiple insurance policies/years, can be "shoehorned" into any one policy of an insured's choosing.

73.    The New York and other courts have held that the only fair and proper approach is to allocate liability in the first instance among all relevant policy years, and apply all deductibles as are required by the insurance policy for each affected year.  That part of the Discretionary Practice requiring allocation of claims to all affected policy years applying the deductibles agreed to in each year has always been consistent with New York law and is fair.

74.    Again, most if not all the Defendants other than PLI and any other Defendant(s) who ceased being members of the Club before about 1986 – 1988 acquiesced to the multiple deductible practice. In these circumstances, if, hypothetically, Plaintiff is not permitted to terminate the Discretionary Practice, then whether or not the Club is permitted to reopen the pre 1989 insurance years, it should be entitled to continue the above part of the Discretionary Practice regarding deductibles, as it is fair, equitable and consistent with New York law, including the requirement for mutuality.

75.    As there have been no payments to the Prudential Lines' Trustee under the decisions in the Prudential Lines case regarding allocation of claims and

34

application of multiple deductibles, and thus neither Plaintiff nor Defendants have changed their positions or done anything in reliance upon those decisions, it is open to the federal courts to reconsider their decisions in light of the more recent decisions of the New York Courts reaching a contrary result. In fact, the Club will seek that relief at the earliest opportunity.

## XII

## DEFENSES SPECIFICALLY APPLICABLE
## TO DEDUCTIBLE ISSUES

76. To the extent some Defendants have sought or may seek the refund of any deductibles they absorbed in excess of the one of the their choice under the Prudential Lines approach and such refunds are not barred for the reasons outlined above, (1) Defendants' claims for such refunds are time barred in whole or in part because such refunds were not sought within the time permitted in the insurance policies in question and/or are barred on grounds of (2) accord and satisfaction; (3) laches; (4) waiver; (5) estoppel and/or (6) each of the affected insurance years should be reopened and the claims reallocated to the proper years' members and those members assessed to pay and required to pay their proper shares thereof.

## XIII

### THE FACT THAT THE CLUB JOINED THE INTERNATIONAL GROUP AS OF FEBRUARY 20, 1989 AND THEREAFTER THE CLUB'S MEMBERS MUST COMPLY WITH THAT GROUP'S REQUIREMENTS CAUSES NO UNFAIRNESS OR LACK OF MUTUALITY TOWARDS DEFENDANTS

77.    As of February 20, 1989, under the leadership of the Defendants who controlled the Club, including Keystone, the Club became a member of the International Group of Protection and Indemnity Clubs (the "International Group"), which Group, itself, is a form of non-profit mutual indemnity insurer.

78.    As a result of joining the International Group, the American Club and its members agreed thereafter to comply with the practices and procedures of the other International Group members.

79.    The benefits of joining the International Group include obtaining reinsurance from other Group members because indemnity claims of members of Clubs in the Group above certain levels are "pooled" and each Group member must pay a proportionate share thereof.    The cost of membership in the Group includes the Club's agreement to share and paying its shares of the of costs of all contributions to the pooled claims of other International Group members; and the members of the Club after February 20, 1989 have been assessed to cover the American Club's shares of the costs of such pooled claims.

80.    One of the International Group's requirements is that occupational disease claims arising in closed insurance years be dealt with as follows:

   (a)   Liability is deemed to have been incurred uniformly over the period of exposure.

   (b)   One deductible will apply for each Club the owner may have been entered with regardless of the number of years involved.

   (c)   The deductible to be applied is:

   (i)   The deductible in force for the year suit (writ) is filed or if not in suit, the deductible in force in the year the claim is settled.

   (ii)   If the owner has left the Club prior to suit being filed (or claim settled) the deductible in force in the last year the owner was entered in the particular Club.

81.    Since 1989, the above requirements have been followed by the Club and its members, including some of the Defendants.

82.    By stipulation, the Defendants, some of whom remained members of the Club after February 20, 1989 and new members joining thereafter are entitled to the benefits of the American Club's being a member of the International Group. They are also, of course, subject to the obligations noted above. Members of the

37

American Club before February 20, 1989, i.e., the Defendants, are neither entitled to the benefits of the International Group membership nor are they subject to any of the obligations of such membership.

83.    The application of the Rules of the International Group to the American Club's members after February 20, 1989 is thus not unfair in any way to the American Club's members before February 20, 1989.

## XIV

### POLICY TERMS, EXCLUSIONS, CONDITIONS AND LIMITATIONS

84.    Defendants' claims are barred, in whole or in part, by the terms, exclusions, conditions and limitations contained in the insurance policies issued by the Club, the Club's Charter and By-Laws and applicable New York law.

## XV

### OTHER INSURANCE

85.    To the extent any Defendant may have other insurance that is applicable to the Defendants' claims, including insurance as members of the Club in other years, the liability of the American Club under each of the policies, if any, is limited by the "other insurance" provisions of the policies.

## XVI

## EXHAUSTED LIMITS

86.    To the extent the limits of the Policies are exhausted, the Club has no obligation to reimburse Defendants.

## XVII

## LACK OF GOOD FAITH AND
## FAIR DEALING

87.    Every contract entered into in New York includes an implied term requiring good faith and fair dealing by all parties thereto.  The Club has no obligation to indemnify Defendants to the extent they have failed to act in a manner consistent with their obligations of good faith and fair dealing.  As outlined herein Defendants' conduct in connection with the closings of insurance years after they became aware of their liabilities for IBNR claims etc. were not consistent with their obligations of good faith and fair dealing.  Accordingly, the Club has no obligation to Defendants to indemnify them regarding their pre-1989 IBNR liabilities.

