PROSKAUER ROSE LLP
Dale A. Schreiber (DS-9211)
Seth B. Schafler (SS-5993)
Lisa A. Bauer (LB-4057)
1585 Broadway
New York, New York 10036-8299
(212) 969-3000
(212) 969-2900 (fax)
*Attorneys for Defendants Keystone, BP, MTL,*
*Cleveland-Cliffs, Ispat, American Steamship and Sea Mobility*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AMERICAN STEAMSHIP OWNERS MUTUAL
PROTECTION AND INDEMNITY
ASSOCIATION, INC.,

               Plaintiff,

    -against-

ALCOA STEAMSHIP CO., INC., et al.,

               Defendants.

Case No. 04 CV 4309 (LAK)

**AMENDED ANSWER AND**

**COUNTERCLAIMS**

**(ECF Case)**

Defendants Keystone Shipping Co. ("Keystone")[1]; BP America, Inc. ("BP")[2], Marine

Transport Lines, Inc. ("MTL")[3], The Cleveland-Cliffs Steamship Company ("Cleveland-

---

[1]    Plaintiff has named Keystone Shipping Co. and several entities listed under Keystone Shipping Co. as defendants on Ex. A to its Second Amended Complaint, dated July 8, 2004. Those entities are: (1) Chas. Kurz & Co., Inc.; (2) several wholly owned subsidiaries of Chas. Kurz & Co., Inc., all managed by Keystone Shipping Co., Baldbutte Shipping Company, Chestnut Shipping Corporation, Chilbar Shipping Company, Fredericksburg Shipping Company, and Margate Shipping Company; (3) Keystone Tankship Corporation, an affiliate managed by Keystone Shipping Co.; (4) Timbo Shipping Ltd., and Calendar Navigation Corporation, which have been dissolved; (5) New England Collier Company, a joint venture which has been dissolved, and which was managed by Keystone Shipping Co., and (6) Paco Tankers, Inc., an entity which was managed by Keystone Shipping Co. but was not and is not now related to or controlled by any Keystone entity. At various times each of these entities is believed to have been insured by the AC. To the extent these entities are required to respond, they and the other entities listed under Keystone Shipping Co. will be referred to as "Keystone." Plaintiff amended its Complaint to add additional Keystone entities on January 24, 2005. As to those entities, it is averred that (1) Chas. Kurz & Co. has never existed, the proper corporate name is Chas. Kurz & Co., Inc., and it is not a successor to any of the

Cliffs"),[4] Ispat Inland Inc. ("Ispat"),[5] American Steamship Company ("American Steamship"),

and Sea Mobility Inc. ("Sea Mobility")[6] ("Defendants"), by their undersigned counsel, for their

---

entities listed on Plaintiff's Additional Defendants List. Keystone denies knowledge or information sufficient to form a belief as to the existence of the entities listed as Antietam Steamship Corp., Baldhill Steamship Co., Dannadaike Tankers Inc., Dilworth Steamship Co., Hagan Steamship Co., Meton Steamship Co., The Naeco Co., Inc., and Thermo Steamship Co., but avers that it was aware of vessels with similar names that may or may not have had a corporate existence and if they did avers upon belief that they were dissolved at least fifty (50) years ago. As to Kaymar Tankers Inc. also added by Plaintiff, it is averred that it ceased to exist in the early 1940's. Lastly, as to Delaware Tankers Inc. and Pennsylvania Tankers Inc., also added by Plaintiff, Keystone denies knowledge or information sufficient to form a belief as to the existence of these entities, but avers upon belief that if they had a corporate existence they were dissolved at least fifty (50) years ago.

[2]      BP was erroneously named as BP and as successor to several entities on Ex. A to the Second Amended Complaint. Its proper name is BP America Inc. and it responds on behalf of (1) named Defendants Atlantic Richfield Co., American Oil Co., and Standard Oil Co. (Ohio) which are wholly owned by BP America Inc.; (2) on behalf of named Defendants Sohio Alaskan Petroleum Co., which is now called BP Exploration (Alaska) Inc., and SPC Shipping, Inc. which is now called BP Oil Shipping Co., which are wholly owned by Standard Oil Co. (Ohio); and (3) on behalf of named Defendant Atlantic Richfield Indonesia Inc., which was properly called Atlantic Richfield Indonesia Co., is now called BP West Java Ltd. and is owned indirectly owned by BP America Inc.

[3]      Plaintiff named Marine Transport Lines, Inc. as manager and agent of several entities on Ex. A to its Second Amended Complaint. Marine Transport Lines, Inc. is neither the manager nor the agent of the entities but responds on behalf of itself and the other named entities to the extent that they are required to respond at all. The other named entities are as follows: (1) Marine Interests Corporation which has been dissolved; (2) Union Marine Transport Co., which has been dissolved; (3) Marine Chemical Navigation Corp., which is now named Marine Chemical Navigation Co. LLC; (4) Marine Sulphur Shipping Corporation, which is now Marine Sulphur Shipping Company LLC; and (5) Oswego Tanker Corp. which has been dissolved. Plaintiff amended its Complaint to add additional related entities on January 24, 2005. As to those entities, it is averred that Delta Steamship Lines, Inc. and Delta Lines Inc. were formerly wholly owned by Crowley Maritime Corporation and such companies have, as of the date of this pleading, either been dissolved or merged into other companies and no longer exist. Crowley Maritime Corporation, to the extent it is required to answer for Delta Steamship Lines, Inc. and Delta Lines Inc., answers herein with MTL and is included in the definition of MTL. As to the remaining entities listed on Plaintiff's Additional Defendants List as predecessors to Crowley Maritime Corporation, CD Mallory Corp., Ardmore Steamship Co. Inc., Farr Spinning & Operating Company, Inc., Malston Co., Inc., Matinicock Steamship Company, and Matinicock Corp., it is averred that that they are not associated with Crowley Maritime Corporation nor is it the successor to them.

[4]      Plaintiff erroneously named Cleveland-Cliffs, Inc. as successor to The Cleveland-Cliffs Steamship Company on Ex. A to its Second Amended Complaint. By stipulation, The Cleveland-Cliffs Steamship Company has been substituted for Cleveland-Cliffs, Inc.

