Nourse & Bowles, LLP
Attorneys for Plaintiff
One Exchange Plaza
At 55 Broadway
New York, New York 10006
(212) 952-6200
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------X
                                  :

AMERICAN STEAMSHIP OWNERS    :     04 Civ. 04309 (LAK)(JCF)
MUTUAL PROTECTION AND       :
INDEMNITY ASSOCIATION, INC.,   :

                              :        **AFFIDAVIT OF**

              Plaintiff,     :     **SHAUN F. CARROLL**
                              :     **IN SUPPORT OF MOTION**
                              :     **FOR PROTECTIVE ORDER,**
   - against -                 :     **ORDER COMPELLING**
                              :     **PRODUCTION AND**
ALCOA STEAMSHIP CO., INC., et. al  :     **AMENDMENT OF**
                              :     **<u>SCHEDULING ORDER</u>**
              Defendants.   :

----------------------------------------------------------X

STATE OF NEW YORK      )
                        )   ss.:
COUNTY OF NEW YORK   )

SHAUN F. CARROLL, being duly sworn, deposes and says:

1.  I am a partner in the firm of Nourse & Bowles, LLP, attorneys for plaintiff,

The American Steamship Owners Mutual Protection and Indemnity Association, Inc. (the

"American Club" or "Club"); and I am fully familiar with the captioned matter.

2.  Attached hereto as Exhibit "1" is a copy of the Second Amended Complaint herein.

3.  Attached hereto as Exhibit "2" is the Amended Answer and Counterclaim of Keystone Shipping Company.

4.  Attached hereto as Exhibit "3" is the Answer and Counterclaim of American President Lines;

5.  Attached hereto as Exhibit "4" is the Answer and Counterclaim of Farrell Lines;

6.  Attached hereto as Exhibit "5" is Plaintiff's First Request for Production of Documents;

7.  Attached hereto as Exhibit "6" is Plaintiff's Second Request for Production of Documents;

8.  Attached hereto as Exhibit "7" is Plaintiff's Third Request for Production of Documents;

9.  Attached hereto as Exhibit "8" is Keystone's Privilege Log;

10.  Attached hereto as Exhibit "9" is Farrell Lines' Privilege Log;

11.  Attached hereto as Exhibit "10" is APL's Revised Privilege Log;

12.   Attached hereto as Exhibit "11" is a copy of Kirlin, Campbell & Keating's opinion letter dated February 14, 1979;

13.   Attached hereto as Exhibit "12" is the American Club's letter to the Board of Directors dated May 4, 1995;

14.   Attached hereto as Exhibit "13" is the Deposition Testimony of Richard H. Brown, Jr.

15.   Attached hereto as Exhibit "14" is Holland & Knight's letter of May 19, 2005 refusing production of the Malloy opinion letter;

16.   Attached hereto as Exhibit "16" is a copy of Nourse & Bowles, LLP's letters dated February 24, 2005 and February 25, 2005 to Brown & Rudnick concerning the concerning the non-production of Nourse & Bowles, LLP's opinion letters;

17.   I hereby certify that the discovery disputes addressed herein have been the subject of prior discussions among the counsel and there is no prospect these disputes can be resolved other than by motion.

_Shaun Carroll_
Shaun F. Carroll

Sworn to before me this
27th day of May 2005

_Karlene S. Jackson_
Notary Public

Karlene S. Jackson, Notary Public
State of New York, #01JA5083169
Qualified in Kings County
Commission Expires August 4, 2005

3

# EXHIBIT 1

Nourse & Bowles, LLP
Attorneys for Plaintiff
Lawrence J. Bowles, Esq. (LB 5950)
One Exchange Plaza
New York, New York 10006
(212) 952-6200
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------X
                              :

AMERICAN STEAMSHIP OWNERS  :
MUTUAL PROTECTION AND
INDEMNITY ASSOCIATION, INC.,  :

            Plaintiff,  :

   - against -  :

                    :

                    :

                    :

Alcoa Steamship Co., Inc.  :
and the Other Entities Listed on Exhibit A
hereto,  :

            Defendants.  :

-------------------------------------------------X

04 CIV. 04309 (LAK)

SECOND AMENDED
COMPLAINT

Plaintiff American Steamship Owners Mutual Protection and Indemnity

Association, Inc. ("American Club" or "Club" or "Association" or "Corporation")

by and through its attorneys, Nourse & Bowles, LLP, as and for its complaint

against defendant Alcoa Steamship Co., Inc. and the other entities listed on Exhibit

A hereto, who were members of the American Club before February 20, 1989

(collectively "Defendants"), alleges on information and belief as follows:

## Introduction and Background

1.     This is an action brought by the American Club, a non-profit mutual

indemnity insurance association, pursuant to 28 U.S.C. §2201 for a Declaratory

Judgment that as those Defendants who were members of the Club before the

Insurance Year that commenced on February 20, 1977 and for the Insurance Year

that began on February 20, 1978 did not pay any amounts in premiums or

assessments to the Club with respect to claims for incurred but not reported

occupational diseases of seamen and others (hereinafter "IBNR") during those

years, and as those Defendants who were members of the American Club in the

Insurance Year that commenced on February 20, 1977 and in the Insurance Years

between February 20, 1979 and February 20, 1989 paid assessments to the Club for

IBNR which they knew or should have known might be inadequate to cover such

claims and which now have proved to be inadequate, they are not entitled to any

further indemnifications from the Club with respect to their payments to seamen

and others regarding IBNR occupational disease claims or regarding any other

claims arising in the Insurance Years before February 20, 1989.

2

2.    The above relief is necessary to restore and preserve the requisite mutuality under the Club's By-Laws and applicable New York law between and among the members of the Club before February 20, 1989 and the members thereafter.

3.    The fundamental requirement underpinning a non-profit mutual indemnity insurance association such as the American Club is that its members operate the Club for their own exclusive benefit to provide indemnity insurance to each other at cost.  They do this by paying premiums and assessments to the Club, under the members' fully assessable indemnity insurance policies sufficient to provide the funds necessary to indemnify or reimburse each other with regard to reported occurrences which give rise to claims against the members in each separate Insurance Year.  That is, when claims against members are reported to the Club, the members must contribute to the Club the funds needed to pay such claims.  In most instances, the reported claims are not paid during the Insurance Year in which the alleged injuries occurred.  Accordingly, specific reserves are established to indemnify the members with respect to each reported claim (hereinafter "case" reserves), after they resolve and pay those claims.

4.    When the costs of insurance in each Insurance Year have been determined on the basis of known claims, the Year's members are assessed a final

3

amount to cover or reserve against each reported claim, or may be given a refund of any amounts collected in excess of the amount needed to pay or reserve against such claims and this process is generally referred to as "closing" a year.

5.    In connection with the closing of the Insurance Years between 1946 and 1976, the Defendants received refunds of assessments of more than $16 million.

6.    After "closing" an Insurance Year, the Club has no right to seek further assessments from the members for that Year and correlatively those members have no right to obtain further funds from the Club to the extent not covered by the case reserves established for that Year.

7.    After an Insurance Year is closed the Club's reserves, including the case reserves, become the property of the members of the Club in the open years and those members have an obligation to indemnify the closed years' members for their payments of reported claims from the case reserves.  In view of the requirement for mutuality, the members in the open years have no legal obligation to indemnify members in closed years for any unreserved or inadequately reserved IBNR claims that may be made against them.

4

8.     In about the early 1980s, seamen and others working on or about the members' vessels began to assert they had been injured by exposure to asbestos many years earlier, in some cases going back to the 1940s, and by the mid 1980s the assertion of such claims was accelerating, and was expected to continue.

9.     Despite the fact that in the Insurance Years before 1977 the Defendants did not report any such IBNR claims or pay any premiums or assessments to the Club to establish any case or IBNR reserves to cover for amounts they might pay to seamen and others with respect to IBNR claims arising in those long closed years, in about 1980, those Defendants, who were largely the same members of the Club as those in the 1940s and thereafter, developed a practice (which is discretionary, in that it is not provided for in the Club's Charter, By-Laws or insurance policies or in the principle of full mutuality under New York law), of indemnifying each other for IBNR claims from the Club's general reserves. They did so notwithstanding that such reserves were not the property of the members in the closed Years. This discretionary practice included allocating each seaman's or other's claim over the years in which he worked on or about the members' vessels, applying the members' deductibles for each of those years, and indemnifying each other for the balance, if any (the "Discretionary Practice"). At the same time, the Defendants did not assess each other any amounts to establish

5

any reserves for their continued indemnifications regarding such IBNR claims arising before the Insurance Year that commenced on February 20, 1977.

10.    In 1988, with the closing of the Insurance Year that commenced on February 20, 1977, the Club's directors decided to assess that Year's members the sum of $100,000 for IBNR claims arising in that Year and to make the same assessments in future Years (except for the 1978 Year which had previously been closed).

11.    Through December 31, 2003 the Club's reimbursements to its members regarding occupational disease claims attributable to alleged exposure as far back as the 1940s totaled almost $6 million, while the members' actual contributions to the IBNR reserves have been only $2.2 million.

12.    Thousands of claims by seamen and others are still pending in the Courts; and new claims are being filed and the Club's current members, who, as such, have no obligations to indemnify the Defendants in respect of unreserved or inadequately reserved IBNR claims that arose from occurrences before February 20, 1989, have been inequitably prejudiced by the Discretionary Practice the Defendants developed in about 1980 of indemnifying each other from the Club's general reserves for such claims.  The Discretionary Practice has now become

6

unsustainable and the Club's current members will be further inequitably prejudiced if this Discretionary Practice continues, which it should not.

13.    The Club has informed the Defendants that it has terminated this Discretionary Practice and will no longer indemnify them with respect to IBNR claims arising before February 20, 1989.   To date several Defendants have objected to the Club's position and threatened litigation, and other Defendants may do the same.  Several Defendants also object to that part of the Discretionary Practice involving allocation of claims to the Years the seamen worked on the members' vessels and requiring the members to absorb multiple deductibles. Several have commenced or have threatened to commence litigation regarding the Club's position on this also.  Accordingly, actual justiciable controversies exist.

## The Parties

14.    The American Club is a non-profit mutual indemnity insurance association of shipowners organized and existing under laws of the State of New York with its principal place of business in New York, New York.

15.    The Defendants listed on Exhibit A hereto are corporations or other business entities organized and existing under the laws of various states. Defendants were members of the Club at various times between about 1940 and February 20, 1989.

7

**Jurisdiction and Venue**

16.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1333(1) because it is an admiralty or maritime claim (involving marine insurance contracts) within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.  In addition, the Court has supplemental jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1367(a).

17.   Venue in this judicial district is proper because: (a) at all relevant times, Defendants were and are doing business in this judicial district; (b) the policies were negotiated and delivered in this judicial district; and (c) some of the policies issued to the Defendants specifically require the application of New York law.

**Managing the Club**

18.   Pursuant to its Charter and By-Laws, the business of the American Club is conducted by its Board of Directors.

19.   A majority of the Board members must be either members of the Club or officers of members.  Board members may have equity interests in their shipowning/operating companies and/or hold senior executive positions therein. Directors are elected by the membership each year at the Club's annual meeting.

20.    The Chairman of the Board of Directors, who must be a member or an officer of a member, is elected at each annual meeting of the members. He is the chief executive officer of the Club. He presides at all meetings of the members and directors and has general charge and oversight of the business of the Club and its affairs.

21.    To assist the Chairman and the Board of Directors in carrying out their duties, the Board of Directors appoints a Finance Committee of its members. The Finance Committee functions as an executive committee and makes recommendations to the Chairman and the Board of Directors.

22.    The American Club's day to day affairs are managed by Shipowners Claims Bureau, Inc., (the "Managers" or "SCB"). The Managers provide underwriting, claims handling, accounting and related services to the Club.

23.    The Managers, who are appointed by the Board of Directors and paid by the Club's members, are subject to the direction and control of the members through the Board of Directors.

9

**Insurance Policies**

24.     The American Club issues one-year fully assessable marine protection

and indemnity insurance policies (covering defined marine risks) to each of that

Insurance Year's participating members (the "Policies").

**Mutuality – Contingent Liability for Assessment of All Insurance Costs**

25.     The members of the American Club, through their payments to the

Club under their fully assessable Policies, collectively and mutually indemnify

each other for all known and reserved claims occurring in each Insurance Year,

except for catastrophic claims which are covered by reinsurance collectively

purchased by those members.

26.     Each Policy issued prior to February 20, 1989 contained substantially

the following provision:

> ASSESSABILITY.   The Assured are subject to a
> contingent liability hereunder for assessment without
> limit of amount for their proportionate share of any
> deficiency or impairment as provided by law and fixed in
> accordance with the By-Laws of the Association;
> provided, however, that any such assessment shall be for
> the exclusive benefit of holders of policies which provide
> for such a contingent liability, and the holders of policies
> subject to assessment shall not be liable to assessment in
> the amount greater in proportion to the total deficiency
> than the ratio that the deficiency attributable to the
> assessable business bears to the total deficiency.
> (Emphasis added)

10

27.    Under New York law and pursuant to the American Club's By-Laws, members (who are both insurers and insureds) remain members while the Policies are effective to insure risks.  They are entitled and required to be treated by, and to treat, the Club on a mutually fair and equitable basis so that (a) all members for an Insurance Year pay their fair share of the liabilities incurred in that Insurance Year, (b) no member for any Insurance Year receives inequitably different treatment than any other member for that Insurance Year, and (c) the members individually and as a whole for any Insurance Year do not receive inequitably different treatment than the members individually and as a whole for any other Insurance Year.

28.    Prior to the commencement of each Insurance Year, the American Club, through its Managers, and in conjunction with each member, estimates the estimated total cost ("ETC") of insurance for each member for the forthcoming Insurance Year.  The ETC is based principally upon the member's historical loss experience as reported by each member or prospective member.  Each member's ETC represents its share of the Club's aggregate ETC for that policy year and is charged to them in the form of an advance call and subsequent assessments.  The ratio of each member's ETC to the aggregate ETC determines that member's proportion of the aggregate ETC, advance call, and subsequent assessments.  Accordingly, the higher any member's ETC is, the higher will be its proportion of the aggregate Club ETC, advance calls, and assessments.  Since each member's

11

liability for and proportion of the ETC, advance calls and assessments is based principally on that member's reported loss experience, it is fundamental to the requisite mutuality that such loss experience, including all claims which may result in loss, etc., for which the Club may become liable, be promptly reported to the Club to permit proper evaluation and the determination of the appropriate ETC for each relevant Insurance Year.

**<u>Other Relevant Policy Provisions</u>**

29.     Each Policy contained substantially the following additional provisions:

> Prompt Notice of Claim.
>
> In the event of any happening which may result in loss, damage or expense for which the Association may become liable, prompt notice thereof, on being known to the Assured, shall be given by the Assured to the Association.
>
> Time Bar.
>
> (a)  The Association shall not be liable for any claim not presented to the Association with proper proofs of loss within one year after payment by the Assured.
>
> (b)  In no event shall suit on any claim be maintainable against the Association unless commenced within two yeas after the loss, damage or expense resulting from liabilities, risks, events, occurrences and expenditures specified under this policy shall have been paid by the Assured.

30.    Each Policy also contained endorsements stating the sum insured or policy limit as well as the amount of the "deductions" or deductibles or self insured retentions for different classes of claims.  (The higher the deductibles, the lower the member's ETC.)

31.    Until 1972, the policies were issued for a calendar year or part thereof. In 1972 and thereafter, the policy years commenced at 1201 GMT on February 20th, running to 1200 GMT February 20th the following year (the "Insurance Year" or "Policy Year").

32.    By accepting membership in the Club, members agree to be bound by all of the terms and conditions of the Policies, the Club's Charter, its By-Laws, and applicable New York law.

### Regulating the Club

33.    The American Club is regulated by the Insurance Department of the State of New York and must comply with all relevant provisions of New York law, including, without limitation, Insurance Law Sections 1211 and 4111.

34.    Insurance Law Section 1211 states in material part:

> (a)  Every domestic mutual insurance corporation shall
> be organized, maintained and operated for the benefit of
> its members as a non-stock corporation.  Every policy

13

holder shall be a member of such corporation and shall
... be entitled to vote at any regular or special meeting of
such corporation, to notice thereof pursuant to the By-
Laws and to share equitably in dividends declared by the
Board of Directors.

35.    Insurance Law Section 4111 states in material part:

(a)... every domestic mutual property/casualty insurance
company shall in its by-laws and policies prescribe the
contingent mutual liability of its members for the
payment of assessments, in such a way that each member
shall be liable to pay the member's proportionate share
... of the amount of any assessment or assessments
permitted for any purpose under any provisions of this
chapter ... or necessary to make good any impairment of
the minimum surplus of such company.

36.    The Club's By-Laws, as required by New York law, contain the

following provisions:

Article V.   Policies, Dividends and Assessments

SECTION 1.  All policies issued by the Corporation shall
either be assessable or non-assessable, and every policy
shall clearly state whether or not the holder of such
policy is subject to a liability for assessment.   The
policies which are subject to a liability for assessment
shall contain a clear statement of the liability of the
policy-holder for the payment of his proportionate share
of any deficiency or impairment as provided by law
within the limit provided by the policy, and shall further
state that any assessment shall be for the exclusive
benefit of holders of policies which provide for such a
contingent liability, and the holders of policies subject to
assessment shall not be liable to assessment in an amount
greater in proportion to the total deficiency than the ratio

14

> that the deficiency attributable to the assessable business bears to the total deficiency. ***
>
> SECTION 2.  The assessable policies of the Corporation may be issued without any maximum or limit of the Corporation's total liability thereunder to the member. ***
>
> SECTION 3.  For the purposes of declaring dividends and making assessments the business of the Corporation shall be divided into insurance years ... and the financial results of the insurance years shall be segregated as to business under assessable policies and business under non-assessable policies.

37.    Each Insurance Year is thus a separate accounting unit which typically involves different members and/or members with different proportionate shares of the total ETC premiums and assessments paid that year.

## Notification of Claims

38.    As noted above, in the event of any happening which may result in loss, damage or expense for which the Club may become liable under the Policy terms, each member is obligated to give prompt notice thereof to the American Club.

39.    Claims against shipowner members of the Club by seamen and other claims by other persons or entities frequently are first asserted after the termination of the Insurance Year(s) in which the alleged injury or illness or incident occurred. If the Insurance Year is "open", a reserve for each such claim must be established,

15

and the members in that Insurance Year must be assessed to provide such reserve,

i.e. case reserves.   Each such claim will also be included in the member's loss

record and considered in determining his ETC premiums and assessments in future

Insurance Years.

### "Closing" Insurance Years

40.    The Club's By-Laws contain the following or substantially similar

provisions regarding "closing" Insurance Years:

> Article V.   Policies, Dividends and Assessments
>
> SECTION 4.  From time to time after the termination of
> each insurance year, when the Manager shall determine
> that it is practicable to estimate with a reasonable degree
> of certainty the minimum, probable or final surplus or
> deficiency resulting from all of the Corporation's
> insurances in effect during such insurance year, the
> Manager shall place before the Board of Directors a
> statement of such financial results of such insurances,
> segregated between assessable and non-assessable
> business.  After receipt of any such statement, the Board
> of Directors from time to time may (a) fix and determine
> an amount to be declared and paid as a partial or final
> dividend, after retaining such sums as they may deem
> necessary to meet outstanding policy obligations or for
> the maintenance of reserves and surplus of the
> Corporation, or (b) order an interim or the final
> assessment to be made against the holders of assessable
> policies, fix the due date of such assessment, determine
> the rate of interest that shall be added to and become a
> part of any delinquent assessment, and otherwise provide
> for enforcement or collection thereof.   Any dividend
> declared or any assessment levied shall be based solely

on such surplus or such deficiency, respectively, resulting from the assessable business for the insurance year. All dividends declared and all assessments levied shall be distributed or spread in the ratio that the net premiums paid by the holder of an assessable policy bear to the net premiums paid by all holders of assessable policies for the insurance year. ... In any case, however, all actions of the Board of Directors in respect of dividends or assessments shall conform with the Law and with the Charter and By-Laws of the Corporation.

41.    The process described in Article V, Section 4 of the Club's By-Laws is generally referred to as "closing" a Policy or Insurance Year.

42.    After "retaining such sums as" the Board "deems necessary to meet outstanding policy obligations", i.e., obligations regarding known claims for a designated Insurance Year or "case" reserves, "or for the maintenance of reserves and surplus" of the Club, the Board may declare a "dividend" to be returned to the members, or an "assessment" to be "made" or levied upon them.

43.    Until about 1989, Insurance Years were typically "closed" up to about 10 years after their terminations.

44.    Between Insurance Years 1946 and 1976, the members in those years received refunds of assessments or dividends from the Club of more than $16 million, and the only case reserves were those established for reported claims - no IBNR reserves were established.

17

**Assertion of Late Manifesting Occupational Injury Claims**

45.    Asbestos disease claims of seamen, and others based on alleged exposure to asbestos while employed on or about members' vessels first came to the Club's attention in about the early 1980s.

46.    Those claims usually involved more than one Insurance Year and frequently involved alleged exposure to asbestos during the seaman's employment on members' vessels many years earlier, in the 1940s, 50s and 60s.  By the mid 1980s, thousands of such cases had been filed in the courts, including many against the Club's shipowner members.

**The Club's Discretionary Practices**

47.    Notwithstanding that no case or IBNR reserves had been established to indemnify the members regarding payments to seamen and others for occupational disease claims allegedly resulting from exposures during closed Insurance Years, the Club's membership, which had changed relatively little since the 1940s, requested indemnifications for their costs of resolving these claims.  In about 1980 the Discretionary Practice was developed to indemnify the members from the Club's general reserves including  (a) allocating the amounts paid by the members to each seaman proportionately over the Insurance Years during which the seaman worked on the members' vessel(s), based upon the seaman's sea

18

service each year, (b) applying to each year's proportion of the claim the applicable deductible for each such Insurance Year, and (c) reimbursing or indemnifying the member for the amounts it paid to the seaman and for legal expenses, less the deductibles as thus applied.

48.    After the potential seriousness of these late manifesting claims began to become known, in about the mid 1980s, proposals were made by the Managers and Board members to set aside funds as each open Insurance Year was closed to provide reserves for such Years to cover these newly discovered IBNR claims that they expected would be asserted in future years.

49.    In connection with the closing of Insurance Year 1977, the Board of Directors ordered that a reserve of $100,000 per year be established to cover possible IBNR occupational disease claims arising in that Year.  The Managers, who had recommended a larger yearly reserve, also recommended that the amount be reconsidered periodically for adequacy.

50.    When the decision to reserve $100,000 for IBNR per closed Insurance Year was made, the 1978 Insurance Year had already been closed and no IBNR reserve had been established for that year.  The same assessment has been made as each Insurance Year from 1979 through February 20, 1999 has been closed.  No

19

effort was made to assess members to establish IBNR reserves for previously closed Insurance Years.

51.    For exposures to seamen allegedly occurring entirely after February 20, 1989, the Board, in late 1989, also decided that the allocation and multiple deductible parts of the Discretionary Practice would no longer apply, as the American Club had joined the International Group of P&I Clubs, effective that date, and by doing so, the American Club obtained access to reinsurance for its members on more favorable terms than were previously available.  However, as the International Group is also a mutual insurance association of P&I Clubs, the Club was required to conform to the International Group's practice in dealing with members' claims resulting from settling the occupational injury claims of seamen.

52.    The International Group's practice was, and is, to apply the single deductible from the most recent indemnity policy held by the shipowner member, even if the alleged exposure overlapped more than one Insurance Year.  As deductibles have generally increased over time, the most recent deductible was likely to be the largest deductible in any indemnity policy held by a Club's member.

**Continued Indemnifications to Defendants**
**Under the Discretionary Practice for Insurance Years**
**Before February 20, 1989 Will Inequitably Reduce**
**the Club's General Reserves in an Unsustainable Amount**

53.    Since about 1980, Defendants have sought and received

indemnifications from the American Club regarding their resolutions of the IBNR

claims of hundreds of seamen who worked on their vessels since about 1940.

Those reimbursements, as of December 31, 2003, totaled almost $6 million.  The

bulk of that sum relates to alleged exposures of seamen to asbestos on members'

vessels prior to Insurance Year 1977.  Meanwhile, for the closed Insurance Years

through February 20, 2000, the members contributed only $2.2 million to the

Club's reserve for IBNR.

54.    Over 6,000 seamen's asbestos cases are pending in the courts in

Cleveland and Detroit, alone.  Many other such cases are pending in other courts

around the United States and additional cases are anticipated.  Other forms of

occupational disease claims have been asserted by seamen and others and will

likely continue to be asserted in the future for occupational diseases/injuries

allegedly occurring in closed Insurance Years, including claims for (a) alleged

hearing losses (b) leukemia arising from alleged exposure to benzene, (c) other

diseases related to exposures to other chemical products, (d) exposures to lead,

21

sandblasting grit and fumes from welding operations, and (e) other types presently unknown.

55.    It is unknown how many more seamen and others will succeed on previously filed or new claims against the American Club's members in the Insurance Years prior to February 20, 1989; and as no case or IBNR reserves were established for the Insurance Years prior to 1977 and the limited reserves established for IBNR claims for the Insurance Year 1977 and the Insurance Years 1979 through February 20, 1989 are now known to be plainly inadequate, it is obvious that if the current drain on the Club's general reserves continues, the Club's general reserves, at least those accumulated before February 20, 1989, will continue to decrease and could be depleted.  Such drain is inequitably prejudicing the Club's members in the currently open Insurance Years and will continue to do so in future Insurance Years.   Such members who are largely different entities from those in the Insurance Years before February 20, 1989, had and have no legal or other obligation to indemnify or reimburse the Defendants for unreserved or inadequately reserved IBNR occupational disease claims attributable to the closed Insurance Years prior to February 20, 1989.

56.    Not only are there no provisions for the Discretionary Practice in the Club's Charter, By-Laws, Policies or New York law, such practice if further

continued would be contrary to the applicable provisions of the By-Laws and New York law as outlined above.

57.    On May 25, 2004 the Board of Directors resolved that the Club would terminate the Discretionary Practice, effective immediately, and will no longer indemnify Defendants with respect to IBNR claims for occupational diseases arising in closed Insurance Years before February 20, 1989. This will ameliorate the prior inequitable situation and fairly avoid the further inequitable drain created thereby upon the Club's general reserves. The Defendants were promptly informed of the Club's decision and, to date several have objected thereto.

## Other Issues in Dispute

58.    In the meantime, several of the Defendants, including Keystone Shipping Company and its related entities ("Keystone") and other defendants have demanded a retroactive partial modification of the Discretionary Practice in that instead of allocating the seamen's claims over the years in which they worked on the members' vessels, applying the members' deductibles for those years and then reimbursing the members for the balance, if any, they have demanded the right to designate one Insurance Year's policy to cover each seaman's entire claim and absorb only one deductible (presumably an Insurance Year with the lowest deductible) and be reimbursed in respect of the deductibles in excess of one which

23

they have applied with respect to each of numerous such claims resolved to date and also apply this approach with regard to future seamen's claims. Keystone has sued the Club with respect to this part of the Discretionary Practice and other former members have threatened litigation also.

59.    If the Court approves the termination of the Discretionary Practice, as it should, the Club will have no obligation to indemnify the Defendants for any parts of such claims, and the demands of those Defendants seeking the retroactive and future partial modifications of the Discretionary Practice described above will become moot.

60.    If the Court holds that the Discretionary Practice must continue, which it should not, the Club should be permitted to continue that part thereof regarding allocation of claims and application of multiple deductibles, as that part of the Discretionary Practice is consistent with New York law. See, e.g., Consolidated Edison Co. of NY v. Allstate Insurance Company, et al., 746 NYS 2d 622 (NY 2002).

61.    In any event, the retroactive partial modification of the Discretionary Practice demanded by some Defendants is barred in whole or in part by the applicable statute of limitations and/or by the doctrines of laches and/or waiver.

## FIRST CAUSE OF ACTION

### Declaratory Judgment

### (The Club is Entitled to Terminate
### The Discretionary Practice)

62.     The American Club repeats and realleges the allegations contained in

paragraphs 1 through 57 as if fully set forth herein.

63.     As a result of the foregoing and the objections of some of the

Defendants with respect thereto, an actual and justiciable controversy exists

between the American Club and Defendants with respect to the termination of the

Discretionary Practice.

64.     The American Club seeks a judicial declaration by this Court that it is

entitled to terminate the Discretionary Practice with respect to IBNR claims arising

in closed Insurance Years before February 20, 1989 to restore and preserve the

mutuality between its members before that date and thereafter as required by the

Club's By-Laws and New York law.

WHEREFORE, the American Club requests that this Court (a) declare that it

is entitled to terminate the Discretionary Practice as to IBNR claims arising in

closed Insurance Years prior to February 20, 1989 for the reasons as described

above, and (b) award the Club its attorneys' fees and costs expended in connection

with this action and such other and further relief as this Court deems just and proper.

## SECOND CAUSE OF ACTION

### (Alternative Declaratory Judgment)

### (Action to Restore Mutuality)

65.    The American Club repeats and realleges the allegations contained in paragraphs 1 through 57 as if fully set forth herein.

66.    If, hypothetically, Defendants are held entitled to any further indemnifications with respect to alleged IBNR occurring during the Insurance Years before February 20, 1989, which should be denied, there would result gross inequities between the members of the Club before that date and after that date unless the Club may take appropriate steps to restore the requisite mutuality among all of its members in all Insurance Years as its Board of Directors may reasonably determine.  Such steps, *inter alia*, would in substance include ordering "closed" Insurance Years "reopened" for the limited purpose of achieving equitable reimbursement as to each Defendant's claim for indemnification for IBNR claims arising before February 20, 1989 by calculating the amounts in which each relevant Insurance Year should respond to such Defendant's claim, levying the appropriate assessments against each member for that Year (including such Defendant),

collecting those assessments to the extent reasonably possible, and reimbursing such Defendant from such collections, less a debit against such Defendant in the amount of the assessment against it plus the administrative cost to the Club of the process.

67.    As a result of the foregoing, an actual and justiciable controversy exists between the American Club and Defendants with respect to the rights and obligations of each.

68.    The American Club seeks a judicial declaration by this Court that if, hypothetically, Defendants are held entitled to any further indemnifications with respect to alleged IBNR occurring during the Insurance Years before February 20, 1989, which should be denied, then the American Club is entitled and required to restore the requisite mutuality and equities between and among all of its members in all Insurance Years in the manner outlined above.

WHEREFORE, the American Club requests that this Court (a) declare that if Defendants are held entitled to any further indemnifications with respect to alleged IBNR occurring during the insurance years before February 20, 1989, that the American Club is entitled and required to restore the requisite mutuality and equities in the manner outlined above and (b) award the American Club its

27

attorneys' fees and costs expended in connection with this action and such other and further relief as this Court deems just and proper.

### THIRD CAUSE OF ACTION

### (Further Alternative Declaratory Judgment)

### (Allocation of Claims and Application of Multiple Deductibles)

69.    The American Club repeats and realleges the allegations contained in paragraphs 1 through 61 as if fully set forth herein.

70.    If, hypothetically, Defendants are held entitled to any further indemnifications with respect to alleged IBNR occurring during the Insurance Years before February 20, 1989, which should be denied, the Club should also be held entitled to continue its current Discretionary Practice, as more fully described above, of allocating each seaman's or other's claim over the years he worked on or about the members' vessels, applying the members' deductibles for each of those years and indemnifying the members for the balance, if any.

71.    As a result of the foregoing, and the objections and actions of some of the Defendants with respect thereto, an actual and justiciable controversy exists between the American Club and some of the Defendants with respect to the rights and obligations of each.

28

WHEREFORE, the American Club requests that this Court (a) declare that if Defendants are held entitled to any further indemnifications with respect to alleged IBNR occurring during the Insurance Years before February 20, 1989, that the American Club is also entitled to continue its current Discretionary Practice in the manner outlined above and (b) award the American Club its attorneys' fees and costs expended in connection with this action and such and other further relief as this Court deems just and proper.

Dated:     New York, New York
           July 8, 2004

NOURSE & BOWLES, LLP
Attorneys for Plaintiff

By:                           
Lawrence J. Bowles, Esq. (LB 5950)
One Exchange Plaza
New York, New York 10006
(212) 952-6200

TO:  Defendants Listed on
      Exhibit "A" Hereto

29

EXHIBIT "A"

To the following Defendants and each of their predecessors and related companies who were members of the American Steamship Owners Mutual Protection and Indemnity Association, Inc. between 1946 and February 20, 1989:

Academy Tankers Inc.
Canterbury Shipping Corp.
National Oil Transport Co.
c/o Secretary of State
Townsend Building
Dover, DE  19901

Alcoa Steamship Co., Inc. as Successor to
Lib-Ore Steamship Company, Inc.
Pan-Ore Transportation, Inc.
Reynolds Metals Company
201 Isabella Street
Pittsburgh, PA  15212

Amerada Hess as Successor to
Hess Oil and Chemical Corp.
1185 Avenue of the Americas
New York, NY  10036

American Maritime Holdings Inc.
39 Broadway
New York, New York  10006

American Maritime Holdings Inc.
Sea Mobility Inc.
World Wide Tankers Inc.
c/o US Corporation Company
2711 Centerville Road, Suite 400
Wilmington, DE  19808

APL, Ltd. as Successor to
American Mail Line
American President Lines, Inc.
1111 Broadway Street, 6th floor
Oakland, CA  94607

American Steamship Company
500 Essjay Road
Williamsville, NY 14221

Apex Oil Co., Inc.
8182 Maryland Avenue
St. Louis, MO  63105

Apex Oil Co., Inc.
3314 River Road
P.O. Box 3127
Wilmington, NC  28403

Aremar C.I.F.S.A
Viamonte 494
9 Piso
1053 Buenos Aires, Argentina

Argosy Offshore Ltd.
1010 Milam
Houston, TX  77002

Argosy Offshore Ltd.
c/o CT Corporation System
8550 United Plaza Blvd.
Baton Rouge, LA  70809

Arpez S.A.
Calle Venezuela 110
1095 Buenos Aires, Argentina

Astra Compania Argentina de Petroleo S.A.
Tucuman 744
11th floor
1049 Buenos Aires, Argentina

Atlantic Richfield Company
515 South Flower Street
P.O. Box 2679
Los Angeles, CA  90071

Atlantic Richfield Indonesia Inc.
Landmark Center Tower B
Jl. Jenderal Sudirman Kav. 70A
P.O. Box 1063
12910 Jakarta Java, Indonesia

Avila y Pizarro Compania Ltda.
Agents for Van Gogh Inversiones SA
Blanco 570
Valparaiso Chile

Avon Steamship Co. Inc.
Agents for Amherst Shipping Inc.
410 Lakeville Road, Rm. 201
Lake Success, NY  11040

Barber Asphalt Corp.
c/o CT Corporation System
277 Park Avenue
New York, NY  10017

Barge Transport Company
P.O. Box 2569
1812 Durham Drive
Houston, TX  77252-2569

Bermuda Atlantic Line Ltd.
P.O. Box 1198
Hamilton 5, Bermuda

Bermuda Atlantic Line Ltd.
760 N.E. 7th Avenue
Dania, FL  33004

Bessemer Trust Co. as Successor to
Howard Phipps, Ogden Phipps,
David Layman, Jr., Bessemer Trust Co.,
Bessemer Securities Corp.
Grosvenor-Dale Co., Inc.
630 Fifth Avenue
New York, New York 10111-0333

BP as Successor to
American Oil Company
Standard Oil Company
Sohio Alaskan Petroleum Co. and
SPC Shipping Inc.
28100 Torch Parkway
Warrenville, IL 60555

Bridgeport & Port Jefferson Steamboat Co.
102 West Broadway
Port Jefferson, NY  11777

Brokerage & Management Corp.
90 Broad Street, 24th floor
New York, NY  10004

Caribbean Steamship Co. S.A.
P.O. Box 2568
Corpus Christi, TX  78403

Central Gulf Lines as Successor to
Central Gulf Lighters
Poydras Center
650 Poydras Street, Suite 1700
P.O. Box 53366
New Orleans, LA  70153

ChevronTexaco Corporation as Successor to
California Oil Company
6001 Bollinger Canyon Rd.
San Ramon, CA 94583

Cleveland-Cliffs, Inc. as Successor to
Cleveland-Cliffs Steamship Company
1100 Superior Avenue
Cleveland, OH  44114

Coal Logistics Corporation
30 Skyline Drive
Lake Mary, FL  32795

Coastal Carriers Inc.
1607 Belle Chasse Highway
Belle Chasse, LA  70037

Coastal Carriers Inc.
c/o Clayton Ragas
216 Ft. Jackson Street
Belle Chasse, LA 70037

Companhia de Navegacao Maritima Netumar
Avenida Presidente Vargas 482
22 Andar
Rio de Janeiro, 2000RJ Brazil

Crest Tankers Inc.
8182 Maryland Avenue
St. Louis, MO  63105

Dillingham Construction World Headquarters
1020 Serpentine Lane Suite 110
Pleasanton, CA  94566

Dillingham Construction Corporation
5960 Inglewood Drive
P.O. Box 1089
Pleasanton, CA  94566

The Dow Chemical Company
2030 Dow Center
Midland, MI  48674

Carolyn S. Schwartz, Esq.
Office of United States Trustee
Of Enron Corporation
33 Whitehall Street
21st Floor
New York, N. Y. 10004

Empresa de Navegacion El Faro
Calle Lavalle 388
1047 Buenos Aires, Argentina

Equistar Chemicals, LP as Successor to
Cuba Distilling  Company
National Distillers Products Corp.
300 Doremus Avenue
Newark, NJ 07105

Euro Gulf International
c/o Diamond State Corp. Agents Inc.
1200 North Broom Street
Wilmington, DE  19806

Federal Transport Company, Inc.
c/o Del Monte Fresh Produce Company
P.O. Box 149222
Coral Gables, FL 33114

Foss Maritime Company
c/o Saltchuk Resources, Inc.
660 West Ewing St.
Seattle, WA 98119

Georgia-Pacific Corporation
133 Peachtree Street, NE
Atlanta, GA  30303

Georgia-Pacific Corp.
P.O. Box 105605
Atlanta. GA  30348

Global Bulk Transport Inc.
280 Park Avenue
New York, New York  10017

Grace Lines, Inc./Prudential Lines, Inc.
c/o PLI Disbursement Trustee
Lee J. DiCola, Esq.
2800 Carrington Street NW
North Canton, OH 44720

Gulf International Marine Inc.
c/o Gil Anthony Hebert
437 Menard Road
Houma, LA  70360

Hendry Corporation
P.O. Box 13228
Tampa, Florida 33681-3228

Inland Lakes Management Inc.
112 West Chisolm
P.O. Box 646
Alpena, MI  49707

Ispat Inland Inc.
3210 Watling Street
East Chicago, IN  46312

Keyspan Corporation as Successor to
Eastern Gas and Fuel Associates and
1 Metrotech Center
Brooklyn, NY  11201

Keystone Shipping Co.
1 Bala Plaza East, Suite 600
Bala Cynwyd, PA 19004

    Baldbutte Shipping Company
    1 Bala Plaza East, Suite 600
    Bala Cynwyd, PA 19004

    Calendar Navigation Corp.
    1 Bala Plaza East, Suite 600
    Bala Cynwyd, PA 19004

    Chas. Kurz & Co., Inc.
    1 Bala Plaza East, Suite 600
    Bala Cynwyd, PA 19004

    Chestnut Shipping Corp.
    1 Bala Plaza East, Suite 600
    Bala Cynwyd, PA 19004

    Chilbar Shipping Co.
    1 Bala Plaza East, Suite 600
    Bala Cynwyd, PA 19004

    Fredericksburg Shipping Co.
    1 Bala Plaza East, Suite 600
    Bala Cynwyd, PA 19004

    Keystone Tankship Corporation
    1 Bala Plaza East, Suite 600
    Bala Cynwyd, PA 19004

    Margate Shipping Co.
    1 Bala Plaza East, Suite 600
    Bala Cynwyd, PA 19004

    New England Collier Co.
    1 Bala Plaza East, Suite 600
    Bala Cynwyd, PA 19004

    Paco Tankers Inc.
    1 Bala Plaza East, Suite 600
    Bala Cynwyd, PA 19004

Timbo Shipping Ltd.
1 Bala Plaza East, Suite 600
Bala Cynwyd, PA  19004

Kimberly-Clark Corporation as Successor to
Scott Paper Company
Dept. INT
P.O. Box 2020
Neenah, WI 54957-2020

Kirby Inland Marine, Inc. as Successor to
Hollywood Marine, Inc.
55 Waugh Drive, Suite 1000
Houston, TX  77007

Lafarge North America Inc. as Successor to
Huron Transportation, Inc.
12950 Worldgate Drive, Suite 600
Herndon, Virginia 20170

Marifran International S.A.
Calle Paraguay 577
4 Piso
Buenos Aires, 1057 Argentina

Marifran International S.A.
Avenida 25 de Mayo 401
1002 Buenos Aires, Argentina

Marine Transport Lines, Inc.
Managers for Marine Interests Corp. and
Union Marine Transport Co.
Agents for Marine Chemical Navigation Corp.,
Marine Sulphur Shipping Corp. and Oswego
Tanker Corp.
1200 Harbor Blvd., C-901
Weehawken, NJ  0708

Mathiasen's Tanker Industry Inc.
8182 Maryland Avenue
St. Louis, MO  63105

McAllister Brothers Inc. as Successor to
Outreach Marine Corporation
17 Battery Place, 15th floor
New York, NY  10004

Mu-Petco Shipping Co. Inc.
New Jersey Barging Corp. (Del.)
Texas City Refining Inc.
c/o The Corporation Trust Co.
Corporation Trust Center
1209 Orange Street
Wilmington, DE  19801

National Gypsum Co.
2001 Rexford Rd.
Charlotte, NC 28211

Nedbarges Sublift BV
Westmolenstraat 1
Lange Haven, 3111 BS Schiedam
Netherlands

Nicor Inc. as Successor to
National Marine Service Inc.
Lake Tankers Corporation
1209 Orange Street
Wilmington, DE 19801

Companhia de Navegacao Maritima Netumar
d/b/a Netumar Lines
c/o Stacey L. Meisel, Esq.
Trustee in Bankruptcy
Becker Meisel LLC
Eisenhower Plaza II
345 Eisenhower Parkway
Suite 2800
Livingston, NJ 07039

Offshore Express Inc.
438 Menard Road
P.O. Box 2666
Houma, LA  70361

Oglebay Norton as Successor to
Columbia Steamship Company Inc.
North Point Tower
1001 Lakeside Avenue, 15th Floor
Cleveland, OH 44114

Ormet Corporation
1233 Main Street, Suite 4000
Wheeling, WV  26003

Oscar Transportation Group
97, Akti Miaouli
185 38 Piraeus, Greece

Puerto Rico Maritime Shipping Authority
Building No. 123
Fleet and Bombay Streets
Elizabeth, NJ  07208

Resolve Maritime Corporation
436 SW 8th Street, Suite 206
Miami, FL  33130

Resolve Maritime Corporation
c/o Charles Lea Hume
25 W. Flagler Street
5th fl., City National Bank Building
Miami, FL  33130
Royal P&O Nedlloyd N.V. as Successor to
Farrell Lines Inc.
Farrell Lines (Lighters)
One Meadowlands Parkway
East Rutherford, NJ 07073

S.C. Loveland Co., Inc.
P.O. Box 368
Supawna Road
Pennsville, NJ  08070

Sabine Towing & Transportation Co., Inc.
7200 Highway 87 East
Port Arthur, TX  77642

SEI II Equipment Inc.
(f/k/a Shearson Equipment Management)
745 7th Avenue
New York, New York  10019

Seaport Harbor Cruise Lines, Inc.
17 Battery Place
New York, NY  10004

Tecomar S.A.
Avenida 39 Ote. No. 1204A
Col Anzures
Puebla, 72530 Mexico

Tecomar S.A.
Benjamin Franklin 232
Mexico DF 11800

Texas City Refining Inc.
P.O. Box 1271
Texas City, TX  77592-1271

Trade & Transport Inc.
61-65, Filonos Street
P.O. Box 104
Piraeus Greece

Trafluen Compania Armadora SA
7° Piso, Oficina 52
San Martin 50
1004 Buenos Aires
Argentina

Transfrimar SA
6° Piso
Colon 602
Guayaquil, Ecuador

Trinidad Corporation
8182 Maryland Avenue
St. Louis, MO  63105

Tropigas Inc.
2151 LeJune Road
Coral Gables, FL 33134

Union Carbide Corporation,
A Subsidiary of The Dow Chemical Company
P.O. Box 4393
Houston, Texas 77210

Union Carbide Corp.
100 Lighting Way, Suire 402
Secaucus, NJ  07094

United States Maritime Administration
U.S. Department of Transportation
400 7th Street, SW
Washington, D.C. 20590

John T. Paulyson, Trustee
United States Lines, Inc. &
United States Lines (S.A.) Inc.
184-186 North Avenue East, Suite 103
Cranford, NJ 07015-2488

Verizon Communications as Successor to
New York Telephone
1095 Avenue of the Americas,
New York, New York  10036

Waterman Steamship Corp.
One Whitehall Street
New York, NY  10004

Weeks Marine Inc. as Successor to
American Dredging Company
4 Commerce Drive
Cranford, NJ 07016

West India Shipping Co., Inc.
Agents for West India Industries, Inc.
18th fl., Great Southwest Building
1314 Texas Street
Houston, TX  77002

# EXHIBIT 2

PROSKAUER ROSE LLP
Dale A. Schreiber (DS-9211)
Seth B. Schafler (SS-5993)
Lisa A. Bauer (LB-4057)
1585 Broadway
New York, New York 10036-8299
(212) 969-3000
(212) 969-2900 (fax)
*Attorneys for Defendants Keystone, BP, MTL,*
*Cleveland-Cliffs, Ispat, American Steamship and Sea Mobility*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN STEAMSHIP OWNERS MUTUAL PROTECTION AND INDEMNITY ASSOCIATION, INC., <br><br> Plaintiff, <br><br> -against- <br><br> ALCOA STEAMSHIP CO., INC., et al., <br><br> Defendants. | Case No. 04 CV 4309 (LAK) <br><br> **AMENDED ANSWER AND** <br><br> **COUNTERCLAIMS** <br><br> **(ECF Case)** |

Defendants Keystone Shipping Co. ("Keystone")[1]; BP America, Inc. ("BP")[2], Marine

Transport Lines, Inc. ("MTL")[3], The Cleveland-Cliffs Steamship Company ("Cleveland-

---

[1]     Plaintiff has named Keystone Shipping Co. and several entities listed under Keystone Shipping Co. as defendants on Ex. A to its Second Amended Complaint, dated July 8, 2004.  Those entities are: (1) Chas. Kurz & Co., Inc.; (2) several wholly owned subsidiaries of Chas. Kurz & Co., Inc., all managed by Keystone Shipping Co., Baldbutte Shipping Company, Chestnut Shipping Corporation, Chilbar Shipping Company, Fredericksburg Shipping Company, and Margate Shipping Company; (3) Keystone Tankship Corporation, an affiliate managed by Keystone Shipping Co.; (4) Timbo Shipping Ltd., and Calendar Navigation Corporation, which have been dissolved; (5) New England Collier Company, a joint venture which has been dissolved, and which was managed by Keystone Shipping Co., and (6) Paco Tankers, Inc., an entity which was managed by Keystone Shipping Co. but was not and is not now related to or controlled by any Keystone entity.  At various times each of these entities is believed to have been insured by the AC. To the extent these entities are required to respond, they and the other entities listed under Keystone Shipping Co. will be referred to as "Keystone."  Plaintiff amended its Complaint to add additional Keystone entities on January 24, 2005.  As to those entities, it is averred that (1) Chas. Kurz & Co. has never existed, the proper corporate name is Chas. Kurz & Co., Inc., and it is not a successor to any of the

Cliffs"),[4] Ispat Inland Inc. ("Ispat"),[5] American Steamship Company ("American Steamship"),

and Sea Mobility Inc. ("Sea Mobility")[6] ("Defendants"), by their undersigned counsel, for their

---

entities listed on Plaintiff's Additional Defendants List. Keystone denies knowledge or information sufficient to form a belief as to the existence of the entities listed as Antietam Steamship Corp., Baldhill Steamship Co., Dannadaike Tankers Inc., Dilworth Steamship Co., Hagan Steamship Co., Meton Steamship Co., The Naeco Co., Inc., and Thermo Steamship Co., but avers that it was aware of vessels with similar names that may or may not have had a corporate existence and if they did avers upon belief that they were dissolved at least fifty (50) years ago. As to Kaymar Tankers Inc. also added by Plaintiff, it is averred that it ceased to exist in the early 1940's. Lastly, as to Delaware Tankers Inc. and Pennsylvania Tankers Inc., also added by Plaintiff, Keystone denies knowledge or information sufficient to form a belief as to the existence of these entities, but avers upon belief that if they had a corporate existence they were dissolved at least fifty (50) years ago.

[2]    BP was erroneously named as BP and as successor to several entities on Ex. A to the Second Amended Complaint. Its proper name is BP America Inc. and it responds on behalf of (1) named Defendants Atlantic Richfield Co., American Oil Co., and Standard Oil Co. (Ohio) which are wholly owned by BP America Inc.; (2) on behalf of named Defendants Sohio Alaskan Petroleum Co., which is now called BP Exploration (Alaska) Inc., and SPC Shipping, Inc. which is now called BP Oil Shipping Co., which are wholly owned by Standard Oil Co. (Ohio); and (3) on behalf of named Defendant Atlantic Richfield Indonesia Inc., which was properly called Atlantic Richfield Indonesia Co., is now called BP West Java Ltd. and is owned indirectly owned by BP America Inc.

[3]    Plaintiff named Marine Transport Lines, Inc. as manager and agent of several entities on Ex. A to its Second Amended Complaint. Marine Transport Lines, Inc. is neither the manager nor the agent of the entities but responds on behalf of itself and the other named entities to the extent that they are required to respond at all. The other named entities are as follows: (1) Marine Interests Corporation which has been dissolved; (2) Union Marine Transport Co., which has been dissolved; (3) Marine Chemical Navigation Corp., which is now named Marine Chemical Navigation Co. LLC; (4) Marine Sulphur Shipping Corporation, which is now Marine Sulphur Shipping Company LLC; and (5) Oswego Tanker Corp. which has been dissolved. Plaintiff amended its Complaint to add additional related entities on January 24, 2005. As to those entities, it is averred that Delta Steamship Lines, Inc. and Delta Lines Inc. were formerly wholly owned by Crowley Maritime Corporation and such companies have, as of the date of this pleading, either been dissolved or merged into other companies and no longer exist. Crowley Maritime Corporation, to the extent it is required to answer for Delta Steamship Lines, Inc. and Delta Lines Inc., answers herein with MTL and is included in the definition of MTL. As to the remaining entities listed on Plaintiff's Additional Defendants List as predecessors to Crowley Maritime Corporation, CD Mallory Corp., Ardmore Steamship Co. Inc., Farr Spinning & Operating Company, Inc., Malston Co., Inc., Matinicock Steamship Company, and Matinicock Corp., it is averred that that they are not associated with Crowley Maritime Corporation nor is it the successor to them.

[4]    Plaintiff erroneously named Cleveland-Cliffs, Inc. as successor to The Cleveland-Cliffs Steamship Company on Ex. A to its Second Amended Complaint. By stipulation, The Cleveland-Cliffs Steamship Company has been substituted for Cleveland-Cliffs, Inc.

[5]    Ispat Inland Inc. was formerly called Inland Steel Co.

2

answer to the second amended complaint dated July 8, 2004 of American Steamship Owners Mutual Protection and Indemnity Association, Inc. ("the Club") ("the Complaint"):

1.      Deny the allegations of paragraph 1 of the Complaint, except to the extent the allegations of that paragraph purport to be a statement of the Club's position in this action to which no response is required.

2.      Deny the allegations of paragraphs 2, 3 and 4 of the Complaint.

3.      Deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 5 of the Complaint.

4.      Deny the allegations of paragraph 6 of the Complaint, except admit that the Club has no right to assess policyholders, members or former members for years closed with a "final assessment."

5.      Deny the allegations of paragraph 7 of the Complaint.

6.      Deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 8 of the Complaint, except admit that seamen and others who had worked on the vessels owned or chartered by members or former members began asserting occupational disease claims based upon their asserted exposure to asbestos during their years of service.

7.      Deny the allegations of paragraphs 9 and 10 of the Complaint.

---

[6]      Plaintiff named Sea Mobility Inc. on Ex. A to its Second Amended Complaint, under the same address as American Maritime Holdings Inc. and World Wide Tankers Inc. There is no relationship between those entities and Sea Mobility Inc. Named Defendant Sea Mobility Inc. has been duly dissolved. To the extent it is required to respond at all it responds herein as "Sea Mobility."

8.      Deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 11 of the Complaint and deny that payments under insurance policies issued by the Club to Defendants provide for any payments to Defendants as "members" of the Club (as opposed to policyholders of such policies) and further deny that payments made under such policies, by way of premiums and/or assessments, are standing alone a valid measure of whether or not the Club has sustained a loss or deficiency with respect to any particular policy year under such policies.

9.      Deny the allegations of paragraph 12 of the Complaint, except deny knowledge or information sufficient to form a belief as to the number of occupational disease claims filed or still pending against members or former members of the Club.

10.     Deny the allegations of paragraph 13 of the Complaint, except aver that, in or about June 7, 2004, the Club breached the insurance policies issued to the answering Defendants for policy years ended February 20, 1989 ("the Pre-1989 Years") by announcing that it would no longer pay indemnity claims of the holders under any policies that the Club had issued for any of the Pre-1989 Years ("the Pre-1989 Policies") based upon occupational disease claims and that Keystone has previously commenced litigation against the Club concerning the Club's practice known as "stacking of deductibles" under which policyholders have been required to absorb multiple deductibles for each claim under Pre-1989 Policies.

11.     Deny the allegations of paragraph 14 of the Complaint, except admit that the Club is incorporated under the laws of the State of New York.

12.     In response to paragraph 15 of the Complaint, Keystone:

4

i.      admits that Keystone Shipping Co. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Wilmington, Delaware;

ii.     admits that Chas. Kurz & Co., Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Wilmington, Delaware;

iii.    admits that the following are wholly owned subsidiaries of Chas Kurz & Co., Inc. and are managed by Keystone Shipping Co.:  Baldbutte Shipping Company, a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Wilmington, Delaware; Chestnut Shipping Company, a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Wilmington, Delaware; Chilbar Shipping Company, a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Wilmington, Delaware; Fredericksburg Shipping Company, a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Wilmington, Delaware; and Margate Shipping Company, a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Wilmington, Delaware;

iv.     admits that Keystone Tankship Corporation is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in

5

Wilmington, Delaware, and avers that it is an affiliate of, and is managed by, Keystone Shipping Co.;

      v.     admits that New England Collier Corporation was an entity organized and existing under the laws of the State of Delaware and avers it was a joint venture managed by Keystone Shipping Co. and was duly dissolved in or about 1987;

      vi.     admits that Timbo Shipping Ltd. was an entity organized and existing under the laws of Monrovia and avers that it was duly dissolved in or about the early 1990's;

      vii.     admits that Calendar Navigation Corporation, was a corporation organized and existing under the laws of Monrovia and avers that it was duly dissolved in or about the early 1980's;

      viii.     avers that Paco Tankers, Inc. was managed by Keystone Shipping Co. but was not and is not related to or controlled by any Keystone entity.

    13.    In response to paragraph 15 of the Complaint, Marine Transport Lines, Inc.:

      i.     admits that it is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Seacaucus, New Jersey;

      ii.     avers that Marine Chemical Navigation Corporation is now called Marine Chemical Navigation Corporation LLC and is an entity organized and existing under the laws of the State of Delaware with its principal place of business in Seacaucus, New Jersey;

iii.     avers that Marine Sulphur Shipping Corporation is now called Marine Sulphur Shipping Corporation LLC and is an entity organized and existing under the laws of the State of Delaware with its principal place of business in Seacaucus, New Jersey;

iv.     admits that Marine Interests Corporation was a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Weehawken, New Jersey, and avers that it was duly dissolved on or about October 7, 1998;

v.     admits that Union Marine Transport Company was a partnership organized and existing under the laws of the State of Delaware with its principal place of business in Weehawken, New Jersey and avers that it was duly dissolved in or about 1999;

vi.     admits that Oswego Tanker Corporation was an entity organized and existing under the laws of Liberia and avers that it was duly dissolved on or about December 21, 1998.

14.     In response to paragraph 15 of the Complaint, BP America Inc.:

i.     admits that it is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Warrenville, Illinois;

ii.     admits that Atlantic Richfield Co., American Oil Co., BP Exploration (Alaska) Inc. (formerly Sohio Alaskan Petroleum Co.), and BP Oil Shipping Co. (formerly SPC Shipping, Inc.) are organized and existing under the laws of the State of Delaware with principal places of business in Warrenville, Illinois;

7

iii.    admits that BP West Java Ltd. (formerly Atlantic Richfield Indonesia Co.) is organized and existing under the laws of the State of Delaware with its principal place of business in Jakarta, Indonesia; and

iv.    admits that Standard Oil Co. (Ohio) is organized and existing under the laws of the State of Ohio with its principal place of business in Warrenville, Illinois.

15.    In response to paragraph 15, Defendant Cleveland-Cliffs is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Cleveland, Ohio.

16.    In response to paragraph 15, Defendant Ispat is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in East Chicago, Indiana.

17.    In response to paragraph 15, Defendant American Steamship admits that it is a corporation organized and existing under the laws of the State of New York with its principal place of business in Williamsville, New York.

18.    In response to paragraph 15, Defendant Sea Mobility admits that it was a corporation organized and existing under the laws of the State of Delaware with its principle place of business in Virginia and avers that it was duly dissolved on or about December 21, 2001.

19.    In further response to paragraph 15, Defendants admit that Defendants or various entities related to Defendants, as defined above, were members of the Club at various times

8

between 1940 and February 20, 1989, except for American Oil Co., which upon information and belief was never a member of the Club, and deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 15 of the Complaint.

20.     Admit that, in response to the allegations of paragraphs 16 and 17 of the Complaint, this Court has subject matter jurisdiction over this action and that venue is proper in this District.

21.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraphs 18, 19, 20 and 21 of the Complaint, except admit that the Club's Charter and By-Laws, as well as applicable New York corporate law, generally delegate to the Club's Board of Directors the responsibility to manage the Club's affairs and conduct its business, that the Club's Board of Directors may in some circumstances reasonably rely upon recommendations of the Club's professional manager, that members of the Club's Board of Directors and its officers are subject to eligibility requirements provided, among other places, in the Club's Charter and By-Laws, and that the duties and role of the Club's Chairman are referred to in the Club's Charter and By-Laws, but respectfully refer to the Club's Charter and By-Laws, as they have been amended from time to time, for their respective contents.

22.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraphs 22 and 23 of the Complaint, except admit that Shipowners Claims Bureau, Inc. has acted for many years as a professional manager for the Club and has had responsibility for underwriting, claims handling, and accounting services for the Club.

9

23. Deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 24 of the Complaint, except aver that, at various times during the period from the 1940's through the late 1990's, in consideration of the premiums paid to the Club by policyholders, the Club issued Policies to Defendants or their predecessors in interest providing what is generally known as protection and indemnity ("P&I") insurance on an occurrence basis during the stated policy period for covered vessels under terms providing for possible future assessments ("the Policies") and respectfully refer to the original or true copy of each of such Policies for their respective terms and conditions.

24. Deny the allegations of paragraph 25 of the Complaint.

25. Deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 26 of the Complaint, except respectfully refer to the originals or true copies of the Policies for their respective terms.

26. Deny the allegations of paragraph 27 of the Complaint.

27. Deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 28 of the Complaint, except deny the allegations of the last sentence thereof.

28. Deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraphs 29, 30 and 31 of the Complaint, except respectfully refer to the originals or true copies of the Policies for their respective terms and conditions.

29. Deny the allegations of paragraph 32 of the Complaint.

10

30.     Deny the allegations of paragraphs 33, 34 and 35 of the Complaint, except respectfully refer to relevant provisions of the New York Insurance Law for their contents.

31.     Deny the allegations of paragraph 36 of the Complaint, except refer to the original or a true copy of the Club's By-Laws (as amended from time to time) applicable to the rights and obligations, if any, of Defendants under their respective Policies in issue in this action.

32.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 37 of the Complaint.

33.     Deny the allegations of paragraph 38 of the Complaint, except respectfully refer to the originals or true copies of the Policies for their respective terms and conditions.

34.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 39 of the Complaint.

35.     Deny the allegations of paragraph 40 of the Complaint, except refer to the original or a true copy of the Club's By-Laws (as amended from time to time) applicable to the rights and obligations, if any, of Defendants under their respective Policies in issue in this action.

36.     Deny the allegations of paragraph 41 of the Complaint.

37.     Deny the allegations of paragraph 42 of the Complaint, except refer to the original or a true copy of the Club's By-Laws (as amended from time to time) applicable to the rights and obligations, if any, of Defendants under their respective Policies in issue in this action.

38.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraphs 43, 44, 45 and 46 of the Complaint.

39.     Deny the allegations of paragraph 47 of the Complaint.

11

40.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraphs 48, 49, 50, 51, 52, 53 and 54 of the Complaint.

41.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 55 of the Complaint, except deny the allegations of the last sentence thereof.

42.    Deny the allegations of paragraph 56 of the Complaint.

43.    Deny the allegations of paragraph 57 of the Complaint, except deny knowledge or information sufficient to form a belief as to the truth of allegations in that paragraph purporting to describe the actions, if any, taken by the Club's Board of Directors on May 25, 2004 with respect to Pre-1989 Policies or the subjective motivations for such actions and admit that Defendants objected to the Club's Board of Directors' actions to the extent described in a Circular dated June 7, 2004 and in the Club's various complaints in this action.

44.    Keystone admits that it has asserted the right to designate one insurance year's policy to cover each seaman's entire claim for which a single deductible would be applicable in accordance with *Dicola v. American S.S. Owners Mutual Protection and Indemnity Association, Inc. (In re Prudential Lines, Inc.)*, 158 F.3d 65 (2d Cir. 1998), and has sued for a declaratory judgment of such right and denies the remaining allegations of paragraph 58 of the Complaint and the other Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 58 of the Complaint.

45.    Deny the allegations of paragraphs 59, 60 and 61 of the Complaint.

12

46.     Refer to their respective responses to the allegations incorporated by reference into paragraph 62 of the Complaint.

47.     Admit the allegations of paragraph 63 of the Complaint.

48.     Deny the allegations of paragraph 64 of the Complaint.

49.     Refer to their respective responses to the allegations incorporated by reference into paragraph 65 of the Complaint.

50.     Deny the allegations of paragraph 66 of the Complaint.

51.     Admit the allegations of paragraph 67 of the Complaint.

52.     Deny the allegations of paragraph 68 of the Complaint.

53.     Refer to their respective responses to the allegations incorporated by reference into paragraph 69 of the Complaint.

54.     Deny the allegations of paragraph 70 of the Complaint.

55.     Admit the allegations of paragraph 71 of the Complaint.

**First Affirmative Defense**
**(Insurance Policies)**

56.     The Club's claims are barred, in whole or in part, by the terms of the Policies, all of the obligations of which Defendants have fulfilled and which provide occurrence-based coverage for liability-incurring occurrences transpiring, in whole or in part, during the policy period of each such Policy, without any aggregate limit on losses payable thereunder, any time deadline for the making of claims thereunder, or any limitation on recourse against the Club.

13

**Second Affirmative Defense**
**(By-Laws)**

57.     The Club's claims are barred, in whole or in part, by the terms of the By-Laws

applicable to the Policies, and documented actions thereunder of the Club's Board of Directors,

including but not limited to the Club's Board of Directors' actions in closing policy years under

all Pre-1989 Years with "final assessments" pursuant to By-Laws, Article VI, Section 4.

**Third Affirmative Defense**
**(Estoppel and Waiver)**

58.     The Club's claims are barred, in whole or in part, by the doctrine of estoppel, in

that the Club, among other things, has since at least 1980 consistently indemnified policyholders,

including Defendants, for occupational disease claims arising from injuries in closed insurance

years and has consistently represented to Defendants that the Club had a legal obligation to do so

and has acted to affirm its contractual obligation by asserting its rights to receive cooperation

from policyholders under one or more of the Pre-1989 Policies and its right to consent to the

policyholders' settlement of occupational disease claims.  Defendants have relied on the Club's

conduct and representations to their detriment.  Moreover, the Club has waived its right to now

deny coverage and seek further assessments from policyholders and has waived its right to deny

policyholders coverage based on the inability to further assess them.

**Fourth Affirmative Defense**
**(Laches)**

59.     The Club's claims are barred, in whole or part, by the doctrine of laches, in that

the Club has since at least 1980 consistently recognized its legal obligation to indemnify

policyholders, including Defendants, for occupational disease claims arising from injuries in

closed insurance years and has delayed announcing that it will no longer pay such

indemnification, without excuse or justification, until June 7, 2004. Defendants have been

prejudiced by that delay.

**Fifth Affirmative Defense**
**(Res Judicata)**

60.    The Club's claims are barred, in whole or in part, by the doctrines of *res judicata*

and/or collateral estoppel because the issues the Club now seeks to raise were either fully

litigated or necessary to the judgment entered against the Club in *Dicola v. American S.S.*

*Owners Mutual Protection and Indemnity Association, Inc., supra.* These issues include but are

not limited to (a) the continuing rights of holders of Pre-1989 Policies, including Defendants, to

make claims for indemnity payments under these occurrence-based policies after the policy year

for which they were issued and without any time limitation as to when claims can first be made

against the insured and still be covered by the policy, (b) the rights of the holders of Pre-1989

Policies, including Defendants, to seek indemnity payments under the Pre-1989 Policy providing

the lowest per-claim deductible for occupational disease claims spanning multiple, consecutive

policy years. The Club had a full and fair opportunity to litigate those issues in that litigation

and the issues were decided adversely to the Club.

**Sixth Affirmative Defense**
**(Mutuality)**

61.    The declaratory relief sought by the Club would, in whole or in part, result in

inequitable treatment of members and former members of the Club, including Defendants,

contrary to principles of mutuality asserted by the Club in that, among other things, (a) the Club

15

would be treating the holders under Pre-1989 Policies differently from holders of its policies for policy years after the Pre-1989 Years by denying the former and granting the latter indemnity payments for years closed with "final assessments," despite the fact that the total losses for each such year exceeded total premiums and assessments ("Policyholder Payments") (with or without allocating income earned by the Club to such amounts), (b) the Club has aggregated all Policyholder Payments for all Pre-1989 Years (with or without allocating income earned by the Club to such amounts) and all losses for such years to deny policyholders, including, upon information and belief, Defendants, indemnity payments for some such years where the losses do not exceed Policyholder Payments (with or without allocating income earned by the Club to such amounts), (c) the Club has created a first-come, first-serve system for paying losses under Pre-1989 Policies in violation of mutuality principles, and (d) the Club has illegally transferred its assets in amounts reflected by its general reserves, if not more, to current members by refusing to make indemnity payments to holders of Pre-1989 Policies on the spurious ground that those general corporate assets "belong" to current members only.

### Seventh Affirmative Defense
#### (Reserves)

62.    To the extent that the Club's claims are based on the failure of its Board of Directors to set adequate reserves for unreported claims before closing an insurance year with a "final assessment" in accordance with the Club's By-Laws, Article VI, Section 4, the Club has sole responsibility for any such inadequacy and such inadequacy is not a defense to the rights of Defendants under their respective Policies to indemnification for payments that they have made for occupational disease claims for any of the Pre-1989 Years.

16

**Eighth Affirmative Defense**
**(Disregard of Membership Rights)**

63.     This affirmative defense is asserted only to the extent that the Club's claims are

based on the premise that Defendants remained members of the Club on May 25, 2004 and/or

June 7, 2004, long after the expiration of the policy years under all of their respective Policies

and long after they had formally resigned as members.  Defendants continue to assert that they

were not members of the Club as of either of those dates and ceased to be members after they

ceased purchasing insurance policies from the Club and resigned as members.  The Club's

actions taken on those dates in determining not to honor any future claims under Pre-1989

Policies for indemnity payments to reimburse Defendants with respect to seamen's occupational

disease claims, subject only to applicable deductibles, are null and void because Defendants and

others similarly situated were not afforded the right to vote for the Club's Directors who

approved such actions or to exercise other incidents of membership in connection with such

actions.  Defendants nevertheless retained all rights as insureds and policyholders under their

respective Pre-1989 Policies.

**Ninth Affirmative Defense**
**(Release)**

64.     The Club's claims are barred by the terms of releases given to members in

connection with closing policy years and/or the releases given to former members in connection

with their withdrawal from membership in the Club.

17

**Tenth Affirmative Defense
(Untimely Notice of Disclaimer)**

65.    To the extent that the Club seeks to disclaim coverage for claims previously
reported to the Club under any of the Policies, such disclaimer is untimely and in violation of
N.Y. Insurance Law §3420(d).

**Eleventh Affirmative Defense
(Failure to Provide Notice of Cancellation of Coverage)**

66.    To the extent that the Club bases any of its claim on the cancellation of further
coverage under any of the Policies at the time an insurance year is closed, the Club has failed to
comply with the notice of cancellation requirement of N.Y. Insurance Law §3426.

**Twelfth Affirmative Defense
(Dissolution of Entities)**

67.    To the extent any Defendant is an entity which has been duly dissolved, the
applicable limitations periods for suits against such entities bars the Club's claims in whole or in
part.

**Thirteenth Affirmative Defense
(Failure to State a Claim)**

68.    The Complaint fails to state a claim upon which relief may be granted.

**Fourteenth Affirmative Defense
(Statute of Limitations)**

69.    The Club's claims in the Complaint are time barred, in whole or in part, by the
statute of limitations.

18

**Fifteenth Affirmative Defense**
**(Failure to Reserve Rights)**

70.     To the extent that the Club failed to assert coverage defenses within the time limitations set forth under the applicable claims statute or failed to reserve rights with respect to indemnification, the Club waived those defenses to indemnification for the affected claims.

**Sixteenth Affirmative Defense**
**(Promissory Estoppel)**

71.     The Club's claims are barred, in whole or in part, by the doctrine of promissory estoppel, in that Defendants reasonably relied on the express and implied promise of the Club with respect to the existence of coverage for occupational disease claims and express and implied promise of the Club to release policyholders from further assessment when it closed a year with a "final assessment." This reliance was foreseeable.

**Seventeenth Affirmative Defense**
**(Defendants Not Responsible for Certain Entities)**

72.     To the extent the AC seeks to assess Defendants, which they do not have the authority to do, for the pro rata shares of other policyholders who are insolvent, have been dissolved, or have merged with other entities, or for any shares that should be allocated to them, those claims are barred against Defendants because Defendants are not legally responsible for those entities.

19

73.    Defendants respectfully request leave to assert additional defenses which they deem necessary to their defense during or upon conclusion of their investigation and discovery of the Club's claims.

## COUNTERCLAIMS

74.    The counterclaims alleged below seek (a) a declaratory judgment, adjudicating Defendants' rights and the Club's obligations under Pre-1989 Policies issued by the Club to Defendants, their predecessors, successors and/or affiliated companies, with respect to Occupational Disease Claims (as defined below) and Defendants' freedom from further assessments under any such Policies, and (b) damages for breach of contract, breach of the implied covenant of good faith and fair dealing, violation of New York General Business Law §349 and other relief arising out of the Club's unjustified refusal to pay on and after June 7, 2004, any Occupational Disease Claims under Pre-1989 Policies.

### The Parties

75.    Keystone Shipping Co. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Wilmington, Delaware.  Through various entities Keystone Shipping Co. is an owner and operator of shipping vessels.

76.    Chas. Kurz & Co., Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Wilmington, Delaware.  Through various entities Chas. Kurz & Co., Inc. is an owner and operator of shipping vessels.

20

77.     Baldbutte Shipping Company, Chestnut Shipping Company, Chilbar Shipping Company, Fredericksburg Shipping Company, and Margate Shipping Company are corporations organized and existing under the laws of the State of Delaware with principal places of business in Wilmington, Delaware.

78.     Keystone Tankship Corporation is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Wilmington, Delaware.

79.     Marine Transport Lines, Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Seacaucus, New Jersey and through various entities is an owner and operator of shipping vessels.

80.     Marine Chemical Navigation Co. LLC is an entity organized and existing under the laws of the State of Delaware with its principal place of business in Seacucus, New Jersey and through various entities is an owner and operator of shipping vessels.

81.     Marine Sulphur Shipping Co. LLC is an entity organized and existing under the laws of the State of Delaware with its principal place of business in Seacucus, New Jersey and through various entities is an owner and operator of shipping vessels.

82.     BP America Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Warrenville, Illinois, and through various entities is an owner and operator of shipping vessels.

83.     Atlantic Richfield Co. is organized and existing under the laws of the State of Delaware with its principal place of business in Warrenville, Illinois and is an owner and operator of shipping vessels.

21

84.     Standard Oil Co. (Ohio) is organized and existing under the laws of the State of Ohio with its principal place of business in Warrenville, Illinois and is an owner and operator of shipping vessels.

85.     The Cleveland-Cliffs Steamship Company is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Cleveland, Ohio. It was at all material times the owner of vessels insured by the Club under policies issued for the 1977 through 1985 Policy Years.

86.     Ispat Inland Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in East Chicago, Indiana, and through various entities is an owner and operator of shipping vessels.

87.     American Steamship Company is a corporation organized and existing under the laws of the State of New York with its principal place of business in Williamsville, New York, and through various entities is an owner and operator of shipping vessels.

88.     Sea Mobility Inc. was a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Virginia and was duly dissolved on or about December 21, 2001.

89.     The Club is a corporation organized pursuant to and existing under the New York Insurance Law Article 41 as a mutual company and in that capacity has issued marine P&I policies to shipowners and charterers that become members of the Club under assessable policies in more or less the same form.  Pursuant to New York Insurance Law §108, the Club is also

subject to the New York Business Corporation Law and maintains a principal place of business in New York, New York.

## Jurisdiction and Venue

90.    The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1333(1) because it is an admiralty or maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.  In addition, this Court has supplemental jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1367(a).

91.    Venue in this judicial district is proper under 28 U.S.C. §§1391(b)(1) and 1391(b)(2) because the Club resides in this judicial district and a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## Defendants' Insurance Coverage

92.    Defendants, as defined above, as themselves or through various entities related to them, ceased being members of the Club at various times prior May 25, 2004 and in most cases many years before that date, except for American Oil Co. who upon information and belief was never a member of the Club.

93.    The Pre-1989 Policies constitute a promise by the Club to indemnify Defendants against any loss, damage or expense, which a Defendant becomes liable to pay by reason of its ownership, operation, management, chartering or other enumerated connection with a designated insured vessel resulting from occurrences during the policy year designated in the Policy. Specifically, the Policies provide:

> The [Club] agrees to indemnify the Assured [*i.e.*, Defendant] against any loss, damage or expense which the Assured shall become liable to pay and shall pay by

23

reason of the fact that the Assured is the owner (or operator, manager, charterer, mortgagee, trustee, receiver or agent, as the case may be) of the insured vessel and which shall result from the following liabilities, risks, events, occurrences and expenditures: . . . Liability for . . . loss of life of, or personal injury to, or illness of any person . . . .

94.    The Pre-1989 Policies are assessable policies issued under the Club's By-Laws, which govern the Club's authority to issue assessable policies, to make assessments thereunder, and to terminate the Assured's liability for further assessments thereunder.

95.    In particular, the policies provide:

The Assured are subject to a contingent liability hereunder for assessment without limit of amount for their proportionate share of any deficiency or impairment as provided by law and fixed in accordance with the by-laws of the [Club]; provided, however, that any such assessment shall be for the exclusive benefit of holders of policies which provide for such a contingent liability, and the holders of policies subject to assessment shall not be liable to assessment in an amount greater in proportion to the total deficiency than the ratio that the deficiency attributable to the assessable business bears to the total deficiency.

96.    Article VI, Section 3 of the By-Laws (as amended September 18, 1987) (the By-Laws have been amended over time but the sections quoted herein, upon information and belief, do not appear to have substantially changed) provides:

For the purposes of declaring dividends and making assessments the business of the [Club] shall be divided into insurance years . . .

The insurance years referred to in this By-Law have coincided with the policy periods under the insurance policies issued by the Club during all relevant times.

97.    Article VI, Section 4 of the By-Laws provides:

From time to time after the termination of each insurance year, when the manager shall determine that it is practicable to estimate with a reasonable degree of certainty the minimum, probable or final surplus or deficiency resulting from all of the [Club's] insurances in effect during such insurance year, the manager shall place before the board of directors a statement of such financial results of

24

insurances, segregated between assessable and non-assessable business. After receipt of any such statement, the board of directors from time to time may (a) fix and determine an amount to be declared and paid as a partial or the final dividend, after retaining such sums as they may deem necessary to meet outstanding policy obligations or for the maintenance of reserves and surplus of the [Club], or (b) order an interim or *the final assessment to be made against the holders of assessable policies*, fix the due date of such assessment, determine the rate of interest that shall be added to and become a part of any delinquent assessment, and otherwise provide for enforcement and collection thereof. (Emphasis added.)

98.     The Pre-1989 Policies provide occurrence-based coverage and therefore permit claims to be made thereunder without any time limitation as to when claims can first be made against the insured and still be covered by the policy.

99.     The Pre-1989 Policies have no aggregate limit, only a per-claim limit, and therefore contain no language or provision limiting the Club's liability thereunder.

100.    The Pre-1989 Policies do not limit the recourse of the policyholders against any assets of the Club or to the amount collected by way of premiums and assessments from holders of policies issued to all policyholders for the same policy year.

**The Club's "Final Assessment" Practices**

101.    In the event that the aggregate losses paid by the Club under all Pre-1989 Policies for any open policy year exceed the amounts collected from policyholders for that year through premiums and assessments, the Club, acting through its Board of Directors, has the discretionary authority under the By-Law, Article VI, Section 4 to levy additional assessments on the policyholders for that year to cover the deficiency on an interim or final basis. Likewise, if such amounts collected from policyholders exceed such losses, the Club, again acting through its

25

Board of Directors, has discretionary authority under the same By-Law provision to refund some or all of the surplus to those policyholders or to decide not to do so.

102.    If the Club's Board of Directors determines to make an assessment for any policy year, the assessments are made against all policyholders for the policy year in issue and are prorated on the basis of the relative amounts of the initial premiums paid under such policies by each policyholder for such policy year.  In other words, assessments for a particular policyholder are not predicated upon claims experience of that policyholder standing alone, but upon the basis of the aggregate claims experience of all policyholders for that policy year.

103.    Thus, as long as a policy year is kept open by the Club, the Club is fully protected against any aggregate deficiency resulting from all claims payments to all policyholders for that year.  In so doing, the Club can protect itself against losses caused by claims arising many years after the policy year in question has passed by making additional assessments of policyholders for that year based on the continuing aggregate claims experience of all policyholders for that policy year.

104.    The Club's Board of Directors' business decision to keep a policy year open for assessment purposes can also be a benefit for policyholders because assessments can be deferred until they are actually needed to pay claims under the policies in issue.  If the assessments in hindsight are larger than necessary to pay all losses for the policy year, the Club, acting through its Board of Directors, may decline to refund any resulting surplus and instead retain the surplus as capital for the Club's operations including the payment of claims for other policy years.  By deferring the closing of a policy year and the making of a final assessment, policyholders can

26

avoid concerns about being over-assessed and therefore making payments not needed to cover payment of actual claims and earn investment income on their funds that would otherwise be used for payment of assessments.

105.    However, the Club's Board of Directors' business decision to keep a policy year open may not always be viewed as advantageous to the Club's business interest in maintaining its existing members and in attracting new members, because both constituencies do not want to have exposures for contingent liabilities under their policies by way of assessments for the indefinite future.

106.    Thus, as noted, the By-Laws provide for the closing of policy years with so-called "final assessments" by action of the Club's Board of Directors based upon a report and recommendation from the Club's professional claims manager that it is practicable to estimate the losses for the policy year in issue.  Once a policy year has been declared closed by the Club's Board of Directors, under the By-Laws, no further premium or assessment can be levied upon the policyholders with respect to that policy year, even if the operations for that year result in an ultimate deficiency to the Club.

107.    After a policy year has been closed, the Club's balance sheet is updated to transfer all amounts received by way of premiums and assessments after payment of claims for that year into either case reserves for that year, reserves for incurred but not reported losses ("IBNR") for that year, or general reserves not dedicated to any particular policy year.  These reserves, however, do not result in the imposition of any security interest or charge on specified assets or the segregation of any assets.  All funds collected from the assessment of policyholders are assets

27

of the Club, subject to the claims of all of its creditors including but not limited to policyholders for claims payments under their respective policies.

108.    The Club's Board of Directors' determination to close a policy year with a "final" assessment or dividend does not terminate the Club's continuing obligations under the policies for that policy year, unless the policyholder agrees to releases of policy coverage.  Upon information and belief, the Club has neither sought nor obtained any releases of policy coverage for any of the Pre-1989 Policies.

### The Club's Payment of Occupational Disease Claims for Closed Years

109.    Seamen have asserted claims that are still pending and will likely in the future assert additional claims against Defendants seeking damages resulting from their alleged exposure to asbestos, benzene, noise and other substances or conditions on board or in working in or about vessels owned, chartered, operated or managed by one or more Defendants during one or more of the Pre-1989 Years ("Occupational Disease Claims").

110.    The Club has continuously represented expressly and impliedly to policyholders that closing policy years does not impair their coverage rights under the Pre-1989 Policies and that policyholders of those Policies would continue to be insured under those Policies for the Pre-1989 Years.  Defendants and other policyholders of Pre-1989 Policies have relied upon these representations by, among other things, not seeking available coverage alternatives.

111.    For over twenty years the Club has consistently recognized that it is legally obligated to pay for Occupational Disease Claims arising from the Pre-1989 Years, despite the fact that each such year had been closed with a "final assessment," and, in recognition of its

obligation to the policyholders, has paid hundreds, if not thousands, of such claims to policyholders. Upon information and belief, the Club has submitted claims for reimbursement for some payments to its own re-insurers under its own reinsurance and stop-loss policies and in so doing represented to such re-insurers that the Club had become legally obligated to make such payments under one or more of the Pre-1989 Policies.

112. The Club has also acted to affirm its contractual obligations by, *inter alia*, asserting its rights to receive cooperation from policyholders under one or more of the Pre-1989 Policies and its right to consent to the policyholders' settlement of Occupational Disease Claims.

113. The Club never reserved its rights to deny coverage under the Policies based on insufficiency of reserves set when an insurance year was closed, or on the basis that its obligation to provide such coverage was a "discretionary" practice that could be "terminated."

### The Club's Defeat in the In Re Prudential Lines Case

114. An adverse judgment was entered against the Club in the action entitled *Dicola v. American S.S. Owners Mutual Protection and Indemnity Association, Inc. (In re Prudential Lines, Inc.), supra.* In 1998, the United States Court of Appeals for the Second Circuit held that, for Occupational Disease Claims involving exposures occurring over multiple policy years, the Pre-1989 Policies entitle a policyholder to designate the Policy for one of those policy years for payment of its claim, subject to only the one deductible for that policy year. 158 F.3d 65 (2d Cir. 1998). In this litigation, the Club acknowledged that it was obligated to provide coverage for

29

Occupational Disease Claims in closed years and never asserted that its obligation to provide such coverage was "discretionary."

115.    The Club has required, and continues to require, contrary to the Policies and in violation of the mandate of the United States Court of Appeals for the Second Circuit in *In re Prudential Lines, Inc.*, that Defendants pay multiple deductibles for a single claim filed with the Club where the claimant has alleged exposure to asbestos during multiple years of sea service aboard a vessel entered in the Club.

**The June 7, 2004 Circular**

116.    In or about June 7, 2004, the Club announced through its June 7, 2004 Circular that the Club no longer intended to make payments to policyholders with respect to Occupational Disease Claims under any Pre-1989 Policies with respect to which such claims had not been reported by the time each such year was closed or for such claims that had been under-reserved or unreserved by the Club.  In so doing, the Club claimed that its payment of such claims for over twenty years was merely a "discretionary practice."

117.    At no time prior to June 7, 2004, has the Club advised its policyholders that the payment of valid claims under any Pre-1989 Policy was "discretionary" or subject to termination if the amount of the Club's reserves for a closed policy year were deemed insufficient or for any other reason.

**FIRST CLAIM FOR RELIEF**
**(Declaratory and Injunctive Relief)**

118.    Incorporate by reference into this counterclaim the allegations of paragraphs 74 through 117 of these counterclaims.

30

119. Defendants have incurred and will likely incur in the future "loss, damage or expense" in connection with Occupational Disease Claims that are still pending and that are not yet asserted or resolved, resulting from the claimants' exposures occurring during one or more of the Pre-1989 Years and for reimbursement of which Defendants have coverage under one or more Pre-1989 Policies.

120. The Club is obligated to indemnify Defendants under the Pre-1989 Policies in full for any loss, damage or expense that Defendants become liable to pay, subject to the applicable deductible, in connection with Occupational Disease Claims resulting from exposures occurring during one or more of the Pre-1989 Years, without any time limitation as to when such claims are first made under any one or more of such policies.

121. The Club has disputed and is likely to continue to dispute its obligations under the Pre-1989 Policies to so indemnify Defendants with respect to Occupational Disease Claims, now pending or made in the future and the Club has asserted the right, which Defendants have disputed and will continue to dispute, to make future assessments under the Pre-1989 Policies to cover losses not covered by reserves established as of June 7, 2004.

122. As a result of the foregoing, an actual and justiciable controversy exists between Defendants and the Club with respect to (a) the duties and obligations of the Club under one or more of their respective Pre-1989 Policies to provide continuing coverage to Defendants for Occupational Disease Claims resulting from claimants' exposures occurring during one or more of the Pre-1989 Years, and (b) the Club's right to make assessments under the Pre-1989 Policies to cover losses not covered by reserves established as of June 7, 2004.

31

123. Accordingly, this Court should (a) declare that Defendants have the right under their respective Pre-1989 Policies to continuing coverage for Occupational Disease Claims resulting from claimants' exposures occurring during any one or more of the Pre-1989 Years, subject only to the applicable deductible, and that the Club has no right to make any further assessment or assessments against any Defendants under any Pre-1989 Policies; (b) grant Defendants a mandatory injunction compelling the Club to provide such coverage and a negative injunction barring, restraining and prohibiting the Club from making, or seeking to make, any such assessment or assessments; (c) award Defendants their attorneys' fees and other costs and expenses incurred in connection with this action to fullest extent permitted by applicable law; and (d) grant Defendants such other and further relief as this Court deems just and proper.

## SECOND CLAIM FOR RELIEF
### (Breach of Contract)

124. Incorporate by reference into this counterclaim the allegations of paragraphs 74 through 123 of these counterclaims.

125. Defendants have complied with all applicable conditions of the Pre-1989 Policies that have arisen to date with respect to all pending Occupational Disease Claims.

126. The Club has breached, and threatens in the future to continue to breach, its obligations to Defendants under one or more of the Pre-1989 Policies by, among other things, (a) refusing on and after June 7, 2004, to make claim payments under Pre-1989 Policies for Occupational Disease Claims resulting from claimants' exposures occurring during one or more of the Pre-1989 Years and (b) reducing its indemnification payments to Defendants otherwise due and payable under the Pre-1989 Policies by applying multiple deductibles for Occupational

32

Disease Claims based upon the number of years that the claimant served on one or more of Defendant's vessels.

127.    In so doing, the Club has also breached, and threatens to continue to breach, its duty under such Pre-1989 Policies to settle claims in good faith, as well as the warranty of utmost good faith and fair dealing implied in every marine insurance policy.

128.    As a direct and foreseeable result of these breaches, Defendants have been damaged and continue to be damaged in an amount to be determined at trial.

**THIRD CLAIM FOR RELIEF**
**(Violation of New York General Business Law §349)**

129.    Incorporate by reference into this counterclaim the allegations of paragraphs 74 through 128 of these counterclaims.

130.    The Club represented to policyholders of all Pre-1989 Policies that such policyholders would continue to be covered by their respective Pre-1989 Policies for Occupational Disease Claims arising during any one or more of the Pre-1989 Years.

131.    Defendants reasonably relied on such representations and have sustained and will continue to sustain damages as a result of the Club's attempt to renege on its obligations to Defendants under their respective Pre-1989 Policies.

132.    The conduct of the Club in purporting to withdraw coverage for claims arising from closed years constitutes deceptive acts or practices within the meaning of New York General Business Law §349.

133.    As a result of the these violations of New York General Business Law §349, the Club is liable to Defendants for damages, attorneys' fees and other costs and expenses and should be enjoined from continuing those deceptive acts or practices.

## FOURTH CLAIM FOR RELIEF
### (Release)

134.    Incorporate by reference into this counterclaim the allegations of paragraphs 74 through 133 of these counterclaims.

135.    In connection with the closing of insurance years and the levying of "final" assessments, the Club granted Defendants releases from any liability for further assessments under one or more the Pre-1989 Policies.

136.    Defendants seek a declaration that any further assessments are barred against Defendants with respect to the Pre-1989 Years covered by such releases.

## FIFTH CLAIM FOR RELIEF
### (Breach of Implied Covenant of Good Faith)

137.    Incorporate by reference into this counterclaim the allegations of paragraphs 74 through 136 of these counterclaims.

138.    As policyholders of the Club, the Club owed Defendants an obligation to act reasonably and in good faith and to deal fairly with Defendants in connection with their rights and obligations under the Pre-1989 Policies.

139.    The Club, in breach of the implied covenant of good faith and fair dealing, has conditioned continuing coverage to which the Defendants are entitled under the express provision of the Pre-1989 Policies upon their payment of additional assessment.  The Club has

34

previously waived and released Defendants from any additional assessment by issuing "final assessments" several years ago.

140.    As a result of the Club's wrongful conduct, Defendants has suffered and will suffer damages in an amount to be determined at trial, including but not limited to attorneys' fees, and are further entitled to claim and recover damages from the Club.

## SIXTH CLAIM FOR RELIEF
### (Promissory Estoppel)

141.    Incorporate by reference into this counterclaim the allegations of paragraphs 74 through 140 of these counterclaims.

142.    Defendants reasonably relied on the express and implied promises of the Club with respect to the existence of coverage for Occupational Disease Claims and express and implied promise of the Club to release policyholders from further assessment when it closed a year with a "final assessment." The Defendants' reliance was foreseeable.

143.    The Club has issued a blanket disclaimer of coverage under Pre-1989 Policies and has threatened to make further assessments on former members such as Defendants.

144.    By reason of the forgoing, the Defendants have suffered damages.

WHEREFORE, Defendants demand judgment:

(a)    dismissing all claims in the Complaint with prejudice and costs;

(b)    declaring that (i) Defendants have the right under their respective Pre-1989 Policies to continuing coverage for Occupational Disease Claims resulting from claimants' exposures occurring during any one or more of the Pre-1989 Years, subject only to the applicable deductible or deductibles, (iii) the Club has no right to make any further assessment or

35

assessments against any Defendants under any Pre-1989 Policies; and (iii) Defendants have the

right under their respective Pre-1989 Policies to designate one of such Policies to indemnify such

Defendant for the payment a particular Occupational Disease Claim, subject to only the

deductible under that Policy and no other;

      (c)    granting Defendants a mandatory injunction compelling the Club to

provide the coverage described in (b) above;

      (d)    barring, restraining and prohibiting the Club from making, or seeking to

make, any assessment or assessments under any Pre-1989 Policies;

      (e)    granting Defendants damages against the Club, in such amount as is

determined at trial, together with pre-judgment interest;

      (f)    granting Defendant their reasonable attorneys' fees and other costs and

expenses incurred in this action;

      (g)    granting such other and further relief as this Court deems just and proper.

Dated:  February 4, 2004        PROSKAUER ROSE LLP
        New York, NY

               By:    /s/ Dale A. Schreiber
                     Dale A. Schreiber (DS-9211)
                     Seth B. Schafler (SS-5993)
                     PROSKAUER ROSE LLP
                     1585 Broadway
                     New York, NY  10036-8299
                     (212) 969-3000
                     (212) 969-2900 (fax)

                     *Attorneys for Defendants Keystone, BP,*
                     *MTL, Cleveland-Cliffs, Ispat, American*
                     *Steamship and Sea Mobility*

-and-

RAY, ROBINSON, CARLE & DAVIES
P.L.L.
Gene B. George
Julia R. Brouhard
1717 East 9th Street, Ste. 1650
Cleveland, OH 44114-2898
(216) 861-4533
(216) 861-4568 (fax)
*Attorneys for Defendant Cleveland-Cliffs*

-and-

DLA Piper Rudnick Gray Cary US LLP
Stanley McDermott, III (SM-0530)
Camilo Cardozo (CC-9710)
1251 Avenue of the Americas
New York, NY  10020
(212) 835-6123
(212) 835-6001 (fax)
*Attorneys for Defendant Ispat*

-and-

GARAN LUCOW MILLER, P.C.
Thomas W. Emery, Esq.
1000 Woodbridge Street
Detroit, Michigan 48207-3192
(313) 446-5525
(313) 259-0450 (fax)
*Attorneys for Defendant American
Steamship*

# EXHIBIT 3

HOLLAND & KNIGHT LLP
195 Broadway, 24th Floor
New York, NY 10007
(212) 513-3200

Attorneys for Defendants
American President Lines, Ltd., and
American President Lines, Ltd. as Successor to American Mail Line

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN STEAMSHIP OWNERS MUTUAL PROTECTION AND INDEMNITY ASSOCIATION, INC., | 04 Civ. 04309 (LAK) |
| Plaintiff, | **ANSWER TO SECOND AMENDED COMPLAINT** |
| -against- | |
| ALCOA STEAMSHIP CO., INC., et al., | |
| Defendants. | |

Defendants American President Lines, Ltd. ("American President Lines"), sued herein as American President Lines, Inc., and American President Lines, Ltd. as Successor to American Mail Line ("AML") (collectively, "APL"), sued herein as APL, Ltd. as successor to AML, by and through their attorneys, Holland & Knight LLP, as and for their Answer to the Second Amended Complaint ("Complaint") by plaintiff American Steamship Owners Mutual Protection and Indemnity Association, Inc. ("American Club"), as and for its Counterclaims, state upon information and belief as follows:

1.    Denies each and every allegation of Paragraph 1, except denies having knowledge or information sufficient to form a belief as to the allegation that the American Club is a non-profit mutual indemnity insurance association.

2.    Denies each and every allegation of Paragraph 2.

3.    Denies each and every allegations of Paragraph 3.

4.    Denies having knowledge or information sufficient to form a belief as to the truth of each and every allegation contained in Paragraph 4.

5.    Denies having knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 5.

6.    Denies each and every allegation of Paragraph 6; except admits that after "closing" an insurance year, the American Club has no right to seek further assessments from the members for that Year.

7.    Denies each and every allegation of Paragraph 7.

8.    Denies having knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 8.

9.    Denies each and every allegation of Paragraph 9, except admits that the American Club has paid IBNR claims arising during closed years to its members, denies having knowledge or information sufficient to form a belief as to the truth of the allegation that defendants did not assess each other any amounts to establish any reserves for their continued indemnifications regarding such IBNR claims arising before the insurance year that commenced on February 20, 1977, and

respectfully refers the Court to the American Club's Charter, By-Laws and insurance policies for terms thereof.

10.    Denies having knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 10.

11.    Denies having knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 11.

12.    Denies each and every allegation of Paragraph 12, except denies having knowledge or information sufficient to form a belief as to the number of asbestos exposure claims filed or still pending against members or former members.

13.    Denies having knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 13.

14.    Denies having knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 14.

15.    Admits the allegations of Paragraph 15 to the extent they relate to APL; except denies knowledge or information sufficient to form a belief as to the truth of the allegations regarding any defendant other than APL.

16.    Admits the allegations of Paragraph 16.

17.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 17.

18.    Denies having knowledge or information sufficient to form a belief as to truth of the allegations in Paragraph 18.

19.     Denies having knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 19.

20.     Denies having knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 20.

21.     Denies having knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 21.

22.     Denies having knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 22.

23.     Denies having knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 23.

24.     Denies having knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 24, except admits that American Club has issued assessable protection and indemnity policies to APL covering a one-year period, in consideration of premiums paid by APL.

25.     Denies each and every allegation of Paragraph 25.

26.     Denies having knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 26.

27.     Denies having knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 27.

28.     Denies having knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 28.

29.    Denies having knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 29.

30.    Denies having knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 30.

31.    Denies having knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 31.

32.    Denies each and every allegation of paragraph 32.

33.    Denies having knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 33.

34.    Denies the allegations in Paragraph 34.

35.    Denies the allegations in Paragraph 35.

36.    Denies having knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 36.

37.    Denies having knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 37.

38.    Answering Paragraph 38, APL states that the terms of the American Club's policies speak for themselves and therefore the Court is respectfully referred to these documents for the full and complete terms thereof.  To the extent a response is required, APL denies having knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 38.

39.    Denies having knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 39.

40.     Answering Paragraph 40, APL states that the terms of the American Club's By-Laws speak for themselves and therefore the Court is respectfully referred to these documents for the full and complete terms thereof.  To the extent a response is required, APL denies having knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 40.

41.     Denies having knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 41.

42.     Denies  the allegations of Paragraph 42.

43.     Denies having knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 43.

44.     Denies having knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 44.

45.     Denies having knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 45.

46.     Denies having knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 46.

47.     Denies having knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 47.

48.     Denies having knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 48.

49.     Denies having knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 49.

50.    Denies having knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 50.

51.    Denies having knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 51.

52.    Denies having knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 52.

53.    Denies having knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 53.

54.    Denies having knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 54.

55.    Denies each and every allegation of Paragraph 55; except admits that it is unknown how many seaman will succeed on filed or new claims against the American Club's members in the insurance years prior to February 20, 1989; except denies having knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 55 regarding the amount of the IBNR reserves and the adequacy of such reserves.

56.    Denies each and every allegation of Paragraph 56.

57.    Denies each and every allegation of Paragraph 57; except denies having knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 57 regarding whether the Board of Directors resolved that the American Club would terminate the practice of indemnifying defendants with

respect to IBNR claims for occupational diseases arising in closed insurance years before February 20, 1989.

58.    Denies having knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 58.

59.    Denies each and every allegation of Paragraph 59.

60.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 60.

61.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 61.

## AS AND FOR AN
## ANSWER TO THE FIRST CAUSE OF ACTION

62.    In response to the allegations of Paragraph 62, APL repeats and realleges its responses contained in the preceding paragraphs with the same force and effect as if set forth at length herein.

63.    Admits the allegation of Paragraph 63.

64.    Denies each and every allegation of Paragraph 64, except admits that the American Club is seeking a judicial declaration.

## AS AND FOR AN
## ANSWER TO THE SECOND CAUSE OF ACTION

65.    In response to the allegations of Paragraph 65, APL repeats and realleges its responses contained in the preceding paragraphs with the same force and effect as if set forth at length herein.

66.    Denies each and every allegation of Paragraph 66.

67.    Admits the allegation of Paragraph 67

68.    Denies each and every allegation of Paragraph 68, except admits that the American Club is seeking a judicial declaration.

## AS AND FOR AN
## ANSWER TO THE THIRD CAUSE OF ACTION

69.    In response to the allegations of Paragraph 69, APL repeats and realleges its responses contained in the preceding paragraphs with the same force and effect as if set forth at length herein.

70.    Denies having knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 70.

71.    Admits the allegation of Paragraph 71.

## AS AND FOR A FIRST DEFENSE

72.    The Complaint fails to state a claim upon which relief may be granted.

## AS AND FOR A SECOND DEFENSE

73.    The American Club's claims in the Complaint are time barred, in whole or in part, by the statute of limitations.

## AS AND FOR A THIRD DEFENSE

74.    The American Club's claims in the Complaint are time barred, in whole or in part, by laches in that the American Club has since on or about 1980 consistently recognized its legal obligations to indemnify policyholders, including

defendants, for occupational disease claims arising from injuries in closed insurance years and has delayed without excuse or justification in announcing that it will no longer pay such indemnification. Defendants have been prejudiced by such delay.

## AS AND FOR A FOURTH DEFENSE

75.    The American Club's claims in the Complaint are barred, in whole or in part, by waiver in that the American Club has waived its right to now seek further assessments from policy holders and it has waived its right to deny policyholders coverage on its inability to further assess them.

## AS AND FOR A FIFTH DEFENSE

76.    The American Club's claims in the Complaint are barred, in whole or in part, by estoppel in that the American Club has since on or about 1980 consistently indemnified policyholders, including defendants, for occupational disease claims arising from injuries in closed insurance years and has consistently represented to defendants, that it had a legal obligation to do so.

## AS AND FOR A SIXTH DEFENSE

77.    The American Club's claims in the Complaint are barred, in whole or in part, by the terms, conditions and limitations contained in the policies.

## AS AND FOR A SEVENTH DEFENSE

78.     The American Club's claims in the Complaint are barred, in whole or in part, by the terms of the American Club's By-Laws applicable to the policies, and documented actions of the American Club's Board of Directors, including the American Club's Board of Directors' actions in closing policy years prior to February 20, 1989 with "final assessments."

## AS AND FOR A EIGHTH DEFENSE

79.     The American Club's claims in the Complaint are barred, in whole or in part, by the doctrine of *res judicata* and/or collateral estoppel.

## AS AND FOR A NINTH DEFENSE

80.     The declaratory relief sought by the American Club would, in whole or in part, result in inequitable treatment of members and former members of the American Club, including defendants, contrary to the principles of mutuality asserted by the American Club.

## AS AND FOR A TENTH DEFENSE

81.     To the extent that the American Club's claims are based on the failure of its Board of Directors to set adequate reserves for unreported claims before closing an insurance year with a "final assessment" in accordance with the American Club's By-Laws, the American Club has the sole responsibility for such inadequacy and such inadequacy is not a defense to the rights of defendants under their respective

American Club policies to indemnification for payments they have made for occupational disease claims.

## AS AND FOR A ELEVENTH DEFENSE

82.    This affirmative defense is asserted only to the extent that the American Club's claims are based on the premise that defendants remained members of the American Club on May 25, 2004 and on June 7, 2004, long after the expiration of the policy years under all of their respective American Club policies.  Defendants continue to assert that they were not members of the American Club as of either of those dates and ceased to be members after they stopped purchasing insurance policies from the American Club.  The American Club's actions taken on those respective dates in determining that it will no longer indemnify defendants with respect to IBNR claims arising before February 20, 1989 are null and void because defendants and others similarly situated were not afforded the right to vote for the American Club's directors who approved such actions or to exercise other incidents of membership in connection with such actions and any related actions.

## AS AND FOR A TWELFTH DEFENSE

83.    The American Club's claims in the Complaint are barred by the terms of the releases given to members in connection with closing policy years and/or the releases given to former members in connection with their withdrawal from membership.

## AS AND FOR A THIRTEENTH DEFENSE

84.    To the extent that the American Club seeks to disclaim coverage for claims previously reported to the American Club under any of the American Club policies, such disclaimer is untimely and in violation of N.Y. Insurance Law § 3420(d), and California insurance law, including Cal. Ins. Code § 790.03.

## AS AND FOR A FOURTEENTH DEFENSE

85.    To the extent that the American Club failed to assert coverage defenses within the time limitations set forth under applicable law or failed to reserve rights with respect to indemnification, the American Club waived those defenses to indemnification for the affected claims.

## AS AND FOR A FIFTEENTH DEFENSE

86.    To the extent that the American Club bases any of its claims on the cancellation of further coverage under any of the policies, the American Club has failed to comply with the required notice of cancellation required by N.Y. Insurance Law § 3426, and California law.

## AS AND FOR A SIXTEENTH DEFENSE

87.    The Club's claims are barred, in whole or in part, by the doctrine of promissory estoppel, in that Defendants reasonably relied on the express and implied promise of the Club with respect to the existence of coverage for occupational disease claims and express and implied promise of the Club to release policyholders from further assessment when it closed a year with a "final assessment." This reliance was forseeable.

13

## **ADDITIONAL DEFENSES**

88.    APL respectfully requests leave to assert additional defenses which it deems necessary to its defense during or upon conclusion of its investigation and discovery of the American Club's claims.

## **COUNTERCLAIM AGAINST THE AMERICAN CLUB**

89.    The counterclaims alleged below seek (a) a declaratory judgment, adjudicating Defendant's rights and the Club's obligations under Pre-1989 Policies issued by the Club to Defendants, their predecessors, successors and/or affiliated companies, with respect to Occupational Disease Claims and Defendant's freedom from further assessments under any such Policies, and (b) for damages for breach of contract, breach of the covenant of good faith and fair dealing, violation of California's Unfair Competition law, violation of New York General Business Law §349, and other relief arising out of the Club's unjustified refusal to pay any Occupational Disease Claims under Pre-1989 Policies on and after June 7, 2004.

## **The Parties**

90.    APL is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Oakland, California.

91.    The American Club is a non-profit mutual indemnity insurance company organized and existing under the laws of the State of New York with its principal place of business in New York, New York.

## Jurisdiction and Venue

92.    This Court has jurisdiction over the subject matter of these counter-claims pursuant to 28 U.S.C § 1333(1) because it is an admiralty or maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.  This Court has supplemental jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1367(a).

93.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## Insurance Policies and By-Laws

94.    The Club issued insurance policies to APL from 1958 through 1986 and issued policies covering various APL vessels from 1986 through 1990 ("the Pre-1989 Policies").  These policies were each issued for a one-year period and created a contractual obligation between the parties.

95.    Upon information and belief, APL paid the Club all premiums and deductibles as required by the policies.

96.    The indemnification provisions of the Pre-1989 policies provide in relevant part:

> The [Club] agrees to indemnify the Assured against any loss, damage or expense which the Assured shall become liable to pay and shall pay by reason of the fact that the Assured is the owner (or operator, manager, charterer, mortgagee, trustee, receiver or agent, as the case may be) of the insured vessel and which shall result from the following liabilities, risks, events, occurrences and expenditures:  Liability for . . . loss of life of, or personal injury to, or illness of any person….

15

97.   The Pre-1989 Policies provide that every holder of a policy issued by the [Club] shall be a member of the [Club] during the period while such policy is effective to insure risks, and as such member shall be entitled to vote and to share in dividends as hereinafter provided.

98.   The Pre-1989 Policies are assessable policies issued according to the Club's By-Laws.   The Club's By-Laws govern the Club's authority to issue assessable policies, to make assessments thereunder, and to terminate the Assured's liability for further assessments thereunder.   In particular, these policies provide:

> The Assured are subject to a contingent liability hereunder for assessment without limit of amount for the proportionate share of any deficiency or impairment as provided by law and fixed in accordance with the by-laws of the [Club]; provided however, that any such assessment shall be for the exclusive benefit of holders of policies which provide for such a contingent liability, and the holders of policies subject to assessment shall not be liable to assessment in an amount greater in proportion to the total deficiency than the ratio that the deficiency attributable to the assessable business bears to the total deficiency.

99.   Relevant By-Law provisions of the Club, which appear to have remained substantially similar through all relevant policy years, provide:

> For the purposes of declaring dividends and making assessments the business of the [Club] shall be divided into insurance years.

100.   The insurance years referred to in this By-Law have coincided with the policy periods under the insurance policies issued by the Club during all relevant times.

101.   The By-Laws, Article VI, Section 4 provide for the closing of insurance years and final assessments:

16

> From time to time after the termination of each insurance year, when the manager shall determine that it is practicable to estimate with a reasonable degree of certainty the minimum, probable or final surplus or deficiency resulting from all of the Corporation's insurances in effect during such insurance year, the manager shall place before the board of directors a statement of such financial results of insurances . . . . After receipt of any such statement, the board of directors from time to time may (a) fix and determine an amount to be declared and paid as a partial or the final dividend, after retaining such sums as they may deem necessary *to meet outstanding policy obligations or for the maintenance of reserves and surplus of the Corporation*, or (b) order an interim or *the final assessment to be made against the holders of assessable policies*, fix the due date of such assessment, determine the rate of interest that shall be added to and become a part of any delinquent assessment, and otherwise provide for enforcement and collection thereof. (Emphasis added.)

102. The Pre-1989 Policies provide occurrence-based coverage and therefore permit claims to be made thereunder without any time limitation as to when claims can first be made against the insured and still be covered by the policy.

103. The Pre-1989 Policies have no aggregate limit, only a per-claim limit, and contain no language or provision limiting the Club's liability thereunder, and thus appear to be a full expression of the policyholder's rights under the Policies.

104. The Pre-1989 Policies do not limit the recourse of the policyholders against any assets of the Club or to the amount collected by way of premiums and assessments from holders of policies issued to all policyholders for the same policy year.

### Board of Director's Management Responsibilities

105. The responsibility for the proper management of the Club rests with its Board of Directors ("the Board"). Article II, Section I of the policies provide:

> The policies provide that the business of the Corporation shall be conducted by a board of directors who shall arrange for a suitable

17

principal office for the Corporation ...shall employ a manager as hereinafter provided, shall select depositories for the Corporation's funds, shall adopt a seal for the Corporation, and shall have all other powers necessary or proper for the management and conduct of the business and affairs of the Corporation that are not by law or these bylaws required to be exercised otherwise.

106.    Assessments made by the Board for any policy year were made against all policyholders for the year in issue.    These assessments were prorated among policyholders for that policy year.

107.    The Board has the discretionary authority under the By-Law, Article VI, Section 4 to levy additional assessments on the policyholders should the aggregate claims paid by the Club for an open year exceed the amounts paid by the policyholders.    The Board also has the authority to pay dividends to the policyholders.

108.    Thus, while a policy year is kept open by the Club, the Club may assess the policyholders for aggregate deficiency for that year.

109.    Once the Board accepts the managers' estimate with a reasonable degree of certainty of the probable surplus or deficiency and orders a final, rather than interim assessment or dividend, no further premium or assessment can be levied upon the policyholders with respect to that policy year, even if the operations for that year result in an ultimate deficiency to the Club.

110.    After a policy year has been closed, the Club's balance sheet is updated to transfer all amounts received by way of premiums and assessments after payment of claims for that year into either case reserves for that year, reserves for incurred but not reported losses ("IBNR") for that year, or general reserves not

dedicated to any particular policy year. These reserves, however, do not result in the imposition of any security interest or charge on specified assets or the segregation of any assets. All funds collected from the assessment of policyholders are assets of the Club, subject to the claims of all of its creditors including but not limited to policyholders for claims payments under their respective policies.

111. The Board's determination to close a policy year does not terminate the Club's continuing obligations under the policies for that policy year, unless the policyholder agrees to a full policy release. Upon information and belief, the Club has neither sought nor obtained any policy releases for any of the Pre-1989 Policies from APL.

## Occupational Disease Claims Coverage

112. Plaintiff seamen have sought and continue to seek damages resulting from their alleged exposure to asbestos, benzene, noise, and other substances or conditions on board or working in or about vessels owned, chartered, operated, or managed by APL and one or more other Defendants during the Pre-1989 Years ("Occupational Disease Claims").

113. Until June 7, 2004, the Club provided continuing coverage for Occupational Disease Claims arising during closed insurance years and did not assess members for any deficiencies. Upon information and belief, the Club paid IBNR claims arising during closed years to its members from its general reserves. APL has relied upon this policy by, among other things, not seeking available

coverage alternatives and proceeding with its corporate and business affairs on the basis of this continuing coverage for Occupational Disease Claims..

114.    Upon information and belief, in 1988 for all then open insurance years, the Board decided to put $100,000 per insurance year into an IBNR reserve to cover anticipated occupational disease claims that were not yet reported when insurance years would be closed.

## The Prudential Lines Case

115.    In *Dicola v. American S.S. Owners Mutual Protection and Indemnity Association, Inc. (In re Prudential Lines, Inc.)* the United States Court of Appeals for the Second Circuit held that, policyholders under Pre-1989 Policies could select the Policy year to apply Occupational Disease Claims involving exposures occurring over multiple policy years, subject only to the one deductible for that policy year. 158 F.3d 65 (2d Cir. 1998).  In this litigation, the Club acknowledged that it was obligated to provide coverage for Occupational Disease Claims in closed years and never asserted that its obligation to provide such coverage was "discretionary."

## The Club's Recent Decision to Terminate Coverage

116.    On or about June 7, 2004, the Club announced in its June 7, 2004 Circular that the Club no longer intended to make payments to policyholders with respect to Occupational Disease Claims under any Pre-1989 Policies with respect to such claims as had not been reported by the time each such year was closed or for such claims that had been under-reserved or unreserved by the Club.  In so doing,

the Club claimed that its payment of such claims for over twenty years was merely a "discretionary practice."

117.    At no time prior to June 7, 2004 has the Club advised its policyholders that the payment of valid claims under any Pre-1989 Policy was "discretionary" or subject to termination if the amount of the Club's reserves for closed policy year were deemed insufficient or for any other reason.

## FIRST CLAIM FOR RELIEF
### (Declaratory and Injunctive Relief)

118.    APL incorporates by reference paragraphs 88 through 116 of these counterclaims with the same force and effect as if set forth at length herein.

119.    The Club issued Pre-1989 Policies obligating them to indemnify APL in full for any loss, damage or expense that APL became liable to pay, subject to deductibles.

120.    These Pre-1989 Policies include coverage for Occupational Disease Claims resulting from exposures occurring during one or more years.

121.    The Club now asserts that it is no longer obligated to provide continuing coverage for Occupational Disease Claims and that it has the right to make additional assessments under Pre-1989 Policies to cover claims not covered by reserves established as of June 7, 2004.

122.    Therefore, an actual and justiciable controversy exists between APL and the Club with respect to (a) the duties and obligations of the Club under one or more of their respective Pre-1989 Policies to provide continuing coverage to Defendants

for Occupational Disease Claims resulting from claimants' exposures occurring during one or more of the Pre-1989 Years, and (b) the Club's right to make assessments under the Pre-1989 Policies to cover losses not covered by reserves established as of June 7, 2004.

123.    Accordingly, this Court should (a) declare that APL has the right under their respective Pre-1989 Policies to continuing coverage for Occupational Disease Claims resulting from claimants' exposures occurring during any one or more of the Pre-1989 Years, subject only to a single applicable deductible, and that the Club has no right to make any further assessment or assessments against any Defendants under any Pre-1989 Policies; (b) grant APL a mandatory injunction compelling the Club to provide such coverage and a negative injunction barring, restraining and prohibiting the Club from making, or seeking to make, any such assessment or assessments; (c) award APL its attorneys' fees and other costs and expenses incurred in connection with this action to fullest extent permitted by applicable law; and (d) grant APL such other and further relief as this Court deems just and proper.

## SECOND CLAIM FOR RELIEF
### (Breach of Contract)

124.    APL incorporates by reference paragraphs 88 through 122 of these counterclaims with the same force and effect as if set forth at length herein.

125.    The Pre-1989 Policies entered into by APL and the Club are enforceable agreements.

126.   The Club breached its obligations to APL by failing to provide coverage for Occupational Disease Claims resulting from claimants' exposures during one or more of the Pre-1989 Years and (b) reducing its indemnification payments to Defendants otherwise due and payable under the Pre-1989 Policies by applying multiple deductibles for Occupational Disease Claims based upon the number of years that the claimant served on one or more of Defendant's vessels.

127.   Upon information and belief, APL complied with its duties under the Pre-1989 Policies, including the full payment of all required premiums and deductibles.

128.   As a direct and foreseeable result of these breaches, APL has been damaged and continues to be damaged in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF
**(Violation of California Business and Professional Code § 17200 "California's Unfair Practices Act")**

129.   APL incorporates by reference paragraphs 88 through 127 of these counterclaims with the same force and effect as if set forth at length herein.

130.   APL is an intended beneficiary of the Pre-1989 Policies.

131.   The Club represented to APL that it would be covered for Occupational Disease Claims arising during any of the Pre-1989 years.

132.   APL relied on these representations and has and will sustain damages as a result of the Club's refusal to provide coverage under the Pre-1989 Policies.

133.   The Club's conduct constitutes a fraudulent business act or practice within the meaning of California's Unfair Practices Act.

134.   As a result of these violations of California's Unfair Practices Act, APL requests damages, attorneys' fees and costs and other expenses.

## FOURTH CLAIM FOR RELIEF
### (Breach of Implied Covenant of Good Faith)

135.   APL incorporates by reference paragraphs 88 through 133 of these counterclaims with the same force and effect as if set forth at length herein.

136.   As a policyholder of the Club, the Club owed APL an obligation to act reasonably and in good faith and to deal fairly with APL in connection with its rights to the benefit of the Pre-1989 Policies.

137.   The Club, in breach of the covenant of good faith and fair dealing, has unreasonably refused to provide the insurance coverage to which it agreed in the Pre-1989 Policies.

138.   As a proximate result of the Club's wrongful conduct, APL has suffered damages in an amount to be proven at trial, including but not limited to attorneys' fees, and is further entitled to claim and recover damages from the Club.

## FIFTH CLAIM FOR RELIEF
### (Release)

139.   APL incorporates by reference paragraphs 88 through 137 of these counterclaims with the same force and effect as if set forth at length herein.

140.    In connection with the closing of insurance years and the levying of "final" assessments, the Club granted APL releases from any liability for further assessments under one or more the Pre-1989 Policies.

141.    APL seeks a declaration that any further assessments are barred against APL with respect to the Pre-1989 Years covered by such releases.

## SIXTH CLAIM FOR RELIEF
### (Violation of New York General Business Law §349)

142.    APL incorporates by reference paragraphs 88 through 140 of these counterclaims with the same force and effect as if set forth at length herein.

143.    The Club has continually represented to its policyholders that it would indemnify its members for claims arising during any one or more of Pre-1989 Years.

144.    APL reasonably relied on the Club's representations and continually contracted with the Club each year for more than thirty years.

145.    APL and the other members and policyholders of the American Club have been damaged and will continue to be damaged by the Club's refusal to honor its legal obligation of providing the benefit of these policies.

146.    The Club's unjust refusal to provide coverage for Occupational Disease Claims arising during any one or more of the Pre-1989 Years constitutes deceptive acts or practices within the meaning of New York General Business Law §349.

147.    As a result of the Club's violation of New York General Business Law §349, the Club is liable to APL for damages, attorneys' fees and other costs and expenses and should be enjoined from continuing those deceptive acts or practices.

WHEREFORE, having fully answered the Complaint, APL requests that said Complaint be dismissed, with prejudice, and that it be awarded its costs of suit, and that judgment be entered in its favor on its counterclaims as follows:

a.  declaring that (i) APL has the right under their respective Pre-1989 Policies to continuing coverage for Occupational Disease Claims resulting from claimants' exposures occurring during any one or more of the Pre-1989 Years, subject only to a single deductible, and (ii) the Club has no right to make any further assessment or assessments against APL under any Pre-1989 Policies;

b.  granting APL an injunction compelling the Club to provide the coverage described in (b) above and barring, restraining and prohibiting the Club from making, or seeking to make, any assessment or assessments under any Pre-1989 Policies;

c.  granting APL damages against the Club, in such amount as is determined at trial, together with such pre-judgment interest;

d.  granting APL their reasonable attorneys' fees and other costs and expenses incurred in this action;

e.  granting such other and further relief as this Court deems just and proper.

Dated: October 8, 2004
      New York, New York

                                 HOLLAND & KNIGHT LLP
                                 Attorneys for APL

                                 By _____
                                   John M. Toriello (JT1822)

                                 195 Broadway
                                 New York, NY   10007
                                 (212) 513-3200

# 2243960_v3

26

## CERTIFICATE OF SERVICE

I hereby certify, pursuant to Title 28 U.S.C.§1746, that on October 8, 2004, I served a true and correct copy of the Defendants' Rule 7.1 Disclosure Statement and Answer to Second Amended Complaint, by mailing it in a sealed envelope, with postage prepaid thereon, in an official depository of the U.S. Postal Service, to be delivered by First Class Mail to:

NORSE & BOWLES, LLP
Lawrence J. Bowles
One Exchange Plaza
New York, New York 10006
(212) 952-6200
Attorney for Plaintiff American Steamship Owners
Mutual Protection and Indemnity Association, Inc.

PROSKAUER ROSE LLP
Dale A. Schreiber (DS-9211)
Seth B. Schafler (SS-5993)
1585 Broadway
New York, New York 10036-8229
(212) 969-3000
Attorneys for Defendant Keystone
Shipping Co., and related entities,
Marine Transport Lines, Inc. and
related entities, BP America Inc. and
related entities, Cleveland-Cliffs,
Inc., and Amerada Hess Corporation

PIPER RUDNICK
Stanley McDermott, III (SM-0530)
Camilo Cardozo (CC-9710)
1251 Avenue of the Americas
New York, NY 10020
(212) 835-6123
(212) 835-6001 (fax)
*Attorneys for Defendant Ispat*

GARAN LUCOW MILLER, P.C.
Thomas W. Emery, Esq.
1000 Woodbridge Street
Detroit, MI 48207-3192
(313) 446-5525
Attorneys for Defendant American Steamship

HOWREY SIMON ARNOLD & WHITE LLP
Mindy G. Davis
Christine Davis
1299 Pennsylvania Avenue, NW
Washington, DC 20004-2402
Tel: 202-783-0800
Attorneys for Defendant Amerada Hess Corporation

O'HARE PARNAGIAN LLP
Robert O'Hare Jr.
Chrstopher P. Parnagian
63 Wall Street, Suite 1801
New York, N.Y. 10005-3001
(212) 425-1401
Attorneys for Central Gulf Lines
(as Successor to Central Gulf Lighters/
Waterman Steamship Corporation)

RAY, ROBINSON, CARLE & DAVIES P.L.L.
Gene B. George
Julia R. Brouhard
1717 East 9th Street, Ste. 1650
Cleveland, OH 44114-2898
Tel: 216-861-4533
Attorneys for Cleveland-Cliffs, Inc.,
(as Successor to Cleveland-Cliffs Steamship Co.)

DICKSTEIN SHAPIRO MORIN & OSHINSKY, LLP
Stacey Saiontz, Esq. (SS-1705)
David Elkind, Esq.
1177 Avenue of the Americas
New York, NY  10036
(212) 835-1400
Attorneys for Defendant
Keyspan Corporation
(as Successor to Eastern Gas and Fuel
Associates and Mystic Steamship)

TISDALE & LENNON, LLC
Patrick F. Lennon
36 West 44th Street, Suite 1111
New York, New York 10036
(212) 354-0025
Attorneys for Defendant
Bridgeport & Port Jefferson
Steamboat Co.

GARVEY SCHUBERT BARER
Mario Aieta
599 Broadway, 8th Floor
New York, New York 10012
(212) 431-8700
Attorneys for Defendant
Foss Maritime Company, c/o
Saltchuk Resources, Inc.


MORGAN, LEWIS & BOCKIUS LLP
Lisa M. Campisi
101 Park Avenue
New York, New York 10178
(212) 309-10178
Attorneys for Defendant
Kimberly-Clark Corporation
(as Successor to Scott Paper Company)

BROWN RUDNICK BERLACK ISRAELS LLP
Andrew S. Dash
Peter Adelman
120 West 45th Street
New York, New York 10036
(212) 209-4811
Attorneys for Defendants
Royal P&O Nedlloyd N.V.,
Farrell Lines, Inc., Farrell Lines (Lighters)

HOLLSTEIN KEATING CATTELL
JOHNSON & GOLSTEIN, P.C.
Edward v. Cattell, Jr.
8 Penn Center, 1628 JFK Blvd., Suite 2000
Philadelphia, PA 19103
(215) 320-2073
Attorneys for Defendant
S.C. Loveland Co., Inc.

NAGEL RICE & MAZIE, LLP
Herbert I. Waldman
301 S. Livingston Avenue, Ste. 201
Livingston, NJ 07039-3991
(973) 535-3100
Attorneys for Defendant
United States Lines, Inc.
(Reorganization Trust x/o John T.
Paulyson, Trustee)

DECHERT LLP
Robert A. Cohen
30 Rockefeller Plaza
New York, NY 10112
(212) 698-3501
Attorneys for Defendant
American Atlantic Company
(as Successor to American Dredging Company)

JASPAN SCHLESINGER HOFFMAN LLP
Scott B. Fisher
300 Garden City Plaza
Garden City, NY 11530
(516) 746-8000
Attorneys for Defendant
Prudential Lines Disbursement Trust

SHAKED & POSNER
Dan Shaked
225 West 34th St., Suite 705
New York, NY 10122
(212) 494-0035
Attorneys for Defendant
William F. Higgins

I declare under penalty of perjury that the foregoing is true and correct.

      Executed on October 8, 2004.

                                  Elvin Ramos

                                  Holland & Knight LLP
                                  195 Broadway
                                  New York, NY 10007

# EXHIBIT 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

AMERICAN STEAMSHIP OWNERS    :
MUTUAL PROTECTION AND INDEMNITY   :
ASSOCIATION, INC.,              :   04-CV-04309
                                :   (LAK) (FM)
                Plaintiff,    :
                                :
    – against –           :   **ANSWER AND**
                                :   <u>**COUNTERCLAIMS**</u>
ALCOA STEAMSHIP CO., INC., <u>et</u> <u>al.</u>,  :
                                :
                                :
               Defendants.  :

---------------------------------------------------------------x

      Royal P&O Nedlloyd N.V., as Successor to Farrell Lines, Inc. ("Farrell"),
as and for its answer to the Second Amended Complaint (the "Complaint"), alleges,
except as noted, on information and belief as to all matters other than its own status and
actions, as follows:

      1.    Admits that Plaintiff has characterized the relief sought in the
Complaint, and, to the extent that paragraph 1 alleges that Farrell is not entitled to
further indemnification for incurred but not reported ("IBNR") claims for the reasons set
forth therein, denies the allegations of paragraph 1 of the Complaint.

      2.    Denies the allegations of paragraph 2 of the Complaint.

      3.    Denies the allegations of paragraph 3 of the Complaint to the extent
that they allege that members of the Club (as defined in the Complaint) are reimbursed
for reported claims by other members and not the Club, denies further that the reporting
of claims by members automatically obligates members to contribute to the Club funds
sufficient to pay such claims, and denies knowledge or information sufficient to form a
belief as to the truth of the remaining allegations of paragraph 3 of the Complaint.

4.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 4 of the Complaint.

5.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 5 of the Complaint.

6.      Admits that, after closing an Insurance Year, the Club has no right to seek further assessments from the members for that Year, and denies the remaining allegations of paragraph 6.

7.      Denies the allegations of paragraph 7 of the Complaint.

8.      Admits the allegations of paragraph 8 as to seamen and others working on Farrell's vessels, and denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 8.

9.      Denies the allegations of paragraph 9 of the Complaint.

10.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 10 of the Complaint.

11.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 11 of the Complaint.

12.      Denies the allegations of paragraph 12 of the Complaint, except denies knowledge or information sufficient to form a belief as to the truth of the allegation as to the number of occupational disease claims filed or still pending, or the allegation that new claims are being filed.

13.      Admits that the Club has informed its members of its purported intention to cease indemnifying them with respect to IBNR claims "arising" before February 20, 1989, admits further that Farrell has objected to absorbing multiple deductibles for claims allocated over two or more Insurance Years and that actual

justiciable controversies are presented by this action, and denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 13 of the Complaint.

14.    Admits that the Club is incorporated under the laws of the State of New York and has its principal place of business in New York, New York, and denies the remaining allegations of paragraph 14 of the Complaint.

15.    Admits the allegations of paragraph 15 as to itself, and denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 15 as to the other Defendants.

16.    The allegations contained in paragraph 16 of the Complaint are conclusions of law as to which no response is required herein.

17.    Admits that Farrell is doing business in this judicial district, and otherwise denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 17 of the Complaint, except as to the allegation that venue in this judicial district is proper, which is a conclusion of law as to which no response is required herein.

18.    With respect to paragraph 18 of the Complaint, respectfully refers the Court to the Club's Charter and By-Laws for their contents.

19.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 19 of the Complaint, except respectfully refers the Court to the Club's Charter and By-Laws for their contents.

20.    Denies knowledge or information sufficient to form a belief as to the allegations of paragraph 20 of the Complaint, except respectfully refers the Court to the Club's Charter and By-Laws for their contents.

21.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 21 of the Complaint, except respectfully refers the Court to the Club's Charter and By-Laws for their contents.

22.    Admits the allegations of paragraph 22 of the Complaint.

23.    Denies the allegations of paragraph 23 of the Complaint.

24.    Admits that the American Club has issued marine protection and indemnity insurance policies to Farrell, and denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 24 of the Complaint.

25.    Denies the allegations of paragraph 25 of the Complaint.

26.    With respect to paragraph 26 of the Complaint, respectfully refers the Court to the relevant Policies for their contents.

27.    Denies the allegations of paragraph 27 of the Complaint, except to the extent the allegations contained in paragraph 27 of the Complaint are conclusions of law as to which no response is required herein, and to the extent they purport to characterize the Club's By-Laws, respectfully refers the Court to the Club's By-Laws for their contents.

28.    Denies the allegations of the last sentence of paragraph 28, and denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 28 of the Complaint.

29.    With respect to paragraph 29 of the Complaint, respectfully refers the Court to the relevant Policies for their contents.

30.    With respect to paragraph 30 of the Complaint, respectfully refers the Court to the relevant Policies for their contents.

31.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 31 of the Complaint.

32.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 32 of the Complaint.

33.    The allegations contained in paragraph 33 of the Complaint are conclusions of law as to which no response is required herein.

34.    With respect to paragraph 34 of the Complaint, respectfully refers the Court to New York Insurance Law § 1211 for its contents.

35.    With respect to paragraph 35 of the Complaint, respectfully refers the Court to New York Insurance Law § 4111 for its contents.

36.    With respect to paragraph 36 of the Complaint, respectfully refers the Court to the Club's By-Laws for their contents.

37.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 37 of the Complaint.

38.    Denies the allegations of paragraph 38 of the Complaint, except respectfully refers the Court to the Policies in question for the terms thereof.

39.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 39 of the Complaint.

40.    With respect to paragraph 40 of the Complaint, respectfully refers the Court to the Club's By-Laws for their contents.

41.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 41 of the Complaint.

42.    Respectfully refers the Court to the Club's Charter and By-Laws for their contents.

43.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 43 of the Complaint.

44.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 44 of the Complaint.

45.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 45 of the Complaint.

46.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 46 of the Complaint.

47.     Denies the allegations of paragraph 47 of the Complaint.

48.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 48 of the Complaint.

49.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 49 of the Complaint.

50.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 50 of the Complaint.

51.     Denies the allegations of paragraph 51 to the extent that they allege that the Club's obligation to indemnify Farrell for covered claims is discretionary, and denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 51 of the Complaint.

52.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 52 of the Complaint.

53.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 53 of the Complaint.

54.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 54 of the Complaint.

55.     Denies that the Club's members in currently open Insurance Years have no legal or other obligation to provide funds to the Club to indemnify or reimburse Farrell for unreserved or inadequately reserved IBNR claims attributable to the closed Insurance Years prior to February 20, 1989, denies that so indemnifying Farrell would "inequitably prejudice" the Club's members, and denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 55 of the Complaint

56.     Denies that the Club's obligation to indemnify Farrell for covered claims is discretionary, except to the extent the allegations contained in paragraph 56 of the Complaint are conclusions of law, as to which no response is required herein, and except to the extent the allegations in this paragraph of the Complaint purport to characterize the Club's Charter, By-Laws, or Policies, as to which Farrell respectfully refers the Court to the Club's Charter, By-Laws, and Policies for their contents.

57.     Admits that the Club has informed its members that it will no longer indemnify them with respect to IBNR claims for occupational diseases arising in closed Insurance Years before February 20, 1989, denies that its members were promptly informed of its decision, denies that so indemnifying its members is "discretionary," denies that so indemnifying its members created an "inequitable situation" and would result in an "inequitable drain" upon the Club's general reserves, and denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 57 of the Complaint.

58.    Admits that Farrell has objected to absorbing multiple deductibles for claims allocated over two or more Insurance Years, admits that Keystone initiated a lawsuit against the Club with respect to various of its policies, denies the allegations of paragraph 58 to the extent that they allege that the Club's obligation to indemnify Farrell for covered claims is discretionary, and denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 58 of the Complaint.

59.    Denies the allegations of paragraph 59 of the Complaint.

60.    Denies the allegations of paragraph 60 of the Complaint, except the allegation that the Club's practice regarding the allocation of claims and application of multiple deductibles is consistent with New York law, which is a conclusion of law as to which no response is required herein.

61.    Denies the allegations of paragraph 61 to the extent that they allege that the Club's obligation to indemnify Farrell for covered claims is discretionary, and avers that the remaining allegations contained in paragraph 61 of the Complaint are conclusions of law to which no response is required herein.

62.    With respect to paragraph 62 of the Answer and Counterclaims, Farrell repeats and realleges the allegations contained in paragraphs 1 through 61 of this Answer and Counterclaims as if set forth in full herein.

63.    Admits that an actual and justiciable controversy between Plaintiff and Farrell exists.

64.    Denies the allegations of paragraph 64 of the Complaint.

65. With respect to paragraph 65 of the Answer and Counterclaims, Farrell repeats and realleges the allegations contained in paragraphs 1 through 64 of this Answer and Counterclaims as if set forth in full herein.

66. Denies the allegations of paragraph 66 of the Complaint.

67. Admits that an actual and justiciable controversy exists between Plaintiff and Farrell.

68. Admits that Plaintiff has requested the relief described in paragraph 68, and otherwise denies the remaining allegations contained therein.

69. To the extent not otherwise specifically responded to herein, Farrell generally denies the allegations of the Complaint.

## FIRST AFFIRMATIVE DEFENSE

### (Failure to State a Claim)

70. The Complaint fails to state any claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

### (Insurance Policies)

71. The Club's claims are barred, in whole or in part, by the terms of the Policies, all of the obligations of which Farrell has fulfilled and which provide coverage for all loss incurred as a result of occurrences transpiring, in whole or in part, during the policy period of each such Policy, without any aggregate limit on losses payable thereunder, any time deadline for the making of claims thereunder, or any limitation on recourse against the Club.

## THIRD AFFIRMATIVE DEFENSE

### (By-Laws)

72.     The Club's claims are barred, in whole or in part, by the terms of the By-Laws applicable to the Policies, and actions thereunder of the Club's Board of Directors, including, but not limited to, the Club's Board of Directors' actions in closing policy years prior to 1989 with "final assessments" pursuant to By-Laws, Article VI, Section 4.

## FOURTH AFFIRMATIVE DEFENSE

### (Estoppel And Waiver)

73.     The Club's claims are barred, in whole or in part, by the doctrine of estoppel, in that the Club has, since at least 1980, consistently indemnified policyholders, including Farrell, for occupational disease claims arising from injuries in closed Insurance Years and has represented to Farrell that the Club had a legal obligation to do so.  Farrell has relied on the Club's conduct and representations to its detriment.  Moreover, the Club has waived its right to seek further assessments from policyholders in closed Insurance Years and has waived its right to deny policyholders coverage based on its inability to seek or enforce such assessments.

## FIFTH AFFIRMATIVE DEFENSE

### (Laches)

74.     The Club's claims are barred, in whole or in part, by the doctrine of laches, in that the Club has, since at least 1980, consistently recognized its legal obligation to indemnify policyholders, including Farrell, for occupational disease claims arising from injuries in closed  Insurance Years and has delayed without excuse or

justification until June 7, 2004 announcing that it will no longer pay such indemnification. Farrell has been prejudiced by that delay.

## SIXTH AFFIRMATIVE DEFENSE

### (Res Judicata/Collateral Estoppel)

75.    The Club's claims are barred, in whole or in part, by the doctrines of res judicata and/or collateral estoppel because the issues the Club now seeks to raise were either fully litigated or necessary to the judgment entered against the Club in Dicola v. Am. S.S. Owners Mut. Protection and Indemnity Assoc., Inc., 158 F.3d 65 (2d Cir. 1998).  These issues include, but are not limited to, (a) the continuing rights of holders of pre-1989 policies, including Farrell, to make claims for indemnity payment under these occurrence-based policies at any time after the policy year for which they were issued, and (b) the rights of the holders of pre-1989 policies, including Farrell, to seek indemnity payments under the pre-1989 policy providing the lowest per-claim deductible for occupational disease claims spanning multiple, consecutive policy years. The Club had a full and fair opportunity to litigate those issues in that litigation, and the issues were decided adversely to the Club.

## SEVENTH AFFIRMATIVE DEFENSE

### (Mutuality)

76.    The declaratory relief sought by the Club would, in whole or in part, result in inequitable treatment of members and former members of the Club, including Farrell, contrary to principles of mutuality asserted by the Club, in that, among other things, (a) the Club would be treating the holders under pre-1989 Policies differently from holders of its policies for policy years after the pre-1989 policy years by denying the former and granting the latter indemnity payments for years closed with "final

assessments," despite the fact that the total losses for each such year exceeded total premiums and assessments (with or without allocating income earned by the Club to such amounts), (b) the Club has created a first-come, first-served system for paying losses under pre-1989 Policies in violation of mutuality principles, and (c) the Club has illegally transferred its assets in amounts reflected by its general reserves, if not more, to current members by refusing to make indemnity payments to holders of pre-1989 Policies on the spurious and unjustifiable assertion that those general corporate assets "belong" to current members only.

## EIGHTH AFFIRMATIVE DEFENSE

### (Reserves)

77.    To the extent that the Club's claims are based on the failure of its Board of Directors to set adequate reserves for unreported claims before closing an insurance year with a "final assessment" in accordance with the Club's By-Laws, Article VI, Section 4, the Club has sole responsibility for any such inadequacy and any such inadequacy is not a defense to the right of Farrell under its Policies to indemnification for payments that it has made, or will make, for occupational disease claims for any of the pre-1989 Years.

## NINTH AFFIRMATIVE DEFENSE

### (Release)

78.    The Club's claims are barred by the terms of releases given to Farrell in connection with closing policy years.

## TENTH AFFIRMATIVE DEFENSE

### (Untimely Notice Of Disclaimer)

79.     To the extent that the Club seeks to disclaim coverage for claims previously reported to the Club under any of the Policies, such disclaimer is untimely and in violation of New York Insurance Law § 3420(d).

## ELEVENTH AFFIRMATIVE DEFENSE

### (Failure To Provide Notice Of Cancellation Of Coverage)

80.     To the extent that the Club bases any of its claims on the cancellation of further coverage under any of the Policies at the time an insurance year is closed, the Club has failed to comply with the required notice of cancellation required by New York Insurance Law § 3426.

## TWELFTH AFFIRMATIVE DEFENSE

### (Statute of Limitations)

81.     The Club's claims in the Complaint are time barred, in whole or in part, by applicable statutes of limitation.

## THIRTEENTH AFFIRMATIVE DEFENSE

### (Failure to Reserve Rights)

82.     To the extent that the Club failed to assert coverage defenses within the time limitations set forth under the applicable claims statute or failed to reserve rights with respect to indemnification, the Club waived those defenses to indemnification for the affected claims.

## COUNTERCLAIMS

83.     The counterclaims alleged herein seek a declaratory judgment adjudicating Farrell's rights and the Club's obligations under policies issued by the Club

to Farrell prior to 1989 (the 'Pre-1989 Policies") with respect to Occupational Disease Claims (as defined below) and other relief arising out of the Club's unjustified refusal to pay, on and after June 7, 2004, any Occupational Disease Claims under Pre-1989 Policies.

## THE PARTIES

84.    Farrell is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in East Rutherford, New Jersey. Farrell, through various affiliated entities, is an owner and operator of shipping vessels.

85.    The Club is a corporation organized and existing under the New York Not-for-Profit Corporation Law (or one or more of its predecessors) with its principal place of business in New York, New York.  The Club is, and for many years has been, subject to regulation under Article 41 of the New York Insurance Law as a mutual company and in that capacity has issued marine insurance policies to shipowners and charterers that become members of the Club under assessable policies in more or less the same form.

## JURISDICTION AND VENUE

86.    The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1333(1) because it is an admiralty or maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.  In addition, this Court has supplemental jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1367(a).

87.    Venue in this judicial district is proper under 28 U.S.C. § 1391(b)(2); a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## THE FACTS

**Farrell's Insurance Coverage**

88.    The Pre-1989 Policies constitute a promise by the Club to indemnify Farrell against any loss, damage, or expense that Farrell becomes liable to pay, and does pay, by reason of its ownership, operation, management, or chartering of a designated insured vessel, if such loss results from an occurrence during the policy year designated in the Policy.  Specifically, the Policies provide:

> The [Club] agrees to indemnify the Assured [i.e., Farrell] against any loss, damage, or expense which the Assured shall become liable to pay and shall pay by reason of the fact that the Assured is the owner (or operator, manager, charterer, mortgagee, trustee, receiver or agent, as the case may be) of the insured vessel and which shall result from the following liabilities, risks, events, occurrences and expenditures: . . . Liability for . . . loss of life of, or personal injury to, or illness of any person . . . .

89.    The Pre-1989 Policies are assessable policies issued under the Club's By-Laws, which govern the Club's authority to issue assessable policies, to make assessments thereunder, and to terminate the assureds' liability for further assessments thereunder.

90.    In particular, the Pre-1989 Policies provide:

> The Assured are subject to a contingent liability hereunder for assessment without limit of amount for their proportionate share of any deficiency or impairment as provided by law and fixed in accordance with the by-laws of the [Club]; provided, however, that any such assessment shall be for the exclusive benefit of holders of policies which provide for such a contingent liability, and the holders of policies subject to assessment shall not be liable to assessment in an amount greater in proportion to the total deficiency than the ratio that the deficiency attributable to the assessable business bears to the total deficiency.

91.    Article VI, Section 3 of the By-Laws (as amended September 18, 1987) provides:

> For the purposes of declaring dividends and making assessments the business of the [Club] shall be divided into insurance years.

The insurance years referred to in this By-Law have coincided with the policy periods under the insurance policies issued by the Club during all relevant times.

92.    Article VI, Section 4 of the By-Laws provides:

> From time to time after the termination of each insurance year, when the manager shall determine that it is practicable to estimate with a reasonable degree of certainty the minimum, probable or final surplus or deficiency resulting from all of the Corporation's insurances in effect during such insurance year, the manager shall place before the board of directors a statement of such financial results of insurances . . . .  After receipt of any such statement, the board of directors from time to time may . . . order an interim or <u>the final assessment to be made against the holders of assessable policies</u>, fix the due date of such assessment, determine the rate of interest that shall be added to and become a part of any delinquent assessment, and otherwise provide for enforcement and collection thereof.

(Emphasis supplied).

93.    The Pre-1989 Policies provide occurrence-based coverage and, therefore, permit claims to be made thereunder without any time limitation as to when claims can first be made against the insured or the Club and still be covered by the policy.

94.    The Pre-1989 Policies have no aggregate limit, only a per-claim limit, and therefore contain no language or provision limiting the Club's total liability for claims thereunder.

95.    The Pre-1989 Policies do not limit the recourse of the policyholders against any assets of the Club or to the amount collected by way of premiums and assessments from holders of policies.

**The Club's "Final Assessment" Practices**

96.    In the event that the aggregate losses paid by the Club under all Pre-1989 Policies for any open policy year exceed the amounts collected from policyholders for that year through premiums and assessments, the Club, acting through its Board of Directors, has the authority under the By-Laws, Article VI, Section 4, to levy additional assessments on the policyholders for that year to cover the deficiency on an interim or final basis.    Likewise, if such amounts collected from policyholders exceed such losses, the Club, again acting through its Board of Directors, has discretionary authority under the same By-Law provision to refund some or all of the surplus to those policyholders or to decide not to do so.

97.    The By-Laws further provide for the closing of policy years with so-called "final assessments" by action of the Club's Board of Directors based upon a report and recommendation from the Club's professional claims manager that it is practicable to estimate the losses for the policy year in issue.    Once a policy year has been declared closed by the Club's Board of Directors, under the By-Laws, no further premium or assessment can be levied upon the policyholders with respect to that policy year, even if the operations for that year result in an ultimate deficiency to the Club.

98.    The Club's Board of Directors' determination to close a policy year with a "final" assessment or dividend does not terminate the Club's continuing obligations under the policies for that policy year, unless the policyholder agrees to releases of policy coverage.    Upon information and belief, the Club has neither sought nor obtained any releases of policy coverage for any of the Pre-1989 Policies from Farrell.

**The Club's Payment of Occupational**
**Disease Claims for Closed Years**

99.    Seamen and others working on Farrell's vessels have asserted claims that are still pending and will likely in the future assert additional claims against Farrell seeking damages resulting from their alleged exposure to asbestos, benzene, noise, and other substances or conditions on board or in working in or about vessels owned, chartered, operated, or managed by Farrell during one or more of the Pre-1989 Years ("Occupational Disease Claims").

100.    The Club has represented either expressly or impliedly to policyholders, including Farrell, that closing policy years does not impair their coverage rights under the Pre-1989 Policies and that policyholders of those Policies would continue to be insured under those Policies for the Pre-1989 Years.  Farrell has relied upon these representations by, among other things, not seeking available coverage alternatives.

101.    Moreover, Farrell Lines, Inc. relied on the Club's direct or indirect representations when it merged with various of Farrel's affiliates, pursuant to which Farrell Lines, Inc. warranted:

> 3.24    <u>Insurance</u>.    The Company [Farrell Lines] is, and continuously since June 7, 1995 has been, <u>insured with respect to risks normally insured against</u> and in amounts that are customary for companies in the industry sector in which the Company operates, <u>and all the insurance policies and bonds maintained by the Company are in full force and effect</u> . . . .

(Emphasis supplied.)

102.    Farrell relied on these representations and similar representations made by the Club in deciding to enter into the merger.

103.   For over twenty years, the Club consistently has recognized that it is legally obligated to pay for Occupational Disease Claims arising from the Pre-1989 Years, despite the fact that each such year had been closed with a "final assessment," and, in recognition of its obligation to the policyholders, has paid hundreds, if not thousands, of such claims to policyholders, including Farrell.  The Club has submitted claims for reimbursement for some payments to its own re-insurers under its own reinsurance and stop-loss policies and, in so doing, represented expressly or impliedly to such re-insurers that the Club had become legally obligated to make such payments under one or more of the Pre-1989 Policies.

104.   The Club also has acted to affirm its contractual obligations by, inter alia, asserting its rights to receive cooperation from policyholders under one or more of the Pre-1989 Policies and its right to consent to the policyholders' settlement of Occupational Disease Claims.

**Issues Finally Decided Against the
Club in the In re Prudential Lines Case**

105.   An adverse judgment was entered against the Club in the action entitled Dicola v. Am. S.S. Owners Mut. Protection and Indemnity Assoc., Inc. (In re Prudential Lines, Inc.), 158 F.3d 65 (2d Cir. 1998).  In that case, the United States Court of Appeals for the Second Circuit held that, for Occupational Disease Claims involving exposures occurring over multiple policy years, the Pre-1989 Policies entitle a policyholder to designate the Policy for one of those policy years for payment of its claim, subject only to the one deductible for that policy year.  See Prudential Lines, 158 F.3d at 83.  In the Prudential Lines case, the Club acknowledged that it was obligated to provide coverage for Occupational Disease Claims in closed years and never asserted that its obligation to provide such coverage was "discretionary."

**The June 7, 2004 Circular**

106.  On or about June 7, 2004, the Club announced in a circular to members that the Club no longer intended to make payments to policyholders under any Pre-1989 Policies with respect to Occupational Disease Claims that had not been reported by the time each such year was closed or for such claims that had been under-reserved or unreserved by the Club.  In so doing, the Club claimed that its payment of such claims for over twenty previous years was merely a "discretionary practice."

107.  At no time prior to June 7, 2004 has the Club advised its policyholders that the payment of valid claims under any Pre-1989 Policy was "discretionary" or subject to termination if the amount of the Club's reserves for closed policy years were deemed insufficient or for any other reason.

## FIRST CLAIM FOR RELIEF

### (Declaratory And Injunctive Relief)

108.  Farrell repeats and realleges the allegations of paragraphs 83 through 107 of this Answer and Counterclaims as if set forth in full herein.

109.  Farrell has incurred, and will likely incur in the future, "loss, damage, or expense" in connection with Occupational Disease Claims that are still pending, and that are not yet asserted or resolved, resulting from the claimants' exposures occurring during one or more of the Pre-1989 Years.  Farrell has coverage under one or more Pre-1989 Policies for reimbursement of all such "loss, damage, or expense."

110.  The Club is obligated to indemnify Farrell under the Pre-1989 Policies in full for any loss, damage, or expense that Farrell becomes liable to pay, and has paid, subject to the applicable single deductible for each claim, in connection with

Occupational Disease Claims resulting from exposures occurring during one or more of the Pre-1989 Years, without any time limitation as to when such claims are first made under any one or more of such policies.

111.    The Club has disputed, and is expected to continue to dispute, its obligations under the Pre-1989 Policies to so indemnify Farrell with respect to Occupational Disease Claims now pending or made in the future, and the Club has alternatively asserted the right, which Farrell has disputed and will continue to dispute, to make future assessments under the Pre-1989 Policies to cover losses not covered by reserves established as of June 7, 2004.

112.    As a result of the foregoing, an actual and justiciable controversy exists between the Club and Farrell with respect to (a) the duties and obligations of the Club under one or more of its respective Pre-1989 Policies to provide continuing coverage to Farrell for Occupational Disease Claims resulting from claimants' exposures occurring during one or more of the Pre-1989 Years, and (b) the Club's right to make assessments under the Pre-1989 Policies to cover losses not covered by reserves established as of June 7, 2004.

113.    Accordingly, this Court should: (a) declare that Farrell is entitled under its Pre-1989 Policies to continuing coverage for Occupational Disease Claims resulting from claimants' exposures occurring during any one or more of the Pre-1989 Years, subject only to the applicable single deductible for each claim, and that the Club has no right to make any further assessment or assessments against Farrell under any Pre-1989 Policies; (b) grant Farrell a mandatory injunction compelling the Club to provide such coverage and a negative injunction barring, restraining, and prohibiting the Club from making, or seeking to make, any such assessment or assessments; (c)

award Farrell its attorneys' fees and other costs and expenses incurred in connection with this action to the fullest extent permitted by applicable law; and (d) grant Farrell such other and further relief as this Court deems just and proper.

## SECOND CLAIM FOR RELIEF

### (Release)

114.    Farrell repeats and realleges the allegations of paragraphs 83 through 113 of this Answer and Counterclaims as if set forth in full herein.

115.    In connection with the closing of insurance years and the levying of "final" assessments, the Club granted Farrell releases from any liability for further assessments under one or more the Pre-1989 Policies.

116.    As a result of the foregoing, an actual and justiciable controversy exists between the Club and Farrell.

117.    Farrell seeks a declaration that any further assessments are barred against Farrell with respect to the Pre-1989 Years covered by such releases.

**WHEREFORE**, Farrell respectfully demands judgment:

(a)    dismissing all claims in the Complaint with prejudice and costs;

(b)    declaring that (i) Farrell has the right under its Pre-1989 Policies to continuing coverage for Occupational Disease Claims resulting from claimants' exposures occurring during any one or more of the Pre-1989 Years, subject only to the applicable deductible (ii) the Club has no right to make any further assessment or assessments against Farrell under any Pre-1989 Policies; and (iii) Farrell has the right under its Pre-1989 Policies to designate one of such Policies to indemnify it for the payment a particular Occupational Disease Claim, subject only to the deductible under that Policy and no other;

(c)      granting Farrell a mandatory injunction compelling the Club to provide the coverage described in (b) above;

(d)      barring, restraining and prohibiting the Club from making, or seeking to make, any assessment or assessments under any Pre-1989 Policies;

(e)      granting Farrell its reasonable attorneys' fees and other costs and expenses incurred in this action, as allowed by law; and

(f)      granting such other and further relief as this Court deems just and proper.

Dated:  New York, New York
          October 8, 2004

                    Respectfully submitted,

                    BROWN RUDNICK BERLACK ISRAELS LLP


                    By: /s Andrew Dash_____
                         Andrew Dash (AD-7913)
                         Peter Adelman (PA-1562)
                    120 West 45th Street
                    New York, NY 10036
                    Tel: (212) 704-0100
                    Fax: (212) 704-0196

                    Counsel to Defendant Royal P&O
                    Nedlloyd N.V. as Successor to Farrell
                    Lines, Inc.

# EXHIBIT 5

Nourse & Bowles, LLP
Attorneys for Plaintiff
Lawrence J. Bowles (LB 5950)
One Exchange Plaza
New York, New York 10006
(212) 952-6200
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
                                                  :
                                                  :
AMERICAN STEAMSHIP OWNERS      :      04 Civ. 04309 (LAK)
MUTUAL PROTECTION AND          :
INDEMNITY ASSOCIATION, INC.,   :
                                                  :
                    Plaintiff,      :
                                                  :
      - against -                   :
                                                  :
Alcoa Steamship Co., Inc.           :
and the Other Entities Listed on Exhibit A   :
to Second Amended Complaint         :
                                                  :
                    Defendants.     :
                                                  :
-----------------------------------------------------X

## PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS

PLEASE TAKE NOTICE, that pursuant to Rule 34 of the Federal Rules of

Civil Procedure, plaintiff, the American Steamship Owners Mutual Protection and

Indemnity Association, Inc. ("Plaintiff" or the "American Club" or "Club"), hereby

requests that each of the appearing defendants produce for copying and inspection

the documents requested below at the offices of Nourse & Bowles, LLP, within 30 days after service of this request.

To the extent required by Section 26(e) of the Federal Rules of Civil Procedure, material which you discover subsequent to your response should be provided in a supplemental or corrected compliance.

## Directions and Construction/Instructions

Plaintiff adopts and incorporates by reference the definitions and construction and instructions, with logical amendments stated in Defendants' first request for production of documents in this action dated October 29, 2004 and signed by Proskauer Rose et al.

## DOCUMENTS REQUESTED

1.    Each copy of a letter dated February 14, 1979 on the stationary of Kirlin, Campbell & Keating addressed to Mr. John H. Cassedy, Secretary of the American Club, the caption of which is "Associations Reserve Account" (copy attached), and each and every cover letter forwarding the above letter to each Defendant and/or its representative(s) on the American Club's Board of Directors and/or to any of Defendants other executives.

2

2.    All documents prepared or produced since 1975 referring to or commenting upon the aforementioned letter of February 14, 1979 on Kirlins' letterhead in any way including all letters and memos.

3.    All documents prepared or produced since 1975 concerning possible uses of the Club's reserve account or any parts thereof in connection with the closing of any insurance years or for any other purpose.

4.    Each copy of any other letter on the stationary of Kirlin, Campbell & Keating addressed to the American Club or to any manager or director of the American Club since 1975 dealing with either the Association's reserve account or the reopening of insurance years, for any purpose.

5.    All documents concerning (i) the allegations in Defendants' answers and/or counterclaims to the effect that Plaintiff has "consistently represented to defendants that the Club had a legal obligation to indemnify members or policy holders with respect to occupational disease claims arising from alleged injuries in closed insurance years before 1989", and (ii) Defendants alleged "reliance" thereon; and (iii) that Plaintiff knowingly waived any rights it may have had under the insurance policies in question to require Defendants to pay their agreed pro rata shares of any indemnities any other Defendants would seek under those insurance policies.

3

6.    All documents concerning alleged "releases" given to members in connection with the closing of any policy year(s).

7.    All documents concerning the allegation in Defendants' answers and/or counterclaims that the Club's Board of Directors' determinations to close a policy year with a "final" assessment or dividend does not terminate the Club's alleged continuing obligation under the policies for that policy year, unless the policy holder agrees to releases of policy coverage.

8.    All documents concerning the allegation in Defendants' answers that Defendants "resigned as members" of the Club.

9.    All documents concerning the allegations in Defendants' answers and/or counterclaims that the Club has continuously represented expressly and impliedly to policy holders that the closing policy years allegedly does not impair their coverage rights under pre-1989 policies and that policy holders of those policies would continue to be insured under those policies for the pre-1989 years.

10.    All documents concerning when each Defendant first learned that shipowners were being sued by seamen and others, including longshoremen, with respect to their employment on or about Defendants' vessels in any insurance or policy year, including, without limitation, copies of all internal reports, newspapers

4

reports and the like regarding the then newly asserted asbestos claims against shipowners.

11.    All documents concerning the closing of each insurance or policy year from the time each Defendant received its first asbestos claim from any seaman or others working on or about their vessels until the closing of the 1988 insurance year, in or about 1994.

12.    All documents concerning the closing of the 1977 insurance year, and rejection of the Manager's and others' recommendation to reserve more than $100,000 per year for IBNR occupational disease claims for the 1977 and later insurance years the then directors decision to reserve only $100,000 per year for such claims which documents were circulated to members and/or directors in or about 1987, 1988 and 1989.

13.    All lists or summaries concerning each asbestos or other occupational disease type claim each Defendant settled with each seamen and longshoremen or others working on or about each Defendants' vessels in the insurance years before February 20, 1989.  If a Defendant does not have such lists or summaries, then, in the alternative, produce such document(s) with respect to each such settled claim which show the name of each seaman or other and the amount each Defendant paid or contributed to the settlement of his claim.

5

14.    All lists or summaries concerning which of the foregoing claims, if any, were presented to the American Club for indemnification and showing the amounts of any such indemnifications received from the Club and how it was calculated, including the number of deductibles and the total amounts for deductibles it absorbed.  If a Defendant has no such lists or summaries, then produce only those documents with respect to each such claimant as will show the amount each Defendant paid in settlement of each such claim, the indemnity each Defendant received from the American Club and how it was calculated including the number of deductibles, and the total amounts for deductibles which each Defendant absorbed in connection with the indemnity received from the American Club.

15.    All documents sent by any Defendant between 1985 and the present to any new member of the American Club concerning the genesis of the Discretionary Practice and its negative effects on such new member.

16.    All documents concerning the American Club's application for membership with the International Group of P&I Clubs between about 1985 and the present and concerning any modifications to the practices and procedures of the American Club necessitated and/or made as a result of such membership.

17.    All documents concerning the alleged "detriment" and or "damages"
Defendants claim they have suffered or may suffer as a result of the American
Club's termination of the Discretionary Practice in June 2004.

18.    All documents showing the current addresses and phone numbers of
each living employee/representative of each Defendant who was a member of the
Club's Board of Directors at any time between about 1975 and the present.


Dated:        New York, New York
              November  /2 , 2004

                              Respectfully submitted,

                              NOURSE & BOWLES, LLP
                              Attorneys for Plaintiff

                              By:_____
                                   Lawrence J. Bowles (LB 5950)
                                   One Exchange Plaza
                                   New York, New York 10006
                                   (212) 952-6200

7

K _IN. CAMPBELL & KEATING

ONE TWENTY BROADWAY

NEW YORK, N.Y. 10005

212-732-5520

CABLEGRAMS "VASEFIELD NEWYORK"
TELEX 177 422219
WUI 62344
WU 12-8188

WILLIAM A SHEEHAN
ELMER C MADDY
LOUIS GUSMANO
WALTER H EVEY
MARSHALL R KEATING
RICHARD H SHOAN, JR
JAMES J HIGGINS
ALEXANDER E GIGIANI
RICHARD H SOMMER
DANIEL J LOUGHERTY
WILLIAM M O'BRIEN
EMILE J BRUNEL
THOMAS LEE
EARL T WILLIAMS
ROBERT S HART
WILLIAM F FALLON
EDWARD L SMITH
HENRY J O'BRIEN
LAWRENCE J BOWLES
ANTHONY P MARSHALL
DAVID W MARTOWSKI
JOSEPH F RYAN, JR
DONALD J DANKER
ERNESTO V. LUZZATTO

WASHINGTON OFFICE
THE CONNECTICUT BUILDING
1150 CONNECTICUT AVE, N W
SUITE 800
WASHINGTON D C 20036
202-288-4811

RESIDENT PARTNERS

RONALD A CAPONE
RUSSELL T WEIL
ROBERT J MICKEY
JAMES P. MOORE

OF COUNSEL

CHARLES MAECHLING, JR.

February 14, 1979

Mr. John H. Cassedy, Secretary
American Steamship Owners Mutual
Protection and Indemnity Association, Inc.
25 Broad Street
New York, New York  10004

OUR REF. 86059

Re:   Association's
      <u>Reserve Account</u>

Dear Mr. Cassedy:

        This opinion is submitted in response to your request for
our advice as to the status, from a legal standpoint, of the Asso-
cition's "Reserve Account" and, in particular:

        1.  Who owns the funds represented by the Reserve
        Account, the Association or its members?

        2.  Must any portion of the annual income derived from
        the Association's investments be credited to the Reserve
        Account?

        3.  May any part of the Reserve Account be transferred to
        an open Insurance Year, or Years, in order to defray ad-
        ministrative expenses and/or policy liabilities incurred
        with respect to said open Insurance Year or Years?

        4.  Would it be permissible to put a ceiling on the
        Reserve Account as to, in effect, "wash out" reserves on
        claims in an Insurance Year that is about to be closed?

KEY 002384

Based upon our legal analysis hereinafter set-forth, it is our opinion that:

1.    The funds represented by the Association's Reserve Account, since, the Association is a fully operating and financially viable entity, belong to the Association.

2.    It is not required that a portion of the Association's annual income from investments be credited to the Reserve Account.

3.    In the appropriate circumstances it would be permissible for funds represented by the Reserve Account to be transferred to an open Insurance Year or Years.

4.    As a general rule funds from the Reserve Account may not be allocated to an Insurance Year that is about to be closed so as to reduce, or eliminate, the amount determined necessary to satisfy anticipated policy liabilities for such Year.

## ANAYLSIS

1.    _Ownership of Reserve Account._  In order to determine who owns the funds represented by the Association's Reserve Account, it is necessary to review the nature of the Association's organization and business, and also the make-up of such Account.  The American Steamship Owners Mutual Protection and Indemnity Association, as its name implies, is a mutual insurance company (without stockholders)

KEY 002385

whose members consist of owners and operators of ships for whom it writes marine protection and indemnity insurance. Since a mutual insurance company is operated solely for the benefit of its policy holders, it does not seek to amass profits in the ordinary business sense.

Although the Association has authority to issue either assessable or non-assessable policies, it has for many years past issued only assessable ones. Thus the Association has been in the position to rectify a deficiency in a particular Insurance Year -- arising by reason of the fact that the actual policy liabilities and administrative expenses in said year are in excess of the premiums collected, by levying an assessment. In every such instance each member for the Year is required to pay its proportionate share of the assessment.

It also happens that following the termination of an Insurance Year the Association's Board of Directors, based upon a statement placed before it by the Manager of the Association, will determine that, after the payment of all applicable administrative expenses and proven claims, and setting aside funds deemed reasonable in amount for pending claims, there remains a final excess resulting from all the policies in effect during such Insurance Year. If the excess is the result of unused premium, a final dividend may be declared; while if it represents the balance of an assessment a final refund must be made. In either case the said Insurance Year is closed. In both instances, the members, for the applicable

KEY 002386

Insurance Year, receive distributions in proportion to the re-
sspective net premiums they paid.

Such a determination to make appropriate distributions
and close the Insurance Year, is generally made seven to ten years
after the termination of the Insurance Year. As pointed out in the
previous paragraph, in closing an Insurance Year, there are set
aside funds for pending claims. These are the funds that become
part of, and constitute, the Reserve Account. The Reserve Account
has been built up over the intervening years, between the organi-
zation of the Association in 1917 and the present, because a portion
of the Association's annual investment income has been included in
said Account, and because the policy liabilities actually incurred,
following the close of an Insurance Year, have on occasion been
less than anticipated.

The Reserve Account, which pertains to the closed Insurance
Years, together with the net credit or debit balances for each of
the open Insurance Years, comprise the Association's Surplus. The
rulings in a number of decided court cases show that the Association's
Surplus except to the extent that it includes that part, or all, of
an assessment for an open Insurance Year which may ultimately be
determined to be the collection of an excess amount [a matter which
will be discussed below], belongs to the Association. It follows,
as a necessary corollary, that no part of such Surplus, subject to
the possible limited exception referred to in the previous sentence,
belongs to the members, either past or present, at least as long as

KEY 002387

the Association is a going concern.    In <u>Uhlman v. New York</u>

<u>Life Ins. Co.</u> (1888) 109 N.Y. 421 at pg. 429, the New York Court

of Appeals stated:

> "It has been held that the holder
> of a policy of insurance, even in
> a mutual company, was in no sense
> a partner of the corporation
> which issued the policy, and that
> the relation of the policyholder
> and the company was one of contract
> measured by the terms of the policy."

Likewise, in <u>Greeff v. Equitable Life Ass. Soc.</u> (1899) 160 N.Y. 19

the Court said (page 39):

> "By its [the policy's] terms he [Greeff]
> possessed no legal right to any part
> of the defendant'a [company's] surplus,
> except in that portion which its
> officers determined to distribute
> among the holders of its policies,
> and an action at law could not
> be maintained until that determination
> was made."

    Several other New York cases have included statements which

are in accord with the just stated rule.    <u>Rhine v. New York Life</u>

<u>Ins. Co.</u> (1948) 273 N.Y. 1; and <u>Birne v. Public Service Mut. Cas.Co.</u>

(1948) 77 N.Y.S. 2d. 446.    The foregoing cases relate to New York

law regarding the surplus of mutual insurance companies and therefore

are controlling insofar as the Association is concerned.

    As pointed out above the Association's Surplus, except to

the extent it includes that part, or all, of an assessment for an

open Insurance Year which may ultimately be determined to be the

collection of an excess amount, belongs to the Association.    The

reason for this particular exception is the different status, from a

- 6 -

legal standpoint, between premiums and assessments. Premiums paid to a mutual insurance company, because of their voluntary nature, belong to the company. Couch on Insurance 2nd, Section 34:54. However, assessments represent a call on mutual policy holders, irrespective of their consent at the time, to cover either a deficiency in revenue or an impairment of capital. Because assessments represent imposed liabilities, required by subsequent developments, the law has surrounded assessments with many restrictions that do not apply to premiums.

Generally speaking, a "profit" derived from an excess of premiums may be either transferred to Surplus or declared as a "dividend" to the mutual policy holders of that Insurance Year, at the discretion of the Directors. It does not follow, however, that the same optional treatment applies to the unneeded "excess" of an assessment. In this connection, Section 58(2) of the New York Insurance Law provides as follows:

> "Every policy issued by any such company shall clearly state whether or not the holder of such policy is subject to a liability for assessment. All policies issued by any such company which are subject to a liability for assessment shall contain a clear statement of the liability of the policyholder for the payment of his proportionate share of any deficiency or impairment as provided by law within the limit provided by the policy, and shall further state that any assessment shall be for the exclusive benefit of holders of policies which provide for such a contingent liability, and the holders of policies subject to assessment shall not be liable to assessment in an amount greater in proportion to the total deficiency than the ratio that the deficiency attributable to the assessable business bears to the total deficiency." [Emphasis supplied].

- 7 -

Thus the Association's authority to levy an assessment upon a policy holder is limited to "his proportionate share of any deficiency or impairment". If the assessment, as made, should prove ultimately to be greater than the limiting "deficiency", the excess belongs pro rata to the policy holders who contributed it. This means such unauthorized excess is held for their benefit and must be refunded to them or applied against their respective shares of an assessment levied to cover the "deficiency" for some other Insurance Year.

However, the amount of any assessment transfered to the Reserve Account, in closing an Insurance Year, does not constitute such an "excess". The Association's By-Laws, specifically Article V, Section 4, provides, in part, that:

> "From time to time after the termination of each insurance year, when the Manager shall determine that <u>it is practicable to estimate with a reasonable degree of certainty the minimum, probable or final surplus or deficiency resulting from all of the Corporation's insurances in effect during such insurance year, the Manager shall place before the Board of Directors a statement of such financial results of such insurances, segregated between assessable and non-assessable business.</u> After receipt of any such statement, the Board of Directors from time to time may (a) fix and determine an amount to be declared and paid as a partial or the final dividend, after retaining such sums as they may deem necessary to meet outstanding policy obligations or for the maintenance of reserve and surplus of the Corporation, or (b) order an interim or the final assessment to be made against the holders of assessable policies, fix the due date of such assessment, determine the rate of interest that shall be added to and become a part of any delinquent assessment, and otherwise provide for enforcement or collection thereof. Any dividend declared or any assessment levied shall be based

KEY 002390

- 8 -

> solely on such surplus or such deficiency, respectfully,
> resulting from the assessable business for the in-
> surance year.  All dividends declared and all assess-
> ments levied shall be distributed or spread in the
> ratio that the net premiums paid by the holder of an
> assessable policy year to the net premiums paid by
> all holders of assessable policies for the insurance
> year. ***"  [Emphasis supplied]

In estimating "with a reasonble degree of certainty the ***
final surplus", if any, for an Insurance Year about to be closed, the
Manager makes provision for a certain amount of funds on hand, pertain-
ing to such Year, to be transferred to the Reserve Account.  This is
done so that such transferred funds may be available to pay the
future proven claims, as currently estimated, with respect to said
Year.  It is only after provision is made for this reasonable esti-
mated amount that the remaining available fund is considered the
"final surplus" or "excess" which, if it represents part or all of an
assessment, must be refunded pro rata to the members for the particular
Insurance Year involved.

There is another legal principle which confirms the con-
clusion that funds, although derived by means of an assessment, lose
their legal identity as such when they are transferred to the Associ-
ation's Reserve Account, and thus can not constitute an assessment
"excess" which belongs to the members.  In recommending the closing
of an Insurance Year the Association's Manager must "estimate with a
reasonable degree of certainty" [Association's By-Laws, Art. V., Sec.
4] the amount required to be transferred to the Reserve Account to
satisfy projected policy liabilities for such Year.  This estimate
must then be approved by the Association's Board of Directors.  In
effect, it is also subject to the acceptance of the policy holders'

- 9 -

involved because naturally they retain the legal right to dispute such "estimate" if they conclude it is not reasonably supported by the facts available to them.

Thus in consummating the closing of an Insurance Year it would appear that within the contemplation of law, there has been a final settlement of accounts, for such Year between the Association and the policy holders involved. That is, if the amount set aside in the Reserve Account is not sufficient to satisfy all the policy liabilities, for the closed Insurance Year, as subsequently proven, then the Association can not make any assessment against the policy holders for such Year to eliminate the deficit. And, conversely, if the amount is ultimately determined to be more than needed to pay all the proven claims for the closed Insurance Year, the respective policy holders are not entitled to any refund. This conclusion would appear to necessarily follow from the decision of the New York Court of Appeals in the case of Hyde v. Lynde (1850) 4 N.Y. 387, and the holding of the New York Supreme Court, Appellate Division, in the proceeding of Patrons of Industry Fire Ins. Co. v. Harwood (1901) 72 N.Y.S. 8. Although it is recognized that these cases were decided many years ago, we have not been able to find any subsequent New York decisions which contravert their holdings. Both of these cases involved mutual insurance companies, and while each considered the effect of the "settlement of accounts" between the company and the policy holder, in connection with the authorized surrender of a policy by the insured, there does not appear to be any reason why the

- 10 -

"settlement of accounts" which, in effect, occurs when an Insurance

Year is closed by the Association, should be viewed differently.

The Court stated in the Hyde v. Lynde, case, page 390:

> "When the parties have come to an agreement
> and the policy and the note* have been
> surrendered, the individual ceases to
> be a member of the company; and all rights
> to make assessments or calls upon him
> *** is at an end."

The corollary to this holding must be that the former

member no longer has any claim to the funds of the company. In fact,

the Court specifically recognized this circumstance because it stated

later in its opinion, beginning on page 391, "If they [the company

and the former member] had come to the conclusion that some or all of

the [pending insurance] claims were valid, and the defendant [former

member] had paid fifty dollars as his proportion of the supposed

losses, proof that all claims turned out to be unfounded would not

enable him to recover back the money".

Similarly, in the Patrons of Industry Fire Ins. Co. v.

Harwood case, it was stated: "When a settlement and adjustment is in

good faith made between the company and a member, and his policy or

policies are canceled, he not only ceases to be a member of the

company, but can not be again assessed as such, nor compelled to pay

any further claims for losses or expenses, unless the settlement and

---

*The insured in the Hyde v. Lynde case was obliged, before
receiving his policy, to deposit his promissory note for a sum of
money determined by the directors of the mutual insurance company,
of which he paid 5% in cash, and the remainder was payable in whole,
or in part, whenever the directors should require it for the payment
of losses and expenses; and at the expiration of the insurance term,
the note, or the part which remained unpaid, after deducting all
losses and expenses which accrued during the term, was to be returned
to the maker.

KEY 002393

- 11 -

adjustments is set aside for fraud or mutual mistake". It thus
follows that funds proceeding from an assessment which are ultimately
transferred to the Association's Reserve Account in closing an
Insurance Year belong to the Association and not the members.

Of course, it is recognized that by statute when the New
York State Superintendent of Insurance institutes a proceeding to
permit him to supervise the activities of a mutual insurance company,
which is encountering financial difficulties, that even if an Insurance
Year has been closed an assessment may be levied against an insured
who was a member at any time within one year prior to the institution
of such proceeding. New York Insurance Law, Section 541. And that
where a mutual insurance company has been adjudicated insolvent, but
upon a later re-examination is found to be clearly solvent, the
surplus shall be distributed among the persons, partnerships or
corporations whose membership did not cease earlier than five years
prior to the date on which the corporation ceased issuing policies,
in the proportion which the total premium contributions of such
member during his or its entire membership in the corporation bear to
the total premium contributions of all members entitled to receive
distributions. New York Insurance Law, Section 545. However, these
statutory provisions are limited to liquidation, or financial diffi-
culty, situations that are not applicable to the question here under
consideration. Since these provisions are not applicable in the
present instance, it must be concluded that the Reserve Account of
the Association, which is a fully operating and financially viable
mutual insurance company, belongs to the Association and not its
members.

KEY 002394

- 12 -

2. <u>Crediting Investment Income to Reserve Account</u>. An examination of the New York statutory law, and the Charter and By-Laws of the Association, disclosed that there is no specific directives contained therein as to the application of the income realized, by the Association from its investments. However, it is clear that the business of the Association shall be conducted by its Board of Directors [See By-Laws, Art. II, Sec. 1.] and that is is accorded great latitude in this regard in making all necessary business decisions provided its judgment is exercised in good faith and not fraudulently or arbitrarily. <u>Barnett v. Metropolitan Life Ins. Co.</u> (1939) 16 N.Y.S. 2d 198 aff'd 285 N.Y. 627; <u>Turner v. American S.S. Owners' Mutual P & I, Ass'n., Inc.</u> (1927, CCA 5th), 16 F. 2d 707.

Since the Association is a mutual insurance company, and thus is operated for the <u>benefit</u> of its policy holders, the Directors are required, by the principles of equity to handle the Association's operations, and correspondingly the earnings from its investments, in a way that is fair and equitable to all its members.

As pointed out above the Association's Reserve Account includes the funds that have been set aside therein, with respect to closed Insurance Years, for the purpose of being available to satisfy any proven policy liabilities which may arise with regard to such Years. As the calendar termination for such Insurance Years generally occurs seven to ten years prior to the time they are closed, it appears obvious that the quantum of the anticipated policy liabilities for such years are generally known at the time of closing so that sufficient funds can be transferred to the Reserve Account to usually

KEY 002395

- 13 -

take care of such anticipated obligations.  Thus it would appear to

be a reasonable exercise of discretion by the Directors, in a particular

year, not to credit any portion of the investment income realized in

that year to the Reserve Account if it is concluded that said Account

is adequate to satisfy anticipated liabilities, for all the closed

Insurance Years, and the maintenance of reserves and surplus of the

Association.  Such action would certainly be for the mutual benefit

of the Association and its members because the investment earnings

could then be allocated to open Insurance Years to reduce, on an

equitable basis, the amounts of present or future assessments or,

conversely, increase the quantum of determined dividends or refunds.

Thus it is to be concluded that, in an appropriate circumstances such

as outlined above, the Board of Directors may, in a particular year

determine, that no portion of the Association's earnings from invest-

ments need be credited to the Reserve Account.

      3.  <u>Transfer of Reserve Account Funds to an Open Insurance</u>

<u>Year</u>.  The Association's Surplus, of which the Reserve Account con-

stitutes a part, obviously exists to carry out the purposes of the

Association, primarily to assure that its insurance contracts will be

honored.  If the Association's operations, relating to a particular

open Insurance Year, shows a deficit, the Board of Directors may

decide, within reasonable limits, whether all or part of such deficit

should be absorbed against the Association's Surplus.  This could

mean the transfer of Reserve Account funds to the open Insurance Year

to compensate for such deficit.

- 14 -

However, it must be remembered that, as a mutual insurance company, the Board of Directors in carrying on the Association's business, and making decisions as to the application of its Surplus, must act fairly and equitable towards all its members. This is especially significant in this particular area of the Association's operations because of its authority, both statutory and under its By-Laws, to levy an assessment if the business relating to a particular open Insurance Year is running at a deficit. Section 57(1), of the New York Insurance Law requires domestic mutual companies to be maintained and operated for the benefit of their members. Therefore, in utilizing a portion of the Reserve Account to compensate for a deficit in an open Insurance Year, The Board of Directors must assure itself that its action in this regard is reasonable and equitable so as not to adversely affect the interests of the members for the other open Insurance Years. Within the confines of this restriction it is our opinion that, on occasion, a part of the Association's Reserve Account may be transferred to an open Insurance Year.

    4. Application of Reserve Account to Insurance Year that is about to be closed. Article V, Section 4. of the Association's By-Laws provides that:

> "From time to time after the termination of each insurance year, when the Manager shall determine that it is practicable to estimate with a reasonable degree of certainty the minimum, probable or final surplus or deficiency resulting from all the Corporation's insurance in effect

Directors may not, in closing an Insurance Year, decide to eliminate any deficit determined to exist for said year by utilizing monies, available in the Reserve Account, for such purpose. To so do would, in our opinion, be equivalent, to the declaring of a dividend or refund to the policy holders of the closed Insurance Year at the expense of the policy holders for other Insurance Years. This is not to say that in the appropriate situation, if the Reserve Account should exceed the amount necessary to satisfy anticipated policy claims for closed Insurance Years and also the reserves and surplus required by the New York Insurance Department that an application may not be made of part of the Reserve Account to an Insurance Year about to be closed. However, the circumstances for such application would be limited, and such action would only be permitted if determined to be equitable and fair insofar as the members for other Insurance Years are concerned.

It is believed that the foregoing is fully responsive to your inquiries. However, if you feel that anything discussed herein requires further consideration or clarification, please let us know.

Very truly yours,

KIRLIN, CAMPBELL & KEATING

By: William F. Fallon

WFF:ib

KEY 002399

# EXHIBIT 6

Nourse & Bowles, LLP
Attorneys for Plaintiff
Lawrence J. Bowles (LB 5950)
One Exchange Plaza
New York, New York 10006
(212) 952-6200
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
                                       :

AMERICAN STEAMSHIP OWNERS    :    04 Civ. 04309 (LAK)
MUTUAL PROTECTION AND        :
INDEMNITY ASSOCIATION, INC.,   :
                                         :
               Plaintiff,     :
                                         :
   - against -               :
                                         :
Alcoa Steamship Co., Inc.          :
and the Other Entities Listed on Exhibit A  :
to Second Amended Complaint       :
                                         :
              Defendants.    :
                                         :
-----------------------------------------------------X

## PLAINTIFF'S SECOND REQUEST FOR
## <u>PRODUCTION OF DOCUMENTS</u>

PLEASE TAKE NOTICE, that pursuant to Rule 34 of the Federal Rules of

Civil Procedure, plaintiff, the American Steamship Owners Mutual Protection and

Indemnity Association, Inc. ("Plaintiff" or the "American Club" or "Club"), hereby

requests that each of the appearing defendants produce for copying and inspection

the documents requested below at the offices of Nourse & Bowles, LLP, within 30 days after service of this request.

To the extent required by Section 26(e) of the Federal Rules of Civil Procedure, material which you discover subsequent to your response should be provided in a supplemental or corrected compliance.

## Directions and Construction/Instructions

Plaintiff adopts and incorporates by reference the definitions and construction and instructions, with logical amendments stated in Defendants' first request for production of documents in this action dated October 29, 2004 and signed by Proskauer Rose et al.

## DOCUMENTS REQUESTED

1.     Each copy of a letter dated July 2, 1964 on the stationary of Kirlin, Campbell & Keating addressed to Mr. C. Williamson, Secretary of the American Club, the caption of which is "Association's Surplus" (copy attached), and each and every cover letter forwarding the above letter to each defendant and/or its representative(s) on the American Club's Board of Directors and/or to any of the defendants other executives.

2

2.    All documents prepared or produced since July 2, 1964 referring to or commenting upon the aforementioned letter dated July 2, 1964 on Kirlin's letterhead in any way, including all letters and memos with respect thereto.

3.    All documents prepared or produced since 1964 concerning possible uses of the Club's surplus or reserves or any parts thereof in connection with the closing of any insurance years or for any other purpose.

4.    All insurance policies issued to each defendant by the American Club before February 20, 1989 and all endorsements thereto.

5.    All correspondence regarding all insurance policies issued by the American Club to all defendants regarding all modifications to the aforesaid insurance policies including without limitation modifying premiums and canceling or terminating coverage with respect to individual vessels.

6.    All documents regarding all payments of premiums and assessments, to the American Club under all of the aforesaid insurance policies, especially late payments.

7.    All documents regarding the American Club's issuance of final dividends and final assessments to all defendants under all of the aforesaid insurance policies.

3

8.     All correspondence with the American Club regarding setting reserves for all claims including any and all claims still open at the closing of each insurance year before February 20, 1989.

9.     All correspondence with the American Club regarding each and every claim submitted by each defendant to the Club in each and every insurance year before February 20, 1989 including requests and receipts for indemnities for all losses/claims.

10.     All documents reflecting the first indemnity payment by the American Club to each defendants with respect to asbestos-related and other occupational disease claims under the Discretionary Practice (which Practice is described in plaintiff's Second Amended Complaint and in the Master Reply to All Counterclaims).

11.     All documents reflecting alleged "other available coverage alternatives" mentioned in paragraph 110 in the answer and counterclaims filed by defendant Keystone Shipping Co. and in the comparable paragraphs in other defendants' answers and counterclaims including the nature of such insurance, its terms, the entities willing to provide such insurance and all estimates of the costs thereof.

4

12.    All documents reflecting alleged "releases from any liability for further assessments under one or more of the pre-1989 policies" mentioned in paragraph 135 of the answer and counterclaims of Keystone Shipping Co. and in the comparable paragraphs in other defendants' answers and counterclaims.

13.    All minutes of all meetings of the American Club's Board of Directors and Finance Committee received or prepared by Club Directors appointed and/or employed by each Defendant including retired and deceased Directors and all documents received and prepared in connection therewith by Defendants.

14.    All annual reports of the American Club in the possession of defendants and/or the Club Directors they appointed and/or employed including retired and deceased directors.

15.    The documents of each of defendants' executives who served on the American Club's Board of Directors and Finance Committee (including retired and deceased executives/representatives) related to the issues in dispute in this action, including without limitation al documents related to asbestos and other occupational disease claims, closing insurance policy years, establishing reserves for IBNR occupational disease claims, the policy regarding allocation of claims and application of deductible sand the like.

5

16.    All documents related to that part of the Discretionary Practice (as described in plaintiff's Second Amended Complaint and Master Reply to Counterclaim) dealing with the allocation of claims over the years seamen and others worked on or about the defendants' vessels and the application of the deductible for each of those years.

Dated:        New York, New York
              December 7, 2004

                              Respectfully submitted,
                              NOURSE & BOWLES, LLP
                              Attorneys for Plaintiff

                              By: _____
                                  Lawrence J. Bowles (LB 5950)
                                  One Exchange Plaza
                                  New York, New York 10006
                                  (212) 952-6200

Encl. – KCK Letter dated July 2, 1964

TO:    Seth Schafler, Esq.              sschafler@proskauer.com
       Dale Schreiber, Esq.            dschreiber@proskauer.com
       Proskauer Rose, LLP

       Brent A. Hannafan, Esq.         brent.hannafan@dechert.com
       Dechert, LLP

       John M. Toriello, Esq.          john.toriello@hklaw.com
       Nora Nellis, Esq.               nora.nellis@hklaw.com
       Wallis Karpf, Esq.              wallis.karpf@hklaw.com
       Holland & Knight LLP

Donald Strauber, Esq.                           dstrauber@chadbourne.com
Melissa LaRocca, Esq.                           mlarocca@chadbourne.com
Chadbourne & Parke LLP

Patrick Lennon, Esq.                            plennon@tisdale-lennon.com
Tisdale & Lennon LLP

Edward A. Keane, Esq.                           Ekeane@mahoneykeane.com
Mahoney & Keane, Esqs.

Mario Aieta, Esq.                               maieta@gsblaw.com
Garvey Schubert Barer

Deborah A. Silodor, Esq.                        dsilodor@lowenstein.com
Lowenstein Sandler, PC

Alissa C. Malone, Esq.                          amalone@fieldshowell.com
Lynn S. Concha, Esq.                            lconcha@fieldshowell.com
Fields, Howell, Athans, McLaughlin LLP

Scott Fisher, Esq.                              sfisher@jshllp.com
Jaspan Schlesinger Hoffman LLP

Charles Stewart, Esq.                           cstewart@somlaw.com
Stewart Occhipinti, LLP

Stacey Saiontz, Esq.                            saiontzs@dsmo.com
Dickstein Shapiro Morin & Oshinsky LLP

David A. Luttinger, Esq.                        dluttinger@morganlewis.com
Lisa Campisi, Esq.                              lcampisi@morganlewis.com
Morgan Lewis & Bockius LLP

Andrew Dash, Esq.                               adash@brbilaw.com
Peter Adelman, Esq.                             padelman@brbilaw.com
Brown Rudnick Berlack Israels

Edward V. Cattell, Jr., Esq.                    ecattell@hollsteinkeating.com
Holstein Keating Cattell Johnson
  & Goldstein, P.C.

Herbert I. Waldman, Esq.                        hwaldman@nrdmlaw.com
Nagel Rice & Mazie, LLP

7

Robert A. O'Hare, Jr., Esq.                    rohare@ohareparnagian.com
O'Hare Parnagian LLP

Robert J. Gruendel, Esq.                       rgruendel@cm-p.com
John D. Pizzurro, Esq.                         jpizzurro@cm-p.com
Curtis Mallet-Prevost, Colt & Mosle LLP

Raymond A. Connell, Esq.                       raconnell@mindspring.com
McMahon & Connell, P.C.

Gene B. George, Esq.                           ggeorge@rayrobcle.com
Julia R. Brouhard, Esq.                        jbrouhard@rayrobcle.com
Ray, Robinson, Carle & Davies, P.L.L.

John G. Cameron, Jr., Esq.                     jcameron@wnj.com
Warner, Norcross & Judd, LLP

Nancy Ledy-Gurren, Esq.                        nledygurren@lgb-law.com
Ledy-Gurren & Blumenstock, LLP

Christine S. Davis                             daviscs@howrey.com
Mindy G. Davis                                 davism@howrey.com
Howrey Simon Arnold & White, LLP

John W. Cannavino                              jcannavino@cl-law.com
Cummings & Lockwood, LLC

Stephen J. Sheinbaum                           ssheinbaum@sbgmlaw.com
Sheinbaum, Bennett, Giuliano & McDonnell

Allen K. von Spiegelfeld, Esq.                 avonsp@fowlerwhite.com
Fowler White Boggs Banker

Adam P. Wofse, Esq.
Harold D. Jones, Esq.
Jaspan Schlesinger Hoffman LLP
300 Garden City Plaza
Garden City, NY 11530

Michael H. Ahrens, Esq.
Sheppard, Mullin, Richter and Hampton
4 Embarcadero Center – 17th Floor
San Francisco, CA 94111

Sam Hatchett, Esq.
Alcoa Steamship Co., Inc.
1 Gateway Center
Fort Duquesne Blvd
S-1600
Pittsburgh, PA 15222

Resolve Maritime Corporation
c/o Charles Lea Hume, Esq.
1441 Brickell Avenue
Suite 1014
Miami, FL 33131

Offshore Express Inc.
P.O. Box 1420
Houma, LA 70361

CABLEGRAMS "VASEFIELD NEWYORK"

CLETUS KEATING
L. DE GROVE POTTER
VERNON S. JONES
H. MAURICE FRIDLUND
JAMES H. HERBERT
CLEMENT C. RINEHART
ARNOLD TULP
WILLIAM A. SHEEHAN
LOUIS J. GUSMANO
JOHN F. GERITY
EARL Q. KULLMAN
JAMES B. MAGNOR
J. M. CUNNINGHAM
WALTER P. HICKEY
ELMER C. MADDY
JAMES J. HIGGINS
MATTHEW L. DANAHAR
THOMAS COYNE
EDWARD J. HEINE, JR.
MARSHALL P. KEATING
RICHARD H. BROWN, JR.
RICHARD H. SOMMER
PAUL F. McGUIRE
ALEXANDER E. RUGANI
ROBERT P. HART
DANIEL J. DOUGHERTY

KIRLIN, CAMPBELL & KEATING

ONE TWENTY BROADWAY

NEW YORK 5, N.Y.

July 2, 1964

WASHINGTON OFFICE
THE FARRAGUT BUILDING
900 SEVENTEENTH St, N.W.
WASHINGTON 6, D.C.
——
RONALD A. CAPONE
RESIDENT PARTNER

OUR REF. NO.

68638

American Steamship Owners Mutual
   P&I Association, Inc.
25 Broad Street
New York, N. Y. 10004

                Attention of Mr. C. Williamson, Secretary.

## Association's Surplus

Dear Sirs:

      This opinion is submitted in reply to your question: Who owns the Association's Surplus, and to what uses may it be applied?

      1. <u>What is Surplus</u>? First, it is necessary to define what is meant by the term, "Surplus", as applied to a mutual insurance company. In an ordinary business corporation, the term, "Surplus", is usually equated with the net earnings which are available for Dividends. This is not true, however, in the case of an insurance company, particularly a mutual, which may have a large Surplus, no part of which is available for Dividends.

- 2 -

As of December 31, 1963, this Association had a surplus of $9,113,499.11, computed on the Insurance Department basis. Based on actual market values of investments, the Surplus at that date was $9,073,071.52, which figure was made up of the following items:

(a) $4,812,830.53 Contingency Reserve, representing the balance of "closed" Insurance Years prior to 1957, and including in this figure a reserve for unpaid losses of $301,158.00; and

(b) $4,260,240.99 Balance of "open" Insurance Years 1957 to 1963 inclusive, including $2,198,582.16 of Excess Assessments for the Insurance Years 1957 and 1958, which latter amount was refunded to the Members on April 1, 1964. How much of such reduced Balance ($2,061,658.83) will remain after closing the Insurance Years still "open" (1958 to 1964 inclusive) is impossible to predict, as the answer will depend on future policy as to (i) levying Assessments with respect to such years as will show deficits and (ii) declaring Dividends with respect to such years as will show a profit.

On December 31, 1963, the Association had outstanding Loss Reserves of $16,396,308.00 applying to the open Insurance Years 1957 to 1963 inclusive. Obviously, that amount, representing liability provisions, cannot be treated as part of the Surplus.

- 3 -

2. Ownership of Surplus: The short answer is that the Association's Surplus belongs to the Association. We think the necessary corollary is that except to the extent that a Refund of the excess of an Assessment may become due for an open year, no part of such Surplus belongs to the Members, either past or present, at least so long as the Association is a going concern. In Uhlman v. New York Life Ins. Co. (1888) 109 NY 421 at p. 429, the New York Court of Appeals stated:

> "It has been held that the holder of a policy of insurance, even in a mutual company, was in no sense a partner of the corporation which issued the policy, and that the relation of the policyholder and the company was one of contract, measured by the terms of the policy."

Similarly, in Greeff v. Equitable Life Ass. Soc. (1899) 160 NY 19 the Court said (page 39):

> "By its [the policy's] terms he [Greeff] possessed no legal right to any part of the defendant's [company's] surplus, except in that portion which its officers determined to distribute among the holders of its policies, and an action at law could not be maintained until that determination was made."

Several more recent New York cases have made statements which accord with the above-stated rule. Rhine v. New York Life (1936) 273 NY 1; Berner v. Public Service Mutual Casualty Co. (1943) 273 AD 288. The foregoing cases relate to the New York law regarding declaration and payment of Dividends by mutual

- 4 -

insurance companies, and are necessarily controlling as to the Association.

There is sometimes cited, for the proposition that a mutual company's Surplus belongs to all of its Members, the well-known Georgia case of <u>Carlton v. Southern Mutual Insurance Co.</u> (1884) 72 Ga. 371. There it was held that all policyholders whose premiums contributed to produce an excess of Surplus, were entitled to share ratably in the distribution thereof. Reasoning from principles of partnership law and the equitable concept of mutuality, the Court said:

> "The essence of mutuality is that those who contributed to produce assets are interested [in those assets] in proportion to their contributions."

It was necessary for the Court to proceed on purely equitable grounds, because neither the Georgia law nor the company's Charter and By-Laws made any provision as to the rights of the policyholders (present or past) in the company's surplus or the distribution thereof.

We think that, unless and until the Association is in liquidation, the Georgia case has no application to the distribution of its Surplus. While the Association is a going concern, the New York Statutes and the Association's By-Laws spell out the Dividend rights of the Members, as will be pointed out subsequently.

- 5 -

3. <u>Uses of Surplus</u>:  Obviously, the Surplus exists to carry out the purposes of the Association, primarily to assure that its insurance contracts, both assessable and non-assessable, will be honored.  If in a particular Insurance Year the assessable business shows a Deficit, the Board of Directors may decide, within reasonable limits, whether all or part of such Deficit should be absorbed against the Association's Surplus.  As to non-assessable business, the Board of Directors would not have any choice but to charge any net Deficit therefrom against Surplus, since such Deficit could not be assessed against the Members.  Surplus must also absorb any decline in the value of investments allocable to the Contingency Reserve.  The use of Surplus to pay Dividends will be discussed separately.

4. <u>Dividends</u>:  The declaration and payment of Dividends is governed generally by the <u>New York Insurance Law</u> and specifically by the <u>Association's By-Laws</u>.  The <u>law</u> contains two general principles:  <u>Section 57(1)</u> provides that the Board of Directors of a mutual company may from time to time declare a Dividend from the Surplus of the Company, and for that purpose may make such "reasonable classifications of policies" as shall be "fair and equitable to the policy-holders".  <u>Sections 323 and 346</u> provide that "every such classification shall be filed with the Superintendent and

- 6 -

shall not become effective unless and until approved by the
Superintendent as fair and equitable to policyholders and not
impracticable in operation."

To implement those statutory provisions, the Associa-
tion in its By-Laws has made specific provisions as to declara-
tion, computation and payment of Dividends, based on results
of each Insurance Year. Those By-Laws, which have been
approved by the New York Superintendent of Insurance, contain
the following provisions:

By-Laws, Article V, Section 3:

"For the purposes of declaring dividends and
making assessments the business of the Corpor-
ation shall be divided into insurance years
which shall coincide with calendar years,
Eastern Standard Time, and the financial re-
sults of the insurance years shall be segregated
as to business under assessable policies and
business under non-assessable policies."
[Emphasis supplied.]

By-Laws, Article V, Section 4 provides that, upon receipt of
financial results of a particular "insurance year",

"* * * the Board of Directors from time to time
may (a) fix and determine an amount to be de-
clared and paid as a partial or the final divi-
dend, after retaining such sums as they may deem
necessary to meet outstanding policy obliga-
tions or for the maintenance of reserves and
surplus of the Corporation, * * *. * * * Any
dividend declared * * * shall be based solely
on such surplus * * *, resulting from the assess-
able business for the insurance year. All
dividends declared * * * shall be distributed or
spread in the ratio that the net premiums paid
by the holder of an assessable policy bear to the

- 7 -

> net premiums paid by all holders of assessable
> policies for the insurance year.  * * *."
> [Emphasis supplied.]

The By-Laws, therefore, set up a complete code for the declar-
ing, spreading and paying of "any dividend" by the Association,
based on the profit realized from assessable business for each
"insurance year".  Once the Surplus of the Association has
attained a level which the Board of Directors consider suffi-
cient, it is permissible to declare the Profit from assessable
business of any closed "Insurance Year" as a Dividend to the
Members of that year, without retaining any part "for mainte-
nance of * * * surplus of the Corporation".  It would be
foreign to the concept of the By-Laws, and violative of their
express provisions, for the Board of Directors to attempt to
declare and pay a General Dividend from the Association's
Surplus.  To do so, it would be necessary first to amend the
present By-Laws, with the prior approval of the Superintendent
of Insurance, which, to say the least, would be hard to obtain.
Even if the By-Laws could be amended to permit such General
Dividend, however, four conditions precedent must be met
simultaneously, which as a practical matter would be difficult,
if not impossible to fulfill:  (a) the Board of Directors must
determine that there has been accumulated in the Association's
Surplus an "excess" of a specific amount, which is unnecessary
either for present or future purposes; (b) the concurrence of

- 8 -

the Insurance Superintendent in such determination must be obtained; (c) the Board of Directors must determine how a General Dividend of such amount is to be allocated among the Members of each Insurance Year which has contributed to such "excess"; and (d) the determination of the Insurance Superintendent must be obtained that such distribution would be "fair and equitable" and "not impracticable". We may point out further that no part of any such General Dividend could go, even theoretically, to any Member for the Insurance Years 1958 to 1964 inclusive, for the simple reason that those years have not been closed and consequently could not have contributed to any such possible "excess" of General Surplus.

5. Summary: (A) It is impossible at this time to say that the Association's Surplus when broken down into all constituent parts, is in excess of its needs, both present and prospective. (B) So long as the Association is a going concern, and except as may become necessary to pay a Refund of the unneeded portion of an Assessment for an open year, the Surplus belongs to the Association, and not to its Members, either present or past. (C) The Surplus should be held and used by the Association to carry out its corporate purposes, including protection of policyholders and absorption of Deficits, within reason, for any particular Insurance Year. (D) Under the general rules laid down by the New York Insurance

- 9 -

Law, the By-Laws provide solely for Dividends payable from the Profit from the assessable business for a particular Insurance Year, to the Members of such Insurance Year.  Once the Profit of an Insurance Year is closed into the Association's Surplus, this is equivalent to a determination by the Directors that such addition to Surplus is needed for the Association's business.  A General Dividend from the Association's Surplus is foreign to the concept inherent in the By-Laws, namely to deal with Dividends on each separate Insurance Year.  Even if the By-Laws could be changed, it would be extremely difficult if not impossible, to meet all of the statutory conditions precedent to declaration of a General Dividend.  (E) Even if this were theoretically possible, such General Dividend could not be shared by the Members of any Insurance Year that has not been "closed" with a Profit therefrom added to Surplus.

6.  Recommendations:  (I) The Association should continue its policy of declaring and paying Dividends in accordance with its By-Laws on the basis of Profits of each particular Insurance Year.  (II) No attempt should be made to determine, declare and pay a General Dividend, as this would be impracticable, and illegal under the present By-Laws.

Very truly yours,

KIRLIN, CAMPBELL & KEATING

By    *H. Maurice Fridlund*
H. Maurice Fridlund

HMF:MG

# EXHIBIT 7

Nourse & Bowles, LLP
Attorneys for Plaintiff
Lawrence J. Bowles (LB 5950)
One Exchange Plaza
New York, New York 10006
(212) 952-6200
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------X
                                                   :

AMERICAN STEAMSHIP OWNERS    :     04 Civ. 04309 (LAK)(FM)
MUTUAL PROTECTION AND          :
INDEMNITY ASSOCIATION, INC.,    :

                         Plaintiff,    :

    - against -                  :

Alcoa Steamship Co., Inc.          :
and the Other Entities Listed on Exhibit A  :
to Second Amended Complaint     :

                   Defendants.    :
---------------------------------------------------X

**PLAINTIFF'S THIRD REQUEST FOR
PRODUCTION OF DOCUMENTS ADDRESSED
TO KEYSTONE SHIPPING COMPANY
AND RELATED ENTITIES AS WELL AS
<u>CHARLES KURZ II</u>**

PLEASE TAKE NOTICE, that pursuant to Rule 34 of the Federal Rules of

Civil Procedure, plaintiff, the American Steamship Owners Mutual Protection and

Indemnity Association, Inc. ("Plaintiff" or the "American Club" or "Club"), hereby

requests that Defendant Keystone Shipping Company, its related entities and

Charles Kurz II produce for copying and inspection the documents requested below at the offices of Nourse & Bowles, LLP, within 30 days after service of this request.

To the extent required by Rule 26(e) of the Federal Rules of Civil Procedure, material which you discover subsequent to your response should be provided in a supplemental or corrected compliance.

## Directions and Construction/Instructions

Plaintiff adopts and incorporates by reference the definitions and construction and instructions, with logical amendments stated in Defendants' first request for production of documents in this action dated October 29, 2004 and signed by Proskauer Rose et al.

## DOCUMENTS REQUESTED

1.    All files maintained by Charles Kurz (the grandfather of Charles Kurz II) related to:

   (a)   The American Club's Reserve Account;

   (b)   Closing insurance years of the American Club; and

   (c)   Indemnifications to members with respect to unreported, unreserved claims arising in previously closed insurance years, if any.

2

2.    Copies of the Rules of the United Kingdom Mutual Steamship Assurance Association (the "UKP&I Club") issued by the UKP&I Club between 1979 and 1989 in the possession of Charles Kurz II and/or Keystone Shipping Company, and/or any of its related entities which were members of the UKP&I Club whether or not named as defendants in this action.

3.    All correspondence between Keystone its related entities, Adolf Kurz and Charles Kurz II (on the one hand) and the UKP&I Club and/or its claims agents/representatives (on the other hand) and circulars received by Keystone, et al. related to changes in the UKP&I Club's Rules between 1979 and 1989 related to indemnifying members with respect to claims arising in closed insurance years.

4.    All annual financial statements of the UKP&I Club issued between 1979 and 1989.

Dated:        New York, New York
              February _10_, 2005

                                    Respectfully submitted,
                                    NOURSE & BOWLES, LLP
                                    Attorneys for Plaintiff

                                    By:_____
                                        Lawrence J. Bowles (LB 5950)
                                        One Exchange Plaza
                                        New York, New York 10006
                                        (212) 952-6200

cc:    All Counsel

3

# EXHIBIT 8

*American Steamship Owners Mutual Protection and Indemnity Association, Inc. v. Alcoa Steamship Co., et al.*

04 CV 4309 (LAK)

Defendant Keystone Shipping Co. and related entities'

**PRIVILEGE LOG**

| Date | From: | To: | Cc/Bcc: | Description | Privilege |
|------|-------|-----|---------|-------------|-----------|
| 1/8/85 | Ralph Hill, Esq. | Charles Kurz, II | | Handwritten note re: counsel's recommendations in connection with "Center for Seafarers' Rights" solicitation | AC WP[1] |
| 10/30/85 | James R. Campbell | Adolph B. Kurz | Charles Kurz, II, Ralph Hill, Esq., Cecil Davies | Memo re: asbestosis claims, discussing correspondence from counsel | AC |
| 12/4/85 | James R. Campbell | William Ristine, Ralph Hill, Esq., George Clark | Adolph B. Kurz, Karl Kurz, Charles Kurz, II, Phil Fisher, H. Norman Wallin, Cecil Davies, Cecil Davies, Harry Diamond, Lous Cavaliere | Memorandum to file re: asbestosis claims – discussing general deposition of Keystone and correspondence from counsel | AC |
| 1/16/86 | James R. Campbell | Adolph B. Kurz | Charles Kurz, II, Phil Fisher, Cecil Davies | Memo re: SS Santa Clara, Paul Killeen – settlement recommendation of counsel | AC |
| 6/20/86 | John A. Bolles, Esq. | James R. Campbell. | Adolph B. Kurz, Karl Kurz, Charles Kurz, II, Robert Kurz, William Ristine, | Letter advising of developments in Ohio asbestos litigation | AC WP |

[1]  AC= Attorney Client Privilege; WP= Work Product Privilege.

| Date | From: | To: | Cc/Bcc: | Description | Privilege |
|---|---|---|---|---|---|
| 8/8/86 | | | Robert Dombrowski, Cecil Davies, Ralph Hill, Esq., Timothy O'Connor, George Clark | | |
| | John A. Bolles, Esq. | James R. Campbell | Adolph B. Kurz, Karl Kurz, Charles Kurz, II, Robert Kurz, William Ristine, Ed Dieterle, Robert Dombrowski, Cecil Davies, Ralph Hill, Esq., Timothy O'Connor, George Clark | Letter re: developments in Ohio asbestos litigation | AC WP |
| 10/2/86 | James R Campbell | File | Adolph B. Kurz, Karl Kurz, Charles Kurz, II, Robert Kurz, Phil Fisher, Cecil Davies, Timothy O'Connor, William Ristine | Memo re: Ohio maritime asbestos litigation, discussing letter from counsel dated 9/26/86 and representation by such counsel | AC WP |
| 12/11/86 | James R. Campbell | Charles Kurz, II | Adolph B. Kurz, Phil Fisher, Cecil Davies | Memo re: asbestos civil action in Cleveland, Ohio – handling crew members lawsuits | AC |
| 6/30/87 | James R. Campbell | Charles Kurz, II | Adolph B. Kurz, | Memo re: Ohio maritime asbestos litigation strategy, | AC |

-2-

| Date | From: | To: | Cc/Bcc: | Description | Privilege |
|---|---|---|---|---|---|
|  | Campbell |  | Karl Kurz, Phil Fisher, Richard Marmon, Cecil Davies, Ralph Hill, Esq. | discussing 6/15/87 letter from Thompson, Hine & Flory | WP |
| 4/13/88 | James R. Campbell / Ralph Hill, Esq. | Charles Kurz, II | Adolph B. Kurz | Memo evaluating settlement proposal and attached 4/13/88 memo from Charles Kurz, II to Ralph Hill, Esq. and James R. Campbell seeking legal advice attaching 4/12/88 memo from McGowan to Board of Directors with extensive marginalia of Charles Kurz, II seeking legal advice | AC WP |
| 4/29/88 | Thomas O. Murphy, Esq., Richard C. Binzley, Esq. | Keystone Employees as "Shipowners and Other Interested Parties" | James R. Campbell, Adolph B. Kurz, Charles Kurz, II, Robert Kurz, Phil Fisher, Ralph Hill, Esq., George Clark, Timothy O'Connor, Cecil Davies, William Ristine, Robert Dombrowski | Memo updating recent developments in Ohio maritime asbestos litigation | WP |
| 10/27/89 | James R. Campbell | Phil Fisher | Adolph B. Kurz, Karl Kurz, Charles Kurz, II, Robert Kurz, Ralph Hill, Esq. | Memo discussing attached 10/26/89 letter from Thompson, Hine & Flory and litigation strategy | WP AC |
| 11/6/90 | Timothy J. Abeel, Esq. | Charles Kurz, II | Adolph B. Kurz | Letter providing legal analysis of possible impact on shipowners by a recent U.S. Supreme Court decision in *Miles v. Melrose* | AC WP |
| 11/21/90 | Charles Kurz, | Timothy J. | Adolph B. Kurz, | Letter commenting in response to the attached 11/6/90 | AC |

| Date | From: | To: | Cc/Bcc: | Description | Privilege |
|---|---|---|---|---|---|
| | II | Abeel, Esq. | William Ristine, James R. Campbell, Ralph Hill, Esq. | Letter from Timothy J. Abeel, Esq. | |
| 5/24/91 | Thomas A. Heffernan, Esq. | Timothy J. O'Connor | James R. Campbell, George Clark, Mitchell Koslow, H. Norman Wallin, Adolph B. Kurz, Charles Kurz, II | Letter re: *Estate of Maurice J. Moline v. American Mail Lines*, Case No. C86-821, suggesting defense strategy | WP AC |
| 6/4/91 | T.J. O'Connor | Thomas A. Heffernan, Esq. | James R. Campbell, George Clark, Mitchell Koslow, H. Norman Wallin, Adolph B. Kurz, Charles Kurz, II | Letter to counsel re: facts relevant to the asbestos litigations | AC |
| 11/24/93 | Joseph Barone, Esq. | Adolph B. Kurz | | Memo providing legal analysis of *Prudential Lines, Inc.* litigation | WP AC |
| 12/7/93 | Joseph Barone, Esq. | Adolph B. Kurz | | Memo providing legal analysis of *Prudential Lines, Inc.* litigation | WP AC |
| 6/10/94 | James R. Campbell | Charles Kurz, II | | Memo re: Charles Ortiz asbestosis lawsuit, discussing counsel's recommendation re: settlement | AC |
| 7/11/95 | Richard D. Moore, Esq. | Charles Kurz, II | | Memo re: Raymond Rose asbestosis claim, discussing counsel's recommendation re: settlement; handwritten notes re: same | AC |
| 7/11/95 | Richard D. Moore, Esq. | Charles Kurz, II | | Memo re: Harry Fisher asbestosis claim, discussing counsel's recommendation re: settlement; handwritten notes re: same | AC |
| 10/20/95 | Richard D. Moore, Esq. | Charles Kurz, II | | Memo re: Robert Kimmons asbestosis claim, discussing counsel's recommendation re: settlement; handwritten | AC |

-4-

| Date | From: | To: | Cc/Bcc: | Description | Privilege |
|---|---|---|---|---|---|
| | | | | notes re: same | |
| 10/20/95 | Richard D. Moore, Esq.. | Charles Kurz, II | | Memo re: David E. Fitzgerald asbestosis claim, discussing counsel's recommendation re: settlement; handwritten notes re: same | AC |
| 10/20/95 | Richard D. Moore, Esq.. | Charles Kurz, II | | Memo re: Antoine Rodgers asbestosis claim, discussing counsel's recommendation re: settlement; handwritten notes re: same | AC |
| 6/17/96 | Richard D. Moore, Esq.. | Charles Kurz, II | | Memo re: Barbara McGuffick asbestosis claim, discussing counsel's recommendation re: settlement; handwritten notes re: same | AC |
| 7/11/96 | Richard D. Moore, Esq.. | Charles Kurz, II | | Memo re: Ralph Ward asbestosis claim, discussing counsel's recommendation re: settlement; handwritten notes re: same | AC |
| 8/26/96 | Richard D. Moore, Esq.. | Charles Kurz, II | | Memo re: Frederick Naumann asbestosis claim, discussing counsel's recommendation re: settlement; handwritten notes re: same | AC |
| 9/4/96 | Richard D. Moore, Esq.. | Charles Kurz, II | | Memo re: James Todd asbestosis claim, discussing settlement proposal; handwritten notes re: same | AC |
| 10/14/96 | Richard D. Moore, Esq.. | Charles Kurz, II | | Memo re: Albert Finkle asbestosis claim, discussing counsel's recommendation re: settlement; handwritten notes re: same | AC |
| 10/24/96 | Richard D. Moore, Esq.. | Charles Kurz, II | | Memo re: discussions with counsel about developments in, and assessment of, Jack Anderton mesothelioma claim; handwritten notes re: same | AC |
| 12/16/96 | Richard D. Moore, Esq.. | Charles Kurz, II | | Memo re: Dennis O'Conner mesothelioma claim, discussing counsel's recommendation re: settlement; handwritten notes re: same | AC |
| 9/8/04 | Charles B. Achuff | Michael J. Mitchell, Esq. | Rose Murphy, Esq. | Redacted portion of document KEY 033417, advising counsel re: factual issues relevant to litigation | AC |
| 9/9/04 | Charles B. Achuff | Michael J. Mitchell, Esq. | Rose Murphy, Esq. | Redacted portion of document KEY 033661, advising counsel re: factual issues relevant to litigation | AC |
| 9/9/04 | Charles B. | Michael J. | Rose Murphy, | Redacted portion of document KEY 033220, advising | AC |

| Date | From: | To: | Cc/Bcc: | Description | Privilege |
|------|-------|-----|---------|-------------|-----------|
| 9/16/04 | Charles B. Achuff | Michael J. Mitchell, Esq. | Rose Murphy, Esq. | Redacted portion of document KEY 033494, advising counsel re: factual issues relevant to litigation | AC |
| 9/16/04 | Charles B. Achuff | Michael J. Mitchell, Esq. | Rose Murphy, Esq. | Redacted portion of document KEY 032819, advising counsel re: factual issues relevant to litigation | AC |
| 9/22/04 | Charles B. Achuff | Michael J. Mitchell, Esq. | Rose Murphy, Esq. | Redacted portion of document KEY 033825, advising counsel re: factual issues relevant to litigation | AC |
| 9/23/04 | Charles B. Achuff | Michael J. Mitchell, Esq. | Rose Murphy, Esq. | Redacted portion of document KEY 034014, advising counsel re: factual issues relevant to litigation | AC |
| 9/29/04 | Charles B. Achuff | Michael J. Mitchell, Esq. | Rose Murphy, Esq. | Redacted portion of document KEY 033333, advising counsel re: factual issues relevant to litigation | AC |
| 9/29/04 | Charles B. Achuff | Michael J. Mitchell, Esq. | Rose Murphy, Esq. | Redacted portion of document KEY 033364, advising counsel re: factual issues relevant to litigation | AC |

# EXHIBIT 9

American Steamship Owners Mutual Protection and Indemnity Association, Inc. v. Alcoa Steamship Co., et al.

04 CV 4309 (LAK)

Defendant Farrell Lines' Privilege Log

| Date | From: | To: | Cc/Bcc: | Description: | Privilege |
|---|---|---|---|---|---|
| 11/18/1987 | Thomas V. Halley | John Scalia | | Letter regarding P&I coverage | AC |
| 9/28/1987 | Thomas V. Halley | Farrell Lines | | Letter regarding Torrens asbestos litigation | AC |
| 3/9/1988 | John Scalia | John Kimball | | Letter regarding Torrens asbestos litigation | AC |
| 11/18/1987 | Thomas V.Halley | John Scalia | | Letter regarding Fulton P&I Coverage | AC |
| 9/28/1987 | Thomas V. Halley | Farrell Lines | | Letter regarding Torrens asbestos litigation | AC |
| 12/4/1997 | Peter Junge | James Norton | Richard Gronda Elizabeth Lang | Letter regarding stacking of deductibles | AC |
| 11/20/1997 | Peter Junge | Richard Gronda | Elizabeth Lang | Letter regarding asbestos claims | AC |
| 11/20/1997 | Peter Junge | Thomas McGowan | Richard Gronda James Norton | Draft of letter regarding pooling of claims | WP |
| 7/14/1997 | Peter Junge | James Norton | | Cover letter of drafts of letters to Ian Carter and Thomas McGowan | AC |
| 7/14/1997 | Peter Junge | Ian Carter | | Draft of letter regarding asbestos deductibles | WP |
| 7/14/1997 | Peter Junge | Thomas McGowan | | Draft of letter regarding asbestos deductibles | WP |
| 7/27/1998 | Peter Junge | James Norton | | Letter regarding asbestos litigation | AC |
| 12/4/1997 | Peter Junge | James Norton | Richard Gronda Elizabeth Lang | Letter regarding stacking of deductibles | AC |
| 5/14/1998 | James Norton | Peter Junge | | Facsimile Regarding Telephone Conversations | AC |
| 4/21/1998 | Peter Junge | James Norton | Elizabeth Land Philip Worsdale | Facsimile enclosing arbitration demand | AC |
| 4/21/1998 | Holmes Hardingham | London Steamship Owners | | Draft facsimile regarding potential arbitrators | WP |
| 12/24/1997 | Peter Junge | James Norton | Richard Gronda | Letter regarding stacking deductibles | AC |
| 7/23/1997 | Peter Junge | James Norton | | Letter regarding deductibles in asbestos cases | AC |
| 6/26/1997 | James Norton | Peter Junge | | Letter regarding developments in asbestos litigation | AC |
| 12/2/1999 | Peter Junge | James Norton | | Facsimile enclosing message from Farrell's London solicitors regarding deductibles | AC |

| Date | From | To | | Description | Code |
|---|---|---|---|---|---|
| 12/2/1999 | Holmes | Peter Junge | | Letter regarding arbitration of asbestos claim | AC |
| 7/8/1999 | Hardingham | Peter Junge | | | |
| 4/8/1999 | James Norton | James Norton | Elizabeth Lang | Letter regarding status of Charles Reiff litigation | AC |
| 4/1/1999 | Peter Junge | James Norton | Elizabeth Lang | Letter regarding status of Charles Reiff litigation | AC |
| 3/31/1999 | Peter Junge | James Norton | Elizabeth Lang | Letter regarding status of Charles Reiff litigation | AC |
| 3/30/1999 | Peter Junge | James Norton | Elizabeth Lang | Letter regarding status of Charles Reiff litigation | AC |
| | Holmes | Peter Junge | | Letter regarding status of Charles Reiff litigation | AC |
| 2/23/1999 | Hardingham | | | | |
| 2/8/1999 | Peter Junge | James Norton | Elizabeth Lang | Letter regarding status of Charles Reiff litigation | AC |
| 2/3/1999 | Peter Junge | James Norton | Elizabeth Lang | Letter regarding status of Charles Reiff litigation | AC |
| | Holmes | Peter Junge | | Letter regarding status of Charles Reiff litigation | AC |
| 1/4/1999 | Hardingham | | | | |
| 12/30/1998 | Peter Junge | James Norton | | Letter regarding status of Charles Reiff litigation | AC |
| | Holmes | Peter Junge | | Letter regarding status of Charles Reiff litigation | AC |
| 11/17/1998 | Peter Junge | | | | |
| | Holmes | James Norton | | Letter regarding status of Charles Reiff litigation | AC |
| 10/20/1998 | Hardingham | | | | |
| 10/20/1998 | Peter Junge | James Norton | Elizabeth Lang | Letter regarding status of Charles Reiff litigation | AC |
| 10/7/1998 | Holmes | Peter Junge | | Letter regarding status of Charles Reiff litigation | AC |
| 9/18/1998 | Peter Junge | Glenn Winter | James Norton | Letter regarding status of Charles Reiff litigation | AC |
| 9/21/1998 | Peter Junge | Ian Ferguson | | Draft letter regarding causes of action | WP |
| 10/19/1998 | Peter Junge | James Norton | Elizabeth Lang | Letter regarding the draft letter to Ian Ferguson | AC |
| 10/6/1997 | Peter Junge | James Norton | Elizabeth Lang | Letter regarding status of Charles Reiff litigation | AC |
| | Peter Junge | Richard Gronda | | Letter regarding status of Charles Reiff litigation | AC |
| | | James Norton | | | |
| 10/9/1997 | Peter Junge | Richard Gronda | | Letter regarding status of Charles Reiff litigation | AC |
| | | James Norton | | | |
| 9/30/1997 | Peter Junge | James Norton | | Letter regarding American Club asbestos claims | AC |
| 5/28/1997 | Peter Junge | Elizabeth Lang | James Norton | Letter regarding status of Charles Reiff litigation | AC |
| 5/28/1997 | Elizabeth Lang | Thomas McGowan | | Draft letter regarding status of Charles Reiff litigation | WP |
| 5/20/1997 | James Norton | Steven J. Barkan | | Draft letter regarding status of Charles Reiff litigation | WP, AC |
| 5/20/1997 | James Norton | Steven J. Barkan | | Letter regarding status of Charles Reiff litigation | AC |
| 4/1/1999 | Peter Junge | James Norton | Elizabeth Lang | Letter regarding status of Charles Reiff litigation | AC |

| | | | | |
|---|---|---|---|---|
| 10/19/1998 | Peter Junge | James Norton | Elizabeth Lang | Letter regarding status of Charles Reiff litigation | AC |
| 2/8/1999 | Peter Junge | James Norton | Elizabeth Lang | Letter regarding status of Charles Reiff litigation | AC |
| 2/23/1999 | Peter Junge | James Norton | Elizabeth Lang | Letter regarding status of Charles Reiff litigation | AC |
| 3/3/1992 | Steven J. Barkan | Elizabeth Lang | | Draft letter regarding SS Export Palmblad | WP, AC |
| 2/26/1992 | Steven J. Barkan | Elizabeth Lang | | Facsimile regarding SS Export Palmblad | AC |
| 2/26/1992 | Steven J. Barkan | Richard Gronda | Elizabeth Lang | Facsimile regarding SS Export Palmblad | AC |
| 6/12/1992 | Steven J. Barkan | Richard Gronda | | Letter regarding SS Export Palmblad | AC |
| 3/1/1996 | Steven J. Barkan | Farrell Lines | | Facsimile regarding SS Export Palmblad | AC |
| 3/1/1996 | Steven J. Barkan | Farrell Lines | | Correspondence regarding Palmblad matter | AC |
| 9/28/1995 | Steven J. Barkan | Richard Gronda | | Letter regarding SS Export Freedom | AC |
| 9/26/1995 | Peter Junge | Richard Gronda | | Letter regarding Palmblad litigation | AC |
| 9/28/1995 | Steven J. Barkan | Richard Gronda | James Norton | Letter regarding Palmblad litigation | AC |
| 9/26/1995 | Peter Junge | Richard Gronda | | Letter regarding Palmblad litigation | AC |
| 6/12/1995 | Steven J. Barkan | Richard Gronda | James Norton | Letter regarding Palmblad litigation | AC |
| 5/5/1995 | Steven J. Barkan | James Norton | | Letter regarding Palmblad litigation | AC |
| 3/20/1995 | Steven J. Barkan | Richard Gronda | James Norton | Letter regarding Palmblad litigation | WP, AC |
| 2/17/1995 | Steven J. Barkan | Richard Gronda | James Norton | Letter regarding Palmblad litigation | AC |
| 3/13/1995 | Steven J. Barkan | Richard Gronda | James Norton | Letter regarding Palmblad litigation | AC |
| 6/24/1994 | Steven J. Barkan | Richard Gronda | James Norton | Letter regarding Palmblad litigation | AC |
| 10/22/1993 | Steven J. Barkan | Richard Gronda | | Letter regarding Palmblad litigation | AC |
| 9/8/1992 | Steven J. Barkan | Richard Gronda | | Letter regarding Palmblad litigation | AC |

| Date | Author | Recipient | Description | Privilege |
|---|---|---|---|---|
| 9/8/1992 | Steven J. Barkan | Richard Gronda | Letter regarding Palmblad litigation | AC |
| 9/3/1992 | Steven J. Barkan | James Norton | Letter regarding Palmblad litigation | AC |
| 8/7/1992 | Steven J. Barkan | James Norton | Letter regarding various litigation matters | AC |
| 8/6/1992 | Steven J. Barkan | Richard Gronda | Letter regarding Palmblad litigation | AC |
| 8/6/1992 | Steven J. Barkan | James Norton | Letter regarding Palmblad litigation | AC |
| 6/29/1992 | Steven J. Barkan | Richard Gronda | Letter regarding Palmblad litigation | AC |
| 6/12/1992 | Steven J. Barkan | Richard Gronda | Letter regarding Palmblad litigation | AC |
| 6/10/1992 | Steven J. Barkan | Richard Gronda | Letter regarding Palmblad litigation | AC |
| 6/10/1992 | Steven J. Barkan | Richard Brown | Draft of letter regarding Palmblad litigation | WP |
| 5/29/1992 | Steven J. Barkan | Richard Gronda | Letter regarding Palmblad litigation | AC |
| 5/16/1992 | Steven J. Barkan | Richard Gronda | Letter regarding Palmblad litigation | AC |
| 4/30/1992 | Steven J. Barkan | Richard Gronda | Letter regarding Palmblad litigation | AC |
| 4/24/1992 | Steven J. Barkan | Richard Gronda | Letter regarding Palmblad litigation | AC |
| 4/23/1992 | Steven J. Barkan | James Norton | Elizabeth Lang | Letter regarding Palmblad litigation | AC |
| 4/20/1992 | Steven J. Barkan | James Norton | Correspondence regarding Palmblad matter | AC |
| 4/3/1992 | Steven J. Barkan | James Norton & Elizabeth Lang | Draft of letter regarding Palmblad litigation | AC |
| 3/30/1992 | Steven J. Barkan | James Norton | Letter regarding Palmblad litigation | AC |
| 2/26/1992 | Elizabeth Lang | James Norton and Richard Gronda | Letter regarding legal advice from Steven Barkan in the Palmblad matter | AC |

| | | | | | |
|---|---|---|---|---|---|
| 2/26/1992 | Steven J. Barkan | Richard Gronda | Elizabeth Lang | Letter regarding Palmblad litigation | AC |
| 10/12/1995 | Richard Gronda | Steven J. Barkan | | Notes regarding Palmblad litigations | AC |
| 6/12/1995 | Steven J. Barkan | Richard Gronda | James Norton | Letter regarding Palmblad litigation | AC |
| 6/12/1995 | Steven J. Barkan | Richard Gronda | James Norton | Letter regarding Palmblad litigation | AC |
| 1/12/1995 | Steven J. Barkan | Richard Gronda | James Norton | Letter regarding Palmblad litigation | AC |
| 1/12/1995 | Steven J. Barkan | Richard Gronda | James Norton | Letter regarding Palmblad litigation | AC |
| 5/12/1995 | Steven J. Barkan | Richard Gronda | | Letter regarding Palmblad litigation | AC |
| 1/9/1995 | Steven J. Barkan | Richard Gronda | James Norton | Letter regarding Palmblad litigation | AC |
| 12/19/1994 | Steven J. Barkan | Richard Gronda | James Norton | Letter regarding Palmblad litigation | AC |
| 12/19/1994 | Steven J. Barkan | | | Draft of Stipulated Facts in Palmblad litigation | WP |
| 11/21/1994 | Steven J. Barkan | Richard Gronda | James Norton | Letter regarding Palmblad litigation | AC |
| 10/17/1994 | Steven J. Barkan | Richard Gronda | | Letter regarding Palmblad litigation | AC |
| 1/17/1994 | Steven J. Barkan | Richard Gronda | James Norton | Letter regarding Palmblad litigation | AC |
| 1/17/1994 | Steven J. Barkan | Richard Gronda | James Norton | Letter regarding Palmblad litigation | AC |
| 10/12/1993 | Steven J. Barkan | James Norton | | Letter regarding Palmblad litigation | AC |
| 9/24/1992 | Steven J. Barkan | Richard Gronda | | Letter regarding Palmblad litigation | AC |
| 5/17/1988 | Kenneth H. Volk | James Norton | | Letter regarding Torrens asbestos litigation | AC |
| 9/16/1992 | Richard Gronda | George Sullivan | | Letter regarding fiancial obligations to American Club | AC |
| 7/26/1998 | Peter Junge | James Norton | | Letter regarding status of Charles Reiff litigation | AC |
| 6/9/1998 | Peter Junge | Richard Gronda | | Letter regarding status of Charles Reiff litigation | AC |

| Date | Author | Recipient | CC | Description | Designation |
|---|---|---|---|---|---|
| 6/9/1998 | Peter Junge | Ian Ferguson | | Draft of letter regarding status of Charles Reiff litigation | AC |
| 4/11/1995 | Steven J. Barkan | Richard Gronda | James Norton | Letter regarding Palmblad litigation | AC |
| 6/7/1989 | Kenneth H. Volk | James Norton | | Letter regarding Torrens asbestos litigation | AC |
| 12/31/1987 | M.E. DeOrchis | Richard Lepage | | Letter regarding Fulton P&I Coverage | AC |
| 2/22/1988 | Richard J. Berka | John C. Scalia | | Letter regarding Fulton P&I Coverage | AC |
| 2/9/1988 | Richard Lepage | M.E. DeOrchis | | Letter regarding Fulton P&I Coverage | AC |
| 1/26/1988 | M.E. DeOrchis | Joseph Stapleton | | Draft letter re. Fulton P&I Coverage | WP |
| 12/31/1987 | M.E. DeOrchis | Richard Lepage | | Letter regarding Fulton P&I Coverage | AC |
| 1/28/2003 | Robert A. Agresti | Michael Mitchell, Esq. | | Draft letter regarding legal opinions concerning the calculation of deductibles | WP |
| 1/28/2003 | Robert A. Agresti | Michael Mitchell, Esq. | | Draft letter regarding legal opinions concerning the calculation of deductibles | WP |
| 3/6/2003 | Robert A. Agresti | Michael Mitchell, Esq. | | Draft letter regarding legal opinions concerning the calculation of deductibles | WP |
| 3/6/2003 | Robert A. Agresti | Michael Mitchell, Esq. | | Draft letter regarding legal opinions concerning the calculation of deductibles | WP |
| 5/24/2004 | Steve Walegir | Robert A. Agresti | P.L. Shahbazian, Raymer McQuiston | Email regarding American Club litigation | AC |
| 6/25/2004 | Raymer McQuiston | Robert A. Agresti | wkuntz@toys.com, Louis Ederer, mandre@toys.com | Email regarding Robert Agresti's position on the Board of the American Club | AC |
| 6/24/2004 | Raymer McQuiston | Robert A. Agresti | | Email regarding Keystone matter. | AC |
| 9/27/2004 | Raymer McQuiston | Robert A. Agresti | | Email regarding asbestos matters | AC |
| 6/11/2004 | Steve Walegir | Raymer McQuiston | N. Mayer, Robert A. Agresti | Email regarding declaratory judgment | AC |
| 6/10/2004 | Steve Walegir | Raymer McQuiston, | P.L. Shahbazian, Robert A. Agresti | Email regarding declaratory judgment | AC |

| Date | Author | Recipient | CC | Description | Privilege |
|---|---|---|---|---|---|
| 5/26/2004 | Raymer McQuiston | Robert A. Agresti | | Email regarding declaratory judgment | AC |
| 5/27/2004 | Steve Walegir | Robert A. Agresti | P.L. Shahbazian, Raymer McQuiston | Email regarding declaratory judgment | AC |
| 5/24/2004 | Raymer McQuiston | Steve Walegir | Robert A. Agresti | Email regarding American Club bylaws | AC |
| 12/22/2004 | Sheron Lee | Raymer McQuiston | | Email regarding asbestos matters | AC |
| 1/15/2002 | Raymer McQuiston, Vincent J. Foley | Robert A. Agresti | | Draft Memo regarding Asbestos Claims Coverage | AC, WP |
| 1/10/2005 | Raymer McQuiston | Gary Martin, Robert A. Agresti | | Email regarding American Club litigation | AC |
| 2/14/2005 | Raymer McQuiston | G. Cheeseman | Ron Pape, Robert Agresti | Email regarding American Club litigation | AC |
| 1/15/2002 | Raymer McQuiston | Robert A. Agresti | | Email regarding Asbestos Claims Coverage | AC |
| 1/10/2002 | Raymer McQuiston | Robert A. Agresti | | Draft Memo regarding Asbestos Claims Coverage | AC, WP |
| 1/15/2002 | Raymer McQuiston, Vincent J. Foley | Robert A. Agresti | | Draft Memo regarding Asbestos Claims Coverage | AC, WP |
| 1/25/2002 | Vincent Foley | Raymer McQuiston, Robert A. Agresti | | Draft Memo regarding Asbestos Claims Coverage | AC, WP |
| 1/9/2002 | Robert Dees, Raymer McQuiston | P&O Nelloyd Limited | | Draft Memo regarding Asbestos Claims Coverage | AC, WP |
| 1/9/2002 | Carlton Greer | Raymer McQuiston | | Draft Memo regarding Asbestos Claims Coverage | AC, WP |
| 3/25/2002 | Raymer McQuiston | Robert A. Agresti | | Draft Memo regarding Asbestos Claims Coverage | AC, WP |
| 1/15/2002 | Vincent Foley | Robert A. Agresti | | Draft Memo regarding Asbestos Claims Coverage | AC, WP |

| Date | | | | | |
|---|---|---|---|---|---|
| 2/14/2005 | Raymer McQuiston | G. Cheeseman | Ron Pape, Robert Agresti | Email regarding Club reserves | AC |
| 2/14/2005 | Raymer McQuiston | G. Cheeseman | Ron Pape, Robert Agresti | Email regarding reimbursements | AC |
| 2/14/2005 | Raymer McQuiston | G. Cheeseman | Ron Pape, Robert Agresti, Andy Dash | Email regarding American Club litigation | AC |
| 4/9/2005 | Raymer McQuiston, Andy Dash | G. Cheeseman | Ron Pape, Robert Agresti, Eta O'Brien | Draft memo regarding American Club litigation | AC, WP |
| 1/14/2005 | Raymer McQuiston | Gary Martin | Robert A. Agresti | Email regarding American Club litigation | AC |
| 9/23/2002 | Raymer McQuiston | G. Cheeseman | Ron Pape, Robert Agresti | Email regarding Sledz litigation | AC |
| 2/14/2005 | Raymer McQuiston | G. Cheeseman | Ron Pape, Robert Agresti | Memo regarding asbestos litigation | AC, WP |
| 2/2/2005 | Raymer McQuiston | G. Cheeseman, Gary Martin, Ron Pape | Andy Dash, Robert A. Agresti | Email regarding American Club litigation | AC |
| 2/2/2005 | Raymer McQuiston, Andy Dash, Peter Adelman | Ron Pape, Gary Martin, Robert Agresti | | Memo regarding American Club litigation | AC, WP |
| 11/26/2002 | Steve Walegir | Robert A. Agresti | | Email regarding American Club litigation | AC |
| 11/16/2004 | Raymer McQuiston | Robert A. Agresti | Peter Adelman | Email regarding American Club litigation | AC |
| 6/28/2004 | Robert A. Agresti | Ron Pape, Raymer McQuiston | | Email regarding American Club litigation | AC |
| 12/3/2004 | Raymer McQuiston | Robert A. Agresti | | Email regarding draft correspondence with the American Club | AC |
| 12/_/2004 | Robert A. Agresti | Joseph Hughes, Vincent Solarino, Michael Mitchell | | Draft letter regarding supplementary calls | WP |

| Date | From | To | Description | Privilege |
|------|------|-----|-------------|-----------|
| 7/23/2004 | Raymer McQuiston | Robert A. Agresti | Email regarding American Club litigation | AC |
| 10/29/2004 | Raymer McQuiston | Robert A. Agresti | Email regarding American Club board meeting minutes | AC |
| 11/11/2004 | Raymer McQuiston | Robert A. Agresti, Ron Pape | Email regarding American Club litigation | AC |
| 11/9/2004 | Raymer McQuiston, Andy Agresti, Ron Dash, Peter Adelman | Robert A. Agresti, Ron Pape | Memo regarding American Club litigation | AC, WP |
| 10/25/2004 | Raymer McQuiston | Robert A. Agresti, Peter Adelman, Andy Dash | Email regarding American Club litigation | AC |
| 7/6/2004 | Raymer McQuiston | Robert A. Agresti | Email regarding American Club litigation | AC |
| 8/11/2004 | Raymer McQuiston | Robert A. Agresti | Email regarding American Club litigation | AC |
| 8/11/2004 | Seth Schaffer | Raymer McQuiston | Email regarding American Club litigation | AC |
| 11/11/2004 | Raymer McQuiston | Robert A. Agresti, Ron Pape | Email regarding American Club litigation | AC |
| 9/15/2004 | Raymer McQuiston | Sheron Lee | Email regarding Keystone matter | AC |
| 10/5/2004 | Raymer McQuiston | Robert A. Agresti, Peter Adelman | Email regarding American Club litigation | AC |
| 10/5/2004 | Peter Adelman | Robert A. Agresti | Email regarding American Club litigation | AC |
| 10/5/2004 | Peter Adelman | Seth Schaffer | Draft of letter regarding American Club litigation | AC, WP |
| 10/7/2004 | Peter Adelman | Robert A. Agresti | Raymer McQuiston, Andy Dash | Email regarding American Club litigation | AC |
| 10/8/2004 | Andy Dash | | Draft Answer and Counterclaims | WP |
| 12/17/2004 | Raymer McQuiston | P.L. Shahbazian, R. Morales Robert A. Agresti | Email regarding American Club litigation | AC |

| Date | From | To | Description | Code |
|---|---|---|---|---|
| 9/21/2004 | Raymer McQuiston | Robert A. Agresti | Email regarding American Club litigation | AC |
| 6/28/2004 | Robert A. Agresti | Ron Pape | Email regarding attorney review of American Club board issues | AC |
| 6/25/2004 | Raymer McQuiston | Robert A. Agresti, wkuntz@torys.com, Louis Ederer, mandre@torys.com | Email regarding Robert Agresti's position on the Board of the American Club | AC |
| 6/28/2004 | Robert A. Agresti | Ron Pape | Email regarding attorney review of American Club board issues | |
| 6/25/2004 | Raymer McQuiston | Robert A. Agresti, wkuntz@torys.com, Louis Ederer, mandre@torys.com | Email regarding Robert Agresti's position on the Board of the American Club | AC |
| 12/17/2004 | Raymer McQuiston | Robert A. Agresti | Email regarding American Club litigation | AC |
| 2/10/2005 | Raymer McQuiston | Andy Dash, Robert A. Agresti | Email regarding American Club litigation | AC |
| 4/9/2005 | Raymer McQuiston, Andy Dash | Guy Cheeseman, Robert Agresti, Ron Pape, Eta O'Brien | Memo regarding status of American Club litigation | AC |
| 1/14/2005 | Raymer McQuiston | Gary Martin, Robert A. Agresti | Email regarding American Club litigation | AC |
| 2/14/2005 | Raymer McQuiston | Guy Cheeseman, Ron Pape, Robert A. Agresti | Email regarding Sledz litigation | AC |
| 9/23/2002 | Raymer McQuiston | Robert A. Agresti | Memo regarding Sledz litigation | AC, WP |
| 2/14/2005 | Raymer McQuiston | Guy Cheeseman, Ron Pape, Robert A. Agresti, Andy Dash | Email regarding American Club litigation | AC |

| Date | Author | To | CC | Description | |
|---|---|---|---|---|---|
| 4/8/2005 | Raymer McQuiston | Guy Cheeseman | Robert Agresti, Ron Pape, Eta O'Brien | Memo regarding status of American Club litigation | AC |
| 2/14/2005 | Raymer McQuiston | Guy Cheeseman | Ron Pape, Robert A. Agresti | Email regarding disbursements | AC |
| 2/14/2005 | Raymer McQuiston | Guy Cheeseman | Ron Pape, Robert A. Agresti | Email regarding reserves | AC |
| 2/14/2005 | Raymer McQuiston | Guy Cheeseman | Ron Pape, Robert A. Agresti | Email regarding American Club litigation | AC |
| 1/15/2002 | Raymer McQuiston | Robert A. Agresti | | Email regarding American Club litigation | AC |
| 1/10/2002 | Raymer McQuiston | Robert A. Agresti | | Draft of letter regarding asbestos liabilities | AC, WP |
| 1/15/2002 | Raymer McQuiston, Vincent J. Foley | Robert A. Agresti, P&O Nedlloyd Limited | | Draft of memo regarding asbestos liabilities | AC, WP |
| 3/25/2002 | Vincent Foley | Robert A. Agresti, Raymer McQuiston | | Memo regarding asbestos liabilities | AC, WP |
| 1/9/2002 | Robert Dees, Raymer McQuiston | P&O Nedlloyd | | Memo regarding asbestos liabilities | AC, WP |
| 1/9/2002 | Carlton Greer | Raymer McQuiston | | Memo regarding asbestos liabilities | AC, WP |
| 3/25/2002 | Raymer McQuiston | Robert A. Agresti | | Memo regarding asbestos liabilities | AC, WP |
| 1/15/2002 | Vincent Foley | Robert A. Agresti | | Draft of memo regarding asbestos liabilities | AC, WP |
| 2/2/2005 | Raymer McQuiston | Guy Cheeseman, Gary Martin, Ron Pape | Andy Dash, Robert A. Agresti | Email regarding status of American Club litigation | AC |

| Date | From | To | CC | Description | Designation |
|---|---|---|---|---|---|
| 2/2/2005 | Raymer McQuiston, Andy Martin, Robert Dash, Peter Adelman | Ron Pape, Gary Agesti | | Memo regarding status of American Club litigation | AC, WP |
| 1/10/2005 | Raymer McQuiston | Gary Martin | Robert A. Agresti | Email regarding American Club litigation issues | AC |
| 1/28/2003 | Robert A. Agresti | Michael Mitchell, Esq. | | Draft letter regarding legal opinions concerning the calculation of deductibles | WP |
| 3/6/2003 | Robert A. Agresti | Michael Mitchell, Esq. | | Draft letter regarding legal opinions concerning the calculation of deductibles | WP |
| 1/28/2003 | Robert A. Agresti | Michael Mitchell, Esq. | | Draft letter regarding legal opinions concerning the calculation of deductibles | WP |
| 3/6/2003 | Robert A. Agresti | Michael Mitchell, Esq. | | Draft letter regarding legal opinions concerning the calculation of deductibles | WP |
| 12/22/2004 | Sheron Lee | Raymer McQuiston | | Memo regarding asbestos litigation | AC |
| 2/10/2005 | Raymer McQuiston | Andy Dash, Robert A. Agresti | | Email regarding status of American Club litigation | AC |
| 4/11/2005 | Raymer McQuiston, Andy Dash | Guy Cheeseman | Ron Pape, Robert Agresti, Eta O'Brien | Memo regarding status of American Club litigation | AC, WP |
| 11/11/2004 | Raymer McQuiston | Robert A. Agresti, Ron Pape | | Email regarding status of American Club litigation | AC |
| 11/9/2004 | Raymer McQuiston, Andy Agresti, Ron Dash, Peter Adelman | Robert A. Agresti, Ron Pape | | Memo regarding status of American Club litigation | AC, WP |
| 8/11/2004 | Raymer McQuiston | Robert A. Agresti | | Email regarding status of American Club litigation | AC |
| 8/11/2004 | Seth Schafler | Raymer McQuiston | | Email regarding American Club litigation | AC |
| 7/6/2004 | Raymer McQuiston | Robert A. Agresti | | Email regarding status of American Club litigation | AC |
| 10/25/2004 | Raymer McQuiston | Robert A. Agresti | Peter Adelman, Andy Dash | Email regarding status of American Club litigation | AC |

| Date | From | To | Description | |
|---|---|---|---|---|
| 10/29/2004 | Raymer McQuiston | Robert A. Agresti | Email regarding status of American Club litigation | AC |
| 12/3/2004 | Raymer McQuiston | Robert A. Agresti | Email regarding supplemtal calls | AC |
| 11/16/2004 | Raymer McQuiston | Robert A. Agresti, Peter Adelman | Email regarding status of American Club litigation | AC |
| 12/17/2004 | Raymer McQuiston | Robert A. Agresti | Email regarding status of American Club litigation | AC |
| 6/25/2004 | Raymer McQuiston | Robert A. Agresti, wkuntz@torys.com, Louis Ederer, mandre@torys.com | Email regarding Robert Agresti's position on the Board of the American Club | AC |
| 9/21/2004 | Raymer McQuiston | Robert A. Agresti | Email regarding status of American Club litigation | |
| 12/17/2004 | Raymer McQuiston | P.L. Shahbazian, R. Morales, Robert A. Agresti | Email regarding status of American Club litigation | AC |
| 10/7/2004 | Peter Adelman | Robert A. Agresti, Raymer McQuiston, Andy Dash | Email regarding draft answer and counterclaims | AC |
| 10/5/2004 | Raymer McQuiston | Robert A. Agresti | Email regarding American Club litigation issues | AC |
| 10/5/2004 | Peter Adelman | Seth Schafler | Draft of letter regarding American Club litigation | AC, WP |
| 9/15/2004 | Raymer McQuiston | Sheron Lee, Robert A. Agresti, Peter Adelman | Email regarding American Club litigation issues | AC |
| 11/11/2004 | Raymer McQuiston | Robert A. Agresti, Ron Pape | Email regarding American Club litigation issues | AC |
| 11/2/2004 | Ron Pape | Robert A. Agresti | Email regarding litigation issues | AC |

# EXHIBIT 10

# DEFENDANT AMERICAN PRESIDENT LINES LOG OF WITHHELD DOCUMENTS

American Steamship Owners Mutual Protection and Indemnity Association, Inc. v. Alcoa Steamship Co., et al.

04 CV 4309 (LAK) (JCF)

| Date | From | To | CC/BCC | Description | Privilege[1] |
|---|---|---|---|---|---|
| 10/23/1984 | R.L. Tavrow, Esq. | D.I. Bunch | J.T. Di Palermo; D.A. Metcalf; Jeanne Martin; W.F. Fontaine | Memorandum from counsel re Asbestos Litigation and discussing "Asbestos Claims Facility" | AC |
| 12/16/86 | KAC Patterson | K.H. Nash, Esq. | John Bolles, Esq. | Letter enclosing legal opinions re Ohio Asbestos Litigation | AC, WP, JDP |
| 01/08/87 | K.H. Nash, Es. | J.T. Di Palermo; J. Juergens; J. Roethke; F. Spess; J. Scalai; A. Rutherford | | Letter enclosing letter legal opinions re Ohio Asbestos Litigation | AC, WP, JDP |
| 07/08/87 | Sally Stambaugh | D.I. Bunch | | Letter from Thompson Hine & Flory, Esq. enclosing invoice for fees incurred in Ohio Maritime Asbestos Litigation | AC |
| 07/09/87 | J.T. Di Palermo | D.W. Foote | R.L. Tavrow, Esq.; C.B. Gleason; D.I. Bunch; S.G. Carbiener | Memorandum copied to counsel discussing recommendations from outside counsel re Asbestos Claims | AC, WP |
| 07/24/87 | J.T. Di Palermo | D.W. Foote | R.L. Tavrow, Esq.; C.B. Gleason; D.I. Bunch | Memorandum copied to counsel discussing recommendations from outside counsel re Asbestos Claims | AC, WP |
| 06/28/90 | D.I. Bunch | R.L. Tavrow, Esq. | C.B. Gleason; W. Storey | Memorandum enclosing legal opinion letters | AC, WP |
| 08/18/93 | Ben Gleason | Maryellen Cattani, Esq. | S. Hazlak; F. Sevekow, Esq. | Memorandum to counsel re Asbestos Claims, Prudential Lines decision | AC |

[1] "AC" refers to the Attorney-Client Privilege; "WP" refers to the Work-Product Privilege; "JDP" refers to Joint Defense Privilege.

| Date | From | To | CC/BCC | Description | Privilege |
|---|---|---|---|---|---|
| 01/25/94 | C.B. Gleason | Maryellen Cattani, Esq.<br>Mark Christensen<br>Steve Schmidt<br>Will Storey | | Memorandum to counsel re P&I Insurance and discussing exposure | AC |
| 04/22/94 | Pat Francisco<br>Stan Hazlak | Maryellen Cattani, Esq.<br>Fred Sevekow, Esq. | Marty Gordon | Memorandum re Thompson Hine & Flory Status Report dated 04/01/94 | AC, WP |
| 10/04/94 | Ellis Mirsky, Esq. | Fred Sevekow, Esq. | Maryellen Cattani, Esq.<br>Pat Francisco<br>C.B. Gleason<br>Marty Gordon<br>Stan Hazlak | Legal Opinion/Status Report | AC, WP |
| 10/12/94 | Pat Francisco | Fred Sevekow, Esq. | Maryellen Cattani, Esq.<br>Ben Gleason<br>Marty Gordon<br>Stan Hazlak<br>Will Storey<br>Ellis Mirsky, Esq. | Memorandum to counsel re status report from Richard Binzley of Thompson Hine & Flory | AC, WP |
| 12/09/94 | Ellis Mirsky, Esq. | P. Chun | F. Sevekow, Esq.<br>C.B. Gleason | Letter re draft financial models for use with report. | AC |
| 12/19/94 | Ellis Mirsky, Esq. | C.B. Gleason | | Fax enclosing letter re revisions to report | AC |
| 12/19/94 | Ellis Mirsky, Esq. | P. Francisco | R. Basseches<br>J. Collins<br>C. Gleason<br>M. Gordon<br>S. Hazlak<br>F. Sevekow, Esq. | Letter re revisions to report | AC |
| 12/29/94 | Ellis Mirsky, Esq. | C.B. Gleason | | | AC |
| 01/18/95 | Ellis Mirsky, Esq. | C.B. Gleason | F. Sevekow, Esq.<br>P. Francisco<br>S. Hazlak<br>M. Gordon | Legal advice re work performed by other counsel | AC, WP |

| Date | From | To | CC/BCC | Description | Privilege |
|---|---|---|---|---|---|
| 01/25/95 | Pat Francisco | Ben Gleason<br>Marty Gordon<br>Stan Hazlak<br>Ellis Mirsky, Esq. | F.M. Sevekow, Esq. | Letter attaching January 10, 1995 status report Richard Binzley of Thompson Hine & Flory | AC, WP |
| 01/27/95 | Ellis Mirsky, Esq. | C.B. Gleason | F. Sevekow, Esq.<br>P. Francisco<br>S. Hazlak<br>M. Gordon | Letter re further legal advice re work performed by other counsel | AC, WP |
| 02/07/95 | Ellis Mirsky, Esq. | Frederick Sevekow, Esq. | C.B. Gleason<br>R. Basseches<br>M. Gordon<br>S. Hazlak<br>P. Francisco | Letter re update on Report and Analysis of Maritime Asbestos Litigation | AC |
| 02/08/95 | Ellis Mirsky, Esq. | C.B. Gleason. | | Fax enclosing letter re update on Report and Analysis of Maritime Asbestos Litigation | AC |
| 02/15/95 | Ellis Mirsky, Esq. | F. Sevekow, Esq. | C.B. Gleason | Draft Report and Analysis of Maritime Asbestos Litigation | AC |
| Not dated | Ellis Mirsky, Esq. | C.B. Gleason | | Reports re Valuation of Asbestos Cases | AC |
| 03/31/95 | Ellis Mirsky, Esq. | C.B. Gleason | | Update to Report and Analysis of Maritime Asbestos Litigation | AC |
| 04/06/95 | Ellis Mirsky, Esq. | APL | | Model for valuation of asbestos cases | AC, WP |
| 04/26/95 | Maryellen Cattani, Esq. | F.M. Sevekow, Esq.<br>C.B. Gleason<br>Marty Gordon<br>Stan Hazlak<br>Patricia Francisco | | Memorandum re follow-up from Asbestos Litigation Meeting | AC |
| 05/22/95 | Ellis Mirsky, Esq. | C.B. Gleason | | Letters re Newman & Harrington, Esq. CVs and reference for advice on mutual P&I clubs | AC |
| 05/31/95<br>06/02/95 | Thomas R. Newman, Esq.<br>Joseph K. Molloy, Esq. | C.B. Gleason | Ellis Mirsky, Esq.<br>M. Cattani, Esq.<br>F. Sevekow, Esq. | Legal Opinion re coverage issue.  Billing invoice for fees incurred re same. | AC |

3

| Date | From | To | CC/BCC | Description | Privilege |
|---|---|---|---|---|---|
| 07/19/95 | Pat Francisco, Ben Gleason, Marty Gordon, Stan Hazlak, Fred Sevekow, Esq. | | | Notes from Asbestos Team Meeting | WP |
| 05/20/96 | Ellis R. Mirsky, Esq. | C.B. Gleason | R. Binzley, Esq. R. Francisco M. Gordon S. Hazlak F. Sevekow, Esq. | Advice re recent rulings in Maritime Litigation | AC, WP |
| 05/25/96 | Ellis R. Mirsky, Esq. | C.B. Gleason | | Letter enclosing email correspondence with codefendants in Maritime Asbestos Litigation | AC, JDP, WP |
| 01/06/97 | Richard C. Binzley, Esq. | Irene Manske | F. Sevekow, Esq. | Status report re Maritime Asbestos Litigation | AC, WP |
| 02/25/97 | Cheryl Brodsky, Esq. | Irene Manske | | Advice re San Francisco General Orders that apply to asbestos litigation | AC, WP |
| 03/04/97 | Richard C. Binzley, Esq. | APL | M. Gordon B. Gleason | Status report re Maritime Asbestos Litigation | AC, WP |
| 03/11/97 | Cheryl Brodsky, Esq. | Marty Gordon | | Advice re San Francisco General Orders that apply to asbestos litigation | AC, WP |
| 04/15/97 | Richard C. Binzley, Esq. | APL | B. Gleason F. Sevekow, Esq. | Status report re Maritime Asbestos Litigation | AC, WP |
| 04/22/97 | Irene Manske | Marty Gordon C.B. Gleason F.M. Sevekow, Esq. | | Memorandum enclosing letter from Cheryl Brodsky, Esq. re advice on CA asbestos cases | AC, WP |
| 06/20/97 | Richard C. Binzley, Esq. | APL | | Status report re Maritime Asbestos Litigation | AC, WP |
| 06/27/97 | Richard C. Binzley, Esq. | APL | M. Gordon B. Gleason F. Sevekow, Esq. | Status report re Maritime Asbestos Litigation | AC, WP |
| 08/11/97 | Richard C. Binzley, Esq. | APL | M. Gordon B. Gleason F. Sevekow, Esq. | Status report re Maritime Asbestos Litigation | AC, WP |

4

| Date | From | To | CC/BCC | Description | Privilege[2] |
|---|---|---|---|---|---|
| 09/04/97 | Richard C. Binzley, Esq. | APL | M. Gordon C.B. Gleason F. Sevekow, Esq. | Status report re Maritime Asbestos Litigation | AC, WP |
| 10/13/97 | Richard C. Binzley, Esq. | APL | C.B. Gleason F. Sevekow, Esq. M. Gordon | Status report re Maritime Asbestos Litigation | AC, WP |
| 12/4/97 | Richard C. Binzley, Esq. | APL | C.B. Gleason Sevekow, Esq. M. Gordon | Status report re Maritime Asbestos Litigation | AC, WP |
| 01/23/98 | James F. Kelley | Maryellen Cattani, Esq. | | Letter re Asbestos Legislative Group | AC, WP |

# 2771490_v3

2 "AC" refers to the Attorney-Client Privilege; "WP" refers to the Work-Product Privilege; "JDP" refers to Joint Defense Privilege.

5

# DEFENDANT AMERICAN PRESIDENT LINES LOG OF WITHHELD DOCUMENTS

American Steamship Owners Mutual Protection and Indemnity Association, Inc. v. Alcoa Steamship Co., et al.

04 CV 4309 (LAK) (JCF)

| Date | From | To | CC/BCC | Description | Privilege[1] |
|---|---|---|---|---|---|
| 10/23/1984 | R.L. Tavrow, Esq. | D.I. Bunch | | Memorandum from counsel re Asbestos Litigation and discussing "Asbestos Claims Facility" | AC |
| 12/16/86 | KAC Patterson | K.H. Nash, Esq. | J.T. Di Palermo<br>D.A. Metcalf<br>Jeanne Martin<br>W.F. Fontaine<br>John Bolles, Esq. | Letter enclosing legal opinions re Ohio Asbestos Litigation | AC, WP, JDP |
| 01/08/87 | K.H. Nash, Es. | J.T. Di Palermo<br>J. Juergens<br>I. Roethke<br>F. Spess<br>J. Scalai<br>A. Rutherford | | Letter enclosing letter legal opinions re Ohio Asbestos Litigation | AC, WP, JDP |
| 07/08/87 | Sally Stambaugh | D.I. Bunch | | Letter from Thompson Hine & Flory, Esq. enclosing invoice for fees incurred in Ohio Maritime Asbestos Litigation | AC |
| 07/09/87 | J.T. Di Palermo | D.W. Foote | R.L. Tavrow, Esq.<br>C.B. Gleason<br>D.I. Bunch<br>S.G. Carbiener | Memorandum copied to counsel discussing recommendations from outside counsel re Asbestos Claims | AC, WP |
| 07/24/87 | J.T. Di Palermo | D.W. Foote | R.L. Tavrow, Esq.<br>C.B. Gleason<br>D.I. Bunch | Memorandum copied to counsel discussing recommendations from outside counsel re Asbestos Claims | AC, WP |
| 06/28/90 | D.I. Bunch | R.L. Tavrow, Esq. | C.B. Gleason | Memorandum enclosing legal opinion letters re Asbestos Claims | AC, WP |
| 08/18/93 | Ben Gleason | Maryellen Cattani, Esq. | W. Storey<br>S. Hazlak<br>F. Sevekow, Esq. | Memorandum to counsel re Asbestos Claims, Prudential Lines decision | AC |

[1] "AC" refers to the Attorney-Client Privilege; "WP" refers to the Work-Product Privilege; "JDP" refers to Joint Defense Privilege.

1

| Date | From | To | CC/BCC | Description | Privilege |
|------|------|-----|--------|-------------|-----------|
| 01/25/94 | C.B. Gleason | Maryellen Cattani, Esq. Mark Christensen Steve Schmidt Will Storey | | Memorandum to counsel re P&I Insurance and discussing exposure | AC |
| 04/22/94 | Pat Francisco | Maryellen Cattani, Esq. Fred Sevekow, Esq. | Marty Gordon | Memorandum re Thompson Hine & Flory Status Report dated 04/01/94 | AC, WP |
| 10/04/94 | Ellis Mirsky, Esq. Stan Hazlak | Fred Sevekow, Esq. | Maryellen Cattani, Esq. Pat Francisco C.B. Gleason Marty Gordon Stan Hazlak | Legal Opinion/Status Report | AC, WP |
| 10/12/94 | Pat Francisco | Fred Sevekow, Esq. | Maryellen Cattani, Esq. Ben Gleason Marty Gordon Stan Hazlak Will Storey Ellis Mirsky, Esq. | Memorandum to counsel re status report from Richard Binzley of Thompson Hine & Flory | AC, WP |
| 12/09/94 | Ellis Mirsky, Esq. | P. Chun | F. Sevekow, Esq. C.B. Gleason | Letter re draft financial models for use with report. | AC |
| 12/19/94 | Ellis Mirsky, Esq. | C.B. Gleason | | Fax enclosing letter re revisions to report | AC |
| 12/19/94 | Ellis Mirsky, Esq. | P. Francisco | R. Basseches J. Collins C. Gleason M. Gordon S. Hazlak F. Sevekow, Esq. | Letter re revisions to report | AC |
| 12/29/94 | Ellis Mirsky, Esq. | C.B. Gleason | | | AC |
| 01/18/95 | Ellis Mirsky, Esq. | C.B. Gleason | F. Sevekow, Esq. P. Francisco S. Hazlak M. Gordon | Legal advice re work performed by other counsel | AC, WP |

| Date | From | To | CC/BCC | Description | Privilege |
|---|---|---|---|---|---|
| 01/25/95 | Pat Francisco | Ben Gleason Marty Gordon Stan Hazlak Ellis Mirsky, Esq. | F.M. Sevekow, Esq. | Letter attaching January 10, 1995 status report Richard Binzley of Thompson Hine & Flory | AC, WP |
| 01/27/95 | Ellis Mirsky, Esq. | C.B. Gleason | F. Sevekow, Esq. P. Francisco S. Hazlak M. Gordon | Letter re further legal advice re work performed by other counsel | AC, WP |
| 02/07/95 | Ellis Mirsky, Esq. | Frederick Sevekow, Esq. | C.B. Gleason R. Basseches M. Gordon S. Hazlak P. Francisco | Letter re update on Report and Analysis of Maritime Asbestos Litigation | AC |
| 02/08/95 | Ellis Mirsky, Esq. | C.B. Gleason. | | Fax enclosing letter re update on Report and Analysis of Maritime Asbestos Litigation | AC |
| 02/15/95 | Ellis Mirsky, Esq. | F. Sevekow, Esq. | C.B. Gleason | Draft Report and Analysis of Maritime Asbestos Litigation | AC |
| Not dated | Ellis Mirsky, Esq. | C.B. Gleason | | Reports re Valuation of Asbestos Cases | AC |
| 03/31/95 | Ellis Mirsky, Esq. | C.B. Gleason | | Update to Report and Analysis of Maritime Asbestos Litigation | AC |
| 04/06/95 | Ellis Mirsky, Esq. | APL | | Model for valuation of asbestos cases | AC, WP |
| 04/23/95 | Ellis Mirsky, Esq. | C.B. Gleason | | Model for valuation of asbestos cases APL006708 – APL006801 | AC, WP |
| 04/26/95 | Maryellen Cattani, Esq. | F.M. Sevekow, Esq. C.B. Gleason Marty Gordon Stan Hazlak Patricia Francisco | | Memorandum re follow-up from Asbestos Litigation Meeting | AC |
| 05/22/95 | Ellis Mirsky, Esq. | C.B. Gleason | | Letters re Newman & Harrington, Esq. CV's and reference for advice on mutual P&I clubs | AC |
| 05/31/95 06/02/95 | Thomas R. Newman, Esq. Joseph K. Molloy, Esq. | C.B. Gleason | Ellis Mirsky, Esq. M. Cattani, Esq. F. Sevekow, Esq. | Legal Opinion re coverage issue. Billing invoice for fees incurred re same. | AC |

| Date | From | To | CC/BCC | Description | Privilege |
|---|---|---|---|---|---|
| 07/19/95 | | Pat Francisco<br>Ben Gleason<br>Marty Gordon<br>Stan Hazlak<br>Fred Sevekow, Esq. | | Notes from Asbestos Team Meeting | WP |
| 05/20/96 | Ellis R. Mirsky, Esq. | C.B. Gleason | R. Binzley, Esq.<br>R. Francisco<br>M. Gordon<br>S. Hazlak<br>F. Sevekow, Esq. | Advice re recent rulings in Maritime Litigation | AC, WP |
| 05/25/96 | Ellis R. Mirsky, Esq. | C.B. Gleason | | Letter enclosing email correspondence with codefendants in Maritime Asbestos Litigation | AC, JDP, WP |
| 01/06/97 | Richard C. Binzley, Esq. | Irene Manske | F. Sevekow, Esq. | Status report re Maritime Asbestos Litigation | AC, WP |
| 02/25/97 | Cheryl Brodsky, Esq. | Irene Manske | | Advice re San Francisco General Orders that apply to asbestos litigation | AC, WP |
| 03/04/97 | Richard C. Binzley, Esq. | APL | M. Gordon<br>B. Gleason | Status report re Maritime Asbestos Litigation | AC, WP |
| 03/11/97 | Cheryl Brodsky, Esq. | Marty Gordon | | Advice re San Francisco General Orders that apply to asbestos litigation | AC, WP |
| 04/15/97 | Richard C. Binzley, Esq. | APL | B. Gleason<br>F. Sevekow, Esq. | Status report re Maritime Asbestos Litigation | AC, WP |
| 04/22/97 | Irene Manske | Marty Gordon<br>C.B. Gleason<br>F.M. Sevekow, Esq. | | Memorandum enclosing letter from Cheryl Brodsky, Esq. re advice on CA asbestos cases | AC, WP |
| 06/20/97 | Richard C. Binzley, Esq. | APL | | Status report re Maritime Asbestos Litigation | AC, WP |
| 06/27/97 | Richard C. Binzley, Esq. | APL | M. Gordon<br>B. Gleason<br>F. Sevekow, Esq. | Status report re Maritime Asbestos Litigation | AC, WP |
| 08/11/97 | Richard C. Binzley, Esq. | APL | M. Gordon<br>B. Gleason<br>F. Sevekow, Esq. | Status report re Maritime Asbestos Litigation | AC, WP |

4

| Date | From | To | CC/BCC | Description | Privilege[2] |
|------|------|-----|--------|-------------|--------------|
| 09/04/97 | Richard C. Binzley, Esq. | APL | M. Gordon C.B. Gleason F. Sevekow, Esq. | Status report re Maritime Asbestos Litigation | AC, WP |
| 10/13/97 | Richard C. Binzley, Esq. | APL | C.B. Gleason F. Sevekow, Esq. M. Gordon | Status report re Maritime Asbestos Litigation | AC, WP |
| 12/4/97 | Richard C. Binzley, Esq. | APL | C.B. Gleason Sevekow, Esq. M. Gordon | Status report re Maritime Asbestos Litigation | AC, WP |
| 01/23/98 | James F. Kelley | Maryellen Cattani, Esq. | | Letter re Asbestos Legislative Group | AC, WP |

#2771490_v4

2 "AC" refers to the Attorney-Client Privilege; "WP" refers to the Work-Product Privilege; "JDP" refers to Joint Defense Privilege.

# EXHIBIT 11

KIRLIN, CAMPBELL & KEATING

ONE TWENTY BROADWAY

NEW YORK, N.Y. 10005

212-732-5520

CABLEGRAMS "WAKEFIELD NEWYORK"
TELEX 177 422219
WUI 82344
WUI 12-8195

February 14, 1979

WILLIAM A. SHEEHAN
ELMER C. MADDY
LOUIS J. GUSMANO
WALTER P. HICKEY
MARSHALL P. KEATING
RICHARD H. BROWN, JR
JAMES J. HIGGINS
ALEXANDER P. RUGANI
RICHARD H. SONNER
DANIEL L. DOUGHERTY
WILLIAM J. O'BRIEN
DANIEL A. MOJIRÉ
THOMAS COYNE
PAUL F. McGUIRE
ROBERT P. HART
WILLIAM R. FALLON
EDWARD L. SMITH
HENRY J. O'BRIEN
LAWRENCE J. BOWLES
ANTHONY P. MARSHALL
DAVID H. MANTOWSKI
JOSEPH F. RYAN, JR
DONALD J. SAWLER
ERNESTO V. LUZZATTO

WASHINGTON OFFICE
THE CONNECTICUT BUILDING
1180 CONNECTICUT AVE, N.W.
SUITE 800
WASHINGTON D C 20036
801-296-48-

RESIDENT PARTNERS

RONALD A. CAPONE
RUSSELL T. WEIL
ROBERT J. HICKEY
JAMES P. MOORE

OF COUNSEL
CHARLES MAECKLING, JR

Mr. John H. Cassedy, Secretary
American Steamship Owners Mutual
Protection and Indemnity Association, Inc.
25 Broad Street
New York, New York  10004

OUR REF. 86059

Re:  Association's
     Reserve Account

Dear Mr. Cassedy:

This opinion is submitted in response to your request for our advice as to the status, from a legal standpoint, of the Association's "Reserve Account" and, in particular:

1.  Who owns the funds represented by the Reserve Account, the Association or its members?

2.  Must any portion of the annual income derived from the Association's investments be credited to the Reserve Account?

3.  May any part of the Reserve Account be transferred to an open Insurance Year, or Years, in order to defray administrative expenses and/or policy liabilities incurred with respect to said open Insurance Year or Years?

4.  Would it be permissible to put a ceiling on the Reserve Account as to, in effect, "wash out" reserves on claims in an Insurance Year that is about to be closed?

CONFIDENTIAL

Exhibit
AC-31

AC3504206

- 2 -

Based upon our legal analysis hereinafter set-forth, it is our opinion that:

    1.  The funds represented by the Association's Reserve Account, since, the Association is a fully operating and financially viable entity, belong to the Association.

    2.  It is not required that a portion of the Association's annual income from investments be credited to the Reserve Account.

    3.  In the appropriate circumstances it would be permissible for funds represented by the Reserve Account to be transferred to an open Insurance Year or Years.

    4.  As a general rule funds from the Reserve Account may not be allocated to an Insurance Year that is about to be closed so as to reduce, or eliminate, the amount determined necessary to satisfy anticipated policy liabilities for such Year.

### ANALYSIS

    1.  <u>Ownership of Reserve Account.</u>  In order to determine who owns the funds represented by the Association's Reserve Account, it is necessary to review the nature of the Association's organization and business, and also the make-up of such Account.  The American Steamship Owners Mutual Protection and Indemnity Association, as its name implies, is a mutual insurance company (without stockholders)

CONFIDENTIAL

AC3504207

3

whose members consist of owners and operators of ships for whom it writes marine protection and indemnity insurance. Since a mutual insurance company is operated solely for the benefit of its policy holders, it does not seek to amass profits in the ordinary business sense.

Although the Association has authority to issue either assessable or non-assessable policies, it has for many years past issued only assessable ones. Thus the Association has been in the position to rectify a deficiency in a particular Insurance Year -- arising by reason of the fact that the actual policy liabilities and administrative expenses in said year are in excess of the premiums collected, by levying an assessment. In every such instance each member for the Year is required to pay its proportionate share of the assessment.

It also happens that following the termination of an Insurance Year the Association's Board of Directors, based upon a statement placed before it by the Manager of the Association, will determine that, after the payment of all applicable administrative expenses and proven claims, and setting aside funds deemed reasonable in amount for pending claims, there remains a final excess resulting from all the policies in effect during such Insurance Year. If the excess is the result of unused premium, a final dividend may be declared; while if it represents the balance of an assessment a final refund must be made. In either case the said Insurance Year is closed. In both instances, the members, for the applicable

CONFIDENTIAL

AC3504208

Insurance Year, receive distributions in proportion to the re-
sspective net premiums they paid.

Such a determination to make appropriate distributions,
and close the Insurance Year, is generally made seven to ten years
after the termination of the Insurance Year. As pointed out in the
previous paragraph, in closing an Insurance Year, there are set
aside funds for pending claims. These are the funds that become
part of, and constitute, the Reserve Account. The Reserve Account
has been built up over the intervening years, between the organi-
zation of the Association in 1917 and the present, because a portion
of the Association's annual investment income has been included in
said Account, and because the policy liabilities actually incurred,
following the close of an Insurance Year, have on occasion been
less than anticipated.

The Reserve Account, which pertains to the closed Insurance
Years, together with the net credit or debit balances for each of
the open Insurance Years, comprise the Association's Surplus. The
rulings in a number of decided court cases show that the Association's
Surplus except to the extent that it includes that part, or all, of
an assessment for an open Insurance Year which may ultimately be
determined to be the collection of an excess amount [a matter which
will be discussed below], belongs to the Association. It follows,
as a necessary corollary, that no part of such Surplus, subject to
the possible limited exception referred to in the previous sentence,
belongs to the members, either past or present, at least as long as

CONFIDENTIAL

AC3504209

- 5 -

the Association is a going concern.  In <u>Uhlman v. New York</u>

<u>Life Ins. Co.</u> (1888) 109 N.Y. 421 at pg. 429, the New York Court

of Appeals stated:

> "It has been held that the holder
> of a policy of insurance, even in
> a mutual company, was in no sense
> a partner of the corporation
> which issued the policy, and that
> the relation of the policyholder
> and the company was one of contract
> measured by the terms of the policy."

Likewise, in <u>Greeff v. Equitable Life Ass. Soc.</u> (1899) 160 N.Y. 19

the Court said (page 39):

> "By its [the policy's] terms he [Greeff]
> possessed no legal right to any part
> of the defendant'a [company's] surplus,
> except in that portion which its
> officers determined to distribute
> among the holders of its policies,
> and an action at law could not
> be maintained until that determination
> was made."

Several other New York cases have included statements which

are in accord with the just stated rule.  <u>Rhine v. New York Life</u>

<u>Ins. Co.</u> (1948) 273 N.Y. 1; and <u>Birne v. Public Service Mut. Cas.Co.</u>

(1948) 77 N.Y.S. 2d. 446.  The foregoing cases relate to New York

law regarding the surplus of mutual insurance companies and therefore

are controlling insofar as the Association is concerned.

As pointed out above the Association's Surplus, except to

the extent it includes that part, or all, of an assessment for an

open Insurance Year which may ultimately be determined to be the

collection of an excess amount, belongs to the Association.  The

reason for this particular exception is the different status, from a

CONFIDENTIAL

AC3504210

- 2 -

legal standpoint, between premiums and assessments. Premiums paid
to a mutual insurance company, because of their voluntary nature,
belong to the company.  Couch on Insurance 2nd, Section 34:54.
However, assessments represent a call on mutual policy holders,
irrespective of their consent at the time, to cover either a
deficiency in revenue or an impairment of capital.  Because assess-
ments represent imposed liabilities, required by subsequent devel-
opments, the law has surrounded assessments with many restrictions
that do not apply to premiums.

Generally speaking, a "profit" derived from an excess of
premiums may be either transferred to Surplus or declared as a
"dividend" to the mutual policy holders of that Insurance Year, at
the discretion of the Directors.  It does not follow, however, that
the same optional treatment applies to the unneeded "excess" of an
assessment.  In this connection, Section 58(2) of the New York In-
surance Law provides as follows:

> "Every policy issued by any such company
> shall clearly state whether or not the holder
> of such policy is subject to a liability for
> assessment.  All policies issued by any such
> company which are subject to a liability for
> assessment shall contain a clear statement
> of the liability of the policyholder for the
> payment of his proportionate share of any
> deficiency or impairment as provided by law
> within the limit provided by the policy, and
> shall further state that any assessment
> shall be for the exclusive benefit of holders
> of policies which provide for such a contingent
> liability, and the holders of policies subject
> to assessment shall not be liable to assessment
> in an amount greater in proportion to the total
> deficiency than the ratio that the deficiency
> attributable to the assessable business bears
> to the total deficiency." [Emphasis supplied].

CONFIDENTIAL

AC3504211

7

Thus the Association's authority to levy an assessment upon a policy holder is limited to "his proportionate share of any deficiency or impairment". If the assessment, as made, should prove ultimately to be greater than the limiting "deficiency", the excess belongs pro rata to the policy holders who contributed it. This means such unauthorized excess is held for their benefit and must be refunded to them or applied against their respective shares of an assessment levied to cover the "deficiency" for some other Insurance Year.

However, the amount of any assessment transfered to the Reserve Account, in closing an Insurance Year, does not constitute such an "excess". The Association's By-Laws, specifically Article V, Section 4, provides, in part, that:

"From time to time after the termination of each insurance year, when the Manager shall determine that it is practicable to estimate with a reasonable degree of certainty the minimum, probable or final surplus or deficiency resulting from all of the Corporation's insurances in effect during such insurance year, the Manager shall place before the Board of Directors a statement of such financial results of such insurances, segregated between assessable and non-assessable business. After receipt of any such statement, the Board of Directors from time to time may (a) fix and determine an amount to be declared and paid as a partial or the final dividend, after retaining such sums as they may deem necessary to meet outstanding policy obligations or for the maintenance of reserve and surplus of the Corporation, or (b) order an interim or the final assessment to be made against the holders of assessable policies, fix the due date of such assessment, determine the rate of interest that shall be added to and become a part of any delinquent assessment, and otherwise provide for enforcement or collection thereof. Any dividend declared or any assessment levied shall be based

CONFIDENTIAL

AC3504212

solely on such surplus or such deficiency, respectfully, resulting from the assessable business for the insurance year. All dividends declared and all assessments levied shall be distributed or spread in the ratio that the net premiums paid by the holder of an assessable policy year to the net premiums paid by all holders of assessable policies for the insurance year. **** [Emphasis supplied]

In estimating "with a reasonble degree of certainty the *** final surplus", if any, for an Insurance Year about to be closed, the Manager makes provision for a certain amount of funds on hand, pertaining to such Year, to be transferred to the Reserve Account. This is done so that such transferred funds may be available to pay the future proven claims, as currently estimated, with respect to said Year. It is only after provision is made for this reasonable estimated amount that the remaining available fund is considered the "final surplus" or "excess" which, if it represents part or all of an assessment, must be refunded pro rata to the members for the particular Insurance Year involved.

There is another legal principle which confirms the conclusion that funds, although derived by means of an assessment, lose their legal identity as such when they are transferred to the Association's Reserve Account, and thus can not constitute an assessment "excess" which belongs to the members. In recommending the closing of an Insurance Year the Association's Manager must "estimate with a reasonable degree of certainty" [Association's By-Laws, Art. V., Sec. 4] the amount required to be transferred to the Reserve Account to satisfy projected policy liabilities for such Year. This estimate must then be approved by the Association's Board of Directors. In effect, it is also subject to the acceptance of the policy holders'

CONFIDENTIAL

- 9 -

involved because naturally they retain the legal right to dispute such "estimate" if they conclude it is not reasonably supported by the facts available to them.

Thus in consummating the closing of an Insurance Year it would appear that within the contemplation of law, there has been a final settlement of accounts, for such Year between the Association and the policy holders involved. That is, if the amount set aside in the Reserve Account is not sufficient to satisfy all the policy liabilities, for the closed Insurance Year, as subsequently proven, then the Association can not make any assessment against the policy holders for such Year to eliminate the deficit. And, conversely, if the amount is ultimately determined to be more than needed to pay all the proven claims for the closed Insurance Year, the respective policy holders are not entitled to any refund. This conclusion would appear to necessarily follow from the decision of the New York Court of Appeals in the case of Hyde v. Lynde (1850) 4 N.Y. 387, and the holding of the New York Supreme Court, Appellate Division, in the proceeding of Patrons of Industry Fire Ins. Co. v. Harwood (1901) 72 N.Y.S. 8. Although it is recognized that these cases were decided many years ago, we have not been able to find any subsequent New York decisions which contravert their holdings. Both of these cases involved mutual insurance companies, and while each considered the effect of the "settlement of accounts" between the company and the policy holder, in connection with the authorized surrender of a policy by the insured, there does not appear to be any reason why the

CONFIDENTIAL

AC3504214

10

"settlement of accounts" which, in effect, occurs when an Insurance Year is closed by the Association, should be viewed differently.

The Court stated in the Hyde v. Lynde, case, page 390:

> "When the parties have come to an agreement
> and the policy and the note* have been
> surrendered, the individual ceases to
> be a member of the company; and all rights
> to make assessments or calls upon him
> *** is at an end."

The corollary to this holding must be that the former member no longer has any claim to the funds of the company.  In fact, the Court specifically recognized this circumstance because it stated later in its opinion, beginning on page 391, "If they [the company and the former member] had come to the conclusion that some or all of the [pending insurance] claims were valid, and the defendant [former member] had paid fifty dollars as his proportion of the supposed losses, proof that all claims turned out to be unfounded would not enable him to recover back the money".

Similarly, in the Patrons of Industry Fire Ins. Co. v. Harwood case, it was stated: "When a settlement and adjustment is in good faith made between the company and a member, and his policy or policies are canceled, he not only ceases to be a member of the company, but can not be again assessed as such, nor compelled to pay any further claims for losses or expenses, unless the settlement and

---

*The insured in the Hyde v. Lynde case was obliged, before receiving his policy, to deposit his promissory note for a sum of money determined by the directors of the mutual insurance company, of which he paid 5% in cash, and the remainder was payable in whole, or in part, whenever the directors should require it for the payment of losses and expenses; and at the expiration of the insurance term, the note, or the part which remained unpaid, after deducting all losses and expenses which accrued during the term, was to be returned to the maker.

CONFIDENTIAL

AC3504215

adjustments is set aside for fraud or mutual mistake". It thus
follows that funds proceeding from an assessment which are ultimately
transferred to the Association's Reserve Account in closing an
Insurance Year belong to the Association and not the members.

Of course, it is recognized that by statute when the New
York State Superintendent of Insurance institutes a proceeding to
permit him to supervise the activities of a mutual insurance company,
which is encountering financial difficulties, that even if an Insurance
Year has been closed an assessment may be levied against an insured
who was a member at any time within one year prior to the institution
of such proceeding. New York Insurance Law, Section 541. And that
where a mutual insurance company has been adjudicated insolvent, but
upon a later re-examination is found to be clearly solvent, the
surplus shall be distributed among the persons, partnerships or
corporations whose membership did not cease earlier than five years
prior to the date on which the corporation ceased issuing policies,
in the proportion which the total premium contributions of such
member during his or its entire membership in the corporation bear to
the total premium contributions of all members entitled to receive
distributions. New York Insurance Law, Section 545. However, these
statutory provisions are limited to liquidation, or financial diffi-
culty, situations that are not applicable to the question here under
consideration. Since these provisions are not applicable in the
present instance, it must be concluded that the Reserve Account of
the Association, which is a fully operating and financially viable
mutual insurance company, belongs to the Association and not its
members.

CONFIDENTIAL

AC3504216

- 12 -

2. <u>Crediting Investment Income to Reserve Account</u>. An examination of the New York statutory law, and the Charter and By-Laws of the Association, disclosed that there is no specific directives contained therein as to the application of the income realized, by the Association from its investments. However, it is clear that the business of the Association shall be conducted by its Board of Directors [See By-Laws, Art. II, Sec. 1.] and that is is accorded great latitude in this regard in making all necessary business decisions provided its judgment is exercised in good faith and not fraudulently or arbitrarily. <u>Barnett v. Metropolitan Life Ins. Co.</u> (1939) 16 N.Y.S. 2d 198 aff'd 285 N.Y. 627; <u>Turner v. American S.S. Owners' Mutual P & I, Ass'n., Inc.</u> (1927, CCA 5th), 16 F. 2d 707.

Since the Association is a mutual insurance company, and thus is operated for the <u>benefit</u> of its policy holders, the Directors are required, by the principles of equity to handle the Association's operations, and correspondingly the earnings from its investments, in a way that is fair and equitable to all its members.

As pointed out above the Association's Reserve Account includes the funds that have been set aside therein, with respect to closed Insurance Years, for the purpose of being available to satisfy any proven policy liabilities which may arise with regard to such Years. As the calendar termination for such Insurance Years generally occurs seven to ten years prior to the time they are closed, it appears obvious that the quantum of the anticipated policy liabilities for such years are generally known at the time of closing so that sufficient funds can be transferred to the Reserve Account to usually

CONFIDENTIAL

AC3504217

- 23 -

take care of such anticipated obligations. Thus it would appear to be a reasonable exercise of descretion by the Directors, in a particular year, not to credit any portion of the investment income realized in that year to the Reserve Account if it is concluded that said Account is adequate to satisfy anticipated liabilities, for all the closed Insurance Years, and the maintenance of reserves and surplus of the Association. Such action would certainly be for the mutual benefit of the Association and its members because the investment earnings could then be allocated to open Insurance Years to reduce, on an equitable basis, the amounts of present or future assessments or, conversely, increase the quantum of determined dividends or refunds. Thus it is to be concluded that, in an appropriate circumstances such as outlined above, the Board of Directors may, in a particular year determine, that no portion of the Association's earnings from invest-ments need be credited to the Reserve Account.

3. Transfer of Reserve Account Funds to an Open Insurance Year. The Association's Surplus, of which the Reserve Account con-stitutes a part, obviously exists to carry out the purposes of the Association, primarily to assure that its insurance contracts will be honored. If the Association's operations, relating to a particular open Insurance Year, shows a deficit, the Board of Directors may decide, within reasonable limits, whether all or part of such deficit should be absorbed against the Association's Surplus. This could mean the transfer of Reserve Account funds to the open Insurance Year to compensate for such deficit.

CONFIDENTIAL

AC3504218

- 14 -

However, it must be remembered that, as a mutual insurance company, the Board of Directors in carrying on the Association's business, and making decisions as to the application of its Surplus, must act fairly and equitable towards all its members. This is especially significant in this particular area of the Association's operations because of its authority, both statutory and under its By-Laws, to levy an assessment if the business relating to a particular open Insurance Year is running at a deficit. Section 57(1), of the New York Insurance Law requires domestic mutual companies to be maintained and operated for the benefit of their members. Therefore, in utilizing a portion of the Reserve Account to compensate for a deficit in an open Insurance Year, The Board of Directors must assure itself that its action in this regard is reasonable and equit- able so as not to adversely affect the interests of the members for the other open Insurance Years. Within the confines of this restric- tion it is our opinion that, on occasion, a part of the Association's Reserve Account may be transferred to an open Insurance Year.

4. Application of Reserve Account to Insurance Year that is about to be closed. Article V, Section 4. of the Association's By-Laws provides that:

> "From time to time after the termination of each insurance year, when the Manager shall determine that it is practicable to estimate with a reasonable degree of certainty the minimum, probable or final surplus or deficiency resulting from all the Corporation's insurance in effect

CONFIDENTIAL

*15*

<u>during such insurance year, the
Manager shall place before the
Board of Directors a statement
of such financial results of
such insurances, segregated between
assessable and non-assessable
business.</u>  After receipt of any
such statement, the Board of
Directors from time to time may
<u>(a) fix and determine the amount
to be declared and paid as a
partial or the final dividend,
after retaining such sums as
they may deem necessary to meet
outstanding policy obligations or
for the maintenance of reserves
and surplus of the Corporation,</u> or
<u>(b) order an interim or the final
assessment to be made against the
holders of the assessable policies***.
Any dividend declared or any assessment
levied shall be based solely on such
surplus or such deficiency, respectively,
resulting from the assessable business
for the insurance year***.</u> (Emphasis supplied)

In addition, Section 58(2) of the New York Insurance Law

requires that, with respect to a member for any particular Insurance

Year, his

(1) "liability for assessment
***[is]*** for his proportionate
share of any deficiency"; and

(2) "any assessment shall be
for the exclusive benefit of
the holders of [mutual] policies"

These provisions of the Association's By-Laws, and the New

York Insurance Law, indicate that each Insurance Year is an independent

period and must be treated separately for assessment, dividend and

refund purposes.  This is the very essence of a mutual insurance

company which must be operated for the equal benefit of all its

members. For this reason it appears that the Association's Board of

CONFIDENTIAL

AC3504220

16

Directors may not, in closing an Insurance Year, decide to eliminate any deficit determined to exist for said year by utilizing monies, available in the Reserve Account, for such purpose. To so do would, in our opinion, be equivalent, to the declaring of a dividend or refund to the policy holders of the closed Insurance Year at the expense of the policy holders for other Insurance Years. This is not to say that in the appropriate situation, if the Reserve Account should exceed the amount necessary to satisfy anticipated policy claims for closed Insurance Years and also the reserves and surplus required by the New York Insurance Department that an application may not be made of part of the Reserve Account to an Insurance Year about to be closed. However, the circumstances for such application would be limited, and such action would only be permitted if determined to be equitable and fair insofar as the members for other Insurance Years are concerned.

It is believed that the foregoing is fully responsive to your inquiries. However, if you feel that anything discussed herein requires further consideration or clarification, please let us know.

Very truly yours,

KIRLIN, CAMPBELL & KEATING

By: _William F. Fallon_
William F. Fallon

WFF:ib

CONFIDENTIAL

AC3504221

# EXHIBIT 12

MAY-04-1995 16:19 FROM SHIP OWNERS CLAIM TO 16106176899 P.02

American Steamship Owners Mutual Protection and Indemnity Association, Inc.



Shipowners Claims Bureau, Inc., Manager
Five Hanover Square – 20th Floor
New York, New York 10004-2698
Main: (212) 269-2350 (or 908-2400)
Fax: (212) 825-1391
Telex: 222091
Direct: (212) 908-2444

May 4, 1995

SENT VIA FAX

BOARD OF DIRECTORS

Re:     U.S. LINES BANKRUPTCY

Gentlemen:

Reference is made to our letter dated April 20, 1995 enclosing a letter of the same date from Association's counsel regarding asbestos related claims in the U.S. Lines bankruptcy.

Counsel's proposed course of action was discussed at length by the Finance Committee on May 2. While no decision was made, the Finance Committee was generally in agreement with counsel's proposal but wished to have the opportunity to review the matter with their own counsel as well as to give all Directors the opportunity to be heard. Mr. Brown recommends that his draft letter to the U.S. Lines Trustee be sent the week of May 15, and the Committee members agreed to respond to the managers with their final views by May 15. The managers were also asked to communicate with the Directors to permit all the opportunity to provide input on this subject.

Please review the material sent with my April 20 letter, and let me have the benefit of your views by May 15. If you have any questions on this matter, Mr. Brown (212) 425-7800, or myself are available to discuss the matter with you.

Regards,

*Shipowners Claims Bureau, Inc., MANAGER*

T.J. McGowan

VAP\S AC\GENERAL

KEY 002258

# EXHIBIT 13

Page 65

```
 1   American Club.
 2      Q.    Now, you also testified that you
 3   recalled one director opposed to sending the
 4   proposed letter to the U.S. Lines bankruptcy
 5   trustee.
 6            Do you recall who that director
 7   was?
 8      A.    Yes.
 9      Q.    Who was that director?
10      A.    Ben Gleason.
11      Q.    Did Mr. Gleason express to you a
12   reason why he opposed the sending of the
13   recommended letter to the U.S. Lines bankruptcy
14   trustee?
15      A.    Yes.
16      Q.    What did he say in words or
17   substance to the best of your recollection?
18      A.    He actually wrote me a letter --
19   which I believe is an exhibit, although I'm not
20   entirely sure; I think so -- expressing the
21   view that the concept of reopening closed years
22   was inconsistent with previous advice which
23   Kirlin's had given.
24            I responded in a letter pointing
25   out the reasons I thought he was mistaken.
```

Page 66

```
 1      Q.    Now, apart from this exchange of
 2   correspondence that you've just described, do
 3   you recall any additional communications with
 4   Mr. Gleason on the subject that was raised by
 5   your recommended letter to the U.S. Lines
 6   bankruptcy trustee?
 7      A.    Yes.
 8      Q.    Tell me, to the best of your
 9   recollection -- well, strike that.
10            Do you recall one conversation or
11   multiple conversations?
12      A.    I recall one in particular, and
13   there may have been one or two others that were
14   shorter.
15      Q.    The conversation that you recall
16   in particular, is that a face-to-face
17   conversation?
18      A.    Yes.
19      Q.    Where did it occur?
20      A.    Somewhere in New York.
21      Q.    Can you be any more specific?
22      A.    I really don't remember.
23      Q.    Was there anyone else present?
24      A.    No.
25      Q.    What was the occasion for this
```

Page 67

```
 1   conversation?
 2      A.    I understood that Gleason was
 3   opposed to the concept of reopening closed
 4   years.  We had a private meeting at which he
 5   showed me an opinion he had obtained from
 6   another lawyer who happened to be Joe Molloy --
 7   and I think that spelling is M-o-l-l-o-y -- who
 8   had actually been at Kirlin's some years before
 9   and was now with another firm.
10            Molloy had given the opinion, a
11   written opinion, to Gleason, which in substance
12   disagreed with the concept of reopening closed
13   years.
14      Q.    Did he provide you with a copy of
15   that opinion?
16      A.    He showed me the letter and
17   permitted me to read it, but did not provide me
18   with a copy although I asked for one.
19      Q.    How long did the meeting or
20   conversation last?
21      A.    Between half an hour and an hour.
22   Something of that sort.
23      Q.    Did you take any notes of the
24   meeting?
25      A.    I probably did, but I no longer
```

Page 68

```
 1   have them.
 2      Q.    Have you checked?  Have you
 3   checked to see whether you have such notes?
 4      A.    I haven't checked, but I wouldn't
 5   know where to check now.  I doubt very much
 6   that they still exist.
 7      Q.    Would you relay to me, as best as
 8   you can currently recall, the substance of your
 9   conversation with Mr. Gleason beyond what
10   you've already testified, which is that he
11   showed you a copy of this opinion of other
12   counsel?
13      A.    Well, I read the opinion letter
14   and told Gleason I disagreed with it.
15      Q.    Do you recall any other things
16   that were said either by you or by Mr. Gleason?
17      A.    No.
18      Q.    And what is your recollection of
19   when this conversation took place?
20      A.    It occurred around the time or
21   shortly after the time I had written a letter
22   on the U.S. Lines case.  Somewhere in that time
23   frame.  I'm not sure whether it was before or
24   after the exchange of correspondence between
25   Gleason and myself or not, but it was within
```

Page 69

1  that general time frame.
2      Q.      Apart from showing you the legal
3  opinion of Mr. Molloy, did Mr. Gleason provide
4  any further explanation to you of the basis for
5  his disagreement with you on the concept of
6  reopening closed years?
7      A.      No, except for what he had
8  expressed in his own letter to me.
9      Q.      And that was a letter in which he
10  expressed the view that your opinion was
11  contrary to earlier advice received from the
12  Kirlin's firm.  Is that correct?
13      A.      Yes, essentially.
14      Q.      What, as best you recall, was the
15  substance of Mr. Molloy's opinion as to why he
16  thought the concept of reopening a closed year
17  was not agreeable?
18      A.      I have no recollection of the
19  substance of it.
20      Q.      What subsequently transpired with
21  respect to the issue of whether closed years
22  should be reopened insofar as payment would be
23  made for occupational disease claims in those
24  years?
25      A.      I never received authorization to

Page 70

1  send a letter to the U.S. Lines trustee.  So
2  far as I now recall, nothing else was done.
3      Q.      Do you recall comments or
4  positions asserted by any other directors on
5  this issue?
6      A.      No.
7      Q.      Do you recall whether the Board of
8  Directors ever subsequently took a position one
9  way or the other on whether closed years could
10  be reopened?  I'm talking about prior to the
11  current time, in which case the board --
12      A.      The prior time?
13      Q.      Prior to now, --
14      A.      The 2004 decision.
15      Q.      -- when the board terminated the
16  obligatory practice.
17      MR. CARROLL:  Objection to the
18  phrase.
19      A.      Read back that question, please.
20      - - - - - -
21      (Record read)
22      - - - - -
23      A.      Could you rephrase that question,
24  please?  It's jumbled now.
25      Q.      I'm sorry.

Page 71

1      Excepting from my question the
2  current decision of the 2004 board with respect
3  to the obligatory practice, --
4      MR. CARROLL:  Objection.
5      Q.      -- do you recall whether the Board
6  of Directors subsequently took a position one
7  way or the other on whether closed years could
8  be reopened?
9      A.      Well, without agreeing on whether
10  the practice was obligatory or not, I don't
11  recall the board taking any position in that
12  time frame.
13      Q.      Did you provide legal advice or
14  review the rule book that the Club issued in
15  1997?  Let me rephrase that a little
16  differently.
17      Do you recall that in or about the
18  time frame of 1997, the Club changed from
19  having bylaws and an insurance policy to having
20  rules?
21      A.      Yeah.  It changed from the policy
22  and bylaws -- they retained bylaws, but they
23  also had rules, I think.
24      Q.      · Did you provide any legal advice
25  in connection with the rules that were

Page 72

1  promulgated by the American Club in 1997?
2      MR. CARROLL:  Can I ask you to
3  hold off?  I just need a short conference to
4  determine whether the privilege should be
5  asserted.
6      (Pause in proceedings.)
7      MR. CARROLL:  I'm going to object
8  and direct him not to answer any question
9  concerning his advice that he gave at that
10  time, because he was still counsel to the Club
11  at that time.
12      MR. SCHAFLER:  I would, number
13  one, register my exception to your instruction;
14  and, number two, make inquiry of counsel as to
15  just what exactly you are asserting as
16  privileged and not -- we have gotten production
17  of numerous opinions --
18      MR. CARROLL:  A lot.
19      MR. SCHAFLER:  -- of counsel.  So
20  how are you defining what is or is not
21  privileged?
22      MR. CARROLL:  It's being decided
23  on an ad hoc basis.
24      MR. SCHAFLER:  Okay.  But with
25  respect to the ad hoc decision that you just

Page 137

1 Q. All right. Now, D-122 appears to
2 be Mr. Gusmano's comments on a draft sent by
3 Mr. Cassedy of a memorandum to the Finance
4 Committee regarding use of reserve account.
5  Do you see that?
6 A. Yes, I see that.
7 Q. And according to Mr. Gusmano, he
8 had also given a copy of it to Bill Fallon.
9  Is Bill Fallon the same Mr. Fallon
10 who wrote the 1979 Fallon opinion letter that
11 we've been discussing here today?
12 A. Yes.
13 Q. Now, if you look at AC0076797, in
14 the discussions concerning the reserve account,
15 there is a recommendation -- again, this is a
16 draft, but the recommendation is that the
17 reserve account not be permitted to drop below
18 nine million.
19  Do you see that?
20 A. Yes, I see that.
21 Q. And then there's a parenthetical,
22 a lengthy parenthetical, concerning certain
23 circumstances that may allow the account to
24 drop below that mark.
25  Do you see that?

Page 138

1 A. Yeah, I see that.
2 Q. And one of the circumstances is
3 unknown claims for accidents in closed years
4 being settled.
5  Do you see that?
6 A. Yes, I see that.
7 Q. Now, apart from occupational
8 disease claims, do you know whether it has ever
9 transpired that there have been claims, unknown
10 claims, for accidents in closed years that were
11 asserted after the year was closed and not
12 reported prior to that time?
13 A. Do I know whether -- I don't
14 recall any such claim to my recollection.
15 Q. Do you know whether that has ever
16 occurred?
17 A. I don't know.
18  MR. SCHAFLER: Anyone else have
19 any questions?
20  MR. MARKS: I do.
21  MR. SCHAFLER: I have no further
22 questions at this time. Thank you.
23  MR. CARROLL: Let the record
24 reflect it's now approximately 4:20 p.m.
25  - - -

Page 139

1 EXAMINATION
2  - - -
3 BY MR. MARKS:
4 Q. Good afternoon, Mr. Brown. My
5 name is James Marks and I'm one of the
6 attorneys for APL in this litigation.
7 A. Good afternoon.
8 Q. Do you know whether Kirlin's ever
9 provided legal advice to APL?
10 A. I don't know. Well, I do know.
11 Yes, Kirlin's did provide legal advice.
12 Q. To APL?
13 A. Yeah, to APL in connection with at
14 least one American Club collision.
15 Q. Do you know whether Kirlin's ever
16 provided legal advice to any of APL's
17 affiliated companies besides that one instance
18 you just mentioned?
19 A. No, I don't know.
20 Q. Had you ever provided any legal
21 advice to APL directly?
22 A. I think in connection with the
23 collision case I mentioned, I went to a meeting
24 out in San Francisco where we discussed a
25 particular collision.

Page 140

1 Q. Do you recall when that was?
2 A. Probably ten to fifteen years ago.
3 Something like that.
4 Q. What year would that put us in
5 that you're talking about?
6 A. It would be the early -- probably
7 the early '90s.
8 Q. Somewhere between 1990 and '95?
9 A. As best I can recollect.
10 Q. Yesterday I believe you testified
11 that you met with Ben Gleason in a private
12 meeting.
13  Do you recall that?
14 A. Yes.
15 Q. And do you recall that during that
16 private meeting, you discussed your proposed
17 letter to U.S. Lines' trustee?
18 A. I don't know that we discussed the
19 proposed letter, as such. We discussed the
20 concept of reopening closed years.
21 Q. And that was in and around the
22 time that you had drafted a proposed letter to
23 U.S. Lines' trustee. Correct?
24 A. By my recollection, yes.
25 Q. Who was Mr. Gleason -- or during

| Page 141 | Page 143 |
|---|---|
| 1  that time, who did Mr. Gleason work for? | 1    A.    Yes. |
| 2    A.    American President Lines. | 2    Q.    And you testified yesterday that |
| 3    Q.    And I've been referring to it as | 3  Mr. Molloy was an attorney. Is that correct? |
| 4  APL. You understand APL to be American | 4    A.    Yes. |
| 5  President Lines? | 5    Q.    Did you have an -- strike that. |
| 6    A.    Yes. | 6        Do you actually recall seeing that |
| 7    Q.    Do you know whether Mr. Gleason | 7  opinion? |
| 8  was a lawyer at that time? | 8    A.    Yes. |
| 9    A.    No, I don't. | 9    Q.    To whom was that opinion |
| 10    Q.    Do you know what Mr. Gleason's job | 10  addressed? |
| 11  was at APL? | 11    A.    I don't actually remember, but I |
| 12    A.    I don't remember the title, but he | 12  think -- I don't remember clearly, but I think |
| 13  handled insurances and perhaps claims, as well. | 13  it was to Mr. Gleason. |
| 14    Q.    But you don't recall whether he | 14    Q.    Was it addressed to anyone else? |
| 15  was a lawyer? | 15    A.    I don't remember. |
| 16    A.    I do not. | 16    Q.    Okay. Do you know what the date |
| 17    Q.    And I believe you testified that | 17  of that opinion was? |
| 18  during this meeting with Mr. Gleason, there was | 18    A.    No. |
| 19  nobody else present? | 19    Q.    Okay. Do you know who was copied |
| 20    A.    That's correct. | 20  on the letter, if anyone? |
| 21    Q.    Okay. And you described it | 21    A.    No. |
| 22  yesterday as a private meeting? | 22    Q.    Do you know who signed the letter? |
| 23    A.    Yes. | 23    A.    I believe it was Joe Molloy. |
| 24    Q.    Who requested that meeting? | 24    Q.    Anyone else? |
| 25    A.    He did. | 25    A.    Not that I remember. |

| Page 142 | Page 144 |
|---|---|
| 1    Q.    And how did he request that | 1    Q.    Okay. Do you recall how many |
| 2  meeting of you? Did he ask in writing? Did he | 2  pages the letter was? |
| 3  pull you aside? | 3    A.    No. |
| 4    A.    I really don't remember. I think | 4    Q.    Now, prior to reviewing the |
| 5  probably by telephone. | 5  opinion of Mr. Molloy, did you tell Mr. Gleason |
| 6    Q.    Now, prior to meeting with | 6  that he should consult with APL's counsel |
| 7  Mr. Gleason, did you suggest to him that he | 7  before showing it to you? |
| 8  should consult with counsel before he spoke | 8    A.    No. |
| 9  with you about any issue? | 9    Q.    Why didn't you tell him that? |
| 10    A.    Not that I remember. | 10    A.    It did not occur to me. |
| 11    Q.    Would there be a reason why you | 11    Q.    Did you tell Mr. Gleason prior to |
| 12  did not tell him to consult with counsel prior | 12  reviewing Mr. Molloy's opinion that you were |
| 13  to you meeting with him privately? | 13  not acting on behalf of the American Club? |
| 14    A.    It did not occur to me. | 14    A.    Sorry. I don't quite understand |
| 15        MR. CARROLL: I'm falling asleep | 15  that question. |
| 16  at the switch here. I'm objecting after the | 16    Q.    I'll rephrase that. |
| 17  fact. | 17        Prior to reviewing Mr. Molloy's |
| 18        MR. MARKS: Too late. | 18  opinion, did you tell Mr. Gleason that you were |
| 19        MR. CARROLL: It's a question that | 19  not acting as counsel for APL? |
| 20  assumes a fact not in evidence. | 20    A.    Not asking what? |
| 21  BY MR. MARKS: | 21    Q.    My question was: Did you tell |
| 22    Q.    You mentioned that Mr. Gleason | 22  Mr. Gleason that you were not acting as counsel |
| 23  showed you an opinion that had been prepared by | 23  for APL at the time he showed you this opinion |
| 24  a Mr. Molloy. | 24  of Mr. Molloy? |
| 25        Do you recall that? | 25    A.    No, I did not tell him I was not |

Page 145

1  acting as counsel for APL.
2      Q.      Why not?
3      A.      I presumed he knew it.
4      Q.      And what was the basis of your
5  presumption?
6      A.      Because we had not been retained
7  by APL.
8      Q.      But you personally had done work
9  for APL before.  Correct?
10      A.      In connection with this collision
11  case in which the American Club was involved.
12      Q.      Did you have a retainer letter for
13  APL related to that collision case?
14      A.      No.
15      Q.      And by retainer letter, I mean
16  something that limited the scope of your
17  representation of APL.
18      A.      There was no retainer letter at
19  all.  I actually went out and consulted with
20  APL in connection with the American Club
21  representative who went out to discuss this
22  collision case.
23      Q.      Who at APL did you meet with in
24  connection with that collision case?
25      A.      There was someone from APL whose

Page 146

1  name I forget.  I don't know whether Gleason
2  was there or not.  There was the lawyer for APL
3  who was handling the collision case whose name
4  escapes me now, but I could think of it later
5  if I review the MLA directory.
6      Q.      Prior to reviewing Mr. Molloy's
7  opinion, did you warn Mr. Gleason that by his
8  showing you the opinion, that he may be waiving
9  an attorney-client privilege that APL had with
10  respect to Mr. Molloy's opinion?
11      A.      No, I did not.
12      Q.      Why not?
13      A.      It did not occur to me.
14      Q.      Do you remember the employees of
15  APL who were members of the board of the
16  American Club?
17      A.      Mr. Gleason, John DiPalermo.
18      Q.      Any others?
19      A.      I can't recall any others.
20  Tavrow.  Dick Tavrow?  Was he with APL?  He
21  might have been.
22      Q.      Any others?
23      A.      No, I can't think of any.
24      Q.      Do you recall any specific
25  conversations that you had with Mr. DiPalermo

Page 147

1  regarding the American Club's reserves?
2      A.      No.
3      Q.      Do you recall any specific
4  conversations with Mr. DiPalermo regarding IBNR
5  claims?
6      A.      No.
7      Q.      Do you recall any specific
8  conversations with Mr. DiPalermo regarding
9  coverage for closed year claims?
10      A.      No.
11      Q.      Do you ever recall any
12  conversations with Mr. DiPalermo regarding the
13  possibility of reopening closed year claims?
14      A.      No.
15      Q.      With respect to Mr. Tavrow who you
16  mentioned, do you ever recall discussing with
17  him the level or amount of the American Club's
18  reserves?
19      A.      No.
20      Q.      Do you ever recall discussing with
21  Mr. Tavrow the reserve set aside for IBNR
22  claims?
23      A.      No.
24      Q.      Do you ever recall discussing with
25  Mr. Tavrow coverage for closed year claims?

Page 148

1      A.      No.
2      Q.      Do you ever recall discussing with
3  Mr. Tavrow the establishment of the contingency
4  fund?
5      A.      No.
6      Q.      With respect to Mr. Gleason, do
7  you ever recall having any conversations with
8  him about the amount or level of the Club's
9  reserves?
10      A.      No.
11      Q.      Do you ever recall any
12  conversations with Mr. Gleason about the amount
13  of monies being set aside for IBNR reserves --
14  I'm sorry, IBNR claims?
15      A.      No.
16      Q.      Do you ever recall any discussions
17  with Mr. Gleason regarding the establishment of
18  the contingency fund?
19      A.      No.  Except to the extent he was
20  present at Finance Committee meetings, and I
21  don't recall the substance of those
22  conversations.
23      Q.      So is it fair to say you do not
24  know what position Mr. Gleason took with
25  respect to the establishment of the contingency

Page 149

1  fund?
2      A.     I do not know right now.
3      Q.     Is it fair to say you do not know
4  what position Mr. Gleason took with respect to
5  the amount set aside for IBNR claims?
6      A.     Again, I do not know right now.
7      Q.     Now, yesterday you testified about
8  this one private conversation you had with
9  Mr. Gleason regarding the possibility of
10 reopening closed years.  Correct?
11     A.     Yes.
12     Q.     Other than that conversation, do
13 you recall any other conversations with
14 Mr. Gleason about that subject?
15     A.     There were conversations
16 occasionally, usually during the time when he
17 was in New York for meetings.  And I remember
18 on one occasion, at one of those conversations,
19 which were very brief, he expressed a
20 disinclination to reopen closed years.
21     Q.     Do you recall what meeting that
22 was?
23     A.     No, I don't recall.
24     Q.     Do you recall who was present at
25 that meeting?

Page 150

1      A.     No.
2      Q.     Do you recall --
3      A.     Except Mr. Gleason.  There may
4  have been another member of the board there or
5  something of that sort, but I don't remember
6  who it would have been.
7      Q.     Do you recall Mr. Gleason
8  explaining his disinclination as to reopening
9  closed years?
10     A.     You mean the reasons for it?
11     Q.     Yes.
12     A.     No.
13     Q.     During that meeting that you just
14 referred to, do you know whether Mr. Gleason
15 was referring to previously closed years or
16 prospective closed years?
17     A.     I understood him to be referring
18 to previously closed years.
19     Q.     Do you recall -- strike that.
20            Did Mr. Gleason explain to you the
21 reason for his disinclination to reopen closed
22 years?
23     A.     Not that I remember.
24     Q.     Did he ever explain to you his
25 disinclination for reopening closed years?

Page 151

1      A.     The only explanation I think was
2  contained in his letter to me, to which I
3  replied, which is already an exhibit, and
4  whatever the reasons were in the letter from
5  Joe Molloy.
6      Q.     Anything else?
7      A.     No.
8      Q.     Thank you.
9            Earlier, the term "stacking of
10 deductibles" was used.
11            Do you recall that?
12     A.     Yes.
13     Q.     And you said that was a shorthand
14 way to refer to a practice of allocating
15 deductibles.
16     A.     Yes.
17     Q.     For our purposes, or for the
18 purposes of my next question, I'm just going to
19 refer to it as stacking of deductibles.  Is
20 that understood?
21     A.     By that you mean the allocation as
22 I described?
23     Q.     Correct.
24            Did the American Club's practice
25 of stacking -- strike that.

Page 152

1            Was the American Club's practice
2  of stacking deductibles ever communicated to
3  the membership of the American Club as a whole?
4      A.     I don't know whether there was any
5  broadcast communication.  It was communicated,
6  of course, to the directors who were involved
7  in affirming the decision.  And it was also
8  communicated to any member of the Club who
9  presented for payment an asbestos-related
10 claim.
11     Q.     Do you know when the Club's
12 stacking of deductibles practice was ever
13 included in the Club's bylaws?
14     A.     It never was to my knowledge.
15     Q.     Was the American Club's practice
16 of stacking deductibles ever included in the
17 American Club's rule book?
18     A.     Not to my knowledge.
19     Q.     Do you know why this practice was
20 never placed either in the bylaws or in the
21 rule book?
22     A.     It was simply a claims handling
23 practice which were ordinarily not put into the
24 rule books or the bylaws.  It was incidental to
25 the claim.

Page 157

1  anything be done with respect to this inherent
2  technical conflict of interest?
3      A.    No.  It's obvious on its face.
4  There was nothing to be done about it.
5      Q.    During the time that you were
6  counsel for the board, did you ever suggest
7  that certain members of the board not be
8  permitted to vote on issues that were before
9  the board other than the payment of specific
10  claims?
11     A.    No.
12     Q.    Is there a reason why you did not
13  make any recommendations that certain people
14  not be permitted to vote on certain matters
15  that were before the board other than those
16  specific claims that we've discussed?
17     A.    No reason I could think of.
18     Q.    Is it fair to say that if you
19  thought that some of the directors had
20  something other than the inherent technical
21  conflict of interest to which you referred, you
22  would have recommended that they not be
23  permitted to vote on a particular issue?
24         MR. CARROLL:  Objection to form.
25  Hypothetical.

Page 158

1      A.    Yes, I think that's fair.
2      Q.    I just have a few more questions.
3         Do you know what members of the
4  Club were told to do when they were notified of
5  a new asbestos claim?
6      A.    Well, under the Club's policy, and
7  subsequently under its rules, they were
8  required to report it promptly.
9      Q.    Do you know whether the members
10  were told to report those claims directly to
11  the counsel who had handled previous claims for
12  that member?
13     A.    I don't know.  The policy
14  provisions required reporting promptly to the
15  Club or to the Club's manager.  Whether any
16  other directives were sent out, I don't know.
17     Q.    So you don't know whether members
18  were directed to simply refer the claims to
19  counsel who had handled previous claims?  For
20  example, Mr. Binzley, who would in turn then
21  notify the managers and the Club of the claim?
22         MR. CARROLL:  Object to form.
23  Mischaracterizes his testimony.
24     A.    I don't know.
25         MR. MARKS:  I don't have any

Page 159

1  further questions, but I believe Seth does.
2         MR. SCHAFLER:  No.
3         MR. MARKS:  I have no further
4  questions.  Anyone else?
5         MR. CARROLL:  I'm obliged to ask
6  one.
7                - - -
8         EXAMINATION
9                - - -
10  BY MR. CARROLL:
11     Q.    How did Mr. Gleason come to show
12  you Mr. Molloy's opinion letter?
13     A.    He asked me to meet him and he
14  gave it to me and asked me to read it.
15     Q.    One last one.
16         For the record, how old are you?
17     A.    Seventy-seven.
18         MR. CARROLL:  Thank you.  That's
19  it.
20         MR. MARKS:  I just have a
21  follow-up with respect to that.
22                - - -
23         EXAMINATION
24                - - -
25  BY MR. MARKS:

Page 160

1      Q.    □Was anyone present when
2  Mr. Gleason told you that he would like to
3  speak with you?
4      A.    I don't remember.  To the best of
5  my recollection, it was by telephone.  I just
6  don't remember anything beyond that.
7      Q.    Did you ask Mr. Gleason to explain
8  to you why he believed that closed years could
9  not be reopened?
10     A.    I didn't ask him.  Whatever
11  explanation he gave me was in the letter he
12  wrote to me directly or in the letter from
13  Molloy which he showed me and asked me to read.
14     Q.    Did he explain to you why he was
15  showing you Mr. Molloy's opinion?
16     A.    I don't know whether he explained
17  or not.  I inferred that he wanted to persuade
18  me that closed years should not be reopened.
19     Q.    Was it fair to say that he was
20  seeking advice from you on the issue with
21  respect to whether closed years should be
22  reopened?
23         MR. CARROLL:  Objection to form.
24     A.    No.
25     Q.    Why was it that Mr. Gleason was

| Page 161 | Page 163 |
|---|---|
| 1 trying to persuade you as opposed to any other | 1    MR. MARKS: Thank you. I have no |
| 2 member of the board? | 2 further questions. |
| 3    MR. CARROLL: Objection. | 3    MR. SCHAFLER: One last question. |
| 4    A.    I don't know. That would be in | 4 BY MR. SCHAFLER: |
| 5 Mr. Gleason's mind. | 5    Q.    When you were referring in your |
| 6    Q.    I believe you testified yesterday | 6 testimony in response to Mr. Marks to the |
| 7 that Mr. Gleason did not give you a copy of | 7 members being both insurers and insureds, were |
| 8 Mr. Molloy's opinion. Is that correct? | 8 you referring to the obligation of the members |
| 9    A.    That's correct. | 9 to pay assessments to the Association? |
| 10    Q.    Did he tell you why he was not | 10    A.    As part of paying assessments and |
| 11 giving you a copy of it? | 11 premiums and -- yeah, the fact that the members |
| 12    A.    I don't remember. | 12 mutually cover each other for the claims |
| 13    Q.    Is it fair to say that Mr. Gleason | 13 involved. |
| 14 realized during his meeting with you that you | 14    Q.    But the Association issues the |
| 15 were taking an adverse -- a position adverse to | 15 policy. Right? |
| 16 APL? | 16    A.    Yes. |
| 17    MR. CARROLL: Objection. | 17    Q.    So the members only cover each |
| 18    A.    I was taking a position adverse to | 18 other indirectly insofar as they're obligated |
| 19 APL? | 19 to pay assessments to the Association. Is that |
| 20    Q.    Yes. | 20 correct? |
| 21    A.    No, I don't think that's fair to | 21    A.    That's the machinery of doing it, |
| 22 say. | 22 but the effect ever it is that the members are |
| 23    Q.    Do you know whether Mr. Gleason | 23 both insurers and insureds. |
| 24 showed Mr. Molloy's opinion to any person other | 24    Q.    I understand that's your |
| 25 than yourself? | 25 terminology. But, in fact, Farrell Lines can't |

| Page 162 | Page 164 |
|---|---|
| 1    A.    No, I don't know. | 1 sue Keystone for coverage on an Association |
| 2    Q.    Do you recall discussing | 2 policy, can they? |
| 3 Mr. Molloy's opinion with anyone other than | 3    A.    No. It goes through the |
| 4 Mr. Gleason? | 4 Association, but the members, as I say, are |
| 5    A.    No. | 5 mutual members. |
| 6    Q.    Other than the people here today | 6    MR. SCHAFLER: Thank you. I have |
| 7 and yesterday. | 7 nothing further. |
| 8    A.    That's correct. | 8    MR. CARROLL: That's it. |
| 9    Q.    So is it fair to say that that | 9    (Deposition is concluded at 4:55 |
| 10 conversation between you and Mr. Gleason | 10 p.m.) |
| 11 remained private until yesterday and today? | 11 |
| 12    MR. CARROLL: Object to form. | 12 |
| 13    A.    Well, I did notify counsel, | 13 |
| 14 Mr. Carroll and Mr. Bowles, that we had that | 14 |
| 15 conversation. | 15 |
| 16    Q.    When did you notify Mr. Carroll | 16 |
| 17 and Mr. Bowles? | 17 |
| 18    A.    I think in the last week or so. | 18 |
| 19    Q.    Did you notify Mr. Carroll and | 19 |
| 20 Mr. Gleason -- I'm sorry, Mr. Carroll and | 20 |
| 21 Mr. Bowles of any other issue that was | 21 |
| 22 discussed by you and Mr. Gleason during that | 22 |
| 23 meeting other than what has already been | 23 |
| 24 testified to? | 24 |
| 25    A.    Not that I can remember. | 25 |

# EXHIBIT 14

# NOURSE & BOWLES, LLP

Nourse & Bowles, LLP
115 Mason Street
Greenwich, Connecticut

One Exchange Plaza
at 55 Broadway
New York, NY 10006-3030
Telephone: (212) 952-6200
Facsimile: (212) 952-0345
Direct Dial: (212) 952-6213
E-Mail: lbowles@nb-ny.com
Web site: www.nb-ny.com

Nourse & Bowles
75 Main Street, Suite 205
Millburn, New Jersey

February 24, 2005

Andrew Dash, Esq.                                        adash@brbilaw.com
Brown Rudnick Berlack Israels

**Re:    American Steamship Owners Mutual
Protection and Indemnity Association, Inc.
v. Alcoa, etc. – 04 CV 4309 (LAK) (FM)**

Dear Andrew:

I think the language you suggest regarding the substitution of Farrell Lines should work. Please let me see a draft stipulation which can be circulated to the defendants for their review.

As to Farrell Lines' responses to plaintiff's requests for production of documents, I have the following requests:

1. We need Farrell Lines' responses as soon as reasonably possible.

2. I reiterate our concerns that the former Club directors appointed by Farrell Lines, including Messrs. Gronda and Agresti have in their possession documents received from Dick Brown at Kirlins, or from ourselves, dealing with current cases, including the suit by Keystone against the American Club regarding deductibles and, more recently, documents in the captioned declaratory judgment action. The earliest of those documents is dated in 1999 or 2000.

All such letters were sent to and received by those directors in the course of their fiduciary duties as directors of the Club and all such letters and other document referring to them clearly are attorney/client privileged, and many of them are so marked.

I had some correspondence with Bob Agresti on this last summer, insisting that he keep all such correspondence protected as attorney/client privileged and I hope he has done so. Giving such letters to you in the circumstances, in my view, is a breach of his fiduciary duty to the Club. Messrs. Gronda and Agresti should be directed to destroy all

such letters, if they have not already done so, or return them to us. Please let us know what has been done with those letters.

If, perchance, you have received any such letters from Messrs. Gronda or Agresti or Farrell Lines, I ask that you immediately destroy them or return them to us as you would be precluded, in any event from, using them in any way in this litigation. Please report what has been done. I will shortly provide a list of those letters, but, in the meantime, I would ask you to segregate all such letters and any related correspondence/documents dealing with the Keystone litigation and the captioned declaratory judgment action.

As to other correspondence from Kirlins involving the litigation with Prudential Lines, U.S. Lines, Apex/Trinidad and Watermann, we have agreed with Seth Schafler that all such documents will be marked "confidential", and if placed on discs for production will be placed on separate discs marked "confidential". Our main concern with regard to those letters is keeping them out of the hands of the attorneys for U.S. Lines and Prudential as those legal actions are still proceeding. We have also agreed with Seth that all documents related to the International Group and the management agreement, etc. between Shipowners Claims Bureau and the American Club be treated as confidential also. We have also asked that all numbers in the management agreement, etc. be redacted. Please confirm that you will mark all such documents as "confidential" etc.. as agreed with Seth.

Please call if you have any questions regarding the attorney/client and confidential document issues.

Thank you for your cooperation.

All without prejudice, of course.

Very truly yours,

NOURSE & BOWLES, LLP


By:

Lawrence J. Bowles

LJE/jtc

# NOURSE & BOWLES, LLP

**One Exchange Plaza**
**at 55 Broadway**
**New York, NY 10006-3030**
Telephone: (212) 952-6200
Facsimile: (212) 952-0345
Direct Dial: (212) 952-6213
E-Mail: lbowles@nb-ny.com
Web site: www.nb-ny.com

Nourse & Bowles, LLP
115 Mason Street
Greenwich, Connecticut

Nourse & Bowles
75 Main Street, Suite 205
Millburn, New Jersey

February 25, 2005

Andrew Dash, Esq.                    adash@brbilaw.com
Brown Rudnick Berlack Israels

**Re:     American Steamship Owners Mutual**
**Protection and Indemnity Association, Inc.**
**v. Alcoa, etc. – 04 CV 4309 (LAK) (FM)**

Dear Andrew:

Further to my letter yesterday, attached is a list of documents I think Farrell Lines may have which are attorney-client privileged and which should either be destroyed or returned to us with a certification as to what has been done.

As you can see from the attached list, item 5, my two letters dated June 18, 2004, were both addressed to the "Members of the Board of Directors [except Robert Agresti]" which letters were inadvertently sent to him by Mr. Hughes' assistant, Jenn Bennett.

Also attached are copies of my letters to Bob Agresti dated June 21 and June 24, 2004 in case you have not received them, regarding the return of my June 18th letters. Please note my prompt, specific warning not to distribute the letters to anyone else. The June 18th letters have not yet been returned. We had several other exchanges also.

As shown on the face of each letter dated June 18th, they were not intended to go to Mr. Agresti and, they should have been returned by him immediately as I requested on June 21st and 24th as I am sure you will undoubtedly agree.

In any event, neither those letters nor any other attorney/client privileged letters can be used in any way in this litigation.

It is possible that Messrs. Gronda and Agresti could have letters or documents regarding either the suit by Keystone against the American Club or the captioned declaratory judgment action other than those on the attached list. If so, those should also be destroyed or returned to us with a report as to what has been done.

At the very least we are entitled to a list of **all** attorney-client privileged documents in Messrs. Gronda's/Agresti' hands so that we can further discuss/resolve their proper disposition, promptly.

Thank you for your cooperation.

All without prejudice of course to all of the American Club's rights in these circumstances.

Very truly yours,

NOURSE & BOWLES, LLP


By:
      Lawrence J. Bowles

LJB/mb
Enclosures

2

Partial List of Documents
As to which the American Club Claims
Attorney/Client Privilege and/or Work Product Privilege


1. Letter dated September 13, 2000 from Kirlin, Campbell & Keating ("KCK") to Gary Stevell at SCB entitled Keystone Shipping Co. – reassertion of asbestos claims.

2. Letter dated November 2, 2000 from KCK to Mr. Strevell entitled Keystone Shipping Co. – reassertion of asbestos claims.

3. Letter dated January 4, 2001 from KCK to Mr. Stevell entitled Keystone Shipping Co. – reassertion of asbestos claims.

4. Letter dated May 18, 2004 from Nourse & Bowles, LLP ("N&B") to the Members of the Board of Directors of the American Club entitled Keystone Shipping Co. v. American Club and changing the Club's discretionary practice of reimbursing Members with respect to unknown and unreserved claims arising in closed insurance years before February 20, 1989.

5. Two letters dated June 18, 2004 from N&B to SCB for distribution to the Members of the Board of Directors, except Robert Agresti, entitled Keystone v American Club.

6. Letters dated June 21 and 24, 2004 from N&B to Mr. Robert Agresti re American Club declaratory judgment action and related actions by Keystone.

7. Any and all other letters and documents regarding the suit by Keystone against the American Club and/or the American Club's declaratory judgment action, even if not specifically listed above.

If in doubt, please identify the document(s) to us so we can take appropriate action.


E&OE

# EXHIBIT 15

# Holland+Knight

Tel 212 513 3200
Fax 212 385 9010

Holland & Knight LLP
195 Broadway
New York, NY 10007-3189
www.hklaw.com

James V. Marks
212 513 3531
james.marks@hklaw.com

May 19, 2005

VIA EMAIL
Lawrence J. Bowles, Esq.
Shaun F. Carroll, Esq.
Nourse & Bowles, LLP
One Exchange Plaza
New York, NY 10006-3030

Re:    American Steamship v. Alco, et al. - 04 Civ. 4309 (LAK)(JAF)

Dear Messrs. Bowles and Carroll:

We refer to Mr. Carroll's oral request yesterday during Mr. Richard Brown's deposition that APL produce a unidentified legal opinion given to APL by "a Mr. Molloy." (Brown Tr., Vol. 2, p. 2). Please consider this letter as APL's formal objection to Mr. Carroll's request on the grounds that, *inter alia*, such request is vague, ambiguous, and overbroad and apparently seeks the production of a document protected by the attorney-client privilege.

At his deposition, Mr. Brown testified that during a "private meeting" (Brown Tr., Vol. 1, p. 67, Vol. 2, p. 141) on some unknown date "somewhere in New York" (Brown Tr., Vol. 1, pp. 66, 68), Mr. Ben Gleason of APL allegedly showed him a legal opinion written by "Joe Molloy." (Brown Tr., Vol. 1, pp. 67). Mr. Brown stated, however, that he could not remember most of the particulars of that document such as its date, number of pages, addressee(s), author(s), etc. (Brown Tr., Vol. 2, pp. 143-44). Moreover, he testified that he could not remember the substance of Mr. Molloy's opinion. (Brown Tr., Vol. 1, p. 69). Given Mr. Brown's lack of memory on the specifics of that document, Mr. Carroll's request for production of "Mr. Molloy's opinion" is patently vague, ambiguous, and overbroad.

More fundamentally, Mr. Carroll's request for production of "Mr. Molloy's opinion" is objectionable because it apparently seeks the production of a document protected by the attorney-client privilege. There is no dispute that Joseph K. Molloy was an attorney who provided legal advice to APL; Mr. Brown admitted as much during his deposition (Brown Tr., Vol. 1, p. 67). In this regard, APL's privilege log identifies one or more documents authored by Mr. Molloy as being withheld because of, *inter alia*, the attorney-client privilege.

Finally, we note that Mr. Brown's purported discussion with Mr. Gleason about Mr. Molloy's legal opinion, and Mr. Brown's alleged review of that opinion, appears to be a clear violation of Disciplinary Rule 7-104. See 22 N.Y.C.R.R. § 1200.35. This Rule provides, in part:

(a) During the course of the representation of a client <u>a lawyer shall not:</u>
<u>(1) Communicate</u> or cause to communicate <u>on the subject of the representation</u>

Page 2
May 19, 2005

> with a party the lawyer knows to be represented by a lawyer in that matter <u>unless</u>
> <u>the lawyer has prior consent of the lawyer representing such other party</u> or is
> authorized by law to do so.

<u>Id.</u> (emphasis added). In this instance, Mr. Brown knew that APL had retained Mr. Molloy to provide it with a legal opinion on a particular matter. Nevertheless, Mr. Brown communicated with Mr. Gleason about that matter even though he apparently had not sought Mr. Molloy's consent to do so. Mr. Brown's conduct is particularly troublesome given that he did not (i) advise Mr. Gleason to consult with APL's counsel prior to allegedly revealing Mr. Molloy's opinion or (ii) explain to Mr. Gleason the possible consequences of such a revelation. (Brown Tr., Vol. 2, pp. 142, 144, 146). Mr. Brown, having himself represented APL during this time period (Brown Tr., Vol. 2, pp. 139, 145), surely owed at least this minimal duty to APL. Even if he had no such duty, the very purpose of Rule 7-104 was severely undermined by Mr. Brown's communication with Mr. Gleason under these circumstances, which purpose is to

> provide protection of the represented person against overreaching by adverse
> counsel, <u>safeguard the client-lawyer relationship</u> from interference by adverse
> counsel, and <u>reduce the likelihood that clients will disclose privilege or other</u>
> <u>information that might harm their interests.</u>

ABA Comm. on Professional Ethics and Grievances, Formal Op. 396 (1995) (emphasis added). As noted by the ABA's Standing Committee on Ethics and Professional Responsibility, a represented person may not waive the prohibitions set forth in Rule 7-104. <u>See id.</u> It follows, therefore, that the American Club cannot obtain Mr. Molloy's opinion based upon the theory that APL had somehow waived the attorney-client privilege. To conclude otherwise would reward the American Club for its counsel's apparent violation of Rule 7-104.

In view of the foregoing, and absent a Court Order, APL does not intend to produce any of Mr. Molloy's opinions at this time. Please note that the foregoing is without prejudice to APL's rights to assert subsequently different or additional bases for its position.

Please contact us should you wish to discuss this matter further.

Very truly yours,

James V. Marks

cc: All Counsel (Via Email)

# 2858875_v1