Nourse & Bowles, LLP
Attorneys for Plaintiff
One Exchange Plaza
At 55 Broadway
New York, New York 10006
(212) 952-6200
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
                                                        :
AMERICAN STEAMSHIP OWNERS          :        04 Civ. 04309 (LAK)(JCF)
MUTUAL PROTECTION AND              :
INDEMNITY ASSOCIATION, INC.,       :
                                   :
                    Plaintiff,     :
                                   :
     - against -                   :
                                   :
ALCOA STEAMSHIP CO., INC., et al.  :
                                   :
                    Defendants.    :
--------------------------------------------------------X

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S MOTION FOR
PROTECTIVE ORDER, AND
ORDER COMPELLING PRODUCTION
OF DOCUMENTS**

**NOURSE & BOWLES, LLP
ATTORNEYS FOR
AMERICAN STEAMSHIP OWNERS MUTUAL PROTECTION
AND INDEMNITY ASSOCIATION, INC.
One Exchange Plaza
At 55 Broadway
New York, NY 10006-3030**

## TABLE OF CONTENTS

Facts ....................................................................................................................... 3

    Background ....................................................................................................... 3

    Overview of the Case and the Main Issues to be Resolved ............................................ 4

    Events Leading to Nourse & Bowles, LLP Opinion...................................................... 10

    Facts Concerning Production of Club Counsel's
    Opinion Letters and Need for a Protective Order ......................................................... 12

    Defendants' Assertions of Attorney/Client Privilege
    To Hide Relevant Facts .................................................................................................. 15

I     DEFENDANTS SHOULD BE PROHIBITED FROM USING
       OR DISSEMINATING CLUB COUNSEL'S OPINION LETTERS ...................... 17

    a)   The May 18, 2004 letter was given to Mr. Agresti in
        his capacity as a fiduciary to the Club with an
        expectation of confidentiality............................................................................ 17

    b)   The June 18, 2004 letter was inadvertently produced........................................ 18

II    DEFENDANTS ARE NOT ENTITLED TO ASSERT
      ATTORNEY CLIENT PRIVILEGE IN RESPECT OF
      RELEVANT DOCUMENTS AND INFORMATION
      OBTAINED WHILE SERVING AS FIDUCIARIES OF THE CLUB .................... 20

III  APL SHOULD BE ORDERED TO PRODUCE THE
      MOLLOY OPINION LETTER................................................................................. 23

IV  THE COURT SHOULD DEFER THE DEPOSITIONS OF
      DEFENDANTS' WITNESSES UNTIL DEFENDANTS
      PRODUCE THE DOCUMENTS REQUESTED BY PLAINTIFF .......................... 24

Conclusion................................................................................................................. 25

Nourse & Bowles, LLP
Attorneys for Plaintiff
One Exchange Plaza
At 55 Broadway
New York, New York 10006
(212) 952-6200
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------X
                                     :

AMERICAN STEAMSHIP OWNERS       :        04 Civ. 04309 (LAK)(JCF)
MUTUAL PROTECTION AND            :
INDEMNITY ASSOCIATION, INC.,     :
                                       :

                    Plaintiff,       :

                                         :

    - against -                         :

                                         :

ALCOA STEAMSHIP CO., INC., et al.    :

                                         :

                   Defendants.     :
----------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF
## NOTICE OF PLAINTIFF'S MOTION FOR
## PROTECTIVE ORDER AND ORDER
## COMPELLING PRODUCTION OF DOCUMENTS

Plaintiff, American Steamship Owners Mutual Protection and Indemnity Association, Inc. (the "American Club"), by its attorneys, Nourse & Bowles, LLP, submits this memorandum in support of its motions:

(A) for a protective order pursuant to Rule 26(c) of the Federal Rules of Civil Procedure directing that (1) Nourse & Bowles LLP's letters to its client dated May 18 and June 18, 2004 are attorney client privileged and thus no person in any of the

defendants' law firms may seek in any way to take any advantage of any of the information contained therein; and (2) directing that defendants' law firms, and any defendants who have any copies of these letters, remove those letters from the hands of all of the attorneys for defendants participating in this litigation, and return them and any copies to Nourse & Bowles, LLP; and

(B) for an order pursuant to Rule 37 Fed. R. Civ. P. compelling (1) defendants Keystone, Farrell and APL to produce all opinions and reports from all counsel including but not limited to counsel retained or approved by the Club concerning then pending and anticipated occupational disease claims and lawsuits including (without limitation asbestos claims and lawsuits), as well as the issue of reopening closed insurance years, all as identified on defendants' privilege logs; (2) defendants Keystone, Farrell and APL to produce certain of their former counsel for depositions; (3) defendants Keystone, Farrell and APL to produce any and all internal corporate reports and analyses concerning actual and anticipated liability for occupational disease claims including without limitation asbestosis claims, as identified on defendants' privilege logs; (4) defendant APL to produce the opinion of Joseph K. Molloy, Esq. dated in or about May 1995 given to APL's Mr. C.B. Gleason, who was then a member of the American Club's Board of Directors and shown by Mr. Gleason to the American Club's counsel Richard Brown, Esq. in or about May 1995; and

(C) deferring the depositions of defendants' witnesses pending defendant's compliance with this Court's orders on items (B) 1 – 4 above.

