UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

AMERICAN STEAMSHIP OWNERS MUTUAL
PROTECTION AND INDEMNITY ASSOCIATION, INC.,

    Plaintiff,

-against-

ALCOA STEAMSHIP CO., INC., et al.,

    Defendants.

04 Civ. 04309 (LAK)
(JCF)

(ECF CASE)

---

# DECLARATION OF LISA A. BAUER IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PROTECTIVE ORDER AND ORDER COMPELLING PRODUCTION OF DOCUMENTS

I, Lisa A. Bauer am associated with the law firm of Proskauer Rose LLP, counsel for Defendants Keystone, BP, MTL, Kirby Inland Marine (as successor to Hollywood Marine Inc.), American Steamship, American Steamship Company, The Cleveland-Cliffs Steamship Company, Ispat, Amerada Hess Corporation, Sea Mobility, SEI II Equipment Inc., Alcoa Steamship Company, Inc., and related entities, Sabine Towing & Transportation Co., Inc., and Tecomar, S.A. de C.V., as defined in their answers filed in this action on October 8 and 20, November 12, December 1 and 10, 2004, and January 31, 2005.  I submit this declaration in support of Defendants' Opposition to Plaintiff's Motion For Protective Order and Order Compelling Production of Documents.

## I     Preliminary Statement

    1.    Attached as Ex. A are excerpts of the deposition transcript of Vincent Solarino, dated May 5 and 6, 2005.

1

2.      Attached as Ex. B are excerpts of the deposition transcript of John Sandercock, dated June 1, 2005.

3.      Attached as Ex. C is an April 9, 1959 Kirlin, Campbell & Keating ("Kirlin") opinion letter concerning proposed final and interim assessments. (AC[1] 35033-46). The opinion states: "Even upon closing of an 'Insurance Year', it may be decided to charge all or part of the deficiency against the Association's Surplus, at least if the deficiency is relatively small and the Surplus is relatively large." (*Id.* at AC 35037).

4.      Attached as Ex. D is the American Club's 2005/06 By-Laws, Rules & List of Correspondents, marked as Defendants' Ex. 21 during the May 2, 2005 deposition of Martin Recchuite.

5.      Attached as Ex. E is a Specimen insurance policy issued by the American Club, marked as Ex. AC-11 during the May 4, 2005 deposition of Thomas McGowan.

6.      Attached as Ex. F are excerpts of the deposition transcript of Thomas McGowan, dated February 2 and May 3 and 4, 2005.

7.      Attached as Ex. G are excerpts of the deposition transcript of Martin Recchuite, dated February 9 and May 2, 2005.

8.      Attached as Ex. H is an excerpt of the deposition transcript of Thomas McGowan from *In Re: Apex Oil Companies, et al.*, dated December 13, 1990.

9.      Attached as Ex. I is a copy of the American Club's Conflict of Interest Policy, marked as Defendants' Ex. 3 during the February 2, 2005 deposition of Thomas McGowan and a copy of the approval of such policy by the New York Insurance Department in 1964. (AC 3023455).

---

[1]     An AC Bates number indicates that the document was produced by the Plaintiff, the American Club.

2

**II    Response to the American Club's Motion For Protective Order**

10.    Upon discovering the production of the documents in question, Seth Schafler of Proskauer Rose phoned defendant Farrell Lines to determine whether the documents were properly produced. Upon this notification, Proskauer Rose destroyed the documents and copies thereof, removed electronic copies of the documents from its document production database and sequestered the discs containing the documents.

11.    Attached as Ex. J are excerpts of the deposition transcript of Richard Brown, dated May 17 and 18, 2005.

12.    The Plaintiff struggles to assert privilege as to the documents it seeks to protect in this motion, and others on its privilege log (Ex. K), while at the same time it has produced at least a box of its counsel's opinions, detailed below.

