PROSKAUER ROSE LLP
Seth B. Schafler (SS-5993)
Lisa A. Bauer (LB-4057)
1585 Broadway
New York, New York 10036-8299
(212) 969-3000
(212) 969-2900 (fax)

Attorneys for Defendants
Keystone, BP, MTL, Kirby Inland Marine, LP
(as successor to Hollywood Marine Inc.), American Steamship Company,
The Cleveland-Cliffs Steamship
Company, Ispat, Amerada Hess Corporation,
Sea Mobility, SEI II Equipment, Inc., Alcoa, Sabine, and
Tecomar, S.A. de C.V. (as successor to Tecomar S.A.)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------

AMERICAN STEAMSHIP OWNERS MUTUAL
PROTECTION AND INDEMNITY ASSOCIATION, INC.,

      Plaintiff,

  -against-

ALCOA STEAMSHIP CO., INC., et al.,

      Defendants.

------------------------------------------------

04 Civ. 04309 (LAK)(JCF)

(ECF CASE)

**MEMORANDUM OF LAW IN OPPOSITION
OF PLAINTIFF'S MOTION FOR PROTECTIVE ORDER AND
ORDER COMPELLING PRODUCTION OF DOCUMENTS**

  Defendants Keystone, BP, MTL, Kirby Inland Marine (as successor to Hollywood Marine Inc.), The Cleveland-Cliffs Steamship Company, Ispat, Amerada Hess Corporation, Sea Mobility, SEI II Equipment Inc., Alcoa Steamship Company, Inc., and related entities, Sabine Towing & Transportation Co., Inc., and Tecomar, S.A. de C.V., as defined in their answers filed in this action on October 8, October 20, November 12, December 1 and 10, 2004, and January

31, 2005 by and through their undersigned counsel, hereby submit this memorandum of law in opposition to Plaintiff's motion dated May 27, 2005 and ask that all relief sought in such motion be denied and request that Plaintiff be ordered to produce additional documents as to which it has waived the privilege.

**I.     Preliminary Statement**

This case arises from the plaintiff's (the "American Club" or the "Club") current Board of Directors' decision to repudiate marine protection and indemnity insurance coverage for more than 100 former member companies and current policyholders of the Club for occupational disease claims. In so doing, the Club violates its contractual insurance obligations. Through its declaratory judgment action, the Club seeks judicial approval of its determination to wall off its reserves – reserves that were built up over the years by contributions of former members for the explicit purpose of paying those members' claims in closed insurance years – to avoid using any part of them for payment of covered claims in years prior to 1989. The Club wants to use those reserves for the sole benefit of its current membership; to absolve its current membership from any assessment liability for the Club's insurance coverage obligations in violation of New York law; and to shift the Club's liabilities onto the policyholders themselves, who paid all premiums and assessments owing for their coverage, and who have no say in the Club's current affairs.[1]

Acting in the pecuniary interests of its current Board members and those of their member companies, the Club now accuses certain former Board members of breach of duty in actions taken decades ago, all in an effort to avoid the Club's contractual obligations to policyholders with valid insurance claims. It invokes certain principles of "mutuality" that, by its declaratory judgment action, it blithely violates. The Club arrogates to itself the power to "grant" insurance

---

[1]     With few exceptions, Defendants are all former members of the Club.

coverage to policyholders in insurance years after 1989 while denying it to those who built the Club throughout its history from 1917 onward, and from whose efforts and capital contributions the current members continue to benefit.[2]

Its legal posturing aside, there is nothing "nominal" about the Club's status as plaintiff in this action. Nor is there anything "discretionary" about its legal obligation to provide insurance coverage to defendants consistent with its policies. The Club seeks judicial endorsement of the rescission of insurance coverage for hundreds of its policyholders. Accordingly, it is the Club who bears the burden of proof in this case.

Specifically, in its motion, the Club alleges that it is entitled to a protective order prohibiting the Defendants from using or disseminating the Club's counsel's opinion letters. However, the Club deliberately waived the privilege by producing and making affirmative use of numerous legal opinions regarding the issues in this litigation. Accordingly, since Plaintiff has selectively disclosed certain privileged materials and has made an explicit full subject matter waiver of privilege, the Club may not now withhold from production other documents regarding legal advice to the Club's Board of Directors or Manager on the same subject matters.

