UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X
                                                  :
AMERICAN STEAMSHIP OWNERS          :          04 Civ. 04309 (LAK)(JCF)
MUTUAL PROTECTION AND              :
INDEMNITY ASSOCIATION, INC.,       :
                                                  :
                    Plaintiff,                    :
                                                  :
    - against -                                   :
                                                  :
ALCOA STEAMSHIP CO., INC., et al.  :
                                                  :
                    Defendants.                   :
---------------------------------------------------------X


**PLAINTIFF'S OBJECTIONS
TO MAGISTRATE JUDGE'S ORDERS
DATED SEPTEMBER 13 AND 15, 2005
DIRECTING PRODUCTION OF
<u>ATTORNEY OPINION LETTER</u>**


Nourse & Bowles, LLP
Attorneys for Plaintiff

## TABLE OF AUTHORITIES

### FEDERAL CASES

*U.S. v. Skeddle*, 989 F.Supp. 905 (N.D. Ohio 1977) ........................ 11, 12, 13

*In Re Von Bulow*, 823 F.2d 94 (2d Cir. 1987) ................................................ 9

### FEDERAL STATUTES

28 U.S.C. §636(b)(1)  ....................................................................... 1

Nourse & Bowles, LLP
Attorneys for Plaintiff
One Exchange Plaza
At 55 Broadway
New York, New York 10006
(212) 952-6200
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
                                             :

AMERICAN STEAMSHIP OWNERS       :      04 Civ. 04309 (LAK)(JCF)
MUTUAL PROTECTION AND           :
INDEMNITY ASSOCIATION, INC.,      :
                                             :

                    Plaintiff,         :
                                             :

   - against -                     :
                                             :

ALCOA STEAMSHIP CO., INC., et al.     :
                                             :

                  Defendants.     :
--------------------------------------------------------X

**PLAINTIFF'S OBJECTIONS
TO MAGISTRATE JUDGE'S ORDERS
DATED SEPTEMBER 13 AND 15, 2005
DIRECTING PRODUCTION OF
<u>ATTORNEY OPINION LETTER</u>**

PLEASE TAKE NOTICE that pursuant to 28 U.S.C. §636(b)(1) and    Fed.

R.Civ.P. 72, Plaintiff, American Steamship Owners Mutual Protection and Indemnity

Association, Inc. (the "American Club" or the "Club"), hereby objects to two Orders of

Magistrate Judge James C. Francis, IV, dated September 13 and September 15, 2005

(collectively, the "Orders"), copies of which are annexed hereto as Exhibits "1" and "2".

Pursuant to the Orders, Magistrate Judge Francis concluded that the Club waived the

work-product protection otherwise applicable to the Club's counsel's written opinion letter dated May 18, 2004 (the "Opinion Letter"), which was provided to the Club's current Board and which concerned this very litigation. In particular, Magistrate Judge Francis concluded that the Opinion Letter was part of indivisible stream of communications with the defendants that began with other, older privileged communications that the Club had voluntarily disclosed. Thus, the Magistrate held. "fairness" requires that the Club disclose the Opinion Letter, prepared on the eve of this action.

Respectfully, the Magistrate Judge erred. The Opinion Letter was not part of a stream of communications. Rather it was prepared by different counsel for different audiences, at different times, in different circumstances, and for different purposes.

## Nature of this Action

The Club is a mutual insurance association that provides indemnity to its "members," various ship and transport companies. The defendants are the Club's members for and in the years prior to 1989. In all relevant years, the Club's Board was comprised almost entirely of officers and employees of the Defendants.

Pursuant to applicable terms and conditions set forth in the Club By-Laws and insurance policies, the Club indemnifies members for particular losses incurred within a given twelve month period, known as an "insurance year".

Generally speaking, the Club "opens" an insurance year at the outset of a given twelve month period and, historically "closed" that insurance year several years later. During the time the insurance year is open, the Club can assess its members for payments in addition to the premium in order to address actual or projected shortfalls in funds collected from the members of each year to provide indemnities to the members of those insurance years regarding their reported claims. In theory, the Club closed an insurance year after the passage of time sufficient for all members to learn of and report all losses (or claims that might lead to losses) for which they were entitled to seek indemnity. With this information, in theory, the Club was able to (1) impose the appropriate financial assessment on members and (2) establish appropriate reserves sufficient to satisfy all future, known claims.

In this action, the Club seeks a determination that, with respect to insurance years prior to 1989[1], it is not required to indemnify members for a type of occupational injury claims that were "incurred but not reported" to the Club before a given insurance year was closed (referred to by the parties as "IBNR claims"). Alternatively, the Club seeks a declaration that it is entitled to reopen those closed years to make further assessments of those members to satisfy IBNR claims[2].

---

[1] Insurance years 1989 and later are subject to a different rule regime and are not at issue in this case.
[2] For a more complete recitation of the factual background of this action, plaintiff respectfully refers the court to the factual recitation in Magistrate Judge Francis' September 13th Order.

The defendants contend that when they were the Directors of the Club in the past, it was always their intention and understanding that, in closing an insurance year, the Club would not make further assessments, but would remain liable to indemnify members for IBNR occupational disease claims. Defendants seek, in essence, unlimited insurance coverage for which they never paid.

### Facts Related to the Pending Discovery Issue

Opinions Produced and Used by the Club

During discovery, the Club produced all attorneys' opinion letters contained in its files dated prior to January 2000, that is, the date at which the relationship between the Club and its former members became or was about to become adversarial. In addition, the Club also produced several opinions dated after 2000 dealing with the closing of insurance years after 1989, but as the years after 1989 are not at issue in this case, those opinions are irrelevant. All of these opinions had previously been circulated to the Club's former Boards of Directors in the ordinary course of the Club's and the Director's business. At mentioned above, at that time, the Directors were largely comprised of defendants' officers and employees. The defendants, at the Club's request, produced their copies of the same documents.

The opinions used by the Club are those marked at the deposition of Charles Kurz as Club Exhibits 31, 36, 36A, 55, 56, 57, 58 and 61 (copies are annexed hereto as Ex. "3"). All of those opinions pre-date January 2000. Subjects discussed include the effects

4

of closing an insurance year, the use of the Club's Reserves and reopening of Closed Years. All of those opinions had previously been distributed to the Club's former Boards of Directors, some more than once.

The American Club's Investigation

In 2002, defendant Keystone filed a suit against the American Club, <u>Keystone Shipping Co. v American Steamship Owners Mutual Protection and Indemnity Association</u>, 02 Civ. 1477 (LAK) (S.D.N.Y.), in which Keystone challenged the American Club's policy of applying multiple deductibles to claims arising under policies over multiple closed claim years. Keystone sought a ruling that the American Club should be required only to apply a single deductible in such claims, the effect of which would be to provide greater insurance coverage to Keystone at the expense of the American Club and its current members. In response to Keystone's suit, <u>and relying in large part on documents produced by Keystone in that suit</u>, including American Club counsel opinions, the American Club's <u>current</u> Directors, only one of which (Robert Agresti of defendant Farrell Lines) represented a company that was a Club member prior to 1989, re-examined the entire matter. Upon finally learning the true facts, the Club's current Directors determined that, in fact, the Club had no obligation to indemnify members of closed insurance years for their unreported, unreserved or deliberately underreserved-for claims arising from long closed years. The prior practice was discretionary.

5

It was in this context that the American Club's current counsel, Nourse & Bowles, LLP, provided the Opinion Letter dated May 18, 2004. The American Club thereafter terminated the discretionary practice and filed the instant declaratory judgment action seeking a declaration of its right to terminate the practice and/or, alternatively, to reopen each of the insurance years in question, as authorized by New York law, on the ground of mutual mistake or other good and sufficient cause.

### Prior Proceedings

In or around early May, 2005, the American Club learned that defendant Farrell Lines, whose employee Robert Agresti had received a copy of the May 18, 2004 Opinion Letter in his capacity as a director of the American Club, had improperly produced copies as part of its document production. Such production by Farrell Lines was in direct contravention of notices sent by counsel to the American Club to Mr. Agresti personally (June, 2004) and to counsel for defendant Farrell Lines (February, 2005).

On May 11, 2005, in response to a request by counsel for the American Club, Magistrate Judge Francis issued a memorandum and endorsed order permitting the American Club to file a motion for protective order regarding, inter alia, the Opinion Letter, and ordering all defendants who had received copies to sequester the documents pending his ruling. The motion was duly briefed, and oral argument was held on the motion in connection with a status conference held before Magistrate Judge Francis on July 6, 2005.

6

In the September 13, 2005 Magistrate Judge Francis denied the protective order,

ruling that attorney/client privilege was waived[3] because the Club had produced and used

a number of the old opinion letters in deposing former Club members and directors, and

the defendants, in "fairness," were entitled to obtain the Opinion Letter in order to

determine whether the advice given to the former Board directors, the defendants'

employees, "remained uniform over time," Opinion, Ex. "1", pg. 23.

The next day, counsel for the American Club asked the Court to reconsider certain

portions of the September 13 Order, to consider the Club's work-product argument, and,

in the alternative, to stay enforcement of the Order pending this appeal.  By memorandum

and order dated September 15, 2005, Magistrate Judge Francis granted the request for

reconsideration in part and denying it in part, finding that his ruling with respect to

waiver of attorney-client privilege applied equally to plaintiff's assertion of protection

under the work product doctrine.  The September 15 order, did, however, grant plaintiff's

request for a stay.[4]

The American Club objects to these rulings on the ground that Nourse & Bowles'

May 2004 Opinion Letter has no bearing on the uniformity of advice given to the former

---

[3] On July 11, 2005, counsel for the American Club wrote to the court and withdrew the claim of attorney client privilege with respect to the Opinion Letter, but maintained its assertion of work product.  The Club abandoned its privilege argument because it learned, during the pendency of the protective order application, that that a copy of the Opinion Letter had been provided to its independent actuaries in connection with their preparation of state law-mandated reports.

[4] Counsel for certain defendants have also requested a further ruling from Magistrate Judge Francis that he expand the scope of his September 13 order to require the American Club to produce all documents appearing on the American Club's privilege log.  By memo endorsed letter dated September 27, 2005, Magistrate Judge Francis deferred any ruling on defense counsel's request pending this Court's ruling on these objections.

Directors many years ago, and the only opinions needed to evaluate the uniformity of that advice are the old opinions already produced.  There are no others.

The Orders fail to recognize that, over time, the American Club's counsel has acted in different capacities as to the defendants: (1) as American Club counsel to the members in the years when the defendants were members of the American Club, (2) as American Club counsel to the current members in the years after the defendants left the American Club, and during which time the conduct of the former members was being investigated, and (3) as American Club counsel to the current members, adversarial to the former members after litigation was commenced by defendant Keystone in 2002.  The opinions of counsel in stage "1" are distinguishable from those in stages "2" and "3", and counsel's opinions and work product in stages "2" and "3" are entitled to protection.

In the circumstances of this case, it was an abuse of discretion and clearly erroneous and contrary to law for the Court below to rule that the American Club's production and use of the old opinion letters resulted in a broad, prospective subject matter waiver encompassing the May 18, 2004 opinion.

The Court should rule that the American Club has not waived the work-product immunity attached to the May 18, 2004 opinion letter by reason of its production and use of the old opinion letters.

**<u>Argument</u>**

**The American Club's Production Of Opinion Letters
Was Not "Selective" Within The Meaning
Of The "Fairness" Doctrine Because Production
Of The May 18, 2004 Opinion Is Not Necessary For
A Full And Complete Understanding Of
The Legal Advice Given To Former Directors
Contemporaneously With Their Conduct**

The Club does not dispute the proposition that where a party discloses part of a privileged "conversation", it waives attorney-client and work-produce product protection as to the balance of that "conversation". <u>See</u>, <u>In Re Von Bulow</u>, 823 F.2d 94, 101-102 (2d Cir. 1987). The Club, however, does challenge the finding that the May 2004 Opinion Letter to the current Board of Directors forms any part of the prior "conversation" between former Club counsel and former Boards of Directors or relates in any way thereto.

The Court below ruled, in pertinent part:

\*  \*  \*

> In this case, the American Club has engaged in wholesale disclosure of apparently privileged documents. For example, it has produced in discovery sixteen different opinions of counsel, dated from 1955 to 2003, regarding the closing of insurance years and the Club's ability to assess members after a year has been closed. (Bauer Decl., Exh. L). It has also disclosed attorney-client communications relating to coverage for occupational disease claims (Bauer Decl., Exh. M), use of the Club's reserves (Bauer Decl.,Exh. N), application of deductibles (Bauer Decl., Exh. O), and a variety of other topics. (Bauer Decl., Exh. P).

9

Moreover, the American Club has relied on those documents in conducting depositions.

\*     \*     \*

The American Club argues that this conduct does not constitute a waiver of the privilege because it disclosed only those documents that were issued or prepared before January 2000, and withheld those created thereafter, when the relationship between the Club and at least some of its former members "was or was about to become adversarial." (Reply Memorandum in Support of Plaintiff's Motion for Protective Order and Order Compelling Production of Documents at 4). But this is precisely the type of selectivity that constitutes a waiver. The opinions of counsel were privileged regardless of when they were authored, and yet the American Club chose to divulge some and not others.

\*     \*     \*

[T]he disclosure by the American Club was plainly tactical and operated to the disadvantage of the defendants in the litigation.   While the Club has been able to suggest that certain deponents testimony is inconsistent with legal advice that the Board received and with the position that these deponents may have adhered to while serving as Directors – the defendants have been deprived of information about the extent to which that legal advice remained uniform over time. To the extent that the American Club implicitly presents an argument that the Directors did follow or should have followed the opinions of counsel, the defendants are entitled to know what all of those opinions were.

The American Club, then, has waived the privilege.

See Ex. "1", pg. 22, 23

In so holding, the court implicitly and, the Club respectfully submits, incorrectly, treats the May 18, 2004 Opinion Letter as part and parcel of an indivisible stream of communication between counsel and the defendants which must be construed as a whole

10

in order to be understood.  In fact, that is emphatically not the case because it is clear that a distinction must be drawn between opinions tendered to the former Board members when they were members, and opinions tendered to the present Board members at a time when the relationship between the Club and at least one former member Defendant had already become adversarial, and the relationship with the other defendants was in the process of becoming so.  The pre-2000 and 2004 and later opinions are drafted by different counsel for different audiences, at different times, in different circumstances, and for different purposes.  In these circumstances, there is no justification, legal or otherwise, for holding that production of the old opinion letters results in a broad prospective waiver of work product immunity for the May 18, 2004 opinion.

U.S. v. Skeddle, 989 F.Supp. 905 (N.D. Ohio 1977), recognized exactly this point. Skeddle dealt with the issue of subject matter waiver in connection with assertion of attorney-client privilege.  Nonetheless, in this case the Court below held that issues of waiver are applicable to both work-product and attorney client privilege.  See Ex. "2", p. 2.  Thus, the principles of Skeddle are applicable to the issue of work-product immunity, and to the degree that work-product involved concerns somewhat different and broader than attorney-client privilege, the limitations discussed therein should apply with even greater force to a document protected by work product.

In Skeddle, former officers and employees of a corporation were charged with defrauding the corporation.  Corporate counsel had early on communicated with the

11

former employees regarding the subject transactions. Thereafter, suspicions arose and counsel conducted an investigation. Subsequently, the corporation commenced suit against the former employees. The Corporation waived its claim of privilege as to the early communications, but maintained it as to the investigatory and litigation phases. The defendants argued that disclosure of the early communications waived the privilege as to all other communications on the same subject.

The Skeddle court found that the changing circumstances over time in the relationship between counsel and the defendants warranted a limited subject matter waiver of privileged materials and communications. The Skeddle Court stated:

*   *   *

> [4] Among the factors which appear to be pertinent in determining whether disclosed and undisclosed communications relate to the same subject matter are: 1) the general nature of the lawyer's assignment; 2) the extent to which the lawyer's activities in fulfilling that assignment are undifferentiated and unitary or are distinct and severable; 3) the extent to which the disclosed and undisclosed communications share, or do not share, a common nexus with a distinct activity; 4) the circumstances in and purposes for which disclosure originally was made; 5) the circumstances in and purposes for which further disclosure is sought; 6) the risks to the interests protected by the privilege if further disclosure were to occur; and 7) the prejudice which might result if disclosure were not to occur. By applying these factors, and such factors as may appear appropriate, a court may be able to comply with the mandate that it construe "same subject matter" narrowly while accommodating fundamental fairness.

989 F.Supp. at 909.

12

* * *

> If waiver of the privilege with regard to communications during the implementation phase were to lead to waiver with regard to communications during the investigatory and litigation phases, the interests protected by the attorney-client privilege would be placed at considerable risk. On the other hand, the risk of prejudice to the defendants from limiting the waiver to communications during the implementation phase appears nonexistent. Given the distinctive character of both Miller's activities and the lack of nexus between the earlier and the later communications there is no basis for concern that disclosure only of communications occurring before discovery of the alleged frauds is unfairly selective. By asserting the privilege with regard to communications after the implementation phase, LOF is not simultaneously using that claim as a sword and shield.

Id. at 910.

Thus, in Skeddle the court recognized that counsel's involvement with the defendants encompassed several distinct phases: (1) a phase in which they worked together in essence for a common purpose; (2) a phase in which a conflict of interest between the corporate principal and former management had arisen and investigations were underway; and (3) a phase in which the former management and counsel were adversarial due to the commencement of litigation. The Skeddle court ruled that disclosure of communications in the first stage where there was a commonality of interest between corporate counsel and the defendants did not warrant a subject matter waiver in the second and third phase where that commonality of interest was absent and, indeed, an adversarial relationship had begun.

13

Similarly, in this case, there is no justification for extending a waiver of work-product immunity due to disclosure of communications at a time when the American Club and former members, whose employees served as Directors, were apparently united in interest, to later periods when the relationship had become distant and adversarial. The issue in this case is what the former Directors knew and understood or should have understood when, among other things, they purported to rule out all further assessments when closing an insurance year[5]. The relevant inquiry, therefore, is what they were told when they were Directors. That evidence is found in the pre-2000 opinions, all of which the Club has produced, <u>not</u> in the May 18, 2004 letter. The Club's counsel's communications with the <u>current</u> Board in 2004 concerning this investigation, and his advice concerning this litigation has no bearing on the uniformity of advice given to prior Boards of Directors in years past. Counsel's communication in these later stages, including the May 18, 2004 opinion, are entitled to work-product protection.

## CONCLUSION

For the foregoing reasons, the Magistrate Judge's discovery orders dated September 13 and 15, 2005 should be reversed to the extent the order denied plaintiff's motion for protective order with respect to the May 18, 2004 Opinion Letter. This Court should order that the Opinion Letter is protected from disclosure pursuant to the

---

[5] The Club disputes that this was ever actually done.

14

work-product doctrine, and should further order all defendants and their counsel to return

forthwith all copies of the Opinion Letter to plaintiff's counsel.

Dated:    New York, New York
          September 28, 2005

                                        Respectfully submitted,

                                        NOURSE & BOWLES, LLP
                                        Attorneys for Plaintiff

                                        By:

                                            Shaun F. Carroll (SC 9898)
                                            One Exchange Plaza
                                            At 55 Broadway
                                            New York, New York 10006
                                            (212) 952-6200

Of Counsel
    Lawrence J. Bowles

SULLIVAN & WORCESTER LLP

15

*Exhibit 1*

UNITED STATES DISTRICT COURT                    **(ECF)**
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -:
AMERICAN STEAMSHIP OWNERS MUTUAL    :   04 Civ. 4309 (LAK) (JCF)
PROTECTION AND INDEMNITY            :
ASSOCIATION, INC.,                  :       MEMORANDUM
                                    :       AND  ORDER
                Plaintiff,          :
                                    :
        - against -                 :
                                    :
ALCOA STEAMSHIP CO., INC.,          :
et al.,                             :
                                    :
                Defendants.         :
- - - - - - - - - - - - - - - - - -:
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

    The American Steamship Owners Mutual Protection and Indemnity
Association, Inc. (the "American Club" or the "Club") has brought
this action pursuant to 28 U.S.C. § 2201, seeking a determination
that it is not obligated to indemnify its members for certain
occupational disease claims that were not reported to the Club
prior to February 20, 1989.  The American Club now moves under Rule
26(c) of the Federal Rules of Civil Procedure for a protective
order foreclosing the defendants from access to two opinion
letters, dated May 18 and June 18, 2004, provided to the Club by
its counsel, Nourse & Bowles LLP ("Nourse & Bowles").  The Club
also moves pursuant to Rule 37 for an order compelling defendants
Keystone  Shipping  Co.  ("Keystone"),  Farrell  Lines,  Inc.
("Farrell"), and American President Lines, Ltd. ("APL") to: (1)
produce all opinions and reports of counsel concerning pending and
anticipated occupational disease claims and lawsuits as well as the

1

issue of reopening closed insurance years; (2) make available a number of their former counsel for deposition; and (3) produce all internal corporate reports and analyses concerning actual and anticipated liability for occupational disease claims.[1]  For the reasons that follow, the motion for a protective order is granted in part and denied in part and the motion to compel is denied in its entirety.

Background[2]

The American Club is a mutual indemnity insurance association organized under the laws of New York State.  (Second Amended Complaint ("SAC"), ¶¶ 1, 14).  The defendants are vessel owners and related entities that were members of the Club prior to February 20, 1989.  (SAC, ¶ 15).  During each year, the American Club would issue to each of its members a fully assessable marine protection

---

[1] The American Club also initially sought an order directing APL to produce an opinion provided to APL by Joseph K. Molloy, Esq. in May 1995, on the basis that APL had waived the attorney-client privilege by showing the opinion letter to counsel for the Club. The American Club has abandoned that argument but continues to contend that this letter, along with other opinions provided to the defendants that relate to the Club's practices, has been placed "at issue" by the defendants' allegations that they acted in reliance on those practices.  (Letter of Lawrence J. Bowles dated July 11, 2005, at 3-4).

[2] The general background of this case is set forth at length in a prior decision by the Honorable Frank Maas, U.S.M.J., to whom the case was then assigned.  American Steamship Owners Mutual Protection and Indemnity Association, Inc. v. Alcoa Steamship Co., No. 04 Civ. 4309, 2005 WL 427593 (S.D.N.Y. Feb. 22, 2005). The facts will be summarized here only to the extent necessary for an understanding of the pending discovery disputes.

and indemnity insurance policy. (SAC, ¶ 24). Premiums for each member were based primarily on its historical loss experience. (SAC, ¶ 28). On the basis of these payments, the members mutually indemnified each other except for catastrophic claims, which were covered by reinsurance. (SAC, ¶ 25).

Prior to 1989, the club typically closed each policy year about ten years after the actual end of that year, at which time the Board of Directors would determine which members owed final assessments and which were entitled to dividends. (SAC, ¶¶ 40, 43). The Board also established reserves to pay additional claims that might arise out of a given year, but once the year was closed, it neither sought additional assessments nor paid additional dividends. (SAC, ¶¶ 6, 40). Between 1946 and 1976, case reserves were set aside for claims that were reported but unresolved, but no funds were reserved for claims that were incurred but not reported ("IBNR" claims). (SAC, ¶ 44).

By the early 1980's, members of the American Club began to receive claims from seamen for occupational diseases that allegedly resulted from exposure to asbestos aboard vessels as early as the 1940's. (SAC, ¶¶ 45, 46). No IBNR reserves had been established for these claims when the relevant policy years had been closed, but the Club nevertheless began indemnifying its members for asbestos-related diseases from its general reserves. (SAC, ¶ 47). The American Club characterizes this policy as discretionary and

3

contends that the payments were not required by its charter or by-laws or by New York law. (SAC, ¶ 56).

On May 25, 2004, the Board of Directors discontinued this practice and determined that the American Club would not indemnify its members for IBNR claims that arose in closed policy years prior to February 20, 1989. (SAC, ¶ 57). This determination had a disparate impact on Club members both because members had varying levels of exposure for occupational disease claims and because the Club's membership had changed over time as some members terminated their relationship while new members joined. Certain members adversely affected by this decision objected, and the Club therefore initiated this declaratory judgment proceeding seeking a determination that it is entitled to decline to use its general reserves to pay IBNR claims for closed years. (SAC, ¶ 64). To the extent this argument is rejected, the Club requests a determination that it may reopen closed years in order to levy the assessments necessary to pay for the IBNR claims for that year. (SAC, ¶ 60).

Shortly before the Board voted to discontinue the American Club's discretionary practice, its counsel, Nourse & Bowles, provided it with an opinion letter dated May 18, 2004. That letter was circulated to each member of the Board of Directors, including Robert Agresti, who was an officer of Farrell Lines, one of the members of the Club. The letter bore a legend indicating that it was a confidential attorney-client communication.

4

After the Board vote, and after this litigation had been commenced, Nourse & Bowles provided the Board with a second opinion letter dated June 18, 2004. That letter was also identified as an attorney-client communication. It was intended to be circulated to all Board members except Mr. Agresti but, according to the American Club, was inadvertently delivered to him as well. Immediately thereafter, the Club notified Mr. Agresti of its error and requested that the letter be returned or destroyed.

In February 2005, Nourse & Bowles notified counsel for Farrell Lines that both the May 18 and June 18, 2004 letters were attorney-client communications and demanded their return. Farrell, however, mistakenly circulated these opinions to its co-defendants on a computer disk containing discovery materials in this case. All defendants then agreed not to utilize the letters until their status had been determined by the Court. The American Club seeks a ruling that these letters are privileged.

