PROSKAUER ROSE LLP
Seth B. Schafler (SS-5993)
Lisa A. Bauer (LB-4057)
1585 Broadway
New York, New York 10036-8299
(212) 969-3000
(212) 969-2900 (fax)

Attorneys for Defendants
Keystone, BP, MTL, Kirby Inland Marine, LP
(as successor to Hollywood Marine Inc.), American Steamship Company,
The Cleveland-Cliffs Steamship
Company, Ispat, Amerada Hess Corporation,
Sea Mobility, Alcoa, and Sabine

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------

AMERICAN STEAMSHIP OWNERS MUTUAL
PROTECTION AND INDEMNITY ASSOCIATION, INC.,

                Plaintiff,

        -against-

ALCOA STEAMSHIP CO., INC., et al.,

                Defendants.

---------------------------------------------------------------

04 Civ. 04309 (LAK)(JCF)

(ECF CASE)

**DEFENDANTS' RESPONSES TO PLAINTIFF'S OBJECTIONS TO
MAGISTRATE JUDGE FRANCIS'S ORDERS OF SEPTEMBER 13 AND 15, 2005**

## TABLE OF CONTENTS

I.  Nature of the Action.................................................................................................2

II.  Factual Background ................................................................................................3

III.  The Magistrate Correctly Found that the Club Waived Any Applicable Privilege as to the May 18, 2004 Letter.............................................................................................6

IV.  In the Event This Court Determines That Subject Matter Was Not Waived, Further Proceedings Are Required ......................................................................................9

CONCLUSION.................................................................................................................10

## TABLE OF AUTHORITIES

### Cases

**Pages**

*Easley v. Cromartie,*
    532 U.S. 234, 121 S. Ct. 1452 (2001) ...................................................................6

*United States v. Skeddle,*
    989 F. Supp. 905 (N.D. Ohio 1997) ............................................................... 6-8

*Urban Box Office Network, Inc. v. Interfase Managers, L.P.,*
    No. 1 Civ. 8854, 2005 WL 1639333 (S.D.N.Y. July 12, 2005) ........................6

### Statutes and Rules

Fed. R. Civ. P. 72(a) .........................................................................................6

Defendants Keystone, BP, MTL, Kirby Inland Marine (as successor to Hollywood Marine Inc.), The Cleveland-Cliffs Steamship Company, Ispat, Amerada Hess Corporation, Sea Mobility, Alcoa Steamship Company, Inc., and related entities, and Sabine Towing & Transportation Co., Inc. submit this response to Plaintiff's Objections to the Orders of Magistrate Judge Francis dated September 13 and 15, 2005 ("Obj."). Plaintiff's objections are without merit and should be rejected.

## I.    Nature of the Action

This is an insurance coverage dispute between the American Steamship Owners Mutual Protection and Indemnity Association, Inc. (the "American Club" or "Club"), a mutual insurance company incorporated under New York law, and its insureds under liability insurance policies issued by the American Club which cover claims arising from occurrences in insurance years prior to 1989. The Club's insureds are its current and former shipowner members who are holders of American Club policies issued in insurance years prior to 1989. The Club brought this declaratory judgment action against those current and former members, seeking judicial endorsement of the Club's termination of coverage in May 2004 for occupational disease claims ("ODCs"), a category which includes but is not limited to asbestos bodily injury claims.

Until its abrupt termination of coverage in May 2004, the Club recognized coverage and paid for ODCs since they first emerged by the early 1980s, never once suggesting that such claims were not covered under any of its insurance policies or that its coverage for such claims could be "terminated" at the Club's "discretion" at some later date. Even now, the Club does not dispute that ODCs are covered by the express terms of its insurance policies, and admits that it is obligated to pay for such claims under post-1989 American Club policies. Yet the Club claims that alleged "principles of mutuality" entitle it to terminate coverage solely under its pre-1989

insurance policies, which contain the same coverage terms as the later policies. Alternatively, the Club seeks to rescind its own corporate resolutions in order to "reopen" insurance years the Club long ago closed to further assessment after issuing "final" assessments to the policyholders in those years.[1]

The issue presented in this case is a straightforward one of insurance coverage for insureds under American Club policies. Plaintiff's characterization of this action as involving allegations of wrongdoing against certain former directors and former members of the Club whose representatives sat on the Club's Board in certain years, is erroneous. As Magistrate Francis noted, Plaintiff has not asserted any claims of breach of fiduciary duty against former Club directors, and no Club directors have been named as defendants. (*See* Ex. 1 to Obj. at 27-28). Nor would any such claim, even if one were made, have any impact on the existence of coverage for insureds under American Club policies.

## II.     Factual Background

Over the years, the American Club obtained frequent opinions from its outside counsel, a representative of which sat on its Board of Directors.[2] These opinions were provided to the Club to evaluate the legality of actions proposed to be taken by the Club through its Board of Directors and professional managers, the Shipowners' Claims Bureau ("SCB").

---

[1]     These corporate resolutions were duly enacted by the Club's Board of Directors pursuant to the Club's By-laws, upon the recommendation of its professional managers and endorsed in legal opinions of the Club's outside counsel (who sat on the Club's Board, and not only opined upon the legality of the corporate resolutions in question, but voted in favor of all of them). Those resolutions were ratified by the Club.

[2]     Kirlin Campbell & Keating ("Kirlin") served as the Club's longtime outside counsel. Richard H. Brown, a member of Kirlin, sat on the Club's Board until June 2002. In April or May of 2001, Brown joined Nourse & Bowles, LLP, the Club's current counsel, with the expectation that the American Club's business would be transferred to Lawrence J. Bowles, a former member of Kirlin, after Brown's retirement. Nourse & Bowles became Club counsel in June 2002 and Bowles then assumed Brown's position as a Director on the Club's Board.

In the course of this litigation, the Club has chosen to produce numerous opinions of its legal counsel involving key legal issues in this case, including the closing of insurance years, coverage for ODCs, the Club's alleged ability to assess policyholders after a year has been closed, use of the Club's reserves, and the application of deductibles, among others.[3] (*See* Ex. 1 to Obj. at 20). The Club not only produced such opinions, it marked them as deposition exhibits and used them to aggressively question Defendants' representatives. (See Ex. 1 to Obj. at 20-21). Magistrate Francis, after reviewing the May 18, 2004 opinion letter *in camera*, found that that letter was "one among several related communications" on the same topics of other legal opinions produced by the Club. Magistrate Francis found that the Club's selective disclosure of certain legal opinions but not others was "plainly tactical and operated to the disadvantage of the defendants in the litigation." (*Id.* at 22-23).

The Club, in an effort to avoid the effect of its broad subject matter waiver, now seeks to draw an artificial dividing line between opinions rendered before the year 2000 and after the year 2000, and between opinions involving insurance years before 1989 and after 1989. These distinctions are arbitrary creations of the American Club and have no factual or logical basis.[4] As Magistrate Francis noted: "In fact, the Club has produced and relied on number opinion letters postdating 1989 which like the May 18, 2004 letter, discuss issues central to this case."

---

[3]   Contrary to the Club's statements in its Objections that it only "used" Exhibits AC 31, 36, 36A, 55, 56, 57, 58 and 61, it marked at depositions several additional letters of Club counsel which it had produced dealing with: the closing of years (AC 19A, 41), Asbestos—Coverage and Deductibles (part of AC 51), and a Wartime P&I settlement (AC 27).

[4]   The Club erroneously asserts that the opinion letters it produced in this case were also produced by the defendants in this action. (Obj. at 4). The Club offers no proof that all opinions it produced were also produced by the defendants; in fact, only *some* of the defendants produced only *some* of the opinion letters. Putting aside the Club's misstatement of fact, its assertion is irrelevant. With respect to the May 18, 2004 letter, the Club argued that its disclosure to a current director who was employed by a Defendant here was not a waiver of privilege because he received the document in his capacity as a director of the Club. The Club, had it chosen to do so, could have made a similar argument with respect to prior opinion letters. Instead, it chose to select certain opinion letters, inject them into this case, and affirmatively use them against defendants.

(Ex. 2 to Obj. at 3, citing Ex. L(k), (l), (m), (o) and (p) to the Bauer Decl.). Similarly, the Club produced selected opinions issued both before and *after* the year 2000. (Ex. 1 to Obj. at 20). Magistrate Judge Francis found that there was no distinction between pre- and post-2000 opinion letters of counsel. (*Id*. at 21-22). Indeed, Magistrate Francis found that this artificial time distinction creates "precisely the type of selectivity that constitutes a waiver." (*Id*.).[5]

Plaintiff's reliance on the alleged "adversity" between the Club and its former members commencing in 2000 is likewise unsupported and inaccurate. Although a single former member of the Club, Keystone, initiated action against the Club on the limited issue of application of deductibles under the American Club policies, this did not happen until 2002, when hope of reaching a settlement with the American Club evaporated. No other Club members sued the Club at that time. Nor did the Club initiate action against other Club members in the year 2000 or advise them of any purported generalized "adversity." The Club itself created the "adversity" of which it now speaks in May 2004, when, without prior warning, it terminated coverage for all of its pre-1989 insureds.[6]

Nor is there any validity to the Club's attempt to draw a line between its "current" and "former" membership and Directors. Seven members of the Club's current seventeen-member Board were Directors of the Club prior to the year 2000, when many of the Club's opinions

---

[5]     The Club's attempt to distinguish its coverage for insurance years pre- and post-1989 is equally spurious. There is no meaningful distinction, and the Club's differential treatment of insurance years further demonstrates the lack of merit of its overall legal position in this case and its selective assertion of so-called "principles of mutuality."

[6]     The Club misleadingly contends that it first "discovered," in 2004, documents contained within its own files – such as minutes of its Board of Directors, opinions of its legal counsel, and records regarding its payment of ODCs – that somehow established that coverage under its policies is "discretionary." In reality, the Club has always been aware of these facts.

produced in this case were issued; the Club's assertion that such letters were prepared for "another audience" is disingenuous.[7]

### III.    The Magistrate Correctly Found that the Club Waived Any Applicable Privilege as to the May 18, 2004 Letter

The Club has not shown, and cannot show, that Magistrate Francis's determinations were clearly erroneous or an abuse of discretion.[8]

In his September 13 Order, Magistrate Francis carefully considered the Club's contentions regarding subject matter waiver and issued a detailed and well-reasoned 30 page opinion explaining the reasons for his conclusion. Plaintiff does not dispute the fact that it deliberately produced numerous legal opinions of its counsel and used them against defendants tactically, and to the Club's perceived advantage. The "fairness doctrine," as Magistrate Francis concluded, does not permit privilege to be employed as a sword and a shield in this fashion. (*See* Ex. 1 to Obj. at 19).

Plaintiff's sole authority in support of its objections, *United States v. Skeddle*, 989 F. Supp. 905 (N.D. Ohio 1997), was never even cited to Magistrate Francis, and is wholly inapposite. *Skeddle* was a criminal action against former employees for fraud and other wrongdoing. *Id.* at 907. In *Skeddle*, counsel to the company communicated individually with

---

[7]     These overlapping Directors include: Paul Sa, the Club's current Chairman, who has been a director since 1992; Martin Recchuite (1995); Markos Marinakis (1997); Jonathan Wales (1997); Robert Guthans (1997); and David Gare (1998). In addition, Club counsel Richard Brown continued on the Board until June 2002, and Defendant Farrell Lines continued as a member until 2005.

[8]     The standard for reversing a Magistrate's opinion is that the decision is clearly erroneous or contrary to law. Fed. R. Civ. P. 72(a); *see Easley v. Cromartie*, 532 U.S. 234, 235, 121 S. Ct. 1452, 1454 (2001) (an order is "clearly erroneous" where " 'on the entire evidence' the [district court] is 'left with the definite and firm conviction that a mistake has been committed.'" (citations omitted)); *Urban Box Office Network, Inc. v. Interfase Managers, L.P.*, No. 1 Civ. 8854, 2005 WL 1639333 at *1 (S.D.N.Y. July 12, 2005) (magistrate judges are "afforded broad discretion in resolving non-dispositive disputes."). "[R]eversal is appropriate only if [a Magistrate's] discretion is abused." *Urban Box Office*, 2005 WL 1639333 at *1. In this case the Club has not and cannot meet the standard required to reverse Magistrate Francis' ruling.

former employees concerning the transactions underlying the federal indictment. *Id.* at 908. However, after becoming suspicious of the employees, counsel to the company began an investigation into the transactions and hired an outside law firm to assist. *Id.* Eventually, the company brought an action against those former employees. *Id. Skeddle* held that privilege was not waived as to the investigatory and litigation phases after counsel became suspicious of the former employees' activities. *Id.* at 909.

In *Skeddle*, unlike here, no finding was made of tactical use of the documents disclosed. *Id.* at 910. Plaintiff's blatant tactical use of privileged documents for perceived litigation advantage mandates a different result here. Moreover, here, unlike in *Skeddle*, the counsel opinions that the Club chose to produce were not communications between Club counsel and individual directors later sued by the Club for fraud, but rather opinions communicated to the Club as an entity and to its Board of Directors as a whole for the purpose of guiding Board action. The opinions the Club seeks to shield from discovery have the same purpose and relate to the same subject matter. There are no claims of breach of fiduciary duty in this case. As Magistrate Judge Francis stated his Order of September 13:

> The Club contends that '[a] central issue in this case concerns the good faith of decisions these individual directors [those employed by Keystone, Farrell, and APL] made on Defendants' behalf in respect of paying indemnities from the Club's reserves to defendants for unreported unreserved occupational disease claims.' (Pl. Memo. at 20). ***But that is plainly not the case.*** The complaint in this action asserts no claim remotely resembling breach of fiduciary duty, and no Director has been named as a defendant. (emph. added).

