UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AMERICAN STEAMSHIP OWNERS MUTUAL
PROTECTION AND INDEMNITY
ASSOCIATION, INC.,

Plaintiff,

- v -

ALCOA STEAMSHIP CO., INC., *et al*

Defendants.



No. 04 Civ. 04309 (LAK)(JCF)

(ECF Case)

## AMENDED JOINT PRETRIAL ORDER

The parties having conferred among themselves and with the Court pursuant to Fed. R. Civ. P. 16, the following statements, directions and agreements are adopted as the Amended Pretrial Order herein.

### I. NATURE OF THE CASE

Plaintiff, the American Steamship Owners Mutual Protection and Indemnity Association, Inc., (the "American Club" or "Club") filed this declaratory judgment action on June 7, 2004. In its first cause of action the American Club seeks declaratory relief that it was entitled to terminate making indemnity payments to defendants for their payment of certain occupational disease claims ("ODCs"). In its second cause of action, the American Club seeks declaratory relief that, should it be required to indemnify the defendants regarding the ODCs, it should have the right to levy assessments against defendants for the costs of such indemnities. In its third cause of action, the American Club seeks declaratory relief that, if defendants are entitled to indemnification for the

ODCs, then with respect to each claim, the Club has the right to continue allocating the amount of each indemnity claim over each year of alleged exposure, and applying the member's deductible in each such year in calculating the indemnity.

Defendants' counterclaims, among other things, seek declaratory relief that the Club is obligated to provide insurance coverage to defendants regarding their payments of the aforementioned ODCs. Defendants also assert that the Club is not permitted to levy assessments against defendants in connection with the aforementioned ODCs. Further, defendants assert that in calculating the indemnities, the Club may only allocate a single policy year's deductible for any one claim. In addition, certain defendants seek to have indemnity claims regarding ODCs previously paid to them by the Club on the basis of the Club's application of multiple deductibles recalculated on the basis of a single deductible and a refund of the difference.

The American Club and the defendants deny each other's right to the relief requested and raise defenses thereto; and the parties each seek certain damages including their legal fees and their costs of this action.

## II.    JURY/NON-JURY

This is a case within the Court's admiralty and maritime jurisdiction, and, accordingly, the parties are not entitled to a trial by jury. The parties estimate that, assuming all witnesses identified below are cross-examined, trial of this matter will take five (5) to ten (10) trial days.

## III.    STIPULATED FACTS

2

1.    The American Club is a non-profit mutual indemnity insurance association of ship owners organized and existing under the laws of New York State with its principal place of business in New York City.

2.    The defendants, which are merchant vessel owners and/or operators, or successors thereto, were members of the Club in various years prior to February 20, 1989.

3.    The American Club is licensed and regulated by the Insurance Department of the State of New York and must comply with all relevant provisions of New York law, including, without limitation, Insurance Law Sections 1211 and 4111.

4.    The insurance policy attached hereto as Exhibit 1 is representative of all of the policies issued by the American Club to its members in the period between about 1940 and February 20, 1988.

5.    Until 1972, the Club's insurance policies were issued for a calendar year or part thereof. In 1972 and thereafter, the policy years commenced at 1201 GMT on February 20th, running to 1200 GMT February 20th the following year (the "Insurance Year" or "Policy Year").

## IV.    PARTIES' CONTENTIONS

The pleading are deemed amended to embrace the following, and only the following, contentions of the parties:

3

## I    Contentions of Plaintiff

A.    Preliminary Statement

The central issue in this case is whether the defendants are entitled to mutual indemnity insurance from the American Club for which they never paid.

This dispute arose because seamen and others who worked on or about defendants' merchant ships between the 1940s and 1980s very belatedly asserted that they were exposed to asbestos and other hazardous substances on defendants' ships in those years. These claims were unknown until asserted long after the Club's accounts for those insurance years, each of which was kept separate, were "closed" without the members of those years having been assessed for such claims (the "Closed Year ODCs"). As the American Club will show at trial, upon the "closing" of an insurance year, the Club issued a "final" assessment with respect to only those claims for which it was "practicable to estimate with a reasonable degree of certainty" – *i.e.*, only claims that, unlike Closed Year ODCs, were reported and reserved for at the time of closing. As a result, either the mutual indemnity insurance policies in issue are not effective to require the Club to pay any indemnities to defendants regarding Closed Year ODCs, or if indemnities are to be paid, the defendants must be assessed to provide all funds with which to do so, as they agreed to when they entered into the contract.

Defendants' arguments that the American Club "breached" its contracts ignore the unique nature of the mutual indemnity insurance provided by the American Club,

particularly defendants' express obligation to pay "assessments without limit of amount" to the American Club to provide its members (the defendants) with the very same mutual indemnity insurance they seek.

Defendants' contention that the Club must indemnify them regarding Closed Year ODCs because the Club previously and, for a period of time, provided such indemnities, ignores the fact that the practice of paying Closed Year ODCs was discretionary, in that they were not provided for under the applicable insurance policies or the Club's by-laws, and were started at a time when defendants acting through their senior executives and equity owners then serving as Club directors, controlled the Club, and they initiated the practice for their own economic benefit. In other words, defendants seek to take advantage of actions of their own senior executives which were *ultra vires*, arbitrary and made in bad faith as to the Club.

The applicable insurance policies and by-laws further rule out defendants' claim that the American Club has no right to assess defendants to pay indemnities regarding the Closed Year ODCs. Defendants seek to transform fully assessable mutual indemnity insurance policies into unlimited liability policies, the cost of which defendants seek to shift to the Club's current and future members without their consent.

Defendants were never exempted from their agreed assessment obligations and the Club's current and future members never agreed to bear any responsibility for defendants' liabilities. As outlined in the Club's Second Amended Complaint and Master

Reply to Counter Claims, this action was filed to protect the Club's current and future members from the inequitable effects of the self-serving actions of defendant's own senior executives when they were running the American Club.

B.    Contentions

1.    This is an admiralty and maritime case within the meaning of Rule 9 (h) of the Federal Rules of Civil Procedure, as the case concerns the interpretation of marine insurance contracts. The Court has jurisdiction pursuant to 28 U.S.C. § 1333. Venue is proper in the Southern District of New York.

2.    Plaintiff, the American Steamship Owners Mutual Protection and Indemnity Association, Inc., (the "American Club" or "Club"), is a mutual indemnity insurance association of shipowners that exists to provide mutual marine indemnity insurance to its members at cost.

3.    The American Club is incorporated in New York, its principle office is in New York and of the applicable policies were issued in New York, and are governed by New York law.

4.    The defendants, which are shipowners and operators and/or their successors in interest, were members of the Club in various years before February 20, 1989.

5.    Contrary to the approach of commercial insurers, the American Club's mutual members do not simply "buy" insurance from the Club as defendants pretend. Rather, the Club's mutual members each year agree to pay not only premiums but

assessments without limit of amount.    The premiums and assessments the members pay to the Club are the sole source of funds to pay the mutual indemnity insurance claims of the Club's members at cost.

6.    The Club's members are, for all practical purposes, insurers as well as insureds. Each member's right to indemnity payments from the Club is contingent upon each member also paying his proportionate share of all premiums and assessments required each year to pay all indemnities to the members of that year, and the expenses of operating the Club that year.

7.    The Club's membership each year is different as is each member's proportionate share of assessments.

8.    The Club's members operate the Club through the directors they elect each year.

9.    Under the Club's insurance policies, each member agrees promptly to report each claim asserted against it for which indemnity might be sought. The Club thereupon establishes a reserve for each such claim, making assessments on all of that year's members to provide sufficient funds with which to pay an indemnity for each reported claim after it is resolved.

10.    The accounts of each year, which were kept totally separate for assessment purposes, were kept open, at times up to 10 to 11 years until the Club and its members believed that all claims against all members each year had been reported and reserved for.

11.    At a time when the Club's manager could estimate "with a reasonable degree of certainty the minimum probable or final surplus or deficiency resulting from all of the Club's insurances in effect for the year", the accounts for that year were "closed" and were "zeroed out".

