UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- X

AMERICAN STEAMSHIP OWNERS MUTUAL
PROTECTION AND INDEMNITY
ASSOCIATION, INC.,

                             Plaintiff,

-against-

ALCOA STEAMSHIP CO., INC., et al.,

                        Defendants.

-------------------------------------------------------- X

No. 04-cv-04309 (LAK)

**DECLARATION OF
<u>RICHARD GRONDA</u>**

**(ECF Case)**

I, Richard Gronda, hereby declare, pursuant to 17 U.S.C. § 1746:

1.    I submit this declaration on behalf of Farrell Lines, Inc. ("Farrell"), a defendant in the above-captioned action. I am fully familiar with the facts stated herein, which are based on my personal knowledge.

<u>**Background**</u>

2.    I graduated from St. Peters College in 1965, where I obtained a degree in accounting. In 1973, I became a certified public accountant. From 1965 to 1971, I was employed as an auditor by the firm then known as Peat, Marwick Mitchell & Co. From 1971 to 1981 I held a succession of positions at the steamship company Seatrain Lines, including Director of Accounting, Vice-President of Accounting, General Manager, and Executive Vice-President, Caribbean Division. Following my tenure at Seatrain Lines, I became employed at Farrell, and served as Vice-President, Finance and Chief Financial Officer from 1981 to 1990. In 1990 I became President of Farrell. I left Farrell in 2000.

3.    Farrell is a shipping company and the operator of numerous vessels. Plaintiff, the American Steamship Owners Mutual Protection and Indemnity Association,

Inc. (the "American Club" or the "Club") is a mutual insurance company licensed and regulated by the New York State Insurance Department. During the years 1954 to 2005, Farrell obtained protection and indemnity insurance from the American Club. Farrell is not a licensed insurer, and to my knowledge, none of the other members that obtained insurance from the Club during this period was a licensed insurer.

**The Operation of the American Club**

4.    I began serving on the American Club's board of directors in 1984, and continued as a director for 18 years, until 2002. I served on the Club's Finance Committee from 1985 until 2001. In these capacities, I attended Board meetings and Finance Committee meetings regularly.

5.    The American Club's Board is elected by the Club's members at an annual meeting. Other than electing the Directors, and approving certain By-Law changes, the members do not play a role in the management of the Club.

6.    The Club's directors make many important decisions on behalf of the Club, and do so based on the advice of the Club's managers, the Shipowners Claims Bureau, which at all relevant times was engaged both to manage the Club's day-to-day operations and to advise the directors with respect to their various responsibilities. As the managers are insurance professionals, the Board placed great weight on their advice. At all relevant times, the Board also relied on the advice of the Club's counsel in making its decisions.

7.    At Board meetings, the directors, among other things, make decisions with respect to the levying of assessments, the closing of insurance years, the use of reserves, and the payment of large claims that exceed the managers' approval

authority.  We took our fiduciary duties seriously, and, notwithstanding my own role as an officer of Farrell, when I acted as an American Club Board member or Finance Committee member, I always acted in the best interest of the Club.  I did not consider my being an officer of both the Club and Farrell to have presented a conflict of interest, and in fact, the Club had a conflict of interest policy that explicitly provided that it was not a conflict of interest to serve on the American Club Board and to hold a position with, or equity interest in, an American Club insured.  See Exh. DX-AP (Statement of Policy on Conflict of Interest).

8.  In keeping with the conflict of interest policy, I recused myself from votes concerning Farrell claims, but as to all other matters, I participated in voting and took whatever informed action I determined after due consideration was in the Club's best interest.  I note that many of my fellow Board members were also affiliated with American Club insureds.  Also, during the majority of my tenure on the Club's Board, the Board included a director from the Club's then-counsel, Kirlin, Campbell & Keating. For much of the time I served on the Board, the Kirlin representative was Richard Brown.  (I am informed that Mr. Brown has been identified as a proposed "expert" witness by the Club.)

