UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
AMERICAN STEAMSHIP OWNERS MUTUAL  :
PROTECTION AND INDEMNITY          :     No. 04-cv-04309 (LAK)
ASSOCIATION, INC.                 :
                  Plaintiff,  :     **AFFIDAVIT OF**
                                  :     **CHARLES B. ACHUFF**
    -against-                  :
                                  :     (ECF Case)
ALCOA STEAMSHIP CO., INC., et al., :
                                  :
                 Defendants.  :
------------------------------------------------------------- X

STATE OF PENNSYLVANIA   )
                        ) ss.:
COUNTY OF MONTGOMERY    )

      CHARLES B. ACHUFF, being duly sworn, deposes and says:

      1.    The facts stated herein are based on my own personal knowledge and/or review of various documents that have either been produced or marked as trial exhibits in this action, and the facts are true to the best of my knowledge, information and belief. I submit this affidavit on behalf of Defendant Keystone, as defined in its answer filed in this action on October 8, 2004 and amended answer filed February 4, 2005 (mistakenly dated February 4, 2004), in the suit brought against it by the American Steamship Owners Mutual Protection and Indemnity Association, Inc. (the "American Club" or the "Club").

      2.    Plaintiff, the American Club, named Keystone Shipping Co. and several entities listed under Keystone Shipping Co. as defendants on Ex. A to its Second Amended Complaint, dated July 8, 2004. Those entities are (1) Chas. Kurz & Co., Inc.; (2) several wholly owned subsidiaries of Chas. Kurz & Co., Inc., all managed by Keystone Shipping Co., Baldbutte Shipping Company, Chestnut Shipping Corporation, Chilbar Shipping Company, Fredericksburg

Shipping Company, and Margate Shipping Company; (3) Keystone Tankship Corporation, an affiliate managed by Keystone Shipping Co.; (4) Timbo Shipping Ltd., and Calendar Navigation Corporation, which have been dissolved; (5) New England Collier Company, a joint venture which has been dissolved, and which was managed by Keystone Shipping Co., and (6) Paco Tankers, Inc. an entity which was managed by Keystone Shipping Co. but was not and is not now related to or controlled by any Keystone entity. At various times, each of these entities (which I will refer to here collectively as "Keystone") was insured by the American Club, and from at least 1944-1996, at least one Keystone entity was insured by the American Club in each year.

## Background

3. I am currently engaged as a consultant for both Keystone and Aon Risk Services Inc. of New York ("Aon"), Keystone's insurance broker.

4. I have been actively involved with Keystone's insurance since 1957, when I became employed by H.C. Knight & Company ("H.C. Knight"). I was employed by H.C. Knight from 1957 through 1990. Throughout my entire tenure with H.C. Knight, it served as the insurance broker for Keystone. Additionally, throughout my entire tenure with H.C. Knight, Keystone was the major client that I serviced. My initial responsibilities on the Keystone account included clerical work, assistance with brokering the account (negotiating with underwriters for Keystone's insurance, including P&I insurance and Hull insurance), and assistance with processing Keystone's claims with its underwriters.

5. In 1966, I became a partner of H.C. Knight. At this time, I took over full responsibility for the Keystone account, and therefore was responsible for dealing with all aspects of Keystone's insurance. Then, in 1988, I became the sole owner of H.C. Knight.

Case 2:04-cv-04309-LAK-JCF   Document 364   Filed 07/07/2006   Page 3 of 14

6. In 1990, I became employed by Sedgwick James of Pennsylvania, Inc. ("Sedgwick"), which took over for H.C. Knight as Keystone's insurance broker. At Sedgwick, I continued to have complete responsibility for the Keystone account.

7. In late 1997, Aon became Keystone's broker, at which time Aon engaged me as a consultant to serve as its risk manager, including involvement in the occupational disease claims ("ODCs") on behalf of Keystone and submission of these claims to the American Club for indemnity. Although Keystone was no longer a member of the American Club as of 1997, I continued to deal with the American Club to the extent there were insurance issues involving the years for which Keystone was insured by the Club.

8. I retired from the consultancy position with Aon at the end of 2002. However, after I retired, I continued to periodically perform consulting work for Keystone, including work related to the handling of Keystone's ODCs.

9. In the beginning of 2004, I became a consultant for both Keystone and Aon, and have been actively involved with the matters related to Keystone's settled and pending ODCs.

