UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
AMERICAN STEAMSHIP OWNERS MUTUAL  :
PROTECTION AND INDEMNITY          :     No. 04-cv-04309 (LAK)
ASSOCIATION, INC.                 :
                Plaintiff,   :     **AFFIDAVIT OF**
    -against-                 :     **Philip W.J. Fisher**
                                  :
ALCOA STEAMSHIP CO., INC., et al., :     (ECF Case)
                                  :
                Defendants.  :
------------------------------------------------------------- X

STATE OF PENNSYLVANIA    )
                               ) ss.:
COUNTY OF MONTGOMERY    )

       Philip W.J. Fisher, being duly sworn, deposes and says:

1.     The facts stated herein are based on my own personal knowledge and/or review of various documents that have either been produced or marked as trial exhibits in this action, and the facts are true to the best of my knowledge, information and belief. I submit this affidavit on behalf of Defendant Keystone, as defined in its answer filed in this action on October 8, 2004 and amended answer filed February 4, 2005 (mistakenly dated February 4, 2004), in this suit brought against it by the American Steamship Owners Mutual Protection and Indemnity Association, Inc. (the "American Club" or the "Club").

**Background**

2.     I am currently employed as Chief Financial Officer and Executive Vice-President of Keystone Shipping Co.

3.     Plaintiff, American Club, named Keystone Shipping Co. and several entities listed under Keystone Shipping Co. as defendants on Ex. A to its Second Amended Complaint, dated July 8, 2004. Those entities are (1) Chas. Kurz & Co., Inc.; (2) several wholly owned

subsidiaries of Chas. Kurz & Co., Inc., all managed by Keystone Shipping Co., Baldbutte Shipping Company, Chestnut Shipping Corporation, Chilbar Shipping Company, Fredericksburg Shipping Company, and Margate Shipping Company; (3) Keystone Tankship Corporation, an affiliate managed by Keystone Shipping Co.; (4) Timbo Shipping Ltd., and Calendar Navigation Corporation, which have been dissolved; (5) New England Collier Company, a joint venture which has been dissolved, and which was managed by Keystone Shipping Co., and (6) Paco Tankers, Inc. an entity which was managed by Keystone Shipping Co. but was not and is not now related to or controlled by any Keystone entity. At various times, each of these entities (which I will refer to here collectively as "Keystone") was insured by the American Club, and for the years 1944-1996, at least one Keystone entity was insured by the American Club in each year.

4.  I graduated with a degree in accounting from La Salle University and earned a Masters of Business Administration from Drexel University. I am a Certified Public Accountant in the Commonwealth of Pennsylvania.

5.  I first joined Keystone Shipping Co. in 1966. Prior to that time, I was employed by Frank W. Harris, Jr. & Company, a public accounting firm which later merged and became a part of KPMG Peat Marwick. During my time with Keystone, I have had the responsibility of overseeing the company's finances.

6.  As part of my role at Keystone, I participated in negotiating premiums with the American Club. Although they were generally kept aware of the status of these negotiations, neither Charles Kurz, II nor Adolph Kurz negotiated Keystone's premiums with the Club when they were Board members of the American Club.

7. When making decisions as Board members of the American Club, Charles Kurz, II and Adolph Kurz acted in the best interests of the American Club and did not take direction from myself or others at Keystone.

### Keystone's Payments for Insurance Coverage

8. From the time I first began working at Keystone in 1966 through the time Keystone left the American Club in 1997, at least one Keystone entity purchased insurance coverage from the American Club in each year. During some of that time, other Keystone entities occasionally purchased insurance coverage from another mutual club, the UK Club. The Keystone entities which purchased insurance coverage from the American Club during my tenure, and also before my time with Keystone, have paid all premiums and assessments levied by the American Club.

### Occupational Disease Claims

9. At some point during the 1980s, Keystone began receiving notice of occupational disease claims ("ODCs"). Like other personal injury claims brought against Keystone, we were responsible for directly paying the legal fees associated with the respective ODCs and any resulting settlement or judgment. The American Club would then indemnify Keystone for such costs.

