UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
: 
AMERICAN STEAMSHIP OWNERS MUTUAL :
PROTECTION AND INDEMNITY :
ASSOCIATION, INC., : (ECF Case)
                            Plaintiff, :
: 04 Civ. 04309 (LAK)
   - against - :
:
ALCOA STEAMSHIP CO., INC., et al., :
:
                          Defendants. :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF ANDREA ST. PAUL BLAND

ANDREA ST. PAUL BLAND declares, pursuant to 28 U.S.C. Section 1746, that:

    1.    The facts stated herein are based on my own personal knowledge and/or review of various documents that have either been produced or marked as trial exhibits in this action, and the facts are true to the best of my knowledge, information and belief. I submit this affidavit on behalf of Defendants Central Gulf Lines, Inc. ("Central Gulf") and Waterman Steamship Corporation ("Waterman") in this suit brought against them by the American Steamship Owners Mutual Protection and Indemnity Association, Inc. (the "American Club" or the "Club").

    2.    Since 1996, I have been employed by LMS Shipmanagement, Inc. ("LMS"). I currently hold the title of Vice President Loss Prevention & Claims Department. Prior to becoming a vice president, I held the titles of Administrative Manager of the Insurance and Claims Division and Director of Claims Administration.

3. I hold a B.S. in business administration which I received from Louisiana State University in 1979. I also hold an M.B.A. from Louisiana State University which I received in 1982.

4. LMS is an affiliate of Waterman and Central Gulf and acts as agent for each of those companies. Each of LMS, Waterman, and Central Gulf is a subsidiary of International Shipholding Corporation ("ISC").

5. During my tenure at LMS, I have been responsible for reviewing and monitoring the handling of occupational disease claims, cargo claims, hull and machinery claims, and barge claims against Waterman and Central Gulf, among other companies. My duties now include supervising the review of incoming claims, verifying insurance coverage, assigning defense counsel, apprising underwriters of the status of claims, overseeing and monitoring litigations, approving the settlements of claims, and obtaining insurance recoveries.

6. In addition, since 2005, I have been responsible for all aspects of risk management, including the placement of insurance coverage for several of the subsidiary companies of ISC.

**Years of Membership in the American Club**

7. In the course of my employment with LMS, I have learned that Waterman was a member of the American Club for three years in the mid- to late-1970's. According to the Club's records, Waterman was a member during policy years: February 20, 1975 to February 20, 1976 ("1975/76"); February 20, 1976 to February 20, 1977 ("1976/77"); and February 20, 1977 to February 20, 1978 ("1977/78"). (PX-270.)

8. In addition, I learned that Central Gulf was a member of the Club for at least three years in the mid-to late-1970's. According to the Club's records, Central Gulf was a member during policy years: 1976/77; 1977/78; and February 20, 1978 to February 20, 1979 ("1978/79"). (*Id.*)

9. It is my understanding that Waterman and Central Gulf Lines paid all premiums and assessments levied by the American Club in connection with the aforementioned insurance years.

**Closing Of Policy Years Of Which
Waterman And Central Gulf Were Members**

10. Based on the Club's records, the Club, pursuant to resolutions of its board of directors, closed the 1975/76 insurance year in 1985; the 1976/77 insurance year in 1987; the 1977/78 insurance year in 1988; and the 1978/79 insurance year in 1987. (PX-276.)

11. Waterman ceased being a member of the American Club on February 20, 1978, and Central Gulf ceased being a member of the American Club on February 20, 1979. Thus, neither Waterman nor Central Gulf was a member of the American Club at the times the relevant insurance years were closed. More important, I am aware of no representative of Waterman or Central Gulf being a member of the Club's board of directors when the decisions were being made to close the aforementioned policy years. Thus, neither Waterman nor Central Gulf was in a position to influence any decision of the Club to close the policy years relating to the periods when Waterman and Central Gulf were members. It simply was not within their control.

