UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
AMERICAN STEAMSHIP OWNERS MUTUAL :
PROTECTION AND INDEMNITY             :   No. 04-cv-04309 (LAK)
ASSOCIATION, INC.                    :
                           Plaintiff, :   **AFFIDAVIT OF**
   -against-                       :   **KEITH S. KENNEDY**
                                        :
ALCOA STEAMSHIP CO., INC., et al.,   :   (ECF Case)
                                      :
                        Defendants. :
------------------------------------------------------------- X

STATE OF FLORIDA           )
                           ) ss.:
COUNTY OF PALM BEACH       )

      **KEITH S. KENNEDY**, being duly sworn, deposes and says:

      1.    The facts stated herein are based on my own personal knowledge and/or review of various documents that have either been produced or marked as trial exhibits in this action, and the facts are true to the best of my knowledge, information and belief. I submit this affidavit on behalf of Defendant BP America, Inc. ("BP") in the suit brought against it by the American Steamship Owners Mutual Protection and Indemnity Association, Inc. (the "American Club," the "Club," or the "AC").

**Background**

      2.    I am the former Assistant Treasurer, Director of Insurance and Risk Management for BP.

      3.    BP is the successor-in-interest to Standard Oil of Ohio ("Sohio"), which was insured by the Club from the 1982/83 insurance year to the 1986/87 insurance year.

4. BP is also the successor-in-interest to SPC Shipping, Inc. ("SPC"), now called BP Oil Shipping Co., which was insured by the Club from the 1982/83 insurance year to the 1990/91 insurance year.

5. BP is also the successor-in-interest to Atlantic Richfield Co. ("ARCO"), which was insured by the Club from the 1975/76 insurance year to the 2000/01 insurance year.[1]

6. I graduated from West Virginia University in 1966 with a Bachelor of Science in Business Administration. I also have a Juris Doctorate from Duquesne University School of Law, received in 1970. I practiced law from 1971 through 1976 as an attorney for West Penn Power Company.

7. From 1976 to 1979, I was Assistant General Counsel and later, General Counsel of Chase Brass & Copper Company, a subsidiary of Kennecott Copper Corporation which was purchased in or around 1979 by Sohio. From 1979 to 1985, I was a Senior Attorney and Assistant General Counsel for Sohio. In 1985, I became Assistant Treasurer, Director of Insurance & Risk Management for Sohio.

8. In 1987 Sohio was purchased by BP where I remained Risk Manager until I left BP in July 1993.

9. Since leaving BP in 1993, I have been employed by Florida Power & Light as Director of Risk Management.

---

[1] I was never employed by ARCO. Sohio and SPC will be collectively referred to herein as "BP."

### Sohio and BP Buy Insurance from the American Club

10. Upon taking the position of Director of Insurance and Risk Management in 1985, I became directly involved with Sohio's, and later BP's acquisition of mutual marine insurance coverage from the American Club. In addition, I was involved with the acquisition of non-marine mutual insurance coverage as well as all commercial property and casualty insurance for Sohio operations (and later, BP operations in the United States).

11. The Club provided protection and indemnity insurance for a variety of risks as detailed in the policies issued to Sohio, SPC and ARCO. For this the Club charged premiums at the inception of each policy year and later, if needed, the Club charged assessments until the closing of the particular insurance year for which the insurance policy was purchased. Once a policy year was closed, it ceased to be assessable. BP and its entities have paid all premiums and assessments charged by the Club.

12. BP believed it had no further liability to the Club for that insurance year after a final assessment or closure of the insurance year. In my view as an insurance manager responsible for placing insurance, as long as an insurance year was open, it was assessable. When it was closed, it became non-assessable. I would no longer budget money or carry reserves on my department's budget for any closed insurance year because the insurance year was complete, the assessment or refund final and BP's liability for payment finished.

13. BP relied on the closure of an insurance year as signifying that it had no more liability to the Club for that insurance year. However, I always understood

that coverage continued, it was not terminated upon closure of an insurance year and it was never my understanding that the policies or coverage had been cancelled or terminated upon the closure of an insurance year or for any other reason.

**My Service as a Director on the Board of the American Club**

14. I was elected to the American Club Board of Directors in March 1986 and served on the Board until I left BP in September 1993.

15. The Club's Directors make important decisions on behalf of the Club, and do so based on the advice of the Club's Managers, Shipowners Claims Bureau, who are hired to manage the Club's day-to-day operations and to provide advice to the Directors with respect to actions the Directors may take. The Managers are responsible for, among other things, the Club's accounting and claims handling and the setting of premiums. The Managers also provide input and recommendations with respect to decisions of the Directors, including the closure of all insurance years. As the Managers are insurance professionals, the Board relies on their recommendations. The Board also relies on the advice and legal opinion of the Club's Counsel (which was Kirlin Campbell & Keating while I served on the Board), in making many of their decisions, and expects the Club's Counsel to advise it if any of the Board's decisions or Managers' recommendations are unauthorized or contrary to law.

