UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

AMERICAN STEAMSHIP OWNERS                    :
MUTUAL PROTECTION AND                        :          No. 04-cv-04309 (LAK)
INDEMNITY ASSOCIATION, INC.                  :
                              Plaintiff,     :          **(ECF Case)**
        -against-                            :
                                             :
ALCOA STEAMSHIP CO., INC., et al.,           :
                                             :
                              Defendants.    :
------------------------------------------------------------- X

### AFFIDAVIT OF TERENCE COGHLIN
### ON BEHALF OF VARIOUS DEFENDANTS

I, Terence Coghlin, hereby declare, pursuant to 17 U.S.C. § 1746:

1.      The opinions stated herein are based on my own personal knowledge and

experience of the mutual protection and indemnity insurance industry, in which I was employed

or involved for the past 40 years.  The opinions are also based on my review of various

documents that have been produced or marked as trial exhibits in this action, testimony of

witnesses and other fact affidavits submitted in this action, and documents discovered in my own

research.  The statements contained herein are true to the best of my knowledge, information and

belief.  I submit this affidavit as direct trial testimony on behalf of various defendants[1] in this suit

brought against them by the American Steamship Owners Mutual Protection and Indemnity

Association, Inc. (the "American Club" or the "Club").

---

[1] I have been retained on behalf of the following defendants: Keystone Shipping Company (and related entities), BP America Inc. (and related entities), Marine Transport Lines, Inc. (and related entities), Kirby Inland Marine, LP (as successor to Hollywood Marine Inc.), American Steamship Company, The Cleveland-Cliffs Steamship Company, Ispat Inland Inc., Amerada Hess Corporation, Sabine Towing and Transportation Company, Inc., Alcoa Steamship Co. Inc. (and related entities), APL, Ltd. (as Successor to American Mail Line and American President Lines, Inc.), Apex Oil Company, Inc. (and related entities), Central Gulf Lines, Inc., Waterman Steamship Corporation, Farrell Lines, Inc., Bridgeport & Port Jefferson Steamboat Co., Brokerage & Management Corp., McAllister Towing and Transportation Company, Inc. (as Successor to Outreach Marine Corp.), and Trade & Transport, Inc.

2.      Earlier in this action, I submitted an expert report in which I explained the concepts of mutual protection and indemnity ("P&I") insurance, how mutual P&I clubs are structured and the way in which they normally operate, described the types of claims they cover, and gave my opinion on certain points that have been made by the American Club in this litigation. I understand that this report was submitted as trial exhibit DX-IJ. The opinions presented in my report have not changed. I submit this affidavit to summarize key points contained therein and add certain additional information in response to various points raised by the American Club since the submission of that report.

## BACKGROUND AND QUALIFICATIONS

3.      I will briefly detail my background here. It is more fully set forth in my report. I was educated at Ardingly College between 1950 and 1958. In 1963, I graduated from Oxford with a law degree. I qualified as a barrister in 1964 and for a year was pupil to Mr. Conrad Dehn at 2 Crown Office Row (now Fountain Court, Middle Temple).

4.      In 1965 I joined Thos R. Miller & Son ("Millers") as a graduate recruit, specialising in maritime law. The main part of that firm's business was managing the largest of the P&I clubs, the United Kingdom P&I Club, and its affiliated Defence Club. It also managed the United Kingdom War Risks Club and the Hellenic War Risks Club.

5.      In 1970, I became a partner in Millers. I was involved in many aspects of P&I and Defence Club claims, particularly in helping shipowner members of the UK P&I Club defend themselves against liabilities flowing from cargo damage, collisions and spills of oil. I was also involved in the underwriting of some fleets, notably some of those from Greece and Japan, and those from the USSR and China whom I helped to introduce to P&I insurance. Increasingly I became involved in the day to day management of UK P&I Club activities in general and in speaking on behalf of Millers at meetings of that club's Board of Directors, which

2

included the presentation of management reports and recommendations to the Board on a wide range of P&I topics. For many years up to late 1987 I was the partner within Millers with responsibility for leading all of its P&I club management activities. This naturally brought me into continuous contact with the managers and members of the other mutual P&I clubs, not just from England but from around the world, including Norway, Sweden, Japan, Luxembourg, Bermuda and the United States, and exposed me to their similarities and their differences, which were also the subject of comment by insurance brokers and in the trade press.

6.      I was elected senior partner of Millers in 1991. In 1999 I oversaw the conversion of Millers from a partnership to an employee-owned private company, Thomas Miller & Co., and served as its first chairman until my retirement in July 2001. By then Millers operated from offices in London, the Isle of Man, Piraeus, New Jersey, Miami, San Francisco, Hong Kong, Beijing, Shanghai, Singapore and Sydney. We had also created a number of new mutual associations, all following the P&I club model, such as the Through Transport Club which insured containers and the liabilities of those involved in the carriage of goods by container, and the International Transport Intermediaries Club which insured the liabilities of agents and brokers in the transport business.

7.      In the 1980s Millers also created specialised mutuals to insure the liabilities of groups of professional people, including British barristers, solicitors, patent agents and surveyors. In subsequent years it became increasingly difficult to start new mutuals from scratch because of the demands of regulators that from day one the club would be required to hold substantial reserves.

8.      While working at Millers, I served for three years (from November 1991 to November 1994) as Chairman of the International Group of P&I Clubs (the "IG"), an

3

organization which is more fully described below.  In this position, among other things, I

negotiated with EC officials in Brussels on aspects of the IG's arrangements and gave evidence

to sub-committees of the United States Congress on the limitation of shipping liabilities and on

the certification of shipowners' ability to meet the financial burdens imposed by the Oil Pollution

Act, 1990.

9.    My limited involvement with the plaintiff in this case, the American Club,

came mainly after it became a reinsured member of the IG in 1989.  I sometimes met

representatives of its managers at IG managers' meetings.  I was Chairman of the IG when the

American Club applied to become a direct member of the IG in 1993.  But that application was

handled in detail by the Membership Sub-committee, of which I was not a member.  My own

involvement was focused on ensuring, as chairman of the IG, that this sub-committee was

moving the matter forward at a reasonable speed.

10.    I am an Associate of Southampton University's Institute of Maritime Law

(which provides a bridge between that University's maritime law department and the City of

London); series editor of Lloyd's Shipping Law Library and a member of the editorial board of

Lloyd's Maritime & Commercial Law Quarterly.  I am an active maritime arbitrator and, after

my retirement from Millers, was a non-executive Director of Stelmar Tankers in the three years

up to its recent take-over by Overseas Shipholding Group, Inc.  I was also recalled by Millers to

handle claims for the Hellenic War Risks Club for nine months during 2002.

11.    I am joint author of a legal textbook, "Time Charters," now in its fifth

edition, and author of a number of articles and reports on various aspects of P&I insurance, of

which a list is appended to my report.  (*See* DX-IJ, at App. I).

