UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

AMERICAN STEAMSHIP OWNERS MUTUAL : 
PROTECTION AND INDEMNITY           :        No. 04-cv-04309 (LAK)
ASSOCIATION, INC.                  :
                        Plaintiff, :        (ECF Case)
                                   :
        -against-                  :        **AFFIDAVIT OF**
                                   :        **DEBORAH A. WEEDMAN**
ALCOA STEAMSHIP CO., INC., et al., :
                                   :
                        Defendants. :
------------------------------------------------------------- X


STATE OF MISSOURI      )
                       ) ss.:
COUNTY OF ST. LOUIS    )


DEBORAH A. WEEDMAN, being duly sworn, deposes and says:

1.      I am employed as "in-house" counsel to Defendant Apex Oil Company,

Inc. ("Apex Oil") and its affiliates, including Defendants Trinidad Corporation ("Trinidad"),

Mathiasen's Tanker Industries, Inc. ("MTI") and, when it was in existence, Crest Tankers, Inc.

("Crest") (collectively, the "Apex Oil Defendants").  I submit this affidavit on behalf of the Apex

Oil Defendants in the above-captioned action brought by plaintiff the American Steamship

Owners Mutual Protection and Indemnity Association, Inc. (the "American Club," or the

"Club").

2.      I am fully familiar with the facts stated herein, which are based upon my

personal knowledge.

## Background

3.      I am a member of the Bar of the State of Missouri.

4.      I have been employed as an attorney by Apex Oil and its affiliates since 1990.

5.      My duties and responsibilities as counsel for Apex Oil and its affiliates include, among other things, the management and oversight of legal claims brought against Apex Oil and its affiliates. Such claims include lawsuits that have been brought by seamen and others for injury (including occupational disease claims ("ODCs")) allegedly due to service upon vessels previously owned and/or operated by the Apex Oil Defendants.

6.      I am also responsible for handling insurance matters with respect to such claims. Since 1990, I have handled the submission of claims for indemnification to the American Club under insurance policies issued by the Club to the Apex Oil Defendants. Apex Oil's former General Counsel, Neil H. Miller, also handled the submission of such claims for indemnification to the Club during his employment at Apex Oil (approximately 1990 to September of 2000).

## The Apex Oil Defendants' History of
## Insurance Coverage With The American Club

7.      Documents produced in this litigation establish that the earliest American Club policies with respect to the Apex Oil Defendants were those issued to Trinidad by the Club in the year 1947. These policies insure vessels once owned and/or operated by Trinidad and cover liability for "loss of life of, or for personal injury to, or illness of, any person…," which includes seamen who served aboard the vessels. American Club policies were issued to Trinidad through and until the mid-1980s.

8.    Documents produced in this litigation establish that the Club first issued an insurance policy to MTI for the insurance year February 20, 1966 – February 20, 1967. Like Trinidad, MTI was variously issued American Club insurance policies through and until the mid-1980s, as were other Apex Oil affiliates.

9.    From the documents produced in this litigation, the last insurance policies issued in the name of any Apex Oil Defendant were issued for the February 20, 1983 – February 20, 1984 insurance year. However, additional later policies issued by the Club also covered certain vessels chartered by certain of the Apex Oil Defendants through the policy year February 20, 1989 – February 20, 1990. Even after the Apex Oil Defendants' membership in the Club had ceased, the American Club policies insuring the Apex Oil Defendants and their vessels, or vessels once chartered by them, remained in full force and effect. To my knowledge, none of the American Club policies issued to the Apex Oil Defendants, or covering vessels once chartered by them, were ever cancelled or surrendered.

10.    To my knowledge, the Apex Oil Defendants paid all premiums and assessments duly issued to them by the Club pursuant to the policies purchased from the Club.

### The Club's Insurance Coverage For Occupational Disease Claims Was Never Disputed or "Discretionary"

11.    Throughout my years of dealing with the Club with respect to indemnification of ODCs under the American Club policies, it was always understood – by both me, the representative of the insured, and the Club, the insurer – that such claims were covered by the policies, notwithstanding that the claimants had filed suit many years after the insurance year(s) in which the ODCs arose were already "closed" by the Club. The Club never claimed or invoked a so-called "discretionary" policy when it indemnified Apex Oil and its affiliates for

such ODCs. Coverage for these claims was never in doubt or dispute – indeed, we sought and received indemnification for the claims long after the relevant insurance years had been closed.

12.     The only issue of contention ever to arise (discussed below) was the number of deductibles that we, the insured, were required by the Club to satisfy before being indemnified. While it was Apex Oil's position that only one policy deductible should apply to any given seaman's claim, the Club instead "stacked" deductibles, *i.e.*, if an injured seaman served on a vessel or vessels for a period of more than just one year (or policy period), the Club applied *all* of the deductibles contained in all of the policies corresponding to the seaman's years of sea service to the amount of our single claim, thereby reducing the overall amount indemnified to us.

