UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
AMERICAN STEAMSHIP OWNERS MUTUAL  :
PROTECTION AND INDEMNITY          :    No. 04-cv-04309 (LAK)
ASSOCIATION, INC.                 :
                                     Plaintiff,  :    **AFFIDAVIT OF**
    -against-                   :    **CHARLES KURZ, II**
                                  :
ALCOA STEAMSHIP CO., INC., et al.,:    (ECF Case)
                                  :
                                    Defendants.  :
-------------------------------------------------------------- X

STATE OF PENNSYLVANIA    )
                                ) ss.:
COUNTY OF MONTGOMERY   )

       CHARLES KURZ, II, being duly sworn, deposes and says:

       1.     The facts stated herein are based on my own personal knowledge and/or review of various documents that have either been produced or marked as trial exhibits in this action, and the facts are true to the best of my knowledge, information and belief. I submit this affidavit on behalf of Defendant Keystone, as defined in its answer filed in this action on October 8, 2004 and amended answer filed February 4, 2005 (mistakenly dated February 4, 2004), in this suit brought against it by the American Steamship Owners Mutual Protection and Indemnity Association, Inc. (the "American Club" or the "Club").

**Background**

       2.     I am currently employed as President Emeritus of Keystone Shipping Co.

       3.     Plaintiff, American Club, named Keystone Shipping Co. and several entities listed under Keystone Shipping Co. as defendants on Ex. A to its Second Amended Complaint, dated July 8, 2004. Those entities are: (1) Chas. Kurz & Co., Inc.; (2) several wholly owned subsidiaries of Chas. Kurz & Co., Inc., all managed by Keystone Shipping Co., Baldbutte

Shipping Company, Chestnut Shipping Corporation, Chilbar Shipping Company, Fredericksburg Shipping Company, and Margate Shipping Company; (3) Keystone Tankship Corporation, an affiliate managed by Keystone Shipping Co.; (4) Timbo Shipping Ltd. which has been dissolved; (5) New England Collier Company, a joint venture which has been dissolved, and which was managed by Keystone Shipping Co.; and (6) Paco Tankers, Inc. an entity which was managed by Keystone Shipping Co. but was not and is not now related to or controlled by any Keystone entity. At various times, each of these entities (which I will refer to here collectively as "Keystone") was insured by the American Club, and from 1944 or earlier until 1997, at least one Keystone entity was insured by the American Club in each year.

4. At times, I was an officer of Keystone, Chas. Kurz & Co., Inc., and Keystone Tankship Corporation. My responsibilities for the most part have been related to operations, safety, quality management, and security. I was also a board member of various Keystone entities, including: Chas. Kurz & Co., Inc., Chilbar Shipping, Fredericksburg Shipping, Margate Shipping, Chestnut Shipping, and Baldbutte Shipping.

5. I graduated from Trinity College in Hartford, Connecticut, in 1967, majoring in religion. In 1969, I received an MBA from the Wharton School of the University of Pennsylvania. I then attended the U.S. Navy's Officer Candidate School and Supply Corps Officers' School and served as a supply officer in the Navy until 1972.

6. After leaving the Navy, I joined Keystone in 1973. From the time I was first employed by Keystone in 1973, until Keystone left the American Club in 1997, various Keystone entities purchased P&I insurance from the American Club each year.

### The American Club

7. The American Club is an insurer licensed by and regulated by the New York State Insurance Department. During my time as an American Club Director, the American Club sold insurance to Keystone entities and to various other shipowners. None of the Keystone entities are or were licensed insurers, and I am not aware of any members who bought insurance from the Club being licensed insurers.

8. I began serving as an American Club Director in 1975 and continued as a Director until 1997 when Keystone did not renew its membership in the Club. In 1994, I became Chairman of the Club's Board of Directors. I also served on the Club's Finance Committee from 1987 until 1997. My father, Adolph Kurz, also served on the Club's Board of Directors and as the Club's Chairman for many years.

9. During some of the years Keystone entities purchased P&I insurance from the American Club, other Keystone entities purchased P&I insurance from a different P&I club, the UK Club. I never served as a Board member of the UK Club.

10. The American Club's Board is elected by the Club's members at an annual meeting. Other than electing the Directors, and approving certain By-Law changes, the members do not play a role in the management of the Club.

