UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
AMERICAN STEAMSHIP OWNERS MUTUAL :
PROTECTION AND INDEMNITY : No. 04-cv-04309 (LAK)
ASSOCIATION, INC. :
                       Plaintiff, : **AFFIDAVIT OF**
   -against- : **STEVEN VALERIUS**
                                  :
ALCOA STEAMSHIP CO., INC., et al., : **(ECF Case)**
                                  :
                     Defendants. :
------------------------------------------------------------ X

STATE OF TEXAS       )
                           ) ss.:
COUNTY OF HARRIS   )

        **STEVEN VALERIUS**, being duly sworn, deposes and says:

        1.     The facts stated herein are based on my own personal knowledge and/or review of various documents that have either been produced or marked as trial exhibits in this action, and the facts are true to the best of my knowledge, information and belief. I submit this affidavit on behalf of Defendant Kirby Inland Marine, LP, as successor to Hollywood Marine Inc., in the suit brought against it by the American Steamship Owners Mutual Protection and Indemnity Association, Inc. (the "American Club," the "Club," or the "AC").

**Background**

        2.     I am currently the President of Defendant Kirby Inland Marine, LP ("Kirby"), successor to Hollywood Marine Inc. ("Hollywood"), who was insured by the American Club from 1986-1993.

        3.     I began working for Hollywood in January 1979, as

Treasurer. Prior to that I was employed by KPMG Peat Marwick as an auditor. I served as Treasurer of Hollywood until 1988 when I was promoted to Vice President. I was subsequently promoted to Executive Vice President in 1994.

4. In October 1999, Hollywood was acquired by Kirby Corporation and I became President of Kirby Inland Marine, a subsidiary of Kirby Corporation.

5. I was graduated from the University of Texas at Austin. I am a Certified Public Accountant. I also have a Juris Doctor from Southwestern College of Law, received in 1992. I never practiced as an attorney.

6. I am involved in many waterway groups which deal with safety and shipping on inland waterways and other shipping issues. I am the immediate Past Chairman of the American Waterways Association.

7. Hollywood and/or Kirby Inland Marine or affiliated companies have also been members of other mutual clubs, including the West of England Club and Steamship Mutual, each of which are P&I clubs, and the Signal Club (which provides workmen's compensation coverage under the U.S. Longshoremen and Harborworkers Compensation Act). All of these clubs provide insurance similar to the American Club and our experience with each has been and continues to be that they assess their policyholders for costs until an insurance year is closed. None of these mutuals have ever assessed Hollywood or Kirby after the closure of an insurance year which is understood to terminate the liability of the policyholder to the club, but not to terminate the coverage provided.

**Hollywood Buys Insurance from the American Club**

8. Hollywood decided to purchase insurance from the American Club in 1986, after its then broker approached it with a proposal to purchase protection and indemnity ("P&I") insurance from the American Club for a substantial savings over the commercial insurance Hollywood then had. Hollywood was one of the first major brown water[1] shipping companies in the American Club. At the time Hollywood joined the Club it brought substantial tonnage to it.

9. The American Club is a licensed insurer, regulated by the New York Insurance Department. Hollywood is not a licensed insurer and I am not aware of any other American Club policyholder being a licensed insurer.

10. I attended the Annual General Meetings of Membership of the American Club. In general, the activities at the Annual General Meetings consisted of electing Directors and approving the auditor and any changes to the By-laws. The members, as such, do not play any other role in the management of the American Club.

11. I understood that the Club provided protection and indemnity insurance for a variety of risks as detailed in the policies issued to Hollywood. For this the Club charged premiums and assessments until, and only until, it closed the accounts on a particular insurance year. The advance premium was charged before the beginning of the insurance year. The aggregate amount of

---

[1] Brown water shipping is performed on inland waterways and close coastal waters, as opposed to in the larger and more open ocean waters.

premium collected was then used to pay claims as they came in to the Club, and if the aggregate amount, including investment income, fell short of the claims and operating expenses of the Club for that insurance year, assessments or supplemental calls were charged to the policyholders in that insurance year. At the closure of an insurance year, which took place several years after the insurance year expired, Counsel to the Club advised the Board of Directors that the surplus of assessments, if any, was required to be returned to the policyholders in that insurance year. If the insurance year was in deficit, a final assessment would have been made. That final assessment was always understood to be final, in the sense that no further assessments could be levied on the policyholders in that insurance year. Hollywood believed it had no further liability to the Club for that insurance year after the issuance of a final assessment or final refund for the insurance year.

12.     The Club was run by its Managers, the Shipowners Claims Bureau (the "Managers"). They were insurance professionals and ran the Club on a daily basis. The Managers provided recommendations to the Board of Directors of the Club on a variety of high level decisions. Generally the Board accepted the recommendations of the Managers. The Managers also were responsible for negotiating premiums with the Club's policyholders. The Club's Directors did not play any role with respect to the negotiation of premiums with the Club's policyholders. I don't remember any dissent between the Board and the Managers while I served on the Board of the American Club as described below. The Directors placed reliance upon the advice of the Managers, and also relied on

the advice and legal opinion of its Counsel, Kirlin, Campbell & Keating.

