John M. Toriello (JT 1822)
James V. Marks (JM 6257)
HOLLAND & KNIGHT LLP
195 Broadway, 24th Floor
New York, New York 10007
(212) 513-3200
(212) 385-9010 (fax)

Attorneys for Defendants
American President Lines, Ltd., and
American President Lines, Ltd. as Successor to American Mail Line

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X

AMERICAN STEAMSHIP OWNERS
MUTUAL PROTECTION AND
INDEMNITY ASSOCIATION, INC.,

        Plaintiff,

- against -

Alcoa Steamship Co., Inc.
and the Other Entities Listed on Exhibit A
to Second Amended Complaint

        Defendants.

-----------------------------------------------------------X

04 Civ. 04309 (LAK)(JCF)

(ECF Case)

## DECLARATION OF C. BENNETT GLEASON
## IN SUPPORT OF APL'S CLAIMS AND DEFENSES

    C. BENNETT GLEASON, declares under penalty of perjury pursuant to 17 U.S.C. Section 1746 as follows:

    1. I am currently employed as the Director, Risk Management for Matson Navigation Company.

2. From 1986 until 1998, I was employed by the defendant American President Lines, Ltd., and certain of its predecessor and successor companies (collectively, "APL"), as Director, Risk Management.

3. I understand that this declaration will be submitted on behalf of APL and used in the trial of this action. The statements contained herein are based on my personal knowledge and/or review of various documents that have either been produced or marked as trial exhibits in this action.

### Background at APL

4. In the late 1980's, I succeeded John DiPalermo as Director, Risk Management at APL. In this position at APL, my duties and responsibilities included assessment, procurement, and management of insurance. In addition, at various times I supervised claims handling and safety and loss prevention.

5. When I became a director of the American Club in 1990, approximately half of APL's fleet was insured by the American Steamship Owners Mutual Protection and Indemnity Association, Inc. (the "American Club" or the "Club") for P&I risks and half was insured by Assuranceforeningen Gard ("Gard") for similar risks.

6. Between 1990 and about 1998, I was a member of the Board of Directors of the American Club. In or about March 1990, I was named a member of the Finance Committee of the Board of Directors of the American Club.

7. I also was a member of the Committee of Gard in the 1990's. The Committee is similar to a board of directors.

8. Upon joining the Board of the American Club, I disclosed my membership in the Gard Committee to members of the American Club's Board of Directors and to employees of

Shipowners' Claims Bureau. ("SCB"), the American Club's managers. I also disclosed my membership in the American Club's Board of Directors to members of Gard's Committee.

9. Despite my employment with APL, when I acted as an American Club Board member or Finance Committee member, I always acted in the interests of the Club as I saw it. I did not consider my various roles to create a conflict of interest, and in fact, the Club had a Conflict of Interest Policy (see, e.g., DX-AP: April 30, 1986 cover letter from Thomas McGowan to myself with attached Policy on Conflict of Interest, which Mr. McGowan notes was adopted by the Club on May 14, 1964) which explicitly deemed that it was not a conflict of interest to serve on the American Club Board and to hold a position with or equity interest in an insured member of the American Club.

10. In keeping with the Conflict of Interest Policy, I recused myself from votes concerning APL claims. As to other matters, I participated in voting and took whatever action I felt was in the Club's best interest.

11. It was during my tenure as a member of American Club's Board of Directors that the American Club embarked on its Vision 2000 plan, which was designed to increase the Club's tonnage, diversify its membership, and eventually become a full pooling member of the International Group.

### The American Club

12. I understand that the American Club is an insurer licensed by and regulated by the New York State Insurance Department. During my time as an American Club Director, the American Club sold insurance to APL and various other shipowners.

13. The American Club's Board is elected by the Club's members at an annual meeting. The members did not play an active role in the management of the Club. They did at least elect Directors and approve By-Law changes.

14. The Club's Directors made many policy decisions on behalf of the Club, and did so based on the recommendations of the SCB, who were hired to manage the Club's day-to-day operations and to provide recommendations to the Directors with respect to actions the Directors may take. The Managers were responsible for, among other things, the Club's accounting, claims handling and negotiating premiums to be paid by the Club's policyholders. The Board did not play any role in the negotiation or calculation of premiums with the Club's policyholders. As the Managers are insurance professionals, the Board relied on their recommendations. The Board also relied on the advice and legal opinion of the Club's Counsel, Kirlin Campbell & Keating, in making many of their decisions, and expected the Club's Counsel to advise it if any of the Board's decisions or Managers' recommendations were unauthorized or contrary to law.

15. At Board meetings, the Directors, among other things, considered and adopted resolutions related to interim and final assessments, the closing of policy years, the use of reserves, and the payment of large claims. I attended Board meetings and Finance Committee meetings regularly.

16. Many, but not all, of my fellow Board members were also affiliated with other insured members of the American Club. Also, during my tenure on the Club's Board, the Board included a Director from the Club's Counsel, Kirlin Campbell & Keating. For much of the time I served on the Board, the Kirlin representative was Richard Brown, also known as Dick Brown.

