UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X

AMERICAN STEAMSHIP OWNERS MUTUAL : 
PROTECTION AND INDEMNITY                   :          No. 04-cv-04309 (LAK)
ASSOCIATION, INC.,                                     :
                                    Plaintiff,          :
            -against-                                          :
                                                              :
ALCOA STEAMSHIP CO., INC., et al.,           :          **(ECF Case)**
                                                              :
                                Defendants.          :
-------------------------------------------------------------- X


## <u>TRIAL MEMORANDUM OF VARIOUS DEFENDANTS</u>[1]


                                                                        July 7, 2006


---

[1] The Defendants submitting this Memorandum are listed on the signature pages at the end of the Memorandum.

## TABLE OF CONTENTS

Preliminary Statement..................................................................................................... 1

Overview of the Facts .................................................................................................... 2

Argument ...................................................................................................................... 11

I.    The American Club Is Obligated To Indemnify Defendants For Occupational Disease
      Claims Under The Pre-1989 Policies................................................................. 11

      A.    The Pre-1989 Policies Expressly Provide Coverage for Occupational Disease
            Claims ..................................................................................................... 11

      B.    The Pre-1989 Policies are in Full Force and Effect and Reflect the Club's
            Ongoing Contractual Obligation to Continue to Provide Coverage ..................... 11

      C.    The Parties' Conduct with Respect to Occupational Disease Claims Demonstrates
            that Such Claims are Covered by the Pre-1989 Policies....................................... 13

II.   The American Club Has No Right to Further Assess Policyholders from Insurance Years
      Prior to 1989 .................................................................................................. 15

      A.    Pursuant to New York Law, and in Accordance with the Club's Policies and By-
            Laws, No Further Assessments Can Be Ordered Against Defendants ................. 15

      B.    The Closing of Insurance Years Was a Release.................................................. 20

      C.    The Club is Barred by the Doctrines of Waiver and Estoppel from "Re-Opening"
            the Pre-1989 Insurance Years ............................................................................ 21

      D.    Plaintiff's Arguments that It has a Right to Order Post-Closure Assessments Find
            No Support in the By-Laws, Applicable Law, or Policy ..................................... 24

            1.    The Board of Directors had the power to close years as to known and
                  unknown claims........................................................................................ 24

            2.    The Club's argument that mutuality requires the "re-opening" of closed
                  years is meritless..................................................................................... 28

            3.    The doctrine of mutual mistake is not applicable to the unilateral corporate
                  actions of the club.................................................................................... 30

            4.    The relief sought by the Club does not meet the Club's alleged mutuality
                  requirements. ........................................................................................... 32

III.  The Second Circuit Has Ruled That The Club May Not Apply Multiple Deductibles To
      Occupational Disease Claims ........................................................................... 33

A.     The Club's Acquiescence Argument is to No Avail.............................................. 37

Conclusion ......................................................................................................................... 38

## TABLE OF AUTHORITIES

PAGE(s)

### CASES

*711 Kings Highway Corp. v. F.I.M. 's Marine Repair Serv., Inc.*,
   51 Misc. 2d 373, 273 N.Y.S.2d 299 (N.Y. Sup. Ct. 1966) ................................................27

*Allen v. Westpoint-Pepperell, Inc.*,
   933 F. Supp. 261 (S.D.N.Y. 1996) ............................................................................ 30-31

*Aloya v. Planning Bd.*,
   241 A.D.2d 73, 671 N.Y.S.2d 124 (2d Dep't 1998) ..........................................................17

*Antilles S.S. Co. v. Members of Am. Hull Ins. Syndicate*,
   733 F.2d 195 (2d Cir. 1984) ............................................................................................13

*Barclay Arms, Inc. v. Barclay Arms Assocs.*,
   74 N.Y.2d 644, 542 N.Y.S.2d 512 (1989) .......................................................................32

*Bayer v. Beran*,
   49 N.Y.S.2d 2 (N.Y. Sup. Ct. 1944) ...............................................................................27

*B.R. De Witt, Inc. v. Hall*,
   19 N.Y.2d 141, 278 N.Y.S.2d 596 (1967) .......................................................................11

*Bray v. Grand Lodge, K.P.*,
   121 Misc. 764, 202 N.Y.S. 219 (N.Y. Sup. Ct. Westchester Co. 1923) ............................16

*Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*,
   302 F.3d 83 (2d Cir. 2002) ..............................................................................................14

*Chimart Assocs. v. Paul*,
   66 N.Y.2d 570, 498 N.Y.S.2d 344 (1986) .......................................................................32

*Congregation Yetev Lev D'Satmar v. 26 Adar N.B. Corp.*,
   219 A.D.2d 186, 641 N.Y.S.2d 680 (2d Dep't 1996) ..................................................23, 27

*Consol. Edison Co. of N.Y., Inc. v. Allstate Ins. Co.*,
   98 N.Y.2d 208, 746 N.Y.S.2d 622 (2002) ................................................................... 33-35

*Continental Cas. Co. v. Rapid-American Corp.*,
   80 N.Y.2d 640, 593 N.Y.S.2d 966 (1993) ...................................................................13, 37

*Continental Ins. Co. v. Allianz Ins. Co.*,
   2001 WL 289959 (S.D.N.Y. March 23, 2001) ..................................................................24

*Cucchi v. New York City Off-Track Betting Corp.*,
  818 F. Supp. 647 (S.D.N.Y. 1993) ................................................................................27

*DFI Communications, Inc. v. Greenberg*,
  41 N.Y.2d 602, 394 N.Y.S.2d 586 (1977) .......................................................................20

*Dicola v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n (In re Prudential Lines, Inc.)*,
  158 F.3d 65 (2d Cir. 1998)................................................................... 1, 2, 8, 10, 11, 33-37

*Duncan v. New York Mut. Ins. Co.*,
  138 N.Y. 88 (1893) ...........................................................................................................12

*E.R. Squibb & Sons, Inc. v. Lloyd's & Cos.*,
  241 F.3d 154 (2d Cir. 2001) .............................................................................................36

*Frazier v. Royal Ins. Co. of Am.*,
  110 F. Supp. 2d 110 (N.D.N.Y. 2000)...............................................................................14

*Gray v. Daly*,
  40 A.D. 41, 57 N.Y.S. 527 (2d Dep't 1899) .....................................................................25

*Hartford Fire Ins. Co. v. Federated Department Stores, Inc.*,
  723 F. Supp. 976 (S.D.N.Y 1989) .....................................................................................32

*Holmes v. St. Joseph Lead Co.*,
  84 Misc. 278, 147 N.Y.S. 104 (N.Y. Sup. Ct. 1914) ........................................................31

*Hyde v. Lynde*,
  4 N.Y. 387 (1850) ........................................................................................................12, 27

*IBJ Schroder Bank & Trust Co.v. Resolution Trust Corp.*,
  26 F.3d 370 (2d Cir. 1994)................................................................................................27

*Ingersoll Milling Mach. Co. v. M/V Bodena*,
  829 F.2d 293 (2d Cir. 1987)..............................................................................................14

*Kay-R Elec. Corp. v. Stone & Webster Constr. Co.*,
  23 F.3d 55 (2d Cir. 1994)....................................................................................................5

*Kelly v. Bremmerman*,
  21 N.Y.2d 195, 287 N.Y.S.2d 41 (1967) ..........................................................................15

*Lightfoot v. Union Carbide Corp.*,
  110 F.3d 898 (2d Cir. 1997)................................................................................................5

*Loyalty Life Ins. Co. v. Fredenberg,*
   214 A.D.2d 297, 632 N.Y.S.2d 901 (3d Dep't 1995) .......................................................32

*Magaliff v. New York Life Ins. Co.,*
   247 A.D. 810, 286 N.Y.S. 303 (2d Dep't 1936) ...............................................................12

*Marvel Entm't Group, Inc. v. Young Astronaut Council,*
   747 F. Supp. 945 (S.D.N.Y. 1990) ...................................................................................20

*Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.,*
   906 F.2d 884 (2d Cir. 1990) ...............................................................................................5

*Middle East Banking Co. v. State St. Bank Int'l,*
   821 F.2d 897 (2d Cir. 1987) ................................................................................................5

*Moradi-Shalal v. Fireman's Fund Ins. Cos.,*
   46 Cal. 3d 287 (1988) ......................................................................................................14

*Mygatt v. N.Y. Prot. Ins. Co.,*
   21 N.Y. 52 (1860) ......................................................................................................17, 28

*Nassau Trust Co. v. Montrose Concrete Prods. Corp.,*
   56 N.Y.2d 175, 451 N.Y.S.2d 663 (1982) ......................................................................23

*National Amusements, Inc. v. South Bronx Dev. Corp.,*
   253 A.D.2d 358, 676 N.Y.S.2d 166 (1st Dep't 1998) .....................................................32

*New York State Elec. & Gas Corp. v. Saranac Power,*
   117 F. Supp. 2d 211 (N.D.N.Y. 2000) .......................................................................31, 32

*Nichols v. Regent Properties, Inc.,*
   49 A.D.2d 847, 373 N.Y.S.2d 613 (1st Dep't 1975) .......................................................32

*Olin Corp. v. Ins. Co. of North Am.,*
   221 F.3d 307 (2d Cir. 2000) .............................................................................................36

*One Beacon Ins. Co. v. Old Williamsburg Candle Corp.,*
   386 F. Supp. 2d 394 (S.D.N.Y. 2005) (Kaplan, J.) ....................................................23, 24

*Patrons v. Industry Fire Ins. Co. v. Harwood,*
   64 A.D. 248, 72 N.Y.S. 8 (3d Dept. 1901) ......................................................................12

*People v. Gaggi,*
   104 A.D.2d 422, 478 N.Y.S.2d 732 (2d Dep't 1984) ......................................................17

*Pratt v. Dwelling-House Mut. Fire Ins. Co.,*
   7 A.D. 544, 40 N.Y.S. 179 (4th Dep't 1896) ............................................................. 32-33

*Rous v. Carlisle,*
   14 N.Y.S.2d 498 (N.Y. Sup. Ct. 1939) .......................................................................... 31

*Seaboard Sur. Co. v. Gillette Co.,*
   64 N.Y.2d 304, 486 N.Y.S.2d 873 (1984) ...................................................................... 12

*Skaneateles Paper Co. v. Am. Underwriters' Fire Ins. Co.,*
   61 Misc. 457, 114 N.Y.S. 200 (N.Y. Sup. Ct. Monroe Co. 1908) .................................... 15

*Smith v. State Farm Mut. Auto. Ins. Co.,*
   93 Cal. App. 4th 700 (2d Dist. 2001) ............................................................................ 14

*Spence v. Med. Mut. Liab. Ins. Soc.,*
   65 Md. App. 410 (1985) .......................................................................................... 12, 16

*Sperling v. Great Am. Indem. Co.,*
   7 N.Y.2d 442, 199 N.Y.S.2d 465 (1960) ........................................................................ 12

*St. Paul Fire & Marine Ins. Co. v. Barry,*
   438 U.S. 531, 98 S.Ct. 2923 (1978) ............................................................................... 11

*Star Ring Mfg. Co. v. Fireman's Fund Am. Ins. Cos.,*
   49 A.D.2d 1007, 374 N.Y.S.2d 171 (4th Dep't 1975) ..................................................... 23

*Sukup v. State,*
   19 N.Y.2d 519, 281 N.Y.S.2d 28 (1967) ........................................................................ 14

*T.G.I. East Coast Constr. Corp. v. Fireman's Fund Ins. Co.,*
   600 F. Supp. 178 (S.D.N.Y. 1985) ................................................................................. 21

*Taylor v. United States Cas. Co.,*
   269 N.Y. 360 (1936) ...................................................................................................... 12

*Tidewater Oil Co. v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n,*
   156 Misc. 367, 281 N.Y.S. 729 (N.Y. Sup. Ct. 1935) ..................................................... 14

*Turner v. Am. S.S. Owners' Mut. Prot. & Indem. Ass'n,*
   16 F.2d 707 (5th Cir. 1927) .......................................................................................... 27

*United States Fid. & Guar. Co. v. Treadwell Corp.,*
   58 F. Supp. 2d 77 (S.D.N.Y. 1999) ................................................................................ 36

*Van Schaick v. Stiering*,
   141 Misc. 461, 253 N.Y.S. 235 (N.Y. Sup. Ct. Albany Co. 1931).....................................15

*Warner-Lambert Pharm. Co. v. John J. Reynolds, Inc.*,
   178 F. Supp. 655 (S.D.N.Y. 1959) ..................................................................................13

## STATUTES

11 N.Y.C.R.R. § 70.1 ...........................................................................................................11

CPLR § 213(6)......................................................................................................................31

CPLR § 213(7)......................................................................................................................31

Cal. Bus. & Prof. Code §17200 et seq. ...............................................................................14

N.Y. BUS. CORP. L. § 203(a) ...............................................................................................27

N.Y. INS. L. § 1211 .............................................................................................................17

N.Y. INS. L. § 4111 ...........................................................................................15, 16, 22, 23, 29

N.Y. INS. L. § 7430 .....................................................................................................15, 22, 23

## OTHER AUTHORITIES

13A Appleman, *Insurance Law and Practice* § 7582 (1976)..........................................16

<u>PRELIMINARY STATEMENT</u>

The case involves three basic issues: whether Plaintiff American Steamship Owners Mutual Protection and Indemnity Association, Inc. (the "American Club" or "Club") can after more than twenty years terminate coverage, particularly for occupational disease claims ("ODCs"), under American Club protection and indemnity ("P&I") insurance policies covering policy periods prior to February 20, 1989 (the "Pre-1989 Policies"); whether Plaintiff can "re-open" Insurance Years ("Insurance Year" means the year long insurance policy period as defined by the Club's By-Laws as running from February 20 of one year to February 20 of the next year) long closed to further assessment pursuant to duly enacted corporate resolutions of the Club; and whether Plaintiff can properly charge Defendants with "stacked" deductibles — one full deductible for each year in which a claimant served aboard a vessel entered in the Club — for a single ODC, contrary to the holding of the Second Circuit in *Dicola v. American S.S. Owners Mutual Protection and Indemnity Ass'n, Inc. (In re Prudential Lines, Inc.)*, 158 F.3d 65 (2d Cir. 1998) ("*Prudential*"). Plaintiff's positions on all of these points is erroneous.

