UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AMERICAN STEAMSHIP OWNERS MUTUAL
PROTECTION AND INDEMNITY
ASSOCIATION, INC.,

No. 04 Civ. 04309 (LAK) (JCF)

               Plaintiff,

(ECF Case)

       -against-

ALCOA STEAMSHIP CO., INC., et al.,

               Defendants.

# TRIAL MEMORANDUM OF PLAINTIFF AMERICAN STEAMSHIP OWNERS MUTUAL PROTECTION AND INDEMNITY ASSOCIATION, INC.

NOURSE & BOWLES, LLP
One Exchange Plaza
At 55 Broadway
New York, New York 10006
(212) 952-6200
Lawrence J. Bowles (LB 5950)
Shaun F. Carroll (SC 9898)

SULLIVAN & WORCESTER, LLP
1209 Avenue of the Americas, 29th Floor
New York, New York 10104
(212) 660-3000
Franklin B. Velie (FV 4918)
Mitchell C. Stein (MS 3118)

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................1

FACTUAL BACKGROUND AND PROCEDURAL HISTORY ..............................................3

A. The Parties ...........................................................................................................................3

B. The Club's Fully Assessable Indemnity Policies................................................................4

C. The Club's Practice of "Closing" Insurance Years............................................................5

D. The Rise of Asbestos and Other ODCs...............................................................................6

E. Defendants' Representatives on the Club's Board of Directors Improperly Closed
Insurance Years....................................................................................................................8

F. The American Club's Counsel Repeatedly Advises  the Board that Closed Years Can
be Reopened..........................................................................................................................9

G. The Club Creates the Contingency Fund. ..........................................................................11

H. The International Group Requires the American Club to Change Its Rules.............................11

I. Events Leading to the Filing of This Action........................................................................12

ARGUMENT..............................................................................................................................13

I. THE AMERICAN CLUB IS NOT OBLIGATED TO INDEMNIFY DEFENDANTS
FOR CLAIMS FOR WHICH THEY PAID NO PREMIUMS OR ASSESSMENTS. ...........13

A. Defendants Have No Right to Indemnities for Any Pending or Future Closed
Year ODCs Because No Premiums or Assessments were Paid to Fund the
Indemnities...................................................................................................................13

B. The Club's Policies and By-Laws Mandate that, upon Closing an Insurance
Year, the Club Either Has No Obligation to Indemnify Defendants for
Closed Year ODCs or, if the Obligation Exists, the Club May Assess
Defendants for any Deficiencies..................................................................................15

1. The Club's Closing of Insurance Years Constituted a Complete Closing....................15

2. In the Alternative, the Club's Closing of Insurance Years Constituted an
Incomplete Closing, Preventing Future  Assessment only as to Reported
Claims. ....................................................................................................................19

3. The $100,000 Per Year Set-Aside for Closed Year ODCs was Not
Estimated with the "Reasonable Degree of Certainty"  Necessary to
Render Unreported ODCs the Equivalent of a "Known" Claim for
Purposes of Closing.................................................................................................20

II. THE AMERICAN CLUB HAS PROPERLY APPLIED MULTIPLE
DEDUCTIBLES TO CLOSED YEAR ODCS IN THE PAST AND MAY
CONTINUE TO DO SO IF REQUIRED TO PAY ADDITIONAL INDEMNITIES
FOR CLOSED YEAR ODCS....................................................................................................21

## TABLE OF CONTENTS
### (continued)

Page

A. The American Club has Properly Calculated Indemnity Payments for Occupational Disease Claims Based Upon A Multiple Deductible Approach..................21

B. Defendants Have Acquiesced in the Club's Multiple Deductible Approach. ...................23

C. Defendants' Claims for the Recalculation of Deductibles are Time Barred. ....................24

III. DEFENDANTS' COUNTERCLAIMS AND DEFENSES SHOULD BE DISMISSED. ........................................................................................................24

A. Expert Testimony on the Policies, By-laws, and Custom and Practice is Irrelevant. ..........................................................................................................24

B. The Doctrines of Promissory Estoppel, Estoppel, Waiver, and Laches do not Preclude the Club from Terminating the Discretionary Practice or Levying Assessments on the Defendants. ........................................................................27

   1. The American Club has Never Made a Knowing Statement  or Promise, or Intentionally Waived Any Rights. ............................................................27

   2. Defendants Did Not Reasonably Rely on the American Club's Prior Acts. ..............................................................................................................28

C. The Club is Not Barred by the Doctrines of Res Judicata or Collateral Estoppel from Litigating any Claims in this Action. .............................................29

D. The Club Did Not Breach the Implied Covenant of Good Faith and Fair Dealing. ..............................................................................................................30

E. The Club has Not Violated the Cancellation Provisions of NY Insurance Law §3426. ...........................................................................................................31

F. The American Club is not Subject to Liability for any Purported "Untimely Disclaimer" under NY Insurance Law § 3420(d). ...............................................32

G. The American Club Has Not Engaged in Unfair or Deceptive Trade Practices. ............................................................................................................32

IV. THE AMERICAN CLUB IS ENTITLED TO LEVY ASSESSMENTS AGAINST ALL DEFENDANTS...................................................................................................33

A. The American Club Has Not Released Defendants Union Carbide and Dow Chemical from Further Assessment for Closed Year ODCs. ..............................33

B. The American Club's Claims against Apex are not barred by the Ordered Stipulation dated April 4, 1991...........................................................................33

V. THE AMERICAN CLUB IS ENTITLED TO A FULL  REFUND OF THE FARLEY ADVANCE. .................................................................................................................34

CONCLUSION...............................................................................................................34

# TABLE OF AUTHORITIES

## FEDERAL CASES

Asbeka Indus. v. Travelers Indemnity Co., 831 F. Supp. 74 (E.D.N.Y. 1993) ................32

Concesionaria DHM, S.A. v. International Finance Corp.,
    307 F. Supp.2d 553 (S.D.N.Y. 2004)...........................................................31

Dicola v. Am. S.S. Owners Mut. Protection and Indemnity Ass'n., Inc. (In Re
    Prudential Lines),158 F.3d 65 (2d Cir. 1998)................................................4, 23, 29, 30

Fasolino Foods Co., Inc. v. Banca Nazionale Del Lavoro,
    961 F.2d 1052 (2d Cir. 1992).......................................................................31

Faulkner v. Nat'l Geographic Enters., 409 F.3d 26 (2d Cir. 2005)....................................30

General Electric Co. v. Compagnie Eurolair S.A.,
    945 F.Supp. 527 (S.D.N.Y. 1996) ...............................................................28

Harris v. Provident Life & Accident Ins. Co., 310 F.3d 73 (2d Cir. 2002) ......................31

Hartford Fire Ins. Co. v. Federated Department Stores, Inc.,
    723 F. Supp. 976 (S.D.N.Y. 1989) ..............................................................31

ICD Holdings S.A. v. Frankel, 976 F. Supp. 234 (S.D.N.Y. 1997)....................................31

Interoceanica Corp. v. South Pilots, Inc., 107 F.3d 86 (2d Cir. 1997) .............................29

Marvel Characters, Inc. v. Simon, 310 F.3d 280 (2d Cir. 2002) .................................29, 30

Olin Corp. v. Insurance Co. of North Amer., 221 F.3d 307 (2d Cir. 2000) ..........21, 22, 23

PenneCom B.V. v. Merrill Lynch & Co. Inc., 372 F.3d 488 (2d Cir. 2004)....................28

Scientech, Inc. v. Metro-North R.R., 2002 WL 1813854,
    No. 01 CIV. 8210 (LAK) (S.D.N.Y. Aug. 7, 2002) (Kaplan, J)................................31

Securities and Exch. Comm'n v. First Jersey Sec., Inc,
    101 F.3d 1450 (2d Cir. 1996) .....................................................................29

Turner v. Am. S.S. Owners Mutual Protection and Indemnity Ass'n, Inc.,
    16 F.2d 707 (5th Cir. 1927) ........................................................................17

Van Buskirk v. The New York Times Co., 325 F.3d 87 (2d Cir. 2003)............................23

## STATE CASES

Airco Alloys Division, Airco Inc. v. Niagara Mohawk Power Corp.,
    76 A.D.2d 68, 430 N.Y.S.2d 179 (4th Dep't 1980) ....................................28

In the Matter of Barabash,
    31 N.Y.2d 76, 286 N.E.2d 268, 334 N.Y.S.2d 890 (1972)...........................27

Barnett v. Metropolitan Life Ins. Co.,
    258 A.D. 241, 16 N.Y.S.2d 198 (1939) .......................................................17

BWA Corp. v. Alltrans Express U.S.A., Inc.,
    112 A.D.2d 850, 493 N.Y.S.2d 1 (1st Dep't 1985)..................................27, 28

Cent. New York Bridge Assoc., Inc. v. Am. Contract Bridge League,
    72 Misc. 2d 271, 339 N.Y.S.2d 438 (Sup. Ct. 1972)...................................17

Consolidated Edison Co. of New York, Inc. v. Allstate Ins. Co.,
    98 N.Y. 2d 208, 774 N.E.2d 687, 746 N.Y.S.2d 622 (2002)..............13, 21, 22, 23, 30

Excess Ins. Co., Ltd. v. Factory Mut. Ins. Co.,
    2 A.D.3d 150, 769 N.Y.S.2d 487 (1st Dep't 2003).......................................25

Gilbert Frank Corp. v. Federal Ins. Co.,
    70 N.Y.2d 966, 520 N.E.2d 512, 525 N.Y.S.2d 793 (1988)..........................27

Halifax Fund, L.P. v. MRV Communications, Inc.,
    2001 WL 1622261, No. 00 CIV 4878 HB (S.D.N.Y. Dec. 18, 2001) ........................27

Hartford Ins. Co. of the Midwest v. Halt,
    223 A.D.2d 204, 646 N.Y.S.2d 589 (4th Dep't. 1996) .................................13

Home Ins. Co. v. North American Specialty Ins. Co.,
    273 A.D.2d 443, 709 N.Y.S.2d 624 (2d Dep't. 2000)...................................31

Hyde v. Lynde, 4 N.Y. 387 (1850) ...............................................................16, 17

Jersey Interstate Wire & Strip Corp. v. Metropolitan Life Ins. Co.,
    41 Misc.2d 967, 247 N.Y.S.2d 27 (Sup. Ct. 1964).......................................18

Metropolitan Life Ins. Co. v. Oseas,
    261 A.D. 768, 27 N.Y.S.2d 65 (1st Dep't 1941).........................................18

Moradi-Shalal v. Fireman's Fund Ins. Cos., 758 P.2d 58 (1988)......................33

New York Univ. v. Continental Ins. Co.,
    87 N.Y.2d 308, 662 N.E.2d 763, 639 N.Y.S.2d 283 (1995)........................................32

Patrons of Industry Fire Ins. Co. v. Harwood,
    64 A.D. 248, 72 N.Y.S. 8 (3d Dep't 1901)............................................................16, 17

R/S Assocs. v. New York Job Dev. Auth.,
    98 N.Y.2d 29, 771 N.E.2d 240, 744 N.Y.S.2d 358 (2002)..........................................13

Textron Financial Corp. v. National Union Fire Ins. Co.,
    13 Cal Rptr.3d 586(Cal. Ct. App. 2004)..................................................................33

Vogel v. City Bank Farmers Trust Co.,
    152 Misc. 18, 272 N.Y.S. 643 (Sup. Ct. 1934)..........................................................18

W.W.W. Assocs., Inc. v. Giancontieri,
    77 N.Y.2d 157, 566 N.E.2d 639, 565 N.Y.S.2d 440 (1990).................................13, 24

## STATE STATUTES

California Insurance Code §790.03(h)....................................................................33

California Unfair Practices Act...........................................................................33

California Business & Professional Code §17200...........................................................33

New York General Business Law §349....................................................................32, 33

New York Civil Practice Law and Rules § 213(6) ...........................................................17

New York Insurance Law § 3420(d) ...................................................................32

New York Insurance Law §3420(i) ....................................................................32

New York Insurance Law §2117(b)(3)(B) .............................................................32

New York Insurance Law 1113(a)(21) .................................................................32

## TREATISES

3 Couch on Ins. (3d) §39:31 ..........................................................................17

## PRELIMINARY STATEMENT

Plaintiff American Steamship Owners Mutual Protection and Indemnity Association, Inc. (the "American Club" or "Club"), is a member-operated, non-profit mutual indemnity insurance association. The Club seeks declaratory relief on legal and equitable grounds that the defendants, various ship-owning companies and their successors which were members of the Club for insurance years prior to 1989, are not entitled to indemnity insurance for which they never paid.

The mutual indemnity insurance at issue here is fundamentally different from commercial insurance. Members of the American Club, unlike policy holders of commercial insurance, are both insurers and insureds in that for each "insurance year," the members collectively agree to mutually indemnify each other regarding liabilities listed in the policies arising from occurrences in that year. In order to fund the indemnities, the Club's members pay premiums and assessments "without limit of amount."

The claims at issue in this dispute stem from occupational disease claims against the defendants by seaman they employed, including asbestos claims that arose from alleged exposure in insurance years prior to 1989 (the "Closed Year ODCs"). These claims, which have long latency periods, were unknown when the accounts for these years were "open." If these claims had been known then, the Club would have assessed defendants before the closing of the 1988 year to pay all of the indemnities in question. Defendants not only paid no premiums or assessments toward the Closed Year ODCs, the defendant-dominated board awarded members over $31 million in refunds.[1]

It is undisputed that under the Club's by-laws, to authorize any refund or assessment, the Club's board must find that it is "practicable to estimate with a reasonable degree of certainty" the amounts needed to pay all indemnity claims for the subject year. In violation of the by-laws, such

---

[1] This includes more than $18 million refunded before 1980, before anyone knew of the Closed Year ODCs, and over $13 million after 1980, after the first ODCs were filed with the Club.

estimates were not made, as initially no one knew that such claims might later be asserted, and later, what claims might be presented, or when, or in what amounts.

When these Closed Year ODCs first came to the Club's attention in the early 1980s, defendants' representatives, who as board members controlled the Club, authorized the indemnification of such claims without assessing the members of the relevant years (themselves) and without first obtaining the opinion of counsel as to whether the Club had a legal obligation to pay any such indemnity claims. Defendants received a net amount of over $5.6 million in such indemnities. In 1988, in connection with the closing of the accounts of the 1977 year, the Club's board, still controlled by defendants, rejected the manager's recommendation to set aside adequate amounts toward Closed Year ODCs, and instead authorized the set aside of only $100,000, an arbitrary and nominal sum. Similar amounts were set aside with the closings of insurance years 1979-1988, which closings took place in calendar years 1988-1993, respectively. All of these "closings" were *ultra vires* in that the defendant-dominated board did not, as required by the by-laws, estimate "with a reasonable degree of certainty" the claims for such years.