## XVIII

## RESERVATION

88.    Plaintiff respectfully reserves the right to amend this Reply to assert such additional defenses to Defendants' counterclaims as it deems necessary

39

during or upon conclusion of its investigation and discovery of Defendants'

counterclaims.

## MASTER REPLY TO ALL COUNTERCLAIMS

89.    Defendants Keystone and each of the Defendants who have filed

counterclaims have each asserted the same or substantially the same counterclaims.

In these circumstances, Plaintiff's replies to Keystone's counterclaims are intended

to be and are replies to all counterclaims all Defendants have filed or may file.  For

convenience, the allegations of Keystone's counterclaims all are repeated, in bold,

and Plaintiff's replies follow.  To the extent any Defendant has made any different

or additional allegations than Keystone, Plaintiff denies each such allegation.

90.    To the extent that any of Defendants' allegations are inconsistent with

either the allegations in Plaintiff's Second Amended Complaint herein or as

alleged in paragraphs 1 through 88 of this Reply, Plaintiff denies each such

allegation.

**74.  The counterclaims alleged below seek (a) a declaratory judgment, adjudicating Defendants' rights and the Club's obligations under Pre-1989 Policies issued by the Club to Defendants, their predecessors, successors and/or affiliated companies, with respect to Occupational Disease Claims (as defined below) and Defendants' freedom from further assessments under any such Policies, and (b) damages for breach of contract, breach of the implied covenant of good faith and fair dealing, violation of New York General Business Law §349 and other relief arising out of the Club's unjustified**

refusal to pay on and after June 7, 2004, any Occupational Disease Claims under Pre-1989 Policies.

91.    Plaintiff denies the matters alleged in paragraph 74 of the counterclaims and denies that Defendants are entitled to the relief requested.

75.    Keystone Shipping Co. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Wilmington, Delaware.  Through various entities Keystone Shipping Co. is an owner and operator of shipping vessels.

76.    Chas. Kurz & Co., Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Wilmington, Delaware.  Through various entities Chas. Kurz & Co., Inc. is an owner and operator of shipping vessels.

77.    Baldbutte Shipping Company, Chestnut Shipping Company, Chilbar Shipping Company, Fredericksburg Shipping Company, and Margate Shipping Company are corporations organized and existing under the laws of the State of Delaware with principal places of business in Wilmington, Delaware.

78.    Keystone Tankship Corporation is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Wilmington, Delaware.

79.    Marine Transport Lines, Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Seacaucus, New Jersey and through various entities is an owner and operator of shipping vessels.

80.    Marine Chemical Navigation Co. LLC is an entity organized and existing under the laws of the State of Delaware with its principal place of business in Seacucus, New Jersey and through various entities is an owner and operator of shipping vessels.

81.    Marine Sulphur Shipping Co. LLC is an entity organized and existing under the laws of the State of Delaware with its principal place of

business in Seacucus, New Jersey and through various entities is an owner and operator of shipping vessels.

82. BP America Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Warrenville, Illinois, and through various entities is an owner and operator of shipping vessels.

83. Atlantic Richfield Co. is organized and existing under the laws of the State of Delaware with its principal place of business in Warrenville, Illinois and is an owner and operator of shipping vessels.

84. Standard Oil Co. (Ohio) is organized and existing under the laws of the State of Ohio with its principal place of business in Warrenville, Illinois and is an owner and operator of shipping vessels.

85. The Cleveland-Cliffs Steamship Company is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Cleveland, Ohio. It was at all material times the owner of vessels insured by the Club under policies issued for the 1977 through 1985 Policy Years.

86. Ispat Inland Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in East Chicago, Indiana, and through various entities is an owner and operator of shipping vessels.

87. American Steamship Company is a corporation organized and existing under the laws of the State of New York with its principal place of business in Williamsville, New York, and through various entities is an owner and operator of shipping vessels.

88. Sea Mobility Inc. was a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Virginia and was duly dissolved on or about December 21, 2001.

92.    Plaintiff denies knowledge or information sufficient to form a belief as to the matters alleged in paragraphs 75 through 88 of Keystone's counterclaims and the equivalent allegations of each other Defendants' counterclaims.

**89. The Club is a corporation organized pursuant to and existing under the New York Insurance Law Article 41 as a mutual company and in that capacity has issued marine P&I policies to shipowners and charterers that become members of the Club under assessable policies in more or less the same form.  Pursuant to New York Insurance Law §108, the Club is also subject to the New York Business Corporation Law and maintains a principal place of business in New York, New York.**

93.    Plaintiff avers that the American Club is a non-profit corporation, and otherwise admits the generality of the matters alleged in paragraph 89 of the counterclaims.

**90. The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1333(1) because it is an admiralty or maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.  In addition, this Court has supplemental jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1367(a).**

**91. Venue in this judicial district is proper under 28 U.S.C. §§1391(b)(1) and 1391(b)(2) because the Club resides in this judicial district and a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.**

**92. Defendants, as defined above, as themselves or through various entities related to them, ceased being members of the Club at various times prior May 25, 2004 and in most cases many years before that date, except for American Oil Co. who upon information and belief was never a member of the Club.**

94.    Plaintiff admits the matters alleged in paragraphs 90, 91 and 92 of the counterclaims.

**93. The Pre-1989 Policies constitute a promise by the Club to indemnify Defendants against any loss, damage or expense, which a Defendant becomes liable to pay by reason of its ownership, operation, management, chartering or other enumerated connection with a designated insured vessel resulting from occurrences during the policy year designated in the Policy.  Specifically, the Policies provide:**

> **The [Club] agrees to indemnify the Assured [*i.e.*, Defendant] against any loss, damage or expense which the Assured shall become liable to pay and shall pay by reason of the fact that the Assured is the owner (or operator, manager, charterer, mortgagee, trustee, receiver or agent, as the case may be) of the insured vessel and which shall result from the following liabilities, risks, events, occurrences and expenditures: . . . Liability for . . . loss of life of, or personal injury to, or illness of any person . . . .**

95.    As to paragraph 93 of the counterclaims, Plaintiff admits that the pre-1989 policies contained substantially the quoted language and Plaintiff refers to the policy terms for precision; Plaintiff admits that while an insurance year was open, if the members/Defendants complied with all of the terms and conditions of their insurance policies and the Club's By-Laws, they were entitled to the indemnities provided in those policies, less the applicable deductibles for each relevant policy each year; Plaintiff denies that Defendants were or are entitled to any such indemnities with respect to previously unreported unreserved or inadequately reserved claims arising in any closed insurance year before February 20, 1989.