[5]      Ispat Inland Inc. was formerly called Inland Steel Co.

answer to the second amended complaint dated July 8, 2004 of American Steamship Owners Mutual Protection and Indemnity Association, Inc. ("the Club") ("the Complaint"):

1.      Deny the allegations of paragraph 1 of the Complaint, except to the extent the allegations of that paragraph purport to be a statement of the Club's position in this action to which no response is required.

2.      Deny the allegations of paragraphs 2, 3 and 4 of the Complaint.

3.      Deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 5 of the Complaint.

4.      Deny the allegations of paragraph 6 of the Complaint, except admit that the Club has no right to assess policyholders, members or former members for years closed with a "final assessment."

5.      Deny the allegations of paragraph 7 of the Complaint.

6.      Deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 8 of the Complaint, except admit that seamen and others who had worked on the vessels owned or chartered by members or former members began asserting occupational disease claims based upon their asserted exposure to asbestos during their years of service.

7.      Deny the allegations of paragraphs 9 and 10 of the Complaint.

---

[6]      Plaintiff named Sea Mobility Inc. on Ex. A to its Second Amended Complaint, under the same address as American Maritime Holdings Inc. and World Wide Tankers Inc. There is no relationship between those entities and Sea Mobility Inc. Named Defendant Sea Mobility Inc. has been duly dissolved. To the extent it is required to respond at all it responds herein as "Sea Mobility."

8.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 11 of the Complaint and deny that payments under insurance policies issued by the Club to Defendants provide for any payments to Defendants as "members" of the Club (as opposed to policyholders of such policies) and further deny that payments made under such policies, by way of premiums and/or assessments, are standing alone a valid measure of whether or not the Club has sustained a loss or deficiency with respect to any particular policy year under such policies.

9.     Deny the allegations of paragraph 12 of the Complaint, except deny knowledge or information sufficient to form a belief as to the number of occupational disease claims filed or still pending against members or former members of the Club.

10.     Deny the allegations of paragraph 13 of the Complaint, except aver that, in or about June 7, 2004, the Club breached the insurance policies issued to the answering Defendants for policy years ended February 20, 1989 ("the Pre-1989 Years") by announcing that it would no longer pay indemnity claims of the holders under any policies that the Club had issued for any of the Pre-1989 Years ("the Pre-1989 Policies") based upon occupational disease claims and that Keystone has previously commenced litigation against the Club concerning the Club's practice known as "stacking of deductibles" under which policyholders have been required to absorb multiple deductibles for each claim under Pre-1989 Policies.

11.     Deny the allegations of paragraph 14 of the Complaint, except admit that the Club is incorporated under the laws of the State of New York.

12.     In response to paragraph 15 of the Complaint, Keystone:

i.       admits that Keystone Shipping Co. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Wilmington, Delaware;

ii.      admits that Chas. Kurz & Co., Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Wilmington, Delaware;

iii.     admits that the following are wholly owned subsidiaries of Chas Kurz & Co., Inc. and are managed by Keystone Shipping Co.:  Baldbutte Shipping Company, a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Wilmington, Delaware; Chestnut Shipping Company, a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Wilmington, Delaware; Chilbar Shipping Company, a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Wilmington, Delaware; Fredericksburg Shipping Company, a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Wilmington, Delaware; and Margate Shipping Company, a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Wilmington, Delaware;

iv.      admits that Keystone Tankship Corporation is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in

5

Wilmington, Delaware, and avers that it is an affiliate of, and is managed by, Keystone Shipping Co.;

    v.  admits that New England Collier Corporation was an entity organized and existing under the laws of the State of Delaware and avers it was a joint venture managed by Keystone Shipping Co. and was duly dissolved in or about 1987;

    vi.  admits that Timbo Shipping Ltd. was an entity organized and existing under the laws of Monrovia and avers that it was duly dissolved in or about the early 1990's;

    vii.  admits that Calendar Navigation Corporation, was a corporation organized and existing under the laws of Monrovia and avers that it was duly dissolved in or about the early 1980's;

    viii.  avers that Paco Tankers, Inc. was managed by Keystone Shipping Co. but was not and is not related to or controlled by any Keystone entity.

  13.  In response to paragraph 15 of the Complaint, Marine Transport Lines, Inc.:

    i.  admits that it is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Seacaucus, New Jersey;

    ii.  avers that Marine Chemical Navigation Corporation is now called Marine Chemical Navigation Corporation LLC and is an entity organized and existing under the laws of the State of Delaware with its principal place of business in Seacaucus, New Jersey;

    iii.  avers that Marine Sulphur Shipping Corporation is now called Marine Sulphur Shipping Corporation LLC and is an entity organized and existing under the laws of the State of Delaware with its principal place of business in Seacaucus, New Jersey;

    iv.  admits that Marine Interests Corporation was a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Weehawken, New Jersey, and avers that it was duly dissolved on or about October 7, 1998;

    v.  admits that Union Marine Transport Company was a partnership organized and existing under the laws of the State of Delaware with its principal place of business in Weehawken, New Jersey and avers that it was duly dissolved in or about 1999;

    vi.  admits that Oswego Tanker Corporation was an entity organized and existing under the laws of Liberia and avers that it was duly dissolved on or about December 21, 1998.

  14.  In response to paragraph 15 of the Complaint, BP America Inc.:

    i.  admits that it is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Warrenville, Illinois;

    ii.  admits that Atlantic Richfield Co., American Oil Co., BP Exploration (Alaska) Inc. (formerly Sohio Alaskan Petroleum Co.), and BP Oil Shipping Co. (formerly SPC Shipping, Inc.) are organized and existing under the laws of the State of Delaware with principal places of business in Warrenville, Illinois;

       iii.    admits that BP West Java Ltd. (formerly Atlantic Richfield Indonesia Co.) is organized and existing under the laws of the State of Delaware with its principal place of business in Jakarta, Indonesia; and

       iv.    admits that Standard Oil Co. (Ohio) is organized and existing under the laws of the State of Ohio with its principal place of business in Warrenville, Illinois.

15.    In response to paragraph 15, Defendant Cleveland-Cliffs is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Cleveland, Ohio.

16.    In response to paragraph 15, Defendant Ispat is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in East Chicago, Indiana.