## **Facts**

### Background

The American Club filed this declaratory judgment action in June 2004 seeking a ruling that it was entitled to discontinue a prior discretionary practice of indemnifying defendants for unreported and unreserved or intentionally underreserved occupational disease claims arising in closed insurance years before February 20, 1989, a practice adopted in years past when certain former Club members/defendants, including defendants Keystone Shipping Company ("Keystone", Farrell Lines ("Farrell") and American President Lines ("APL"), controlled the management of the American Club through their representatives on the Club's Board of Directors.

This declaratory judgment action was filed in response to a suit against the Club filed in 2002 by Keystone (02 Civ. 1477 (LAK)) pertaining to a modification of part of the Club's discretionary practice regarding the application of deductibles to claims, and in anticipation of suits by other nominal defendants on the same issue as well as suits by defendants for alleged breach of contract and related claims arising out of the Club's June 2004 termination of the above discretionary payments to former members. Many of the defendants have filed counterclaims in this action alleging breach of contract claims against the Club. Though it is the named plaintiff, the reality is that the American Club is the defendant and the named or nominal defendants are in reality the plaintiffs. Copies of the Club's Amended Complaint herein and the Answers and Counterclaims of Defendants Keystone, APL and Farrell are annexed to the Carroll Affidavit as Exhibits "1", "2", "3" and "4".

3

The documents at issue in part "(A)" of this motion pertain to the improper disclosure of the American Club's counsel's opinions in this action, while those in part (B) all pertain to the knowledge and intent of the defendants' representatives on the American Club's Board of Directors at the time those Board members adopted or tacitly allowed the discretionary practice of paying indemnities for unreported unreserved for occupational disease claims to be followed. Copies of plaintiffs' first, second and third request for production of documents are annexed to the Carroll Affidavit as Exhibits "5", "6" and "7"). As shown by the privilege logs of Keystone, Farrell and APL (see Carroll Affidavit Exhibits. "8", "9" and "10"), all of the documents in dispute have been withheld on grounds of attorney client privilege and/or work product, and all relate on their face to asbestosis claims or litigation or related matters at issue in this case.

Overview of the Case and the Main Issues to be Resolved

As outlined in the Amended Complaint herein, the American Club is a non-profit mutual indemnity insurance association of shipowners and is based in New York City. The defendants, 89 of whom are actively participating in this action, were shipowner members of the American Club in the insurance years between about 1940 and 1988.

The insurance policies in issue here are very different from typical liability policies in that the American Club is a true mutual indemnity insurance association. Accordingly, its members in each separate insurance year are issued fully assessable indemnity insurance policies under which they agree to pay not only premiums, but assessments, in unlimited amounts, to cover the costs of all indemnities that may have to

4

be paid to each of that year's members in respect of all reported claims against each member in that insurance year plus the Club's operating costs. The Second Circuit Court of Appeals has recognized that the Club's members are both "insurers and insureds". <u>In Re Prudential Lines</u>, 158 F.3d 65, 77 (2d Cir. 1998).

In each insurance year, the members elect a Board of Directors, whose fiduciary duty it is to operate the Club for the exclusive benefit of its members. One of the directors' primary duties is to ensure that the Club collects sufficient funds from the members of each year to cover indemnities to Club members for all reported claims and expenses of that year. The directors make all relevant decisions. The directors hire a manager which is, according to the Club's By-Laws, subject always to the Directors' direction and control. The manager provides accounting, underwriting and related services to the Club.

The Club membership is different each year as old members may leave and new members may join. Members' percentage shares of premiums and assessments also change each year for several reasons, including changes in the number of vessels entered, etc. Under the principles of mutuality under New York law, the members in any one year cannot be assessed to cover the liabilities of members in any other year(s). Each year must stand on its own and the Club, in effect, is a different entity each year.