13.    Attached as Exhibit L, are the following letters the Club has selectively produced with regard to closing insurance years and the Club's assessment power[2]:

    (a)    December 16, 1955 letter from Kirlin to the American Club giving an opinion regarding the closing of the 1949, 1950 and 1951 insurance years. (AC 34996-5014).

    (b)    April 8, 1957 letter from Kirlin regarding "closing of assessment years." (AC 34990-95).

    (c)    April 9, 1959 letter from Kirlin explaining that the Club has the power to issue either "interim" or "final" assessments and such power is explicitly set forth in the By-Laws. (*See supra* ¶3).

---

[2]   It was the Club's practice to obtain an opinion letter from counsel whenever issuing an interim or final assessment. The Club has, to our knowledge, produced all such opinions in this litigation. The opinions included in this exhibit include examples of such opinions but represent only a small fraction of the opinions produced by the Club.

3

(d)  November 12, 1959 letter from Kirlin giving the opinion that the Club Board, in its discretion, may impose a second interim assessment for an open insurance year. (AC 34964-74).

(e)  November 26, 1962 Kirlin letter stating that the Club is entitled to close its Wartimepandi accounts and transfer any profits to the Club's Contingency Reserve. (AC 36073-83).

(f)  August 7, 1979 letter from Kirlin stating that an impairment of the Club's surplus caused by the inability to assess a bankrupt member would remain impaired unless the remaining members for that insurance year were assessed. (AC 35694-701).

(g)  June 3, 1982 letter from Kirlin giving an opinion that the Club may properly issue a final refund upon the closing of the 1970 and 1973/74 Insurance Years. (AC 36239-56).

(h)  June 12, 1985 letter from Kirlin giving the opinion that upon closing the 1975 Insurance Year, the Club may properly transfer a final surplus to the Reserve Account. (AC 80813-29).

(i)  October 15, 1985 letter from Kirlin which is a reconsideration of the June 12, 1985 opinion and states that if the surplus for the insurance year comes from assessments, that surplus must be returned to the members as a dividend. (AC 35453-78).

(j)  April 8, 1988 letter from Kirlin giving an opinion that the Club may, among other things, close the 1977/78 insurance year with a final refund. (AC 3061172-88).

    (k)    May 27, 1993 letter from Kirlin opining that it would not be appropriate to use the Reserve Account to remedy a deficiency when closing an insurance year in lieu of assessing members from that insurance year. (AC 32965-68).

    (l)    June 4, 1993 letter from Kirlin giving an opinion that the Club may close the 1987/88 Insurance Year with a final assessment. (AC 53130-43).

    (m)    November 3, 1993 letter from Kirlin opining that a closed insurance year might be able to be reopened for assessments if necessary. (AC 3066799-809).

    (n)    April 20, 1995 letter from Kirlin stating that the Club could reopen a closed year for assessments at least for insurance years prior to 1977. (AC 73719-34).

    (o)    June 3, 1996 letter from Kirlin opining that the estimated total cost ("ETC") of an insurance year is the true premium under New York statutory law, and, thus is not required to be refunded to members when closing the year. (AC 3069080-88).

    (p)    June 6, 2003 letter from Nourse & Bowles providing an opinion that the Club Board of Directors has the authority to close the 1999/2000 Insurance Year without further assessment. (AC 46407-13).

14.    Attached as Ex. M, are the following letters the Club has selectively produced with regard to coverage for occupational disease claims:

    (a)    November 12, 1986 letter from Kirlin taking the position that Prudential Lines should not receive coverage until it pays claims first,

notwithstanding the fact that it was in bankruptcy and would likely not have the money to pay those claims. (AC 33620-34).

(b) September 11, 1987 letter from Kirlin entitled "Coverage and Deductibles" regarding asbestos claims. (AC 73846-65).

(c) March 13, 1991 letter from Kirlin arguing in favor of entering a settlement with Apex whereby the Club would agree to apply only one deductible per claim instead of stacking deductibles as was its general practice. This letter refers back to Kirlin's September 11, 1987 opinion on "Coverage and Deductibles." (AC 3064110-16).