Plaintiff's motion to compel production of certain documents designated as privileged on Keystone's privilege log also lacks merit. Spurious allegations of breach of fiduciary duty by individual directors decades ago have no bearing on any relevant issue in this case. Nor is the fact that a member had a representative who sat on the Club's Board of Directors a basis for wholesale abrogation of the member's attorney-client privilege.

---

[2] The Club's current membership benefits from the "closed year surplus" built up over the history of the Club, absent which the current members would be required to contribute sufficient amounts to capitalize the Club with their own funds and meet New York State minimum surplus requirements.

Additionally, contrary to Plaintiff's assertions, the Club was fully aware of the breadth and scope of Occupational Disease Claims from their onset and has demonstrated no need for privileged information. Consequently, since Keystone, unlike the Plaintiff, did not waive its attorney-client privilege with respect to these documents, the Club has no basis to invade Keystone's validly asserted privilege.

## II.    Counterstatement of Facts

While defendants will not, in the context of the Club's discovery motion, rebut all of the factually inaccurate, misleading and argumentative assertions contained in the American Club's papers, in light of the accusatory tone of plaintiffs' submission, it is appropriate that certain observations be made to set the record straight.

The American Club is an incorporated and licensed insurer under New York law. The Club issued occurrence-based liability insurance policies to defendants. (*See* Bauer Decl. Ex. E, Specimen Policy). The Club is not a "separate organization" in each insurance year, nor has it ever acted as such.[3] Nor is there any legal requirement under New York law or otherwise that the costs of an insurance year fall solely on the membership of that year. (*See, e.g.,* Bauer Decl. Ex. C, letter dated April 9, 1959 from Kirlin to Mr. C. Williamson, Secretary of the American Club) ("Even upon closing of an 'Insurance Year', it may be decided to charge all or part of the deficiency against the Association's Surplus, at least if the deficiency is relatively small and the Surplus is relatively large."). As a corporate entity, the American Club entered into insurance

---

[3]    For example, the American Club takes the position that because it is an ongoing corporate entity, it "owns" the general reserves of the Club. Yet the Club denies that it should be treated as a singular corporate entity for purposes of its insurance obligations to defendants. The Club historically has treated its "closed" insurance years as a "merged" liability of the reserve account and has claimed the right to offset liabilities to policyholders without regard to the insurance year involved. (*See* Declaration of Lisa A. Bauer, dated June 10, 2005 ("Bauer Decl.") at Ex. F, testimony of Thomas McGowan, former president of Shipowners Claims Bureau ("SCB"), taken on February 2 and May 3 and 4, 2005 at 96, 173, 249, 310; Ex. A, testimony of Vincent Solarino, CFO of SCB, taken on May 5 and 6, 2005 at 80-81, 149-50; Ex. B, testimony of John Sanderock, former SCB executive, taken on June 1, 2005, at 150-52, 171-73).

4

contracts with policyholders, which were renewed from year to year until such time as the member withdrew from the Club; these policies have never been terminated or cancelled. The insuring party under these policies is the American Club, not the members of a particular insurance year.[4] Nothing in the Club's insurance policies limits resort of the policyholder insured by the Club to any particular assets of the Club for payment of claims, or provides that closure of an insurance year for accounting purposes terminates insurance coverage.

Based on the advice of its professional Managers, the SCB, and its outside legal counsel, Kirlin Campbell & Keating ("Kirlin's"), whose representative sat on the American Club's Board, the American Club has, for more than 20 years, duly recognized and paid its insurance liabilities for occupational disease claims for both "open" and "closed" years[5], without once suggesting, until now, that the "practice" of providing coverage pursuant to the terms of the American Club policies was in any way "discretionary." Indeed, Thomas McGowan, President of SCB for over 16 years and the Club's Rule 30(b)(6) witness, had never even heard of the so-called "discretionary practice."[6] (*See* Bauer Decl. Ex. F, McGowan at 14). At no time did the Club or

---

[4] The Club incorrectly asserts that its members are both insurers and insureds. Although this loose terminology is sometimes used by courts, statements that members are insurers as well as insureds simply refer to the fact that members provide the Club's capital as opposed to stockholders in a stock insurance company. The Club's members, however, are quite obviously not licensed insurers subject to New York state's complex regulatory demands, nor do they have any right to sue each other for indemnification under the policies issued by the Club. (*See, e.g.* Bauer Decl. Ex. D, The American Club's 2005/06 ByLaws and Rules, Class I, Rule 4, Section 12 (AC83487); Ex. B, Sandercock at 169-71).