The second set of documents at issue consists of "internal documentation concerning [the defendants'] exposure to occupational disease claims[.]" (Memorandum of Law in Support of Plaintiff's Motion for Protective Order, and Order Compelling Production of Documents ("Pl. Memo.") at 15). To the extent that such documents reflect communications with counsel, the defendants have identified them as privileged. Although the American Club has not itemized the documents that it considers as falling into this category, it

5

has identified one representative example. After a $6 million judgment was entered against the American Club on an asbestos claim, Club counsel suggested in April 1995 that closed policy years be reopened and the members in those years be required to pay additional assessments. Prior to responding to that recommendation, the Directors were given the opportunity to confer with their own counsel. Accordingly, Ben Gleason, a member of the American Club's Board and an officer of APL, solicited the advice of an attorney, James Molloy, who provided a written opinion. The Club now seeks disclosure of that letter as well as similar communications between each of the defendants and their respective counsel.

Discussion

    A. Choice of Law

    The parties have not addressed what law should govern the privilege issues in this action, though they have generally relied on federal case law. The starting point for any choice-of-law analysis relating to an issue of privilege is Rule 501 of the Federal Rules of Evidence, which provides:

> Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness . . . shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness . . . shall be

determined in accordance with State law.

At first glance, this framework would appear to call for the application of state privilege law here.  In a case brought in admiralty, federal choice-of-law rules apply.  See Advani Enterprises, Inc. v. Underwriters at Lloyds, 140 F.3d 157, 162 (2d Cir. 1998); Sundance Cruises Corp. v. American Bureau of Shipping, 7 F.3d 1077, 1080 (2d Cir. 1993).  Those rules, in turn, provide that in cases construing marine insurance contracts, the law of the state with the greatest weight of contacts with the transaction at issue will govern.  See Advani, 140 F.3d at 162; Hartford Fire Insurance Co. v. Mitlof, 193 F.R.D. 154, 157 (S.D.N.Y. 2000); Royal Insurance Co. of America v. Sportswear Group, LLC, 85 F. Supp. 2d 275, 278 (S.D.N.Y. 2000).  And, although this case concerns the general obligations of the American Club to its members rather than any specific policy of insurance, it is still likely that those obligations will be determined in accordance with New York law: the Club is organized under New York law, it holds its annual meeting in New York City (American Club By-Laws, Rules & List of Correspondents ("By-Laws and Rules"), Art. I, § 2, attached as Exh. D to Declaration of Lisa A. Bauer dated June 10, 2005 ("Bauer Decl."), at AC0083421), and, according to the American Club's rules, both the rules themselves and any insurance policies that are issued by the Club are governed by New York law.  (By-Laws and Rules, Rule 1.4.45, attached as Exh. D to Bauer Decl., at

7

AC0083453).  New York State law, then would seem to supply the
"rule of decision" for the substantive claims and therefore to
govern privilege issues as well.

Such an analysis, however, fails to give sufficient weight to
the well-documented legislative history of Rule 501, which supports
the conclusion that Congress intended federal privilege law to
apply in cases such as this, where the state substantive law is
operative not of its own force, but as adopted by the federal
common law.  In 1971, the Advisory Committee on the Federal Rules
of Evidence recommended that common law privileges be abolished for
any case brought in federal court; the only privileges that would
remain would be those established by the Constitution or federal
statute or specifically enumerated in the proposed rules.  This
proposal was highly controversial because it did not provide for
the application of state privilege law in diversity cases, and
Congress consequently became actively involved  in the rulemaking
process.  See 23 Charles Alan Wright & Kenneth W. Graham, Jr.,
Federal Practice and Procedure § 5421 (1980).  The House Judiciary
Committee drafted what is now Rule 501, designing the state law
proviso to require the application of state privilege law in
proceedings governed by Erie R. Co. v. Tompkins, 304 U.S. 64
(1938).  H.R. Rep. No. 650, 93d Cong., 2d Sess. (1974), reprinted
in 1974 U.S.C.C.A.N. 7075.  The Senate Judiciary Committee was
concerned that the House draft could be construed to require the

8

application of state privilege law not only in diversity cases but also in those federal question cases where courts use state substantive law to fill in the gaps of federal common law. <u>See</u> 23 Wright & Graham § 5433. To give the rule greater precision, the Senate Judiciary Committee drafted, and the Senate adopted, an amendment limiting the use of state privilege law to diversity cases. 23 Wright & Graham § 5433. While the Conference Committee declined to replace the House proviso with the Senate language, it did indicate its endorsement of the Senate view by explaining the final version of the Rule as follows:

> In nondiversity jurisdiction civil cases, federal privilege law will generally apply. In those situations where a federal court adopts or incorporates a state law to fill the intersticies or gaps in federal statutory phrases, the court generally will apply federal privilege law. . . . When a federal court chooses to absorb state law, it is applying the state law as a matter of federal common law. Thus, state law does not supply the rule of decision (even though the federal court may apply a rule derived from state decisions), and state privilege law would not apply.

Conf. Rep. No. 1597, 93d Cong., 2d Sess. (1974), <u>reprinted in</u> 1974 U.S.C.C.A.N. 7098, 7101. Accordingly, "[w]here the state substantive law is being used as part of the 'federal common law', the Conference Report makes it clear that state privilege law need not be applied under Rule 501." 23 Wright & Graham § 5433 at 857.

Thus, in cases arising under the Federal Tort Claims Act (the "FTCA"), for example, federal privilege rules apply because, although state law governs the substantive issues, it is only

because that law has been "absorbed" by the federal statute.  <u>See</u> <u>Tucker v. United States</u>, 143 F. Supp. 2d 619, 622-23 (S.D. W. Va. 2001); <u>Syposs v. United States</u>, 179 F.R.D. 406, 410-11 (W.D.N.Y. 1998); <u>Young v. United States</u>, 149 F.R.D. 199, 204 (S.D. Cal. 1993).  <u>But see</u> <u>Ellis v. United States</u>, 922 F. Supp. 539, 540 (D. Utah (1996)(characterized in <u>Tucker</u>, 143 F. Supp. at 624, as "lacking in . . . awareness of the legislative history behind Rule 501"); <u>Oslund v. United States</u>, 128 F.R.D. 110, 113-14 (D. Minn. 1989) (same).  Similarly, courts have concluded that federal privilege law applies in cases involving other federal statutes that incorporate state law.  <u>See, e.g.,</u> <u>Crowe v. County of San Diego</u>, 242 F. Supp. 2d 740, 746-48 (S.D. Cal. 2003) (42 U.S.C. § 1983); <u>Burrows v. Redbud Community Hospital District</u>, 187 F.R.D. 606, 608 (N.D. Cal. 1998) (Emergency Medical Treatment and Active Labor Act).

The same result follows here.  Cases in admiralty are generally governed by federal common law.  <u>See</u> <u>Woodward Governor Co. v. Curtiss-Wright Systems, Inc.</u>, 164 F.3d 123, 126 (2d Cir. 1999) ("[S]uits involving maritime claims are governed by the venerable federal common law of admiralty."); Thomas J. Schoenbaum, <u>Admiralty and Maritime Law</u> § 5-1 (4th ed. 2004).  State law controls specific issues only to the extent that it is incorporated or "absorbed" by federal maritime law.  Indeed, the case for applying federal privileges in admiralty cases is even stronger

than it is in FTCA cases, because the incorporation of state jurisprudence into maritime law is a function of judicial creation of federal common law, while the FTCA specifically directs the application of state law. Cf. Crowe, 242 F. Supp. at 748 (argument for applying federal privilege stronger in § 1983 cases than in FTCA cases). Accordingly, federal privilege principles govern in this case. See Hartford Fire Insurance Co. v. Garvey, 109 F.R.D. 323, 327 (N.D. Cal. 1985) (applying federal privilege law in admiralty case, albeit without Rule 501 analysis).

   B. Club Counsel's Opinion Letters

   The American Club contends that the defendants should be prohibited from using or disseminating the Nourse & Bowles opinion letters because the May 18 letter was provided to Mr. Agresti in confidence solely in his capacity as a Director of the Club and because the June 18 letter was delivered to him inadvertently. The defendants respond, first, that the American Club had no expectation of confidentiality with respect to the letters.[3] Further, they argue that the Club has waived any privilege it might have had by affirmatively utilizing earlier opinion letters relating to the same subject matter in the course of this litigation. The Club replies that it has properly withheld only

_____

[3] Defendant APL has taken no position with respect to the American Club's motion for a protective order. (Memorandum of Defendant APL in Opposition to Plaintiff's Motion for a Protective Order and to Compel Production of Documents Identified in APL's Privilege Log at 1 n.2).

11

those attorney-client communications that were created after January 2000, because it was at that point that the relationship between the Club and some of its present or former members had become adversarial. In addition, the American Club contends that because it has not relied on an advice-of-counsel defense, its use of privileged documents in discovery in this case does not constitute a subject matter waiver.

### 1. The Privilege Generally

The attorney-client privilege protects from disclosure communications among clients and counsel made for the purpose of obtaining legal advice, provided that the communications were intended to be kept confidential and the privilege has not been waived. See United States v. International Brotherhood of Teamsters, 119 F.3d 210, 214 (2d Cir. 1997); United States v. Doe (In re Six Grand Jury Witnesses), 979 F.2d 939, 943 (2d Cir. 1992); Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A., 160 F.R.D. 437, 441 (S.D.N.Y. 1995). The burden of establishing each of the elements of the privilege rests on the party asserting it. See United States v. Doe (In re Grand Jury Proceedings), 219 F.3d 175, 182 (2d Cir. 2000); International Brotherhood of Teamsters, 119 F.3d at 214).

It is beyond question that corporations as well as individuals are entitled to assert the privilege. See Commodity Futures Trading Commission v. Weintraub, 471 U.S. 343, 348 (1985); Upjohn

<u>Co. v. United States</u>, 449 U.S. 383, 386 (1991). As the Supreme Court has observed, however,

> The administration of the attorney-client privilege in the case of corporations . . . presents special problems. As an inanimate entity, a corporation must act through its agents. A corporation cannot speak directly to its lawyers. Similarly, it cannot directly waive the privilege when disclosure is in its best interest. Each of these actions must necessarily be undertaken by individuals empowered to act on behalf of the corporation.

<u>Weintraub</u>, 471 U.S. at 348. Thus, for a solvent corporation, corporate management, acting through its officers and directors, has the authority to exercise the privilege, a power that must be exercised consistent with management's fiduciary duties. <u>Id.</u> at 348-49.

### 2. <u>The Club's Assertion of the Privilege</u>

The individuals who serve as Directors of the American Club are also officers or employees of the Club's constituent members. Thus, for example, Mr. Agresti was not only a Director of the American Club, but also an officer of Farrell Lines. Accordingly, the defendants argue that a document provided by Club counsel to Mr. Agresti cannot be considered confidential such that it could not be disseminated to Farrell Lines; the defendants rely on "the common sense notion that a director would not sequester a document from the very company he represents on the board." (Memorandum of Law of Defendant Farrell Lines, Inc. in Opposition to Plaintiff's Motion for Protective Order and Order Compelling Production of

Documents ("Farrell Memo.") at 8-9). They contend that "the Club has freely distributed opinion letters with the understanding (and very likely the expectation) that they would be shared with the non-fiduciary members the directors represented" (Farrell Memo. at 8), and the defendants cite as an example an instance in which the American Club acceded to the suggestion of certain of its Directors that they have the opportunity to review with their own attorneys a legal issue that had been raised in an opinion letter from Club counsel. (Farrell Memo. at 9).

The example referred to by the defendants fails to support their position for two reasons. First, the fact that the American Club might have chosen to waive confidentiality with respect to a single attorney-client communication hardly proves that it did not treat other such communications as privileged. Second, the defendants mischaracterize the Club's handling of that particular communication. There is no evidence that the American Club expected that its attorney's opinion "would be disseminated to the counsel of the Club's non-fiduciary members." (Farrell Memo. at 9). Rather, the Club simply acknowledged that the Directors wished to obtain their own legal advice about the issue addressed in Club counsel's opinion. (Letter of T.J. McGowan dated May 4, 1995, attached as Exh. 12 to Affidavit of Shaun F. Carroll dated May 27, 2005 ("Carroll Aff.")). The Directors were perfectly capable of obtaining the desired input without disclosing the substance of the

opinion letter.

More generally, the defendants' argument raises the issue of whether the attorney-client privilege may be properly invoked by a corporation or similar entity against someone who was a director at the time that the document in question was created. Several cases have found that it may not. In Kirby v. Kirby, No. 8604, 1987 WL 14862 (Del. Ch. July 29, 1987), the plaintiffs, who had been ousted as directors of a charitable corporation, sought access to documents generated while they were in office but withheld by the defendants on the basis of the attorney-client privilege. The court reasoned as follows:

> The issue is not whether the documents are privileged or whether plaintiffs have shown sufficient cause to override the privilege. Rather, the issue is whether the directors, collectively, were the client at the time the legal advice was given. Defendants offer no basis on which to find otherwise, and I am aware of none. The directors are all responsible for the proper management of the corporation, and it seems consistent with their joint obligations that they be treated as the "joint client" when legal advice is rendered to the corporation through one of its officers or directors.

Id. at *7. Accordingly, the court rejected any claim of privilege and ordered disclosure of the documents created prior to the plaintiffs' ouster. Id.; see also Harris v. Wells, Nos. B-89-391, B-89-482, 1990 WL 150445, at *4 (D. Conn. Sept. 5, 1990) (requiring disclosure of documents based, in part, on Kirby).

Similarly, in Gottlieb v. Wiles, 143 F.R.D. 241 (D. Colo. 1992), the court found that a former chairman and CEO of a

15

corporation was not barred by the attorney-client privilege from obtaining documents generated during his tenure.  The court found that this was analogous to the situation in which "parties with a common interest retain a single attorney to represent them.  When they later become adverse, neither is permitted to assert the attorney-client privilege as to communications occurring during the period of common interest."  Id. at 247.

Other courts, however, have either refined or criticized the analysis advanced in these cases by drawing a distinction between former or dissident directors who are acting as individuals and those who are acting in their fiduciary capacity.  In Moore Business Forms, Inc. v. Cordant Holdings Corp., Civ. A. Nos. 13911, 14595, 1996 WL 307444 (Del. Ch. June 4, 1996), the Delaware Chancery Court clarified the rationale of Kirby:

> Although the Kirby Court described the directors as a "joint client," a more accurate description of the relationship is that there was a single "client," namely, the entire board, which includes all its members.  That is, a director seeking information furnished to the board that is the subject of the privilege claim is a "client" not in his or her individual capacity, but as a member of the collective body (the board) of which the director is one member.

Id. at *4 n.4.  Likewise, in Dexia Credit Local v. Rogan, No. 02 C. 8288, 2004 WL 3119026, at *10 (N.D. Ill. Dec. 21, 2004), the court rejected the common interest paradigm utilized by the court in Gottlieb, saying, "[t]hat model does not fit here, because during the time that he was in the control group, [the former director who

16

was seeking discovery] had no personal attorney-client privilege or relationship; that relationship rested solely in the corporation."

That distinction between a board member's personal role and his role as a director is critical in this case. As a matter of corporate law, any Director on the American Club's Board may have the right of access to attorney-client communications between the Club and its counsel generated during his or her tenure. But with that right comes the obligation to maintain the confidentiality of that communication, since the privilege belongs to the American Club and is not the Director's to waive. As the court reasoned in Genova v. Long Peak Emergency Physicians, P.C., 72 P.3d 454, 463 (Colo. Ct. App. 2003),

> Although plaintiff's status as a former director would have entitled him to learn privileged information when he was a director, he would then have been duty bound to keep such information confidential. He would not have been entitled alone to assert or waive the privilege on behalf of [the defendant corporation].

When a Director of the Club, then, is acting on behalf of the member entity of which he is an officer, he can neither disseminate confidential information he has received as a Board member nor pierce the privilege to obtain additional information. See Milroy v. Hanson, 875 F. Supp. 646, 650 (D. Neb. 1995) (denying access to director for privileged material sought to further personal goals in litigation rather than in fiduciary role). Thus, the fact that Mr. Agresti and other Directors of the American Club also had roles in the member entities does not undermine the Club's ability to

17

assert the privilege, since information shared with these directors was provided to them in their capacity as fiduciaries. This does not end the inquiry, however, because the defendants also argue that the Club has waived its privilege by disclosing protected communications during the course of this litigation.

3. <u>Waiver</u>

It is well established that "the attorney-client privilege cannot at once be used as a shield and a sword." <u>United States v. Bilzerian</u>, 926 F.2d 1285, 1292 (2d Cir. 1991) (citations omitted). Accordingly, if a party places advice that it has received from an attorney "at issue" in litigation, it has waived the privilege with respect to all such advice on the same topic. An "at issue" waiver occurs, for example, when a defendant raises a defense of advice of counsel, <u>see</u> <u>Bilzerian</u>, 926 F.2d at 1292; <u>Convolve, Inc. v. Compaq Computer Corp.</u>, 224 F.R.D. 98, 104 (S.D.N.Y. 2004); <u>In re Buspirone Patent Litigation</u>, 210 F.R.D. 43, 53 (S.D.N.Y. 2002); <u>Resolution Trust Corp. v. Massachusetts Mutual Life Insurance Co.</u>, 200 F.R.D. 183, 191 (W.D.N.Y. 2001), or when a plaintiff sues a former attorney for professional malpractice, <u>see</u> <u>Louima v. City of New York</u>, No. 98 CV 5083, 2004 WL 2359943, at *70 (E.D.N.Y. Oct. 18, 2004); <u>Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez</u>, No. 96 Civ. 7233, 2003 WL 21277139, at *2 (S.D.N.Y. June 2, 2003). Here, disclosure of the Nourse & Bowles opinion letters is not required by the "at issue" doctrine because the American Club has

18

never advanced a claim or defense as to which the opinion of counsel is a critical element.

However, reliance on advice of counsel is not the exclusive basis for finding waiver of the attorney-client privilege. "Fairness considerations may also come into play where the party asserting the privilege makes factual assertions, the truthfulness of which may be assessed only by an examination of the privileged communications or documents." Falise v. American Tobacco Co., 193 F.R.D. 73, 84 (E.D.N.Y. 2000)(citations omitted); see also In re Broadcom Corp. Securities Litigation, Nos. SA CV 1275, SA CV 2301, 2005 WL 1403516, at *1 (C.D. Cal. Feb. 10, 2005) ("A party waives the privilege if it injects into the case an issue that in fairness requires an examination of otherwise protected communications."). Furthermore, the "fairness doctrine" "aim[s] to prevent prejudice to a party and distortion of the judicial process that may be caused by the privilege-holder's selective disclosure during litigation of otherwise privileged information." In re von Bulow, 828 F.2d 94, 101 (2d Cir. 1987).  Thus,

> if a party's disclosure of a portion of a communication or of one among several related communications may be misleading because the party has disclosed only favorable material while concealing unfavorable information, waiver is likely to be found for so much of the withheld information "as will make the disclosure complete and not misleadingly one-sided."

Koster v. Chase Manhattan Bank, No. 81 Civ. 5018, 1984 WL 883, at *4 (S.D.N.Y. Sept. 18, 1984) (quoting Teachers Insurance and

19

<u>Annuity Association v. Shamrock Broadcasting Co.</u>, 521 F. Supp. 638, 641 (S.D.N.Y. 1981)); <u>see also</u> <u>Hercules, Inc. v. Exxon Corp.</u>, 434 F. Supp. 136, 156 (D. Del. 1977) (unfair to allow party to "disclose only those facts beneficial to its case and refuse to disclose, on the grounds of privilege, related facts adverse to its position"); <u>Haymes v. Smith</u>, 73 F.R.D. 572, 576 (W.D.N.Y. 1976) ("If a party-client chooses to disclose part of an otherwise privileged communication directed to his legal counsel, then he waives the privilege and the production of all the correspondence or the remainder of the consultations about the same subject can be demanded.").

In this case, the American Club has engaged in wholesale disclosure of apparently privileged documents. For example, it has produced in discovery sixteen different opinions of counsel, dated from 1955 to 2003, regarding the closing of insurance years and the Club's ability to assess members after a year has been closed. (Bauer Decl., Exh. L). It has also disclosed attorney-client communications relating to coverage for occupational disease claims (Bauer Decl., Exh. M), use of the Club's reserves (Bauer Decl., Exh. N), application of deductibles (Bauer Decl., Exh. O), and a variety of other topics. (Bauer Decl., Exh. P).

Moreover, the American Club has relied on those documents in conducting depositions. When, for instance, Keith Kennedy, a former Director and member of the Club's Finance Committee

testified to his understanding that the closing of an insurance year precluded the Club from making further assessments but did not relieve the American Club of its obligation to pay claims incurred in that year, counsel for the Club sought to have him reconcile his answer with an opinion letter provided to the Directors during Mr. Kennedy's tenure.  (Deposition of Keith Kennedy, attached as Exh. Q to Bauer Decl., at 140-47).  Similarly, during the deposition of another former Director, Richard Gronda, Club counsel presented the witness with an opinion letter and asked him if he would have questioned the author about it, since it appeared to express a legal opinion different from the witness' own.  (Deposition of Richard Gronda, attached as Exh. R to Bauer Decl., at 122-27). Finally, when deposing yet a third former Director, Charles Kurz, II, Club counsel proffered a letter from the American Club's attorney to the Board and asked whether the opinions it contained comported with the witness' understanding.  (Deposition of Charles Kurz, attached as Exh. S to Bauer Decl. at 296-311).

The American Club argues that this conduct does not constitute a waiver of the privilege because it disclosed only those documents that were issued or prepared before January 2000, and withheld those created thereafter, when the relationship between the Club and at least some of its former members "was or was about to become adversarial."  (Reply Memorandum in Support of Plaintiff's Motion for Protective Order and Order Compelling Production of Documents

21

at 4). But this is precisely the type of selectivity that constitutes a waiver. The opinions of counsel were privileged regardless of when they were authored, and yet the American Club chose to divulge some and not others.

According to some case law, this alone is enough to trigger broad subject matter waiver. See United States v. Bernard, 877 F.2d 1463, 1465 (10th Cir. 1989); Lorenz v. Valley Forge Insurance Co., 815 F.2d 1095, 1099 (7th Cir. 1987); Hollins v. Powell, 773 F.2d 191, 196 (8th Cir. 1985); Weil v. Investment/Indicators, Reasearch & Management, Inc., 647 F.2d 18, 24 (9th Cir. 1981); and Bower v. Weisman, 669 F. Supp. 602, 204 (S.D.N.Y. 1987). One court has stated:

> It bears emphasis that these cases do not require the discovering party to demonstrate prejudice, such as, for example, proof that the privilege holder has disclosed only favorable materials. They also do not require the discovering party to demonstrate that the privilege holder is putting the privileged communications in issue in the litigation. It appears sufficient, for a waiver as to subjects discussed in the disclosed conversations, that the privilege holder has voluntarily revealed only some of the communications on the subject and has withheld others.

Bowne of N.Y. City, Inc. v. AmBase Corp., 150 F.R.D. 465, 485 (S.D.N.Y. 1993). Other courts have criticized Bowne for suggesting that subject matter waiver does not require a showing of tactical disclosure or other unfairness. See Falise, 193 F.R.D. at 85. That debate need not be resolved here, however, for the selective disclosure by the American Club was plainly tactical and operated

22

to the disadvantage of the defendants in the litigation.  While the Club has been able to suggest that certain deponents' testimony is inconsistent with legal advice that the Board received -- and with the position that these deponents may have adhered to while serving as Directors -- the defendants have been deprived of information about the extent to which that legal advice remained uniform over time.  To the extent that the American Club implicitly presents an argument that the Directors did follow or should have followed the opinions of counsel, the defendants are entitled to know what all of those opinions were.

The American Club, then, has waived the privilege.  The precise scope of that waiver need not now be determined, as only the May 18 and June 18, 2004 opinion letters are currently in question.  It is plain that the May 18 letter, which I have reviewed in camera, is "one among several related communications" along with  the opinions that the Club has already divulged in this litigation.  Koster, 1984 WL 883, at *4.  By contrast, the June 18 letter deals with two groups of issues -- a potential conflict of interest on the part of Club counsel and strategic considerations relating to ongoing litigation -- which are not closely enough related to the disclosed documents to warrant production under the fairness doctrine.  Therefore, while the May 18 letter shall be produced because the privilege has been waived, the June 18 letter

need not be.[4]

    C. Opinions of Counsel Provided to the Defendants

    The American Club's second application is for an order requiring Keystone, Farrell, and APL to produce "all opinions and reports from all counsel . . . concerning then pending and anticipated occupational disease claims and lawsuits . . . as well as the issue of reopening closed insurance years[.]" (Pl. Memo. at 2). The Club argues that certain officers and employees of these defendants were members of the Board and therefore were fiduciaries of the Club. Accordingly, the American Club contends that under the doctrine established in Garner v. Wolfinbarger, 430 F.2d 1093 (5th Cir. 1970), "[w]here a party has acted as a fiduciary of an opponent, the attorney client privilege may not be invoked to conceal documents and information obtained during the course of that relationship, where such documents and information are important to the opponent's case." (Pl. Memo. at 20).

    Garner was an action brought by stockholders against a corporation and its officers alleging violations of federal and state securities laws as well as common law fraud. When the plaintiffs sought information about advice given to the corporation by its counsel concerning the transactions at issue, the

---

    [4] The defendants have not challenged the Club's position that the disclosure of the June 18 letter to Mr. Agresti does not create an independent basis for asserting that the privilege was waived because that disclosure was inadvertent.

corporation objected on grounds of attorney-client privilege.
Garner, 430 F.2d at 1095-96. The Fifth Circuit concluded as
follows:

> The attorney-client privilege still has viability for the
> corporate client. The corporation is not barred from
> asserting it merely because those demanding information
> enjoy the status of stockholders. But where the
> corporation is in suit against its stockholders on
> charges of acting inimically to stockholder interests,
> protection of those interests as well as those of the
> corporation and the public require that the availability
> of the privilege be subject to the right of the
> stockholders to show cause why it should not be invoked
> in the particular instance.