(Ex. 1 to Obj. at 27-28; *see also id.* at n. 5, "Here, the complaint alleges no misconduct by the defendants, much less by the former Directors.").

Indeed, allegations of breach of fiduciary duty have no possible part in this case because, as Magistrate Francis also found, and Plaintiff does not dispute, the insurance relationship between the Club and its members is a contractual one defined by the terms of the insurance contracts issued by the Club. (Ex. 1 to Obj. at 27).

Further, the *Skeddle* case concerned only the attorney-client privilege, not the work product doctrine, and it is the work product doctrine that the Club belatedly claimed protects these documents and upon which its letter request for reconsideration was based. Nonetheless, even if applicable to a work-product analysis, *Skeddle* is inapposite. Ultimately, *Skeddle* analyzed several documents on an individual basis and found that all analyses on a certain topic should be produced in fairness to prevent the use of privileged documents as both a sword and a shield. *Id.* at 912. Likewise here, the consistency of the advice to the Board regarding the Club's obligations to its insured requires production of the May 18, 2004 opinion letter and other withheld documents on the same subject matter.

The Club argues that Magistrate Judge Francis overlooked the fact that the Club's counsel acted in three different capacities – as counsel to the members in the years defendants were members, as counsel to the current members in the years after defendants left the Club and while they were investigating their conduct, and as counsel to the current members after litigation was commenced by Keystone in 2002. (Obj. at 8). This is simply not true. Counsel to the Club, whether Mr. Brown and Kirlin or Mr. Bowles and Nourse & Bowles, acted at all times with respect to the opinions in issue as counsel to the Club, not as counsel to the members

individually.[9]  The Club's assertion of different "capacities" served by its counsel is incorrect and untenable.

### IV.    In the Event This Court Determines That Subject Matter Was Not Waived, Further Proceedings Are Required

In its letter motion for reconsideration submitted to Magistrate Francis, the Club conceded that it had waived attorney-client privilege as to the May 18, 2004 letter when it produced this letter to its outside auditor, Deloitte.  The Club then asked Magistrate Francis to consider the potential application of attorney work-product protection.[10]  Magistrate Francis then ruled that the Club's waiver applied equally to work-product protection, assuming such protection was in fact applicable. (*See* Ex. 2 to Obj. at 2).  Defendants subsequently contested the applicability of work product protection to the May 18, 2004 opinion letter.  Magistrate Francis reserved ruling on this threshold issue pending this Court's determination with respect to his prior rulings on subject matter waiver. (*See* Ex. A, endorsed letter of Mr. Schafler dated September 27, 2005).  Magistrate Francis also reserved ruling on the issue of whether the disclosure to Deloitte constituted a waiver of work product privilege. (*See* Ex. B, endorsed letter of Mr. Carroll dated September 23, 2005; *see also* Ex. C, July 13, 2005 letter of Mr. Adelman).[11]

---

[9]     Magistrate Judge Francis held that the members themselves have no fiduciary relationship to the Club, rather the relationship is contractual. (Ex. 1 to Obj. at 27).  There is no attorney-client relationship between Club counsel and Club members as such.

[10]     Plaintiff sought reconsideration on an emergency basis due to a scheduled deposition of a Deloitte representative the following day.  Magistrate Francis therefore ruled the following day without providing Defendants an opportunity to reply.

[11]     Prior to the July 6 hearing, the Club ignored Defendants' demands for the letter given its disclosure to Deloitte.  The Club did not disclose to Defendants that the letter had been given to Deloitte for purposes other than in connection with the litigation, which it now concedes.  In fact, the May 18 letter was not listed on the Club's privilege log.  The July 29, 2004 letter, when challenged by the Defendants, was listed by the Club on its privilege log as having been copied to Deloitte and was described as, "Counsel's opinion provided to Club's auditors in furtherance of advice." (*See* Ex. D hereto, letter of Mr. Schafler dated September 20, 2005 at Ex. 1, Plaintiff's amended log).  The Club now concedes this letter was not given to Deloitte "in furtherance of advice," but rather "in connection with their preparation of state law-mandated reports." (Obj. at 7 n. 3).

Accordingly, should this Court decide that Plaintiff did not waive privilege with respect to the subject matter of the May 18, 2004 letter, further proceedings are required to determine whether work product protection applies to that and other documents withheld by the Club.

## CONCLUSION

For the foregoing reasons Plaintiff's Objections should be denied in their entirety. Moreover, Plaintiff should be ordered to promptly produce all documents to which it has waived the privilege.

Dated:  October 17, 2005          PROSKAUER ROSE LLP
        New York, NY
                                  By: _____
                                      Seth B. Schafler (SS-5993)
                                      Lisa A. Bauer (LB-4057)
                                      PROSKAUER ROSE LLP
                                      1585 Broadway
                                      New York, NY  10036-8299
                                      (212) 969-3000
                                      (212) 969-2900 (fax)

                                      *Attorneys for Defendants Keystone,
                                      BP, Kirby Inland Marine, LP, MTL
                                      American Steamship Company, The
                                      Cleveland-Cliffs Steamship Company, Ispat,
                                      Amerada Hess, Sea Mobility, Alcoa
                                      Steamship, and Sabine*

                                      -and-

                                      RAY, ROBINSON, CARLE & DAVIES
                                      P.L.L.
                                      Gene B. George
                                      Julia R. Brouhard
                                      1717 East 9th Street, Ste. 1650
                                      Cleveland, OH 44114-2898
                                      (216) 861-4533
                                      (216) 861-4568 (fax)
                                      *Attorneys for Defendant The Cleveland-
                                      Cliffs Steamship Company*

                                      -and-

DLA Piper Rudnick Gray Cary US LLP
Stanley McDermott, III (SM-0530)
Camilo Cardozo (CC-9710)
1251 Avenue of the Americas
New York, NY  10020
(212) 835-6123
(212) 835-6001 (fax)
*Attorneys for Defendant Ispat*

-and-

GARAN LUCOW MILLER, P.C.
Thomas W. Emery, Esq.
1000 Woodbridge Street
Detroit, Michigan 48207-3192
(313) 446-5525
(313) 259-0450 (fax)
*Attorneys for Defendant American
Steamship Company*

-and-

Robert Shulman
Mindy Davis
Christine Davis
Howrey LLP
1299 Pennsylvania Avenue NW
Washington, D.C.  20004-2402
(202) 783-0800
(202) 383-6610 (fax)
*Attorneys for Defendant Amerada Hess*

# EXHIBIT A

# MEMO ENDORSED

## PROSKAUER ROSE LLP

1585 Broadway
New York, NY 10036-8299
Telephone 212.969.3000
Fax 212.969.2900

LOS ANGELES
WASHINGTON
BOSTON
BOCA RATON
NEWARK
NEW ORLEANS
PARIS

Seth B. Schafler
Senior Counsel

Direct Dial 212.969.3660
sschafler@proskauer.com

September 27, 2005

**By Fax: 212-805-7930**

Honorable James C. Francis IV
United States Magistrate Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 1960
New York, New York 10007-1312

Re:   American Steamship Owners Mutual Protection and Indemnity Association, Inc. v.
      Alcoa Steamship Co., Inc., et al., No. 04 Civ. 04309 (LAK) (JCF)

Dear Magistrate Francis:

We are counsel to Defendants Keystone, BP, MTL, Kirby Inland Marine (as successor to
Hollywood Marine Inc.), American Steamship Company, The Cleveland-Cliffs Steamship
Company, Ispat, Sea Mobility, SEI II Equipment Inc., Alcoa Steamship Company, Inc., and
related entities, Sabine Towing & Transportation Co., Inc., and Tecomar, S.A. de C.V. as defined
in their Answers and Counterclaims filed in the captioned action. We write in reply to Mr.
Carroll's letter dated September 23, 2005. I am informed by counsel for defendant Farrell Lines,
Inc. ("Farrell") and American President Lines ("APL") that Farrell and APL join in the positions
set forth in this letter.

In my letter dated September 20, 2005, I asked the Court to consider two additional issues raised
by its Orders dated September 13 and 15, 2005: (a) whether any otherwise applicable work
product privilege had been waived with respect to documents that the American Club had
provided to its actuary, Deloitte & Touche; and (b) whether subject matter waiver had occurred
with respect to other documents listed on plaintiff's privilege log supplied to the Court under
cover of my letter dated September 20, 2004 (and also attached to the declaration of Lisa Bauer
submitted in opposition to defendants' opposition papers).

In his September 23 letter, Mr. Carroll requests the Court to defer consideration of those issues
pending the outcome of the Club's appeal from the September 13, 2005 Order. Mr. Carroll's
request should be denied. It makes little sense for these issues to be considered on a piecemeal
basis. The Court should consider all issues involving the American Club's assertion of privilege
with respect to the May 18, 2004 letter, the June 18, 2004 letter, the July 29, 2004 letter and the

## PROSKAUER ROSE LLP

Honorable James C. Francis IV
United States Magistrate Judge
Daniel Patrick Moynihan United States Courthouse
September 27, 2005
Page 4


The primary Second Circuit authority on work product upon which the American Club relies, United States v. Adlman, 134 F. 3d 1194 (2d Cir. 1998), does not support attachment of work product privilege under these circumstances.

The Club's contention that it was the pendency of the Keystone litigation that caused it belatedly to "reexamine" its obligations to provide coverage for closed year occupational disease claims (Plaintiff's Memorandum in Support of Protective Order at 12) also is not a basis for work product protection. The Club would have procured substantially the same opinions if it wished to change its long-standing (and contractually mandated) practice of paying and making provision for payment of occupational disease claims whether litigation was anticipated or not. Indeed the Club contends that prior Boards should have obtained a legal opinion on the same subject when payments for occupational disease claims in substantial numbers commenced in the early 1980s, although no litigation between the Club and any member was pending at that time. It follows that the Club's procurement of such an opinion more than twenty years later is entitled to no greater protection from a work-product standpoint.

As the Club has failed to establish that the opinions in question were prepared "because-of" the prospect of litigation, and that they would not have been created in essentially similar form irrespective of the litigation, under Adlman, the Club's work product argument fails as a matter of law. This provides an independent basis upon which the Court's September 13 and 15 rulings should be sustained. Documents on the American Club's privilege log should be produced to the extent they were not prepared "because of" litigation and, alternatively, because of the Club's subject matter waiver.

We respectfully urge the Court to resolve the issues raised in this letter and in our letter of September 20, 2005 at this time so as to limit further motion practice and appeals.

Respectfully yours,

Seth B. Schafler

cc via email:  All Counsel of Record

*[handwritten note:]* 9/29/05

As previously indicated, I will defer decision until the objections have been ruled upon. My prior orders assumed but did not decide that the May 18, 2004 letter was work product and ruled that if it were work product, any protection had been waived. SO ORDERED.

James C. Francis IV
USMJ

# EXHIBIT B

# MEMO ENDORSED

## NOURSE & BOWLES, LLP

One Exchange Plaza
at 55 Broadway
New York, NY 10006-3030
Telephone: (212) 952-6200

Facsimile: (212) 952-0345
E-Mail: reception@nb-ny.com
Web site: www.nb-ny.com
September 23, 2005

Nourse & Bowles, LLP
115 Mason Street
Greenwich, CT 06830-6630
Telephone: (203) 869-7887
Facsimile:  (203) 869-4535

Nourse & Bowles
75 Main Street, Suite 205
Millburn, NJ 07041-1322
Telephone: (973) 258-9811
Facsimile:  (973) 258-1480

**Via Facsimile and E-Mail**

Honorable James C. Francis IV                          1-212-805-7930
United States Magistrate Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 1960
New York, New York 10007-1312

Re:    American Steamship Owners Mutual Protection and Indemnity Association, Inc.
       v. Alcoa Steamship Co., Inc., et al., No. 04 Civ. 04309 (LAK) (JCF)

Dear Judge Francis:

We are counsel for the American Steamship Owners Protective and Indemnity Association (the "American Club") in the captioned litigation. We write in reply to Messrs. Proskauer's letter to the Court dated September 20, 2005.

We respectfully submit that Defendants request to expand the scope of the production required under the Court's September 13, 2005 Order and, indeed, to expand the scope of the ruling, is premature and in contravention of the stay presently in place. We ask that the Court defer consideration of Defendants' request until the hearing and determination of the Club's appeal from the September 13th Order.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/26/05

Should the Court prefer to rule upon the Defendants' application, we respectfully request leave to submit a formal opposition and reasonable time to do so.

Thank you for your attention.

Respectfully submitted,

NOURSE & BOWLES, LLP

By: _____

Shaun F. Carroll, Esq.

SFC/jtc
cc:    All Counsel

9/26/05

Defendants' application does not contravene the stay, since it simply seeks a further ruling. It will, however, be more efficient to withhold further rulings on related issues until the objections to my September 13, 2005 order have been adjudicated. Therefore, defendants may renew their application after the objections have been ruled upon.