12.    At each closing, all income and expenses regarding each year were tallied and, at least until 1988, with the closing of the 1977 insurance year, the only reserves retained by the Club were for reported claims which had not yet been resolved (the "pending" claims) with respect to which there was sufficient information that the claims' likely costs could be and were estimated with a reasonable degree of certainty. Until 1988 nothing was reserved for the possibility that after the accounts for a year were closed, additional claims might be asserted against that insurance year's members.

13.    Upon closing, if the statement of account showed a deficiency, the Club's directors levied a "final" assessment on the members of that year sufficient to bring the account balance to zero. On the other hand, if the statement of account showed a "surplus", the directors ordered a "final" refund of that surplus, again, to bring the account balance to zero.

14.    Over the years, because the Club was required to refund to the members all surplus caused by assessments, the members of the pre-1989 years, received over $31 million in refunds. However, that approach prevented the Club from building up large reserves.

8

15.     After insurance years were closed, if any claim that was reported and pending at the time a year was closed was ultimately settled for more than the amount reserved, in the absence of fraud and mutual mistake regarding the facts of that claim, the Club could not further assess the members of that year regarding such claim, but would be required to pay the excess from its general reserves.

16.     Conversely, if a claim that had been reported and reserved for was ultimately settled for less than the amount reserved, the Club had no obligation to refund such excess to the members of that year, and the excess, if any, was retained in the Club's general reserves.

17.     All funds in the Club's reserve account, including those that may represent the occasional excess regarding pending claims, are the Club's property and are not the property of the members of any year.

18.     If a member has reported a claim while a year is open and reserves are established for such a claim, that member has a legal right to an indemnity from the Club regarding that claim. But if a claim is not reported and reserved for prior to closing the accounts of a year, the Club cannot have any liability to the member or anyone else regarding any such claim.

19.     All uses of all funds in the Club's reserve account are discretionary as no member has any legal right to any part thereof, except with respect to claims that have been reported while a year was open and properly reserved for.

20.     Under the Club's By-Laws, a primary duty of the directors is to ensure that sufficient funds are collected by way of premiums and assessments on each year's members to provide indemnities to those members regarding all claims asserted against them.

21.     Under the Club's By-Laws, it is also a duty of the directors to ensure that only proper claims are paid.

22.     The pre-1989 members of the Club were never exempted or excused from their assessment obligations and no member of any other year has ever consented to be assessed for claims asserted with respect to closed pre-1989 years which claims had not been reported and reserved for before those years' account were closed.

23.     In the early 1980s, members of the Club in the 1940s, 1950s, and 1960s, began receiving claims from seamen and others who had worked on or about their ships in those years asserting Closed Year ODCs relating to exposures to asbestos on the closed year members' vessels in those years.

24.     If those claims had been reported while those years were open, those members would have been assessed to provide all funds with which to pay all indemnities regarding the Closed Year ODCs.

25.     None of those claims were reported while the accounts for those years were open and thus: (i)  no assessments were made on those members, (ii) no reserves were established to pay indemnities regarding those claims at the time the accounts for those

years were closed and "zeroed" out. Instead, large refunds were mistakenly paid to those same members as "surplus."

26.     Additionally the premiums negotiated between the Club and defendants, which were based on the members' loss records, did not reflect the cost of Closed Year ODCs. This is because premiums were based on a member's losses and indemnities paid by the Club only within the period five (5) years prior to the insurance year for which premiums were being negotiated (referred to as a member's "five-year loss record"), and the Closed Year ODCs at issue arose well prior to that five-year period.

27.     In the early 1980s, in the belief that these claims were a "trickle" of small claims, a practice developed of indemnifying the closed years members with regard to those belatedly asserted Closed Year ODCs. As the Club had no legal obligation to indemnify members for such claims, any payment thereof was discretionary (the "Discretionary Practice").

28.     The indemnities were based upon allocating the members' requested indemnities over the years of alleged exposure on the members' vessels, based on the number of days of sea service on each vessel each year and the member's chosen deductibles were applied for each such year.

29.     Neither the Club's Manager, nor the members of the Boards of Directors in those years either consulted with the Clubs counsel as to whether the Club had any

11

obligation to pay the Closed Year ODCs, and the matter was not brought before the

Board for any discussion and no resolutions were discussed or passed on that subject.

30.    In fact, as the directors at the time knew or should have known, the Club

had no obligation whatsoever to indemnify any member regarding any claim that was not

reported and properly reserved for while the insurance years in question were open, and

the Club had no legal obligation to utilize the Club's modest reserves for that purpose. In

this regard, the claims in question were primarily those of the companies whose senior

executives were also Club directors in the 1980s, and those directors frequently held an

equity interest in those member companies.

31.    It was not in the financial interest of either those directors or their

companies to challenge the Discretionary Practice, and they did not do so. In effect, the

closed year members received indemnity insurance for which they never paid and to

which they were not legally entitled, all of which benefited the companies that employed

those directors, but prejudiced the Club and its future members.

32.    The decisions or lack of decisions by the directors in the 1980s in failing to

address the Discretionary Practice were *ultra vires*, arbitrary and not made in good faith.

33.    In 1988, with the closing of the 1977 year, the Club's manager, as a matter

of prudence, proposed to the then directors, that a reserve be established to provide funds

with which to pay indemnities to the 1977 year's members in the future, should Closed

Year ODC claims be asserted against that year's members in the future.

12

34.     The credit balance for the 1977 year was then over $1.5 million and the Club's manager made three proposal to the then directors:

>      Reserve the entire credit balance of more than $1.5 million;
>      Reserve approximately half of the credit balance or $750,000.00; or
>      Reserve the credit balance up to, but not exceeding, $250,000.

35.     Initially, the then directors refused to set any reserve for future occupational disease claims against the members of 1977 and later years.

36.     The manager consulted with several prominent attorneys who were representing the defendants in connection with the asbestos claims. One of them, who was counsel for defendants in extensive asbestos litigation in Cleveland, opined that even $250,000 "could be low".

37.     As a compromise, the then-directors agreed to set aside only $100,000 toward future closed year ODCs that might be asserted against the 1977 year's members.

38.     As was predicted in 1988, the reserve of only $100,000 per year has turned out to be insufficient to cover all ODC claims arising in the 1977 and later insurance years.

39.     The $100,000 "reserve" was not the product of an estimate made "with a reasonable degree of certainty" as required by the Club's By-Laws. There were no studies made to support that number. Defendants' representatives admit that at that time, they knew nothing about when, in the future, Closed Year ODCs would be asserted

against the members of the 1977 and later years, the type of claims, the number of claims, or the quantum of each claim or the aggregate of all such claims.

40.    Setting a nominal reserve was very different from the procedure involving setting a reserve for each "pending claim" when the accounts of a year were closed. In that case, all necessary information was available on which to set a proper reserve, including the name of each claimant, the date and type of his injury, medical reports, experts' reports, lawyers' reports, and estimates as to all damages in each individual case, including loss of income, pain and suffering, etc. on which an estimate of cost could be based with a reasonable degree of certainty.

41.    The $100,000 "reserve", which defendants' representatives concede was "nominal", was not based on any actuarial or other reliable data or calculations, it was arbitrary, not made in good faith, *ultra vires* and is not binding on the Club's current and future members.

42.    Indeed, the defendants were taking a substantial risk that the nominal amount the directors they employed reserved might prove inadequate (which is now the case). In so doing, the members of the 1977 year, enabled themselves to receive a refund from that year's credit balance of over $1.4 million, after deducting $100,000 for the arbitrary reserve.

43.    There is simply no justification for burdening the Club's current or future members, who received no benefit from defendants' gamble, with the huge costs of

14

providing indemnity insurance to the defendants sufficient to cover an unlimited number of their unknown future claims of unlimited unknown value, as defendants' demand. In essence, defendants argue that each closing somehow transformed each mutual indemnity insurance policy, under which the members agreed to provide all of the necessary funds to pay all indemnities, into unlimited liability insurance policies the costs of which must be borne by the Club's future members. A reserve of nothing or a reserve of a mere $100,000 per year provided by defendants simply does not justify defendants' demand. At most, the members of the 1977 and 1979-1988 years purchased $100,000 per year of indemnity insurance which, to date, has been expended by the Club on defendants' Closed Year ODCs for the 1977 and later years. In total, while the Discretionary Practice was in effect, the defendants received over $6.7 million in indemnity insurance. During the same time, at $100,000 per year, defendants contributed only $1.1 million to the Club for the 1977 and 1979-1988 years. In other words, up to the termination of the Discretionary Practice in May 2004, the defendants received over $5.6 million in indemnity insurance for which they never paid.