**Closing of Insurance Years**

9.  In addition to the initial premium charged to assessable policyholders, the operative contractual agreements between the Club and its members (i.e., the Club's insureds) permitted the levying of subsequent assessments when deemed necessary to pay for estimated claims in a particular insurance year exceeding the amount collected from that year's initial premiums, or from prior assessments, or from investment income

earned on such funds.  Several years after a given insurance year ended, when it was determined by the managers that the final results for the year could be estimated with a reasonable degree of certainty, the Club, with the detailed advice of its managers and legal counsel, as described below,  would "close" the insurance year.  If the estimated final costs of the insurance year exceeded the amount already collected in premium and assessments, the Club collected a final assessment from members before closing the year.  Conversely, if the estimated final costs of the insurance year were less than what had been previously collected from premiums and assessments, the Club would issue a final refund before closing the insurance year.  The Club's counsel advised us that the Club was obligated to make such refunds if they resulted from the collection of assessments, and, during my entire tenure on the Board, the Board followed this advice in ordering such refunds.

10.     Before the Board closed a particular insurance year, the managers first provided a report to the Finance Committee, estimating the final results for the year and recommending that the year be closed.  The Club's counsel then drafted an opinion letter on whether the proposed closing was lawful and valid, and whether the Board had the authority to take such action.    The Finance Committee then made a recommendation, in reliance on the managers' report, on whether the Board should enact the closing resolutions drafted by the Club's counsel.  Based on this information and professional advice, the Board voted on closing the year in question.  During the time that I was a Director, no year was closed without a recommendation from the managers and an opinion from counsel supporting such closing as matters of their respective professional judgments.

4

11.    It was always my understanding – and, to my knowledge, the understanding of other board members – that once a year was closed, members from that year could not be further assessed. We never intended that a closed year could be "reopened" for any purpose. There would have been no need for the managers, the Club's counsel, the Finance Committee or the Board itself to engage in the involved and deliberative closing process if insurance years could simply be reopened at the discretion of the Club. When the Board called for a final assessment or issued a final refund, it was always our intent that such an action constitute a final determination of the policyholders' liability to the Club to pay for its insurance coverage for that to-be-closed policy year. The Club benefited from this finality as well. Once a year was closed, the Club knew that it would not have to issue any future refunds to that year's members, even if funds remained long after the year's liabilities had been satisfied. Thus, after the closing of an insurance year, any remaining surplus from that year became a general Club asset.

12.    Consistent with this understanding, Farrell relied on the closure of an insurance year as establishing that, while its insurance protection continued, it had no more liability to the Club for that insurance year.

13.    Based on documents produced in this action, Richard Brown suggested in a November 3, 1993 letter that he believed that years could be "re-opened" under certain circumstances. See Exh. PX-177 (November 3, 1993 Kirlin letter to Thomas J. McGowan). I recall occasional discussion among board members between 1993 and 1996 about whether the Club had the ability to "reopen" years, but I, and to my knowledge, my fellow board members, all believed that the Club did not have the ability

to "reopen" years for the purposes of making further assessments (except in narrow circumstances as permitted by the New York Insurance Law).  I believe that I would have remembered had anyone on the Board given credence to the notion that the Club could simply "reopen" a year, because it would have constituted a radical departure from the manner in which the Club had operated since my first days on the Board, and, as I understand, since the Club's inception.  In any event, the Board made its position on the subject plain in the Club's June 13, 1996 Board minutes, which state "the Directors wished to make clear that when taking action to close a year it is their intention that such closed year cannot be opened unless through the operation of New York statute."  Exh. PX-222 at AC3069006.

**The Club's Reserve Account**

14.    After insurance years were closed, the money retained by the American Club upon closing was transferred to what we referred to as the reserve account (later renamed the "contingency fund").  Unlike funds from open years, which are generally accounted for on a year-by-year basis, funds in the reserve account are aggregated and not segregated by years.

15.    As I noted, it was always my understanding, and, I believe the understanding of the Board, that policyholders from a given insurance year could not be further assessed once that year was closed.  Therefore, the primary purpose of the reserve fund has always been to pay for claims arising from closed years that had not been settled or identified at the time the year was closed.  In addition, the reserve fund was seen as a marketing tool, which some thought could be used to attract new members.

16.    In 1985, after engaging in the closing process I described above, the Board voted to close the 1975/1976 insurance year.  There remained with respect to that year a surplus of over $850,000, which was the result of overpaid premiums or assessments and accumulated investment income.  Thomas McGowan, then-president of the Shipowners Claims Bureau, recommended that the surplus be retained in the reserve fund, and the Board so resolved.  Later, after further deliberation, and in reliance on advice we received from the Club's counsel, the Board elected to rescind its earlier resolution, and return the surplus to the members of the 1975/1976 insurance year. See Exh. PX-88 at AC3058533-5 (January 9, 1986 Board minutes).