### The History of the American Club's Indemnification of Keystone's Occupational Disease Claims Under Keystone's Insurance Policies With The Club

10. Throughout my tenure with the various entities that served as the insurance broker for Keystone, I have been involved with, or aware of, the submission of claims to the American Club for indemnity pursuant to Keystone's insurance contracts with the Club, including ODCs of seaman who sailed on Keystone vessels.

11. From the time Keystone first became aware of potential ODCs of seaman, it provided notice to the Club by providing notice to the Club's Managers' the Shipowners Claims Bureau ("SCB") of such claims. It was always my understanding that coverage existed

–3–

for ODCs, and I submitted claims to the Club on this basis. I frequently discussed these claims with Club representatives, including Gary Strevell, Michael Mitchell, and Bill Craig, and they treated these claims as covered claims in the same manner as any other claims falling within the terms of the policies. The Club never suggested in the time that I was involved in presenting claims to the Club for payment, prior to this lawsuit, that such claims were not covered or that any issues existed with respect to coverage. If the Club had any question of whether coverage existed for these claims, I would have expected the Club to issue a reservation of rights articulating its position. The Club never did so.

12. As with any other claim insured under American Club insurance policies, when Keystone received notice of an ODC, it promptly notified the Club of such claim by notifying the SCB. The defense of each ODC was handled by an outside law firm. Both Keystone and the outside defense counsel defending the claim regularly kept the Club up to date on the status of each case, and any material developments. If there was a possibility of settlement of a claim, the SCB was notified of the settlement proposal, and often actively participated in the settlement negotiations and approved the settlement proposal before it was made.

13. The Club also set reserves on the active ODCs at the end of each year, as it did with all other claims. While Keystone was provided the opportunity to comment on the reserves set for an individual claim, including individual ODCs, it was the Club's decision what amount to reserve for each individual claim, not Keystone's. The Club set reserves for each individual claim, whether Keystone agreed with the amount of the reserve or not. There was no discussion between Keystone representatives and the Club regarding the appropriate reserves for all claims in an insurance year, nor was Keystone involved in any manner in the decision of how

much the Club should reserve for incurred but not reported claims in any insurance year. If Charles Kurz II or Adolf Kurz were involved in such decisions acting as Board members of the Club, they did not discuss such issues with me. As Keystone's representative handling Keystone's insurance procurement and claims submission with the Club, I was never told by the Club that the amount of reserves set by the Club, either for an individual claim, or the total aggregate reserve for all claims in an insurance year, had any relationship to the coverage to which Keystone was entitled under the Club's insurance policies. It was always my understanding that the Club's obligations were determined solely and exclusively by the limits of coverage set forth in the Club's insurance policies, and that the setting of reserves was the Club's responsibility as an insurer, as with any other insurance company.

14. Since Keystone's insurance contract with the American Club was an indemnity contract, Keystone was responsible for directly paying the legal fees associated with the defense of each claim, as well as any settlement or judgment in favor of the claimant. While the Club was consistently advised of the status of each individual claim, it was Keystone's regular practice not to submit its actual claim for indemnification to the Club until after the final settlement or judgment was paid, and all the legal bills were received and paid. The Club was aware and approved of this practice.

15. From the time Keystone submitted its first ODC to the Club for indemnification in the 1980s, the Club accepted coverage. Up until the time of this lawsuit, the SCB and the Club continuously indemnified Keystone with respect to ODCs, without ever once asserting that coverage was in dispute, or reserving its right to deny coverage for such claims.

16. The only coverage issue I was ever aware of regarding the Club's indemnification of ODCs involved the allocation of deductibles to the individual claims. This

would not have been an issue unless coverage existed under the policies. In the late 1980s, Keystone learned that the Club had decided to apply a multiple deductible approach to ODCs. Under the Club's multiple deductible approach, the Club would apply the deductible applicable to each policy year in which the claimant had sailed on a Keystone vessel, to the amount of the claim allocable to that year based on the claimant's days of sea service. This approach was referred to as a "stacked" deductible approach, because rather than simply applying one single deductible per claim, the Club "stacked" deductibles from every policy year in which the claimant sailed on a Keystone vessel. If the amount of the claim in any insurance year of a claimant's sea service did not exceed Keystone's deductible in that year, the Club provided no indemnity under the policy covering that year.

17. Based on the Club's position with respect to the application of deductibles, some claims were not indemnifiable according to the Club. As such, for these particular claims, although the Club had been on notice of the existence of these claims (like any other claims), I did not submit such claims to the Club because the Club denied that it was obligated to indemnify Keystone for such claims under the multiple deductible approach.