10. It has always been my understanding that the American Club was obligated to indemnify Keystone for ODCs which occurred in years in which Keystone had purchased insurance policies from the American Club. During my career, I have had experience with both mutual insurers and fixed premium insurers. I have never (prior to the present suit) heard of any insurer refusing to cover claims based on the premium that the carrier charged being deemed insufficient in hindsight, nor have I ever (prior to the present suit) heard of a

3

mutual insurer refusing to cover claims based on an insurance year having been closed. I understood that Keystone had an obligation to pay all duly issued premiums and assessments, and Keystone fulfilled this obligation. My understanding of the coverage has always been that the American Club would then fulfill its obligation to its insureds and pay for claims in accordance with the terms and conditions of its insurance policies. Thus, I expected the American Club to indemnify Keystone for all covered claims we presented to it.

11. For twenty years or more, the American Club acted in accordance with my understanding of its obligations, as set forth in ¶8. The American Club paid the ODCs presented by Keystone, and no one from the Club ever suggested to me, or to anyone else at Keystone of which I am aware, that the Club was paying the claims on a discretionary basis or that the Club was in any way reserving its right to deny future similar claims. I understand that the American Club's history of indemnifying Keystone's ODCs is being set forth more fully in the affidavit of Charles Achuff.

12. I reviewed American Club financial statements which were provided to Keystone. As these statements, beginning at some point in the 1990s, indicated that the American Club had set reserves for unreported asbestos claims, which I considered to be an additional representation of coverage of such claims by the American Club. (See, e.g., DX-DZ: American Club 1996 Financial report at AC0024335-6).

**Keystone's Reliance on Coverage for ODCs**

13. Keystone relied on the fact that the Club would continue to provide coverage for ODCs.

14. Keystone also forbore from obtaining protection and indemnity or other insurance from other sources because of its clear understanding that coverage was ongoing for closed

4

year ODC claims. Had Keystone known that the Club viewed its coverage obligations as "discretionary," it would, at minimum, have sought insurance protection from a different source.

15.    Had the American Club suggested that it was only paying ODCs on a discretionary basis, Keystone would have explored alternative coverage for those previously closed years, and definitely ceased purchasing insurance coverage from the American Club in future years. Keystone would not have stayed in the American Club if the Club had provided any indication that, unlike other Clubs and other insurers, it believed that it could disclaim coverage based on the closure of insurance years. Instead, Keystone continued buying insurance coverage from the Club through the 1996 insurance year.

16.    Based on the clear understanding, consistently reaffirmed by the American Club, that Keystone was covered by the Club for ODCs, Keystone frequently represented to auditors and lenders that it had such coverage. Keystone did not include reserves on its books for ODCs because it understood that it had coverage from the American Club for such claims. Instead, Keystone only recorded ODCs on an actual basis, meaning that we recorded what we paid for ODCs and what indemnification we received. Had we not assured auditors that Keystone had coverage for ODCs, we would have had to reserve for such claims. Given the need to provide such representations to third parties, had the Club indicated that it reserved the right to unilaterally withdraw coverage purchased by Keystone, Keystone would have withdrawn from the American Club immediately and instead purchased coverage, for future claims, from an insurer that was unequivocal about its intent to meet its coverage obligations.

5

17.     Keystone would never have purchased insurance policies which allowed the insurer to terminate coverage without seeking Keystone's consent. Thus, had the Club ever suggested that its closing of insurance years for assessment purposes affected Keystone's coverage, Keystone would not have purchased its coverage from the Club.

**Closing of Insurance Years**

18.     It has always been my understanding that when the American Club closed an insurance year, Keystone's liability for assessments was extinguished. When the Club intended to close a year, they would send Keystone a final assessment or final refund, and we would pay whatever was required of us. The Club did not negotiate the amount of any final assessment or final refund with Keystone but simply unilaterally chose to issue such refund or assessment. No one from the Club ever informed me, or anyone else at Keystone of which I am aware, that the Club may assert that it could charge future assessments after having closed a year.