## American Club Policies Provide Coverage For Claims
## Of Personal Injury And Death From Any Occurrence

12. I am familiar with the American Club's form of insurance policy. Each American Club policy issued by the Club contains an indemnity provision which provides coverage for all loss, damage, or expense for which an insured is liable as a result of loss of life, personal injury or illness, of any person. The relevant policy language provides:

> [AMERICAN CLUB] AGREES TO INDEMNIFY THE ASSURED AGAINST ANY LOSS, DAMAGE OR EXPENSE WHICH THE ASSURED SHALL BECOME LIABLE TO PAY AND SHALL PAY BY REASON OF THE FACT THAT THE ASSURED IS THE OWNER . . . OF THE INSURED VESSEL AND WHICH SHALL RESULT FROM THE FOLLOWING LIABILITIES, RISKS, EVENTS, OR OCCURRENCES AND EXPENDITURES:
>
> (1) LIABILITY FOR LIFE SALVAGE, LOSS OF LIFE OF, OR PERSONAL INJURY TO, OR ILLNESS OF ANY PERSON . . .

(*See* Specimen Policy, PX-117 (attached as Exhibit 1 to the Joint Pre-trial Order, at 1.)

13. Thus, under the plain language of the policies, occupational disease claims are covered under "clause one," to which it is referred.

14. I am aware of no language in any policy issued by the Club which provides that once an insurance year is closed, insurance coverage ceases.

15. As to any claim made to the American Club, a single deductible is to be applied. The relevant policy language provides: "Claims hereunder, other than for burial expenses, are subject to a deduction of [$25,000], with respect to each accident or occurrence." (*Id.* at 3)

## Procedure For Apportioning Claims To
## <u>Marine Insurers For Occupational Disease Claims</u>

16. A custom and practice developed among shipowners and their marine P&I insurers for allocating occupational disease claims for which indemnification is sought.

17. First, when a lawsuit is commenced, liability is allocated among answering shipowner defendants on a pro rata basis according to the number of sea service days the claimant was employed by each answering shipowner defendant.

18. Next, if an answering shipowner has more than one insurer for the years covering the underlying claimant's employment, a second allocation is made among each such insurer based on the number of claimant's sea service days during which the insurers provided coverage to the shipowner.

19. In the case of Waterman, this second level of allocation may be made to its other insurers, *i.e.*, the Fulton Protection and Indemnity Underwriting Syndicate, UK P&I Club, Marine Office of America (Continental Insurance Co.), Britannia Club, London Club, and Standard Club.

20. In the case of Central Gulf, this second level of allocation may be made to its other insurers, *i.e.*, the West of England Club, Gard, and Standard Club.

21. Thus, the American Club is never called upon to provide coverage during periods when other insurers are on the risk or for periods of no-insurance or self-insurance because the Club is only responsible for its proportionate share of its time on the risk. In virtually every case, and I know of no exception, the Club has not been called upon to indemnify for the total loss associated with any claim, it simply provides coverage for its fractional share.

**Submission Of Occupational Disease Claims To The Club**

22.     To my knowledge, it has always been the practice of Waterman and Central Gulf initially to present claims based on the established allocation practice set forth above. Generally, therefore, after calculating the American Club's fractional share of an asbestos or other occupational disease claim, Waterman and Central Gulf have always selected a triggered policy of the Club, applied that policy's deductible, and submitted the claim or proof of loss to Shipowners Claims Bureau, the Club's manager.

23.     I am aware that in 1998, the Second Circuit Court of Appeals held that under American Club policies an insured submitting a claim "has the right to demand that a policy pay full coverage for each insurance claim in which the underlying Claimant suffered asbestos exposure and therefore asbestos injury during the policy period," subject only to a single deductible. *In re Prudential Lines Inc.*, 158 F.3d 65, 86 (2d Cir. 1998).

24.     Other insurers of Waterman and Central Gulf accept the application of a single deductible to their proportionate share of the loss, *e.g.*, West of England, Standard Club, and Gard.

25.     To my knowledge, Waterman and Central Gulf only have submitted five asbestos-related claims to the American Club for indemnification. I understand that Linda K. Daniels of my office has submitted an affidavit detailing the particular claim submissions.