16. In 1987 I was appointed to the Finance Committee of the Board of Directors where I served until I left the Board in September, 1993. The Finance Committee made recommendations to the Board regarding the accounts of the Club, including with respect to closing insurance years, based on information and advice provided by the Managers.

17. While on the Board I always acted in the best interest of the Club as I saw it without regard to my position or employment at Sohio or BP. Each insurance year each Board member was required to sign a conflict of interest statement, which I did, in substantially the same form as DX-AP. This conflict of interest form specifically provided that the employment of a Board member by a policyholder was not deemed a conflict of interest. (Id., "A director of the Association shall not be deemed to have a conflict of interest by reason of his interest in or employment by a company or concern which is a Member of the Association."). The Board members did not vote on claims involving their own employer or related entities. At PX-157 at AC3064485-6, there is an example in the Board minutes of my recusal from the vote on a claim involving BP.

18. When the Board resolved to close an insurance year, the intent was to release the policyholders in that insurance year from any further liability to the Club for assessments. Once an insurance year was closed it would always remain closed. We never intended nor did I believe that a closed insurance year could be "re-opened" for any purpose.

19. Before closing an insurance year, the Managers would determine what they believed to be an appropriate reserve for that insurance year which reserve was intended to cover known claims still pending at the time of closing of the year as well as unknown claims which might be reported later. This evaluation was presented to the Finance Committee, who would discuss the Managers' recommendation. Upon approving the closing of the insurance year and an amount to be reserved, the Finance Committee would report to the full Board with the recommendation. In addition, the Club's Counsel would prepare a letter to the Board recommending the closing of that

insurance year and stating that the Board had the authority to do so. The Board would discuss the matter and make a determination based upon the information presented. The members of the Club did not have any role in the decision of when to close an insurance year nor as to any assessments or reserves relating thereto other than electing the Directors of the Board, who acted on behalf of the Club in making such decisions.

20. By the terms of the By-laws, the Board of Directors was not permitted to close an insurance year without the recommendation of the Managers. If the Managers did not believe an insurance year could properly be closed, the Board would expect the Managers to say so.

21. If there were sufficient funds remaining from assessments collected for a given insurance year, the insurance year would be closed without further assessment. These funds were an accumulation of premiums paid at the inception of the of an insurance year and assessments collected while the insurance year was open less the cost of claims paid and other costs relating to that insurance year. An "advance premium" was the premium paid by an insured when an insurance policy was issued.[2] "Interim assessments" were issued to reflect the actual loss experience for a given insurance year. For example, if the insureds for a given insurance year had an actual loss experience that was larger than anticipated, the Club would issue interim assessments to those insured for that insurance year. This would continue for a number of years as claims developed, and eventually when many claims had been resolved the Managers would estimate an appropriate loss reserve for the insurance year. If the insurance year was in a deficit, a

---

[2] The Board of Directors had nothing to do with the setting of premiums. The setting of premiums was the Manager's task.

6

final assessment was issued and the insurance year was closed. If the Board determined that a surplus existed over and above the necessary reserve amounts, this surplus would be refunded to the members for that insurance year, which Counsel advised was required, provided the surplus was derived from assessments.

22. The Club's Counsel, Kirlin Campbell & Keating, advised that the Club was not permitted to use its general reserves to satisfy a deficiency in order to close an insurance year.

23. Assessments were authorized by the Board only after having received a recommendation from the Managers that such assessment should be made and an opinion from Counsel that the assessment was proper. At no point were any assessments made without a Managers' recommendation and Counsel's opinion.. In addition, the New York Insurance Department was informed of assessments and their lack of objection as to assessments and closings of insurance years was taken as approval.

24. No insurance year was closed without a recommendation from the Managers and an opinion letter from Counsel. Indeed, it was my understanding that according to the Club's By-laws an insurance year could not be closed without a recommendation from the Managers, and I would not have voted to close an insurance year in the event that the Managers had objected to such closing as inappropriate or if Counsel had advised that such closing was improper.

25. After a final assessment or final refund was issued to members for an insurance year, any balance or reserve attributable to that insurance year was

transferred to the Club's general reserve account and commingled into an aggregate reserve as opposed to the generally separate accounting for each open insurance year.[3]

26. While I was on the Board, the suggestion was never made that claims arising in closed insurance years were not covered claims and an obligation of the Club. It was my view that if a claim was presented that was covered by the policy, it was the Club's obligation to cover that claim. The insurance policy is a contract between the Club and an insured and whether an insurance year is open or closed is irrelevant to the Club's obligation to honor that contract.