4

12.    I have acted previously as an expert witness.  In 2004 I presented an arbitration tribunal in London with a written report on P&I club practice in relation to the giving of guarantees to release ships from arrest; I was not asked to give oral evidence.

## PREPARATION OF MY OPINION IN THIS ACTION

13.    In my report, I described the documents and other work I did to prepare my report and generally form my opinions in this action, in addition to preparing to testify both at deposition and trial.   I was deposed by Plaintiff on January 12, 2006.

14.    Since my deposition, I have researched into the Rules of other clubs as described below.

15.    I have been reimbursed by the Defendants who engaged me for this action at the rate of £150 per hour (plus travel and other reasonable expenses), and £750 per day for drafting my expert report.  I was also reimbursed for collecting documents in response to discovery requests by Plaintiff and preparing for and attending the deposition conducted by Plaintiff at the rate of £150 per hour, plus travel expenses, and for travel time at half the hourly rate.

## THE MANAGEMENT OF PROTECTION AND INDEMNITY CLUBS

16.    The members of a P&I club do not take any direct role in the management or operation of a club.  They elect a Board of Directors, most of whom are senior employees of member companies (who act on behalf of the club), and they hire insurance professionals, called managers, to handle the daily affairs of the club.  The members have no part to play in, for example, decisions concerning the rating of individual fleets, the indemnification of claims or the closing of policy years.  These are decisions taken by the club's Board of Directors and/or its professional managers, not by the membership.

17.     The managers are full-time insurance professionals directly involved in the day to day operations of the club.  By contrast, the directors, few of whom are insurance specialists, come together as the Board of the club only intermittently.  Inevitably, therefore, they are reliant on the information, figures, advice and recommendations put before them at their periodic meetings by the managers.

18.     The managers create, maintain and process all the financial figures for the club.  It is they who will bring forward a policy year for closure, provide the Directors with all the relevant figures and make recommendations to them as to the basis on which it should be closed.  The importance of the managers' role in this process is made clear by the By-laws of the American Club during the years here in issue; unless and until "the manager" has made the determination therein described,[2] the process of Board approval of closure of an insurance year cannot begin.  As and when the process does begin, the directors must consider the figures that the By-law requires "the manager" to place before the Board and the recommendations that they will have made, based on those figures, as to the decisions the Board should then make.

19.     The extent to which authority to approve policyholders' claims for payment by the club is retained by the Board or delegated to the managers has varied over time and from club to club.  But the distinction is not important to the policyholders because, as explained in my report and below, their entitlement to be paid depends on whether or not their claims fall within the words used in the club's insurance policy or rules to define a head of cover and only in a very few exceptional circumstances do those words allow the exercise of any discretion at all.  So a claim will be paid or declined by reference to those words, whether the

---

[2] The American Club By-laws in effect at the relevant times provided: "From time to time after the termination of each insurance year, when the manager shall determine that it is practicable to estimate with a reasonable degree of certainty the minimum, probable or final surplus or deficiency resulting from all of the Corporation's insurances in effect during such insurance year, the manager shall place before the board of directors a statement of such financial results of such insurances, segregated between assessable and non-assessable business." *See* PX-109.

6

decision is made by the managers alone or, alternatively, is made by the Board upon the advice of the managers and/or counsel. In either event, the Board relies on the expertise and integrity of the managers (assisted by any advice that the managers may wish to take from lawyers or other experts) to ensure that claims falling within the words of the cover are paid and that those falling outside them are rejected. The managers will neither seek Board approval for a claim they do not believe to be within the cover nor sit silent were the Board to approve such a claim on its own initiative.

## THE AMERICAN CLUB, LIKE ALL OTHER P&I CLUBS, IS AN INSURER AND EXISTS TO PROVIDE INSURANCE

20.     P&I clubs indemnify their policyholders in respect of the liabilities to which they are exposed as owners and/or operators of ships. These include, among other risks not at issue here, liability for injury or sickness to crew, stevedores and others working on or about the insured's ships.

21.     The cover provided by the American Club is typical of that provided by the other clubs. In particular, ODCs by crew members from causes such as exposure to asbestos were, for all the years in issue here, covered by the American Club under clause 1 of its standard form policy, in which it agreed to indemnify policyholders for: "Liability for life salvage, loss of life of, or personal injury to, or illness of any person....".[3] (See, e.g., DX-BP, Specimen Policy; PX-117, Example of 1988-89 Policy).

22.     Although, as described below, the cost of insurance to an insured under the mutual underwriting system will vary in response to the club's overall experience, the

---

[3] Although for the years at issue here, the American Club issued insurance policies to its members and provided for other rights of its members in its By-laws, the Club today sets forth the terms of cover which it provides in its Rules, which are issued annually in a "rule-book format" with its By-laws. The personal injury cover provided by the Club in these Rules has not changed from that provided by previously issued policies. (See Rule 2, Section 1 of PX-234, 1997-98 By-laws and Rules; Rule 2, Section 1(B) of PX-267, 2005-06 By-laws and Rules).

*proportion* of the club's total calls for a policy year that each policyholder must bear is fixed in advance. That proportion does not change however much a policyholder's own claims on the club differ from original expectations. Unexpected variations in the level of a policyholder's own claims do not affect the percentage the member must pay to the club in respect of that policy year (although of course they may well influence his rate in subsequent years; *see* paragraphs 36-39 below). Thus, the right to insurance coverage and the obligation to pay for calls follow separate paths.

23.    There is transfer of risk from the member to the club at the inception of the policy when the percentage of total premium and "assessments" a member must pay is fixed. It is important to understand that in the American Club, as with other P&I clubs, the transfer of risk is from the member to *the club*, not to *the other members* individually. The obligation to pay a member's claims is assumed by the club as such. (*See D*X-BP, Specimen Policy; PX-117, Example of 1988-89 Policy: "The *Association* agrees to indemnify the assured against any loss, damage or expense which the assured shall become liable to pay…" (emphasis added); *see also D*X-IJ: Expert Report at Ex. 9, Testimony of Richard Brown, former outside counsel and Director, dated May 17 and 18, and September 13, 2005, "Brown Tr.," at 164). In the event of non-payment of a claim, the action for coverage lies against the club and the policyholder is neither obliged nor able to sue his fellow members. So, it is the Club itself that seeks any necessary protection by way of reinsurance. Conversely, it is the club and not its members which has the right to sue a policyholder for any failure to pay club calls.

24.    P&I club cover is occurrence-based rather than being provided on a claims-made basis. As it is occurrence-based coverage, a claim will be assigned to the policy year or years in which arose the occurrence that gave rise to the claim, regardless of when the

8

original claimant made his or her claim against the club's shipowner policyholder (or of when the shipowner satisfied that claim and turned to the club for indemnity). (*See* DX-BP, Specimen Policy; PX-117, Example of 1988-89 Policy: "The Association agrees to indemnify the assured against *any* loss, damage or expense which the assured shall become liable to pay…" (emphasis added)).