### The 1991 Order & Stipulation

13.     That the Club always understood and acknowledged that its policies covered liability for closed-year ODCs is evidenced by a prior court order issued by the United States Bankruptcy Court for the Eastern District of Missouri: the *Order Approving Stipulation Between Trinidad Corporation and Mathiasen's Tanker Industries, Inc. and American Steamship Owners Mutual Protection and Indemnity Association, Inc.*, dated April 4, 1991 (the "1991 Order & Stipulation") (DX-BS).

14.     The 1991 Order & Stipulation resulted from a declaratory judgment action which Apex Oil's affiliates, Trinidad and MTI, filed against the Club in 1990.

15.     The 1990 declaratory judgment action against the Club arose in the context of voluntary petitions for reorganization filed by Apex Oil and its affiliates, including

Trinidad and MTI, in the United States Bankruptcy Court for the Eastern District of Missouri in 1987.[1]

16.    The Club and Apex Oil ultimately settled the declaratory judgment action pursuant to the terms of the 1991 Order & Stipulation.  The background leading to the declaratory judgment action and the resulting 1991 Order & Stipulation is as follows:

17.    In connection with Apex Oil's bankruptcy proceedings, four hundred eighty (480) proofs of claim were filed against Trinidad and MTI by four hundred two (402) claimants alleging tortious exposure to asbestos and to toxic materials during the scope and course of employment with Trinidad and/or MTI and seeking damages under, *inter alia*, the Jones Act (collectively, the "Asbestosis Claimants").  (DX-BS, Stipulation at ¶ 2.[2])

18.    The claims of the Asbestosis Claimants (the "Asbestosis Claims") were filed in the amount of $1 million each.

19.    The majority of these claims arose out of the Asbestosis Claimants' alleged service aboard various vessels covered by American Club policies issued to Trinidad and/or MTI.  (Id. at ¶¶ 3-4.)  It is my understanding that the majority of the Asbestosis Claims covered by American Club policies occurred in insurance years that had already been closed by the Club.

20.    In connection with their bankruptcy proceedings, Apex Oil and its affiliates filed a First Amended Joint Partially Consolidating Plan of Reorganization (the "Plan"). The Plan was a typical "pot plan," *i.e.*, a finite "pot" of money was available for payment by the Apex Oil debtors to their creditors; the percentage that a creditor ultimately would receive depended upon the number of allowed claims in the bankruptcy case.

---

[1] Apex Oil and its affiliates successfully emerged from the bankruptcy proceedings under a Plan of Reorganization dated August 16, 1990.

21.     The Plan provided a procedure for payment of the Asbestosis Claims.

22.     First, as to any general unsecured claims that were covered by insurance, the Plan provided that the amount of the claim equal to the insurance policy's unpaid deductible (if any) was classified as a general unsecured claim and was to be distributed as such.  The Plan further provided that any amounts in excess of such deductible were to be paid in full by the insurance carrier pursuant to the terms of the insurance policy.

23.     The Plan thus required Apex Oil and its affiliates to reserve for future distributions to holders of *disputed* claims the full face amount of the claim (unless the Bankruptcy Court ordered otherwise).  Thus, the larger the required reserves for disputed claims, the less money would be available from the pot for distributions to holders of allowed unsecured claims.  (For example, if a reserve for each Asbestosis Claim was to have been set in the amount of $1,000,000 (the face amount of each such claim), there would have been little money available for distribution to Apex Oil's creditors holding allowed claims.)  As to undisputed claims against the Apex Oil estates that were covered by insurance, the Bankruptcy Court agreed to limit the reserve for each such claim to the amount of the unexpended deductible under the applicable insurance policy.

24.     The American Club policies fully covered the Asbestosis Claims, so there was no basis for a reserve in the face amount of $1,000,000 for each such claim.  If the reserve for each Asbestosis Claim was limited to the amount of the deductible under the applicable American Club insurance policy, a substantial portion of the reserved funds would be released for distribution under the Plan to holders of general unsecured claims.