11. The Club's Directors make many important decisions on behalf of the Club, and do so based on the recommendations of the Club's Managers, Shipowners Claims Bureau, who are hired to manage the Club's day-to-day operations and to provide recommendations to the Directors with respect to actions the Directors may take. The Managers are responsible for, among other things, the Club's accounting, claims handling, and negotiating premiums to be paid by the Club's policyholders. The Board does not play any role in the

negotiation or calculation of premiums with the Club's policyholders. As the Managers are insurance professionals, the Board relies on their recommendations. The Board also relies on the advice and legal opinion of the Club's Counsel, Kirlin Campbell & Keating, in making many of their decisions, and expects the Club's Counsel to advise it if any of the Board's decisions or Managers' recommendations are unauthorized or contrary to law.

12.    At Board meetings, the Directors, among other things, make decisions with respect to the issuing of assessments, the closing of policy years, the use of reserves, and the payment of large claims which exceed the Managers authority. I attended Board meetings and Finance Committee meetings regularly; and it was my practice to take notes regarding what transpired at these meetings. I made an effort to write down the more important issues that were discussed at such meetings. I kept such notes in my files and sometimes prepared summary memoranda based on my notes. I believe the notes I took at Board and Finance Committee meetings accurately reflect what transpired at such meetings.

13.    Despite my roles with various Keystone entities, when I acted as an American Club Board member or Finance Committee member, I always acted in the interests of the Club as I saw it. I did not consider my various roles to create a conflict of interest, and in fact, the Club had a Conflict of Interest Policy (*see, e.g.*, DX-AP: April 30, 1986 cover letter from Thomas McGowan to myself with attached Policy on Conflict of Interest, which Mr. McGowan notes was adopted by the Club on May 14, 1964) which explicitly deemed that it was not a conflict of interest to serve on the American Club Board and to hold a position with or equity interest in an insured member of the American Club.

14.    In keeping with the Conflict of Interest Policy, I recused myself from votes concerning Keystone claims. As to all other matters, I participated in voting and took

4

whatever action I felt was in the Club's best interest.

15.     Many, but not all, of my fellow Board members were also affiliated with other insured members of the American Club. Also, during my tenure on the Club's Board, the Board included a voting Director from the Club's Counsel, Kirlin Campbell & Keating. For much of the time I served on the Board, the Kirlin representative was Richard Brown.

**Keystone's Payments for Insurance Coverage**

16.     The American Club charged its policyholders an initial premium for each policy year which would be used to pay for claims arising in that year as well as the general operating expenses of the Club.

17.     The American Club is a mutual insurer, which means that along with the initial premium charged to policyholders, the Club could also later issue "assessments" to policyholders when deemed necessary to pay for estimated claims that exceeded the amount collected from the initial premium or from prior assessments. Assessments were made only after the money collected from premium and prior assessments (and the investment income earned off such funds) was deemed by the Managers as inadequate to meet the estimated costs of the particular insurance year viewed in its entirety.

18.     Assessments were authorized by the Board only after having received a recommendation from the Managers that such assessment should be made, and a legal opinion from Counsel was provided that the assessment was proper. I do not recall any assessments made without the Managers' recommendation and Counsel's approval.

**Closing of Insurance Years**

19.     Several years after an insurance year ended, when it was determined by the Managers that they could estimate the final results for the insurance year with a reasonable

degree of certainty, the Club would issue a final assessment or refund for that insurance year. If the estimated final costs of the insurance year exceeded the amount already collected in premium and assessments, the Club collected a "final assessment" from policyholders of that insurance year. If the estimated final cost of the insurance year was less than what had previously been collected from premiums and assessment, the Club would issue a "final refund." This process was referred to as "closing" the insurance year and was understood by the Board and the members as terminating the Club's power to make further assessments or the policyholders' right to a further refund of any excess assessments for that insurance year. The Club's Counsel advised that the Club was obligated to refund excess assessments, and the Board followed this advice in approving such refunds. (*See, e.g.,* PX-100: Minutes of June 11, 1987 Board of Directors meeting together with June 10, 1987 Kirlin Opinion Letter at AC3060033-34).

20.    Before the Board closed a particular insurance year, the Managers would first provide a report to the Finance Committee, estimating the final results for the insurance year, recommending that the insurance year be closed. The Club's Counsel would then prepare an opinion letter stating that the proposed closing was valid and that the Board had the authority to take such action. The Finance Committee would then make a recommendation following the Managers' report, that the Board enact the closing resolutions prepared by the Club's Counsel. Based on this record, the Board would then vote to close the insurance year in question. The Club did not seek or obtain the consent of policyholders before issuing assessments or closing an insurance year and such consent was not required to be obtained.