**My Service as a Director on the Board of the American Club**

13. I was elected to the American Club Board of Directors in 1988 and served on the Board from March 16, 1988 through January 13, 1994. I left the Board because Hollywood decided to purchase insurance from another source at that time. I have not had any contact with any AC Board members since I left the Board other than through industry trade associations.

14. I developed and sat on a Safety/Claims Committee of the Board of the American Club. We developed a newsletter for Club members regarding safety and other shipping issues, entitled *Currents*. My work on that subcommittee is not relevant to this litigation. I did not serve on the Finance Committee of the Board of Directors.

15. While on the Board I always acted in the best interest of the Club as I saw it without regard to my position or employment at Hollywood. Each year each Board member was required to sign a conflict of interest statement, which I did, in substantially the same form as DX-AP. This conflict of interest form specifically provided that the employment of a Board member by a policyholder was not deemed a conflict of interest. (*Id.*, "A director of the Association shall not be deemed to have a conflict of interest by reason of his interest in or employment by a company or concern which is a Member of the Association.").

16. The Board members did not vote on claims involving their own employer or related entities. At Ex. PX-127, there is an example in the

Board minutes of my recusal from the vote on a claim involving Hollywood (at AC 3061045-46).

17. The Board members took their fiduciary duties seriously. I do not recall any significant controversy surrounding decisions made by the Board.

18. When the Board resolved to close an insurance year, the intent was to release the policyholders in that insurance year from any further liability to the Club for assessments. Once an insurance year was closed it would always remain closed. We never intended that a closed insurance year could be "re-opened" for any purpose. I never heard any suggestion that a closed insurance year could be "re-opened."

19. The process of closure of an insurance year at the Board level was as follows: The Head of the Finance Committee would give a report, describing the Managers recommendation of closure, including any final assessment to be levied or any final refund to be given, and then he would make the recommendation of the Finance Committee to the Board of Directors, which was as I recall, always in accordance with the Managers' recommendation. The recommendation would be supported by an opinion of the Club's Counsel that the Board had the authority to close the insurance year and it was proper to do so. (*See, e.g.*, PX-100 at AC 3060024-43). There would then be some discussion by the Board members. It was generally not controversial. The Board would then approve the Finance Committee's recommendation to close the insurance year. I do not recall ever not approving the Finance Committee's recommendation to

close an insurance year or otherwise.

20. I do not recall any insurance year being closed without the Board having received both a recommendation from the Club's Managers and an opinion letter from the Club's Counsel that the closing was proper, and I would not have voted to close an insurance year if either the Managers or Counsel objected to the closing. In fact, it was my understanding that an insurance year could not be closed without a recommendation from the Managers.

21. I do not recall a final refund ever being large enough to affect Hollywood's financial results.

22. My compensation at Hollywood was not tied to our payments to or refunds from the American Club in any way.

23. Hollywood relied on the closure of an insurance year as establishing that it had no more liability to the Club for that insurance year. However, it was always understood that coverage continued; it was not terminated upon closure of an insurance year and Hollywood was never told that its Policies or coverage had been cancelled or terminated upon the closure of an insurance year or for any other reason.

24. On Hollywood's books it projected the supplementary assessments it would owe to the American Club based on experience with the Club, the Club's estimates for the insurance year and the broker's projections. Hollywood booked an expense/reserve for those assessments and eliminated it on closure of the particular insurance year. When it removed from its accounts the

amount reserved to pay supplementary assessments for any particular insurance year, any amount due to the Club over the estimate was accounted for as an increase in expenses, and any amount under the estimate was accounted for as a reduction in expenses.

25. Hollywood would not have continued to renew its Policies with the Club if it had been told insurance years could remain open forever, or be "re-opened." It would not have agreed to an open ended liability for assessments indefinitely into the future.

**Occupational Disease Claims**

26. I became aware of the assertion of Occupational Disease Claims ("ODCs") against shipowners and operators, mainly asbestosis claims, when I was on the American Club Board.

27. At the time Hollywood joined the Club, it did not have any ODCs asserted against it. Much later, after Hollywood left the Club, some ODCs were asserted against it. I am aware of about five ODCs asserted against Hollywood which are covered by American Club Policies.

28. The Board routinely approved the payment of ODCs. When the Board approved the payment of ODCs to policyholders, I do not recall any Board member objecting to the payment of the claims. We understood that the Club was obligated to pay these claims under the Policies it issued. No one ever said that the payments of these types of claims was discretionary. Had I believed that the payments were being made on a discretionary basis, I would have so advised Hollywood and would have instructed the Managers to so advise

the Club's policyholders.

29. The Managers would pay claims below a certain monetary level which they had authority to approve. Claims above that level would be presented to the Board for approval, as described above. The Managers only presented covered claims to the Board for approval.