**Membership on the Board**

17. When I was elected to the Board, the membership of the Club essentially consisted of a few U.S. major ocean carriers and a number of smaller marine operators. The Club had a management contract with SCB. In my view and the view of other Board Members, the Club needed to strengthen its financial standing. From the perspective of the members, this was very important so as to ensure that the Club would continue as a viable entity capable of fulfilling its insurance obligations. From the perspective of the insurance regulators, this also appeared important since there was a continuing issue with the Club's ability to satisfy the minimum surplus requirements of the State of New York.

18. In order to achieve the goal of improved financial strength, I believed it was important to broaden and increase the tonnage entered in the Club by attracting quality ocean carriers that themselves had substantial financial strength. A major effort was undertaken by the Board to improve the management of the Club by SCB and to bring the Club in line with the practices of the other P&I clubs. This effort ultimately was aimed at making the American Club competitive with the other P&I Clubs and thereby allowing the American Club to compete for quality tonnage worldwide.

19. Among the important steps in this process were:

   a. improving SCB's budgeting process and thereby permitting a better understanding at the outset of an insurance year of the ultimate cost of insurance;

   b. collecting a significantly larger portion of the premium at the beginning of the year;

   c. changing the practices of the Club so as to be able to join the International Group of P&I clubs and gain access to the same levels of reinsurance;

   d. changing the insurance contract from a policy format to a rules format; and

e. most significantly, obtaining a stronger management team that could both accomplish these tasks and more effectively market the Club.

20. In the context of this lawsuit, it is important to understand the reason the budgeting process and estimate of total costs of insurance were important. Before 1989, the American Club through SCB set an initial premium for each of its members for a given insurance year. The members were then subject to assessments or "calls" as the year developed and the claims and losses were realized. These assessments or calls would fluctuate greatly and it was not uncommon for calls to be 80 to 100 percent of the initial premium. However, these calls could be made at anytime up to the closing of the insurance year. In 1989, the American Club did not typically close an insurance year until seven to ten years had elapsed from the end of the particular insurance year. For a large shipowner's insurance department, such frequent and large fluctuations were unacceptable. Each insurance manager was required to budget the company's insurance costs at or before the beginning of the year. Obviously, the large, fluctuating calls over an extended period of time made this budgeting process impossible for a member or, more importantly, a prospective member.

21. A second and very important disadvantage of this system was the credit risk that it created. Obviously, the longer the Club waited to collect monies from its members the greater the risk that one or more of these members would no longer be able to pay its assessment. That inability in turn directly affected the Club's surplus and then potentially the Club's members. This risk was even greater in the American Club due to the composition of its membership.

### Closing Years

22. In or about 1995, the Club was discussing the establishment of a contingency fund. This fund was a part of the effort to make the Club establish practices similar to practices of other Clubs. This fund would also enhance the Club's ability to minimize the need to make assessments, especially assessments that would exceed the estimated total cost of insurance. This, in turn, would make the Club more attractive to larger and better established ocean carriers. At the same time, the Club was confronted with large claims in bankruptcy proceedings commenced by Prudential Lines, United States Lines, and others. In the context of trying to defeat the claims of United States Lines, the Club's attorney, Dick Brown, proposed to the Managers and in turn to the Board that the Club could reopen long closed years and reassess members of those years for Occupational Disease Claims such as asbestosis. (PX 198) This proposal to suggest the reopening of closed years was not accepted by the Board and became a part of the discussion of the contingency fund.

23. As a member of the Board and a member of the Finance Committee, I participated in a number of meetings prior to 1995 in which the American Club closed years and either issued a "final assessment" or made a dividend. In participating in these discussions, I relied on the Managers (SCB) and their reports as wells as the Club's counsel, Dick Brown, and his opinion letters. On each occasion, I understood that the closing of the year meant that no further assessments could be made against the members. In other words, I understood that "closed" meant closed and that "final" assessment meant that it was final. The Board took various actions on assessments, sometimes making "interim" assessments and sometimes making a "final" assessment for an insurance year. This distinction was made purposefully and was communicated to the members.

24. In each instance when I participated in closing a year, I understood that the managers had considered incurred but not reported claims (IBNR) and had made an appropriate provision for it. Indeed, with respect to asbestosis claims, Dick Brown's opinion letters each made specific reference to a provision for such unreported claims, noting that the Managers (SCB) believed this provision was prudent. He also advised us that we could rely on the Managers in this regard and generally I did so rely. I do not recall SCB or anyone else questioning or challenging the prudence or sufficiency of this reserve at any time when I was on the Board.

25. I approved the reports submitted by SCB at the time of the closing of years including the provisions for unreported claims. This approval of, among other things, the provision for unreported claims was based on the understanding that coverage for the member for claims arising in the closed years continued subject of course to policy terms, even though those claims might still be unreported. No one ever suggested that this coverage was discretionary. To the contrary, it was, in my view, a contractual obligation as provided in the insurance policies issued by the Club.