As demonstrated below, there is no legitimate issue concerning Plaintiff's obligation to provide insurance coverage to Defendants for ODCs under the Pre-1989 Policies. The label "discretionary practice" to describe its practice of providing coverage for ODCs for more than twenty-five years is a recent invention of the Club's litigation Counsel in an effort to nullify its coverage retroactively.[2]

---

[2] As Plaintiff's own 30(b)(6) witness, involved in running the Club on a day-to-day basis for nearly twenty years, admitted: "The discretionary practice? No. No, I never heard or used the term until I heard of it last July." (*See* McGowan Tr. at 14-15) (deposition transcripts will be referred to herein with the witness' last name and "Tr." and all references are contained in the deposition designations submitted on this same date).

Plaintiff's contention that it should be entitled to further assess members of long closed Insurance Years is equally baseless. Nothing in the Pre-1989 Policies, the Club's By-Laws or New York law empowers the Club to order further assessments after the Club has formally closed an Insurance Year, nor do so-called principles of "mutuality" justify this result.

With respect to "stacked" deductibles, this precise issue was considered and decided in Defendants' favor by the Second Circuit in *Prudential* and its holding is controlling.

## OVERVIEW OF THE FACTS

The Club is an incorporated, licensed insurance company and benefits from its corporate status.[3] Although its membership changes from year to year, the Club as a corporate entity does not. It is the Club that issues insurance policies, sets reserves, charges premiums, invests funds, orders assessments, purchases reinsurance, pays insurance claims, files lawsuits (including this one), enters into contracts with third parties and must comply with New York insurance regulations.[4] As a mutual company, the Club raises capital from its membership and, unlike a stock company, does not aim to earn a profit from its underwriting activities. But, as explained in the affidavit of Defendants' expert, Terence Coghlin, this "collection mechanism" does not change the nature of the Club's insurance product. As with any other insurance policy, P&I insurance issued by a mutual "club" is a promise by the Club to pay claims that fall within the

---

[3] For example, the Club's corporate status allows it to maintain corporate reserves that belong to the Club as an ongoing entity and to use them for the benefit of the Club as a whole as distinct from its membership in any particular year. With the Club's corporate status come corporate liabilities including its obligations under its insurance contracts.

[4] The New York Insurance Department, in determining the adequacy of the Club's surplus, historically has viewed the American Club as an entity and does not consider whether any particular Insurance Year has a deficiency or surplus. (*See* McGowan Tr. at 65).

terms of the policy – nothing less. (*See* Coghlin Aff. at ¶¶ 25-26).[5]  The Club is managed by a company called Shipowners Claims Bureau ("SCB" or the "Managers").

For purposes of accounting for premiums and assessments, the Club generally treated its Insurance Years as separate accounting units until Insurance Years were closed.  Closure of an Insurance Year was a business decision of the Club, not an agreement between the Club and its membership.[6]  When Insurance Years were closed, reserves from the closed years were transferred into the Club's general reserves and treated as the Club's assets.  The Club ceased accounting to policyholders for post-closure developments or investment income.  (*See, e.g.,* Solarino Tr. at 80-81, 218-22).

Throughout its history, the Club acknowledged that the primary purpose of its reserve account was the payment of claims in closed Insurance Years (whether reported or unreported at the time of closure), and the reserve account was consistently used for this purpose.  (*See, e.g.,* DX-AO: Memo re: Reserve Account; DX-CP: Draft 1995 Financial Report at AC0075406; Kurz Aff. at ¶ 27).  It was also used to satisfy the Club's minimum surplus requirements under New York's insurance regulations, and, in certain years, to pay for stop loss reinsurance premiums

---

[5] All cites herein are to the Trial Affidavits or Declarations of Plaintiff or Defendants submitted on the dates required by the March 7, 2006 Order, unless otherwise noted.  They will be referred to by the witness' last name and "Aff." or "Decl." or "Reb. Aff." or "Reb. Decl." as appropriate.

[6] As the uncontested evidence shows, to reach a determination about closing an Insurance Year, first the Club's Managers provided a report to the Finance Committee estimating the final surplus or deficiency for the Insurance Year.  Then, the Finance Committee made a recommendation following the Managers' report, recommending that the Board enact the resolutions drafted by the Club's counsel.  The Club's counsel, for the years at issue, Kirlin, Campbell & Keating ("Kirlin"), then issued an opinion that the proposed action was valid and that the Board had authority to take the action.  Based on this record, the Board voted to approve a Resolution to close the year in question, without seeking or obtaining consent of the individual Policyholders.  The Board Resolutions state that the Managers would also clear the action with the N.Y. State Insurance Department.  Lack of objection by the Insurance Department was taken by the Club as approval.  After approval by the Board, invoices were sent to the Policyholders regarding the final assessment or declaration of a refund (or dividend).  (*See* Kurz Aff. at ¶¶ 19-21; Kennedy Aff. at ¶¶ 18-21; Valerius Aff. at ¶¶ 19-20; Gronda Decl. at ¶ 10; *see, e.g.,* PX-100: June 11, 1987 Board Minutes and attachments re: closure of the 1976/77 and 78/79 Insurance Years).  Policyholders were thus ordered to pay any final assessment.

and other reinsurance premiums. (*See, e.g.*, DX-BA: June 16, 1988 Board Minutes at AC3060906; PX-144; Kurz Aff. at ¶ 31). In 1996, the Club labeled its reserve account a "Contingency Fund" and authorized its future use to offset deficiencies that would have normally required assessment when the relevant years were closed. The Contingency Fund guidelines continued to reflect the primary and overriding purpose that the reserve account, now Contingency Fund, fulfill the Club's contractual requirements to pay claims, including ODCs, in closed Insurance Years.[7]

Closure of Insurance Years was intended to extinguish policyholders' contingent liability for further assessment[8] and, concomitantly, their entitlement to refund of excess assessments.[9] Closure was never understood or intended to be a restriction of coverage. (*See, e.g.*, Kennedy Aff. at ¶ 27; Kurz Aff. at ¶ 34; Gronda Decl. at ¶ 27). Not until shortly before this action was brought did anyone associated with the Club even conceive of such an argument.

The Club's recognition that closed years were closed is illustrated by the letter it provided to Union Carbide Corporation ("UCC") in which it unambiguously released UCC from all liabilities for any further assessments. (DX-GG: May 7, 2002 letter stating in part: "...Union

---

[7] *See* DX-DI: June 25, 1996 Memorandum: "The disposition of reserves allocated to and designated as the Contingency Fund would remain subject to the absolute discretion of the Board of Directors save, obviously, to the extent that they would not have power to allocate to the Fund any monies from the balance available for closed years so as to reduce that balance below the total reasonably estimated for unpaid losses and expenses (including IBNR) for those years. *This constraint flows from a primary consideration that sufficient funds always be available to cover claims in closed years and, indeed, provide for the unanticipated growth of claims in such years.*"

[8] *See* Gleason Decl. at ¶ 26; Gronda Decl. at ¶ 11; Kennedy Aff. at ¶ 18; Kurz Aff. at ¶ 22-23; Valerius Aff. at ¶ 18.

[9] Plaintiff's accusation that Defendants awarded themselves millions of dollars in refunds while failing to build up the Club's reserves ignores the fact that these refunds were required in accordance with the Club's Counsel's advice, to comply with New York law. (*See, e.g.*, DX-BT: May 31, 1991 Kirlin opinion letter at AC3064264-5). In 1996, the Club first redefined its "premium" to include not only the advance payment when the insurance policies were issued, but the "total estimated cost" (ETC) of the Insurance Year as estimated by the Managers. Thus, beginning in 1996 the Club's Counsel advised that any amount within the ETC did not have to be returned or accounted for to the policyholders of the year in terms of investment income. (*See* PX-220: June 6, 1996 Kirlin Opinion letter at AC3069081).

Carbide Corporation has paid all premium - including Release Calls - billed to them by the [Club].... [UCC] is hereby released from all obligations to the [Club] for any future Supplementary Calls, as and when levied, for the policy years in which [UCC] was a member of the Club."). The Club now argues that the letter was somehow "clearly erroneous" because it had presented UCC with invoices that referenced only the "open years." (See Solarino Reb. Decl. at ¶ 32). On its face, the release letter is an unequivocal release. At a minimum, it is a clear admission that the Club understood it could charge UCC solely for liability in open years, and that final payment on open years combined with final payments already made on closed years resulted in a complete release from further assessments.[10] (See Dougherty Aff. at ¶¶ 7-12).

The Club has been aware of the potential for the assertion of asbestos claims since the late 1970s (McGowan Tr. at 91, 334-35), and, over time, its involvement in the handling of such claims steadily increased. By 1982, the Club, together with other marine P&I Clubs worldwide, was coordinating efforts to defend ODCs. (See DX-AL: September 9, 1982 Board Minutes at KEY010563). The Club's Managers handled ODCs in the same manner as any other covered claim.

---

[10] The unambiguous release is ample basis for summary judgment dismissing the action against UCC. In view of the court's Order of March 7, 2006, UCC did not file such a motion, but, such a summary judgment should be granted. The impact of this unambiguous release, signed by an Assistant Vice President of the Club, after collection of over $175,000, cannot be avoided on the basis of inadmissible parol evidence proffered by the Club's Mr. Solarino. (See Solarino Reb. Decl. at ¶¶ 30-38). Solarino was uninvolved in the release issued to UCC and can do no more than offer speculation and argument on the point. In contrast, UCC has provided testimony of Charles Dougherty who was instrumental in determining the need for the release and obtaining it. In any event, the release is dispositive on its face and cannot be changed by extrinsic evidence or argument. See Metropolitan Life Ins. Co. v. RJR Nabisco, Inc., 906 F.2d 884, 889 (2d Cir. 1990); Lightfoot v. Union Carbide Corp., 110 F.3d 898, 906 (2d Cir. 1997); Kay-R Elec. Corp. v. Stone & Webster Constr. Co., 23 F.3d 55, 58 (2d Cir. 1994). If there was any doubt, the words of the release are of general effect and should be construed against the Club. Middle East Banking Co. v. State St. Bank Int'l, 821 F.2d 897, 907 (2d Cir. 1987). The discrete legal issues concerning the release as to UCC, and specific issues as to The Dow Chemical Company ("Dow") which contends it is not subject to assessment under some or all of the policies at issue, are not fully briefed here. UCC and Dow respectfully reserve on more fully addressing issues unique to them in a manner directed by the Court after it rules on what further proceedings will be had.

In 1987, with the entry of a multi-million dollar verdict against Defendant Farrell Lines for the *Torrens* claim, the Club became even more aware of the potential severity of ODCs.[11] Recognizing that *Torrens* could be the tip of the iceberg with respect to the emergence of future ODCs, the Club and its Managers considered the scope of insurance coverage for asbestos claims, specifically the trigger of coverage and how deductibles should be applied, and whether additional reserves should be set for future ODCs that were "incurred but not reported" (IBNR) at the time the previous Insurance Years were closed. The Managers recommended application of a "stacked" or "multiple" deductible approach to ODCs (a practice that had begun earlier but without Board approval) because it provided policyholders with "assurance of proper limit" for payment of ODCs while protecting the Club against what the Managers thought might be potentially ruinous exposure. (*See* DX-AS: September 16, 1987 Memo from McGowan, then President of the Club's Managers). The Club also obtained a legal memorandum evaluating the Club's obligations with respect to "Asbestosis - **Coverage** and Deductibles," which concluded that stacking deductibles appeared to be legally permissible (albeit subject to modification based on future legal developments).[12] (DX-AR: September 11, 1987 Kirlin opinion letter) (emph. added).

---

[11] *Torrens* was a claim that involved previously closed Insurance Years in the 1950s, when no reserves were set aside specifically for ODCs. (*See* PX-120: March 8, 1988 Memo by McGowan at KEY002730).

[12] The Club's contention that it did not obtain a coverage opinion concerning its obligation to pay for ODCs until 2004 is untrue. In fact, the Club's counsel provided a lengthy legal opinion in 1987 (DX-AR) and again in 1991 (DX-BQ: March 13, 1991 Letter regarding Trinidad/Mathiasen asbestos claims) concerning its obligation to provide insurance coverage for ODCs. The application of deductibles would not have been an issue if insurance coverage did not exist. (*See* Kennedy Aff. at ¶ 52; Valerius Aff. at ¶ 39; Weedman Aff. at ¶ 32). Moreover, the Club's Counsel, sitting as a Board member, approved settlement of numerous ODCs without once suggesting that payment of such claims was anything but obligatory. (*See, e.g.,* Weedman Aff. at ¶¶ 11-39; DX-BQ; DX-BR at AC3063950-51; DX-BS; DX-FO). The Pre-1989 Policies contain no provision under which a "discretionary" payment could have been permitted. (*See* Coghlin Aff. at ¶ 27).

In 1988, the Club began to set aside $100,000 upon the closure of each Insurance Year, in recognition of the existence of coverage for ODCs.[13] The purpose of the provision was to increase existing reserves due to the expectation that future ODCs, such as *Torrens,* might arise in previously closed Insurance Years. (*See* PX-127: April 14, 1988 Board minutes with attachments, including April 8, 1988 opinion letter and closing resolutions).[14]

The Club continued the practice of setting aside $100,000 for ODCs upon closure of years from the 1977 Insurance Year until the 2000 Insurance Year (*see* PX-127; PX-139; PX-148; PX-156; PX-163; PX-173; DX-CV; PX-222; DX-EE; DX-EP; DX-ER; PX-240; PX-246; DX-GI; DX-GN),[15] at which point it increased this amount to $500,000 (*see* DX-HF). The Club continued to reserve the same amount for twelve years because the amount proved reasonable based on loss experience. (McGowan Tr. 197-200).