The case boils down to this: defendant-dominated and controlled boards "closed" the relevant insurance years without estimating "with a reasonable degree of certainty" the future indemnity claims. Instead, they approved refunds totaling $31 million. Defendants now claim that the effect of these improper "closings" of the years in question is that they may now present an unknown and unlimited number of new indemnity claims in unlimited amounts for which no premiums or assessments were ever paid, and that they cannot be assessed to fund the expense of their indemnity claims. In short, defendants demand unlimited indemnity insurance for which they have never paid. Defendants' arguments are without merit. The "closing" of the years in question means only that there will be no further assessments for claims which had been reported prior to the time of closing, and as to which reserves estimated with a reasonable degree of certainty had been set aside to pay indemnities for those

2

known claims. Assessments are appropriate for new, previously unreported, unreserved for claims. Alternatively, it is plain the years were never properly "closed," and may be "reopened" to assess defendants regarding the new claims.

The American Club also seeks a declaration that its approach of allocating indemnity claims over the years of alleged exposure and applying the deductible for each year to claims attributable to more than one policy year is appropriate, and that defendants have no right to seek the re-calculation of any prior indemnity payments on a single deductible basis. This method is consistent with the terms of the pre-1989 policies, it was expressly approved by defendants' representatives on the Club's board of directors in 1989, and it was recently approved by the New York Court of Appeals under similar circumstances. Moreover, defendants have acquiesced in this method for decades, and are otherwise barred from asserting claims for recalculation under the time bar in each contract.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY[2]

### A.     The Parties

The Club is a member-operated, non-profit mutual indemnity insurance association of ship owners that exists to provide mutual marine indemnity insurance to its members at cost.[3]  (McGowan Aff. ¶10; Brown Aff. ¶4).  Defendants are shipowners and operators or their successors in interest who were members of the Club in various years before February 20, 1989.  (Amended Pretrial Order ("Am. PTO"), Stipulated Fact No. 2).

The Club's members operate the Club through the boards of directors they elect each year. (Brown Aff. ¶5).  At all relevant times, the majority of directors, including various chairmen of the boards of directors, were officers or employees of defendants (including Keystone Shipping Lines, Inc.

---

[2] For a full recitation of the facts, the American Club refers the Court to the direct and rebuttal sworn witness statements filed on its behalf, particularly those of Messrs. McGowan, Brown, Hughes and Solarino. Citations to witness statements are to the witness's direct testimony, unless otherwise specified.

[3] The American Club is organized and existing under New York law and its principal office is in New York. (Am. PTO, Stipulated Fact No. 1). All of the applicable policies were issued in New York, and are governed by New York law.

("Keystone"), Farrell Lines, Inc. ("Farrell") and American President Lines, Inc. ("APL")), all long

term Club members. (McGowan Aff. ¶12; PX-295, 296). Under the Club's by-laws, the directors'

primary duties include ensuring that sufficient funds are collected by way of premiums and

assessments from each year's members to provide indemnities to those members for all claims asserted

against them, and that only proper indemnity claims are paid. (McGowan Aff. ¶¶13, 32, 37). The day-

to-day business of the Club is carried on by a manager, Shipowners Claims Bureau, Inc. ("SCB"),

which is appointed by and subject to the direction and control of the board. (Brown Aff. ¶5).

    From the 1940's through about the mid-1990's, the Club had between 30 and 40 members,

primarily American companies. (McGowan Aff. ¶11). After a new marketing initiative in the mid-

1990's, the Club's membership grew and diversified to over 400 members, most of which are foreign

companies. (Hughes Aff. ¶29; PX-289). Keystone left the Club in 1997, APL in 1998, and Farrell in

early 2005. All other defendants but one left the Club before the commencement of this action.

**B.**    **The Club's Fully Assessable Indemnity Policies**

    During the relevant period, the Club issued to its members fully assessable policies of one-year

term which provided indemnities for personal injury and death claims. (Am. PTO, Exh. 1, p.2).

    Club members for each insurance year mutually indemnified each other for losses and expenses

listed in the policies due to occurrences during the year. Members funded these indemnities through

payment of premiums and assessments. In this sense, all Club members were insurers as well as

insureds. (Brown Aff. ¶¶7, 8; PX-307, p.9).[4] Their premiums and assessments, plus investment

income thereon, were the sole sources of funds for the indemnities. Because the members' proportions

of premiums and assessments, and members' losses changed from year to year (see PX-300), New

---

[4] See Dicola v. Am. S.S. Owners Mut. Protection and Indemnity Ass'n, Inc. (In Re Prudential Lines), 158 F.3d 65, 77 (2d Cir. 1998) (each member of a mutual insurance association such as the American Club is "both an insured and an insurer"). Defendants' expert, Terence Coghlin, has repeatedly acknowledged this fact in articles he wrote prior to the commencement of this Action. (See PX-316, p.403 and PX-317, p.131).

York Insurance Law and the Club's by-laws require that separate accounts be kept for each insurance year for purposes of determining assessments, dividends and refunds. (PX-109; Brown Aff. ¶7; McGowan Aff. ¶16). Members of an insurance year were liable only for their proportions of the premiums and assessments for occurrences and expenses attributable to that year. The members of one year could not be assessed to pay for the claims or expenses of members of another year. (Brown Aff. ¶¶7-8; McGowan Aff. ¶¶14-17).

As claims in each policy year were reported and developed, the Club set and adjusted reserves for each individual claim based upon consideration of, among other things, the seaman's medical records and opinions of trial counsel. If the premiums paid by members of an insurance year were insufficient to fund indemnities for that year's claims, assessments were levied on that year's members. (McGowan Aff. ¶¶31-38).

**C.     The Club's Practice of "Closing" Insurance Years**

Pursuant to Article VI, Section 4 of the Club's by-laws, when the Club's manager could estimate "with a reasonable degree of certainty the minimum probable or final surplus or deficiency resulting from all of the Club's insurances in effect for the year," the board would order "final" dividends or refunds, or levy assessments, with respect to all reported claims. (Brown Aff. ¶9). This practice was known, informally, as "closing" the insurance year. During the pre-1989 years at issue in this suit, insurance years were kept "open" at times up to 10 to 11 years and were then "closed" on the understanding that all claims against all members each year had been reported and reserved for. (McGowan Aff. ¶¶39-52).

At each closing, all income and expenses regarding each year were tallied and, at least until 1988, with the closing of the 1977 insurance year, the only funds retained by the Club were reserves for reported claims which had not yet been resolved ("Pending Claims") with respect to which there was sufficient information that the claims' likely costs could be and were estimated with a reasonable

degree of certainty. Upon "closing" a year, accounts for that year were "zeroed out" and any

remaining surplus that was the result of assessments was refunded to that year's members. However,

nothing was reserved for any possible unknown claims.[5] To the extent that the amount thereafter paid

for indemnities on claims *known, reported, and properly reserved for prior to closing* exceeded the

amount the board had ordered reserved for such claims, the Club paid such claims from its Reserve

Account. (McGowan Aff. ¶¶47, 50-52). The board was advised on a number of occasions that closing

was a final settlement of accounts between the Club and its members, meaning there would be no more

assessments and no more new claims. The Club's board resolutions for closing years used in the

1940's and 1950's made clear that closing was only in respect of claims "outstanding" at the time of

closing – i.e., known, reported and unresolved prior to closing. Any further claims to be submitted by

members were subject to all the terms and conditions set forth in the policies, including the

assessability provisions. (Brown Rebuttal Aff. ¶¶6-17).

Over the years, all surplus funds that were derived from assessments were refunded to the

members of the pre-1989 years upon closing of those years. In total, defendants voted themselves over

$31 million in refunds. (PX-297). This approach, however, prevented the Club from building up large

reserves.[6]

## D.    **The Rise of Asbestos and Other ODCs**

In the early 1980s, members of the Club in closed years in the 1940s, 1950s, and 1960s, began

seeking indemnities for unreported ODCs from seamen and others who had worked on or about their

ships in those years resulting from exposure to asbestos. (McGowan Aff. ¶53). Because of the long

latency periods – sometimes decades – virtually all Closed Year ODCs did not arise until long after the

---

[5] Indeed, until the 1980s, no member had ever presented a previously unreported and unreserved for occupational disease claim in respect of a "closed" insurance year.

[6] For a detailed discussion regarding the American Club's slow build-up of reserves, see Solarino Aff. at ¶¶7–13. Defendants provided only a nominal part of the Reserve Account, all of which by 2004 was expended on their Closed Year ODCs. (Solarino Rebuttal Decl. ¶¶2-8).

relevant insurance years were closed.  As a result, the premiums negotiated between the Club and defendants, which were based on the members' losses over the preceding five year period, did not reflect the costs of Closed Year ODCs.  (McGowan Aff. ¶¶17-19; Craig Aff. ¶¶9-10; Sandercock Aff. ¶6).  Moreover, because Closed Year ODCs were unknown prior to the closing of each relevant insurance year, the Club had not assessed the members of those insurance years for those claims. (McGowan Aff. ¶54).  Accordingly, defendants never paid premiums or assessments in respect of these claims, and the premiums they did pay were less than they would have been if the ODCs had been earlier asserted.

In the belief that there would be only a "trickle" of small ODCs, the Club indemnified the closed years members for Closed Year ODCs from the Club's Reserve Account.  (McGowan Aff. ¶¶55-56).  Each member's indemnity was based upon allocation of each given loss over the years of the seaman's sea service on each vessel each year.  The deductible for each year was then applied. (McGowan Aff. ¶¶63-65; Craig Aff. ¶¶29-31).  Defendants repeatedly acquiesced to this "Multiple Deductibles" approach.  (Solarino Rebuttal Decl. ¶¶11-12; Craig Aff. ¶¶33, 35).

Neither the Club's manager nor the boards of directors in the years in question ever consulted with the Club's counsel as to whether the Club had any legal obligation to pay indemnities on Closed Year ODCs.  (Brown Aff. ¶14; McGowan Aff. ¶60).  The issue was not brought before any board for discussion, and the board passed no resolutions on the subject.  (McGowan Aff. ¶60).  The indemnities were simply paid on an unexamined and mistaken assumption that the Club was obligated to pay them, even though the members receiving the benefits of such indemnities had not paid for them.  (See McGowan Aff. ¶56; Sandercock Aff. ¶11; Cassedy Aff. ¶¶6-9).  As this practice benefited primarily those members whose senior executives were Club directors (some of whom held equity interests in their companies), it was not in the financial interest of either those directors or their companies - i.e., the defendants - to challenge the practice, and they did not do so.  (McGowan Aff. ¶¶57-62).  As a

result, the Club's practice of paying Closed Year ODCs continued without examination or

consideration of the Club's legal obligations to do so until 2004, just prior to the filing of this action.

(Hughes Aff. ¶¶14, 30).   Thereafter, Club counsel concluded that the practice of paying such

indemnities was discretionary (the "Discretionary Practice") and should be discontinued.  (PX-257).

**E.    Defendants' Representatives on the Club's Board of Directors
        Improperly Closed Insurance Years**

In 1988, with the closing of the 1977 year, the Club's manager advised the board, which at the

time was largely composed of defendants' representatives, that it would be prudent to establish a

reserve for future Closed Year ODCs arising in the 1977 and later insurance years.  (See McGowan

Aff. ¶¶74-81; Cassedy Aff. ¶¶10-15; Brown Aff. ¶¶18-24).  The surplus for the 1977 insurance year

was then over $1.5 million.  The manager made several proposals that $1.5 million, $750,000, or even

$250,000 of that surplus be set aside for such claims, but all were rejected by the board.  The manager

then spoke with defendants' asbestos counsel, who advised that even $250,000 could be low.

Ultimately, the board agreed to set aside only a nominal and arbitrary amount – $100,000 per insurance

year – to pay for Closed Year ODCs.  Upon the closing of the 1977 insurance year, the directors

ordered that more than $1.4 million be refunded to their companies and other members of the Club in

that year, after the $100,000 set-aside, instead of ordering that the surplus be reserved for future Closed

Year ODCs.  (McGowan Aff. ¶¶74-78).

The $100,000 "reserve" agreed to by the then-directors was not the product of an estimate

made "with a reasonable degree of certainty" as required by the Club's by-laws.  There were no studies

made in support of that number.  (McGowan Aff. ¶¶79-81).  Defendants' representatives admit that, at

that time, they knew nothing about the number or quantum of claims, or the aggregate liabilities for

claims that would be asserted in the future against the members of the 1977 and later years  (See, e.g.,

Gronda Dep. Tr. pp. 165-67, 182-84).  Thus, unlike all prior years in which the Club set reserves for

specific claims based on analysis of, among other things, the identity of the claimant, the date and type

of his injury, medical and experts' reports, lawyers' reports, and estimates as to all damages in each individual case, so that the proper reserve could be set for each claim with a reasonable degree of certainty (McGowan Aff. ¶¶36-39), the $100,000 annual set aside for Closed Year ODCs was nothing more than an arbitrary and "low ball" guess.

As predicted in 1988, the reserve of only $100,000 per year has turned out to be insufficient to cover all Closed Year ODCs arising in the 1977 and later insurance years. For the eleven insurance years 1977 and 1979-1988 – only $1.1 million in total was set aside to pay for Closed Year ODCs. Through May, 2004, however, the Club has paid defendants over $6.7 million in indemnities for Closed Year ODCs arising from alleged exposure in the 1940 through 1988 years. (Solarino Aff. ¶¶21-33). Defendants, therefore, have received approximately $5.6 million in indemnities for which they never paid.

**F.    The American Club's Counsel Repeatedly Advises
        the Board that Closed Years Can be Reopened**

In 1993, the US Bankruptcy Court entered a judgment against the Club in favor of closed-year Club member Prudential Lines, Inc. ("PLI") for over $66 million regarding the claims of seamen who had worked on PLI vessels in years long closed prior to PLI's bankruptcy in 1986. As this judgment exceeded the Club's assets, the Club's then counsel, Mr. Brown, advised in writing that if the Club were forced to pay the judgment, the closed insurance years implicated by the judgment could and should be "reopened," and the members of those years assessed, because the Club's current members could not be assessed to pay judgments with respect to years for which they were not members. (PX-175, 176). Those letters were circulated to all of the then-directors of the board, including a number of defendants' representatives. (See also McGowan Aff. ¶¶82-83; Brown Aff. ¶¶25-35).