Plaintiff avers that if such insurance years are reopened and the members of each insurance year, including Defendants, are assessed to pay and pay their proportionate shares of the indemnities sought, net of applicable deductibles, the Defendants would then be entitled to whatever amounts may be collected from the other members in any reopened insurance year, less the Club's reasonable fees and expenses in collecting such assessments from the affected year's members, and Plaintiff denies the remaining matters alleged.

**94.    The Pre-1989 Policies are assessable policies issued under the Club's By-Laws, which govern the Club's authority to issue assessable policies, to make assessments thereunder, and to terminate the Assured's liability for further assessments thereunder.**

**95.   In particular, the policies provide:**

> **The Assured are subject to a contingent liability hereunder for assessment without limit of amount for their proportionate share of any deficiency or impairment as provided by law and fixed in accordance with the by-laws of the [Club]; provided, however, that any such assessment shall be for the exclusive benefit of holders of policies which provide for such a contingent liability, and the holders of policies subject to assessment shall not be liable to assessment in an amount greater in proportion to the total deficiency than the ratio that the deficiency attributable to the assessable business bears to the total deficiency.**

96.    As to paragraphs 94 and 95 of the counterclaims, Plaintiff admits that the pre-1989 policies are assessable and contain substantially the quoted language

and Plaintiff refers to the policies for their precise terms; Plaintiff admits the pre-1989 policies were issued in conformity with the Club's By-Laws and New York law which give the Club authority to issue assessable policies and to levy assessments thereunder; Plaintiff admits that in certain circumstances, not relevant here, and if specifically authorized by the affected years' members, or, if otherwise appropriate, the Club could terminate a member's or former member's liability for further assessments under such policy; Plaintiff denies that the Defendants' liabilities for further assessments have been released, waived or terminated in any way, and denies the remaining matters alleged.

**96. Article VI, Section 3 of the By-Laws (as amended September 18, 1987) (the By-Laws have been amended over time but the sections quoted herein, upon information and belief, do not appear to have substantially changed) provides:**

> **For the purposes of declaring dividends and making assessments the business of the [Club] shall be divided into insurance years . . .**

**The insurance years referred to in this By-Law have coincided with the policy periods under the insurance policies issued by the Club during all relevant times.**

**97. Article VI, Section 4 of the By-Laws provides:**

> **From time to time after the termination of each insurance year, when the manager shall determine that it is practicable to estimate with a reasonable degree of certainty the minimum, probable or final surplus or deficiency resulting from all of the [Club's] insurances in effect during such insurance year, the manager shall place before the board of directors a**

46

> statement of such financial results of insurances, segregated between assessable and non-assessable business. After receipt of any such statement, the board of directors from time to time may (a) fix and determine an amount to be declared and paid as a partial or the final dividend, after retaining such sums as they may deem necessary to meet outstanding policy obligations or for the maintenance of reserves and surplus of the [Club], or (b) order an interim or *the final assessment to be made against the holders of assessable policies,* fix the due date of such assessment, determine the rate of interest that shall be added to and become a part of any delinquent assessment, and otherwise provide for enforcement and collection thereof. (Emphasis added.)

97. Plaintiff admits the generality of the matters alleged in paragraphs 96 and 97 of the counterclaims, and refers to the referenced documents for their precise terms.

**98. The Pre-1989 Policies provide occurrence-based coverage and therefore permit claims to be made thereunder without any time limitation as to when claims can first be made against the insured and still be covered by the policy.**

98. As to paragraph 98, Plaintiff admits that the pre-1989 policies provide occurrence-based coverage; Plaintiff refers to each policy for its precise terms and conditions; denies the remaining matters alleged as inaccurate legal argument which is contrary to the Club's Charter, By-Laws and applicable New York law, and refers to the allegations of Plaintiff's Second Amended Complaint herein and the allegations in paragraphs 1 through 88 of this Reply.

47

**99.   The Pre-1989 Policies have no aggregate limit, only a per-claim limit, and therefore contain no language or provision limiting the Club's liability thereunder.**

99.    As to paragraph 99 of the counterclaims, Plaintiff avers that each of the pre-1989 policies contains an "insured sum" and other terms and refers to each policy for its precise terms and conditions and denies the remaining allegations as inaccurate legal argument which is contrary to the Club's Charter, By-Laws, insurance policies and applicable New York law.

**100.  The Pre-1989 Policies do not limit the recourse of the policyholders against any assets of the Club or to the amount collected by way of premiums and assessments from holders of policies issued to all policyholders for the same policy year.**

100.  As to paragraph 100 of the counterclaims, Plaintiff refers to each policy for its precise terms and conditions and denies the Defendants' allegations as inaccurate legal argument which is contrary to the Club's Charter, By-Laws, insurance policies and applicable New York law.