17.    In response to paragraph 15, Defendant American Steamship admits that it is a corporation organized and existing under the laws of the State of New York with its principal place of business in Williamsville, New York.

18.    In response to paragraph 15, Defendant Sea Mobility admits that it was a corporation organized and existing under the laws of the State of Delaware with its principle place of business in Virginia and avers that it was duly dissolved on or about December 21, 2001.

19.    In further response to paragraph 15, Defendants admit that Defendants or various entities related to Defendants, as defined above, were members of the Club at various times

between 1940 and February 20, 1989, except for American Oil Co., which upon information and belief was never a member of the Club, and deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 15 of the Complaint.

20.    Admit that, in response to the allegations of paragraphs 16 and 17 of the Complaint, this Court has subject matter jurisdiction over this action and that venue is proper in this District.

21.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraphs 18, 19, 20 and 21 of the Complaint, except admit that the Club's Charter and By-Laws, as well as applicable New York corporate law, generally delegate to the Club's Board of Directors the responsibility to manage the Club's affairs and conduct its business, that the Club's Board of Directors may in some circumstances reasonably rely upon recommendations of the Club's professional manager, that members of the Club's Board of Directors and its officers are subject to eligibility requirements provided, among other places, in the Club's Charter and By-Laws, and that the duties and role of the Club's Chairman are referred to in the Club's Charter and By-Laws, but respectfully refer to the Club's Charter and By-Laws, as they have been amended from time to time, for their respective contents.

22.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraphs 22 and 23 of the Complaint, except admit that Shipowners Claims Bureau, Inc. has acted for many years as a professional manager for the Club and has had responsibility for underwriting, claims handling, and accounting services for the Club.

23.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 24 of the Complaint, except aver that, at various times during the period from the 1940's through the late 1990's, in consideration of the premiums paid to the Club by policyholders, the Club issued Policies to Defendants or their predecessors in interest providing what is generally known as protection and indemnity ("P&I") insurance on an occurrence basis during the stated policy period for covered vessels under terms providing for possible future assessments ("the Policies") and respectfully refer to the original or true copy of each of such Policies for their respective terms and conditions.

24.     Deny the allegations of paragraph 25 of the Complaint.

25.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 26 of the Complaint, except respectfully refer to the originals or true copies of the Policies for their respective terms.

26.     Deny the allegations of paragraph 27 of the Complaint.

27.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 28 of the Complaint, except deny the allegations of the last sentence thereof.

28.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraphs 29, 30 and 31 of the Complaint, except respectfully refer to the originals or true copies of the Policies for their respective terms and conditions.

29.     Deny the allegations of paragraph 32 of the Complaint.

30.     Deny the allegations of paragraphs 33, 34 and 35 of the Complaint, except respectfully refer to relevant provisions of the New York Insurance Law for their contents.

31.     Deny the allegations of paragraph 36 of the Complaint, except refer to the original or a true copy of the Club's By-Laws (as amended from time to time) applicable to the rights and obligations, if any, of Defendants under their respective Policies in issue in this action.

32.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 37 of the Complaint.

33.     Deny the allegations of paragraph 38 of the Complaint, except respectfully refer to the originals or true copies of the Policies for their respective terms and conditions.

34.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 39 of the Complaint.

35.     Deny the allegations of paragraph 40 of the Complaint, except refer to the original or a true copy of the Club's By-Laws (as amended from time to time) applicable to the rights and obligations, if any, of Defendants under their respective Policies in issue in this action.

36.     Deny the allegations of paragraph 41 of the Complaint.

37.     Deny the allegations of paragraph 42 of the Complaint, except refer to the original or a true copy of the Club's By-Laws (as amended from time to time) applicable to the rights and obligations, if any, of Defendants under their respective Policies in issue in this action.

38.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraphs 43, 44, 45 and 46 of the Complaint.

39.     Deny the allegations of paragraph 47 of the Complaint.

40.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraphs 48, 49, 50, 51, 52, 53 and 54 of the Complaint.

41.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 55 of the Complaint, except deny the allegations of the last sentence thereof.

42.    Deny the allegations of paragraph 56 of the Complaint.

43.    Deny the allegations of paragraph 57 of the Complaint, except deny knowledge or information sufficient to form a belief as to the truth of allegations in that paragraph purporting to describe the actions, if any, taken by the Club's Board of Directors on May 25, 2004 with respect to Pre-1989 Policies or the subjective motivations for such actions and admit that Defendants objected to the Club's Board of Directors' actions to the extent described in a Circular dated June 7, 2004 and in the Club's various complaints in this action.

44.    Keystone admits that it has asserted the right to designate one insurance year's policy to cover each seaman's entire claim for which a single deductible would be applicable in accordance with *Dicola v. American S.S. Owners Mutual Protection and Indemnity Association, Inc. (In re Prudential Lines, Inc.)*, 158 F.3d 65 (2d Cir. 1998), and has sued for a declaratory judgment of such right and denies the remaining allegations of paragraph 58 of the Complaint and the other Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 58 of the Complaint.

45.    Deny the allegations of paragraphs 59, 60 and 61 of the Complaint.

46.    Refer to their respective responses to the allegations incorporated by reference into paragraph 62 of the Complaint.

47.    Admit the allegations of paragraph 63 of the Complaint.

48.    Deny the allegations of paragraph 64 of the Complaint.

49.    Refer to their respective responses to the allegations incorporated by reference into paragraph 65 of the Complaint.

50.    Deny the allegations of paragraph 66 of the Complaint.

51.    Admit the allegations of paragraph 67 of the Complaint.

52.    Deny the allegations of paragraph 68 of the Complaint.

53.    Refer to their respective responses to the allegations incorporated by reference into paragraph 69 of the Complaint.

54.    Deny the allegations of paragraph 70 of the Complaint.

55.    Admit the allegations of paragraph 71 of the Complaint.

**First Affirmative Defense**
**(Insurance Policies)**

56.    The Club's claims are barred, in whole or in part, by the terms of the Policies, all of the obligations of which Defendants have fulfilled and which provide occurrence-based coverage for liability-incurring occurrences transpiring, in whole or in part, during the policy period of each such Policy, without any aggregate limit on losses payable thereunder, any time deadline for the making of claims thereunder, or any limitation on recourse against the Club.