Insurance years were historically left "open" for about ten years to ensure that all claims were reported and reserved for to provide funds for prospective indemnities to that year's members for claims against them. When a year came to be "closed", if the funds

5

in hand were deemed insufficient by the directors, the members were levied with a "final" assessment to meet the projected shortfall. If the directors deemed there were surplus funds, the members received a "final" dividend or refund thereof. Prior to 1988, with the closing of the 1977 year, no reserves were ever intentionally established for the possibility of unreported claims.

Attached to the Carroll Affidavit as Exhibit "11" is a copy of a letter dated February 14, 1979 from the Club's then general counsel, Kirlin, Campbell & Keating, to the Club's Manager, dealing with, among other things, the legal consequences of closing an insurance year and the rights and obligations of the Association or Club and its members after the resulting "final settlement of accounts" for that year. New York law concerning the legal effect of closing an insurance year of a mutual insurance association is outlined on pages 9-12 of Exhibit "11". The key points are that after an insurance year is "closed", the former members no longer have any claim to the funds of the Club and the Club no longer has a right to make assessments or calls upon the former members, unless the final settlement of accounts at the year's closing is set aside for fraud or mutual mistake (or for other good cause such as lack of good faith and/or arbitrariness), and the year in question is reopened. Copies of Exhibit "11" were circulated to the Club's Board of Directors, including those representing the defendants on a number of occasions, and all are charged with knowledge of the principles expressed therein.

6

The disputes in this action arise out of an avalanche of asbestosis claims against shipowners, manufacturers and others, which commenced in about 1980 and continues to date, along with other forms of occupational disease claims.

Such claims were wholly unknown and unexpected before about 1980. Thus, all of the pre 1970 insurance years, which were closed before 1980, were closed without the Club's members ever being assessed to provide so much as a dollar in reserves for any of these future claims. At the closing of each of these years, in the mistaken belief that their members' potential liabilities were fully known, the Club's directors ordered refunds to the members of those years of many millions of dollars in the belief that these funds were "surplus" and the Club would not be asked to provide indemnities for any claims except those previously reported and reserved for. Many of the members in the pre 1970 years continued as members into the 1980s and beyond.

However, when the asbestos claims were first asserted starting in the early 1980s, the Club's members demanded indemnities for claims they had to pay. In the mistaken belief that the asbestos claims were a "trickle", and on the incorrect assumption that the Club had a legal obligation to pay indemnities to the members in closed years for these unreported, unreserved for asbestos claims, the directors then controlling the Club, i.e., the defendants' representatives, commenced or permitted the commencement of, a practice of paying indemnities to the Club's then present and former members for unreported, unreserved for asbestos claims arising from the long closed years. As those former members had never paid any premiums or assessments for such claims, and thus

7

no specific reserves had ever been established for such claims, the closed insurance years should have been reopened and the members thereof assessed to pay their liabilities under their fully assessable policies for those years. But this was <u>not</u> done. Instead, the payments were drawn from the Club's reserve account, which is, as a matter of law, the property of the Association or Club, not its members. This approach was of immediate and significant financial benefit to the members/defendants which employed those directors (such as Keystone, Farrell and APL), because those defendants received indemnity insurance for which they <u>never</u> paid. The former directors acquiesced and indulged in the practice because their companies, as Club members, and they, individually as equity owners and as officers of the defendant companies, benefited financially from the many millions of dollars in indemnities that their companies obtained from the Club.

This practice of providing indemnities for unreported unreserved for claims without any contribution by defendants, which has come to be called the "discretionary practice", is not only <u>not</u> provided for in the Club's By-Laws, insurance policies or New York law, it is plainly contrary to the core concepts of mutuality upon which the American Club and other true mutual indemnity insurance associations operate. Those core concepts include the agreements/responsibility of the members each year to contribute to paying <u>all</u> claims against <u>all</u> members arising in <u>each</u> such year through the premiums and assessments levied by the Club. There is no other proper source of money to fund indemnity claims arising in each separate insurance year.

8

In 1988, in connection with the closing of the 1977 insurance year and shortly after a judgment of over $10 million was entered against Farrell in an asbestos case brought by a former employee, the Club's manager advised it would be "prudent" to require the members to contribute to a reserve for asbestos or similar claims that, in the future would likely be made against the Club's members regarding the 1977 insurance year and later years after they were closed. He proposed several alternatives for this reserve for 1977 and later years, varying between $250,000 and $1.5 million.