15. Attached as Ex. N, are the following letters the Club has selectively produced with regard to the use of Reserves and Surplus:

(a) April 9, 1959 letter from Kirlin explaining that the Club has the power to issue either "interim" or "final" assessments and such power is explicitly set forth in the By-Laws. The opinion states: "Even upon closing of an 'Insurance Year', it may be decided to charge all or part of the deficiency against the Association's Surplus, at least if the deficiency is relatively small and the Surplus is relatively large." (*See supra* ¶3).

(b) December 7, 1961 letter from Kirlin stating that certain investment options could be invested in blue chip stocks without contravening New York Insurance Law. (AC 35645-52).

(c) July 2, 1964 letter from Kirlin giving its opinion that the Club's Surplus should be used to carry out its corporate purpose for any insurance year. (AC 40000-08).

6

    (d)    February 14, 1979 letter from Kirlin analyzing the proper uses of the Club's Reserve Account and opining that the Club's Reserve Account belongs to the Club and not the members. (AC 35479-94).

    (e)    January 31, 1983 memorandum from Kirlin stating that the Club could use Reserve funds to purchase stop loss insurance provided that such use of the funds does not have a detrimental affect on the Club's Surplus. (AC 36233-36).

    (f)    February 9, 1984 Kirlin memo concluding that it would not be appropriate for the Club to use the Reserve Fund to compensate for a premium shortfall resulting from the fact that not all members were willing to pay the premium for a fifth layer of excess coverage. (AC39913-16).

    (g)    June 13, 1988 letter from Kirlin (AC 3061032-33) and a May 27, 1993 (corrected by hand) letter from Kirlin (AC 32969-72) concluding that the Reserve funds can be used to defray the cost of reinsurance.

    (h)    October 20, 1999 letter from Kirlin taking the position that investment income derived from the Contingency Fund could be allocated among open years provided the Contingency Fund is adequate to satisfy anticipated liabilities for all closed years. (AC 32666-67).

16.    Attached as Ex. O, are the following letters the Club has selectively produced with regard to deductibles:

    (a)    September 11, 1987 letter from Kirlin. (*See supra* ¶14).

    (b)    March 13, 1991 letter from Kirlin arguing in favor of entering a settlement with Apex whereby the Club would agree to apply only one deductible per

claim instead of stacking deductibles as was its general practice. (*See supra* ¶14).

(c) December 17, 1998 letter from Kirlin reviewing the Club's practice of stacking deductibles, in light of the Second Circuit's decision in the *Prudential Lines* case, and recommending that the Club continue its practice because it was "fairer and more practicable than the Second Circuit's decision." (AC 33482-85).

17. Attached as Ex. P, are the following letters the Club has selectively produced with regard to other topics[3]:

(a) October 7, 1959 letter from Kirlin regarding changes in the By-Laws. (AC 36107-125).

(b) October 13, 1959 letter from Kirlin regarding quorums for directors meetings and votes. (AC 36103-06).

(c) November 2, 1962 letter from Kirlin opining that the Club's dividends, interest and rents will continue to be taxable, but its underwriting profits would not under Section 8 of the Revenue Act of 1962. (AC 35639-41).

(d) December 16, 1963 letter from Kirlin regarding taxability of gross receipts for insured risks that are within New York City. (AC 36050-64).

(e) May 17, 1996 letter from Kirlin regarding Judge Weiner's dismissal of all asbestos claims subject to reinstatement upon providing evidence of compensable asbestos-related injury. (AC 75715-23).

---

[3] The Club has produced opinions on a wide variety of topics. This exhibit simply presents a sample of the wide range of legal opinions which the Club produced.