[5] The "closing" of an insurance year refers to a decision by the Board of Directors pursuant to the Club's By Laws to issue a "final refund" or "final assessment" and release the members of the insurance year from further assessment liability to the Association. The closing of an insurance year means that no further assessments will be levied on policyholders, and has no impact on the continuation of insurance coverage under American Club insurance policies. (*See* Bauer Decl. Ex. F, McGowan at 77-78, Ex. D, ByLaws and Rules, Class I, Rule 4, Section 16-17 (AC 83496).

[6] Plaintiff misleadingly asserts that coverage of occupational disease claims has "come to be called" the "discretionary practice." (Pl. Mem. at 8). However, as one of the Club's Rule 30(b)(6) witnesses, Martin Recchuite admits, the "discretionary practice" is a term only recently coined for purposes of this litigation, designed to justify the Club's rescission of coverage for policyholders prior to 1989 and the differential treatment afforded to policyholders after 1989. (*See* Bauer Decl. Ex. G, testimony of Martin Recchuite,

5

its Managers ever inform former members that the insurance coverage they purchased was "discretionary" or that decisions made by the Board's duly authorized representatives – including its Board of Directors, professional Manager and outside counsel – had the "discretion" to limit or terminate insurance coverage under the American Club members' insurance policies.

The American Club seeks to justify its recent action as mandated by purported principles of "mutuality," but its application of this amorphous principle is selective at best. The Club cannot explain why "mutuality" principles allow it to grant insurance coverage for members in years 1989 and forward, but to deny it to policyholders in prior years.[7] The Club's contention that its "reinsured" member status in the International Group beginning in 1989 somehow justifies discriminatory treatment of insurance coverage for policyholders in different insurance years strains credulity beyond the breaking point. (*See* n. 6).

Following the principle that the best defense is a good offense, especially where the action in question is indefensible, the Club now accuses certain former Board members, most particularly representatives of Keystone, Farrell Lines and American President Lines ("APL") of

---

current Chairman of the Club's Finance Committee and Board Member taken on February 9 and May 2, 2005 at 56-57).

[7] Although in 1989 the American Club became a "reinsured" member of the International Group ("IG") an organization of mutual protection and indemnity insurers, it did not become a full "pooling" member of this Group until 1998 (*See* Bauer Decl. Ex. G, Recchuite at 195). Moreover, although the IG requires Members to follow a specific deductible practice when submitting occupational disease claims for reinsurance, nothing in the American Club's membership in the IG mandates that the American Club pay for occupational disease claims incurred after 1989 or submit such claims for "pooling" under the Group's reinsurance arrangements. (Bauer Decl. Ex. H, deposition testimony of Thomas McGowan from *In Re: Apex Oil Companies, et al.*, dated December 13, 1990). The legal obligation to pay such claims derives solely from the Club's insurance contracts, both before and after 1989. In testimony of one of the American Club's Rule 30(b)(6) witnesses, Martin Recchuite, current chairman of the Club's finance committee and Board member, Mr. Recchuite was unable to identify any provision of any agreement between the IG and the American Club that "obligates" the American Club to pay for occupational disease claims. (*See* Bauer Decl. Ex. G, Recchuite at 84-85).

Evidently, the American Club seeks to avoid a controversy with the IG, whose membership continues to recognize cover for occupational disease claims, and therefore has decided to exempt these insurance years from its decision to terminate coverage in contradiction of the "mutuality" principle it now purports to want to protect.

6

dereliction of duty as directors for actions taken decades ago (while pretending that it never "knew" about these actions and only just "discovered" them). The American Club peppers its pleadings and motion papers with these allegations, but has not asserted any claims of breach of fiduciary duty against any former director of the Club.