Id. at 1103-04. The court went on to identify a variety of factors
to be considered in determining whether the party seeking to pierce
the corporation's privilege has demonstrated good cause:

> the number of shareholders and the percentage of stock
> they represent; the bona fides of the shareholders; the
> nature of the shareholders' claim and whether it is
> obviously colorable; the apparent necessity or
> desirability of the shareholders having the information
> and the availability of it from other sources; whether,
> if the shareholders' claim is of wrongful action by the
> corporation, it is of action criminal, or illegal but not
> criminal, or of doubtful legality; whether the
> communication related to past or to prospective actions;
> whether the communication is of advice concerning the
> litigation itself; the extent to which the communication
> is identified versus the extent to which the shareholders
> are blindly fishing; the risk of revelation of trade
> secrets or other information in whose confidentiality the
> corporation has an interest for independent reasons.

Id. at 1104.

Although the Garner doctrine arose in a shareholder derivative
action, most courts have not limited it to that context. Compare
Weil v. Investment/Indicators Research & Management, Inc., 647 F.2d

18, 23, (9th Cir. 1981) (restricting doctrine to derivative actions) with Fausek v. White, 965 F.2d 126, 130-31 (6th Cir. 1992) (rejecting restriction and applying Garner to non-derivative claims against corporation) and Ward v. Succession of Freemen, 854 F.2d 780, 786 (5th Cir. 1988) (same).  Rather, it has been applied generally where there is "a fiduciary relationship which obligates the fiduciary to safeguard his or her beneficiaries' interest without obscuring his or her reason from the legitimate inquiries of the beneficiaries."  Henry v. Champlain Enterprises, Inc., 212 F.R.D. 73, 84 (N.D.N.Y. 2003).  Thus, Garner has been found applicable to relationships between an attorney and a client, In re Sunrise Securities Litigation, 130 F.R.D. 560, 596 & n.9 (E.D. Pa. 1989), between a union and its members, Aguinaga v. John Morrell & Co., 112 F.R.D. 671, 679-81 (D. Kan. 1986), between a bank and a party for which it was acting as fiduciary, Quintel Corp. v. Citibank, N.A., 567 F. Supp. 1357, 1362-63 (S.D.N.Y. 1983), and between a pension fund trustee and its members, Donovan v. Fitzsimmons, 90 F.R.D. 583, 586 (N.D. Ill. 1981).  And, while the Second Circuit has never expressly adopted the Garner analysis, district courts within the circuit have regularly applied it.  See Henry, 212 F.R.D. at 84 (collecting cases); RMED International, inc. v. Sloan's Supermarkets, Inc., No. 94 Civ. 5587, 2003 WL 41996, at *4 (S.D.N.Y. Jan. 6, 2003) (collecting cases and concluding that "the Court is confident that the Garner rationale

26

is alive and well in this Circuit").

Nevertheless, in the absence of a fiduciary relationship owed by the party asserting the privilege to the party seeking to abrogate it, the Garner doctrine has no application. See Henry, 212 F.R.D. at 84; Asian Vegetable Research & Development Center v. Institute of International Education, No. 94 Civ. 6551, 1996 WL 14448, at *6 (S.D.N.Y. Jan. 16, 1996); Quintel Corp., 567 F. Supp. at 1361. Here, while the Directors owed a fiduciary relationship to the American Club, the Club is not seeking documents from the Directors. Rather, it is demanding documents in the possession of those defendants whose employees or officers also acted as Directors. But the members themselves have no fiduciary duty to the American Club; the relationship between a mutual insurance association and its members is a contractual one. See In re Metropolitan Life Derivative Litigation, 935 F. Supp. 286, 293 (S.D.N.Y. 1996); Shah v. Metropolitan Life Insurance Co., Nos. 108887/00, 601181/00, 2003 WL 728869, at *14 (N.Y. Sup. Ct. Feb. 21, 2003); Fidelity and Casualty Co. of New York v. Metropolitan Life Insurance Co., 42 Misc. 2d 616, 623, 248 N.Y.S.2d 559, 565 (N.Y. Sup. Ct. 1963). Therefore, the Garner doctrine is simply inapplicable.

Indeed, even if the doctrine did apply in these circumstances, the American Club has failed to demonstrate good cause for piercing the attorney-client privilege. The Club contends that "[a] central

27

issue in this case concerns the good faith of decisions these individual directors [those employed by Keystone, Farrell, and APL] made on Defendants' behalf in respect of paying indemnities from the Club's reserves to defendants for unreported unreserved occupational disease claims[.]" (Pl. Memo. at 20). But that is plainly not the case. The complaint in this action asserts no claim remotely resembling breach of fiduciary duty, and no Director has been named as a defendant.[5]

Accordingly, the defendants need not produce the documents demanded by the Club.[6]

Conclusion

For the reasons set forth above, the American Club's application for a protective order is granted with respect to the June 18, 2004 opinion letter but denied with respect to the May 18,

---

[5] Pebble Cove Homeowners Association, Inc. v. Shoratlantic Development Co., 191 A.D.2d 544, 544-45, 595 N.Y.S.2d 92, 92-93 (2d Dep't 1993), upon which the Club relies, is therefore distinguishable. There, the court concluded that officers of a developer who sat on the board of a homeowners association could be held liable for breaching their fiduciary duty to the association by failing to disclose information about misconduct by the developer. Here, the complaint alleges no misconduct by the defendants, much less by the former Directors.

[6] In addition to seeking documents identified by Keystone, Farrell, and APL as privileged, the American Club sought the depositions of certain of their counsel and disclosure of internal reports and analyses. The demand to take the depositions of defendants' counsel has been rendered moot by the determination that the Club is not entitled to breach the defendants' attorney-client privilege. The demand for corporate analyses other than those identified as privileged was never addressed by the American Club in its briefing of this motion. (Pl. Memo. at 20-23).

2004 letter.   Its motion to compel disclosure of communications identified as privileged by Keystone, Farrell, and APL is denied.

SO ORDERED.

*James C. Francis IV*

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
       September 13, 2005

Copies mailed this date:

Lawrence J. Bowles, Esq.
Shaun F. Carroll, Esq.
Nourse & Bowles, LLP
One Exchange Plaza
At 55 Broadway
New York, New York  10006-3030

Franklin B. Velie, Esq.
Michael T. Sullivan, Esq.
Mitchell C. Stein, Esq.
Sullivan & Worcester
1290 Avenue of the Americas
New York, New York  10104

Dale A. Schreiber, Esq.
Seth Schafler, Esq.
Lisa Bauer, Esq.
Proskauer Rose LLP
1585 Broadway
New York, New York  10036

Peter Adelman, Esq.
Andrew S. Dash, Esq.
Brown Rudnick
Seven Times Square
New York, New York  10036

Mario Aieta, Esq.
Elizabeth L. Hubbard, Esq.
Garvey Schubert Barer
599 Broadway - 8th Floor
New York, New York  10012

Gene B. George, Esq.
Julia R. Brouhard, Esq.
Ray, Robinson, Carle & Davies, PLL
1717 East 9th Street, Suite 1650
Cleveland, Ohio  44114

David A. Luttinger, Jr. Esq.
Lisa M. Campisi, Esq.
Morgan Lewis and Bockius LLP
101 Park Avenue
New York, New York  10178

Edward V. Cattell, Jr., Esq.
Hollstein Keating Cattell
  Johnson & Goldstein PC
8 Penn Center, 1628 JFK Blvd.
Suite 2000
Philadelphia, PA  19103

Raymond A. Connell, Esq.
Maloof, Lebowitz Connahan & Oleske
299 Broadway - Suite 1700
New York, New York  10007

Christine S. Davis, Esq.
Mindy G. Davis, Esq.
Robert H. Shulman, Esq.
Howrey, Simon, Arnold & White LLP
1299 Pennsylvania Avenue NW
Washington, DC  20004

Adam Wofse, Esq.
Scott Fisher, Esq.
Jaspan Schlesinger Hoffman LLP
300 Garden City Plaza
Garden City, New York  11530

Steven I. Frenkel, Esq.
Cummings & Lockwood LLC
107 Elm Street
Four Stamford Plaza
Stamford, CT  06902

Nicholas P. Giuliano, Esq.
Bennett, Giuliano, McDonnell & Perrone LLP
225 West 34th Street
New York, New York  10122

Donald I. Strauber, Esq.
Melisa J. LaRocca, Esq.
Chadbourne & Parke LLP
30 Rockefeller Plaza
New York, New York  10112

Edward A. Keane, Esq.
Mahoney & Keane, LLP
111 Broadway
New York, New York  10006

Nancy Ledy-Gurren, Esq.
Ledy-Gurren & Blumenstock LLP
475 Park Avenue South
New York, New York  10016

Patrick F. Lennon, Esq.
Tisdale & Lennon, LLC
36 West 44th Street
Suite 1111
New York, New York  10036

Robert A. O'Hare, Jr., Esq.
O'Hare Parnagian LLP
82 Wall Street - Suite 300
New York, New York  10005

Joseph D. Pizzurro, Esq.
Dora Straus, Esq.
Curtis, Mallet-Prevost,
  Colt & Mosle LLP
101 Park Avenue
New York, New York  10178

Stacey A. Saiontz, Esq.
Dickstein Shapiro Morin & Oshinsky
1177 Avenue of the Americas
New York, New York  10036

Deborah A. Silodor, Esq.
Lowenstein Sandler PC
65 Livingston Avenue
Roseland, New Jersey  07068

Alissa Malone, Esq.
Lyn S. Concha, Esq.
Fields, Howell, Athans &
  McLaughlin, LLP
One Midtown Plaza
1360 Peachtree Street, NE
Suite 800
Atlanta, Georgia  30309

Allen von Spiegelfeld, Esq.
Fowler White Boggs Banker
501 E. Kennedy Boulevard
Suite 1700
Tampa, Florida  33602

Charles A. Stewart, III, Esq.
Stewart Occhipinti LLP
1350 Broadway - Suite 2200
New York, New York  10018

John G. Cameron, Jr., Esq.
Warner, Norcross & Judd, LLP
900 Fifth Third Center
111 Lyon Street N.W.
Grand Rapids, Michigan  49503

Camilo Cardozo, Esq.
DLA Piper Rudnick Gray Cary US LLP
1251 Avenue of the Americas
New York, New York  10020

John M. Toriello, Esq.
Holland & Knight LLP
195 Broadway
New York, New York  10007

Herbert I. Waldman, Esq.
Nagel, Rice & Mazie, LLP
301 S. Livingston Avenue
Suite 201
Livingston, New Jersey  07039

Rodney M. Zerbe, Esq.
Robert A. Cohen, Esq.
Brent A. Hannafan, Esq.
Dechert LLP
30 Rockefeller Plaza
New York, New York  10112

Alan Kellman, Esq.
The Maritime Asbestosis Legal Clinic
a division of The Jaques Admiralty
     Law Firm
645 Griswold - Suite 1570
Detroit, Michigan  48225

Dan Shaked, Esq.
Shaked & Posner
225 West 34th Street - Suite 705
New York, New York  10122

Terry L. Stoltz, Esq.
News America Incorporated
1211 Avenue of the Americas
New York, New York  10036

Ms. Melanie Callahan
Offshore Express Inc.
P.O. Box 1420
Houma, Louisiana  70361

*Exhibit 2*

UNITED STATES DISTRICT COURT            **(ECF)**
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
AMERICAN STEAMSHIP OWNERS MUTUAL   :  04 Civ. 4309 (LAK) (JCF)
PROTECTION AND INDEMNITY           :
ASSOCIATION, INC.,                 :        MEMORANDUM
                                   :        AND  ORDER
                    Plaintiff,     :
                                   :
        - against -                :
                                   :
ALCOA STEAMSHIP CO., INC.,         :
et al.,                            :
                                   :
                    Defendants.    :
- - - - - - - - - - - - - - - - - -:
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

    In a Memorandum and Order dated September 13, 2005 (the
"Order"), I determined, among other things, that the American
Steamship Owners Protective and Indemnity Association (the
"American Club" or the "Club") had waived the attorney-client
privilege with respect to an opinion letter dated May 18, 2004,
provided to the Club by its counsel, Nourse & Bowles LLP, because
it had produced in the course of this litigation numerous opinion
letters dealing with the same subject matter and had utilized them
in depositions.  The American Club now seeks reconsideration of the
Memorandum and Order on the grounds that: (1) the May 18, 2005
letter is shielded from disclosure by the work product doctrine;
(2) the work product doctrine should also be held to protect an
opinion letter dated July 29, 2004; and (3) waiver should not be
found on the basis of the "fairness doctrine" because the Club was
not selective in its disclosure of opinion letters.  The American

1

Club also asks that I stay enforcement of the Order until this application and any appeal has been heard. (Letter of Shaun F. Carroll dated September 14, 2005 ("Carroll Letter")). The Club's application is granted in part and denied in part.

First, reconsideration is granted with respect to the work product issue. Although no argument based on work product was advanced in the memoranda on the Club's motion, it was briefly raised by counsel on oral argument and alluded to, at least tangentially, in a subsequent letter. However, upon reconsideration, I adhere to my prior determination that the May 18 letter is subject to disclosure. The "fairness doctrine" analysis applies to waiver of work product protection just as it does to waiver of the attorney-client privilege. See In re Grand Jury Proceedings, 219 F.3d 175, 191 (2d Cir. 2000); In re Grand Jury Proceedings, No. M-11-189, 2001 WL 237377, at *12-13 (S.D.N.Y. March 2, 2001); ESPN, Inc. v. Office of the Commissioner of Baseball, 76 F. Supp. 2d 383, 416 n.34 (S.D.N.Y. 1999); Granite Partners, L.P. v. Bear, Stearns & Co., 184 F.R.D. 49, 54 (S.D.N.Y. 1999). Thus, to the extent that the Club introduced similar opinion letters offensively in this litigation, it waived the work product doctrine as well as the attorney-client privilege for the May 18 letter.

Reconsideration is denied with respect to the July 29, 2004 letter because the Order does not address it in the first place.

2

With respect to the issue of waiver, the Order was explicitly limited to the May 18, 2004 letter and to a second letter dated June 18, 2004. (Order at 23). The July 29 letter was not then considered, and if counsel now wish to present an application with respect to that document, they may.

Reconsideration is also denied with respect to my determination that the American Club engaged in selective disclosure of its opinion letters. The Club now suggests that it only produced letters relating to insurance years 1989 and before and that a letter authored in 2004 has no similar relevance. (Carroll Letter at 2-3). In fact, the Club has produced and relied on number opinion letters postdating 1989 which, like the May 18, 2004 letter, discuss issues central to this case (Declaration of Lisa A. Bauer dated June 10, 2005, Exhs. L(k), (m), (n), (o), (p)), and this was fully considered at the time the Order was issued.

Finally, it is appropriate to stay the effect of the Order insofar as it requires disclosure of the May 18 letter to give the Club an opportunity to appeal this decision. Otherwise, the Club's right to object would, in practical effect, be nullified.

Conclusion

For the reasons set forth above, reconsideration of my September 13, 2005 Memorandum and Order is granted to the extent that the Club's claim of work product protection for the May 18, 2004 letter is addressed and is otherwise denied. Upon

reconsideration, I adhere to my prior determination and find that, like the attorney-client privilege, work product protection for this letter has been waived. The Club's obligation to disclose the letter is stayed pending determination of a timely appeal of this decision.

SO ORDERED.

*James C. Francis IV*
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
       September 15, 2005

Copies mailed this date:

Lawrence J. Bowles, Esq.
Shaun F. Carroll, Esq.
Nourse & Bowles, LLP
One Exchange Plaza
At 55 Broadway
New York, New York  10006-3030

Franklin B. Velie, Esq.
Michael T. Sullivan, Esq.
Mitchell C. Stein, Esq.
Sullivan & Worcester
1290 Avenue of the Americas
New York, New York  10104

Dale A. Schreiber, Esq.
Seth Schafler, Esq.
Lisa Bauer, Esq.
Proskauer Rose LLP
1585 Broadway
New York, New York  10036

4

Peter Adelman, Esq.
Andrew S. Dash, Esq.
Brown Rudnick
Seven Times Square
New York, New York  10036

Mario Aieta, Esq.
Elizabeth L. Hubbard, Esq.
Garvey Schubert Barer
599 Broadway - 8th Floor
New York, New York  10012

Gene B. George, Esq.
Julia R. Brouhard, Esq.
Ray, Robinson, Carle & Davies, PLL
1717 East 9th Street, Suite 1650
Cleveland, Ohio  44114

David A. Luttinger, Jr. Esq.
Lisa M. Campisi, Esq.
Morgan Lewis and Bockius LLP
101 Park Avenue
New York, New York  10178

Edward V. Cattell, Jr., Esq.
Hollstein Keating Cattell
  Johnson & Goldstein PC
8 Penn Center, 1628 JFK Blvd.
Suite 2000
Philadelphia, PA  19103

Raymond A. Connell, Esq.
Maloof, Lebowitz Connahan & Oleske
299 Broadway - Suite 1700
New York, New York  10007

Christine S. Davis, Esq.
Mindy G. Davis, Esq.
Robert H. Shulman, Esq.
Howrey, Simon, Arnold & White LLP
1299 Pennsylvania Avenue NW
Washington, DC  20004

Adam Wofse, Esq.
Scott Fisher, Esq.
Jaspan Schlesinger Hoffman LLP
300 Garden City Plaza
Garden City, New York  11530

5

Steven I. Frenkel, Esq.
Cummings & Lockwood LLC
107 Elm Street
Four Stamford Plaza
Stamford, CT  06902

Nicholas P. Giuliano, Esq.
Bennett, Giuliano, McDonnell & Perrone LLP
225 West 34th Street
New York, New York  10122

Donald I. Strauber, Esq.
Melisa J. LaRocca, Esq.
Chadbourne & Parke LLP
30 Rockefeller Plaza
New York, New York  10112

Edward A. Keane, Esq.
Mahoney & Keane, LLP
111 Broadway
New York, New York  10006

Nancy Ledy-Gurren, Esq.
Ledy-Gurren & Blumenstock LLP
475 Park Avenue South
New York, New York  10016

Patrick F. Lennon, Esq.
Tisdale & Lennon, LLC
36 West 44th Street
Suite 1111
New York, New York  10036

Robert A. O'Hare, Jr., Esq.
O'Hare Parnagian LLP
82 Wall Street - Suite 300
New York, New York  10005

Joseph D. Pizzurro, Esq.
Dora Straus, Esq.
Curtis, Mallet-Prevost,
  Colt & Mosle LLP
101 Park Avenue
New York, New York  10178

Stacey A. Saiontz, Esq.
Dickstein Shapiro Morin & Oshinsky
1177 Avenue of the Americas
New York, New York  10036

Deborah A. Silodor, Esq.
Lowenstein Sandler PC
65 Livingston Avenue
Roseland, New Jersey  07068

Alissa Malone, Esq.
Lyn S. Concha, Esq.
Fields, Howell, Athans &
  McLaughlin, LLP
One Midtown Plaza
1360 Peachtree Street, NE
Suite 800
Atlanta, Georgia  30309

Allen von Spiegelfeld, Esq.
Fowler White Boggs Banker
501 E. Kennedy Boulevard
Suite 1700
Tampa, Florida  33602

Charles A. Stewart, III, Esq.
Stewart Occhipinti LLP
1350 Broadway - Suite 2200
New York, New York  10018

John G. Cameron, Jr., Esq.
Warner, Norcross & Judd, LLP
900 Fifth Third Center
111 Lyon Street N.W.
Grand Rapids, Michigan  49503

Camilo Cardozo, Esq.
DLA Piper Rudnick Gray Cary US LLP
1251 Avenue of the Americas
New York, New York  10020

John M. Toriello, Esq.
Holland & Knight LLP
195 Broadway
New York, New York  10007

Herbert I. Waldman, Esq.
Nagel, Rice & Mazie, LLP
301 S. Livingston Avenue
Suite 201
Livingston, New Jersey  07039

Rodney M. Zerbe, Esq.
Robert A. Cohen, Esq.
Brent A. Hannafan, Esq.
Dechert LLP
30 Rockefeller Plaza
New York, New York  10112

Alan Kellman, Esq.
The Maritime Asbestosis Legal Clinic
a division of The Jaques Admiralty
     Law Firm
645 Griswold - Suite 1570
Detroit, Michigan  48225

Dan Shaked, Esq.
Shaked & Posner
225 West 34th Street - Suite 705
New York, New York  10122

Terry L. Stoltz, Esq.
News America Incorporated
1211 Avenue of the Americas
New York, New York  10036

Melanie Callahan
Offshore Express Inc.
P.O. Box 1420
Houma, Louisiana  70361

# Exhibit 3

KIRLIN, CAMPBELL & KEATING

ONE TWENTY BROADWAY

NEW YORK, N.Y. 10005

212-732-5520

CABLEGRAMS "WAKEFIELD NEWYORK"
TELEX 177 485319
WUI 62344
WU 12-6195

WILLIAM R SHEENAN
ELMER C MADDY
LOUIS J. GUSMANO
WALTER P M CREY
MARSHALL R KEATING
RICHARD H BROWN JR
JAMES J. HIGGINS
ALEXANDER E RUGANI
RICHARD F SOMMER
DANIEL J. DOUGHERTY
WILLIAM J O'BRIEN
EARLE A NOJOSE
THOMAS COYNE
PAUL F McGUIRE
ROBERT P HART
WILLIAM C FALLON
EDWARD L SMITH
HENRY J O'BRIEN
LAWRENCE J BOWLES
ANTHONY P MARSHALL
DAVID R MARTOWSKI
JOSEPH F RYAN JR
DONALD J DANILEK
ERNESTO V LUZZATTO

WASHINGTON OFFICE
THE CONNECTICUT BUILDING
1150 CONNECTICUT AVE, N W
SUITE 800
WASHINGTON D C 20036
202-296-4811

RESIDENT PARTNERS

RONALD A CAPONE
RUSSELL T NEIL
ROBERT J HICKEY
JAMES P MOORE

OF COUNSEL
CHARLES HAECKLING JR

February 14, 1979

Mr. John H. Cassedy, Secretary
American Steamship Owners Mutual
Protection and Indemnity Association, Inc.
25 Broad Street
New York, New York  10004

OUR REF. 86059

                    Re:   Association's
                          Reserve Account

Dear Mr. Cassedy:

        This opinion is submitted in response to your request for

our advice as to the status, from a legal standpoint, of the Asso-

cition's "Reserve Account" and, in particular:

        1.   Who owns the funds represented by the Reserve

Account, the Association or its members?

        2.   Must any portion of the annual income derived from

the Association's investments be credited to the Reserve

Account?

        3.   May any part of the Reserve Account be transferred to

an open Insurance Year, or Years, in order to defray ad-

ministrative expenses and/or policy liabilities incurred

with respect to said open Insurance Year or Years?

        4.   Would it be permissible to put a ceiling on the

Reserve Account as to, in effect, "wash out" reserves on

claims in an Insurance Year that is about to be closed?

5/12/05
Exhibit AN
AC-31

CONFIDENTIAL

- 2 -

Based upon our legal analysis hereinafter set-forth, it is our opinion that:

    1.  The funds represented by the Association's Reserve Account, since, the Association is a fully operating and financially viable entity, belong to the Association.

    2.  It is not required that a portion of the Association's annual income from investments be credited to the Reserve Account.

    3.  In the appropriate circumstances it would be permissible for funds represented by the Reserve Account to be transferred to an open Insurance Year or Years.

    4.  As a general rule funds from the Reserve Account may not be allocated to an Insurance Year that is about to be closed so as to reduce, or eliminate, the amount determined necessary to satisfy anticipated policy liabilities for such Year.

<u>ANAYLSIS</u>

    1.  <u>Ownership of Reserve Account.</u>  In order to determine who owns the funds represented by the Association's Reserve Account, it is necessary to review the nature of the Association's organization and business, and also the make-up of such Account.  The American Steamship Owners Mutual Protection and Indemnity Association, as its name implies, is a mutual insurance company (without stockholders)

CONFIDENTIAL

AC3504207

3

whose members consist of owners and operators of ships for whom it writes marine protection and indemnity insurance.  Since a mutual insurance company is operated solely for the benefit of its policy holders, it does not seek to amass profits in the ordinary business sense.

Although the Association has authority to issue either assessable or non-assessable policies, it has for many years past issued only assessable ones.  Thus the Association has been in the position to rectify a deficiency in a particular Insurance Year -- arising by reason of the fact that the actual policy liabilities and administrative expenses in said year are in excess of the premiums collected, by levying an assessment.  In every such instance each member for the Year is required to pay its proportionate share of the assessment.

It also happens that following the termination of an Insurance Year the Association's Board of Directors, based upon a statement placed before it by the Manager of the Association, will determine that, after the payment of all applicable administrative expenses and proven claims, and setting aside funds deemed reasonable in amount for pending claims, there remains a final excess resulting from all the policies in effect during such Insurance Year.  If the excess is the result of unused premium, a final dividend may be declared; while if it represents the balance of an assessment a final refund must be made.  In either case the said Insurance Year is closed.  In both instances, the members, for the applicable

CONFIDENTIAL

AC3504208

Insurance Year, receive distributions in proportion to the re-spective net premiums they paid.

Such a determination to make appropriate distributions, and close the Insurance Year, is generally made seven to ten years after the termination of the Insurance Year. As pointed out in the previous paragraph, in closing an Insurance Year, there are set aside funds for pending claims. These are the funds that become part of, and constitute, the Reserve Account. The Reserve Account has been built up over the intervening years, between the organization of the Association in 1917 and the present, because a portion of the Association's annual investment income has been included in said Account, and because the policy liabilities actually incurred, following the close of an Insurance Year, have on occasion been less than anticipated.