SO ORDERED,

James C. Francis IV
USMJ

2

# EXHIBIT C



Peter Adelman, Esq.
Direct dial: (212) 209-4810
padelman@brownrudnick.com

Seven
Times
Square
New York
New York
10036
*tel* 212.209.4800
*fax* 212.209.4801

July 13, 2005

**BY HAND**

Honorable James C. Francis IV
United States Magistrate Judge
for the Southern District of New York
500 Pearl Street, Room 1960
New York, NY 10007-1312

RE:    **American Steamship Owners Manual Protection and
       Indemnity Association, Inc. v. Alcoa Steamship Co., et al.
       04  CV 4309 (LAK) (JCF)**

Dear Judge Francis:

        This firm represents Farrell Lines, Inc. ("Farrell") in the above-captioned
action.  I respectfully write to respond to Lawrence J. Bowles's July 11, 2005 letter to
Your Honor (the "July 11th Letter").  While we hesitate to burden the Court with another
letter, we feel constrained to do so in order to respond to arguments raised for the first
time by Plaintiff.[1]

        Plaintiff has now conceded that the May 18, 2004 opinion letter, as well
as the draft and final copy of the July 29, 2004 opinion letter (the "Opinion Letters") are
unprotected by the attorney-client privilege because of Plaintiff's disclosure of the
Opinion Letters to Deloitte Consulting ("Deloitte").  In light of this concession, Plaintiff
must produce the Opinion Letters, for they are plainly not protected by the work-
product immunity.  This much is clear from a reading of United States v. Adlman, 134
F.3d 1994 (2d Cir. 1998), the case upon which Plaintiff relies.

        Adlman contemplates litigation analyses prepared "in order to inform a
business decision which turns on the party's assessment of the likely outcome of
litigation expected to result from the transaction." Adlman at 1197.  Thus, had the Club
requested that Deloitte perform a liability analysis, or in any other way analyze an
expected litigation, the disclosed Opinion Letters might arguably be protected by the
work-product immunity.   Here, however, by Plaintiff's own admission, it sought
Deloitte's advice simply "to assess the adequacy of the Club's reserves" – in other

---
[1]    This letter responds to part one of the July 11th Letter.  By separate letter dated
       July 13, 2005, defendant American President Lines is responding to part two of
       the July 11th Letter.

B112532



Honorable James C. Francis IV
July 13, 2005
Page 2

words, to conduct a routine actuarial analysis of maintaining the status quo of indemnifying members' claims. See July 11th Letter at 2. Such a consultation cannot have been made "in anticipation of litigation," and cannot enjoy work-product immunity. Plaintiff's attempt to shoehorn its third-party disclosure into the ambit of Adlman should be rejected.

Plaintiff's reliance on In re Pfizer Inc. Sec. Litig., No. 90 Civ.1260, at *6 (S.D.N.Y. Dec. 23, 1993) and the cases cited therein is likewise misplaced. These cases state a general rule that waiver of the work-product immunity is normally found where the disclosure "substantially increases the opportunity for potential adversaries to obtain the information." Pfizer at *6 (citations and internal quotations omitted). But because of the very nature of mutual insurance companies, recommendations regarding the adequacy of reserves and their accounting treatment are subject to the scrutiny (and open to challenge) by current members, former members, and the New York State Insurance Department.[2] It is natural to assume that consultations with Deloitte would make disclosure to members of any materials provided to Deloitte not only possible, but highly likely. Plaintiff cannot sustainably claim that its disclosure of the Opinion Letters to Deloitte did not substantially increase the likelihood that the members – already identified by Plaintiff as potential adversaries – would obtain them. It accordingly cannot avail itself of the rule of Pfizer.

Finally, Farrell takes issue with Plaintiff's puzzling claim that, because it is not intending to raise a reliance on counsel defense, it is entitled to disclose privileged materials selectively without committing subject matter waiver. See July 11th Letter at 4, n.4. This is not the law. In fact, the case on which Plaintiff primarily relies in its motion to compel, Bairnco Corp. Secs. Litig. v. Keene Corp., 148 F.R.D. 91, 99 (S.D.N.Y. 1993), makes plain that it is merely a party's reliance on privileged information to support its claims that triggers subject matter waiver. See Bairnco at 99 (subject matter waiver triggered despite absence of formal advice of counsel defense, where party relies in litigation on conclusions of its counsel). Plaintiff cannot at once cite Bairnco affirmatively and avoid its legal conclusions when they are unfavorable.

It is, in fact, Plaintiff that wishes to use privileged materials as both a shield and a sword. In its moving papers, Plaintiff cites to, and relies on, a favorable opinion letter from its former counsel concerning coverage and the ability to reopen closed years, claiming that various directors were exposed to, and bound by, its contents. See Pl. Mem. at 6, and exhibit 11 to the supporting Carroll affidavit. Plaintiff

---

[2]    Indeed, Joseph Hughes, a prior chairman of the Shipowners Claims Bureau, Plaintiff's manager, testified that Deloitte's function was to "review the loss reserves of the Club for the purpose of certification, as required by New York State, and basically say whether the Club's loss reserves were appropriate or not for the purposes of obtaining that certification." Deposition transcript of Joe Hughes, pages 131-32 (appended hereto as Exhibit A).



Honorable James C. Francis IV
July 13, 2005
Page 3

cannot now claim an entitlement to withhold other privileged materials concerning the same subjects. See United States v. Bilzerian, 926 F.2d 1285, 1293-94 (2d Cir. 1991) (impermissible to introduce certain attorney-client communications, but not others, where disclosure of selected communications is for self-serving purposes); see also Smith v. Alyesak Pipeline Serv. Co., 538 F. Supp. 977, 979 (D. Del. 1982), aff'd, 758 F.2d 668 (Fed. Cir. 1984) (unfair to permit party to shield disclosure of damaging communications while allowing party to disclose other selected communications solely for self-serving purposes).

Farrell respectfully requests that Your Honor reject Plaintiff's eleventh-hour attempt to avoid its waiver of the work-product immunity, and direct that Plaintiff promptly produce the Opinion Letters.

Respectfully submitted,

Peter Adelman

cc: Counsel of record (by e-mail)

# EXHIBIT A

Southern District of NY       FINAL          Joseph Hughes
American Steamship Owners v. Alcoa                    June 21, 2005

Page 1

1    UNITED STATES DISTRICT COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    ----------------------------------------

4    AMERICAN STEAMSHIP OWNERS
     MUTUAL PROTECTION AND

5    INDEMNITY ASSOCIATION, INC.,

6        Plaintiff,

7    -against-

8    ALCOA STEAMSHIP CO., INC., ET AL.,

9        Defendants.

10

11   Civil Action 04-CIV-4309 (LAK)(FM)

12   ----------------------------------------

13

14

15

16

17

     DEPOSITION OF:

18   JOSEPH E.M. HUGHES - VOL 1
     June 21, 2005

19   New York, New York
     LEAD:  Proskauer Rose

20

21

22

23

24   FINAL COPY

25   JANE ROSE REPORTING  1-800-825-3341

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

Southern District of NY        FINAL            Joseph Hughes
American Steamship Owners v. Alcoa                June 21, 2005

Page 131

1      A.    At SCB.
2      Q.    In other words, you can't speak to
3    the period prior to the time you were there?
4      A.    No, I can't.  I have some
5    recollection that another actuary may have been
6    involved prior to my arrival at the Club, but I
7    may be wrong in my recollection.
8      Q.    Does the name Foster Higgins ring
9    any bell?
10     A.    Yes, it does.
11     Q.    What function did that firm serve?
12     A.    They may have been involved,
13   actually, earlier than Deloitte, but, again,
14   that's pure speculation on my part.  I can't
15   recall.
16     Q.    What was the role of Deloitte with
17   respect to The American Club?
18     A.    Deloitte had a dual role:  They
19   were both its auditors when I was there, and
20   still are, and its consulting actuaries, and
21   they still are.
22     Q.    What was their role as consulting
23   actuaries?
24     A.    They would review the loss
25   reserves of the Club for the purpose of

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

Southern District of NY        FINAL              Joseph Hughes
American Steamship Owners v. Alcoa                June 21, 2005

Page 132

1    certification, as required by New York State,
2    and basically say whether the Club's loss
3    reserves were appropriate or not for the
4    purpose of obtaining that certification.
5        Q.    In connection with the loss
6    reserves certification process in which
7    Deloitte was engaged, did Deloitte review the
8    adequacy of The American Club's reserves for
9    unreported losses in closed insurance years?
10       A.    I'm not particularly well
11   qualified to talk in detail on what their
12   procedures would be on that particular point.
13   I think Mr. Solarino is much better qualified
14   to say exactly what they would do in that
15   context, but I think they would have a view on
16   that.
17       Q.    In general terms, you were aware
18   of the fact, were you not, that Deloitte opined
19   upon the adequacy of the reserves set by The
20   American Club for occupational disease claims
21   prior to 1981?
22           MR. CARROLL:  Nineteen...?
23       A.    1989?
24       Q.    1981.
25       A.    I did not know that.

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

# EXHIBIT D-1

# PROSKAUER ROSE LLP

1585 Broadway
New York, NY 10036-8299
Telephone 212.969.3000
Fax 212.969.2900

LOS ANGELES
WASHINGTON
BOSTON
BOCA RATON
NEWARK
NEW ORLEANS
PARIS

**Seth B. Schafler**
Senior Counsel

Direct Dial 212.969.3660
sschafler@proskauer.com

September 20, 2005

**By Fax: 212-805-7930**

Honorable James C. Francis IV
United States Magistrate Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 1960
New York, New York 10007-1312

Re:     American Steamship Owners Mutual Protection and Indemnity Association, Inc. v.
        Alcoa Steamship Co., Inc., et al., No. 04 Civ. 04309 (LAK) (JCF)

Dear Magistrate Francis:

We enclose a revised version of our letter and exhibits dated September 20, because we received
the final certified transcript of Mr. Pearl's deposition and also noted copying mistakes in the
original exhibits containing that testimony. Please replace our original September 20 letter with
this REVISED letter which attaches selected pages of the final version of Mr. Pearl's testimony,
all within exhibit 2. We apologize for any inconvenience which this change has caused.

Respectfully,

Seth B. Schafler

cc via e-mail: All Counsel of Record

# PROSKAUER ROSE LLP

1585 Broadway
New York, NY  10036-8299
Telephone 212.969.3000
Fax 212.969.2900

LOS ANGELES
WASHINGTON
BOSTON
BOCA RATON
NEWARK
NEW ORLEANS
PARIS

Seth B. Schafler
Senior Counsel

Direct Dial 212.969.3660
sschafler@proskauer.com

**Revised**

September 20, 2005

**By Fax: 212-805-7930**

Honorable James C. Francis IV
United States Magistrate Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 1960
New York, New York 10007-1312

Re:    American Steamship Owners Mutual Protection and Indemnity Association, Inc. v.
       <u>Alcoa Steamship Co., Inc., et al., No. 04 Civ. 04309 (LAK) (JCF)</u>

Dear Magistrate Francis:

We represent Defendants Keystone, BP, MTL, Kirby Inland Marine (as successor to Hollywood
Marine Inc.), American Steamship Company, The Cleveland-Cliffs Steamship Company, Ispat,
Sea Mobility, SEI II Equipment Inc., Alcoa Steamship Company, Inc., and related entities,
Sabine Towing & Transportation Co., Inc., and Tecomar, S.A. de C.V. as defined in their
Answers and Counterclaims filed in the above-referenced action.

We write in regard to two issues raised in your Orders dated September 13, 2005 and September
15, 2005.  First, based on your ruling that Plaintiff's selective disclosure of various opinion
letters of counsel has waived attorney-client and work-product privilege as to the May 18, 2004
letter, we respectfully request that the Court review *in camera* the remaining applicable
documents on Plaintiff's privilege log (attached hereto as Ex. 1) in order to determine for each of
these documents whether privilege has been waived.  An earlier version of plaintiff's privilege
log was submitted to the Court as exhibit K to the Declaration of Lisa A. Bauer, submitted in
support of defendants' opposition papers, and referred to at ¶ 12 of the Bauer Declaration.  We
will of course be happy to submit formal motion papers if the Court so desires, but believe that
further motion practice is unnecessary as the contents of the documents remaining on Plaintiff's

PROSKAUER ROSE LLP

Honorable James C. Francis IV
United States Magistrate Judge
Daniel Patrick Moynihan United States Courthouse
September 20, 2005
Page 2

log will be determinative as to whether privilege has been waived pursuant to the Court's
September 13, 2005 Order.

As to the opinion letters dated May 18, June 18 and July 29, 2004, (this Court has already ruled
that the May 18, 2004 letter should be produced but stayed disclosure pending determination of a
timely appeal), we respectfully ask the Court to clarify its ruling as to whether work-product
privilege as to these documents has been waived by their disclosure to Deloitte Consulting
("Deloitte").

Such disclosure was conceded in Plaintiff's letter to Court dated July 11, 2005. Further, during
his deposition on September 15, 2005, Deloitte partner Mark Pearl admitted seeing at least one if
not all of these opinions and showing at least one if not more of the opinion letters to a Deloitte
partner who was not working on the Club account for "peer review". (*See* pages 149-150, 154 of
Mr. Pearl's testimony attached hereto as Ex. 2). We were unable to determine which opinion
letters Mr. Pearl saw, as counsel for the Club objected to their use at the deposition. Attached
hereto as Exhibits 3 and 4 are covering letters from the American Club to Deloitte, noting the
attachment of opinion letters of counsel in support of Deloitte's actuarial opinion and
certification of the Club's loss reserves to be presented to the New York State Insurance
Department.

Mr. Pearl conceded that he was not asked by the Club to perform any analysis to assist in this
litigation (*see* pages 142-143 of Mr. Pearl's testimony attached hereto as Ex. 2) but was given the
opinion letters solely to determine whether to acquiesce in the Club's request to eliminate
aggregate reserves amounts related to asbestos claims incurred in years prior to 1989. (*See* page
150 of Mr. Pearl's testimony attached hereto as Ex. 2). We believe Mr. Pearl's testimony and
the facts of this case call for a decision that work-product protection has been waived as to the
letters given to Deloitte, and that this Court should follow the decision reached in *Medinol Ltd. v.
Boston Scientific Corporation*, 214 F.R.D. 113 (S.D.N.Y. 2002).