44.     In June 1996, the American Club switched from issuing insurance policies to a Rulebook format. One of the new Rules exempted members of the 1997 and later insurance years from assessments following the close of those insurance years.

45.     In 2004, under pressure from the International Group of P&I Clubs, of which the American Club became a member in 1998, the American Club adopted a new rule effective for the 2005 and future years under which, the 2005 and future Club

members agreed to be responsible for deficiencies arising in closed years from February 20, 1989, forward.

46.    Neither of these Rule changes were made retroactive to cover the pre-1989 years, which are the subject of the disputes in this action.

47.    Defendants' arguments, relying upon contract changes made in 1997 and 2005, on a prospective basis, are irrelevant to the issues in this action.

48.    Defendants also rely on the alleged "practices" of other P&I clubs, but other Club's practices, based upon their unique rules/contracts are irrelevant.

49.    Another new Rule which became effective on February 20, 1997 for that year and future years, was the provision for "Release Calls". A "Release Call" is a payment that may be made by a member leaving the Club at a time when the accounts of one or more years are still "open" for assessment purposes. By paying a "Release Call", set at approximately 25% of the "Advance Call" or initial premium, the member would be released from further assessments with respect to each of those then open years. That Release Call Rule did not purport to have and could not have any effect regarding insurance years before February 20, 1997.

50.    Defendants' arguments suggesting that the Club made various "admissions" and engaged in certain conduct that requires the Court to order the Club to continue providing indemnities for Closed Year ODCs are meritless. All of the alleged "admissions", "representations" and conduct identified by defendants occurred while the

Discretionary Practice was in effect and are based upon the same mistake that caused the Club to commence the Discretionary Practice, which practice was exploited by defendants through the self-serving efforts of their employees who were serving as directors of the Club during the relevant time period.

51.     The issue of whether the American Club had any liability to defendants regarding the unreported, unreserved claims from Closed Year ODCs was reviewed for the first time in 2004, after defendant Keystone Shipping Co. sued the Club seeking further indemnity payments to which Keystone was not entitled. Upon review, the Club's directors in May 2004 determined that the Club did not have and never had any obligation to indemnify defendants regarding the Closed Year ODCs and immediately terminated the Discretionary Practice.

52.     The termination of the Discretionary Practice was appropriate, as the Club never had a legal obligation to pay any such claims from its reserve account, and, as the defendants had never been charged premiums and were never assessed or properly assessed to provide full and proper reserves with respect to the Closed Year ODCs.

53.     In the alternative, if the Club is required to pay indemnities to the defendants regarding the Closed Year ODCs, it seeks the right to now assess the members of each closed year with respect to each ODC claim which may be asserted by the pre 1989 closed year members. If the indemnity insurance policies are effective to require the Club to pay any indemnities to defendants regarding the Closed Year ODCs,

the same policies are effective to require the defendants to pay assessments without limit of amount to provide the funding for those indemnities, just as defendants agreed to do.

54.     The defendants assert that if such assessments are allowed, the Club must "re-open" each of the implicated insurance years back to that date of its closure to determine if the accounts for those years are currently in deficiency or surplus. Such a step is not appropriate. There is no dispute that the only factor missing from the accounting when each pre-1989 year was closed, was the Closed Year ODCs. More specifically, there is no dispute regarding any of the other accounting factors regarding the Club's income or expenses in each of those years or with respect to any of the then "pending claims." The defendants were given all credits deemed appropriate at the time when each of those years were closed, including large refunds based upon the incomplete facts that were known at the time of each closing. Defendants are not entitled to another accounting regarding these known matters. Each closing was a final settlement of accounts regarding the known expenses, and all funds now in its reserve account are the Club's.

55.     The defendants are not entitled to an accounting of the Club's funds, as they have no legal claims to those funds.

56.     Defendants claims are time-barred.

57.     If the Club is required to indemnify the pre-1989 Closed Year members, the Club should be permitted to assess each member of each relevant year with respect to

each currently pending occupational disease claim and those requested in the future. The
Club should be authorized to remit the amount recovered in the assessment process to the
defendant seeking the indemnity, less the Club's reasonable expenses in conducting the
assessments. The Club is not liable for any shortfall, if some of those closed year
members do not pay their shares of the assessments.

58.    In the assessment process, as before, the Club, seeks to allocate each claim
over the years of alleged exposure and apply the members' deductible for each such year
(an allocation defendants refer to as "multiple" or "stacked" deductibles). The Club's
practice is consistent with the terms of each of the policies which repeatedly refer to
"liabilities hereunder," and regarding deductibles repeatedly refers to "claims hereunder."
The term "hereunder" must refer to injuries occurring within each policy period, not
outside of it.

59.    It is improper to attempt, as defendants demand, to "shoehorn" all liability
for injuries that spanned several policy years into any one year of a defendant's choice –
i.e. apply a "single deductible" to claims for injuries spanning multiple policy years.
Such attempt presupposes that an ODC involving a person's alleged exposure to asbestos,
etc. over a number of policy years can be allocated with certainty to any one particular
year. In fact, no one can say with certainty when the injury-producing event or events
occurred, and a reasonable practice, approved by the New York Court of Appeals, is to
allocate the claims over all periods of alleged exposure. The American Club has
followed this approach as to claims asserted against its members. The defendants, who

19

are occasionally sued by seamen along with other shipowners, have also utilized the same approach when they are joined with other shipowners as defendants in suits by seamen, namely allocating the seamen's claims over the entire period of alleged exposure on the different owners' vessels, with each shipowner then bearing his proportionate share of any judgment/settlement.

60.   If the Club is required to pay any indemnities to the pre-1989 members, it should be entitled to continue that part of the Discretionary Practice regarding allocating the claims to the years of employment by sea service days and apply the member's chosen deductible for each such year.

61.   As to the defendants' contentions that they are entitled to recalculations of the indemnity claims previously paid by the Club to them on a "multiple deductible" basis to a "single deductible" basis and the payment of the difference, that relief is not justified. Many of the defendants repeatedly acquiesced in that part of the practice of the Club providing indemnities to members regarding Closed Year ODCs on the basis of allocating each such claim over the years of service and applying a deductible for each such year. Further, given the passage of time, the claims for recalculation are time barred. Other defenses include final settlement, accord and satisfaction, estoppel, and waiver.

62.   The defendants' contention that the Club must continue to provide indemnities to them regarding the Closed Year ODCs are barred by the following:

(a)    Failure of condition precedent, as the defendants have refused to pay their agreed to liability for assessments to provide the necessary funds to the Club to pay those indemnity claims.

(b)    Final settlements of account and mutual releases.

(c)    Failure of consideration in that defendants never paid for the indemnity insurance they seek.

(d)    Mutual mistake in the sense that no one knew that long after the years were closed, the Closed Year ODCs would be asserted.

(e)    Intentional assumption of risk in failure to set aside adequate funds for the 1977 and later years.

(f)    Estoppel, waiver, and failure to state a claim.

(g)    Unjust enrichment.

(h)    The bad faith, arbitrary, and *ultra vires* actions of defendants' executives while they were responsible for operating the American Club.

63.    Nothing done or said by the Club's representatives while the Discretionary Practice was in effect binds the Club or its current and future members, who never consented thereto.

64.    To the extent defendants' allege that plaintiff is bound by anything stated in any alleged "agreement" or "representation" while the Discretionary Practice was in effect, defendants' claims are barred because the actions of directors who allegedly made any such agreements on behalf of the Club's future members were *ultra vires*, arbitrary and made in bad faith;

65.    The defendants' claims are also barred by lack of good faith and fair dealing throughout the 1980s and 1990s.

66.    The defendants' claim that American Club acted in bad faith in terminating the discretionary practice in May 2004 is meritless. The Club acted appropriately to protect its current and future members from the inequitable actions of the directors representing the defendants when those directors controlled the Club in the 1980s and 1990s.