17.    I, in my informed discretion as a Club board member, voted for the surplus to be returned to the members of the 1975/1976 insurance year because I believed those funds, which were determined by the Club's professional advisors to be surplus, to be the property of the members.  Moreover, I believed that retaining the surplus in the reserve account was unnecessary from an accounting or a marketing standpoint. Voting to return these funds to the members was, in my judgment, in no way inconsistent with my fiduciary duties to the Club.

18.    In 1988, with the closure of policy years 1977-78, 1979-80, and 1981-82, the Board concluded, after extensive discussions, that the Club should begin including on an annual basis an additional $100,000 in the reserves when closing policy years. This action was taken in an effort to strengthen the Club's reserves against the emergence of occupational disease claims ("ODCs"). See Exh. PX-127 at AC3061048 (April 14, 1988 Board minutes).  This additional $100,000 was contributed by policyholders from the insurance year to be closed, either through an assessment, or

from the Club's retaining funds that would have otherwise been returned to the policyholders as excess assessments. Like other funds in the reserve account, this additional $100,000 was intended to be available to pay for claims from any closed year, including years that had been previously closed, such as the Torrens claim described in paragraph 27, which involved insurance years in the 1950s.

19.     No suggestion was made at that time that previously closed insurance years could be "reopened" for further assessment. The understanding shared by all concerned with the setting of a reserve for ODCs was that such ODCs were covered in the years in which the occurrences took place, regardless of whether the claims were noticed to the Club before or after the closing of the relevant insurance years.

20.     There was at that time some discussion about reserving up to $250,000 of a year's credit balance (but only if such a balance existed) at the time of closing the insurance year. See Exh. PX-120 (March 8, 1988 letter from Thomas McGowan to the members of the Finance Committee regarding a planned discussion on closing insurance years). The Finance Committee, however, determined (again, after extensive discussions) that a more appropriate approach was to fix the sum at $100,000, even if making that payment required an assessment of members from that insurance year. In the Finance Committee's judgment, such a certain payment into the reserve fund was a more reliable and appropriate mechanism for dealing with any Club indemnity obligations arising out of unreported ODCs, because the alternative proposal would have provided for a contribution into the reserve fund only if there were a sufficient surplus in a given insurance year at the time of closing. Upon receiving the managers' recommendation, and an opinion letter from counsel stating that setting such a reserve

was proper upon closing a year, the Finance Committee recommended that the years in question be closed, and that the annual reserve fund contribution be fixed at $100,000, and the Board so voted.

21.    I, again in my informed discretion as a Club board member, voted to fix the reserve fund contribution at $100,000 because, based on all the information provided to the Board by the managers and the Club's counsel, I thought this certain amount, in addition to the other reserves available to pay claims and available reinsurance, was sufficient.

22.    Over the years, the funds retained by the Club upon closing years, and the investment income generated by such funds, have developed into substantial sums. The balance of the reserve account as of December 31, 1988 – the year we fixed the annual reserve fund contribution at $100,000 – was $18,142,712 (see Exh. PX-297 at AC086798, referencing AC3062106) and was $41,343,320 as of December 31, 2002, the year I resigned from the Club's Board (see Exh. PX-297 at AC086799, referencing AC3077029).[1] I believe that these healthy reserve figures further demonstrate that the Board, as well as the Club's managers, acted responsibly and in the Club's best interests when voting on assessments, the return of surplus to members, and other financial matters relating to the closing of the insurance years in question and otherwise.

23.    As noted above, in or around 1996, the Board renamed the reserve account the "contingency fund." The contingency fund, like the reserve account, existed primarily to pay for claims from closed years. The creation of the contingency fund, for

---

[1]    The documents bearing the Bates stamps AC3062106 and AC3077029 are both surplus statements that are part of a set of voluminous documents not individually marked as trial exhibits.

9

the first time, allowed the Board to use the Club's existing reserves to close insurance years without fully assessing the policyholders from those insurance years. Prior to that time, counsel for the Club had advised that the Club's reserves should not be used to offset deficiencies upon the closing of insurance years. See, e.g., PX-171 (May 27, 1993 letter from Richard Brown to Thomas McGowan stating policy). Because of the prudent way in which the Club had been managed historically, its reserves had increased to a point that the contingency fund was able to provide this new benefit to the Club's members.