18. In 1999, Keystone learned that the Second Circuit, in *Prudential Lines*, decided that the American Club was only entitled to apply one deductible for each ODC under the American Club's insurance policies. This decision caused Keystone to revisit the manner in which it had previously been submitting its ODCs to the Club, as well as the manner in which it would submit its future ODCs to the Club.

19. After the Second Circuit's decision in *Prudential Lines*, Keystone objected to the continued use of the multiple deductible approach by the Club for indemnification of new ODCs. Objections were made at various times in letters from myself or Janet Pajan, to Gary

Strevell or Michael Mitchell of the SCB, regarding the indemnification of ODCs. (*See, e.g.*, DX-IV, referencing KEY006001, which is part of a set of voluminous documents not individually marked as trial exhibits). These letters made clear that Keystone reserved its right to seek reimbursement from the Club based on a single deductible, as decided in *Prudential Lines*, and in the event of a ruling in favor of Keystone arising out of pending and/or future litigation against the Club regarding deductibles.

20. In addition to reserving Keystone's rights to seek full reimbursement for ODCs based on the application of only one deductible for new indemnity claims submitted to the Club, at this time, Keystone also sent letters to the SCB resubmitting ODCs involving multiple years of sea service aboard Keystone vessels that had been incorrectly reimbursed to Keystone under the multiple deductible approach. (*See, e.g.*, DX-IV, referencing KEY 007852, which is part of a set of voluminous documents not individually marked as trial exhibits).

21. Aside from the aforementioned issue with respect to deductibles, in the years following the *Prudential Lines* case, nothing else changed with respect to the Club's indemnification of Keystone's ODCs. From 1999 to May 2004, Keystone continued to submit ODCs to the SCB, while reserving its rights as to the number of deductibles, and the SCB and the Club continued to treat these claims as covered under the Club's insurance policies. Then, in May 2004, the Club announced for the first time that it was suing all of its former members (and one current member), seeking a declaration that it no longer was obligated to provide coverage for ODCs. As I stated above, prior to this time, there was never any indication from the Club that there was any question as to coverage for ODCs.

22. In addition to seeking a declaration that it no longer had to provide coverage for future ODCs, in conjunction with this action the Club has also reserved its rights to

seek reimbursement of amounts it paid to indemnify Keystone with regard to the Timothy J. Farley claim. The Club had been notified of the Farley claim prior to instituting the present action. In fact, the Club expressly acknowledged coverage and asserted control over the Farley claim by insisting that counsel of its choice be involved in the claim. (*See* DX-GU). Thereafter, only after a mandatory settlement conference had been scheduled, the Club abruptly and without explanation withdrew settlement authority. On May 17, 2004, Keystone unexpectedly received a letter from Michael Mitchell of the SCB, informing Keystone that the Club would not be providing coverage for this claim. (*See* DX-HA). Counsel for Keystone ultimately negotiated a settlement with the Club regarding the Farley claim, whereby the Club indemnified Keystone for this claim but reserved its right to seek reimbursement based on a favorable ruling in the present action.

23. Since the date that the Club initiated this lawsuit, Keystone has received notice of several active ODCs (these claims are discussed in detail below).[1] Keystone has continued to provide the Club with general information regarding these new claims, as well as notice of any material developments with respect to the claims, including settlement discussions. However, in light of the Club's denial of coverage for such claims, Keystone has not disclosed any privileged information regarding these claims to the Club.

### Explanation and Summary of Keystone's Occupational Disease Claims Chart

24. Since the late 1990s, I have assisted with the creation and updating of a chart detailing all of Keystone's ODCs that involve its insurance policies with the American Club. (*See* DX-IV). This chart was created from documents in Keystone's files, and the bates

---

[1] There are over seven thousand ODCs against Keystone that have been administratively dismissed on the multidistrict litigation docket administered in the Eastern District of Pennsylvania. These claims could become active at anytime should the plaintiffs in these cases come forward with medical evidence substantiating their claims.

numbers of the applicable documents are listed on the chart under the column "KEY Bates No." for reference. I have reviewed the chart for accuracy, and confirm that it is an accurate representation of the documents and information from which it is based, with the exception of the revisions noted in paragraph 25 below.