19.     When the Club communicated to Keystone that an insurance year had been closed, Keystone eliminated the potential liability for assessment from its books, and communicated this change to its auditors. At the end of each financial year, Keystone set up accruals on its books for open insurance years. When Keystone was notified that an insurance year had been closed, Keystone eliminated the accrual for that insurance year from its books and instead provided a "true-up" figure for that insurance year. The auditors then checked the accuracy of such adjustments.

20.     Had the American Club indicated to me at the time that it closed the pre-1989 insurance years that the closures were subject to reopening, Keystone would not have continued to purchase insurance from the Club and would have explored the possibility of

buying "call insurance" for the years already closed. Call insurance is a type of insurance which provides the insured protection if the calls/assessments it is charged are higher than expected. On one occasion, Keystone purchased call insurance with respect to an open year, but we did not seek such coverage with respect to closed years because we understood that such years were not subject to further calls/assessments. We would have considered it completely unacceptable to have such an indefinite exposure to liability on Keystone's books.

### Deductibles

21.   I understand that for some period of time when indemnifying its policyholders for ODCs, the American Club applied multiple deductibles when the particular ODC spanned multiple policy years. I have always felt that this practice was incorrect, and when the Second Circuit in *Dicola v. American S.S. Owners Mutual Protection and Indemnity Association, Inc. (In re Prudential Lines, Inc.)* held that only one deductible should be applied, Keystone demanded that the Club fulfill its contractual obligation of indemnifying Keystone for ODCs on the basis of a single deductible. (*See* PX: 237: February 12, 1999 Letter from Seth Schafler to me with attached article regarding the Second Circuit's decision). However, it has not done so. I understand that the details regarding Keystone's assertion of its right to be indemnified on the basis of a single deductible are set forth more fully in the affidavit of Charles Achuff, who corresponded with the American Club frequently on this topic.

### Farley Claim

22.   I understand that Charles Achuff's affidavit discusses claims for which Keystone has either received no indemnity, or only been partially indemnified, as well as the current

7

pending claims against Keystone. In addition to those claims, the Club has also reserved its rights with regard to the Timothy J. Farley claim.

23.     The Club had been notified of the Farley claim prior to instituting the present action. The Club asserted control over the Farley case by instructing Keystone to hire Dante Mattioni and his firm to handle the case. (*See* DX-GU: January 30, 2004 E-mail from Gary Strevell to Frank Belinske). Further, the Club acknowledged coverage upon Keystone's engagement of Mattioni. (*See* DX-GP November 13, 2003 E-mail string between Gary Strevell and Frank Belinske). It was not until a mandatory settlement conference had been scheduled that the Club belatedly withdrew settlement authority. On May 17, 2004, Keystone unexpectedly received a letter from Michael Mitchell of the SCB, informing Keystone that the Club would not be providing coverage for this claim. (DX-HA). Counsel for Keystone ultimately negotiated a settlement with the Club regarding the Farley claim. The Club indemnified Keystone for the Farley claim subject to reserving its right to seek reimbursement based on a favorable ruling in the present action.

### Keystone's Departure from the American Club

24.     Keystone ceased purchasing insurance from the American Club after the 1996-97 insurance year and began purchasing the P&I insurance from the Steamship Mutual Underwriting Association. The decision to cease purchasing P&I insurance from the American Club was an economic decision made by myself and other executives at Keystone, not by Charles Kurz, II. Charles Kurz, II expressed his disappointment when the decision was made that Keystone would not renew its membership in the American Club. Prior to that time, no one from the American Club had advised me, or anyone else at Keystone of

which I am aware, that the Club either contended it had the right to deny ODCs or that it had the right to charge further assessments with respect to years it had closed.

25. I swear that the foregoing is true to the best of my recollection and knowledge.

Philip W.J. Fisher

Sworn to before me this
9th day of June, 2006

Mary A. Price
Notary Public

NOTARIAL SEAL
MARY A. PRICE, Notary Public
Lower Merion Twp., Montgomery County
My Commission Expires June 14, 2007

9