### The Club's Historical Coverage Of Occupational Disease Claims

26. Prior to the Club's announcement in June 2004, that it was suddenly disclaiming coverage for occupational claims related to years prior to 1989, the Club's practice was as follows.

27. When Waterman and Central Gulf submitted a fractional claim to the Club, the Club would perform another allocation. The Club would further allocate among all triggered American Club policies. The chief effect of such allocation was the multiplication of the deductibles applicable to each claim.

28. For purposes of the policies implicated in this litigation, Waterman's and Central Gulf's deductibles for each of the years they were members of the Club were $25,000 and $15,000, respectively. Accordingly, the financial consequence of the Club's further allocation practice was the significant reduction and, in some cases, the complete elimination of coverage for claims clearly covered by its policies.

29. I believe and have always believed that the Club's practice was not supported by its policies, rules or by-laws. Further, it violated the decision of the Second Circuit in the *Prudential Lines* case, and was wholly inequitable given the Club is generally only called upon to pay a fractional share of any claim. Insureds, on the other hand, are forced to absorb full multiple deductibles to such fractional claims.

### Neither Waterman Nor Central Gulf Ever Accepted or Acquiesced In The Club's Deductible Practice, And The Club Never Once Asserted That Pre-1989 Claims Were Not Covered Under The Policies

30. On behalf on Waterman and Central Gulf, I submitted asbestos-related claims to the Club for reimbursement or oversaw the submissions of such claims. In each

instance, reimbursement was sought based on the application of a single deductible per fractional claim.

31.     By way of example, I refer the Court to my submission of the Louis Lassiter claim to the Club, which, I believe, was the first time I was involved in submitting a claim to the American Club for reimbursement. In my cover letter to the Club I stated:

> We refer to the [*Prudential Lines*] decision and are hereby submitting our initial invoice for reimbursement of the settlement paid by Central Gulf Lines in this matter.
>
> . . . The Court of Appeals rejected the American Club's argument that in cases of injury spanning two or more policy years, liability should be allocated among all of its triggered policies, with a deductible applicable to each. Instead, the Court held that the Insured **could designate any one of the triggered policies to indemnify it in full** for an insured claim. We hereby designate the 1976-1977 policy year and have therefore applied a $10,000 [sic] deductible.

(DX-EW; April 5, 1999 cover letter from me to William Craig.)

32.     On July 15, 1999, I submitted the William Shaw claim for reimbursement to the Club based on the application of a single deductible. (DX-EY; July 15, 1999 cover letter from me to William Craig.)

33.     In response to my July 15, 1999 letter, Mr. Craig wrote: "we completely disagree with the decision of the Second Circuit but the decision will not be appealed." Mr. Craig went on to explain that, notwithstanding the Second Circuit's edict, the Club would continue to allocate among triggered policies and apply multiple deductibles to single claims for indemnification. However, he explained that this practice would only apply to claims arising prior to February 20, 1989. He explained that for claims arising after February 20, 1989, regardless of the number of policy years implicated, the Club

would only apply a single deductible per claim. (DX-EZ; July 23, 1999 letter of William Craig to me.) Thus, the Club was clearly treating policy holders differently in the face of identical policy language.

34. Mr. Craig went on to suggest in his July 23, 1999 letter that Central Gulf "refile [its] claim based on the above information." Obviously, there was never a mention that there was no coverage for such claims. Indeed, Mr. Craig was inviting me to refile it.

35. My objections to the Club's improper stacking of deductibles continued with respect to the other three claims submitted to the Club for reimbursement, namely the claims concerning seaman Brunnel, Clark, and Tagliaferri.

36. On December 12, 2001, I wrote to Mr. Gary F. Strevell, Mr. Craig's successor. In my letter I wrote: "we would expect The American Club's Board of Directors 1989 policy to "stack" deductibles, to be revised. Please justify the continuance of this policy in light of the contrary judicial ruling against the club, which renders it obsolete and improper." (DX-FY.)