27. If closure terminated coverage for unknown or potential claims arising in the insurance year to be closed, the Managers or the Board would have had to so notify the members. We did not because it was contrary to how the occurrence-based policies issued by the Club operated.

28. Similarly, neither the Club's Managers or its Counsel ever suggested to me that the Club did not have an obligation to pay such claims or that the Club was only paying the claims on a discretionary basis. It was a primary part of the Managers' job to determine whether claims fell within the terms of the policies issued by the Club. The Managers consistently paid Occupational Disease Claims ("ODCs") and recommended that the Board approve various ODCs. The Club's then Counsel, Richard Brown, as a voting member of the Board, voted in favor of paying various ODCs that reached the Board level. Had ODCs not been covered under the Club's policies or had the payment of ODCs been discretionary, I would have expected the Club's Managers or

---

[3] Even though the open years were generally accounted for separately, they were not always completely self supporting. For example, the reserve account was at times used to pay for stop loss insurance costs of open years.

Counsel to have so advised. Instead, the Club's Managers and Counsel treated ODCs in the manner in which all covered claims were treated: claims below a certain dollar amount were approved for payment by the Managers while larger claims were presented to the Board for approval.

29. There was always a possibility that amounts reserved at the closure of an insurance year would be insufficient to cover every claim submitted for that insurance year. It was never in my contemplation as a member of the Board that the Club's obligation to pay all claims in full for a closed insurance year was eliminated merely because it had not reserved the amount of funds which became necessary for claims reported and unknown upon the closing of that insurance year.

**Occupational Disease Claims**

30. I became aware of the assertion of ODCs, primarily asbestos related claims, against shipowners and operators while I was Assistant General Counsel of Sohio.

31. ODCs were presented to the American Club by its insureds for payment as a matter of right based upon the terms of the insurance contracts. At no time did I regard that the Club paid these claims on a discretionary basis.

32. ODCs over the Managers' approval amount were reviewed by the Board just as any other significant claims were reviewed by the Board.

33. When the Board approved the payment of ODCs to policyholders, I do not recall any Board member objecting to the payment of the claims. As a member of the Board I understood that the Club was obligated to pay these claims under the

policies it issued and I do not recall anyone on the Board saying that the payments of these types of claims was discretionary.

34. Counsel to the Club, Dick Brown of Kirlin, Campbell & Keating, was aware that these claims were being paid and never advised that the Club was not obligated to pay them. In fact, he and I were both present at several Board meetings where the Board approved the payment of several claims that arose during closed insurance years.[4]

35. The Managers would pay claims below a certain monetary level which they had authority to approve. Claims above that level would be presented to the Board for approval, as described above. As far as I know, the Managers only paid covered claims and only presented covered claims to the Board for approval.

36. If approval of the ODCs was discretionary, as a Board member I would have expected the Managers and Counsel to so advise the Board. They did not.

## The American Club IBNR Amount

37. In 1988, due to the rising number of ODCs, the Managers proposed the addition of monies to the reserve account to assist with the payment of claims that were incurred but unknown, and therefore unable to be reported,[5] before the closure of the insurance year ("IBNR Amount").

---

[4] See, e.g., PX-127, Kenneth Torrens claim approved at the 4/14/88 Board Meeting; PX-168, Frank Stashin claim approved 1/14/93.

[5] It is the obligation of the insured to pay premiums and give prompt notice of claims to the Club. Prompt notice is based upon when the insured learned of the claim. For example, if a claim occurred in 1960 but the insured was not informed of it until 1980, due to latent manifestation, the insured cannot give notice of the claim until it is aware of it in 1980. It makes no difference whether the claim had been noticed at a time when the insurance year was open or closed.

38.   As of that time (April 30, 1988), the Club had $15,019,654 in its reserve account, and thus available to pay for closed year claims. (See PX-297, referencing AC3061011, a surplus statement, which is part of a set of voluminous documents not individually marked as trial exhibits). In addition, the Club had reinsurance in place for each insurance year to protect the Club in the event of catastrophic liability. (See PX-299). However, the Board still thought it prudent to strengthen the reserve account with additional funds.

39.   The Club's Manager, the Shipowners Claims Bureau, proposed that if an insurance year was about to be closed with a surplus, that surplus should be placed into the reserve account, instead of being refunded to the members for that insurance year, up to a maximum of $250,000. Any surplus above $250,000 would be refunded to the members.