### CLUB COVER IS NOT DISCRETIONARY: IT MUST BE CERTAIN AND IT MUST BE CLEAR

25.     As with any insurance, the insured must be able to rely on the existence of P&I cover falling within the wording of the insurance policy or rules. The fact that a P&I club is a mutual does not imply that its cover to its insureds is any less precise than that afforded by a commercial insurance company. That valid claims will be paid must be as certain in a mutual P&I club policy as under a commercial insurance policy.

26.     P&I cover is as of right. If a claim falls within one of the heads of basic cover, as defined in the club's policy or rules, the insured has a contractual right to be indemnified. The whole purpose of shipowners in having P&I clubs is that their claims should be paid. That is what these clubs are for.

27.     Discretion affects P&I club cover only in two respects. First, P&I clubs have traditionally offered, as a separate and additional head of cover, what is generally referred to as the "omnibus clause." This clause allows the Directors only to add to an insured's cover, not to detract from it. The American Club did not have an omnibus clause in the policies at issue here (*see, e.g.*, PX-117, Example of 1988-89 Policy). Such a clause was not included in its policies until 1991. (*See* DX-BP, Specimen Policy at Clause 16, page dated 1991). The expressly discretionary operation of this additional head of cover contrasts with the 'as of right' operation of the others. Coverage for ODCs was never "discretionary" under American Club

9

insurance policies as such claims fall, and always did fall, squarely within the coverage expressly provided by Clause 1 of the policies.

28.    Second, some heads of cover, although clearly themselves 'as of right,' are worded in P&I club policies or rules so as to give the Directors some specific discretion to respond to the special circumstances of an individual claim.

29.    The head of cover for ODCs does not include any reference to any such discretion. (*Id.* at 2.1). Moreover, there was no reference to any discretion in the head of cover for ODCs in the American Club's policies which defined the cover for the years in issue here. (*See, e.g., P*X-117, Example of 1988-89 Policy). Then and now, the cover for ODCs is 'as of right' and contains no element of discretion. Thus, payment for ODCs could not have been understood as being "discretionary," and I have seen nothing in the records of the American Club to suggest it was so understood.

30.    I know of no club that purports to decide what P&I cover is provided only after claims are asserted, with the specific and limited exceptions described above. Nor have I seen any documents or testimony suggesting that American Club members were notified in advance that the Club claimed the discretion to deny indemnification of claims expressly covered under the terms of its insurance contracts or that ODCs indemnified by the Club since the 1980s were being paid on an allegedly discretionary basis. Such arguments seem to have occurred to the American Club only subsequently; in truth there was nothing discretionary about the indemnification of these claims.

## CALL COLLECTION MACHINERY

31.    A mutual P&I club's mechanism for collection of funds does not bear upon or affect its obligation to provide coverage for claims falling within the terms of its

insurance contracts or rules. *The call collection machinery and the terms of coverage are separate.*

32.    The *only* overlap between the collection machinery and coverage occurs when a policyholder fails to pay calls due and owing to the club.  In that situation, a P&I club will typically have the right to deny coverage for that policyholder's claims.  But I mention this point only in the interest of completeness.  It is an issue specific to an individual insured and it arises only when a specific call has been validly made upon a policyholder and he has failed to pay it.

33.    The main difference between a mutual P&I club and a commercial fixed premium insurer is that a mutual P&I club is capitalised differently from an ordinary commercial insurance company, in that its capital is developed from its members rather than from external owners or shareholders, and that it therefore does not aim to earn a profit.

34.    Mutual P&I clubs exist to pay their insureds' claims, not to generate profits from their underwriting for the members' benefit.  They do not need to aim to produce profits to satisfy other providers of capital, as they have no external shareholders.  They normally aim simply to "break even," generating enough money from calls and investment to pay the claims and to meet their own operating costs.

35.    There is, however, nothing wrong or unusual in a club making a surplus after paying claims and costs in any given year or over several years.  This frequently happens 'accidentally' because of the difficulty of predicting the eventual cost of liabilities and investment returns and the commercial necessity of closing policy years as explained below.  It may also be a planned outcome, as when a club needs to increase reserves in order to satisfy the solvency requirements of its regulator or of a rating agency.  The fact that a P&I insurer is a

mutual does not mean it must or will break even in any given year.  Indeed, such a result would be highly unusual for the reasons described above.  As of December 31, 1989, there was $18,499,402 in the American Club's reserves, and as of June 30, 1993, after the 1988/89 year was closed, $19,814,267 in the Club's reserves.  ( PX-297, referencing AC3066585, a surplus statement, which is part of a set of voluminous documents not individually marked as trial exhibits).  These amounts are mainly from surplus balances in closed insurance years (due in most part to conservative reserving of known claims), investment income thereon, reinsurance recoveries and profits.

### MUTUAL UNDERWRITING SYSTEM

36.     Mutual P&I clubs collect money from their shipowner members in accordance with the mutual system of underwriting.  The distinguishing features of this system are advance and supplementary calls based on an individual rate for each member.

37.     Under the mutual underwriting system, each member is assigned an individual rate which takes account of the risk that his fleet is judged to bring to the club for the coming year, normally expressed in dollars per ton.  This rate may be adjusted in advance of the start of each new policy year, usually in a negotiation between the member (or his broker) and an underwriter in the club's management, to take account of changes to that perceived risk.  The reason for such a change will usually be that over recent years the member has brought to the club more claims or fewer claims than were anticipated when his current rate was set.

38.     I should make clear, for the avoidance of any doubt, that a member's claims cover is not limited or otherwise constrained by the size of his rate, nor by the number or type of past claims that the club's underwriter may have taken into account in determining what that rate should be.  The member is entitled to be paid by the club for claims that fall within the

heads of cover delineated in the claims cover section of the club's policy or rules. This is so regardless of whether he had had such claims in the past or whether the club's underwriter had anticipated the likelihood of the member having such claims or of having them at such aggregate cost to the club. This may be an argument for not underwriting on the basis of claims record alone, particularly as new liabilities emerge, but it cannot support any suggestion that the member should be denied in whole or in part the full contractual claims cover that he has purchased.

39.    It is traditional for a P&I club to call from each member at the start of each insurance year only an initial portion of what it expects it will eventually need. This is expressed as a percentage of each member's individual rate. The percentage is the same for each member. The club will subsequently make a further call or calls in respect of that year. This 'supplementary' call or calls ("assessments" in American Club terminology) will also be expressed as a percentage of members' individual rates. The size of the percentage chosen for any supplementary call or calls will depend primarily on the overall financial development of the policy year in the club's books, taking account in particular of all claims paid and anticipated, of investment income received and anticipated and of reinsurance recoveries received or anticipated.