25.     While it was Apex Oil's position that only one deductible applied to a single Asbestosis Claim covered by the American Club policies, even where the seaman claimant

---

[2] Stand-alone references to the "Stipulation" refer to the Stipulation that is part of the 1991 Order & Stipulation.

had more than one year of sea service, the American Club contended that multiple deductibles applied to a single Asbestosis Claim under all applicable American Club policies spanning the seaman's years of sea service.  For this reason, on June 27, 1990 Apex Oil and its affiliates filed a declaratory judgment action against the Club "to confirm (a) that American Club had issued certain P&I Policies to Trinidad or MTI for specific vessels for specific periods of time; (b) that, pursuant to the terms of such P&I Policies, American Club agreed to indemnify Trinidad or MTI (as the case may be) against the claims and/or causes of action asserted by certain Asbestosis Claimants and the costs, charges and expenses incurred in connection with such claims; (c) the deductible amount applicable to each claim asserted by the Asbestosis Claimants; (d) that the deductible requirement payable by Trinidad or MTI under such P&I Policies is satisfied by the treatment and discharge of the deductible portion of such claims under the Plan ... regardless of the distributions, if any, actually made under the Plan on account of such claims; and (e) that, upon payment by Trinidad or MTI of all amounts that either of them shall become liable to pay, and shall pay, with respect to the covered Asbestosis Claims (above the applicable deductible amount), the American Club will immediately reimburse MTI or Trinidad for such payments." (DX-BS, Stipulation at ¶ 6.)

   26. By Order of the Bankruptcy Court, entered on August 16, 1990, the Plan was confirmed.  (Id. at ¶ 7.)  Pursuant to the confirmed Plan, to the extent that an Asbestosis Claim is covered under any contract of insurance or similar policy, the Asbestosis Claimant is entitled to receive the amount of the claim, directly or indirectly, payable under such policy. (Id.)  The Plan provides that if such policy requires Trinidad or MTI to make payment for such claim amounts prior to being indemnified or reimbursed for those amounts (as is the case under the American Club policies), then any such payment by Trinidad or MTI shall be subject to the

condition subsequent that Trinidad or MTI (whichever entity made the payment) is in fact

indemnified and reimbursed for the payment. (Id.) Pursuant to the Plan, each Asbestosis

Claimant has an allowed claim in the amount of the deductible under the insurance policy.

      27.    Following the Bankruptcy Court's confirmation of the Plan, the American

Club agreed to settle Apex Oil's declaratory judgment action on the terms set forth in the 1991

Order & Stipulation.

      28.    Pursuant to the terms of the 1991 Order & Stipulation, the American Club

"agree[d] to indemnify Trinidad or MTI (as the case may be) against the claims and/or causes of

action asserted by the Asbestosis Claimants listed on Exhibits B-1 and B-2 to th[e] Stipulation,

subject to the deductible amounts set forth opposite each Asbestosis Claimant's name on said

Exhibits." (Id. at ¶ 8(A).)

      29.    Thus, the reserve set for each such Asbestosis Claim under the Plan

equaled the compromise deductible amount set forth in the 1991 Order & Stipulation.

      30.    I was extensively involved, on behalf of Apex Oil and its affiliates, in the

declaratory judgment action and in the negotiation of the terms of the Stipulation. Richard

Brown, then counsel for the Club, negotiated the terms of the Stipulation on behalf of the Club.

During negotiations in 1991, there was never any doubt or question that the Asbestosis Claims at

issue were covered by the American Club policies – both the Club and the Apex Oil entities

understood that such claims were covered by the American Club policies, a premise which

underlies the Stipulation itself. The Club gave no indication to Apex Oil and its affiliates that

coverage was not in place for such claims or that such coverage was somehow "discretionary"

because insurance years had already been closed, or for any other reason.

31.    Moreover, the Club, by entering into the Stipulation, acknowledged that the Asbestosis Claims were covered by the American Club policies.  The Club knew that the Apex Oil entities' Plan may not have been confirmed had the reserve for each Asbestosis Claim been as high as the face amount of the claim.  If Apex Oil had not been able to reduce the reserve – as it was able to do precisely because it had insurance coverage in place – Apex Oil and its affiliates would have been forced to resolve, by settlement, each Asbestosis Claim in order to make meaningful distribution under its Plan to allowed claim holders.  The Club, fully apprised of the Apex Oil entities' position in the bankruptcy proceedings – and fully cognizant of its coverage obligations under the American Club policies – strongly urged Apex Oil *not* to settle the Asbestosis Claims, for two reasons:  the Club felt that the Asbestosis Claims were without merit and the Club did not want to contribute to the "war chest" of the attorneys prosecuting the Asbestosis Claims.

32.    Further, the Club would never have reached the point of compromising on the amount of applicable deductibles for the Asbestosis Claims unless it understood and acknowledged that these claims were covered by the American Club policies.  One does not reach the issue of deductibles if there is no insurance coverage – the existence of coverage is a predicate to any compromise on an applicable deductible.

33.    In negotiating the settlement of the 1990 declaratory judgment action, the Club's only point of contention was the number of deductibles – one or more – that the Club would apply to a claim when an Asbestosis Claimant had multiple years of sea service.  Apex Oil's position was that to the extent that more than one American Club policy applied to a given Asbestosis Claim, the insured (Apex Oil, Trinidad or MTI) could select the policy it wished to cover the claim and, after satisfying the deductible prescribed by that policy, could exhaust the

coverage available and, if necessary, then invoke additional coverage under a second policy. Only after exhausting coverage available under the first selected policy would the insured be required to satisfy a second deductible amount.  (Id. at ¶ 8(C).)