21.    To the best of my knowledge and recollection, no insurance year was closed without a recommendation from the Managers and an opinion letter from Counsel. Indeed, it

6

was my understanding that according to the Club's By-Laws an insurance year could not be closed without a recommendation from the Managers, and I would not have voted to close an insurance year in the event that the mangers had objected to such closing as inappropriate or if Counsel had advised that such closing was improper.

22. It has always been my understanding that once an insurance year was closed it could not be "re-opened", and policyholders from that insurance year could not be further assessed. The intent of the Board in issuing a final assessment or a final refund was that such action was a final determination of the policyholders' liability to the Club to pay for its insurance coverage for that policy year. Based on documents produced in this action, Richard Brown suggested in a November 3, 1993 letter that he believed that years could be "re-opened" under certain circumstances. (PX-177: November 3, 1993 Kirlin letter to Thomas McGowan re: Prudential Lines, Inc.). I do not recall anyone, including Mr. Brown, making such a suggestion on any prior occasion, and certainly not at the time the insurance years at issue in this action were closed.

23. Again, the Board's intent when closing insurance years was that the years could not be "reopened" for further assessment. Although I do not recall the context (but based on the records produced in this action, Mr. Brown's suggestion in late 1993 regarding "re-opening" was likely the impetus) there came a point in time that a fellow Director, Ben Gleason, sought to reaffirm that this understanding was correct. Thus, on June 13, 1996, the Board, in closing the 1992-93 insurance year, resolved "that when taking action to close a year it is their intention that such closed year cannot be reopened unless through the operation of New York statute." (*See* DX-DH: June 13, 1996 Board Minutes at KEY004118). I understood this statement to be a reaffirmation that previously closed years

7

could not be "re-opened."

24. A handwritten note of mine on a February 27, 1996 letter I received from Gerry Bobb, an Insurance Coordinator from American President Companies, LTD., indicates that in a March 5, 1996 telephone call with Richard Brown, I "[e]xpressed my concern that Ben's agenda may not be in the best interest of other club members now that APL has reduced its tonnage to <u>one</u> vessel." (emphasis in original) (PX-214). Although I do not recall this conversation with Mr. Brown, it appears from my handwritten note that given APL's reduced tonnage, I wanted to make sure that whatever Mr. Gleason was proposing was in the Club's best interests. Since it turned out that what Mr. Gleason was proposing was that the Board reaffirm that closed insurance years could not be "re-opened", I clearly viewed such action as being in the Club's bests interests because the reaffirmation reflected the long-held understanding of my fellow Directors and the Club's policyholders that closed insurance years could not be "re-opened." Moreover, any attempt to "re-open" closed insurance years would have undermined all the rightful expectations of all policyholders that they would not be further assessed in closed insurance years, and this might have also undermined the Club's ability to attract new members.

25. The representative of the Club's Counsel, Richard Brown, as a voting member of the Board, took part in voting for this resolution, as did Paul Sa, Martin Recchuite and James Sweeney, all of whom I understand are current Directors of the Club. As explained in ¶ 12, it was my practice to take notes at Board and Finance Committee meetings; the notes that I took during that time period support my recollection that the Club's Directors reaffirmed that previously closed insurance years were not to be "re-opened." I have reviewed DX-DG and confirm that it is a true and correct copy of my handwritten notes from the June 12, 1996