30. In early 1990 I was asked to review the record of claims paid by the Managers and make a motion at the Board meetings that the Board approve the claims as presented by the Managers. As far as I am aware only covered claims were presented to me and I was never told that any of these claims had been paid by the Managers on a "discretionary" basis. I read the reports and any supporting documentation. I made motions at Board Meetings to approve the claims report of the Managers and I do not recall any discussion of the reports. I do not recall the reports indicating whether a claim arose in a closed or open insurance year or whether they were ODCs. There was nothing significant or controversial that I remember in regard to my reviewing the claims records.

31. I remember Paul Sa, the Club's current chairman, joining the Board in 1992. I do not remember him being told that the Club did not have to pay ODCs arising in closed insurance years. Nor do I remember him ever objecting to the payment of these claims, raising any question about the Club's obligation to make such payments, or anyone else objecting for that matter. Neither the Club's Managers nor its Counsel ever suggested to me that the Club did not have an obligation to pay such claims or that the Club was paying the claims on a discretionary basis. I would have expected the Club's Managers or

Counsel to have advised the Board if they did not believe that the Club had an obligation to pay ODCs. It was part of the Managers' responsibility to ensure that claims presented to the Club for indemnification fell within the terms of the relevant policies. I, therefore, expected that claims approved by the Managers were covered claims and that the Managers would advise the Board of any questions regarding coverage as to the larger claims which they presented to the Board for approval.

**The American Club Reserves and Accounts**

32. Shortly after I joined the Board there was discussion at a Board meeting regarding the closing of several insurance years and increasing the reserves to satisfy the New York Insurance Department. (*See* PX-127). At this time an amount to increase the Club's reserves, in light of ODCs that had been brought after closure of the insurance years in which they arose, was approved as well ("IBNR Reserve Amount"), although the main Board concern was the regulations of the New York Insurance Department. The IBNR Reserve Amount was created by charging $100,000 to each insurance year about to be closed to increase the closed year reserves, which were also the general reserves of the Club. This would have the effect of increasing the overall amount of the reserve account, and would be used, with the remainder of the reserve account, for the payment of any claim in any closed insurance year. It was my intent when voting for this additional reserve to provide funds to pay for covered claims, including ODCs arising in closed insurance years. The Board understood that the Club was obligated to pay for ODCs, which is precisely why we increased the Club's

reserves.

33. At no time did I ever advise a new member of the Club that they would not be responsible for paying assessments in the event that the Club's surplus was impaired as a result of deficiencies emerging in closed insurance years.

34. The Finance Committee presented to the Board the recommendation to increase the reserve account through the IBNR Reserve Amount and charge the $100,000 to insurance years about to be closed. The IBNR Reserve Amount, in combination with the previously built up reserve from prior insurance years and reinsurance and stop loss arrangements, was believed to be adequate and appropriate to protect the Club in the event of future liability to its policyholders for ODCs. I do not recall any other recommendations or any controversy concerning this issue. The Managers did not disagree with the Finance Committee regarding the amount to be charged and added to the Club's reserves at the Board meeting, or at any other time of which I am aware, and this action was approved by Counsel to the Club.

35. While Hollywood was a policyholder of the American Club, and while I was on the Board of the American Club, I do not recall that each insurance year was mandated to stand on its own in terms of accounting, especially after closure. The American Club bought stop loss insurance, and used the reserve account to pay for a portion of the stop loss insurance premiums, which contradicts the notion that each insurance year must be self supporting. This use of the reserve account was approved by the Board and Counsel to the

Club.

36. While the Club has alleged that various Board members received a 1979 opinion letter written by the Club's Counsel, Kirlin, Campbell & Keating, I do not recall the opinion or receiving it.

37. I do not recall any discussion of "re-opening" closed insurance years, or "re-assessing" policyholders of closed insurance years while I was on the Board of the Club. Certainly, no one suggested insurance years could be "re-opened" at the time that we voted to close insurance years during my tenure on the Club's Board, including all of the insurance years at issue in this case.

**The American Club's Entry into the International Group**

38. While I was on the Board of the American Club, the Club became a reinsured member of the International Group of Protection and Indemnity Associations ("IG"), which the Board believed would benefit the Club financially as it was a more favorable reinsurance arrangement than commercial reinsurance.

39. The Board was not told and indeed did not understand that this would change the scope of the insurance coverage provided by the Club, nor would it change the Club's obligation to pay ODCs. The only change in American Club claims practices that I recall regarding the entry into the IG in 1989 as a reinsured member is the application of deductibles to ODCs arising in insurance years after 1989. Indeed, the very premise for any analysis of the application of deductibles to these claims is that the claims are covered.

40. I am not aware of any member, including Hollywood, being notified of any change in the coverage obligations of the Club due to its entry into the IG.

41. I swear that the foregoing is true to the best of my recollection and knowledge.

_____
STEVEN VALERIUS

Sworn to before me this
9 day of June 2006

_Teresa L. Robertson_
Notary Public

TERESA L. ROBERTSON
MY COMMISSION EXPIRES
July 26, 2009

—13—