26. Dick Brown's proposal that closed years could be reopened was unacceptable to me and ultimately to the Board. To begin with, I did not believe that his legal arguments in this regard were persuasive and they seemed to contradict earlier letters written by his firm. (Defendants' Exhibit DB) More important for me as a non-lawyer was that this view, created for the purpose of one case, was at odds with the established expectations of the Club members. That expectation was like mine: the word "closed" and the word "final" should have their plain meaning. For businesses to suddenly confront potential liabilities for "closed" contract obligations upsets that company's ability to budget for and plan its activities. It is not a readily acceptable approach for a businessman. Thirdly, I was concerned that such a view if adopted by

the Club would undermine our efforts to strengthen the Club by attracting quality tonnage. No other club so far as I was aware was suggesting in the 1990's that its closed years were not really closed. For potential new members, this view would undoubtedly make the Club unattractive because it would undermine the insurance manager's ability to budget with confidence for his insurance costs.

27. After discussions in the Finance Committee and at the Board, a resolution was passed by the Board creating a contingency fund. In the context of those discussions, the ability of the Club to open closed years was important in considering the guidelines for the use of the contingency fund. Both the Board and the Finance Committee decided at the time the contingency fund was created that the prior years could not be reopened (Defendants' Exhibit DH at KEY 04117-18; AC 3069017) As a result, the guidelines for the contingency fund specifically provided that the fund would be used to pay claims in closed years. (Defendants' Exhibit DI) The Manager's memorandum circulating these guidelines makes the point:

> Attached is a revised Contingency Fund memorandum which provides for the transfer of the entire closed year surplus but which allows the managers to utilize the fund to cover growth in closed year reserves when necessary.

(Id. at AC0032834). Similarly the memorandum itself states:

> This constraint flows from the primary consideration that sufficient funds always be available to cover claims in closed years and, indeed, provide for the unanticipated growth of claims in such years.

(Id. at AC0032836)

### Deductibles

28. While I was on the Board, I do not recall resolutions with respect to the use of stacked deductibles for asbestosis claims. There were some discussions about this practice and how for individual policyholders a single deductible would be advantageous. I did not take issue with the practice of applying stacked deductibles because, as a board member, I believed it was beneficial to the Club to adhere to this practice for claims prior to joining the International Group. In short, it did not create a competitive disadvantage for the Club since its practice on a going forward basis conformed to the International Group's practices. With respect to individual policyholders, including APL, I believed that such policyholders could, if they wanted to, challenge the practice. That challenge would then be resolved in the context of the particular circumstances presented at that time.

### Actions of the Board from 1990-1997

29. In making decisions with respect to (a) closing years, (b) the contingency fund, (c) Dick Brown's suggestion that the words "closed" or "final" do not mean what they appear to mean, (d) asbestos claims, and (e) other matters, I relied on, among other things, information that was conveyed to me by SCB as well as the Club's auditors and the auditors' actuarial opinions. This information in the relevant time supported the view that the Club was well positioned for its closed year obligations and that appropriate reserves had been set for known and IBNR claims as well as for loss adjustment expenses.

30. For example, a January 5, 1996 Memorandum to the Finance Committee from SCB provides a useful snapshot of the information regarding the Club's reserves. (PX208) At this time, I was the Chairman of the Finance Committee. As that memorandum shows, the Closed

Years were very well positioned. In addition to the funded loss reserves and IBNR for these years amounting to 6.3 million dollars, these Closed Years had an additional 16.47 million dollars in unallocated reserves. All of this money was either funded by the members of the Closed Years or by investment income on the funds that had been paid by those members. The purpose of the contingency fund was to permit these additional reserves to be available not only to pay claims that might arise from the Closed Years (see my discussion above at paragraph 27), but also to permit the Board to use a portion of it, if appropriate, to minimize the need for supplementary calls in future years. In short, the Closed Years were not short of available funds. To the contrary, those years were well funded. Those years' funds were being made available – to the extent not needed for claims – to strengthen the ongoing finances of the Club, making it a more predictable and therefore more attractive business partner.

31. In ultimately setting up the contingency fund, the Board also allocated more than one million dollars from the 1992 year to that fund. (Defendants' Exhibit DI) Thus, the 1992 year had ended with a significant surplus. Rather than declare a dividend, the Board closed the year without a dividend and applied the surplus to the Contingency Fund. That Fund, in turn, with the 1992 surplus and the Closed Years' surplus, was available to pay unanticipated or under-reserved claims from the Closed Years or to assist the Club in minimizing assessments in future years.

I declare under the penalty of perjury under the laws if the United States of America that the foregoing is true and correct.

Executed on:

June 12, 2006

11

## CERTIFICATE OF SERVICE

I hereby certify, pursuant to 28 U.S.C. §1746, that on June 12, 2006, I served a true and correct copy of the attached Declaration of C. Bennett Gleason in Support of APL's Claims and Defenses by electronic mail to all counsel of record.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 7, 2006

_____
Marc L. Antonecchia