In 1993, a $66 million judgment was entered in favor of a bankrupt former member of the Club, Prudential. Although this judgment was later vacated, the Club's recognized obligation to provide coverage for ODCs in closed Insurance Years led Brown, the Club's Counsel, to

---

[13] *See* PX-120: March 8, 1988 memorandum by McGowan: "This practice [adding additional monies to the reserves for IBNR] is not only prudent but, perhaps, vital to ensure the ongoing solvency of the Association's surplus funds *when called upon to pay claims of this category.*" *See also* Kurz Aff. at ¶ 38; Kennedy Aff. at ¶ 45; Gronda Decl. at ¶ 19; Valerius Aff. at ¶ 32.

[14] The Club makes much of the fact that the Managers' initial recommendation that the Club set aside the credit balance of the year about to be closed, up to $250,000 per year, was not adopted as proposed, and the Finance Committee agreed to a lower number of $100,000 per year recommended by the Managers as a "compromise" proposal. (*See, e.g.*, McGowan Aff. at ¶ 78). The Club seeks to attack this decision, on the one hand, as a breach of fiduciary duty by the directors, and on the other as an "arbitrary" decision. These arguments are irrelevant. The point is that provisions were set aside to cover ODCs because the Club and its Directors recognized that such coverage was obligatory. The decision of the Club was eminently reasonable at the time (*see* Coghlin Aff. at ¶ 103), particularly given that: (1) the Directors knew there was over $15 million in the reserve account available to pay for closed year claims (*see* PX-297, referencing AC3061011, a surplus statement, which is part of a set of voluminous documents not individually marked as trial exhibits); and (2) the Club had reinsurance in place, both excess and stop-loss in various years, to protect it in the event of large losses. If the Club's Directors had opted to set aside up to $250,000 per year instead of $100,000 the Club undoubtedly would be making the same argument.

[15] However, the 1978 Insurance Year had been closed before this $100,000 set aside began and the Club apparently did not include this provision when closing Insurance Years 1989/90 and 1990/91. (*See* PX-189).

devise an argument that previously closed Insurance Years might be "re-opened" if necessary to block Prudential or its claimants from asserting insurance claims against the Club. (*See* PX-177: November 3, 1993 Kirlin letter to McGowan re: *Prudential*).[16]

In early 1995, in continuing recognition of coverage, the Club considered reinsuring "the *Association's liability* to pay claims in closed insurance years including, if possible, the exposure for asbestos-related claims." (*See* DX-CM at KEY004162) (emph. added). During discussion regarding creation of the Contingency Fund, Brown's suggestion that previously closed Insurance Years might be "re-opened" was challenged.[17] After thorough consideration of this issue, the Board reconfirmed its intention and belief that closed Insurance Years "*cannot* be reopened *unless* through the operation of New York statute." (*See* PX-222) (emph. added).[18] So that there would be no doubt on this score, the Club formalized this conclusion in the Club's Rules for the 1997 Insurance Year.[19] (*See also* DX-DG; DX-DM).

---

[16] By this time, all of the Pre-1989 Insurance Years had been closed. Brown's theory was that Prudential would not be able to pay for additional assessments and therefore would not be able to avail itself of coverage.

[17] Gleason, a Director at that time, wrote to Brown explaining that Brown's argument with respect to "re-opening" Insurance Years contradicted previous legal advice provided by Kirlin. (*See* PX-210: January 22, 1996 Letter). After discussion, the Board reaffirmed its consistent, prior understanding that closed years could not be re-opened. (*See* Gronda Decl. at ¶ 13; Kurz Aff. at ¶ 23).

[18] The Club's belated attempts to characterize the statement made in the 1996 Board Minutes as "prospective only" and including purported considerations of "mutuality" (*see, e.g.*, Recchuite Decl. at ¶¶ 7-10; Brown Aff. at ¶ 42) ignore the wording and context of the statement and would render it meaningless. (*See infra.*).

[19] Beginning in 1997, the Club changed from an insurance policy format to a "Rules" format. The 1997 Rules incorporated a provision specifically stating (as had been previously understood) that after the Board declares a year closed "no further assessments shall be levied in respect thereof." (PX-234, Rule 4, Section 11). In a covering letter to the Board of Directors this provision was described as a "change" but only insofar as the Club was now "specifically providing" that no further assessments could be made. (PX-219 at Item (7)). The members had never been told anything to the contrary with respect to earlier years, and this description merely indicated that the manner in which closing had always been understood was being made explicit. Similarly, the covering letter stated that it was "specifically providing" that a member must obtain the Club's prior consent to settlements, although this was always understood to be the case. (*See, e.g.*, PX-179: December 28, 1993 Affidavits of Adolph B. Kurz and Charles Kurz, II, both at ¶ 5). (PX-219, Item (8), *compare* Item 7, stating that the new Rules were "adding provisions for a Release Call and Overspill Calls [Article VII, Sections 5 and 10]" that did not previously exist.). That the new Rules, coming on the heels of the Finance Committee discussions and Board confirmation that closed years could not be re-opened, was merely confirmatory of the prior understanding is also established by the Finance Committee minutes prepared by Hughes. (*see* DX-DF: June 12, 1996 Finance Committee minutes) which stated under the

The Club also acknowledged its obligation to pay for ODCs under Pre-1989 Policies in communications with its auditors/actuaries.[20]  In 1996, upon Deloitte's recommendation, the Club began including in its reserves an additional IBNR provision of $1,000,000 regarding asbestos claims from Insurance Years 1981 and prior. (*See* DX-DR: October 8, 1996 Letter from Sandercock to Hughes of SCB).  The Club continued including a provision for such IBNR in its reserves and annual statements, and by 2001, the amount of such provision was $2,500,000.[21] (*See, e.g.*, DX-GQ at KEY22127; DX-IL at ¶ 57).  These reserve amounts were included in the Club's quarterly and annual filings with the New York State Insurance Department.

In addition, the Club acknowledged its coverage obligations with respect to ODCs in connection with its application for full membership in the International Group ("IG").[22]  In October 1996, the IG inquired as to how the Club would fund a deficiency that might arise due to the payment of claims attributed to closed Insurance Years. (PX-223).  The Club responded that the only way of doing so was "*by assessing current members (i.e., open years) in sufficient amount to remedy any deficiency.*" (PX-224) (emph. added).  It did not suggest that coverage was "discretionary" or closed years could be re-opened.[23]

---

heading "Rule Book" that: "Substantive changes to the previous regime related only to the incorporation of a power to levy a release call and to certain technical rules concerning the recoverability of cargo's proportion of general average."

[20] *See, e.g.*, DX-CF: April 26, 1994 Letter from Sandercock to Gozzo of Deloitte & Touche at AC0079513: "The Club also *covers* claims by members of the crews of insured vessels who suffer bodily injury as a result of exposure to various substances found on ships...Most asbestos claims arise out of the period from 1940-1970 when asbestos was widely used on ships.") (emph. added).

[21] The Club eliminated this provision after refusing to continue to honor its coverage obligations under the Pre-1989 Policies in 2004. (*See* DX-IA: March 22, 2005 Letter from Solarino to Pearl, of Deloitte, at DT001209).

[22] The IG is a group of P&I Clubs that join in a reinsurance pooling arrangement.  In 1989, the Club became a "reinsured" member of the IG through London Steamship Club.  It did not become a full pooling member of the IG until 1998. (*See* McGowan Tr. at 146).

[23] Although the Club explicitly acknowledged its power to assess current members for deficiencies attributable to closed Insurance Years, this power is *not* at issue in this case.  The American Club, like any other insurer, has a

9

During the period 1996 to 2004, the Club continued to pay for ODCs in the same manner as it had previously done, without any reservation of rights to disclaim coverage. In *Prudential*, and other actions, the Club did not assert that coverage for ODCs was "discretionary," and it continued to confirm coverage for ODCs at the request of certain Defendants. (*See, e.g.*, PX-251). During this time the Club continued to assert control over the defense and settlement of asbestos claims, and raised no question concerning coverage until June of 2004. In total, the Club paid approximately $6.7 million to policyholders with respect to ODCs from Pre-1989 Insurance Years. (*See* PX-292; Solarino Aff. at ¶ 10). All were approved or recommended for indemnification by the Club's professional Managers, and several large ODCs were approved by the Club's Board of Directors, which included its Counsel. (*See, e.g*, PX-127; PX-168; DX-EM; DX-FO).[24]

After the Second Circuit's decision in *Prudential* in late 1998, certain Defendants challenged the Club's continued application of "stacked deductibles" and reserved their rights with respect thereto. (*See, e.g.*, DX-EW; DX-EY; DX-EH; DX-FQ). As late as February 18, 2004, the Club's counsel, in a letter to this Court, asserted that: "The Club's practice [of paying ODCs and applying stacked deductibles] is fully consistent with the insurance policy terms and applicable New York law.[25]  In June 2004, the Club abruptly reversed its position, terminated coverage and commenced this lawsuit.

---

contractual obligation to policyholders and an obligation to maintain minimum surplus requirements imposed by the New York State Department of Insurance. How the Club obtains the funds to meet its contractual obligations is not in issue in this case. Nor are the Club's current members parties in this case. In any event, the Club's contention that it cannot assess current members for closed year ODCs is without merit. (*See infra* at Point II D.3.).

[24] Notably, current Club Directors Sa, Recchuite and Sweeney voted to approve payment of several large ODCs and were on the Board since at least the mid-1990s. (*See, e.g.*, PX-168; DX-EM).

[25] See Letter dated February 18, 2004 from Lawrence A. Bowles to Hon. Lewis A. Kaplan, submitted in the matter of *Keystone v. Am. Steamship Owners Mut. Prot. and Ind. Ass'n., Inc.*, No. 02-CV-1477 (LAK).

ARGUMENT

I.    **The American Club Is Obligated To Indemnify Defendants For Occupational Disease Claims Under The Pre-1989 Policies**

A.    **The Pre-1989 Policies Expressly Provide Coverage for Occupational Disease Claims**

As Magistrate Judge Francis held, "the relationship between a mutual insurance association and its members is a contractual one." September 13, 2005 Order of Magistrate Judge Francis at 27 (citing cases). ODCs fall squarely within Clause 1 of the Pre-1989 Policies, in which the Club agreed to indemnify policyholders for: "Liability for life salvage, loss of life of, or personal injury to, or illness of any person...." (*See, e.g.*, PX-117: Policy). In *Prudential*, the Second Circuit held that the Policies provide coverage for ODCs.[26] 158 F.3d at 83. This decision is controlling here.[27]

B.    **The Pre-1989 Policies are in Full Force and Effect and Reflect the Club's Ongoing Contractual Obligation to Continue to Provide Coverage**

The Pre-1989 Policies are occurrence-based policies that provide coverage for occurrences that take place at some point during the policy period regardless of when the claim is made. *Prudential*, 158 F.3d at 83; *see also* 11 N.Y.C.R.R. § 70.1 (defining occurrence policy as one where a claim may be made subsequent to the policy period); *St. Paul Fire & Marine Ins.*

---

[26] Although the Second Circuit did not apply the "contra-insurer rule" due to the Club's status as a mutual insurer, (*id.* at 77), it nevertheless found that the scope of the Club's coverage obligation to its policyholder was to be determined by construing the involved insurance policies as contracts, not by applying principles of so-called "mutuality."

[27] *Res judicata* bars the Club from re-litigating the issue of coverage under the Pre-1989 Policies. *See B.R. De Witt, Inc. v. Hall*, 19 N.Y.2d 141, 278 N.Y.S.2d 596 (1967). In *Prudential*, an American Club policyholder and the Club sought judicial determination of the same issues being litigated in the instant suit, and the Second Circuit explicitly stated that the Pre-1989 Policies provide coverage for asbestos claims: "Prudential has the right to demand that a policy pay full coverage for each insurance claim in which the underlying Claimant suffered asbestos exposure and therefore asbestos injury during the policy period." *Prudential*, 158 F.3d at 86. The Defendants' interest in coverage for asbestos claims (occurring in closed policy years) is identical to Prudential's interest in its previous litigation with the Club. Since *Prudential* involved the precise type of insurance claims at issue in this case, the Club had every reason to assert all possible defenses to coverage in its litigation with Prudential and has no excuse for not having done so. Therefore, the Club should be barred from relitigating the coverage issue under the doctrine of *res judicata*.

11

*Co. v. Barry*, 438 U.S. 531, 535 n.3, 98 S. Ct. 2923, 2927 n. 3 (1978) (distinguishing occurrence and claims-made policies). Although the Club seeks to transform its Pre-1989 Policies into a species of claims-made policy that requires claims to be reported before an Insurance Year was closed,[28] "[t]he court is not at liberty to inject a clause into the policy or to make a new contract for the protection of the insurance company." *Taylor v. United States Cas. Co.*, 269 N.Y. 360, 363 (1936); *see also Sperling v. Great Am. Indem. Co.*, 7 N.Y.2d 442, 447, 199 N.Y.S.2d 465, 469 (1960); *Spence v. Med. Mut. Liab. Ins. Soc.*, 65 Md. App. 410, 421 (1985) (coverage under occurrence-based policy not extinguished on the closing of an Insurance Year). The Policies contain no exclusion for claims reported after closure of the Insurance Year,[29] and the cancellation provisions in the Club's Pre-1989 Policies make no reference to the closure of Insurance Years.[30] (*See, e.g.*, PX-117).[31]

---

[28] The Club relies on two wholly inapposite cases in support of its argument that the closure of an insurance year results in the termination of the Club's coverage obligation with respect to unreported claims. *See Hyde v. Lynde*, 4 N.Y. 387 (1850) and *Patrons of Industry Fire Ins. Co. v. Harwood*, 64 A.D. 248, 72 N.Y.S. 8 (3d Dept. 1901). Neither case involved the question of whether coverage continued after the closure of an insurance year. Rather, both cases involved the question of whether a former policyholder remained liable for assessments after the surrender or cancellation of an insurance policy or note, and in both cases the insured clearly understood that coverage had ended by virtue of giving up the note or policy. The Pre-1989 Policies, however, have neither been surrendered nor cancelled. (*See, e.g.*, Weedman Aff. at ¶ 9). Nor was there any "final statement of account" between Defendants and the Club. The Club made a unilateral decision to close insurance years, and Defendants paid all amounts required by the Club in connection therewith. They did not negotiate a release or limit on coverage in return for the payment of that amount.