The director representing APL, Mr. Gleason, questioned the Club's right to reopen closed insurance years. At Mr. Gleason's request, Mr. Brown corresponded with APL's attorney on these

9

issues in December 1994, with a copy to SCB (McGowan Aff. ¶¶ 84-85; PX-192), but never received a reply (Brown Aff. ¶29).

The issue of reopening closed years was raised again in 1995 in connection with the bankruptcy of another former long-term member, United States Lines, Inc. ("USL"), at which time Mr. Brown wrote a letter to the Club on April 20, 1995 proposing to write a letter to the USL Trustee raising the point that if the Club were required to indemnify the Trustee with regard to Closed Year ODCs, the Club should have a right to reopen the years to require them to pay assessments regarding those occupational disease claims. (McGowan Aff. ¶86; Brown Aff. ¶¶30-33; PX-198).

Thereafter, in early 1996, there was correspondence directly between Mr. Gleason and Mr. Brown in which Mr. Gleason sought to persuade Mr. Brown that the Club could not reopen any closed years, an idea which Mr. Brown refuted. (McGowan Aff. ¶87; PX-211; PX-212).

Later, in 1996, the issue of reopening years was further discussed in connection with the closing of the 1992 year. The board minutes of the meeting on June 13, 1996 contain the following statement:

> In discussing this recommendation, [regarding the closing of the 1992 year] the Directors wished to make clear that when taking action to close a year, it is their intention that such closed year cannot be reopened unless through the operation of New York statute.

(McGowan Aff. ¶¶88, 89; Brown Aff. ¶42; PX-221, p. AC3069006). At the same meeting on June 13, 1996, the board adopted a proposal to change from an insurance policy form of contract to a rule book. Starting with the 1997 insurance year, the rules prohibited assessments on members after a year was closed. This rule was incorporated in the 1997 and later contracts between the members and the Club. (See PX-234, R. 4.11; PX-283, R. 4.16, 4.17). This rule was, by its express terms, prospective only. Neither the board minutes nor the new rule purported to affect the Club's right to reopen the pre-1989 years. (See Brown Aff. ¶42; Recchuite Aff. ¶¶6-10; Sandercock Aff. ¶10).

**G.     The Club Creates the Contingency Fund**

In June 1996, the board of directors, including representatives of defendants Keystone, Farrell and APL, set up a "Contingency Fund," the purpose of which was to use the Club's reserve accounts to ameliorate assessments on insurance years as they were being closed. By reducing the need for, or amount of, assessments made upon the closing of an insurance year, the Club would appear more attractive economically to current and potential future members and look more like competing P&I Clubs in the "International Group of P&I Clubs," the dominant market collective in the field of marine P&I insurance.

The Contingency Fund was governed by various guidelines designed to ensure that the funds allocated to the Contingency Fund would not result in undue depletion of the Club's Reserve Account. At no point was it contemplated that the Contingency Fund would be used in a manner that would result in open-year members being assessed to pay for claims arising in closed years, such as Closed Year ODCs. (Solarino Aff. ¶¶14-20; Sandercock Aff. ¶12; Hughes Aff. ¶20; Brown Rebuttal Aff. ¶56).

**H.     The International Group Requires the American Club to Change Its Rules**

Beginning in 1989, the American Club became a reinsured member of the International Group and thus was able to pool its losses with other Clubs in the International Group and obtain reinsurance at favorable rates. The American Club joined the International Group as a full member in 1998. (Hughes Aff. ¶¶9, 18-20).

In 2004, a working group of the International Group found that the American Club and several other International Group members had no rule requiring open year members to pay assessments for deficiencies in closed years, and required that the American Club and others adopt such a rule. (See Hughes Aff. ¶¶40-44).

In compliance with the International Group's demand, the American Club thereafter adopted a rule, effective for the 2005 and future years, under which the 2005 and future Club members agreed to be responsible for deficiencies arising in closed years only from February 20, 1989 forward – i.e., for the period in which the Club was a reinsured or full member of the International Group and entitled to pool claims with other members, but not for the insurance years at issue in this action, which are prior to the Club's membership in the International Group.  No member of any other year has ever consented to be assessed for claims asserted with respect to Closed Year ODCs.  (Hughes Aff. ¶¶43-44; Sweeney Aff. ¶¶6-16).[7]

## I.    Events Leading to the Filing of This Action

In 2002, defendant Keystone Shipping Co. sued the Club, claiming that the Club's practice of applying Multiple Deductibles to Closed Year ODCs was improper.  As a consequence of Keystone's suit, and having received a written opinion of counsel in 2004 that the Club had no legal obligation to indemnify Closed Year ODCs or, in the alternative, could assess the applicable closed year members to fund indemnities for Closed Year ODCs, the board voted to discontinue the Discretionary Practice of indemnifying Closed Year ODCs from the Club's Reserve Account (see Hughes Aff. ¶¶31-38; Sweeney Aff. ¶12), and so notified all members by circular dated June 7, 2004.  (PX-258).  The Club filed this declaratory judgment action that same day to protect its current and future members from the consequences of defendants' inequitable, arbitrary, bad faith and *ultra vires* actions.  (Sweeney Aff. ¶16).  By agreement, the claims and counterclaims in the Keystone action were merged into this Action.

---

[7] Arguments defendants raise regarding communications between the Club and the International Group in 1996 are refuted by Mr. Hughes (Hughes Aff. ¶45, Hughes Rebuttal Aff. ¶¶13-14) and Mr. Brown (Brown Rebuttal Aff. ¶42).

## ARGUMENT

I.  **THE AMERICAN CLUB IS NOT OBLIGATED TO INDEMNIFY DEFENDANTS FOR CLAIMS FOR WHICH THEY PAID NO PREMIUMS OR ASSESSMENTS**

A.  **Defendants Have No Right to Indemnities for Any Pending or Future Closed Year ODCs Because No Premiums or Assessments were Paid to Fund the Indemnities**

The insurance policies issued to defendants expressly incorporate the Club's charter and by-laws for that insurance year.[8]  (Am. PTO, Exh. 1, p. 1).  These policies and by-laws must be construed and enforced in accordance with their express terms,[9] and construed in a way that "affords a fair meaning to all of the language employed by the parties in the contract and leaves no provision without force and effect."[10]

The insurance policies and by-laws at issue, construed as a whole, demonstrate that the Club is not obligated to pay indemnities to defendants for any pending or future Closed Year ODCs because defendants have not paid premiums or assessments to fund any such indemnities.  (See Am. PTO, Exh. 1, p. 2, p. 11, ¶ 28(b); PX-109, Art. VI, §§1, 4).

The business of the Club is divided into insurance years.  (Plaintiff's Trial Memorandum at 4-5[11]; Statement of Facts, § (B); PX-109, Art. VI, §3).  At the beginning of each pre-1989 insurance year, defendants were required to pay premiums and later, if necessary, assessments to provide their "proportionate share" of the funds needed to pay any indemnities for any covered claims asserted by

---

[8] The parties to this action agree that any disputes under the Club's Charter and applicable pre-1989 insurance polices and by-laws are governed by New York law.  (Am. PTO, §III, ¶¶1, 3, §IV(A), ¶3; §IV(B), ¶1.)

[9] See W.W.W. Assocs., Inc. v. Giancontieri, 77 N.Y.2d 157, 162, 566 N.E.2d 639, 642, 565 N.Y.S.2d 440, 443 (1990) ("when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms."); accord R/S Assocs. v. New York Job Dev. Auth., 98 N.Y.2d 29, 32-33, 771 N.E.2d 240, 242, 744 N.Y.S.2d 358, 360 (2002); Hartford Ins. Co. of the Midwest v. Halt, 223 A.D.2d 204, 212, 646 N.Y.S.2d 589, 594 (4th Dep't. 1996) ("where the provisions of an insurance contract are clear and unambiguous, they must be enforced as written.").

[10] See Consolidated Edison Co. of New York, Inc. v. Allstate Ins. Co., 98 N.Y. 2d 208, 221-22, 774 N.E.2d 687, 693, 746 N.Y.S.2d 622, 628 (2002) (internal citations and quotations omitted); see also Hartford Ins. Co., 223 A.D.2d at 212, 646 N.Y.S.2d at 594 ("The parties' intent is to be ascertained by examining the policy as a whole, and by giving effect and meaning to every term of the policy … Reasonable effort must be made to harmonize all of the terms of the contract.")

[11] References to Plaintiff's Trial Memorandum hereafter appear as "Plaintiff's Memo at ___."

members of that insurance year. (Plaintiff's Memo at 5; Am. PTO, Exh. 1, p. 2; PX-109, Art. VI, §4).

Defendants' obligation to provide such funds is set forth in the assessability clause of each pre-1989

insurance policy, which subjects each defendant:

> to a contingent liability hereunder for <u>assessment without limit of amount</u> for their proportionate share of <u>any deficiency or impairment</u>[12] as provided by law and fixed in accordance with the by-laws of the Association. (Am. PTO, Exh. 1, p. 2 (emphasis added)).

Additionally, each defendant agreed that if it failed to pay the necessary premiums and

assessments for a given insurance year, the American Club would have the right to cancel its insurance

policy for that insurance year and the Club would have no obligation to pay any indemnities sought by

the defendant attributable to that insurance year. (Am. PTO, Exh. 1, ¶28(b)). In short, defendants had

no right to indemnity insurance unless they paid for it.

Defendants never paid any premiums for Closed Year ODCs because the premiums they did

pay did not reflect a loss history of ODCs. (Plaintiff's Memo at 6-7.) Likewise, defendants never paid

any assessments for any Closed Year ODCs prior to and including 1976, and for insurance year 1978.

(Plaintiff's Memo at 7.) At a minimum, the Club should not be obligated to indemnify any Closed

Year ODCs arising in those years.

Although a nominal and arbitrary sum of a $100,000 was set aside for Closed Year ODCs

attributable to the 1977 and 1979 through 1988 insurance years by the defendants' representatives on

the Club's board, those funds were exhausted long ago to pay indemnities to defendants and do not

entitle defendants to the payment of additional indemnities for Closed Year ODCs (Plaintiff's Memo at

16-19.) Accordingly, defendants are not entitled to any further indemnity payments for any pending or

future Closed Year ODCs.

---

[12] "Deficiency" or "impairment" includes unfunded costs of indemnity claims and expenses for an insurance year. (See McGowan Aff. ¶15).

**B.** **The Club's Policies and By-Laws Mandate that, upon Closing an Insurance Year, the Club Either Has No Obligation to Indemnify Defendants for Closed Year ODCs or, if the Obligation Exists, the Club May Assess Defendants for any Deficiencies**

Defendants' argument that closing an insurance year terminates the Club's right to assess members in an insurance year, but does not affect the members' right to receive indemnity payments for claims arising in that year, is contradicted by the terms of the Club's policies and by-laws, the prior resolutions of the Club's board of directors, and common sense. A proper reading of the Club's by-laws and policies compels the conclusion that a "closing" precludes the Club from further assessments related to only those claims known and reported prior to the closing of the year. This leads to only two possible conclusions:

(a)    the "closing" is literally complete and the Club will pay the "known" claims (i.e., those whose costs could be estimated with a reasonable degree of certainty at "closing") without further refund or assessment even if the assessments prove to be insufficient, but need not pay "unknown" claims (i.e., those whose costs could not be estimated with a reasonable degree of certainty at "closing"), ("Complete Closing"); or

(b)    there is a "closing" only with respect to known claims, and those will be paid without further assessment, but unknown claims should only be paid under the policy, subject to all policy terms, including the assured's contractual contingent liability to pay assessments ("Incomplete Closing").

(Brown Rebuttal Aff. ¶¶6-7).

**1.** **The Club's Closing of Insurance Years Constituted a Complete Closing**

Under the theory of Complete Closing, a closing acts as a "final settlement of account," terminating both the members' rights to assert claims after closing, as well as the Club's right to assess. Defendants' representatives on the Club's board were advised by letter from the Club's counsel in 1979 that a closing constituted a final settlement of the accounts for an insurance year. (See PX-37 (the "Fallon Letter")). This letter has been widely distributed on numerous occasions since that time. (See PX-304).

The Fallon Letter pointed out that, under New York law, where there has been a final settlement of the accounts between a mutual insurance association and a policy holder, it constitutes a

mutual release between the association and that policy holder. <u>Hyde v. Lynde</u>, 4 N.Y. 387, 390-92 (1850) (final settlement of the accounts between a mutual insurance association and a policy holder constitutes a mutual release); <u>see also</u> <u>Patrons of Industry Fire Ins. Co. v. Harwood</u>, 64 A.D. 248, 252-54, 72 N.Y.S. 8, 10-12 (3d Dep't 1901) (same). As set forth in <u>Hyde</u>, this mutual release is "<u>binding upon both parties</u>" unless it can be impeached on the grounds of, among other things, mutual mistake, bad faith, or fraud. <u>Hyde</u>, 4 N.Y. at 390-92 (emphasis added); <u>Patrons</u>, 64 A.D. at 253, 72 N.Y.S. at 11. This mutual release extinguishes: (i) the mutual insurance association's right to levy further assessments on the policy holder (certainly for all claims known at the time of the settlement); and (ii) the policy holder's right to make or assert any new demands or claims to the funds of the association. <u>Id</u>.[13]

Though the Fallon Letter was written at a time when the Club's insurance years were kept open for up to ten calendar years, and thus contemplated that all claims would be known by closing, it follows from the logic of the letter that claims unknown at closing are either barred or constituted grounds for re-opening on the basis of mistake. This, in fact, was the advice given to the Club's board on a number of occasions in the 1990s.

Given the advice contained in the Fallon Letter and the subsequent advice from Mr. Brown on the issue of re-opening, defendants have no good faith basis to allege that they always "understood" that closing was a one-way termination of the Club's right to assessment only.