**101.  In the event that the aggregate losses paid by the Club under all Pre-1989 Policies for any open policy year exceed the amounts collected from policyholders for that year through premiums and assessments, the Club, acting through its Board of Directors, has the discretionary authority under the By-Law, Article VI, Section 4 to levy additional assessments on the policyholders for that year to cover the deficiency on an interim or final basis. Likewise, if such amounts collected from policyholders exceed such losses, the Club, again acting through its Board of Directors, has discretionary authority under the same By-Law provision to refund some or all of the surplus to those policyholders or to decide not to do so.**

102. If the Club's Board of Directors determines to make an assessment for any policy year, the assessments are made against all policyholders for the policy year in issue and are prorated on the basis of the relative amounts of the initial premiums paid under such policies by each policyholder for such policy year. In other words, assessments for a particular policyholder are not predicated upon claims experience of that policyholder standing alone, but upon the basis of the aggregate claims experience of all policyholders for that policy year.

103. Thus, as long as a policy year is kept open by the Club, the Club is fully protected against any aggregate deficiency resulting from all claims payments to all policyholders for that year. In so doing, the Club can protect itself against losses caused by claims arising many years after the policy year in question has passed by making additional assessments of policyholders for that year based on the continuing aggregate claims experience of all policyholders for that policy year.

104. The Club's Board of Directors' business decision to keep a policy year open for assessment purposes can also be a benefit for policyholders because assessments can be deferred until they are actually needed to pay claims under the policies in issue. If the assessments in hindsight are larger than necessary to pay all losses for the policy year, the Club, acting through its Board of Directors, may decline to refund any resulting surplus and instead retain the surplus as capital for the Club's operations including the payment of claims for other policy years. By deferring the closing of a policy year and the making of a final assessment, policyholders can avoid concerns about being over-assessed and therefore making payments not needed to cover payment of actual claims and earn investment income on their funds that would otherwise be used for payment of assessments.

105. However, the Club's Board of Directors' business decision to keep a policy year open may not always be viewed as advantageous to the Club's business interest in maintaining its existing members and in attracting new members, because both constituencies do not want to have exposures for contingent liabilities under their policies by way of assessments for the indefinite future.

106. Thus, as noted, the By-Laws provide for the closing of policy years with so-called "final assessments" by action of the Club's Board of Directors based upon a report and recommendation from the Club's professional claims

manager that it is practicable to estimate the losses for the policy year in issue. Once a policy year has been declared closed by the Club's Board of Directors, under the By-Laws, no further premium or assessment can be levied upon the policyholders with respect to that policy year, even if the operations for that year result in an ultimate deficiency to the Club.

107. After a policy year has been closed, the Club's balance sheet is updated to transfer all amounts received by way of premiums and assessments after payment of claims for that year into either case reserves for that year, reserves for incurred but not reported losses ("IBNR") for that year, or general reserves not dedicated to any particular policy year. These reserves, however, do not result in the imposition of any security interest or charge on specified assets or the segregation of any assets. All funds collected from the assessment of policyholders are assets of the Club, subject to the claims of all of its creditors including but not limited to policyholders for claims payments under their respective policies.

101.  Plaintiff denies the matters alleged in paragraphs 101, 102, 103, 104, 105, 106 and 107 of the counterclaims and refers to the allegations of Plaintiff's Second Amended Complaint herein and paragraphs 1 through 88 of this Reply for more accurate descriptions of the Club's operations and procedures.

108. The Club's Board of Directors' determination to close a policy year with a "final" assessment or dividend does not terminate the Club's continuing obligations under the policies for that policy year, unless the policyholder agrees to releases of policy coverage. Upon information and belief, the Club has neither sought nor obtained any releases of policy coverage for any of the Pre-1989 Policies.

102.  Plaintiff denies the matters alleged in paragraph 108 of the counterclaims and avers that the closing of a policy or insurance year with a "final" dividend or assessment is a final statement of account and mutual release as between the members that year and the Club with respect to both claims by the

50

member and assessments by the Club for such year; Plaintiff avers that a policy or insurance year may be reopened in the event of fraud, mutual mistake or other good cause shown; and Plaintiff avers that each time a member of a closed year seeks indemnities for unreported, unreserved or underreserved claims he is, in effect, demanding that the Club reopen such year and consenting to the assessments necessary to provide such indemnities, which is the only proper, mutual and equitable approach consistent with the Club's Charter, By-Laws, insurance policies and New York law.

**109. Seamen have asserted claims that are still pending and will likely in the future assert additional claims against Defendants seeking damages resulting from their alleged exposure to asbestos, benzene, noise and other substances or conditions on board or in working in or about vessels owned, chartered, operated or managed by one or more Defendants during one or more of the Pre-1989 Years ("Occupational Disease Claims").**

103.  Plaintiff admits the generality of the matters alleged in paragraph 109 of the counterclaims.

**110. The Club has continuously represented expressly and impliedly to policyholders that closing policy years does not impair their coverage rights under the Pre-1989 Policies and that policyholders of those Policies would continue to be insured under those Policies for the Pre-1989 Years. Defendants and other policyholders of Pre-1989 Policies have relied upon these representations by, among other things, not seeking available coverage alternatives.**

104.  Plaintiff denies the matters alleged in paragraph 110 of the counterclaims; avers that if, during the pendency of the Discretionary Practice

commenced by Defendants for their sole benefit, any representations were made to Defendants by any other Defendant or at Defendants' behest, neither the Plaintiff nor its current members are responsible therefor; and refers to the allegations of Plaintiff's Second Amended Complaint herein and the allegations in paragraphs 1 through 88 of this Reply.