**Second Affirmative Defense**
**(By-Laws)**

57.    The Club's claims are barred, in whole or in part, by the terms of the By-Laws

applicable to the Policies, and documented actions thereunder of the Club's Board of Directors,

including but not limited to the Club's Board of Directors' actions in closing policy years under

all Pre-1989 Years with "final assessments" pursuant to By-Laws, Article VI, Section 4.

**Third Affirmative Defense**
**(Estoppel and Waiver)**

58.    The Club's claims are barred, in whole or in part, by the doctrine of estoppel, in

that the Club, among other things, has since at least 1980 consistently indemnified policyholders,

including Defendants, for occupational disease claims arising from injuries in closed insurance

years and has consistently represented to Defendants that the Club had a legal obligation to do so

and has acted to affirm its contractual obligation by asserting its rights to receive cooperation

from policyholders under one or more of the Pre-1989 Policies and its right to consent to the

policyholders' settlement of occupational disease claims.  Defendants have relied on the Club's

conduct and representations to their detriment.  Moreover, the Club has waived its right to now

deny coverage and seek further assessments from policyholders and has waived its right to deny

policyholders coverage based on the inability to further assess them.

**Fourth Affirmative Defense**
**(Laches)**

59.    The Club's claims are barred, in whole or part, by the doctrine of laches, in that

the Club has since at least 1980 consistently recognized its legal obligation to indemnify

policyholders, including Defendants, for occupational disease claims arising from injuries in

14

closed insurance years and has delayed announcing that it will no longer pay such indemnification, without excuse or justification, until June 7, 2004.   Defendants have been prejudiced by that delay.

### Fifth Affirmative Defense
### (Res Judicata)

60.     The Club's claims are barred, in whole or in part, by the doctrines of *res judicata* and/or collateral estoppel because the issues the Club now seeks to raise were either fully litigated or necessary to the judgment entered against the Club in *Dicola v. American S.S. Owners Mutual Protection and Indemnity Association, Inc., supra.*  These issues include but are not limited to (a) the continuing rights of holders of Pre-1989 Policies, including Defendants, to make claims for indemnity payments under these occurrence-based policies after the policy year for which they were issued and without any time limitation as to when claims can first be made against the insured and still be covered by the policy, (b) the rights of the holders of Pre-1989 Policies, including Defendants, to seek indemnity payments under the Pre-1989 Policy providing the lowest per-claim deductible for occupational disease claims spanning multiple, consecutive policy years.  The Club had a full and fair opportunity to litigate those issues in that litigation and the issues were decided adversely to the Club.

### Sixth Affirmative Defense
### (Mutuality)

61.     The declaratory relief sought by the Club would, in whole or in part, result in inequitable treatment of members and former members of the Club, including Defendants, contrary to principles of mutuality asserted by the Club in that, among other things, (a) the Club

would be treating the holders under Pre-1989 Policies differently from holders of its policies for policy years after the Pre-1989 Years by denying the former and granting the latter indemnity payments for years closed with "final assessments," despite the fact that the total losses for each such year exceeded total premiums and assessments ("Policyholder Payments") (with or without allocating income earned by the Club to such amounts), (b) the Club has aggregated all Policyholder Payments for all Pre-1989 Years (with or without allocating income earned by the Club to such amounts) and all losses for such years to deny policyholders, including, upon information and belief, Defendants, indemnity payments for some such years where the losses do not exceed Policyholder Payments (with or without allocating income earned by the Club to such amounts), (c) the Club has created a first-come, first-serve system for paying losses under Pre-1989 Policies in violation of mutuality principles, and (d) the Club has illegally transferred its assets in amounts reflected by its general reserves, if not more, to current members by refusing to make indemnity payments to holders of Pre-1989 Policies on the spurious ground that those general corporate assets "belong" to current members only.

### Seventh Affirmative Defense
#### (Reserves)

62.     To the extent that the Club's claims are based on the failure of its Board of Directors to set adequate reserves for unreported claims before closing an insurance year with a "final assessment" in accordance with the Club's By-Laws, Article VI, Section 4, the Club has sole responsibility for any such inadequacy and such inadequacy is not a defense to the rights of Defendants under their respective Policies to indemnification for payments that they have made for occupational disease claims for any of the Pre-1989 Years.

16

**Eighth Affirmative Defense**
**(Disregard of Membership Rights)**

63.    This affirmative defense is asserted only to the extent that the Club's claims are

based on the premise that Defendants remained members of the Club on May 25, 2004 and/or

June 7, 2004, long after the expiration of the policy years under all of their respective Policies

and long after they had formally resigned as members.  Defendants continue to assert that they

were not members of the Club as of either of those dates and ceased to be members after they

ceased purchasing insurance policies from the Club and resigned as members.  The Club's

actions taken on those dates in determining not to honor any future claims under Pre-1989

Policies for indemnity payments to reimburse Defendants with respect to seamen's occupational

disease claims, subject only to applicable deductibles, are null and void because Defendants and

others similarly situated were not afforded the right to vote for the Club's Directors who

approved such actions or to exercise other incidents of membership in connection with such

actions.  Defendants nevertheless retained all rights as insureds and policyholders under their

respective Pre-1989 Policies.

**Ninth Affirmative Defense**
**(Release)**

64.    The Club's claims are barred by the terms of releases given to members in

connection with closing policy years and/or the releases given to former members in connection

with their withdrawal from membership in the Club.

17

### Tenth Affirmative Defense
### (Untimely Notice of Disclaimer)

65.     To the extent that the Club seeks to disclaim coverage for claims previously reported to the Club under any of the Policies, such disclaimer is untimely and in violation of N.Y. Insurance Law §3420(d).

### Eleventh Affirmative Defense
### (Failure to Provide Notice of Cancellation of Coverage)

66.     To the extent that the Club bases any of its claim on the cancellation of further coverage under any of the Policies at the time an insurance year is closed, the Club has failed to comply with the notice of cancellation requirement of N.Y. Insurance Law §3426.