The then directors, despite their knowledge of the burgeoning asbestos claims arising from the 1940s to 1970s, and despite advice from one of their own attorneys that even $250,000 "could be low", and despite the absence of any study of the matter, and despite the fact that they had no factual or reasonable basis for their decision, chose to reserve of only $100,000 per year, an amount they then knew was no more than an arbitrary and "nominal" reserve. By reserving only $100,000 per year, instead of a more prudent, larger amount, those directors enabled themselves to vote their companies a refund of alleged surplus of over $1.4 million from the 1977 insurance year. Thereafter, only $100,000 per year was reserved because that is all the then directors would consent to. Again, by reserving only $100,000 per year, as each later year was closed, the former directors continued to provide significant benefits to their companies in the form of large refunds or smaller assessments, while failing to build the Club's reserves to cover foreseeable future occupational disease claims.

9

In April 1995, after a $6 million asbestos judgment was entered against the Club in In Re Prudential Lines and the prospect of further large verdicts loomed, Club counsel raised the prospect of reopening closed insurance years for further assessments. The directors were then given the opportunity to confer with their own counsel as to Club counsel's advice that insurance years could be reopened. See Carroll Affidavit, Exhibit "12", (letter to the Board of Directors dated May 4, 1995.) It appears that APL's Mr. Ben Gleason consulted an attorney named James Molloy on the issue of reopening closed years and obtained a written opinion.

Thereafter, and again in or about May 1995, Mr. Gleason invited Club counsel Richard H. Brown, Jr. to a meeting at a hotel in New York. Upon Mr. Brown's arrival, Mr. Gleason voluntarily produced Mr. Molloy's opinion to Mr. Brown and asked that he read it, which Mr. Brown did. Mr. Brown returned the letter to Mr. Gleason after Mr. Gleason refused to give him a copy. (See Mr. Brown's deposition testimony, Carroll Exhibit "13".)

Thereafter, instead of attempting to resolve the issue on the basis of opinions of counsel, APL's Mr. Gleason sought to persuade the Club's Board of Directors to agree not to reopen closed years.

Events Leading to Nourse & Bowles, LLP Opinion

Once the discretionary practice was established, and consistent with it, numerous indemnity claims were paid over the years to members of the long closed insurance years, i.e., the defendants. By the Spring of 2004 the total had reached almost $9 million, and it

10

was then estimated that the future amount could exceed $6 million more if the discretionary practice were allowed to continue.

Meanwhile, over the years, the Club's membership changed considerably as new members joined and old members left. The Club changed from about 35 mostly U.S. members in the mid 1980s to over 400 mostly non U.S. members in 2004. The personnel employed by the manager also changed. All of the directors in 2004 were different from those in the 1980s.

The new members and new directors were never told how, when or why the discretionary practice came to be, and they never knowingly consented to its continuation at their expense, nor would they have had they known the true facts. Nor were the new members or new directors ever told any of the facts as to how the reserve of only $100,000 per year came to be set or the extent of the financial benefits the Defendants bestowed on themselves.

The defendants herein, having refunded to themselves as supposed "surplus" over $31 million for the insurance years between 1944 and 1988, part or all of which should have been retained as reserves against foreseeable occupational disease claims, in effect, sought and continue to seek to change their fully assessable indemnity policies under which they agreed to be assessed to cover all of their own insurance costs each year into unlimited liability policies, the insurance costs of which the defendants seek to shift to the Club's new and future members without their consent. All of the foregoing is in direct contravention of the fundamental rule of mutuality that the members of one

11

insurance year have no obligation to pay and cannot without their consent be assessed to pay the claims against members of another year.

In 2002, defendant Keystone filed a suit against the American Club, 02 Civ. 1477 (LAK) (S.D.N.Y.), in which Keystone challenged the Club's policy of applying multiple deductibles to claims arising under policies over multiple claim years. Keystone sought a ruling that the Club should be required only to apply a single deductible in such claims, the effect of which would be to provide greater insurance coverage to Keystone at the expense of the Club and its reinsurers. In response to Keysone's suit, the Club's current directors re-examined the entire matter and, upon finally learning the true facts, determined that, in fact, the American Club had no legal obligation to indemnify members of closed insurance years for their unreported, unreserved or deliberately underreserved-for claims. In this connection, the Club's current counsel, Nourse & Bowles, LLP, provided an opinion letter dated May 18, 2004 regarding the Club's lack of liability. The Club thereafter terminated the discretionary practice and filed the instant declaratory judgment action seeking a declaration of its right to terminate the practice and/or, alternatively, to reopen each of the insurance years in question, as authorized by New York law, on the ground of mutual mistake or other good and sufficient cause.