8

18. Attached as Ex. Q are excerpts of the deposition transcript of Keith Kennedy, dated June 2, 2005.

19. Attached as Ex. R are excerpts of the deposition transcript of Richard Gronda, dated May 19 and 20, 2005.

20. Attached as Ex. S are excerpts of the deposition transcript of Charles Kurz II, dated May 12 and 13, 2005.

**III    Response to the American Club's Motion to Compel**

21. Attached as Ex. T are various documents demonstrating the club's complete knowledge of asbestos claims and litigation regardless of their alleged need for Defendants' privileged documents. Included are:

   (a) A September 27, 1982 Letter from Terriberry, Carroll, Yancey & Farrell ("Terriberry") to Keystone Shipping Co. copied to the Shipowners Claims Bureau ("SCB") regarding pending asbestos cases. This letter indicates that as early as 1982 the American Club was aware of asbestosis claims and their current status. (KEY[4] 22067-69).

   (b) A November 9, 1982 memo from Charles Kurz II (of Keystone Shipping) copied to Fischer at SCB regarding a November 7, 1982 Philadelphia Inquirer Today Magazine article entitled "The Deadly Curse of Asbestos." This memo indicates that Charles Kurz promptly notified the SCB and American Club of asbestos concerns and related information. (KEY 21741).

---

[4]    A KEY Bates number indicates that the document was produced by the Keystone Defendants.

9

(c) An October 20, 1983 memo to Fischer at SCB attaching the October 19, 1983 meeting minutes of the New York Asbestos Committee regarding how to designate counsel for each port for future asbestos claims, and showing that SCB was involved as early as 1983 in strategizing how best to handle asbestos cases. (AC 83408-10).

(d) A May 3, 1984 letter to Fischer at SCB attaching a draft letter to shipowners regarding concerns about the cost of asbestosis claims and attaching March 28, 1984 minutes of the Meeting on Asbestosis Claims of the New York and London Sub-Committees regarding pending claims and coordination of counsel, which shows that the SCB was proactive in keeping informed about the status, management and costs of asbestos litigation. (AC 83372-82).

(e) An August 13, 1984 letter from Healy & Baillie to A. Bilbrough & Co. Ltd. regarding theories of asbestos liability, deductibles and coverage. This opinion letter was found in the American Club's files, showing that the Club maintained files with legal opinions dating at least as far back as 1984 that were relevant to analysis of asbestos claims. (AC 83383-407).

(f) An October 18, 1985 Letter from Terriberry to Keystone Shipping Co. copied to Edward Grosso at SCB regarding deposition topics in asbestos cases. This shows that Keystone continually apprised the SCB of the administration of ongoing asbestos claims. (KEY 22099-103).

(g) A December 5, 1985 memo from Grosso to Thomas J. McGowan at SCB copied to William Craig, regarding asbestosis claims affecting the

      American Club and the fact that the SCB did not yet know what percentage of the 123 pending claims would result in payments as "reserves have been very difficult to establish." (AC 83357-61).

(h) An August 11, 1986 letter from Craig at SCB to United States Lines, Inc. regarding the fact that using Terriberry as defense counsel for asbestosis claims has resulted in small settlements. This letter shows that it was not clear that asbestos claims were going to create large financial liability for the Club or its members. (AC 41110-11).

(i) An October 20, 1986 memo to Charles Kurz from James Campbell (also of Keystone Shipping) regarding an Insurance/Claims Seminar sponsored by the American Club where the SCB's own William Craig presented a program on handling asbestos claims. (KEY 4927-35).

(j) A March 9, 1987 letter from Thompson, Hine and Flory ("Thompson") to Keystone Shipping Co. copied to McGowan and Grosso at SCB including a Status Report to All Shipowners and Other Interested Parties regarding the Ohio Maritime Asbestos Litigation. This shows that the SCB remained involved with defense counsel and was regularly updated by defense counsel as to the status of asbestos litigation. (KEY 22083-91).

(k) An October 22, 1987 letter from Thompson to Grosso at SCB regarding the fact that no information had been furnished to date which would enable the establishment of an appropriate reserve estimate. This shows that any estimation of future asbestos claims was still extremely unpredictable. (KEY 220-25).