These allegations are not only irrelevant but false.[8] Every single action to which the Club now points was recommended by its professional Manager, approved by and voted for by outside counsel – who also sat on the Club's Board – and done with the knowledge of the New York State Department of Insurance. This case concerns the American Club's repudiation of insurance coverage of over 100 prior members and current policyholders, many of whom are defendants in pending asbestos cases, who never had representatives of their companies on the Board of Directors of the Club. The relationship between a mutual insurance company and its policyholder is contractual as set forth in the policy of insurance and not fiduciary in nature. *See, e.g., In Re Metropolitan Life Derivative Litig.*, 935 F. Supp. 286, 293 (S.D.N.Y. 1996) ("the relationship between a mutual insurer and a policyholder 'is not of a fiduciary nature' but is instead that of a debtor and creditor"); *Fidelity & Cas. Co. of New York v. Metropolitan Life Ins. Co.*, 248 N.Y.S.2d 559, 565, 42 Misc. 2d 616, 623 (N.Y. Sup. Ct., N.Y. Cty. 1963) . Thus,

---

[8] The American Club's conflict of interest policy, approved by the New York Insurance Department in 1964 (*see* Bauer Decl. Ex. I), explicitly states that: "A director of the Association shall not be deemed to have a conflict of interest by reason of his interest in or employment by a company or concern which is a Member of the Association, provided however, that no director shall act upon any claim against the Association, in which he or any corporation of which he is officer, director, employee or stockholder is interested." (*See* Bauer Decl. Ex. I, at KEY 015713). Moreover, the deposition testimony to date has made clear that decisions made by prior Boards regarding reserves for occupational disease claims were entirely reasonable under the circumstances and given what was known at the time. In fact, the American Club's own 30(b)(6) witness, Mr. McGowan, testified that as of 1996, the decision still appeared reasonable even with hindsight: "No [he hadn't advised that a higher reserve might be needed], because we had not seen any deterioration. I mean, the whole scenario of asbestos claims was still developing. There's no reason to suspect that we were in the doomsday or moving into the doomsday type of scenario because nothing was being paid. And most attorneys would tell us that the vast majority of these asbestos claims would be dismissed because there was no disease." (*See* Bauer Decl. Ex. F, McGowan at 198).

alleged breaches of duty by representatives of certain former members, acting in their capacity as directors of the Club, are not a valid defense to coverage of insured claims.[9]

### III. Argument

#### A. Plaintiff's Unequivocal Waiver of the Attorney-Client Privilege Mandates a Denial of its Motion for a Protective Order

Keystone's counsel first discovered the production of the documents in question, and called defendant Farrell Lines to determine whether the documents were properly produced. Upon this notification, Keystone's counsel destroyed the documents and copies thereof, removed electronic copies of the documents from its document production database and sequestered the discs containing the documents. (*See* Bauer Decl. at ¶ 10).

In seeking to protect these and other privileged documents from disclosure, the Club improperly uses privileged information, consisting of legal opinions of its counsel, both as a sword and a shield.[10] The Club's counsel admits that the Club is pursuing an "ad hoc" strategy in its privilege assertions.[11] In furtherance of this "ad hoc" strategy the Club has produced a box

---

[9] The American Club's effort to "re-open" insurance years that were duly closed to further assessments decades ago, either on grounds of alleged "mutual mistake" or because of an alleged failure to adequately reserve for incurred but not reported (IBNR) claims are also meritless. First, the closing of an insurance year was not, as the American Club would have it, a mutually agreed "settlement of accounts" between the Club and members of an insurance year. Rather, the "closing" of an insurance year was an action which the Board of Directors of the Club was authorized to take on behalf of the Club pursuant to the Club's ByLaws, without the concurrence of the membership, and releases the member from further assessment liability to the Club. Second, 20/20 hindsight is not a basis for upsetting judgments made by directors many years ago. Third, the Club knowingly ratified the closure of these insurance years. In addition, the Club cannot establish the necessary prerequisite of a deficiency in each insurance year it now seeks to "reopen."

[10] There is a close business tie between the Club's current counsel, Larry Bowles, and its former counsel Kirlin's. Mr. Bowles practiced at Kirlin's for approximately 15 years before leaving to form Nourse & Bowles in 1982. When Kirlin's folded in late 2000, Mr. Brown, then counsel to the Club, left Kirlin's and, after a brief stint at Hills Rivkins, joined Nourse & Bowles, bringing the Club with him as a client. At the time of this move, it was anticipated that Mr. Bowles would take over as counsel to the Club, which he did in June 2002 (*See* Bauer Decl. Ex. J, testimony of Richard Brown, former Club Counsel, taken on May 17 and 18, 2005 at 21-24).