The Reserve Account, which pertains to the closed Insurance Years, together with the net credit or debit balances for each of the open Insurance Years, comprise the Association's Surplus. The rulings in a number of decided court cases show that the Association's Surplus except to the extent that it includes that part, or all, of an assessment for an open Insurance Year which may ultimately be determined to be the collection of an excess amount [a matter which will be discussed below], belongs to the Association. It follows, as a necessary corollary, that no part of such Surplus, subject to the possible limited exception referred to in the previous sentence, belongs to the members, either past or present, at least as long as

CONFIDENTIAL

- 5 -

the Association is a going concern.  In Uhlman v. New York
Life Ins. Co. (1888) 109 N.Y. 421 at pg. 429, the New York Court
of Appeals stated:

> "It has been held that the holder
> of a policy of insurance, even in
> a mutual company, was in no sense
> a partner of the corporation
> which issued the policy, and that
> the relation of the policyholder
> and the company was one of contract
> measured by the terms of the policy."

Likewise, in Greeff v. Equitable Life Ass. Soc. (1899) 160 N.Y. 19
the Court said (page 39):

> "By its [the policy's] terms he [Greeff]
> possessed no legal right to any part
> of the defendant'a [company's] surplus,
> except in that portion which its
> officers determined to distribute
> among the holders of its policies,
> and an action at law could not
> be maintained until that determination
> was made."

Several other New York cases have included statements which
are in accord with the just stated rule.  Rhine v. New York Life
Ins. Co. (1948) 273 N.Y. 1; and Birne v. Public Service Mut. Cas.Co.
(1948) 77 N.Y.S. 2d. 446.  The foregoing cases relate to New York
law regarding the surplus of mutual insurance companies and therefore
are controlling insofar as the Association is concerned.

As pointed out above the Association's Surplus, except to
the extent it includes that part, or all, of an assessment for an
open Insurance Year which may ultimately be determined to be the
collection of an excess amount, belongs to the Association.  The
reason for this particular exception is the different status, from a

CONFIDENTIAL

AC3504210

- 6 -

legal standpoint, between premiums and assessments. Premiums paid
to a mutual insurance company, because of their voluntary nature,
belong to the company. Couch on Insurance 2nd, Section 34:54.
However, assessments represent a call on mutual policy holders,
irrespective of their consent at the time, to cover either a
deficiency in revenue or an impairment of capital. Because assess-
ments represent imposed liabilities, required by subsequent devel-
opments, the law has surrounded assessments with many restrictions
that do not apply to premiums.

Generally speaking, a "profit" derived from an excess of
premiums may be either transferred to Surplus or declared as a
"dividend" to the mutual policy holders of that Insurance Year, at
the discretion of the Directors. It does not follow, however, that
the same optional treatment applies to the unneeded "excess" of an
assessment. In this connection, Section 58(2) of the New York In-
surance Law provides as follows:

> "Every policy issued by any such company
> shall clearly state whether or not the holder
> of such policy is subject to a liability for
> assessment. All policies issued by any such
> company which are subject to a liability for
> assessment shall contain a clear statement
> of the liability of the policyholder for the
> payment of his proportionate share of any
> deficiency or impairment as provided by law
> within the limit provided by the policy, and
> shall further state that any assessment
> shall be for the exclusive benefit of holders
> of policies which provide for such a contingent
> liability, and the holders of policies subject
> to assessment shall not be liable to assessment
> in an amount greater in proportion to the total
> deficiency than the ratio that the deficiency
> attributable to the assessable business bears
> to the total deficiency." [Emphasis supplied].

CONFIDENTIAL

AC3504211

Thus the Association's authority to levy an assessment upon a policy holder is limited to "his proportionate share of any deficiency or impairment". If the assessment, as made, should prove ultimately to be greater than the limiting "deficiency", the excess belongs pro rata to the policy holders who contributed it. This means such unauthorized excess is held for their benefit and must be refunded to them or applied against their respective shares of an assessment levied to cover the "deficiency" for some other Insurance Year.

However, the amount of any assessment transferred to the Reserve Account, in closing an Insurance Year, does not constitute such an "excess". The Association's By-Laws, specifically Article V, Section 4, provides, in part, that:

> "From time to time after the termination of each insurance year, when the Manager shall determine that it is practicable to estimate with a reasonable degree of certainty the minimum, probable or final surplus or deficiency resulting from all of the Corporation's insurances in effect during such insurance year, the Manager shall place before the Board of Directors a statement of such financial results of such insurances, segregated between assessable and non-assessable business. After receipt of any such statement, the Board of Directors from time to time may (a) fix and determine an amount to be declared and paid as a partial or the final dividend, after retaining such sums as they may deem necessary to meet outstanding policy obligations or for the maintenance of reserve and surplus of the Corporation, or (b) order an interim or the final assessment to be made against the holders of assessable policies, fix the due date of such assessment, determine the rate of interest that shall be added to and become a part of any delinquent assessment, and otherwise provide for enforcement or collection thereof. Any dividend declared or any assessment levied shall be based

CONFIDENTIAL

AC3504212

solely on such surplus or such deficiency, respectfully, resulting from the assessable business for the insurance year. All dividends declared and all assessments levied shall be distributed or spread in the ratio that the net premiums paid by the holder of an assessable policy year to the net premiums paid by all holders of assessable policies for the insurance year. **** [Emphasis supplied]

In estimating "with a reasonble degree of certainty the *** final surplus", if any, for an Insurance Year about to be closed, the Manager makes provision for a certain amount of funds on hand, pertaining to such Year, to be transferred to the Reserve Account. This is done so that such transferred funds may be available to pay the future proven claims, as currently estimated, with respect to said Year. It is only after provision is made for this reasonable estimated amount that the remaining available fund is considered the "final surplus" or "excess" which, if it represents part or all of an assessment, must be refunded pro rata to the members for the particular Insurance Year involved.

There is another legal principle which confirms the conclusion that funds, although derived by means of an assessment, lose their legal identity as such when they are transferred to the Association's Reserve Account, and thus can not constitute an assessment "excess" which belongs to the members. In recommending the closing of an Insurance Year the Association's Manager must "estimate with a reasonable degree of certainty" [Association's By-Laws, Art. V., Sec. 4] the amount required to be transferred to the Reserve Account to satisfy projected policy liabilities for such Year. This estimate must then be approved by the Association's Board of Directors. In effect, it is also subject to the acceptance of the policy holders'

CONFIDENTIAL

AC3504213

- 9 -

involved because naturally they retain the legal right to dispute such "estimate" if they conclude it is not reasonably supported by the facts available to them.

Thus in consummating the closing of an Insurance Year it would appear that within the contemplation of law, there has been a final settlement of accounts, for such Year between the Association and the policy holders involved. That is, if the amount set aside in the Reserve Account is not sufficient to satisfy all the policy liabilities, for the closed Insurance Year, as subsequently proven, then the Association can not make any assessment against the policy holders for such Year to eliminate the deficit. And, conversely, if the amount is ultimately determined to be more than needed to pay all the proven claims for the closed Insurance Year, the respective policy holders are not entitled to any refund. This conclusion would appear to necessarily follow from the decision of the New York Court of Appeals in the case of <u>Hyde v. Lynde</u> (1850) 4 N.Y. 387, and the holding of the New York Supreme Court, Appellate Division, in the proceeding of <u>Patrons of Industry Fire Ins. Co. v. Harwood</u> (1901) 72 N.Y.S. 8. Although it is recognized that these cases were decided many years ago, we have not been able to find any subsequent New York decisions which contravert their holdings. Both of these cases involved mutual insurance companies, and while each considered the effect of the "settlement of accounts" between the company and the policy holder, in connection with the authorized surrender of a policy by the insured, there does not appear to be any reason why the

CONFIDENTIAL

10

"settlement of accounts" which, in effect, occurs when an Insurance Year is closed by the Association, should be viewed differently.

The Court stated in the Hyde v. Lynde, case, page 390:

"When the parties have come to an agreement and the policy and the note* have been surrendered, the individual ceases to be a member of the company; and all rights to make assessments or calls upon him *** is at an end."

The corollary to this holding must be that the former member no longer has any claim to the funds of the company. In fact, the Court specifically recognized this circumstance because it stated later in its opinion, beginning on page 391, "If they [the company and the former member] had come to the conclusion that some or all of the [pending insurance] claims were valid, and the defendant [former member] had paid fifty dollars as his proportion of the supposed losses, proof that all claims turned out to be unfounded would not enable him to recover back the money".

Similarly, in the Patrons of Industry Fire Ins. Co. V. Harwood case, it was stated: "When a settlement and adjustment is in good faith made between the company and a member, and his policy or policies are canceled, he not only ceases to be a member of the company, but can not be again assessed as such, nor compelled to pay any further claims for losses or expenses, unless the settlement and

---

*The insured in the Hyde v. Lynde case was obliged, before receiving his policy, to deposit his promissory note for a sum of money determined by the directors of the mutual insurance company, of which he paid 5% in cash, and the remainder was payable in whole, or in part, whenever the directors should require it for the payment of losses and expenses; and at the expiration of the insurance term, the note, or the part which remained unpaid, after deducting all losses and expenses which accrued during the term, was to be returned to the maker.

CONFIDENTIAL

AC3504215

adjustments is set aside for fraud or mutual mistake". It thus follows that funds proceeding from an assessment which are ultimately transferred to the Association's Reserve Account in closing an Insurance Year belong to the Association and not the members.

Of course, it is recognized that by statute when the New York State Superintendent of Insurance institutes a proceeding to permit him to supervise the activities of a mutual insurance company, which is encountering financial difficulties, that even if an Insurance Year has been closed an assessment may be levied against an insured who was a member at any time within one year prior to the institution of such proceeding. New York Insurance Law, Section 541. And that where a mutual insurance company has been adjudicated insolvent, but upon a later re-examination is found to be clearly solvent, the surplus shall be distributed among the persons, partnerships or corporations whose membership did not cease earlier than five years prior to the date on which the corporation ceased issuing policies, in the proportion which the total premium contributions of such member during his or its entire membership in the corporation bear to the total premium contributions of all members entitled to receive distributions. New York Insurance Law, Section 545. However, these statutory provisions are limited to liquidation, or financial diffi-culty, situations that are not applicable to the question here under consideration. Since these provisions are not applicable in the present instance, it must be concluded that the Reserve Account of the Association, which is a fully operating and financially viable mutual insurance company, belongs to the Association and not its members.

CONFIDENTIAL

AC3504216

- 12 -

2. Crediting Investment Income to Reserve Account. An examination of the New York statutory law, and the Charter and By-Laws of the Association, disclosed that there is no specific directives contained therein as to the application of the income realized, by the Association from its investments. However, it is clear that the business of the Association shall be conducted by its Board of Directors [See By-Laws, Art. II, Sec. 1.] and that is is accorded great latitude in this regard in making all necessary business decisions provided its judgment is exercised in good faith and not fraudulently or arbitrarily. Barnett v. Metropolitan Life Ins. Co. (1939) 16 N.Y.S. 2d 198 aff'd 285 N.Y. 627; Turner v. American S.S. Owners' Mutual P & I, Ass'n., Inc. (1927, CCA 5th), 16 F. 2d 707.

Since the Association is a mutual insurance company, and thus is operated for the benefit of its policy holders, the Directors are required, by the principles of equity to handle the Association's operations, and correspondingly the earnings from its investments, in a way that is fair and equitable to all its members.

As pointed out above the Association's Reserve Account includes the funds that have been set aside therein, with respect to closed Insurance Years, for the purpose of being available to satisfy any proven policy liabilities which may arise with regard to such Years. As the calendar termination for such Insurance Years generally occurs seven to ten years prior to the time they are closed, it appears obvious that the quantum of the anticipated policy liabilities for such years are generally known at the time of closing so that sufficient funds can be transferred to the Reserve Account to usually

CONFIDENTIAL

AC3504217

- 13 -

take care of such anticipated obligations.  Thus it would appear to
be a reasonable exercise of descretion by the Directors, in a particular
year, not to credit any portion of the investment income realized in
that year to the Reserve Account if it is concluded that said Account
is adequate to satisfy anticipated liabilities, for all the closed
Insurance Years, and the maintenance of reserves and surplus of the
Association.  Such action would certainly be for the mutual benefit
of the Association and its members because the investment earnings
could then be allocated to open Insurance Years to reduce, on an
equitable basis, the amounts of present or future assessments or,
conversely, increase the quantum of determined dividends or refunds.
Thus it is to be concluded that, in an appropriate circumstances such
as outlined above, the Board of Directors may, in a particular year
determine, that no portion of the Association's earnings from invest-
ments need be credited to the Reserve Account.

    3.  <u>Transfer of Reserve Account Funds to an Open Insurance</u>
<u>Year</u>.  The Association's Surplus, of which the Reserve Account con-
stitutes a part, obviously exists to carry out the purposes of the
Association, primarily to assure that its insurance contracts will be
honored.  If the Association's operations, relating to a particular
open Insurance Year, shows a deficit, the Board of Directors may
decide, within reasonable limits, whether all or part of such deficit
should be absorbed against the Association's Surplus.  This could
mean the transfer of Reserve Account funds to the open Insurance Year
to compensate for such deficit.

CONFIDENTIAL

AC3504218

- 74 -

However, it must be remembered that, as a mutual insurance company, the Board of Directors in carrying on the Association's business, and making decisions as to the application of its Surplus, must act fairly and equitable towards all its members. This is especially significant in this particular area of the Association's operations because of its authority, both statutory and under its By-Laws, to levy an assessment if the business relating to a particular open Insurance Year is running at a deficit. Section 57(1), of the New York Insurance Law requires domestic mutual companies to be maintained and operated for the benefit of their members. Therefore, in utilizing a portion of the Reserve Account to compensate for a deficit in an open Insurance Year, The Board of Directors must assure itself that its action in this regard is reasonable and equitable so as not to adversely affect the interests of the members for the other open Insurance Years. Within the confines of this restriction it is our opinion that, on occasion, a part of the Association's Reserve Account may be transferred to an open Insurance Year.

4. **Application of Reserve Account to Insurance Year that is about to be closed.** Article V, Section 4. of the Association's By-Laws provides that:

> "From time to time after the termination of each insurance year, when the Manager shall determine that it is practicable to estimate with a reasonable degree of certainty the minimum, probable or final surplus or deficiency resulting from all the Corporation's insurance in effect

CONFIDENTIAL

AC3504219

15

> during such insurance year, the
> Manager shall place before the
> Board of Directors a statement
> of such financial results of
> such insurances, segregated between
> assessable and non-assessable
> business. After receipt of any
> such statement, the Board of
> Directors from time to time may
> (a) fix and determine the amount
> to be declared and paid as a
> partial or the final dividend,
> after retaining such sums as
> they may deem necessary to meet
> outstanding policy obligations or
> for the maintenance of reserves
> and surplus of the Corporation, or
> (b) order an interim or the final
> assessment to be made against the
> holders of the assessable policies***.
> Any dividend declared or any assessment
> levied shall be based solely on such
> surplus or such deficiency, respectively,
> resulting from the assessable business
> for the insurance year***. (Emphasis supplied)

In addition, Section 58(2) of the New York Insurance Law

requires that, with respect to a member for any particular Insurance

Year, his

> (1) "liability for assessment
> ***[is]*** for his proportionate
> share of any deficiency"; and

> (2) "any assessment shall be
> for the exclusive benefit of
> the holders of [mutual] policies"

These provisions of the Association's By-Laws, and the New

York Insurance Law, indicate that each Insurance Year is an independent

period and must be treated separately for assessment, dividend and

refund purposes. This is the very essence of a mutual insurance

company which must be operated for the equal benefit of all its

members. For this reason it appears that the Association's Board of

CONFIDENTIAL

AC3504220

16

Directors may not, in closing an Insurance Year, decide to eliminate any deficit determined to exist for said year by utilizing monies, available in the Reserve Account, for such purpose. To so do would, in our opinion, be equivalent, to the declaring of a dividend or refund to the policy holders of the closed Insurance Year at the expense of the policy holders for other Insurance Years. This is not to say that in the appropriate situation, if the Reserve Account should exceed the amount necessary to satisfy anticipated policy claims for closed Insurance Years and also the reserves and surplus required by the New York Insurance Department that an application may not be made of part of the Reserve Account to an Insurance Year about to be closed. However, the circumstances for such application would be limited, and such action would only be permitted if determined to be equitable and fair insofar as the members for other Insurance Years are concerned.

It is believed that the foregoing is fully responsive to your inquiries. However, if you feel that anything discussed herein requires further consideration or clarification, please let us know.

Very truly yours,

KIRLIN, CAMPBELL & KEATING

By: _William F. Fallon_
William F. Fallon

WFF:ib

CONFIDENTIAL

AC3504221

KIRLIN, CAMPBELL & KEATING

RICHARD H. BROWN, JR.
DONALD BURKE
DANIEL J. DOUGHERTY
CONSTANTINE P. GEORGIOPOULOS
HARRY A. GOTIMER
ALBERT C. GOUTNIR
KEITH W. HEAND
KAREN C. HILDEBRANDT
H. ALEXANDER HULTEN
MARSHALL P. KEATING
ERNESTO V. LUCEATTO
PAUL F. McGUIRE
JOSEPH H. MOLLOY
MARK F. MULLER
WILLIAM J. O'BRIEN
MARY L. O'CONNOR
JAMES E. PRATT
J. SCOT PROVAN
RICHARD H. SOMMER
CARY R. WIENER

SPECIAL COUNSEL
THOMAS COTHE
JAMES J. HIGGINS
ALEXANDER E. RUGANI

14 WALL STREET

NEW YORK, N.Y. 10005

212 - 732 - 5520

TELEX: ITT 423219
TRT 177117
TELECOPIER: 212-732-3421
CABLEGRAMS "VASEFIELD NEW YORK"

June 13, 1988

OF COUNSEL
FRANK T. LENOVSKY
WASHINGTON OFFICE
ONE FARRAGUT SQUARE SOUTH
SECOND FLOOR
WASHINGTON, D.C. 20006
202-639-0000
RESIDENT PARTNERS
RUSSELL T. WEIL
ROBERT J. HICKEY
JAMES W. PEWETT
PETER G. KILGORE
NEW JERSEY OFFICE
85 BLOOMFIELD AVENUE
CALDWELL, N.J. 07006
201-228-7400
RESIDENT PARTNER
DONALD L. O'CONNOR
CONNECTICUT OFFICE
24 HOYT STREET
STAMFORD, CONNECTICUT 06905
203-359-6383
RESIDENT PARTNER
DANIEL P. WEINER

OUR REF. 97250

BY HAND

Mr. Thomas J. McGowan
Secretary
American Steamship Owners Mutual
   Protection and Indemnity
   Association
Five Hanover Square
New York, New York  10004

Re:  Association's Reserve Account

Dear Sir:

We refer to your request that we review our opinion of
February 14, 1979 concerning the Association's Reserve Account
and give you our further advices in connection with possible use
of the Reserve Account to defray the cost of the proposed stop
loss program.

On the basis of the detailed analysis in our February 14,
1979 letter, we concluded inter alia, that:

1.  The funds represented by the Association's
Reserve Account belong to the Association, since it
is a fully operating and financially viable entity.

2.  In the appropriate circumstances it would
be permissible for funds represented by the Reserve
Account to be transferred to an open Insurance Year
or Years.

The foregoing conclusions are the ones material to consideration
of use of funds represented by the Reserve Account in connection
with a stop loss program.  We have reviewed the law since Febru-
ary 14, 1979 and are of the opinion that all of the conclusions
stated in our letter of that date are still correct.  There has
been a recodification of the New York State Insurance Law since
1979 which has altered the section numbers of the Insurance Law,
but there has been no material change in the substance of the
statutes.

5/12/05 /t/
Exhibit
AC-36

KEY 002382

- 2 -

     If Reserve Account funds are used to fund a stop loss
program for any given insurance year, that is tantamount to a
transfer of such funds to that open year.  As pointed out on
pages 13-14 of our February 14, 1979 letter, in our view such
a transfer is proper provided that the Board of Directors acts
reasonably and equitably towards all members, including members
in other open insurance years.

     In the context of obtaining stop loss insurance we believe
the directors should also have in mind consistency with past and
future practice.  That is, if a decision is made to defray at
least some of the cost of stop loss insurance from the Reserve
Account, the amount so allocated should be reasonably consistent
with past practice and at a level which can be reasonably con-
sistently maintained in the foreseeable future.  It should be
reasonably consistent with past practice in order to avoid
inequitably favoring members of the current Insurance Year over
members during past years.  It should be at a level which could
be reasonably maintained during future years to foster the
objectives of the Association's continuation and growth as an
ongoing business concern; this would make it desirable to
continue a stop loss program at a reasonable cost in the future.

     If the foregoing considerations are borne in mind, it is
our opinion that the Board of Directors may, within reasonable
limits, allocate part of the Reserve Account towards defraying
the cost of a stop loss program.

     Very truly yours,

     KIRLIN, CAMPBELL & KEATING

     By: *Richard H. Brown Jr.*
         Richard H. Brown, Jr.

RHB:tc.

KEY 002383



**American Steamship Owners Mutual Protection and Indemnity Association, Inc.**

Five Hanover Square, New York, N.Y. 10004
(212) 269-2350

Cable Address "PANDICLUB"
Telex No. 222091

November 7, 1989

To:       Finance Committee

From:     T.J. McGowan


      Attached are two letters from Kirlin, Campbell & Keating dealing with the
Reserve Account, one written in 1979, the second in 1988.  Mr. Brown is preparing
another opinion on the specific question now before the Committee.


                    SHIPOWNERS CLAIMS BUREAU, INC.
                    Manager


:vap
Attachments



5/12/05
Exhibit
AC- 36 A

KEY 002929

*Please see
February 14, 1979
and
June 13, 1988
letters
previously
attached*

# KIRLIN, CAMPBELL, MEADOWS & KEATING

**14 WALL STREET**

**NEW YORK, N.Y. 10005**

**212 · 732 · 5520**

ONE FARRAGUT SQUARE SOUTH
WASHINGTON, D.C. 20006
TEL: 202-639-8000
FAX: 202-639-8003

85 BLOOMFIELD AVENUE
CALDWELL, NEW JERSEY 07006
TEL: 201-226-7400
FAX: 201-403-9029

24 HOYT STREET
STAMFORD, CONNECTICUT 06905
TEL: 203-359-6383
FAX: 203-324-5024

FAX: 212 · 732 · 8421
TELEX: I·T 4222·8
TAT 177117
CABLEGRAMS "VASEFIELD NEW YORK"

425 CALIFORNIA STREET, SUITE 1700
SAN FRANCISCO, CALIFORNIA 94104
TEL: 415-981-5277
FAX: 415-981-2732

301 E. OCEAN BLVD., SUITE 540
LONG BEACH, CALIFORNIA 90802
TEL: 310-491-1267
FAX: 310-590-8999

SUITE 200, MARKET PLACE TWO
2001 WESTERN AVENUE
SEATTLE, WASHINGTON 98121
TEL: 206-448-2550
FAX: 206-448-2252

November 3, 1993

95528

American Steamship Owners Mutual
 Protection and Indemnity Association, Inc.
Shipowners Claims Bureau, Inc.
Five Hanover Square
New York, NY 10004

Attn: Mr. T.J. McGowan, President

                    Re:  <u>PRUDENTIAL LINES, INC.</u>

Dear Sirs:

        You have our letter dated November 2, 1993, which summarized
largely for the benefit of reinsurers the events in this matter
which have led the Bankruptcy Court to issue an Order to Convene
Settlement Negotiations. We suggest that our November 2 letter
with its enclosures be sent to the Board of Directors, as it
conveniently outlines the principal steps in the PLI bankruptcy
proceedings to the present date. For that reason we suggest that
each director should read our November 2 letter before this one.

               <u>THE FIRST PARTIAL JUDGMENT AGAINST THE CLUB</u>

        In our November 2 letter, we have intentionally been low key
with respect to Bankruptcy Judge Conrad's words and actions, as we
do not want to be open to a charge of undermining potential
settlement negotiations, which is the purported basis on which
Judge Conrad stayed execution of the First Partial Judgment
against the Club. Nevertheless we think a knowledgeable
reinsurer, or his counsel, should recognize that the First Partial
Judgment is highly questionable and likely to be vacated on appeal.

        We say this for the following reasons:

        (1) There is no significant evidentiary
        support for the judgment.

CONFIDENTIAL



AC3066799

(2) There has been no trial or evidentiary hearing.

(3) The Bankruptcy Judge has made no supporting findings other than those quoted in the first three paragraphs at the top of page 5 of our November 2 letter, and those findings are patently inadequate and wrong;

(4) To the extent we have been able to review the relatively few supporting documents provided by the Trustee after the judgment; they provide inadequate information, and what is provided indicates the settlement amounts are grossly excessive, e.g., $110,000 for a man who died at 87 of prostate cancer with no significant asbestos problem.

(5) The settlements fail to take into account the fact that the claimants sailed on other companies' vessels (which companies have also been sued) and those companies should contribute to any reasonable settlement or judgment.

(6) The recycling here of the same $100,000 between the Trustee and MALC goes far beyond the Liman case situation, if such recycling constitutes payment, the "pay first" requirement (which is supported by New York statute) would be meaningless; the Bankruptcy Judge should not have accepted such recycling as satisfying the "pay first" provision of the policy.

In short, the entry of the First Partial Judgment clearly violated due process of law. It is unexplained by the Court and, in our view, cannot be sensibly defended. For those reasons (among others) we expect the judgment to be vacated on appeal.