In *Medinol*, Judge Hellerstein ruled that the defendant waived work product production as to
documents it disclosed to its outside auditor where such disclosure did not have the purpose of
aiding litigation. The Court stressed the "watchdog" role played by outside auditors – a role
which is even more critical in this case as the New York Insurance Department *requires* the
American Club to provide an actuarial opinion to the Department regarding its reserves. (*See*
pages 146-148 of Mr. Pearl's testimony attached hereto as Ex. 2).

PROSKAUER ROSE LLP

Honorable James C. Francis IV
United States Magistrate Judge
Daniel Patrick Moynihan United States Courthouse
September 20, 2005
Page 3

Since at least the mid-1990s, due to repeated failures of loss reserve tests, the New York Insurance Department required that the American Club engage a qualified independent loss reserve specialist to render an opinion as to the adequacy of the Club's loss and loss adjustment expense reserves. (*See* pages 428-430 of the testimony of Thomas R. McGowan, former President of Shipowners Claims Bureau, attached hereto as Ex. 5; D-56: January 15, 1996 letter from New York Insurance Department attached hereto as Ex. 6). As Deloitte has acknowledged, its actuarial reports are intended to be filed, together with the American Club's audited statutory financial statements, with the Insurance Department of the State of New York and other insurance departments in which the Club is licensed, to be relied upon by the insurance commissioners of those states "in monitoring and regulating the statutory financial condition of the Association". (*See* March 24, 2000 Deloitte report to the Club's Board of Directors attached hereto as Ex. 7). Deloitte's April 6, 2005 Statement of Actuarial Opinion expressly notes the "impact" of termination of the so-called "prior discretionary practice" in a reduction of $3,000,000 for policy years prior to 1989 (Ex. 8 at DT003611) – an impact that the American Club justified to Deloitte solely on the basis of opinion letters of its legal counsel. Deloitte is required to make its actuarial report and the workpapers supporting its findings available for regulatory examination. (*See* Deloitte's April 6, 2005 Statement of Actuarial Opinion at DT003613 attached hereto as Ex. 8; pages 148-149 of Mr. Pearl's testimony attached hereto as Ex. 2). Thus, the reports given by the Club to Deloitte are part of the record supporting its actuarial opinion, and available for regulatory review for the benefit of the public.

In its July 11, 2005 letter to the Court, Plaintiff suggests that its disclosure of opinion letters to Deloitte falls within a hypothetical example provided by the Second Circuit as *dicta* in *United States v. Adlman*, 134 F.3d 1194 (2d Cir. 1998). The situation present here, however, is quite different than the hypothetical presented in *Adlman* or the situation considered in *Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc.*, 2004 WL 2389822 (S.D.N.Y.). The American Club did not simply engage an auditor in an effort to present information to executives, stockholders, and the like; it hired an actuary each year because it was required to do so to certify its reserves to the New York Insurance Department. If the Club's reserves are not adequate, the Superintendent of the New York Insurance Department has the power to order the Club to fix that impairment in a certain amount of time and suspend its right to issue policies. (*See* Ins. L. §1311). The Department also has the authority to request back up support for Deloitte's review, including the opinion letters at issue here. Given the adversarial relationship between the American Club and the New York Insurance Department, a waiver of privilege occurred when the opinions of counsel were disclosed to auditors for the purpose of justifying elimination of the Club's loss reserves for insurance years prior to 1989.

PROSKAUER ROSE LLP

Honorable James C. Francis IV
United States Magistrate Judge
Daniel Patrick Moynihan United States Courthouse
September 20, 2005
Page 4

Nor is this a case such as *Merril Lynch* in which an auditor and its client share a common interest in working together to root out corporate fraud.  The American Club could not reasonably have expected that, having hired Deloitte to provide an actuarial opinion to comply with New York Insurance Department requirements, and having provided Deloitte with legal opinions intended to justify eliminating previously set loss reserves, it would not be required to disclose those opinions to regulatory authorities acting on behalf of the public.  Under these circumstances, the Club has waived work product protection as to any opinion letters which it provided to Deloitte.

Respectfully yours,

Seth B. Schafler

cc via email:   All Counsel of Record

# EXHIBIT 1

*AMERICAN STEAMSHIP OWNERS MUTUAL PROTECTION AND INDEMNITY ASSOCIATION, INC.,*

**American Club Privilege Log**

**Annotated with challenges of Defendants by Proskauer and Nourse & Bowles responses**

| Date | From: | To: | CCs | Document Type | Description | Privilege Asserted by AC | Challenge | Response |
|---|---|---|---|---|---|---|---|---|
| 1/13/2000 | | | | Minutes of a Meeting of the Board of Directors (Redacted) | Regarding Asbestos Claims and providing legal advice thereon | AC, WP | (1) No author or indication of attorney client | Produced unredacted. |
| 8/11/2000 | Shipowners Claims Bureau -- G. Strevell | Shipowners Claims Bureau -- J. Hughes -- V. Solarino | R. Brown | Office Memorandum | Regarding Keystone's reassertion of asbestos claims and providing legal advice thereon | AC, WP | (2) No indication of attorney giving legal advice; only copied to counsel | Work product prepared in anticipation of litigation and settlement of same and reported to counsel for that purpose |
| 9/14/2000 | | | | Minutes of a Meeting of the Board of Directors (Redacted) | Regarding Keystone's reassertion of asbestos claims and providing legal advice thereon | AC, WP | (1) | Author J. Hughes reporting on advice of counsel R. Brown re Keystone asbestos claims |
| 11/9/2000 | | | | Minutes of a Meeting of the Board of Directors (Redacted) | Regarding Keystone Shipping Co., Reassertion of Asbestos Claims and legal advice thereon | AC, WP | (1) | Attorney Richard Brown reporting on Keystone claims and settlement discussions. Author Hughes |
| 1/11/2001 | | | | Minutes of a Meeting of the Board of Directors (Redacted) | Regarding Keystone's reassertion of asbestosis claims and providing legal advice thereon | AC, WP | (1) | Attorney Richard Brown Author Hughes |

| Date | From: | To: | CCs | Document Type | Description | Privilege Asserted by AC | Challenge | Response |
|------|-------|-----|-----|---------------|-------------|--------------------------|-----------|----------|
| 6/14/2001 | | | | Minutes of a Meeting of the Board of Directors (Redacted) | Regarding Keystone's Occupational Illness Claims and providing legal advice thereon | AC, WP | (1) | Attorney Richard Brown Author Hughes |
| 3/14/2002 | | | | Minutes of a Meeting of the Finance Committee (Redacted) | Regarding Keystone Shipping's Action Against the Club for Unliquidated Damages and providing legal advice thereon | AC, WP | (1) | Attorney Richard Brown Author Hughes |
| 11/14/2002 | | | | Minutes of a Meeting of the Board of Directors (Redacted) | Regarding Keystone Occupational Injury Claims and provided legal advice thereon | AC, WP | (1) | Attorney Lawrence J. Bowles Author Hughes |
| 12/31/2003 | | | | Draft | Re: Resolutions to close 2000/2001 insurance year w/ a final levy of assessment and to levy additional interim assessments for insurance years 2001/2002 and 2002/2003 | AC, WP | (1) | Attorney Lawrence J. Bowles |
| 12/31/2003 | | | | Draft | Regarding Resolutions to close 2000/2001 insurance year w/ a final levy of assessment with legal advice thereon | AC, WP | (1) | Attorney Lawrence J. Bowles |
| 3/8/2004 | Nourse & Bowles | Shipowners Claims Bureau -- D. Moore | R. Binzley | Letter | Regarding Farley v. Keystone and providing legal advice thereon | AC, WP | (3) Privilege appears to be waived due to sharing it with a third party | R. Binzley is counsel for Member and Club Re: subject litigation |

2

| Date | From: | To: | CCs | Document Type | Description | Privilege Asserted by AC | Challenge | Response |
|---|---|---|---|---|---|---|---|---|
| 5/13/2004 | Shipowners Claims Bureau | Members of the Finance Committee | | E-Mail and letter | Regarding the Discretionary Practice and legal advice thereon | AC, WP | (4) Appears to be shared among AC Directors and SCB employees with no indication of counsel on the document | Counsel shown on enclosure as Nourse & Bowles. Document limited to Club management |
| 5/14/2004 | Shipowners Claims Bureau -- J. Hughes | Members of the Finance Committee | | E-Mail with attachment | Regarding the Discretionary Practice and commenting on legal advice thereon. | AC, WP | (4) | See above |
| 5/14/2004 | K. Engstrom | American Club -- J. Hughes | | Letter | Regarding the Discretionary Practice and commenting on legal advice thereon | AC, WP | (4) | Director comment on Bowles' legal advice limited to Club management |
| 5/14/2004 | J. Sweeney | Members of the Finance Committee | | E-Mail with attachment | Regarding the Discretionary Practice and commenting on legal advice thereon | AC, WP | (5) Communication between Directors with no indication of counsel on the document | See above |
| 5/14/2004 | J. Sweeney | J. Wales | | E-Mail | Regarding Keystone v. American Club and commenting on legal advice thereon | AC, WP | (5) | See above |
| 5/14/2004 | J. Sweeney | Members of the Finance Committee | J. Bennett | Chain of E-Mails | Regarding Keystone v. American Club and commenting on legal advice thereon | AC, WP | (4) and (5) | See above |
| 5/14/2004 | J. Sweeney | Shipowners Claims Bureau -- V. Solarino | Members of the Finance Committee | E-Mail | Regarding Keystone v. American Club and commenting on legal advice thereon | AC, WP | (4) | See above |

3

| Date | From: | To: | CCs | Document Type | Description | Privilege Asserted by AC | Challenge | Response |
|---|---|---|---|---|---|---|---|---|
| 5/17/2004 | | | | Minutes of Finance Committee Meeting (Redacted) | Regarding Keystone v. American Club and terminating the Discretionary Practice, and providing legal advice thereon | AC, WP | (1) | Attorney Lawrence J. Bowles |
| 5/18/2004 | J. Hughes | Members of the Board of Directors | | Letter | Regarding Keystone v. American Club and terminating the Discretionary Practice and providing legal advice thereon | AC, WP | (4) | Enclosing Bowles' opinion. Limited to Club management |
| 5/18/2004 | Shipowners Claims Bureau -- J. Hughes | Shipowners Claims Bureau J. Bennett | | E-Mail with Attachments | Regarding Keystone Shipping and changing the club's discretionary practice with legal advice therein | AC, WP | (6) Communication between SCB employees with no indication of counsel on document | See above (same document) |
| 5/19/2004 | Shipowners Claims Bureau -- J. Hughes | Shipowners Claims Bureau -- D. Moore | | E-Mail with attachment | Regarding Keystone and Changing the Club's Discretionary Practice and providing legal advice | AC, WP | (6) | See above (same document) |
| 5/28/2004 | American Club --M. Mitchell | S. Pennicott; R. Deitch, I. Cameron; B. Davies A. Maroulletis; S. MacDonald, M. Mitchell; H. Forde; G. Tsimis; G. Strevell; D. Moore; D. Messick D. Croce; C. Gornell; C. Bianco-Biagini; B. Rouse; and A. Quinn | -- J. Hughes -- I. Farr | E-Mail | Regarding Occupational Illness Claims and providing legal advice thereon | AC, WP | (7) No indication of affiliation of recipients | All claims handling personnel of Shipowners Claims Bureau in New York and London |
| 6/4/2004 | American Club -- G. Strevell | --V. Solarino -- L.Bowles | M. Mitchell | Chain of E-Mails | Regarding Keystone v. American Club and requesting legal advice thereon | AC WP | (2) | Not copied to counsel – sent in response to Club counsel |

4

| Date | From: | To: | CCs | Document Type | Description | Privilege Asserted by AC | Challenge | Response |
|------|-------|-----|-----|---------------|-------------|--------------------------|-----------|----------|
| 6/14/2004 | Jim Sweeney | J. Hughes V. Solarino Members of the Finance Committee | | E-Mail | Regarding the American Club's Declaratory Judgment action and commenting on legal advice. | AC, WP | (4) | Circulation limited to Club Management – all relates to counsel's advice |
| 6/15/2004 | | | | Minutes of Finance Committee Meeting (Redacted) | Regarding Developments in The Club's Treatment of Claims for Occupational Disease; The Recent Petition for a Declaratory Judgment. | AC, WP | (1) | Counsel is Lawrence J. Bowles |
| 6/25/2004 | Shipowners Claims Bureau – V. Solarino | Jim Sweeney | Members for the Finance Committee J. Hughes M. Mitchell | E-mail | Regarding Keystone's claims and commenting on legal advice thereon | AC, WP | (4) | Document is addressed to counsel Bowles and limited to Club management |
| 7/2/2004 | Nourse & Bowles | St. Paul Fire & Marine Insurance Company | Svend Hansen | Letter | Regarding the case Keystone v. American Club and reporting to D&O insurer thereon | AC, WP | (3) | Produced |
| 7/6/2004 | Nourse & Bowles | Thomas McGowan | | Letter | Regarding the American Club's Declaratory Judgment action | AC, WP | (8) Communication with former employee, no indication of whether or not that former employee was represented by Nourse & Bowles | McGowan represented by Nourse & Bowles as 30(b)(6) party witness |
| 7/6/2004 | Nourse & Bowles | William A. Craig | | Letter | Regarding the American Club's Declaratory Judgment action | WP | (8) | Same as above |
| 7/12/2004 | Nourse & Bowles | St. Paul Fire and Marine Insurance Company | Svend Hansen | Letter | Regarding Keystone v. American Club, SCB and | AC, WP | (3) | Produced |