67.    In July 2004, the American Club and defendant Keystone entered into an agreement under which the American Club made an "advance" to Keystone regarding its settlement of Mr. Timothy Farley's Closed Year ODC. The parties agreed that their rights regarding that advance would be decided in this action.

68.    The American Club is entitled to a full refund of the advance it paid to Keystone regarding Mr. Farley's claims.

69.    No defendant was ever released from its obligations to pay assessments for unreported, unreserved for pre-1989 Closed Year ODCs including, without limitation, Union Carbide Corporation.

70.    No current or future Club members ever agreed to be assessed regarding defendants' liabilities arising from occurrences in long closed years and not asserted until after the years were closed.

71.    The American Club denies each and every contention asserted by defendants that are inconsistent with the above or with the allegations in the American

Club's Second Amended Complaint and Master and Supplemental Replies to
Defendants' Counter Claims.

C.    Plaintiff's Statement of Issues to be Tried

This is a contract action in which the defendants assert that the plaintiff has
breached certain contracts with them. Plaintiff filed this action seeking declarations that
it did not breach any contracts with defendants and for declarations of both parties' rights
and obligations under the contracts.

1.    The primary issue is, do the pre-1989 assessable, mutual indemnity
insurance contracts issued by the Club require the American Club to provide mutual
indemnity insurance to its pre-1989 members for which those members never paid?

2.    If those policies require the American Club to provide mutual indemnity
insurance to its pre-1989 members, must those members comply with their assessment
obligations in each of the same contracts and may the Club assess those members to
provide the indemnities to those year's members?

3.    If the assessments mentioned above are permissible, may the Club treat
each pending or future Closed Year ODC as constituting a deficiency that may be
assessed in full to the relevant years' members?

4.    If indemnities must paid to the Closed Year members, may the Club continue its practice of allocating each indemnity claim over the years of alleged exposure by sea service days and apply one deductible with respect to each such year?

5.    Do the defendants' have any legal right to any funds in the Club's reserve accounts? And do the defendants have any right to accountings with respect to such funds?

6.    Does a Board of Directors of a mutual indemnity insurance association, such as the American Club, have the power to limit closed years' members liability for assessment for late-arising claims in closed years which were unknown and unreserved for or inadequately reserved for at the time the accounts for the years in question were closed, thereby shifting responsibility for funding those claims to members of future open insurance years without the open-year members' consent?

7.    Were the actions of the Club Directors in the 1980s and 1990s, who were senior executives of, and holders of equity interests in, defendants *ultra vires*, arbitrary and made in bad faith?

8.    Are the defendants' demands for recalculations of the indemnities previously paid by the Club regarding deductibles barred on the grounds of acquiescence, time bar, estoppel, waiver, and/or other defense presented by the Club?

9.    If the Court permits the recalculation of prior indemnity payments (which it should not), may the Club assess the members of the applicable insurance years to

provide the funds with which to make any required additional payments to the defendants?

10.     Is the American Club is entitled to a refund of the advance it provided to Keystone Shipping Company in or about August 2004 in connection with Keystone's settlement of the Closed Year ODC of Mr. Timothy Farley, one of Keystone's former employees, and may the Club include that claim in the assessments referred to above?

11.     Are the release calls paid by defendant, Union Carbide Corp. in 2001 with respect to its future assessment obligations regarding the 1997, 1998, 1999 and 2000 years, which years were still open when Union Carbide Corp. terminated its membership in the American Club, effective to release Union Carbide Corp. from its liability for assessments regarding the 1940 – 1988 years?

12.     Plaintiff reserves all of its positions and defenses as stated in its Second Amended Complaint and Master Reply and Supplemental Replies to Defendants' Counter-Claims whether or not specifically stated herein.

D.     Injunctions

Plaintiff also seeks certain injunctions against the defendants. These injunctions are noted in Section XI, Relief Sought, and Proposed Orders granting same are attached as Exhibits 2 and 3.

## II     Contentions of Defendants

1.      Defendants purchased insurance coverage under protection and indemnity (P&I) insurance policies issued by the Plaintiff, a licensed insurance company organized under New York law and regulated by the Insurance Department of the State of New York, in one or more years prior to 1989 (the "Policies"). The Policies provide (under Clause 1) that the Club will indemnify the policyholder for: "Liability for life salvage, loss of life of, or personal injury to, or illness of any person...." Occupational disease claims (ODC) fall squarely within the scope of insurance coverage under Clause 1 of the Policies. As with any insurance contract, the scope of coverage is spelled out in the terms of the Policy.

2.      The Policies provide occurrence-based coverage, such that insurance coverage under the Policies is triggered by an occurrence that takes place in whole or in part during one or more years covered by an American Club Policy, regardless of when a liability claim is asserted. In the context of ODCs, this means that coverage is triggered by the exposure of a claimant to asbestos or other hazardous substance during one or more Policy years, regardless of when an ODC may be reported to the Club or asserted by a claimant.

3.      Defendants paid all premiums due and owing to the Club under the Policies, and insurance coverage attached upon inception of the Policy period.

4.      The Policies and By-Laws of the Club authorized the Club, acting through its Board of Directors, to levy assessments against Policyholders "for their proportionate

share of any deficiency or impairment as provided by law and fixed in accordance with the By-Laws of the Association …." Any assessment by the Club was required to be based on the aggregate results of the Policy year, rather than the results for a particular claim or category of claims. The Club's By-Laws also authorized the Club acting through its Board of Directors, to close the accounts of Policy years and thereby terminate the Club's power to further assess the Policyholders of such Policy years and at the same time to terminate the right of the Policyholders of those years to seek a refund of any excess assessments from the Club.

5.      The closing of Policy years did not, as the Club contends, involve a bilateral agreement between the Club and the Policyholders of a Policy year concerning the adequacy and scope of reserves or coverage for future claims, and did not and was never intended to have any impact on the scope of coverage provided for any claim. Rather the closure of a Policy year was a unilateral decision of the Club, acting through its duly appointed Board of Directors, to close the accounts of a Policy year, solely with respect to the Club's power to issue further assessment orders or its obligation to refund excess assessments. Decisions concerning the setting of reserves and closure of Policy years were made by the Club on terms the Club and its managers felt appropriate, without seeking or obtaining the consent of individual Policyholders.

6.      The closing of a Policy year did not affect in any way the continuation of insurance coverage for claims, whenever asserted, arising from occurrences taking place during the Policy year, which had already triggered the Club's Policies. At no time prior

to May 2004, when it terminated what it then, for the first time, disingenuously labeled the "discretionary practice," did the Club inform its Policyholders that the closing of Policy years would have any impact on the continuation of coverage. To the contrary, the Club, by setting reserves and paying for ODCs, without reservation of rights for over 20 years, clearly communicated to its Policyholders that coverage existed and would continue to be provided after Policy years were closed. In closing Policy years the Club knew of the possibility and assumed the risk that ODCs or other claims might be asserted after a Policy year was closed to further assessment, and expected the Club's reserves to be used to pay for such claims.

7.    At the time of closing a Policy year, the Club, acting through its Board of Directors, could if it chose, order a refund of excess premiums to the Policyholders of a Policy year, something it rarely if ever did. In contrast, according to the opinion of the Club's then counsel, the Club was obligated at the time of closing a Policy year, to refund any assessments deemed as excess to the Policyholders of the Policy year. The Club could also order a final assessment as permitted by New York law and to the extent authorized by the Club's By-Laws.

8.    A "final" refund or "final" assessment was intended to mean just what the word says, to be the last assessment and, as such, to preclude further assessments. The closure of a Policy year constituted a release of the Policyholders for the Policy year from any future assessment obligation to the Club.

9.    Certain seaman employed by Defendants, or employed by others aboard vessels owned by Defendants, as well as other employees of Defendants and longshoreman, have alleged and will likely in the future assert ODCs alleging that they were injured by exposure to dangerous substances, mostly, although not exclusively, asbestos. Defendants have incurred losses as a result of payment of judgments and settlements of such claims and expenses incident to their investigation and defense, and will likely continue to do so. Defendants reasonably relied upon the existence of insurance coverage under Club policies for payment of such losses.