24.     Thus, the contingency fund guidelines state: "The disposition of reserves allocated to and designated as the Contingency Fund would remain subject to the absolute discretion of the Board of Directors save, obviously, to the extent that they would not have power to allocate to the Fund any monies from the balance available for closed years so as to reduce that balance below the total reasonably estimated for unpaid losses and expenses (including IBNR) for those years. This constraint flows from a primary consideration that sufficient funds always be available to cover claims in closed years and, indeed, provide for the unanticipated growth of claims in such years." Exh. DX-DE at AC3069074 (May 30, 1996 Memo to the Board of Directors from the Finance Committee regarding the Contingency Fund). The primary purpose of the contingency fund, like that of the reserve account, was to meet the Club's insurance obligations with respect to closed insurance years, as policyholders from those closed insurance years were no longer subject to assessment.

25.     The Club's reserve account and contingency fund provide a significant benefit to members of the Club. The New York Insurance Department requires the Club

to maintain a specified surplus, and without the reserve account, the Club's members might have to be assessed amounts sufficient to meet the surplus requirements imposed by the Department.  The reserve account has also been used at various times to offset costs in open insurance years.  For example, during my tenure as a Director, the reserve account was at times used to pay for the cost of stop loss insurance for open insurance years.

26.     It has always been my understanding that policyholders in open insurance years were responsible for maintaining the Club's minimum surplus level as required by the New York Insurance Department, regardless of what caused the surplus to become impaired.  I never represented to any new member of the Club that they would not have to contribute to maintaining the Club's surplus in the event that an impairment was attributable to claims from closed insurance years, nor do I know of any other Director or anyone else representing the Club making such a representation.

**Occupational Disease Claims**

27.     In the early 1980s, American Club members began presenting asbestosis, mesothelioma, and other ODCs to the Club for indemnification.  These claims were presented for payment as a matter of right based on the terms of the insurance contracts.  At no time did Farrell – or to my knowledge any other policyholder – request that the Club pay ODCs as a matter of discretion.  Because these policyholders had purchased insurance coverage from the American Club for the years in which the underlying occurrences took place, I believed then – and I believe now – that the Club had an obligation to pay such claims.  I am aware of no suggestion by anyone, including the Club's counsel – at least, prior to the commencement of this litigation – that the

closing of an insurance year terminated the Club's obligation to pay claims. The very purpose of the reserve account was to pay such closed year claims, and it was used accordingly.

28.　Nor did I ever hear – far less believe – that the Club was only paying such claims on a discretionary basis. Indeed, Farrell itself requested indemnification for several claims arising from occurrences that took place during closed years, which the Club duly paid, with no suggestion that it was doing so on a "discretionary" basis. One of these claims – an asbestosis claim brought by a seaman named Richard Torrens – resulted in a final payment by the Club to Farrell of $1,210,000.

29.　More specifically, until this litigation was commenced, neither the Club's managers nor its counsel ever suggested to me (or to my knowledge anyone else) that the Club had no obligation to pay such claims or that the Club was only paying the claims on a "discretionary" basis. Had ODCs not been covered under the Club's policies, or had the payment of ODCs been discretionary, I believe the Club's managers or counsel would have advised us.

30.　Farrell, like, I believe, all of the Club's other insureds, operated under the clear understanding (supported, among other things, by the plain language of the insurance contracts and the Club's longstanding practice of providing coverage) that continuing coverage of closed year ODCs was mandatory. As a consequence, Farrell determined that it was unnecessary to establish internal reserves for closed year ODCs. We believed it was unnecessary because of the Club's continuing obligation to indemnify these claims, even if they arose from occurrences that took place during closed years.

31.    Farrell also forbore from obtaining protection and indemnity or other insurance from other sources because of its clear understanding that coverage was ongoing for closed year ODC claims.  Had Farrell known that the Club viewed its coverage obligations as "discretionary," it would, at minimum, have sought insurance protection from a different source.

32.    Finally, it is preposterous to think that Farrell would have entered into an insurance contract in which the Club could disclaim its obligation to provide coverage in its discretion.  Such an arrangement would be antithetical to the very notion of insurance – exchanging premium for certain coverage for otherwise eligible claims.


I declare under penalty of perjury that the foregoing is true and correct.

Richard Gronda

Executed on June 12, 2006

8133138

13