25. While verifying the accuracy of the Keystone Claims Chart (DX-IV), I discovered two claims missing from the chart, the Rose claim and the Dowling claim. The information pertinent to those claims is as follows:

| Name | KEY Bates No. | Legal Costs | Settlement | Total | No. of Ded(s) | Deductible | Net | Vessel | Pol. Yr. | Date sent to SCB | Amount Paid | Date Paid | Date Resubmit | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dowling, Carlos | KEY 33333-63 | 679.75 | 1,350.00 | 2,029.75 | 2 | 3,500.00 | 0.00 | Perryville | 69 & 70 | No claim made on TAC - below deductible | | | | Claim settled 4/99 - legal paid 5/02 |
| Rose, Raymond | | 3,066.00 | 2,250.00 | 5,316.00 | 3 | 75,000.00 | 0.00 | Petersburg and 2 Shell One Gov't and 2 Mobil | 56 to 89 | Claim not made on TAC as below deductible | | | | Claim settled 1/96 - legal 10/96 |

I also noticed that the Alexander claim has the wrong amount listed. The correct total for Alexander is $21,310.81, with $8,070.00 in settlement costs and $13,240.81 in legal costs. The chart has been revised and will be submitted as revised trial exhibit DX-IV as well.

26. The claims chart lists each claimant in alphabetical order. For each claimant, there are columns listing the "legal costs," "settlement costs," and "total costs." The "legal costs" column refers to the amount paid out by Keystone to outside counsel who represented Keystone in the underlying suit with the claimant. The "settlement costs" column refers to the amount that the underlying law suit against Keystone was settled for, or the amount of a judgment against Keystone in those cases that did not settle. As with the legal costs, this amount was also directly paid out by Keystone to the claimant. The "total costs" column simply

refers to the addition of the legal costs and the settlement costs. In other words, it represents the total amount Keystone directly paid out as a result of the claimant's ODC against Keystone.

27. For each claimant, the claims chart has columns for "deductible" and "net." The "deductible" column represents the amount of Keystone's deductible on its American Club insurance policy for the first year in which the claimant sailed on a Keystone vessel that was insured by the American Club. This amount represents the deductible that should be applied by the Club prior to indemnifying Keystone for an ODC. The "net" column simply represents the total column (i.e., the total amount paid out by Keystone) minus the deductible column. This is the amount that Keystone was, and is, entitled to claim for indemnity from the American Club.

28. For each claimant, the claims chart also has columns for "Vessel" and "Pol. Yr." The "Vessel" column refers to the Keystone ship upon which the claimant sailed that was covered by an American Club insurance policy. In some cases, claimants have sailed on multiple Keystone vessels that were insured by the American Club, and these ships are also listed (or listed as "other[s]"). The "Pol. Yr." column represents the policy year or years in which the claimant sailed on a Keystone vessel or vessels insured under an American Club insurance policy.

29. For each claimant, the claims chart also lists the "Date sent to SCB," the "Amount Paid," the "Amount Due," and the "Date Paid." The "Date sent to SCB" column represents the date upon which Keystone sent its indemnity claim to the SCB for each claimant. As was our customary practice with the American Club, Keystone would wait until all of the legal fees were billed to and paid out by Keystone, as well as the final settlement or judgment paid out by Keystone, before it would submit its claim to the Club for indemnification.

30. Also, as I stated above, Keystone was previously informed by the Club that it was applying a multiple deductible approach to ODCs, and therefore, prior to *Prudential Lines*, all potential indemnity claims were evaluated on this basis to determine whether the claim would be indemnified by the Club under the policies. Therefore, as a result of the application of multiple deductibles, certain claims were not submitted to the Club, although the Club was notified of such claims. These claims are listed under the "Date sent to SCB" column as "No claim made on TAC due to deductibles."

31. The "Amount Paid" column represents the amount indemnified to Keystone by the American Club for each individual claimant, while the "Date Paid" column represents the date upon which this amount was paid. For the majority of claims, the "Amount Paid" column is "0.00," and the "Date Paid" column is blank, indicating that the American Club did not indemnify Keystone any amount for those claims.

32. The "Amount Due" column equals the "Net" column minus the "Amount Paid" column. This is the total amount owed to Keystone by the American Club for each claim.