37. In addition, I objected to the stacking of deductibles in several telephone conversations with Mr. Craig. On one occasion, I met personally with Mr. Craig in New York City regarding the Club's practice and registered my objection.

38. Thus, Waterman and Central Gulf never wavered in their beliefs that only one deductible could be applied per claim. However, in order to be partially reimbursed by the Club, I instructed my assistant, Linda K. Daniels, to resubmit any Waterman and Central Gulf claims to the Club based on its stacking practice with a full reservation of

rights. Ms. Daniels did so. The payments on re-submitted claims were accepted only as partial payments.

39.     Most important, at no time throughout my course of dealing with the Club regarding the indemnification of asbestos-related claims, did the Club ever decline or suggest that there was no coverage for pre-1989 asbestos-related claims on the basis that the insurance years applicable to such claims were previously closed. Moreover, the Club never declined or stated there was no coverage for pre-1989 years on the basis that no particular reserves were set for those claims.

**Waterman Commences Actions Based On The
Improper Stacking Of Deductibles Wherein The Club
Never Raised The Issue Of Non-Coverage For Pre-1989 Claims**

40.     Waterman, along with another international carrier, commenced two related lawsuits in this Court before Your Honor in 2000 and 2001, captioned *SL Service, Inc. and Waterman Steamship Corporation v. The Protection & Indemnity Underwriting Syndicate et al.*, 00 Civ. 9831.(LAK), and *SL Service, Inc. and Waterman Steamship Corporation v. Marine Office of America Corporation et al.*, 01 Civ. 0038 (LAK). In each case, Waterman claimed that the insurers' practice of stacking deductibles was improper under the respective insurance policies and the *Prudential Lines* decision.

41.     In each of those actions, the American Club was named a third-party defendant by the other insurers and asserted a claim for declaratory judgment against Waterman declaring that its practice of stacking deductibles was proper. (*See, e.g.*, Third-Party Defendant's Answer To Third-Party Complaint And Counter-Claim And Cross-Claim dated January 22, 2002 (00 Civ. 9831).) Waterman, in turn, asserted claims against the Club arguing that its practice of stacking was improper under the terms of the

American Club's policies and under the *Prudential Lines* decision. (*See, e.g.*, Answer To Third-Party Defendant's Cross Claim and Counterclaims Against Third-Party Defendant dated February 28, 2002 (00 Civ. 9831).)

42. I actively participated in both of those actions, including being deposed. The Club's long time counsel and director Richard H. Brown, Jr. was the attorney of record for the Club.

43. Tellingly, the Club never asserted in either its claim for declaratory relief or in the defense of Waterman's claims that there was no coverage for asbestos claims. (*See* Third-Party Defendant's Answer To Third-Party Complaint and Counter-Claim And Cross-Claim dated January 22, 2002 (00 Civ. 9831); Third-Party Defendant's Answer To Counterclaims Of Plaintiff Waterman dated March 20, 2002 (00 Civ. 9831).)

44. Each of the main actions was resolved without trial or motion practice. However, Waterman and the American Club entered into a Tolling Agreement dated January 23, 2003, wherein all limitations periods, whether statutory, contractual or otherwise, applicable to any claim of Waterman under the American Club policies was tolled as of February 27, 2002. The Tolling Agreement remains in effect today.

**Waterman and Central Gulf's Reliance On Express And Implied Representations For Coverage For Pre-1989 Years**

45. Based on the express and implied representations the Club made during a consistent course of conduct, Waterman and Central Gulf reasonably believed that they each had insurance coverage for occupational disease claims under American Club policies. Clearly, the only unresolved issue was the American Club's continued insistence regarding the application of multiple deductibles to occupational disease claims in the face of the Second Circuit's holding in *Prudential Lines*.

46. Indeed, had the American Club even suggested that it was only paying occupational disease claims on a so-called "discretionary" basis – a term that was never used in such context before this litigation – Waterman and Central Gulf would have seriously explored alternatives to coverage for such claims. Today, however, these possibilities are remote.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 9, 2006

                                          Andrea St. Paul Bland