40.   The Finance Committee engaged in a spirited debate as to the necessity and/or appropriateness of a $250,000 IBNR Amount.

41.   This debate was part of several interrelated issues that the Finance Committee was discussing. These included closing insurance years to facilitate reinsurance from the International Group, the Club's current financial situation with respect to the reserves generally and the New York Insurance Department's rules regarding surplus.

42.   At the time, my employer, BP, had been sued in several asbestos cases, unrelated to its maritime activities. In addition, many of the lawsuits regarding ODCs were active in the Cleveland federal court, near BP's offices, which made me very sensitive to reserving additional amounts for these claims. These claims were not, to my

11

knowledge, in the shipping industry per se, but my experience with them encouraged me to argue in favor of a higher IBNR Amount.

43. Ultimately, the Finance Committee recommended a contribution of $100,000 be made to the reserve account from insurance years about to be closed. This amount was believed to be appropriate and would be reserved regardless of whether the insurance year had a surplus.

44. While I had originally argued in favor of a higher yearly contribution, I believe the final decision to reserve $100,000 was a good result. I believed that it was necessary to reserve some additional amount and I believed that we accomplished that because the reserves were increased by this amount regardless of whether or not the insurance year was in surplus, unlike the Manager's recommendation of up to $250,000 if, and only if, the insurance year was in surplus.

45. The setting of the IBNR Amount was a recognition of the Club's obligation to cover all ODCs regardless of whether they arose during closed insurance years.

46. As previously stated, at that time the aggregate reserve of the Club was $15,019,654.

47. I do not recall any discussion of "re-opening" closed insurance years, or "re-assessing" policyholders of closed insurance years depending upon the adequacy of the IBNR Amount. This is contrary to my understanding of the agreement between the Club and its insureds. It is also contrary to what I believe the Board intended when it issued final assessments and closed insurance years. In fact, while I was on the

12

Board of the American Club I do not remember any mention ever of "re-opening" closed insurance years, and all the years at issue in this case were closed before I left the Board of the Club.

**The American Club Joins the International Group**

48. In 1989, the American Club obtained reinsurance through the International Group of P&I Clubs as a reinsured, rather than full, member.

49. At that time no changes were made in the American Club's claims handling process, except in the limited circumstances of the deductible to be applied to ODCs arising in post-1989 insurance years or spanning pre and post-1989 insurance years.

50. For ODCs spanning these two periods, the Club decided that the deductibles in force over the pre-1989 period of exposure would be applied, and no post-1989 deductible would be applied unless the accumulated pre-1989 deductibles were less than the single post 1989 deductible required by the International Group practice. In that case, the Club would follow the International Group practice and apply the one post-1989 deductible. (PX-145: December 14, 1989 Board Minutes and attached memo re: asbestos claims). As with other Board decisions, this decision was made based on a recommendation by the Club's Managers and the opinion of the Club's Counsel. The relevant opinion from the Club's Counsel noted: "Therefore, although we think that on a proper reading of the policy it is proper to apply a full deductible for each policy year, we also believe there is a very substantial chance that a court would conclude otherwise if necessary to afford coverage to an insured." (DX-AR: September 11, 1987 Kirlin opinion re: "Asbestosis - Coverage and Deductibles" at KEY004745) (emphases added). Given the title of Mr. Brown's opinion letter, it certainly encompassed an opinion that there was coverage for asbestos claims under the policies issued by the American Club. Indeed,

in later referring to this opinion letter, Mr. Brown stated: "By letter of September 11, 1987 we reported on the general subject of asbestosis coverage and deductibles in detail." (See DX-BQ: March 13, 1991 Letter re: Trinidad/Mathiasen (Apex) Asbestos Claims at AC3064110) (emphasis added).

51. No mention was ever made of the Club treating the coverage of ODCs differently after becoming reinsured by the International Group. No notice was given to any member that coverage for ODCs arising in years before 1989 could be denied, but that the International Group rules required ODCs arising thereafter be covered.

52. In fact, this is not the case, nor was it intended by the Board at the time. Fundamentally, a coverage obligation of the Club is a necessary premise to any discussion and establishment of rules regarding deductibles. The Club had and still has an obligation to pay ODCs arising in any year covered by an American Club Policy regardless of whether it was reported at the time of closure.

53. When I left the Board on September 9, 1993 (after all the insurance years at issue in this case were closed), the documents reflect that the reserve account stood at $19,432,511. (See PX-297, referencing AC3066920, a surplus statement, which is a part of a set of voluminous documents not individually marked as trial exhibits).

54. I swear that the foregoing is true to the best of my recollection and knowledge.

_____
KEITH S. KENNEDY

Sworn to before me this
12 day of June, 2006.

_____
Notary Public