40.    The total amount that the club eventually calls depends on the financial performance of the club as a whole, with the proportion of that total falling on each policyholder depending on his individual pre-fixed rate. Calls are not made in response to the payment of individual claims or categories of claims; rather calls are made when the aggregate accounts show that they are or will be necessary. So nothing in the American Club's By-laws authorizes calls for deficiencies with respect to individual claims or categories of claims. Thus the By-law

invoked to close years, Article V, Section 4, depends on the Managers' ability to estimate the "final surplus or deficiency resulting from all of the Corporation's insurances in effect during such insurance year." ( PX-109).

## ESTIMATES ON CLAIMS

41.     One of the many functions performed by a club's managers is the placing in the club's books of estimates (or "reserves") against pending claims.  A claims handler within the club's management will normally set a reserve against each potential claim of which he or she becomes aware, consisting of an estimate of its likely eventual cost to the club.  The initial estimate will be revised by the claims handler as the case develops.  It will be reviewed from time to time.  The member concerned will normally be advised of the current estimate and have the opportunity to provide input.  However, the estimating function remains the responsibility of the club's managers.  The reserve need not be approved by the member.

42.     All claim reserve estimates are aggregated by the managers into that year's total figures.  The managers typically will add to this aggregate a lump sum under the heading "IBNR."  "IBNR" stands for claims "incurred but not reported" and it is intended to allow for factors that can be expected to add to the aggregate in the future, albeit to a currently uncertain extent.  It covers claims of which the managers are as yet unaware (and so bear no individual estimate or reserve) and also any eventual insufficiency in the aggregate of the estimates on the reported claims.

43.     This process is not subject to review or approval by the membership.  It is carried out by the managers (under the oversight of the club's auditors and actuary).  The total aggregate reserves for a policy year are not discussed with or approved by the membership;

rather, they are compiled by the club's managers and notified by them to the Board. The directors are largely dependent in this area on the managers.

44.    In addition to providing for IBNR while a policy year is still open, a P&I club will often decide to make provision for IBNR at the time a policy year is to be closed. As indicated above, the reasons for making such a provision are twofold.

45.    First, claims pending at the time a policy year is to be closed may ultimately be settled for a greater amount than estimated. So the club may wish to make provision for possible underestimation of reported claims. Alternatively, a specific provision may be unnecessary because the club's managers make the provision indirectly by consistently estimating reported claims on a conservative basis. The fact that the American Club's contingency fund[4] stood at $17,838,000 as of December 31, 1996 (*See* DX-DZ, 1996 Financial Report by Deloitte & Touche LLP at AC24340) indicates to me that its Managers and Directors were generally conservative in making decisions as to what amounts should be reserved upon closing policy years.

46.    Second, certain claims may be unreported at the time a policy year is closed. ODCs are an example of this type of claim. Such claims may be asserted many years after closure of the policy years during which the exposure took place, due to the long latency periods involved. The potential for latent disease claims became known to the American Club's Managers by at least 1980. The potential severity of these types of claims was illustrated by the Torrens claim. In order to insure that adequate provision would be made for payment of such claims without impairing its reserves, the American Club began to make an additional IBNR

---

[4] The American Club formed a contingency fund in 1996 from its reserve account for closed years.

provision for ODCs with the closure in 1988 of policy years 1977-78, 1979-80, and 1981-82. (*See* PX-127, April 8, 1988 Kirlin, Campbell and Keating opinion letter).

47.    The American Club says that for policy years before policy year 1977-78 (and policy year 1978-79) it did not at the time of closure include a specific IBNR provision for latent ODCs which had not been reported to it. (*See, e.g., D*X-HG, Plaintiff's Second Amended Complaint at ¶ 9). That unilateral decision of the Club has no impact on the existence of coverage for such claims – otherwise the Club could have prejudiced the cover of its insureds (and diminished its own exposure to them) by under-reserving. It must also be understood that what matters in considering closure of an insurance year is not the amount, if any, set aside for any claim or for any type of claim, but rather the aggregate figures for all claims as well as the club's general reserves and reinsurance arrangements. Over the years in issue here, the American Club seems to have made ample aggregate provisions at the time of closure (*see* paragraph 35 above).

48.    Any decision to close a year must involve the risk that reported claims may later be settled for amounts higher than anticipated and that previously unreported claims may emerge after the year is closed. However experienced and professional the managers may be, it is inevitable that the development of the year from closure onwards will produce an eventual result that is either better or worse than was expected at the time of closure. But, post-closure developments do *not* affect coverage. The American Club's conduct since the 1980s illustrates this. Once the Club's Managers realized that substantial numbers of latent injury claims could be asserted in previously closed policy years, the Club behaved exactly as one would expect an insurer to behave in that situation: it recognized its insurance obligation and began making additional provisions to fund that obligation, taking into consideration its already

substantial closed year reserves.  (*See P*X-127, April 14, 1988 Board minutes at AC3061048).  It

certainly did not then contend that coverage did not exist because of the absence of a specific

provision for IBNR ODCs in closed years.  The Club began to consistently set reserves for

ODCs in closed years.

       49.    On pages 38 and 39 of my report I commented on the remarkable

uncertainty as to the implied term that in this action the American Club is seeking to substitute

for the express provisions of its policy as to which claims are and are not payable.  The term

seemed to change significantly every time an attempt was made to define it.  This uncertainty is

illustrated (and maybe increased) by Mr. Craig's recent affidavit.  He states that when an ODC

was being pressed on a Club policyholder he would initially place upon it a reserve "in the

amount of one deductible per year" which "would result in a net reserve of zero because the

member was responsible for the deductible(s)."  (*See* Affidavit of William A. Craig at ¶ 25).  So

the estimate of the Club's liability was zero.  Assuming that the Club is willing to pay for

underestimated claims as opposed to unestimated claims (*See, e.g., D*X-IJ at Ex. 4, Hughes

Transcript at 393), on which side of this line does Mr. Craig's claim fall?  Then suppose that the

answer given by the Club is that the claim is excluded, why should the policyholder's cover be

prejudiced in this case but not if Mr. Craig had instead of zero raised an equally "arbitrary

'placeholder' reserve" of $1?  (Affidavit of William A. Craig at ¶ 25).  It cannot be right that the

policyholder's cover depends on the (uncertain) answer to such questions, which are about the

unilateral internal decision of one of the Club's Managers' own officers.

      50.    Quite apart from the unacceptability of the Club's Managers being able by

their internal estimating practices to eliminate the Club's liability to its policyholder, the

absurdity of the above speculations shows the Club's position to be unsustainable.

51.     Certainly the Directors, at the time they began to set aside an annual $100,000 towards ODC claims, do not seem to have expressed reservations about coverage, whether or not based on these fine distinctions.  Nor do the Managers seem to have done so; they say that their concern was that not enough was being set aside to meet these claims. Reservations about coverage seem to have come to mind only many years later.  I am not aware of any P&I club, other than the American Club in this case, that has ever contended that an absence of dedicated reserves for occupational disease (or any other) claims in closed years was a basis for denial of coverage.