34.     It was the Club's position that if a seaman's service spanned more than one policy period or more than one vessel, the deductible amount prescribed by each applicable policy must be added together, i.e., "stacked".  (Id.)  The Club contended that an insured must satisfy the deductible amounts under all applicable policies before the Club was obligated to indemnify the insured for the claims asserted by the Asbestosis Claimants.  (Id.)

35.     The Club and Apex Oil settled their dispute over the number of applicable deductibles by agreeing upon the compromise deductible formula set forth in the 1991 Order & Stipulation.  Again, at no point was the existence of insurance coverage for ODCs such as the Asbestosis Claims at issue in the declaratory judgment action ever in doubt or dispute – to the contrary, the Club acknowledged coverage.

36.     Had the Club, in 1991, said (or even hinted) that insurance coverage for such ODCs was somehow "discretionary" or otherwise not obligatory under the American Club policies, Apex Oil and its affiliates would have been required to procure other insurance for such claims.  Without insurance coverage for the Asbestosis Claims, distribution to allowed claim holders would have been substantially adversely affected and would have jeopardized the Bankruptcy Court's confirmation of the Plan.  The entire 1991 Order & Stipulation is based on the premise that the Asbestosis Claims are covered by the American Club policies, as is the confirmed Plan itself.

37.     Apex Oil and its affiliates thus relied on the understanding and acknowledgement by the Club that ODCs such as the Asbestosis Claims listed in the exhibits to

the 1991 Order & Stipulation are covered by the American Club policies and the Club's lack of statements, representations or indications to the contrary.

   38. The Bankruptcy Court also relied on the Club's acknowledgment that the Asbestosis Claims are covered by the American Club policies. After the Bankruptcy Court approved and "so ordered" the 1991 Stipulation, the Bankruptcy Court, by further order dated June 14, 1991, reduced the reserve for each of the Asbestosis Claims from $1,000,000 to the amount of the agreed-upon deductibles as set forth in the 1991 Order & Stipulation, thereby maximizing the money available in the "pot" for distributions to Apex Oil's creditors holding allowed claims. If the Club had cast any doubt on the existence of insurance coverage, the Bankruptcy Court would not have permitted the Apex Oil entities to reduce the reserves for the Asbestosis Claims.

   39. Separate and apart from the need for confirmed insurance coverage of the specific Asbestosis Claims listed in the 1991 Order & Stipulation in connection with obtaining the Plan's confirmation, had the American Club indicated that coverage for such ODCs occurring in previously closed insurance years was merely "discretionary," or anything less than firmly in place, Apex Oil and its affiliates, as a matter of prudent business practice, would have procured insurance coverage for such claims from a source other than the American Club.

### Procedure For Submitting Claims For Indemnification To The Club

   40. In the past, I submitted for indemnification to the Club several ODCs brought by claimants long after the insurance years in which the ODCs occurred had been closed by the Club. These include the claims of Otto Kelley, Hugh Watkins, Bruce Rogers, Arnold Teeple and Agustinho Monteiro, all discussed more fully below.

41.    When submitting a claim for indemnification from the Club, it was my routine procedure to correspond in writing with a representative of the Club's manager, the Shipowners Claims Bureau (the "SCB"). In the 1990s, I corresponded with William A. Craig, Senior Vice President of the SCB. Commencing in or about 2001, I corresponded with Gary Strevell, Vice President of the SCB. From time to time, I also spoke with these representatives by phone.

42.    The litigation and defense of ODCs filed by seamen against the Apex Oil Defendants and other named shipowners was (and, in the usual case, still is) handled by an outside law firm on behalf of all named shipowner defendants. As these litigations progressed, the defense firm kept the shipowner defendants and the Club and the SCB apprised of developments in the case, including settlement negotiations.

43.    When and if a claim reached the point of settlement, such as the claims of Kelley, Watkins, Rogers and Teeple (discussed below), the American Club approved the settlement amount before the Apex Oil entity paid the settlement amount. After the Apex Oil entity paid the settlement amount, I sent a letter to the SCB, together with a copy of our company check evidencing payment and seeking indemnification of the amount.

44.    In addition, after the Apex Oil entity paid invoices for legal defense services rendered by the outside law firm in connection with a particular case, I sent letters to the SCB seeking indemnification for the legal defense costs incurred and paid by the Apex Oil entity, together with copies of the company checks evidencing payment.