8

Finance Committee Meeting. My notes state that "all previously closed years are officially CLOSED." (DX-DG: My June 12, 1996 handwritten notes of the Finance Committee meeting, the day before the June 13, 1996 Board meeting at KEY040296). These handwritten notes are consistent with my recollection that the topic under discussion at that time was the reaffirmation of the understanding that previously closed years could not be "re-opened." Mr. Recchuite and Mr. Brown were both present at this Finance Committee meeting as were several representatives from the Club's Managers, including: Joseph Hughes, Thomas McGowan, John Sandercock, and Vincent Solarino. I do not recall any of these gentlemen expressing any view contrary to the statement in my notes that "all previously closed years are officially CLOSED." (*Id.*) Had any of these gentlemen expressed such disagreement, I would have recorded that in my June 12, 1996 handwritten notes. Similarly, DX-DM, which I have reviewed and confirm is a true and accurate copy of my handwritten notes from the September 11, 1996 Finance Committee Meeting, reaffirms the understanding in connection with Finance Committee approval of the contingency fund, that "all closed years are closed and not subject to further assessment." (DX-DM: My September 11, 1996 handwritten notes). These handwritten notes of September 11, 1996 are consistent with my notes of the June 12, 1996 Finance Committee meeting and the Board's statement in the June 13, 1996 Board minutes. Mr. Recchuite and Mr. Brown were both present at the September 11, 1996 Finance Committee meeting as were Mr. Hughes, Mr. McGowan, Mr. Sandercock, and Mr. Solarino. I do not recall any of these gentlemen expressing any view contrary to the statement in my notes that "all closed years are closed and not subject to further assessment." Had any of these gentlemen expressed such disagreement, I would have recorded that in my September 11, 1996 handwritten notes as

well. Again, as a Director, it had always been my understanding based on the process of closing insurance years and issuing final assessments or final refunds that the closure of an insurance year ended the Club's ability to assess policyholders from that insurance year. In 1996 the Board reaffirmed its prior understanding that previously closed insurance years could not be "re-opened."

**The Club's Reserve Account**

26.   After insurance years are closed, the money retained by the American Club upon closing is transferred to what we referred to as the reserve account. Unlike open years, which are generally accounted for on a year-by-year basis, funds in the reserve account are not segregated by insurance years.

27.   As I noted, policyholders from closed insurance years could not be further assessed. Therefore, the primary purpose of the reserve account has always been to pay for claims in closed years, which had not been settled or known at the time the insurance year was closed. The importance of having this reserve account available to pay for claims arising in closed years is noted in DX-BK, which I have reviewed and confirm is a true and accurate copy of my handwritten October 12, 1989 Finance Committee Notes: "Kennedy [referring to fellow Director Keith Kennedy] believes Reserve Account is attractive to BP America because it provides protection to losses arising in closed years where members can not be assessed further." (DX-BK: My October 12, 1989 handwritten notes).

28.   Over the years, the funds retained by the Club upon closing years, and the investment income generated by such funds, have developed into a substantial amount of money. The balance of the reserve account stood at $18,499,402 as of December 31, 1989 (DX-BO: American Club Financial Statement for the Years Ended December 31, 1990 and

1989 at AC0016843 ); at $19,814,267 as of June 30, 1993 after the 1988/89 insurance year was closed (*see* PX-297, referencing AC3066585, a surplus statement, which is part of a set of voluminous documents noted on AC086799 not individually marked as trial exhibits); and at $17,838,000 as of December 31, 1996 when the account was renamed as the contingency fund (DX-DZ: American Club's 1996 Financial Report at AC0024340). I believe that these reserve figures further demonstrate that I and my fellow Directors, as well as the Club's Managers and Counsel, acted responsibly and in the Club's best interests when voting on assessments and other financial matters.

29.     As noted above, towards the end of my tenure as a Director, the Board renamed the reserve account as the "contingency fund." The contingency fund, like the reserve account, existed primarily to pay for claims from closed years. The creation of the contingency fund, for the first time, allowed future Boards to use the Club's existing reserves to close insurance years without fully assessing the policyholders from those insurance years. Prior to that time, Counsel for the Club had advised that the Club's reserves should not be used to offset deficiencies upon closing of insurance years. (*See, e.g.*, PX-171). Because of the prudent way in which the Club had been managed historically, its reserves had increased to a point that the contingency fund was able to provide this new benefit to the Club's members.

30.     The contingency fund guidelines state:

> The disposition of reserves allocated to and designated as the Contingency Fund would remain subject to the absolute discretion of the Board of Directors save, obviously, to the extent that they would not have power to allocate to the Fund any monies from the balance available for closed years so as to reduce that balance below the total reasonably estimated for unpaid losses and expenses (including IBNR) for those years. This constraint flows from a primary consideration that sufficient funds always be

> available to cover claims in closed years and, indeed, provide for the unanticipated growth of claims in such years. (DX-DE: May 30, 1996 Memo to the Board of Directors from the Finance Committee re: Contingency Fund at AC3069074 and DX-DI: June 25, 1996 Letter from Thomas McGowan to the Finance Committee with attached June 13, 1996 Memo to the Board of Directors from the Finance Committee re: Contingency Fund at AC0032836).