[29] It was the Club's obligation to set forth any exclusion clearly and explicitly, which it did not. *See Seaboard Sur. Co. v. Gillette Co.*, 64 N.Y.2d 304, 311, 486 N.Y.S.2d 873, 876 (1984).

[30] Further, nothing in the Pre-1989 Policies purports to limit the Club's coverage obligations to specific assets of the Club, such as funds collected from a particular Insurance Year. (*See* McGowan Tr. at 321).

[31] Even if cancelled, the policies would remain effective as to ODCs because these were risks that already accrued as of the cancellation date. *See Duncan v. New York Mut. Ins. Co.*, 138 N.Y. 88, 92 (1893); *Magaliff v. New York Life Ins. Co.*, 247 A.D. 810, 286 N.Y.S. 303 (2d Dep't 1936).

C.    **The Parties' Conduct with Respect to Occupational Disease Claims
Demonstrates that Such Claims are Covered by the Pre-1989 Policies**

There is overwhelming evidence that both the Club and its insureds understood the Pre-

1989 Policies (and all polices for that matter) covered ODCs regardless of whether such claims

were reported prior to the closure of the relevant Insurance Year.[32]  Over the past twenty-five

years, the Club repeatedly and continuously paid ODCs arising during closed Insurance Years.

Since 1988, the Club has assessed policyholders and current members to strengthen the Club's

reserves for the purpose of payment of such claims.  At no time did the Club reserve any

purported right to deny coverage for such claims or notify its policyholders it was paying such

claims on a so-called "discretionary basis."[33]

Policyholders submitted ODCs to the Club for indemnification on the basis that such

claims were covered by the Pre-1989 Policies, and the Club paid them on the same basis.  The

---

[32] The Club's practical construction of its coverage obligations is entitled to great weight and, in this case, is dispositive on the point. *See Continental Cas. Co. v. Rapid-American Corp.*, 80 N.Y.2d 640, 651, 593 N.Y.S.2d 966, 971 (1993) (evidence of practical construction admissible in the event of ambiguity).  Further, expert testimony provided by Coghlin, Defendants' expert witness, establishes that the custom and practice within the P&I industry is that claims are covered regardless of whether they are reported prior to the closure of an Insurance Year.  (Coghlin Aff. at ¶¶ 63, 64, 89-96).  Coghlin's testimony is entitled to great weight as the Second Circuit recognizes the importance of custom and practice in interpreting marine insurance policies. *See, e.g., Antilles S.S. Co. v. Members of Am. Hull Ins. Syndicate*, 733 F.2d 195, 198 (2d Cir. 1984).

[33] *See, e.g.,* Fisher Aff. at ¶¶ 10-11; Bihn Aff. at ¶ 7; Achuff Aff. at ¶ 11; Gronda Decl. at ¶¶ 27-28; Peterson Decl. at ¶ 4; Weedman Aff. at ¶ 11, 30, 45, 52-53, 62-63; Popov Aff. at ¶ 11; Lowson Aff. at ¶ 6; Ladmer Aff. at ¶¶ 6-7).  The Club's Director, Managers and Counsel always believed coverage existed. (*See* Kurz Aff. at ¶¶ 34-36; Kennedy Aff. at ¶¶ 26-28; Gronda Decl. at ¶¶ 27-29; Valerius Aff. at ¶¶ 28-31).  The Club suggests that its conduct was the result of its misinterpreting its own legal obligation during that period or alternatively that it should not be bound by decisions made by previous Boards.  However, both of these arguments have been appropriately rejected as defenses to practical construction under similar circumstances. *See Warner-Lambert Pharm. Co. v. John J. Reynolds, Inc.*, 178 F. Supp. 655, 667 (S.D.N.Y. 1959) ("[S]ome twenty-five years elapsed between public disclosure, of which the plaintiff's predecessor was fully and completely aware, and the time when the plaintiff asserted its right to terminate this obligation because of such disclosure.  During that entire period the plaintiff's predecessor, with full knowledge of the facts on which it now relies, continued to make the periodic payments required by the contract without protest and without the slightest indication that it considered that its obligation had been terminated... During this period the Lambert Company was no innocent lamb wandering in the wilderness of big business ready to be shorn.  It carried on a highly successful business on a large scale.  It had available the advice of competent counsel.").  The Club, upon the advice of its Counsel and its professional Managers, provided indemnification for ODCs under the Pre-1989 Policies without protest for over twenty-five years.  Like the plaintiff in the *Warner-Lambert* case, the Club should be bound by the practical construction it has applied to the Pre-1989 Policies.

Club has waived any purported right to deny coverage as to ODCs based on such claims being unreported at the time of closure[34] and should also be estopped from denying coverage. *See Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 95 (2d Cir. 2002) (estoppel arises where an insurer acts in a manner inconsistent with a lack of coverage, and the insured reasonably relies on those actions to his detriment); *Frazier v. Royal Ins. Co. of Am.*, 110 F. Supp. 2d 110, 115 (N.D.N.Y. 2000) (insurer estopped from denying coverage where insurer's delays in disclaiming coverage caused insured to believe there was coverage). Defendants clearly relied upon the Club's representation of coverage. (*See, e.g.,* Fisher Aff. at ¶¶ 13-17; Gronda Decl. at ¶¶ 30-32 Weedman Aff. at ¶¶ 36-37).[35]

---

[34] In addition to this general waiver as to all ODCs, the Club has, with respect to the Farley claim (a claim for which it provided indemnification subject to a reservation of rights), waived its right to deny coverage by expressly acknowledging coverage and asserting control over the defense of the Farley claim by insisting that counsel of its choice be assigned to defend the claim. (*See* DX-GU: January 30, 2004 E-mail from Strevell, SCB Claims Manager, to Belinske, instructing Keystone to hire Dante Mattioni; DX-GP: November 13, 2003 E-mail string among Strevell, Quigley and Belinske, regarding the engagement of Mattioni; Fisher Aff. at ¶¶ 22-23; Achuff Aff. at ¶ 22.). *See Tidewater Oil Co. v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n*, 156 Misc. 367, 373, 281 N.Y.S. 729, 736-737 (N.Y. Sup. Ct. 1935).

[35] Plaintiff's denial of coverage is utterly baseless and, therefore, Defendants should be awarded attorneys' fees. *Sukup v. State,* 19 N.Y.2d 519, 522, 281 N.Y.S.2d 28, 31 (1967) (award of attorneys' fees warranted where "no reasonable carrier would, under the given facts, be expected to assert" such a denial of coverage); *Ingersoll Milling Mach. Co. v. M/V Bodena,* 829 F.2d 293, 309 (2d Cir. 1987).

In addition to the arguments presented on behalf of all Defendants who are signatories to this brief, Defendants American President Line, Ltd., sued herein as American President Lines, Inc., and American President Lines, Ltd. as Successor to American Mail Line (collectively "APL"), are entitled to judgment on their claim that the Club violated California' Business and Professions Code ("Code"). Plaintiff suddenly refused to indemnify Defendants for ODCs under Pre-1989 Policies and attempted to rewrite the policies, and ignored its obligations, all in an attempt to force Defendants to acquiesce in the complete loss of coverage. This conduct constitutes a violation of Section 17200 of the Code, which prohibits unlawful and unfair business acts and practices. *See Smith v. State Farm Mut. Auto. Ins. Co.*, 93 Cal. App. 4th 700, 717 (2d Dist. 2001). Breach of contract or breach of the implied covenant of good faith or fair dealing are cognizable pursuant to Section 17200's prohibition against unlawful practices. *See Moradi-Shalal v. Fireman's Fund Ins. Cos.*, 46 Cal. 3d 287, 289 (1988). By excluding coverage for claims not reported before an insurance year was closed, the Club has breached the Pre-1989 Policies that provide coverage for ODCs and committed an unlawful practice pursuant to Section 17200. The "unfair" standard provides an additional and independent basis for relief. *See Smith*, 93 Cal. App. 4th at 718. Here, the Club's practices are especially unfair given the fact that the Club paid ODCs arising during closed insurance years and did not suggest that it was only paying such claims as a matter of discretion.

II.    **The American Club Has No Right to Further**
       **Assess Policyholders from Insurance Years Prior to 1989**

    A.    **Pursuant to New York Law, and in Accordance with the Club's Policies and**
              **By-Laws, No Further Assessments Can Be Ordered Against Defendants**

By statute, New York law expressly authorizes a mutual insurance company to set forth

in its By-Laws limitations on the aggregate amount of its members' contingent liability for

assessments.[36]  Section 4111(a) of the New York Insurance Law provides:

> . . . each member shall be liable to pay the member's proportionate share, *subject to the*
> *limitations hereinafter specified*, of the amount of any assessment or assessments
> permitted for any purpose under any provisions of this chapter *or necessary to make good*
> *an impairment of the minimum surplus of such company. . . . The aggregate amount of*
> *all assessments* whether levied by the board of directors of such insurer or by the
> superintendent as liquidator or rehabilitator of the insurer, or otherwise, *shall be no*
> *greater amount than that specified in the by-laws and polices.*[37] (emph. added).

Under this statute, former members of a mutual insurer do not remain liable for assessments

except in limited circumstances not applicable here.[38]  However, current members are liable for

---

[36] New York courts have upheld provisions limiting a mutual insurer's assessment rights. *Cf. Kelly v. Bremmerman*,
21 N.Y.2d 195, 204, 287 N.Y.S.2d 41, 47 (1967) (holding that time limitation upon policyholder's liability for
assessments was valid because it did not conflict with statute), *citing Van Schaick v. Stiering*, 141 Misc. 461, 463,
253 N.Y.S. 235, 238 (N.Y. Sup. Ct. Albany Co. 1931) ("When the period of liability for assessment expired, the
right to levy assessment likewise expired."); *see also Skaneateles Paper Co. v. Am. Underwriters' Fire Ins. Co.*, 61
Misc. 457, 464, 114 N.Y.S. 200, 205-206 (N.Y. Sup. Ct. Monroe Co. 1908).

[37] Section 4111(a) of the New York Insurance Law also requires that the effect of the by-law provision be clearly
articulated in the assessable policies issued by the mutual company. N.Y. INS. L. § 4111(a) (2006).

[38] Section 4111(b) and 7430 are the only provisions of the New York Insurance Law which allow for assessment of
former members, and both apply only to those former members in the one year period before the making of an
assessment ("one-year lookback") and only where an "impairment" of statutory surplus exists. This is inapplicable
here because it applies solely to former members within one-year of an assessment order authorized by the
Superintendent of Insurance and only where statutory impairment exists. There is no statutory impairment in this
case—the Club's surplus as of December 31, 2004 was $35,298,589. (PX-266), and in response to the Keystone
Defendants' Requests for Admission ¶ 133 (DX-1L), the Club admitted that it "has assets deemed sufficient to
provide currently projected indemnities to Closed Year Members and sufficient to meet the $7.5 million minimum
surplus requirement of the New York State Department of Insurance." (*See also* PX-262 at AC32163; Hughes Tr. at
361-63). Moreover, almost all Defendants withdrew from the Club many years ago and thus are no longer members
of the Club, nor are they subject to the "one-year lookback" provision.

assessment for any purpose permitted by the Insurance Law or to "make good" an impairment of minimum surplus of the company.[39]

In accordance with § 4111(a), the American Club's By-Laws during the applicable period set forth a mechanism for the Club to "fix and determine" the amount of *final* assessments (or final refunds) and thereby cap its policyholders' assessment liability.[40] Article VI, Section 4 of the Club's By-Laws (As amended September 17, 1987, and in effect since 1958), provides:

> From time to time after the termination of each insurance year, when the manager shall determine that it is practicable to estimate with a reasonable degree of certainty the minimum, probable or *final* surplus or deficiency resulting from *all* of the Corporation's insurances in effect during such insurance year, the manager shall place before the board of directors a statement of such financial results of such insurances[.]. . . After receipt of any such statement, the board of directors from time to time may (a) *fix and determine* an amount to be declared and paid as a partial or *the final* dividend, after retaining such sums as they may deem necessary to meet outstanding policy obligations or for the maintenance of reserves and surplus of the Corporation, or (b) order an *interim* or *the final* assessment to be made against the holders of assessable policies . . . .

(*See* PX-109) (emph. added). This By-Law provision plainly limits the Club's right of assessment once a "final" dividend or assessment is declared or ordered and the year closed, and has always been understood by the Club's Board, Managers and Counsel (*see* Brown Rebuttal Aff. at ¶ 5) as providing for "closure" of Insurance Years. (*See, e.g.,* PX 35: June 17, 1977 Board Minutes with attachments, including Opinion Letter and Resolutions at AC3046566: "RESOLUTIONS TO CLOSE INSURANCE YEAR 1967 By DECLARATION OF A FINAL REFUND OF ASSESSMENTS FOR SAID YEAR.").

---

[39] The Club's contention that current members could not, under the Club's By-Laws, be assessed to pay deficiencies resulting from closed year claims therefore is without merit and would be contrary to New York statute as the Club itself recognized. (*See infra.* at 28).

[40] The Club's power to levy assessments is dependent upon and limited by the provisions of its By-Laws, to the extent they comport with the enabling statute. (*See* n. 57 *infra.*) *See Bray v. Grand Lodge, K.P.,* 121 Misc. 764, 766, 202 N.Y.S. 219, 220 (N.Y. Sup. Ct. Westchester Co. 1923) ("[i]t is fundamental that the power to levy fines, dues and assessments depends upon the provisions of the charter. . . .and by-laws."); *see also Spence v. Med. Mut. Liab. Ins. Soc.,* 65 Md. App. at 419 (citing 13A Appleman, *Insurance Law and Practice* § 7582 (1976)).

The reference in the Club's By-Laws to "the final" assessment[41] or "the final" refund (as distinguished from an "interim" assessment) authorizes the Board of Directors, acting on behalf of the Club, to *terminate* its members' (or policyholders')[42] contingent assessment liability for all claims falling within the Insurance Year. Nothing in the Club's By-Laws purports to authorize the Club to order further assessments after a year has been closed.