Even assuming, for argument only, that closing terminated only the Club's right of assessment, but not members' rights to assert claims after a year was closed, it is well settled under New York law that this closing may be set aside and additional assessments levied, if the accounts in question were

---

[13] This remains good law. The American Club is the only mutual marine insurance association in the United States and, possibly the only true mutual insurance association still in existence in the United States. Accordingly, the applicable New York case law and legal literature on the issues in this action are sparse. The cases referenced above, however, are on point and have never been overruled.

settled based upon a mutual mistake of fact or in bad faith, or if the directors' actions were *ultra vires*.[14]

Prior to the close of the 1977 insurance year in 1988, nothing was set aside for the possible assertion of previously unreported asbestos or occupational disease claims at the time insurance years were closed, and only a nominal and arbitrary sum of $100,000 was set aside for the 1977 and 1979 through 1989 insurance years. (Plaintiff's Memo at 7-9.) This failure to properly account for unreported asbestos or other occupational disease claims resulted from mutual mistakes of fact. Initially, neither the Club nor the defendants were aware of these occupational disease claims. Even when the Club and defendants began to set aside funds to satisfy potential Closed Year ODCs beginning in 1988, neither the Club nor defendants had the necessary facts to properly account for such claims. (Plaintiff's Memo at 7-9.)

Obviously, if the existence and facts about specific Closed Year ODCs had been known, proper reserves would have been set aside to satisfy them at the time a "final" assessment, refund, or dividend was issued. As the failure to do so resulted, at least in part, from the mutual mistake of facts by the manager, defendants, and defendants' representatives on the Club's board, if the Club is required to pay indemnities to defendants for Closed Year ODCs, the Club should have the right to set aside any prior settlement of the accounts for these insurance years and to assess the defendants for any new Closed Year ODCs asserted.[15]  (See, supra, n. 14).

---

[14] See Cent. New York Bridge Ass'n, Inc. v. Am. Contract Bridge League, 72 Misc. 2d 271, 278-80, 339 N.Y.S.2d 438, 444-46 (Sup. Ct. 1972) (actions taken by directors in violation of corporate by-laws are *ultra vires* and may be set aside); Hyde, 4 N.Y. at 390-91 (the settlement of the accounts of a member may be set aside if impeached on the grounds of, among other things, a mutual mistake of fact); Patrons, 64 A.D. at 252-54, 72 N.Y.S. at 10-12 (a settlement of a member's accounts may be set aside if made in bad faith, or as a result of a mutual mistake of fact); Barnett v. Metropolitan Life Ins. Co., 258 A.D. 241, 245, 16 N.Y.S.2d 198, 202, aff'd, 285 N.Y. 627 (1939) (bad faith, willful neglect or abuse of discretion are grounds to set aside apportionment of divisible surplus by mutual life insurance company); Turner v. Am. S.S. Owners' Mutual P&I Ass'n, Inc., 16 F.2d 707, 709 (5th Cir. 1927) (fraudulent or arbitrary assessments fixed by board of directors of mutual insurance association may be set aside); 3 Couch on Ins. (3d), §39:31 ("any attempt to limit arbitrarily the number and amount of assessments for which members are liable is *ultra vires* and void") (emphasis added).

[15] The Club is not barred from asserting these mutual mistakes of fact under C.P.L.R. § 213(6) which provides a 6 year statute of limitation for "an action based upon mistake." N.Y. C.P.L.R. § 213(6). This is not an action based on

In setting aside the $100,000 for Closed Year ODCs with the close of the 1977 and 1979

through 1988 insurance years, the Board acted arbitrarily, and its acts were, therefore, *ultra vires* in

violation of Article VI, Section 4 of the Club's by-laws. The Club's board – which was dominated by

defendants' representatives – had an express obligation in issuing a "final" assessment or refund to

"estimate with a reasonable degree of certainty the minimum, probable or final surplus or deficiency

resulting from all of the [Club's] insurances in effect during such insurance year" and to set aside

"such sums as they may deem necessary to meet outstanding policy obligations". (PX-109, Art. VI,

§4).

This was not done. (Plaintiff's Memo at 7-9.) The $100,000 that was set aside at the close of

each insurance year was not based upon a reasonable estimate of the costs of Closed Year ODCs

attributable to that insurance year – the facts of which were not known. Id. Nor was it based upon any

sort of reasoned study or investigation. Id. In fact, it was substantially less than the amounts

recommended by the Club's manager and defendants' asbestos counsel. Id. Instead, defendants'

representatives on the Club's board, arbitrarily set aside only $100,000 in order to maximize the

refunds the board issued to their member companies, in which many of them owned an equity stake.

Id. Equally *ultra vires* is any suggestion by defendants that, in adopting the usage of the Contingency

Fund, they intended to establish an unlimited right to claim against the Club's reserves while, at the

same time, denying the Club recourse to assessments. A director's fiduciary obligations to the Club

---

mistake: it is an action to enforce the Club's policies and by-laws. (Plaintiff's Memo at 13-14.) The Club is asserting these mutual mistakes solely as a defense to defendants' unjust claim that there has been a one-sided closing. Id. In any event, it is well-settled under New York law that insurance disputes "stand on somewhat different footing" than do other disputes and the courts should use their broad equitable powers "to prevent an unconscionable advantage to the insured." Jersey Interstate Wire & Strip Corp. v. Metro. Life Ins. Co., 41 Misc.2d 967, 967-68, 247 N.Y.S.2d 27, 28 (Sup. Ct. 1964). Accordingly, the courts have held that the statute of limitations cannot be used as a shield where the mistake would result in an unjust windfall to the insured and have tolled the statute of limitations appropriately. Id.; see also Metro. Life Ins. Co. v. Oseas, 261 A.D. 768, 770-71, 27 N.Y.S.2d 65, 68 (1st Dep't 1941) (same), aff'd, 289 N.Y. 731, 46 N.E.2d 348 (1942); cf. Vogel v. City Bank Farmers Trust Co., 152 Misc. 18, 21, 272 N.Y.S. 643, 646 (Sup. Ct. 1934) (statute of limitation for action based on mistake should not bar an action for reformation of a trust instrument where grantor would be unjustly harmed, "justice forbids such an unhappy result; and fortunately, the law does not exact it"). Defendants' representatives

prevent him from knowingly committing the Club to such a self-destructive course. In any event, the record shows that the Contingency Fund did not operate as defendants have suggested. (See Solarino Aff. ¶¶14-20).

Accordingly, if the Club is required to pay indemnities for any Closed Year ODCs attributable to these insurance years, the Club should have the right to set aside any prior settlement of the accounts for these years, as they were rendered in bad faith, arbitrarily, and in violation of Article VI, Section 4 of the Club's by-laws, and assess the applicable years' members. (See, supra, n. 14).

### 2. In the Alternative, the Club's Closing of Insurance Years Constituted an Incomplete Closing, Preventing Future Assessment only as to Reported Claims

The express terms of the applicable pre-1989 policies and by-laws and the language historically used by the Club in its closing resolutions throughout the 1940's and 1950's makes clear that there was complete closure in respect of known claims only, and the policies remained effective to respond to later arising unknown claims subject to all policy terms, including the assessability provision. (Brown Rebuttal Aff. ¶¶5-17; Plaintiff's Memo at 15-17.)

Allowing defendants to seek indemnity in respect of unknown Closed Year ODCs, and requiring them to abide by the assessability provisions of their policies is proper because it gives effect to all of the policies' terms and conditions. (Plaintiff's Memo. At 13-15). If the Court finds that the Club is obligated to indemnify defendants' liabilities for Closed Year ODCs, it should require defendants to comply with the terms of the assessability clause.

If the Club is required to pay indemnities for Closed Year ODCs, it is entitled to treat each Closed Year ODC as de facto in deficiency and assess the applicable year's defendants, in full, for their proportionate share of the Closed Year ODC. Prior to 1988, at the close of each insurance year,

---

on the board set in motion a self-serving and unjust practice, the full effect of which was not understood by the Club's current board until 2004. Defendants should not be permitted to benefit from their inequitable conduct.

the accounts for that year were "zeroed out," i.e., the Club refunded to defendants any funds that were not needed to fund Pending Claims. (Plaintiff's Memo at 5-6.) As a consequence, any new indemnity claim that is now asserted puts the years in question automatically into deficiency in the amount of the claim. Id. As the Club never received any premiums or assessments to fund indemnities for Closed Year ODCs attributable to those years, it should now be permitted to assess defendants, in full, for their proportionate shares of these claims.[16]

### 3. The $100,000 Per Year Set-Aside for Closed Year ODCs was Not Estimated with the "Reasonable Degree of Certainty" Necessary to Render Unreported ODCs the Equivalent of a "Known" Claim for Purposes of Closing

The unreasoned, *de minimis* set-aside of $100,000 per year for insurance years 1977 and 1979-1989 cannot logically entitle defendants to indemnities for an unlimited number of unknown ODCs of an unlimited unknown value or cost. Such a result would be preposterous: by failing and refusing to estimate claims with the certainty required by the by-laws, the board in effect would have given members not only too much in refunds, but also the unlimited right to present new claims in the future without any further assessment. Yet, this is the result argued for by defendants.

Unlike the amount set aside for Pending Claims, the $100,000 set aside regarding Closed Year ODCs was not estimated "with a reasonable degree of certainty," as expressly required by Article VI, Section 4 of the Club's by-laws. (Id.; PX-109, Art. VI, §4). This set-aside therefore cannot and does not convert Closed Year ODCs into known and reported claims for purposes of closing.

---

[16] Defendants are not entitled to offset their liability for assessments for Closed Year ODCs with any amounts that were previously reserved to fund Pending Claims even if some portion of these funds were not used by the Club for this purpose. As the Fallon Letter makes clear, following the settlement of the accounts for an insurance year, all funds remaining in the Club's reserves for that year become the property of Club, and the members have no right to those funds except to the extent necessary to indemnify claims that were reported prior to the close of that year. (PX-37, pp. 9-11; Solarino Rebuttal Decl. ¶5).

**II.    THE AMERICAN CLUB HAS PROPERLY APPLIED MULTIPLE DEDUCTIBLES TO CLOSED YEAR ODCS IN THE PAST AND MAY CONTINUE TO DO SO IF REQUIRED TO PAY ADDITIONAL INDEMNITIES FOR CLOSED YEAR ODCS**

**A.    The American Club has Properly Calculated Indemnity Payments for Occupational Disease Claims Based Upon A Multiple Deductible Approach**

The New York Court of Appeals recently passed upon what it termed an "issue of first impression," holding that under New York law, where an insured occurrence spans the life of several defined term insurance policies, it is appropriate to allocate the risk proportionately over all of the policies implicated and by inference apply all applicable self-insured retentions or deductibles. See Consolidated Edison Co. of New York v. Allstate Ins. Co., 98 N.Y.2d 208, 774 N.E.2d 687, 746 N.Y.S.2d 622 (2002).

In Con Edison, that company was seeking indemnification for costs associated with its remediation of environmental damage which occurred over a period of 50 years. The New York Court of Appeals rejected Con Edison's request for the application of a "joint and several liability" approach as inconsistent with its policies' unambiguous terms. Con Edison, 98 N.Y.2d at 224, 774 N.E.2d at 694-95, 746 N.Y.S.2d at 630. Con Edison's approach would have allowed it to choose one year's insurance policies to answer in full for all costs associated with the remediation, thereby shoehorning all liability for a multi-year loss into one year's policies, just as the defendants seek to do here. Id.

In rejecting this approach, the Court of Appeals was guided primarily by the terms of the insurance policies at issue, which expressly provided that each policy would only answer for insured occurrences "during the policy period". Con Edison, 98 N.Y. at 224, 774 N.E. 2d at 695, 746 N.Y.S. 2d at 630, citing with approval Olin Corp. v. Insurance Co. of N. Am., 221 F.3d 307, 323 (2d Cir. 2000). The Court of Appeals held that to allow the "joint and several" approach in the face of such language would fundamentally alter the terms of the insurance contracts agreed to by the parties, allowing the insured to trigger the application of various layers of excess insurance in the year of his choice - which would not otherwise be triggered. Id. On that approach, the insured would also avoid

the effects of the large self insured retentions or deductibles in each of the other years' policies, as well, which were $100,000 and $500,000 in various years.  Con Edison, 98 N.Y.2d at 216, 774 N.E. 2d at 689, 746 N.Y.S.2d at 624.

As with the policies at issue in Con Edison, the applicable pre-1989 American Club policies provide that:  (i) defendants are entitled to indemnities only for "liability hereunder," i.e., for occurrences within the twelve month term of each policy; and (ii) deductibles are applicable to any "claims hereunder," i.e., deductibles are applicable to any such claims attributable to this same period. (See Am. PTO, Exh. 1, pp. 2-8).

Additionally, the American Club's applicable pre-1989 by-laws make clear that each insurance year is to be treated as a separate and distinct accounting entity.  (See PX-109, Art. VI, §3).  Section 4 of the by-laws also refers to the "insurance year" in connection with levying assessments and declaring dividends.  (See PX-109, Art. VI,  §4).

In Con Edison, the Court of Appeals stated:

> Pro rata allocation under these facts, while not explicitly mandated by the policies is consistent with the language of the policies.  Most fundamentally, the policies provide indemnification for liability incurred as a result of an accident or occurrence during the policy period not outside that period [citation omitted].

98 N.Y.2d at 224; 774 N.E. 2d at 695, 746 N.Y.S.2d at 630.

As in Con Edison, the American Club's policy language compels the conclusion that losses spanning more than one policy year should be allocated among all of the triggered policies and that the terms of these policies must be applied in full, i.e., the policy deductible for each triggered policy should be applied to each indemnity claim.  Defendants should not be awarded more insurance than provided for under the express terms of each pre-1989 American Club policy.

The decision of the Court of Appeals in Con Edison is consistent with prior Second Circuit decisions.  For example, in Olin Corp., 221 F.3d at 323, the Second Circuit, noting that it had not previously addressed this issue directly, held that it was appropriate to allocate a multi-year

22

environmental damage loss among all of the policies in effect throughout the period in question, largely for the same reasons expressed by the New York Court of Appeals in <u>Con Edison</u>.[17] <u>Id</u>. Accordingly, the Multiple Deductibles approach is appropriate under New York law.

**B.     Defendants Have Acquiesced in the Club's Multiple Deductible Approach.**

The Club's approach to deductibles was approved by Club counsel and endorsed by the resolution of a board composed mainly of defendants' representatives.  Numerous defendants have acknowledged the propriety of the Club's approach over the past 20 years by repeatedly accepting indemnity payments on this basis.  (Solarino Rebuttal Aff. ¶¶11-12).  Also, it is uncontradicted that prior to and following the board's resolution on September 14, 1989 (PX-303, pp AC3062296-7), the American Club consistently calculated defendants' indemnity claims on the basis of Multiple Deductibles.  (<u>See</u> e.g., McGowan Aff. ¶63-69; Solarino Rebuttal Decl. ¶¶9-12).  Five of the leading defendants accepted at least forty-nine indemnity payments from the Club based on Multiple Deductibles regarding their submitted claims, and at least two accepted the application of Multiple Deductibles on over three hundred other claims regarding other claims which they did not submit to the American Club.  (Solarino Rebuttal Decl. ¶¶11-12).  Defendants' repeated acquiescence to Multiple Deductibles bars their deductible recalculation claims.