**111. For over twenty years the Club has consistently recognized that it is legally obligated to pay for Occupational Disease Claims arising from the Pre-1989 Years, despite the fact that each such year had been closed with a "final assessment," and, in recognition of its obligation to the policyholders, has paid hundreds, if not thousands, of such claims to policyholders. Upon information and belief, the Club has submitted claims for reimbursement for some payments to its own re-insurers under its own reinsurance and stop-loss policies and in so doing represented to such re-insurers that the Club had become legally obligated to make such payments under one or more of the Pre-1989 Policies.**

105. Plaintiff denies the matters alleged in paragraph 111 of the counterclaims, and refers to the allegations of Plaintiff's Second Amended Complaint herein and the allegations in paragraphs 1 through 88 of this Reply; admits that, before, for the reasons outlined above, the Discretionary Practice was properly terminated, and consistent with the Discretionary Practice commenced by Defendants (for their sole benefit) in connection with indemnifying Defendants regarding IBNR claims and for their further benefit and as directed by Defendants, the Club submitted some claims for reimbursements to reinsurers to provide the indemnities in question to Defendants.

112. **The Club has also acted to affirm its contractual obligations by, *inter alia*, asserting its rights to receive cooperation from policyholders under one or more of the Pre-1989 Policies and its right to consent to the policyholders' settlement of Occupational Disease Claims.**

113. **The Club never reserved its rights to deny coverage under the Policies based on insufficiency of reserves set when an insurance year was closed, or on the basis that its obligation to provide such coverage was a "discretionary" practice that could be "terminated."**

114. **An adverse judgment was entered against the Club in the action entitled *Dicola v. American S.S. Owners Mutual Protection and Indemnity Association, Inc. (In re Prudential Lines, Inc.), supra.* In 1998, the United States Court of Appeals for the Second Circuit held that, for Occupational Disease Claims involving exposures occurring over multiple policy years, the Pre-1989 Policies entitle a policyholder to designate the Policy for one of those policy years for payment of its claim, subject to only the one deductible for that policy year. 158 F.3d 65 (2d Cir. 1998). In this litigation, the Club acknowledged that it was obligated to provide coverage for Occupational Disease Claims in closed years and never asserted that its obligation to provide such coverage was "discretionary."**

106. Plaintiff denies the matters alleged in paragraphs 112, 113 and 114 of the counterclaims; avers that before, for the reasons outlined above, the Discretionary Practice was properly terminated, Plaintiff's actions were consistent with the Discretionary Practice commenced by Defendants for their sole benefit and at their direction the Plaintiff did not contest coverage for Prudential Lines, and refers to the allegations of Plaintiff's Second Amended Complaint herein and the allegations in paragraphs 1 through 88 of this Reply.

115. **The Club has required, and continues to require, contrary to the Policies and in violation of the mandate of the United States Court of Appeals for the Second Circuit in *In re Prudential Lines, Inc.*, that Defendants pay**

**multiple deductibles for a single claim filed with the Club where the claimant has alleged exposure to asbestos during multiple years of sea service aboard a vessel entered in the Club.**

107.   As to paragraph 115 of the counterclaims, Plaintiff admits that before, for the reasons outlined above, the Discretionary Practice was properly terminated, and consistent with that the Discretionary Practice and at the direction of the Defendants' who then controlled the Club, the Club required the Defendants to absorb multiple deductibles when they sought indemnities for their IBNR claims; asserts that that part of the Discretionary Practice dealing with deductibles is both fair and consistent with New York law refers to the allegations of Plaintiff's Second Amended Complaint herein and the allegations of paragraphs 1 through 88 of this Reply; and Plaintiff denies the remaining matters alleged.

**116. In or about June 7, 2004, the Club announced through its June 7, 2004 Circular that the Club no longer intended to make payments to policyholders with respect to Occupational Disease Claims under any Pre-1989 Policies with respect to which such claims had not been reported by the time each such year was closed or for such claims that had been under-reserved or unreserved by the Club. In so doing, the Club claimed that its payment of such claims for over twenty years was merely a "discretionary practice."**

108.   As to paragraph 116 of the counterclaims, Plaintiff admits that on or about June 7, 2004, the Club announced through its June 7, 2004 Circular that the Club had terminated the Discretionary Practice commenced by Defendants for their sole benefit; refers to the terms of the Circular for its precise terms; avers that

Defendants knew from the beginning, have always known and know now that the Discretionary Practice was purely discretionary and thus could be terminated at any time; avers that if Defendants wish the benefits of the only indemnity insurance policies in existence, Plaintiff first demands Defendants' full performance of their obligations under each of the relevant insurance policies; denies that former members are mere "policy holders" with no obligations to contribute their proportionate shares of the indemnities they seek; refers to the allegations of its Second Amended Compliant herein and paragraphs 1 through 88 of this Reply and denies the remaining matters alleged.

**117. At no time prior to June 7, 2004, has the Club advised its policyholders that the payment of valid claims under any Pre-1989 Policy was "discretionary" or subject to termination if the amount of the Club's reserves for a closed policy year were deemed insufficient or for any other reason.**

109. As to paragraph 117 of the counterclaims, Plaintiff avers that Defendants knew from the beginning, have always known and know now, that the Discretionary Practice they created for their sole benefit was always purely discretionary and as such could be terminated at any time, and denies the remaining matters alleged.

**118. Incorporate by reference into this counterclaim the allegations of paragraphs 74 through 117 of these counterclaims.**

110. Plaintiff repeats its responses to paragraphs 74 – 117 of the counterclaims and refers to the allegations of its Second Amended Complaint herein and paragraphs 1 through 88 of this Reply.

**119. Defendants have incurred and will likely incur in the future "loss, damage or expense" in connection with Occupational Disease Claims that are still pending and that are not yet asserted or resolved, resulting from the claimants' exposures occurring during one or more of the Pre-1989 Years and for reimbursement of which Defendants have coverage under one or more Pre-1989 Policies.**

111. As to paragraph 119 of the counterclaims, Plaintiff denies that Defendants now have coverage under one or more pre-1989 policies for the claims alleged; avers that if each insurance year for which said coverage is sought is reopened and the members thereof are assessed to pay and pay their proper *pro rata* shares of the indemnities Defendants seek now or in the future may seek, the Defendants will be entitled to the benefits of the assessments, less the Club's reasonable costs thereof; and refers to the allegations of Plaintiff's Second Amended Complaint herein and paragraphs 1 through 88 of this Reply.