### Twelfth Affirmative Defense
### (Dissolution of Entities)

67.     To the extent any Defendant is an entity which has been duly dissolved, the applicable limitations periods for suits against such entities bars the Club's claims in whole or in part.

### Thirteenth Affirmative Defense
### (Failure to State a Claim)

68.     The Complaint fails to state a claim upon which relief may be granted.

### Fourteenth Affirmative Defense
### (Statute of Limitations)

69.     The Club's claims in the Complaint are time barred, in whole or in part, by the statute of limitations.

**Fifteenth Affirmative Defense**
**(Failure to Reserve Rights)**

70.     To the extent that the Club failed to assert coverage defenses within the time limitations set forth under the applicable claims statute or failed to reserve rights with respect to indemnification, the Club waived those defenses to indemnification for the affected claims.

**Sixteenth Affirmative Defense**
**(Promissory Estoppel)**

71.     The Club's claims are barred, in whole or in part, by the doctrine of promissory estoppel, in that Defendants reasonably relied on the express and implied promise of the Club with respect to the existence of coverage for occupational disease claims and express and implied promise of the Club to release policyholders from further assessment when it closed a year with a "final assessment."  This reliance was foreseeable.

**Seventeenth Affirmative Defense**
**(Defendants Not Responsible for Certain Entities)**

72.     To the extent the AC seeks to assess Defendants, which they do not have the authority to do, for the pro rata shares of other policyholders who are insolvent, have been dissolved, or have merged with other entities, or for any shares that should be allocated to them, those claims are barred against Defendants because Defendants are not legally responsible for those entities.

19

73.     Defendants respectfully request leave to assert additional defenses which they deem necessary to their defense during or upon conclusion of their investigation and discovery of the Club's claims.

## COUNTERCLAIMS

74.     The counterclaims alleged below seek (a) a declaratory judgment, adjudicating Defendants' rights and the Club's obligations under Pre-1989 Policies issued by the Club to Defendants, their predecessors, successors and/or affiliated companies, with respect to Occupational Disease Claims (as defined below) and Defendants' freedom from further assessments under any such Policies, and (b) damages for breach of contract, breach of the implied covenant of good faith and fair dealing, violation of New York General Business Law §349 and other relief arising out of the Club's unjustified refusal to pay on and after June 7, 2004, any Occupational Disease Claims under Pre-1989 Policies.

### The Parties

75.     Keystone Shipping Co. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Wilmington, Delaware.  Through various entities Keystone Shipping Co. is an owner and operator of shipping vessels.

76.     Chas. Kurz & Co., Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Wilmington, Delaware.  Through various entities Chas. Kurz & Co., Inc. is an owner and operator of shipping vessels.

20

77. Baldbutte Shipping Company, Chestnut Shipping Company, Chilbar Shipping Company, Fredericksburg Shipping Company, and Margate Shipping Company are corporations organized and existing under the laws of the State of Delaware with principal places of business in Wilmington, Delaware.

78. Keystone Tankship Corporation is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Wilmington, Delaware.

79. Marine Transport Lines, Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Seacaucus, New Jersey and through various entities is an owner and operator of shipping vessels.

80. Marine Chemical Navigation Co. LLC is an entity organized and existing under the laws of the State of Delaware with its principal place of business in Seacucus, New Jersey and through various entities is an owner and operator of shipping vessels.

81. Marine Sulphur Shipping Co. LLC is an entity organized and existing under the laws of the State of Delaware with its principal place of business in Seacucus, New Jersey and through various entities is an owner and operator of shipping vessels.

82. BP America Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Warrenville, Illinois, and through various entities is an owner and operator of shipping vessels.

83. Atlantic Richfield Co. is organized and existing under the laws of the State of Delaware with its principal place of business in Warrenville, Illinois and is an owner and operator of shipping vessels.

84.    Standard Oil Co. (Ohio) is organized and existing under the laws of the State of Ohio with its principal place of business in Warrenville, Illinois and is an owner and operator of shipping vessels.

85.    The Cleveland-Cliffs Steamship Company is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Cleveland, Ohio. It was at all material times the owner of vessels insured by the Club under policies issued for the 1977 through 1985 Policy Years.

86.    Ispat Inland Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in East Chicago, Indiana, and through various entities is an owner and operator of shipping vessels.

87.    American Steamship Company is a corporation organized and existing under the laws of the State of New York with its principal place of business in Williamsville, New York, and through various entities is an owner and operator of shipping vessels.

88.    Sea Mobility Inc. was a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Virginia and was duly dissolved on or about December 21, 2001.

89.    The Club is a corporation organized pursuant to and existing under the New York Insurance Law Article 41 as a mutual company and in that capacity has issued marine P&I policies to shipowners and charterers that become members of the Club under assessable policies in more or less the same form.  Pursuant to New York Insurance Law §108, the Club is also

22

subject to the New York Business Corporation Law and maintains a principal place of business in New York, New York.

### Jurisdiction and Venue

90.    The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1333(1) because it is an admiralty or maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.  In addition, this Court has supplemental jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1367(a).

91.    Venue in this judicial district is proper under 28 U.S.C. §§1391(b)(1) and 1391(b)(2) because the Club resides in this judicial district and a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

### Defendants' Insurance Coverage

92.    Defendants, as defined above, as themselves or through various entities related to them, ceased being members of the Club at various times prior May 25, 2004 and in most cases many years before that date, except for American Oil Co. who upon information and belief was never a member of the Club.

93.    The Pre-1989 Policies constitute a promise by the Club to indemnify Defendants against any loss, damage or expense, which a Defendant becomes liable to pay by reason of its ownership, operation, management, chartering or other enumerated connection with a designated insured vessel resulting from occurrences during the policy year designated in the Policy. Specifically, the Policies provide:

> The [Club] agrees to indemnify the Assured [*i.e.*, Defendant] against any loss, damage or expense which the Assured shall become liable to pay and shall pay by

23

reason of the fact that the Assured is the owner (or operator, manager, charterer, mortgagee, trustee, receiver or agent, as the case may be) of the insured vessel and which shall result from the following liabilities, risks, events, occurrences and expenditures: . . . Liability for . . . loss of life of, or personal injury to, or illness of any person . . . .