Facts Concerning Production of Club Counsel's
Opinion Letters and Need for a Protective Order

By letter dated May 10, 2005, the American Club asked the Court to address a flagrant violation of the Club's attorney client privileges arising from the production and dissemination by one of the defendants, Farrell Lines, to counsel for a number of

12

defendants[*] herein of a computer disc containing of two of Club counsel's opinion letters to the Club's directors concerning this litigation, one dated May 18, 2004, and the other dated June 18, 2004. Copies of these opinion letters are submitted herewith under seal for *in camera* inspection by the Court, to avoid any further disclosure beyond that already admitted to by several defendants.

Farrell Lines obtained these two letters through one of its officers, Mr. Robert Agresti. The American Club could not avoid providing Mr. Agresti with the May 18th letter as he was then a member of the Club's Board of Directors. It was provided to him in May 2004 in connection with a special meeting of the Club's Board of Directors called to vote upon the termination of the discretionary practice mentioned above. Mr. Agresti received that letter solely in his capacity as a director and fiduciary of the Club, not as an officer of Farrell Lines.

Thereafter, Nourse & Bowles, LLP issued a second opinion, dealing with this litigation dated June 18, 2004. The June 18 letter was inadvertently sent to Mr. Agresti after the rest of the American Club's Board of Directors voted to terminate the above practice. As shown on its face he was not an intended recipient of our June 18 letter. Mr. Agresti was immediately and specifically notified by Nourse & Bowles, LLP in writing in June 2004 that his possession and retention of the June 18 letter was wrongful as to the

---

[*] At the time of that letter, counsel for the American Club understood that all defendants had received the discs. Several of the defense attorneys have since advised that they did not request or receive copies of the disc. The American Club's counsel do not have a list of the attorneys who received the disc from Farrell Lines' counsel.

American Club and he was asked to return or destroy his copies of that letter. Copies of the letters to and from Mr. Agresti are also submitted herewith under seal.

In February 2005 Nourse & Bowles, LLP placed Farrell Lines' counsel on notice that their possession and retention of these two letters and other attorney client privileged material was wrongful as to the American Club and Nourse & Bowles, LLP demanded their return or destruction. Copies of our letters dated February 24 and 25, 2005 to Farrell Lines' counsel, Brown Rudnick, are also attached to the Carroll Affidavit as Exhibit "14".

Notwithstanding the foregoing, in clear violation of Nourse & Bowles, LLP's written demands, Farrell Lines' counsel copied and produced the opinion letters on computer disk to a number of their co-defendants in this action and thereafter claimed that their production was "inadvertent." There is nothing "inadvertent" about that production after our multiple written warnings and demands for the return or destruction of the specifically identified documents in question. Their conduct is inexcusable, by any measure, as is Mr. Agresti's in giving Nourse & Bowles, LLP's two letters to Farrell Lines' counsel.

As soon as Nourse & Bowles, LLP learned of the production of these two letters to all defendants, they immediately informed defendants of the privileged nature of the documents, which should have been obvious from the fact that both letters were clearly marked at the top of the first page thereof:

14

"CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS"

Nourse & Bowles, LLP also warned all defendants' counsel that any review of the documents beyond the above statement would constitute serious violations of their ethical obligations and we demanded a stipulation from the defendants' counsel agreeing to destroy the documents in question and not to use any of the material contained therein in this litigation. While several of the defendants' counsel say they will not use these letters, they also claim the right to challenge the American Club's assertion of privilege as to the letters in question. These issues must be resolved to protect the American Club's rights.

Defendants' Assertions of Attorney/Client Privilege To Hide Relevant Facts

It appears from their privilege logs, that between 1980 and 1997, Keystone, Farrell and APL all generated some amount of internal documentation concerning their exposure to occupational disease claims, largely in the form of records, facts, statistics and estimates of liability. Much if not all of the information concerning asbestos litigation and defendants' exposure therefrom depended on information provided by counsel. All of this information would have been available to their officers and employees who sat on the Board of the Club, but these Directors did not share all of the information they had with the Club, or use it to protect the Club. This is the information the Club seeks in its Requests to Produce and in Part B of this motion, and it is this information which some of the defendants now seek to hide behind the attorney/client privilege. The burden of this evidence is to show that some of the Club directors the defendants employed did not have

15

the Club's best interests in mind when they (a) failed to set proper reserves for such claims and (b) attempted in 1996 to bind the Club to a position whereby closed insurance years could not be reopened for further assessments.

The American Club demanded that Keystone, Farrell and APL produce all the documents shown in defendants' privilege log and further demanded the depositions of a number of the attorneys representing the defendants seeking information regarding the matters in the documents those defendants seek to hide. The Club further specifically demanded production of the Molloy opinion at the Brown Deposition.