11

(l) An April 8, 1988 letter from Charles Kurz to Cassedy at SCB attaching an article regarding potential health hazards of chemical tankers. In the covering letter, Kurz tells Cassedy that the article should be read by the managers in light of the recent recommendation to establish a special reserve for occupational/health hazard claims, showing that Kurz was acting in the best interests of the Club in determining an appropriate reserve and discussing such reserve with the managers. (KEY 205-15).

(m) A July 7, 1988 letter from Charles Kurz to Cassedy at SCB regarding an attached article about the fact that nearly 1,600 asbestos claims filed by the Jacques firm had been dismissed (KEY 202-04) and a July 14, 1988 telex from Campbell to Grosso at SCB regarding new asbestos claims filed by the Jacques firm after the 1,600 original claims were dismissed. (KEY 196). These documents show that Kurz continued to discuss with the SCB developments in the asbestos litigation.

(n) An October 26, 1988 letter from Mr. Murphy at Thompson to Grosso at SCB regarding the inability to establish reserve estimates for asbestos claims due to the lack of significant developments in the pending cases. (KEY 514-15).

(o) A December 22, 1989 telex from Campbell to Grosso at SCB regarding the transfer of many asbestos claims to Mobile, San Francisco or Philadelphia. This shows Keystone's continued involvement in assisting the SCB with the effective administration of asbestos claims against the Club's members. (KEY 511).

12

(p) An August 14, 1990 facsimile from Charles Kurz to McGowan at SCB attaching an August 13, 1990 Business Week article on strategies to end the asbestos "crisis" demonstrating again Kurz's directions to the SCB that it provide the Club Board with continued asbestos litigation updates. (KEY 4410-11).

(q) A December 20, 1991 letter from Campbell to Craig at SCB attaching a letter from Thompson regarding the establishment of a defense steering committee. This shows that Keystone had continued interest in advising the SCB with regard to how best to handle asbestos litigation for the benefit of the American Club and its members. (KEY 493-97).

(r) A June 1, 1992 memo from Craig at SCB to the Board of Directors of the Club regarding asbestos litigation status and the fact that there were nearly 3,000 pending cases and that to date, over $6 million had been paid in legal fees to Cleveland counsel. In addition, the memo continues that if asbestos manufacturers go bankrupt, the lack of indemnity by the shipowners from those manufacturers is a grave concern. Thus, the SCB was fully aware of and continued to analyze the potential exposure to the Club resulting from asbestos claims. (KEY 467).

(s) A January 12, 1993 Letter from Craig at SCB to Keystone regarding the fact that the SCB has no objection to members of the association referring asbestos claims to a certain defense firm, showing the Club's continued awareness and involvement in asbestos claims. (KEY 22002).

(t) A March 7, 1994 memo from Craig at SCB regarding the fact that hearing loss cases have settled for an average of $8,515 and that the disposition of these cases is extremely slow. This shows that the SCB continued to monitor evolving occupational disease claims, and in 1994 did not consider them a threat to members. (AC 26675-76).

(u) A March 24, 1994 letter from Charles Kurz to McGowan copied to Dick Brown, attaching a March 20, 1994 Philadelphia Inquirer article regarding potential creation of a settlement fund for asbestos claims (KEY 393-95) and a November 18, 1994 letter from Charles Kurz to Dick Brown attaching a Department of Transportation Rule regarding Coast Guard exposure to asbestos (KEY 25011-12). Again, these show that Kurz continued to promote the best interests of the Club by forwarding relevant and helpful materials to the SCB.

(v) An April 21, 1995 facsimile from Charles Kurz to McGowan attaching a letter from International Shipholding Corporation inviting various shipowners to attend a Shipowners' Committee meeting to discuss asbestos litigation. This establishes that Kurz was clearly acting in the best interests of the Club, as he was encouraging actions that would help the Club adequately handle asbestos claims. (KEY 350-53).