[11] Mr. Schafler: ". . . So how are you defining what is or is not privileged?" Mr. Carroll: "It's being decided on an ***ad hoc*** basis." (Emph. added). (*See* Bauer Decl. Ex. J, Brown at 80-81).

8

load of coverage opinions and work product of its former counsel with respect to, among other issues, coverage issues, asbestos claims, deductibles and the use and purposes of the Club's funds.[12] Throughout its depositions, the Club's counsel has cross-examined defense witnesses on their understanding of Club counsel's prior advice.[13] Having done so, the Club may not now withhold from production legal advice to the Club's Board of Directors or Manager on the same subject matters. The American Club simply cannot have it both ways. It should be ordered to produce all legal opinions as to which it has waived the privilege, prior to the commencement of this litigation. Rather then repeating all legal argument here, we incorporate Defendant Farrell's brief at I.

      **B.**    **Defendants Should Not Be Compelled to Produce the Documents on Their Privilege Log Based on Plaintiff's Mischaracterization of the Relevant Issues in this Litigation**

Section II of the American Club's motion seeks production of unspecified materials designated as privileged on Keystone's privilege log. These documents concern legal advice obtained by Keystone separate and apart from any role Keystone might have had in connection with Charles Kurz II's or others' directorships on the Club's Board of Directors. The notion that the Club needs to obtain legal advice that a member such as Keystone (Farrell or APL) may independently have received from their own separate counsel to determine whether Club directors breached their fiduciary duties to the Club is incorrect. Such documents have no bearing on any issue in this case and are properly withheld as privileged.

---

[12] The Club also produced attorney-client work product materials relating to the *Prudential Lines* case, (*See, e.g.,* Bauer Decl. Exs. M, O), a prior litigation involving the Club which, among other things, concerned the treatment of deductibles for asbestos claims under American Club policies (and in which notably, the American Club never took the position in this Court or the Second Circuit that payment of asbestos claims was "discretionary").

[13] (*See* Bauer Decl. Ex. Q, testimony of Keith Kennedy, former Director and member of Finance Committee, taken on June 2, 2005 at 140-47; Ex. R, testimony of Richard Gronda, former Director and member of Finance Committee, taken on May 19 and 20, 2005 at 114-31; Ex. S, testimony of Charles Kurz, II, Former Director and member of Finance Committee, taken on May 12 and 13, 2005 at 296-311).

9

The Club itself argues that documents received by a corporate representative in his capacity as a fiduciary of one entity are not received by him as a representative of another organization. (Pl. Mem. at 13). By the same token, to the extent a member procured legal advice of its own counsel, the Club has no right to disclosure of that information, whether or not an employee of the member sat as a Director of the Club. The cases upon which the AC relies (Pl. Mem. at 20-21, *Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir. 1970); *Bairnco Corp. Sec. Litig. v. Keene Corp.*, 148 F.R.D. 91, 99 (S.D.N.Y. 1993)) are inapposite and do not support the extraordinary proposition that a member loses its right to assert attorney-client privilege merely because its employee also sat as a Director on the Club's Board. The members here owed no fiduciary duties to the Club, and the privilege in issue is not that of the Club but of the individual members.[14] Moreover, the legal opinions on which the Club relies[15] concur that the relationship between the Club and its policyholders is solely contractual, citing *Uhlman v. New York Life Ins. Co.*, 109 N.Y. 421, 429 (1888): "It has been held that the holder of a policy of insurance, even in a mutual company, was in no sense a partner of the corporation which issued the policy, in that the relation of the policyholder and the company *was one of contract, measured by the terms of the policy.*" (Emphasis added). Thus, the Club has no right to demand disclosure of a member's privileged information. We further incorporate §§ B, B.2 and B.3 of the brief of Defendant APL as to this issue.

Nor has the Club even begun to satisfy the necessary showing of special need for information that can only be obtained through disclosure of privileged documents. Indeed, it is

---

[14] *And see In Re Metropolitan Life Derivative Litig.*, 935 F. Supp. 286, 293 (S.D.N.Y. 1996) ("the relationship between a mutual insurer and a policyholder 'is not of a fiduciary nature' but is instead that of a debtor and creditor"); *Fidelity & Cas. Co. of New York v. Metropolitan Life Ins. Co.*, 248 N.Y.S.2d 559, 565, 42 Misc. 2d 616, 623 (N.Y. Sup. Ct., N.Y. Cty. 1963).