It can also be said that the PLI Trustee's actions in cooperating with MALC have been such as to raise the possibility that reimbursement for the so-called settlements here might be declined on grounds of excessive cooperation, perhaps approaching collusion.

In summary, it is our appraisal that the present judgment will be vacated on appeal. Beyond that, we would expect it to be vacated on such terms that the Trustee would be unlikely to embark on such a course again, inasmuch as the judgment lacks rational support and, in our view, his conduct has been inconsistent with his obligations to the Club.

- 2 -

CONFIDENTIAL

AC3066800

## CONSIDERATIONS ON POSSIBLE CONSEQUENCES
## OF LARGE RECOVERIES FOR CLOSED YEARS

A related question has also been raised as to the consequences if, contrary to our expectation, large sums should be recovered against the Club in respect of closed years, with which these asbestos cases are involved. We have not had an opportunity fully to review this question, but our preliminary views are as follows.

The material provisions in the By-Laws are found in Article VI and state:

SECTION 1...The policies which are subject to a liability for assessment shall contain a clear statement of the liability of the policyholder for the payment of his proportionate share of any deficiency or impairment as provided by law within the limit provided by the policy, and shall further state that any assessment shall be for the exclusive benefit of holders of policies which provide for such a contingent liability, and the holders of policies subject to assessment shall not be liable to assessment in an amount greater in proportion to the total deficiency than the ratio that the deficiency attributable to the assessable business bears to the total deficiency...

SECTION 3. For the purpose of declaring dividends and making assessments the business of the Corporation shall be divided into insurance years...From and after Midnight, Eastern Standard Time, December 31, 1971, the next succeeding insurance year shall be the period commencing Midnight, Eastern Standard Time, December 31, 1971, and ending at Noon, Greenwich Mean Time, February 20, 1972, and thereafter each succeeding insurance year shall consist of the twelve month period commencing at Noon, Greenwich Mean Time, February twentieth of each year, and ending at Noon, Greenwich Mean Time, February twentieth of the year immediately following. The financial results of the insurance years shall be segregated as to business under assessable policies and business under non-assessable policies.

SECTION 4. From time to time after the termination of each insurance year, when the

– 3 –

CONFIDENTIAL                                                                 AC3066801

manager shall determine that it is practicable to estimate with a reasonable degree of certainty the minimum, probable or final surplus or deficiency resulting from all of the Corporation's insurances in effect during such insurance year, the manager shall place before the board of directors a statement of such financial results of such insurances, segregated between assessable and non-assessable business. After receipt of any such statement, the board of directors from time to time may (a) fix and determine an amount to be declared and paid as a partial or the final dividend, after retaining such sums as they may deem necessary to meet outstanding policy obligations or for the maintenance of reserves and surplus of the Corporation, or (b) order an interim or the final assessment to be made against the holders of assessable policies, fix the due date of such assessment, determine the rate of interest that shall be added to and become a part of any delinquent assessment, and otherwise provide for enforcement or collection thereof. Any dividend declared or any assessment levied shall be based solely on such surplus or such deficiency, respectively, resulting from the assessable business for the insurance year. All dividends declared and all assessments levied shall be distributed or spread in the ratio that the net premiums paid by the holder of an assessable policy bear to the net premiums paid by all holders of assessable policies for the insurance year...In any case, however, all action of the board of directors in respect of dividends or assessments shall conform with the Law and with the Charter and By-Laws of the Corporation.

(Emphasis added.)

The foregoing provisions are based on and consistent with New York statutory law applicable to assessments, e.g., Insurance Law, §4111, which provides in part:

§ 4111. Mutual companies; assessments

(a) Except as provided in section four thousand one hundred thirteen of this article [concerning nonassessable policies], every domestic mutual property/casualty insurance company shall in its by-laws and policies

- 4 -

CONFIDENTIAL

prescribe the contingent mutual liability of
its members for the payment of assessments, in
such a way that <u>each member shall be liable to
pay the member's proportionate share</u>, subject
to the limitations hereinafter specified, of
the amount of any assessment or assessments
permitted for any purpose under any provisions
of this chapter or necessary to make good an
impairment of the minimum surplus of such
company...

(b)  If any domestic mutual property/casualty
insurance company does not have admitted assets at
least equal in amount to the aggregate of its
liabilities and its minimum surplus as required by
the provisions of this chapter, and if such
impairment is not otherwise made good, the board of
directors of the company may, with the approval of
the superintendent and within such time as he
prescribes, order an assessment in the manner
specified in the by-laws for an amount which will
provide  sufficient  funds  to  make  good  the
impairment...All orders of assessment made by the
board  of  directors  shall  be  filed  with  the
superintendent and shall not take effect unless and
until approved by him.  The superintendent may
refuse any such approval if, in his judgment,
refusal will best promote the interest of the
policyholders and creditors of the company, and of
the insuring public. <u>Every assessment shall be made
upon all members liable to assessment therefor in
the  proportion  hereinafter  specified.    Every
person, firm or corporation who or which was a
member of such company at any time during one year
prior to the making of an order of assessment by
the board of directors shall be liable to pay and
shall pay the member's proportionate share of any
assessment which may be made in accordance with
law, if the member is notified of the assessment
within  one  year  after  making  of  an  order  of
assessment.  A member's proportionate part of any
assessment shall be determined by applying to the
premium earned on the member's policy or policies
in force during a period of one year next preceding
the  order  of  assessment  the  ratio  of  the  total
assessment to the total premiums earned during such
period on all policies subject to assessment...</u>

(Emphasis added.)

The statutory requirement of membership during one year prior
to the order of assessment in the next to last sentence of §4111(b)

- 5 -

CONFIDENTIAL                                                    AC3066803

above is apparently met by the first sentence of Article 4 of the Charter, which reads:

### ARTICLE 4

> Every holder of a policy issued by this corporation shall be a member of the corporation during the period while such policy is effective to insure risks...

In our view, this means that, if, say, the 1950 policy is effective to insure an asbestos exposure risk in that year, members during that year are still members. If that is correct, such a member would still be subject to assessment if the board should issue a valid order of assessment approved by the New York Superintendent of Insurance.

It might be said that the By-Law language underscored above concerning the final assessment or dividend implies that there can be no further assessments. However, such determinations are necessarily based on estimates, and if such estimates prove to be wrong to an extent that a further assessment seems necessary, we do not think the implication in the By-Law phrase would suffice to overcome the more explicit language of statute and Charter. The statute of course is paramount. Also, if a policy in a closed year is effective to insure a risk, the general principle of mutuality suggests that members benefiting from that coverage ought not do so without being also subject to further assessment if necessary.

The cases we have found dealing with this situation are mostly old and, as we have not completed exhaustive research, we shall confine ourselves to discussing two whose language and holdings seem reasonable and persuasive.

In Seamans v. Millers' Mut. Inc. Co., 63 N.W. 1059, 90 Wisc. 490 (1895), the Supreme Court of Wisconsin dealt with the appeal of a policyholder, Kendall, who was ordered to pay an assessment. At a meeting of the mutual company's directors on July 7, 1892, it was decided to wind up the company's affairs, go out of business, cancel all policies, and levy an assessment to pay losses and expenses, notifying the policyholders that the possibility of further assessments would thereby be removed. This was done and Kendall duly paid its "final" assessment. Thereafter, Seamans, a creditor of the company, brought an action against it to wind up its affairs and appoint a receiver on the ground that it was insolvent. The receiver was appointed, who made a further assessment which was approved by the court. Kendall refused to pay, arguing that it was no longer liable for further assessments, and it appealed from the orders of the lower court. The Supreme Court affirmed the court below, upholding the further assessment, saying, at pages 1060-61:

- 6 -

CONFIDENTIAL

AC3066804

The first and most important question on this appeal is as to the effect of the transaction of July, 1892, between the appellants, Kendall & Co., and the officers of the defunct insurance company, by which the appellants' policy was surrendered to the company, their deposit note returned to them, and the assessment of July 7, 1892, paid, upon the assurance that they would not be called upon for any further assessment. It is argued that the effect of this arrangement was to terminate the contract of insurance, for all purposes, and to release them from any future assessments. Were the case one where a person had bought his release from the obligations of an ordinary executory contract by a payment of money not then owing, the argument would be strong, but it is not such a case. One who is insured in a mutual insurance company, such as the one in question, occupies the double position of the insurers well as the insured. He has not only obtained a contract by which the other policy holders are obligated to indemnify him against loss, but he has bound himself to indemnify, up to a certain amount, his fellow insurers against loss occurring during the term of his insurance. This obligation results, not only from the terms of his policy and deposit note, but also from the terms of the organic law under which the company is organized, as well as from the provisions of its charter and by-laws. Section 1941c, Sanb. & B. Ann. St., under which this company was organized, provides that all persons insured by such company shall give their obligations, binding themselves, their successors, heirs, and legal representatives, to pay to such company their pro rata "of the necessary expenses of such company, and of all losses by fire or lightning which may be sustained by any member thereof, upon property insured during the time for which their respective policies shall continue in force." The question, simply, is whether the officers of the company can release a member from his contract and statutory obligations with other members, upon his payment of an insufficient assessment. If they can, there would seem to be no safety in mutual insurance. If they can release one, they can release all. If, upon payment of an assessment of 75 per cent of the amount of the

- 7 -

CONFIDENTIAL                                           AC3066805

unpaid losses, they can release their policy holders, they may, with equal reason, release them upon payment of an assessment of 5 per cent. The absurdity of such a result is apparent...The action of the directors of the company, in substance, was simply a determination to cease business, issue no further policies, make and collect an assessment to pay outstanding claims, and discharge such claims. It seems very clear to us that this action does not constitute an annulment of a policy. Our conclusion is that the appellants were not released from further necessary assessments for losses occurring during the life of the policy by the arrangement of July, 1892...

It is said that no assessment could be made for the expenses of the receivership, nor for shrinkage and uncollectible assessments. This question was very recently examined and decided by this court in favor of such right. Davis v. Shearer, 62 N. W. 1050. It is true that the assessment in this case makes a very large allowance for shrinkage and uncollectible assessments, but the court below approved the estimate upon testimony given by the receiver's attorney, who has managed the receiver's legal affairs from the beginning, and has very complete knowledge of the probabilities of collection, and we cannot say that too great an allowance was made...

The foregoing language supports the concept of further assessments in closed years, if necessary.

The last paragraph from Seamans quoted above sanctions assessment for shrinkage and uncollectible assessments, rather than only losses and expenses. However, a New York decision, Pratt v. Dwelling House Mut. Fire Ins. Co., 7 App. Div. 544 (4th Dept., 1896), contradicts that approach.

In that case, Pratt, a member of a mutual company, sustained a $3,400 loss and recovered a judgment against the mutual company for that amount. The judgment was not paid, and a receiver of the mutual was appointed, who made assessment on the members sufficient to pay the judgment if all members paid their assessments. Some did not, for various reasons; a balance of $1,200 was left unpaid, and Pratt applied for a further assessment on the solvent members to make up the deficiency. The lower court refused this, and Pratt appealed. The Appellate Division (an intermediate appellate court)

- 8 -

CONFIDENTIAL

AC3066806

affirmed, agreeing that there should be no further assessment. In doing so, it said (page 547-8):

> ...It is provided by the statute that every person who becomes a member of the corporation shall pay his "pro rata share to the company of all losses or damages caused by fire or lightning, which may be sustained by any member or members thereof." It surely would be a strained construction to say that it was intended by the use of these words to bind each member of the company to the payment of an entire loss, if all the other member should prove to be insolvent. If it were so intended, the words "pro rata," that is, a distribution proportionately, would not have been used in expressing the intention of the Legislature. There is nothing in the statute which indicates that the members of a corporation organized thereunder are to indemnify those insured against loss by reason of the insolvency of a member, nor any obligation to pay the share or proportion of any other member who may become insolvent, or from any cause unable to pay his proportionate share of the loss. Under the construction contended for by appellant, a solvent member might be compelled to pay the entire loss and also the expenses of the company or receiver in ascertaining and determining the question of the solvency or insolvency of the other members. Will it be contended for a moment that any person would become a member of such a corporation, knowing that he might become liable individually to pay all the losses occurring in the class in which he was insured? If such were the intention expressed in this statute, and so expressed as to be clearly understood and comprehended, there would be no corporation organized under the law, for no sane man would venture on so hazardous an undertaking. The regnant idea and intention of the statute are that each member of the company is to pay such proportion of the loss as the amount of his insurance bears to the whole amount of insurance in the same class. The liability of the member is not joint and several, but the principle is that each one contracts that, in respect of a certain sum or premium to be levied by a pro rata contribution on the amount for which he himself is insured, he

— 9 —

CONFIDENTIAL

AC3066807

will contribute to pay any losses resulting
from the happening of the contingency insured
against, which may occur to any other member;
but there is no participation by any member in
respect of the liability of any other in
regard to solvency, default or dishonor. No
member insures the solvency, the honesty or
good faith of other members. The question of
contribution depends on the contract and not
on equitable considerations. A member
undertakes no liability other than that of
contributing his share of the losses, and is
in no way a party to the debt or obligation of
any other member to a suffering member. Each
member, foreseeing the contingency of himself
suffering a loss, took his chances with the
rest. He knew when he executed his contract
that if he suffered loss by fire his entire
loss might not be made up to him, for the
contract he and all other members executed
provided that each member should pay only his
proportionate share of such loss and not the
share of a defaulting or dishonest member.
Each man agreed to pay, but his proportion was
limited, and beyond that he could not be
called upon.

The above reasoning makes sense. It may be somewhat vitiated by
further comments of the court commenting adversely on plaintiff
Pratt's failure to inform the court more definitely what members
were liable to assessment. However, we think the principle stated
is sound, and each member should properly be liable only for its
proportionate share of assessments, at least in a situation where
a significant number of other assessable members are unable to
contribute. (Commercial realities may dictate otherwise if only one
or two members are unable to contribute.)

Accordingly, we preliminarily conclude that it would be
possible, if necessary, to reopen a closed year to make further
assessments, to be paid only pro rata by the members for that year,
with each member contributing only its own proportionate share.
Concomitantly, in the present situation PLI should also be subject
to such further assessment, and its failure to pay should entitle
the Club to utilize such sum as an offset against claims by PLI or
the Trustee.

We are aware that reopening a closed year for further
assessment is a step which should be used only as a last resort, —
in view of policy reasons, complexities of calculations (including
substantial reinsurance available), difficulty of justifying such
action, and the necessity of getting the Superintendent of
Insurance's approval. However, we now consider it a realistic possibility.

– 10 –

CONFIDENTIAL

AC3066808

**SUMMARY**

To summarize the points above, in our view:

1.   It is very probable that the First Partial Judgment outstanding against the Club will be vacated on appeal.

2.   Preliminarily, if necessary, it should be possible to reopen a closed year for further assessments pro rata against members for that year, with PLI also subject to its pro rata share for the year.

While we emphasize that our views as to 2 above are still preliminary, we thought it would be of benefit to the board to give the foregoing advices now.

Very truly yours,

KIRLIN, CAMPBELL, MEADOWS & KEATING


By: _____
Richard H. Brown, Jr.


RHB:img

– 11 –

CONFIDENTIAL                                           AC3066809

### KIRLIN, CAMPBELL & KEATING

85 BLOOMFIELD AVENUE
CALDWELL, NEW JERSEY 07006
TEL: 201-228-7400
FAX: 201-403-8029

24 HOYT STREET
STAMFORD, CONNECTICUT 06905
TEL: 203-359-6382
FAX: 203-324-5024

901 S.E. 17TH STREET CAUSEWAY
FORT LAUDERDALE, FLORIDA 33316
TEL: 305-832-0048
FAX: 305-462-0272

14 WALL STREET

NEW YORK, N.Y. 10005

212 - 732 - 5520

FAX: 212 - 732 - 5421
TELEX: TRT 177117

January 6, 1995

ONE FARRAGUT SQUARE SOUTH
WASHINGTON, D.C. 20006
TEL: 202-639-8000
FAX: 202-639-8003

301 E. OCEAN BLVD., SUITE 540
LONG BEACH, CALIFORNIA 90802
TEL: 310-491-1267
FAX: 310-590-8999

OUR REF.    102-07

**BY HAND**

American Steamship Owners Mutual
   Protection and Indemnity Association, Inc.
c/o Shipowners Claims Bureau, Inc.
Five Hanover Square
New York, New York 10004

Attn:  Thomas J. McGowan, President and
       William A. Craig, Senior Vice President

Re: USL Reorganization Trust - Adversary
    Proceeding against U.S. Lines Insurers -
    Dickstein, Shapiro & Morin
    Asbestos Cases - Proposed Settlement

Dear Sirs:

     We now report and recommend a proposed settlement of certain
asbestos cases in the United States Lines bankruptcy.

The U.S. Lines Trustee's Adversary Proceeding

     As we have previously reported, the United States Lines
Reorganization Trust instituted an adversary proceeding against
U.S. Lines' eight insurers some years ago, in which the Trustee
seeks certain declaratory relief in respect of asbestos-related
insurance issues, concerning such things as coverage allocation,
deductibles, etc.

     One of the Trustee's causes of action involves an assertion of
bad faith and a claim for punitive damages in that insurers have
declined to pay in respect of certain asbestos claims advanced on
behalf of numerous marine engineers by the law firm of Dickstein,
Shapiro and Morin (DS&M). In connection with the bad
faith/punitive damages cause of action, the Trustee has sought
extensive discovery which so far has not been produced.

     The adversary proceeding is pending before Bankruptcy Judge
Conrad, who also is dealing with the asbestos claims presented by

CONFIDENTIAL

5/12/05
Exhibit
AC-56

AC3068013

Leonard C. Jaques (the Maritime Asbestosis Legal Clinic (MALC)) in both the U.S. Lines and Prudential Lines bankruptcies.

Judge Conrad is the judge who handed down a number of unfavorable (even bizarre) rulings in the Prudential Lines bankruptcy - many of which have now been vacated. Recently, in connection with evidence submitted concerning the MALC claims in the U.S. Lines bankruptcy, he has displayed more common sense and seems to be more sympathetic to insurers' position that those claims are very poorly supported and most of them probably have no substantial value. Nevertheless, in our judgment he remains unpredictable, with a considerable capacity for impulsive action, which at worst could be substantively detrimental and at all events could entail substantial additional legal expense.

### The DS&M Claims

The DS&M claims differ from MALC's in that they involve marine engineers who in most cases were actually exposed to asbestos. They have been fairly well screened. Settlements, negotiated in New Orleans (with Terriberry, Carroll & Yancey representing most shipowners), have generally been reasonable. The claims have numbered in the hundreds rather than in the many thousands advanced by MALC.

### The Trustee's Conditional Settlement

Pending in the U.S. Lines bankruptcy are some 106 DS&M claims. The overwhelming majority have been settled by solvent shipowners and manufacturers. However, the releases have not included bankrupt entities such as U.S. Lines who have not contributed to the settlements. Accordingly, if DS&M claimants served in U.S. Lines vessels, their claims are pending in the U.S. Lines bankruptcy. Approximately two years ago the Trustee agreed to a conditional settlement of all the pending DS&M claims for various amounts based on allocations of the values of claims and proportions of U.S. Lines sea service furnished by Messrs. Terriberry. Generally speaking, the amounts are reasonable and the proportions allocated to U.S. Lines are appropriate. The total amount of the DS&M conditional settlement was $ 464,725. However, the insurers resisted payment for a number of reasons.

First, as mentioned, most of the DS&M claims have been settled by solvent shipowners and manufacturers, probably at or near their full values, and insurers have maintained that the claimants are entitled to no more. That argument has been severely impaired by the Supreme Court decision in 1994 in McDermott v. Amclyde, 1994 A.M.C. 1521, which is discussed in more detail below.

Second, the Trustee, in dealing with the individual settlements, has utilized only one deductible per claim and that the smallest, which he proposes to pay with essentially valueless

- 2 -

CONFIDENTIAL

AC3068014

reorganization securities. Many of the insurers, including the American Club, would apply more than one deductible. Moreover, while the Trustee probably has sufficient funds to "pay first" and thereafter seek reimbursement, he wishes to be assured of such reimbursement by obtaining an advance of funds to be held in escrow pending actual payment so that the bankrupt estate cannot be impaired by a failure of reimbursement.

### Proposed Resolution of the DS&M Claims

In dealing with the adversary proceeding, there has been considerable discussion with regard to settling the DS&M asbestos cases, with all of the insurers contributing, on the understanding that such a settlement will result in the Trustee withdrawing his allegations of bad faith and demand for punitive damages against the insurers which are presently pending in the adversary proceeding. We think that that result would avoid substantial litigation costs (particularly with regard to discovery) and would dispose Bankruptcy Judge Conrad to deal with the remaining issues in a more sensible and fairer manner.

The upshot of extensive negotiations is that the attorneys for the insurers have reached agreement to recommend settlement of the DS&M claims on the basis set forth in Appendix A, whereby the American Club would contribute $158,871 of a cash settlement of $313,856.25 to be provided to the Trustee to settle the DS&M claims against releases provided by each claimant. In exchange, the claim of bad faith and demand for punitive damages would be dropped by the Trustee. We recommend this resolution of the DS&M phase of the adversary proceeding for the reasons stated below.

Preliminarily, there was considerable discussion about the apportionment among insurers of the payments to be made, and we endeavored to obtain agreement to a more substantial "general" contribution (i.e., one not geared only to sea service) than is described in Appendix A. There was strong objection to this from a number of the insurers whose sea service share is only minor. Accordingly, the smaller insurers would make only a nominal "general" contribution totalling $8,500, which would be credited to the American Club which is the largest contributor, with the three "mid-range" contributors paying solely on the basis of sea service. As a practical matter, we think that the Appendix A allocation is the best from the American Club's point of view that could be agreed.

While this payment would be a departure from previous Club practice, we think it is justified for the reasons referred to above and also on the basis of the following considerations.

As to the first difficulty discussed above (page 2), i.e., the probability that most of the DS&M claims have been settled for

- 3 -

CONFIDENTIAL

AC3068015

their approximate full settlement values, there has been a significant decision, materially modifying the applicable law.

As mentioned, most of the DS&M claims pending against the USL Trust are claims which were previously settled by payments by solvent steamship owners and manufacturers. This was done at a time when, at least under New York law, the non-settling defendant(s) could claim a credit in respect of the settlement to the extent that the settling plaintiff had been compensated for the non-settling defendant(s) liability in terms of either percentages or dollars. That is, if the full value of the plaintiff's claim against all defendants was, say, $100,000 and he settled for $95,000 with some defendants and there was one non-settling defendant who was 25% liable, the plaintiff's potential recovery against the non-settlor would be limited to $5,000 on the theory that this would make him whole. On the other hand, if in the same circumstances he settled with some defendants for only $50,000, his maximum recovery from the non-settling defendant who was 25% liable would be $25,000 (25% of his total damages). The non-settlor(s) could invoke whichever rule was more favorable to it.

However, earlier this year, in McDermott v. Amclyde, 1994 A.M.C. 1521, the Supreme Court laid down a rule under which when a maritime claim is settled with fewer than all joint tortfeasors, a non-settling defendant's liability is determined solely by the proportionate share rule, under which the liability of a non-settling defendant is reduced by the amount of the settling defendants' proportion of liability determined on a percentage basis. To adapt this rule to the first situation described in the paragraph above, if the settling defendants paid $95,000 in respect of a case having a full value of $100,000, the plaintiff would still be able to collect from a non-settling defendant who was 25% liable the sum of $25,000, so that the plaintiff would wind up with a total recovery of $120,000. In light of the McDermott decision there is, therefore, still exposure on the part of non-settling defendants in proportion to their liability regardless of how much money plaintiff has been able to obtain from the settlors.

In respect of the DS&M settlements in the U.S. Lines matter, a number of those cases involved situations in which a very substantial proportion of sea service was in U.S. Lines vessels, and there remains substantial exposures in those cases. In view of that risk and the general considerations discussed above, we think it advisable to agree to a settlement on terms whereby the American Club would contribute $158,871 of the contemplated $313,856.25 overall settlement of 106 asbestos claims.

The second difficulty referred to above (page 2), concerning the "pay-first" requirement and application of deductibles, remains. Candidly, with respect to all insurers, those arguments are effectively being waived (without prejudice to future cases) in the expectation that the proposed settlement will be sufficiently

- 4 -

CONFIDENTIAL

AC3068016

compensated by the bad faith/punitive damage claim being dropped, thereby saving considerable litigation costs and at least a slight risk of an adverse result.  Moreover, the DS&M settlement is expected to make Judge Conrad more receptive to reasoned argument, particularly in connection with the MALC claims, which are the insurers' chief concern insofar as asbestos claims are concerned.

<u>Recommendation</u>

We recommend that we be authorized to agree to the proposed settlement, which will require from the American Club a contribution of $158,871.  We will appreciate instructions as soon as possible.  This settlement would be effected on the understanding that it is limited to the DS&M claims in the U.S. Lines proceeding only and is not to serve as a precedent for other cases and, moreover, is without prejudice to all Club defenses.

Please let us have instructions.

Very truly yours,

KIRLIN, CAMPBELL & KEATING

By: _Richard H Brown_
Richard H. Brown, Jr.

RHB:img
Encl.