5

| Date | From: | To: | CCs | Document Type | Description | Privilege Asserted by AC | Challenge | Response |
|------|-------|-----|-----|---------------|-------------|--------------------------|-----------|----------|
| | | | | | Directors and reporting to D&O insurer thereon | | | |
| 7/13/2004 | Nourse & Bowles | Alistair Groom | D. Comer L. Readman G. Berkeley J. Hughes V. Solarino M. Mitchell | E-Mail | Regarding The American Club's Declaratory Judgment Action and providing legal advice thereon | AC, WP | (3) | Produced |
| 7/29/2004 (N&B date) 8/3/2004 (Proskauer date) | Nourse & Bowles | American Club – J. Hughes | Deloitte – Marc Pearl | Letter | Regarding Resolutions of the Board of Directors and providing legal advice thereon | AC, WP | (3) | Counsel's opinion provided to Club's auditors in furtherance of advice |
| 9/15/04 (Proskauer date) | Thacher Profitt & Wood – A. Kaufman | American Club – M. Mitchell | J. Woods J. Grasso | E-Mail with attachments | Regarding the American Club's Declaratory Judgment action and providing legal advice thereon | AC, WP | (3) No indication of affiliation of J. Woods or J. Grasso | Counsel to Club, Thacher Profitt Wood. [Note: Date given is incorrect. Letter dated 10/15/04] |
| 2/14/2005 2/16/2005 (Proskauer date) | American Club – M. Mitchell | – J. Grasso | | E-Mail | Regarding the American Club's Declaratory action and providing legal advice thereon | AC, WP | (3) No indication of affiliation of J. Grasso | See above |
| 3/10/2005 (N&B date) 3/16/2005 (Proskauer date) | | | | Minutes of a Meeting of the Board of Directors of The American Club (Redacted) | Regarding Treatment of Claims for Occupational Disease, The Declaratory Judgment action and providing legal advice thereon | AC, WP | (1) | Counsel is Lawrence J. Bowles |

6

# EXHIBIT 2

AM CLUB                    FINAL              Marc Pearl, 30(b)(6)
v. ALCOA                                      September 15, 2005

Page 142

1     resolution that essentially eliminated the need
2     to pay those claims.
3          Q.     Who told you that?
4          A.     Vince Solarino told me that.
5          Q.     Do you remember when he told you
6     that?
7          A.     I don't remember specifically
8     when, no.
9          Q.     Did you ever attend any meetings
10    of The American Club in which that action was
11    discussed?
12         A.     No.
13         Q.     Were you shown the Complaint that
14    was filed in this action by The American Club?
15         A.     I don't remember specifically.  I
16    think I saw something when the deposition first
17    came out, but I don't remember if that was
18    specifically what you're talking about.
19         Q.     Were you asked to comment on the
20    Complaint or asked for any advice on any of the
21    filings in this litigation by The American Club
22    or its manager, the Shipowners Claims Bureau?
23         A.     No.
24         Q.     Were you asked to do any analysis
25    for counsel for The American Club or for the

AM CLUB                    FINAL            Marc Pearl, 30(b)(6)
v. ALCOA                                    September 15, 2005

Page 143

1   Shipowners Claims Bureau to give to counsel for
2   The American Club in relation to this
3   litigation?
4        A.    No.
5            MS. BAUER:  I'd like to have
6   marked as Defense Exhibit 242 a July 15th, 2004
7   letter from Vincent Solarino to Mr. Pearl,
8   Bates No. DT 427.
9            - - - - - -
10           (Defendants' Exhibit 242 marked.)
11           - - - - - -
12  BY MS. BAUER:
13       Q.    Mr. Pearl, do you recognize this
14  document?
15       A.    Yes, I do.
16       Q.    Do you recall receiving it from
17  Mr. Solarino on or about July 15th, 2004?
18       A.    I recall seeing it.  I can't say
19  when.
20       Q.    Is this the type of letter you
21  would receive every year in relation to your
22  review of the loss reserves and your
23  certification of the actuarial opinion for The
24  American Club?
25       A.    Something like this.

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

AM CLUB                    FINAL        Marc Pearl, 30(b)(6)
v. ALCOA                                September 15, 2005

Page 144

1        Q.      Would you look at No. 5?  It
2    states, about halfway through the paragraph,
3    "Listed as Item D is a significant change that
4    affects our ultimate liability related to these
5    claims."
6            Do you see that?
7        A.    (Indicating.)
8        Q.    Do you remember the significant
9    change that related to these claims?
10       A.    Well, that would be the board
11   resolution.
12       Q.    If you turn to the third page,
13   Item D states:  "Please be advised that the
14   Association's Board of Directors passed a new
15   resolution that eliminates the discretionary
16   payment practice of paying claims on closed
17   policy years prior to February 20th, 1989.  We
18   understand that this resolution is effective
19   immediately and it will eliminate the need to
20   provide for future asbestos and other
21   occupational disease claims payments for policy
22   years prior to February 20th, 1989.  Attached
23   is a letter from our legal counsel confirming
24   the legality of such a resolution, and how it
25   affects future exposure to loss."

AM CLUB                    FINAL          Marc Pearl, 30(b)(6)
v. ALCOA                                  September 15, 2005

Page 145

1          **Do you see that?**
2      A.   Yes.
3      **Q.   Do you remember what effect this**
4  **had on your analysis of the loss reserves?**
5      A.   Well, essentially I didn't include
6  any provision for asbestos losses in my
7  analysis as a result of this.
8      **Q.   For any asbestos losses or just**
9  **asbestos losses in years prior to 1989?**
10     A.   For any of the ones that we would
11 have looked at, which I believe were all prior
12 to 1989 anyway.
13     **Q.   Okay.  The American Club had been**
14 **carrying this liability for asbestos losses**
15 **since at least when you began working on their**
16 **account in 1995.  Correct?**
17     A.   They've been carrying a liability.
18 Yes.
19     **Q.   So what did you do when you were**
20 **told that there no longer was the liability?**
21 **Did you simply take them on their word, or did**
22 **you investigate the change in that liability?**
23     A.   Well, we asked to have a legal
24 opinion, you know, from their attorneys
25 basically substantiating that.

AM CLUB                    FINAL          Marc Pearl, 30(b)(6)
v. ALCOA                                  September 15, 2005

Page 146

1        Q.      Why did you need the legal
2    opinion -- or why did you ask for it?
3        A.      Well, because this would cause a
4    change in our analysis.  And, so, we wanted to
5    make sure we had sufficient support for that.
6        Q.      After you do your analysis, you
7    have to certify to the New York Insurance
8    Department that the loss reserves carried are
9    appropriate.  Is that correct?
10       A.      Yes.
11       Q.      And it's part of the regulatory
12   oversight of the Insurance Department of the
13   State of New York for any licensed New York
14   State insurer.  Is that correct?
15           MR. CARROLL:  Objection.
16       A.      I'm not sure what their -- if it's
17   correct or, you know. . .
18       Q.      Let me clarify the question.
19           Does the New York State Insurance
20   Department require a certified opinion from an
21   outside actuary with the filing of an insurance
22   company's annual statement?
23           MR. CARROLL:  Objection.
24       A.      No.
25       Q.      There's something wrong with my

AM CLUB                    FINAL          Marc Pearl, 30(b)(6)
v. ALCOA                                  September 15, 2005

Page 147

1      question because you said "no."
2              Why did you provide the opinion to
3      The American Club every year for filing with
4      the Insurance Department?
5          A.    Well, it was required of The
6      American Club to provide an actuarial opinion.
7          Q.    And what did that actuarial
8      opinion need to contain?
9          A.    Well, actuarial opinion
10     essentially needed to contain certain elements
11     as specified by the National -- NAIC, National
12     Association of Insurance Commissioners,
13     referencing certain items in the annual
14     statement.  And it had to contain -- there had
15     to be a report provided to back up or support
16     the conclusions in the reserve opinion.
17         Q.    Can you tell me which elements the
18     NAIC required?
19         A.    Well, it varied over time.
20         Q.    Can you tell me the basic elements
21     that the NAIC requires?
22         A.    Well, they required you to
23     comment -- well, to review the reserves, first
24     and foremost, and, as I said, there's a report
25     that's needed to back it up; and then they also

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

AM CLUB                    FINAL          Marc Pearl, 30(b)(6)
v. ALCOA                                  September 15, 2005

Page 148

1    require you to look at, for instance, IRIS
2    ratios and comment on that; look at -- comment
3    on environmental and asbestos; comment on
4    reinsurance collectibility; comment on
5    retroactive reinsurance.
6         Q.    Anything else?
7         A.    That's all I could recall right
8    now.
9         Q.    What are IRIS ratios?
10        A.    IRIS ratios essentially are
11   standardized industry tests that are used to
12   monitor -- well, they're used in evaluating the
13   solvency of an insurance company.
14        Q.    Can you briefly tell us how they
15   work?
16        A.    Well, there are a series of tests,
17   and they pretty much pull off numbers from
18   annual statements that are filed.  And they
19   take various ratios to determine if there's a
20   problem.
21        Q.    Does the Department have the
22   ability to request the underlying data used in
23   forming your actuarial opinion?
24        A.    Does the Department have the...?
25   I'm sorry.

AM CLUB                    FINAL         Marc Pearl, 30(b)(6)
v. ALCOA                                 September 15, 2005

Page 149

1        Q.     Does the Department of Insurance
2    have the ability to request the underlying data
3    used in forming your actuarial opinion?
4        A.     They can request the actuarial
5    report.
6        Q.     Can they request the data
7    underlying what's summarized in the actuarial
8    report?
9        A.     They can request it if they're
10   doing a specific examination, and they hire an
11   outside actuary or they have their actuaries
12   review it.  And they want data.
13       Q.     I think you said when the
14   liability for asbestos claims in years prior to
15   1989 was eliminated, you asked for a letter
16   from legal counsel to evaluate that action.  Is
17   that correct?
18       A.     Yes.
19       Q.     Do you remember what letter you
20   saw?
21       A.     I don't remember the specific
22   letter, but I did get one.
23       Q.     Was the reason you were asking for
24   that letter so that when you certified the
25   actuarials, you would have a reason for

AM CLUB                    FINAL          Marc Pearl, 30(b)(6)
v. ALCOA                                  September 15, 2005

Page 150

1      approving the elimination of the IBNR reserve
2      for asbestos claims prior to 1989?
3          A.    That wasn't the -- the specific
4      reason was if I was going to include it or not
5      include it in my review.
6          Q.        Include the amount of the
7      reserves?
8          A.    Right.  Not just IBNR.
9          Q.    Oh, IBNR and reserves for known
10     cases, you mean?
11         A.    Reserves, yes.
12         Q.    I'm sorry.  I just want to
13     understand.
14              The reason you looked at the
15     opinion of counsel was to determine whether or
16     not you should include in the aggregate
17     reserves amounts related to asbestos claims,
18     either reported or unreported?
19         A.    Yes.
20         Q.    Do you remember when you received
21     the letter from counsel?
22         A.    No.
23         Q.    Do you remember which letter from
24     counsel -- or which counsel wrote the letter
25     that was attached and referred to here in item

AM CLUB                          FINAL                    Marc Pearl, 30(b)(6)
v. ALCOA                                                  September 15, 2005

Page 151

1      D?
2          A.      Do I remember which...?
3          **Q.      Which counsel wrote the letter**
4      **that was attached to Defense Exhibit 242 and**
5      **referred to in item D.**
6          A.      I believe it was Lawrence Bowles.
7          **Q.      Do you remember what the letter**
8      **said?**
9              MR. CARROLL:  Objection.  You're
10     getting into the substance.  The topic.  But if
11     you're going to get into the substance, we're
12     at the point we'll have to call the magistrate.
13             MS. BAUER:  Well, we firmly
14     believe that the substance of the letter is not
15     privileged.  And I believe the testimony that's
16     just been elicited establishes that in
17     accordance with Southern District Case Law.
18             MR. CARROLL:  That's your argument
19     to the magistrate.
20             MS. BAUER:  And it's not actually
21     the topic of your letter from yesterday.  So I
22     don't think it's appropriate to yet call the
23     magistrate.
24             MR. CARROLL:  I don't know that I
25     agree with that.

JANE ROSE REPORTING
1-800-825-3341    janerose@janerose.net

AM CLUB                    FINAL              Marc Pearl, 30(b)(6)
v. ALCOA                                      September 15, 2005

Page 154

1     and as of yesterday's order, we were permitted
2     to unsequester it and look at it.
3            MR. CARROLL:  I think that might
4     complicate what is already a bad situation.  I
5     think we should call him before we even do
6     that.
7            MS. BAUER:  Okay.  Then let me
8     move on to one more question.
9     BY MS. BAUER:
10       Q.    Do you remember if you saw --
11    Mr. Pearl, I'm sorry for the sideshow here,
12    which I suspect is going to take up quite a bit
13    of time in this deposition and may cause us to
14    ask you to come back for another day, which I
15    apologize for in advance.
16           Could you tell me if you remember
17    seeing one or more than one letter from counsel
18    on the issue of The American Club removing
19    their reserves for asbestos claims?
20       A.    I just remember there was a letter
21    that was attached to this one.
22       Q.    Okay.  Do you remember sharing
23    that letter with anyone else?
24       A.    Sharing it with anyone else?
25       Q.    Did you show it to anyone else at

JANE ROSE REPORTING
1-800-825-3341    janerose@janerose.net

AM CLUB                    FINAL              Marc Pearl, 30(b)(6)
v. ALCOA                                      September 15, 2005

Page 155

1      Deloitte?
2          A.     Well, we have a peer-review
3      process.  So in the process of peer review, we
4      would include that with the material that our
5      peer review would look at.
6          Q.     What do you mean by "a peer-review
7      process"?
8          A.     Well, before we issue an actuarial
9      report or any kind of actuarial analysis, we
10     have, you know, another partner essentially
11     review it, just to make sure everything's
12     reasonable.
13         Q.     A partner who's not working on the
14     account?
15         A.     Yes.
16         Q.     Did you show it to anyone -- let
17     me ask you.  Do you remember specifically who
18     conducted the peer-review analysis on this
19     actuarial report for The American Club?
20         A.     I don't remember specifically who.
21         Q.     Would it just have been a partner
22     or would it have been another team of actuaries
23     doing the peer review?
24         A.     No.  It would have been just a
25     partner.