10.    Although neither the Club nor its Policyholders anticipated ODCs when Policy years prior to the late 1970s were closed, the Club and its managers were always aware of the possibility that claims could be asserted after a Policy year was closed, and knew that the Club was obligated to provide coverage for such claims, whether or not specifically reserved for prior to closure of the accounts for the Policy year. The Club's general and/or closed year reserves were maintained to pay for such claims.

11.    In addition, since the late 1970s, the Club knew of the existence of ODCs and of the potential for future ODCs; knew that the Club was obligated to pay for such claims, whether or not reserved for prior to closure of the accounts of the Policy year; and, with intent to make provision for this obligation, set reserves for potential ODCs that might emerge after Policy years were closed beginning in 1988 when the 1977-78 Policy year was closed. Such reserves were intended to pay for ODCs resulting from

occurrences in any Policy year before or after 1988, and were not earmarked for a particular Policy year.

12.    At no time prior to the closure of any pre-1989 Policy year did the Club advise any Policyholder that it had the "discretion" to deny payment of claims falling within the Policy coverage -- an invention of the Club's current counsel -- or to "reopen" such Policy year for further assessment, for any reason.

13.    The Club is legally obligated, pursuant to the terms of its Policies, to indemnify Defendants in full for any loss, damage or expense that Defendants become liable to pay, subject to the applicable deductible, in connection with ODCs resulting from exposures taking place in whole or in part during the pre-1989 insurance years.

14.    The Club's reliance on principles of "mutuality" to justify its denial of insurance coverage is baseless. Nothing in New York law justifies the Club's breach of its insurance contracts. Indeed, contradicting the very principles it purports to espouse, the Club recognizes that it is legally obligated to provide insurance coverage for Policy years from 1989 onward, even though these Policy years were closed and reserved for on the exact same basis as Policy years prior to 1989. The Club's attempt to justify this discriminatory treatment based on membership in the International Group, an organization of mutual P&I Clubs participating in a reinsurance pool, is merely a cover for the Club's decision to protect what it perceives to be its present members' interests while shirking its contractual obligations to prior members.

15.    In or about 1996, the Club's then counsel, Richard Brown, erroneously argued that closed years, under certain circumstances, might be reopened so that bankrupt former members could be further assessed. Rejecting this proposition, the Club reaffirmed the existence of insurance coverage for ODCs, and explicitly recognized at a June 1996 Board of Directors meeting that closed years could not be reopened for further assessment unless mandated by statute. In doing so, the Club waived any right it might otherwise have had to reopen previously closed years.

16.    The Policies contain no limitation on a Policyholder's recourse against the Club to particular assets of the Club for payment of the Club's contractual obligations. Thus, the Club's attempt to bar use of its reserves from payment of pre-1989 contractual obligations is meritless.

17.    There is no requirement in either the Policies or applicable By-Laws that claims must be reported before closure of the relevant policy period in order for the claims to be covered or that claims must be specifically reserved-for in order to be covered. The Club's attempt to rewrite the Policies to impose such a requirement is untenable.

18.    The Club, like other corporations, acts through its Board of Directors and is bound by actions taken by its Board.

19.    From time to time some of Defendants' employees served as members of the Board of Directors of the American Club, as did its counsel. However, not every

31

Defendant had an employee elected to the Board of Directors. Further, to the extent employees of Defendants were members of the Board of Directors, they acted on behalf of the American Club and not their individual employers, and the American Club explicitly deemed the employment of such member of the Board of Directors by an American Club insured not to be a conflict of interest.

20.    To the extent there is any ambiguity as to whether closure of a Policy year terminates coverage under the Policies, both the Club and its Policyholders understood and recognized by their conduct in submitting and paying for ODCs that coverage continues for claims reported after closure of a Policy year.

21.    To the extent there is any ambiguity as to whether closing of an insurance year terminates coverage under the Policies, in the mutual P&I industry, it is understood that coverage continues for claims reported after closure of a Policy year.

22.    The Policies do not have any applicable termination provision. Coverage has not been terminated or cancelled by the Club, nor have Defendants otherwise released the Club from its coverage obligations.

23.    The Policies have not been surrendered.

24.    To the extent the Club bases any of its claim on the cancellation of further coverage under any of the Policies at the time an insurance year is closed, the Club has failed to comply with the notice of cancellation requirement of N.Y. Insurance Law § 3426.

25.     To the extent the Club seeks to disclaim coverage for claims previously reported to the Club under any of the Policies, such disclaimer is untimely and in violation of N.Y. Insurance Law § 3420(d).

26.     The Club has waived any alleged right to deny coverage under the Policies as to ODCs. Such waiver is demonstrated by, among other things, (a) the Club's payment without any reservation of rights of ODCs over a period of more than 20 years in a total amount of approximately $6,700,000 and (b) the Club's reserving monies for such claims. In addition, the Club waived its right to deny coverage for ODCs by asserting control over the defense of such claims, requiring its policyholders to obtain the Club's approval of settlements, and repeatedly acknowledging that such claims were covered.

27.     Current Club directors Paul Sa, James Sweeney, and Martin Recchuite each have voted in favor of paying various ODCs during their tenures as directors.

28.     The doctrine of estoppel bars the Club from denying coverage under the Policies as to ODCs. The Club consistently recognized its obligation to pay such claims, and Defendants relied upon such representations by, among other things, continuing to buy insurance from the Club and not purchasing alternative insurance to cover ODCs.

29.     The doctrine of laches bars the Club from denying coverage under the Policies as to ODCs. There is no excuse for the Club's delay in disclaiming coverage as to pre-1989 ODCs, and Defendants have been prejudiced by such delay by, among other

things, continuing to buy insurance from the Club and not purchasing alternative insurance to cover ODCs.

30.    The Club had the opportunity to litigate the issue of coverage in *Dicola v. American S.S. Owners Mutual Protection and Indemnity Association, Inc. (In re Prudential Lines, Inc.)*, 158 F.3d 65 (2d Cir. 1998), and the Second Circuit determined that there was coverage for ODCs under the Policies. The Club is, therefore, barred by the doctrines of *res judicata* and/or collateral estoppel from litigating the issue of coverage under the Policies without any time limitation as to when claims can first be made against the insured and still be covered under the Policies.

31.    All pre-1989 insurance years have been "closed" by the American Club. For each such year, the Club's Board of Directors, pursuant to the By-Laws of the Club issued a resolution fixing and/or determining the amount of a final assessment or final dividend payment applicable to policyholders for that insurance year.

32.    As to all Defendants, the Club is not entitled to "reopen" closed insurance years to further assess Defendants. There is no contractual or legal basis for such action. In addition, certain Defendants including The Dow Chemical Company were issued non-assessable policies by the Club which may not be reopened for further assessments. Certain additional policies were issued on a "named assured" basis which may not be reopened for reassessment.

33.    The applicable By-Laws do not allow for the assessment of policyholders after an insurance year has been closed.

34.    To the extent there is any ambiguity with respect to the Club's assessment power under the relevant By-Laws, both the Club and its policyholders understood that the closing of an insurance year terminated the policyholders' liability for further assessments.

35.    To the extent there is any ambiguity with respect to the Club's assessment power under the relevant By-Laws, custom and practice within the mutual P&I industry is that policyholders' liability for further assessments is terminated by the closure of the insurance year.

36.    New York Insurance Law does not permit assessments against the Defendants. The Insurance Law limits the Club's assessment power to assessing current *members* of the Club, except if the company is impaired, which the Club is not. Even during impairment, the New York Insurance Law only permits the assessment of former members in the year before the impairment. The Defendants are no longer members of the American Club and do not fall within the limited category of former members that may be assessed.

37.    To the extent the Club's claims are based on the premise that Defendants are "members" of the Club, the Club's purported denial of coverage as to pre-1989 ODCs is null and void because Defendants were not afforded the right to vote for the Directors

who approved such action or to exercise other incidents of membership in connection with such action.

38.    Current Club directors Paul Sa, James Sweeney and Martin Recchuite were members of the Board that reaffirmed that closed years could not be reopened in June 1996.

39.    The Club has released some or all Defendants from any further liability for assessments in the relevant insurance years. As to all Defendants, the Club demonstrated the requisite intent to release Defendants from further assessment both at the time the relevant insurance years were closed and subsequently, including but not limited to its affirmation on June 13, 1996 when its Board reaffirmed that closed insurance years were not to be further assessed, and each time it paid a pre-1989 ODC.