33. The final column on the chart is the "Date Resubmit" column. As I previously stated, the Club applied a multiple deductible approach to the indemnification of Keystone's ODCs, and has continued to do so up until the time it filed the present lawsuit, despite the Court's decision in *Prudential Lines* that the Club was only entitled to apply one single deductible to these claims. Therefore, following *Prudential Lines*, Keystone resubmitted certain ODCs to the Club (which had previously been indemnified by the Club based on the multiple deductible approach), so that it could be indemnified for the difference between the multiple deductible approach that the Club had wrongfully applied, and the single deductible approach. (*See* DX-259).

34. Several claims have not been indemnified by the Club as a result of its position in this action. Since mid-2004, no claims have been indemnified by the Club. In addition, since the date that the Club initiated its lawsuit, Keystone has received notice of several active ODCs involving claimants who sailed on Keystone vessels during the period in which Keystone had insurance with the American Club.

35. For example, in May 2005, Keystone received notice of a mesothelioma claim brought by Alfred T. Rebenack, who sailed on Keystone vessels between 1958 and 1974. The Club received notice of this active claim, and was updated periodically regarding its status.[2] On August 24, 2005, the Club was notified that the Rebenack claim against Keystone was settled in consideration of a payment of $300,000, not including the associated defense fees. The Club has made no indemnity payments to Keystone with respect to this claim.

36. On August 8, 2005, Keystone notified the Club of another active ODC, brought by Thomas Stroker, who sailed on Keystone vessels in 1979 and 1981. As with the Rebenack claim, the Club has been provided non-privileged documents regarding this case, and has been updated on the material developments. This claim was recently settled by Keystone for $344,400, with expected legal fees exceeding $200,000. However, Keystone will only be charged for its proportion of the claim representing the amount of time the claimant sailed on Keystone vessels insured by the Club, because Stroker also sailed on Keystone vessels insured by the United Kingdom P&I Club. When there are multiple P&I clubs involved in a single claim, there is an informal agreement between the P&I clubs and the shipowners that the total amount of the claim is allocated to the implicated P&I clubs based on the number of days of sea service involving each club. Here, Stroker worked on Keystone vessels for two years, with

---

[2] The information shared with the Club regarding this claim was restricted to non-privileged information due to the Club's denial of coverage in this action.

approximately 60 percent of his sea service days implicating Keystone's insurance with the United Kingdom P&I Club, and 40 percent of his sea service days implicating Keystone's insurance with the American Club. Accordingly, the American Club is only liable for 40 percent of the total claim, totaling approximately $218,000.00.

37. In addition to the legal costs of defending each active ODC, which has been included in the claims chart, there is also a yearly legal expense required for the general maintenance of all of the ODCs on the multidistrict litigation docket. Thompson Hine, the law firm assigned to monitor these claims, on Keystone's and certain other shipowners' behalf, charges a general legal expense for their services, which is allocated to each shipowner which the firm represents, according to their proportion of all of the claims on the docket. For example, Keystone currently is involved in approximately 6.8% of the total number of claims on the docket,[3] and therefore is allocated approximately 6.8% of the total general maintenance expenses for all of the claims on the docket, which amounts to approximately $10,000 per month.

38. Keystone's methodology for apportioning this general legal expense, which was accepted by the Club, was to allocate these expenses to each individual claimant by dividing the total general legal expense apportioned to Keystone in each year by the number of Keystone's open cases on the multi-district litigation docket, as quoted in Thompson Hine's December legal statement to Keystone for that year. In 2000, Keystone submitted an indemnity claim to the Club for the general legal expenses allocated to approximately 300 claimants, all of which were claimants who sailed on a Keystone vessel for only one year. Since each claimant only sailed for one year, each only had a single deductible applicable to their claims. The Club reimbursed Keystone in full for this indemnity claim, after subtracting the applicable deductible from each claim. Subsequently, the Club refused to indemnify Keystone for these general legal

expenses, asserting that the Club was not obligated to indemnify Keystone until after each claim was settled or a judgment was executed.

39. According to the Chart, the total amount owed to Keystone by the American Club for indemnity is at least $2,409,057.20. In addition, Keystone is entitled to recover for its general legal expenses associated therewith. I swear that the foregoing is true to the best of my recollection and knowledge.

*Charles B. Achuff*

Sworn to before me this
12th day of June, 2006
*Janet M Pajan*
Notary Public

**COMMONWEALTH OF PENNSYLVANIA**
NOTARIAL SEAL
JANET M. PAJAN, Notary Public
Lower Merion Twp., Montgomery County
My Commission Expires August 19, 2008

---

[3] This number varies slightly each year as claims are either added or deleted from the docket.