## SIGNIFICANCE OF CLOSING A POLICY YEAR

52.     By declaring a policy year closed, a club effectively tells its policyholders that there will be no further calls ("assessments") upon them in respect of that year (and that, conversely, no further returns ("refunds") will be made to them).  It is well understood in the mutual P&I insurance industry that closing of a policy year terminates the club's right to further assess the members of that year, as well as the members' entitlement to any refund from the club. This is what "closing" means.  To my knowledge, there has never before been a case, other than this one, in which a P&I club has attempted to further assess insureds in a policy year after the year was closed (*i.e.*, to in effect "re-open" the year for further assessment).

53.     Subsequent to my report, the American Club has produced two documents which might seem to cast doubt on this assertion that a closed year is closed for good.  Upon examination, however, they do not do so.

54.     The first document was put to me at my deposition.  It contains a rule of the Britannia P&I Club from its 1967 year which provided that members were released from liability for further calls once a year's accounts were closed, but contained an exception for un-

notified or non-estimated claims.  (*See* PX-22, 1967 Britannia Club Rules, Rule 19, second

paragraph).

       55.     It seems, however, that only the Britannia Club had a rule with such an

exception[5] and this rule was removed from that club's rule book in 1968 (being replaced by a

conventional rule on closure that contained no such exception[6]) and has not reappeared since.

Moreover, even while the old rule existed, its exception seems not to have been invoked[7]; indeed

the Britannia Club's Committee was at pains to reassure members, after it had closed years, that

there would be no further liability upon the members in respect thereof.[8]

       56.     It is therefore no surprise that this unique, unused and anomalous rule has

long since been forgotten and, more importantly, did not weaken the understanding of the whole

P&I insurance industry that closed does indeed mean closed.  Indeed, the history of this rule

tends to reinforce that understanding, as the Britannia Club found it expedient not merely to

assure its members that it was not using the exception within the rule but eventually to withdraw

the rule in its entirety and replace it.  The commercial pressure for such a withdrawal, in order to

conform to the industry norm, is explained in page 23 of my Report.  (*See* DX-IJ).

       57.     Nor does the past existence of such a rule give any support by analogy to

positions adopted by the American Club in this action.  Before 1968 the Britannia Club could in

theory have invoked its rule, but the American Club never had such a provision in its own

policies, By-laws or Rules nor did it ever notify its members of the potential for further

---

[5] This is based on my examination of the rule books of numerous P&I Clubs that are kept in the library of the London P&I Club.  I looked at the rules of each of them for the years 1959, 1962, 1968, and 1974.

[6] This is based on my examination of the collection of Britannia club rule books in that club's own library.  (*See* DX-Y).

[7] This is based on my study of the Britannia Club's Committee records from 1968 back as far as the 1950 year; these records are contained in that club's library.  (*See, e.g.*, DX-AB.)

[8] *See* Exs. DX-Z, DX-AA and DX-AB.

assessments after insurance years were closed.  Moreover, if it is correct to see the exception in the Britannia rule (had it ever been invoked) as making the whole rule into one dealing only with closure in respect of notified and estimated claims, the American Club cannot validly claim that it sought the same result; it paid un-notified and non-estimated claims and previously never argued that closed years were not closed as to unknown claims.  Significantly the American Club included amounts for IBNR in response to these claims on the closure of policy years (after the 1977 policy year) and even assessed for these IBNR amounts.

58.    The second document was included by the American Club in its trial exhibits.  It is a June 2005 circular from the Liverpool and London P&I Club (which ceased underwriting in 2000) reviewing the status of all its policy years.  In respect of all its years up to 1978 it says "....members entered for these years are reminded that the Association reserves the right to make further calls on these years in respect of both paid and future claims." (*See* PX-274, June 2005 Liverpool and London Club circular).  But this is not because those years have or are being "re-opened."  It is because they were never closed.  Until 1979, this club had no rule about closure.[9]  Nor had it before then developed a practice of declaring years closed.  Rather, as was common knowledge throughout the P&I insurance industry, it had distinguished itself from most of its competition by relying strongly on "arrears calling" (bringing money into the club only as when required to pay claims) and it therefore wanted to keep years open indefinitely.  After 1979 the club began to close years, as the same circular shows.  It does not purport to reserve a right to make further calls on those closed years.  As would be expected, its final three underwriting years remain open, again as shown in the circular.

---

[9] This is based on my examination of the Liverpool and London P&I Club's rulebooks kept in the library of the London P&I Club.

59.    If unprovided-for claims emerge in a policy year that has been closed, P&I clubs customarily look to their reserves and, if necessary, their current membership to pay for such liabilities. The American Club behaved consistently with this practice until recently and indeed now expressly recognizes a right to assess its current membership for deficiencies caused by claims in closed years. (*See* PX-224, October 25, 1996 fax from Joseph Hughes to David Comer; PX-267, 2005-06 By-laws and Rules, Rule 4, Section 6).

60.    Moreover, when the Club's Managers began making provision for payment of ODCs in the 1980s, there was no suggestion at that time that closed year policyholders could be further assessed. This is consistent with general industry understanding that *closed means closed*.

61.    This industry understanding serves an essential purpose. Policy years are closed in order to give shipowners the assurance of finality with respect to their exposure to any further calls ("assessments"). That is the whole purpose of closing. Shipowners rely on this assurance as an end of their exposure to calls ("assessments") in a policy year, so that they can confidently close their books on further call liability. The shipowners (or operators) need this assurance not only for their own benefit but because they must give their own similar assurances to others, including charterers, auditors, lending banks and shareholders. If these assurances cannot be given with complete confidence, there is no point in closing; the year might as well be left open indefinitely.

62.    If a club were to announce in advance that closed years could be reopened in the future to make further provision for unforeseen events, it would destroy the expectation of finality that closure entails and be wholly unacceptable to shipowners as introducing open-ended uncertainty. Shipowners would not choose to be members of such a club and would look

elsewhere for their insurance.  Thus, it is not surprising that the Britannia Club decided in 1968

to remove the rule that is discussed at paragraphs 54-55, above.

63.    Importantly, closure of a year affects only the obligation of the

policyholders to pay calls to the club (and the reciprocal possibility of a refund of calls or

"assessments" to the policyholders).  In other words, closure of a policy year affects only the call

collection machinery.  It has no effect on coverage.  Closure means "no more calls (or returns)"

and nothing more.  In particular, closure has no effect on a club's obligation to pay claims arising

from that policy year which fall within the cover provided by the club's policy or rules.