45.    When I submitted ODCs for indemnification to the Club, I did so on the basis that the Apex Oil entity, as the insured, was entitled to coverage under the American Club policies as a matter of right. It has always been my understanding that the Club was obligated to

–12–

indemnify the Apex Oil entities for ODCs which occurred in those years covered by the American Club policies that the Apex Oil entities had purchased from the Club. I did not submit ODCs for indemnification as a matter of the Club's exercise of its "discretion." Further, when the Club indemnified an Apex Oil entity for an ODC I submitted on its behalf, the Club did so because the Club understood that such claims were covered by the American Club policy. I was never told by any representative of the Club or its manager that the Club was indemnifying the ODC pursuant to some sort of "discretionary" policy because the insurance years had been closed before the claim had been reported to the Club, or for any other reason.

### The Apex Oil Defendants' Objection
### To The Club's "Stacking" of Deductibles

46.     The Club's wrongful "stacking" of deductibles first came to the forefront in 1990 or 1991, in the context of Apex Oil's bankruptcy proceeding as described above.

47.     The Club's wrongful "stacking" of deductibles then arose on two subsequent occasions. The issue arose in 1997, with my submission of a demand for indemnification for the claim of seaman Otto Kelly, and then again in 2001, with my submission of a demand for indemnification for the claim of seaman Hugh Watkins.

48.     I objected, on behalf of the Apex Oil entities, in writing, to the Club's "stacking" of deductibles with respect to each of these claims.

### The Kelley Claim

49.     The documents contained in my files show that Otto Kelley was a seaman who allegedly developed mesothelioma as a result of exposure to asbestos. Kelley's estate filed a lawsuit naming various shipowner defendants, including Trinidad, which once owned and operated the tanker Houston, a vessel aboard which Kelley had allegedly sailed over the years of

approximately 1967 through 1984. The documents produced in this litigation establish that the Houston is one of the vessels insured by multiple American Club policies issued to Trinidad.

50.    The Kelley lawsuit eventually settled. The documents contained in my files establish that Trinidad's portion of the settlement amounted to $348,678 and legal fees totaled $114,855.37, for a total amount of $463,533.37.

51.    The documents contained in my files reflect that I submitted the settlement amount and legal fees to the Club for indemnification on behalf of Trinidad.

52.    The Club did not dispute that the Kelley claim was covered under an American Club policy, notwithstanding that when I submitted this claim for indemnification in 1997, the Club had long since closed the insurance years applicable to the Kelley claim. The documents contained in my files establish that the American Club indemnified Trinidad for the claim, but not for the entirety of the claim. With respect to the $348,678 settlement amount, the Club indemnified only $243,603. With respect to the $114,855.37 in legal fees, the Club indemnified only $109,435.22. Thus, for a total claim in the amount of $463,533.37, the Club indemnified Trinidad for only $353,435.22.

53.    The reason the Club did not indemnify Trinidad in full for the Kelley claim had nothing to do with a denial of coverage or the invocation of some sort of "discretionary" policy – the Club never disputed that the Kelley claim, an ODC occurring in insurance years that had already been closed, fell within the coverage of the American Club policy.

54.    Rather, the documents contained in my files show that the Club did not indemnify Trinidad in full for the Kelley claim because the Club "stacked" the deductibles

contained in multiple American Club policies insuring Trinidad and the Houston over the years of Kelley's sea service.

55.    The Club could have applied a single deductible to the Kelley claim. For example, American Club policy A-3481 (DX-JE[3]) insures Trinidad and various vessels, including the Houston, for the insurance year December 31, 1968 – December 31, 1969, a period of time during which Kelley allegedly sailed aboard the Houston. This policy contains a deductible of $250 for personal injury claims such as Kelley's. Had the Club applied only one deductible in the amount of $250, the Club would have indemnified Trinidad for $463,283.37 (the total claim amount of $463,533.37 less $250). But the Club instead chose to "stack" deductibles and indemnified Trinidad in total amount of only $353,038.22, as the documents in my files reflect.

56.    As a result of the Club's wrongful stacking of deductibles with respect to the Kelley claim, the Club owes Trinidad $110,245. 15. This calculation is illustrated in Defendants' Exhibit IN ("DX-IN"), a summary entitled "Chart of Apex Oil Defendants' Partially Indemnified Occupational Disease Claims."

57.    The documents from my files on the Kelley claim, as well as documents produced by the Club in this action, were used to create DX-IN. The specific documents relied upon to create DX-IN are listed therein as "Supporting Documents." I participated in the creation of DX-IN. I have reviewed DX-IN against the underlying supporting documents and I confirm that DX-IN fairly represents and accurately summarizes the underlying documentary

---

[3] The specific American Club policies referenced as exhibits in this Affidavit (DX-JE, DX-JF, DX-JG, DX-JH and DX-JI) were not previously individually listed on the Defendants' exhibit list appended to the Amended Pretrial Order dated May 18, 2006 ("PTO"). However, pursuant to the PTO, the parties may introduce specific American Club polices at trial and supply an exhibit number, as has been done herein. See PTO, Part VIII ¶ 2; Appendix 2 (Defendants' List of Exhibits), p. 15 n. 2.

evidence upon which it is based.