The primary purpose of the contingency fund, like that of the reserve account, was to meet the Club's insurance obligations with respect to closed insurance years, as policyholders from those closed insurance years are no longer subject to assessment.

31.     The Club's reserve account and contingency fund provide a significant benefit to members of the Club. The New York Insurance Department requires the Club to maintain a certain level of surplus, and without the reserve account, the Club's future members might have to be assessed amounts sufficient to meet the surplus requirements imposed by the New York Insurance Department. The reserve account has also been used at various times to offset costs in open insurance years. For example, during my tenure as a Director, the reserve account was at times used to pay for the cost of stop loss insurance for open insurance years.

32.     It has always been my understanding that policyholders in open insurance years were responsible for maintaining the Club's minimum surplus level as required by the New York Insurance Department, regardless of what caused the surplus to become impaired. I never represented to any new member of the Club that they would not have to contribute to maintaining the Club's surplus in the event that an impairment was attributable to claims from closed insurance years, nor do I remember any other Director or anyone else representing the Club making such a representation.

**Occupational Disease Claims**

33.     At some point in time, American Club policyholders began presenting asbestos

and other occupational disease claims ("ODCs") to the Club for indemnification. These claims were presented for payment as a matter of right based on the terms of the insurance policies. At no time did Keystone or any other policyholder to my knowledge request that the Club pay ODCs as a matter of discretion. Because these policyholders had purchased insurance coverage from the American Club for the years in which the claims occurred, I believed then and believe now that the Club had an obligation to pay such claims. Had I believed that the indemnification of ODCs was discretionary, and could later be terminated by a subsequent Board, I would have instructed the Managers to so advise policyholders and I would have so advised Keystone.

34.    I never believed that the closing of an insurance year terminates the Club's obligation to pay claims, and I do not recall anyone suggesting otherwise. The reserve account, and subsequently the contingency fund, exists to pay closed year claims and was used accordingly to pay ODCs. In authorizing the setting of reserves on behalf of the Club it was my understanding that funds were provided for all covered claims.

35.    I never heard any Director suggest that the Club was not obligated to pay for ODCs or suggest that the Club was only paying such claims on a discretionary basis. Towards the later part of my time as a Director, the American Club's Board included several Directors who I understand are still Directors of the American Club: Paul Sa (the Club's current Chairman), James Sweeney and Martin Recchuite. During that time, I do not recall any Director ever taking the position that the Club was only approving oODCs on a "discretionary basis."

36.    Similarly, neither the Club's Managers nor its Counsel ever suggested to me that the Club did not have an obligation to pay such claims or that the Club was paying the claims

on a discretionary basis. It was a part of the Managers' job to verify that all submitted claims for indemnification were within the terms of the policies issued by the Club, and the Managers consistently paid ODCs and recommended that the Board approve various ODCs. The representative of the Club's Counsel, Richard Brown, as a voting member of the Board, voted in favor of paying various ODCs that reached the Board level. (*See, e.g.,* DX-127: April 14, 1988 Board Minutes, approval of settlement of claim of Kenneth Torrens at AC3061044-45; PX-168: January 14, 1993 Board Minutes, approval of settlement of claim of Frank Stashin at AC3065873). Had ODCs not been covered under the Club's policies or had the payment of ODCs been discretionary, I would have expected the Club's Managers and Counsel to have so advised, and I would have expected Mr. Brown to raise lack of coverage as a defense in the litigation related to Prudential Lines. Instead, the Club's Managers and Counsel treated ODCs in the manner in which all covered claims were treated: claims below a certain authorized dollar amount were approved for payment by the Managers while larger claims were required to be presented to the Board for approval.

37.     In 1988, with the closure of policy years 1977-78, 1979-80, and 1981-82, in an effort to strengthen the Club's reserves against the emergence of ODCs, the Club began including an additional $100,000 in the reserves upon closing each insurance year. This additional $100,000 was contributed by policyholders from the relevant insurance year, about to be closed, either through an assessment or from the Club retaining funds which would have otherwise been returned to the policyholders as excess assessments. (*See* PX-127: April 14, 1988 Board Minutes with attachments, including April 8, 1988 Kirlin opinion letter and closing resolutions).