The Club's Pre-1989 Policies incorporated, at all relevant times, the assessment provision of the By-Laws, including its provision regarding closure, as follows:

> The Assured are subject to a contingent liability hereunder for assessment without limit of amount for their proportionate share of any deficiency or impairment as provided by law and *fixed in accordance with the by-laws* of the Association; . . .

(PX-117) (emph. added). Thus, under the Policies, the policyholders' contingent assessment obligation is subject to termination by the Club in accordance with its By-Laws.

The record evidence overwhelmingly demonstrates that the American Club's Board resolutions closing Insurance Years were intended to terminate its policyholder's contingent assessment liability – including for subsequently reported claims. This evidence includes (but is not limited to) the following:

- While issuing "final" assessments and "final" refunds and describing that process as the "closure" of the Insurance Year, the American Club never notified its

---

[41] The plain meaning of the word "final" in the By-Laws is that there will be no further assessment after an Insurance Year has been closed. *Cf. Aloya v. Planning Bd.*, 241 A.D.2d 73, 76, 671 N.Y.S.2d 124, 126 (2d Dep't 1998) (the word "final" is unambiguous, and means "'conclusive,' 'definitive,' 'terminated' or 'completed.'"); *People v. Gaggi*, 104 A.D.2d 422, 424, 478 N.Y.S.2d 752, 734-735 (2d Dep't 1984) ("In legal terminology 'final' means . . . necessarily precluding review; precluding further controversy on the question passed upon; that which absolutely ends or concludes a matter."). Textually, the definite article "the" preceding the phrase "final assessment" connotes the *only* one and further conveys the notion of finality.

[42] A policyholder is only a "member" during "the period while such policy is effective to insure risks." (PX-7, Charter, Art. 4). This refers to the policy period, not the subsequent indeterminate period during which claims may be brought under an occurrence-based policy. This is confirmed by the fact that Plaintiff has not afforded Defendants voting rights to which they would be entitled as "members" since they withdrew from the Club. *See* PX-283, Article 1, Section 2; *and see* N.Y. INS. L. §1211; *Mygatt v. N.Y. Prot. Ins. Co.*, 21 N.Y. 52, 63 (1860) (membership in a mutual insurance company refers to voting rights in the election of directors).

policyholders that they continued to be liable for assessments after Insurance Years were closed.[43]

- Upon "closure" of Insurance Years, the Club treated all funds contributed by the members of that year as its own, and did not recognize any further obligation to account to the membership of that year with respect to post-closure developments, in effect closing its own books on Closed Insurance Years. (*See, e.g.,* Solarino Tr. at 80-81, 218-219).

- In closing Insurance Years, the Club's Directors intended that closed years could not be "re-opened" for further assessment. (*See* Gleason Decl. at ¶ 23; Gronda Decl. at ¶ 11; Kennedy Aff. at ¶ 18; Kurz Aff. at ¶ 22-23; Valerius Aff. at ¶ 18).

- The Club's current Manager, Mr. Hughes, admits that, in the mutual P&I industry, a "final call" implies that an Insurance Year will not be "re-opened." (*See* Hughes Tr. at 137-138).

- When the Club became aware of the assertion of ODCs in the 1970s, it did not assert a right to further assess policyholders from previously closed years, but instead increased its reserves to pay for them through contributions from current members and maintained reserves for closed year claims on its books and paid for such claims from its general reserves until the Club brought this litigation. (*See, e.g.,* DX-GQ at KEY22127; DX-IL at ¶ 57).

- In 1988, the Club's Managers proposed that an additional amount be reserved for "Torrens like claims," deeming such a reserve was "not only prudent but, perhaps, vital to ensure the ongoing solvency of the Association's surplus funds when called upon to pay claims of this category." (PX-120 at Key 002730). Such claims were described as "unfunded, unreported loss" that would be "paid from general reserves." *Id.*

- The Club has long recognized that unknown claims may arise after closure of an Insurance Year and such claims must be paid from its general reserves. (*See, e.g.,* DX-AI: November 13, 1980 Memo by Cassedy, then Manager of the Club, re: Use of Reserve Account at AC3051841: "On occasion, it is possible the Account will drop below that mark because of other reasons such as, closed years' claims being settled for amounts higher than reserved, *unknown claims for accidents in closed years being settled...*" (emph. added); DX-AF: June 22, 1978 letter, attaching June 25, 1975 memo by Gusmano, former Club Counsel, from Kirlin,

---

[43] The Club's attempt to construct an argument through the purported "expert" testimony of its counsel, Mr. Brown, that Board resolutions resolving that years be "finally closed" (*see* Brown Reb. Aff. at ¶ 15) in the 1940s and 1950s "notified" policyholders that they might be assessed for future "unknown" claims strains credulity beyond the breaking point. Nothing in these resolutions advised policyholders that they could be further assessed after Insurance Years were closed. If the Club wished to so inform its policyholders it could easily have done so in clear and unequivocal terms. It did not.

and Board member at AC0039980: ("What develops, however, is sometimes the amount set aside under 'Reserve' for *possible claims which might arise after a year is closed* is more than needed." (emph. added)).

- In a Finance Committee meeting on October 12, 1989, American Club director Kennedy commented that the "Reserve Account is attractive to BP America because it provides protection to losses arising in closed years where members *cannot be assessed further*." (DX-BK) (emph. added).

- The Club represented, under oath, to the U.S. Bankruptcy Court for the Southern District, that: "Once the Insurance Year is 'closed' no further assessments are levied." (DX-BY: Affidavit of McGowan, November 20, 1991, submitted in *Prudential*, at ¶ 6).

- The March 1995 Draft of Coopers & Lybrands' ("C&L") Financial Review of the American Club stated, in language with which the Club's manager agreed, that: "*The primary purpose of the reserve account is to permit funding of any losses or claim-related expenses which may develop in closed years **which are not specifically reserved for***." (bolded section was handwritten by the Club's then Manager McGowan (McGowan Tr. at 428)) (*See* DX-CP at AC0075406).

- In 1996, the Club represented to the IG that: "After closure, there has never been a re-opening of a year to make further assessments. The Club is required to maintain adequate reserves and surplus, and the *only practicable way of doing that if a deficiency arises* which is not attributable to an open year, including one attributable to any closed year, is *by assessing current members (i.e. open years) in sufficient amount to remedy any deficiency*." (*See* PX- 224) (emph. added).

- Referring to the newly created Contingency Fund, the Club stated in its 1997 Annual Report that: "The reserve remains available at the discretion of the Directors . . .the *need to maintain* the *adequate funding of closed policy years remain paramount considerations in the use of relevant funds*." (DX-EB at AC0052762) (emph. added).

- At the June 13, 1996 Board meeting, the Directors resolved that: "In discussing this recommendation [to close the 1992 Insurance Year], the Directors wished to make clear that when taking action to close a year *it is their intention that such closed year cannot be reopened unless through the operation of New York statute*." (emph. added) (PX-222). The contemporaneous handwritten notes of Charles Kurz, II, then Chairman of the Club, taken at the Finance Committee meeting the day before the June 13, 1996 Board action, memorialize the understanding at that time that "*all previously closed years are officially CLOSED*." (DX-DG); *see also* the similar statement in Kurz's notes of September 11, 1996 (DX-DM) ("*all closed years are closed and not subject to future assessment*." (emph. added)).

- In 1997, while the IG was evaluating the Club's membership application to become a full, rather than reinsured, pooling member, C&L studied its financial accounts. In his notes on C&L's comments, Solarino, the Club's long time financial officer, wrote, "It must be noted that the Club ultimately has the ability to assess its members for an amount equal to the statutory admitted asset. (*Can't assess closed years*)". (DX-EC  (emph. added); *and see* Solarino Tr. at 283-84).

- The Club's 1997 Rules incorporated a provision specifically stating that after the Board declares a year closed for assessments "*no further assessments shall be levied in respect thereof.*" (PX-234, Rule 4, Section 11) (emph. added).

- In November of 1999, Sandercock, the Club's legal compliance officer, represented to the New York State Insurance Department that: "The members are *released* from liability for assessment when the Board of Directors resolves to close the policy year." (DX-FC) (emph. added).

- It is a well-established custom and practice in the mutual P&I industry that closing an Insurance Year releases a policyholder's liability for further assessments. No other club has ever "re-opened" a closed year or taken the position that a closed year can be re-opened. (*See* DX-IJ: Coghlin Report at 21, 22; *and see* Coghlin Aff. at ¶¶ 52-67).

- Shipowners press for closure of Insurance Years so that they can close their books on "long-tail liability." (*See* McGowan Tr. at 119-122).

**B.     The Closing of Insurance Years Was a Release**

Under New York law, any words may be used to grant a release so as long as they manifest the releasor's intent to discharge. *Marvel Entm't Group, Inc. v. Young Astronaut Council*, 747 F. Supp. 945, 948 (S.D.N.Y. 1990). The signed minutes of a board of directors' meeting can provide written memorialization of an agreement such as a release. *See DFI Communications, Inc. v. Greenberg*, 41 N.Y.2d 602, 607, 394 N.Y.S.2d 586, 590 (1977). Here, the Club's resolutions closing Insurance Years were clearly intended to finally "fix and determine" the aggregate amount of the assessment liability for the Insurance Year. (*See, e.g.,* PX-109 at Article VI, Section 4; PX-35 at AC3046566-9). They unequivocally conveyed the Club's intention to discharge policyholders from further assessment liability. (*See* Gleason Decl. at ¶ 23; Gronda Decl. at ¶ 11; Kennedy Aff. at ¶ 18; Kurz Aff. at ¶¶ 22-23; Valerius Aff. at ¶ 18).

20

C.    **The Club is Barred by the Doctrines of Waiver and
Estoppel from "Re-Opening" the Pre-1989 Insurance Years**

The Club also waived any right to "re-open" previously closed Insurance Years by,

among other things, confirming coverage for ODCs and electing to charge its current members

$100,000 per year as a provision for future payment of such claims.[44] *See, e.g., T.G.I. East

Coast Constr. Corp. v. Fireman's Fund Ins. Co.*, 600 F. Supp. 178, 181 (S.D.N.Y. 1985) (waiver

is implied by law when a party's conduct is inconsistent with an intent to enforce a right). It

further waived any right to re-open in 1996, when the Board of Directors explicitly reaffirmed

"that when taking action to close a year it is their intention that such closed year cannot be

reopened unless through the operation of New York statute." (See PX-222).

Although the Club now seeks to characterize its 1996 resolution as "prospective only,"

this characterization cannot withstand scrutiny. First, Board members have provided testimony

that this resolution was not "prospective only." (*See* Kurz Aff. at ¶ 23, Gronda Decl. at ¶ 13;

Gleason Decl. at ¶ 27). Second, the impetus for the clarification was Brown's suggestion, first

made in late 1993 and discussed among the Finance Committee in 1996 in connection with

creation of the Contingency Fund, that previously closed Insurance Years could be "re-opened"

if necessary to defend the claims of bankrupt former members. (*See* PX-215: March 8, 1996

letter from McGowan to the Finance Committee with attached correspondence between Gleason

and Brown). It is inexplicable that the Club would make such a "prospective only" clarification

when, according to the Club's witnesses, it has been understood since 1989, when the Club

---

[44] This action is also inconsistent with the Club's contention that it had no power to assess its current members for payment of closed year claims until it passed a new Rule to that effect in 2005. It clearly did just that in 1988 and subsequent years to cover its liability for asbestos claims such as *Torrens* in previously closed years.

21

became a reinsured member of the IG,[45] that closed years could not be re-opened and the asbestos claims mainly implicated earlier years. (*See, e.g.*, Hughes Tr. at 137). The Board's statement clearly was intended to *reaffirm* the finality of closure with respect to *previously* closed (as well as yet to be closed) years in response to proposed arguments to the contrary. This intention is confirmed by the contemporaneous notes taken by Charles Kurz II at preceding and subsequent Finance Committee meetings. (*See* DX-DG; DX-DM).

The intent of the Board (followed immediately by adoption of an explicit Rule to the same effect in 1997) was to *prohibit* re-opening of previously closed Insurance Years *except* where mandated by statute.[46] Any other explanation would render the Board's statement meaningless. The Club's interpretation, under which an Insurance Year can be re-opened whenever the Club's current management concludes that "mutuality" so requires, would nullify the restriction that Insurance Years "*cannot* be reopened *unless* through *operation* of New York statute." (*See* PX-222). Moreover, the only New York statute through whose "operation"

---

[45] Although the Club sought to characterize this as a new understanding commencing with its indirect membership in the IG in 1989, there is no evidence that the Club's understanding of closure of an Insurance Year changed in 1989 or differed in any way from the understanding prevalent within the IG.

[46] The reference in the 1996 Board minutes "unless through the *operation* of New York statute" clearly refers to the one-year lookback provision contained in § 4111(b) (or the same provision in § 7430), which provides for issuance of assessments against former members only within one-year of the assessment order where the Club's statutory surplus is impaired. (*See supra* at 21). That "unless through the operation of New York statute" was intended to refer to this statutory provision is made clear by Gleason's specific reference of it in his January 22, 1996 letter to Brown (which was distributed to the Finance Committee). In this letter, Gleason, a member of the Club's Board and Finance Committee, expressed his understanding (consistent with prior legal advice from Kirlin), that (a) even if the amounts set aside upon closing prove inadequate to satisfy "all the policy liability for the closed Insurance Year," policyholders from that year could not be further assessed and (b) that the only exception to this understanding was the one-year lookback provision in § 4111(b). (*See* PX-210: January 22, 1996 Letter from Gleason to Brown, quoting the Fallon letter, PX-37, of course, it is recognized "[b]y Statute when the New York State Superintendent of Insurance institutes a proceeding to permit him to supervise the activities of a mutual insurance company, which is encountering financial difficulties, that even if an Insurance Year has been closed an <u>assessment may be levied against an insured who was a member at any time within one year prior to the institution of such proceedings.</u>" (emph. in the original) (Fallon here refers to former Insurance Law § 541 which is now § 7430, but Gleason references § 4111 which is substantively the same as to the assessment of former members.). The June 13, 1996 resolution thus affirmed the Club's long-held understanding regarding closure as set forth in Gleason's letter to Brown.

former members could be assessed, which *may* extend liability beyond closing, is the one-year lookback provision of § 4111(b), also contained in § 7430. Accordingly, the Club waived any argument that it now has the right to "re-open" Insurance Years unless such act is mandated and done in accordance with the one-year lookback provision.