---

[17]Defendants' reliance on the Second Circuit's decision in <u>Prudential Lines</u>, 158 F3d 65, is misplaced. Acknowledging <u>Prudential Lines</u> in <u>Olin</u>, the Second Circuit made it clear that it had not "directly addressed when allocation is required or permitted." <u>Olin</u>, 221 F.3d at 322.  Moreover, the outcome in <u>Prudential Lines</u> was tied to the unique facts of that case, and relied on the Second Circuit's finding that Prudential Lines never acquiesced in the Club's policy of applying multiple deductibles.  <u>Prudential Lines</u>, 158 F.3d at 78.  Defendants herein have repeatedly acquiesced in the Club's practice.  In any event, to the extent the <u>Prudential Lines</u> Court addressed how to allocate deductibles, it is not binding on this Court because its analysis was based upon an erroneous prediction about how that issue would be resolved by the New York courts.  <u>Van Buskirk v. The New York Times Co.</u>, 325 F.3d 87, 89 (2d Cir. 2003) ("As the 'highest court of a state has the final word on the meaning of state law, [we] are bound to apply New York law as determined by the New York Court of Appeals.'")

**C.**    **Defendants' Claims for the Recalculation of Deductibles are Time Barred**

Defendants seek recalculation of at least three hundred, and possibly as many as six hundred,

ODCs based on single deductibles  (Solarino Rebuttal Decl. ¶13.)[18]  If the Court follows Con Edison

and other relevant cases, it will be unnecessary for the Court to try this burdensome recalculation issue.

Most, if not all of defendants' deductible recalculation claims are time barred under clauses 17

and/or 18 of each policy.  For example, defendant Keystone alone has submitted two hundred sixty

four such claims, of which over two hundred are time barred or otherwise non-indemnifiable.

(Solarino Rebuttal Decl. ¶¶19-21; PX-312, PX-315).  Although several of the defendants allege they

"objected" to Multiple Deductibles, or claim that they "reserved their rights" with respect thereto, they

still repeatedly accepted payments from the Club based on this approach, as noted above, and until

2002, no defendant sued the Club on this issue.

**III.    DEFENDANTS' COUNTERCLAIMS AND DEFENSES SHOULD BE DISMISSED**

All of defendants' counterclaims and defenses based upon the insurance policies and by-laws at

issue here must fail for the reasons set forth in Argument Sections I & II, supra.  Defendants'

remaining counterclaims and defenses should be dismissed for the reasons forth below.

**A.**    **Expert Testimony on the Policies, By-laws, and Custom and Practice is Irrelevant**

This dispute is governed by the express terms of the Club's pre-1989 policies and by-laws

which are clear and unambiguous on their face.  (Plaintiff's Memo at 13.)  Accordingly, the

interpretation of these policies and by-laws is a question of law for the court and the testimony offered

by defendants' expert, Mr. Terence Coghlin, regarding:  (i) the meaning of these policies and by-laws;

and (ii) purported industry custom and practice is irrelevant.  W.W.W. Assocs., Inc. v. Giancontieri, 77

N.Y.2d 157, 162-63, 566 N.E.2d 639, 642, 565 N.Y.S.2d 440, 443 (1990) (where a contract is clear

---

[18] Granting such relief would provide defendants with additional indemnity insurance for which they paid no premiums or assessments.  (Solarino Rebuttal Decl. ¶23).

and unambiguous extrinsic "[e]vidence outside the four corners of the document" is inadmissible); Excess Ins. Co., Ltd. v. Factory Mut. Ins. Co., 2 A.D.3d 150, 151, 769 N.Y.S.2d 487, 489 (1st Dep't 2003), aff'd by 3 N.Y. 3d 577, 822 N.E.2d 768 (2004) (expert testimony "regarding industry custom is extrinsic evidence which should not be considered in interpreting [a] clear and unambiguous document."), aff'd, 3 N.Y.3d 577, 822 N.E.2d 768 (2004).

In any event, it is clear that the terms of the applicable pre-1989 policies and by-laws should be construed as set forth in Points I and II herein, and Coghlin's attempt to distort these provisions is to no avail. Moreover, Mr. Coghlin's opinion on custom and practice is fundamentally flawed because there is no relevant industry custom and practice. Every mutual P&I insurance club operates pursuant to its own unique set of policies, by-laws, and practices, which have evolved over time, in different ways, in accord with the preferences of the members of that club. What Mr. Coghlin calls "industry custom and practice" is nothing more than the current practices of a few foreign, mainly English, marine mutuals that he became familiar with while he worked at Thos R. Miller & Son - managers for the United Kingdom P&I Club (the "U.K. Club"). (Coghlin Aff. ¶¶ 4-6).

Tellingly, when shown that other foreign clubs, at various times, adopted rules and practices similar to the American Club's pre-1989 policies and by-laws, and interpreted them in the same way as the American Club does here, Coghlin dismisses them as exceptions. (Coghlin Aff. ¶¶54-55, 58). This misses the point: so was the American Club; indeed so was every club. The dozen or so foreign clubs in existence today have struggled with similar issues, at different times, in different ways. Some, like the Britannia Club, adopted rules and practices similar to the American Club, others did not. (Brown Rebuttal Aff. ¶¶22-23). The Britannia Club, in fact, implemented and maintained a rule for over 30 years, similar to Article VI, Section 4 of the Club's by-laws, which provided for the "closing" of insurance years, but preserved the club's right to assess members of closed years for previously unreported claims. (Brown Rebuttal Aff. ¶¶22-23).

25

Nor is it proper to use the current rules and practices of the U.K. Club and other foreign clubs relied on by Coghlin as a guidepost for interpreting the American Club's pre-1989 policies and by-laws with respect to the treatment of Closed Year ODCs. Prior to 1989 the American Club was still conducting itself as far more of a true "mutual" than these foreign clubs, in that the American Club was: (i) arranging its business strictly by insurance year, holding years open for 10-11 years until it was determined that all claims had been reported; (ii) taking a strict "pay as you go" approach, i.e., setting minimal premiums and levying assessments only as needed to meet reported claims; and (iii) returning funds that were not needed to pay indemnities for reported claims at the time insurance years were closed. (Plaintiff's Memo at 4-5; PX-307, pp. 13-15).

The U.K. Club and other foreign clubs relied on by Coghlin, however, no longer operate in the same way. (See PX-307, pp. 11-15, 19-21, 23-24). Critical to the issues in this Action, is why and how this came about. For example, when the U.K. Club began closing insurance years on a regular basis in the 1960s it adopted express rules - with the consent of its members - that moved the U.K. Club away from the model of a true "mutual" with respect to the treatment of Closed Year ODCs. (PX-307, pp. 11-13, 15, 19-21, 23-24; Brown Rebuttal Aff. ¶23). Specifically, in the 1960s the U.K. Club began to adopt express rules: (a) exempting members of closed years from further assessment; (b) permitting the club to use its reserves to pay indemnities for unreported claims asserted following the close of an insurance year; and (c) permitting assessments on members in open years to raise the funds needed to pay indemnities for such claims. (PX-307, pp. 11-13, 15, 19-21, 23-24; Brown Rebuttal Aff. ¶23). The U.K. Club built up hundreds of millions of dollars of reserves by 1990 through, among other things, the establishment of a catastrophe and contingency fund. (See PX-202, p. AC0054301; PX-49, R. 19A(iii), R.22).

The American Club's pre-1989 policies and by-laws contain no similar provisions. (Am. PTO, Exh. 1; PX-109). The American Club did not adopt any rules or practices similar to the U.K. Club or

other foreign clubs until recently (see PX-307, pp. 13-16, 19, 21; Brown Rebuttal Aff. ¶23), and, by their express terms, these new rules were not intended to apply to the pre-1989 insurance years at issue in this Action.[19]  (See PX-267, Rule 4 Sect. 6).  As a result of the American Club's very different practices, its Reserve Account by early 1990 was only just over $18 million.  (See PX-297).

The rules, practices and experiences of the U.K. Club and other foreign clubs relied on by Coghlin are fundamentally different, and cannot serve as a meaningful reference for interpreting the American Club's pre-1989 policies and by-laws with respect to the treatment of Closed Year ODCs.

**B.      The Doctrines of Promissory Estoppel, Estoppel, Waiver, and Laches do not Preclude the Club from Terminating the Discretionary Practice or Levying Assessments on the Defendants**

**1.      The American Club has Never Made a Knowing Statement or Promise, or Intentionally Waived Any Rights**

Defendants' claims and defenses based on promissory estoppel, estoppel, waiver, and laches must fail because: (i) the Club has never made an intentional or knowing statement or promise that it would continue paying indemnities for Closed Year ODCs, or that it would continue to do so without assessing defendants; nor (ii) has the Club intentionally waived its rights with respect to these matters.[20]

The Club's current board allowed the practice of paying Closed Year ODCs without assessing defendants to continue because they were unaware of how the practice came about.  Once the Club's current directors learned how this practice came about, and that the Club was not obligated to pay such

---

[19] As set forth above, in fact, the Club enacted its new rule in 2005 because the International Group -- a highly respected group of mutual marine insurance clubs -- determined that a rule was necessary to permit the Club to assess members in open insurance years in order to satisfy Closed Year ODCs.  (Plaintiff's Memo at 11-12; PX-307, pp. 16-18.)

[20] BWA Corp. v. Alltrans Express U.S.A., Inc. 112 A.D.2d 850, 853, 493 N.Y.S.2d 1, 3 (1st Dep't 1985) (estoppel requires a knowingly false representation); Halifax Fund, L.P. v. MRV Communications, Inc., 2001 WL 1622261, No. 00 CIV 4878 HB, *2 (S.D.N.Y. Dec. 18, 2001) ("[t]o constitute a promise for purposes of the promissory estoppel doctrine, the representation must be intentional" and not an unknowing "mistake.") (annexed hereto as Exhibit A), aff'd, 54 Fed. Appx. 718 (2d Cir. 2003); Gilbert Frank Corp. v. Federal Ins. Co., 70 N.Y.2d 966, 968, 520 N.E.2d 512, 514, 525 N.Y.S.2d 793, 795 (1988) ("Waiver is an intentional relinquishment of a known right and should not be lightly presumed."); In the Matter of Barabash, 31 N.Y.2d 76, 82, 286 N.E.2d 268, 271, 334 N.Y.S.2d 890, 894-895 (1972) (laches does not apply if the party is "justifiably ignorant of the facts giving rise to the cause of action.").

claims, they immediately ceased the practice.  See e.g., BWA Corp., 112 A.D.2d at 853, 493 N.Y.S.2d

at 3 (plaintiff not barred on the grounds of estoppel where it did not have knowledge of the facts and

did not act knowingly).

Nor does the Club's initial payment of Closed Year ODCs or the Club's setting aside of a

nominal and arbitrary reserve of $100,000 at the close of the 1977 and 1979 through 1988 insurance

years constitute an intentional or knowing statement, promise, or waiver because these acts were taken

by defendants' former representatives on the Club's board either by mistake, or in bad faith, or were

*ultra vires*.  (Plaintiff's Memo at 8-9; 17-19.)  If a party acts with unclean hands, it cannot rely upon

equitable claims or defenses.  PenneCom B.V. v. Merrill Lynch & Co. Inc., 372 F.3d 488, 493 (2d Cir.

2004) ("[t]he equitable powers of this court can never be exerted in behalf of one who has acted

fraudulently, or who by deceit or any unfair means has gained an advantage") (internal quotations and

citations omitted).

2.    <u>**Defendants Did Not Reasonably Rely on the American Club's Prior Acts**</u>

Defendants' claims and defenses based on promissory estoppel, estoppel, waiver, and laches

also must fail because defendants cannot demonstrate that they reasonably relied on the Club's prior

conduct.  See, General Elec. Co. v. Compagnie Euralair, S.A., 945 F.Supp. 527, 536 (S.D.N.Y. 1996);

BWA Corp., 112 A.D.2d at 853, 493 N.Y.S.2d at 3; Airco Alloys Division, Airco Inc. v. Niagara

Mohawk Power Corp., 76 A.D.2d 68, 82, 430 N.Y.S.2d 179, 187 (4th Dep't 1980).  The unique nature

of a member-operated organization such as the Club renders concepts of reasonable reliance essentially

meaningless.  Defendants knew, or should have known, that the Club was not obligated to pay

indemnities for any Closed Year ODCs and, if it did, that defendants would still be "subject to a

contingent liability … for assessment without limit of amount for their proportionate share" of the

funds needed to satisfy any such indemnity payments.  (Am. PTO, Exh. 1, p. 2; Plaintiff's Memo at 4-

6.)  Also, defendants knew or should have known that the nominal and arbitrary $100,000 reserve set

aside at the close of the 1977 and 1979 through 1988 insurance years for Closed Year ODCs was
grossly inadequate. (Plaintiff's Memo at 7-9; 17-18.)

**C.    The Club is Not Barred by the Doctrines of *Res Judicata* or Collateral
         Estoppel from Litigating any Claims in this Action**

  *Res judicata* bars future actions between the same parties only when the second action arises
from the same "transaction" as the first. Marvel Characters, Inc. v. Simon, 310 F.3d 280, 287 (2d Cir.
2002). The fact that a second action involves the same wrongful course of conduct, "same parties,
similar or overlapping facts and similar legal issues" is not dispositive. Securities and Exch. Comm'n
v. First Jersey Sec., Inc, 101 F.3d 1450, 1463 (2d Cir. 1996) (internal quotations omitted) (cited in
Interoceanica Corp. v. South Pilots, Inc., 107 F.3d 86, 91 (2d Cir. 1997)). Different or subsequent
transactions do not fall within the bar. Interoceanica, 107 F.3d at 91 (citing First Jersey, 101 F.3d at
1463). The determination, therefore, is fact-dependent and must be viewed pragmatically, with a
"flexible, common-sense construction." Interoceanica, 107 F.3d at 91.