**120. The Club is obligated to indemnify Defendants under the Pre-1989 Policies in full for any loss, damage or expense that Defendants become liable to pay, subject to the applicable deductible, in connection with Occupational Disease Claims resulting from exposures occurring during one or more of the Pre-1989 Years, without any time limitation as to when such claims are first made under any one or more of such policies.**

112. Plaintiff denies the matters alleged in paragraph 120 of the counterclaims; avers that if each year for which said coverage is sought is reopened and the members thereof are assessed to pay and pay their proper *pro rata* shares of the indemnities Defendants seek now or in the future may seek the Defendants will be entitled to the benefits thereof as outlined herein; and refers to the allegations of Plaintiff's Second Amended Complaint herein and paragraphs 1 through 88 of this Reply.

**121. The Club has disputed and is likely to continue to dispute its obligations under the Pre-1989 Policies to so indemnify Defendants with respect to Occupational Disease Claims, now pending or made in the future and the Club has asserted the right, which Defendants have disputed and will continue to dispute, to make future assessments under the Pre-1989 Policies to cover losses not covered by reserves established as of June 7, 2004.**

113. Plaintiff admits the generalities alleged in paragraph 121 of the counterclaims and denies that the Club or its current members have any obligations under pre-1989 policies to indemnify Defendants with respect to occupational disease claims arising before February 20, 1989; avers that if each year for which coverage is sought is reopened, and the members thereof are assessed to pay and pay their proper shares of such indemnities, the Defendants will be entitled to the benefits thereof as outlined herein, and refers to the allegations of Plaintiff's Second Amended Complaint herein and paragraphs 1 through 88 of this Reply.

**122. As a result of the foregoing, an actual and justiciable controversy exists between Defendants and the Club with respect to (a) the duties and obligations of the Club under one or more of their respective Pre-1989 Policies to provide continuing coverage to Defendants for Occupational Disease Claims resulting from claimants' exposures occurring during one or more of the Pre-1989 Years, and (b) the Club's right to make assessments under the Pre-1989 Policies to cover losses not covered by reserves established as of June 7, 2004.**

114.  Plaintiff admits that paragraph 122 of the counterclaims generally describes the controversies between the parties.

**123. Accordingly, this Court should (a) declare that Defendants have the right under their respective Pre-1989 Policies to continuing coverage for Occupational Disease Claims resulting from claimants' exposures occurring during any one or more of the Pre-1989 Years, subject only to the applicable deductible, and that the Club has no right to make any further assessment or assessments against any Defendants under any Pre-1989 Policies; (b) grant Defendants a mandatory injunction compelling the Club to provide such coverage and a negative injunction barring, restraining and prohibiting the Club from making, or seeking to make, any such assessment or assessments; (c) award Defendants their attorneys' fees and other costs and expenses incurred in connection with this action to fullest extent permitted by applicable law; and (d) grant Defendants such other and further relief as this Court deems just and proper.**

115.  Plaintiff denies the matters alleged in paragraph 123 of the counterclaims and denies that Defendants are entitled to any of the relief requested.

**124. Incorporate by reference into this counterclaim the allegations of paragraphs 74 through 123 of these counterclaims.**

116.  As to paragraph 124 of the counterclaims, Plaintiff repeats its responses to paragraphs 74 – 123 of the counterclaims and refers to the allegations

of its Second Amended Complaint herein and paragraphs 1 through 88 of this Reply.

**125. Defendants have complied with all applicable conditions of the Pre-1989 Policies that have arisen to date with respect to all pending Occupational Disease Claims.**

**126. The Club has breached, and threatens in the future to continue to breach, its obligations to Defendants under one or more of the Pre-1989 Policies by, among other things, (a) refusing on and after June 7, 2004, to make claim payments under Pre-1989 Policies for Occupational Disease Claims resulting from claimants' exposures occurring during one or more of the Pre-1989 Years and (b) reducing its indemnification payments to Defendants otherwise due and payable under the Pre-1989 Policies by applying multiple deductibles for Occupational Disease Claims based upon the number of years that the claimant served on one or more of Defendant's vessels.**

**127. In so doing, the Club has also breached, and threatens to continue to breach, its duty under such Pre-1989 Policies to settle claims in good faith, as well as the warranty of utmost good faith and fair dealing implied in every marine insurance policy.**

**128. As a direct and foreseeable result of these breaches, Defendants have been damaged and continue to be damaged in an amount to be determined at trial.**

117. Plaintiff denies the matters alleged in paragraphs 125, 126, 127 and 128 of the counterclaims as inaccurate legal argument which is contrary to the Club's Charter, By-Laws, insurance policies and applicable New York law.

**129. Incorporate by reference into this counterclaim the allegations of paragraphs 74 through 128 of these counterclaims.**

59

118.  As to paragraph 129 of the counterclaims Plaintiff repeats its responses to paragraphs 74 – 128 of the counterclaims and refers to the allegations of its Second Amended Complaint herein and paragraphs 1 through 88 of this Reply.