94.    The Pre-1989 Policies are assessable policies issued under the Club's By-Laws, which govern the Club's authority to issue assessable policies, to make assessments thereunder, and to terminate the Assured's liability for further assessments thereunder.

95.    In particular, the policies provide:

The Assured are subject to a contingent liability hereunder for assessment without limit of amount for their proportionate share of any deficiency or impairment as provided by law and fixed in accordance with the by-laws of the [Club]; provided, however, that any such assessment shall be for the exclusive benefit of holders of policies which provide for such a contingent liability, and the holders of policies subject to assessment shall not be liable to assessment in an amount greater in proportion to the total deficiency than the ratio that the deficiency attributable to the assessable business bears to the total deficiency.

96.    Article VI, Section 3 of the By-Laws (as amended September 18, 1987) (the By-Laws have been amended over time but the sections quoted herein, upon information and belief, do not appear to have substantially changed) provides:

For the purposes of declaring dividends and making assessments the business of the [Club] shall be divided into insurance years . . .

The insurance years referred to in this By-Law have coincided with the policy periods under the insurance policies issued by the Club during all relevant times.

97.    Article VI, Section 4 of the By-Laws provides:

From time to time after the termination of each insurance year, when the manager shall determine that it is practicable to estimate with a reasonable degree of certainty the minimum, probable or final surplus or deficiency resulting from all of the [Club's] insurances in effect during such insurance year, the manager shall place before the board of directors a statement of such financial results of

24

insurances, segregated between assessable and non-assessable business. After receipt of any such statement, the board of directors from time to time may (a) fix and determine an amount to be declared and paid as a partial or the final dividend, after retaining such sums as they may deem necessary to meet outstanding policy obligations or for the maintenance of reserves and surplus of the [Club], or (b) order an interim or *the final assessment to be made against the holders of assessable policies*, fix the due date of such assessment, determine the rate of interest that shall be added to and become a part of any delinquent assessment, and otherwise provide for enforcement and collection thereof. (Emphasis added.)

98.     The Pre-1989 Policies provide occurrence-based coverage and therefore permit claims to be made thereunder without any time limitation as to when claims can first be made against the insured and still be covered by the policy.

99.     The Pre-1989 Policies have no aggregate limit, only a per-claim limit, and therefore contain no language or provision limiting the Club's liability thereunder.

100.    The Pre-1989 Policies do not limit the recourse of the policyholders against any assets of the Club or to the amount collected by way of premiums and assessments from holders of policies issued to all policyholders for the same policy year.

**The Club's "Final Assessment" Practices**

101.    In the event that the aggregate losses paid by the Club under all Pre-1989 Policies for any open policy year exceed the amounts collected from policyholders for that year through premiums and assessments, the Club, acting through its Board of Directors, has the discretionary authority under the By-Law, Article VI, Section 4 to levy additional assessments on the policyholders for that year to cover the deficiency on an interim or final basis. Likewise, if such amounts collected from policyholders exceed such losses, the Club, again acting through its

Board of Directors, has discretionary authority under the same By-Law provision to refund some or all of the surplus to those policyholders or to decide not to do so.

102.    If the Club's Board of Directors determines to make an assessment for any policy year, the assessments are made against all policyholders for the policy year in issue and are prorated on the basis of the relative amounts of the initial premiums paid under such policies by each policyholder for such policy year.  In other words, assessments for a particular policyholder are not predicated upon claims experience of that policyholder standing alone, but upon the basis of the aggregate claims experience of all policyholders for that policy year.

103.    Thus, as long as a policy year is kept open by the Club, the Club is fully protected against any aggregate deficiency resulting from all claims payments to all policyholders for that year.  In so doing, the Club can protect itself against losses caused by claims arising many years after the policy year in question has passed by making additional assessments of policyholders for that year based on the continuing aggregate claims experience of all policyholders for that policy year.

104.    The Club's Board of Directors' business decision to keep a policy year open for assessment purposes can also be a benefit for policyholders because assessments can be deferred until they are actually needed to pay claims under the policies in issue.  If the assessments in hindsight are larger than necessary to pay all losses for the policy year, the Club, acting through its Board of Directors, may decline to refund any resulting surplus and instead retain the surplus as capital for the Club's operations including the payment of claims for other policy years.  By deferring the closing of a policy year and the making of a final assessment, policyholders can

avoid concerns about being over-assessed and therefore making payments not needed to cover payment of actual claims and earn investment income on their funds that would otherwise be used for payment of assessments.

105.    However, the Club's Board of Directors' business decision to keep a policy year open may not always be viewed as advantageous to the Club's business interest in maintaining its existing members and in attracting new members, because both constituencies do not want to have exposures for contingent liabilities under their policies by way of assessments for the indefinite future.

106.    Thus, as noted, the By-Laws provide for the closing of policy years with so-called "final assessments" by action of the Club's Board of Directors based upon a report and recommendation from the Club's professional claims manager that it is practicable to estimate the losses for the policy year in issue.  Once a policy year has been declared closed by the Club's Board of Directors, under the By-Laws, no further premium or assessment can be levied upon the policyholders with respect to that policy year, even if the operations for that year result in an ultimate deficiency to the Club.

107.    After a policy year has been closed, the Club's balance sheet is updated to transfer all amounts received by way of premiums and assessments after payment of claims for that year into either case reserves for that year, reserves for incurred but not reported losses ("IBNR") for that year, or general reserves not dedicated to any particular policy year.  These reserves, however, do not result in the imposition of any security interest or charge on specified assets or the segregation of any assets.  All funds collected from the assessment of policyholders are assets

27

of the Club, subject to the claims of all of its creditors including but not limited to policyholders for claims payments under their respective policies.

108.    The Club's Board of Directors' determination to close a policy year with a "final" assessment or dividend does not terminate the Club's continuing obligations under the policies for that policy year, unless the policyholder agrees to releases of policy coverage.  Upon information and belief, the Club has neither sought nor obtained any releases of policy coverage for any of the Pre-1989 Policies.

### The Club's Payment of Occupational Disease Claims for Closed Years

109.    Seamen have asserted claims that are still pending and will likely in the future assert additional claims against Defendants seeking damages resulting from their alleged exposure to asbestos, benzene, noise and other substances or conditions on board or in working in or about vessels owned, chartered, operated or managed by one or more Defendants during one or more of the Pre-1989 Years ("Occupational Disease Claims").