The defendants have refused to waive the attorney/client privilege as to both the documents as their privilege logs show and have not agreed to permit their attorneys to testify on what the American Club views as key issues, central to its case including what the then Club directors representing defendants knew and when they knew it while seeking to influence the actions of the American Club's board of directors in their favor.

APL's counsel has specifically refused to produce the Molloy opinion without Court order. A copy of their letter refusing production is attached to the Carroll Affidavit as Exhibit "15".

**I**

## DEFENDANTS SHOULD BE
## PROHIBITED FROM USING
## OR DISSEMINATING CLUB
## COUNSEL'S OPINION LETTERS

a)    The May 18, 2004 letter was given to Mr. Agresti in his capacity
as a fiduciary to the Club with an expectation of confidentiality.

There is no dispute that Mr. Lawrence Bowles was acting in his capacity as

counsel for the Club when he provided the directors with this May 18, 2004 opinion letter

concerning the Club's lack of liability for unreported, unreserved for occupational disease

claims in closed years.   Nor is there any dispute that Mr. Robert Agresti obtained and

reviewed that letter in his capacity as a director of the Club.   Though he was also at that

time an officer of Farrell Lines, disclosure of the letter to Agresti should not be deemed

the equivalent of disclosure to an unrelated third party sufficient to waive the privilege

which clearly attached to it.   The situation is more analogous to cases where disclosure of

privileged material to a third party is not deemed a waiver when such disclosure is

"necessary or at least highly useful, for the effective consultation between the client and

the lawyer which the privilege is designed to permit."   Status Time Corp. v. Sharp Elecs.

Corp., 95 F.R.D. 27, 34 (S.D.N.Y. 1982), or where the third party is the "functional

employee" of the client, integrally involved in the litigation.   Ross v. UKI Ltd., No. 02

Civ. 9277, 2004 WL 67221 (S.D.N.Y. Jan 15, 2004).   In such cases, there is no waiver by

disclosure.

Agresti, as director of the American Club, was a fiduciary and, as such, was

obligated to preserve confidential communications including the advice of counsel on a

17

matter vital to Club affairs presented to him as a number of the Board for decision. Diamond v. Oreamuno, 287 N.Y.S.2d 300, 304 (1968), aff'd, 301 N.Y.S.2d 78 (1969) ("An agent who acquires confidential information in the course of his employment … has a duty not to use it to the disadvantage of the principal".)  The May 18, 2004 letter was and remains privileged.  Mr. Agresti's provision of that letter to his counsel, and counsel's release of the letter to all counsel was wrongful.

b)    The June 18, 2004 letter was inadvertently produced.

Inadvertent disclosure of a document will not ordinarily be deemed a waiver of privilege absent evidence a party was guilty of carelessness amounting to indifference in the treatment of privileged material. Standard Chartered Bank PLC v. Ayala Int'l. Holdings (U.S.), Inc., 111 F.R.D. 76, 22 Fed. R. Evid. Serv. (LCP) 1526 (S.D.N.Y. 1986); Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co., 104 F.R.D. 103, 17 Fed. R. Evid. Serv. (CBC) 1440 (S.D.N.Y. 1985), aff'd, 799 F.2d 867 (2d Cir. 1986) (inadvertent production of otherwise privileged communication results in no waiver).

The courts in the Southern District consider several factors in determining whether production amounts to waiver of privilege (1) the reasonableness of precautions undertaken to prevent inadvertent disclosure, (2) the time taken to rectify the error, (3) the scope of discovery, (4) the extent of disclosure and (5) the over arching issue of fairness. Prescient Partners, L.P. v. Fieldcrest Cannon, Inc., No. 96 Civ. 7590, 1997 WL 736726 (S.D.N.Y. Nov. 26, 1997), King v. Dept. of Correction, No. 95 Civ. 3057, 1998

WL 67669 (S.D.N.Y. Feb. 18, 1998); S.E.C. v. Cassano, 189 F.R.D. 83, 85 (S.D.N.Y. 1999), No. 99 Civ. 3822, 2000 WL 777930 (S.D.N.Y. Jun 19, 2000);

Here, it is clear that Club counsel explicitly instructed the individual responsible for the dissemination of the June 18th letter that the letter was not to be sent to Mr. Agresti, as the letter shows on its face. The transmittal to Mr. Agresti on Friday, June 18, 2004, was clearly inadvertent, and counsel for the Club immediately (the following Monday, June 21, 2004) wrote to Mr. Agresti to demand the return or destruction of the letter. Counsel wrote several other letters to Mr. Agresti, as well. Further, counsel subsequently put Farrell's counsel on notice by letter dated February 24 and 28, 2005, that both the May 18 and June 18 letters were privileged and confidential and were not to be produced in discovery. Notwithstanding the foregoing, defendant Farrell provided the letters in discovery, and have since refused to acknowledge that the letters are confidential and privileged.