(w) A January 30, 1996 letter from Craig at SCB to Moran Services Corporation regarding allocating settlements and legal fees for a seaman who had exposure to asbestos on various ships over time and

14

demonstrating the Club had developed sophisticated and routine practices for dealing with its obligations on asbestos claims. (AC 20017).

(x) A May 17, 1996 facsimile from Dick Brown to Charles Kurz regarding a Lloyds List article that had inaccuracies with regard to the order issued by Judge Weiner that administratively dismissed all MARDOC cases and required substantiation for a case to be reinstated. This shows that Kurz, as a Club director, wanted to be sure he fully understood the legal ramifications of ongoing court decisions regarding asbestos litigation. (KEY 25000-01).

(y) An October 16, 1996 letter from Solarino at SCB to D.D.S. Comer regarding the Club's application to the International Group, attaching an October 15, 1996 memo from Craig to Solarino regarding the Club's application for full membership in the International Group and how the SCB was unable to advise how many asbestosis cases had been reported by the Club's members. This establishes that even in the mid-1990s it was difficult to adequately assess and reserve for the full extent of the asbestos claims against the Club's members. (AC 76455-90).

22. Ex. U is two documents produced by Keystone in this litigation regarding Keystone's internal analysis of its asbestos exposure. (KEY 280-83 and 232-85). The first document is a June 30, 1987 memorandum from Jim Campbell to Charles Kurz II discussing the status of Keystone's asbestos litigation. The second document is a September 3, 1987 letter from Charles Kurz II to John Cassedy, attaching a September 2, 1987 memorandum from Jim Campbell to Charles Kurz II discussing the status of Keystone's asbestos litigation and noting

that he had previously sent the June 30, 1987 memorandum to SCB. Keystone produced these documents on or before April 15, 2005, and the Club also had these documents in its own files and produced them in this litigation. (Ex. V). (AC83316-19 and 83320-23). Plaintiff requested these and similar documents on May 20, 2005. (Ex. W) and included this request in its motion to compel before Keystone even responded to it. (*See* Ex. X, June 6, 2005 letter of Ms. Bauer to Mr. Stein re: the Club's May 20 Requests).

23. Additionally, Plaintiff never contacted counsel for Keystone and sought the production of any of the documents listed on Keystone's log before bringing this motion to compel. Keystone's log was produced on March 2, 2005 and is attached as Ex. 8 to the Affidavit of Shaun Carroll. An updated version removing several documents on further review was produced on June 9, 2005. (Ex. Y).

24. Attached as Ex. Z is Plaintiff's May 16, 2005 letter requesting depositions of Messrs. Murphy and Bolles, and Ex. AA is Keystone's response stating that those witnesses should be subpoenaed as they are not under Keystone's control and upon information and belief reside in Cleveland, Ohio and New Orleans, Louisiana.

25. In this litigation, discovery has been significantly hampered by Plaintiff's overall dilatory approach and uncooperative tactics. Plaintiff's failure to cooperate necessitated several letters to Magistrate Judge Maas regarding discovery. (*See* Exs. BB and CC).

26. On March 22, 2005, Magistrate Maas entered a discovery scheduling order which extended his previously ordered deadline for the completion of fact discovery by three months. (*See* Ex. DD).

27. Despite having already produced numerous privileged documents in this litigation (Exs. L-P), Plaintiff is attempting to assert privilege with respect to similar documents regarding

16

identical topics. (Ex. K, Plaintiff's 24 page privilege log). Since Plaintiff waived privilege through its voluntary production of privileged documents, and has put privileged material at issue in this litigation, it must be compelled to produce the remainder of these documents.

28.     Attached as Ex. EE is a June 7, 2004 Circular of the American Club.

29.     I declare under penalty of perjury that the foregoing is true and correct.

June 10, 2005
New York, New York

_____
LISA A. BAUER