[15] *See* Bauer Decl., Ex. N, February 14, 1979 Opinion of William J. Fallon and July 2, 1964 Opinion of H. Maurice Fridlund.

10

apparent that Plaintiff's true goal is not to obtain relevant information but to further delay discovery.[16] Contrary to Plaintiff's assertions, Keystone produced documents analyzing its asbestos exposure. (*See, e.g.,* Bauer Decl. Ex. U). Plaintiff misleadingly states that "these Directors did not share all of the information they had with the Club, or use it to protect the Club." (Pl. Mem. at 15). However, the documents cited above from the Keystone production clearly indicate that they were transmitted to the Club and these same documents were produced by the Club as part of its files in this litigation. (*See* Bauer Decl. Ex. V). Further, documents from the Club's own files show that the Club was aware, at all times, of the status of asbestosis litigation (*See, e.g.,* Bauer Decl. Ex. T).

Moreover, Plaintiff's recent requests for additional documents, "constituting internal analyses by Charles Kurz & Co., Keystone Shipping Co., or any of their wholly or partially owned subsidiaries (collectively, the "Kurz Companies") of their possible exposure to asbestos claims from 1980 through and including 1997)", was not made until at the deposition of Charles Kurz, II on May 12 and 13, 2005 and not confirmed in writing until May 20, 2005. (*See* Bauer Decl. Ex. W, letter of M. Stein dated May 20, 2005). Before Keystone was even able to respond to this request, Plaintiff included it in its motion to compel. To the extent any of these types of documents were listed on Keystone's privilege log, Plaintiff never contacted counsel for Keystone to seek the production of any of the documents listed on Keystone's log before

---

[16] The American Club's feigned need for privileged documents is especially transparent given the clear record that the Club's managers and directors had information about asbestos claims. (*See e.g*., Bauer Decl. Ex. F, McGowan at 439; and at 335-36 ("I mean, I think we all knew. When I say 'we,' the members. We all had asbestos claims. Any U.S. flag operator who was in business back to the, you know, '50s and afterwards has exposure. Everyone knew that. And just - - sure, they all knew. I don't know how many or how much, but we were all in the same barrel, so to speak.").

11

bringing this motion to compel. (*See* Bauer Decl. ¶ 23). As shown above, these documents are not needed and should not be produced.[17]

Plaintiff also misrepresents that Keystone has refused to "permit their attorneys to testify" (Pl. Mem. at 16). Plaintiff only sought depositions of two of Keystone's attorneys on asbestos litigation, Messrs. Murphy and Bolles, on May 16, 2005. (*See* Bauer Decl. Ex. Z, Bowles letter dated May 16, 2005). Keystone did not refuse to permit them to testify. Rather, on May 18, 2005, it correctly asserted that they were third parties not under Keystone's control. (*See* Bauer Decl. Ex. AA). These witnesses also reside out of state in, upon information and belief, Cleveland, Ohio and New Orleans, Louisiana. If the American Club wanted to depose them prior to the discovery deadline, it should have subpoenaed them in a timely manner.[18]

---

[17]  Keystone's privilege log was less than six pages long and contained only 41 documents. (*See* Ex. 8 to Carroll Aff.). It was produced on March 2, 2005. On June 9, 2005 Keystone produced additional documents from its log after further review. Its log is now only five pages long and contains only 35 documents. (*See* Bauer Decl. Ex. Y).

[18]  Plaintiff's dilatory approach to discovery in this case is not new. (*See* Bauer Decl. Exs. BB and CC) In March 2005, before Magistrate Maas recused himself from this case, he entered a discovery scheduling order which extended his previously ordered deadline for the completion of fact discovery by three months. (*See* Bauer Decl. Ex. DD). Plaintiff has continued to delay and now seeks to further extend the discovery schedule by bringing this back door motion to compel rather than moving forward towards completion of discovery.

12

## CONCLUSION

For the foregoing reasons Plaintiff's motion should be denied in its entirety. Moreover, Plaintiff should be ordered to promptly produce all documents to which it has waived the privilege and any other documents it has not yet produced so that discovery can be completed forthwith.