− 5 −

CONFIDENTIAL

AC3068017

APPENDIX A

## DS&M CLAIMS

Total Number of Claimants - 106
Gross amount of settlements - $464,725
Applicable deductible amounts - $266,550
*Net deductible amounts - $134,350
Initial cash settlement amount - $330,375 [$464,725 less $134,350]
Final cash settlement amount-$313,856.25 [applying 5% reduction]

| CLUB | USL TRUSTEE'S ALLOCATION ON DAYS WORKED AMOUNT ($) | 5% DISCOUNT** ($16,518.60) (DISCOUNT AMOUNT) | FINAL ALLOCATION AGREED AMONG INSURERS |
|---|---|---|---|
| American | $  176,177.00 | $  167,368.15 ( 8,808.85) | $  158,871.00 (-8,500.00) (+2.85)*** |
| W.O.E. | 69,140.00 | 65,683.00 ( 3,457.00) | 65,683.00 |
| Fulton | 47,731.00 | 45,344.45 ( 2,386.55) | 45,344.45 |
| U.K. | 29,929.00 | 28,432.55 ( 1,496.45) | 28,432.55 |
| Skuld | 5,171.00 | 4,912.45 ( 258.55) | 7,912.45 (+3.000.00) |
| MOAC | 1,312.00 | 1,246.40 ( 65.60) | 3,746.40 (+2.500.00) |
| L&L | 902.00 | 856.90 ( 45.10) | 2,856.90 (+2,000.00) |
| Travellers | 10.00 | 9.50 ( 0.50) | 1,009.50 (+1,000.00) |
| Total: | $  330,372.00 (Amounts rounded off) | $  313,853.40 | $  313,856.25 |

*     Some claims do not exceed the deductible; therefore the entire
      amount of applicable deductible does not go towards reducing the
      gross claim.

**    Following the Trustee's negotiation of the $330,375 cash figure,
      insurers negotiated a further 5% reduction with DS&M.

***   To correct error due to rounding off in first column.

CONFIDENTIAL                                                    AC3068018



## KIRLIN, CAMPBELL & KEATING

| | | |
|---|---|---|
| 86 BLOOMFIELD AVENUE<br>CALDWELL, NEW JERSEY 07006<br>TEL: 201-228-7400<br>FAX: 201-403-9029 | **14 WALL STREET**<br><br>NEW YORK, N.Y. 10005<br><br>212 · 732 · 5520 | ONE FARRAGUT SQUARE SOUTH<br>WASHINGTON, D. C. 20006<br>TEL: 202-639-8000<br>FAX: 202-639-8003 |
| 24 HOYT STREET<br>STAMFORD, CONNECTICUT 06905<br>TEL: 203-339-6383<br>FAX: 203-324-5024 | | 301 E. OCEAN BLVD., SUITE 840<br>LONG BEACH, CALIFORNIA 90802<br>TEL: 310-491-1207<br>FAX: 310-590-8999 |
| 901 S.E. 17TH STREET CAUSEWAY<br>FORT LAUDERDALE, FLORIDA 33316<br>TEL: 305-832-0048<br>FAX: 305-462-0272 | FAX: 212 · 732 · 5421<br>TELEX: TRT 177117 | |

JAN 2 · 1995

RISK MANAGEMENT

December 27, 1994                                       OUR REF. 102-11

Ellis R. Mirsky, Esq.
120 White Plains Road
Tarrytown, NY  10591

                        Re:  <u>Asbestos Claims – American Club</u>

Dear Ellis:

     Ben Gleason requested that I write to you with the reasoning behind my view that closed insurance years could be reopened if necessary to assess members for those years in connection with such things as asbestos claims.  I know of no case specifically discussing the reopening of a closed year, and my view is based on the nature of a mutual insurance association in New York.

     I enclose, from our brief of November 9, 1993 submitted in connection with the appeal to Judge Haight from the now-vacated First Partial Judgment against the Club, a five page excerpt (pp 42-46) which states the basic rationale behind the view that a closed year can be reopened by the Club, if necessary.

     Essentially this view is based on the proposition that, under the charter, every member of the Club shall be a member "during the period while such policy is effective to insure risks;" if, as is the case, a policy issued during a year now closed is effective to insure an asbestos-caused injury risk during that year, the members during that year could still be subject to further assessment if reasonably necessary to pay the claim.  However, no member should be liable for more than its <u>pro rata</u> share under the reasoning in the <u>Pratt</u> case, cited in the enclosure, which strikes me as a very sound, common-sense approach.

     If the member claiming against the Club is a bankrupt (such as PLI) it seems to me that member would have to pay the claim, say, $50,000.  It could then make claim on the Club for $50,000 less the deductible (say $1,000) or a net $49,000.  The Club could choose to assess the material year.  Let's say there were 7 members then, each with an equal tonnage, but 3 (including PLI) are bankrupt or defunct.  Theoretically each member could be assessed $7,000.  Multiplied by 4 solvent members, that would be $28,000, which should be all to which PLI would be entitled as reimbursement in



APL 006703

respect of the $50,000 it paid out, - leaving PLI to bear $22,000 of the $50,000 it had paid. Whether a bankrupt could carry on that sort of process is extremely doubtful, and this approach, it seems to me, would be a useful defense' to the Club if substantial payments should ever have to be made in these asbestos cases relating to closed years.

As a practical matter, so far as I know the American Club has never reopened a closed year and such a step would be taken only most reluctantly. However, it seems to me from the reasoning described above that such a step could be taken if necessary and advisable from the point of view of the current Club members. It would seriously impair the principle of mutuality to require the present membership to pay substantial monies in respect of claims properly allocable to closed years.

I would appreciate any comments you might have.

Best regards.

Sincerely,

*Dick*

Richard H. Brown, Jr.

RHB:img
Encls.

cc: Mr. C. Bennett Gleason
    Director, Risk Management
    American President Lines, Ltd.

    Mr. Thomas J. McGowan
    Shipowners Claims Bureau

— 2 —

APL 006704

**American Steamship Owners Mutual Protection and Indemnity Association, Inc.**



Shipowners Claims Bureau, Inc., Manager
Five Hanover Square – 20th Floor
New York, New York 10004-2698
Main: (212) 269-2350 (or 908-2400)
Fax: (212) 825-1391
Telex: 222091
Direct: (212) 908-2444

April 20, 1995



BOARD OF DIRECTORS

Re:    <u>U.S. LINES BANKRUPTCY</u>

Gentlemen:

Attached is a copy of a letter from Kirlin, Campbell & Keating dated April 20, 1995 dealing with asbestos related claims and, particularly, the bankruptcy litigation involving United States Lines.

Counsel has provided regular reports to the Directors regarding these matters and now is recommending an approach to the U.S. Lines trustee. Prior to doing so, however, Mr. Brown recommends this matter be reviewed by the Directors and the Finance Committee

Very truly yours,

*Shipowners Claims Bureau, Inc.,* MANAGER

Thomas J. McGowan
President

VAPS AC\GENERAL
Attachment

KEY 002260



5/12/05
Exhibit
AC-58

# KIRLIN, CAMPBELL & KEATING

85 Bloomfield Avenue
Caldwell, NJ 07006
Tel.: (201) 228-7400
Fax: (201) 403-9029

24 Hoyt Street
Stamford, CT 06905
Tel.: (203) 359-6383
Fax: (203) 324-5024

901 S.E. 17th Street Causeway
Fort Lauderdale, FL 33316
Tel.: (305) 832-0048
Fax: (305) 462-0272

5 Hanover Square
New York, NY 10004-2614

Tel.: (212) 425-7800
Fax: (212) 425-7856
Telex: 177117

301 E. Ocean Blvd., Suite 540
Long Beach, CA 90802
Tel.: (310) 491-1267
Fax: (310) 590-8999

One Farragut Square South
Washington, DC 20006
Tel.: (202) 639-8000
Fax: (202) 639-8003

April 20, 1995                    102-07

BY HAND

American Steamship Owners Mutual
 Protection and Indemnity Association, Inc.
c/o Shipowners Claims Bureau, Inc., Manager
Five Hanover Square
New York, NY  10004

Attn:  Mr. Thomas J. McGowan, President

                    Re:  U.S. LINES BANKRUPTCY

Dear Sirs:

        We now report on recent developments and request instructions
as to a proposed further step in this matter.

        To recapitulate the situation, on January 12, 1995 the Board
approved the recommended settlement of the Dickstein Shapiro &
Morin claims.  The Club has paid its share, as have most of the
other insurers, and we expect those settlements will be duly
consummated by the Trustee.  As a consequence, certain issues
pending against the insurers in the Trustee's adversary proceeding
seeking punitive damages, etc., and charging bad faith have been
eliminated, thereby reducing substantially the discovery in those
matters.  Following that settlement, Judge Conrad signed an order
to enforce his decision of July 5, 1994, which held in favor of the
Trustee and against insurers on a number of issues, the most
significant of which was his denial of arbitration to the English
clubs.  Appeals have been taken from that order to the District
Court by all eight of the insurers, including the American Club,
and presently under consideration is the question whether the
American insurers have a right to appeal inasmuch as the only
clearly appealable issue concerns arbitration of the claims against
the English clubs.  The issue of appealability is under
consideration by the District Court, which heard argument on the
point on April 18, 1995.

KEY 002261

Meanwhile, Bankruptcy Judge Conrad held a pretrial status conference yesterday. At that conference, he decided to proceed with the adversary proceeding despite the pending appeals and directed the Trustee to submit a proposed order concerning discovery. The Trustee had prepared and yesterday served amended discovery requests deleting the areas of discovery now eliminated by the Dickstein Shapiro & Morin settlement. The Trustee will submit a proposed order which provides for a response to discovery by June 4, 1995.

Judge Conrad also requested the Trustee to prepare an order transferring the adversary proceeding back to Bankruptcy Judge Blackshear, whose docket includes the U.S. Lines bankruptcy proceeding. As you may recall, Judge Blackshear transferred the U.S. Lines adversary proceeding to Judge Conrad because the latter was dealing with the PLI adversary proceeding concerning in particular the asbestos claims and insurance issues. Judge Conrad is a visiting bankruptcy judge from Vermont and will be returning permanently to Vermont on June 28, 1995, after which he will have no further part to play in these bankruptcy cases. He also mentioned yesterday that he intends to transfer the PLI adversary proceeding back to Judge Blackshear. We regard this as a favorable development in light of Judge Conrad's past actions and decisions.

At this transition point, in light of the order to continue discovery in the U.S. Lines adversary proceeding, we recommend the course of action outlined below, as further explained in the enclosures to this letter.

Recommendation as to Dealing with Asbestos Claims Presented by Bankrupt Former Club Members, in the event they are held entitled to Reimbursement from the Club

In connection with the U.S. Lines bankruptcy and also those of Prudential and States Steamship, we think the Club should assert the position that asbestos claims against the bankrupts, if paid, will evoke a need for assessments, at least for the insurance years before the 1977 year when the practice of retaining $100,000 for IBNR of a disease nature started.

We have raised points along these lines in prior briefs, but we think the position should be clearly stated by letter to the U.S. Lines Trustee's lawyer now in an effort to discourage as much as possible the prospective further legal proceedings in the Bankruptcy Court which could be a considerable legal expense and probably would be unproductive.

KEY 002262

- 2 -

Accordingly, we have drafted the enclosed letter which discusses the point in the concrete context of the Brandenburg asbestos case (the Brandenburg settlement was approved some years ago). We also enclose five pages from our brief in the appeal to District Judge Haight from Bankruptcy Judge Conrad's [now vacated] First Partial Judgment which discusses the concept of liability of a mutual's members only pro rata, including a quotation from the Pratt decision which makes sense.

The objective is to try to persuade the U.S. Lines Trustee that his present course of trying to pursue the Club (and other insurers) on these MALC asbestos claims is leading up a blind alley. I think this is true because it is extremely doubtful that the Trust can pay out any substantial sums of money without being almost fully reimbursed. At a minimum, even without assessing other members, the Club should have a good argument that the Trustee should absorb the U.S. Lines "assessment share" of any payment. That was 23.4% for the 1969 year (U.S. Lines' last year) and, since U.S. Lines was a major member, the percentages for the earlier years would also be large.

I realize that the argument for assessment of unreserved closed year claims may present problems. However, if its effect is to prevent U.S. Lines from obtaining sufficient reimbursement and therefore blocking it from settling asbestos claims at all (as I think would be the case), the Club would be protected from this potential inequitable drain.

Moreover, I think the position advanced in the attached draft letter is legally sound and fair. Why should present Club members be obliged to pay asbestos claims against bankrupt former members who never contributed any assessments in respect of such claims, unless those former members pay their shares of such assessments, if necessary by the Club obtaining an appropriate credit against the claim? And why should any member pay for a claim by a bankrupt member attributed to an insurance year in a proportion beyond its pro rata share of assessable premium for that year? Those "obligations" were simply not part of the agreement.

In this connection it could be legitimate to make a distinction between bankrupts and present solvent members with claims stemming from similar closed years -- the rationale being that present members have a stake in present assets and have some claim on them, although bankrupts would have none. Moreover, such a distinction would be beneficial to the operations and continuation of the Club.

KEY 002263

- 3 -

I realize this represents something of a new tack and therefore recommend that this approach be made known to the Board to obtain their views. I suggest that this letter and enclosures be circulated at an early date with a request for Board members' views and having in mind discussing the matter at the Finance Committee meeting on May 2nd. One reason for some urgency now is the program of discovery about to be commenced following yesterday's status conference before Bankruptcy Judge Conrad.

Please advise if you have any questions or comments.

Very truly yours,

KIRLIN, CAMPBELL & KEATING

By: _____
        Richard H. Brown, Jr.

RHB:img
Encls.

KEY 002264

- 4 -

DRAFT                    102-13

Re:  Asbestos Settlement Proposals
     in Bankruptcies - Assessments
     in Relevant Years

Dear Sir:

    This letter deals primarily with the above-captioned topic.

    The Brandenburg claim should be viewed in the context of all
American Club defenses vis-a-vis that claim and probably against
other similar asbestos claims.  As I understand it, Brandenburg, an
engineer, was born in 1918, spent most of his seagoing career with
U.S. Lines (serving in U.S. Lines vessels from 1948-1969), retired
in 1969, and was in apparent good health until he developed left
neck pain in December 1982 although, according to Terriberry's
April 3, 1989 letter, there was evidence of asbestosis as early as
1978.  He was admitted to hospital for evaluation in April 1983 and
was found to be seriously ill, as Terriberry's letter describes
(page 2).  His condition worsened, and he died on August 17, 1983,
according to his death certificate as a result of mesothelioma of
one year's duration.  Medical opinion generally supports the
mesothelioma diagnosis.

    The other parties (manufacturers) settled for $360,000.
Terriberry's letter proposed a settlement.  On June 8, 1989 the
Club board approved a settlement whereby U.S. Lines would pay
$35,000 cash and the Brandenburgs would be recognized as unsecured
pre-petition creditors for $55,000.  We presume that the dollar
value of the unsecured pre-petition claim is zero, and hence the
Club would not regard that to be actual payment of cash, but please
advise if our presumption is incorrect.

    Assuming it is correct, the Club's position is that, if the
$35,000 settlement were actually paid by U.S. Lines, it should be
allocated to all of Brandenburg's years of service on U.S. Lines
vessels, some 22 insurance years, and deductibles for those years
only should be applied.  This point is on appeal in the PLI
litigation.  We are aware that you disagree with the Club's
position.

KEY 002265

We understand that you also maintain the claim should be all charged against only one insurance year. Even assuming that to be correct, we do not think that would significantly improve U.S. Lines' chances of realizing any recovery against the Club. For one thing, since U.S. Lines owes about $200,000 in unpaid assessments, that balance in the Club's favor could at most be only diminished by $35,000 if U.S. Lines actually paid that sum to the Brandenburgs.

However, quite apart from the foregoing points, let us assume the $200,000 offset does not exist and the $35,000 claim is actually paid and charged to one Club insurance year.

For simplicity, since the data for the most recent year of Brandenburg's service, 1969, can be quite easily retrieved by computer, we use that year (1969) as an example of the proper consequences of allocation to one insurance year. However, we would expect the results to be substantially similar for any insurance year applicable to Brandenburg's service.

A principle mandated by statute applicable to New York mutuals is that any loss is to be allocated only to the members during the insurance year involved. The present version of the applicable statute in Insurance Law §4111, which reads, in material part:

> §4111.  Mutual companies; assessments
>
> (a)    Except as provided in section four thousand one hundred thirteen of this article [concerning nonassessable policies], every domestic mutual property/casualty insurance company shall in its by-laws and policies prescribe the contingent mutual liability of its members for the payment of assessments, in such a way that each member shall be liable to pay <u>the member's proportionate share</u>, subject to the limitations hereinafter specified, of the amount of any assessment or assessments permitted for any purpose under any provisions of this chapter or necessary to make good an impairment of the minimum surplus of such company...
>
> Every assessment shall be made upon all members liable to assessment therefor in the proportion hereinafter specified... A member's proportionate part of any assessment shall be determined by applying to the premium earned on the member's policy or policies in force during a period of one year next preceding the order of assessment <u>the ratio of the total assessment to the total premiums earned during such period on all policies subject to assessment...</u> (Emphasis added)

- 2 -

KEY 002266

Consistent with that statute, the Club's by-laws (Art. IV, Sec. 4), provide:

> ... All dividends declared and all assessments levied shall be distributed or spread in the ratio that the net premiums paid by the holder of an assessable policy bear to the net premiums paid by all holders of assessable policies for the insurance year...In any case, however, all action of the board of directors in respect of dividends or assessments shall conform with the Law and with the Charter and By-Laws of the Corporation [Club]. (Emphasis added.)

And the first sentence of Article 4 of the Club's charter provides:

> Every holder of a policy issued by this corporation [Club] shall be a member of the corporation during the period while such policy is effective to insure risks...

It follows that, _assuming_ all liability were charged to 1969, the members for that year would be the only entities obligated to contribute, and each member would only have an obligation to pay its share of any liability _pro rata_ to its proportion of premiums.

The now-bankrupt members for the 1969 year, with the amounts and percentages of premiums they paid, and the year's total premium were apparently as follows:

| | Premium Amounts | Approx. Percentage |
|---|---|---|
| U.S. Lines (bankrupt) – | $ 2,551,936.47 | 23.4% |
| PLI (Grace) (bankrupt) – | 1,916,867.42 | 17.6% |
| States (bankrupt) – | 711,701.25 | 6.5% |
| Trinidad (bankrupt) – | 212,077.05 | 1.9% |
| Sub-total | $ 5,392,582.19 | 49.4% |
| Presumably solvent 1969 members | 5,508,194.50 | 50.6% |
| Total Assessable Premium | $10,900,776.69 | 100% |

See attached summary.

No assessments in respect of possible asbestos liabilities were levied for 1969 and, if that year were to be charged for Brandenburg in the amount of $35,000 paid by U.S. Lines, and claimed against the Club, the Club would be constrained by statute and by-laws to levy a $35,000 assessment to pay the claim. In light of the above-described situation as to the 1969 membership

- 3 -

KEY 002267

(but ignoring any deductible for the purpose of this exercise), the result would be approximately as follows, assuming that presumably solvent former members would pay:

| | |
|---|---|
| U.S. Lines pays | $35,000 |
| Solvent members pro rata reimburse 50.6%..... | 17,710 |
| U.S. Lines bears balance .................... | $17,290 |

The net result would be that the Trust, if it actually paid out $35,000, would be entitled to reimbursement of no more than $17,710. If the 1969 deductible were applied, as minimally we think it should be despite Judge Conrad's holding in the PLI case, the amount to be reimbursed would be reduced by the deductible amount. If more than one year's deductible were applied, the truly proper procedure in our view, the reimbursement would be still less, perhaps negligible.

The foregoing outcome follows New York law and the Club's by-laws. The Club is not a monolithic corporation, unchanging from one year to the next. It is an association whose membership changes. The present members of the Club own its present assets. However, those assets do not include any reserves for 1969 asbestos claims and the assets therefore should not legally be required to be a source of payment for such unreserved 1969 claims, nor should any 1995 member be under any obligation to contribute to assessments to pay 1969 claims unless it was a member in 1969 and then only to the extent of its pro rata share for 1969.

I suggest that the foregoing analysis is sound and would bar the Trust from obtaining reimbursement for more than a portion of whatever asbestos claim payments it might actually make, even if the Club's defenses should fail. If, under such circumstances, the Trust does not have the assets to effect genuine payments it would appear that further entertainment of the MALC claims (which in any case seem to have little or no value as emphasized by the fact that they have been pending against solvent companies for almost ten years with virtually no activity on plaintiffs' part) would be largely an exercise in futility insofar as American Club reimbursement might be concerned.

Very truly yours,

KIRLIN, CAMPBELL & KEATING

Richard H. Brown, Jr.

RHB:img

- 4 -

KEY 002268

**1969 Policy Year**

| Bankrupt Members | Assessable Premium | |
|---|---|---|
| Grace Line | 1,499,927.10 | |
| Grace Line | 133,870.92 | |
| Prudential Lines | 215,551.00 | |
| World Wide Tankers | 67,518.50 | |
| | 1,916,867.52 | 18% |
| | | |
| United States Lines | 332,479.20 | |
| United States Lines | 25,604.72 | |
| United States Lines | 94,102.54 | |
| United States Lines | 452,366.64 | |
| United States Lines | 277,512.48 | |
| United States Lines | 152,256.00 | |
| United States Lines | 93,144.78 | |
| United States Lines | 266,944.80 | |
| United States Lines | 163,503.69 | |
| United States Lines | 121,200.80 | |
| United States Lines | 74,527.20 | |
| Moore-McCormack | 498,293.62 | |
| | 2,551,936.47 | 23% |
| | | |
| States Steamship | 711,701.25 | 7% |
| | | |
| Trinidad | 169,808.70 | |
| | 42,268.35 | |
| | 212,077.05 | 2% |
| | | |
| Total Assessable Premium | 10,900,776.69 | |

KEY 002269

*Excerpt from brief on appeal
from First Partial Judgment*

- 42 -

In New York, mutual insurance companies are regulated by statute, and one of the statutory requirements is a genuine mutuality with respect to assessments. New York Insurance Law §4111 provides in material part:

> §4111. Mutual companies: assessments
>
> (a) Except as provided in section four thousand one hundred thirteen of this article [concerning nonassessable policies], every domestic mutual property/casualty insurance company shall in its by-laws and policies prescribe the contingent mutual liability of its members for the payment of assessments, in such a way that each member shall be liable to pay the member's proportionate share, subject to the limitations hereinafter specified, of the amount of any assessment or assessments permitted for any purpose under any provisions of this chapter or necessary to make good an impairment of the minimum surplus of such company...
>
> Every assessment shall be made upon all members liable to assessment therefor in the proportion hereinafter specified... A member's proportionate part of any assessment shall be determined by applying to the premium earned on the member's policy or policies in force during a period of one year next preceding the order of assessment the ratio of the total assessment to the total premiums earned during such period on all policies subject to assessment... (Emphasis added).

A case involving a similar statute applicable to a mutual fire insurance company, Pratt v. Dwelling House Mut. Fire Ins. Co., 7 App. Div. 544, 40 N.Y. Supp. 179 (4th Dept., 1896), explains the principle. In that case, Pratt, a member of a mutual company, sustained a $3,400 loss and recovered a judgment against the mutual company for that amount. The judgment was not paid, and a receiver of the mutual was appointed, who made assessment on the members sufficient to pay the judgment if all members paid their

KEY 002270

- 43 -

assessments. Some did not, for various reasons including insolvency; a balance of $1,200 was left unpaid, and Pratt applied for a further assessment on the solvent members to make up the deficiency. The lower court refused this, and Pratt appealed. The Appellate Division affirmed, agreeing there should be no further assessment. In doing so, it said:

> ...It is provided by the statute that every person who becomes a member of the corporation shall pay his "pro rata share to the company of all losses or damages caused by fire or lightning, which may be sustained by any member or members thereof." It surely would be a strained construction to say that it was intended by the use of these words to bind each member of the company to the payment of an entire loss, if all the other members should prove to be insolvent. If it were so intended, the words "pro rata," that is, a distribution proportionately, would not have been used in expressing the intention of the Legislature. There is nothing in the statute which indicates that the members of a corporation organized thereunder are to indemnify those insured against loss by reason of the insolvency of a member, nor any obligation to pay the share or proportion of any other member who may become insolvent, or from any cause unable to pay his proportionate share of the loss. Under the construction contended for by appellant, a solvent member might be compelled to pay the entire loss and also the expenses of the company or receiver in ascertaining and determining the question of the solvency or insolvency of the other members. Will it be contended for a moment that any person would become a member of such a corporation, knowing that he might become liable individually to pay all the losses occurring in the class in which he was insured? If such were the intention expressed in this statute, and so expressed as to be clearly understood and comprehended, there would be no corporation organized under the law, for no sane man would venture on so hazardous an undertaking. The regnant idea and intention of the statute are that each

KEY 002271

- 44 -

member of the company is to pay such
proportion of the loss as the amount of his
insurance bears to the whole amount of
insurance in the same class. The liability of
the member is not joint and several, but the
principle is that each one contracts that, in
respect of a certain sum or premium to be
levied by a pro rata contribution on the
amount for which he himself is insured, he
will contribute to pay any losses resulting
from the happening of the contingency insured
against, which may occur to any other member;
but there is no participation by any member in
respect of the liability of any other in
regard to solvency, default or dishonor. No
member insures the solvency, the honesty or
good faith of other members...Each member,
foreseeing the contingency of himself
suffering a loss, took his chances with the
rest. He knew when he executed his contract
that if he suffered loss by fire his entire
loss might not be made up to him, for the
contract he and all other members executed
provided that each member should pay only his
proportionate share of such loss and not the
share of a defaulting or dishonest member.
Each man agreed to pay, but his proportion was
limited, and beyond that he could not be
called upon.

Id. at 547-8, 40 N.Y. Supp. at 181-12. The same reasoning would be

possibly applicable here to limit any potential Club responsibility

to respond to the PLI claim by (a) considering the extent of the

pro rata shares of members during relevant insurance years still

available to respond and (b) taking into account the ability of PLI

to pay any supplementary assessment against it necessitated by its

own claim against any Insurance Year. As to (a), particularly in

older insurance years, some members may no longer be available to

respond, which would limit the Club's responsibility on a pro rata

basis. As to (b), if the Trustee is unable to contribute PLI's

share of any further assessment, he may not be entitled to payment

KEY 002272

- 45 -

of all or part of his claim under the <u>cum onere</u> principle.