JANE ROSE REPORTING
1-800-825-3341    janerose@janerose.net

AM CLUB                    FINAL           Marc Pearl, 30(b)(6)
v. ALCOA                                   September 15, 2005

Page 156

1        Q.      Did you share it with anyone else

2    besides the person doing the peer review?

3        A.      I don't recall.

4        Q.      Was it shared with other people on

5    The American Club audit or actuary review team?

6        A.      I don't remember if I shared it or

7    not.

8        Q.      Do you remember whether or not you

9    shared it with anyone outside of Deloitte?

10       A.      I don't think I did.

11               MS. BAUER:  I'd like to have

12   marked as Defense Exhibit 243 an e-mail dated

13   July 29th, 2004, from Vincent Solarino to

14   Mr. Pearl.  It's Bates stamped DT 3163 to 3164.

15               - - - - - -

16           (Defendants' Exhibit 243 marked.)

17               - - - - - -

18   BY MS. BAUER:

19       Q.      Do you recognize this e-mail,

20   Mr. Pearl?

21       A.      Yes.

22       Q.      Do you remember receiving it?

23       A.      Not specifically.

24       Q.      It states, "Here is the draft

25   letter from the Club's attorney.  I will have

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

AM CLUB                    FINAL          Marc Pearl, 30(b)(6)
v. ALCOA                                  September 15, 2005

Page 157

1     the final letter sent to you as soon as I
2     receive it by e-mail. Vince." And it's dated
3     July 29th, 2004.
4          Do you remember receiving this
5     draft letter from the Club's attorney?
6          A.     I remember receiving a draft
7     letter. I don't remember the specific one.
8          Q.     Do you have a recollection of
9     whether this letter attached to this e-mail was
10    different from the letter attached to the
11    previous exhibit dated July 15th, 2004?
12         A.     I don't remember if it was
13    different or not.
14         Q.     Okay. So you definitely received
15    one letter from counsel, and possibly two?
16         A.     Possibly, yeah.
17         Q.     Do you remember receiving the
18    final letter that this was the draft of?
19         A.     I don't remember receiving it.
20         Q.     If you turn to the second page of
21    the exhibit, you'll note that it's "From: Jane
22    (jcolasurdo@nb-ny.com)" to Marc Pearl and
23    "solarino@american-club.net." Also dated July
24    29th, 2004.
25         And it says, "Please see attached

AM CLUB                    FINAL          Marc Pearl, 30(b)(6)
v. ALCOA                                   September 15, 2005

Page 158

1      from Lawrence J. Bowles."
2             Do you see that?
3      A.     (Indicating.)
4      Q.     Do you recall whether that letter
5      was dated July 29th, 2004, also, or if it was
6      an earlier June or May letter?
7      A.     I don't remember.
8      Q.     Did you read the opinion that was
9      attached to these e-mails?
10     A.     At the time I did, yes.
11     Q.     And what did you use it for?
12     A.     Well, essentially that was the
13     support that we used in deciding that they
14     didn't need to book a reserve.
15     Q.     Did you use anything else besides
16     that letter for the support in deciding that
17     The American Club didn't need to book a
18     reserve?
19     A.     Well, the letter and the
20     resolution of the board essentially.
21     Q.     Anything else?
22     A.     Not that I can recall.
23     Q.     Did you question anything
24     contained in the letter or have any further
25     discussion with anyone at Shipowners Claims

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

AM CLUB                  FINAL            Marc Pearl, 30(b)(6)
v. ALCOA                                  September 15, 2005

Page 159

1    Bureau about that action?
2        A.    No.
3        Q.    Did you discuss it with anyone on
4    the Board of Directors of The American Club?
5        A.    No.
6        Q.    Did you discuss it with anyone
7    internally at Deloitte as to whether or not it
8    was appropriate to take down the reserve?
9        A.    Just during the course of the peer
10   review.
11       Q.    Do you remember if the peer that
12   reviewed your report had any specific questions
13   or comments on that action?
14       A.    Well, they just wanted to know the
15   general background, and I explained it to them.
16       Q.    Would you have been able to
17   certify the actuarial statement if you didn't
18   receive the opinion from counsel?
19       A.    Probably -- it depends on what the
20   results would have been in terms of my
21   analysis.
22       Q.    I don't know what you mean by
23   that.
24       A.    Well, it could have meant that
25   whether or not the asbestos reserves were

AM CLUB                    FINAL          Marc Pearl, 30(b)(6)
v. ALCOA                                  September 15, 2005

Page 160

1    included or not included didn't make a
2    difference in terms of assessing the overall
3    reserves.
4        **Q.    So if they were overreserved in**
5    **some other area and you were still including in**
6    **your analysis the amount of asbestos reserves,**
7    **it wouldn't have mattered if The American Club**
8    **took it out of their asbestos reserve amount?**
9    **Is that what you're saying?**
10       A.    I'm sorry?
11       **Q.    Maybe you should just explain to**
12   **me what you're saying.**
13       A.    Well, as I said earlier, we review
14   the total reserves.  So it's quite possible
15   that whether we include the asbestos or whether
16   we don't include the asbestos, they might have
17   been within the range of what we were coming up
18   with.
19       **Q.    Okay.  Earlier you said that the**
20   **NAIC requires you to comment on asbestos**
21   **reserves, though.  Correct?**
22       A.    Right.
23       **Q.    So you would have had to say**
24   **something one way or the other.  Isn't that**
25   **true?**

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

AM CLUB                    FINAL          Marc Pearl, 30(b)(6)
v. ALCOA                                  September 15, 2005

Page 161

1       A.    We don't have to comment on the
2   adequacy of the reserves.  We just have to
3   comment on whether there are reserves or not,
4   as stated in the annual statement.
5       **Q.    Do you know what you would have**
6   **done if you hadn't received this letter from**
7   **counsel in terms of your comments on the**
8   **asbestos reserves in relation to analyzing and**
9   **certifying the actuarial opinion?**
10      A.    No, I don't.
11           MS. BAUER:  Shaun, I think I'm
12  entitled to ask him what the opinion contained
13  and to more specifically know which opinions he
14  saw.  So I think if you want to call the judge,
15  now is the time to do it.
16           MR. CARROLL:  Let's call.
17           MS. BAUER:  Off the record.
18           (Whereupon, there is a discussion
19  held off the record.)
20           MS. BAUER:  Back on the record.
21  BY MS. BAUER:
22      **Q.    Mr. Pearl, are you involved with**
23  **the interaction between the Insurance**
24  **Department from the State of New York and The**
25  **American Club?**

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

AM CLUB                    FINAL          Marc Pearl, 30(b)(6)
v. ALCOA                                  September 15, 2005

Page 162

1        A.      From time to time, I might be
2    called as it relates to actuarial areas.
3        Q.      How?
4        A.      Well, if the State -- the State
5    has a requirement to examine the reserves of
6    the insurance companies that it regulates.  And
7    to the extent that they reviewed the reserves
8    for ASOMPIA and they have questions related to
9    things related to the reserves, they might --
10   the Club may bring me into those discussions.
11       Q.      Do you recall any specific
12   instances where you were brought into
13   discussions with the Insurance Department?
14       A.      Well, I know that they examined
15   their reserves.  I think it was the 2001
16   reserves.  And in conjunction with that
17   examination, I know there were some issues
18   related to the reserves.
19       Q.      What issues were related to the
20   reserves?
21       A.      Well, the one I specifically
22   remember addressing was the concern that the
23   Department had about the fact that one of the
24   schedules in the annual statement looked like
25   the results were deteriorating quite a bit.  It

AM CLUB                          FINAL           Marc Pearl, 30(b)(6)
v. ALCOA                                          September 15, 2005

Page 163

1    was the Schedule P.  And I was called in to try
2    to explain it.  Some of it was this effect
3    about the policy year that I had mentioned to
4    you before, policy year versus accident year.
5    Other companies uses accident year; the Club
6    uses a policy year.  So that distorts some of
7    the numbers in their financial statements.
8        **Q.    Was there anything else that was**
9    **distorting the schedule?**
10       A.    I don't remember anything
11   offhand.
12       **Q.    Did you talk to the Insurance**
13   **Department directly about this?**
14       A.    Well, I usually went with someone
15   from American Steamship.  And we spoke with --
16   I spoke with one of the actuaries over there,
17   yes.
18       **Q.    Did you provide any written**
19   **documentation to the Insurance Department?**
20       A.    I believe I provided something in
21   writing to the Club, which I think they
22   included in just their overall response to all
23   of the questions that they had.
24       **Q.    Do you remember anything else?**
25       A.    That was really what I remember.

AM CLUB                    FINAL          Marc Pearl, 30(b)(6)
v. ALCOA                                  September 15, 2005

Page 192

1       Q.     Do you know if there was any
2    impact on the Club's finances after this point
3    due to the reduction of the loss reserves by
4    $3 million, in your opinion?
5         MR. CARROLL:  Objection.
6       A.     I don't know.
7       Q.     Can you turn to page DT 2662?
8    Again, under "Asbestos Liabilities," under that
9    heading there's a paragraph which states,
10   towards the end of the paragraph, "As a result,
11   our range of reserve estimates reflects this
12   resolution as a reduction of $3 million."
13          When you made this opinion and
14   your reserve estimates were reflecting the
15   reduction of $3 million, had you already read
16   the Club's legal opinion?
17      A.     I believe so, yes.
18      Q.     Do you remember if you'd read more
19   than one at that time?
20      A.     No.
21      Q.     Do you remember which one was sent
22   to you at that time?
23      A.     No.
24      Q.     If you want, we could look back at
25   the cover letters if that would help you.

AM CLUB                    FINAL          Marc Pearl, 30(b)(6)
v. ALCOA                                  September 15, 2005

Page 193

1      A.    My guess is it would have been,
2   you know, whatever would have been the final
3   version.
4      Q.    The next sentence states, "The
5   company expects the remaining $844,158 to be
6   sufficient to cover any expenses associated
7   with these claims."
8            Can you explain to me what
9   expenses associated with these claims are?
10     A.    Again, this was told to me by the
11  Club.  And it was expenses to, I guess, close
12  out the claims.
13     Q.    What do you mean by "close out the
14  claims"?
15     A.    Essentially to defend them.
16     Q.    But they're no longer going to pay
17  the claims, so why would they be defending
18  them?
19     A.    I don't know the specific reasons
20  for setting up these expense reserves,
21  specifically why.
22     Q.    Well, were you told anything about
23  what these expense reserves were for?
24     A.    Just what I told you.  Essentially
25  for -- to the extent that there might be

AM CLUB                    FINAL             Marc Pearl, 30(b)(6)
v. ALCOA                                     September 15, 2005

Page 213

1      Q.    And then they come to you in 2004
2   and say We never had to pay any of those claims
3   and we're no longer going to have to pay any of
4   those claims.
5          Did that seem logical to you?
6      A.    Well, that's why I asked for
7   something in writing, you know, determining the
8   legality of that.
9      Q.    And that opinion of counsel
10  satisfied your concerns?
11     A.    Yes, it did.
12     Q.    Did you ask if they received any
13  other opinions that were contrary to that
14  opinion?
15     A.    No.
16     Q.    Did you consider whether or not
17  additional counsel should be consulted before
18  you were satisfied that they no longer had to
19  pay these claims?
20     A.    I'm sorry. Did I...?
21     Q.    Did you consider whether or not
22  additional counsel should be consulted before
23  you became satisfied that they no longer had to
24  pay these claims?
25     A.    No.

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

# EXHIBIT D-2

# EXHIBIT 3

**Pearl, Marc (US - New York)**

| | |
|---|---|
| From: | Vincent J. Solarino [solarino@american-club.net] |
| Sent: | Thursday, July 29, 2004 3:07 PM |
| To: | Pearl, Marc (US - New York) |
| Subject: | FW: Resolutions of the Board of Directors |

 

Solarino Ltr.pdf (48 KB)    Draft Hughes Ltr.pdf (465 KB)

Marc;

Here is the Draft letter from the Club's attorney. I will have the Final
letter sent to you as soon as I receive it by email.

Vince

-----Original Message-----
From: Corine [mailto:ccolligan@nb-ny.com] On Behalf Of ljb
Sent: Friday, July 23, 2004 2:18 PM
To: 'solarino@american-club.net'
Cc: 'Jhughes@american-club.net'; 'mitchell@american-club.net'
Subject: Resolutions of the Board of Directors

  <<Solarino Ltr.pdf>>  <<Draft Hughes Ltr.pdf>>

1



EXHIBIT
D-243
9-15-05 /1/

CONFIDENTIAL          DT 003163

DT003163

**Pearl, Marc (US - New York)**

| | |
|---|---|
| From: | Jane [jcolasurdo@nb-ny.com] |
| Sent: | Thursday, July 29, 2004 4:15 PM |
| To: | Pearl, Marc (US - New York); 'solarino@american-club.net' |
| Subject: | American Club - Resolutions of Board of Directors |



SFXA97.pdf (360
KB)

               <<SFXA97.pdf>>

Please see attached from Lawrence J. Bowles.

1

CONFIDENTIAL

DT 003164

DT003164

# EXHIBIT 4

American Steamship Owners Mutual Protection and Indemnity Association, Inc.