40.    As to Defendant Union Carbide Corporation (as variously sued), the Club has specifically released it by issuing its Release Letter in exchange for payment of premium therefor.

41.    The Club has waived any alleged right to seek further assessments from Defendants. The Club's intent to waive such alleged right is demonstrated by (a) its payment of ODCs without "reopening" insurance years, (b) its reserving practices for ODCs (without any "reopening"), and (c) its decision on June 13, 1996 to reaffirm the closures of the insurance years in question.

42.     In accordance with a recommendation from its outside auditors, Deloitte and Touche, the Club included in its reserves and annual statements for 1996 a provision of $1,000,000 for payment of asbestos claims occurring in insurance years prior to 1981. The Club later increased this amount to $2,500,000 and reported such amounts in its annual reports and its statutory filings with the New York State Insurance Department.

43.     Until bringing this action, the Club continued to include provisions in its reserves for the payment of asbestos claims in pre-1989 insurance years.

44.     The Club is barred by the doctrine of estoppel from "reopening" closed insurance years and further assessing Defendants. The Club represented to Defendants that Closed Years could not be reopened, and Defendants relied on these representations by, among other things, continuing to purchase insurance from the Club and by making representations to third parties regarding their lack of exposure to further assessments.

45.     The Club is barred by the doctrines of *res judicata* and/or collateral estoppel from litigating the rights of the Club to issue further assessments against holders of the Policies.

46.     With respect to the Defendants Mathiasen's Tanker Industries, Inc. and Trinidad Corporation, the Order Approving Stipulation Between Trinidad Corporation and Mathiasen's Tanker Industries, Inc. and American Steamship Owners Mutual Protection and Indemnity Association, Inc., dated April 4, 1991, estops, bars and waives the Club's claims in whole or in part.

37

47.    If the Court decides that the Club is permitted to reopen insurance years, any assessments against Defendants should be limited to proven deficiencies in particular insurance years. In determining whether a deficiency exists in a particular insurance year, investment income derived from sums the Club retained when closing the particular year must be included in the calculation.

48.    If the Court decides that the Club is permitted to reopen insurance years, the Club alone bears the risk that insolvent policyholders will be unable to pay their share(s) of assessments. Defendants may not be charged additional assessments to cover assessments that insolvent policyholders are unable to pay, and indemnity payments due Defendants may not be reduced due to the inability of an insolvent policyholder to pay assessments.

49.    The closing of an insurance year is not a bilateral agreement negotiated between the Club and its members. Therefore, the doctrine of mutual mistake is inapplicable to the Club's unilateral action in closing insurance years.

50.    Any alleged "mistake" made in connection with closing the relevant insurance years was a unilateral mistake and, thus, insufficient to reform any alleged agreement between the Club and its members.

51.    The closing of insurance years was explicitly authorized to be based on estimates of the final results for the insurance year. Thus, there has been no mistake of fact to warrant reformation of the closed insurance years.

38

52.    The so-called "mistakes" alleged by the Club occurred many years ago and in all instances before 1993. Thus, the Club is barred by CPLR § 213(6) from bringing an action for reformation based on mutual mistake.

53.    In accordance with the Second Circuit's holding in *Dicola v. American S.S. Owners Mutual Protection and Indemnity Association, Inc. (In re Prudential Lines, Inc.)*, when receiving indemnity payments from the Club for ODCs, Defendants are obligated to pay only a single policy's deductible (chosen by the relevant Defendant) for any one claim presented to the Club.

54.    To the extent Defendants have previously been indemnified by the Club or denied indemnification altogether for ODCs on the basis of multiple deductibles, Defendants are entitled to have such payments recalculated on the basis of a single deductible.

55.    The Club is barred by the doctrines of *res judicata* and/or collateral estoppel from litigating the rights of the holders of Policies, including Defendants, to indemnification under the pre-1989 Policies subject to the application of more than one deductible.

56.    Certain Defendants objected to the Club's indemnification of ODCs on the basis of applying multiple deductibles.

57.    The American Club did not have a good faith basis for denying coverage as to the ODCs in question in this action. Thus, Defendants are entitled to their attorneys' fees and costs incurred in this action.

58.    The conduct of the Club in purporting to withdraw coverage for ODCs constitutes deceptive acts or practices within the meaning of New York General Business Law § 349.

59.    The Club is liable to certain Defendants for damages, attorneys' fees and other costs and expenses as a result of violating New York General Business Law § 349.

60.    The Club's representations to APL that it would be covered for ODCs and its purported withdrawal of such coverage constitutes a fraudulent business act or practice within the meaning of California's Unfair Practices Act.

61.    As a result of the Club's unfair and unlawful violations of California's Unfair Practices Act, APL is entitled to damages, attorneys' fees and costs and expenses.

62.    Defendant Union Carbide Corporation is entitled to judgment on its Affirmative Defense of Release on all Causes of Action asserted by Plaintiff.

63.    That all causes of action must be dismissed as to The Dow Chemical Company ("TDCC") for the years, *inter alia*, 1952, 1953, 1954, 1955, and 1956 as any policies actually issued TDCC by the plaintiff for those years were on a non-assessable basis.

64.     That all other years TDCC is alleged to have been a member of plaintiff

any policies issued concerning TDCC refer to TDCC, if at all, as a "named insured" only.

As a result, TDCC is entitled to dismissal of all causes of action asserted by the plaintiff.

65.     The sample Plaintiff Insurance Policy used as a representative Policy of

Insurance at trial, by agreement between the parties, is not accurate as to the discrete

issues referred to in the above two contentions as to TDCC and TDCC reserves its right

rely upon any actual TDCC polices of insurance involved.

**Contention Submitted by Defendant S.C. Loveland, Co., Inc. n/k/a Loveland
Holding Company ("Loveland"):**

66.     Loveland contends that it is entitled to coverage by the American Club for

policy years in which Loveland was a member, including for ODCs incurred prior to

February 20, 1989, which were not reported prior to the closure of the pre-1989 Policy

Years. Loveland further contends it is not responsible to pay any assessments for any of

those years, said assessments having been paid to the Club as part of the Club's claim

against Loveland in Loveland's 1993 bankruptcy action.

## V.    ISSUES TO BE TRIED

1.     Is the American Club obligated to indemnify defendants for the ODCs?

2.     If the American Club is obligated to indemnify any defendants with respect

to the ODCs, may the Club assess defendants to satisfy those claims?

3.      If assessments as set forth above in 2 are permissible, how are they to be calculated?

4.      If indemnities are to be paid by the American Club to the defendants regarding their payments to claimants of the ODCs, what deductible or deductibles will the defendants be required to absorb?

5.      Whether any of the defendants are entitled to payments from the American Club, if a change in the American Club's deductible approach is ordered by the Court?

6.      Whether the parties are entitled to recover their legal fees and expenses from the other?

OTHER ISSUES TO BE TRIED ARE CONTAINED IN THE PARTIES' CONTENTIONS IN PART IV.

### VI.    PLAINTIFF'S EXHIBITS

No exhibit not listed below may be used at trial except (a) for cross-examination purposes or (b) for rebuttal purposes or (c) if good cause for its exclusion from the amended pretrial order is shown.

See Appendix 1 attached hereto, Plaintiff's List of Exhibits with Defendants' Objections.

## VII.    DEFENDANTS' EXHIBITS

No exhibit not listed below may be used at trial except (a) for cross-examination purposes or (b) or rebuttal purposes or (c) if good cause for its exclusion from the amended pretrial order is shown.

See Appendix 2 attached hereto, Defendants' List of Exhibits with Plaintiff's Objections.

## VIII.    STIPULATIONS AND OBJECTIONS WITH RESPECT TO EXHIBITS

Any objections not set forth herein will be considered waived absent good cause shown.

1. The parties hereto stipulate that, to the extent a document has been authenticated through deposition testimony, no party shall be required to designate such testimony in the amended pre-trial order. Any such documents authenticated in this manner shall be deemed authenticated for any such purposes in this litigation.