64.    So the policyholders are "released" by a club's declaration of closure; but

the club's quite separate liability to pay valid claims continues.  At the time of closure, the

insureds do not surrender their insurance policies or agree to limit coverage to reserve figures set

by the club's managers.

65.    A call can be made upon the insureds for a particular policy year only in

accordance with the by-laws and/or rules applicable to that year.  However, the assets of the club

are available to back the club's insurance obligations in any policy year, whether open or closed.

66.    The principle of closure (as explained here) is not inconsistent with the

assessment provision of the American Club policies.  The policy's assessment provision

provides:

> "The Assured are subject to a contingent liability hereunder for assessment without limit
> of amount for their proportionate share of any deficiency or impairment as provided by
> law and fixed in accordance with the by-laws of the Association . . ."

(*See* DX-BP: Specimen Policy).  This provision does not state that assessments may continue to

be made indefinitely, only that their *amount* is not limited (to distinguish the Club's policy

from those mutual policies that *did* put an upper financial limit on the exposure of the assured

to assessment).  Further this provision references that the assessments are fixed in accordance with the By-laws, which provide for closure and a "final" assessment, thus placing an end point in time to the policyholder's liability to the Club.  (*See* PX-109 at Article VI, Section 4 )  However, the policy does not provide that closure ends the Club's coverage obligation to the policyholder.  Nor do the By-laws.

   67. Moreover, the call collection machinery for a policy year becomes redundant as soon as that year is closed.  If the year, although "balanced" at the time of closure, develops badly thereafter, for example because claims are settled in excess of claim reserves, the club must make good the consequent deficit either by drawing on reserves built up from previous years or by calling on ("assessing") members in one or more open years pursuant to common P&I practice.  By the same token, if the year develops well, the policyholders in the closed policy year are not entitled to a refund.

### COMMENTS ON CERTAIN POINTS MADE BY THE AMERICAN CLUB IN THIS LITIGATION

#### A. THE MOVEMENT OF MONEY BETWEEN POLICY YEARS DOES NOT VIOLATE ANY FUNDAMENTAL PRINCIPLE

   68. The adjective "mutual" is helpfully used to differentiate the P&I club concept from that of commercial insurance companies.  It draws attention to two differences in particular: first that a P&I club is the creature of the shipowner members themselves and second that, as these members provide its capital, the club has no need to make profits.  By extension, "mutual" is also used as convenient shorthand for the clubs' system of underwriting, based on advance and supplementary calls, the size of the latter depending on the overall underwriting result, as described above.

   69. The noun "mutuality" is much more nebulous.  In the marine insurance world, it is commonly used simply as a label for the mutual P&I concept.  But if there is indeed a

"fundamental rule" or "core concept" underlying the way the mutual P&I clubs have always operated, it may be simply that each member should be treated fairly by comparison with all the other members.

70.    Fairness is, of course, an issue in relation to a club's call collection machinery as opposed to its claim cover. The entitlement to make a claim is a matter of construction of the club's policy or rules. Moreover, once policy years are closed, the collection machinery is shut down, and with it any obligation on a club to account to its closed year policyholders for the results of closed years, positively or negatively.

71.    It is simply not right to say, as Plaintiff has, that an insurance year must (always) stand entirely on its own and the Club, in effect, is a different entity each year. Quite apart from other considerations, each new policy year needs the surplus reserves accumulated from previous years in order to satisfy the insurance regulators. This is why it has become so difficult to start a new mutual, as mentioned in paragraph 7 above; the benefit to current members of the reserves built up by earlier members is considerable.

72.    As explained above, when a policyholder purchases insurance from the club, risk is transferred to the club itself. The other members of the club are not his underwriters. In the event of non-payment of his claim, the action lies against the club and he is neither obliged nor able to sue club members. So the language of, for instance, paragraph 7 of the Second Amended Complaint ( DX-HG) is inaccurate in so far as it characterizes an issue in this action as whether the members have an obligation to indemnify the Defendants for ODCs: It is *the Club itself* which must indemnify. Similarly, the statement in paragraph 25 of that Complaint that "The members....collectively and mutually indemnify each other..." is an over-simplification. From this it will be appreciated that the statement that a club's members are "both insurers and

24

insureds" (*See, e.g.,* Affidavit of Joseph E.M. Hughes at ¶ 10) may be a useful shorthand expression, but it is not a technically accurate statement of the relationship between a member, his club and its other members.

73.    The new members of a club, and in this case, the American Club's current members, substantially benefit from the monies contributed by former members. If reserves were not already in existence, these members would have to pay to capitalize the Club to the satisfaction of the state regulator to enable it to continue to underwrite their risks; *see* paragraphs 7 and 71 above.

74.    Additionally, new and current members of clubs which use a "contingency fund" or other similar method to "smooth" the financial results of policy years and avoid larger than expected supplementary calls, benefit substantially from the reserves contributed by former members of the club. In this case, American Club members have, since 1996, benefited from such a contingency fund, built up by contributions of former members such as the Defendants. In fact, since 1996, over $9 million from the Contingency Fund has been used to avoid assessing the current members for deficiencies in open years about to be closed. (*See* Exs. DX-EE, DX-EF, DX-GN, DX-GO, DX-HD, DX-HE, DX-HF, and PX-298).

75.    I understand that the American Club has continued, in its affidavits, to raise the issue of whether its current members can be assessed for claims from closed policy years. Of course the exposure of its members is not directly in respect of such claims, as clubs do not assess on such basis, but rather in respect of amounts needed to replenish the Club's reserves when these are being depleted by claims and expenses from any years, whether closed or open. The American Club recognized, in Joseph Hughes' fax of October 25, 1996 ( PX-224) to David Comer of the International Group's Membership Subcommittee, that the Club's current

members are and have always been subject to "assessments" for deficiencies resulting from closed year claims.

    76.  The American Club, under pressure from the IG, adopted a rule effective February 20, 2005 which explicitly stated that the Club had the power to assess its members for losses resulting from closed insurance years. In paragraph 45 of his affidavit, Mr. Brown said, "I infer that the IG had concluded that, in the absence of such a rule, the American Club could not assess open year members for such a purpose." This inference seems to me to be without foundation and wrong. What happened was that while the American Club was applying for full membership in the IG in 1996, it was asked whether it had the ability to assess its members for deficiencies attributable to closed insurance years. The reply from the American Club, drafted by Mr. Brown himself, was affirmative:

> [t]he Club is required to maintain adequate reserves and surplus, and the only practicable way of doing that if a deficiency arises which is not attributable to an open year, including one attributable to any closed year, is by assessing current members in sufficient amount to remedy any deficiency. (DX-DW and DX-DX).