58.    On July 14, 1997,[4] I objected in writing to the Club's wrongful stacking of deductibles on behalf of Trinidad (DX-EH).

### The Watkins Claim

59.    The documents contained in my files show that Hugh Watkins was a seaman who allegedly developed mesothelioma as a result of exposure to asbestos. Watkins filed a lawsuit naming various shipowner defendants including Trinidad, which owned and operated numerous vessels aboard which Watkins had allegedly sailed over the years of approximately 1945 through 1964.

60.    The Watkins lawsuit eventually settled. The documents contained in my files establish that the settlement amounted to $998,000 and legal fees totaled $81,463.37, for a total amount of $1,079,463.37.

61.    The documents contained in my files reflect that I submitted the settlement amount and legal fees to the Club for indemnification on behalf of Trinidad.

62.    The Club did not dispute that the Watkins claim was covered under an American Club policy, notwithstanding that when I submitted this claim for indemnification in 2001, the Club had long since closed the insurance years applicable to the Watkins claim. The documents contained in my files establish that the Club indemnified Trinidad for the claim, but not in its entirety. With respect to the $998,000 settlement amount, the Club indemnified only $993,000. The Club fully indemnified the $81,463.37 in legal fees. Thus, for a total claim in the amount of $1,079,463.37, the Club indemnified Trinidad for only $1,074,463.37.

---

[4] The reference to "June" on the face of my letter was an error. As the fax transmission at the top of the page shows, this letter was prepared and sent on July 14, 1997. That the letter was actually written in July, and not in June, makes sense based upon other correspondence concerning the Kelley claim from that time.

63.    The reason the Club did not indemnify Trinidad in full for the Watkins claim had nothing to do a denial of coverage or the invocation of some sort of "discretionary" policy – the Club never disputed that the Watkins claim, an ODC occurring in insurance years that had already been closed, fell within the coverage of the American Club policy.

64.    Rather, the documents contained in my files show that the Club did not indemnify Trinidad in full for the Watkins claim because it "stacked" the deductibles contained in multiple American Club policies insuring Trinidad and its vessels over the years of Watkins' sea service.

65.    Documents produced in this litigation from the Club's own files show that each of the American Club policies insuring Trinidad's vessels served upon by Watkins over his years of sea service contained a deductible in the amount of $250.

66.    The Club could have applied a single deductible in the amount of $250 to the Watkins claim, but the Club did not. Instead, the Club "stacked" the deductibles and indemnified Trinidad for only $1,074,463.38 – less than its entire claim. Had the Club applied only one deductible in the amount of $250, the Club would have indemnified Trinidad for $1,079,213.27 (the total claim amount of $1,079,463.37 less $250).

67.    As a result of the Club's wrongful stacking of deductibles with respect to the Watkins claim, the Club owes Trinidad $4,750. This damages calculation is illustrated in DX-IN.

68.    The documents from my files on the Watkins claim, as well as documents produced by the Club in this action, were used to create DX-IN. The specific documents relied upon to create DX-IN are listed therein as "Supporting Documents." As stated *supra*, I participated in the creation of DX-IN; I have reviewed DX-IN against the underlying supporting

documents and I confirm that DX-IN fairly represents and accurately summarizes the underlying documentary evidence upon which it is based.

69.    On June 7, 2001, I again objected in writing to the Club's wrongful stacking of deductibles on behalf of Trinidad (DX-FQ).

**The Club's Denial of Insurance Coverage**
**for Additional Occupational Disease Claims**

70.    The Club has failed to indemnify Trinidad and MTI for any portion of three other ODCs, namely the claims of seamen Bruce Rogers, Arnold Teeple and Agustinho Monteiro. The Club never provided Trinidad or MTI with a reason for the Club's failure to indemnify Trinidad and MTI for these claims.

The Rogers Claim

71.    The documents in my files establish that in 2001 seaman Bruce F. Rogers filed a lawsuit against Trinidad (and other named shipowners) alleging personal injuries sustained due to exposure to asbestosis arising out of his service aboard the vessels New Market and Lyons Creek during various periods of time in 1958 and 1959. Mr. Miller notified the Club of this lawsuit by a letter dated March 6, 2002 addressed to Mr. Gary Strevell of the SCB.

72.    American Club policy A-2696 (DX-JF) insures Trinidad Corporation with respect to the vessels San Jacinto, Fruitvale Hills, Lyon's Creek, New Market and Tillamook, at and from the 31st day of December 1957, at Midnight, Eastern Standard Time, until the 31st day of December 1958, at Midnight, Eastern Standard Time, on the terms and provisions set forth in the policy.