38.     As of that time (April 30, 1988), the Club had $15,019,654 in its reserve account,

and thus available to pay for closed year claims. (*See* PX-297 at AC 086798, referencing AC3061011, a surplus statement, which is part of a set of voluminous documents not individually marked as trial exhibits). In addition, the Club had excess and in certain years stop loss reinsurance in place to protect the Club in the event of catastrophic liability of the Club to its policyholders. (*See* PX-299). However, the Board still thought it prudent to strengthen the existing reserve account with additional funds. After taking into account the size of the reserve account, it was decided that $100,000 would be an appropriate IBNR (incurred but not reported) figure to be added to the reserve account, especially for possible ODCs, upon the closing of an insurance year. No suggestion was made at this time that previously closed insurance years could be "re-opened" for further assessment. The understanding shared by all concerned with the setting of a reserve for ODCs was that such ODCs were covered in the years in which the occurrences took place regardless of whether the claims were noticed to the Club before or after closing of the relevant insurance years. Indeed, this additional $100,000 reserve was approved precisely because the Club's Managers, Counsel and Board recognized that the Club had a potential exposure as to ODCs that would be covered claims, and it would be prudent for the Club to add additional funds to its reserve account to help meet this obligation.

39.     Significantly, the 1977-78, 1979-80, and 1981-82 insurance years were closed in reliance on the Managers' determination in accordance with the Club's By-Laws that it was practicable to estimate the financial results of those insurance years with a reasonable degree of certainty, as well as Counsel's opinion that it was proper for the year to be closed under those circumstances. (*See* PX-127: April 14, 1988 Board Minutes with attachments, including April 8, 1988 Kirlin opinion letter and closing resolutions at AC3061050 and

AC3061172, 80). In the absence of the Managers' determination and Counsel's opinion endorsing closure as being proper and lawful, I don't believe that the Board would have closed the insurance years in question. If the Managers or Counsel had believed that it was not proper to close the insurance years in question on the basis of a $100,000 IBNR reserve, I would have expected them to not make such a recommendation to the Board.

40.   Like other funds in the reserve account, this additional $100,000 per policy year was intended to be available to pay for claims from any closed insurance year. I recall that there was some discussion as to precisely what amount should be reserved, but ultimately $100,000 was the amount agreed by the Board. Documents produced in this action indicate that the Managers and Finance Committee also considered the possibility of reserving up to $250,000 of a year's credit balance (in the event that such a balance existed) at the time of closing the insurance year. (PX-120: March 8, 1988 Letter from Thomas McGowan to the members of the Finance Committee re: planned discussion of closing insurance years). I do not recall the Finance Committee rejecting this proposal. A document produced in this litigation (PX-124: March 21, 1988 Letter) refers to the Finance Committee's "decision, wherein the Manager's recommendation was not followed as presented." There could have been many reasons why the Board did not immediately approve the initial proposal, such as a need for further information. However, the Managers ultimately recommended that $100,000 be reserved regardless of whether a year had a credit balance at the time of closing. Upon receiving the Managers' recommendation and an opinion letter from Counsel that setting such an additional $100,000 reserve was proper upon closing an insurance year, the Board voted to close the insurance years in question. I have no reason to believe that the Managers acted in bad faith in making this proposal or that the Club's Counsel acted in bad

faith in opining that the Board's action was proper.

41.     The Club continued this practice of reserving an extra $100,000 at the time of closing an insurance year through the remainder of the time Keystone remained in the Club. Although the Managers were responsible for monitoring the developing asbestos situation, I forwarded the Managers any information regarding occupational disease claims that came to my attention and that I thought they might find useful. (*See, e.g.,* DX-BB and DX-AX). DX-BB is a letter that I sent to John Cassedy, Chairman of the Club's Mangers, on July 7, 1988 with an attached article, "Mishandled asbestos suits dismissed." I sent DX-AX, a separate letter, to Mr. Cassedy on April 8, 1988, with an attached article titled "Chemical Tankers—Are There Serious Health Hazards?". In my April 8, 1988 cover letter, I stated: "I believe this article should be read by the Managers of the American Club especially because of the recent recommendation to establish a special reserve for occupational/health hazard claims prior to closing a policy year." I went on to say: "**In addition to setting up a reserve for occupational/health hazard claims**, I think there should be a unique opportunity for the American Club to take some new P&I initiative on these claims which would distinguish the American Club's claims handling ability from other clubs in the International Group." (emphasis added). As reflected in this cover letter, it was my desire that the Club's Managers stay fully abreast of issues concerning occupational disease claims and that the Club, as an insurer exposed to such claims, respond to the threat of such claims appropriately. Given the proactive manner in which I provided the Club's Managers with information about occupational disease claims, and the encouragement I gave them with respect to taking steps to protect the Club, I find any suggestion that I was not acting in the Club's best interests with respect to occupational disease claims to be both inappropriately unfair and inaccurately

wrong.