The Club also should be estopped from "re-opening" long closed Insurance Years. Estoppel precludes a party from denying a certain fact or state of facts exists to the detriment of another party who was entitled to rely on such facts and had acted accordingly. *See Nassau Trust Co. v. Montrose Concrete Prod. Corp.*, 56 N.Y.2d 175, 184, 451 N.Y.S.2d 663, 667 (1982). Like waiver, estoppel may be based on express representations or statements, or on specific acts or conduct. *See Star Ring Mfg. Co. v. Fireman's Fund Am. Ins. Cos.*, 49 A.D.2d 1007, 1008, 374 N.Y.S.2d 171, 173 (4th Dep't 1975) (conduct by one party inconsistent with a position later adopted is prejudicial to the rights of another who relied on such conduct); *One Beacon Ins. Co. v. Old Williamsburg Candle Corp.*, 386 F. Supp. 2d 394, 401 (S.D.N.Y. 2005) (Kaplan, J.).

The American Club's closure of Insurance Years with no reservation of any right to further assess for any purpose, as well as its reserving practices with specific reference to IBNR and its repeated statements that the purpose of its reserve account was to pay for claims in closed insurance years, constituted representations to policyholders that they would not be subject to liability for further assessment after insurance years were closed. Defendants relied on the Club's express statements, specific acts and conduct as described above to their detriment. (*See, e.g.*, Gronda Decl. at ¶ 12; Fisher Aff. at ¶¶ 19-20; Valerius Aff. at ¶¶ 23-25; Kennedy Aff. at ¶¶ 12-13; Bland Decl. at ¶¶ 45-46).

Finally, the Club also is barred by the doctrine of laches from contesting the closure of the long-closed Insurance Years at this late date. *See Congregation Yetev Lev D'Satmar v. 26*

23

*Adar N.B. Corp.*, 219 A.D.2d 186, 191, 641 N.Y.S.2d 680, 683-684 (2d Dep't 1996). The Club had all of the information necessary to investigate the coverage and payment of ODCs since at least the early 1980s, and was aware of Brown's "re-opening" theory in late 1993. There is simply no excuse for the Club's delay in bringing this action. *See, e.g., One Beacon*, 386 F. Supp. 2d at 398-99; *Continental Ins. Co. v. Allianz Ins. Co.*, 2001 WL 289959 (S.D.N.Y. March 23, 2001).

### D. Plaintiff's Arguments that It has a Right to Order Post-Closure Assessments Find No Support in the By-Laws, Applicable Law, or Policy

#### 1. The Board of Directors had the power to close years as to known and unknown claims.

Recognizing the legal and factual weakness of its attempts to "re-open" closed Insurance Years, the Club has concocted a new argument: that its closing of an Insurance Year was only a partial closing, *i.e.*, only as to "known" claims, which it interprets as only those claims that it both "knew about and had enough information to reasonably reserve for." (*See* Brown Reb. Aff. at ¶ 7). This self-serving litigation construct finds no support in the By-Laws or the conduct of the Club over the past twenty-five years.

Nothing in the Club's By-Laws distinguishes "known" from "unknown" claims. To the contrary, the relevant By-Law provision clearly refers to the "*final* surplus or deficiency resulting from *all* of the corporations [sic] insurances in effect during such Insurance Year...." (*See* PX-109). The finality of closure in the Club's By-Laws refers to the Club's ability to assess or refund, not to its liability under its *insurance policies*, nor to any particular claims which may have been "known" or "unknown" at the time of closing.[47] The distinction between "known"

---

[47] By the same token, under the American Club's By-Laws, Insurance Years are to be closed on the basis of estimation of the results of an Insurance Year in their totality, not separately with respect to different categories of

and "unknown" claims is also foreign to occurrence based P&I coverage. An interpretation that would narrow closure of an Insurance Year solely to those claims which the Club "knew" about and had enough information to reserve for would mean that an Insurance Year could *never* be closed, thus defeating the whole purpose of closure.[48] (*See, e.g.*, McGowan Tr. at 119-122).[49]

Contrary to the proffered testimony of the Club's purported "expert," the Club never at any time construed its By-Laws as limiting closure to "known" claims or precluding closure as to claims for IBNR events. Brown's belated argument for "re-opening" years, first asserted in late 1993 after all of the pre-1989 Insurance Years were closed, presumed such years had previously been "closed" as to both ODCs or any other claims. In addition, when the Club set aside reserves for IBNR ODCs beginning in 1988 *as part of the closure of open Insurance Years in which those claims had not occurred*, it was well aware that IBNR reserves had not previously been set aside for such claims. Yet no suggestion was made that previously closed Insurance Years had remained open with respect to "unknown claims."

Moreover, in its 1997 Rules, the Club inserted a new provision in its Rules providing that: "The Board may declare any policy year closed for assessments *notwithstanding that it is known or anticipated that there are in existence or may in the future arise legal costs, charges or disbursements recoverable in respect of such policy year which have not yet accrued or the*

___

claims. (*See* PX-109 at Article VI, Section 4: ". . . resulting from all of the Corporation's insurances in effect during such insurance year . . ."). No provision in the By-Laws authorizes assessments for particular categories of claims in the Insurance Year, so long as the year, as a whole, is not in a deficiency position. (*See, e.g.*, Solarino Tr. at 226).

[48] The American Club's reliance on a rule once contained in the Britannia Club's Rules is, if anything, the exception which proves the rule. In 1967, a former Britannia rule provided for a closure as to known claims, and permitted further calls for claims later reported. However, the American Club has never had such a provision nor notified its policyholders of such practice. Moreover, as Coghlin explains, the Britannia rule was rarely, if ever, used (of which he found no evidence) and was eliminated in 1968 to conform with the industry norm. (*See* Coghlin Aff. at ¶¶ 54-57).

[49] *Cf. Gray v. Daly*, 40 A.D. 41, 44-45, 57 N.Y.S. 527 (2d Dep't 1899).

*validity, extent or amount of which have yet to be established.*" (*See* PX-234 at Rule 4, Section 11) (emph. added). At the same time the 1997 Rules retained the language from the Club's previous By-Laws, predicating closure upon a determination by the Managers that it was practicable to estimate the Club's liability for the Insurance Year with a "reasonable degree of certainty." (*See* PX-234 at Rule 4, Section 4). Clearly, the Club did not view the closure of Insurance Years (with a $100,000 provision for future ODCs since 1988) as in any way inconsistent with the By-Law language regarding estimation of liabilities with a "reasonable degree of certainty." Rather, its Rules expressly endorsed the practices previously followed.

Further, the Club's proffered distinction between "known" and "unknown" claims is specious. To call a claim "unknown" simply because the resulting liability is difficult to estimate is simply wrong. Moreover, there is no substantive difference between a claim that is reported to the Club but may be years away from resolution when the Insurance Year is closed, and incurred but not reported ODCs the existence of which the Club was well aware of from the late 1970s. (*See* Coghlin Aff. at ¶¶ 49-51). Whether reported or not, the Club had the power to set reserves for existing or future claims, and cannot come back to the members for more money if its "estimates" turn out to be wrong. By electing to close Insurance Years, the Club took the risk that its decision regarding the reserves it set (or did not set) could turn out to be inaccurate.[50] It is no different than any other insurance company, which cannot be heard to complain if, in retrospect, it failed to charge enough in premium for covered claims.

Once the Club became aware of ODCs, it confirmed and ratified its prior closure of Insurance Years by charging *current* members for such claims from 1988 forward and by

---

[50] As stated earlier, considering the substantial funds attributable to the Pre-1989 Insurance Years, it is far from clear the Club's "estimates" were wrong. Under the Club's argument, coverage would be barred for "unknown" claims even if the reserves set for such claims were in fact reasonably accurate.

confirming in 1996 that previously closed Insurance Years would not be re-opened. Thus, its

closure of previously closed years is binding. *See IBJ Schroder Bank & Trust Co.v. Resolution*

*Trust Corp.*, 26 F.3d 370, 375 (2d Cir. 1994); *Congregation Yetev Lev D'Satmar*, 219 A.D.2d at

191-92, 641 N.Y.S.2d at 683-694.[51]

The Club is in no position to challenge the validity of its own corporate acts. *See, e.g.,*

*Hyde v. Lynde*, 4 N.Y. 387, 392-393 (1850) (noting that even if a settlement between a mutual

company and a member had been fraudulent, the company and its receiver would not have

standing to invalidate the settlement). Moreover, the Club's Directors were entitled to rely upon

the statement of the Managers, and the actions of the Club's Directors are "not subject to be

interfered with by the courts, if their judgment and discretion were exercised in good faith and

not fraudulently or arbitrarily." *See Turner v. Am. S.S. Owners' Mut. Prot. & Indem. Ass'n*, 16

F.2d 707, 709 (5th Cir. 1927). Every action by the Club's Directors in this case was taken with

the concurrence of the Managers, Counsel, "unaffiliated directors," and under the close

supervision of the New York State Department of Insurance. Plaintiffs self-serving accusations

against prior Directors are baseless.

---

[51] In a continuing effort to inject inapplicable breach of fiduciary duty concepts into this contract case, Plaintiff vaguely asserted, over a year after it began this case, that the acts of the Directors in closing Insurance Years were *ultra vires* although no such allegations are included in the Club's pleadings. The doctrine of *ultra vires* has no application in this case. New York law only provides for actions alleging *ultra vires* in the following situations: (1) *a shareholder* can bring an action against the corporation to enjoin the doing of a corporate act; (2) the corporation can bring an action to procure a judgment *against an incumbent or former officer or director for loss due to unauthorized act*; (3) the attorney general can bring an action. N.Y. BUS. CORP. L. § 203(a) (McKinney 2006). None of these three situations has occurred here. *See Cucchi v. New York City Off-Track Betting Corp.*, 818 F. Supp. 647, 657-58 (S.D.N.Y. 1993); *711 Kings Highway Corp. v. F.I.M.'s Marine Repair Serv., Inc.*, 51 Misc. 2d 373, 374, 273 N.Y.S.2d 299, 301 (N.Y. Sup. Ct 1966) ("*ultra vires* may not be invoked as a sword in support of a cause of action" except in the three limited statutorily recognized actions, none of which are applicable here). The Club also ratified the closure of all Pre-1989 Insurance Years in 1996 (DX-222). *See Bayer v. Beran*, 49 N.Y.S.2d 2, 11-12 (N.Y. Sup. Ct. 1944) (even if an act was ultra vires it can be ratified by later Board resolution).

2.     *The Club's argument that mutuality requires the "re-opening" of closed years is meritless.*

Plaintiff further asserts that so-called principles of "mutuality" allow, and supposedly require, the "re-opening" of closed years to fund ODCs that occurred in those closed years. (*See, e.g.*, Brown Aff. at ¶ 7; Hughes Aff. at ¶¶ 10, 33). No such requirement is contained in the New York Insurance Law, the Club's By-Laws or the insurance contracts between the parties. As explained by the New York Court of Appeals in *Mygatt v. New York Prot. Ins. Co.*, 21 N.Y. at 65:

> A mutual insurance company is simply a company whose fund for the payment of losses and expenses consists not of a capital subscribed or furnished by outside parties, but of premiums *mutually* contributed by the parties insured.... There is not a word about the parties being insurers of each other, further than as they were made so by the payment of a cash premium. ... The 'mutual principle,' as it is called, requires nothing more. (emph. added).

Thus, "mutuality" does not require the "re-opening" of closed Insurance Years, nor anything more than the simple fact that the Club is not comprised of capital generated from shareholders. This is, of course, in line with the industry understanding that mutuality is "used simply as a label for the mutual P&I concept," as opposed to carrying with such label any legal or equitable requirements. (*See* Coghlin Aff. at ¶ 69, *and see generally* Coghlin Aff. at ¶¶ 68-78).

However, the Club pleads that "mutuality" requires each Insurance Year be self-sufficient as if any deviation from such an alleged attribute of "mutuality" is illegal. Nothing in the New York statute or the Club's By-Laws[52] mandates that each Insurance Year stand entirely "on its

---

[52] The Club's argument that the By-Laws, Art. VI, Sec. 3, mandate that years must stand on their own is an overly rigid and unsustainable interpretation of that By-Law. (*See* Brown Rebuttal Aff. at ¶¶ 4, 8). The Club itself never viewed its By-Laws as requiring Insurance Years to be hermetically sealed accounting units forever, and never followed it as such. Moreover, that By-Law does not state that the assessment can only be related to costs of claims in that year, but that "for the purposes of declaring dividends and making assessments" the business shall be divided into years. This clearly refers to dividing the business into years to determine which policyholders to bill. It does not preclude an assessment which contains a provision for the increase of reserves or surplus, that may indirectly

own" as if the Club were a separate legal entity for purposes of each Insurance Year.[53]  Thus, the Club's premise of self-supporting Insurance Years is flawed and cannot lead to the Club's illogical conclusion that in connection with this "mutuality" principle, post-closure imbalances must be rectified by "re-opening." (*See* Coghlin Aff. at ¶ 71).

Tellingly, the Club's current position is in direct contradiction with its past practices. The Club has not treated individual Insurance Years as hermetically sealed units, even while these years were open.[54]  Moreover, after Insurance Years were closed the Club merged the closed year's funds together into a general reserve account from which it also paid the liabilities of those closed Insurance Years (without any attempt to allocate the costs to any particular closed year) and other liabilities of the Club. (*See, e.g.,* Solarino Tr. at 80-81, 218-222). Closure of an Insurance Year, permitted by New York law and the Club's By-Laws, necessarily involves a transfer of risk from the members of the Insurance Year to the Club with respect to post-closure developments, and thus is inconsistent with the notion that the year must forever stand "on its own."[55]  (*See* Coghlin Aff. at ¶ 72).