  Defendants' mechanistic assertion that the litigation in Prudential Lines acts as *res judicata* on
coverage,[21] assessments, and payment of deductibles, ignores the key differences between the issues,
and the absence of identity among the parties. First, the defendants were not parties in Prudential
Lines. Second, this action concerns different transactions. At issue here is the Club's right to decline
to pay unreported, unreserved for claims submitted from about the beginning of 2004 onwards. The
Club's alleged liability for such claims arose after Prudential Lines, and, therefore, could not have been
raised or litigated in that action. Prudential Lines never addressed the practical effect that closure of
the pre-1989 policy years had on unknown claims with regard to: (i) payment of the members' claims;
and/or (ii) additional assessments because the member, Prudential Lines, never (and still has not) paid

---

[21] Illness and death claims are indemnifiable under the policy. Defendants' contention (para.30) that the Club is
barred from contesting "coverage" incorrectly frames the issue and is nothing more that a "straw man" argument. The issue
is not whether coverage exists, but whether a valid defense to defendants' indemnity claims exist by virtue of the closure of

any claims under its indemnity policy[22] which would create any possible right of recovery from the Club.

Res judicata also does not require this Court to adopt the holding of Prudential Lines on the deductible question, for the reasons previously discussed herein at Point II. (Plaintiff's Memo at 21-24). Further, the New York Court of Appeals' resolution of a previously undetermined question of state law renders res judicata inapplicable. Cf. Faulkner v. Nat'l Geographic Enters., 409 F.3d 26, 37 (2d Cir. 2005), cert. denied, 126 S.Ct. 833 (2005) (Intervening change in law rendered collateral estoppel inappropriate).

Neither does collateral estoppel bar this action. Collateral estoppel only applies when: (i) the identical issue was raised; (ii) the issue was actually litigated and decided; (iii) the party had a full and fair opportunity to litigate the issue; and (iv) resolution of the issue was necessary to support a valid and final judgment. Marvel, 310 F.3d at 288-89. Only the deductible issue was litigated in Prudential Lines and that ruling now has no prospective effect in this action in light of its unique facts and the Con Edison decision. See Faulkner, 409 F.3d at 37.

## D.   The Club Did Not Breach the Implied Covenant of Good Faith and Fair Dealing

Defendants' claim that the American Club breached an implied covenant of good faith and fair dealing by refusing to provide indemnities is predicated on the same conduct as the breach of contract claim. Accordingly, the implied covenant claims must be dismissed. "A claim for breach of the implied covenant 'will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying

---

the pre-1989 insurance years without any or proper assessments for their Closed Year ODCs, or, alternatively, the failure to pay future assessments regarding such claims.

[22] Prudential's policy with the Club was an indemnity policy which required the insured to pay the claim first as a condition precedent to coverage. In Prudential Lines, the court rejected the sham payments made by Prudential to the claimants and held that the condition precedent was never met. To date, Prudential has never satisfied this condition. In this action, the defendants present ripened claims for which indemnities are sought, and the issues include under what conditions defendants may be entitled to indemnities including whether they must pay assessments to fund them.

contracts.'" <u>ICD Holdings S.A. v. Frankel</u>, 976 F. Supp. 234, 243-44 (S.D.N.Y. 1997) (Kaplan, J.)

(internal quotations and citations omitted).[23] Moreover, as shown above, the American Club's decision

to terminate indemnities for Closed Year ODCs is a proper exercise of the American's Club's rights

under the applicable policies and by-laws, and cannot form the basis of a claim for breach of the

implied covenant of good faith and fair dealing.[24] Defendants' claim for breach of the implied

covenant of good faith and fair dealing is therefore without merit.

**E.    The Club has Not Violated the Cancellation Provisions of NY Insurance Law §3426**

The cancellation provisions of New York Insurance Law § 3426 are triggered only if there is a

cancellation of an insurance contract or insurance coverage. <u>See Home Ins. Co. v. North American</u>

<u>Specialty Ins. Co.</u>, 273 A.D.2d 443, 709 N.Y.S.2d 624, 625 (2d Dep't. 2000). Here, there has been no

cancellation of insurance coverage because the American Club had no obligation to indemnify

defendants for Closed Year ODCs. Alternately, the policies remain in effect to indemnify defendants

for all Closed Year ODCs for which they are willing to be assessed. Accordingly, this defense should

be dismissed.

---

[23] <u>See also</u> <u>Harris v. Provident Life & Accident Ins. Co.</u>, 310 F.3d 73, 80 – 83 (2d Cir. 2002) (affirming dismissal of breach of implied covenant claim under New York and California Law); <u>Concesionaria DHM, S.A. v. International Finance Corp.</u>, 307 F. Supp.2d 553, 564 (S.D.N.Y. 2004) (dismissing implied covenant claim as redundant of breach of contract claim where "[t]he predicate conduct for the claims is the same."); <u>Scientech, Inc. v. Metro-North R.R.</u>, 2002 WL 1813854 No. 01 CIV. 8210 (LAK), *1 (S.D.N.Y. Aug. 7, 2002) (Kaplan, J.) (dismissing implied covenant claim as duplicative of claim for breach of contract) (annexed hereto as Exhibit B).

[24] <u>See e.g.</u>, <u>Fasolino Foods Co., Inc. v. Banca Nazionale Del Lavoro</u>, 961 F.2d 1052, 1056 (2d Cir. 1992) (Bank's refusal to approve letters of credit pursuant to terms of letter of credit agreement did not constitute breach of implied covenant); <u>Hartford Fire Ins. Co. v. Federated Department Stores, Inc.</u>, 723 F. Supp. 976, 990–93 (S.D.N.Y. 1989) (defendant's exercise of rights under an indenture agreement did not constitute breach of implied covenant); <u>see also id.</u> at 991 ("[T]he implied covenant of good faith and fair dealing does not provide a court *carte blanche* to rewrite the parties' agreement.").

**F.    The American Club is not Subject to Liability for any Purported
<u>"Untimely Disclaimer" under NY Insurance Law § 3420(d)</u>**

There was no purported untimely disclaimer under NY Insurance Law § 3420(d) because there is no "coverage" for unreported Closed Year ODCs or, alternatively, there is no coverage in the absence of assessment under the applicable pre-1989 policies. Moreover, marine insurance contracts, such as the contracts at issue in this action, are exempt from the regulations set forth under NY Insurance Law § 3420(d). N.Y. Ins. Laws §3420(i); 2117(b)(3)(B); 1113(a)(21). Accordingly, this defense should be dismissed.

**G.    <u>The American Club Has Not Engaged in Unfair or Deceptive Trade Practices</u>**

Defendants' allegations that the conduct of the American Club violates New York's Deceptive Acts of Practices law, NY Gen. Bus. Law §349 is baseless. Section 349 is a consumer protection statute that does not afford remedies regarding purely private transactions, including denials of insurance coverage.[25]

Here, defendants' deceptive practices claims are simply iterations of their assertion that the American Club has breached its indemnity obligations under its insurance policies. Moreover, as demonstrated above, the Club's conduct at all times was in accordance with its policies, by-laws and rules, and not undertaken in bad faith or with deceptive intent. Indeed, the Club's decision to terminate the Discretionary Practice was done only after seeking the advice and recommendation of counsel. Moreover, defendants did not reasonably rely upon any purported misrepresentations by the Club, and could not have done so, because the Club at the time in question was being operated and run by

---

[25] <u>See</u> <u>Asbeka Indus. v. Travelers Indemnity Co.</u>, 831 F. Supp. 74, 88 (E.D.N.Y. 1993) ("In this case, the defendant insurers' refusal to defend or to indemnify Asbeka in pending lawsuits is nothing more than a private contractual dispute – and not a recurring deceptive business practice that is harmful to the public at large – and is, therefore, beyond the ambit of section 349."); <u>New York Univ. v. Continental Ins. Co.</u>, 87 N.Y.2d 308, 321, 662 N.E.2d 763, 771, 639 N.Y.S.2d 283, 291 (1995) (dismissing section 349 claim in case involving complex insurance coverage issues and proof of loss because dispute was "essentially a 'private' contract dispute over policy coverage and the processing of a claim which is unique to these parties, not conduct which affects the consuming public at large").

defendants. Accordingly, defendants' claims under NY Gen. Bus. Law §349 should be dismissed, and claims for attorney's fees under the statute should be denied.[26]

## IV. THE AMERICAN CLUB IS ENTITLED TO LEVY ASSESSMENTS AGAINST ALL DEFENDANTS [27]

### A. The American Club Has Not Released Defendants Union Carbide and Dow Chemical from Further Assessment for Closed Year ODCs

Defendants Union Carbide and Dow Chemical assert that they were released from liability for assessments because of a release purportedly granted by the Club for all years in which they were members. These defendants, however, paid for releases only for the years 1997 through and including 2000, and not any years prior to 1989. (See Solarino Rebuttal Decl., ¶¶30-38). Accordingly, neither Union Carbide nor Dow Chemical should be released from their liabilities under their pre-1989 assessable policies.

### B. The American Club's Claims against Apex are not barred by the Ordered Stipulation dated April 4, 1991

Apex asserts that the American Club is barred from denying coverage with respect to certain seamen's claims that were the subject of a Stipulation between Apex and the American Club in 1991 (the "1991 Stipulation"). None of the claims identified in the 1991 Stipulation, however, have been

---

[26] In addition to alleging violation of NY Gen. Bus. Law §349, defendant APL, a California corporation, also alleges violation of California's consumer protection statute, the California Unfair Practices Act, Cal. Bus. & Prof Code §17200, et seq. APL's California claim is meritless for the reasons stated for above. Additionally, §17200 does not create a private cause of action against insurers who allegedly engage in business practices which misrepresent the nature or terms of insurance coverage. Such conduct is proscribed by California's Unfair Insurance Practices Act ("UIPA"), see Cal. Ins. Code §790.03(h), a statute which does not provide a private cause of action. See Moradi-Shalal v. Fireman's Fund Ins. Cos., 758 P.2d 58, 68 (1988) ("Neither section 790.03 nor section 790.09 was intended to create a private civil cause of action against an insurer that commits one of the various acts listed in section 790.03, subdivision (h)."). APL may not plead around the bar to private causes of action set forth in Moradi-Shalal by recasting the pleading as a violation of section 17200. See Textron Financial Corp. v. National Union Fire Ins. Co., 13 Cal Rptr.3d 586, 594 (Cal. Ct. App. 2004) (affirming dismissal of plaintiff's allegations against insurer under Unfair Practices Act because the acts alleged, including misrepresenting the terms of insurance policies and the obligations thereunder, "are the type of activities covered by the UIPA"). Accordingly, APL's claim under California's Unfair Practices Act is barred.

[27] One defendant, SC Loveland, relies upon an order of the US Bankruptcy Court. The Club has agreed to dismiss its claims against Loveland. Another defendant, Hendry, has filed a motion for summary judgment. After a conference with Magistrate Judge Francis on June 27, 2006, it was agreed that consideration of that motion would be adjourned pending the Court's decision at trial.

prosecuted, and, accordingly, the issues raised by the 1991 Stipulation are not ripe for adjudication. Nothing in the 1991 Stipulation, however, bars the Club from assessing Apex in connection with those claims, or, for that matter, any other claims that arise in insurance years in which Apex was a member. Finally, the Club's decision, as part of a settlement, to agree to pay certain specified claims pursuant to certain deductibles, however, does not indicate or suggest (as Apex's counsel Deborah Weedman implies in her affidavit) that the Club in any way recognized that it has obligation to pay any Closed Year ODCs that may be presented in the future, whether by Apex or any other defendant.

## V.    THE AMERICAN CLUB IS ENTITLED TO A FULL REFUND OF THE FARLEY ADVANCE

Finally, the Club is entitled to a full refund of the advance it made to Keystone pursuant to the written agreement between the Club and Keystone regarding Keystone's settlement of the Farley claim (the "Farley Advance").  (PX-260; Solarino Rebuttal Decl. ¶¶24-29).

## CONCLUSION

For the foregoing reasons, this Court should grant plaintiff, the American Club, the relief sought in its complaint and dismiss all defendants' counterclaims.

Dated:  New York, New York
        July 7, 2006

NOURSE & BOWLES LLP

By _____
Lawrence J. Bowles (LB 5950)
Shaun F. Carroll (SC 9898)
One Exchange Plaza
55 Broadway
New York, New York 10006
(212) 952-6200
(212) 952-0345

*and*

SULLIVAN & WORCESTER LLP
Franklin B. Velie (FV 4918)
Mitchell C. Stein (MS 3118)
1290 Avenue of the Americas, 29th Floor
New York, New York  10104
(212) 660-3000
(212) 660-3001 (fax)

# *Exhibit A*
# *to*
# *Plaintiff's Trial*
# *Memorandum*

**Exhibit A**

Westlaw.

Not Reported in F.Supp.2d                                              Page 1
Not Reported in F.Supp.2d, 2001 WL 1622261 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
HALIFAX FUND, L.P. Plaintiff,
v.
MRV COMMUNICATIONS, INC. Defendant.
**No. 00 CIV 4878 HB.**

Dec. 18, 2001.

*OPINION & ORDER*

BAER, J.
*1 Following a three day trial the jury returned a verdict on April 4, 2001 in favor of defendant MRV Communications ("MRV") on the two legal claims presented, breach of contract and negligent misrepresentation. With respect to the two equitable claims, for which the Court requested that the jury provide advisory verdicts, the jury found for MRV on the promissory estoppel claim and for Halifax Fund, L.P. ("Halifax") on the equitable estoppel claim, and awarded $3,625,049 in damages. Both parties submitted post-trial motions requesting that the Court decline to adopt the recommendations of the jury. For the reasons discussed below, I subscribe to the jury's advisory verdicts in regards to liability on equitable claims, and award damages to Halifax of $1,799,417.

BACKGROUND

In 1996, Thomas Lumsden ("Lumsden") of Promethean Investment Group ("Promethean") approached MRV to determine whether MRV would be interested in raising capital through a private financing arranged by Promethean. MRV was interested and Promethean proceeded to line up investors, negotiate the terms of the financing with Edmund Glazer ("Glazer"), MRV's Chief Financial Officer, and perform other services, for which Promethean was compensated by the other investors. The financing consisted of the sale of debentures and warrants, and occurred in three tranches the last of which closed on August 7, 1996. The warrants issued in connection with the financing granted the warrant holders the right to purchase a predetermined number of common shares at a predetermined price within a given period of time. All of the warrants issued through the financing expired on August 7, 1999.