**130. The Club represented to policyholders of all Pre-1989 Policies that such policyholders would continue to be covered by their respective Pre-1989 Policies for Occupational Disease Claims arising during any one or more of the Pre-1989 Years.**

**131. Defendants reasonably relied on such representations and have sustained and will continue to sustain damages as a result of the Club's attempt to renege on its obligations to Defendants under their respective Pre-1989 Policies.**

**132.  The conduct of the Club in purporting to withdraw coverage for claims arising from closed years constitutes deceptive acts or practices within the meaning of New York General Business Law §349.**

**133.  As a result of the these violations of New York General Business Law §349, the Club is liable to Defendants for damages, attorneys' fees and other costs and expenses and should be enjoined from continuing those deceptive acts or practices.**

119.  Plaintiff denies the matters alleged in paragraphs 130, 131, 132 and 133 of the counterclaims; avers that if, during the pendency of the Discretionary Practice commenced by Defendants for their sole benefit, any representations were made to Defendants by any other Defendant or at Defendants' behest, neither the Plaintiff nor its current members are responsible therefor; refers to the allegations of Plaintiff's Second Amended Complaint herein and paragraphs 1 through 88 of

this Reply and avers that New York General Business Law §349 and the corresponding or similar law of any other state including but not limited to California, are not applicable to the parties or the disputes in this action.

**134. Incorporate by reference into this counterclaim the allegations of paragraphs 74 through 133 of these counterclaims.**

120. As to paragraph 134 of the counterclaims, Plaintiff repeats its responses to paragraphs 74 – 133 of the counterclaims and refers to the allegations of its Second Amended Complaint herein and paragraphs 1 through 88 of this Reply.

**135. In connection with the closing of insurance years and the levying of "final" assessments, the Club granted Defendants releases from any liability for further assessments under one or more the Pre-1989 Policies.**

**136. Defendants seek a declaration that any further assessments are barred against Defendants with respect to the Pre-1989 Years covered by such releases.**

121. Plaintiff denies the matters alleged in paragraphs 135 and 136 of the counterclaims; avers that the closing of each pre-1989 policy year with a "final" dividend or assessment was a final statement of account and a mutual release, as described above; and denies that Defendants are entitled to the relief requested.

**137. Incorporate by reference into this counterclaim the allegations of paragraphs 74 through 136 of these counterclaims.**

61

122. As to paragraph 137 of the counterclaims, Plaintiff repeats its responses to paragraphs 74 – 136 of the counterclaims and refers to the allegations of its Second Amended Complaint herein and paragraphs 1 through 88 of this Reply.

**138. As policyholders of the Club, the Club owed Defendants an obligation to act reasonably and in good faith and to deal fairly with Defendants in connection with their rights and obligations under the Pre-1989 Policies.**

123. Plaintiff denies the matters alleged in paragraph 138 of the counterclaims and avers that at all times all members of the Club, including Defendants, and the Club mutually owe each other the same obligations to act reasonably and in good faith and to deal fairly and equitably with each other and in accordance with the principles of mutuality under the Club's Charter and By-Laws and New York law in connection with their respective rights and obligations under all insurance policies issued both before and after 1989, and avers that the Club has so acted and that Defendants have not.

**139. The Club, in breach of the implied covenant of good faith and fair dealing, has conditioned continuing coverage to which the Defendants are entitled under the express provision of the Pre-1989 Policies upon their payment of additional assessment.  The Club has previously waived and released Defendants from any additional assessment by issuing "final assessments" several years ago.**

**140.  As a result of the Club's wrongful conduct, Defendants has suffered and will suffer damages in an amount to be determined at trial,**

including but not limited to attorneys' fees, and are further entitled to claim and recover damages from the Club.

124.  Plaintiff denies the matters alleged in paragraphs 139 and 140 of the counterclaims.

**141. Incorporate by reference into this counterclaim the allegations of paragraphs 74 through 140 of these counterclaims.**

125.  As to paragraph 141 of the counterclaims, Plaintiff repeats its responses to paragraphs 74 – 140 of the counterclaims and refers to the allegations of its Second Amended Complaint herein and paragraphs 1 through 88 of this Reply.

**142. Defendants reasonably relied on the express and implied promises of the Club with respect to the existence of coverage for Occupational Disease Claims and express and implied promise of the Club to release policyholders from further assessment when it closed a year with a "final assessment." The Defendants' reliance was foreseeable.**

126.  Plaintiff denies the matters alleged in paragraph 142 of the counterclaims.

**143. The Club has issued a blanket disclaimer of coverage under Pre-1989 Policies and has threatened to make further assessments on former members such as Defendants.**

127.  Plaintiff denies the matters alleged in paragraph 143 of the counterclaims; avers that Plaintiff properly terminated the benefits under the Discretionary Practice created by Defendants for their sole benefit and has offered

Defendants the benefits of the only insurance contracts that could provide the benefits they seek, on the condition that they perform their own obligations thereunder, and refers to the allegations of its Second amended Complaint herein and the allegations of paragraphs 1 through 88 of this Reply.

**144. By reason of the forgoing, the Defendants have suffered damages.**

128. Plaintiff denies the matters alleged in paragraph 144 of the counterclaims; avers that if Defendants have suffered or may suffer any damages, it is wholly self-inflicted because they refuse to comply with their obligations under the only insurance policies or contracts that could provide the indemnities they seek; and refers to the allegations of the Second Amended Complaint herein and paragraphs 1 though 88 of this Reply.

129. Plaintiff denies that Defendants are entitled to the relief requested in the "WHEREFORE" paragraph of the counterclaims.