110.    The Club has continuously represented expressly and impliedly to policyholders that closing policy years does not impair their coverage rights under the Pre-1989 Policies and that policyholders of those Policies would continue to be insured under those Policies for the Pre-1989 Years.  Defendants and other policyholders of Pre-1989 Policies have relied upon these representations by, among other things, not seeking available coverage alternatives.

111.    For over twenty years the Club has consistently recognized that it is legally obligated to pay for Occupational Disease Claims arising from the Pre-1989 Years, despite the fact that each such year had been closed with a "final assessment," and, in recognition of its

28

obligation to the policyholders, has paid hundreds, if not thousands, of such claims to policyholders. Upon information and belief, the Club has submitted claims for reimbursement for some payments to its own re-insurers under its own reinsurance and stop-loss policies and in so doing represented to such re-insurers that the Club had become legally obligated to make such payments under one or more of the Pre-1989 Policies.

112.    The Club has also acted to affirm its contractual obligations by, *inter alia*, asserting its rights to receive cooperation from policyholders under one or more of the Pre-1989 Policies and its right to consent to the policyholders' settlement of Occupational Disease Claims.

113.    The Club never reserved its rights to deny coverage under the Policies based on insufficiency of reserves set when an insurance year was closed, or on the basis that its obligation to provide such coverage was a "discretionary" practice that could be "terminated."

**The Club's Defeat in the In Re Prudential Lines Case**

114.    An adverse judgment was entered against the Club in the action entitled *Dicola v. American S.S. Owners Mutual Protection and Indemnity Association, Inc. (In re Prudential Lines, Inc.), supra.* In 1998, the United States Court of Appeals for the Second Circuit held that, for Occupational Disease Claims involving exposures occurring over multiple policy years, the Pre-1989 Policies entitle a policyholder to designate the Policy for one of those policy years for payment of its claim, subject to only the one deductible for that policy year. 158 F.3d 65 (2d Cir. 1998). In this litigation, the Club acknowledged that it was obligated to provide coverage for

29

Occupational Disease Claims in closed years and never asserted that its obligation to provide such coverage was "discretionary."

115.    The Club has required, and continues to require, contrary to the Policies and in violation of the mandate of the United States Court of Appeals for the Second Circuit in *In re Prudential Lines, Inc.*, that Defendants pay multiple deductibles for a single claim filed with the Club where the claimant has alleged exposure to asbestos during multiple years of sea service aboard a vessel entered in the Club.

### The June 7, 2004 Circular

116.    In or about June 7, 2004, the Club announced through its June 7, 2004 Circular that the Club no longer intended to make payments to policyholders with respect to Occupational Disease Claims under any Pre-1989 Policies with respect to which such claims had not been reported by the time each such year was closed or for such claims that had been under-reserved or unreserved by the Club.  In so doing, the Club claimed that its payment of such claims for over twenty years was merely a "discretionary practice."

117.    At no time prior to June 7, 2004, has the Club advised its policyholders that the payment of valid claims under any Pre-1989 Policy was "discretionary" or subject to termination if the amount of the Club's reserves for a closed policy year were deemed insufficient or for any other reason.

### FIRST CLAIM FOR RELIEF
#### (Declaratory and Injunctive Relief)

118.    Incorporate by reference into this counterclaim the allegations of paragraphs 74 through 117 of these counterclaims.

119.    Defendants have incurred and will likely incur in the future "loss, damage or expense" in connection with Occupational Disease Claims that are still pending and that are not yet asserted or resolved, resulting from the claimants' exposures occurring during one or more of the Pre-1989 Years and for reimbursement of which Defendants have coverage under one or more Pre-1989 Policies.

120.    The Club is obligated to indemnify Defendants under the Pre-1989 Policies in full for any loss, damage or expense that Defendants become liable to pay, subject to the applicable deductible, in connection with Occupational Disease Claims resulting from exposures occurring during one or more of the Pre-1989 Years, without any time limitation as to when such claims are first made under any one or more of such policies.

121.    The Club has disputed and is likely to continue to dispute its obligations under the Pre-1989 Policies to so indemnify Defendants with respect to Occupational Disease Claims, now pending or made in the future and the Club has asserted the right, which Defendants have disputed and will continue to dispute, to make future assessments under the Pre-1989 Policies to cover losses not covered by reserves established as of June 7, 2004.

122.    As a result of the foregoing, an actual and justiciable controversy exists between Defendants and the Club with respect to (a) the duties and obligations of the Club under one or more of their respective Pre-1989 Policies to provide continuing coverage to Defendants for Occupational Disease Claims resulting from claimants' exposures occurring during one or more of the Pre-1989 Years, and (b) the Club's right to make assessments under the Pre-1989 Policies to cover losses not covered by reserves established as of June 7, 2004.

123.    Accordingly, this Court should (a) declare that Defendants have the right under their respective Pre-1989 Policies to continuing coverage for Occupational Disease Claims resulting from claimants' exposures occurring during any one or more of the Pre-1989 Years, subject only to the applicable deductible, and that the Club has no right to make any further assessment or assessments against any Defendants under any Pre-1989 Policies; (b) grant Defendants a mandatory injunction compelling the Club to provide such coverage and a negative injunction barring, restraining and prohibiting the Club from making, or seeking to make, any such assessment or assessments; (c) award Defendants their attorneys' fees and other costs and expenses incurred in connection with this action to fullest extent permitted by applicable law; and (d) grant Defendants such other and further relief as this Court deems just and proper.

## SECOND CLAIM FOR RELIEF
### (Breach of Contract)

124.    Incorporate by reference into this counterclaim the allegations of paragraphs 74 through 123 of these counterclaims.

125.    Defendants have complied with all applicable conditions of the Pre-1989 Policies that have arisen to date with respect to all pending Occupational Disease Claims.

126.    The Club has breached, and threatens in the future to continue to breach, its obligations to Defendants under one or more of the Pre-1989 Policies by, among other things, (a) refusing on and after June 7, 2004, to make claim payments under Pre-1989 Policies for Occupational Disease Claims resulting from claimants' exposures occurring during one or more of the Pre-1989 Years and (b) reducing its indemnification payments to Defendants otherwise due and payable under the Pre-1989 Policies by applying multiple deductibles for Occupational

32

Disease Claims based upon the number of years that the claimant served on one or more of Defendant's vessels.