It is clear that reasonable precautions were taken to prevent disclosure and to remedy the inadvertent disclosure once it was discovered. On these facts, there was no waiver of the privilege. The Court should rule that Nourse & Bowles, LLP's letters of May 18, 2004 and June 18, 2004 are privileged and order that defendants may not use or seek to benefit from those letters in any way, and must return or destroy all originals or copies of those letters in their possession. The Court should also direct Farrell Lines' counsel to inform Nourse & Bowles, LLP to whom the discs containing the privileged letters were sent.

## II

## DEFENDANTS ARE NOT ENTITLED TO ASSERT ATTORNEY CLIENT PRIVILEGE IN RESPECT OF RELEVANT DOCUMENTS AND INFORMATION OBTAINED WHILE SERVING AS FIDUCIARIES OF THE CLUB

At all relevant times, certain officers and employees of the Defendants Keystone, Farrell and APL were members of the Club's Board of Directors, and in that capacity acted as fiduciaries of the Club. See Bailey v. Bush Terminal Co., 46 N.Y.S.2d 877 (N.Y. Sup. Ct. 1943), aff'd, 267 A.D. 899, 48 N.Y.S.2d 324 (App. Div.) aff'd, 293 N.Y. 735 (1944). A central issue in this case concerns the good faith of decisions these individual directors made on Defendants' behalf in respect of paying indemnities from the Club's reserves to defendants for unreported unreserved occupational disease claims, and to that end any information concerning these matters available to Defendants at the relevant times is important to the Club's case, and available only from the Defendants themselves.

Where a party has acted as a fiduciary of an opponent, the attorney client privilege may not be invoked to conceal documents and information obtained during the course of that relationship, where such documents and information are important to the opponent's case. Garner v. Wolfinbarger, 430 F.2d 1093 (5th Cir. 1970). Though developed in the context of shareholder litigation, the so called "Garner Doctrine" has been extended to other factual situations where a fiduciary's judgment is at issue. See Henry v. Champlain Enters., 212 F.R.D. 73, 84-85 (N.D.N.Y. 2003); (The exception encompasses fiduciary

20

relationships such as unions and members, lawyers and other lawyers, banks and clients, and general partners in both general and limited partnerships.) Quintel Corp., N.V. v. Citibank, N.A., 567 F. Supp. 1357 (S.D.N.Y. 1983); Burghart v. Landau, No. 82 Civ. 2181, 1985 WL 209 (S.D.N.Y. Jan. 23, 1985); Lugosch v. Congel, 219 F.R.D. 220 (N.D.N.Y. 2003); Bairnco Corp. Secs. Litig. v. Keene Corp., 148 F.R.D. 91 (S.D.N.Y. 1993).

These authorities are directly applicable to the present case, when the Club, on behalf of its present members, is challenging the propriety of the judgment of former member directors regarding decisions which had a direct financial benefit to the former members of the Club and which, unless changed will have detrimental efforts on present and future Club members. In these circumstances, the Defendants have no right to assert an attorney client privilege in respect of documents bearing directly on the knowledge and intent of the Club's former directors whom they employed.

In Bairnco, supra, the plaintiff demanded production of defendants' corporate documents relating generally to statistics summarizing asbestos claims processing and litigation, as well as communications from counsel concerning asbestos litigation and the corporation's economic exposure therefrom, material virtually identical to the documents demanded by the American Club herein. Relying on Garner, the Bairnco court rejected defendants' claims of attorney client privilege and went on to rule that documents were not protected by the work product privilege stating:

21

> After having reviewed the documents *in camera*, we remain unconvinced by Keene's rather conclusory assertion that the documents should enjoy work-product immunity. The documents in question appear to have been generated for purposes other than to assist in preparation for litigation; they are more in the nature of records of facts and statistics, or updates of claims status, costs and exposure, than the traditional work-product of attorneys (see discussion above concerning nature of documents). In any event, even if the documents were to fall under the rubric of privileged attorney work-product, plaintiffs manifest a compelling need to obtain discovery. As previously discussed, communications evidencing Keene's knowledge concerning the prospects of litigation and Keene's economic exposure therefrom, go to the crux of the case plaintiffs hope to present. As already noted, Keene's views as to its litigation prospects were informed by, and perhaps even wholly dependent upon, the information provided by counsel. . . . Hence, the attorney work-product privilege will not immunize the documents from discovery.