Dated:  June 10, 2005
      New York, NY

PROSKAUER ROSE LLP

By: _____
Seth B. Schafler (SS-5993)
Lisa A. Bauer (LB-4057)
PROSKAUER ROSE LLP
1585 Broadway
New York, NY  10036-8299
(212) 969-3000
(212) 969-2900 (fax)

*Attorneys for Defendants Keystone, BP, Kirby Inland Marine, LP, MTL American Steamship Company, The Cleveland-Cliffs Steamship Company, Ispat, Amerada Hess, Sea Mobility, SEI II Equipment, Inc., Alcoa Steamship, Sabine, and Tecomar S.A. de C.V.*

-and-

RAY, ROBINSON, CARLE & DAVIES P.L.L.
Gene B. George
Julia R. Brouhard
1717 East 9th Street, Ste. 1650
Cleveland, OH 44114-2898
(216) 861-4533
(216) 861-4568 (fax)
*Attorneys for Defendant The Cleveland-Cliffs Steamship Company*

-and-

DLA Piper Rudnick Gray Cary US LLP
Stanley McDermott, III (SM-0530)
Camilo Cardozo (CC-9710)
1251 Avenue of the Americas
New York, NY  10020
(212) 835-6123
(212) 835-6001 (fax)
*Attorneys for Defendant Ispat*

-and-

GARAN LUCOW MILLER, P.C.
Thomas W. Emery, Esq.
1000 Woodbridge Street
Detroit, Michigan 48207-3192
(313) 446-5525
(313) 259-0450 (fax)
*Attorneys for Defendant American Steamship Company*

-and-

Robert Shulman
Mindy Davis
Christine Davis
Howrey Simon Arnold & White LLP
1299 Pennsylvania Avenue NW
Washington, D.C.  20004-2402
(202) 783-0800
(202) 383-6610 (fax)
*Attorneys for Defendant Amerada Hess*

**TABLE OF CONTENTS**

I.    Preliminary Statement ...................................................................................................2

II.    Counterstatement of Facts..............................................................................................4

III.   Argument .......................................................................................................................8

A.    Plaintiff's Unequivocal Waiver of the Attorney-Client Privilege Mandates a Denial of its Motion for a Protective Order ......................................................................................8

B.    Defendants Should Not Be Compelled to Produce the Documents on Their Privilege Log Based on Plaintiff's Mischaracterization of the Relevant Issues in this Litigation ............9

CONCLUSION............................................................................................................................13

i

MAGISTRATE JUDGE JAMES C. FRANCIS IV
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

500 PEARL STREET, ROOM 1960
NEW YORK, NEW YORK 10007-1312

# FAX

FAX NO. (212) 805-7930
VOICE NO. (212) 805-0206

DATE: 6/10/05        TIME: 5:30
TO: Matthew          FROM: Laurence
    Rothman

DESCRIPTION: Re American Steamship v. Alcoa

NUMBER OF PAGES (INCLUDING THIS PAGE): 2



## PROSKAUER ROSE LLP

1585 Broadway
New York, NY 10036-8299
Telephone 212.969.3000
Fax 212.969.2900

LOS ANGELES
WASHINGTON
BOSTON
BOCA RATON
NEWARK
NEW ORLEANS
PARIS

Lisa A. Bauer
Attorney at Law

Direct Dial 212.969.3221
lbauer@proskauer.com

**By FAX/EMAIL**

June 10, 2005

Honorable James C. Francis IV
United States Magistrate Judge
Daniel Patrick Moynihan
 United States Courthouse
500 Pearl Street, Room 1960
New York, New York 10007-1312

Re:   American Steamship Owners Mutual Protection and Indemnity Association, Inc.
       v. Alcoa Steamship Co., Inc., et al., No. 04 Civ. 04309 (LAK)(JCF)

Dear Judge Francis:

I write to request your permission to file the exhibits to our opposition brief as hard copies as opposed to filing the exhibits with ECF. Filing the exhibits as hard copies is necessary because the size of the exhibits exceeds th 15 MB limit of the ECF office. According to the ECF clerks, we must obtain a signed order from the Judge in order to accept the filing of hard copies.

Thank you in advance for providing this order.

Respectfully submitted,

*Lisa A. Bauer*

Lisa A. Bauer

cc via email:   All Counsel of Record
                Lawrence J. Bowles, Esq.

6/10/05
Application granted.
SO ORDERED.
*James C. Francis IV*
USMJ