The Club's By-Laws are consistent with and based on the statute (or its predecessor) and case law such as <u>Pratt</u> in that they require that each member be liable for assessments only in his proportionate share, thus (from By-Laws, Article VI, Section 4):

> ... All dividends declared and <u>all assessments</u> <u>levied shall be distributed or spread in the</u> <u>ratio that the net premiums paid by the holder</u> <u>of an assessable policy bear to the net</u> <u>premiums paid by all holders of assessable</u> <u>policies for the insurance year</u>...In any case, however, all action of the board of directors in respect of dividends or assessments shall conform with the Law and with the Charter and By-Laws of the Corporation [Club]. (R-113; emphasis added.)

> The first sentence of Article 4 of the Charter reads:

> Every holder of a policy issued by this corporation [Club] shall be a member of the corporation during the period while such policy is effective to insure risks... (R-411 of Record on Appeal in 93 Civ. 1481)

We submit this means that, if, say, the 1950 policy is effective to insure an asbestos exposure risk in that year, all those who were members during that year are still members. All such members are still subject to further assessment if the board should decide that was necessary, but only for their proportionate shares.

In keeping with New York law, and its own By-Laws, the Club's policies provide protection against solvent members being inequitably required to pay liabilities of members who become

KEY 002273

- 46 -

insolvent and unable to pay their proportions of assessments.
Clause 28(b) of the policy provides, <u>inter alia</u>:

> ...should the Assured or any of them become
> insolvent or bankrupt...the Association shall
> not be liable for any claims whatsoever under
> this policy unless within sixty (60) days from
> the date of such cancellation or the
> occurrence of such insolvency [or]
> bankruptcy...there are paid to be Association
> by or on behalf of the Assured all premiums
> due, and the payment of any premiums to become
> due as well as all possible assessments is
> unconditionally guaranteed by a responsible
> surety.

It is undisputed that PLI has not had all possible assessments so
guaranteed. Coupled with the policy's pay-first requirement,
Clause 28(b) operates to protect solvent members of mutuals from
having to pay the obligations of those who become insolvent to the
point of being unable to pay their proportions of assessments.

Taking both considerations together, the First Partial
Judgment is defective in that it fails to take into account the
consequences of the facts that (a) some former members of the Club
(e.g., Bull Line in the <u>Liman</u> case) are no longer available to
contribute further assessments and (b) the Trustee would be unable
to contribute a further assessment levied for any closed year.
Both factors would operate to reduce the <u>quantum</u> of the judgment.

KEY 002274

*Please see February 14, 1979 letter previously attached*

# KIRLIN, CAMPBELL & KEATING

85 BLOOMFIELD AVENUE
CALDWELL, NEW JERSEY 07006
TEL: 201-228-7400
FAX: 201-403-9029

24 MOTT STREET
STAMFORD, CONNECTICUT 06906
TEL: 203-359-6383
FAX: 203-324-5024

901 S.E. 17TH STREET CAUSEWAY
FORT LAUDERDALE, FLORIDA 33316
TEL: 305-632-0048
FAX: 305-462-0272

5 HANOVER SQUARE

NEW YORK, N. Y. 10004-2614

212 - 425 - 7800

FAX: 212 - 425 - 7856
TELEX: 177117

301 E. OCEAN BLVD., SUITE 540
LONG BEACH, CALIFORNIA 90802
TEL: 310-491-1267
FAX: 310-690-6899

888 16TH STREET, N.W.
WASHINGTON, D. C. 20006
TEL: 202-638-6000
FAX: 202-635-8238

February 1, 1996

OUR REF. 102-13

Mr. C.B. Gleason
Director, Risk Management
American President Companies, Ltd.
1111 Broadway
Oakland, CA  94607

Dear Ben:

Thank you for your letter of January 22, 1996, which we received on Monday.  I will try to respond to the points you make as clearly as possible.

The Kirlin 2/14/79 opinion (authored by William Fallon), in the part with which you are concerned, dealt with the question:

> Who owns the funds represented by the Reserve Account, the Association or its members?

The letter answers that the Association owns the funds, for reasons discussed on pages 2-11 of the letter.

The focus of your comments largely concerns pages 8-11 of the letter and I think the parts you quote may not fully convey the context of the letter.  I quote a little more extensively below, although even the quotes I make might not convey everything.  In any event, the letter says, in part:

> "There is another legal principle which confirms the conclusion that funds, although derived by means of an assessment, lose their legal identity as such when they are transferred to the Association's Reserve Account, and thus can not constitute an assessment "excess" which belongs to the members.  In recommending the closing of an Insurance Year the Association's Manager must "estimate with a reasonable degree of



5/13/05
Exhibit
AC-61

AC0066530

certainty" [Association's By-Laws, Art. V., Sec. 4] the amount required to be transferred to the Reserve Account to satisfy projected policy liabilities for such Year. This estimate must then be approved by the Association's Board of Directors. In effect, it is also subject to the acceptance of the policy holders' involved because naturally they retain the legal right to dispute such "estimate" if they conclude it is not reasonably supported by the facts available to them.

Thus in consummating the closing of an Insurance Year it would appear that within the contemplation of law, there has been a final settlement of accounts, for such Year between the Association and the policy holders involved. That is, if the amount set aside in the Reserve Account is not sufficient to satisfy all the policy liabilities, for the closed Insurance Year, as subsequently proven, then the Association can not make any assessment against the policy holders for such Year to eliminate the deficit...

(pages 8-9)

The foregoing quotation includes within it both quotations 1 and 3 on page 1 of your letter. Your quotation 2 concerns the situation when the Superintendent of Insurance institutes a proceeding to supervise a mutual insurance company pursuant to statutory authorization, which I think does not immediately concern the question here. The various sections of the "old" New York Insurance Law referred to on page 11 concern the situation where the Superintendent institutes proceedings. Section 4111 of the "new" Insurance Law (post-recodification) does not derive from any of those sections. It does derive from a number of other sections, and for ready reference I attach the present §4111.

On the issue material here our 2/14/79 letter referred to two early decisions by the New York courts, Hyde v. Lynde and Patrons of Industry Fire Ins. Co. v. Harwood, copies enclosed for ready reference. On reading those cases, it seems clear that they concerned situations in which the member and the fire insurance mutual company agreed to terminate the policy upon reaching a settlement between them which took into account the pending losses or claims. In Hyde the member surrendered his deposit note, ceasing to become a member. In Patrons the policies were cancelled. Both cases conclude that such termination is final unless it can be impeached on grounds of fraud or mutual mistake (Hyde at 390-391; Patrons at 11). Our 2/14/79 letter, at pages 10-11, quotes the

- 2 -

AC0066531

following statement from page 11 in <u>Patrons</u>:

> ...When a settlement and adjustment is in good
> faith made between the company and a member,
> and his policy or policies are canceled, he
> not only ceases to be a member of the company,
> but can not be again assessed as such, nor
> compelled to pay any further claims for losses
> or expenses, unless the settlement and
> adjustment is set aside for fraud or mutual
> mistake.

It will be noted that in both of the above cases (a) fire insurance
mutuals were concerned whose claims would ordinarily be known or at
least apparent at the time of termination, (b) the policies were
cancelled or the membership otherwise ceased, and (c) the courts
specifically mentioned the possibility of reconsideration for
mutual mistake.

Although, as noted, our 2/14/79 letter, by quoting <u>Patrons</u>,
refers to the possibility of mutual mistake, it was essentially
written in the usual context, i.e., concluding that where the
managers "estimate with a reasonable degree of certainty" what is
needed as a final assessment/refund, and the Board approves, that
should ordinarily terminate further assessments/refunds.  This
conclusion is, I think, correct but would be subject to the
possibility of there having been a mutual mistake of fact (as
distinguished from a mistaken judgment), in which case, in the
words of <u>Patrons</u> "the settlement and adjustment" might be "set
aside."  Barring such an occurrence the monies from the Insurance
Year in the Reserve Fund become the property of the Association to
the extent they are not required to pay claims pending at the time
of final assessment/refund.  No further assessments/refunds being
required, we habitually say the year is "closed," although I don't
recall that word appearing in the statutes or by-laws.

The above description outlines, and to some extent might
further explain, the material part of our 2/14/79 letter which, as
I say, dealt with a specific question.  However, you go on to
suggest a material difference between that and subsequent
correspondence concerning asbestos claims which were unknown or
unrecognized when earlier policy years were "closed."

I think the conclusion stated in the second paragraph of page
2 of your letter is broader than anything I have written or said.
For ready reference, I attach our letter of April 20, 1995, with
its attached draft (which of course was designed to be sent to the
U.S. Lines Trustee, if circumstances warrant).  It speaks for
itself and concerns the point that, on the basis of the reasoning
in the <u>Pratt</u> case (described in the attached Brief excerpt), it can
be reasonably maintained that a bankrupt "former" member who might
seek Club coverage for a "closed" year exposure for asbestos-caused

- 3 -

AC0066532

illness, for which no reserve was established or assessment levied, could (indeed should) be required to contribute its share of any assessment reasonably desirable or necessary as a result of such a claim.   The alternative would fundamentally require that other members pick up the full tab for the bankrupt, while it contributes nothing.  This would severely compromise the principle of mutuality if amounts were large.  Although it did not occur to me at the time, the "mutual mistake" concept might assist in supporting requiring such an assessment.

In any event, it seems to me that, as you suggest, assessments by mutuals are primarily governed by §4111 of the "new" Insurance Law (copy attached with marginal indications of the most pertinent sentences).

Subsection 4111(a) of that section basically limits the obligation of each member to pay only its proportionate share of any assessments "permitted for any purpose under any provisions of this chapter or necessary to make good an impairment of the minimum surplus of such company."  With respect to mutual marine companies §4111(a) seems chiefly derived from "old" §350(1), also attached, which authorizes assessments "[i]f...the minimum surplus...is impaired...in an amount sufficient to make good such impairment."  I have not had time to go through the entire cats-cradle of derivations/distributions with regard to the new/old Insurance Laws, but it seems to me that the basic reason for assessments by the Club has been to "make good" impairments by assessing against the appropriate insurance years.   Since "making good" the impairment would ordinarily mean just that, it seems implicit that, to the extent an over-assessment occurred for any insurance year, the overage should properly be returned.  That would preserve the basic principle of mutuality and limit assessments to "making good" impairment.

While the statutes do not talk in terms of "refunds," I think the refund does no more than effect what was the apparent limitation on marine mutuals to assess to make good impairments under old §350(1).  However, the directors of the Club should have some discretionary latitude.

Also, while the statutes speak of assessments chiefly in terms of remedying impairments, obviously under the by-laws and policies attention must be paid to the status of each insurance year, making appropriate assessments (or refunds) in each year to accomplish that.

In summary, although our 2/14/79 opinion focuses on a subject different from the suggested method of dealing with the bankruptcy asbestos claims, I don't think the former is inconsistent with the latter.  The future disposition of the Reserve Fund is for the Association to decide, subject to law and any necessary approval by the Insurance Department.  The treatment of asbestos claims in

- 4 -

AC0066533

"closed" years is a different subject, the rights and liabilities of the Association and members being those which they have under the statutes, by-laws, policies, and applicable law, which in the event of otherwise irreconcilable dispute would be decided by the courts (a circumstance which I hope will never arise).

I hope this is helpful, but would be happy to discuss anything further.

Sincerely,

Richard H. Brown, Jr.

RHB:img
Encls.

cc:  w/encl. (By Hand)

   J.E.M. Hughes

   T. J. McGowan

- 5 -

AC0066534

Hyde v. Lynde.

I am of opinion that this judgment is erroneous, and should be reversed.

Jewett, J. also delivered an opinion in favor of reversal.

Judgment affirmed.

---

Hyde, receiver of the Chenango Mutual Insurance Company, vs. Lynde. [887]

By the charter of the Chenango Mutual Insurance Company, upon a sale of insured property, the policy becomes void, and the insured was entitled to have his deposit note surrendered and cancelled, on *paying his proportion of losses then incurred.* Under this provision the defendant surrendered a policy which he held from the company, and the secretary of the company cancelled and surrendered the deposit note. At the time of the surrender there were contested claims for losses, against the company, some of which were subsequently established, and the receiver appointed by the court of chancery made an assessment upon a class of deposit notes, including that of the defendant, for the purpose of paying such claims. The note had been given up without the payment of any thing toward the losses, but there was no proof of fraud, or of any mistake of fact in regard to the existing claims against the company. *Held,* that the surrender was a valid transaction, and that the receiver could not maintain an action on the note.

The amount to be paid by the insured, if any thing, toward previous losses on a surrender of the deposit note, is a subject of adjustment between him and the company, and when the adjustment is made and the policy and note are surrendered, the settlement is binding unless impeached on the ground of fraud or mistake.

The receiver of an insolvent corporation can not impeach or disaffirm the lawful and authorized acts of the corporation.

And where a corporate company has done acts in fraud of creditors, or members of the company, and a receiver is afterward appointed, *quere,* whether the remedy should be pursued in his name or in the name of the persons defrauded.

This was an action brought by Hyde, as receiver of the Chenango County Mutual Insurance Company, against Lynde, upon a deposit note as follows:

"$83.30. For value received in policy No. 3471, dated the 3d day of June, 1840, issued by the *Chenango County Mutual Insurance Company,* I promise to pay the said company, or

---

Barnes v. Harris.

that is a material fact. Although a justice can not give parol evidence of a judgment without producing his docket, (*Fance v. Brown,* 11 *John.* 166; *Boomer v. Laine,* 10 *Wend.* 525;) there is no room for doubt that he may produce process and paper, and testify to facts not appearing on the docket. And if the docket or transcript do not show jurisdiction, further evidence must be given. In *Brown v. Cady,* (19 *Wend.* 477,) which was [886] an action of debt on a justice's judgment, a copy of the docket was given in evidence; but as it did not show jurisdiction over the person of the defendant, the justice was examined to make out the fact of regular process; and the common pleas thought the fact sufficiently proved, and the plaintiff recovered. But the judgment was reversed by the supreme court, on the ground that the fact of regular process, giving jurisdiction over the defendant's person, was not sufficiently established. It had been decided long before that time, in *Leon v. Bord,* (5 *Wend.* 299,) that the transcript is not sufficient evidence of the judgment, unless it show jurisdiction of both subject and person. And besides, the question here is not how a judgment may be proved, but how it must be pleaded.

When we consider the great number and magnitude of the powers which have been conferred on inferior courts and officers —how extensive their authority is over the persons and property of individuals—the importance of requiring them to show jurisdiction, or in other words, to show that they have pursued the path marked out for them by law, can hardly be over estimated. But I will not enlarge on the value of the principle involved in the case, after having shown that it has been settled by a long line of judicial decisions, ending in a judgment of this court, rendered within a year, and directly in point.

If it be true, as was said in argument, that we are more strict than the English courts in requiring inferior magistrates and officers to show their jurisdiction, we shall no longer have a title to that commendation—for such I think it to be—after the highest court in the state shall have decided that a justice of the peace may act without authority; for in England, the king himself is not above the law.

their treasurer for the time being, the sum of eighty-three dollars and twenty cents, in such portions and at such time or times as the directors of said company may, agreeably to their act of incorporation require.

In. Lynde."

By the charter of the Oswego Mutual Insurance Company, [388] all persons insuring with the corporation were members of it while the insurance remained, and no longer.' (*Laws* of 1836, p. 314, 42.) Every member was obliged, before receiving his policy, to deposit his promissory note for a sum of money determined on by the directors, of which he paid five per cent in cash, and the remainder was payable in whole, or in part, whenever the directors should require it for the payment of losses and expenses; and at the expiration of the time of insurance, the note, or the part which remained unpaid, after deducting all losses and expenses which accrued during the term, was to be given up to the maker. Upon a sale of the insured property, the policy became void, and was to be surrendered and cancelled, and the assured was entitled to receive its note upon the payment of his proportion of all losses and expenses which had accrued prior to the surrender. Every member of the company was bound to pay losses and expenses in proportion to the amount of his deposit note; and suits at law were authorized to be brought by the company against any of its members for the collection of their notes or any assessment thereon. In case any member sustained loss by fire, and the amount was ascertained either by the directors or by a recovery against the company, they determined the sums to be paid by the several members as their respective proportions of the loss, and advertised the assessment; and if any member neglected to pay within the time required by the statute, the directors were authorized to sue for and recover the whole amount of his deposit note, with costs of suit, and the amount collected remained in the treasury, subject to the payment of such losses and expenses as had accrued or might accrue; the balance, if any, to be returned to the party after the expiration of his term of insurance.

The defendant, on the 2d day of June, 1840, became a member of this company by effecting an insurance on his house and

*[Margin note: Policy void on sale of property]*

barn and some personal property, and executing and depositing the note above set forth. In the following month of October the defendant sold the real property insured, and a part of the personal, to one Leach; and in March, 1842, surrendered his policy, and the secretary of the company cancelled and surrendered his note. In August, 1846, the attorney general filed a bill against the company, and in September following a [389] decree was obtained declaring the company insolvent and unable to pay their debts, and appointing a receiver to take charge of their property, and to collect and recover the debts and demands that might be due to them, &c.; the decree declaring that the receiver should possess all the powers conferred, and be subject to all the duties imposed upon receivers appointed in the case of the voluntary dissolution of a corporation, as provided by the revised statutes.

In September, 1846, the receiver made assessments upon several classes of deposit notes, one of which classes would have included the note in question, if it had not been given up; and the amount to be paid by the defendant would have been about eleven dollars and sixty-four cents. The defendant refused to pay, and in October, 1848, the receiver brought this suit in equity upon the deposit note, claiming to recover the whole amount which had not been previously paid. He proved that when he was appointed receiver there were several claims against the company for losses which happened between the making and giving up of the note in question, all of which claims were contested. In October, 1848, an order of the supreme court in equity was made, directing the receiver to pay Tracy Beadle, one of those claimants, $350, provided he would compromise his claim for that amount; and in January, 1849, there was an order that he pay Harry Jennings, another of those claimants, $500 on a compromise. What became of the other claims did not appear; nor did it appear whether a compromise was effected with Beadle. Nearly $900 was paid over to the receiver on his appointment by the treasurer of the company. Abel Chandler, who was the secretary of the company at the time, testified that he thought the defendant did not pay any thing at the time the

note was cancelled. He further testified, that the note would not have been surrendered if it had been supposed that any thing was due upon it; and that it was the invariable rule to require all assessments and liabilities to be paid before cancelling the notes. On this state of facts the judge who tried the cause at the circuit, directed the jury to find a verdict for the [390] plaintiff; and the jury found a verdict for $70,72, the amount claimed as remaining unpaid on the note. The supreme court sitting in the sixth district refused a new trial, and after judgment the defendant appealed to this court.

*Balcom & Clark,* for appellant.

*H. R. Mygatt,* for respondent.

BROWN, Ch. J. A person who insures in the Chenango Company becomes by that act a member of the corporation. When he alienates the property insured, he may surrender the policy, and is thereupon entitled to his deposit note, upon the payment of his proportion of all losses and expenses that have accrued prior to such surrender; and he then ceases to be a member of the corporation. (*Sess.* 1836, *ch.* 238, *and p.* 48, §§ 3, 7. *And see Niely v. Onondaga Company, 7 Hill,* 49.) Whether any losses or expenses have accrued prior to that time which have not been satisfied, and which the company has not got funds in hand to satisfy; and how much, if any thing, ought to be paid by the person insured, are matters to be adjusted between him and the company before the note is given up. When the parties have come to an agreement, and the policy and the note have been surrendered, the individual ceases to be a member of the company; and all right to make assessments or calls upon him, or upon the note, is at an end. The settlement and surrender of securities are acts authorized by law; and, like other lawful acts, they are binding upon both parties, unless they can be impeached on the ground of fraud or mistake.

It is true, that the statute does not say, in terms, that the

parties may agree concerning the amount, if any thing, which should be paid to the company; but such must have been the intention of the legislature.

There is a provision of a similar kind for giving up the deposit note at the expiration of the term of insurance. (§ 6.) In that case, as well as in the other, the parties would be at liberty to agree whether any thing, and how much, ought [391] to be paid by the maker of the note on account of losses and expenses which had occurred during the term; and if they should come to an agreement and the note should be delivered up, neither party could impeach the transaction without showing such a fraud in the other party, or such a mutual mistake about some matter of fact, as would be sufficient to set aside any other settlement of differences between parties having conflicting interests.

I agree with the supreme court, that the deposit or premium notes are to be regarded as capital for the security of those who may deal with the company. But they can only be regarded as capital so long as they remain in the hands of the company; and not after they have been given up to the makers in pursuance of the charter.

It is not pretended that the defendant is chargeable with any fraud upon the company in procuring the surrender of the note; nor has the transaction been successfully impeached on the ground of a mutual mistake of the parties about any matter of fact. If the defendant paid nothing at the time of the surrender, it was evidently for the reason that the parties supposed there were no valid claims upon the company towards the payment of which the defendant ought to contribute; or none beyond the amount of funds in hand. The receiver proved that when he was appointed there were several claims against the company for losses which happened between the making and the giving up of the note: but the claims were all contested; and it was not shown that the amount which had since been established exceeded the amount of money which was paid over to the receiver at the time of his appointment, by the treasurer of the company. And besides, it would not have been enough

to show that the company made a bad bargain in giving up the note. So far as appears, the parties knew, at the time of the settlement, of all the claims upon the company for losses, and all the facts in relation to the claims, as fully as they do now; and if they made a mistake in judgment, either one way or the other, it would not invalidate the settlement. If they had come to the conclusion that some or all of the claims were valid, and [398] the defendant had paid fifty dollars as his proportion of the supposed losses, proof that all the claims turned out to be unfounded would not enable him to recover back the money. And on the other hand, if the company could show that some or all of the claims which the parties had deemed invalid turned out to be well founded, it would not enable the company to disregard the settlement, and recover upon the note which had been given up. Proof that the parties were mistaken in judgment concerning the validity of the claims could not annul the adjustment.

The recovery in this case seems to have gone upon the ground that the receiver had greater rights than those which belonged to the company. But for most, if not for all purposes, he took the place, and stands as the representative of the company. He is as much bound by a settlement which the company was authorized to make, as was the company itself. It would be strange, indeed, if the legal acts of a corporation did not bind the receiver of its effects. If the rule were not so, no one would dare venture to deal with a corporation. This is not like *Lawis v. Palmer*, (3 Comst. 12,) and *Gillet v. Moody*, (3 id. 479.) In each of those cases the act of the company which the receiver sought to avoid was forbidden by law. It was an illegal act. The case of *Brouwer v. Hill*, (1 Sandf. Supr. Ct. 629,) stands on the same ground. The judge said, the company itself might have maintained the action. Here, the receiver attempts to repudiate a legal transaction of the company. I think it quite clear that such a thing can not be done.

If the settlement, though a lawful act in itself, had been made for an illegal purpose: if, for example, the parties had known that there were valid claims against the company to the

payment of which the defendant ought to contribute, and yet the note was given up without consideration, for the purpose of defrauding either the creditors, or the other members of the corporation, the parties defrauded would undoubtedly have a remedy. But I do not see how the receiver could use. It would be like the case of a conveyance of property made for the purpose of defrauding the creditors of the grantor; which, though void as against the persons intended to be defrauded, is nevertheless valid against the grantor, and all who represent [398] him. A receiver of the effects of such a grantor could not avoid the grant. Neither can this receiver avoid a settlement which bound the corporation, though, in the supposed case, it was a fraud upon the creditors and other members of the company. The persons injured must sue. It is not necessary, however, to decide that question in this case; for there is no proof that the settlement was made with intent to defraud any one. At the most, the evidence only shows that the company made a bad bargain; and that is far enough from making out such a case as would enable creditors, or any one else, to set aside the transaction.

I am of opinion that the judgment is erroneous, and should be reversed.

HITCHMAN, J. (dissenting.) The defendant insists that the surrender and cancellation of the note is a complete bar to a recovery upon it; that if it was cancelled without payment by the defendant of his just proportion of the losses and expenses of the company, the receiver could only have resorted to a special action to recover such proportion, which should have been brought within six years after the surrender of the note.

I think this position is unsound. The receiver is at least in as good a condition to recover on this note as the company would have been, had they remained solvent and continued to carry on their business. Although the policy became liable to be surrendered as to so much of the insured property as had been sold by Lynde; the note nevertheless, in contemplation of law remained a binding obligation of the defendant, who

AC0066549

was liable to pay all just assessments upon it for losses and expenses which had accrued before the surrender of the policy. The defendant paid nothing for the cancellation of the note; so that the transaction is left to be reviewed as one destitute of consideration, and to be tested by the provisions of the statute incorporating the company. The language of the act cannot be misunderstood. It plainly declares the terms upon which only the defendant was entitled to receive his note, and this was upon the payment of his just proportion of all losses and expenses.

[394] This he does not pretend to have done; and now to permit a mere naked surrender of the note by the secretary of the company, without a reckoning of the losses and expenses to which it was subject, and without consideration, to defeat a recovery for the benefit of the creditors of the corporation, would not only be to violate the language and spirit of the charter, but would operate as a fraud upon creditors.