THE
AMERICAN
CLUB

Shipowners Claims Bureau, Inc., Manager
60 Broad Street – 37th Floor
New York, New York 10004
U.S.A.

Tel:        +1-212-847-4500
Fax:        +1-212-847-4599
E-mail:    info@american-club.net
Website:   www.american-club.com

July 15, 2004

Mr. Marc B. Pearl, FCAS, MAAA
Deloitte Consulting LLP
25 Broadway
New York, NY 10004-1010

Dear Marc:

In connection with your review of the loss and loss adjustment expense reserves as of December 31, 2003 of American Steamship Owners Mutual Protection and Indemnity Association, Inc. (ASOMPIA), I, Vincent Solarino, President and Chief Operating Officer do hereby affirm that to the best of my knowledge and belief:

1.  No relevant information which would materially affect the loss and loss adjustment expense reserves has been knowingly withheld from you.

2.  Basic records, listings, summaries and other information furnished to you, and underlying the calculation of the loss and loss adjustment expense reserves, were prepared under my direction and are accurate and complete.

3.  You have been advised of all known changes in internal methods or procedures which would materially affect the determination of needed loss and loss adjustment expense reserves.  Significant changes are listed in Items A to D below.

4.  All material balance sheet accounts dependant upon loss reserve level (e.g. contingent commission) have been disclosed to you.

5.  There are no known Asbestos claims or any potential for additional claims to which we are exposed except for those disclosed in Note 33 of the Notes to Financial Statements and those appearing on the file Asbestos Data.xls sent to us by Steve Ogullukian on April 9, 2004 (11:25 AM).  Listed as Item D is a significant change that affects our ultimate liability related to these claims.  With respect to environmental liability, the Company's only exposure arises out of sudden and accidental pollution caused by the escape of polluting substances (primarily oil) from oceangoing or inland river vessels which are capable of navigation.

6.  There are no known claims related to the September 11th, 2001 Terrorist Attacks or any potential for additional claims we may be exposed to except for the following: None.



EXHIBIT

D-242
9-15-05/JW

**CONFIDENTIAL**

DT 000427

DT000427

7. There are no known claims or any potential claims we believe we may be exposed to related to significant corporate bankruptcies such as Enron, World Com, and Global Crossing, etc. except for the following: None.

8. I have no reason to believe any of our ceded reinsurance will not be collectible except as noted on the attached exhibit.

9. We have not assumed or ceded any contracts categorized as loss portfolio transfers, retroactive reinsurance or financial reinsurance.

10. I confirm that Management of this Company has recorded its best estimate of reserves both on a Gross and Net of Reinsurance basis by line of business and in total.

11. Except for that noted in Items A through D, there have been no subsequent events (between January 1 and the date of your issuance of the Statement of Actuarial Opinion) that could impact the loss and loss adjustment expense reserves and the Company's surplus.

The above statements are made based on my personal knowledge and diligent inquiry made prior to making this affirmation.

Sincerely,

Vincent Solarino
President and Chief Operating Officer

Rep2003.doc

CONFIDENTIAL

DT 000428

DT000428

Item A

Within the past two years ASOMPIA has begun to incorporate annual aggregate deductibles on a number of their policies. The case incurred data included in your loss triangles and Schedule P has not been reduced for these amounts. We estimate that this has affected four fleets (Blue North Fisheries Inc., Peter Pan Seafoods Inc., Pacific Longline Company, and Western Pioneer Inc), overstating outstanding and incurred losses by $450,000.

Item B

Due in part to the implementation of a new claims system, reserves at year end have been overstated. This is similar to the claims reserve problem that occurred last year, and would result in different loss emergence patterns than that implied by the historical data. I will forward you a claims listing displaying the impact of the affected claims.

Item C

The significant growth in the United States fleets came mostly from two fleets with a significantly lower exposure to loss relative to tonnage than the historical United States book. I will forward you additional information related to the loss exposure associated with that tonnage.

Item D

Please be advised that the Association's Board of Directors passed a new resolution that eliminates the discretionary payment practice of paying claims on closed policy years prior to February 20, 1989. We understand that this resolution is effective immediately and it will eliminate the need to provide for future asbestos and other occupational disease claims payments for policy years prior to February 20, 1989. Attached is a letter from our legal council confirming the legality of such a resolution, and how it affects future exposure to loss.

**CONFIDENTIAL**

DT 000429

DT000429

# EXHIBIT 5

1              '95 -- Solarino, John Sandercock, who were

2         meeting with Holloway constantly.  You know,

3         either together or individually or he'd come

4         and sit down and chat with me in the morning

5         about issues, questions, whatever.

6              So "we have been told" is me or

7         someone close to me.

8         Q.      And was the information that you

9         relayed to Mr. Holloway accurate as far as the

10        practices of the American Club at the time?

11        A.      Yes.

12        Q.      And that information was intended

13        to be relied upon by the International Group in

14        reviewing the American Club's application for

15        membership -- for full pooling membership?

16        A.      Yes.

17              - - - - - -

18            (Defendants' Exhibit 56 marked.)

19              - - - - - -

20        BY MR. SCHAFLER:

21        Q.      D-56 is a letter dated January 15,

22        1996 which attaches a letter dated January 3,

23        1996 from someone from the New York Insurance

24        Department.

25        A.      Yes.

1          Q.          Is this the time that the

2     Insurance Department State of New York required

3     the American Club to appoint an actuary to

4     provide an opinion on loss reserves?

5          A.          I think the requirement to have an

6     actuarial certification of loss reserves every

7     year was created before 1996.  I think it was.

8     But we were required to reappoint the actuary

9     every year.  I think that was a State

10    requirement.  So somewhere in the minutes every

11    year you'll see a resolution that Deloitte

12    Touche is appointed for the year commencing

13    January 1st or February 20th, whatever.

14               This is probably a standard letter

15    that the State would send out.  The State had

16    certain pro forma tests that they would use to

17    evaluate a company's status.  And once they fed

18    our annual report into their scenario, there

19    were, I don't know, I think 13 -- it's just my

20    recollection.  There were 13 points that the

21    State uses, 13 areas.  And if you failed three

22    or four of them, you might get a letter from

23    the State.

24               And the Club routinely failed a

25    lot of the tests because of the nature of the

5/3/2005 McGowan, Thomas - Vol 2

```
1           Club.  We automatically failed tests.  An
2           insurance company fails a test if their premium
3           income goes up too much in one year, but as a
4           percentage.  And if the percentage is simply
5           the test, then the Club might fail to meet that
6           test when we're responding to the State's
7           demands that we get more money from the
8           members.  So we get more money from the members
9           and we fail the test because we're growing too
10          fast.
11                  And all these tests are warnings
12          maybe something's going wrong with this
13          company, because a typical sign of danger to an
14          insurance company is whether their premiums
15          written goes way up.  You know they're getting
16          desperate for revenue, for premium.  So that's
17          a flag to a regulator.  And that's what he's
18          saying.  You know, there's a couple of tests
19          that we failed.
20              Q.      But, in any event, Deloitte Touche
21          provided an opinion on the adequacy of the
22          American Club's loss reserves --
23              A.      Yes, certainly.
24              Q.      -- each year from 1995?
25              A.      At least from '96.  As I say, I
```

5/3/2005 McGowan, Thomas - Vol 2

1       think it may have gone back a little bit before

2       that.

3           Q.      And to the extent that the Club

4       was found to have failed a test, as you say,

5       was corrective action taken?

6           A.      No.  All he's saying is as a

7       consequence, you're required to engage an

8       actuary to render an opinion on the adequacy of

9       loss and the LAE to be reported in '95 annual

10      statement, which I think as a matter of course

11      we did.  This could be the first time.  I don't

12      really remember.  I sort of thought it was

13      before '96 or '95 that we started using

14      actuaries.

15              But he's not telling us to do

16      anything other than hire an actuary.

17          Q.      And the Club did that?

18          A.      Yes.

19          Q.      And the actuary provided an

20      opinion that the reserves of the Club were

21      adequate?

22          A.      I don't know what their opinion

23      said.  You'd have to look at it.

24          Q.      Do you have a recollection of the

25      actuary advising the Club that its reserves

5/3/2005  McGowan, Thomas - Vol 2

```
 1        were not sufficient at any point in time?

 2             A.      I don't have a recollection of

 3        that ever happening.  All the actual reports

 4        are there.  They're part of the record.

 5                    Thinking about it, we usually

 6        passed muster with actuaries, because actuaries

 7        always work in ranges and sometimes they're

 8        wide ranges.

 9                    - - - - - -

10                    (Defendants' Exhibit 57 marked.)

11                    - - -   - - -

12        BY MR. SCHAFLER:

13             Q.      Okay.  Question with respect to

14        D-57 is:  Can you identify the handwriting?

15             A.      I don't have a clue.  I have no

16        idea what this is.

17             Q.      All right.  My only question on

18        that document.

19             A.      Okay.

20             Q.      Mr. McGowan, whenever you're

21        ready, I would like to direct your attention to

22        one of the previously marked exhibits.  It's in

23        that notebook.  Exhibit 13, which is a

24        memorandum involving the contingency fund.

25             A.      Okay.
```

# EXHIBIT 6

**American Steamship Owners Mutual Protection and Indemnity Association, Inc.**



Shipowners Claims Bureau, Inc., Manager
Five Hanover Square – 20th Floor
New York, New York 10004-2698
Main: (212) 269-2350 (or 908-2400)
Fax: (212) 825-1391
Telex: 222091
Direct: (212) 908-_____

January 15, 1996

Mr. Eugene Bienskie
Supervising Insurance Examiner,
Financial Condition/Property
Casualty Bureau
State of New York Insurance Department
160 West Broadway
New York, NY 10013-3393

Re:    Section 4117(g); New York Insurance Law

Dear Mr. Bienskie:

Reference is made to your letter dated January 3, 1996 regarding the requirement under Section 4117(g).

We confirm we have appointed Deloitte & Touche, L.L.P. to provide an opinion on the adequacy of loss reserves as of December 31, 1995.

Very truly yours,

*Shipowners Claims Bureau, Inc.,* MANAGER

Thomas J. McGowan
President

cc:    J.P. Sandercock - SCB
       V.J. Solarino - SCB

VAPS TJM\NYSIDGEN.ERL

5/3/05 /W/
Exhibit
D-56

CONFIDENTIAL

AC0079287



**STATE OF NEW YORK**
**INSURANCE DEPARTMENT**
**160 WEST BROADWAY**
**NEW YORK, NEW YORK 10013**

GEORGE E. PATAKI
Governor

EDWARD J. MUHL
Superintendent of Insurance

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

January 3, 1996

Mr. Thomas J. McGowan, Secretary
American Steamship Owners Mutual
Protection & Indemnity Association, Inc.
5 Hanover Square
N.Y.C. N.Y. 10004

RE: <u>Section 4117(g): New York Insurance Law</u>

Dear Mr. McGowan:

Pursuant to Section 4117(g) of the New York Insurance Law, the Company has been identified as having failed at least two of the loss reserve tests set forth therein, by being outside the acceptable range established by the statute. As a consequence, the company will be required to engage a qualified independent loss reserve specialist to render an opinion as to the adequacy of the Company's loss and loss adjustment expense reserves to be reported in its 1995 Annual Statement.

Accordingly, kindly take the necessary steps to comply with the statutory requirements of Section 4117(g) and confirm management's intention to do so.

Very truly yours,

*Eugene Bienskie pu SL*

Eugene Bienskie
Supervising Insurance Examiner
Financial Condition/Property
Casualty Bureau

EB:nd

CONFIDENTIAL

AC0079288

# EXHIBIT 7

# Deloitte & Touche

▲

**Deloitte & Touche LLP**
Two World Financial Center
New York, New York 10281-1414

Telephone: (212) 436-2000
Facsimile: (212) 436-5000

To the Board of Directors

American Steamship Owners Mutual Protection and
  and Indemnity Association, Inc.
5 Hanover Square
New York, New York  10004

We have audited, in accordance with generally accepted auditing standards, the statutory financial statements of American Steamship Owners Mutual Protection and Indemnity Association ("ASOMPIA" or "the Association") for the years ended December 31, 1999 and 1998, and have issued our report thereon dated March 24, 2000.  In connection therewith, we advise you as follows:

a.  We are independent certified public accountants with respect to the Association and conform to the standards of the accounting profession as contained in the Code of Professional Conduct and pronouncements of the American Institute of Certified Public Accountants, and the Rules of Professional Conduct of the New York State Board Education Department.

b.  The engagement partner, Richard Meyerowich and engagement manager, Edward Nosenzo, who are certified public accountants, have 30 years and 6 years, respectively, of experience in public accounting and are experienced in auditing insurance enterprises.  Members of the engagement team, most of whom have had experience in auditing insurance enterprises and 60 percent of whom are certified public accountants, were assigned to perform tasks commensurate with their training and experience.

c.  We understand that the Association intends to file its audited statutory financial statements and our report thereon with the Insurance Department of the state of New York and other state insurance departments in states in which the Association is licensed and that the insurance commissioners of those states will be relying on that information in monitoring and regulating the statutory financial condition of the Association.