2. In order to avoid burdening the Court with a voluminous exhibit list of pre-marked American Club insurance policies, the parties hereto stipulate to waive any and all hearsay and authenticity objections to the extent that any party wishes to use any such policies at trial. Should any party wish to introduce a particular American Club policy or policies at trial, an exhibit number will be supplied to such policy or policies at that time.

3. The parties hereto stipulate to waive any objections regarding any documents that (a) are supporting documentation underlying a party's summary charts, and (b) do not appear on the exhibit list of the party seeking admission ("Supporting Documents") on

the grounds that the Supporting Documents have not been so identified on the exhibit list.
The parties also agree to waive authenticity and hearsay objections to the Supporting
Documents, but all other objections with respect to Supporting Documents are hereby
reserved.

4. Each party reserves the right to offer any of the exhibits listed on any other
party's exhibit list or contained in deposition testimony designated by any other party. as
well as such designated testimony. Each party reserves the right to introduce exhibits in
graphic form.

The parties' objections to Exhibits may be found at Appendices 1 and 2. each of
which is hereby incorporated by reference into this section.


IX.    PLAINTIFF'S WITNESS LIST

The witnesses listed below may be called at trial. No witness not identified herein
shall be permitted to testify on either party's case in chief absent good cause shown.

Peter Bernie

Richard Brown

John Cassedy

David Martin-Clark

William Craig

Joseph Hughes

Thomas McGowan

Martin Recchuite

John Sandercock

Robert Seward

Vincent Solarino

James Sweeney

Designations of Deposition Testimony to be used as part of Plaintiff's case in chief with Defendants' Objections and Counterdesignations and Plaintiff's Objections to the Counterdesignations are annexed hereto as Appendix 3.

Plaintiff hereby reserves the right to call as a witness any person appearing on defendants' witness list.

## X.    DEFENDANTS' WITNESS LIST

The witnesses listed below may be called at trial.  No witness not identified herein shall be permitted to testify on either party's case in chief absent good cause shown.

Charles Achuff

Carissa Barletta

Richard Bihn

Terence Coghlin

Christopher Conley

Kathy Cronin

Linda Daniels

Charles K. Dougherty

David Ekaitis

Philip Fisher

Michael Formoso

C. Bennett Gleason

Marty Gordon

Richard Gronda

John Hendrickson

Keith Kennedy

Charles Kurz, II

S.C. Loveland, III

Steven Lowson

Buckley McAllister

Neil Miller

Marc Pearl

Mark Peterson

Louis E. Piernik

Peter Popov

Andrea St. Paul Bland

Steven Valerius

Raymond J. Van Eperen

Deborah Weedman

Ellen Wiese

Designations of Deposition Testimony to be used as part of defendants' case in chief, Plaintiff's Objections and Counterdesignations and Defendants' Objections to Plaintiff's Counterdesignations are annexed hereto as Appendix 4.

Defendants hereby reserve the right to call as a witness any person appearing on plaintiff's witness list.


### XI.    RELIEF SOUGHT

**A.    Relief Sought by Plaintiff**

Plaintiff seeks judgments

(1)    Declaring that plaintiff has not breached any contracts with defendants;

(2)    Dismissing defendants' affirmative defenses and counterclaims, with prejudice;

(3)    Declaring that the pre-1989 mutual indemnity insurance policies in issue do not require the American Club to pay indemnities to defendants for any claims that were not reported and properly reserved for before the accounts for the pre-1989 insurance years were closed ( i.e., that defendants are not entitled to insurance for which they never paid), and that plaintiff was entitled to terminate the Discretionary Practice;

(4)    Declaring that if those pre-1989 mutual indemnity insurance policies require the American Club to provide indemnities regarding the Closed

Year ODCs, defendants must now comply with their assessment obligations included in each of those same contracts, and that the members of each year implicated in each claim may now be assessed by the Club regarding each such indemnity claim presented by any member of those years;

(5)    Declaring that each such assessment may be based upon allocating each indemnity claim over the insurance years of alleged exposure and applying the member's deductible for each such year;

(6)    Declaring that the defendants have no legal right to any funds in the Club's reserve accounts, and that they have no right to accountings with respect to such funds either;

(7)    Declaring that the Club may remit to the defendants making the claims the sums collected by each assessment less the Club's reasonable expenses of the assessments;

(8)    Declaring that no Board of Directors of the American Club had the power to limit closed years' members' liability for assessments for Closed Year ODCs thereby shifting responsibility for funding those indemnity claims to members of open insurance years without their consent.

(9)    Declaring that actions of members of the American Club's Boards of Directors in the 1980s and 1990s in commencing or permitting the

48

commencement of the Discretionary Practice which benefited defendants were *ultra vires*, arbitrary and made in bad faith.

(10) Declaring that if defendants are entitled to recalculations of indemnities previously paid by the Club under the multiple deductible approach to a single deductible approach, which plaintiff denies, that plaintiff may assess the members of the relevant Closed Years to provide the funds to pay the difference;

(11) Declaring that plaintiff may recover from defendant Keystone the advance provided to Keystone in connection with the Closed Year ODC of Mr. Timothy Farley;

(12) Declaring that no defendant was released from its assessment obligations under the pre-1989 policies including, but not limited to, Union Carbide Corporation;

(13) Declaring that plaintiff recover from the defendants all of its costs and expenses of this litigation and such further or different relief as may be appropriate and just.

Plaintiff also seeks certain injunctions against defendants and attached hereto as Exhibits 2 and 3 are Orders containing the alternative injunctions proposed by Plaintiff.

B.  **Relief Sought by Defendants[1]**

1.  **As to Defendants' First Claim For Relief (Declaratory and Injunctive Relief),**
    an Order:

    A.    declaring that Defendants have the right under their respective Pre-1989
          Policies to continuing coverage for occupational disease claims resulting
          from claimants' exposures occurring during any one or more of the Pre-
          1989 Years, subject only to the applicable deductible;

    B.    declaring that Defendants have the right under their respective Pre-1989
          Policies to designate one of such Policies to indemnify such Defendant for
          the payment of a particular occupational disease claim, subject only to the
          deductible under that Policy and no other;

    C.    declaring that the Club has no right to make any further assessment or
          assessments against any Defendants under any Pre-1989 Policies;

    D.    granting Defendants a mandatory injunction barring, restraining and
          prohibiting the Club from making, or seeking to make, any such assessment
          or assessments;

    E.    granting Defendants their reasonable attorneys' fees and other costs and
          expenses incurred in this action;

    F.    ordering the Club to provide the Defendants with payment, subject to the
          applicable deductible, for all Pre-1989 ODCs which Defendants have

---

[1]    Not all Defendants have sought all of the relief described in this section.

submitted to the Club as of the date of such Order but for which the Club has not provided indemnification, in an amount to be determined at trial. Current lists of such claims and amounts owed by the Club have been submitted by various Defendants as Trial Exhibits. Defendants reserve the right to update or supplement their lists of such claims.

II. **As to Defendants' Second Claim For Relief (Breach of Contract)**, an Order:

    A. granting compensatory damages for claims that were partially paid on the basis of applying multiple deductibles, in an amount to be determined at trial. Lists of such claims and amounts owed by the Club have been submitted by various Defendants as Trial Exhibits. Defendants reserve the right to update or supplement their lists of such claims.

III. **As to Defendants' Third Claim For Relief (Violation of New York General Business Law §349)**, an Order:

    A. granting compensatory damages in an amount to be determined at trial, including but not limited to attorneys' fees and costs incurred in defending this action.

IV. **As to Defendants' Fourth Claim For Relief (Release)**, an Order:

    A. barring any further assessments of policyholders in the Pre-1989 insurance years.

V. **As to Defendants' Fifth Claim For Relief (Breach of Implied Covenant of Good Faith)**, an Order:

    A. granting compensatory damages in an amount to be determined at trial,

including but not limited to attorneys' fees and costs incurred in defending this action.