The IG had no reason to question this unambiguous assurance. It returned to the subject only much later, when the Club itself, by the positions it adopted in this litigation, seemed to withdraw from what Mr. Brown had drafted and the Club had represented to the IG. The obvious way for the IG to put the matter beyond doubt for the future was to require that something be written into the Club's rules. There is no ground whatsoever to suggest that by doing so they indicated that such a rule was necessary to give the Club the ability to make the calls in question. They had accepted the Club's written assurance that the Club already had this ability without the new rule – an assurance which Mr. Brown reiterates in his affidavit as being "both accurate and fully responsive to the questions put by Mr. Comer." (Brown Aff. at ¶ 44).

The IG took this action only when the Club itself caused uncertainty by calling that assurance into question.

77.      It is, of course, a fallacy to suggest that clubs can do nothing that is not expressly sanctioned by a specific rule.  Indeed, it is often the case that they develop practices in response to commercial needs and that it is only at some later date, by when the practice is well-established, that these find their way into the rulebooks – and then often only because it is eventually thought prudent to put particular practices beyond future challenge by some litigious member.  So, to give just two examples, the UK P&I Club had operated its Contingency Fund for several years before it was mentioned at all in its rule book (*see* PX-49: 1981 UK Club Rules); and the American Club itself made interim assessments for a number of years before there was any express right to do so in its By-laws or policies (*see* PX-5: Opinion Letter of Cletus Keating and Maurice Fridlund dated 16 Dec 1955, at AC3010540).  Where a club's rules make detailed provision for an aspect of its operations (the most detailed provision, understandably, relates to the claims cover) there is little if any room for practices to develop in this way, but in other areas the rules have left sufficient gaps – gaps which have allowed practices to evolve before eventually being narrowed or closed by this crystallization of those practices into rules, usually 'for the avoidance of any future doubt.'

78.      In any event, this issue is not directly relevant to the current action.  As explained above, the club's insurance obligations are assumed by the club as such and not by the members of the club individually or collectively.  Defendants in this case have not, so far as I am aware, sought any assessment of the Club's current membership, but have simply sought to have honored the insurance contracts they themselves purchased from the Club.

### B.    THE AMERICAN CLUB IS TREATING POLICYHOLDERS UNFAIRLY

79.    The American Club has drawn a 'bright line' at the year 1989, prior to which it refuses to pay ODCs.  I have seen nothing that indicates that the Club notified its members that in 1989 their treatment would change.  There are no documents reflecting this change and no witness has testified that they were aware of it at that time.

80.    The American Club has sought to justify its differential treatment of members and former members by reference to the Club becoming a reinsured member of the IG in 1989.  It may therefore be helpful for me to explain here the purpose and nature of the IG.

81.    The 13 major P&I clubs join together in the IG in order to share ("pool") part of the larger claims that are made upon them – currently any excess over $6 million per claim.[10]  Clubs do not pay premiums for this to the IG; they "buy" pooling for their own claims by paying an agreed percentage of the pool claims of each of the other participating clubs.

82.    The essential role of the IG is the provision to its constituent clubs of this pooling and the purchase on their behalf of an extensive programme of commercial reinsurance to protect the pool.  Its committees are manned by individuals from the managers of the participating clubs.  They come together only as required, primarily to take the collective decisions needed to facilitate the pooling and reinsurance.

83.    The IG has no regulatory function, but it does require its constituent clubs to co-ordinate their practices in certain respects in order to make effective the pooling of claims.  (Clubs remain free to give cover to their members for claims that are not sufficiently "mutual" to be pooled, for example hull risks; it is just that these are excluded from the pooling arrangements.)

---

[10] In 1989, the equivalent was $1.2 million.

28

84.    The arrangements relating to the sharing of claims and purchase of reinsurance are contained in the Pooling Agreement ( PX-133, 1989 Pooling Agreement) which is signed by each directly participating club. All clubs involved are required to accede to the (separate) International Group Agreement ( DX-EU), which puts restraints on the rate that a participating club may charge a fleet for its first year of cover after transfer from another participating club.

85.    Membership in the IG is voluntary. It is possible for a club that is not a direct member of the IG to be reinsured by a club that is a direct member, and so obtain some indirect benefit from the IG. The American Club was reinsured in this way by the London Club from 1989 to 1998. Others who were by then direct members of the IG had themselves started their relationship with the IG in this indirect way. As the American Club was only an indirect, reinsured member of the IG in 1989, I would not expect it to have signed the Pooling Agreement at that stage, but only on becoming a full, direct member in 1998. Exhibit PX-133, the 1989 Pooling Agreement, does not show the American Club as a signatory.

86.    So far as I am aware, the only requirement upon the American Club in 1989 was that it accede to the (separate) International Group Agreement, mentioned above.

87.    I am unable to see how becoming a reinsured member of the IG in 1989 had any effect on the Club's obligation or lack of obligation to pay claims arising in years after 1989. So far as I am aware, the IG did and said nothing, formally or informally, as to whether claims of this sort should or should not be paid. It did not seek to change that duty either way. Nor have I seen any evidence that, upon becoming reinsured by the IG, the American Club took any decision in that regard. The only difference of which I am aware is that the American Club brought itself into line with the Pooling Agreement's system for the application of deductibles to

such claims.  That went only to the amount to be deducted from payable claims and said nothing about whether claims were or were not payable.

88.    Having read paragraph 39 of Mr. Hughes' affidavit my view is unchanged. The fact that the American Club may have obtained a more advantageous reinsurance program from 1989 onwards seems to me to have no bearing on its obligation to pay the valid claims of its policyholders whether they arose before or after that year.  (Although the Club's reinsurance program is not relevant to its obligation to its own policyholders to pay their valid claims, I note that in any event claims of the type here in issue would seldom exceed the individual clubs' retention against the IG pool and thus trigger a contribution to or from the Club).  At no stage were the members of the American Club themselves members of the IG pool.  Their only cover was and is from the American Club.  Obviously it is to their indirect advantage if the Club is able to make reinsurance arrangements on good terms as this will tend to reduce the calls and assessments they must pay to the Club.  But their cover is in no way affected.  (I might add that if Mr. Hughes' argument did, contrary to my view, have some validity, it might have been applied more convincingly to a bright line drawn at 1998, when the American Club obtained the large and undoubted benefits of direct IG pool membership, rather than at 1989, when the Club merely obtained the smaller and less obvious benefits of indirect membership.  I am not aware of any thought being given to this, which strengthens my opinion that the decision to cut off claims at 1989 cannot be explained, still less justified, in the way that Mr. Hughes suggests.)

### C.    COVERAGE FOR A CLAIM IS NOT AFFECTED BY THE CLOSURE OF ITS POLICY YEAR

89.    The claims that a club covers and the terms on which it covers them are usually set out in the club's rules – although in the case of the American Club they were, for the years at issue in this case, set out in an insurance policy similar to that issued by commercial

underwriters.  An assured will there find each and every limitation or restriction on its club cover.

90.     A common restriction on cover is the requirement that the insured give prompt notice of any incident that may give rise to a claim on the club, and the more specific bar to recovery of any claim of which the insured has not given notice within a set time of it coming to his knowledge or which he has not brought to the club for an indemnity within a set time of his having paid the underlying claim.