73.    Pursuant to the terms of the American Club policy A-2696, the American Club agreed, *inter alia*, "to indemnify [Trinidad Corporation] against any loss, damage or

–18–

expense which [Trinidad Corporation] shall become liable to pay and shall pay by reason of the

fact that [Trinidad Corporation] is the owner (or operator, manager, charterer, mortgagee, trustee,

receiver or agent, as the case may be) of the insured vessel and which shall result from

[enumerated] liabilities, risks, events, occurrences and expenditures...."

74.    The first of the enumerated liabilities, risks, events, occurrences and

expenditures contained in American Club policy A-2696 is liability for, *inter alia*, "loss of life

of, or personal injury, or illness of any person...." ("clause (1)") and is subject to a deductible in

the amount of $250.

75.    American Club policy A-2769 (DX-JG) insures Trinidad Corporation with

respect to the vessels San Jacinto, Fruitvale Hills, Lyon's Creek, New Market and Tillamook, at

and from the 31st day of December 1958, at Midnight, Eastern Standard Time, until the 31st day

of December 1959, at Midnight, Eastern Standard Time, on the terms and provisions set forth in

the policy.

76.    American Club policy A-2769 contains the same terms for

indemnification as quoted above with respect to American Club policy A-2696, including clause

(1), which is likewise subject to a deductible of $250.

77.    The Rogers claim falls squarely within the coverage of clause (1) of

American Club policies A-2696 and A-2769.

78.    The Rogers claim eventually settled.  The documents in my files establish

that Trinidad's portion of the settlement amounted to $4,005.00, which Trinidad paid in full by

check dated January 28, 2003.  The documents in my files establish that legal fees incurred and

paid by Trinidad in connection with the Rogers claim amounted to $1,411.50.  The total amount

incurred and paid by Trinidad in connection with the Rogers claim thus amounted to $5,416.50.

79.     By letter dated January 16, 2004, I submitted a demand to Mr. Strevell of the SCB on behalf of Trinidad for indemnification with respect to the Rogers claim. I included all of the relevant back-up documentation for the Rogers claim, including evidence of Trinidad's payment of the settlement amount and legal defense costs.

80.     The American Club failed to indemnify Trinidad for any portion of the Rogers claim and never gave any reason for its failure to indemnify.

81.     Shortly thereafter, on or about June 7, 2004, the American Club issued a Circular announcing that it would no longer indemnify its insureds for ODCs occurring in insurance years before February 20, 1989 that had already been closed. See PX-258.

82.     The applicable deductible under either American Club policy A-2696 or A-2769 is $250. Applying a deductible of $250 to the total amount of the Rogers claim ($5,416.50), the Club is obligated to indemnify Trinidad in the amount of $5,166.50 ($5,416.50 less $250).

83.     This damages calculation is illustrated in Defendant's Exhibit IO ("DX-IO"), a summary entitled "Chart of Apex Oil Defendants' Unindemnified Occupational Disease Claims."

84.     Documents from my files on the Rogers claim (as well as the claims of Teeple and Monteiro, discussed below), together with documents produced by the Club in this action, were used to create DX-IO. The specific documents relied upon to create DX-IO are listed therein as "Supporting Documents." I participated in the creation of DX-IO. I have reviewed DX-IO against the underlying supporting documents and I confirm that DX-IO fairly represents and accurately summarizes the underlying documentary evidence upon which it is based.

## The Teeple Claim

85.    The documents in my files establish that in 2001 seaman Arnold B. Teeple filed a lawsuit against Trinidad (and other named shipowners) alleging personal injury due to alleged exposure to benzene during various periods of time in 1959 and in 1962 through 1963, when he served aboard Trinidad's vessels the New Market and Houston.  Mr. Miller notified the Club of this lawsuit by a letter dated October 5, 2001 addressed to Mr. Gary Strevell of the SCB.

86.    American Club policy A-3037 (DX-JH) insures Trinidad Corporation with respect to the vessels Austin and Houston, at and from the 31st day of December 1962, at Midnight, Eastern Standard Time, until the 31st day of December 1963, at Midnight, Eastern Standard Time, on the terms and provisions set forth in the policy.

87.    American Club policy A-3037, contains the same terms for indemnification as quoted above with respect to American Club policy A-2769, including clause (1), which is also subject to a deductible of $250.

88.    The Teeple claim falls squarely within the coverage of clause (1) of American Club policies A-2769 and A-3037.

89.    The Teeple claim eventually settled.  The documents in my files establish that Trinidad's portion of the settlement amounted to $2,436.90, which Trinidad paid in full by check dated July 30, 2003.  The documents in my files establish that legal fees incurred and paid by Trinidad in connection with the Teeple claim amounted to $5,676.70.  The total amount incurred and paid by Trinidad in connection with the Teeple claim thus amounted to $8.113.60.