42. In 1989, the American Club became a reinsured member of the International Group, which is a group of mutual P&I clubs which pool claims for reinsurance purposes. I am not aware of any, nor was I advised of any, effect that becoming a reinsured member of the International Group had on either the Club's obligation to pay ODCs or their insureds' liability for assessments.

**Deductibles**

43. In 1989, the Board voted in favor of the Club adopting, for the 1989 and future insurance years, the International Group's practice of applying a single deductible to ODCs but continuing to apply multiple deductibles to pre-1989 ODCs. For ODCs spanning these two periods, the Club decided that the deductibles in force over the pre-1989 period of exposure would be applied, and no post-1989 deductible would be applied unless the accumulated pre-1989 deductibles were less than the single post 1989 deductible required by the International Group practice. In that case, the Club would follow the International Group practice and apply the one post-1989 deductible. (PX-145: December 14, 1989 Board Minutes and attached memo from the Managers re: "Asbestos Related Claims"). As with other Board decisions, this decision was made on the recommendation of the Club's Managers and the opinion of the Club's Counsel. The relevant opinion from the Club's Counsel noted: "Therefore, although we think that on a proper reading of the policy it is proper to apply a full deductible for each policy year, we also believe there is a very substantial chance that a court would conclude otherwise if necessary to **afford coverage** to an insured." (DX-AR: September 11, 1987 Kirlin opinion letter to the Managers re: "Asbestosis - **Coverage** and Deductibles" at KEY004745) (emphases added). Given the title

of Mr. Brown's opinion letter which specifically references "coverage" as well as deductibles, it certainly encompassed an opinion that there was coverage for asbestos claims under the policies issued by the American Club. Indeed, in later referring to this opinion letter, Mr. Brown stated: "By letter of September 11, 1987 we reported on the general subject of **asbestosis coverage** and deductibles in detail" (emphasis added). (*See* DX-BQ: March 13, 1991 Kirlin letter to the Managers re: Trinidad/Mathiasen Asbestos Claims at AC3064110).

44. Based on Mr. Brown's September 11, 1987 opinion letter, the Club's Managers recommended that multiple deductibles be applied with the following caveat: "Counsel is of the opinion that lacking any clear legal precedent, the multiple deductible approach is proper, albeit admitting that future court decisions may modify that position. Based on the above, the managers strongly recommend that the current practice be continued and that the premises of our conclusion be reviewed from time to time to test their ongoing validity." (DX-AS: September 16, 1987 Memo from Thomas McGowan to the Club's Board of Directors). It was thus recognized that the Board's decision with respect to the application of deductibles was subject to future court rulings. The Board's decision to adopt the Managers' recommendation with respect to deductibles, and my vote in favor of this action, is a prime example of my acting in the best interests of the Club as I perceived it, even though Keystone, as an insured member, would have preferred to have absorbed only a single deductible in submitting ODCs.

**Keystone's Departure from the Club**

45. Keystone ceased purchasing P&I insurance from the American Club after the 1996-97 insurance year and instead purchased the P&I insurance from Steamship Mutual

19

Underwriting Association. I was disappointed that Keystone left the American Club as I had spent a significant amount of time helping to market the American Club so as to increase its membership tonnage as well as to gain membership in the International Group. These goals had been quite important to me as I wanted to see the American Club continue to grow and become more attractive to shipowners around the world. I was proud that the Board and Managers were able to achieve these goals during my tenure as Chairman of the American Club. Significantly, it was during my tenure as a member of American Club's Board of Directors that the American Club embarked on its Vision 2000 plan, which was designed to increase the Club's tonnage, diversify its membership, and eventually gain full pooling membership in the International Group.

46. I swear that the foregoing is true to the best of my recollection and knowledge.

_____
Charles Kurz, II

Sworn to before me this
___ day of June, 2006

_____
Notary Public

NOTARIAL SEAL
CATHERINE P. VERDI, Notary Public
Lower Merion Twp., Montgomery County
My Commission Expires June 14, 2007