---

reimburse the association for various expenses unrelated to that Insurance Year, including potentially payments by the Club for closed year claims. (*See* Coghlin at ¶ 75). Indeed, this is in accordance with § 4111(a) of the New York Insurance Law, providing that the policy state a member's contingent liability of the amount of any assessment, "permitted for any purpose under any provision of this chapter or necessary to make good an impairment of the minimum surplus." The Club's By-Laws, incorporate this provision of the statute by allowing the Club to retain funds "for the maintenance of reserves and surplus of the Corporation..." when closing an Insurance Year. (*See* PX-109 at Article VI, Section 4). This is what the Club always understood and the basis on which it acted in, for example, setting aside IBNR reserves since 1988. (*See* DX-DQ, PX-224).

[53] In fact, the New York State Insurance Department treated the Club as a single entity for purposes of minimum surplus requirements. (*See* McGowan Tr. at 65).

[54] For example, the Club has used its general reserves to pay for "stop loss" reinsurance premiums for the benefit of its members in open years, and to avoid assessing current members to meet the Club's ongoing capital surplus requirements. (*See, e.g.,* DX-BA at AC306096; Kurz Aff. at ¶ 31).

[55] The Club acknowledges that such a transfer of risk occurs with respect to "known" claims and does not dispute that as to "known" claims the years need not "stand on their own" even if the liabilities for such "known" claims are grossly disproportionate to the amounts reserved at the time of closure. It thus admits that, after closing, Insurance Years need not "stand on their own" with respect to "known" claims. Why the Club insists it must continue to do so after closure with respect to "unknown" claims is a mystery.

Further, the Club violates the very principles of "mutuality" which it now characterizes as "fundamental" by paying for ODCs from general reserves for years after 1989, using general reserves built up from prior years to avoid assessing members for deficiencies in current years, and authorizing assessment of current members for claims in prior years.[56] If these are violations of "mutuality" then the Club – and every other P&I Club – would be acting illegally. Clearly they are not.

### 3.    The doctrine of mutual mistake is not applicable to the unilateral corporate actions of the club.

Alternatively, the Club seeks to justify its "re-opening" of Insurance Years on the basis of "mutual mistake." However, the closure of an Insurance Year, is not an *agreement* between the Club and its policyholders but is a corporate action unilaterally taken by the Club as it is empowered to do under its By-Laws.[57] Accordingly, the doctrine of "mistake" is inapplicable.

Mutual mistake applies only where both parties to an *agreement* were mistaken as to a basic assumption on which the contract was made and this mistake has a material effect on the

---

[56] The Club's assertion that "mutuality" does not permit charging its current members for prior years' claims is a perfect example of the Club's hypocrisy on this issue. In direct contradiction to this assertion regarding what "mutuality" requires, the Club acknowledged in its 2005 Rules that it does have the power to assess current members for prior years' claims (provided such claims are attributable to post-1989 Insurance Years). (See PX-267 at Rule 4, Section 6). The record demonstrates, however, that the Club has always understood itself to have such power (without distinction as to pre or post-1989 Insurance Years) and that it has exercised such power. The Club represented to the IG in 1996 that it had the power to assess members with respect to closed years' claims. (See PX-224; see also DX-DQ, addressing concern raised in DX-CP: Draft Financial Report at 4.6; and see Coghlin Aff. at ¶¶ 75-76; DX-DCI). More importantly, the Club has assessed then current members (many of the Defendants in this action) with respect to prior years' claims in the form of the $100,000 IBNR provision. (See, e.g., PX-127).

[57] The Club's repeated legal argument that the closing of an Insurance Year represents a "final settlement of accounts" is solely based on a 1979 opinion letter from Kirlin addressing ownership of the reserve account, (PX-37, written by an Kirlin attorney named Fallon). But, that opinion letter did not state that closure was an agreement between the members and the Club but merely, as a fall back argument in support of its conclusion that the Club (rather than its current or former members) owns the Club's general reserves, analogized closure to two cases involving the surrender or cancellation of insurance policies. In any event, the fact that a Kirlin's lawyer says something doesn't make it so. In agreement with Defendants' position here, Fallon opined that policyholders are not subject to further assessment or entitled to any further refund after Insurance Years are closed, id. at 9, in passages which the Club studiously avoids.

agreed exchange of performances. *New York State Elec. & Gas Corp. v. Saranac Power*, 117 F.

Supp. 2d 211, 253 n. 79 (N.D.N.Y. 2000). The mistake must be one of *fact* which is substantial

and existed at the time the contract was entered. *Allen v. Westpoint-Pepperell, Inc.*, 933 F. Supp.

261, 268 (S.D.N.Y. 1996). The closing of an Insurance Year, however, is *not* a contractual

agreement between the Club and the members in that Year. Rather, it is an act authorized by the

Club's By-Laws, which give it the power to unilaterally close Insurance Years and *order* final

assessments. (*See*, PX-109 at Article VI, Section 4; *see also* PX-5: December 20, 1955 Board

Minutes with attached December 16, 1955 Kirlin Opinion letter at AC3010537: "Under Article

V, Section 4 of the By-Laws, the Board of Directors has the power to '*order* an assessment"

within the limits prescribed by the Law and the By-Laws and Policies.") (emph. added). This

power was exercised by the Club, without consent from its policyholders.[58] (*See e.g.*, Popov Aff.

at ¶ 10; Fisher Aff. at ¶ 18; Kurz Aff. at ¶ 20; Kennedy Aff. at ¶ 19).

In any event, even if the closing of an Insurance Year somehow were considered an

"agreement" between the Club and its policyholders, the Club's mutual mistake argument would

fail. The statute of limitations for action based on "mistake" has long passed. *See* CPLR §

213(6) (six year statute of limitations which accrues on date mistake occurs); *National*

---

[58] The service of Directors on the Club's Board does not make the closure of an Insurance Year a bilateral agreement. First, many Defendants did not have a representative elected to the Board of Directors. Second, to the extent that representatives of Defendants were members of the Board, when they made Board decisions, including the "ordering" of assessments as authorized by the By-Laws, they acted on behalf of the American Club and not their individual employers. The Club explicitly deemed the employment of such member of the Board of Directors by an American Club insured not to be a conflict of interest. (*See, e.g.*, DX-AP: April 30, 1986 cover letter from McGowan to Kurz with attached Policy on Conflict of Interest, which McGowan notes was adopted by the Club on May 14, 1964). Finally, the Club's baseless allegations against the former Directors of "intentional conduct" or "*ultra vires*" acts to somehow justify "re-opening" of the Insurance Years is meritless. Notably, such claims were not pleaded by the Club (September 13, 2005 Order by Magistrate Francis at 28), and in any event are barred by the statute of limitations. *See* CPLR § 213(7). Regardless, however, even if the conduct of the Board was relevant to this case, the Board unequivocally acted reasonably at all times. (Coghlin Aff. at ¶¶ 98-104). Therefore, the Club cannot argue that the actions taken by its former Directors are not binding simply because it now deems such actions improvident. *See Rous v. Carlisle*, 14 N.Y.S.2d 498, 502 (N.Y. Sup. Ct. 1939); *Holmes v. St. Joseph Lead Co.*, 84 Misc. 278, 282-283, 147 N.Y.S. 104, 106 (N.Y. Sup. Ct. 1914).

*Amusements, Inc. v. South Bronx Dev. Corp.*, 253 A.D.2d 358, 676 N.Y.S.2d 166 (1st Dep't

1998); *Nichols v. Regent Properties, Inc.*, 49 A.D.2d 847, 847-848, 373 N.Y.S.2d 613, 613-614

(1st Dep't 1975).[59] If any "mistake" were made it was unilateral. A unilateral mistake is

insufficient to reform any alleged agreement between the Club and its Policyholders. *See*

*Loyalty Life Ins. Co. v. Fredenberg*, 214 A.D.2d 297, 299, 632 N.Y.S.2d 901, 902 (3d Dep't

1995); *Barclay Arms, Inc. v. Barclay Arms Assocs.*, 74 N.Y.2d 644, 646, 542 N.Y.S.2d 512, 513-

514 (1989). In addition, "mistake" cannot be predicated on a party's failure to anticipate

contingent events, *see e.g.*, *Chimart Assocs. v. Paul*, 66 N.Y.2d 570, 574, 498 N.Y.S.2d 344,

347 (1986); *New York State Elec. & Gas Corp.*, 117 F. Supp. 2d at 253, or predict future

business outcomes, *see Hartford Fire Ins. Co. v. Federated Department Stores, Inc.*, 723 F.

Supp. 976, 994 (S.D.N.Y 1989) ("[A] party's prediction or judgment as to events to occur in the

future, even if erroneous, it's not a 'mistake' as that word is defined here"). As an insurance

company with the power to set reserves and close insurance years, the Club took the risk of any

"mistake" in prediction of its ultimate liabilities for such years.

> 4.    *The relief sought by the Club does not meet the Club's alleged mutuality*
> *requirements.*

Under its own "mutuality" standard, in order to justify further assessment, the Club must

first establish that a deficiency exists in each of the Insurance Years in question pursuant to its

By-Laws. (*See* PX-109 at Article VI, Section 4).[60] The Club has not proven that any of the Pre-

---

[59] Even if the Court were to determine that the date of accrual for the statute of limitations should be the date of discovery of the mistake, this action would still be time-barred, as the Club admits to realizing the extent of the ODCs brought against Defendants by, at the latest, the early 1980s. (*See* DX-HT: American Club's Master Reply to Counterclaims at ¶ 30).

[60] Further, in the event of any "re-opening," the Club rather than the solvent policyholders from the insurance year would bear the risk that insolvent policyholders would be unable to pay assessments. The Club relies on *Pratt v. Dwelling-House Mut. Fire Ins. Co.*, 7 A.D. 544, 40 N.Y.S. 179 (4th Dep't 1896), to argue that it is not responsible for making up shortcomings in assessments due to insolvency, however, *Pratt* stands for no such proposition. In

1989 years, attributing investment income to their final accounts over time, are in deficiency let alone that the Pre-1989 Insurance Years as a whole are in deficiency. Indeed, the Club has made no attempt at such a showing. To "re-open" would mean each year must be looked at as if it were never closed and then analyzed on a going forward basis, including an analysis of funds aggregated into the reserve account for use by the Club.[61] The balance of the closed year surplus of over $17 million as of December 31, 1996 strongly suggests that the Club is, contrary to its pleas of "inequity," in possession of substantial funds attributable to the closed Insurance Years prior to 1989, including investment income on these funds which derive from contributions of former members whose coverage the Club now seeks to cut off.

### III. The Second Circuit Has Ruled That The Club May Not Apply Multiple Deductibles To Occupational Disease Claims

The Club erroneously contends that New York case law supports its application of multiple, or "stacked," deductibles to a given claim under the American Club policies. (Compl. ¶ 60 (citing *Consol. Edison Co. of N.Y., Inc. v. Allstate Ins. Co.*, 98 N.Y.2d 208, 746 N.Y.S.2d 622 (2002)). However, the Second Circuit has already held, in *Prudential*, that only a single

---

considering a different statute, the court in *Pratt* held that the members of a mutual company could not be compelled to pay assessments to make up a shortfall in assessments due to other members' insolvency. Because the mutual company in *Pratt* was insolvent, the member attempting to compel an assessment ended up being uncompensated for a portion of his loss due to other members' insolvency. Unlike the mutual in *Pratt*, however, the American Club is solvent and would have no basis for avoiding its contractual obligations to its policyholders due to the insolvency of other policyholders. To the extent the Club suggests that *Pratt* stands for the proposition that current members of a mutual cannot be assessed beyond their pro rata percentage of the costs of their particular year, the Club's By-Laws and practices emphatically contradict such argument and nothing in *Pratt* supports it.

[61] Since 1996, the American Club has at times used its Contingency Fund (created from the reserves from closed Insurance Years and aggregated into the Club's general reserves on closure of the year) to avoid assessing current members for deficiencies in open years about to be closed. Over $9 million from the Contingency Fund has been utilized by the Club for this purpose. (*See* DX-EE; DX-EF; DX-GO; DX-HD; DX-HE; DX-HF; PX-298).

deductible applies to a given claim under the American Club policies. *Prudential* is binding on Plaintiff and controlling authority in this case.[62]

In *Prudential*, the Trustee of Prudential, a former member of the Club, sued the Club, seeking declaratory relief clarifying the Club's obligations under its policies. One of the issues before the Second Circuit was the deductible applicable to ODCs falling under clause 1 of the Policies. Rejecting the same arguments the Club makes here, the Second Circuit held that an insured has the right to designate a single policy to pay full coverage for any given claim, even where the injured seaman's years of service spanned more than just one policy year, and that only a single deductible shall be applied to such claim. *Prudential*, 158 F.3d at 83-86. The Second Circuit held:

> Given: (i) the policy's broad language covering "any loss [or] damage" which Prudential becomes liable to pay resulting – presumably even in part – from injuries occurring during the policy period; (ii) the absence of a contractual intent to require allocation of liability among policies in the first instance; and (iii) the lack of any compelling policy or equitable considerations favoring allocation, we decline to read the policies in a way that would have the (probably unintended) effect of multiplying the deductibles applicable to each claim.

The Club argues that *Consolidated Edison*, a case involving environmental pollution liability policies, overruled *Prudential*. *Consolidated Edison* is inapposite.

In *Consolidated Edison*, the New York Court of Appeals held – on very different facts – that an insured's total liability for groundwater contamination could be allocated pro rata over an alleged five decades of property damage. The damage in that case resulted from environmental pollution that had occurred continuously over a period of fifty years at the site of a manufactured gas plant. The insured, Con Edison, held insurance policies over this period of time with twenty-

---

[62] UCC and Dow agree that *Prudential* has preclusive effect and controls this case so that the Club is not entitled to "stack" deductibles, but do not otherwise join the reasoning in Section III of the brief.

four different and *successive* insurance carriers (as opposed to a single or concurrent insurers). *Consol. Edison*, 98 N.Y.2d at 223, 746 N.Y.S.2d at 629.