Halifax, an investment fund managed by The Palladin Group, L.P. ("Palladin"), purchased debentures and warrants from MRV, and later purchased more MRV warrants from two other investors, Samyang Merchant Bank ("Samyang") and CIBC Wood Gundy ("CIBC"). The current litigation concerns only the warrants purchased from Samyang and CIBC; the debentures and warrants that Halifax purchased directly from MRV are not at issue.

In order to their ownership, Promethean forwarded the Samyang and CIBC warrants to MRV in January 1997 and mid-February 1997, respectively, and requested that MRV reissue those warrants in Halifax's name. The Samyang warrants conferred the right to purchase 35,000 shares of MRV common stock at a price of $26.25 per share, and the CIBC warrants conferred the right to purchase 51,000 shares at $26.65 per share. For a number of months MRV sat on the warrants and did nothing despite several requests from Promethean. Although there is some dispute about the implications to the investors of not having physical possession of the warrants, there is no question that the investors were anxious that MRV complete their task and reissue the warrants.

On or about June 15, 1997, MRV issued two warrants to Halifax ("reissued warrants"), one for 35,000 shares and the other for 51,000 shares. Each reissued warrant was dated June 6, 1997, and stated, as had each warrant when originally issued, that it expired on the date "thirty-six (36) months after the date hereof." This language, identical to the expiration clauses of the warrants issued to Samyang and CIBC on August 7, 1996 and later purchased by Halifax, had on its face the effect of extending the exercise period 10 months until June 6, 2000. At the same time, MRV reissued warrants to other investors from the financing, all with the same expiration clause and all having the effect of extending the original warrant period until June 6, 2000.

*2 Jeffrey Devers ("Devers"), Palladin's principal, noticed the extension immediately after receiving the reissued warrants and contacted James O'Brien of Palladin to confirm that the extension had been intentional. As told by Devers, O'Brien reported that Lumsden had negotiated the extension with Glazer as compensation for the delay in MRV's reissuance of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                        Page 2
Not Reported in F.Supp.2d, 2001 WL 1622261 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

the warrants. O'Brien has no recollection of the conversation, and the jury found that Lumsden had not negotiated such an extension and I see no reason to disturb their finding. [FN1] While I find that Devers did have a conversation with O'Brien in which the warrant extension was discussed, I cannot credit Devers' testimony about the contents of that conversation. Devers did not contact MRV directly.

> FN1. Had the jury found otherwise, it would have returned a verdict for plaintiff on the contract claim.

Several years later on March 9, 2000, well before the putative June 6, 2000 expiration of the exercise period, Promethean advised MRV that it wanted to exercise its reissued warrants. At that time, MRV stock, which had long been trading at prices below the $26.65, the exercise price of the options,[FN2] was enjoying a meteoric rise and was trading at prices nearing $200 per share. Edmund Glazer of MRV, however, refused to honor the request to exercise the reissued warrants on the ground that the expiration date indicated on the reissued warrants had been a mistake and that the warrants had expired on August 7, 1999. Glazer testified that he had been unaware of the mistake before Promethean's exercise request, and that it occurred to him at that time that others of the warrants might have the same mistake. That realization, though, apparently did not prompt Glazer to check any of the other warrants, a task amounting to no more than flipping through the binder in which the warrants were kept, or to notify the investors that the warrant period extension was a mistake and that the warrants had in fact expired. Indeed, two weeks later Angelo Gordon, another investor, attempted to exercise its reissued warrants and was refused by MRV. Again, Glazer apparently neither checked other warrants for a mistake nor took steps to notify the investors. Instead, he instructed Lyran Talmor, a MRV employee responsible for the mechanical aspects of exercising warrants, that he should not accept funds from warrant holders or in any way facilitate a warrant exercise until he learned from Glazer that the warrants in question were exercisable. (T.399-403).

> FN2. An option to buy a stock at a price higher than the current market price is often said to be "under water."

In early June 2000, Halifax faxed a notice of the exercise letter to MRV and was told shortly thereafter that MRV would not honor the request. Halifax then sued MRV in this Court, asserting four causes of action: breach of contract, negligent misrepresentation, promissory estoppel and equitable estoppel. Following a three day trial, the jury returned a verdict in favor of MRV on each of the two legal claims. It determined that the reissued warrants were not enforceable contracts, and that MRV had not negligently misrepresented that the warrants would expire 10 months prior to the date indicated on the warrants themselves. Acting in an advisory role, the jury found for defendant on the promissory estoppel claim, but found for plaintiff on the equitable estoppel claim, awarding damages of $3,625,049.[FN3] Thus, although the jury found that there was not an enforceable agreement to extend the warrant period, and that MRV had not made negligent misrepresentations or promises (promissory estoppel) to Halifax with respect thereto, it did find that MRV had wrongfully concealed its knowledge that the warrants had expired, and if timely informed Halifax would have spent $3,625,049 less than it ultimately did covering short market positions taken pursuant to a trading strategy that presumed the validity of the warrants as written. In calculating damages as $3,625,049, the jury apparently relied upon Halifax's exhibit number 38.

> FN3. On the equitable estoppel claim, the jury was charged on April 4, 2001 as follows:
> "Plaintiff must prove by clear and convincing evidence that:
> (1) MRV knew as of March 2000 that the extension of the expiration period on Halifax's reissued warrants was a mistake;
> (2) After it learned of the mistake, MRV deliberately concealed that information from Halifax;
> (3) Halifax did not know that the reissued warrants contained a mistake and that information was not readily accessible to Halifax;
> (4) MRV knew Halifax would rely upon the date indicated on the reissued warrants, and
> (5) Halifax relied on the date indicated on the reissued warrants to its detriment."

### DISCUSSION

### Promissory Estoppel

*3 Under New York law, to prevail on a promissory

Not Reported in F.Supp.2d                                                    Page 3
Not Reported in F.Supp.2d, 2001 WL 1622261 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

estoppel claim the plaintiff must prove the following three elements by clear and convincing evidence: (1) a clear and unambiguous promise existed between the parties; (2) the party to whom the promise was made forseeably and reasonably relied on the promise; and (3) such party sustained injury as a result of its reliance. See *Cyberchron Corp. v. Calldata Sys. Dev. Inc.,* 47 F.3d 39, 45 (2d Cir.1995) (citation omitted). Here, there was no clear and unambiguous promise. Although the reissued warrants clearly provided for an expiration date of June 6, 2000, the 10 month extension of the warrant period was a mistake and thus did not constitute an enforceable promise. See *Edward Joy Co. v. Noise Control Products. Inc.,* 111 Misc.2d 64, 443 N.Y.S.2d 361, 362 (N.Y.Sup.Ct.1981) ("[n]o authority has been supplied to the court nor could the court find any in which the theory of promissory estoppel was enforced against proof of an honest mistake"). To constitute a promise for purposes of the promissory estoppel doctrine, the representation must be intentional. Since the extension of the warrant period was a mistake, the extension is not a promise and the promissory estoppel claim fails.

### Equitable Estoppel

To establish a claim for equitable estoppel under New York law, Halifax must show by clear and convincing evidence: "(1) An act constituting a concealment of facts or a false misrepresentation; (2) An intention or expectation that such acts will be relied upon; (3) Actual or constructive knowledge of the true facts by the wrongdoers; (4) Reliance upon the misrepresentations which causes the innocent party to change its position to its substantial detriment." *General Electric Capital Corp. v. Armadora,* 37 F.3d 41, 45 (2d Cir.1994); *Farkas v. Farkas,* 168 F.3d 638, 642 (2d Cir.1999) (equitable estoppel analysis focuses upon "intentional concealment"). An act, such as the failure to disclose information, may constitute an act of concealment. See *Decarlo v. Archie Comic Publications, Inc.,* 127 F.Supp.2d 497, 509 (S.D.N.Y.2001); *LaPorto v. Village of Philmont,* 39 N.Y.2d 7, 12, 382 N.Y.S.2d 703, 346 N.E.2d 503 (1976). Such is the case "when one party in a relationship with another has an opportunity to speak in order to avoid harm or injury to the other party and fails to do so to the ultimate prejudice of the other party." *Columbia Broad Sys. Inc. v. Stockely-Van Camp. Inc.,* 522 F.2d 369, 377 (2d Cir.1975). Equitable estoppel is an equitable remedy, and its application turns upon a close examination of the facts and the equities.

Edmund Glazer knew on March 9, 2000 when Promethean attempted to exercise its reissued warrants that at least some of the warrants reissued on June 15, 1997 mistakenly extended the warrant period, and he knew or should have known that there was a distinct possibility that Halifax mistakenly believed that their warrants could still be exercised. (T. 399-403). He also knew that MRV's stock was trading in the stratosphere and that the warrants were now incredibly valuable. And yet, Glazer took no steps to determine whether Halifax's warrants bore the same mistake as Promethean's or to notify the other investors that there might be a problem. In sum, he chose not to disclose the mistake to Halifax. At trial, Glazer accounted for this striking omission by stating that he presumed Promethean would have notified the other investors, since most of the information during the financing had been run through Promethean with little direct communication between MRV and any of the other investors. Creative but unlikely. The warrants included a provision that required MRV to provide direct notice to the warrant holder in certain circumstances, and the investors never designated Promethean as its conduit for information from MRV. Further, since there was no evidence that Promethean even possessed copies of the other investors' warrants, Promethean would not have known if Halifax's warrants included the same mistake as their own Perhaps most importantly, Glazer had personally signed each of the reissued warrants and each of the warrants was a misrepresentation, albeit an unintentional one. Thus, Glazer bore a heightened responsibility to find out whether Halifax's warrants included the mistake and if so to notify Halifax.

*4 MRV argues that even if Glazer did conceal the mistake from Halifax while knowing that Halifax would rely on the exercise date provided on the reissued warrants, Halifax's reliance on the warrants was not reasonable. See *Bove v. New York City,* 99 civ. 9181, 2000 U.S.App. LEXIS 11895, 6 (2d Cir.2000) ("[t]he ready availability of the allegedly concealed information to the plaintiff fatally undermine his claim of equitable estoppel"). Not the case. Here, Devers, Palladin's principal, noted that the reissued warrants included a 10 month extension, had a conversation with O'Brien about the extension, and acted in accordance with information provided.[FN4]

> FN4. While I do not credit Devers' statement that he was told by O'Brien that the extension had been intentional, I am

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                                          Page 4
Not Reported in F.Supp.2d, 2001 WL 1622261 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

persuaded that Devers' did discuss the extension with O'Brien.

### Equitable Estoppel-Damages

Because it was not told of the mistake on March 9, 2000, Halifax continued to pursue its short selling market strategy, which in vastly oversimplified terms worked as follows. Halifax sold options to buy MRV common stock (that Halifax did not actually own) at a particular price (the "strike price") within a fixed period of time.[FN5] Typically, investors who make these "short sales" are betting that the market price will not exceed the strike price and that the option buyer will have no opportunity to exercise the option. If the short seller guesses incorrectly, and the market price rises above the strike price before the option expires, then he/she must "cover" the short sale by purchasing shares on the common market.

> FN5. The sale of the option nets a small amount which varies according to the likelihood that it will be profitable for the option buyer/holder to buy the common shares at the strike price from the option seller/writer.

Halifax, however, was not like most short-sellers in that it did not execute trades based on assumptions about the future price of MRV stock. Instead, Halifax's trading strategy pursued market neutrality-or, put another way, indifference to the market's movement-which it could do because of MRV warrants. Since the MRV warrants gave Halifax the right to buy 86,000 shares of MRV stock at approximately $26 per share, Halifax could cover any short position of 86,000 shares or fewer at a cost of $26 per share, regardless of MRV's market price. For complicated strategic reasons beyond the scope of this decision, Halifax engaged in a series of transactions-primarily short sales and short covers-to maintain a constant short position of 86,000 MRV shares, but never exercised the MRV warrants.[FN6] Indeed Halifax's strategy was to "lock in" small profits and was bottomed on Halifax holding onto the warrants until the very end of their exercise period when Halifax would exercise and close out its entire MRV short position. Halifax assumed that date would be June 6, 2000.

> FN6. For example, in March 2002, Halifax short sold MRV stock in 18 separate transactions at different strike prices in

quantities of 20 and 40 shares, and covered short positions in 10 separate transactions at quantities ranging between 10 and 19,600 shares.

When MRV refused to honor Halifax's request to exercise the warrants on June 5, 2000, Halifax had no choice but to cover the entire 86,000 share short position through market purchases. By the time Halifax completed its cover on June 22, 2000, Halifax had spent $10,399,417.50 (the "June cover"). See Def.'s Ex. 8. Thus, for the equitable estoppel claim, the measure of Halifax's damages is the difference between the June cover and what it would have cost Halifax to cover had it been told on March 9, 2000 that the extension of the warrant period had been a mistake and that the warrants had already expired (the "March cover").

*5 To this much the parties largely agree. Where they disagree is in the calculation of the March cover.[FN7] In *Schultz v. Commodity Futures Trading Commission,* 716 F.2d 136 (2d. Cir.1983), the Second Circuit stated that:

> FN7. By Halifax's reckoning its damages are at least $3,625,049, the amount awarded by the jury in its advisory verdict, apparently in reliance upon Plaintiff's exhibit 48, at 3 In stark contrast, MRV calculates Halifax's damages as $0.