WHEREFORE, Plaintiff demands judgment:

1. Dismissing Defendants' affirmative defenses and counterclaims, with prejudice; and

2. Awarding Plaintiff the relief requested in its Second Amended Complaint, herein, including that Plaintiff is entitled:

(i)     To either terminate the Discretionary Practice; or

(ii)    In the event Defendants make future IBNR claims for indemnities with regard to closed insurance years before February 20, 1989, that Plaintiff is entitled to take such steps as necessary to restore mutuality between and among the members before February 20, 1989 and those thereafter by, among other steps, reopening the insurance years before February 20, 1989 which are affected by each such claim and assessing each of the members of each such year their proportionate shares of any indemnities any of the Defendants may, in the future, seek, after allocation of all claims among the insurance years affected by each such claim, requiring the Defendants to absorb their deductibles applicable to each of those policies/years and that the amounts collected, if any, be remitted to the Defendants seeking indemnities less the Club's reasonable costs of the above process; and

(iii)   In the event the Court determines that Plaintiff is not entitled to either (i) or (ii) above, that it is entitled to continue that part of the Discretionary Practice requiring the allocation of claims among the insurance years affected by each Defendant's IBNR claims and

requiring the Defendants to absorb their deductibles applicable to

each of the policies issued in each of those insurance years.

4. That Plaintiff recover from the Defendants all of its costs and expenses of

this litigation, and such further or different relief as may be appropriate and just.

Dated:      New York, New York
            December 10, 2004

                            Respectfully submitted,

                            NOURSE & BOWLES, LLP
                            Attorneys for Plaintiff

                            By:_____
                                Lawrence J. Bowles (LB 5950)
                                One Exchange Plaza
                                New York, New York 10006
                                (212) 952-6200

TO:   Seth Schafler, Esq.                sschafler@proskauer.com
      Dale Schreiber, Esq.               dschreiber@proskauer.com
      Lisa A. Bauer, Esq.                lbauer@proskauer.com
      Proskauer Rose, LLP

      Brent A. Hannafan, Esq.            brent.hannafan@dechert.com
      Dechert, LLP

      John M. Toriello, Esq.             john.toriello@hklaw.com
      Nora Nellis, Esq.                  nora.nellis@hklaw.com
      Wallis Karpf, Esq.                 wallis.karpf@hklaw.com
      Holland & Knight LLP

      Donald Strauber, Esq.              dstrauber@chadbourne.com
      Melissa LaRocca, Esq.              mlarocca@chadbourne.com
      Chadbourne & Parke LLP

Patrick Lennon, Esq.                         plennon@tisdale-lennon.com
Tisdale & Lennon LLP

Edward A. Keane, Esq.                        Ekeane@mahoneykeane.com
Mahoney & Keane, Esqs.

Mario Aieta, Esq.                            maieta@gsblaw.com
Elizabeth Lynn Hubbard, Esq.                 lhubbard@gsblaw.com
Garvey Schubert Barer

Deborah A. Silodor, Esq.                     dsilodor@lowenstein.com
Lowenstein Sandler, PC

Alissa C. Malone, Esq.                       amalone@fieldshowell.com
Lynn S. Concha, Esq.                         lconcha@fieldshowell.com
Fields, Howell, Athans, McLaughlin LLP

Scott Fisher, Esq.                           sfisher@jshllp.com
Jaspan Schlesinger Hoffman LLP

Charles Stewart, Esq.                        cstewart@somlaw.com
Stewart Occhipinti, LLP

Stacey Saiontz, Esq.                         saiontzs@dsmo.com
Dickstein Shapiro Morin & Oshinsky LLP

David A. Luttinger, Esq.                     dluttinger@morganlewis.com
Lisa Campisi, Esq.                           lcampisi@morganlewis.com
Morgan Lewis & Bockius LLP

Andrew Dash, Esq.                            adash@brbilaw.com
Peter Adelman, Esq.                          padelman@brbilaw.com
Brown Rudnick Berlack Israels

Edward V. Cattell, Jr., Esq.                 ecattell@hollsteinkeating.com
Holstein Keating Cattell Johnson
  & Goldstein, P.C.

Herbert I. Waldman, Esq.                     hwaldman@nrdmlaw.com
Nagel Rice & Mazie, LLP

Robert A. O'Hare, Jr., Esq.                  rohare@ohareparnagian.com
O'Hare Parnagian LLP

Robert J. Gruendel, Esq.                              rgruendel@cm-p.com
John D. Pizzurro, Esq.                                jpizzurro@cm-p.com
Curtis Mallet-Prevost, Colt & Mosle LLP

Raymond A. Connell, Esq.                              raconnell@mindspring.com
McMahon & Connell, P.C.

Gene B. George, Esq.                                  ggeorge@rayrobcle.com
Julia R. Brouhard, Esq.                               jbrouhard@rayrobcle.com
Ray, Robinson, Carle & Davies, P.L.L.

John G. Cameron, Jr., Esq.                            jcameron@wnj.com
Warner, Norcross & Judd, LLP

Nancy Ledy-Gurren, Esq.                               nledygurren@lgb-law.com
Ledy-Gurren & Blumenstock, LLP

Christine S. Davis                                    daviscs@howrey.com
Mindy G. Davis                                        davism@howrey.com
Howrey Simon Arnold & White, LLP

John W. Cannavino                                     jcannavino@cl-law.com
Steven Frenkel                                        sfrenk@cl-law.com
Cummings & Lockwood, LLC

Stephen J. Sheinbaum                                  ssheinbaum@sbgmlaw.com
Sheinbaum, Bennett, Giuliano & McDonnell

Allen K. von Spiegelfeld, Esq.                        avonsp@fowlerwhite.com
Fowler White Boggs Banker

Adam P. Wofse, Esq.
Harold D. Jones, Esq.
Jaspan Schlesinger Hoffman LLP
300 Garden City Plaza
Garden City, NY 11530

Michael H. Ahrens, Esq.
Sheppard, Mullin, Richter and Hampton
4 Embarcadero Center – 17th Floor
San Francisco, CA 94111

68

Resolve Maritime Corporation
c/o Charles Lea Hume, Esq.
1441 Brickell Avenue
Suite 1014
Miami, FL 33131

Offshore Express Inc.
P.O. Box 1420
Houma, LA 70361