127.     In so doing, the Club has also breached, and threatens to continue to breach, its duty under such Pre-1989 Policies to settle claims in good faith, as well as the warranty of utmost good faith and fair dealing implied in every marine insurance policy.

128.     As a direct and foreseeable result of these breaches, Defendants have been damaged and continue to be damaged in an amount to be determined at trial.

**THIRD CLAIM FOR RELIEF**
**(Violation of New York General Business Law §349)**

129.     Incorporate by reference into this counterclaim the allegations of paragraphs 74 through 128 of these counterclaims.

130.     The Club represented to policyholders of all Pre-1989 Policies that such policyholders would continue to be covered by their respective Pre-1989 Policies for Occupational Disease Claims arising during any one or more of the Pre-1989 Years.

131.     Defendants reasonably relied on such representations and have sustained and will continue to sustain damages as a result of the Club's attempt to renege on its obligations to Defendants under their respective Pre-1989 Policies.

132.     The conduct of the Club in purporting to withdraw coverage for claims arising from closed years constitutes deceptive acts or practices within the meaning of New York General Business Law §349.

133.    As a result of the these violations of New York General Business Law §349, the Club is liable to Defendants for damages, attorneys' fees and other costs and expenses and should be enjoined from continuing those deceptive acts or practices.

## FOURTH CLAIM FOR RELIEF
### (Release)

134.    Incorporate by reference into this counterclaim the allegations of paragraphs 74 through 133 of these counterclaims.

135.    In connection with the closing of insurance years and the levying of "final" assessments, the Club granted Defendants releases from any liability for further assessments under one or more the Pre-1989 Policies.

136.    Defendants seek a declaration that any further assessments are barred against Defendants with respect to the Pre-1989 Years covered by such releases.

## FIFTH CLAIM FOR RELIEF
### (Breach of Implied Covenant of Good Faith)

137.    Incorporate by reference into this counterclaim the allegations of paragraphs 74 through 136 of these counterclaims.

138.    As policyholders of the Club, the Club owed Defendants an obligation to act reasonably and in good faith and to deal fairly with Defendants in connection with their rights and obligations under the Pre-1989 Policies.

139.    The Club, in breach of the implied covenant of good faith and fair dealing, has conditioned continuing coverage to which the Defendants are entitled under the express provision of the Pre-1989 Policies upon their payment of additional assessment.  The Club has

34

previously waived and released Defendants from any additional assessment by issuing "final assessments" several years ago.

140.    As a result of the Club's wrongful conduct, Defendants has suffered and will suffer damages in an amount to be determined at trial, including but not limited to attorneys' fees, and are further entitled to claim and recover damages from the Club.

## SIXTH CLAIM FOR RELIEF
### (Promissory Estoppel)

141.    Incorporate by reference into this counterclaim the allegations of paragraphs 74 through 140 of these counterclaims.

142.    Defendants reasonably relied on the express and implied promises of the Club with respect to the existence of coverage for Occupational Disease Claims and express and implied promise of the Club to release policyholders from further assessment when it closed a year with a "final assessment." The Defendants' reliance was foreseeable.

143.    The Club has issued a blanket disclaimer of coverage under Pre-1989 Policies and has threatened to make further assessments on former members such as Defendants.

144.    By reason of the forgoing, the Defendants have suffered damages.

WHEREFORE, Defendants demand judgment:

(a)     dismissing all claims in the Complaint with prejudice and costs;

(b)      declaring that (i) Defendants have the right under their respective Pre-1989 Policies to continuing coverage for Occupational Disease Claims resulting from claimants' exposures occurring during any one or more of the Pre-1989 Years, subject only to the applicable deductible or deductibles, (iii) the Club has no right to make any further assessment or

35

assessments against any Defendants under any Pre-1989 Policies; and (iii) Defendants have the

right under their respective Pre-1989 Policies to designate one of such Policies to indemnify such

Defendant for the payment a particular Occupational Disease Claim, subject to only the

deductible under that Policy and no other;

        (c)     granting Defendants a mandatory injunction compelling the Club to

provide the coverage described in (b) above;

        (d)     barring, restraining and prohibiting the Club from making, or seeking to

make, any assessment or assessments under any Pre-1989 Policies;

        (e)     granting Defendants damages against the Club, in such amount as is

determined at trial, together with pre-judgment interest;

        (f)     granting Defendant their reasonable attorneys' fees and other costs and

expenses incurred in this action;

        (g)     granting such other and further relief as this Court deems just and proper.

Dated:  February 4, 2004        PROSKAUER ROSE LLP
       New York, NY

                By:    /s/  Dale A. Schreiber
                     Dale A. Schreiber (DS-9211)
                     Seth B. Schafler (SS-5993)
                     PROSKAUER ROSE LLP
                     1585 Broadway
                     New York, NY  10036-8299
                     (212) 969-3000
                     (212) 969-2900 (fax)

                     *Attorneys for Defendants Keystone, BP,*
                     *MTL, Cleveland-Cliffs, Ispat, American*
                     *Steamship and Sea Mobility*

-and-

RAY, ROBINSON, CARLE & DAVIES
P.L.L.
Gene B. George
Julia R. Brouhard
1717 East 9th Street, Ste. 1650
Cleveland, OH 44114-2898
(216) 861-4533
(216) 861-4568 (fax)
*Attorneys for Defendant Cleveland-Cliffs*

-and-

DLA Piper Rudnick Gray Cary US LLP
Stanley McDermott, III (SM-0530)
Camilo Cardozo (CC-9710)
1251 Avenue of the Americas
New York, NY  10020
(212) 835-6123
(212) 835-6001 (fax)
*Attorneys for Defendant Ispat*

-and-

GARAN LUCOW MILLER, P.C.
Thomas W. Emery, Esq.
1000 Woodbridge Street
Detroit, Michigan 48207-3192
(313) 446-5525
(313) 259-0450 (fax)
*Attorneys for Defendant American
Steamship*