148 F.R.D. at 103.

The documents the Club seeks from the Defendants in this matter are substantially the same as those at issue in Bairnco. The former Club Directors are chargeable with knowledge of their companies' activities. See Pebble Cove Homeowners Association v. Shoratlantic Development Co., 595 N.Y.S.2d 92, 93 (1993). And it is only through the internal corporate records of the defendants that the Club can prove the extent of their knowledge. For the same reasons set forth Bairnco this Court should reject defendants' claims of attorney client privilege and work product, and order all documents identified on defendants' privilege logs produced.

## III

## APL SHOULD BE ORDERED TO
## PRODUCE THE MOLLOY OPINION LETTER

In the event the Court determines that the <u>Garner</u> doctrine does not apply and that the materials in question are protected by attorney client privilege, the Molloy opinion should still be produced. Any voluntary disclosure of a lawyer/client communication to a third party for purposes inconsistent with maintaining confidentiality waives the attorney/client privilege. <u>In re Grand Jury Proceedings</u>, 78 F.3d 251, 254 (6th Cir. 1996) (client waives privilege by "voluntarily disclosing her attorney's advice to third party.")

Here, the evidence is that all Board Members were invited to review the issue of reopening insurance years with "their own counsel" so that they would have "the opportunity to be heard". See, Carroll Affidavit Exhibit "11" Mr. Gleason thereafter obtained the Molloy opinion apparently for the purpose of showing it to Mr. Brown, and he voluntarily did precisely that after inviting Mr. Brown to a face to face meeting. There was never any expectation of confidentiality as to the opinion, and every expectation that the opinion would be shared with others, as was done. On these facts, if there was any privilege attached to the Molloy letter, it was waived.

To determine whether the attorney client privilege is waived one must assess whether the client intended to retain the confidentiality of the privileged information and whether the client took reasonable steps to prevent disclosure of that information. <u>See</u> <u>Kraus v. Brandstetter</u>, 586 N.Y.S.2d 270, 271-272 (1992). Here, Gleason did not intend to keep his attorney's opinion confidential, not did he take reasonable steps to prevent

23

disclosure given that he shared them with Dick Brown in a setting in which there was no expectation of privacy or confidentiality. The communication of privileged information to a third party waives privilege and "normally compels the production of other documents protected by the privilege which relate to the same subject." See In re Stenovich v. Wachtell Lipton, 756 N.Y.S.2d 367 (2003) (granting the production of documents that were shared with third parties). Additionally, "[i]t is clear that the privilege may be waived by the client disclosing a portion of the advice from counsel, and by placing such advice in issue. . . Selective disclosure of the legal advice will lead to a waiver of the privilege." See In the Matter of the Judicial Settlement, 2004 WL 235187 (N.Y.Sur. Jan. 15, 2004) Unpublished. In essence, voluntary and intentional disclosure demonstrates that Gleason did not intent to retain the confidentiality or take reasonable steps to prevent disclosure. See Charter Once Bank v. Midtown Rochester, LLC, 738 N.Y.S.2d 179, 185 (2002).

The Court should order APL to produce the Gleason opinion letter.

### IV

### THE COURT SHOULD DEFER THE DEPOSITIONS OF DEFENDANTS' WITNESSES UNTIL DEFENDANTS PRODUCE THE DOCUMENTS REQUESTED BY PLAINTIFF

Without the opportunity to review relevant documents improperly withheld by defendants on the basis of privilege prior to completing the depositions of defendants' witnesses, plaintiffs will be unduly prejudiced in their ability to conduct the discovery they need to prepare their case. Moreover, APL has refused to produce for deposition in

New York to of its former directors, Ben Gleason and John DiPalermo, instead requiring counsel to travel to San Francisco for the depositions. Plaintiff should not have to incur the cost of travelling to California twice because defense counsel has failed to produce documents in which plaintiff is clearly entitled. Accordingly, plaintiff respectfully requests that the Court defer the depositions of defendants' witnesses pending defendants' production of documents requested herein.

### Conclusion

The American Club's motion should be granted in all respects, and the Club should be awarded all reasonable fees incurred in connection with this motion.

Dated:    New York, New York
          May 27, 2005

                              Respectfully submitted,

                              NOURSE & BOWLES, LLP
                              Attorneys for Plaintiff

                              By: _____
                                  Shaun F. Carroll (SC 9898)
                                  One Exchange Plaza
                                  At 55 Broadway
                                  New York, New York 10006
                                  (212) 952-6200

Of Counsel
    Lawrence J. Bowles

Sullivan & Worchester LLP
Mitchell C. Stein, Esq.
Beth L. Jacobson, Esq.

25