These premium notes constituted the entire fund out of which the losses of the company were to have been paid. If one could have been surrendered without consideration and without payment of its proportion of losses, all might have been, and thus through the mere grace or recklessness of a secretary the entire security of persons insured might have been annihilated. A result so disastrous and unjust can not be permitted to be wrought with so great facility. It is far better to treat these notes as the creatures of the statute, and bound to answer the purpose of their creation. They are permitted to exist for a specific purpose, and until that is answered they can not be annulled. They are not subject to the mere will of any man, but are controlled by the will of the legislature. The statute appointed them as security for losses and expenses, and they must be regarded as obligatory, until they are satisfied. As the creatures of the statute they can only be delivered up and cancelled according to its provisions. The surrender in the present instance was therefore simply void, and the case is to be regarded as though this abortive act had not been performed. This conclusion rests upon the facts presented in the

bill of exceptions, which rebut the presumption that might have arisen in favor of the defendant, had the mere fact of surrender and cancellation appeared without its attendant circumstances.

Nothing was paid as a consideration for the surrender of the note, nor was there any account of losses and expenses to which it was subject; while it satisfactorily appears that losses had accrued before the note was surrendered for which it was liable to be assessed. This continued the obligation of the note, and subjected it to the power of the receiver, whose duty it was because to enforce it for the benefit of the creditors of the company.

The note was payable in such portions and at such [395] times as the directors might legally require. The receiver was endowed with all requisite authority to secure and enforce obligations in favor of the company. The assessment made by him and which embraced this note, for aught that appears, was a proper requirement, and rendered so much as he called for, due and payable. Until then the time of payment had not become fixed, so that the statute of limitations had not run against the note. Nor is there any thing in the objection that the suit should have been brought within six years after the surrender of the note. The action is not based on a tortious cancellation of the instrument; it is rightfully brought on the note itself, which the plaintiff asserts still exists as a valid security. An alleged cancellation and surrender of it is presented, as an obstacle to his recovery, and he shows that the act of surrender was unauthorized and void. This leaves him to recover on the note itself, as if no surrender had been set up.

The offer to prove that the company was solvent was properly overruled. The appointment of receiver concluded the defendant, who if not a number of the company stood in the relation merely of their debtor, and was not at liberty to question collaterally the facts upon which the court of chancery acted in appointing the receiver, nor could this evidence otherwise have aided the defence, as it did not tend to show that the defendant had paid his just proportion of the losses and expenses of the company, which seems to have been the only thing that could have helped him.

AC0066550

I perceive no material error in the rulings at the circuit in respect to the admissibility of evidence. The books of the company were prima facie evidence against the defendant, so far at least as to prove their by-laws, and their transactions while he remained a member of the concern; and the losses which accrued, I think were sufficiently proved otherwise.

On the whole I think the learned judge at the circuit was justified in directing the jury to find in favor of the plaintiff, and that the judgment of the supreme court must be affirmed.

*Judgment reversed, and new trial granted.*

[886]

## FLETCHER vs. BUTTON.

A contract to give a good and sufficient deed of land, free of all incumbrances, is not satisfied by a deed containing covenants of warranty and against incumbrances, where the grantor has not the legal title to the premises.

The case of *Gazley v. Price*, (16 John. 267) and *Parker v. Parmele*, (20 id. 130,) reviewed and questioned.

The purchaser, to whom a conveyance is due under such a contract, may recover back the purchase money paid by him and six years' interest thereon, where the seller is unable to convey a good title.

And although the seller has an equitable title which the purchaser acquires under such a contract, together with the possession and use of the premises, this will constitute no defence to the action in respect either to the principal or interest of the money paid.

Where, in such a case, the purchaser pays a part of the purchase money, and gives his note for the residue, which is received in satisfaction, the whole may be recovered back, although a portion of the note remains unpaid, the balance due not being set up in the pleadings as an offset.

On the 13th of April, 1841, the defendant executed to Isaac Fletcher and Isaac Fletcher, junior, a bond in the penalty of $800, with the following recital and condition: "Whereas the said Fletcher has heretofore bought of me the following described piece of land, situate lying and being in Georgetown aforesaid, containing 35½ acres of land, to be taken off the east end of the north half of lot No. 10, in said town, for which said Fletcher has paid $500, the receipt whereof I do hereby ac-

knowledge, in full satisfaction for the above described land. Now, therefore, the condition of this obligation is such, that if the above bound Edward Button, his heirs, executors or administrators, do well and truly execute or cause to be executed unto the above named Fletcher, their heirs, executors, administrators or assigns, a good and sufficient warrantee deed of the above described land, free from all incumbrances, by the first day of January next, then this to be void, or otherwise to be and remain in full force and virtue."

The plaintiff, Isaac Fletcher, jr., in November, 1848, became the sole owner of the bond, and requested the defendant to perform the condition and give a deed, which the defend- [897] and refused, on the ground that he had no title himself to the land. After waiting six years and upwards from the time of the default, he brought this action on the bond, claiming to recover as damages the purchase money paid for the land and interest thereon. The defendant in his answer claimed to be allowed the sum of $998, for the use of the premises, as a set-off against the claim of the plaintiff; also, that the purchase money actually paid was only $450, instead of $500, as recited in the bond. The answer set up no other defence.

On the trial before Gridley, J. in February, 1849, the defendant offered evidence tending to show that the Fletchers by their agreement with him for the purchase of the land acquired an equitable title thereto, the legal title being outstanding in third persons. This evidence was objected to by the plaintiff and excluded by the judge. The defendant excepted. It appeared in the course of the trial that for $268 of the purchase money mentioned in the bond, the Fletchers gave their note, on which the sum of $30 remained unpaid at the time of the trial. The defendant offered to prove that he had called upon the Fletchers to pay this balance, but they refused to pay it, on the ground that the defendant had not conveyed to them, by deed with warranty, the premises in question. This evidence was objected to and excluded. The defendant excepted.

The defendant requested the court to charge the jury, that inasmuch as the Fletchers went immediately into the possession

AC0066551

of being identified, do not pass to an assignee. The identity and ownership of the money in controversy being conceded, there is but one thing for the court to do in the exercise of its jurisdiction over this money, and that is to direct the funds so held by this bank to be paid over to the plaintiff.

Judgment ordered for the plaintiff, without costs. All concur.

(64 App. Div. 248.)

PATRONS OF INDUSTRY FIRE INS. CO. v. HARWOOD.

(Supreme Court, Appellate Division, Third Department. September 4, 1901.)

INSURANCE—MUTUAL COMPANY—LIABILITY OF MEMBER AFTER CANCELLATION OF POLICY.

Laws 1892, c. 690, § 267, provides that every member of a mutual insurance company shall pay his proportionate share of all losses and also a reasonable sum for expenses; and section 268 authorizes the directors to estimate the sum necessary to pay all losses, damages, and expenses for the current year, and to assess the same, etc. Section 276 allows any member to withdraw at any time, by 10 days' notice, and paying his share of all claims existing against the company, and surrendering his policy. Defendant became a member of a mutual fire insurance company organized under these laws, and after having his policies canceled, paid an assessment for a loss sustained before the cancellation. The money paid on such assessment was partly used to defray the company's expenses incurred after the date of the assessment. Another assessment was levied to pay the deficit on the loss, and, on defendant's refusal to pay, action was brought. Held, that company, by cancellation of the policies and settlement with the company, was not liable for any further assessments connected with such losses.

Appeal from Franklin county court.

Action by the Patrons of Industry Fire Insurance Company against Watson H. Harwood. From a judgment in favor of defendant, plaintiff appeals. Affirmed.

Argued before PARKER, P. J., and KELLOGG, EDWARDS, SMITH, and CHASE, JJ.

Charles A. Burke, for appellant.
John I. Gilbert, for respondent.

CHASE, J. The plaintiff is a co-operative insurance corporation organized pursuant to article 9 of chapter 690 of the Laws of 1892, known as the Insurance Law. In November, 1897, the defendant was the holder of two policies of insurance issued by said company pursuant to said statute and the by-laws of said company. On the 2d day of November, 1897, the defendant received a notice of assessment dated November 1, 1897, on each of the policies held by him. The amount of the assessments was $9.78 and $2.45, respectively. He went to the office of the secretary of the company on November 5, 1897, and, not finding any one in charge of the office, returned, and on November 8th again went to said office. The secretary was then absent, but the office was in charge of the secretary's son. The defendant told the son that he surrendered his policies and delivered the same to him, and left them with him,

and there was then indorsed on each the following words: "This policy returned for cancellation this 8th day of Nov., 1897, at 3 p. m." The defendant then paid the amount of the assessments, and he testifies that the son said "there might be some figuring as to the rebate, but he would fix it up;" father said he would let it go; father would settle that. On the 18th day of November, 1897, said policies were canceled pursuant to statute and said by-laws, and the secretary of the company wrote across each of said policies, "Canceled Nov. 18, 1897," and signed such statement as such secretary as follows: "C. W. Pearl, Secretary." The defendant paid all assessments against him to and including the said 18th day of November, 1897. On the 17th day of November, 1897, the policy holder of said company, suffered a loss by fire. On the 13th day of January, 1898, said company suffered a loss by fire, made for the amount of the Wilson loss, and also a loss to one White, the date of which does not appear. The defendant was included among the persons so assessed. The secretary of the company notified the defendant of the amount assessed to him. The assessment not being paid, on the 12th day of November, 1898, the attorney of the plaintiff wrote a letter to the defendant as follows:

"I have a claim against you for collection in favor of the Patrons of Industry Fire Insurance Company, of New York. The company, as you know, has quit issuing policies, and some may think it a hardship to pay; but it is in condition to enforce payment, and, if suit be brought, I will be obliged to enter judgment and collect; but we do not desire to do so, if it can be avoided. If you will pay it. The amount against you personally is $2.36; as miscellaneous, etc., $13.85. Interest on both from February 13th, 1899."

Thereafter the defendant called on the attorney for the plaintiff and told him that he wanted a receipt that would clear him from further annoyance from the company, and paid him the amount of the assessment, with interest, and the attorney gave him a receipt in full therefor. The material part of the assessment of January 13, 1898, is as follows:

Loss of Bro. Edward B. Wake ........................... $ 100 00
Loss of Bro. T. H. Wilson ............................. 1,180 00
And expense of company.

Your assessment on policy No. 246, on $800.00, is............ $  6 25
Cancellation fee ...............................................    20
                                                           _____
    Total ................................................. $  6 45
The amount of return premium to the credit of said policy is....    54
                                                           _____
    Balance due ........................................... $  5 91

Your assessment on policy No. 620, on $1,500.00, is.......... $ 15 10
Cancellation fee ...............................................    25
                                                           _____
    Total ................................................. $ 15 35
The amount of return premium to the credit of said policy is...  1 25
                                                           _____
    Balance due ........................................... $ 12 85

There is no evidence of any unpaid expenses existing against the company at the time the defendant's policies were canceled. Only

AC0066552

## Left page (p. 10)

part of the persons included in the assessment of the 13th of January, 1898, paid their assessments. Expenses were incurred after January 13, 1898, and, although the assessment was for the purpose of paying losses, the officers of the company paid from the amount collected from said assessment the expenses incurred after the date of said assessment; and the balance so collected was paid first to said White, and next to said Wilson, leaving unpaid to Wilson between six and seven hundred dollars. Subsequently Wilson sued the plaintiff for the amount remaining unpaid to him, and obtained judgment against the plaintiff for the sum of $694.02. Subsequently a payment was made thereon, leaving due to him about the sum of $500, and said company on the 25th day of November, 1899, made an assessment "to collect $700 in favor of Thaddeus R. Wilson of judgment against company in favor of Thaddeus R. Wilson for loss by fire, attorney's fees, and the expense of collecting assessment," winding up the affairs of the company." The defendant was included in this assessment. He refused to pay the amount so assessed against him, and this action was brought to recover the amount of such assessment.

Section 267 of the insurance law provides:

"Every person insured in and by any such corporation shall give his undertaking in such form as the corporation may prescribe to pay his proportion of all losses and expenses which may be incurred by any member thereof. ... No person insured in ... or officers of such corporation as may be fixed by the by-laws, and expenses as may be required by the by-laws, of the members of the corporation. ..."

Section 268 of said law provides:

"... * It the directors or executive committee deem it to be for the interest of the corporation, they may make an estimate of such sums as in their judgment it may be necessary to raise and assess the same in their current year to proceed to assess, levy, and collect the same of the members of the corporation. ..."

Section 274 of said law provides:

"Any member of any such corporation may withdraw therefrom at any time by ten days' notice in writing to the corporation and paying the share of all claims existing against the corporation and surrendering his policy or policies. ..."

The by-laws of the corporation provide:

"Art. 6. Each member of said company shall pay a pro rata share to settle every loss within thirty days after being notified of the same by the secretary or such loss or damage as may be caused by fire or lightning sustained by any member thereof upon the property insured by said company, and of the expenses of the company, in such manner and by such means as may be directed by the directors. ...

"Art. 17. Any member of this company may withdraw at any time by paying his share of any and all losses existing against said company and notice in writing to the secretary and surrendering the policy or policies."

The defendant, in making application to the company for the policies held by him, signed a writing in and by which he covenanted and agreed to pay his just and equitable proportion of all assessments made according to the by-laws of said association for the payment of losses by fire or lightning, and conducting the business of

## Right page (p. 11)

said association. Every person, upon signing an application for insurance and becoming insured in said company, thereby becomes a member thereof. On surrendering his policy or policies he withdraws from the company and ceases to be a member thereof. The payment by a member to the company of his share of all losses existing against the company is a condition precedent to his right to have his policy or policies canceled, and to his withdrawal as a member of the company. When a member of the company makes application to withdraw therefrom, it is necessary that there should be a settlement and adjustment between the company and such retiring member. The share of the member in all claims against the company, whether for loss or damage by fire or for accrued expenses, is a matter of computation. Assuming that such member is liable for prospective expenses, there would be no means for existing for collecting the same. Bostwell, 26 N. Y. 233. The statute only provides for assessing members. When a settlement and adjustment is in good faith made between the company and a member, and his policy or policies are canceled, he not only ceases to be a member of the company, but cannot be again sustained as such, nor compelled to pay any further claim for losses or expenses, unless the settlement and adjustment is set aside for fraud or mutual mistake. Hyatt v. Appleton, N. Y. 367, was an action on a deposit note, given contemporaneously with a member's insurance by a mutual insurance company. Before the expiration of the term of the policy the insured sold the property, and thereupon canceled and surrendered his policy, and the secretary of the company canceled and surrendered the deposit note. Suit was brought on an assessment which included defendant for losses which happened between the making and giving up of the note in question, and which at the time the note was given up was being contested by the company. The court say:

"Whether any losses or expenses have accrued prior to that time which have not been satisfied, and which the company has not power to satisfy, and how much, if anything, ought to be paid by the person insured, are matters to be adjusted between him and the company before the note is given up. When the parties have come to a settlement to be binding on each, and the note has been given up, this individual has ceased to be a member of the company, and all right to make assessments or calls upon him or upon the note is at an end. The settlement and surrender of securities are acts authorized by law, and, the effect being valid, the same can not be permitted after unless they can be impeached on the ground of fraud or mistake."

In Campbell v. Adams, 38 Barb. 132 (subsequently reversed on another point), which was an assessment made upon a premium note where the policy had been surrendered, the court say:

"The surrender of the policy by the defendant and its cancellation by the company dissolved all the defendant's relation as a member of the company, and neither they nor their receiver had any further claim upon them, except for the unpaid balance of the amount of premium notes, etc., by the conditions of the insurance, and, with the policy, constituted the whole of the transaction. One part could not be canceled, and the other remain in full force, without the consent of both parties."

**12**    72 NEW YORK SUPPLEMENT    (Sup. Ct.)

In Huntley v. Beecher, 30 Barb. 580, referring with approval to the case of Hyde v. Lynde, supra, the court say:

"The [insured] had alleged the insured property and had surrendered his policy, which had been accepted by the company, and the note was canceled and surrendered. It was held that he was no longer liable upon his note for use, though they [lapsed] prior to the surrender of the policy, etc., in the absence of all fraud."

In Mills v. Stewart, 62 Barb. 458, the case of Hyde v. Lynde, supra, is referred to in confirmation of the statement, "yet it will not be pretended that a compromise made in good faith is not binding as well upon creditors as stockholders." The decision to the contrary in Sands v. Hill, 42 Barb. 651, was reversed in the court of appeals (see statement on page 19 of 55 N.Y.), and on the second trial the agreement cancelling the note, even after a petition for the dissolution of the corporation had been filed, was held binding upon the company, and that the note was thereby discharged. The evidence herein clearly shows a full settlement and adjustment between the parties hereto, and, in the absence of any claim or proof of fraud or mistake, the verdict in favor of the defendant was right.

Judgment affirmed, with costs. All concur.

(64 App. Div. 618)

**LE VALLEY et al. v. OVERACKER et al.**

(Supreme Court, Appellate Division, Third Department. September 4, 1901.)

1. PARTNERSHIP AND AGENT—AGENT'S AUTHORITY—EVIDENCE.

Where, in an action to foreclose a mechanic's lien for materials and services furnished at the request of the defendant's alleged agent, there was no evidence of the alleged agent's authority, it was error to deny evidence of statements made by him as to his agency.

Appeal from Chemung county court.

Action by Fred Le Valley and others against Johanna H. Overacker and another. From a judgment in favor of plaintiffs, defendants Overacker and another appeal. Reversed.

The undersigned, Johanna H. Overacker, the appellant purchased of one [cha...] in the city of Elmira. During the year 1897 a house was built on said lot at the corner of Washington avenue and Hoffman street, in [Elmira]. The plaintiffs are carpenters doing business in Elmira as plumbers and gas fitters under the name of Le Valley, McLeod & Co. At the request of said George W. MacCallum the plaintiffs performed work in and about said premises and furnished material therefor. On the

8th day of May, 1898, there being a balance of $405 remaining unpaid to the plaintiffs on account of said work and material, the plaintiffs duly filed a mechanic's lien in the clerk's office of the county of Chemung against said property and against said Johanna H. Overacker as the owner thereof. The action thereon is to foreclose that lien. The interest thereon to [this...]. The complaint alleging that he is a tenant residing on said premises.

Argued before PARKER, P. J., and SMITH, KELLOGG, EDWARDS, and CHASE, JJ.

J. John Hasett, for appellant.
George McCann, for respondents.

CHASE, J. It was necessary for the plaintiffs to establish by competent evidence that George W. MacCallum was the agent of the defendant Overacker in making the contract with them. For the purpose of establishing their case and for showing that MacCallum was the agent of Mrs. Overacker the plaintiffs called Mrs. Overacker as their first witness, and she was examined by them. Her memory was very poor and she showed a surprising ignorance regarding all matters concerning the property in controversy. Nevertheless she testified positively that George W. MacCallum was not and never had been her agent, and that the house was built by MacCallum under a written contract with her, at a specified price, and that she had paid him in full therefor. On the cross-examination she produced a written contract between herself and said MacCallum by which he agreed to build the house for her according to plans and specifications agreed upon for the sum of $1,850, payable by her as the work progressed. This contract was signed by her and by MacCallum; that she says that according to her recollection it was signed not very long before the work was commenced. In the absence of other evidence the presumption is that the contract was made on the day that it bears date. Mrs. Overacker testified that her stepfather, Thomas MacCallum, was her agent, and that for several years he had done all of her business, and that he had charge of all matters relating to the purchase of the building of a house for her. She never left everything to him, and did house on much about it after he took it in hand. Thomas MacCallum testified that he never employed George W. MacCallum as agent for Mrs. Overacker, and that he was present when the contract for the building of the house was signed by them. George W. MacCallum testified that he was not the agent of Mrs. Overacker, but that he built the house on his own responsibility, in pursuance of the contract in evidence, and that he had been paid in full therefor. The only evidence received on the trial other than

AC0066554

*Please see April 20, 1995 letter previously attached*

§ 4110

# NEW INSURANCE LAW
## Art. 41

### Historical Note

Derivation. L.1889, c. 882, § 83.

Said section 221 was from L.1909, c. 33, §§ 71-a, 197, 344.

Said section 71-a of L.1909, c. 33, added L.1922, c. 659, § 3; amended L.1927, cc. 464, 471; L.1932, c. 484; L.1933, c. 807, §§ 1, 2; L.1936, c. 844.

Said section 197 of L.1909, c. 33, added L.1923, c. 812, § 10, amended L.1925, c. 632.

Said section 344 of L.1909, c. 33, added ed L.1916, c. 18, amended L.1919, c. 389; L.1922, c. 417, § 7; L.1923, c. 811, § 6; L.1925, c. 630; L.1926, c. 114; L.1935, c. 742, § 3.

### Library References

Insurance ⊂=52 to 59.

C.J.S. Insurance §§ 94 to 116.

### § 4111. Mutual companies; assessments

(a) Except as provided in section four thousand one hundred thirteen of this article, every domestic mutual property/casualty insurance company shall in its by-laws and policies prescribe the contingent mutual liability of its members for the payment of assessments, in such a way that each member shall be liable to pay the member's proportionate share, subject to the limitations hereinafter specified of the amount of any assessment or assessments permitted for any purpose under any provisions of this chapter or necessary to make good an impairment of the minimum surplus of such company. The contingent liability of a member may be limited to an amount not less than one additional annual premium on each policy held by a member. The aggregate amount of all assessments whether levied by the board of directors of such insurer or by the superintendent as liquidator or rehabilitator of the insurer, or otherwise, shall be no greater amount than that specified in the by-laws and policies. Except as provided in section four thousand one hundred thirteen of this article, no such insurance company shall make, issue or deliver any policy of insurance, which does not prescribe the contingent liability of the policyholder in clear and explicit language printed in type not smaller than eight point.

(b) If any domestic mutual property/casualty insurance company does not have admitted assets at least equal in amount to the aggregate of its liabilities and its minimum surplus as required by the provisions of this chapter, and if such impairment is not otherwise made good, the board of directors of the company may, with the approval of the superintendent and within such time as he prescribes, order an assessment in the manner specified in the by-laws for an amount which will provide sufficient funds to make good the impairment, except that no member shall be liable for an

28

# PROPERTY AND CASUALTY COS.
## Art. 41

§ 4111

assessment exceeding the limit specified in his policy in accordance with subsection (a) hereof. All orders of assessment made by the board of directors shall be filed with the superintendent and shall not take effect unless and until approved by him. The superintendent may refuse any such approval if, in his judgment, refusal will best promote the interests of the policyholders and creditors of the company, and of the insuring public. Every assessment shall be made upon all members liable to assessment therefor in the proportion hereinafter specified. Every person, firm or corporation who or which was a member of such company at any time during one year prior to the making of an order of assessment by the board of directors shall be liable to pay and shall pay the member's proportionate share of any assessment which may be made in accordance with law, if the member is notified of the assessment within one year after making of an order of assessment. A member's proportionate part of any assessment shall be determined by applying to the premium earned on the member's policy or policies in force during a period of one year next preceding the order of assessment the ratio of the total assessment to the total premiums earned during such period on all policies subject to assessment.

(c) Unless specifically authorized by the provisions of this chapter to issue non-assessable policies in this state, no foreign mutual property/casualty insurance company shall be or continue to be authorized to do business in this state unless its by-laws and policies issued in this state contain provisions for the levying and collection of assessments upon members, at least for the payment of losses and expenses, which conform in substance to subsection (b) hereof.

(d) In the case of a mutual property/casualty insurance company subject to paragraph two of subsection (a) of section four thousand one hundred seven of this article, an assessment authorized by this section shall be made when, in addition to the grounds set forth in this section, if the ratio of net premium writings to surplus as regards policyholders is four to one or greater, based upon the last annual statement or any quarterly statement projected on an annual basis, subject to the approval of the superintendent, and if, at any time, upon examination, the superintendent determines that an assessment should be made pursuant to subsection (b) hereof or pursuant to this subsection the superintendent shall make an appropriate order that the assessment be made.

29

AC0066569

...d or kinds of insurance business. L.1939, c. 882; amended L.
...6, c. 669, § 5; L.1947, c. 677, § 5; L.1947, c. 678, § 8; L.1949,
...67, § 6, eff. July 1, 1949.

Library references: Insurance ⊂⊃8, 52; C.J.S. Insurance §§ 72, 95, 104 et

### Historical Note

...bd. 1, par. (a) amended L.1947,
...5, § 8, eff. Jan. 1, 1948.

...bd. 1, par. (c) added L.1946, c.
...§ 5, amended L.1947, c. 677, § 5,
...Jan. 1, 1948.

...bd. 1, par. (d) added L.1949, c.
...§ 6, eff. July 1, 1949.

Derivation. Laws 1909, c. 33, §§
150, 151, 152, and 153, which are fully
treated in Historical Notes under
present sections as follows: § 150 un-
der § 4; § 151 under § 43; § 152 under
§ 46; § 153 under § 48.

### Cross References

...compliance with subd. 1(d) of this section, action by Superintendent upon,
...see section 40, subd. 5.

**OLD**

## 350.  Mutual marine insurance companies; assessments; existing corporations

1. Except as provided in section fifty-eight, every domestic
...tual marine insurance company hereafter organized shall pro-
...e in its by-laws that its members shall be liable for the pay-
...nt of assessments in the manner specified therein to the extent
...cified in this section. If, at any time, the minimum surplus of
...y such company is impaired, the board of directors of such
...mpany may, with the approval of the superintendent, order an
...essment in an amount sufficient to make good such impair-
...nt. The provisions of subsections five and six of section fif-
...ix shall not apply to any domestic mutual marine protection
...d indemnity insurance company heretofore organized.

2. Notwithstanding the provisions of sections fifty-eight,
...ree hundred forty-five and three hundred forty-six, any do-
...stic mutual marine and fire insurance company heretofore
...rganized under special act of this state and reincorporated pur-
...ant to section fifty-two of chapter twenty-eight of the consoli-
...ated laws and doing business immediately prior to the effective
...te of this chapter,¹ may continue to issue non-assessable poli-
...es in accordance with its charter powers, without making any
...eposit, if and so long as it maintains a surplus of not less than
...ne million dollars.

523