While we understand that an objective of issuing a report on the statutory financial statements is to satisfy regulatory requirements, our audit was not planned to satisfy all objectives or responsibilities of insurance regulators.  In this context, the Association and insurance commissioners should understand that the objective of an audit of statutory financial statements in accordance with generally accepted auditing standards is to form an opinion and issue a report on whether the statutory financial statements present fairly, in all material respects, the admitted assets, liabilities, and capital and surplus, results of operations and cash flows in conformity with accounting practices prescribed or permitted by the Insurance Department of the state of New York.  Consequently, under generally accepted auditing standards, we have the responsibility, within the inherent limitations of the auditing process, to plan and perform our audit to obtain reasonable assurance about whether the statutory financial statements are free of material misstatement, whether caused by error or fraud, and to exercise due professional care in the conduct of the audit.  The concept of selective testing of the data being audited, which involves judgment both as to the number of transactions to be audited and the areas to be tested, has been

**Deloitte Touche
Tohmatsu**

CONFIDENTIAL

AC0048234

generally accepted as valid and sufficient basis for an auditor to express an opinion on financial statements. Audit procedures that are effective for detecting errors, if they exist, may be ineffective for detecting misstatements resulting from fraud. Because of the characteristics of fraud, particularly those involving concealment and falsified documentation (including forgery), a properly planned and performed audit may not detect a material misstatement resulting from fraud. In addition, an audit does not address the possibility that material misstatements may occur in the future. Also, our use of professional judgment and the assessment of materiality for the purpose of our audit mean that matters may exist that would have been assessed differently by insurance commissioners.

It is the responsibility of the management of the Association to adopt sound accounting policies, to maintain an adequate and effective system of accounts, and to establish and maintain internal control that will, among other things, provide reasonable, but not absolute, assurance that assets are safeguarded against loss from unauthorized use or disposition and that transactions are executed in accordance with management's authorization and are recorded properly to permit the preparation of financial statements in conformity with accounting practices prescribed or permitted by the Insurance Department of the state of New York.

The Insurance Superintendent should exercise due diligence to obtain whatever other information that may be necessary for the purpose of monitoring and regulating the statutory financial position of insurers and should not rely solely on the independent auditors' report.

d.    We will retain the working papers prepared in the conduct of our audit until the Insurance Department of the state of New York has filed a Report of Examination covering 1999, but no longer than seven years. After notification to the Association, we will make the working papers available for review by the Insurance Department of the state of New York, at the offices of the insurer, at our offices, at the Insurance Department of the state of New York, or at any other reasonable place designated by the Insurance Superintendent. Furthermore, in the conduct of the aforementioned periodic review by the Insurance Department of the state of New York photocopies of pertinent audit working papers may be made (under the control of Deloitte & Touche LLP) and such copies may be retained by the Insurance Department of the state of New York.

e.    The engagement partner has served in this capacity with respect to the Association since 1994, is licensed by the New York State Education Department, and is a member in good standing of the American Institute of Certified Public Accountants.

f.    To the best of our knowledge and belief, we are in compliance with the requirements of section 7 of the NAIC's Model Rule (Regulation) Requiring Annual Audited Financial Reports regarding qualifications of independent certified public accountants.

This letter is intended solely for information and use of the board of directors and management of GHI Insurance Association and for filing with the Insurance Department of the state of New York and other state insurance departments to whose jurisdiction the Association is subject and is not intended to be and should not be used by anyone other than these specified parties.

*Deloitte & Touche LLP*

March 24, 2000

AC0048235

# EXHIBIT 8

# Deloitte.

Deloitte Consulting LLP
25 Broadway
New York, NY 10004-1010
USA

Tel: +1 212 618 4000
www.deloitte.com

April 6, 2005

## Statement of Actuarial Opinion

*American Steamship Owners Mutual Protection and Indemnity Association, Inc.*

### Identification

I, Marc B. Pearl, am a Director with the firm of Deloitte Consulting LLP. I am a Member of the American Academy of Actuaries and meet its qualification standards for rendering this Statement of Actuarial Opinion, and I am a Fellow of the Casualty Actuarial Society. I was originally appointed by the Board of Directors of American Steamship Owners Mutual Protection and Indemnity Association, Inc. (the Company) on November 12, 1998 to render this opinion.

### Scope

I have examined the reserves listed in Exhibit A, as shown in the Annual Statement of the Company as prepared for filing with state regulatory officials, as of December 31, 2004. The loss and loss adjustment expense reserves specified in Exhibit A, on which I am expressing an opinion, reflect the Loss Reserve Disclosure items (3 through 8) listed in Exhibit B.

In forming my opinion on the loss and loss adjustment expense reserves, I relied upon data prepared by Steve Ogullukian, Staff Accountant for the Company. I evaluated that data for reasonableness and consistency. I also reconciled that data to Schedule P - Part 1 of the Company's current Annual Statement. In other respects, my examination included the use of such actuarial assumptions and methods and such tests of the calculations as I considered necessary.

My review was limited to items listed in Exhibit A, and did not include an analysis of any other balance sheet items. I have not examined the assets of the Company and I have formed no opinion as to the validity or value of these assets. My opinion on the reserves is based upon the assumption that all reserves are backed by valid assets, which have suitably scheduled maturities and/or adequate liquidity to meet the cash flow requirements.

Member of
Deloitte Touche Tohmatsu

American Steamship Owners Mutual Protection and Indemnity Association, Inc.
April 6, 2005
Page 2

## Opinion

In my opinion, the amounts carried in Exhibit A on account of the items identified:

    (1) meet the requirements of the insurance laws of New York;

    (2) are consistent with reserves computed in accordance with accepted loss reserving standards and principles; and

    (3) make a reasonable provision for all unpaid loss and loss expense obligations of the Company under the terms of its contracts and agreements.

## Relevant Comments

### A. Risk of Material Adverse Deviation

The Company is exposed to the uncertainty of variability of reserves which could result in material adverse deviation.

    (a) With respect to this Statement of Actuarial Opinion, the amount of adverse deviation that I consider to be material is $7,598,222. My basis for determining this amount is 20% of surplus which is an amount that would represent a reasonable upward fluctuation in reserves from those carried by the Company that would be material. My selection of materiality standard was driven by the fact that this opinion is for regulatory purposes. Other measures of materiality might be used for reserves that are being evaluated in a different context.

    (b) Because of the size of the Company's loss and loss adjustment expense reserves relative to its surplus, there is more than a remote possibility that adverse fluctuations of actual versus expected liabilities will be material. For this reason I believe there are risks and uncertainties that could result in material adverse deviation in the loss and loss adjustment expense reserves.

    (c) The major factors underlying the risks and uncertainties which could result in material adverse deviation are as described below. These include but are not necessarily limited to:

        • The nature of the coverage underwritten. Cover provided by the Company is for loss, damage, or expense arising out of the operation of any vessel in use in ocean or inland waterways, including liability for personal injury and property damage. The Company's business is from American members where most claims concern injury to persons employed by the shipowners as crew members, and overseas members where most claims are due to damage to cargo carried on their vessels which tend to settle faster than injury claims.

CONFIDENTIAL

DT 003609

American Steamship Owners Mutual Protection and Indemnity Association, Inc.
April 6, 2005
Page 3

- The Company does not record a separate reserve for Adjusting and Other Expenses for processing claims after the annual report date. The Company pays a fee to Shipowners Claims Bureau (SCB) to handle the administrative, underwriting and claims processing functions of the Club based on policy year premiums written, to continue the processing of claims beyond year-end. The Company and SCB have had discussions with the New York State Insurance Department in the past on this subject and the Company's practice was not found unacceptable in previous state examinations. My opinion is consistent with the manner in which the Company records their reserve for Adjusting and Other Expenses.
- The Company has informed me that they operate on a not for profit basis for the benefit of its mutual policyholder members. All policyholders are subject to liability for assessments to cure deficits in policy years as needed.
- The Company may have additional risk associated with asbestos exposures which are described under (B) below.
- In the past two years, the Company has implemented a new claims system, and introduced aggregate deductibles which add uncertainty to our reserve estimates.

## B. Other Disclosures in Exhibit B

### Discounting

I have evaluated the loss and loss adjustment expense reserves gross of any discount. The Company does not discount its liability for loss and loss adjustment expense reserves explicitly on Page 3 - Liabilities. However, the Company, with the permission of the New York Insurance Department, records on its Balance Sheet a write-in asset entitled "Future Assessments Up to Difference between Ultimate & Present Value of Losses" which reflects the time value of money. The amount shown on the Balance Sheet reflects Company based payout patterns and an interest rate of 4.55%. This interest rate reflects the investment rate implied by the IRIS Investment Yield Test adjusted for realized and unrealized capital gains and losses and direct investment expenses. This rate is below the future rate of return provided by the Company's investment advisors, Deutsche Bank.

### Underwriting Pools or Associations

Management has informed me that the Company does not participate in any pools or associations except for its participation in the reinsurance program of the International Group of P&I Clubs. Company practice is to accrue for its portion of associated liabilities, which includes a provision for IBNR, and is reported as funds held under reinsurance treaties. Aggregate liabilities for such pools are $8.9 million as of December 31, 2004. I have not independently evaluated these liabilities. Therefore, the scope of my opinion does not include these liabilities.

DT 003610

American Steamship Owners Mutual Protection and Indemnity Association, Inc.
April 6, 2005
Page 4

**Asbestos Exposures and Environmental Exposures**

As of December 31, 2004, the Company has net reserves for asbestos claims as indicated in the Notes to Financial Statements of $2.818 million. On May 25, 2004, the Company's Board of Directors resolved to terminate the prior discretionary practice of paying claims on closed policy years prior to February 20, 1989. The Company has advised me that the only payments they expect to make as a result of this resolution are for related legal expenses. Our opinion reflects this impact, and includes a reduction in ultimate losses of $3,000,000 for policy years prior to 1989 to reflect that. The major portion of this reduction is for the asbestos losses referenced above.

With respect to environmental liability, the Company's only exposure arises out of sudden and accidental pollution caused by the escape of polluting substances (primarily oil) from oceangoing or inland river vessels which are capable of navigation.

**Disclosure of Items for Unearned Premium Reserves for Long Duration Contracts**

The Company does not write single or fixed premium policies with coverage periods of thirteen months or greater which are non-cancelable and not subject to premium increase.

**C. Reinsurance**

**Reinsurance Collectibility**

Substantially all of the ceded reserves are with either Lloyds of London or unauthorized reinsurers. With respect to unauthorized reinsurers, the Company has computed a Schedule F penalty in accordance with the accounting practices prescribed or permitted by the State of New York.

Management of the Company has informed me that they are aware of certain situations that may lead to uncollectible reinsurance and has made provisions for all amounts unsecured by letters of credit. With respect to loss and loss adjustment expense reserves net of reinsurance, I have not anticipated any contingent liability which would arise if any of the reinsurers prove unable to meet their loss and loss adjustment expense obligations under terms and conditions of their contracts with the Company.

**Retroactive Reinsurance, Financial Reinsurance**
Based on discussions with Company management and its description of the Company's ceded (and/or assumed) reinsurance, I am not aware of any reinsurance contract that either has been or should have been accounted for as retroactive reinsurance or financial reinsurance.

American Steamship Owners Mutual Protection and Indemnity Association, Inc.
April 6, 2005
Page 5

### D. NAIC IRIS Tests

I have reviewed the results of the NAIC IRIS Tests: One Year Reserve Development to Surplus, Two Year Reserve Development to Surplus and Estimated Current Reserve Deficiency to Surplus, as calculated by the Company's management. Exceptional values were calculated for all three tests.

The One Year Reserve Development Test was affected by additional losses for the 2003 policy year that occurred between December 31, 2003 and February 20, 2004 which distorts the test result by showing up as unfavorable emergence on Schedule P. This accounts for approximately forty one percent of the total one year development with the remainder coming from 2003 and prior loss emergence. The Two Year Reserve Development Test is also impacted by a similar distortion noted above as it affects the 2002 policy year.

The Estimated Current Reserve to Surplus Test result was also impacted by the loss emergence noted previously, and increased pricing levels on new and renewal business which caused the change in earned premiums to be greater than the underlying exposure increase. In addition there was a significant assessment to the Company's policyholders in 2004, to address the deficiencies for the open policy years 2002 and prior, which increased premiums in the year contributing to the exceptional value.

As mentioned in the Risk of Adverse Material Deviation section above, the Company has informed me that they operate on a not for profit basis for the benefit of its mutual policyholder members. All policyholders are subject to liability for assessments to cure deficits in policy years as needed.

### E. September 11, 2001 Terrorist Attack Losses

I reviewed the Company's exposures to terrorist attack losses. No claims have been presented to date. The risk of significant liabilities as of December 31, 2004 arising from terrorist attack losses is remote, given the nature of the coverages provided by the Company and prevailing coverage interpretations.

### F. General Uncertainty

In evaluating whether the reserves make a reasonable provision for unpaid losses and loss adjustment expense, it is necessary to project future loss and loss adjustment expense payments. It is certain that actual future losses and loss adjustment expenses will not develop exactly as projected and may, in fact, vary significantly from the projections. No warranty is expressed or implied that such variance will not occur. Further, my projections make no provision for the broadening of coverage by legislative action or judicial interpretation or for extraordinary future emergence of new classes of losses or types of losses not sufficiently represented in the Company's historical data base or which are not yet quantifiable.

The terrorist attacks of September 11, 2001 give rise to a unique insurance event. Many details of the insurance and reinsurance claims will take years to resolve, and there is a complex web of

American Steamship Owners Mutual Protection and Indemnity Association, Inc.
April 6, 2005
Page 6

legal issues which are continuing to evolve. At this point in time, there is still considerable uncertainty in predicting the eventual outcome of these events for the insurance market in general as well as for any particular insurer or reinsurer specifically.

**Actuarial Report**

An actuarial report and underlying actuarial workpapers supporting the findings expressed in this Statement of Actuarial Opinion will be provided to the Company to be retained for a period of seven years in the administrative offices of the Company and available for regulatory examination.

This Opinion is provided for regulatory purposes only and is not intended for any other purpose.

Marc B. Pearl, FCAS, MAAA
Deloitte Consulting LLP
25 Broadway
New York, NY 10004-1010
(212) 618-4565
April 6, 2005