VI. **As to Defendants' Sixth Claim For Relief (Promissory Estoppel)**, an Order:

A.  dismissing all claims in the Complaint with prejudice and costs;

B.  declaring that (i) Defendants have the right under their respective Pre-1989 Policies to continuing coverage for occupational disease claims resulting from claimants' exposures occurring during any one or more of the Pre-1989 insurance years, subject only to the applicable deductible and (ii) the Club has no right to make any further assessments against any Defendants under any Pre-1989 Policies;

C.  granting Defendants a mandatory injunction compelling the Club to provide the coverage described in (B) above;

D.  barring, restraining and prohibiting the Club from making, or seeking to make, any assessment or assessments as described in (B) above;

E.  ordering the Club to provide the Defendants with payment, subject to the applicable deductible, for all Pre-1989 ODCs which Defendants have submitted to the Club as of the date of such Order, in an amount to be determined at trial. Current lists of such claims and amounts owed by the Club have been submitted by various Defendants as Trial Exhibits. Defendants reserve the right to update or supplement their lists of such claims.

F.  granting Defendants their reasonable attorneys' fees and other costs and

expenses incurred in this action;

G.    granting such other and further relief as this Court deems just and proper.

VII.  **As to Defendant APL's Claim For Relief for Violations of "California's**

**Unfair Practices Act,"** an Order:

A.    granting defendant APL its reasonable attorneys' fees and other costs and

expenses incurred in this action.

Attached hereto as Exhibit 4 is an Order containing the injunctions proposed by

defendants.

Dated: New York, New York
       May 18, 2006

                                        Respectfully submitted,

                                        For Plaintiff, The American Steamship
                                        Owners Mutual Protection and
                                        Indemnity Association, Inc.

                                        NOURSE & BOWLES, LLP
                                        SULLIVAN & WORCESTER, LLP

                    By:

                                        Lawrence J. Bowles (LB 5950)
                                        One Exchange Plaza @ 55 Broadway
                                        New York, New York 10006
                                        (212) 952-6200

For Defendants, as indicated below

PROSKAUER ROSE LLP

By: _____

    Dale A. Schreiber (DS-9211)
    Seth B. Schafler (SS-5993)
    Lisa A. Bauer (LB-4057)
    Nathan R. Lander (NL-6276)
    1585 Broadway
    New York, New York 10036-8229
    (212) 969-3000

*Attorneys for Defendants Keystone, BP,
MTL, Kirby Inland Marine, LP
(as successor to Hollywood Marine Inc.),
American Steamship Company,
The Cleveland-Cliffs Steamship
Company, Ispat, Amerada Hess
Corporation,
Sea Mobility, Alcoa, and Sabine*

HOWREY, LLP
    Robert H. Shulman
    Mindy G. Davis
    Christine Davis
    Averitt Buttry
    1299 Pennsylvania Avenue, NW
    Washington, DC 20004-2402
    (202) 783-0800
    (202) 383-6610 (fax)
    *Attorneys for Defendant Amerada Hess*

DLA PIPER RUDNICK GRAY CARY US LLP
    Stanley McDermott, III
    Camilo Cardozo
    1251 Avenue of the Americas
    New York, NY 10020
    (212) 835-6123
    (212) 884-8523 (fax)
    camilo.cardozo@piperrudnick.com
    *Attorneys for Defendant Ispat Inland Inc.*
    *(formerly called Inland Steel Co.)*

RAY, ROBINSON, CARLE & DAVIES, P.L.L.
    Gene B. George
    Julia R. Brouhard
    1717 East 9th Street, Ste. 1650
    Cleveland, OH 44114-2898
    (216) 861-4533
    (216) 861-4568 (fax)
    ggeorge@rayrobcle.com
    jbrouhard@rayrobcle.com
    *Attorneys for Defendant The*
    *Cleveland-Cliffs Steamship Company*

**---and by proxy for the following Defendants and their counsel of record---**

HOLLAND & KNIGHT
    John Toriello
    195 Broadway, 24th Floor
    New York, NY 10007
    (212) 513-3200
    (212) 385-9010 (fax)

*Attorneys for Defendant*
*American President Lines, Ltd.*
*(sued herein as American President Lines,*
*Inc. and as APL Ltd. as Successor to*
*American Mail Line)*

BROWN RUDNICK BERLACK ISRAELS,
LLP
    Andrew Dash
    Peter Adelman
    Seven Times Square
    New York, New York 10036
    (212) 209-4811
    (212) 938-2811 (fax)

*Attorneys for Defendant*
*Farrell Lines*

CURTIS, MALLET-PREVOST, COLT &
MOSLE LLP
    Joseph D. Pizzurro
    Robert J. Gruerdel
    Dora Straus
    101 Park Avenue
    New York, NY  10178
    (212) 696-6000
    (212) 697-1559 (fax)

*Attorneys for Defendants
Apex Oil Company, Inc., Trinidad
Corporation, Mathiasen's Tanker Industries,
Inc. and Crest Tankers, Inc.*

DICKSTEIN SHAPIRO MORIN &
OSHINSKY LLP
David L. Elkind
Dorothy Thomas
1177 Avenue of the Americas
New York, NY 10036
Tel.: (212) 835-1400
Fax: (212) 997-9880

*Attorneys for Defendant Keyspan
Corporation (as Successor to Eastern Gas
and Fuel Associates and Mystic Steamship)*

O'HARE PARNAGIAN LLP
    Robert A. O'Hare Jr.
    82 Wall Street, Suite 300
    New York, NY 10005
    (212) 425-1401
    (212) 425-1421 (fax)

*Attorneys for Defendants
Central Gulf Lines, Inc. and Waterman Steamship
Corporation*

CUMMINGS & LOCKWOOD LLC
Steven Frenkel
John W. Cannavino
Six Landmark Square
Stamford, CT 06901
main: (203) 327-1700
fax: (203) 351-4534
sfrenkel@cl-law.com

*Attorneys for Defendant Chevron U.S.A. (as
successor to California Oil Company)*

MAHONEY & KEANE
Edward A. Keane
111 Broadway, 10th Fl.
New York, NY 10006
Tel.: (203) 222-1019
ekeane@mahoneykeane.com

*Attorneys for Defendants The Dow Chemical
Company and Union Carbide Corporation*

FIELDS, HOWELL, ATHANS &
MCLAUGHLIN, LLP
Alissa C. Malone
Lynn Concha
One Midtown Plaza, Suite 800
1360 Peachtree Street, NE
Atlanta, GA 30309
(404) 214-1250
lconcha@fieldshowell.com

*Attorneys for Defendant Georgia Pacific Corp.*

PATRICK F. LENNON, ESQ.
11 West 42nd Street, Suite 900
New York, NY 10036
Tel.: (212) 354-0025
Fax: (212) 869-0067
plennon@tisdale-lennon.com

*Attorneys for Defendants Bridgeport & Port
Jefferson Steamboat Co.; Brokerage &
Management Corp.; McAllister Towing and
Transportation Company, Inc.; (as Successor
to Outreach Marine Corp.) and Trade &
Transport Inc.*

HOLLSTEIN KEATING CATTELL JOHNSON
& GOLDSTEIN, PC
Edward V. Cattell, Jr.
Aaron Moody
8 Penn Center, 20th Floor
1628 J.F. Kennedy Blvd.
Philadelphia, PA 19103
Tel: (215) 320-2073

*Attorneys for Defendant Loveland Holding
Company, Inc., f/k/a S.C. Loveland Co., Inc*

**Appendices to the Amended Joint Pre-Trial Order:**

1.    Plaintiff's List of Exhibits with Defendants' Objections.

2.    Defendants' List of Exhibits with Plaintiff's Objections.

expenses incurred in this action;

G.    granting such other and further relief as this Court deems just and proper.

VII.   **As to Defendant APL's Claim For Relief for Violations of "California's**

**Unfair Practices Act," an Order:**

A.    granting defendant APL its reasonable attorneys' fees and other costs and

expenses incurred in this action.


Attached hereto as Exhibit 4 is an Order containing the injunctions proposed by

defendants.

Dated: New York, New York
       May 18, 2006

                              Respectfully submitted,


                              For Plaintiff, The American Steamship
                              Owners Mutual Protection and
                              Indemnity Association, Inc.


                              NOURSE & BOWLES, LLP
                              SULLIVAN & WORCESTER, LLP


         By:

                              Lawrence J. Bowles (LB 5950)
                              One Exchange Plaza @ 55 Broadway
                              New York, New York 10006
                              (212) 952-6200


SO ORDERED:

53

5/23/06