91.     In the American Club's insurance policies for the years at issue here there is in Clause 16 a requirement that upon "any happening which may result in loss, damage or expense for which the Association may become liable," the Assured shall give "prompt notice thereof, on being known to the Assured." (*See* PX-117, Example of 1988-89 Policy).  Clause 17 says that "The Association shall not be liable for any claim not presented to the Association with proper proofs of loss within one year after payment by the Assured," and Clause 18 adds that "In no event shall suit on any claim be maintainable against the Association unless commenced within two years after the loss, damage or expense.... shall have been paid by the Assured."

92.     None of these restrictions applies to a happening, occurrence or claim of which the insured or member is as yet unaware.  The insured's obligations arise and time starts to run only after it has knowledge thereof.

93.     From my review of documents produced in this litigation, the American Club became aware of ODCs by at least 1980 and began paying them.  To the extent the Club's current denial of coverage with respect to ODCs is based on a claim of late notice, I would note that such claim is entirely inconsistent with the Club's practice of indemnifying policyholders for

ODCs that were unknown until after years were closed since it first became aware of them about 1980.

94.     An insured must comply with the express notice requirements. But having complied with them, he would not expect to find that there are other unstated notice requirements which may exclude an otherwise valid claim. The express provisions are exclusive; it is not expected that additional provisions are to be implied. In particular, a club member would be shocked to be told that otherwise valid and timely claims can be refused in whole or in part if not notified or estimated or properly estimated before closing of the year from which they arose.

95.     The suggestion that any such additional term is to be implied seems to me objectionable on four grounds. First, it would restrict cover by an unexpressed term as to notice, which is an area already dealt with expressly and exhaustively in the American Club's policy, as set out above. Second, it would restrict the American Club's insurance cover by reference to the *closure* of a policy year, which has no bearing on claims but rather is part of the Club's separate system for the collection of money from its members and policyholders. (*See above*). Third, it would mean that cover might be lost or reduced as a result of error in a function that is not undertaken by or within the control of the insured but rather by and under the control of a claims handler employed by the Managers of the Club, namely the placing in the Club's books of an estimate against a potential claim on the Club. (*See above*). A fourth reason against any such implied term is the uncertainty as to exactly what the term is supposed to be saying, as set out in my report at pages 38-39.

96.     No shipowner would buy a policy that he knew was subject to such uncertainty. The shipowner would not be able to rely on it himself, nor to satisfy those others who seek assurance that he has in place effective P&I cover.

### D.    CLAIM COVER DOES NOT DEPEND ON RESERVING DECISIONS OF THE BOARD

97.    I note that in its pleadings the American Club seeks to rely, in its refusal to pay the claims in question, on criticism of decisions made by various of its own Directors regarding the closing of policy years, especially decisions relating to reserving against claims of this type. (*See, e.g.,* DX-HT, Plaintiff's Master Reply at ¶ 2).

98.    This criticism seems to me to be both unfounded and irrelevant.

99.    The Board was acting throughout, in taking its decisions on behalf of the Club, in the light of information and recommendations from the Club's Managers and advice from its Counsel.

100.    The amount set aside upon closure for a claim or for a type of claim does not matter in itself, provided that the total amount set aside is appropriate taking into account the Club's general reserves and reinsurance arrangements. In this action the American Club has repeatedly focused on asbestos claims and the additional amounts set aside for them as if this was the only risk it covered, instead of being, as in truth it was, just one of a wide range of equally expensive exposures. When closing a year a club will of course have regard to each of those exposures, but only in order to arrive at an appropriate overall figure to be set aside – which is all that matters in this context.

101.    Hindsight must be ignored. In judging the reasonableness of amounts set aside upon closure, regard must be had only to the information available to the Directors and Managers at that time.

102.    In considering the potential impact of a head of risk that it fears is expanding, a club is entitled to have regard both to the strength of its reserves and to the degree to which it customarily estimates its claims on a conservative basis. This may properly lead it to

33

conclude that there is sufficient 'slack' in its system to allow it to want to see how a new risk develops before making a substantial allowance for it.

103.    Bearing the above comments in mind, it seems to me that the Directors of the Club did not act unreasonably.  At the time the 1977-78 policy year was closed it was very uncertain how damaging to the Club's figures asbestosis claims would turn out to be.  The Directors knew there was over $15 million in the reserves and thus available to pay for closed year claims (see PX-297, referencing AC3061011, a surplus statement, which is part of a set of voluminous documents not individually marked as trial exhibits) and had reinsurance in place, both excess and stop-loss in various years, to protect the Club in the event of heavy losses.  No doubt they also realized that the Managers tended to estimate their claims on a conservative basis.

104.    Against this background their decision to make an additional annual allowance of $100,000 in recognition of asbestosis claims hardly seems to deserve the criticism that has been leveled at it by the Club itself.  It is said that the figure was "arbitrary" (see, e.g., Affidavit of Richard H. Brown, Jr. at ¶ 24), but at that time that same word could have been used of any other figure; there was simply not enough known at that time upon which a more accurate figure could have been calculated (as Richard Brown concedes in paragraph 24 in his affidavit). It is said that they should have chosen another figure proposed by the Managers, namely the credit balance for the year about to closed, up to $250,000.  But on what basis would this have been regarded as more accurate?  Even if this potentially larger amount had been reserved, the resultant total (at most $1.65 million in addition to the $1.1 million actually reserved, if each year had a $250,000 credit balance) would similarly be characterized as inadequate if treated as the only amount available to pay for ODCs.  What the Directors did decide was to flag the potential

34

exposure and to set aside an additional sum certain, on the basis that its adequacy for future closures could be reviewed in the light of growing knowledge as to the real impact of this new type of claim. If, as is being suggested (*see, e.g.,* Declaration of John H. Cassedy at ¶¶ 11-13 and Affidavit of Thomas J. McGowan at ¶ 78), the Managers felt that more should have been set aside, they had thereafter an annual opportunity to press that view upon the Board. I am not aware that they chose to do so. Maybe this restraint was because the Managers sensed that the overall amount being reserved in each year as it was closed was appropriate. Again, I am not aware that these overall amounts – all that really matters in this context, as explained above – have turned out to be inadequate, even with the benefit of hindsight.

105.    Finally, these criticisms are not, in any event, relevant to the issue of coverage. The terms on which the American Club provided cover in the years at issue here are set forth in the Club's insurance policy. Naturally, these terms did not make cover conditional on the accuracy of the reserving decisions of the Club's Directors (or Managers). That is hardly surprising, as any such condition would confuse calls with claims and introduce into the insurance contract a degree of uncertainty that would deter any shipowner from becoming a member of the Club.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
TERENCE G. COGHLIN

Executed on:
12th June 2006