90.    By letter dated January 16, 2004, I submitted a demand to Mr. Strevell of the SCB on behalf of Trinidad for indemnification with respect to the Teeple claim.  I included

all of the relevant back-up documentation for the Teeple claim, including evidence of Trinidad's payment of the settlement amount and legal defense costs.

91.    Again, the American Club failed to indemnify Trinidad for any portion of the Teeple claim and never gave any reason for its failure to indemnify.

92.    The applicable deductible under either American Club policy A-2769 or A-3037 is $250. Applying a deductible of $250 to the total amount of the Teeple claim ($8,113.60), the Club is obligated to indemnify Trinidad in the amount of $7,863.60 ($8,113.60 less $250).

93.    This damages calculation is illustrated in DX-IO.

<u>The Monteiro Claim</u>

94.    The documents in my files establish that in 1994 the estate of seaman Agustinho Monteiro filed a lawsuit against MTI and other named shipowners alleging personal injury arising from Monteiro's development of acute myeloid leukemia as a result of his exposure to benzene during his period of service aboard various vessels, including his service aboard the Tampico, owned or operated by MTI, over the course of approximately August 12, 1967 through October 8, 1967.

95.    American Club policy A-3353 (DX-JI) insures MTI with respect to the vessel Tampico, at and from the 20th day of February 1967, at Noon, Greenwich Mean Time, until the 31st day of December 1967, at Midnight, Eastern Standard Time, on the terms and provisions set forth in the policy.

96.    American Club policy A-3353 contains the same terms for indemnification as quoted above with respect to American Club policies A-2696, A-2769 and A-3037, including clause (1), but clause (1) is subject to a deductible of $750 under policy A-3353.

97.    The Monteiro claim falls squarely within the coverage of clause (1) of American Club policy A-3353.

98.    Following a long period of inactivity due to disciplinary proceedings against plaintiff's counsel, the case was reactivated in or about 2000 and then ultimately dismissed in 2002. The documents in my files establish that legal fees incurred and paid by MTI in connection with the Monteiro claim amounted to $21,952.20.

99.    Documents in my files establish that Mr. Miller sent a letter dated July 17, 2002 to Mr. Gary Strevell of the SCB, seeking indemnification from the Club for legal defense costs incurred and paid by MTI with respect to the Monteiro claim. The Club, without explanation, failed to indemnify MTI for these legal defense costs.

100.    By letter dated March 16, 2004, I submitted a second demand to Mr. Strevell on behalf of MTI for indemnification with respect to the Monteiro claim. I included all of the relevant back-up documentation for the Monteiro claim, including evidence of MTI's payment of the legal defense costs.

101.    Again, the American Club failed to indemnify MTI for any portion of the Monteiro claim and never gave any reason for its failure to indemnify.

102.    The applicable deductible under American Club policy A-3353 is $750. Applying a deductible of $750 to the total amount of the Monteiro claim ($21,952.20), the Club is obligated to indemnify MTI in the amount of $21,202.20 ($21,952.20 less $750).

103.    This damages calculation is illustrated in DX-IO.

### The Club Cannot Deny Coverage For
### Occupational Disease Claims Contained In The 1991 Order & Stipulation

104.    The Club's liability for ODCs is express in the terms of the American Club insurance policies, regardless of whether or when the Club closes its insurance years for

assessment purposes. Further, as explained above, there are certain claims brought by seamen against Trinidad and MTI which, should those claims ever be reduced to judgment or result in a settlement, the Club is also bound to indemnify pursuant to the terms of the 1991 Order & Stipulation.

105.    Pursuant to the terms of the 1991 Order & Stipulation, the American Club *must* "indemnify Trinidad or MTI (as the case may be) against the claims and/or causes of action asserted by the Asbestosis Claimants listed on Exhibits B-1 and B-2 to th[e] Stipulation, subject to the deductible amounts set forth opposite each Asbestosis Claimant's name on said Exhibits." (DX-BS, Stipulation at ¶ 8(A).)

106.    Thus far, none of the claims of the Asbestosis Claimants listed in the exhibits to the 1991 Order & Stipulation have been litigated to judgment or resulted in a settlement. Thus neither Trinidad nor MTI has yet sought indemnification from the American Club for any of these claims under the American Club insurance policies. However, should any of the claims listed in the exhibits to the 1991 Order & Stipulation be litigated and reduced to judgment or result in a settlement, the Club is obligated to indemnify Trinidad or MTI for the costs of such judgment or settlement, including legal defense costs, charges and expenses incurred with respect to such claims, pursuant to the terms of the 1991 Order & Stipulation and subject to the deductible amounts set forth therein.

_____
Deborah A. Weedman

Sworn to before me this
12th day of June, 2006

_____
Notary Public

PATRICIA A. REDINGTON
My Commission Expires
July 26, 2009
St. Louis County
Commission #05489404