The Court of Appeals held that the "joint and several allocation" approach advocated by Con Edison[63] was not warranted in that case because of the involvement of multiple successive insurance companies, noting also its inappropriateness in a case where an insured had periods of self-insurance. *Id.*, 746 N.Y.S.2d at 629. Under such circumstances, the Court of Appeals held that "pro rata allocation" among the successive insurers was proper, *i.e.*, liability should be spread among the policies of the successive insurance carriers (or apportioned to the insured in periods of self-insurance).[64]   Importantly, the Court of Appeals did not address the issue of deductibles at all. However, the Club apparently attempts to draw from its holding the view that it may "stack" deductibles, *i.e.*, apply one deductible for each year over which a claim is allocated.

The factors relied upon by the Court of Appeals in *Consolidated Edison*, *i.e.*, multiple, successive insurers and periods of self-insurance, are not present here. *Prudential*, 158 F.3d at 84-86. Moreover, the Second Circuit specifically held that the deductible provision of the American Club policies unambiguously requires application of a single deductible and, in the situation of the American Club insureds, only one deductible may be equitably applied. *Id.* at 79, 83, 86.

---

[63] Under the "joint and several allocation" approach, the insured may collect its total liability for a claim from any one of its insurance policies that was in effect during the period when continuous property damage had occurred, up to that policy's limit. The indemnifying insurer may then seek contribution from the other insurers who had provided coverage at preceding or successive times during the relevant period. *Id.* at 222, 746 N.Y.S.2d at 629.

[64] The Court of Appeals recognized, however, that "joint and several allocation" is appropriate in cases involving two insurance companies providing *concurrent* coverage for injury, or in cases where the insured did not choose to self-insure for periods of time. *Id.* at 223, 746 N.Y.S.2d at 629.

As was the case with Prudential, here the Defendants' vessels generally are insured *only* by the American Club for successive policy years, with no periods of self-insurance. Thus, the American Club is not being asked to pay for periods where the vessel was covered by other insurers or for periods of self-insurance.[65] The only issue, as the Second Circuit recognized in *Prudential*, is the Club's effort to minimize its coverage obligations by multiplying the number of deductibles applicable to a single claim. Under these circumstances, together with the absence of contractual intent to allocate, there is no justification for applying multiple deductibles. *Id.* at 83-86.

Subsequent Second Circuit case law has affirmed *Prudential's* continued validity on its unique facts. *See E.R. Squibb & Sons, Inc. v. Lloyd's & Cos.*, 241 F.3d 154, 172 n. 9 (2d Cir. 2001) (product liability case involving successive insurers); *Olin Corp. v. Ins. Co. of North Am.*, 221 F.3d 307, 322-24, 328 (2d Cir. 2000) (environmental coverage case involving successive insurers and periods of self-insurance); *United States Fid. & Guar. Co. v. Treadwell Corp.*, 58 F. Supp. 2d 77, 97-99 (S.D.N.Y. 1999) (recognizing Second Circuit's rejection of pro rata allocation and multiple deductibles in *Prudential* case due to lack of successive insurers, no periods of self-insurance, and financial consequences to insurers were deductibles to be "stacked").

---

[65] Where a claimant served aboard vessels insured by different P&I clubs, the shipowners and the P&I carriers generally agreed that the costs of defense and settlement would be allocated among the involved shipowners and their insurers according to the carrier's time on the risk. (*See* DX-CE: February 25, 1994 Memo by Craig; Bland Decl. at ¶¶ 16-21).

A.    The Club's Acquiescence Argument is to No Avail

The Club's assertion that Defendants have acquiesced to the Club's practice of applying

multiple deductibles to ODCs is incorrect.[66] The Club's argument misinterprets the doctrine of

practical construction under New York law, which holds that *if an ambiguity exists*, one party

may show a practical construction if there is conduct by one party claiming as of right under the

doubtful provision, coupled with express or implied acquiescence by the other party. *See, e.g.,*

*Continental Cas. Co. v. Rapid-American Corp.*, 80 N.Y.2d at 651, 593 N.Y.S.2d at 971. First, as

the Second Circuit held in *Prudential*, 158 F.3d at 79, 83, the Pre-1989 Policies unambiguously

allow only a single deductible to be applied. Thus, the doctrine of practical construction is

inapplicable.

Further, the evidence is clear that, despite the Club indemnifying policyholders on the

basis of multiple deductibles, the Club did not attempt to apply multiple deductibles as a matter

of right. In fact, the Club itself acknowledged that the proper application of deductibles was

unclear, and that the position it adopted was subject to change based on future legal decisions.[67]

It was thus explicitly recognized that the Board's decision with respect to the application of

---

[66] Further, the Club's acquiescence argument is irrelevant as to many Defendants. Some Defendants did not have any representative on the Club's Board at the time the Club started its application of multiple deductibles, so cannot be said to have acquiesced by virtue of Board actions (of course, such actions are actions of the Club itself and thus should not be considered evidence of acquiescence by companies who were affiliated with Board members either). Also, some Defendants have as of yet not submitted ODCs to the Club for indemnification, or have reserved their rights with respect to the Club's deductibles practice, and thus cannot be said to have acquiesced to the payment of ODCs on the basis of multiple deductibles. Moreover, certain members specifically objected to the application of multiple deductibles on more than one occasion and therefore cannot be said to have acquiesced to the Club's practice. (*See, e.g.,* Weedman Aff. at ¶¶ 12, 25, 46-48, 58, 69; DX-EH; DX-FQ; Bland Decl. at ¶¶ 29-41; DX-EW ; DX-FY; Achuff Aff. at ¶ 19).

[67] The relevant opinion letter on the subject from the Club's Counsel states: "Therefore, although we think that on a proper reading of the policy it is proper to apply a full deductible for each policy year, we also believe there is a very substantial chance that a court would conclude otherwise if necessary to afford coverage to an insured." (DX-AR: September 11, 1987 Kirlin opinion letter to the Managers re: Asbestosis - Coverage and Deductibles at KEY004745); *see also*, DX-AS: September 16, 1987 Memo from McGowan to the Club's Board of Directors ("Counsel is of the opinion that lacking any clear legal precedent, the multiple deductible approach is proper, *albeit admitting that future court decisions may modify that position*."). This statement turned out to be prescient.

37

deductibles was subject to future court rulings as later came to fruition in *Prudential*. (*See* Kurz

Aff. at ¶ 44).[68]

## CONCLUSION

For the foregoing reasons, the claims and counterclaims should be resolved in

Defendants' favor.[69]

---

[68] To the extent the Club argues that Defendants are time barred under Clause 17 of the Pre-1989 Policies from submitting claims for deductible recalculation of previously submitted claims, or for new claims not previously submitted because the indemnification amount fell below the amount of multiple deductibles, this argument fails. In view of the Club's long-standing position that it would provide indemnification for ODCs only under the stacked deductibles approach unless modified by court decision, submission of such claims would have been futile, at least prior to the Second Circuit's decision in *Prudential*. Indeed, the Club continued to maintain this position even after *Prudential* rejected the stacked deductibles approach. Accordingly, Defendants are excused from compliance with the claim submission deadline contained in the Policies. *See Moye v. Thomas*, 153 A.D.2d 673, 673, 544 N.Y.S.2d 675, 676 (2d Dep't 1989) (notice was excused where forwarding papers to insurance company would have been useless, based upon earlier disclaimer); *De Forte v. Allstate Ins. Co.*, 81 A.D.2d 465, 471, 442 N.Y.S.2d 307, 311-12 (1981).

[69] In addition to the arguments presented on behalf of all Defendants who are signatories to this brief, Loveland Holding Company f/k/a S.C. Loveland Co., Inc. ("Loveland") is entitled to judgment as a matter of law because Plaintiff's claim against Loveland was satisfied as part of Plaintiff's claim in Loveland's 1993 bankruptcy action. Plaintiff's claim against Loveland is therefore barred by the doctrine of accord and satisfaction. *See* Loveland's motion for summary judgment, which is being electronically filed with the Court today.

Respectfully submitted,

PROSKAUER ROSE LLP

By: _____

Seth B. Schafler (SS-5993)
Lisa A. Bauer (LB–4057)
Nathan R. Lander (NL–6276)
1585 Broadway
New York, New York 10036-8229
Tel.: (212) 969-3000
Fax: (212) 969-2900

*Attorneys for Defendants Keystone, BP, MTL, Kirby Inland Marine, LP*
  *(as successor to Hollywood Marine Inc.), American Steamship Company,*
  *The Cleveland-Cliffs Steamship Company, Ispat, Amerada Hess Corporation,*
  *Sea Mobility, Alcoa, and Sabine*

HOWREY, LLP
  Robert H. Shulman
  Mindy G. Davis
  Christine Davis
  Averitt Buttry
  1299 Pennsylvania Avenue, NW
  Washington, DC 20004-2402
  Tel.: (202) 783-0800
  Fax: (202) 383-6610
  *Attorneys for Defendant Amerada Hess*
    *Corporation*

DLA PIPER RUDNICK GRAY CARY US LLP
  Stanley McDermott, III
  Camilo Cardozo
  1251 Avenue of the Americas
  New York, NY 10020
  Tel.: (212) 835-6123
  Fax: (212) 884-8523
  camilo.cardozo@piperrudnick.com
  *Attorneys for Defendant Ispat Inland Inc.*
    *(formerly called Inland Steel Co.)*

RAY, ROBINSON, CARLE
& DAVIES, P.L.L.
  Gene B. George
  Julia R. Brouhard
  1717 East 9th Street, Ste. 1650
  Cleveland, OH 44114-2898
  Tel.: (216) 861-4533
  Fax: (216) 861-4568
  ggeorge@rayrobcle.com
  jbrouhard@rayrobcle.com
  *Attorneys for Defendant The*
    *Cleveland-Cliffs Steamship Company*

GARAN LUCOW MILLER P.C.
  Thomas W. Emery
  1000 Woodbridge Street
  Detroit, MI 48207-3192
  Tel.: (313) 446-5525
  Fax: (313) 259-0450
  temergy@garanlucow.com
  *Attorneys for Defendant American*
    *Steamship Company*

*---and by proxy for the following Defendants and their counsel of record---*

HOLLAND & KNIGHT
  John Toriello
  195 Broadway, 24th Floor
  New York, NY 10007
  Tel.: (212) 513-3200
  Fax: (212) 385-9010

*Attorneys for Defendant*
  *American President Lines, Ltd.*
  *(sued herein as American President Lines,*
  *Inc. and as APL Ltd. as Successor to*
  *American Mail Line)*

CURTIS, MALLET-PREVOST, COLT &
MOSLE LLP
  Joseph D. Pizzurro
  Robert J. Gruendel
  Dora Straus
  101 Park Avenue
  New York, NY 10178
  Tel.: (212) 696-6000
  Fax: (212) 697-1559

*Attorneys for Defendants*
  *Apex Oil Company, Inc., Trinidad*
  *Corporation, Mathiasen's Tanker*
  *Industries, Inc. and Crest Tankers, Inc.*

DICKSTEIN SHAPIRO LLP
  David L. Elkind
  Dorothy Thomas
  1177 Avenue of the Americas
  New York, NY 10036
  Tel.: (212) 835-1400
  Fax: (212) 997-9880

  *Attorneys for Defendant Keyspan*
  *Corporation (as Successor to Eastern*
  *Gas and Fuel Associates and Mystic*
  *Steamship)*

BROWN RUDNICK BERLACK ISRAELS,
LLP
  Andrew Dash
  Peter Adelman
  Seven Times Square
  New York, New York 10036
  Tel.: (212) 209-4811
  Fax: (212) 938-2811

*Attorneys for Defendant*
  *Farrell Lines*

O'HARE PARNAGIAN LLP
  Robert A. O'Hare Jr.
  82 Wall Street, Suite 300
  New York, NY 10005
  Tel.: (212) 425-1401
  Fax: (212) 425-1421

*Attorneys for Defendants*
  *Central Gulf Lines, Inc. and Waterman*
  *Steamship Corporation*

CUMMINGS & LOCKWOOD LLC
  John W. Cannavino
  Steven I. Frenkel
  Six Landmark Square
  Stamford, CT 06901
  Tel.: (203) 327-1700
  Fax: (203) 351-4534
  sfrenkel@cl-law.com

*Attorneys for Defendant Chevron U.S.A. (as*
  *successor to California Oil Company)*

MAHONEY & KEANE
  Stephen J. Murray
  Edward A. Keane
  111 Broadway, 10th Fl.
  New York, NY 10006
  Tel.: (203) 222-1019
  ekeane@mahoneykeane.com

-and-

MAYER, BROWN ROWE & MAW
  Steven Gilford
  71 S. Wacker Drive
  Chicago, IL 60606
  Tel.: (312) 782-0600
  Fax: (312) 701-7711

*Attorneys for Defendants The Dow Chemical
  Company and Union Carbide
  Corporation*


PATRICK F. LENNON, ESQ.
  11 West 42nd Street, Suite 900
  New York, NY 10036
  Tel.: (212) 354-0025
  Fax: (212) 869-0067
  plennon@tisdale-lennon.com

  *Attorneys for Defendants Bridgeport &
    Port
    Jefferson Steamboat Co.; Brokerage &
    Management Corp.; McAllister Towing
    and Transportation Company, Inc.; (as
    Successor to Outreach Marine Corp.)
    and Trade & Transport Inc.*

FIELDS, HOWELL, ATHANS &
MCLAUGHLIN, LLP

  Alissa C. Malone
  Lynn Concha
  One Midtown Plaza, Suite 800
  1360 Peachtree Street, NE
  Atlanta, GA 30309
  Tel.: (404) 214-1250
  lconcha@fieldshowell.com

*Attorneys for Defendant Georgia Pacific Corp.*


HOLLSTEIN KEATING CATTELL JOHNSON
& GOLDSTEIN, PC
  Edward V. Cattell, Jr.
  8 Penn Center, 20th Floor
  1628 J.F. Kennedy Blvd.
  Philadelphia, PA 19103
  Tel: (215) 320-2073

*Attorneys for Defendant Loveland Holding
    Company, Inc., f/k/a S.C. Loveland Co., Inc.*

MORGAN LEWIS & BOCKIUS LLP
  Lisa Campisi
  101 Park Avenue
  New York, NY 10178-0060
  Tel.: (212) 309-6000
  Fax: (212) 309-6001
  lcampis@morganlewis.com

  *Attorneys for Defendant Kimberly-Clark*
  *Corporation*