"[T]he proper rule to be applied in calculating damages when an item of fluctuating value is wrongfully sold, converted or not purchased when it should have been .... is either (1) its value a the time of the [wrong] or (2) its highest intermediate value reached by the stock between notice of the [wrong] and a reasonable time thereafter during which the stock could have been replaced ... whichever of (1) or (2) is [better for the wronged party]." *Id.* at 139, 141 (hereinafter, *"Shultz* rule"). Subsequent courts have applied this damages rule with respect to warrants for the purchase of common stock and to claims for breach of contract, *see e.g. Commonwealth Assoc. v. Palomar Medical Tech., Inc. .,* 982 F.Supp. 205 (S.D.N.Y.1997); *Flickinger v. Harold C. Brown & Co.,* 789 F.Supp. 616 (W.D.N.Y.1992), and I find that the rule should be applied to the facts presented here, notwithstanding MRV's concern that to determine "a reasonable time" this Court must engage in speculation and guesswork. *See Palomar,* 982 F.Supp. at 208 ("certainty as to the amount of damages is not required, particularly when

Not Reported in F.Supp.2d　　　　　　　　　　　　　　　　　　　　Page 5
Not Reported in F.Supp.2d, 2001 WL 1622261 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

it is the defendant's breach that has made such imprecision unavoidable").[FN8] Certainly, as MRV argues, it would be little more than a mechanical exercise to calculate damages as of the date Halifax was informed of the mistake in the warrant period, but the purpose of the rule is "to provide a fair valuation of stocks, by allocating the risk of market fluctuation to the breaching party," *Payne v. Wood,* 1995 U.S.App. LEXIS 22551,*23 (6 th Cir.1995), and to redress the unfairness that would result from allowing the party in the wrong to dictate the timing of the innocent party's trading and thus the recoverable damages. *See id.* ("[t]he risk ... should be assumed by the perpetrator, not by the victim of the wrong); *Lucente v. Int'l Business Machines Corp.,* 117 F.Supp.2d 336, 356 (S.D.N.Y.2000) ("the actual loss to the injured party is the loss associated with being forced to sell at an unfavorable time and being denied the opportunity to sell at a favorable time). These fairness concerns are of particularly salient with respect to equitable claims and in connection with loss mitigation. Where, as here, the innocent party is trading in the market to reduce losses caused in large measure by defendant's mistake, there is no risk of a windfall to the plaintiff. *See Schultz,* 716 F.2d at 141.

> FN8. As MRV points out in its brief, since *Schultz* some courts outside of the Second Circuit, none within, have declined to apply the *Schultz* rule to breach of contract cases. *See Skully v.. U.S. Watts Inc.,* 238 F.3d 497 (3d Cir.2001). However, the damages here do not arise from a breach of contract claim, and like every other court in this Circuit since *Schultz* I do not share the Third Circuit's view that "the speculativeness and hindsight problems attendant to the conversion theory" preclude a court from calculating damages based on stock trades beyond the date of the wrong *Id* at 512-513.

The application of the *Schultz* rule in this case has one unusual permutation. As in *Schultz* and in the cases applying its rule, MRV's commission of a wrong prevented Halifax from trading at favorable prices. In those cases, however, the plaintiff was prevented (either by the nondelivery of stock or for some other reason) from selling stock when market prices were high. *See Palomar,* 982 F.Supp. 205 (defendant refusal to exercise warrants prevented the plaintiff from selling common shares). For that reason, the *Schultz* rule speaks of a plaintiff's right to the *"highest"* intermediate sales price. Here, in contrast, MRV's failure to give timely notice obligated Halifax to make market purchases to cover an open short position. Thus, as applied to these facts, the *Schultz* rule entitles Halifax to the *"lowest"* intermediate purchase price within a "reasonable time."

**\*6** Because Halifax should have received notice of the mistake from MRV on March 9, 2000 its damages equal the difference between the June cover and the hypothetical March cover, where the March cover is calculated by multiplying 86,000 shares by either (1) MRV's price on March 9, 2000 or (2) the stock's lowest intermediate value between March 9, 2000 and the expiration of a "reasonable time," whichever calculation produces a lower number.[FN9] Since the price of MRV stock was at its zenith on March 9, 2000 ($190.5 per share), the March cover is determined by MRV's lowest intermediate value between then and a "reasonable time" thereafter.

> FN9. Obviously, the lower the price of the March cover, the greater is the difference between the June cover and March cover, and, in turn, the greater is the size of Halifax's damages.

What constitutes a "reasonable time" varies from case to case, *Schultz,* 716 F.2d at 140, but includes at least a "reasonable opportunity to consult counsel ... and to watch the market for the purpose of determining whether it is advisable on a particular day or when the stock reaches a particular quotation, and to raise funds if he decides to repurchase." *Caballero v. Anselmo,* 759 F.Supp. 144, 149 (S.D.N.Y.1991). Here, the time that Halifax actually took to cover its position in June, 2000 provides some guidance as to reasonableness. Although MRV believed that Halifax should have covered earlier than it did, there is no evidence in the record that Halifax's cover period-which began when Halifax received notice from MRV on or about June 5, 2000 [FN10] and concluded 3 weeks later on June 22, 2000-was dilatory. Thus, I find that 3 weeks from March 9, 2000 constitutes a reasonable time.[FN11] Although Halifax might have covered in less time, 3 weeks, if not a day or two longer, is a reasonable covered period, especially since MRV's stock was (1) at an all-time high on March 9, 2000 after a meteoric run-up, (2) had a highly volatile trading history of rapid gains and equally rapid retreats, and (3) began falling on March 10, 2000 and continued to drop steeply during the 3 week period.[FN12] A professional investor like Halifax would likely have presumed that the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 1622261 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d)**

share price would fall from its highs in early March and waited a short time before covering the enormous short position. *See Palomar,* 982 F.Supp. 205 ("[i]n determining damages, we look to what would most probably have occurred"). Between March 9, 2000 and March 30, 2000, the lowest intermediate closing price of MRV stock was $100 per share.[FN13] Thus, the March cover equals $8,600,000 ($100 x 86,000 shares) and Halifax's damages (June cover-March cover) amount to $1,799,417 ($10,399,417.50-$8,600,000).

> FN10. The record is not entirely clear as to when Halifax notified MRV of its intent to exercise, the most likely date is June 2, 2000, and is even less clear as to when MRV declined the exercise request. For the purpose of calculating damages only, I find that Halifax learned of MRV's refusal to exercise on June 5, 2000. Certainly, Halifax received notice no later than June 6, 2000, for on that day Halifax made its first covering transaction.

> FN11. MRV cites to a variety of cases, most of them quite old, in which courts in this district and elsewhere have set the period for measuring damages at less than 3 weeks, but in each case the court set the period based upon the specific facts therein, none of which are present here. For example, in one such case, *Flickinger v. Harold C. Brown & Co.,* 789 F.Supp. 616 (W.D.N.Y.1992), the court observed that a reasonable time "would be a relatively short period, perhaps ten days from the date of discovery" of the non-delivery of stock," but set the "reasonable time" as 1 month because the court could not determine precisely when the plaintiff discovered that the stock had not been delivered. *Id.* at 620. By the same token, Halifax's argument that a reasonable period is 4 weeks, rather than the 3 it actually used in the June cover, is supported by no specific facts and appears to be no more than an attempt to exploit the $73 price at which the stock was trading on June 6, 2000, the last day of those 4 weeks. While Halifax would likely have waited some time after March 9, 2000 to cover, I do not credit Halifax with market omniscience. For the same reason that I decline to accept Halifax's measure of a "reasonable time" I find that the jury was mistaken in relying, as

apparently it did, Halifax's exhibit 48 which stated on page 3 of that exhibit that Halifax's damages were $3,625,049. Although the exhibit did indicate that the $3,625,049 presumed a "First Week Of April" cover date, there was no mention of the "reasonable time" concept or explanation for Halifax's choice of an April cover date.

> FN12. The Court also takes note of the high number of covering shares Halifax had to purchase (86,000), the relative difficulty of unwinding such a large short position, and the potentially significant time it would have taken for Halifax to confirm that the extension of the warrants had been a mistake, consult with counsel, determine that further negotiation with MRV would be futile, and devise a cover strategy that took into account the volume of shares available in the market.

> FN13. MRV shares closed at $100 per share on March 29, 2000.

CONCLUSION

For the reasons set forth above, I find for MRV on the promissory estoppel claim and for Halifax on the equitable estoppel claim. MRV must pay to Halifax damages in the amount of $1,799,417.

SO ORDERED

S.D.N.Y.,2001.

Halifax Fund, L.P. v. MRV Communications, Inc.

Not Reported in F.Supp.2d, 2001 WL 1622261 (S.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 1:00cv04878 (Docket) (Jun. 30, 2000)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# *Exhibit B to Plaintiff's Trial Memorandum*

**Exhibit B**

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2002 WL 1813854 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
SCIENTECH, INC., Plaintiff,
v.
METRO-NORTH RAILROAD, Defendant.
AMERICAN MOTORISTS INSURANCE
COMPANY, Plaintiff,
v.
SCIENTECH, INC., Defendant.
GREENWICH INSURANCE COMPANY, Plaintiff,
v.
METRO-NORTH RAILROAD, Defendant.
AMERICAN INTERNATIONAL SPECIALTY
LINES INSURANCE COMPANY, Plaintiff,
v.
SCIENTECH, INC., Defendant.
**Nos. 01 Civ.8210 LAK, 02 Civ.0008 LAK, 02
Civ.1190 LAK, 02 Civ.2196 LAK.**

Aug. 7, 2002.

Insurer filed motion to dismiss certain counterclaims
asserted by its insured, and insured filed motion for
leave to file an amended counterclaim. The District
Court, Kaplan, J., held that: (1) insured's claims for
breach of the implied covenant of good faith and fair
dealing and for bad faith breach of the policy would
be dismissed as duplicative of the claim for breach of
contract, and (2) leave to amend punitive damages
counterclaim would be denied as futile since claim
was legally insufficient.

Motion to dismiss granted; motion for leave to amend
granted in part and denied in part.

West Headnotes

**[1] Federal Civil Procedure 170A ⚖️675.1**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(B) Complaint
            170AVII(B)1 In General
                170Ak675 Alternate, Hypothetical and
Inconsistent Claims
                        170Ak675.1 k. In General. Most
Cited Cases
Insured's claims for breach of the implied covenant of
good faith and fair dealing and for bad faith breach of

the policy would be dismissed as duplicative of
insured's claim for breach of contract.

**[2] Federal Civil Procedure 170A ⚖️851**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(E) Amendments
            170Ak851 k. Form and Sufficiency of
Amendment. Most Cited Cases
Leave to amend punitive damages counterclaim
would be denied as futile since claim was legally
insufficient.

ORDER

KAPLAN, J.
**\*1** In No. 02 Civ. 1190, the *Greenwich* action,
plaintiff seeks a declaration that the claims asserted
against Scientech by Metro-North in No. 01 Civ.
8210 and by American International in No. 02 Civ.
2196 are not covered by a policy of insurance issued
by it to Scientech. Scientech has interposed a
counterclaim that purports to assert four claims for
relief. The first three seek damages for alleged (1)
breach of the contract of insurance, (2) breach of the
policy's implied covenant of good faith and fair
dealing, and (3) bad faith breach of the insurance
contract. The fourth seeks a declaration that the
carrier has breached the contract of insurance in the
respects set forth in the first three. Greenwich now
moves to dismiss the second and third claims for
relief, so much of the fourth claim as is premised on
the second and third, and Scientech's claim for
punitive damages. Scientech opposes the motion and
moves in the alternative for leave to serve amended
counterclaims.

*The Motion to Dismiss*

[1] 1. Greenwich first contends that the claims for
breach of the implied covenant of good faith and fair
dealing and for bad faith breach of the policy (second
and third claims) should be dismissed as duplicative
of the claim for breach of contract (first claim). It
relies on *New York University v. Continental
Insurance Co.,* 87 N.Y.2d 308, 319-20, 639 N.Y.S.2d
283, 289-90, 662 N.E.2d 763 (1995) (*"NYU"* ).
Scientech does not concede the point, although it well

Not Reported in F.Supp.2d                                                                                                    Page 2
Not Reported in F.Supp.2d, 2002 WL 1813854 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

might have done so, but contends that the matter is academic in light of its proposed amended complaint, which would combine all three theories in a single breach of contract claim. Although nothing much turns on it, the second and third claims for relief are dismissed on the ground that they are duplicative of the first.[FN1] It follows also that so much of the fourth claim for relief as seeks a declaratory judgment premised on the second and third claims for relief also is duplicative.

> FN1. This moots Scientech's contention that the third claim is insufficient on the alternative ground that New York does not recognize an independent tort for bad faith of an insurance contract.

2. Greenwich seeks dismissal also of Scientech's punitive damage claim, an application as to which Scientech's papers are silent. As is implicit in Scientech's silence, the counterclaim does not even approach satisfaction of the standard reiterated in _NYU,_ 87 N.Y.2d at 316, 639 N.Y.S.2d at 287, 662 N.E.2d 763.

### The Motion for Leave to Amend

As the Court grants Greenwich's motion to dismiss, it turns to Scientech's alternative motion for leave to file an amended counterclaim, the central feature of which is the combination of what were the first three claims for relief in the original counterclaim into a single claim for breach of contract. Greenwich opposes the motion to the extent that the proposed amended complaint (a) contains a prayer for punitive damages, and (b) alleges bad faith and breach of the implied covenant of good faith and fair dealing claims in the context of the broader breach of contract claim

[2] The first point is well taken, as is implicit in Scientech's studied silence on the punitive damage issue. As the claim for punitive damages on this counterclaim is legally insufficient, leave to amend to assert that claim would be futile and will be denied.

*2 Greenwich's second point raises issues more practical than legal. It ought to go without saying, of course, that a complaint or counterclaim may not be dismissed under Rule 12(b)(6) or, by parity of reasoning, rejected as a futile pleading amendment, unless it is clear that the claimant could prove no facts under the challenged pleading that would entitle

it to relief. _E.g., Conley v. Gibson,_ 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). As Greenwich effectively concedes that the breach of contract claim in the proposed amended counterclaim alleges facts which, if proven, would entitle Scientech to relief, there is no basis for dismissal of that claim, and it must appreciate that fact. Rather, it seeks a determination at the pleading stage that certain of the alternative legal theories under which Scientech might be entitled to relief on that claim will not fly, a determination that probably is sought more for its potential impact on settlement discussions than anything else.

Whatever might be the case at the summary judgment stage, the Court sees no basis for making such a determination on a motion for leave to amend. It suffices for present purposes to say that the contract claim in the proposed amended counterclaim, if proved, would entitle Scientech to some relief. Its assertion therefore would not be futile.

### Conclusion

For the foregoing reasons, Greenwich's motion to dismiss in No. 02 Civ. 1190, which is docket item 41 recorded on the docket in No. 01 Civ. 8210, is granted. Scientech's alternative motion for leave to amend in the same action, recorded as docket item 43 in No. 01 Civ. 8210, is granted in all respects save that it is denied insofar as Scientech purports to assert a claim for punitive damages.

SO ORDERED.

S.D.N.Y.,2002.
Scientech, Inc. v. Metro-North R.R.
Not Reported in F.Supp.2d, 2002 WL 1813854 (S.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 1:02cv02196 (Docket) (Mar. 19, 2002)
• 1:02cv01190 (Docket) (Feb. 11, 2002)
• 1:02cv00008 (Docket) (Jan. 02, 2002)
• 1:01cv08210 (Docket) (Aug. 31, 2001)

END OF DOCUMENT