BROWN RUDNICK BERLACK ISRAELS LLP
Andrew Dash (AD-7913)
Peter Adelman (PA-1562)
Seven Times Square
New York, NY 10036
Tel:    (212) 209-4800
Fax:    (212) 209-4801

Counsel for Farrell Lines, Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN STEAMSHIP OWNERS MUTUAL PROTECTION AND INDEMNITY ASSOCIATION, INC., <br><br> Plaintiff, <br><br> -against- <br><br> ALCOA STEAMSHIP CO., INC., et al., <br><br> Defendants. | 04 Civ. 04309 (LAK) (JCF) <br><br> (ECF CASE) |

## AFFIDAVIT OF PETER ADELMAN

STATE OF NEW YORK    )
                                          ) ss.:
COUNTY OF NEW YORK )

Peter Adelman, being duly sworn, deposes and says as follows:

1.       I am a member of the bar of this Court and an associate of Brown Rudnick Berlack Israels LLP, counsel to defendant Farrell Lines, Inc. ("Farrell").   I submit this affidavit in support of Farrell's motion in limine for an Order excluding before trial certain evidence as set forth in the exhibits attached hereto.   I have personal knowledge of the matters set forth herein.

2.       Attached hereto as Exhibit A are true and correct copies of the Affidavit of Richard H. Brown, Jr.; the Declaration of John H. Cassedy; the Affidavit of William A. Craig; the Affidavit of Joseph E.M. Hughes; the Affidavit of Thomas J.

McGowan; the Affidavit of Vincent J. Solarino; and the Affidavit of James Patrick Sweeney, marked to reflect testimony sought to be excluded.

3. Attached hereto as Exhibit B is a true and correct copy of Trial Exhibit PX-290.

4. Attached hereto as Exhibit C is a true and correct copy of the Rebuttal Declaration of Robert E.M. Hughes.

5. Attached hereto as Exhibit D is a true and correct copy of the Rebuttal Expert Report of Richard H. Brown, Jr.

6. Attached hereto as Exhibit E is a true and correct copy of the Rebuttal Expert Affidavit of Richard H. Brown, Jr.

7. Attached hereto as Exhibit F are true and correct copies of certain excerpted pages from the transcript of the January 31, 2006 Expert Deposition of Richard H. Brown, Jr.

8. Attached hereto as Exhibit G is a true and correct copy of the November 18, 2005 Order of Magistrate Judge James C. Francis IV.

s/ Peter Adelman
Peter Adelman

Sworn to before me this
14th day of July, 2006

/s Amy Cunningham
Notary Public

No. 01CU6004605
Qualified in Queens County
Certificate Filed in New York County
Commission Expires March 23, 2010

# Affidavit of Richard H. Brown, Jr.

Nourse & Bowles, LLP
Attorneys for Plaintiff
One Exchange Plaza
New York, New York 10006
(212) 952-6200

Sullivan & Worcester LLP
1290 Avenue of the Americas
New York, New York 10104
(212) 660-3000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
                                              :
AMERICAN STEAMSHIP OWNERS          :      04 Civ. 04309 (LAK)(JCF)
MUTUAL PROTECTION AND              :
INDEMNITY ASSOCIATION, INC.,        :
                                              :      **AFFIDAVIT OF**
                    Plaintiff,         :      **RICHARD H. BROWN, JR.**
                                              :      **SUBMITTED BY PLAINTIFF**
       - against -                     :      **IN SUPPORT OF ITS CASE IN CHIEF**
                                              :
ALCOA STEAMSHIP CO., INC., et al.,    :
                                              :
                    Defendants.        :
-----------------------------------------------------X

STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF NEW YORK  )


       Richard H. Brown, Jr., being duly sworn, deposes and says:

                    Background and Employment History

       1.       Attached to this affidavit, as Exhibit 1, is my curriculum vitae giving my

general background and experience.  To amplify Exhibit 1, in June 2002 I retired as

Counsel to The American Club and director and was succeeded by Lawrence J. Bowles,

although I regularly attended Board meetings until I retired from the practice of law in

June, 2003.  I have also generally attended at the Club's annual general meetings and

three foreign Board meetings in 2003, 2004, and 2005. After the Club authorized the present action in 2004, I assisted with regard to preparation of the complaint and some other pleadings. I was also requested to assist Nourse & Bowles, LLP in another matter on behalf of the Club, unrelated to this action. In that connection, I am again of counsel to Nourse & Bowles, but only in a limited way, and do not come to the office regularly.

2.    The facts stated herein are based upon my personal knowledge and/or review of various documents that have been either produced or marked as trial exhibits in this action, and the facts are true to the best of my knowledge, information and belief.

3.    In 1982, I was a partner in the law firm of Kirlin, Campbell & Keating ("Kirlins"). In that year, I became the representative of Kirlins acting for the firm in its capacity as counsel to American Steamship Owners Mutual Protection and Indemnity Association, Inc., usually referred to as The American Club ("Club"), plaintiff in this action. I was referred to as counsel, although technically the firm was counsel, and the retainer was paid to the firm. I served in that position until June 2002.

## The American Club's Organization and Structure

4.    The Club is a non-profit mutual indemnity association of shipowner members organized and existing under New York law and licensed and regulated by the New York Insurance Department. During the earlier years of my tenure, the Club and its members, in addition to being governed by New York law, were governed by the Club's charter and by-laws, and the Club's indemnity coverage was furnished under the terms of a policy which also incorporated the charter and by-laws. In 1997 the Club changed from

-2-

a policy to a rule-book format in which rules, rather than a policy, described the terms of the Club's indemnity coverage, and some by-law provisions were transferred to the rules.

5.    Under the by-laws the Club's business was conducted by its Board of Directors elected annually by the members at their annual meeting. The overwhelming majority of the Directors were officers or employees of members of the Club which had a large amount of the tonnage insured under Club's policies. The Board met periodically, about 6-8 times a year. The day-to-day business of the Club was carried on by the manager appointed by and subject to the direction and control of the Board. The manager was (and is) Shipowners Claims Bureau, Inc. ("SCB"), located in New York. Among its many duties SCB handled claims of members seeking indemnity or reimbursement for liabilities covered by the policy, which the members had paid to claimants.

6.    The Directors of the Club elect from among themselves a Chairman and Deputy Chairman, and a Secretary, who is usually the chief executive of the Club's manager. The Board of Directors also appoints a Finance Committee from among the directorship. The Finance Committee functions similarly to an executive committee and makes recommendations to the Board of Directors.

<u>The American Club Insurance Policies and By-Laws</u>

7.    Policies were issued for one year time periods, known as "insurance years" or "policy years", each commencing on February 20th. Through the Club, the members for each insurance year would effectively mutually indemnify each other for covered losses and expenses due to occurrences during the year by payment of premiums and

- 3 -

assessments to cover such losses and expenses together with administrative expenses for the year. Each member for the insurance year would pay an initial premium and, if necessary, subsequent assessments in the same proportion to the whole assessment as the member's premium bore to the total of all members' premiums. Since the membership, members' proportions of premiums/assessments, and members' losses would change from year to year, separate accounts were kept for each of the insurance years. The members for any insurance year were, as such, liable only for their proportions of premiums and assessments attributable to that year. Fundamentally, each insurance year was to be self-supporting, and within the insurance year each member was to be liable for his proportion of the premiums and assessments necessary to cover the claims and expenses for that insurance year and not some other. The foregoing mutual arrangement was pursuant to New York statute (Insurance Law §4111) and the Club's charter, by-laws and insurance policies.

8.     The relevant assessable policies (See Ex. 1 to Joint Pre-Trial Order) prominently included an assessability provision as follows:

> ASSESSABILITY.  The Assured are subject to a contingent liability hereunder for assessment without limit of amount for their proportionate share of any deficiency or impairment as provided by law and fixed in accordance with the by-laws of the Association [Club] ...

9.     Article VI, Section 4 of the by-laws applicable for insurance years 1989 and prior provides that, when the manager of the Club shall determine "that it is practicable to estimate with a reasonable degree of certainty the minimum, probable or final surplus or deficiency resulting from all of the [Club's] insurances in effect during

such insurance year," that the Board of Directors may, among other things, issue "final" refunds or "final" assessments for that insurance year. This process is commonly referred to as "closing" an insurance year. The relevant text of Article VI, Section 4 follows:

> SECTION 4. From time to time after the termination of each insurance year, when the manager shall determine that it is practicable to estimate with a reasonable degree of certainty the minimum, probable or final surplus or deficiency resulting from all of the Corporation's [Club's] insurances in effect during such insurance year, the manager shall place before the board of directors a statement of such financial results of such insurances, segregated between assessable and non-assessable business. After receipt of any such statement, the board of directors from time to time may (a) fix and determine an amount to be declared and paid as a partial or final dividend, after retaining such sums as they may deem necessary to meet outstanding policy obligations or for the maintenance of reserves and surplus of the Corporation, or (b) order an interim or the final assessment to be made against the holders of assessable policies ... Any dividend declared or any assessment levied shall be based solely on such surplus or such deficiency, respectively, resulting from the assessable business for the insurance year. All dividends declared and all assessments levied shall be distributed or spread in the ratio that the net premiums paid by the holder of an assessable policy bear to the net premiums paid by all holders of assessable policies for the insurance year. ... In any case, however, all actions of the board of directors in respect of dividends or assessments shall conform with the Law and with the Charter and By-Laws of the Corporation.

I reviewed PX-109 and confirm that it is a true and correct copy of the by-laws applicable to Club members in insurance years prior to 1989.

## The Rise of Occupational Disease Claims

10.    It was customary that Kirlins furnish "assessment letters" at the time the Board ordered interim and final assessments and partial and final dividends (or refunds)

under the foregoing by-law. At the time I became counsel in 1982, the letters on those subjects were being prepared by William Fallon, another Kirlins partner (now deceased), and he continued to do so for some time. Mr. Fallon subsequently retired, after which I prepared such letters, the first of which is dated May 27, 1986 (Exhibit PX-90).

11.    During the early 1980s, seamen began to claim against shipowners including Club members, for occupational disease claims ("ODCs") due to alleged exposure to asbestos in ships and resultant diseases. The diseases had long periods of latency, so that invariably the seamen's claims and the members' claims for reimbursement from the Club concerned exposures during insurance years which had been closed without assessment for such claims, as the claims were unknown at the time of closing (the "Closed Year ODCs"). The claims for reimbursement were relatively small and of a nature (illness) covered under a provision of the policies. The manager, acting under an assumption that there was coverage despite the lack of assessment in respect of such claims, as I have learned recently, commenced paying them by utilizing funds in the Club's Reserve Account. Apparently under the same assumption, on one occasion. At a meeting on September 9, 1982, the Board approved a settlement in an ODC case substantial enough to require Board approval (DX-AL, p. 8036, Illness of Harris); the minutes do not reflect that I was at that meeting, and I have no recollection of that Board approval.

12.    In dealing with the asbestos claims, the manager allocated the seaman's sea service exposure to all the relevant insurance years, determined each such year's *pro rata*

share of liability, and applied the appropriate policy deductible to that year's share of liability to calculate the amount of the reimbursement due the member. This system of allocation over the years of exposure with multiple applicable deductibles (sometimes referred to as "multiple deductibles") resulted in lower reimbursement than would have been the case if all exposure had been assigned to a single policy with application of a single deductible. The relatively small reimbursements thus calculated and paid were being funded from the Reserve Account built up over prior years.

13.   In addition to the relatively small amount of Club exposure thought to be in prospect and the availability of funds in the Reserve Account thought to be adequate, the Club was not a remote insurance company dealing with faceless insureds. SCB's executives met regularly with the Board and the Board's Finance Committee (composed of a small group of four or five Board members), which generally met with the manager's executives immediately before or after Board meetings, and sometimes on other occasions. In addition, there was a regular annual meeting with all members, and SCB personnel had occasional meetings or conversations with members' employees or officers during the year. During the 1980s, the Club was very small and relatively stable in membership. As a result the Club/SCB combination was essentially collegial, and SCB's general disposition was to allow members' claims unless clearly unacceptable. The same was true of the Board, and in any case most of the Board's shipowning Directors were themselves facing the prospect of asbestos claims stemming from closed years.

14.    I was generally aware of asbestos claims possibly beginning sometime in 1982 and in any case by June 1983, as I attended the June 9, 1983 Board meeting at which the minutes indicate a general memorandum on asbestosis was distributed (PX-63, p. AC3055263).    I do not recall now when I first learned that the Club was paying asbestos claims, or what procedure it was using in doing so, but in any event it was no later than March, 1987 under the circumstances set forth below in paragraph 15 below. I was never requested to furnish an opinion on whether the Club had a legal obligation to reimburse members for such unreserved, unknown claims arising in closed years or whether any such reimbursement should be made subject to payment of assessments on members for those years.

### The Club's Practice of Allocating Claims and Applying Multiple Deductibles

15.    In early March 1987, in connection with an upcoming Finance Committee meeting, I received a March 6, 1987, letter from Thomas McGowan, president of SCB, attaching a February 24, 1987, letter from Richard LePage, Farrell Lines claims manager (PX-97). Mr. LePage's letter objected to the Club's practice of allocating asbestos claims to all relevant policy years and applying the deductibles for each year which, in the case he described (concerning seaman Hodgkins) resulted in no reimbursement to Farrell Lines for a claim slightly exceeding $135,000; LePage argued for application of a single deductible which would have resulted in a substantial reimbursement to Farrell Lines in the Hodgkins case. The matter was possibly discussed at the March 12, 1987 Finance

Committee meeting, but, if so, I do not recall the discussion; in any event the Club's allocation/multiple deductibles practice continued unchanged.

16.    At about the same time, in March 1987, the Club was concerned with the claim of a Club member, Farrell Lines, Inc., for reimbursement in the case of the death of a former ship's officer, K.C. Torrens, from asbestos-caused mesothelioma. The case involved a verdict in Torrens's favor against Farrell Lines of over $10 million (later reduced to somewhat less than $3 million) attributable to asbestos exposure in the 1950s during a time period covered by three insurers, namely the Club, a commercial insurer, and another P&I Club. There is in the Club's files a memorandum in connection with the *Torrens* claim dated March 20, 1987 (DX-AQ) prepared by a Kirlins partner, Alexander Rugani (now deceased), and myself which reflects our general consideration of several possibilities and questions with regard to deductibles, coverage allocation, and reinsurance. Eventually, the *Torrens* verdict was settled for about $2,850,000, with all three insurers contributing on a *pro rata* basis. The Club's share of the payment was calculated by the Club allocation/multiple deductibles method and amounted to about $1,210,000. After recovery from reinsurance, the Club's net loss was on the order of about $660,000 (see PX-111, 119, 126). This, so far as I know, was the largest asbestos payment made by the Club up to that date.

17.    Later in 1987, SCB requested Kirlins' views on the Club's practice of using allocation/multiple deductibles for asbestos cases. I prepared an opinion letter on that subject dated September 11, 1987, concluding that the Club's practice in that regard was

proper, although a court might conclude otherwise. This letter was submitted to the Board with Mr. McGowan's accompanying memorandum of September 16, 1987 describing the Club's deductible practice and the general scope of the asbestos case reimbursements to that date and recommending continuation of the practice. A true and correct copy of that memorandum has been marked as PX-107. Mr. McGowan suggested that this matter be reviewed by the Directors for discussion at the November meeting (PX-108, p. 8510, AC 3060230). I recall no discussion at the November 1987 meeting and, by my recollection, the Board did not again consider the question until the September 1989 meeting by which time the Club had become a reinsured member of the International Group ("IG") through the London Club, effective on February 20, 1989. At the September 1989 meeting the Board resolved that the Club would adopt the IG practice (i.e., applying only the "effectively latest" deductible) for exposures commencing February 20, 1989, but would continue the Club practice of allocation/multiple deductibles for exposures before that date. For a claim involving both pre-1989 and post-1989 exposures, the manager recommended that the deductibles in force over the pre-1989 period of exposure be accumulated and no post-1989 deductible would be taken unless the accumulated pre-1989 deductibles were less than the single post-1989 deductible required by the IG practice. In that case the Club would follow the IG practice and use the IG deductible. This was informally approved by the Board as I understand it. (See PX-145, pp. AC3062714-15, Key 004005.)

## The Then-Directors Set Aside an Arbitrary and Insufficient
## Amount of $100,000 Per Year as a Reserve for ODCs
## Arising in Years as They Were Closed

18.    On March 8, 1988 SCB sent to the Finance Committee (copy to me and

others) a memorandum (PX-120) entitled Closing of Insurance Years (p. KEY 002729)

which suggested closing the 1979/80 and 1981/82, stating, among other things:

> ... Both years are in a slight credit position (1979/80:
> $101,448; 1980/81 [typo. Should read 1981/82]: $169,993)
> and if the Board accepts the proposal contained in Appendix
> I, would be closed with a transfer of such credits into the
> reserve simultaneous with the creation of a [Club] liability in
> an equal amount for unreported occupational disease claims
> ...

Appendix I (p. KEY 002730), expanded on that suggestion and recommended

establishing a reserve for ODCs and pointed out that: (a) the asbestos illnesses' long

latency period meant that the Club was paying claims attributable to closed years without

having had made specific provision [or, indeed, any provision] for them on closing the

years, citing the *Torrens* case as an example of an unfunded, unreported loss which

would be paid from the Reserve Account; (b) the Club should set aside reasonable funds

when a year is closed to protect against severe depletion of the Reserve Account from

unreported claims in closed years; (c) it was impossible to establish settlement reserves

on these cases and therefore they did not propose to establish a reserve for specific

known cases, but rather credit an agreed amount from each year on closing to the Reserve

Account as an IBNR (i.e. incurred but not reported) item; (d) assuming this would be an

ongoing program, SCB recommended that an insurance year's credit balance, but not

exceeding $250,000, be transferred accordingly and once on a five year closing scenario

- 11 -

the final assessment prior to closing would include such a charge; and (e) SCB considered this vital to ensure the ongoing solvency of the Club's surplus funds when called upon to pay this type of claim.

19.    At the Finance Committee March 15, 1988, meeting the manager submitted three alternative proposals as follows:

> A. No refund [particularly notable as to the 1977/78 year which stood in a strong ($1,540,083) credit position]. As discussed in Appendix A, supra, close 1979/80 and 1981/82 with their credits absorbed by asbestos reserving.
>
> B. Same as A, but also close 1977/78 refunding $1,290,083, with the remaining $250,000 credit balance to be absorbed by asbestos reserving.
>
> C. Same as A, but giving 1977/78 a partial refund of $750,000, credits to be absorbed by asbestos reserving.

A true and correct copy of documents setting forth this proposal has been marked at PX-121, pp KEY 00270406.

20.    Following the March 15 Finance Committee meeting the Board met on March 16, 1988.  The Board minutes (PX-122, p. KEY 011098) indicate a Finance Committee report which essentially says that there was consideration of the 1988 assessment, the manager recommended that the committee consider presenting to the Directors at the April meeting a gross assessment of about $11,500,000 for the open years, and the manager was asked to present the proposed figures well in advance of the April 14 meeting.  No mention was made of the manager's proposals regarding asbestos claims.

21.    On March 21, 1988, the manager sent a telex to the Finance Committee stating that on review the manager concluded that the Club's best interests would be served by adopting Proposal B as originally presented and going on to strongly recommend that the committee reevaluate its decision and consider an alternative compromise proposal.  The telex first described telephone conversations with Thomas Murphy of Cleveland and John Bolles of New Orleans, the shipowners' principal counsel in the asbestos cases (approved by the P&I industry), both agreeing that it would be prudent to establish an asbestos IBNR [reserve] with Murphy opining that the originally contemplated $250,000 per year could even be considered low.  The telex also said I advised that such a provision was wise and was legal; I have no present recollection of that and have no reason to question it, as I have held that view consistently.  The telex went on, in part as follows:

> ... WE WISH TO PRESENT A COMPROMISE PROPOSAL B[3] AND STRONGLY RECOMMEND YOUR APPROVAL OF SAME.  INSTEAD OF PUTTING IBNR'S EQUAL TO OUTSTANDING CREDITS (NOT EXCEEDING DLR 250,000) IN 'ABOUT TO BE CLOSED" YEARS, WE SUGGEST AN INBR OF DLS 100,000 PER YEAR BE INCLUDED IN ALL FUTURE "ABOUT TO BE CLOSED" YEARS ...

A true and correct copy of this telex has been marked as Exhibit PX-124.  I recall participating in at least one such conversation, but now recall nothing beyond what the telex says about them.

22.    Following these events the Board of Directors met again on April 14, 1980.  The minutes of that meeting (PX-127) include a report of the Finance Committee (p. AC

3061048) describing, among other things, proposed final refunds for 1977/78, 1979/80, and 1981/82 and stating that in establishing the refund amounts, the Committee agreed to increase the loss reserves for each year by $100,000 to establish within the Club's Reserve Account provision for future ODCs which are unreported when an insurance year is closed. The Kirlins assessment letter (P. AC3061173) states in a note to the calculation for those years that the figures reflect an addition to loss reserves of $100,000 for each insurance year to provide a reserve for IBNR ODCs [the Closed Year ODCs] and describes the amounts to be refunded as excesses remaining after setting aside reserves in figures "to allow $100,000 for each year for incurred but not reported claims for occupational diseases and reserves for pending cases whose result can now be reasonably determined to be within such amount." (P. AC3061179).

23.    I was present at the March 15, 1988, Finance Committee and two Board meetings in March and April, 1988, described in paragraphs 16 – 20 above. Most of my recollection of the events at those meetings depends on the records concerning them included in the exhibits referred to. However, in addition to such recollection, I have a memory of one director, Adolph Kurz, expressing opposition to setting aside any amount for IBNR ODCs (which I later came to think may have been an action in the best interest of his company rather than the Club's) and one other director, Keith Kennedy, expressing strong support for setting something aside and even his view that the amount suggested by the manager might be low. I previously testified to this effect at my discovery deposition but was uncertain whether I observed this at a Board meeting or Finance

- 14 -

Committee meeting (see Brown Dep., May 17, 2005, at pp. 49 – 54); however, further review of the documents leads me to think that my observations of both of those men were made at the March 15, 1988, Finance Committee meeting, as (a) both were present at that meeting, (b) the subject was evidently not discussed at the March Board meeting, and (c) it had been pretty well decided by the time of the April Board meeting, at which the $100,000 figure was adopted without dissent.

24.    In any event, the $100,000 set aside for IBNR ODCs was a purely arbitrary figure as no calculations were or could be made to arrive at any figure as to unknown claims with a reasonable degree of certainty.  The same is true of the higher figures suggested by the manager which, however, were more conservative than the $100,000 in that they were less likely to be insufficient.

<u>Kirlins Repeatedly Advises that Closed Years Can Be Reopened</u>

25.    Two years earlier, in the fall of 1986, two major American steamship companies, United States Lines ("U.S. Lines") and Prudential Lines ("Prudential") (successor to Grace Lines), had gone into bankruptcy.  Both had been members of the Club.  U.S. Lines had been a major member for many years until 1970, when it had withdrawn completely and put its fleet in the U.K. Club, but later put a few ships in the Club in the early 1980s. Grace (succeeded by Prudential) was a long time Club member, but in February 1986 Prudential had left the Club for the Liverpool and London Club.  In both bankruptcies, Kirlins (and I) engaged in filing claims for the Club's unpaid premiums and assessments and generally represented the Club in those bankruptcy

proceedings. In the years after the bankruptcy petitions were filed, numerous asbestos-related seamen claims were filed in both bankruptcies, the eventual relevant consequences of which are described below.

26. In the Prudential bankruptcy proceeding, over 5,000 individuals represented by the Maritime Asbestosis Legal Clinic ("MALC"), a division of the Jaques Admiralty Law Firm, filed over 7,000 claims against the Prudential Trustee alleging injuries/illnesses from alleged asbestos exposure on Prudential vessels. The Trustee commenced an adversary proceeding against the Club to determine rights under the Club policies in respect of those (and other) claims. Following a series of very unfortunate events, which are detailed in Kirlins' November 2, 1993 letter to the Club to be shared with reinsurers (a true and correct copy of which has been marked as PX-175), on September 20, 1993, Bankruptcy Judge Conrad entered a judgment against the Club in the amount of $66,160,000 for the Trustee's purported settlements of the asbestos claims. Among other things, the size of that judgment (which was a threat to the Club's existence) caused me to consider in more detail the Club's by-laws, New York statutes, and law as to assessments. Following that review, on November 3, 1993, I prepared a Kirlins letter (a true and correct copy of which has been marked as PX-177) which was sent to the Directors discussing the judgment and subsequent proceedings and setting forth our preliminary views on the possibility of "reopening" closed years to deal with potentially large recoveries of unfunded asbestos claims. For the reasons stated in some detail in that letter, we concluded:

(a)     Very probably the $66 million judgment would be vacated on appeal.

(b)     Preliminarily, if necessary, it should be possible to reopen a closed year for further assessments *pro rata* against members for that year, with Prudential also subject to such an assessment.

27.     A week later, on November 9, 1993, the Club submitted a brief on appeal to the district court to vacate the judgment, arguing as a supplementary point that any potential liability of the Club to reimburse should be limited to the assessments which could be collected from the members for the relevant years, all of which were closed and preceded 1986, the year Prudential had left the Club (a true and correct copy of that brief has been marked as Exhibit PX-178, pp. 41-46 being the relevant portion).

28.     Subsequently, on July 29, 1994, the $66,160,000 judgment against the Club was vacated by the district court.   On November 4, 1994 co-counsel Christy & Viener and Kirlins sent a joint letter in the Club's behalf to Lee J. DiCola, the Prudential Trustee, advising, among other things "It might be necessary to levy additional assessments for closed years in connection with asbestos claims".   A true and correct copy of that letter has been marked as PX-190.

29.     A short time later, I was requested by a director, C. Bennett Gleason ("Ben Gleason"), of American President Lines ("APL") to write to a lawyer, Ellis Mirsky, whom I presumed was retained in APL's behalf, stating the reasoning behind my view that closed years could be reopened for assessment in the asbestos cases.   On December 27, 1994, I sent a letter to Mr. Mirsky, explaining my views (true and correct

- 17 -

copies of which can be found at PX-192, 193) and enclosing copies of pages 42-46 of our

appellate brief (true and correct copies of which can be found at PX-178), copies to Mr.

Gleason and Mr. McGowan of SCB. I do not recall getting any replies to my December

27, 1994 letter and have seen none in the documents I have reviewed concerning this

matter.

30.    In the U.S. Lines bankruptcy, the Club and other U.S. Lines insurers were

also faced by many thousands of seamen's asbestos claims brought by MALC and the

Trustee's adversary proceeding on coverage issues against the Club and the other

insurers. In connection with that matter, on April 20, 1995, I wrote a Kirlins letter to the

Club, c/o SCB (true and correct copies of which can be found at PX-199), reporting that

Bankruptcy Judge Conrad had ordered that discovery in the adversary proceeding

continue despite pending appeals, which discovery could involve considerable legal

expense and would likely be unproductive. We recommended that:

> In connection with the U.S. Lines bankruptcy and also those
> of Prudential and States Steamship [another bankrupt
> member], we think the Club should assert the position that
> asbestos claims against the bankrupts, if paid, will evoke a
> need for assessments, at least for the insurance years before
> the 1977 year when the practice of retaining $100,000 for
> IBNR of a disease nature started. (PX-199, p. KEY036046)

We recommended that the enclosed draft letter explaining the reasons for that position be

sent to the U.S. Lines Trustee as that matter was pressing in light of the threatened

discovery and the draft was designed specifically for that purpose (see PX-199, the more

complete exhibit, draft at pp. KEY 036049-62 and PX-198), adding that I thought the

position advanced in the draft was legally sound and fair (PX-199 p. KEY 036047). My recommendation letter to the Club was forwarded by SCB the same day, April 20, 1995.

31.    The Club's Finance Committee met on May 2, 1995. A memorandum of the meeting briefly describes the discussion and states that the Committee's members asked for time to consult their legal advisors and agreed to reply to the manager by May 15 and the manager was asked to solicit responses from the other Directors. (a true and correct copy of the memorandum has been marked PX-200, p. AC 3503804 being the relevant page). On May 4, 1995, Mr. McGowan of SCB sent a telefax to the Board, reporting on the Finance Committee meeting and stating among other things:

> ...While no decision was made, the Finance Committee was generally in agreement with counsel's proposal but wished to have the opportunity to review the matter with their own counsel as well as to give all Directors the opportunity to be heard ...

> Please review the material sent with my April 20 letter, and let me have the benefit of your views by May 15.

(a true and correct copy of the telefax has been marked PX-201, p. KEY002258 being the relevant page). I have found no document indicating any views in response to that telefax.

32.    On June 7, 1995, I attended a Finance Committee meeting in which I advised that both the Prudential and U.S. Lines bankruptcy proceedings had been transferred to Bankruptcy Judge Blackshear, the next status conference was scheduled for August 15, 1995, and I thought the Club could defer making any representation about reopening years to the U.S. Lines Trustee for the time being (see BP002318, a document

produced in this matter). On the following day, June 8, 1995, according to the Board meeting minutes (a true and correct copy of which has been marked DX-CS, p. KEY 004151 being the relevant page) I made an oral report to the Board on the two bankruptcies and "[i]t was agreed that no action be taken at this time regarding the issues raised in counsel's letter dated April 20, 1995 [PX-199]."

33.    Following that development, it is my recollection that the urgency in the U.S. Lines matter diminished and eventually evaporated altogether. The U.S. Lines Trustee became less concerned about pursuing discovery against the Clubs and other insurers while the Clubs'/insurers' appeals were pending. In October 1995, the matter was transferred from Bankruptcy Judge Blackshear to newly appointed Bankruptcy Judge Gonzalez. The Clubs'/insurers' appeals (or the issues of whether the bankruptcy court erred in its determination that the adversary proceeding was a core proceeding and in its holding that it had discretion to deny the foreign Clubs' motion to stay the proceedings pending arbitration) were successful in the District Court (see In re United States Lines, Inc., 220 B.R. 5 (SDNY, 1997)), but unsuccessful in the Court of Appeals (see In re United States Lines, Inc., 197 F.3d 631 (2d Cir. 1999)), and the Supreme Court denied certiorari in March 2000. Meanwhile, despite court orders, MALC produced very little or no substantiation for its clients' claims. In May 1999 the Trustee filed a motion to expunge almost all of MALC's claims, as the Clubs/insurers had urged. Virtually all of MALC's claims in the U.S. Lines bankruptcy were expunged. In the foregoing

developing circumstances, I saw no further need to raise the question of the suggested letter to the U.S. Lines Trustee again.

34.    Parenthetically, during the same time period the Prudential bankruptcy was largely dormant insofar as substantive progress in the MALC asbestos cases was concerned, although there was considerable activity in respect to negotiation and procedural aspects.    MALC had the same fundamental difficulty in substantiating its asbestos claims against the Prudential Trustee.    By order of February 6, 1998, Bankruptcy Judge Gonzalez, to whom the Prudential matter had also been transferred, lifted the stay as to the asbestos claims.    The claims are now pending in the multidistrict litigation in the U.S. District Court for the Eastern District of Pennsylvania, where the Prudential Trustee has been added as a defendant in actions already pending against other defendants.    All of those actions were administratively dismissed, subject to reinstatement upon a showing that plaintiff has an asbestos – related personal injury compensable under the law, by court order filed May 22, 1996 (see In Re: Asbestos Products Liability Litigation (No. VI), Civil Action No. 2 MDL 875 (Maritime Actions), 1996 U.S. Dist LEXIS 6119).    So far as I know, there has been no significant activity involving the Prudential Trustee in any of those actions.

35.    The above-mentioned developments reduced pressure with regard to the asbestos claims in the two major bankruptcies and lessened the need, as I then saw it, to pursue the defense of reopening closed years.    In addition, I had the general understanding that the level of asbestos claims seemed to be adequately covered by the

reserves. Also, the concept of reopening years, was considered by the manager and others to be commercially detrimental to the Club, with regard both to present members and potential new members.

### The Contingency Fund and Reopening of Closed Years

36.    Under date of December 22, 1995, the manager submitted a memorandum to the Finance Committee concerning establishing a proposed contingency fund to be utilized to even out supplementary calls (assessments) by applying funds from the contingency fund to smooth out assessments, when necessary, making them more predictable for members (PX-203). This plan was discussed at a Finance Committee meeting on January 10, 1996 (a true and correct copy of which is marked PX-209). Ben Gleason, Finance Committee Chairman, suggested that he review the proposal in greater depth and correspond with me about his concerns (PX-209, p. RHB 00985).

37.    As part of his review, Mr. Gleason reviewed, among other things, a legal opinion letter dated February 14, 1979, written to the Club by William Fallon of the Kirlins firm (the "Fallon Letter," a true and correct copy of which has been marked as PX-212, AC0051582 – 97). At pages 9 – 11, the Fallon Letter concluded, among other things, that:

> (a) In estimating "with a reasonable degree of certainty the ... final surplus", if any, the manager makes provision for funds of the insurance year about to be closed to be transferred to the Reserve

Account to be available to pay the year's future proven claims, as then currently estimated.

(b) The closing of the accounts of an insurance year is a "final settlement of accounts", for such year between the Association and the policy holders/members thereof.

(c) If the amount set aside in the reserve account is not sufficient to satisfy all of the policy liabilities for the closed insurance year as subsequently proven (i.e., the amounts reserved for the pending claims), then the Association cannot make any assessment against the members of such year to eliminate the deficit.

(d) Conversely, if the amount reserved for the pending claims is ultimately determined to be more than needed to pay all pending claims for the closed insurance year, the members are not entitled to any refund thereof; and

(e) the final settlement of accounts resulting from closing an insurance year could be set aside in the event of fraud or mutual mistake of fact, a conclusion that I interpreted to mean that closed years could be re-opened under appropriate circumstances, including, as relevant here, the assertion of claims unknown and unreserved for when the manager made his estimate "with a reasonable degree of certainty".

- 23 -

38.    By letter of January 22, 1996 (misdated 1995) (a true and correct copy of which is marked PX-210), Mr. Gleason wrote to me suggesting, on his reading of the Fallon Letter, that once the manager determines it practicable to estimate with a reasonable degree of certainty the probable final surplus or deficiency and the Board determines a final assessment or dividend the insurance year is effectively "closed" and the Club cannot make any assessment to eliminate the deficit (PX-210, p. AC3504163). Mr. Gleason asserted that such an assessment was inconsistent with the Kirlins letter of April 20, 1995 (written by me) and its enclosed proposed letter to the U.S. Lines Trustee. He also asserted that his position – no reopening of closed years – was more consistent with New York Insurance Law §4111. I replied in some detail, by letter dated February 1, 1996, with attachments (a true and correct copy of which is marked PX-212). I pointed out that when a year was closed in a situation in which the managers can estimate with a reasonable degree of certainty what is needed in respect of a final assessment/refund, there should not be any further assessments. In a situation, however, where no reserve was established or assessment levied at all for a "closed" year exposure for an asbestos-caused illness which was unknown at the time of estimation, "reopening" the year was appropriate on the ground of mutual mistake (PX-212, pp. AC006653103). I sent copies of my letter and enclosures to Joseph Hughes and Thomas McGowan of SCB.    On March 8, 1996, Mr. McGowan forwarded copies of our exchange to the Finance Committee (a true and correct copy of the memorandum and enclosures has been marked PX-215).

- 24 -

39.    I never received a written response to my February 1, 1996 letter (PX-212).

A copy of the exchange of letters between Mr. Gleason and me was sent to

Charles Kurz, II, and I have now (in the last few days) seen for the first time among the

exhibits a letter from Ms. Gerry Bob of APL to Mr. Kurz forwarding copies of that

correspondence (a true and correct copy of that letter has been marked PX-214).  That

document is a handwritten note evidently by Mr. Kurz, as follows:

> Telcon w/Dick Brown 3/5/96
>
> -   Advised Brown that I had attached correspondence from
>     Gleason
>
> -   Expressed my concern that Ben's [Gleason's] agenda may
>     not be in the best interest of other Club members now that
>     APL has reduced its tonnage to <u>one</u> vessel.

Seeing that note reminds me now that I did have a conversation with

Mr. Kurz in which he made a remark to the effect described in his note

quoted above.

40.    On April 25, 1996, the Finance Committee met and agreed to recommend

to the Board that a Contingency Fund be established which, under certain conditions,

could be used to moderate the impact of supplementary calls in excess of those originally

forecast (a true and correct copy of the minutes of that meeting has been marked DX-DD,

p. AC 3504104 being relevant).  The Committee also agreed to recommend to the Board

that once a year was closed no further assessments could be made.  The May 30, 1996

memorandum from the Finance Committee to the Board of Directors (a true and correct

copy of which has been marked DX-DE) described the Contingency Fund in some detail,

- 25 -

with recommended guidelines, including a statement (p. AC3069075) of an aim to create an ongoing Contingency Fund equivalent to a typical policy year's advance call and possibly the ETC (Estimated Total Cost). Parenthetically, the ETC was essentially equivalent to a premium paid in installments. It was my view that establishing such a fund within reasonable limits as a prospective program regularly going forward on a consistent basis was legal.

41.    On June 12, 1996, the Finance Committee met again and approved a revision to the Contingency Fund deleting the originally proposed "buffer" equal to a 10% assessment to be recommended to the Board (a true and correct copy of the meeting's minutes has been marked DX-DF). I no longer recall all the circumstances involved, but in the form ultimately approved, as described in a revised memorandum dated June 13, 1996, circulated to the Finance Committee by covering memorandum dated June 25, 1996, the originally proposed surplus of $2,000,000 for closed years was also deleted, leaving the closed years in balance (a true and correct copy of the memorandum has been marked DX-DI, pp. AC 0032834-8).

42.    At the meeting of the Board on June 13, 1996, the Contingency Fund program was approved. In addition, the Board approved a Finance Committee recommendation that the 1992/93 insurance year be closed. An entry in the minutes of the Board meeting includes the following statement in relation to the closing of the 1992/93 year:

> ... In discussing this recommendation, the Directors wished to make clear that when taking action to close a year it is their

- 26 -

> intention that such closed year cannot be reopened unless
> through the operation of New York statute.

(PX-221, p. AC3069006). I no longer recall the discussion leading to the inclusion of the

phrase "unless through the operation of New York statute". However, my understanding

of it was and is that a year could be reopened for the purpose of complying with the

operation of any New York statute applicable to the Club. In any event, I considered the

foregoing entry in the minutes to have only prospective application, rather than

retroactive application.

International Group Pooling Agreement

43.    Effective February 20, 1997 the Club commenced issuing rules instead of a

policy, publishing a booklet entitled By-Laws and Rules (PX-234). In that booklet, some

of the material concerning premiums, dividends, and assessments which had been in the

former by-laws was included in the rules without substantive change. A new provision

was added dealing for the first time with closing of policy years, as follows, from Rule 4:

> Section 11
>
> Closing of Policy Years
>
> Subject always to the provisions of Rule 4 Section 10 above
> [concerning Overspill Claims/Calls], with effect from such
> date as the Board of Directors in its sole discretion shall
> determine after the end of each policy year, but no sooner
> than thirty-six months from its commencement, the Board
> shall declare the same closed for assessments, after which no
> further assessments shall be levied in respect thereof.
>
> The Board may declare any policy year closed for
> assessments notwithstanding that it is known or anticipated
> that there are in existence or may in the future arise legal
> costs, charges or disbursements recoverable in respect of such

> policy year which have not yet accrued or the validity, extent
> or amount of which have yet to be established.

In my view, that provision was and is clearly solely prospective and effective only going

forward from February 20, 1977.

44.    In 1996, the Club was applying to gain direct entry as a member party to

the IG Pooling Agreement, rather than a reinsured member as it then was.  In connection

with that application, David Comer, Chairman of the Membership Sub-Committee, sent a

telefax to Joseph Hughes on October 23, 1996 (PX-238) with two inquiries.  I was asked

for input and was sent a copy of Mr. Comer's telefax by John Sandercock of SCB.  I

replied by fax of October 24, 1996, attaching a suggested draft reply with attachments (a

true and complete copy of which has been marked DX-DW).  My draft was incorporated

in a reply to Mr. Comer from Mr. Hughes, but signed by Mr. McGowan for him, as he

was not available to sign (DX-DX).  After the present declaratory judgment action was

commenced by the Club in 2004, I understand that some individuals in the IG raised

questions about the reply under circumstances unknown to me.  In my view the draft

reply which I submitted and which was used was both accurate and fully responsive to

the questions put by Mr. Comer.

45.    I understand that, after the present action was commenced, the IG made

inquiries and learned that the American Club and two others had no rule requiring open

year members to pay assessments to cover closed year claims.  As a result, the IG

required that the American Club adopt such a rule and it did so effective February 20,

2005 and applicable only to closed years after February 20, 1989.  I infer that the IG had

concluded that "in the absence of such a rule if the American Club could not assess open year members such a purpose.

## Keystone Files Suit in 2002

46.     In 2000, Keystone, which had left the Club in 1997, through its attorneys, claimed it was entitled to have its ODC's treated on a single deductible, rather than an allocation/multiple deductible basis as had been (and is) the Club's uniform practice, acquiesced in by all members, including Keystone.  I became involved in that matter, meeting with Keystone's counsel in April 2000.  We had a number of discussions and exchanges of correspondence in an effort to reach an amicable resolution of the dispute. Those efforts were unsuccessful, and Keystone commenced suit against the Club on February 25, 2002 (PX-252).  By then Kirlins had ceased doing business.  I was of counsel to Nourse & Bowles, LLP, when I prepared the Club's answer in which the Club alleged, among other defenses, that if Keystone were successful in its claim, the Club was entitled to levy assessments to restore the requisite mutuality and equity of treatment among members (a true and correct copy of which has been marked PX-252, the relevant pages being pp. 17-18).  This was, and is, consistent with the views which I have held since 1993.

Richard H. Brown, Jr.

Sworn to before me this
_12_ day of May, 2006

MARTY P. BANNON
Notary Public, State of New York
No. 31-4785995
Qualified in New York County
Commission Expires February 28, _2010_

- 29 -

**Declaration of John H. Cassedy**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AMERICAN STEAMSHIP OWNERS
MUTUAL PROTECTION AND INDEMNITY
ASSOCIATION, INC.,

                        Plaintiff,

          -against-

ALCOA STEAMSHIP CO., INC., et al.,

                        Defendants.

No. 04 Civ. 04309 (LAK) (JCF)
(ECF Case)

DECLARATION OF
JOHN H. CASSEDY

SUBMITTED BY PLAINTIFF
IN SUPPORT OF ITS
<u>CASE IN CHIEF</u>

JOHN H. CASSEDY hereby declares as follows:

1.     I am 75 years old and currently reside in Naples, Florida. In 1993 I retired

to Normandy Beach, New Jersey, but now reside in Naples, Florida. The facts stated

herein are based upon my own personal knowledge and/or review of various documents

that have either been produced or marked as trial exhibits in this action, and are true to

the best of my knowledge and belief.

2.     From 1972 to 1981 and about 1985 to 1993, I was employed as President,

and subsequently Chairman and Chief Executive Officer, of Shipowners Claims Bureau,

Inc. in New York, New York ("SCB"). SCB was the manager of the plaintiff in this case,

the American Steamship Owners Mutual Protection and Indemnity Association, Inc. (the

"American Club") SCB was responsible for, among other things, claims processing for

the American Club, as well as a number of other foreign protection and indemnity clubs.

For the American Club in particular, however, SCB had broader day-to-day responsibility

for underwriting, investment of the Club's portfolio, member relations and other matters,

all under the supervision and control of the Club's Board of Directors.

3.     Prior to my employment at SCB, I received a bachelor's degree from

Providence College in Rhode Island in 1952, and a master's degree from New York University Graduate School of Business Administration in 1954.

4.    From 1952 to 1972, I was employed at insurance brokers Johnson & Higgins, J.C. Griswold and, later, again at Johnson & Higgins as an "average adjuster" or specialist in adjusting insured losses. At the time Johnson & Higgins owned SCB. I was transferred from Johnson & Higgins to SCB in 1972. In my years with Johnson & Higgins and J.C. Griswold I became broadly familiar with the customs and practices of the marine insurance industry.

5.    From 1972 to 1981, I was the President of SCB. In 1981, I was elected Chairman of SCB, and simultaneously transferred to Wilcox Barringer, a reinsurance broker, where I served as President until 1985. Throughout this period, I continued to maintain contact with SCB principally as a liaison with my successors at SCB, Mr. James Henry and Mr. Thomas McGowan, to maintain continuity with the Club's Board of Directors. In 1985, I was transferred back to SCB as Chairman and Chief Executive Officer, and charged with the responsibility of making SCB profitable.

6.    At some point in the 1980s, I cannot recall precisely when, I learned that American Club members had been receiving small, previously unreported occupational disease claims ("ODCs") involving asbestos related injuries which were reported long after the insurance years in question were closed (the "Closed Year ODCs"), and the Club had been paying members indemnities for those claims out of the reserve account.

7.    How, when and why the Club had begun paying these claims I do not recall, nor do I recall any discussion or debate as to whether these were, in fact, a liability for the Club.

8.    My recollection is that it was my view at the time that these claims were not, strictly speaking, a Club liability, because they were claims reported after the insurance years in question were closed, and I had always understood that claims reported after a year was closed were, in effect, deniable on that basis. Closed meant closed. This, to me, was basic. Once a year was closed, the Club could no longer assess the members for reported claims even if the reported claims in that year were eventually settled for more than reserved for and, conversely, the Club was no longer responsible for losses which were not reported at the time the year was closed. Nonetheless, given the nature and purposes of mutual indemnity insurance, it was not unusual for the Club to accept the infrequent untimely claim from a member as an accommodation, on what I would call a "one off" basis, particularly if the claim was small. While I do not recall anything specific, I am certain that I would have felt that unreported asbestos claims would have fallen into that category.

9.    I always believed that payment of "one off" claims, which would have included the Closed Year ODCs, was something the Board of Directors was entitled to approve of, within their discretion. I never believed the Closed Year ODCs posed a threat to the Club's financial well being because the practice of paying them was discretionary

and, should the losses become significant, the Club could, in my view, simply stop paying them. Again, however, to the best of my recollection, this was not something anyone discussed at the time. I do not recall ever asking for or obtaining an opinion of counsel on these issues, nor did anyone on the Board of Directors ever ask me to do so.

10.     At some point in 1988, SCB's then President, Mr. Thomas McGowan, and I approached the Club's Finance Committee to express the view that, so long as the Board was continuing to pay the Closed Year ODCs, it would be prudent to put funds into the reserve account to cover these payments.

11.     Though I have no detailed recollection of my discussions with Mr. McGowan, I do recall that at the time the Finance Committee was considering closing an insurance year which had a considerable surplus. Mr. McGowan and I were generally of the view that the Committee should consider transferring all or a substantial part of this surplus into the reserve account for the Closed Year ODCs, and we made that proposal. The Committee rejected our proposal outright, my recollection being that they were interested in refunding the surplus for the year in question to the Club's members, who at the time were predominantly the companies by whom the Directors on the Committee were employed, or which they owned. The more that was used for the reserve account, the less that was available to be refunded, and the Committee members' clear preference was for the refund. I recall being very disappointed with the Committee's rejection.

-4-

12.     After our original proposal was rejected, Mr. McGowan and I drafted a telex to the Committee members urging them to reconsider their decision, and proposing a compromise figure, which we said might be considered too low. A copy of that telex is marked as PX 124. After extended discussion, the very best Mr. McGowan and I could get the Committee to agree to do was to set aside the sum of $100,000 per year for ODCs beginning with insurance year 1977 and continuing thereafter.

13.     Though we were clearly disappointed, we had no choice but to abide by the Committee's decision.  The reality of the situation was that the Club was run by the Board, who relied heavily on the advice of the members of the Finance Committee, and it would have been folly for us to push them for more money once the Board's mind had been made up.

14.     This decision was, unfortunately, very much consistent with the Board's overall "pay as you go" approach to the Club's management over the years, which was to leave no more cash in the Club than was absolutely necessary and to defer all payments into the Club, whether by way of premiums or assessment, until the latest possible moment (and then in the least possible amount).  Putting the best face on a bad situation, we marketed this approach as the "Cash Flow Advantage", which placed a high priority on leaving cash in the shipowner's pocket at a time when interest rates were probably at an all time high.  However, the obvious downside to this approach is that it could and did leave the Club with a fairly modest reserve account.  This was, however, as the former

members, who controlled the Club at the time, wished things to be.

15.     During my tenure with SCB, the members of the Finance Committee were the most actively involved, and fully informed of all of the boards and committees on which I have served in my career.  The most prominent and vocal members of the Committee were Mr. Adolph Kurz and Mr. Charles Kurz II of Keystone Shipping, Mr. Richard Gronda of Farrell Lines, Mr. Keith Kennedy of British Petroleum, and Mr. Howard Lucas and Mr. Ben Gleason from American President Lines. Their influence and control over the Club's affairs at the time was, in my view, near total.

16.     I declare under penalty of perjury that the foregoing is true and correct.

Executed on: May _10_ , 2006

John H. Cassedy

**Affidavit of William A. Craig**

Nourse & Bowles, LLP
Attorneys for Plaintiff
One Exchange Plaza
New York, New York 10006
(212) 952-6200

Sullivan & Worcester LLP
1290 Avenue of the Americas
New York, New York 10104
(212) 660-3000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------X
                         :

| | |
|---|---|
| AMERICAN STEAMSHIP OWNERS MUTUAL PROTECTION AND INDEMNITY ASSOCIATION, INC., :<br><br>        Plaintiff, :<br><br>  - against - :<br><br>ALCOA STEAMSHIP CO., INC., et al., :<br><br>        Defendants. : | 04 Civ. 04309 (LAK)(JCF)<br><br>**AFFIDAVIT OF**<br>**WILLIAM A. CRAIG**<br><br>**SUBMITTED BY PLAINTIFF IN**<br>**SUPPORT OF ITS CASE IN CHIEF** |

-------------------------------------------------X

| | |
|---|---|
| STATE OF NEW YORK | ) |
| | )ss.: |
| COUNTY OF NEW YORK | ) |

William A. Craig, being duly sworn, deposes and says:

## BACKGROUND

1.    I was an employee and officer of Shipowners Claims Bureau, Inc. ("SCB"), the manager of the American Club, from 1985 until I retired at the end of 1999. The facts stated herein are based on my personal knowledge and/or review of various documents

that have been either produced or marked as trial exhibits in this action, and the facts are true to the best of my knowledge, information and belief.

2.      I received a Bachelor of Arts degree from Brooklyn College in 1957 and a Juris Doctor degree in law from Fordham University in 1961.

3.      In 1947 I began working at Isthmian Steamship Company, which was later purchased by States Marine Lines, Inc. Isthmian Steamship Company's name was changed to Isthmian Lines, Inc. and both companies were operated by State Marine-Isthmian Agency, Inc.  I was a claims adjuster and then became an assistant vice-president in the law department of that company in 1962.

4.      As an assistant vice-president in the law department, I supervised 30-35 people in the claims department.  I reviewed all claims, including personal injury claims. I also processed the company's indemnity claims with its various insurers.

5.      In 1985, after the above companies wound down, I became employed by SCB as a vice-president and head of the claims department.  I supervised 10-12 claims people.  My responsibilities as head of the claims department included, among other things, overseeing the claims department in the handling of personal injury and death claims of seamen, stevedores, and shipyard workers as well as any claims that were filed against the American Club.

6.      In the early 1990's I was promoted to senior vice-president of SCB. Between 1985 and 1999 my immediate supervisor was Thomas McGowan, President of SCB.  I retired on December 31, 1999.

7.     During my tenure at SCB, I would regularly attend the meetings of the

Club's Board of Directors, for the purpose of answering questions regarding specific

claims before the Board for approval.

## THE AMERICAN CLUB'S ASSESSABLE INDEMNITY INSURANCE POLICIES

8.     The American Club's assessable indemnity insurance policies were

occurrence-based, providing the Club's members, subject to all the terms and conditions

of the policy, with indemnity insurance for the "liabilities hereunder" in categories

specified in such policies, and occurring within the year for which each policy was

issued.

9.     Each member's premiums were calculated based on his own five year "loss

record," which is a list of all claims asserted against that member which were estimated

to exceed the member's deductible and/or paid by the American Club to that member

within the prior five year period.  The average yearly cost and/or cost estimate of those

claims was the base on which the next year's premium was calculated and negotiated.  In

general, if the costs based upon a member's loss record were increasing, his premiums for

the next year increased also.

10.     Members' five-year loss records did not reflect claims based on exposure to

asbestos or other occupational disease claims arising from alleged exposure in closed

years. ("The Closed Year ODCs.")  This is because the insurance years implicated in

such claims – the year(s) in which each seaman was allegedly exposed to asbestos –

occurred many years, if not decades, before the occupational diseases manifested

themselves and the claims were simply not known or knowable at the time the loss record

were compiled.  With a few exceptions, due to the five year limit on loss records, ODCs were not factored into the premiums the closed year members paid either while those years were open or after the claims were asserted, and therefore did not result in premium increases to those members in any later years.

11.     Each American Club indemnity insurance policy required that a "deduction" or deductible apply to "Claims hereunder" – *i.e.*, claims arising during that separate policy period.  I have reviewed Exhibit 1 to the Joint Pretrial Order ("JPTO") and it is an accurate sample of an American Club insurance policy.  In numerous paragraphs, each policy requires that deductibles apply to "claims hereunder" or arising during that policy period.   Accordingly, for each claim arising under a policy, *i.e.* occurring within a policy year, a deductible applies.  In the case of claims regarding exposure to asbestos occurring over multiple policy years, a deductible thus applies for each policy year implicated.

12.     The member's chosen deductibles periodically changed, typically increasing in amount.  Members increased their deductible to attempt to reduce the premiums they would pay in subsequent years.

13.     As to claims where the alleged exposure/damage spanned several years, historically, the American Club has consistently allocated the indemnities sought by the members over all relevant years and applied one deductible for each insurance policy year.  Thus, if a claim spans, say, years 1973 – 1977, the member is required to absorb the deductible for each of those insurance years.  This practice is consistent with the

provisions of the insurance policies regarding "liabilities hereunder" and "claims hereunder" or liabilities incurred within each policy period, not outside thereof.

14.    In my experience as claims manager for States Marine Lines and Isthmian Lines, other insurers followed the same approach.

15.    Exhibit 1 to the JPTO also accurately depicts that each of the policies issued prior to 1989 also contains provisions:

    (a)    requiring members to provide prompt notice of claims (clause 16),

    (b)    barring the Club's liability for claims not presented to it with proper proofs of loss within one year after payment by the member (clause 17), and

    (c)    barring suits against the Club unless commenced within two years after the member has paid amounts for which it seeks indemnity from the Club (clause 18).

16.    It was important to the Club's financial operations for members to promptly report all claims against them which might involve indemnity claims against the Club because:

    (a)    all such claims must be included in each member's loss record for the purposes of accurately determining his subsequent yearly premiums, and

    (b)    a reserve had to be established for each such claim, to ensure that sufficient funds were available to pay indemnities to the member after they paid the underlying claims. I was not directly involved in the Club's process of making assessments on members to provide the necessary funding. However, I provided the loss record data to SCB's president, who did have that responsibility.

## HANDLING OF ASBESTOS CLAIMS AT SCB

17.    When I joined SCB, I familiarized myself with the policies and practices of

the American Club by meeting with Jack Cassedy, the chairman of the board of SCB at

that time. I also spoke with Tom McGowan the then President of SCB about procedures

and regularly spoke to people in the company about their jobs, responsibilities and the

American Club's procedures.

18.    Although I am an attorney, I never researched the issue of whether the

American Club was or was not obliged to pay indemnities to members of closed

insurance years regarding the Closed Year ODCs. At no point during my employment of

SCB was I ever involved in establishing Club policy on that issue.

19.    As the then boards of directors were approving payment of such claims, I

assumed that it was my job to process such claims just as I would process any other

claim, and I did so.

20.    During my tenure at SCB, my department received reports of many

thousands of Closed Year ODCs from the American Club's members regarding asbestos

related and other ODCs that had been made against them. Only a few hundred of these

ODCs involved payments by members to the seamen or indemnity payments by the Club

to members, because most of the claims were meritless and were not pursued by the

claimants to the point of settlement or judgment.

21.    As we received so many notices of Closed Year ODCs, we simply placed

the notices in file folders and did not enter them in SCB's computer accounting system or

deductible per year. This procedure would result in a net reserve of zero because the member was responsible for the deductible(s). When more information became available, I recommended a more appropriate reserve(s).

26.     After assignment to him, Mr. Grosso would review the file, obtain necessary additional documents and handle the case. When I handled a case, I would acquire various reports regarding all necessary information through the member and his defense counsel. I would try to obtain all necessary information, including medical reports, expert reports, and opinions of defense counsel handling the litigation as to its merits and value. Mr. Grosso, under my supervision, proceeded the same way. Collection and review of this information was vital in allowing us to set appropriate and conservative reserves for each such claim.

27.     Only after receiving and reviewing all available information, including the complaint, the seaman's employment records, medical reports, and the opinion of defense counsel handling the underlying litigation, I would recommend that the reserve be modified to reflect a conservative estimate of what the American Club's indemnity to the member might be, net of the member's deductible(s). I would submit my recommendation to Mr. McGowan, who, subject to Board review, had final approval over the reserve set for each claim. If Mr. Grosso recommended a reserve, I would review it before passing it to Mr. McGowan.

28.     Such procedures were followed regarding all Closed Year ODCs, and similar procedures were followed regarding all other claims.

even make lists of all such claims. If it became clear that individual claims were or would be pressed against members, we recorded these claims in SCB's computer accounting system.

22.    After SCB received notice of any ODCs from an American Club member that was being pressed, I would review the initial notice/correspondence relating to the claim and create a file for each claim.

23.    As to each such claim, SCB usually received documents from the member, including a copy of a complaint in an underlying seaman's lawsuit, usually with a letter from the member describing the type of claim and how it arose, when and on what ship, along with the seaman's service record showing the periods of employment on the member's vessels. SCB's underwriting staff would determine whether, at the time alleged, the member's American Club policy included that ship or ships. If the ship was not entered in the Club in the relevant periods, the claim was rejected. If the ship was entered, I assigned the case to the claims adjuster, Edward Grosso, and the file with all available documents would be sent to him. If the case appeared to be particularly difficult, I would work on it myself.

24.    Edward Grosso was an assistant Vice President and a senior claims adjuster. He handled asbestos claims at SCB under my supervision until he left the company in 1990 or 1991. After Mr. Grosso left SCB, I took over the responsibility for occupational disease claims alone.

25.    Upon opening a claims file for a Closed Year ODC, a reserve for the claim was set. Initially, an arbitrary "placeholder" reserve was set in the amount of one

## APPLICATION OF DEDUCTIBLES

29.    Upon receipt of the notice of a claim from a member, the Club's procedure required me to arrange for the input information regarding each claim and the applicable deductible(s) into SCB's computer accounting system, which I did, at least for the Closed Year ODCs that were being pressed. The others were too numerous and speculative to deal with in that way.

30.    If the claim spanned multiple years, I arranged for the underwriting department to set up a different folder for each policy year involved in the claim, and recorded the member's deductible included in each of its implicated policies.

31.    As to each Closed Year ODC arising from alleged exposure occurring in a pre February 20, 1989 insurance year, in calculating the member's indemnity, I allocated the amount of the settlement or judgment paid by the member over each implicated insurance year by the number of the claimants sea service days and I applied the member's deductible for each of those years. (This approach is sometimes called the "multiple deductible" approach.)

32.    As to Closed Year ODCs arising from alleged exposure occurring in insurance years of February 20, 1989 (the year the American Club became a reinsured member of the International Group of P&I Clubs (the "IG")) and thereafter and following the IG practice, I understood we were to apply one deductible in calculating the member's indemnity, namely that of the last year of his membership in the American Club.

33.     Many of the defendants in this action, including Keystone, APL and Farrell Lines, accepted numerous indemnity payments from the Club regarding their Closed Year ODCs based on the "multiple deductibles" approach.

34.     In about 1990, the Trustee in bankruptcy for Prudential Lines Inc. ("PLI"), a former Club member (the "PLI Trustee"), sued the American Club in Bankruptcy Court in New York City.  One of the issues in that case was whether the Club was entitled to require the member to absorb multiple deductibles.  Club counsel, Richard H. Brown, Jr., frequently reported on the status of that case at board meetings attended by board members representing many of the defendants in this case, including, Keystone, Farrell and APL.

35.     Throughout the PLI litigation, from 1990 to 1998, the members other than PLI continued to accept indemnity payments from the Club based upon the allocation of the claims over the years of alleged exposure and the application of a deductible for each year.  Even after the courts in 1998 held that the PLI Trustee could choose one deductible, because PLI had not acquiesced in the multiple deductible approach, the Club still applied the multiple deductible approach to Closed Year members which had so acquiesced.

William A. Craig

Sworn to before me this
____ day of May, 2006.

Notary Public
JANE COLASURDO
Notary Public, State Of New York
No. 31-4766002
Qualified in New York County
Commission Expires April 30, 2007

- 10 -

**Affidavit of Joseph E.M. Hughes**

Nourse & Bowles, LLP
Attorneys for Plaintiff
One Exchange Plaza
At 55 Broadway
New York, New York 10006
(212) 952-6200
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------X

AMERICAN STEAMSHIP OWNERS            :      04 Civ. 04309 (LAK)(JCF)
MUTUAL PROTECTION AND                :
INDEMNITY ASSOCIATION, INC.,         :      **AFFIDAVIT OF**
                                     :      **JOSEPH E.M. HUGHES**
                 Plaintiff,          :
                                     :      **SUBMITTED BY PLAINTIFF**
      - against -                    :      **IN SUPPORT OF ITS**
                                     :      **CASE IN CHIEF**
ALCOA STEAMSHIP CO., INC., et. al    :
                                     :
                 Defendants.         :
                                     :
---------------------------------------------------------X


STATE OF NEW YORK          )
                           )      ss.:
COUNTY OF NEW YORK         )


        JOSEPH E.M. HUGHES, being duly sworn, deposes and says:

        1.      I am the Chairman and Chief Executive Officer of Shipowners Claims

Bureau, Inc., ("SCB") the manager of American Steamship Owners Mutual Protection

and Indemnity Association, Inc. ("the American Club" or "the Club").   I am also

Secretary to the Board of Directors of the American Club. I am not a voting member of the Board.

2.    The facts stated herein are based on my own personal knowledge and/or review of various documents that have either been produced or marked as trial exhibits in this action, and the facts are true to the best of my knowledge, information and belief.

3.    I am an English barrister by training. I attended Balliol College, Oxford, England where I studied law. Having graduated from Oxford in 1975, I was called to the Bar by Gray's Inn in July 1976.

4.    Following call, I was a pupil at Mr. Michael Mustill QC's Chambers at 4 Essex Court, working chiefly with Mr. Jonathan Gilman and also with Mr. Johan Steyn. My knowledge of the world of marine insurance in general and protection and indemnity clubs ("P&I Clubs") in particular began during my pupilage in these chambers which specialized in maritime commercial law.

5.    In April 1977 I joined the Steamship Mutual Underwriting Association Limited, a major P&I Club, as an in-house lawyer and claims handler dealing with a wide range of legal issues concerning the day to day operations of shipowners and charterers. About a year later I was invited to transfer to the underwriting side of the club's business and for the next six years handled a broad spectrum of the club's commercial affairs chiefly in regard to its growing membership in the Far East and North America.

2

6.    Between April 1984 and September 1989 I undertook broadly similar responsibilities with the Norwegian-based P&I Club, Assuranceforeningen Gard. I lived in Norway from 1984 to 1986 and in the latter year returned to London to take operating responsibility for the club's marketing and underwriting activity in London. The club grew extensively during that time. I was appointed a Director of the Club's administration in 1985.

7.    In September 1989 I accepted an invitation to join the Board of Jardine Insurance Brokers International Ltd., a major Lloyd's broker which was part of the well-known Jardine Matheson Group. In addition to managerial and business development responsibilities within the marine sector in general, I maintained a close interest in the protection and indemnity field in the context of my then position as Chairman of the company's Marine Division.

8.    At the beginning of 1995 I was invited to undertake my current role as Chairman and Chief Executive Officer of SCB, the managers of the American Club. I moved to the United States in August 1995 to take up this position and have worked as such ever since.

9.    The American Club was founded in February 1917 in New York where it remains domiciled to this day. Its headquarters are in New York, but it is also represented in London, Athens and Oakland, California in which locations its managers

3

have subsidiary offices. From February 20, 1998 onwards it has been and is a full member of the International Group of Protection and Indemnity Clubs ("the International Group" or "the IG") – the dominant market collective in the sector of Protection and Indemnity insurance. Between February 20, 1989 and February 20, 1998, the American Club was a reinsured member of the International Group. The Club's acceptance into the International Group, which is composed of all the major, internationally recognized P&I Clubs, of which there are thirteen, entailed a number of significant business advantages to the American Club in terms of its ability to pool claims with the other members of the International Group and obtain reinsurance at favorable rates. It should also be noted that the American Club is fully accredited to, and strictly regulated by, the New York State Insurance Department which takes a close interest in its affairs.

10.    Members of all P&I Clubs are, in effect, insurers as well as insureds, in that under their assessable insurance policies, the members provide all of the funds with which to pay the mutual indemnity insurance claims of each other in each separate year.

11.    The American Club's membership was traditionally centered upon US based shipowners and operators. In the early 1990s, however, it became clear to the Club's board and managers that the decline of U.S. flag ocean-going tonnage in particular was creating circumstances where the Club's traditional membership could not be relied upon to provide sufficient business to secure its future.

4

12.    Accordingly, toward the end of 1994, the American Club launched a new initiative to grow and diversify its membership which it called its "Vision 2000" strategy. (See Exhibit PX 191.) I was engaged specifically to promote this new strategy and for the past eleven years have been working toward the fulfillment of the original strategy and its successor business plans in close cooperation with the American Club's Board of Directors.

13.    In the course of my employment at Steamship Mutual and Gard, and more so at Jardine's, I had become familiar with the American Club's reputation in the P&I Insurance market. The American Club was regarded as a small and thinly reserved Club composed almost exclusively of long-standing U.S. flag shipowner members, tightly controlled by a relatively small group of Board members who were senior officers of the longtime member U.S. flag shipping companies. This was an accurate description of the state of the Club when I arrived in 1995. It was, in a general sense, perceived to be out of the mainstream of the P&I world, and it was my task, generally speaking, to change this.

14.    During the course of my first year with SCB in 1995 – 1996, I learned that the Club was and had been since sometime in the early to mid 1980s dealing with gradually emerging, previously unreported, unreserved for seamen's occupational disease claims, mostly attributable to asbestos exposure in long passed and long closed insurance years ("the Closed Year ODCs"). From a number of discussions with my predecessor, Mr. Thomas McGowan, and Club counsel, Richard Brown, Esq., I understood that while

5

many of these claims were attributable to long closed insurance years, the Club had, since long before my arrival, and indeed, I am told, before Mr. McGowan's and Mr. Brown's involvement as President of Shipowners and Club counsel, respectively, allowed their payment out of the Club's reserves. I have since learned this practice commenced without an opinion of counsel and was never the subject of Board discussion or resolution. Given primarily that the claims were the claims of the Club's oldest and most influential members, those being Keystone Shipping Corporation, Farrell Lines and American President Lines, and related entities, all of whom had representatives on the Club's Board, and since the claims had been small and were not perceived to be a significant financial drain on the Club, no objections were made.

15.    I have recently learned that, as the American Club's accounts for most of the pre-1989 years were closed, nothing was reserved for the possibility that unknown claims would later be asserted and that for certain years a nominal sum of only $100,000 was reserved, which the Board was told at the time would likely be inadequate. I had no information at the time I became aware of this as to how that figure was agreed upon.

16.    I did not view the occupational disease claims as a financially significant matter at the time I joined SCB and came to be informed of the issue. However, my major concerns at the time were in the area of marketing, and claims generally were an area in which I deferred to Mr. McGowan and those on the Club's Board. Nonetheless, it was also my understanding at that time, and again from my discussions with Mr. Brown,

6

that if the Closed Year ODCs ever did become a significant drain on the Club's reserves, Mr. Brown was of the view that the closed years affected could and should be reopened for assessment of their respective members to cover the costs of payment.

17.    Though I learned that there had been discussions on the point prior to my time at SCB, my recollection is that in my time, the subject of closed year claims and the related subjects of closing and reopening of closed insurance years arose in the context of three related developments over the course of 1996: (1) the creation of a contingency fund out of the Club's reserves; (2) ongoing discussions between Mr. Brown and Mr. Gleason of American President Lines ("APL") regarding the Club's legal right to reopen closed years in certain circumstances, and (3) the revising of the Club's By Laws and insurance policies to bring them into line with the Rules and practices of the members of the International Group.

THE CONTINGENCY FUND

18.    As part of the Club's plan to grow and diversify, it was necessary, in my view and that of the Board, that the Club should begin to conform its practices with those of the other clubs which formed the International Group, of which the American Club then aspired to become a full pooling member.  We called this process "convergence".  One of the practices the Board decided to adopt was to create out of the Club's reserves a so-called "Contingency Fund", to be used to even out supplementary calls on open years (or, put another way, to subvent deficiencies in such years).

7

19.    By memo dated June 13, 1996 (DX-DI), the Finance Committee provided their recommendation to the Board in respect of the establishment of a Contingency Fund. I call attention to "Guideline 2" on page "2" which provides as follows:

> Adequate free surplus must also be maintained to satisfy the surplus requirements of the New York Insurance Department including surplus based on Risk Based Capital (RBC) calculations.    New York authorities currently require a minimum surplus of $7,500,000. The RBC calculations as of December 31, 1995 were $6,400,000.

20.    Guideline "2" clearly contemplates limits on the Board's power to use the Club's reserves in any manner which threatened the Club's statutorily required surplus.

REOPENING CLOSED YEARS -
THE BROWN – GLEASON CORRESPONDENCE

21.    The initial discussions concerning the creation of a "contingency fund" in about January 1996 caused Mr. Gleason of APL to express reservations about depletion of the Club's reserves. Why, exactly, Mr. Gleason had reason to believe the reserves might be depleted I do not recall him saying.  If APL had internal analyses showing significant liabilities, they did not share them with the Club.  He did, however, express concern, and this led to correspondence between Mr. Brown and Mr. Gleason of APL in January and February 1996 on the subject of reopening closed years, all of which was distributed to all the Finance Committee members in March 1996, and all of which I reviewed at the time. A copy of that correspondence as distributed to Finance Committee members is marked as PX 215.

8

22.     It was my understanding from my review of the correspondence that Mr. Gleason took issue with opinions previously given by Mr. Brown in connection with the Prudential and U.S. Lines bankruptcies, to the effect that if closed year ODC claims against bankrupt members were to be paid by the Club, it would be necessary, permissible and, indeed, proper to reopen the closed years to assess the members of that (those) year (s) to obtain the funds needed to pay those indemnities. Mr. Gleason took the view that once a year was closed, it was closed for assessment purposes and could not be reopened unless the Superintendent of Insurance took over the Club due to insolvency. Mr. Brown responded that Mr. Gleason had failed to take into account all portions of prior opinions relating to these issues, and maintained the position that open year members could not be assessed to pay for closed year members' unreserved ODC claims, and reopening of closed years for assessment was the proper way to obtain the funds to pay such claims.

23.     The issue of closed year claims and reopening closed years was the subject of extended discussion at the Board of Directors meeting on June 13, 1996, at which I was present, between Mr. Gleason, Mr. Brown, Mr. McGowan, and Mr. Recchuite, in the context of the closing of the 1992/93 year. My understanding of that discussion at the time, which was informed by all of the correspondence between Mr. Brown  and Mr. Gleason in the beginning of 1996, was that Mr. Gleason wished to have the Board declare that when years were closed they would not under any circumstances be reopened,

9

whereas Mr. Brown was opposed to that idea and wished to preserve to the Club the right, which it had always had, to reopen closed years for assessments in circumstances where, under New York law, this might be appropriate or, indeed, required, as he had previously opined. Mr. Rechuitte and Mr. McGowan spoke up in favor of Mr. Brown's view.

24. The end result of this discussion was the language inserted in the Board minutes for the meeting of June 12, 1996 (PX 221), as follows:

<u>1992 Insurance Years</u>

The Finance Committee submitted a memorandum dated June 13, 1996 (copy attached) which recommends that the 1992/93 insurance year be closed and that the surplus existing in that year be transferred to the Association's surplus. An opinion letter from Kirlin, Campbell & Keating dated June 16, 1996 (copy attached) was also distributed. <u>In discussing this recommendation, the Directors wished to make clear that when taking action to close a year it is their intention that such closed year cannot be reopened unless through the operation of New York statute.</u>

[emphasis supplied]

25. I understood this at the time to mean that the Club reserved the right to reopen closed years under circumstances where New York law so permitted, as Mr. Brown had opined in the past, including in the correspondence circulated in early 1996 to all Finance Committee members. In any event no Board resolution or contract change ever exempted the members of any already-closed year – i.e., prior to 1992 – from the assessment obligations in each insurance policy that the Club members accepted

10

for those years. On February 20, 1997, the Club changed its rules on a prospective basis to bar the re-opening of closed years.

## REVISION OF THE BY-LAWS AND INSURANCE POLICIES

26.    In this same time period, the issue of closing is addressed in another document circulated to all Board members dated June 5, 1996 (PX 219) in connection with development "3" listed above, the revision of the Association By-Laws.

27.    The letter of June 5, 1996 (PX 219) encloses a revised version of the Association's By Laws and insurance conditions and notes that changes have been made to bring the By-Laws into conformity with the rules of the International Group on a going forward basis. One of the "principal changes" noted is: "7) specifically providing that once a year has been closed there shall be no more supplementary calls". The revised By Law itself reads:

> With effect from such date as the Board in its sole discretion shall determine after the end of each Policy Year, but no sooner than 36 months from its commencement, the Board shall declare the same closed for assessments, after which no further assessments shall be levied in respect thereof.
>
> The Board may declare any Policy Year closed for assessments notwithstanding that it is known or anticipated that there are in existence or may in the future arise Legal Costs, Charges or disbursements recoverable in respect of such Policy Year which have not yet accrued or the validity, extent or amount of which have yet to be established.

11

28.    The fact that this was characterized as a "change" from the prior position indicates to me that the previous position was that closed years could be reopened. Certainly, nothing contained in the pre 1997 contracts even suggested that those years could not be reopened.  The Board voted in favor of the By Law revision, and the Club did switch to a Rule book format as of February 20, 1997, including adoption of the above rule, ruling out assessments on the 1997 Insurance Year after it was closed. That Rule has been included in all rule books since 1997.  (See, e.g., Exhibits PX 234, Rule 4, Sect. 11, PX 235, PX 236 and PX 283 Class I Rules, Rule 4, Sects. 16 and 17.)  All prior years remained under the old regime, which is that under New York law they could be reopened.

29.    From 1996 onwards, I continued to work to expand the Club's membership beyond the traditional U.S. flag base.   From 1996 to about 2000 the Club grew incrementally, gaining tonnage from Greece, Latin America and the Far East.  The most significant period of growth was from about 1999 through 2004, during which time the membership increased from 99 to 397 P&I members plus additional tonnage, due largely to the fortuitous circumstance of several large P&I Clubs and one fixed premium underwriter going out of business, and the addition to SCB's team of an underwriter with significant ties to the Greek market.  This same period also saw the departure of several of the Club's longtime U.S. flag members who had traditionally served on the Board, specifically Keystone Shipping and APL.  Thus, the composition of the Club and the

12

Board changed significantly. By 2004, the Club had grown to 397 members, most of which were non U.S. entities. (See PX 284, list of the American Club's members each year between February 20, 1989 and February 20, 2006.)

30.    Until about the Spring of 2004, asbestosis litigation was a topic of low level concern. Old files were moved to storage and past correspondence filed away and largely forgotten. There were also personnel changes, as Mr. McGowan retired in 1999 and Mr. Brown retired in 2002, taking with them their knowledge of past events.

31.    In 2002, Keystone commenced suit against the Club, ostensibly on the basis of the Second Circuit's decision in <u>Prudential Lines vs. American Steamship Owners Mutual Protection & Indemnity Association</u>, seeking to recalculate all previously filed and settled asbestos indemnity claims on the basis of single as opposed to multiple deductibles. The basis for that action is as set forth in Keystone's complaint (PX 252), which alleges that the Club's longstanding practice of applying multiple deductibles to each ODC based on each seaman's years of sea service, is inconsistent with the Second Circuit's decision in <u>Prudential</u> (See also, PX 237, Article by Seth Schaffler, Esq.) Other former members threatened similar suits. Keystone's suit presented the Club with the prospect of recalculating all of the past asbestos claims of all members, with a potential estimated Club liability of at least $1.5 million in additional payments from the Club's reserves, towards which Keystone and the others for the years before 1977 had contributed nothing.

32.     During the same time, while the Keystone deductible suit was pending in this court, Keystone was presented with a seaman's suit alleging that his leukemia had been caused by exposure to benzene on Keystone tank vessels.  That suit had been filed in the City of Philadelphia by former seaman Timothy Farley, of which Keystone notified the Club.  Keystone's defense counsel estimated a potential jury verdict of about $4 to $9 million (see PX 254, 255), all attributable to the closed years of 1985-1988, towards which Keystone and the other members of those years had contributed an aggregate of only $100,000 per year, most of which, by 2004, had been expended on the defendants' prior Closed Year ODCs. (See, PX 294.)  If the prior discretionary practice were followed, the forecast verdict in <u>Farley</u> would have cost the Club about $4 million, as the Club's retention level for reinsurance purposes (i.e., before it could seek payments from reinsurers) was $1 million in most of those years.  If the reinsurers were not viable, the cost could have been higher, and the depletion of the Club's reserves even more significant.

33.     I believed such a result to be unfair and not "mutual."  Keystone would be getting insurance for which it had never paid or been assessed, and new members, virtually all of whom had joined after the Club had changed its rules and adopted a Rule Book format, would be paying for claims they had not agreed to pay.  Because the Club is a "mutual," and the insurance policies are "fully assessable," -- i.e., each insured is

liable to be assessed for claims against itself and all other members of the insurance year in question -- this result was unthinkable.

34.     In addition to concern over the Farley case, there was other evidence that the levels of Closed Year ODCs were increasing over time and could no longer be dismissed as a "trickle" of small claims.  In May 2004, my staff prepared and provided for the first time ever lists of (a) all asbestos clams paid by the Club to the pre-1989 members and (b) a preliminary list of the refunds of surplus to the same members.  The results were startling.  Over the years, the former members had received millions of dollars in indemnities for closed year ODCs, for which they were never assessed, and, at the same time, taken out of the Club millions of dollars in refunds to themselves of allegedly "excess" assessments.  (See Exhibit PX 290, which was updated recently.  The refunds regarding insurance years 1938 – 1988 exceeded $31 million.)

35.     These developments gave the Club's current Board their first truly informed appreciation of the financial risks posed by Closed Year ODCs, and caused the Club's current Board and managers to consider for the first time precisely where the financial burden of providing for payment of these claims out of reserves truly fell, and to question the basis on which these claims had ever come to be paid out of the Club's reserves, and how the $100,000 "reserve" for the 1977 and later years was arrived at.

15

36.    Based on the documents produced in discovery by Keystone in the Keystone deductible litigation and the data my staff prepared, the Club's present counsel, Mr. Lawrence Bowles, reconstructed the development of the Club's occupational disease claim payment practice, and provided the Board with his report and opinion in May 2004. (See, PX 257.)

37.    As a result of all the above, the Board determined that past Boards of Directors had availed their companies of millions of dollars in indemnity insurance for Closed Year ODC's for which they were never assessed, and routinely deprived the Club's reserves of infusions of much needed cash by refunding to themselves millions of dollars in allegedly "excess" assessments.   The Board further determined that the $100,000 reserve set aside in 1988 for the 1977 and later insurance years was arbitrary and inadequate even by reference to what was known at the time, and reflected a consistent tendency by the Club's former Board members to favor their employers' finances over those of the Club.   The Board concluded that payment of previously unreserved for closed year ODCs out of the Club's reserves could threaten the Club's reserves with potential deficiencies which the Club's present membership would be obliged to redress by way of assessment.   In short, the practice of paying Closed Year ODCs out of "free" reserves inequitably shifted to the Club's present and future membership the financial burden of closed years' members' claims without their consent. The costs of these claims are something the former Club members and their

16

representatives on the Board were obliged, but intentionally failed to provide for when the insurance years in question came to be closed, and it is the view of the Club's present Board that the former Club members are not entitled to continued indemnity insurance for which they never paid.

38.    In consequence of all the foregoing, in May 2004, and to protect the Club's current and future members from the inequitable actions of prior boards of directors, the current Board voted to terminate the practice of paying unfunded Closed Year ODCs out of the Club's reserves for all years prior to 1989, which payments were by definition a discretionary use of the Club's assets, and filed the present action seeking a ruling confirming the Club's right to do so. The members of the Closed pre-1989 years were promptly informed of the Club's decisions. (See Exhibit PX 258.)

39.    The Club continues to provide cover for unreported ODCs in years after 1989, and many of the defendants continue to benefit therefrom, because it was in that year that the Club became a member of the International Group, a primary benefit of which is the ability to pool liabilities with other Clubs in the Group, which reduces the cost of reinsurance. At the same time the Club members are subject to assessment for the American Club's share of the pooled claims and the post 1989 members have paid such assessments. Thus, there is no inequity in differentiating between pre and post 1989 ODC claims because the members prior to 1989 were not entitled to the benefits of International Group membership, nor were they subject to the obligations of such

17

membership.    More importantly the defendants had previously awarded themselves almost $6 million in indemnity insurance from the Club for which they never paid.

40.    Shortly after the American Club gave notice to its pre 1989 members of the termination of the Discretionary Practice and the commencement of this action, the American Club received inquiries regarding its actions from a Working Group ("WG") tasked by the International Group to look into that matter. In the American Club's responses (see Exhibit PX 261, page 2), the American Club noted, among other things that:

> Accordingly, the members of the American Club in any insurance year are responsible for the claims that arise in that year and are not responsible for any claims arising in any earlier or later years.    Perhaps, more importantly, the American Club does not have a rule which requires the members in the oldest open year or years to, in effect, reinsure the obligations of the members in closed years.

41.    After review, the WG polled all of the 13 members of the Group and learned that three of the members, including the American Club, did not have a rule of the type mentioned above.

42.    Thereafter, in October 2004, the International Group circulated a report of the WG. (See Exhibit PX 262) The WG stated in their recommendation:

> Most, but not all, IG Clubs appear to the WG to have rules which expressly give their Boards the right to levy calls on an open year to provide funds for that year, and also for other years, including closed years, and to provide funds for

18

reserves generally. The WG is strongly of the view that it is essential that all clubs should operate on a similar basis to each other in this respect.

Accordingly, the WG recommends to the IG that it seek immediate confirmation from all clubs that their Boards/Committees have the right (either through their rules or through the operation of law in their home countries) to levy supplementary calls on open years on an unlimited basis both as to the amount and as to the purpose for levying calls, including the funding of closed years. The WG further recommends that if any club is not able to make such a declaration it should be required to make a rule change to enable it to do so forthwith.

Given that time is short before the last date when rules can be changed for the 2005/2006 policy year, clubs are requested to provide confirmation that they can indeed make calls as suggested or will take immediate steps to insure that they can do so for the 2005/2006 policy year as soon as possible.

43.    As required by the International Group, the American Club's 2005/2006 Rules were modified to include the required language. (See Exhibits PX 262, 264, 267, and the American Club's 2005/2006 Rules, Rule 4, Sect, 6.)

44.    For the year commencing February 20, 2006, the language of Rule 4, Sect. 6 was further amended. (See Exhibit PX 283.)

45.    There had been correspondence between the American Club and IG in about October 1996 in which the American Club answered the IG's questions regarding the American Club's then By-Laws. In 2005, questions were raised by the IG as to whether there were inconsistencies between the American Club's answers in October

19

1996 and July 2004. Those answers were reconciled. (See Exhibits PX 224 and PX 261.)

46.     It was and is my view that as the members of the pre-1989 years never paid for the indemnity insurance they seek, they have no right to such indemnity insurance and certainly they have no right to expect that the Club's current and future members, never having consented to do so, will continue to pay for it.

Joseph E.M. Hughes

Sworn to before me this

5th day of May 2006

Notary Public

MARY T. BANNON
Notary Public, State of New York
No. 31-4785995
Qualified in New York County
Commission Expires February 28, 2010

# Affidavit of Thomas J. McGowan

Nourse & Bowles, LLP
Attorneys for Plaintiff
One Exchange Plaza
At 55 Broadway
New York, New York 10006
(212) 952-6200
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
                                     :

AMERICAN STEAMSHIP OWNERS    :    04 Civ. 04309 (LAK)(JCF)
MUTUAL PROTECTION AND       :
INDEMNITY ASSOCIATION, INC.,   :    **AFFIDAVIT OF**
                                    :    **THOMAS J. M<sup>c</sup>GOWAN**

           Plaintiff,     :

                                      :    **SUBMITTED BY PLAINTIFF**
- against -                  :    **IN SUPPORT OF ITS CASE**
                                      :    **IN CHIEF**

ALCOA STEAMSHIP CO., INC., et. al   :

                                      :

           Defendants.    :

                                      :
-------------------------------------------------------X

STATE OF NEW YORK      )
                          )   ss.:
COUNTY OF NEW YORK  )

THOMAS J. M<sup>c</sup>GOWAN, being duly sworn, deposes and says:

<u>Background and Employment History</u>

1.    Between February 1977 and March 1999, I was employed by Shipowners

Claims Bureau, Inc., of New York City ("SCB") and between 1983 and 1999, I was its

president and chief operating officer. The facts stated herein are based upon my personal

knowledge and/or review of various documents that have been either produced or marked as trial exhibits in this action and are true to the best of my knowledge and belief.

2.    SCB was and is the manager for plaintiff, the American Steamship Owners Mutual Protection & Indemnity Association, Inc. (the "American Club" or "Club"). As manager, SCB provides the Club with administrative, accounting, underwriting claims handling and related services and runs the Club's day to day operations, all under the direction and control of the Club's Board of Directors.

3.    I retired from SCB in March 1999 and now reside in Colts Neck, New Jersey.

4.    I graduated from Rutgers College in New Jersey in 1964. Between 1964 and 1967, I served as a Lieutenant in the U.S. Navy.

5.    In late 1967, I was employed by Johnson & Higgins, Inc., an insurance brokerage firm in New York City, in their marine insurance department. I dealt with various forms of marine insurance for Johnson & Higgins' clients.

6.    In 1977, I was asked to transfer to SCB, which was then a subsidiary of Johnson & Higgins.

7.    Between 1977 and 1983, I was an underwriter with SCB. My responsibilities included negotiating premium ratings for new members of the American

Club and renewal ratings for existing members. I initiated billings for those premiums and I signed insurance policies on behalf of the American Club.

8.    In June 1983 I became President of SCB and chief operating officer. My duties included overseeing the functions of all of SCB's departments -- *i.e.*, administrative, accounting, underwriting and claims. Additionally, I served as secretary to the Board of Directors of the American Club. Though I regularly attended meetings of the Board of Directors, I was not a voting member of the Board.

9.    As president of SCB and secretary to the Club's Board, my primary duties included providing reports to the Board on all areas of the Club's operations and making recommendations with respect thereto. All decisions were made by of the Board of Directors. Periodically, I also negotiated SCB's management fee with the Club's Board of Directors.

<u>The Composition of the American Club</u>

10.    The American Club is a mutual marine indemnity insurance association of shipowners established under New York law. It existed and exists solely to provide indemnity insurance to its members each year at cost -- that is to say, without profit to the Club.

11.    Throughout my tenure with SCB, the American Club had approximately 30 members, all of whom were the owners and operators of merchant vessels, and the great

majority of their vessels were registered in the United States, *i.e.* they were U.S. flag vessels.

12.    Prior to the 1990s, almost half of the Club's members were represented on the Club's Board of Directors, but at any given time several of those members, including Keystone Shipping Company and Farrell Lines, Inc., had multiple representatives on the Club's Board.    The representatives of those members were, in most cases, the chief executive officers of their respective companies and the others were senior executive officers of their companies. (See PX-295, PX-296.) It was and is my understanding that several of the members of the Club's Board of Directors held equity interests in their companies.

The Business of the American Club

13.    The responsibilities and duties of the members of the Club's Board of Directors and the manager are set forth in the Club's Charter and By-Laws.    (See, Exhibits PX-7 and PX-109.)

14.    The American Club provided insurance to its members by issuing assessable indemnity insurance policies on a defined annual basis to each separate year's members. (See, representative indemnity insurance policy issued each year to the Club's members, Exhibit No. 1 to the Joint Pre-Trial Order or Exhibit PX-117, particularly the "ASSESSABILITY" clause on page 2.) Each policy was effective for a one year period. (The "Insurance Year" or "Policy Year".)

4

15.     Under each insurance policy, the members of each year agreed to pay not only premiums, but assessments without limit of amount sufficient to pay the costs of all indemnity claims of all members of that year regarding occurrences in that year, plus all of the costs of operating the Club that year. The Club's only sources of funds for the above purposes were the premiums and assessments paid by the members each year, plus investment income thereon.

16.     Pursuant to the Club's By-Laws, the accounts of each year were kept separate for assessment purposes. (See, Exhibit PX-109, the Club's By-Laws, Article VI, Sec. 3.) The members of any one year could not be assessed to pay the claims or expenses of the members of any other year, a fact the Club stressed in its promotional materials. (See, "1993 Fact Sheet", Exhibit PX-167, a promotional brochure which I drafted.)

## Calculation of Premiums and Assessments

17.     The premium charged by the Club each year to each member is based upon each individual member's record of losses over the prior five years. Essentially, each member's premium for the forthcoming year is based upon the average yearly cost of all of that member's losses over the prior five years plus a proportionate share of the cost of operating the Club in the next year, including the cost of reinsurance to deal with catastrophic losses. In principle, each member is expected to pay the full cost of all of his own losses each year, net of deductibles and insurance recoveries, if any. The members, by sharing the cost of insurance, effectively share each other's losses. By spreading the

5

costs of reinsurance risks among all members, the effects of a large claim on any one member are minimized.

18.    Each year, the Club reviewed each member's loss records and requested updates from the Club members as to current claims in hand.  (See, e.g. Exhibits PX-47 and 69.)

19.    If an individual member's loss record is improving, then, assuming it enters the same vessels in the Club for the following year, and all other factors remaining the same, its new premium may be less than its prior year's premium.  Conversely, if a member's loss record is deteriorating over time, again all other factors remaining the same, its premium will likely be increased for the forthcoming year, to reflect the increasing cost of its claims.

20.    Another factor in setting members' premiums each year, was a "loading factor" ordered by the Club's Board, which was typically expressed as the percentage increase required of all members above their average loss records on renewal.  The purpose of the loading factor was to keep up with increasing costs.

21.    A further factor affecting the members' premiums is the deductibles chosen by the members with respect to various categories of claims.  The amount of deductible chosen appeared as a term of the member's insurance policy for that year.  In general, the lower the deductible chosen by the member, the higher its premium would be for that year.  Conversely, the higher the deductible, the lower the premium.  In special cases,

however, where the member might have had a particularly bad loss record regarding certain types of claims, the managers, at times, insisted upon increased deductibles for that member, and there may or may not have been a reduction in the premium for it in those cases.

22.    Over time, the deductibles chosen by members have increased significantly. In the 1940s and 50s, deductibles on the order of $50 to $500 were common.  By the 1980s, deductibles of approximately $10,000 to $25,000 were common, and some members chose deductibles as high as $250,000 or more.  The members' increases in deductibles reflected their attempt to minimize the costs of their premiums.

23.    Each member's proportionate share of assessments was based upon the proportion his premium bore to the aggregate of premiums charged to all members that year.  Thus, if a member paid 3% of the aggregate premiums that year, his proportionate share of all assessments against the members of that year would also be 3%.  That member would also receive 3% of any refunds of surplus funds collected from that year's members.

<u>Purchase of Excess of Loss Reinsurance</u>

24.    For each year, before 1989, the Club purchased excess of loss reinsurance in the commercial insurance markets to protect the Club's members from catastrophic claims.  The members of each year, through their premium payments, provided the funds to pay for this excess of loss reinsurance.

7

25.    When the Club negotiated reinsurance contracts with commercial underwriters, the Club agreed to a self-insured retention level which worked the same way as a deductible. In other words, the Club, on behalf of the members that year, would agree to bear a fixed amount of each indemnity claim from its members before the Club would be entitled to seek a payment regarding that claim from the commercial reinsurers. In certain years, there were also annual aggregate deductibles which had to be met before the Club could seek payments from the reinsurers.

26.    As was the case with the members' deductibles, as the costs of reinsurance increased over time, the self-insured retention levels also increased substantially over time. While the self-insured retention level for this reinsurance was on the order of $100,000 in the 1950s, by the 1980s the retention level had risen to $1 million.

<u>The Use of the Club's Reserve Account to Purchase Stop-Loss Reinsurance</u>

27.    In some years, the Club also purchased stop-loss reinsurance when available. This is a form of reinsurance that is designed to supplement the excess of loss reinsurance. Stop-loss reinsurance protects the reinsured against the accumulation of retained losses beyond a pre-agreed cut-in level. Once the net retained or "self-insured" retentions of the excess of loss reinsurance policy reached the pre-agreed amount, the stop-loss reinsurers would pay claims within the retention level up to the stated limit of the stop-loss reinsurance policy. The funds to pay the premiums to the stop loss reinsurers were drawn from the Club's Reserve Account on a number of occasions, but only after approval by Club counsel and as directed by the Board.

8

## The Club's "Cash Flow Advantage"

28.     Before 1988, the initial "premium" charged to each member of each individual year was significantly less than 50% of the projected total cost of indemnity insurance for each of that year's members.   It was anticipated that the balance of the costs would be paid by the members of that year via one or more assessments as the claims against the members of that year matured and developed.   This process was in effect for so long as the insurance year remained open, which in years prior to the 1990s was for a period of seven to ten calendar years.

29.     This approach was favored by the Club's traditional members because it enabled them to defer their insurance payments as long as possible, a "pay as you go" approach.   However, this approach also made it difficult for the managers to market the Club to prospective new members because many shipowners object to being exposed to risk for so long a period.   Making the best of a bad situation, we at SCB marketed this approach as the "Cash Flow Advantage".

30.     Attempting to address the foregoing problems, in about 1988 the Club started trying to obtain a larger initial premium or "advance" call and started closing years five years after the years expired.

## Reserving for and Payment of Indemnity Claims

31.     Each of the insurance policies issued by the Club contained a requirement that the members promptly report to the Club every event or occurrence that could give rise to an indemnity claim by that member against the Club.  (See Clause 16 of the

9

Insurance Policy.) Compliance with this requirement was critical to the Club's financial operations, in that as each claim was reported by a member, an estimate of the cost of resolving that claim was made and that estimate became a charge against the accounts of that year, thereby reducing its surplus. At a certain point, assessment(s) on that year's members would be made to restore surplus.

32.     The reporting of and reserving for claims each year was carefully monitored by the Club's manager and Board, and as the aggregate of all reported claims increased, and approached the amounts previously collected by the Club via premiums, one or more interim assessments were levied on the members of each year by the Board to ensure that adequate funds were collected from that year's members to pay all of the members' indemnity claims arising from occurrences that year. One of the Board of Directors' most important duties was ensuring that adequate funds were collected from each year's members with which to pay indemnities for all of their reported claims.

33.     If a member failed to pay either any premiums billed to him or any assessment levied, then under the insurance policy terms, that member's right to have indemnity claims paid by the Club was terminated. (See the Insurance Policy, Clause No. 28(b).) Under maritime law, the Club was entitled to and did sue members and the vessels, in rem, to collect unpaid premiums and assessments.

34.     After the Club's members settled the reported claims against them and/or paid judgments regarding those claims, the members were entitled to seek indemnities

from the Club.  (See, the third paragraph on page 2 of the Insurance Policy, and particularly the phrase "shall become liable to pay and shall pay".)

35.    All members submitted their indemnity claims to the Club through the manager.  The manager had authority to approve some claim payments to members, but that authority was limited.

36.    At each Board of Directors meeting, the manager was required to report on all claims settled within its authority since the last meeting.  All significant claims had to be approved by the Board of Directors.  The documentation required for each separate claim included a memorandum prepared by SCB's claims manager and a "Board" letter, the written opinion of the member's counsel reporting in detail on each separate claim. With respect to personal injury and death claims, those documents identified each claimant by name, the date, type and extent of his injury, the vessel on which the incident occurred, information on his damages (including medical reports, expert reports and the opinion of counsel regarding the results of their investigations/discovery efforts as to the merits of each claim) and counsel's opinion and recommendation regarding settlement. (See, e.g. PX-11, pages AC 3021175 – 182 and AC 3021185 – 295 and PX-81, pages AC 3057801 – 807, which contain samples of the documentation required before the Board would approve the settlements of claims.)

37.    As the members provided all funds needed to pay indemnities, through the amounts they paid in premiums and assessments, another primary duty of the Board of

Directors was to ensure that only proper indemnity claims were paid to members. Thus, at each Board meeting, the Board members discussed and frequently questioned the members' claims, as was the Board's right and obligation, and at times members' claims were rejected or the amounts requested were reduced by order of the Board. The managers at times rejected claims that were not covered.

38.    Given that the accounts of each individual year were kept "open" at times up to seven to ten years before closing, I believed that all claims against all members of each year had been reported and fully reserved for. No Board member ever informed or advised me otherwise.

The Closing of Insurance Years

39.    Although the term "closing" with respect to insurance years does not appear in the Club's By-laws applicable for insurance years 1989 and prior (See PX-109), Article VI, Section 4 of the By-Laws for the period 1989 and prior did contain language addressing the issuance of "final" refunds and the levying of "final assessments" for insurance years. Specifically, Article VI, Section 4 stated that at a point in time when the manager could determine that "it is practicable to estimate with a reasonable degree of certainty, the minimum, probable or final surplus or deficiency resulting from all of the [Club's] insurances in effect during such insurance year, the manager shall place before the Board of Directors a statement of such financial results of such insurances ...", the Board of Directors would then: "(a) fix and determine an amount to be declared and paid as a partial or the final dividend, after retaining such sums as they may deem necessary to

meet outstanding policy obligations or for the maintenance of reserves and surplus of the corporation, or (b) order an interim or final assessment to be made against the holders of assessable policies, ...".

40.    During my time at SCB, the process of issuing "final" refunds or levying "final" assessments was generally referred to as "closing" the accounts of an insurance year, or "closing a year."

41.    As the accounts of each year came to be closed, I, as manager, prepared a statement of the financial results of the insurances for that year, following the approach of my predecessors (see, e.g. Exhibit PX-27), and under the By-Laws, I accounted for all income received in the forms of premiums, assessments, investment income and resinurance revenues, and I accounted for all of the claims that had been paid to that time (the "proven" or "paid" claims), plus all other expenses of operating the Club that year. If there were known claims that had not yet been resolved, the "pending" claims, reserves estimated with a reasonable degree of certainty were retained to ensure that funds would be available to pay indemnities to the members asserting those claims upon resolution.

42.    If the account showed a credit balance or "surplus," the Board would order a "final" dividend or refund thereof to the members of that year, in proportion to the premiums they had paid for that year, thereby reducing the year's account balance to zero.  If the statement of accounts showed a "deficiency", the Board would order a "final" assessment upon the members of that year, also in proportion to the premiums the

members of that year had paid, again sufficient to bring the year's account balance to zero.

43.     In this way, the accounts for each year were "finally" settled between the Club and the members of that year and the year's accounts were "zeroed out". (See, e.g., the statements of account included in PX-56, pages 3054004 and counsel's letter dated June 3, 1982, page 2 showing amount reserved for "pending claims" and PX-81, pages AC 3058023 showing nothing reserved for "losses unreported" and counsel's letter dated June 12, 1985, page 2 showing amount reserved for "pending claims").

44.     Each statement of account was presented for review and discussion first to the Club's Finance Committee, composed of a subgroup of the Club's Directors, which functioned as an executive committee.  If the statement of account was approved by the Finance Committee, its report and recommendations and my statement of accounts would then be submitted to Club counsel, who would prepare his opinion for submission, along with my statement of accounts and the report of the Finance Committee, to the full Board of Directors.  See, PX-81 which includes a statement of account for the year 1975/76, counsel's report letter dated June 12, 1985 and the minutes of the meeting of the Board of Directors on June 13, 1985 reflecting their discussion thereon and the resolutions closing the accounts of the 1975/76 year.  Similar documents were prepared in connection with closing each other year.

14

45.     Upon the closing of the accounts for each year, the Directors, on behalf of the members of that year, were entitled to question the managers' accounting including the amounts reserved for "pending" claims, as the amounts thereof directly affected the amounts of either the final refund paid to or the final assessment against the members of that year.

46.     After the Board's decision, the members of the year just closed were sent a letter describing the Board's action along with counsel's opinion. (See, Exhibit PX-174, a sample of the letter sent to each member after each year's accounts were closed.) If it disagreed with any of the facts on which the closing was based, each member had the right to challenge that accounting. The managers were fully accountable to the membership as to the financial status of the Club, and the Club's books were open to both the Directors and members at all times.

47.     As noted on each statement of account prepared in connection with the closing of each year before the 1977 year was closed in 1988, nothing was ever retained or reserved out of any year's surplus for unreported claims. (See, e.g. PX-56, PX-81 and others, and note the blank on the line headed "Losses Unreported".)   Every dollar collected from the members of each year by way of premiums and assessments was spent on indemnities for their reported claims and the Club's expenses or returned to them.

48.     Because the initial "premium" was set relatively low, assessments were inevitably required in every insurance year.  As discussed below, the Club was advised

by counsel that if a "surplus" of funds was the product of an assessment, those funds must be returned to the members who contributed to it. Accordingly, all such surpluses, amounting to millions of dollars, were refunded to the members over the years. (See PX--290) This approach of relying upon assessments as opposed to charging an adequate premium at policy inception guaranteed to the members that all "surplus" collected by assessment would have to be returned to them, but inevitably and simultaneously handicapping the building up of the Club's Reserve Account.

49.    The subject of the effect of "closing" an insurance year was addressed at some length in an opinion letter from Kirlin, Campbell & Keating, dated February 14, 1979 authored by William F. Fallon (the "Fallon Letter") (PX-37), copies of which letter I personally distributed to the members of the Board of Directors on at least ten occasions while I was president of SCB and secretary to the Board. (See PX-304.) That letter was also discussed at a number of meetings of the Club's Finance Committee and full Board. The Fallon Letter was preceded by other letters on the same subject by Messrs. Kirlin, Campbell & Keating. (See, Exhibit PX-5, Kirlin's letter dated December 15, 1955 and Exhibit PX-14, Kirlin's letter dated March 4, 1964.)

50.    The Fallon Letter was written at a time when the Club kept years open for ten years, and thus the managers and the Board of Directors believed that, by the time the accounts of each year were closed, all claims against all members of the Club in each year had been reported and properly reserved for.

51.     I read the Fallon Letter for the first time in February 1979, and have re-read it on many occasions since then.  Based on my reading of the Fallon Letter, I have always understood and, on occasion, advised the various Boards of Directors of the Club that:

(a)     no part of the Club's surplus at any time belonged to the Club's members, either past or present, except for the part that may be the product of an unused assessment, and that part was returned to the members at the time of closing each year's accounts (See PX-37, pages 4-5);

(b)     The Club's Reserve Account was owned by the Club;

(c)     The rights and obligations of closed year members and the Association regarding claims known at the time the insurance year in question was closed are stated in the letter.  (See PX-37, pages 9-11);

(d)     The Club was responsible for unanticipated growth of reported claims (See PX-37, pages 9-11);

(e)     The surplus of funds generated from the settlement of claims below the amounts reserved for them belonged exclusively to the Association (See PX-37, pages 9-11);

(f)     Closed insurance years could be reopened in the event of mutual mistake or fraud (See PX-37, pages 9-11); and

(g)     Club members, through the Directors, had the right to inspect the Club's

books and question the club's accounting practices (See PX-37, pages 8-9).

52.     The Fallon Letter was circulated to the members of the Board of Directors

in the 1980s and 1990s and was discussed by them on a number of occasions. During my

tenure at SCB, I was under the impression that all of the Directors in the 1980s and early

1990s were aware of Mr. Fallon's advice.

### The Rise of Occupational Disease Claims ("ODCs")

53.     In the early 1980s, members of the Club in the closed years of the 1940s,

50s and 60s began receiving occupational disease claims from seamen and others who

had worked on their vessels in those years. The claimants alleged that they had been

exposed to asbestos and other hazardous substances on the members' vessels and suffered

a variety of occupational diseases as a consequence. These occupational disease claims

which were reported long after the insurance year in question was closed are hereinafter

referred to as "Closed Year ODCs").

54.     If the Closed Year ODCs had been asserted while the year's accounts were

open, the members of the affected years unquestionably would have been assessed to pay

all such claims, and those claims would have appeared on the members' loss records.  In

reality, however, neither of those things occurred because these claims, in fact, were not

reported until long after the years in question were closed.

18

55.    Initially, the primary targets of the Closed Year ODCs were the asbestos manufacturers and the suppliers of equipment and parts on the vessels which contained asbestos and the bulk of the settlements of those claims were paid by those entities with the vessel owners and operators being called upon to pay relatively small amounts.   The American Club's experience in the early 1980s was that these were a "trickle" of relatively small claims.

56.    However, apparently on the assumption that the Club had a liability to indemnify closed year members regarding Closed Year ODCs, a practice of indemnifying such claims from the Club's Reserve Account had commenced before my time as president of SCB, and I continued the practice without questioning it.

57.    Until the mid to late 1990s a number of the vessel owners which had been Club members in the 1940s, 50s and 60s were still members of the Club and their senior executives were members of the Club's Board of Directors. (See PX-294, PX-295).

58.    The Closed Year ODCs were primarily claims against those same members, which included Keystone Shipping Company, Farrell Lines and American President Lines.

59.    I was aware that the members of the currently open years could not be assessed to pay claims occurring in closed years and I was also aware that closed years could be reopened in appropriate circumstances.   However, I always considered reopening closed years to be undesirable for commercial reasons, as well as impractical,

19

particularly in view of the fact that the claims, at least initially, were a trickle of relatively small claims, and I did not expect those claims to amount to a significant liability.

60.    Thus, I followed the practice that was underway when I became president. I was not aware of any opinions of counsel on this topic. I did not consult with Club counsel on the point and I was never directed by any Directors of the Club to obtain an opinion of counsel on the Club's liability, if any, in these circumstances, and the question of whether the Club had a liability to pay these Closed Year ODCs was never brought before the Board of Directors for discussion and no resolutions were ever passed to authorize the practice.

61.    The members of the Board of Directors, particularly those representing Keystone Shipping, Farrell Lines and APL, which were seeking and receiving indemnities regarding these closed year ODCs, were obviously fully aware of the practice, and, in my view, as they were beneficiaries of this practice, they had little interest in inviting debate.

62.    Once the practice of indemnifying Closed Year members regarding their Closed Year ODCs was underway, it continued without challenge from Board members or review by Club's counsel, throughout my time at SCB. Many things followed upon the assumption that the Club had a liability to pay indemnities to the closed year members regarding the Closed Year ODCs, including, without limitation, payment of those claims from the Club's Reserve Account.

20

### The Club's Application of "Multiple Deductibles"

63.    The individual seaman's claims presented involved alleged exposure to asbestos on the members' vessels over the course of their employments thereon, which typically involved more than one insurance year.  In these circumstances, in calculating the indemnity to be paid from the Club's Reserve Account, the members' requested indemnities were allocated over the periods of the seamen's sea service by number of days within each insurance year, the members' chosen deductibles for each of those insurance years were applied and the balances were paid to the Closed Year members.

64.    A similar approach was followed when different shipowners were sued by the same seaman.  That is, the shipowners shared any settlement payments or judgments based upon the proportion of the claimant's sea service on vessels owned or operated by the different shipowners.

65.    There were alternative deductible theories under discussion at the time, including application of one deductible per member per claim, regardless of the number of years of alleged exposure.  This "single deductible" theory, however, was neither practical or desirable.  First, that theory assumed one could say with certainty when the injury occurred, which was not possible.  Second, applying a single deductible would imply a limitation on coverage of the maximum amount recoverable under the policy from which the deductible was taken.  This could lead to less coverage for members' multi-year claims, as that approach would imply a single policy limit. Other theories involved applying one deductible per vessel per year or voyage on which the seaman had

21

served, and those approaches would increase the number of deductibles absorbed by the member. The allocation approach followed by the Club was a "middle of the road" approach, which seemed fairest at the time, and which still seems fair. Each insurance policy issued by the Club refers to "liability hereunder" and the deductibles clauses therein refer to "claims hereunder." I interpreted the policy to refer to occurrences within each one year policy period.

66.    In early 1987, one of the members, Farrell Lines, argued against the approach to deductibles followed by the Club up to that point in time. (See, Exhibit PX-96, Captain LePage's letter dated February 24, 1987.)

67.    Thereafter I spoke with Club counsel, Richard H. Brown, Jr., and asked for an opinion on the Club's practice of allocating claims over the years of employment and applying a deductible for each such year. After receiving Mr. Brown's opinion letter dated September 11, 1987, I prepared a memorandum to the Board of Directors on the subject and enclosed Mr. Brown's opinion. (See, Exhibit PX-107.)

68.    The question of allocating claims and applying deductibles was briefly discussed at a Board meeting on September 17, 1987. (See, Exhibit PX-108.) But the decision was deferred.

69.    The question was not resolved until September 1989, when the Board which included representatives of Keystone, Farrell Lines and APL, voted to continue the prior practice of applying multiple deductibles. (See, Exhibit PX-303 the minutes of the

Board meeting on September 14, 1989.)  There was no dissenting vote by any member of

the Board, including the member representing Farrell Lines and, during the remainder of

my time as president of SCB, the Club consistently followed this approach in calculating

members' indemnities regarding Closed Year ODCs.

### Defendants Thwart the Manager's Attempt to Build the Club's Reserve Account

70.    At the Board meeting on June 13, 1985, the accounts for the 1975/1976

year were ordered closed.  In this instance, there was a credit balance of over $850,000

which was the product of investment income on the several assessments that had been

levied on the members of that year since 1975.  In this case, on my recommendation, the

Board ordered that the credit balance be transferred to the Club's Reserve Account (see,

PX-81), as in my view, the Club needed to build up its Reserve Account, which at that

time totaled $13,702,449.

71.    Within days after the meeting, two of the Board members, Martin Ytuarte

representing Prudential Lines, Inc., which, I understand, was then experiencing financial

strain, and Richard Gronda, representing Farrell Lines, asked for reconsideration of the

Board's decision as the credit balance was the product of assessments.  They made very

clear that "they wanted their money back," referring to their respective companies.  I

wrote to Mr. Gronda on June 17, 1985 (Ex. PX-82) pointing out the benefits to the Club

of retaining those funds in the Club's Reserve Account, but Mr. Gronda refused to relent.

The matter was referred to Club counsel, who reiterated the prior advice of counsel that

surplus funds that were the product of assessments must be returned to members of that

year unless they consent to the Club's retention. In due course, the decision on the credit balance was reversed and over $900,000 was refunded to the members of the 75/76 insurance year.

### The Board's 1988 Decision to Set Aside Inadequate Reserves for Closed Year ODCs

72.    In December 1987 the Club was informed of an unexpectedly large verdict in an occupational disease case involving Captain K.C. Torrens, a former employee of Farrell Lines. The jury verdict exceeded $10 million, although it was fairly promptly reduced by the Court to under $3 million. Because Captain Torrens' sea service with Farrell Lines spanned a number of years, including several years before Farrell Lines became a member of the American Club, consistent with the then practice, the indemnity Farrell Lines could seek from the American Club was approximately $1.2 million, based upon the proportion of the time Farrell Lines was a member of the American Club. That sum was allocated over the 1954 to 1959 insurance years and the deductible for each of those years was applied, consistent with the existing policy. (See, Exhibit PX-119, showing this allocation.)

73.    I reported the claim to the Club's reinsurers in the affected years and sought payment under the excess of loss insurance policies. The Club in the relevant years held reinsurance contracts providing for a Club retention of between $100,000 and $150,000. Accordingly, a claim was made upon the reinsurers and the Club's aggregate retained share was $655,333.21. (See Exhibit PX-119.)

24

74.     In early March 1988, when the Board was considering closing the accounts of the 1977 and several other insurance years, with the experience of the Torrens case in mind, I recommended to the Board, for the first time, that funds be set aside at the time of the closing of those accounts and upon closing future insurance years, to provide funds with which to pay indemnities to those years' members in the event occupational disease claims, such as Mr. Torrens, were later asserted against them.  This would be a prudent step, in my view that recognized the liabilities of the member of those years to provide all funds necessary to pay indemnities regarding all such claims.

75.     In March 1988, the credit balance for the 1977 insurance year was over $1.5 million, and I made three proposals to the Board:

    (a)   Reserve the entire credit balance;

    (b)   Reserve the credit balance up to an amount not exceeding $250,000; or

    (c)   Reserve approximately half the credit balance or $750,000;

(See, Exhibits PX-120 and 121.)

76.     My proposals were discussed at the Board meeting on March 16, 1988.  I believe it is fair to characterize the Directors' response as negative.   I recall only one Board member, Keith Kennedy, proposing that a substantial sum be reserved each year for cases such as Torrens that might be asserted in the future.  No decision was reached at that meeting regarding the reserve, if any, to be retained towards the occupational disease claims that might in the future be asserted as having occurred in the 1977 or later insurance years.

25

77.    Over the next few days, I consulted with two prominent attorneys, John Bolles, in New Orleans and Thomas Murphy, in Cleveland, each of whom was representing many of the Club's members in asbestos litigation. I discussed the situation with them and Mr. Murphy advised me that in his view a reserve of $250,000 "could even be considered low."

78.    On March 21, 1988, I and Jack Cassedy, who was chairman of SCB at the time, prepared and sent a telex to each of the members of the Finance Committee: Messrs. John T. DiPalermo (APL), Edgar H. Germer (ARCO), Richard H. Gronda (Farrell), Keith Kennedy (SOHIO), A.B. Kurz and Charles Kurz II (Keystone) (See PX-124, copies of my telex sent to Messrs. A.B. Kurz and Charles Kurz, II.) We recounted the status of the matter and reported on our discussions with Messrs. Bolles and Murphy and Mr. Murphy's comment. We also noted that no agreement had been reached as to the levels of reserves I had previously proposed. Mr. Cassedy and I then proposed a "compromise" that the credit balance for the year about to be closed or $100,000, whichever was less, be reserved at the closing of the 1977 and later years. We made this compromise proposal because, after the discussions at the Board meeting on March 16th it was clear that the majority of the Board members would not approve a larger amount. I was disappointed, but $100,000 was the best we could get those Directors' approval for at the time.

79.    The figure of $100,000 was not the product of either an estimate made with a reasonable degree of certainty or any form of analysis or study as to the liabilities of the

26

members of the 1977 and later years for occupational disease claims occurring in any of those years and the Board did not direct me to obtain any such study. At that time, no one knew when, in the future, occupational disease claims might be asserted from the 1977 and later years, or who the claimants might be, what their injuries might be, or what the total amounts in damages to which the members of the Club in that or any other year might be exposed or the aggregate of all such claims. If any member of the Board of Directors was aware of any such study, he never brought it to my or the Board's attention.

80.    The Board members at the time had the opportunity to put aside more than a token amount each year to cover their liabilities, as Jack Cassedy and I had recommended but chose not to do so.

81.    As a result of the Board's decision to reserve only $100,000 for the 1977 year, the remainder of that year's credit balance, or more than $1.4 million, was distributed to the members of the 1977 year, which included Keystone Shipping, Farrell Lines and American President Lines. <u>The Directors representing those companies made clear that they wanted "their" money returned to them, regardless of the Club's needs.</u>

### The Club's 1997 Rule Change to Prohibit the Reopening of That Year and Later Years After They Were Closed

82.    Prior to 1997, the American Club's By-Laws and/or Rules, as I understood them, did not bar the reopening of closed years. In 1986, Prudential Lines, Inc., formerly a long-term member of the Club, had gone bankrupt at a time when it owed the Club

27

more than $1.2 million. In about 1990, the Trustee in bankruptcy for Prudential Lines Inc. commenced suit against the Club seeking indemnities for the claims of thousands of seamen who filed claims against the Trust in the bankruptcy proceedings. Consistent with the assumption that the Club had a liability to pay claims arising in closed years from its Reserve Account, the only defenses raised were with respect to the Club's set off rights and the application of multiple deductibles.

83.    In 1993, the Bankruptcy Court entered a judgment against the Club in favor of Prudential Lines of more than $66 million regarding the claims of seamen who had worked on Prudential Lines vessels in the long closed years before its bankruptcy in 1986. Club counsel, Mr. Brown, advised that, in his view, the judgment could not stand, for a number of reasons, and several years later, the judgment was, in fact, overturned. However, in the meantime, as the aforesaid judgment far exceeded the Club's assets, Mr. Brown also advised that if, hypothetically, the Club were to be forced to pay the judgment, the closed insurance years implicated by the judgment would have to be "reopened" and the members thereof assessed to provide the funds, because the Club's current members could not be assessed to pay judgments with respect to occurrences in the earlier insurance years. (See, Exhibits PX-175 and 176, Mr. Brown's letters dated November 2 and 3, 1993.) Those letters were circulated to all of the then members of the Board of Directors.

84.    Fortunately, the Club was not required to take any action at that time regarding reopening those closed years. However, American President Lines ("APL"),

28

which had been a member in many of the long-closed years potentially implicated by the judgment and which was still a member of the Club, immediately asked for information regarding the identity of the members of a number of the closed years and their percentages for assessment purposes. (See, Exhibit PX-185, 186, 187 and 188.)

85.     Further, the director representing APL, Mr. C. Bennett Gleason, questioned the Club's right to reopen closed insurance years. Club's counsel, Mr. Brown, conferred with Mr. Gleason, and as Mr. Gleason requested, Mr. Brown corresponded with APL's attorney on these issues in December 1994, with a copy to me. (See, Exhibit PX-192.)

86.     In connection with the bankruptcy of another former long-term member, United States Lines, Inc. ("USL"), Mr. Brown wrote a letter to the Club on April 20, 1995 proposing to write a letter to the USL Trustee raising the point that if the Club were required to indemnify the Trustee with regard to Closed Year ODCs, the Club should have a right, at least with respect to bankrupt entities, to reopen the years to require them to pay assessments regarding those occupational disease claims. (See, Exhibit PX-198.)

87.     Thereafter, in January/February 1996, there was correspondence directly between Mr. Gleason and Mr. Brown in which Mr. Gleason sought to persuade Mr. Brown that the Club could not reopen any closed years, an idea which Mr. Brown refuted. (See, Exhibit PX-211 and PX-212.)

88.    Later, in 1996, the issue of reopening years continued to be discussed including in connection with the closing of the 1992 year.  The Board minutes of the meeting on June 13, 1996 contain the following statement:

> In discussing this recommendation, [regarding the closing of the 1992 year] the Directors wished to make clear that when taking action to close a year, it is their intention that such closed year cannot be reopened unless through the operation of New York statute.

(See, Exhibit PX-221, page AC3069006.)

89.    I believe it was Mr. Gleason of APL who proposed the statement that closed years cannot be reopened and others, possibly Club counsel, Mr. Brown, proposed the last part "unless through the operation of New York statute".

90.    At the same meeting on June 13, 1996, the Board adopted a proposal to change from an insurance policy form of contract to a Rule book.  Starting with the 1997 insurance year the rules prohibited assessments on members after a year was closed.  This rule was incorporated in the 1997 and later contracts between the members and the Club. (See Ex. PX-234, the 1997 Rules, Rule 4.11 and Ex. PX-283, the 2006/07 Class I Rules, Rules 4.16 and 4.17.)

91.    I have said that reopening closed insurance years was "commercially stupid" because the members involved could resist it, and it would work to the detriment of the Club.  Conversely, failure to do so could require new members in open years to be charged with the costs of liabilities of the closed year members.  As those members would likely leave the Club, either approach could mean the end of the Club.

30

### The Creation of the Contingency Fund

92.    At the Board meeting on June 13, 1996, the Board approved the creation of a "Contingency Fund" from the Club's Reserve Account or closed year surplus with the idea of bringing the association in line with more successful counterparts than the International Group of P&I Clubs.  The purpose was to smooth out assessments on open year members as years came to be closed.

93.    In June 1996, the Directors and managers were still proceeding on the assumptions that the asbestos claims were relatively modest (in the prior 10+ years, only approximately $2 million had been paid out on such claims, including the Torrens claim, for an average of less than $200,000 per year), and that the Club had a liability to the members of the closed years to pay such claims.  In any event, no definitive opinion had ever been requested or received from Club counsel on the Club's liability as of that time.

94.    The question remained unaddressed up to and including the date of my retirement in 1999.

Thomas J. McGowan

Sworn to before me this
10th day of May, 2006.

Notary Public

RUTH LEININGER ·
Notary Public State of New Jersey
My Commission Expires November 15, 2910

31

**Affidavit of Vincent J. Solarino**

Nourse & Bowles, LLP
Attorneys for Plaintiff
One Exchange Plaza
New York, New York 10006
(212) 952-6200

Sullivan & Worcester LLP
1290 Avenue of the Americas
New York, New York 10104
(212) 660-3000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| AMERICAN STEAMSHIP OWNERS MUTUAL PROTECTION AND INDEMNITY ASSOCIATION, INC., | No. 04 Civ. 04309 (LAK) (JCF) |
| Plaintiff, | (ECF Case) |
| -against- | **AFFIDAVIT OF VINCENT J. SOLARINO** |
| ALCOA STEAMSHIP CO., INC., et al., | **SUBMITTED BY PLAINTIFF IN SUPPORT OF ITS CASE IN CHIEF** |
| Defendants. | |

STATE OF NEW YORK      )
                                            ) ss.:
COUNTY OF NEW YORK  )

VINCENT J. SOLARINO, being duly sworn, hereby deposes and says:

1. I am the current Chief Operating Officer and President of Shipowners Claims

Bureau, Inc. ("SCB"), the managers of the plaintiff herein, the American Steamship

Owners Mutual Protection and Indemnity Association, Inc. (which I refer to hereafter as

the "Club" or the "American Club"). The facts stated herein are based on my personal

knowledge and/or review of various documents that have been either produced or

marked as trial exhibits in this action, and are true to the best of my knowledge and belief.

## BACKGROUND AND EMPLOYMENT HISTORY

2.  I received my Bachelor of Arts degree from Tusculum College in 1972, and received my certification as a certified public accountant in or around 1985. I was first employed by SCB in July, 1984, when I joined SCB as its controller. My duties at the time were to effect the accounting and finance of the American Club, and to conduct other correspondent business for which SCB was responsible. I held this position until January, 1990, when I resigned to pursue other business interests.

3.  I returned to SCB in January, 1995 as a consultant for statutory financial report preparation. As a consultant, I worked on the American Club's statutory filings.

4.  I provided such consulting services to SCB until early 1996, when I took full-time employment again with SCB as its controller, and resumed responsibilities of the accounting operations of both SCB and the American Club.

5.  In 1999, in addition to serving as controller, I took on the additional responsibilities of being chief operating officer and president of SCB.

6.  Beginning in 1996 and continuing to the present, I have regularly attended the meetings of the American Club's Board of Directors and Finance Committee. At those meetings, I was and am responsible for giving financial reports and otherwise providing financial or accounting information concerning the American Club, as well as advising with respect to the Club's compliance with statutory requirements imposed by New York law and the New York Insurance Department.

## THE AMERICAN CLUB'S SLOW ACCUMULATION OF
## RESERVES IN ITS RESERVE ACCOUNT

7. In the course of my employment at the American Club, I have become familiar with the Club's Reserve Account and the historical development of such reserves. As shown below, the American Club's Reserve Account historically have grown slowly, as the Reserve Account has been called upon to provide many financial benefits to defendants herein.

8. I have reviewed Exhibit PX-297, which is a summary chart entitled "Accumulation of American Club Reserves and Certain Payments Therefrom," that demonstrates the growth of the American Club's Reserve Account from 1945 to the end of 2005. This summary was prepared pursuant to my direction and by an employee of SCB under my direct supervision. This chart summarizes information from the Club's surplus statements, which were created and are maintained in the ordinary course of the Club's business and are too voluminous to be conveniently examined in court. All documents upon which this summary chart is based were either marked as trial exhibits in this action, or produced or otherwise made available to defendants. The specific documents supporting each of the assertions on the chart are identified by Bates number in the fifth column of the chart. I have personally reviewed this summary and spot checked it for accuracy. Based on that review, I believe that the summary is accurate.

9. The first column of PX-297 sets forth the date of the surplus statement identified by Bates number in the fifth column of the chart. The second column, setting forth the Closed Year Reserve/Contingency Fund amount as of that date, is taken

3

directly from the surplus statement dated as appearing in column 1. Entries in the third

column, entitled "Change in Reserve/Contingency Fund," were calculated by subtracting

from the total closed year reserve for a given time period the amount of the total closed

year reserve for the immediately prior time period. For example, the change in

Reserve/Contingency Fund as of December 31, 1946 (second row of the summary)

which is stated as $560,815, equals the closed year reserve as of December 31, 1946

($1,486,950) minus the closed year reserve as of March 31, 1945 ($926,135). The

fourth column, entitled "Change in Reserve/Contingency Fund between January 1 and

December 1, shows, where sufficient surplus statements were available, the change in

amount of the Reserve/Contingency Fund over a one year period. The entries in this

column were calculated by subtracting a given year-end's Closed Year

Reserve/Contingency Fund amount from the immediately preceding year-end's amount.

For example, the Change in Reserve Contingency Fund between January 1 and

December 31 as of December 31, 1953, which equals $82,970, was derived by

subtracting the Closed Year Reserve as of December 31, 1952 ($1,119,751) from the

Closed Year Reserve as of December 31, 1953 ($1,202,721).

     10. Exhibit PX-297 shows the very slow accumulation of the Club's Reserve

Account over the years and some of the sources of its changes. Factors that increased

the amounts in the Reserve Account included: (a) profits from its non-assessable

business, up through 1962 (see PX-287); (b) the portion of interest on investments that

was allocated to the Club's Reserve Account; (c) for insurance years 1977 and later, a

set-aside of $100,000 per insurance year at the time it was closed towards occupational

disease claims ("ODCs") which had not been reported or reserved for prior to closing of that insurance year ("Closed Year ODCs"); and (d) a $7.5 million settlement payment from London Steam-Ship Owners Mutual Insurance Association, Limited ("LSSO"). Factors that decreased the amount in the Reserve Account included, without limitation, (a) various discretionary payments ordered or approved by the Club's various Boards of Directors over the years, including payments of stop-loss reinsurance premiums (over $8 million) (see PX-291); (b) payments of members' Closed Year ODCs (over $6.7 million) (see PX-292, 293, 294); (c) use of funds to close open years by means of the Contingency Fund (net of over $1.7 million) (see PX-298).[1]  As a result, the Club's closed year reserve at the end of 2005 totaled little more than $21 million.

11. Another significant factor leading to the slow build-up of the Reserve Account was the large amount of funds paid back to members as interim and final refunds of premiums and assessments.  The history of these payments is reflected in Exhibit PX-290, which is a summary chart entitled "Assessments and Refunds to Pre-1989 Members," that was prepared pursuant to my direction by an employee of SCB under my direct supervision and reviewed by me.

12. Exhibit PX-290 was prepared by having the SCB employee under my supervision review all relevant Board Minutes, and, for each policy year identified in the first column of the chart, find the minutes of the Board of Directors meeting in which the

---

[1] Further testimony regarding how the various exhibits identified in parentheses (all of which are summary charts) were prepared, and the documents upon which the charts were based can be found infra.

Board resolved to close that year. The dates of such minutes appear in the second column of the chart. The information comprising "Dates of Balance Sheets" – the third column of the chart – was found in the applicable Board Minutes. The information comprising a list of interim dividends and refunds – listed in the fourth column of the chart – was obtained from review of Board Minutes spanning the period in which the specified insurance year was open. The information in columns five through seven – "Losses Pending (Net)," "Surplus Balance" and "Final Net Assessment or (Dividend/Refund) or Transfer to Reserve Fund" are taken directly from the specified Board Minutes. To verify accuracy, the numbers from the Board Minutes were cross-checked against the balance sheets identified in the third column, and, where available, Opinion Letters related to the closing of the year in question. Finally, the information in the eighth column – "Date Closed (Approx.)" comes directly from the Board Minutes identified in the second column. At the bottom of the first page of the summary is provided amounts for (a) total interim dividends/refunds (*i.e.*, the sum of all entries in the fourth column), (b) total final dividends/refunds (*i.e.*, the sum of all final dividends and refunds), and (c) total dividends and refunds, which is the sum of total interim dividends/refunds and total final dividends/refunds. I have reviewed Exhibit PX-290 for accuracy and, based on that review, believe that its contents are accurate.

13. Exhibit PX-290 shows that for insurance years 1938 – 1988, Club members received over $31 million in refunds and dividends ($25,106,492.63 issued for insurance years 1938 – 1976 and 1978, which were all closed before the end of 1987, plus $6,065,088.29 issued for insurance years 1977 and 1979 – 1988 years, which were all

closed on or before June, 1993).  The over $6 million in refunds for insurance years

1977 and 1979 – 1888 were ordered by the then Boards of Directors (which included

representatives of Keystone, APL and Farrell Lines), during the same time that those

Boards were aware generally that the number of asbestos claims relating to the years

they were closing were growing, and that the only amounts being set aside for those

claims was $100,000 upon the closing of the year.  Indeed, if the refunds and dividends

of over $31 million that had been paid after 1938 had been retained as part of the Club's

Reserve Account, rather than returned to members, the Club's Reserve Account today

would likely total hundreds of millions of dollars.  Having already awarded themselves

very substantial benefits from the American Club's Reserve Account, Defendants should

not be entitled to any more.

## THE CONTINGENCY FUND

14. Around June, 1996, the Club, under the governance of the then-Board of

Directors, on which Keystone, Farrell and APL each still had directors, set up a

"Contingency Fund."  I understood at the time that the purpose of the Contingency Fund

was to use the Club's Reserve Account to ameliorate assessments on insurance years as

they were being closed.  This was done for marketing purposes.  By reducing the need

for, or amount of, assessments made upon the closing of an insurance year, the Club

would look more attractive economically to current and potential future members.

Furthermore, implementation of a Contingency Fund would make the Club look more

similar to the P&I Clubs in the "International Group," an international consortium of

P&I Clubs of which the American Club was a reinsured member at the time, and which the American Club aspired to join as a full member.

15. As the person at SCB responsible for handling the American Club's financial and accounting issues, I was personally involved in developing the structure and the guidelines for the Contingency Fund.

16. I was opposed to the Contingency Fund implemented by the American Club, and remain opposed to it to this day. My fundamental problem with the Contingency Fund is that it works counter to one of the goals I have had for the American Club since the mid 1990's, which is to build up the Club's "surplus" – that is, the sum of the Club's reserves for closed years and the amounts of surplus and/or deficits in open years. Growing the Club's surplus is important to help the Club, among other things, achieve a better credit rating (and therefore become more attractive to current and potential future members), ensure compliance with surplus requirements imposed by the New York Insurance Department, and, ultimately, provide more insurance protection in the event the Club is required to pay catastrophic claims.

17. The Contingency Fund adopted by the then-Board of Directors, however, is, at best, "surplus neutral." In other words, the Contingency Fund contains no mechanisms for raising additional funding to add to the surplus, but merely redistributes pre-existing surplus. Furthermore, the Contingency Fund burdened what was an already thinly spread amount of reserves with an additional function – to reduce the amount of assessments in years that were closing. Absent a mechanism to raise funding, the Contingency Fund posed a risk that the Club's Reserve Account would be drawn down

8

even further, even possibly below those required under the Risk-Based Capital ("RBC")
requirements set by the New York Insurance Department.

18. Indeed, this risk has come to pass. On March 20, 2006, the rating agency
Standard and Poor's ("S&P") lowered its counterparty credit and financial strength
ratings on the American Club to "B+" from "BB+" and placed the ratings on Credit
Watch with negative implications. The downgrade in part reflected the Club's continued
deterioration in operating performance resulting in capital losses at December 31, 2005.
Among the factors upon which S&P relied was that the Club's total adjusted capital fell
well below the required RBC levels. See Exhibit PX-286, which is a true and correct
copy of the S&P March 20, 2006 announcement of the downgrade.

19. In creating the document that became the "Contingency Fund Memorandum,"
executed by members of the Club's then-Finance Committee (See Exhibit DX-DI),
guidelines were created at my insistence to ensure that the balance in the Contingency
Fund would not be unduly or improperly depleted. These guidelines included:

(a)      a restriction that funds allocated to the Contingency Fund could not reduce
the balance of the Reserve Account below the total reasonably estimated for unpaid
losses and expenses in closed years (See Exh. DX-DI, p. AC0032836, Guideline 1);

(b)      a requirement that adequate free surplus must be maintained to satisfy the
requirements of New York law and the New York Insurance Department (See Exh. DX-
DI, p. AC0032836, Guideline 2);

(c)      limiting the amount that could be applied from the Contingency Fund to
any one insurance year to an amount "not exceeding 25% of the advance call for that

policy year, and not exceeding 25% of the Fund total at the time of such subvention."
(See Exh. DX-DI, p. AC0032836, Guideline 3); and

      (d)    a statement of intention that the amount of funds available in the
Contingency Fund should *grow* "to create an ongoing Contingency Fund equivalent to at
least a typical policy year's advance call and possibly the ETC[2] thereof." (See Exh. DX-
DI, p. AC0032837). This desired amount, which is far in excess of the amounts then and
currently available in the American Club's Contingency Fund, was in line with what
other P&I Clubs in the International Group were maintaining in their Contingency Funds.

      20. At no time during my work in creation and implementation of the
Contingency Fund and its guidelines, did I ever contemplate that the Contingency Fund
could or would be used in a manner that would result in open-year members being
assessed to pay for claims arising in Closed Years (such as Closed Year ODCs), or in a
manner that would result in the depletion of the Reserve Account that has occurred to
date.

## DEFENDANTS' INEQUITABLE WINDFALL

      21. Were the Court to deny the American Club the relief it seeks and require the
Club to indemnify defendants for pre-1989 ODCs that were not reported prior to the
close of those years, without the right to assess members for such claims, defendants
would receive an inequitable windfall.

---

[2] "ETC" is an acronym for "Estimated Total Cost," which is, in essence, the amount of premium charged to members for any given insurance year.

22. As noted in paragraph 13 above, during the time the Club was indemnifying defendants for ODCs arising in pre-1989 years which were submitted after the relevant insurance year or years has been closed (referred to as the "Discretionary Practice"), the Club paid over $6 million in indemnity claims to the members of the pre-1989 insurance years. By contrast, those members paid only $1.1 million towards the Club's reserves for Closed Year ODCs arising in the 1977 and 1979 – 1988 insurance years. (See PX-290, PX-294). Thus, defendants have already received a windfall of approximately $5.6 million dollars, none of which the American Club is seeking to recover in this action.

23. As of today, many thousands of asbestos cases are pending against the Club's pre-1989 members. In addition, other forms of ODCs have been asserted by seaman, and are likely to be asserted in the future for occupational diseases and injuries arising out of closed years, such as (a) hearing loss, (b) leukemia arising from exposure to benzene, (c) other diseases related to exposures to other chemical products, (d) exposures to lead sandblasting grit and fumes from welding operations, and (e) other types presently unknown. (PX-288, PX-285)

24. If the Club is required to continue the Discretionary Practice, it will be forced to pay all such claims, notwithstanding that the members of the pre 1989 years either contributed nothing towards their liabilities or contributed a token, arbitrary amount for several years – an amount which I now understand they were advised would likely be and which has turned out to be insufficient. In effect, the defendants would obtain insurance for which they never paid, all at the expense of the Club's current and future members.

25. The inequity that will occur in the event defendants prevail will be more dramatic than in past years. During my tenure and in the course of my duties at SCB, I have observed an upward trend in the monetary value of asbestos claims and other ODCs for which members have sought indemnity from the American Club. As the value of asbestos claims continues to rise, so does the inequitable nature of the relief sought by defendants.

26. This upward trend in the value of asbestos claims can be discerned from the business records of the American Club. In and around March, 1995, the accounting firm Coopers & Lybrand prepared a report entitled "Financial Review of the American Club" (the "1995 Coopers Report"). At the time this report was prepared, the American Club was applying for full membership in the International Group. In connection with its application to the International Group, Coopers & Lybrand was as an independent auditor to prepare its report in order for the International Group to evaluate the American Club's financial condition. On behalf of the Club, I provided Coopers & Lybrand with financial information in connection with its preparation of the 1995 Coopers Report, which has been marked as a trial exhibit by defendants as DX-CP. On page 39 of that report, Coopers reports that "From 1973 to 1993, total paid losses [by the American Club] were: asbestos related $1.3m. . . ." Thus, according to Coopers & Lybrand, over the 20-year period from 1973 to 1993, the American Club, in the early years of paying asbestos claims, was paying, on average, $65,000 per year ($1.3 million divided evenly over 20 years) – a mere trickle of claims in terms of dollars paid out. Even adjusting for the fact that indemnities on asbestos claims were likely not first paid until the early

1980's (assuming, for argument's sake only, 1983), the amount of asbestos indemnities being paid out by the Club year to year averaged well under $150,000 per year.

27. By contrast, between 1993 and 2004, the Club paid indemnities to the pre-1989 Closed Year members of over $5.4 million, a dramatic escalation of about $500,000 per year. I have reviewed Exhibit PX-305, which is a summary chart entitled "Occupational Disease Claims for Indemnity," which identifies all pre-1989 ODCs submitted by defendants after termination of the Discretionary Practice, for which the Club has not yet paid. This summary was prepared pursuant to my direction and by an employee of SCB under my direct supervision. This chart summarizes the following information, which was taken directly from claim forms submitted to the Club by the defendants listed in the first column of the summary: member's name (first column); name of claimant (second column); type of ODC (third column); member's internal reference number (fourth column); the date the claim and request for indemnification was submitted to the Club (fifth column); and the amount of indemnity requested (sixth column). These claim forms, and the information contained therein, are received and maintained in the Club's files in the ordinary course of the Club's business, and are too voluminous to be conveniently examined in court. I have personally reviewed this summary and spot checked it for accuracy. Based on that review, I believe that the summary is accurate and fair representation of the underlying documents.

28. Exhibit PX-305 shows that, just considering unpaid claims submitted by Farrell and Keystone alone, the dollar amount for claims for insurance year 2004

approximate $430,000, approximately three times the average annual amount paid by the Club prior to 1993.[3]

29. In addition to the dramatic increase in the average rate of payout on asbestos claims over time, another factor that highlights the inequity that would ensue if the Club were forced to continue its discretionary practice is the potential amounts of indemnities that could be required to be paid in the event juries were to award recoveries to seaman in the millions or tens-of-millions of dollars. Published reports of multimillion dollar verdicts abound, some as high as $10 to $25 million. In the case of a seaman named Timothy Farley, who suffered occupational disease injuries on board ships owned and operated by defendant Keystone prior to 1989, Keystone's defense counsel opined that the potential recovery by Mr. Farley at trial could be upwards of $9 million. (See PX-254 and PX-255.) Were the Club required to continue the Discretionary Practice, and either single or multiple "Farley-type" claims were to result in settlements or judgments in ranges predicted by Keystone's counsel in the Farley matter, the American Club's modest reserves could be substantially depleted, if not wiped out. This would shift the cost of all further indemnity claims regarding the Closed year ODC's to the Club's current and future members.

30. At a minimum, if Mr. Farley's claim, for which the Club paid as an advance to Keystone of over $1 million, were added to the claims identified in Exhibit PX-305, the

---

[3] This $430,000 amount was approximated by adding together all Farrell Lines claims listed on PX-305 ($172,019.87) to all Keystone claims listed on PX-305 ($598,881.20), then subtracting the amount of the "Rebenack" claim listed as a Keystone claim ($341,245.93), as the Rebenack claim was paid in 2006, not 2004. (See PX-305).

total claims paid would equal $2.2 million. If all those claims were considered paid in years 2004 – 2006, the yearly average of payouts on ODCs would be over $730,000 for each of those years, approximately 6 – 7 times the annual average amounts paid in years prior to 1993.

### THE AMERICAN CLUB'S DECISION TO FILE THIS ACTION

31. To my knowledge, at no time from when I first began work at SCB and prior to 2004 did the Board of Directors, which, through at least the late 1990's was controlled by the defendants, ever seek or obtain the opinion of counsel as to whether the Club had a legal obligation to pay indemnities to Closed Year members regarding Closed Year ODCs.

32. In the mid-1990's, I became concerned about the Club's practice of indemnifying Closed Year ODCs, as the members receiving indemnities on such claims, in our view, had not paid for such coverage. I was also concerned that asbestos manufacturers, which had been absorbing the brunt of the payouts on asbestos litigation, were going into bankruptcy, and that asbestos plaintiffs could begin to seek other additional targets, such as ship owners (including members of the American Club), for recoveries. I began considering various alternative courses of action the Club could take to address this perceived unfairness in favor of closed year members, including re-opening closed insurance years, and purchasing reinsurance to cover the closed year ODCs. None of these ideas proved to be feasible, for economic and marketing reasons. As a result, I took no further action with respect to these issues at the time.

33. In 2002, defendant Keystone filed a law suit against the Club, claiming that the Club's practice for claims spanning multiple insurance years of allocating one deductible for each such insurance year – a practice defendants refer to as "multiple deductibles" or "stacked deductibles" – was improper, and that these past indemnities paid to Keystone by the Club should be re-calculated on the basis of applying a "single deductible." By that action, Keystone sought additional insurance for which it never paid, and to have the Club treat it differently than other members of the relevant insurance years with respect to deductibles.

34. In response to Keystone's action, the Club's current directors sought advice of legal counsel to determine, for the first time, whether the Club had a legal obligation to continue the practice of paying indemnities to the closed year members regarding ODCs arising out of closed pre 1989 insurance years that had been unknown and unreserved for when the years were closed.

35. Counsel for the Club analyzed the Club's history with respect to the Discretionary Practice and reported its findings to the Board. (See PX-257). Based on counsel's analysis, the Board concluded that the Club did not and never did have any obligation to pay indemnities regarding the Closed Year ODCs, and that, in the alternative, if it did have such an obligation, it was entitled to re-open the closed years in question and assess members of that year. (See PX-256). The Club's current Board thereafter promptly terminated the Discretionary Practice and so notified all members by circular dated June 7, 2004, a true and correct copy of which has been designated as Exhibit PX-258. The Club that same day filed this action seeking declaratory judgment

16

to protect its current and future members from the inequitable actions of the directors representing the defendants who had commenced or permitted the commencement of the Discretionary Practice.

## AUTHENTICATION AND ADMISSIBILITY OF
## CLUB'S DOCUMENTS AND SUMMARY CHARTS

36. All of the documents produced by the American Club and marked with the Bates Designation "AC" (for American Club) which purport on their face, and which I recognize, to be letters, memoranda, circulars, memos to file, minutes of Board or Finance Committee meetings, or other similar business records of the American Club and/or SCB, as well as attorneys' letters from Kirlin Campbell & Keating and/or Nourse & Bowles, were produced under my supervision from the American Club's current files maintained at the offices of SCB in New York City, or storage boxes maintained by the American Club at the GRM Information Management Services Warehouse in Jersey City, NJ. All such documents were prepared or received and maintained in the ordinary course of the American Club's business, and it was and it is the American Club's ordinary course of business to prepare or receive and maintain such records. These documents also were kept in the Club's files in the ordinary course of the Club's business. I also note that all of the records found in the Club's storage boxes from the GRM Warehouse dated prior to 1987 are twenty years old or older.

37. Below, I identify and describe below various summary charts that were prepared on behalf of the American Club in connection with this civil action. Unless otherwise modified or contradicted below, each of the following summary charts:

17

(a)    was prepared at my direction by an employee of SCB under my direct supervision;

(b)    summarizes voluminous writings which cannot be conveniently examined in court;

(c)    summarizes documents that are business records of the Club that were created and maintained in the Club's files in the ordinary course of the Club's business;

(d)    was prepared based on documents and materials that were either marked as trial exhibits in this action, produced to defendants, and/or made available to defendants for examination and/or copying; and

(e)    was personally spot-checked for accuracy by me, and based on that review, appear to be an accurate and fair representation of the documents upon which the summary chart is based.

38. Exhibit PX-270 is a summary chart entitled "Summary of Policies from December 31, 1943 through February 20, 1989." This summary chart summarizes information gleaned from the thousands of Club's insurance policies for the above-stated years.

39. Exhibit PX-270 was prepared by having my employee and an assistant review each policy identified in the chart and, for each policy, record the member's name (first column), the policy number (second column), the total premium (third column), the percentage of assessable premium attributed to that policy (fourth column), the limitation on coverage per vessel (fifth column), the policy's deductible for claims

arising out of loss of life, illness or injury (sixth column), and the vessels insured under the policy (seventh column).

40. Exhibit PX-284 is a document entitled "American Club List of Members 2/20/1989-2/20/2006," which contains, as its title suggests, a list of all members of the American Club from February 20, 1989 through and including February 20, 2006, broken down by insurance policy year. That portion of the document listing members by policy year from 1993/1994 through and including 2003/2004 (bearing Bates numbers AC0086259 – AC0086277) is a business record of the American Club that was prepared and maintained by the Club in its files in the ordinary course of the Club's business. The portions listing members for policy years 1989/1990 through and including 1992/1993, 2004/2005 and 2005/2006 (bearing Bates numbers AC0086255 – AC0086258 and AC0086278 – AC0086294) were prepared pursuant to my direction by an employee of SCB under my direct supervision by pulling data from a computerized spreadsheet containing Club membership information. This portion of the chart summarizes voluminous writings which cannot be conveniently examined in court. The computer spreadsheet upon which this information was based has been made available to defendants for inspection. I have reviewed Exhibit PX-284 for accuracy and, based on that review, believe that its contents are accurate.

41. PX-284 demonstrates that substantial growth in membership from the 1989/1990 insurance year to present. In that period, Club membership has grown from approximately 32 members to over 400 members. It also shows that many of the defendants remained members of the American Club after 1989.

19

42. Exhibit PX-287 is a summary chart, entitled "Income From Non-Assessable Business." This chart summarizes information taken from hundreds of pages of Board Minutes and minutes of the Club's Finance Committee.

43. Exhibit PX-287 was prepared by reviewing various Board Minutes, and, for each policy year identified in the first column of the charts, finding the minutes of the Board meeting in which Board resolved to close that year. The dates of such minutes appear in the second column of the chart. The information comprising "Dates of Balance Sheet" – the third column of the chart – was found in the applicable Board Minutes. Where available, this date information was checked against Opinion Letters. The information in the fourth column comprising the non-assessable balance – *i.e.,* the funds that derived from the non-assessable side of the Club's business – were obtained directly from the balance sheets identified in the third column. The surplus statements identified by date in column five are attachments to the applicable Board Minutes, and the closed year reserve figures in column six are taken directly from said surplus statements. The chart also reflects the addition to the non-assessable balance of over $1.9 million dollars paid by the Federal Government in connection with "Wartime P&I policies" issued by the Club during World War II. Finally, the chart totals, for years, 1942 – 1956, the total non-assessable balance, both inclusive and exclusive of the Wartime P&I policies.

44. PX-287 shows that, between policy years 1942 through and including 1956, the Club earned over $2.3 million in net profits from the non-assessable business (including approximately $439,000 over various years, and over $1.9 million received

from the US Government in connection with Wartime P&I policies). The profit from the Wartime P&I policies was settled with the US Government in 1962 and credited to the Club's Reserve Account at that time. Thus, approximately half of the Club's Reserve Account as of December 31, 1962 was the profit from the Club's non-assessable business. My understanding developed during my tenure at SCB is that all funds in the Club's Reserve Account were the exclusive property of the Club's current members. (*See, e.g.*, PX-37.)

45. Exhibit PX-288 is a summary chart, entitled "Chart of Defendants' Responses to Plaintiff's First and Second Set of Interrogatories Concerning Pending Occupational Disease Claims," that was prepared by a paralegal at counsel's office and verified pursuant to my direction by an employee of SCB under my direct supervision. This chart is based solely upon and summarizes responses defendants' responses to certain interrogatories posed in plaintiff's first and second set of interrogatories. Given the number of interrogatory responses received and the number of pages in such responses, these supporting documents are too voluminous to be conveniently examined in court.

46. Exhibit PX-288 was prepared by reviewing each defendants' responses to plaintiff's first and second set of interrogatories and totaling, for each defendant, the number of claims identified in response to interrogatory number 2 in plaintiff's second set of interrogatories, dated August 8, 2005. These numbers are then totaled at the bottom of the chart.

47. Exhibit PX-288 shows that, as of this past year, defendants collectively have over 26,500 ODCs pending against them arising out of insurance years 1988 and prior.

To the extent any of these pending claims result in judgments or settlements against any of the defendants, such defendants may seek indemnity from the Club. Such indemnities from the Club would increase defendants' unfair windfall, as defendants have not paid premiums or assessments for any such claims. Indemnification of these claims furthermore would be improper and inequitable because current Club members, who would be required to bear the cost of indemnifying such claims, have never agreed to pay such costs.

48. Exhibit PX-289 is a summary chart entitled "Dates of Membership of Certain Pre-February 20, 1989 Members." This summary shows Club members whose membership spanned both prior to and after February 20, 1989. This chart is based upon information from SCB's computerized records, which were created and are maintained in the Club's ordinary course of business and cannot conveniently be examined in court, as well as the information appearing in PX-270, and its voluminous, supporting documentation.

49. Exhibit PX-289 was prepared first by identifying and creating a list from PX-270 of all members of the American Club prior to February 20, 1989, and the date on which they first were insured members of the Club. Each member's name on that list was then checked against a computer database operated and maintained at the Club's offices to determine whether the member was still a member of the Club, and, if not, the date that member left the Club. The lists of pre-1989 members who continued to be members after 1989 were then listed in the first column, and the dates of their membership in the Club were recorded in the second column.

50. Exhibit PX-289 shows that various of the defendants were members of the American Club over a prolonged period of time, both before and after February 20, 1989. For example, American President Lines was a member of the Club for approximately forty years, from 1958 to February 20, 1998. Defendant Farrell Lines was a member of the Club for fifty years, from 1954 to February 20, 2005. Various companies owned by the Kurz family, including without limitation defendants Keystone Shipping Co. and Keystone Tankship Co., have been members from at least as early as 1944 through February 20, 1997. Many of those companies benefited from the prior discretionary payments of Closed Year ODCs and will benefit from future payments regarding ODCs occurring in insurance years before February 20, 1989. The summary further shows that of the thirty-two pre-1989 members listed on the chart, only one – Foss Maritime Company (n/k/a Saltchuk Resources, Inc.) – is still a member of the Club.

51. Exhibit PX-291 is a summary chart, entitled "Use of Reserve Account for Stop Loss Premiums." This chart summarizes information derived from the Club's Board Minutes.

52. Exhibit PX-291 sets forth, for each policy year 1979 – 1993, instances in which the Board of Directors approved use of the Club's Reserve Account to pay for stop loss insurance premiums and/or additional excess stop loss premiums, and the amount of payments authorized by the Board. The specific documents from which the information appearing in the chart was taken are identified in the chart's fifth column, titled "Bates Stamp Numbers."

53. Exhibit PX-291 shows that over $8 million in stop loss reinsurance premiums for policy years 1979 – 1994 were paid from the Club's Reserve Account. Of that sum, approximately $4.8 million can be attributed to spending on stop loss reinsurance policies for policy years 1979 – 1988, and $3.2 million can be attributed to spending on stop loss policies for policy years 1990 – 1993. The members of the Club in those years, which otherwise would have been assessed to pay those premiums, received very substantial benefits from the Club, which again prevented the American Club from building up its Reserve Account.

54. Exhibit PX-292 is a summary chart, entitled "Occupational Disease Claims for Policy Years 1940 – 1988 Paid After Years were Closed Based on Available Data through 12/31/04 (Sorted by Member)." This chart summarizes information taken from SCB's computer databases, which were created and maintained in the ordinary course of SCB's business, and which cannot conveniently be examined in court. All documents upon which this summary chart is based have been made available to defendants for examination and copying.

55. Exhibit PX-292 was prepared by extracting from SCB's computer databases information concerning all ODCs for which the American Club has paid indemnities after the insurance years in which the exposure occurred had been closed ("Closed Year ODCs"). The information was transferred to a spreadsheet, and then edited to remove any duplicate claims and claims that did not fit within the timeframe of the chart, then formatted to present the following information: the policy year involved in the claim (first column); the claim identification number (second column); name of claimant (third

column); name of insured member (fourth column); vessel name on which the

occupational disease injury occurred (fifth column); the description of the type of

occupational disease involved (asbsestos, benzene, other chemical, or hearing loss)

(sixth column); and the total amount paid by the Club in connection with that claim

(seventh column).

56. Exhibit PX-292 shows that each of the claims appearing on the chart was

allocated over the policy years of employment on the members' vessels and the

members' deductibles for each of those years were applied in calculating the indemnities

paid to the members. This chart shows the number of times each pre-1989 member (the

defendants) acquiesced in the part of the Discretionary Practice that involved multiple

deductibles, except in a few cases that involved settlements of disputed claims. A

summary of the chart appearing on page 13 of the exhibit shows that, as of December

31, 2004 the Club has paid over $6.7 million in Closed Year ODCs, and an "advance" to

Keystone of over $1.07 million regarding the Farley Case.

57. Exhibit PX-293 is a summary chart entitled "Occupational Disease Claims for

Policy Years 1940 – 1988 Paid After Years were Closed Based on Available Data

through 12/31/04 (Sorted by Claimant)." This chart is based on the same supporting

documentation and information, and was prepared using the same methodology as

Exhibit PX-292. Indeed, it is identical to PX-292, except that the information is sorted

alphabetically by the claimant's name, rather than the member's name. The same holds

true for Exhibit PX-294, entitled "Occupational Disease Claims for Policy Years 1940 –

1988 Paid After Years were Closed Based on Available Data through 12/31/04 (Sorted

by Policy Year)," which was created using the same supporting documentation and prepared using the same methodology as Exhibits PX-292 and 293, and is otherwise identical to those exhibits, except that it is organized chronologically by the policy year in which the claim arose. I have personally reviewed these summaries and spot checked them for accuracy. PX-294 shows that, for the insurance years 1977 and 1979 – 1988, where $100,000 per year was reserved towards ODCs for those years, those funds have been completely or nearly depleted.

58. Exhibit PX-295 is a summary chart, entitled "Keystone Executives on the American Club's Board and Committees." This chart summarizes information taken from a review of the Club's Board Minutes, as well as a few documents produced by Keystone from its files. The specific documents supporting each of the assertions on the chart are identified by Bates number on the chart.

59. Exhibit PX-295 shows that executives from the Keystone companies have held positions of prominence and control at the American Club continuously since 1935, when Charles Kurz was elected a director of the Club, a position which he held until 1971. Charles Kurz also served on the Club's Finance Committee from 1938 – 1946. Adolph Kurz was elected as a director to the Club in 1956, and served until February 20, 1997, when Keystone left the American Club. During his tenure, Adolph Kurz served as Deputy Chairman and Chairman of the Board, and served on both the Finance Committee and the Safety Committee. Charles Kurz II was elected director in 1975, and served on the Board until February 20, 1997. During his tenure, Mr. Kurz II served as Deputy Chairman and Chairman of the Board, and also served as a member of the

26

Finance Committee, the Safety/Claims Committee, and the Marketing Committee.

Finally, Mr. Leslie Krusen, the vice president, secretary, and general counsel of, among

others, defendant Chas. Kurz & Co, Inc., served as a director of the Club's Board from

1971 to 1974.

60. Exhibit PX-296 is a summary chart entitled "Farrell Lines and American

Export Lines, Inc. Executives on the American Club's Board and Committees." This

chart is a summary of information from the Club's Board Minutes, as well as a few

documents produced by Keystone from its files. The specific documents supporting

each of the assertions on the chart are identified by Bates number on the chart. In cases

where statements of dates of resignation from the Board of Directors do not have a

documentary reference, the dates were identified by a review of Board Minutes to check

which directors attended each Board meeting, and when the director was recorded as no

longer attending any Board meetings, the first date on which the director ceased

attending such meetings was assumed to be the date of that director's resignation.

61. Exhibit PX-296 shows, from as early as 1943, with the election to the Club's

Board of John F. Gehan, until 2005, when P&O Nedlloyd left the American Club, P&O

Nedlloyd and its predecessors, American Export and Farrell Lines, Inc., have had at least

one employee on the Club's Board of Directors.

62. Exhibit PX-298 is a summary chart, entitled "Transfer of Funds To and From

the Contingency Fund in Connection with the Closing of Policy Years 1989 – 2001."

This chart summarizes information from various of the Club's Board Minutes, as of the

time the Board resolved to close each of these years, and provides a "snapshot" of the

expected transfers at those times. As matters developed, and as shown in the fourth column of Exhibit PX-297, the final transfers were in several cases larger that expected.

63. Exhibit PX-298 was prepared by having the SCB employee under my supervision review various Board Minutes, and, for each policy year identified in the first column of the charts, find the minutes of the Board meeting in which Board resolved to close that year. The dates of such minutes appear in the second column of the chart. The date of the balance sheet referred to in the third column of the chart is taken directly from the Board Minutes identified for that row. The balance sheets are attached to and considered a part of, the Board Minutes. The amounts of Surplus Balance, appearing in the fourth column, were also derived from the same Board Minutes, and cross-checked for accuracy against the identified balance sheets and, where possible, cross-checked again against information contained in Opinion Letters for the closing of that insurance year. The information in the final three columns – Proposed Final Assessment (or Refund), Date Due and Payable, and notes – all were taken directly from the relevant Board Minutes and/or accompanying Opinion Letters.

64. Exhibits PX-297 and PX-298 show the substantial benefits received by the members of the Club's 1989-2001 insurance years. The defendants shared in these benefits to the extent they remained members of the Club after February 20, 1989, and all would have shared therein if they had chosen to remain as members of the American Club. Members of the post 1988 years have benefited or will benefit from this payment of occupational disease claims occurring in those closed years, also.

65. Exhibit PX-304 is a summary chart, entitled "Distribution of Kirlin, Campbell & Keating's Letter dated February 14, 1979 (and References Thereto), November 3, 1993, April 20, 1995, and March 1, 1982." The chart shows both the number of times the letter from the Kirlins firm to the Club dated February 14, 1979 authored by William Fallon (the "Fallon Letter") was distributed to various Board and Finance Committee members, or specifically referred to in correspondence to those individuals. The Fallon Letter (see Exhibits PX-37, PX-38, PX-39, PX-40) sets forth the opinion of the American Club's counsel that, among other things, (a) the closed year reserves belong to the Club (and, by implication, that members in any closed years did not have the right to any reserve funds), (b) that closing of insurance years resulted in a "final settlement of accounts," which, among other things, terminated closed year members' right to file claims for insurance years after those insurance year had been closed, and/or that (c) closed years could be re-opened. The specific deposition exhibits from which the information is taken is identified in the first column of the summary. The names appearing in the second column were identified on the previously identified deposition exhibits as recipients of the document referred to in the first column.

66. Exhibit PX-304 shows that the Fallon Letter was distributed and/or referred to in other documents circulated to members of the Club's then Board of Directors and/or Finance Committee on at least fourteen (14) times from its first distribution in February,

1979, through and including March 8, 1996. To my recollection, no director or member of the Finance Committee ever challenged the legal conclusions set forth in the Fallon Letter prior to the institution of this law suit in 2004.

Vincent J. Solarino

Sworn to before me this
12th day of May, 2006

Notary Public

MARGARET LEE
Notary Public, State of New York
No. 31-4908743
Qualified in New York County
Commission Expires October 18, 2009

**Affidavit of James Patrick Sweeney**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AMERICAN STEAMSHIP OWNERS
MUTUAL PROTECTION AND INDEMNITY
ASSOCIATION, INC.,

                      Plaintiff,

        -against-

ALCOA STEAMSHIP CO., INC., et al.,

                    Defendants.

No. 04 Civ. 04309 (LAK) (JCF)

(ECF Case)

AFFIDAVIT OF
JAMES PATRICK SWEENEY

SUBMITTED BY PLAINTIFF IN
SUPPORT OF ITS CASE IN
CHIEF

STATE OF NEW YORK     )
                        ) ss.:
COUNTY OF NEW YORK  )

JAMES PATRICK SWEENEY, being duly sworn, hereby deposes and says:

1.    I am Vice President of Operations ("VPO") for Penn Maritime, Inc. and was VPO of its former subsidiary Morania Oil Tanker Corporation. For the sake of convenience I will refer to both of these entities collectively as "Penn Maritime."

2.    The testimony set forth below is based upon my personal knowledge and/or review of various documents that have been either produced or marked as trial exhibits in this action, and is true to the best of my knowledge and belief.

3.    Penn Maritime is barge and tugboat owner and operator. As VPO of Penn Maritime, I was responsible for, among other things, arranging for insurance coverage for its vessels.

4.    Penn Maritime first joined the American Steamship Owners Mutual Protection and Indemnity Association, Inc. (the "American Club" or "Club") on February 20, 1992 for the 1992 insurance year, in order to obtain indemnity insurance coverage for its vessels for potential claims attributable to that insurance year. Penn Maritime has re-joined the American Club for each subsequent insurance year.

5.    In March 1994 I was elected to the Board of Directors of the American Club and later became a member of its Finance Committee. I am currently Deputy Chairman of the Board of Directors of the American Club and I am still an active member of its Finance Committee.

6.    Penn Maritime agreed at the beginning of the 1992 insurance year, and each subsequent insurance year, to pay premiums and assessments in order to provide funds so that the Club could pay indemnities to all Club members of that year for all insurance claims attributable to that insurance year, as well as certain operational expenses of the Club.

7.    Penn Maritime, however, never agreed to be assessed for claims arising in insurance years prior to 1989, including, without limitation, occupational disease claims ("ODCs") that were not reported and not reserved for, or inadequately reserved for, prior to the close of an insurance year (hereafter referred to as "Closed Year ODCs"). This is because Penn Maritime did not join the Club until 1992, and there was no requirement of which I was aware that would make Penn Maritime liable for such assessments.

8.    After I became a Director of the American Club in 1994, I learned that in the early 1980s under the governance of the then Directors of the Club -- which consisted

-2-

primarily of representatives from the defendants -- the Club was reimbursing members of closed insurance years for Closed Year ODCs, using funds from the Club's Reserve Account.

9.    The fact that the Club was indemnifying Closed Year ODCs out of the Club's Reserve Account was never questioned by me or any new Directors or members of the American Club following my election to the Board of Directors in 1994, until around 2004.

10.    After my election to the Club's Board of Directors in 1994, I did, however, specifically raise at Board meetings the issue of whether Penn Maritime could be *assessed* to indemnify Closed Year ODCs arising in insurance years 1989 and prior. The issue was discussed at length. As a result of those discussions, I understood, and believed that it was widely agreed by the Directors in attendance and the Club's counsel, that Penn Maritime was not required to pay for claims attributable to the pre-1989 insurance years at issue in this action, as they were not a member of the American Club for, and did not participate in, these insurance years. Had anybody told me to the contrary, I would have taken Penn's ships out of the Club. I further understood at the meeting that the Board was generally in agreement that, to the extent assessments might be necessary to satisfy pre-1989 Closed Year ODCs, only members of the applicable closed insurance years could, and would be, assessed to satisfy these claims.

11.    In the Spring of 2004, I was advised, in my capacity as a director of the American Club, that: (i) the American Club had no legal obligation to continue paying Closed Year ODCs attributable to insurance years prior to 1989; and (ii) the actual and

-3-

potential cost to the American Club of satisfying these claims might adversely effect the financial viability of the Club and (ii) the net result would be that the cost of the Closed Year Members ODCs would be indirectly shifted to the new members.

12.    Accordingly, on May 25, 2004, I and an overwhelming majority of the other Directors of the American Club voted to terminate its practice of indemnifying Closed Year ODCs from the Club's reserves with respect to the payment of Closed Year ODCs attributable to insurance years prior to 1989 (hereafter referred to as the "Discretionary Practice"). I believe that the Board of Directors acted appropriately in terminating the Discretionary Practice.

13.    In particular, the Board of Directors took into account that today the American Club is composed of a very different group of shipowners than it was during the pre-1989 period when the Club began the Discretionary Practice. These ship owners -- the defendants in the above-captioned action -- never paid assessments, or knowingly paid assessments that were inadequate, to cover the cost of satisfying Closed Year ODCs.

14.    The Board of Directors further took into account that, at the close of each insurance year at issue in this dispute, the defendants' representatives on the then-Boards of Directors voted to refund to their member companies a substantial portion of the surplus remaining in the Club's reserves for that insurance year, instead of setting aside sufficient funds to cover potential Closed Year ODCs for that year, or to build up the Club's Reserve Account.

15.    In short, it was determined that the defendant shipowners never paid for the insurance coverage they are demanding from the Club, and that neither the Club nor its

current or future members should be forced to bear the cost of these potentially significant claims -- which they never agreed to pay, and are not obligated to pay, on behalf of defendants.

16.    Accordingly, the Board authorized the Club's counsel to file this action on June 7, 2004, in order to protect the American Club and its current and future members from the unjust and inequitable effects of the Discretionary Practice.

James Patrick Sweeney

Sworn to before me this
_12_ day of May, 2006

Notary Public
Exp. Oct 31, 2010

-5-

**AMERICAN STEAMSHIP OWNERS MUTUAL PROTECTION AND INDEMNITY ASSOCIATION, INC.**
**ASSESSMENTS AND REFUNDS TO PRE-1989 MEMBERS**

| Policy Year | Date of Board Meeting | Date of Balance Sheet | Interim (Dividend/ Refund) | Losses Pending (Net) | Surplus Balance (9) | Final Net Assessment or (Dividend/Refund) or Transfer to Reserve Fund | Date Closed (Approx.) |
|---|---|---|---|---|---|---|---|
| 1938-39 (2/20/38-2/20/39)(1)(7) | 6/11/1942 | 5/31/1942 | | | (272,980.00) | (272,980.00) | 6/30/1942 |
| 1939-40 (2/20/39-2/20/40)(1)(7) | 6/11/1942 | 5/31/1942 | | | 57,423.00 | 57,423.00 | 6/30/1942 |
| 1940-41 (2/20/40-2/20/41)(1)(7) | 6/11/1942 | 5/31/1942 | | | 198,959.00 | 198,959.00 | 6/30/1942 |
| 1941-42 (2/20/41-2/20/42)(1)(7) | 6/11/1942 | 5/31/1942 | | | 213,153.00 | 213,153.00 | 6/30/1942 |
| 1942 (2/20/42-6/20/42)(7) | 6/14/1945 | 3/31/1945 | | 185,542.00 | 99,625.31 | 99,625.31 | 6/30/1945 |
| 1942 (6/20/42-12/31/42)(7) | 6/14/1945 | 3/31/1945 | | 199,703.00 | 443,034.12 | 443,034.12 | 6/30/1945 |
| 1943 (7) | 11/13/1947 | 9/30/1947 | | 88,498.00 | 373,424.46 | 373,424.46 | 11/30/1947 |
| 1944 (7) | 11/13/1947 | 9/30/1947 | | 138,806.00 | 125,820.06 | 125,820.06 | 11/30/1947 |
| 1945 (7) | 11/13/1947 | 9/30/1947 | | 16,083.25 | (9,006.62) | (9,006.62) | 11/30/1947 |
| 1946 (7) | 11/8/1951 | 9/30/1951 | | 439,721.25 | (649,463.03) | (649,463.03) | 11/30/1951 |
| 1947 (7) | 11/8/1951 | 9/30/1951 | | 1,255,088.86 | (1,318,560.95) | (1,318,560.95) | 11/30/1951 |
| 1948 (7) | 11/8/1951 | 9/30/1951 | | 1,393,303.00 | 408,222.49 | 408,222.49 | 11/30/1951 |
| 1949 (8) | 12/8/1955 | 10/31/1955 | | 488,732.07 | (138,036.12) | 137,793.93 | 12/31/1955 |
| 1950 (7) (8) | 12/8/1955 | 10/31/1955 | | 284,465.00 | 218,861.68 | 218,861.68 | 12/31/1955 |
| 1951 (8) | 12/8/1955 | 10/31/1955 | | 988,753.71 | (204,700.10) | 150,220.33 | 12/31/1955 |
| 1952 | 4/9/1959 | 12/31/1958 | | 144,232.25 | (160,059.48) | 111,866.09 | 5/15/1959 |
| 1953 | 4/9/1959 | 12/31/1958 | | 387,883.00 | 112,745.49 | (102,851.07) | 5/15/1959 |
| 1954 | 4/9/1959 | 12/31/1958 | | 536,779.80 | (363,626.27) | 363,619.29 | 5/15/1959 |
| 1955 | 3/14/1963 | 2/28/1963 | | 53,500.00 | 312,472.72 | (304,213.90) | 4/15/1963 |
| 1956 | 3/14/1963 | 2/28/1963 | | 234,389.00 | 225,293.87 | (220,083.92) | 4/15/1963 |
| 1957 | 3/12/1964 | 1/31/1964 | | 349,087.00 | 1,017,099.54 | (1,017,089.16) | 4/1/1964 |
| 1958 | 5/13/1965 | 3/31/1965 | (1,181,741.22) | 313,782.05 | 638,315.32 | (638,774.18) | 6/15/1965 |
| 1959 | 11/10/1966 | 9/30/1966 | | 287,975.00 | (435,396.64) | 435,382.17 | 12/15/1966 |
| 1960 | 10/10/1968 | 8/31/1968 | (1,980,886.67) | 240,752.00 | 879,452.39 | (879,441.99) | 11/15/1968 |
| 1961 | 10/10/1968 | 8/31/1968 | | 181,726.00 | 1,465,951.68 | (1,465,974.05) | 11/15/1968 |
| 1962 | 5/11/1972 | 3/31/1972 | | 18,700.00 | 971,531.40 | (971,528.79) | 5/31/1972 |
| 1963 | 5/11/1972 | 3/31/1972 | | 148,607.00 | 1,005,614.80 | (1,005,612.05) | 5/31/1972 |
| 1964 | 5/11/1972 | 3/31/1972 | | 101,585.00 | 256,481.40 | (256,481.34) | 5/31/1972 |
| 1965 | 5/11/1972 | 3/31/1972 | | 215,872.00 | 394,233.25 | (394,231.72) | 5/31/1972 |
| 1966 | 12/11/1975 | 9/30/1975 | | 78,950.00 | 343,687.47 | (343,689.71) | 12/31/1975 |
| 1967 | 6/17/1977 | 3/31/1977 | (886,545.67) | 175,730.00 | 1,031,553.74 | (1,031,553.72) | 6/30/1977 |
| 1968 | 6/14/1979 | 3/31/1979 | (2,591,807.98) | 117,594.00 | 977,839.74 | (977,839.59) | 6/29/1979 |
| 1969 | 6/12/1980 | 3/31/1980 | | 237,668.00 | 2,225,784.25 | (2,225,784.28) | 6/30/1986 |
| 1970 | 6/10/1982 | 3/31/1982 | (769,362.49) | 127,576.00 | 1,547,440.61 | (1,547,440.59) | 6/30/1982 |
| 1971 | 6/11/1981 | 3/31/1981 | | 32,856.00 | 1,079,595.35 | (1,079,595.20) | 6/30/1981 |
| 1971/72 | 6/12/1980 | 3/31/1980 | | 191,508.00 | (75,318.78) | 75,318.28 | 6/30/1980 |
| 1972/73 | 6/11/1981 | 3/31/1981 | | 29,359.00 | 108,937.87 | (108,938.53) | 6/30/1981 |
| 1973/74 | 9/10/1982 | 3/31/1982 | | 31,425.00 | 352,505.35 | (352,507.21) | 6/30/1982 |
| 1974/75 (1) | 6/14/1984 | 3/31/1984 | | 226,874.00 | 88,753.00 | 88,753.00 | after transfer |
| 1975/76 (6) | 6/13/1985 | 3/31/1985 | | 644,113.00 | 856,773.00 | (929,484.05) | |
| 1976/77 | 6/11/1987 | 3/31/1987 | (1,000,002.05) | 741,421.00 | 311,544.00 | (311,536.47) | 6/30/1987 |
| 1978/79 | 6/11/1987 | 3/31/1987 | | 1,931,034.00 | 531,503.00 | (531,495.04) | 6/30/1987 |
| | | | | | | | |
| **Total Interim Dividends/Refunds** | | | (8,410,348.08) | | | | |
| **Total Final Dividends/Refunds** | | | (16,696,145.55) | | | | |
| **Total Dividends/Refunds** | | | (25,106,492.63) | | | | |
| | | | | | | | |
| | | | | | | | |
| 1977/78 (2) | 4/14/1988 | 12/31/1987 | (1,349,939.24) | 1,138,850.00 | 1,440,083.00 | (1,440,075.99) | 4/30/1988 |
| 1979/80 (2) | 4/14/1988 | 12/31/1987 | | 447,436.00 | 1,448.00 | (1,440.38) | 4/30/1988 |
| 1980/81 (2) | 4/20/1989 | 12/31/1988 | | 833,240.00 | 1,452,306.00 | (1,452,307.87) | 4/30/1989 |
| 1981/82 (2) | 4/14/1988 | 12/31/1987 | | 2,080,331.00 | 69,993.00 | (69,990.40) | 4/30/1988 |
| 1982/83 (2) | 4/20/1989 | 12/31/1988 | | 365,136.00 | 649,808.00 | (649,810.67) | 4/30/1989 |
| 1983/84 (2) | 6/14/1990 | 3/31/1990 | | 100,000.00 | 244,473.00 | (244,473.08) | 6/30/1990 |
| 1984/85 (3) (7) | 6/14/1990 | 12/31/1989 | | 1,363,425.00 | (57,440.00) | (57,440.00) | |
| 1985/86 (2) | 8/13/1991 | 3/31/1991 | | 1,597,430.00 | 280,420.00 | (280,416.98) | 6/30/1991 |
| 1986/87 (4) | 6/11/1992 | 3/31/1992 | | 2,704,200.00 | 575,670.00 | (576,633.68) | 6/30/1992 |
| 1987/88 (5) | 8/10/1993 | 3/31/1993 | | 2,704,700.00 | (691,477.00) | 925,952.00 | 6/30/1993 |
| 1988/89 (5) (7) | 8/10/1993 | 3/31/1993 | | 3,188,580.00 | 21,688.00 | 21,688.00 | |
| | | | | | | | |
| **Total Interim Dividends/Refunds** | | | (1,349,939.24) | | | | |
| **Total Final Dividends/Refunds** | | | (4,715,149.05) | | | | |
| **Total Dividends/Refunds** | | | (6,065,088.29) | | | | |

CONFIDENTIAL
AC0086754

Errors and Omissions Excepted
Page 1 of 2
3/29/06

**AMERICAN STEAMSHIP OWNERS MUTUAL PROTECTION AND INDEMNITY ASSOCIATION, INC.**
**ASSESSMENTS AND REFUNDS TO PRE-1989 MEMBERS**

| Notes | | | | |
|---|---|---|---|---|
| (1) Data incomplete in Board and Finance Committee minutes. | | | | |
| (2) Reflects addition to loss reserves of $100,000 and a corresponding $100,000 reduction in refund for the | | | | |
|     insurance year to provide a reserve for incurred but not reported claims for occupational disease. | | | | |
| (3) Closing the 1984/85 year with the deficit of $57,400 is essentially equivalent to keeping the year open to wait for the | | | | |
|     deficit to be corrected by investment income. | | | | |
| (4) Reflects addition to loss reserves of $298,200 following 3/31/92, together with an additional $100,000 | | | | |
|     and a corresponding $100,000 reduction in refund for the insurance year to provide a reserve for incurred | | | | |
|     but not reported claims for occupational disease. | | | | |
| (5) Reflects reduction of loss reserves of $500,000 and $375,000 respectively following 3/31/93, together with an | | | | |
|     additional $100,000 and a corresponding $100,000 increase in deficiency for each insurance year to provide | | | | |
|     a reserve for incurred but not reported claims for occupational disease. | | | | |
| (6) The resolution of the 6/13/85 Board meeting to transfer the final surplus for 1975/1976 of $856,773 to the Reserve Fund | | | | |
|     was rescinded at the 1/9/86 Board meeting whereby a Final Refund of 13.9418% was declared payable from the $856,773 | | | | |
|     credit balance, determined as of 3/31/85 (plus accrued interest from 7/1/85). | | | | |
| (7) Surplus balance was transferred to Reserve Fund. | | | | |
| (8) The resolutions to close policy years 1949 through 1951 which were adopted at the 12/8/55 Board meeting were rescinded | | | | |
|     at the 12/20/55 Board meeting as follows: | | | | |
| | | | | |
| | | 12/8/1955 | 12/20/1955 | |
| | 1949 | 8.00% | 4.19% | Additional Assessment |
| | 1950 | | | Surplus to be transferred to the Reserve Fund |
| | 1951 | 6.00% | 4.25% | Additional Assessment |
| | | | | |
| (9) The surplus balance for policy years 1942 (8/20/42-12/31/42) through 1958 includes both assessable and non-assessable | | | | |
|     surplus balances. | | | | |
| | | | | |
| Source:  Minutes of the regular monthly meetings of the Board of Directors of the American Steamship Owners Mutual | | | | |
| Protection and Indemnity Association, Inc. and attachments thereto as well as Finance Committee Meeting minutes. | | | | |
| The bates stamped numbers of the documents referenced are listed on separate spreadsheet. | | | | |

CONFIDENTIAL
AC0086755

Rebuttal Expert Report of Richard H. Brown, Jr. –
Requesting exclusion in its entirety

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
AMERICAN STEAMSHIP OWNERS          :
MUTUAL PROTECTION AND              :
INDEMNITY ASSOCIATION, INC.,       :          (ECF Case)
                                   :
                Plaintiff,         :          04 Civ. 04309 (LAK) (JCF)
                                   :
        - against -                :
                                   :
ALCOA STEAMSHIP CO., INC., et al.  :
                                   :
                Defendants.        :
                                   :
-------------------------------------------------------------X


**REBUTTAL EXPERT REPORT OF
RICHARD H. BROWN, JR.
ON BEHALF OF PLAINTIFF**

TABLE OF CONTENTS

I.    Personal Experience ................................................................. 1

II.    Preparation and Scope of this Rebuttal Report....................................... 2

III.    Introductory comment on the issues in this case in relation to the
Coghlin Report. ........................................................................ 3

IV.    The principal shortcomings in Mr. Coghlin's Report are his failure to
describe adequately or consider the relevant American Club Policy and By-
Law provisions or to mention New York law. .................................... 5

V.    Mr. Coghlin errs as to basic concepts of P&I mutual club insurance
and he fails to make clear that the development of the practices of clubs in
England was accomplished through rule changes before 1989 and the
American Club did not adopt such rules until recently................................... 8

VI.    Mr. Coghlin misinterprets the effect of the American Club's "closing"
of policy years. ........................................................................ 22

VII.    Conclusion – As Mr. Coghlin's report relies upon irrelevant matters,
his opinions should be disregarded ............................................... 26

**REBUTTAL EXPERT REPORT**
**OF RICHARD H. BROWN, JR.**
**ON BEHALF OF PLAINTIFF**

I.    Personal Experience

My name is Richard H. Brown, Jr.  Submitted with this report as Exhibit A is my curriculum vitae which outlines my education and years of legal practice in maritime law from January 1955 until June 2003, with the New York firm of Kirlin, Campbell & Keating until the end of 2001 and thereafter of counsel successively to the firms of Hill, Rivkins & Hayden, LLP, and Nourse & Bowles, LLP, until June 2003.  As material to this matter, my most significant area of practice was my service as counsel to the American Club from 1982 until June 2002.

After retiring from the regular practice of law in June 2003, I learned in late May 2004 of the American Club's decision to commence the current declaratory judgment action.  I spoke on occasion with Lawrence Bowles on the subject and was sent drafts of various pleadings for suggestions from time to time.  I have not received and will not seek any compensation for the foregoing activity.

Also, in about May 2005 Mr. Bowles requested me to help out with another suit involving the American Club unrelated to this matter, but for which I will be compensated.  In that connection, only, I returned as counsel to Nourse & Bowles,

LLP, but attend at their office only very rarely, in connection with the above-mentioned unrelated suit. I also attended at their office in connection with the preparation of this report.

I gave deposition testimony as a fact witness in this matter in May and June 2005. That involved several days of reviewing documents at home and four and one half days of attending in New York for further review and the depositions themselves, plus reviewing the transcripts, for all of which I received $1,000.

In early December 2005, I was requested by lawyers for Plaintiff to review the Expert Report of Terence Coghlin and subsequently I was requested to prepare a Rebuttal Expert Report. I have not acted as an expert witness before. I am being paid a fee for this report by lawyers representing Plaintiff, based on a rate of $250 per hour for the preparation of this report.

II.    Preparation and Scope of this Rebuttal Report

In preparation for this report I have read or reviewed the following:

1.    Mr. Coghlin's Report with its exhibits.

2.    The articles and reports authored by Mr. Coghlin listed in the attachment to his report.

3.    Various UK Club rules and documents, copies of material portions being submitted as exhibits to my report.

4.    The exhibits to this report.

2

5.    A portion of the transcript of the deposition of Joseph Hughes adjacent to an excerpt appended as an exhibit to Mr. Coghlin's report.

This report is intended to serve as a rebuttal to Mr. Coghlin's Expert Report. I refer to his report by the citation "CR" and page number and to his exhibits by "CR Ex." with exhibit number. For my own exhibits, I use letters rather than numbers, thus Ex. A, B, etc.

III.    Introductory comment on the issues in this case in relation to the Coghlin Report.

In this litigation the primary issues are whether, in the unique circumstances of this case, the American Club is entitled under New York law to terminate its practice of reimbursing for incurred but not reported claims (IBNR) attributable to insurance years before February 20, 1989, or alternatively to take practicable appropriate steps to achieve equitable mutuality among its members, including reopening "closed" insurance years to assess their members for such claims. In view of the issues raised, Mr. Coghlin's Report is deficient in several crucial respects.

First, although he correctly recognizes that the terms under which a member can recover from the Club are found in the Club's Policy or By-Laws for the year(s) in which the occurrence(s) took place,[1] Mr. Coghlin barely mentions

---

[1] Mr. Coghlin writes: "The terms under which the member can recover his indemnity from the Club will be found in the Club's rules, By-laws or policy for the year or years in which the occurrence took place. (CR 10).

3

the American Club's relevant 1988 Policy (CR Ex. 8) and 1987 By-Laws (CR Ex. 12) which as material here are the same as the other pre-1989 Policies and By-Laws and entirely fails to quote their relevant provisions or discuss them accurately. As shown below, the express terms of the Policy and By-Laws are fatal to his argument.

Second, Mr. Coghlin does not even mention New York law or its applicability. As shown below, New York law is also fatal to his argument.

Third, having failed to address accurately (or at all) the relevant Policy and By-Law terms or New York law, Mr. Coghlin's Report concerns largely irrelevant matters, including (a) the practices and rules of unidentified English Clubs (inadequately explained), (b) the inapplicable post-1989 Rules and By-Laws of the American Club, and (c) his views on certain P&I club or mutual insurance concepts, some of which I consider mistaken and/or inapplicable to the American Club during the relevant time period. As set forth below, the history of the UK Club (Mr. Coghlin's own) and the history of the American Club show that these arguments are without merit.

In my view almost all of what he has written has no relevance to the issues in this litigation and some of it is inaccurate or incomplete. The complete information shows Mr. Coghlin to be in error.

4

IV.   <u>The principal shortcomings in Mr. Coghlin's Report are his failure to describe adequately or consider the relevant American Club Policy and By-Law provisions or to mention New York law.</u>

Mr. Coghlin states (CR 13) that "[a]lthough the Policy refers to the 'assessability' feature, the provisions relating to premiums, assessments, dividends and closure of years[2] are spelled out in the By-Laws." That statement and the Report's omissions fail to depict the true situation.

First, the Policy does far more than merely "refer" to assessablity. It expressly provides, as material here:

> ASSESSABILITY.   <u>The Assured are subject to a contingent liability hereunder for assessment without limit of amount for their proportionate share of any deficiency or impairment</u> as provided by law and fixed in accordance with the by-laws of the Association [Club] …

CR Ex. 8, p.2., emphasis added. Thus, the Policy itself (not the by-laws) expressly subjects the Assured to a contingent liability for assessment without limit of amount.

Second, in addition to the above-quoted Policy passage, page one of the policy provides that the (collective) Assured,

> … in accepting this policy agree that the party described above as "Policyholder" shall exclusively be entitled to the rights of a policyholder and member as set forth in the charter and by-laws of the Association …

---

[2] In fact the 1987 By-Laws do not mention, let alone spell out "closure of years".

CR Ex. 8, p. 1. The Policy and By-Laws are thus closely linked; if, as stated above, the named Policyholder is entitled to rights of a policyholder and member, his rights and the other Assureds are necessarily subject to compliance with their express policy obligation of being subject to a contingent liability for assessment without limit of amount, which is fully consistent with the By-Law provisions referring more generally to such liability (CR Ex. 12, Art. VI, Sec.1, Sec. 4(b), pp. BP001429-30).

Third, in stating as quoted above, (supra, 5) that "... the provisions relating to premiums [and] assessments ... are spelled out in the By-laws", Mr. Coghlin omits the fact that there are also provisions in the Policy itself for enforcing collection of premiums and assessments, including, inter alia, that if they are not paid the Club may cancel the policy and/or shall have no liability for claims under the policy (CR Ex. 8, p. 11, (Clause 28(b)). Indeed, this is the true "call collection machinery" (cf. CR 13, 20, 38), rather than the provisions of the By-Laws to which the Coghlin Report refers. Effectively, it directly links cover to being subject to a contingent liability for assessments, contrary to the theory of there being no such connection argued by Mr. Coghlin.

By omitting accurate reference to the Policy provisions the Report buttresses Mr. Coghlin's more general argument in support of his notion that the coverage provisions are "distinct" from the assessment provisions and therefore the American Club's obligation to pay claims is separate from (and somehow

independent of) the member's contingent liability for assessments[3]. (See CR 9, 10, 13, 38). That is simply wrong, as Mr. Coghlin himself seems to recognize elsewhere, supra n.1. If, as he there says "[t]he terms under which the member can recover ... from the club will be found in the ... policy ..." that can only sensibly mean all the policy terms, not only one term or select terms.

Another crucial shortcoming in the Report is found at CR 24 where Mr. Coghlin writes, that he knows "of no justification for" the Club's assertion in its Master Reply's Paragraph 51 that closure of an insurance year amounted to "a final statement of account and a mutual release" as between the Club and its members (see CR 23). Contrary to Mr. Coghlin's disclaimer of any such knowledge, at least considerable justification, indeed authority, is found in the New York cases of Hyde v. Lynde, 4 N.Y. 387 (1850) and Patrons of Industry Fire Ins. Co. v. Harwood, 64 App. Div. 248, 72 N.Y. Supp. 8 (3rd Dept. 1901). Those cases are cited and discussed, with copies included, in a deposition exhibit, Ex. AC 61 (submitted herewith as Ex. B, see esp. AC 0051589-92; 0066546-54) available to Mr. Coghlin (see CR 4); yet his Report does not mention their existence, let alone address them; instead as noted, he merely asserts that he knows of "no justification" for the Club's position outlined above (CR 24).

---

[3] For example, Mr. Coghlin asserts (CR 9): "there is transfer of risk from the member to the club at the inception of the policy when the percentage of total premiums and assessments a member must pay is fixed. That is plainly wrong in view of the American Club's policy provision quoted supra 5. Since the member is "subject to contingent liability for assessment without limit", "transfer of risk" is not absolute, but is contingent upon the member's meeting that contractual obligation.

In summary, Mr. Coghlin's Report never quotes key Policy and By-Law provisions and refers to them only in passing, thereby obscuring their importance. He does not mention New York law. He denies knowledge of any justification for the Club's position as to the effect of closing an insurance year, although the New York cases cited above (supra 7) certainly provide ample justification, whether Mr. Coghlin agrees with them or not; in any case he neither mentions nor discusses them. The foregoing omissions of relevant Policy and By-Law provisions and disregard of New York law are significant shortcomings in the Report, making it of no value in resolving the issues here.

V.    Mr. Coghlin errs as to basic concepts of P&I mutual club insurance and he fails to make clear that the development of the practices of clubs in England was accomplished through rule changes before 1989 and the American Club did not adopt such rules until recently.

In fairness to Mr. Coghlin, he was asked only to describe (1) the basic concepts of P&I club insurance, (2) how clubs are structured and normally operate, and (3) the types of claims covered and (4) to give his opinion on certain points made by the American Club. Setting aside item (4) for the moment, his discussion of the first three items is based chiefly on the practices of the English clubs, with which he is most familiar, and American Club rules adopted long after February 20, 1989; neither of those have significant relevance to the issues in this case compared to the American Club's Policy and By-Laws prior to 1989 and the applicable New York law. However, I will discuss some of the points he makes.

On the basic definition of the adjective "mutual" and ensuing discussion (CR 30-32) Mr. Coghlin does not mention the most essential element of the meaning as applicable to insurance. That may be found in a common dictionary definition as follows:

> Mutual (adj) ... 3. Designating or of a type of insurance in which the policyholders elect their own directors, share in the profits and <u>agree to indemnify each other against loss</u>

<u>Webster's New Universal Unabridged Dictionary (1983)</u>, emphasis added. In his Report, Mr. Coghlin ignores that definition's basic element of the members agreeing to indemnify each other, the heart of mutual insurance, and instead discusses what he calls "the call collection machinery" which is merely the method whereby the basic agreement to mutually indemnify each other is accomplished. In the American Club Policy that "machinery" is used to enforce the members' contractual obligation of being "subject to a contingent liability for assessment without limit of amount", <u>supra</u> 5, 6.

In this connection it is worth noting that Mr. Coghlin's other writings have recognized this key element of mutuality. In 1984, he described the history of the P&I clubs as stemming from the original hull insurance clubs which shared risks

> "... on a mutual basis, <u>each being at the same time an insured and insurer of others – still the basic concept of the present P&I clubs</u> despite the fact that they are now incorporated so that in law it is the Club and not the individual members who provide the insurance."

9

Ex. C, T.G. Coghlin, Protection & Indemnity Clubs, Lloyd's Maritime and Commercial Law Quarterly, Annual Index 1984, at 403, emphasis added. Similarly, in 1996 he wrote, as to P&I Clubs, "each shipowner member is in effect the underwriter [i.e., insurer] of all the other shipowners in his club." Ex. D, T.G. Coghlin, The P&I clubs limit exposure to catastrophe calls and claims, The International Journal of Shipping Law, Part 3, June 1996, at 131.

The foregoing basic concept of each member being both an insurer and insured is significant because, as Mr. Coghlin notes, the capital is provided by the shipowner members by paying premium and assessments as needed to meet outgoings, including payment of claims, and "break even" (CR 14). Since the provision of premium and assessment (and interest they may earn) is the only source of capital to pay claims it is essential that the members' mutual obligations be met for each insurance year and as among different years; otherwise the fundamental principle of mutuality will be impaired, and some members will be treated unfairly[4]. Even more significantly, to absolve certain members of their Policy obligation to be subject to "a contingent liability for assessment without limit" at the expense of others in the same year or different years would breach the contract of insurance.

---

[4] Mr. Coghlin argues at length (CR 32-36) that the Club's setting a "bright line" (CR 32) at February 20, 1989 results in unfair treatment of the pre-1989 year members vis-à-vis the post-1989 year members. I disagree. He completely overlooks the fact that the pre-1989 year members have already received the very substantial benefits of reimbursement of IBNR occupational disease claims in an amount far exceeding assessments paid for such claims in the pre-1989 years (see CR Ex. 5, p. 6 ¶11). The Club has not asked for return of that excess. Quite apart from the Club Board's right to set an appropriate date in the circumstances, there is no unfairness.

10

In arguing (CR 25-27) that policy years are not "ring-fenced" (self-supporting), but are subsidized by other years, Mr. Coghlin fails to make it clear when and how that came about for the English clubs as compared to the American Club, particularly with reference to the relevant time period prior to February 20, 1989. During that time period the English clubs through new rules were changing radically from a more purely mutual concept to what Mr. Coghlin characterizes as one taking into account "modern commercial realities" (CR 32) so that they "now operate very differently from the way they did in [the] early years" (CR 31, and see his broad discussion, CR 31-32). However, Mr. Coghlin fails to make it clear that these changes were not the inevitable product of natural growth. They were effected by express changes to the English clubs rules, which were not made by the American Club until many years later, long after 1989.

The process in England may be illustrated by the experience of the United Kingdom P&I Club ("UK Club") with which Mr. Coghlin was long associated in his capacity as employee, later partner, at Thos. R. Miller & Son ("Millers"), the UK Club's manager. I attach as Exs. E-I, certain UK Club rule excerpts and other documents relevant to this discussion. In order, the following appears:

    (1)    The 1965 Rules, at Rule 7, provided for the raising of funds only by means of advance and supplementary calls on each year's members, and for closing a year, it being left to the Committee's [or Board's] discretion whether to carry any surplus to reserves or

to return it in whole or in part to the persons contributing thereto. (Ex. E)

(2)    A note or circular near the end of 1965 (coincidentally the year Mr. Coghlin joined Millers) dated 28th December 1965 in which the UK Club's Committee states in paragraph (2) as follows: (a) what the Committee regarded as being in [informal] practice the final calls had already been made for the 1959/60 - 1962/63 policy years, any of which might be in deficit when finally closed, (b) the Committee acknowledged that the time was approaching when a formal closing of insurance years would become possible for the first time, (c) existing Rule 7 included no power enabling the Committee to make a call on an open year specifically directed to meeting a closed year deficit and (d) the Committee proposed a change in Rule 7 to give it that power by a "Special Resolution", copy attached (Ex. F).

(3)    The 1966 Rules, incorporating the above-mentioned new Rule 7(1). (Ex. G)

(4)    The 1969 Rules, in which Rule 12 (successor to Rule 7) provides for contributions from members, but now specifically exempts closed policy years from contributions and retains the specific

12

power to make calls on open years in respect of closed years, and in Rule 16 leaves to the Directors' decision whether to return any excess contributions to closed year members. (Ex. H)

(5)    The 1980 Rules, including Rules 12 and 16 making the same provisions as to closed years, with a note entitled "ALTERATION OF THE RULES OF THE ASSOCIATION" proposing a revised set of rules in a different format but continuing the old Rule 12 provisions and clarifying and expanding them in new Rule 19; new Rule 25 performs a similar function for old Rule 16 but modifies it along the lines described in the accompanying note; and in particular new Rule 25(B) specifically makes it clear that no further calls could be levied on a closed year and (C) gives specific authority for providing for a closed year deficiency in three ways, including transferring funds from (1) reserves or (2) any closed year credit balance, or (3) making calls on open years. (Ex. I)

During the same time period, the American Club did not make any corresponding changes in its insurance policies and by-laws. It had no rule or by-law providing authority for closing an insurance year (formally or informally) or exempting members of closed years from further assessments (calls), or authorizing making up closed year deficits from other funds or open years, or to

13

leave to the discretion of directors whether to return excess assessments to members of closed years, all of which the UK Club had authorized by specific new rules.

In addition, the American Club was not closing years only a little over three years after opening, as were the English clubs (CR 21), when the final result for the year would necessarily be little more than an educated guess, nothing more being needed since the English clubs could retain excess calls and deficits could be covered from other funds; instead the American Club was keeping years "open" for about 7-11 years after opening and being "closed" only by levying "final assessments" or making "final refunds" (see CR Exs. 13 and 20: 1987 with final refunds for 1976 and 1978 years and 1988 with final refunds for 1977, 1979, and 1981 years), when the year's final results for known claims could be more accurately determined. Nor, unlike the UK Club, did the American Club leave it to directors' discretion to dispose of excess assessments (calls) but under its interpretation of New York law the directors invariably refunded excess assessments (as distinguished from initial premium) to the year's members (see CR Ex. 20, p. AC 3061180).

In short, over the material time period the American Club was acting far more like a true mutual than the UK Club and apparently the other English clubs, from what Mr. Coghlin has written. In his aforementioned 1984 article, Ex. C at pp. 415-16, he wrote:

14

> ... many clubs have now developed <u>in their Rules</u> machinery which, through a special reserve or otherwise, allows surpluses in respect of one or more good years to be used to reduce the deficit in any year with an exceptionally bad claims experience, and thus smooth these fluctuations to an acceptable extent. <u>The consequent subsidy of one year by another</u> in the search for reasonable stability of total costs <u>represents a departure from the original concept of each Club year being a watertight entity</u> ... which is considered by many clubs to outdated now that club calls are for some members equivalent to the cost of their hull insurance.

(emphasis added).

Thus, Mr. Coghlin himself has recognized that the evolution of the English clubs from the "original concept of each club year being a watertight entity", i.e., more truly mutual, was accomplished only by specific changes in rules. However, the American Club made no such changes. Despite the Board's power to assess in respect of any deficiency or impairment (Policy, <u>supra</u> 5) or to retain sums as deemed necessary for maintenance of reserves and, surplus (CR Ex. 12, p. BP001430) each of the American Club's policy years remained in substance very much a "watertight entity" with deferred "closings" of policy years and substantial refunds to members for those years. It was not until well after February 20, 1989, after it had become a reinsured member of the International Group (IG) that the American Club changed its rules in such respects.

Going to a rule rather than a policy format, the American Club's 1997 – 98 Rules (CR Ex. 2) for the first time expressly provided the directors with authority

during any insurance year, or thereafter, to set aside sums as they deemed necessary or proper to be added to a reserve fund of the Club (Rule 4, Sec. 9) and, subject to provisions for Overspill Calls, the power to "declare" a year "closed for assessments, after which no further assessments shall be levied in respect thereof" (Rule 4, Sec. 11).

For the 2005 –06 year the American Club made a further change in its Rules to come into full accord with the other clubs in the IG, by expressly authorizing making up deficiencies in a closed year (commencing no earlier than February 20, 1989) by (1) transferring funds from reserves, (2) transferring credit balances in different closed years[5], or (3) assessing an open policy year or years. The background of this last change is instructive. When the IG learned of the American Club's decision in June 2004 to discontinue the "Discretionary Practice" (which gave rise to this litigation) it appointed a Working Group (WG) to review the situation. On October 7, 2004 the American Club received the WG's report (Ex. J); inter alia, the WG reported that most, but not all, IG clubs had rules expressly giving their boards the right to levy calls on an open year to provide funds for that year and also for other years, including closed years, and to provide funds for reserves generally; the WG considered it was essential that all clubs operate on a similar basis to each other in this respect and recommended to the IG that it seek immediate confirmation that all clubs' Boards have the right through

---

[5] I understand this provision (No. 2) will be deleted in future years.

rules or operation of law to levy supplementary calls on open years on an unlimited basis for any purpose, including funding of closed years, and that if any club could not so confirm "it should be required to make a rule change to enable it to do so forthwith". (Ex. J, p. 2).

Accordingly, in the view of the WG (i.e. experienced, knowledgeable, and objective observers), in the absence of clearly enabling law, a rule change was required, providing objective confirmation of the view that a mutual club's funding of one year by another could be legitimately accomplished only by rule change, as the UK Club and evidently other English clubs had previously done.

I would note here that those American Club rule changes were clearly prospective and do not affect the obligations and rights of the parties to the present litigation which were fixed by the contractual provisions in force before February 20, 1989.

In arguing that each American Club year does not stand on its own financially, Mr. Coghlin states (CR 28):

> ... the American Club is and has historically been no more of a slave to the concept of each policy year standing alone financially than any other of today's P&I clubs...

and gives as supporting examples 16 unnumbered "bullet points" (CR 28-30). Of these, 13 on their face concern the time period after February 20, 1989 and are inapplicable to the relevant period and the issues here. Of the remaining three:

17

(1) the comment on Mr. Hughes' views (CR 29, first point) seems also to refer to the post-February 20, 1989 period and Mr. Hughes also testified as to his understanding that "each year [before 1989] stood as a separate accounting year... and had to be funded accordingly," see Ex K, Hughes Tr. at 283-84, page 284 having been omitted by Mr. Coghlin.

(2) it is unclear what the third point on CR 29 is meant to prove, but once <u>known</u> claim reserves have been set and the year "closed" the American Club, in responding to those claims takes the risk that the reserve may be too low and correspondingly is entitled to any benefit if a claim is settled for less than the reserve, a practical longstanding fair practice which does not impair mutuality (this has nothing to do with IBNR occupational disease claims which were unknown and thus unreserved-for when the relevant years were closed) ;

(3) as to CR 29, fifth point, in fact John Sandercock's memo was dated February 10, 1999, almost ten years after the February 20, 1989 date and is inapplicable to the issues here.

Mr. Coghlin's above-quoted statement (<u>supra</u> 17) is only half true. The American Club is <u>now</u> "no more of a slave to the concept of each policy year standing alone" than the other P&I clubs. We have seen how, as a result of IG requirement, the American Club adopted its 2005-06 rules as to funding deficiencies in closed years.

In contrast, the second half of Mr. Coghlin's quoted assertion, that the American Club "<u>has historically been no more of a slave</u>" (emphasis added) to the stand-alone policy year concept, is not true. In addition to the thinness of his

"bullet points" as support for that proposition, the evidence is very clear that during the material time period the American Club was very much more of a "slave to the concept of each policy year standing alone" than the other P&I clubs.

To demonstrate that, one need do no more than compare the American Club's approach with that of the UK Club during the relevant time. We have already seen, supra 11-13, how by certain rule changes the UK Club had changed from the "original concept of each Club year being a watertight entity", as Mr. Coghlin has written (supra 14-15), while the American Club had not, supra 13-14. Moreover, in addition to those points of difference, it is evident that the UK Club during the material years was building up reserves for future use by assessing members of each policy year[6]. See CR Ex. 25, a 1995 facsimile transmission from A. Bilbrough & Co. Ltd. (manager for the London P&I Club) to the American Club's manager which includes at pp. AC 0054299-301 an interesting description/analysis of the UK Club Contingency and Catastrophe Reserve Funds. For our purposes, the leading points to note are:

(1) The Catastrophe Reserve Fund was begun in 1972 to protect against possible future catastrophic claims by allocating $549,000 from the 1970 supplementary call; it grew by allocation of 2.5% of all calls, relevant investment income and gains and transfers from reinsurance

---

[6] The authority to make calls on members to build up reserves was also established by specific rule changes. (See, e.g. the UK Club's 1981 Rules 19 and 24, Ex. I.)

surpluses until by February 20, 1982 it stood at about $61 million. In 1982 allocation of calls to the Catastrophe Reserve ceased.

(2)  On February 20, 1983, $35.6 million was transferred to the Contingency Account to allow a transfer to be made from the Contingency Account to the 1979 Policy Year of $60 million. On February 20, 1985 a further $10 million was transferred to the Contingency Account.

(3)  The Contingency Account was created in 1974 with the stated intention that it should be available to protect members from an unexpectedly high supplementary call should an exceptionally bad year develop. By February 20, 1975, from a combination of surplus resulting from reinsurance, closed year surpluses, and investment gains, the balance stood at about $23 million.

(4)  In 1977, it was stated that on the formal closure of a policy year, future investment income is automatically transferred to the Contingency Account, immediately adding the investment income from closed years 1969-73. In 1978, $31 million was transferred to close the 1979 Policy Year. In 1982, over $33 million was transferred to close the 1978 Policy Year. Over the following years, further very large sums were transferred to close the 1979 and 1980 Policy Years, virtually wiping

20

out the Account, but very large investment returns built it up to about

$200 million by February 20, 1990.

(5) Over the next three years the balance was reduced to about $25 million

due to large transfers to the 1987, 1988 and 1989 Policy Years.

Thereafter very high supplementary calls were levied or posted for the

1990, 1991 and 1992 Policy Years, in part because the Contingency

Account was effectively exhausted.

By use of such arrangements as described above, the UK Club very largely

eroded the concept of each year being a "watertight entity" (self sufficient). [7]

However, during the corresponding time frame material here, i.e., the period

before February 20, 1989, (and indeed for some years thereafter) the American

Club had not established similar reserve funds and instead substantially adhered to

the original concept of each year being a "watertight entity." Equally

significantly, the UK Club (and presumably others) obtained the informed consent

of the members of each year thereafter to be assessed (a) to meet deficiencies in

closed years and (b) to build up club reserves for the above-described purposes.

The American Club did not.

---

[7] This is not to suggest that the UK Club's arrangements were at all improper. However, they were significantly different from those of the American Club, which, in addition to the points developed supra 11-15, had not assessed its members to establish similar funds during the material time.

21

VI.    Mr. Coghlin misinterprets the effect of the American Club's "closing" of policy years.

Mr. Coghlin argues (CR 21 – 24, 36 – 39) that closing a policy year simply leaves the member no longer liable to pay assessments or entitled to refunds, but that the member is entitled to recover from the club for both (1) claims known at the time of closing and (2) unknown claims for which no or insufficient funds had been received by assessment before closing. The American Club agrees that as to category (1) known claims should be paid without further assessment or refund, but argues that as to category (2) the Club has no obligation to pay such unknown claims because the closing was effectively a final settlement of accounts for the year, but in the alternative if there is an obligation to pay such unknown claims the Club is entitled to levy further assessments on the members of the relevant closed year(s) to cover their cost, which would be required to achieve mutuality for the relevant year and as among all years.

Mr. Coghlin's opinion is based in part on his view that somehow the assured's right to cover is so divorced from his contingent liability to pay assessment without limit that the latter has ceased to have any effect – in other words a partial one-way "closing". This disregards the principle of New York law that the policy (under which the policyholder claims) must be read as a whole and all its provisions given effect, including here the contingent liability for assessment without limit; indeed there is such a contingent liability for each of the relevant years' members. But Mr. Coghlin would also contend based on the

22

"understanding" of other (English) clubs, that the "closing" of the year operates to cancel the Policy assessment obligation, but the coverage clauses, part of the same Policy, can be enforced. This overlooks the fact that the UK Club (and apparently others) by express rules authorized directors to close a year and also provided that there would be no further calls on such closed years, which were to be funded from other sources, including open years. Those rules would explain such a "general industry understanding" [in England], including Mr. Coghlin's (CR22). However, particularly since the English changes were effected by express rules, Mr. Coghlin's understanding has no relevance in this litigation, which concerns the contractual rights of the parties before February 20, 1989, and the American Club had no such rule before 1997.

Finally, on this point, since "closed" without any qualifier or modifier, was used to describe the "closing" of an insurance year, it can reasonably be understood as meaning "closed in all respects" in the context of the American Club's Policy, By-Laws and practice during the relevant time period. The special limited meaning attached to it by Mr. Coghlin as being "consistent with general industry understanding" is based on the above-mentioned development by rules in England making arrangements to cover deficiencies in closed years from other sources including open years, which the American Club did not effect until 1997. Adapting Mr. Coghlin's phrase, *"closed means closed"* (CR 22), to the American Club situation, "closing" can reasonably be taken to mean "there will be no

additional claims or additional assessments (or refunds) and the known claims will be reimbursed." In other words the "closing" would be a genuinely complete closing, i.e., a final settlement of accounts for the insurance year, as the American Club contends in connection with seeking the primary relief for which it has filed this action.

The American Club's alternative position is that, if there has not been such final settlement of accounts, the "closed" years should be reopened only to fund unknown and inadequately assessed-for claims and assessments must be levied accordingly. One compelling reason for refusing to accept Mr. Coghlin's position is that it disregards the factual situation under which the American Club Board took action. The American Club By-Laws provided, at CR Ex. 12, p. 10, Art. VI, Sec. 4, as the predicate for issuing either a final dividend or final assessment that the manager

> ... determine that it is practicable to estimate with a reasonable degree of certainty the minimum, probable or final surplus or deficiency resulting from all of the [Club's] insurances in effect during such insurance year.

The Club's manager made such a determination prior to the "closing" of each insurance year before 1989. However, in light of what subsequently actually occurred, namely the belated surfacing of many and costly asbestos claims, that determination was mistaken in fact. Had those claims been timely known in the way of ordinary injury claims prior to "closing", it is obvious that they would have

24

been reserved-for, and the Board would have increased assessments against the relevant years to fund such reserves. That was not done solely due to the above-mentioned mistake of fact.

In the case of <u>Hyde v. Lynde</u>, copy in Ex. B and cited supra 7, the New York Court of Appeals, in refusing to set aside the transaction involved, said (at 4 N.Y. 393):

> ... So far as appears, the parties knew at the time of settlement, of all the claims upon the company for losses, and all the facts in relation to the claims, as fully as they do now, and if they made a mistake in judgment, either one way or the other, it would not invalidate the settlement.

However, the Court expressly pointed out that an otherwise binding settlement could be set aside on proof of fraud or mistake (at 390), subsequently further described as:

> ... such a mutual mistake about some matter of fact, as would be sufficient to set aside any other settlement of differences between parties having conflicting interests ... (at 391).

The foregoing holding and language are clearly applicable to this matter. That is, arguably there was a final settlement of accounts by virtue of "closing" the years involved before 1989 but, if not, the years should be reopened on the ground, at least of mutual mistake of fact in respect of the asbestos and other occupational disease claims unknown and unassessed-for at the time of "closing".

VII.    <u>Conclusion – As Mr. Coghlin's report relies upon irrelevant matters, his opinions should be disregarded.</u>

Although Mr. Coghlin's last paragraph includes a statement that the "terms on which cover is provided are set forth in the American Club's insurance policy" (CR 40), unfortunately he fails to consider all the relevant terms of the Club's Policy or By-Laws or any of the applicable New York law.  Instead, most of his Report concerns club practices based on rules inapplicable to the American Club during the relevant time and arguments reflecting his misconceptions of the issues in this case.  As a consequence, his Report is of no value in resolving those issues.

December 30, 2005.

Richard H. Brown, Jr.

Rebuttal Expert Affidavit of Richard H. Brown, Jr. –
Requesting exclusion in its entirety

Nourse & Bowles, LLP
One Exchange Plaza
New York, New York 10006
(212) 952-6200

Sullivan & Worcester LLP
1290 Avenue of the Americas
New York, New York 10104
(212) 660-3000
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
:
AMERICAN STEAMSHIP OWNERS    :    04 Civ. 04309 (LAK)(JCF)
MUTUAL PROTECTION AND    :
INDEMNITY ASSOCIATION, INC.,    :
:    **REBUTTAL EXPERT AFFIDAVIT**
Plaintiff,    :    **OF RICHARD H. BROWN, JR.**
:
- against -    :    **SUBMITTED BY PLAINTIFF IN**
:    **SUPPORT OF THE AMERICAN**
ALCOA STEAMSHIP CO., INC., et.al.,    :    **CLUB'S CASE IN CHIEF**
:
Defendants.    :
-----------------------------------------------------X

STATE OF NEW YORK    )
) ss.:
COUNTY OF NEW YORK    )


Richard H. Brown, Jr., being duly sworn, deposes and says:

Bases For Opinions

1.    I submit herewith, as Exhibit 1, a copy of my curriculum vitae, stating my

education and experience.  The opinions and statements herein are based on: (a) my

knowledge of and experience with American Steamship Owners Mutual Protection and

Indemnity Association, Inc. ("American Club" or "Club") during twenty years of service

as counsel to the Club, most of that time as a director also, between 1982 and 2002;

(b) documents produced or marked as trial exhibits in this action; and (c) testimony of

witnesses and fact affidavits submitted herein.  I submit this affidavit primarily in rebuttal

to the affidavit of Defendants' expert witness, Terence Coghlin.  I expect to be

reimbursed for my work in preparing this affidavit at the rate of $250 per hour.

2.    Under date of 21st October 2005, Terence Coghlin submitted his expert

report in support of Defendants' positions (Trial Exhibit DX-IJ).  On December 30, 2005,

I submitted my rebuttal expert report and exhibits (Trial Exhibits PX-307 and PX-308,

respectively) stating in some detail why I thought his report was of no value in resolving

the issues in this matter.  In brief, I wrote then that Mr. Coghlin had failed to adequately

consider, indeed barely referred to, the American Club's mutual indemnity insurance

policy and by-laws (the most significant relevant documents) and did not mention the

governing New York law.  Instead, he largely relied on generalizations and his views

about P&I insurance (some not accurate) and the experience of P&I clubs (chiefly

English) which had developed rules and practices differing from the American Club's, all

of which was irrelevant in my view.  (See, PX-307.)  I respectfully refer the Court to both

- 2 -

of those reports (DX-IJ and PX-307) and shall not repeat the material in PX-307 except as necessary to respond to Mr. Coghlin's recent affidavit.

<u>The Relevant Policies And By-Laws</u>

3.    Since this is a contractual matter arising in unique circumstances, it is necessary first to consider the documents evidencing the contract among the parties. These include the Club's charter and by-laws and the annual mutual indemnity insurance policies issued to members. The most immediately relevant are the policies and by-laws. The applicable Club policies provide:

> ASSESSABILITY: The Assured are subject to a contingent liability hereunder for assessment without limit of amount for their proportionate share of any deficiency or impairment as provided by law and fixed in accordance with the by-laws of the Association [Club] ...

Exhibit 1 to Joint Pretrial Order, p. AC4053452. Thus, any claim under the policy against the Club is subject to <u>all</u> of the policy terms, including, but not limited to, the above-quoted assessability provision.

4.    The by-laws provide, <u>inter alia</u>:

> For the purposes of declaring dividends and making assessments the business of the Corporation [Club] shall be divided into insurance years ...

PX-109, Art. VI, Sec. 3, p. BP001429. Under that provision, members for a given insurance year may be assessed to cover claims in that insurance year but those who were not members for that year cannot be required to pay assessments for claims in that year. Mr. Coghlin repeatedly acknowledged this point at his deposition (Deposition Transcript

of Terence Coghlin, dated January 12, 2006 ("Coghlin Tr." p. 198, l. 17-38; p. 203, l. 6-9 at 243-4, l. 15-21).

     5.    The by-laws do not mention "closing" of insurance years.  However, they provide, in Article VI, Section 4, as relevant:

> SECTION 4.  From time to time after the termination of each insurance year, <u>when the manager shall determine that it is practicable to estimate with a reasonable degree of certainty the minimum, probable or final surplus or deficiency resulting from all of the Corporation's [Club's] insurances in effect during such insurance year</u>, the manager shall place before the board of directors a statement of such financial results of such insurances, segregated between assessable and non-assessable business.  After receipt of any such statement, the board of directors from time to time may (a) fix and determine an amount to be declared and paid as a partial or final dividend, after retaining such sums as they may deem necessary to meet outstanding policy obligations or for the maintenance of reserves and surplus of the Corporation, or (b) order an interim or the final assessment to be made against the holders of assessable policies ... Any dividend declared or any assessment levied shall be based solely on such surplus or such deficiency, respectively, resulting from the assessable business for the insurance year.  All dividends declared and all assessments levied shall be distributed or spread in the ratio that the net premiums paid by the holder of an assessable policy bear to the net premiums paid by all holders of assessable policies for the insurance year.  ...  In any case, however, all actions of the board of directors in respect of dividends or assessments shall conform with the Law and with the Charter and By-Laws of the Corporation.

PX-109, p. BP001430, emphasis added.  The Club's board or counsel would, however, frequently use the word "closed" in referring to years as to which the board acted to declare final dividends or make final assessments.

6.  The parties dispute the effect of such actions or such "closing". Plaintiff Club has asserted that either:

(a)  the "closing" is literally complete and the Club will pay the "known" claims (i.e., those whose costs could be estimated with a reasonable degree of certainty at "closing") without further refund or assessment even if the assessments prove to be insufficient, but need not pay "unknown" claims (i.e., those whose costs could not be estimated with a reasonable degree of certainty at "closing")[1], nor, of course, would there be any assessments for such unknown claims not paid by the Club, or

(b)  there is a "closing" only with respect to known claims, and those will be paid without further assessment, but unknown claims should only be paid under the policy, subject to all policy terms, including the assured's contractual contingent liability to pay assessments.

Defendants contend that the Club must pay all claims, known and unknown, without any further assessment, i.e., the year has been "closed" only with respect to the members' contingent liability for assessment without limit, but not with respect to the Club's obligation to respond to unknown claims – a partial "one-way" closing.

---

[1] For later economy of words, in the balance of this affidavit, I will use (without quotation marks) "known" and "unknown" in the special sense that "known" refers to claims which practicably could be and were estimated for reserve/assessment purposes prior to closing and "unknown" refers to those which could not be or were not thus estimated and therefore were not included in calculating assessments for years being closed. The "unknown" claims might, for example, include such claims as complaints for ODC's filed in court which are now under administrative dismissal in the multi-district litigation in the Eastern District of Pennsylvania pending possible return to the active docket if there is adequate proof of asbestos-caused disease/injury. The existence of such claims might have been "known" in the word's ordinary sense, but their outcome could not have been practicably estimated with a reasonable degree of certainty and therefore I label them "unknown" for discussion purposes. Certainly, "unknown claims" include claims that were not reported at all, even though, for eleven of the years in question (1977 and 1979 – 1988), an arbitrary sum of $100,000 per year was added to the reserve account in the expectation that such claims might be made in the future. I understand that the members for those years have to date received more in indemnities regarding their Closed Year ODCs than the aggregate they contributed.

7.  <u>Analysis</u>.  The predicate for the Board determining a final dividend or making a final assessment is that

> the Manager shall determine that it is practicable to estimate with a reasonable degree of certainty the ... final surplus or deficiency ... [for the] ... insurance year.

The most (indeed the only) reasonable interpretation is that the Manager's determination and the board's subsequent "final" action must relate only to claims known at the time of the Manager's determination as to which it was practicable to estimate the final surplus or deficiency "with a reasonable degree of certainty," because only a final surplus or deficiency due to such <u>known</u> claims can be estimated "with a reasonable degree of certainty." It is self-evidently impossible to estimate with a reasonable degree of certainty the final surplus or deficiency due in whole or in part to unknown claims. Otherwise expressed, it would literally be impossible to make such a determination if unknown claims are taken into account. This leads to the logical and realistic conclusion that any such "final" action by the Board and "closing" of an insurance year could be final only with respect to known claims. Such action or "closing" in the context of this "reasonable degree of certainty" requirement should have no effect on unknown claims. Since the results of such unknown claims could not practicably have been estimated with a reasonable degree of certainty, they clearly should not be included in the "closed" category, and the Club's liability for them should be determined under all of the policy's terms, including the assureds being subject to a contingent liability for assessment without limit of amount.

8.    Moreover, the foregoing interpretation is required in order to comply with the by-law provision, <u>supra</u> 3, ¶ 4, mandating that the business of the Club be divided into insurance years.  If Defendants' contention were to be accepted, the costs of the unknown claims arising in closed years would improperly fall on members for other, open years, instead of the members for the years in which the claims arose, plainly contrary to the requirement that the Club's business be divided into insurance years.  On the other hand, if this Court rules that the Club must pay indemnities on Closed Year ODCs but may assess closed year members, the Club would remain responsible for paying the known claims in closed years for which assessments had already been paid by those years' members, but as to the unknown claims, for which no such assessments had been levied, the Club would be responsible only under all the terms of the policies, which would include the assureds being subject to a contingent liability for assessment.  Under by-law Art. VI, Sec. 3, <u>supra</u> 3, the Club is entitled and required to assess the members of the relevant insurance years, and the liability of the Club in respect of each claim should not exceed the total assessments thus collected.  This would be fully in accord with the foregoing by-laws and policies.  Any other course of action would unjustifiably impose a burden on members for other years, contrary to the by-laws.

9.    The foregoing is clear simply from the terms of the above-quoted by-laws, but there is also clear evidence that such an understanding was fully recognized and more concretely expressed in the earlier resolutions of the Club's board.  At a board meeting on

June 11, 1942, the board "finally" closed four insurance years using the following resolution:

> WHEREAS, it is deemed desirable by the Board that the insurance year commencing February 20, 1938 and ending February 20, 1939; the insurance year commencing February 20, 1939 and ending February 20, 1940; the insurance commencing February 20, 1940 and ending February 20, 1941; and the insurance year commencing February 20, 1941 and ending February 20, 1942 be finally closed as between the Association and its respective members for said insurance years; and

> WHEREAS, it is impossible now to determine exactly the outstanding [i.e., unresolved or unsettled] liabilities of said insurance years, and the final settlement of all such outstanding [i.e., unresolved or unsettled] liabilities cannot be pressed to an early conclusion;

> NOW, THEREFORE, BE IT RESOLVED that the insurance year commencing February 20, 1938 and ending February 20, 1939; the insurance year commencing February 20, 1939 and ending February 20, 1940; the insurance commencing February 20, 1940 and ending February 20, 1941; and the insurance year commencing February 20, 1941 and ending February 20, 1942, be finally closed as of June 30, 1942; and be it

> FURTHER RESOLVED that all cash, securities and other assets in the possession of the Association, and credited to the aforesaid insurance years, be and they are hereby transferred to and made a part of the Reserve Fund of the Association, and that no further assessment for any of the said years be made, but that the liabilities of the Association for indemnification to the members for any outstanding [i.e., unresolved or unsettled] claims arising during said insurance years shall be charged against the Reserve Fund of the Association; and be it

> FURTHER RESOLVED that the members for said insurance years shall have no further liabilities for the unsettled claims of said years, and the Association shall have

> no further liabilities to the members for any claims
> whatsoever, except for indemnity under the terms of the
> insurance protection accorded to the members by the
> Association; and be it
>
> FURTHER RESOLVED that the Managers be and
> hereby are instructed to send copies of this resolution to the
> members of the Association of said insurance years.

PX-1-A, at p. AC3004255, emphasis added. The explanatory notes in brackets are

inserted to make it clear that in context "outstanding" can only mean "unresolved" or

"unsettled", as confirmed by the use of "unsettled" in the fifth paragraph. Webster's New

Collegiate Dictionary (1981) gives "unpaid" and "unresolved" as synonyms for

"outstanding". Accordingly, the "outstanding liabilities" must refer to known, but

unsettled, claims, in respect of which members will have "no further liabilities" for

assessments. The underscored statement in the fifth paragraph can only sensibly refer to

unknown claims, as to which the Club shall have no further liability except for indemnity

under the terms of the insurance protection accorded to members, i.e., under the policies,

which expressly subject assured (who were members for the relevant years) to a

contingent liability for assessment without limit of amount.

10. The above-described resolution of the June 1942 board is clearly fully

consistent with a reasoned understanding of the terms of the contract (policies and by-

laws) described supra ¶ 7, p. 6 (the "¶ 7 Analysis"), in that it gives effect to both of the

salient contractual provisions in dispute here – i.e., both the members' right to indemnity

and the members' contingent liability for assessment without limit of amount. The

resolution and ¶ 7 Analysis are also fully consistent with the Club's alternative (b), supra

5, ¶ 6, (i.e., if the Club is liable for claims first presented after a year is closed, the Club

may assess members for that year) which would also give effect to both contractual

provisions. The Club's alternative (a) (i.e., once a year is closed, members from that year

cannot present new claims) also is internally consistent in the sense that it would give

complete effect to a literal interpretation of "closing", paying known claims without

further assessment and, considering the year fully closed, neither paying nor assessing for

unknown claims. The Defendants' argument that the claims presented after a year has

closed are payable, but the Club has no right to assess members in that year for such

claims, however, is inconsistent with the board resolutions quoted above, the Club's by-

laws, and the ¶ 7 Analysis. Moreover, Defendants' position is internally inconsistent in

that it would require the Club to pay for unknown claims under the policy, but absolve

the members for the relevant years from their contingent liabilities for assessment without

limit of amount under the same policy, i.e., an unfairly incomplete "closing", improperly

giving effect to only part of the contract. The Defendants' position would unjustifiably

make the Club liable for an unlimited, unknown number of unknown claims at an

unpredictable and unlimited cost, with the Club arbitrarily deprived of its contractual

right to subject the relevant years' members to the assessments for the costs of such

unknown claims and forced to assess to impose such costs on members for different

insurance years, unrelated to the relevant years, contrary to by-law Art. VI, Sec. 3, supra

3.

11.  The June 1942 board meeting, at which the above resolution, supra ¶ 9, pp. 8-9 was approved, included a Mr. Kurz as a member who represented Keystone interests (including Chas. Kurz & Co., Inc.) and describes Marine Transport Lines, Inc., Defendants herein, as evidently among the members to whom copies of the resolution were to be sent. (See, PX-1A, pp. AC3004250, 52, 53.)

12.  At a June 14, 1945, board meeting a resolution was adopted "finally" closing insurance years (or periods) from February 20, 1942, to December 31, 1942, using language substantially identical to that quoted in ¶ 9, pp. 8-9 above.  Mr. Kurz was again listed as a board member present. (See, PX-1, pp. AC3005538, 45, 86.)

13.  At a November 13, 1947, board meeting a resolution was adopted "finally" closing insurance years 1943, 1944, and 1945, using language substantially identical to that quoted in ¶ 9, pp. 8-9, above.  The accounts for the closed years state, "none", for "Losses Unreported (Net)," indicating no reserves for unknown claims and thus confirming that such claims were to be covered under the policy terms, which include the members' contingent liability for assessments. (See, PX-2, pp. AC3006880, 93-97.)

14.  At a board meeting of November 8, 1951, the board closed insurance years 1946, 1947, and 1948 by means of a resolution substantially identical to that quoted supra ¶ 9, pp. 8-9.  The accounts for the years thus closed state "None" for "Losses Pending – Unreported," indicating no reserves for unknown losses, which is fully consistent with the resolution leaving unknown claims to be resolved under the policy terms, including the members' contingent liability for assessments. (See, PX-3, pp. AC3011196, 243-45.)

15.  At a board meeting on December 20, 1955, the board closed insurance years

1949, 1950, and 1951 using a resolution somewhat amended by counsel, but in substance

and effect identical to that quoted supra ¶ 9, pp. 8-9, as further liabilities for "outstanding

[unsettled] claims", were to be charged against the Reserve Fund without further

assessment and the Club was to have no further liabilities "for any claims whatsoever,

except for indemnity under the terms of such insurance policies held by such members."

Such terms include the members' contingent liability for assessment.  Mr. Kurz of

Defendant Keystone and Mr. Lewis who represented Defendant Farrell Lines

Incorporated were at the board meeting.  See, PX-5, pp. AC3010529-31.  A letter from

counsel (Kirlin, Campbell & Keating, hereinafter "Kirlins") dated December 16, 1955,

provided a draft of the amended language of the resolution which the board adopted.

(See, PX-5, pp. AC3010548-50.)  Mr. Coghlin reviewed that letter, making a note about

it in the course of annotating my expert report.  The note indicates he had read the draft

resolution.  It reads:

> KCK letter 16 Dec '55
> - 1950's surplus can be put to Reserve
> (+ Reserve to pay for any o/s claims
> + Release for member and Club, save [?] for claims

See Exhibit 2 to this affidavit, the two pages of my expert report (See, PX-307) relevant

to Mr. Coghlin's annotation which is at the bottom of page 16.  Nevertheless,

Mr. Coghlin's affidavit is silent about the letter and the draft resolution, and he repeatedly

wrongly asserts that, once a Club year is "closed", there can be no further assessments

(Coghlin Aff. pp. 18-23). More wrongly, he goes so far as to claim that the American Club never did "notify its members of the potential for further assessments after insurance years were closed." (Coghlin Aff. pp. 19-20.) On the contrary, the draft resolution he saw (which was adopted and which the manager would routinely distribute to members) was clearly such notification,[2] as had been the case with the prior resolutions starting no later than 1942. In any case, the very nature of the predicate for a final assessment or refund, i.e., requiring a determination "that it is practicable to estimate with a reasonable degree of certainty the ... final surplus or deficiency resulting from all of the [Club's] insurances in effect during such insurance year ..." (supra 4), is itself a clear indication that the action to determine a final dividend or order a final assessment (the "closing") necessarily concerns only known claims, rather than unknown claims, because, as previously mentioned, it is literally impossible to make the required determination if unknown claims are taken into account.

16. Subsequently, three more insurance years were closed, using the same form of resolution as utilized on December 20, 1955. See, PX-6, Minutes of April 9, 1959, meeting at which C. Kurz and A. B. Kurz of Defendant Keystone and Lewis of Defendant Farrell Lines were present (AC3015892), the 1952, 1953, and 1954 years were closed (AC3015903-4), and the insurance year status sheets indicate "None" for "Unreported Losses", indicating no reserves for unreported claims, resolution of which

---

[2] As I stated in my May 22, 2006 fact affidavit herein, the subject of reopening was later raised in my letters to the Board concerning the Prudential and U.S. Lines matters (Brown Aff. ¶28 – 31).

would fall under the policies and thus be subject to a contingent liability for assessment. (AC3016217-9).

17.  After 1959, the detailed "closing" year resolutions clearly providing that claims other than known unsettled claims be indemnified under terms of the policies for those "closed" years, such as in ¶ 9, pp. 8-9, supra or its 1955 successor, utilized at least from 1942 to 1959, were not used.  However, there was no material change in the policy or by-laws, so the above-stated reasoning that the board's "final" actions and "closings" could not reasonably concern unknown claims, still applied.  Moreover, my review of the relevant closed year statements indicates that until 1988 they all continued to show "None" in respect of "Unreported Losses", indicating no reserves for unreported claims, consistent with such claims being left to fall under the policies.  In 1988 the Club closed the 1977, 1979, and 1981 years with a $100,000 per year addition to loss reserves for IBNR ODCs.  Thereafter, all closed years records from the 1977 year on reflected that $100,000 as the figure in respect of the closed year "unreported losses," except for the 1978 year, which had been closed before 1988.

### Mr. Coghlin's Affidavit

18.  The most glaring omission in Mr. Coghlin's affidavit, as in his earlier expert report, is his failure to attempt an analysis of the contract (American Club policies, by-laws, and charter) under which the unique issues in this case must be resolved.  His affidavit refers more often to the policies and by-laws than had his expert report, but he

makes no coherent effort to consider the contractual provisions and their meaning and effect.

19.    Most of his affidavit consists of generalized statements about P&I matters and P&I clubs other than the American Club. These are not useful, because during the relevant period (about 1940-1989) each club had its own rules and by-laws which would differ from others' and would change from time to time.[3] Mr. Coghlin's approach stems directly from Defendants' instructions for him: to describe the basic concepts of P&I club insurance, explain how these mutual clubs are structured and how they normally operate, describe the types of claims they cover, and give his opinion on only certain points made by the American Club in this matter (DX-IJ, 3). This approach seems primarily designed to suggest either that the American Club was operating like the others or, if it was not, it should have been. However, neither is true. What other clubs were doing has no relevance. The issues here concern the contracts between the Club and its members and the contractual obligations and rights of all the parties to the contracts.

20.    That said, I identify below the more significant shortcomings in Mr. Coghlin's assertions, and explain why they are erroneous, misleading, or of no probative value in resolving this dispute.

---

[3] I distinguish the rules and practices of the U.K. Club from those of the American Club in my expert rebuttal report (See, PX-307, p. 11 – 17).

### Significance Of Closing A Policy Year

21.  Mr. Coghlin's statement in paragraph 52 of his trial affidavit, drafted in absolute terms as to what "closing" means, is too sweeping, in light of the ¶ 7 Analysis, and, more particularly, the resolution for December 16, 1955, of which Mr. Coghlin was apparently aware, but does not mention, supra 12-13, ¶15.  Both would plainly ascribe a sensible meaning for "closing," consistent with the contract and different from the one Mr. Coghlin asserts.

22.  Mr. Coghlin asserted in his expert report that there was a general understanding in the P&I industry that "closed means closed" (DX-IJ, p. 22) and testified at his deposition that "reopening years is anathema to the concept of closure" and "he had never heard of it before" (Coghlin Tr. 172).  Moreover, Mr. Coghlin testified that any Club with a rule permitting reopening of closed years would lose its members.  (Coghlin Tr. 173:13 – 16).  At his deposition, however, Mr. Coghlin was confronted with the 1967 rule of the Britannia Club, a major English club in existence since about the mid-nineteenth century, which relieved a member of liability for calls upon closing, but provided an exception for unknown claims or known claims which could not be correctly estimated (Tr. 176).  Mr. Coghlin admitted he was completely unaware of the rule (Tr. 179).  Mr. Coghlin's assertion in paragraphs 55 and 56 of his trial affidavit, that the rule was never invoked and was withdrawn in 1968 (after being in the Britannia Club's rules for over 30 years) is unsupported, and misses the point.  The relevance of the Britannia Club's rule does not depend on whether the rule was enforced.  On the contrary, the sort of claims that could have caused the Britannia Club to enforce such a

- 16 -

rule, such as asbestosis, did not even first appear until the 1980's, well over ten years after the Britannia Club revoked its rule. Instead, the Britannia Club rule is relevant because it demonstrates that a P&I club can, and did, have a rule permitting the reopening of closed years, and that the presence of such a rule did not drive away membership. Similarly, the American Club had a by-law – Article VI, section 4 – stating implicitly what the Britannia Club rule stated expressly (See, ¶ 7 Analysis supra). As we have seen, the American Club's board in earlier years utilized a form of closing resolution which expressly made clear the implicit meaning of the by-law. Mr. Coghlin was clearly aware of such a resolution in preparing his expert affidavit, but chose to ignore it. See discussion, supra ¶ 15. Reopening closed years, therefore, is not anathema to the concept of American Club closure, properly understood.

23. The Britannia Club rule furthermore is relevant because it demonstrates conclusively that, contrary to Mr. Coghlin's assertions, there was no uniform industry-wide practice among P&I clubs about closing years in time periods relevant to this case, and that each club was governed by its own individual rules, by-laws and practices. This point is reinforced by the UK P&I Club's (Mr. Coghlin's own) experience of not closing years until 1966, after many decades of operation as both separate and amalgamated entities, and the Liverpool & London Club's practice, described in paragraph 58 of Mr. Coghlin's trial affidavit, which long had no rule about closure and began to close years after 1979. By contrast, the American Club did not pass a rule barring assessment of members in closed years until 1997. By its terms, the American Club rule applies only

- 17 -

to 1997 and subsequent years. Mr. Coghlin admitted at deposition that such rule changes are prospective only (Coghlin Tr. 291-2). These facts alone, and Mr. Coghlin's admission that rule changes are prospective only, are fatal to Mr. Coghlin's assertion of an industry-wide practice among P&I Clubs during the relevant time period.

24.  The American Club's practice of paying the Closed Year ODC's without further assessment, referred to in paragraph 59 of Mr. Coghlin's trial affidavit, was evidently the result of a mutually mistaken assumption on the part of everyone concerned, board, manager, and members, that there was a liability. That practice continued until a subsequent board, largely composed of representatives of new members, became aware of it. The board considered it was unfair and could become unduly burdensome on the Club, so that legal action should be taken to rectify the situation. The Club is not seeking to undo what has been done, which has substantially benefited the pre-1989 members.

25.  Mr. Coghlin writes in paragraphs 61 and 62 of his trial affidavit that [based on his experience with other P&I clubs, not the American Club] policy years are closed to give shipowners the assurance of finality with respect to further assessments. However, for those other clubs, in one way there is merely an appearance of finality. To the extent that closed liabilities are to be funded from open years, as was often provided in their rules, assessments (or calls) would simply be made under the "label" of the open year rather than the closed year, and the shipowner would pay the same amount unless, of course, he had moved to another club in the meantime. Thus, "open-ended uncertainty"

is essentially disguised, rather than extinguished. In any event, this practice did not apply to the American Club in the relevant years.

26. The American Club's by-law, Art. VI, Sec. 4, <u>supra</u> 4, properly understood, makes it sufficiently clear that Mr. Coghlin's assertions as to the effect of closing with respects to the Club's payment of indemnities and ability to assess members of the closed year (<u>See</u>, Coghlin Aff. ¶¶ 63-67) are incorrect with respect to the American Club. The "closing" was only in respect of known claims, as confirmed by early resolutions of the Club's board, as Mr. Coghlin must be aware (<u>See</u>, ¶ 15, <u>supra</u>).

## The Management Of The P&I Clubs

27. Mr. Coghlin's assertion that "members of a P&I club do not take any direct role in the management or operation of a club" (<u>See</u>, Coghlin Aff. ¶ 16) is incorrect as to the American Club. Members of the American Club have a right to object to the board's decisions and on occasion have done so.

28. Mr. Coghlin implies that the managers of a club, and not the club's board, in effect run the club, subject to the board's rubberstamp of approval (<u>See</u>, Coghlin Aff. ¶¶ 17, 18). Mr. Coghlin, however, overstates the influence of the manager as applied to the American Club. While the manager's role in the American Club is important, the board has the responsibility for conducting the business of the Club (by-laws, Art. II, Sec. 1) and it makes the final decisions, which well might differ from the manager's recommendation. In my experience, the American's Club board was actively involved in the operations of the Club and did not blindly defer to the managers.

- 19 -

29. Mr. Coghlin's suggestion that a member's entitlement to indemnity "depends" upon whether the claim falls under a "head of cover" (Coghlin Aff. ¶ 19) again is incomplete and therefore inaccurate. An American Club policyholder's entitlement to have his claim paid depends not only on whether the claim falls under a "head of cover", as it must, but on whether any other terms of the policy and by-laws affect that "entitlement", including whether assessments were required to fund the indemnity.

### The American Club Is An Insurer And Exists To Provide Insurance, But Only In Accordance With All The Terms Of The Insurance Contracts.

30. Mr. Coghlin emphasizes the fact that a policyholder's proportion of total calls does not change and from this draws the conclusion that the right to insurance coverage and the obligation to pay calls "follow separate paths", evidently trying to convey that there is no connection between the right and the obligation. (Coghlin Aff. ¶ 22). Although his point is obscure, I presume that Mr. Coghlin means by "the right to insurance coverage" the policyholder's "right to payment of his claim". In any case, emphasis on proportion is misplaced. What matters is the quantum of assessments for the year, which should cover the quantum of claims for the year. If a policyholder fails to pay his share of assessments (calls) for the year's claims, it will affect his right to payment, so plainly that right and that obligation are closely linked.

31. Mr. Coghlin's analysis regarding "transfer of risk" (See, Coghlin Aff. ¶ 23) is flawed and inaccurate. As mentioned in my expert report (See, PX-307, p. 7, n.2) the

"transfer of risk" is not absolute, but contingent upon the member's meeting his contractual obligation to pay assessments.

### Club Cover Is Provided Under The Terms Of The Insurance Contract

32.   It is an over-simplification to write, as Mr. Coghlin does in paragraph 26 of his trial affidavit, that, "If a claim falls within one of the heads of basic cover, ... the insured has a contractual right to be indemnified." Other terms of the contract may affect and might even nullify such right, e.g., a failure to pay assessments.

### The Mutual Underwriting System

33.   Mr. Coghlin misinterprets the American Club's by-laws when he suggests broadly that "[c]alls are not made in response to the payment of individual claims or categories of claims; rather calls are made when the aggregate accounts show that they are or will be necessary." (See, Coghlin Aff. ¶ 40).  In quoting too selectively from the by-laws, Mr. Coghlin avoids pointing out the American Club by-law Article VI, Section 4, also provides a broad and flexible procedure for assessments, including not only final assessments, but interim assessments based on the manager's determination "that it is practicable to estimate with a reasonable degree of certainty the minimum [or] probable ... deficiency," for the year.  (See, PX-109, p. BP001430, emphasis added.)  For the relevant years, all of which had been "closed" and "zeroed out" for known claims, any additional claim for an unknown claim would permit such a determination and an immediate interim assessment.

Estimates On Claims

34.   Mr. Coghlin's generalized discussion of how P&I clubs typically estimate reserves for claims (Coghlin Aff. ¶¶ 41-45) is of no probative value in light of the significant body of evidence in this action regarding how the American Club actually estimates reserves for such claims (see, e.g., Affidavit of William Craig submitted by Plaintiff in Support of its Case in Chief, dated May 8, 2006 ("Craig Aff.")).

35.   Contrary to Mr. Coghlin's assertions in paragraph 46 of his trial affidavit, the provision of $100,000 for IBNR ODCs was *not* "[i]n order to insure that adequate provision would be made for payment of such claims without impairing its reserves" (emphasis added).  As discussed in more detail in paragraphs 18 – 24 of my May 22, 2006 affidavit, and in paragraphs 72 – 81 of Mr. McGowan's trial affidavit dated May 12, 2006, it was impossible to estimate what would be "adequate" (i.e., enough, but not too much); the $100,000 set-aside or "addition to loss reserves" (See, PX-127, p. AC3061173) was essentially an arbitrary figure to help cover such potential IBNR ODC's, nothing more.

36.   Mr. Coghlin's statement that "what matters in considering closure of an insurance year is . . . the aggregate figures for all claims as well as the club's general reserves and reinsurance arrangements" (Coghlin Aff. ¶ 47) is flatly wrong with respect to the Club's general reserves.  Contrary to Mr. Coghlin's generalized statement, what really matters to the American Club in considering closure of an insurance year is the aggregate amount of the reserve for all claims based on adequate evaluation of each

claim. The Club's general reserves had no effect on setting the year's reserves. At "closing" (necessarily for known claims) the accounts were "zeroed out", i.e., the amount retained by the Club matched the reserve. This procedure was consistent with the required division of the Club's business into insurance years.

37.    Mr. Coghlin's characterization of the Club's decision in 1988 to set aside funds for Closed Year ODC's (Coghlin Aff. ¶ 48) errs in two respects: there is no evidence that consideration was given to reserves accumulated previously, the board setting an arbitrary figure of $100,000, lower than figures recommended by the manager; and the Club did not commence to set reserves, but continued to set aside an arbitrary $100,000 per year, which was not a true estimated reserve (it could not be, as the claims were unknown), but a decision to "allow" $100,000 for IBNR ODC's, while providing true reserves for pending (known) cases. (See, PX-127, p. AC3061179).

38.    Mr. Coghlin's description of Mr. Craig's practice in dealing with ODCs (Coghlin Aff. ¶¶ 49, 50) does not accurately describe the full process. Mr. Craig's affidavit states: that the original "net reserve of zero" based on deductibles was "an arbitrary 'placeholder' reserve", i.e., not a true estimated reserve at all; when more information became available he recommended a more appropriate reserve; he described in considerable detail the steps he took to arrive at a conservative true reserve based on available information. (Craig Aff. ¶¶ 25-28.) Accordingly, Mr. Coghlin's suggestion that the Club's position is "unsustainable" (Coghlin Aff. ¶ 50) is manifestly unjustified.

39.  Mr. Coghlin's characterization that the Club has denied paying indemnities based on an "absence of dedicated reserves for occupational disease (or any other) claims in closed years" (Coghlin Aff. ¶ 51) is grossly inaccurate.  It is not the absence of "dedicated reserves" that is of concern to the Club.  It is the absence of *any* reserve or, for 1977 and 1979 – 1988, of an adequate reserve for *any* unknown claims in the relevant years.

<u>Response to Mr. Coghlin's Comments on Certain Points Made by the American Club in this Litigation</u>

A.   To Assess One Insurance Year for Another Insurance Year's <u>Claims Would be Contrary to American Club By-Laws</u>

40.  Mr. Coghlin's interpretation of the concepts of "mutual" and "mutuality," as well as his application of those terms to the American Club (<u>See</u>, Coghlin Aff. ¶¶ 68-72), is inaccurate.  As noted <u>supra</u> at ¶ 4, the Club's by-laws expressly mandate that for purposes of dividends and assessments the Club's business shall be divided into insurance years.  It would be contrary to the by-laws to assess one insurance year to pay for the cost of claims in another year and also unfair, again as Mr. Coghlin acknowledged at his deposition, <u>supra</u> 4.  That a mutual insurance club's members are both insurers and insureds of each other is more than a "useful shorthand expression."  The phrase accurately describes the financial realities of the situation in a mutual club:  Although functioning through a corporation, each insurance year's member provides a share of the funds needed to cover claims of others and, in turn, receives the others' funds to cover his own claims – a true mutual relationship.

41. Mr. Coghlin's comments in paragraphs 73 and 74 of his trial affidavit on the purported benefits current members of the Club purportedly enjoy from monies contributed by former members, by way of reserves and contingency funds, are irrelevant. Members of the Club may have contributed, or the Club may have received from other sources, funds used towards the Club's reserves. But the members make their contributions for their own benefit as members of an ongoing organization. The reserves (including any contingency fund) become the property of the Club, to be used in the Club's ongoing business. If members decide to leave the Club voluntarily, it is with the knowledge that the remaining and new members will utilize the reserve similarly for the benefit of the ongoing Club. The departing members (who left voluntarily for their own purposes) have voluntarily relinquished their interest in the Club and any of the Club's funds, and incidentally may have acquired a benefit from the reserves and/or contingency fund of their new club(s). In any event, whatever the former members' contributions, if any, towards the Club's reserves or contingency fund might have been, they have no bearing the issues in this case.

42. Mr. Coghlin is incorrect in asserting in paragraphs 75 and 76 of his trial affidavit that Mr. Hughes' October 25, 1996 fax (See, PX-224 and DX-DX) "recognized" that current members are and always have been subject to assessments for deficiencies arising from closed year claims. What his fax actually said is described below. Mr. Coghlin's conclusion as to my inference is also wrong. Paragraph 45 of my affidavit dated May 12, 2006 states my understanding that the IG learned that the American Club

and two others had no rule requiring open year members to pay assessments to cover closed year claims and, as a result of that discovery, required the American Club to adopt such a rule. I think that is a fair inference. Mr. Coghlin's digression into the 1996 correspondence between the American Club and the IG is inaccurate as to both the inquiry by the IG and the response, which can be found at DX-DV, DX-DW, and DX-DX. As accurately summarized in DX-DX (first two sentences on p. AC0032808), the inquiry and answer were:

> You have also inquired with respect to the language in Article IV, Section 4, as to whether the clause in question precludes the possibility of funding deficiencies in closed years from calls on open years. As a matter of interpretation and practice, that language does not and has never been understood to effect such a preclusion.

The answer was true, as was the further explanatory information in the letter sent by Mr. Hughes, the material part of which I drafted and some of which Mr. Coghlin has quoted. In 1996 the Club, in order to maintain reserves and surplus, had been funding deficiencies, including some attributable to closed years, for about five years and continued for another eight years, until 2004, when it stopped because, among other things, the practice was considered inequitable (See, PX-258, p.KEY024169).

B.    Fairness

43.    While, under a "Fairness" heading Mr. Coghlin asserts erroneously that the "bright line" should have been drawn at 1998 instead of 1989, he is oblivious to the paramount issue of "fairness" here. I have read paragraphs 8 and 16 of Mr. Hughes' rebuttal affidavit to the effect that the real unfairness here would lie in allowing

- 26 -

defendants, who in fact did not assess themselves in amounts adequate to cover their unknown liabilities, to cast on the current members a burden to which they never agreed and which is solely attributable to the pre-1989 years. Mr. Hughes asserts that defendants had already received the benefit of over $31 million in refunds and almost $6 million in indemnities, for which they have paid no premiums or assessments. If Mr. Hughes is correct, which I have no reason to doubt, there is no unfairness or inequity whatever to defendants.

C.    Coverage and "Closure"

44.    I think Mr. Coghlin's discussion (Aff. ¶¶ 89-96) is academic as, so far as I know, the Club makes no argument that its policy provisions concerning time and notice apply until the member is aware of the relevant "happening, occurrence, or claim". As to the effect of "closure", I have already fully discussed that, supra, and have discussed claims estimation, supra, and disagree with certain of his observations, as indicated above.

Comments on Certain Other Affidavits

45.    A number of former directors have submitted affidavits as to which a response is in order. They are Messrs. Charles Kurz, II (for Keystone), Gleason (for APL), Kennedy (for BP), and Gronda (for Farrell).[4] Their affidavits assert, in similar

---

[4] Ms. Deborah A. Weedman has also submitted an affidavit on behalf of the Apex Oil Defendants. The principal point in her affidavit concerns an Order & Stipulation dated April 4, 1991, between the Club and the two Apex Oil Defendants, Trinidad and MTI (the "Stipulation") (DX-BS). The Stipulation was agreed in order to compromise a dispute about the deductible amounts to be applied as to possible claims for reimbursement in respect to a number of allegedly asbestos-injured seamen, whose names are

language, that it was their and other directors' "understanding" that, once a year was "closed," it could not be reopened and the Club would have to pay all claims for the year, but could not make further assessments. (See, e.g. Kurz Aff. ¶¶ 22, 23, 24; Kennedy Aff. ¶¶ 11, 12, 13, 18; Gleason Aff. ¶¶ 23, 25, 26; and Gronda Aff. ¶¶ 11, 13, 15). Their assertions are not grounded in any expressed consideration of the terms of the contract (policy and by-laws), but consist solely of assertions about such things as their expectations and the effect further assessments might have on their business operations.

46.    Defendants' suggestion that they had reasonably believed that Closed Years always would remain closed is belied by the evidence. I first examined the significance of "closing" years when I raised the subject of reopening them in a November 3, 1993 letter to the Club (See, PX-177) concerning the Prudential bankruptcy in which I advised preliminarily that it should be possible to reopen a closed year for further assessments pro rata against that year's members for unknown and unfunded asbestos claims. The details of the circumstances and events thereafter are described in my affidavit of May 12, 2006, previously submitted herein at pages 15-22. In brief, in the Prudential matter after further litigation and a $66,160,000 judgment against the Club was vacated, a letter dated November 4, 1994 was sent by co-counsel Christy & Viener and Kirlins to the Prudential

---

listed in two exhibits to the Stipulation. I am informed that the Club will abide by the terms of the Stipulation, without waiver of or prejudice to its position with respect to assessments with respect to possible reimbursements, asserted in this action, a subject which was not discussed at the time or covered by the Stipulation, because the Club had not then decided to raise the issue, nor had I then thought it might. In the fifteen years since the Stipulation was executed, so far as I know, none of the seamen has pressed his claim, a circumstance which seems to be consistent with ¶106 of Ms. Weedman's affidavit. Accordingly, none of the potential future claims identified in the stipulation is ripe for judicial review at this time.

Trustee advising that, "It might be necessary to levy additional assessments for closed years in connection with asbestos claims." (See, PX-190.) A copy of that letter was sent to SCB. A short time later I was asked by Mr. Gleason to write a lawyer, Ellis Mirsky, stating the reasoning for my view. I did so by letter of December 27, 1994 (See, PX-192, 193) copies to Mr. McGowan of SCB and Mr. Gleason. I do not recall receiving any replies.

    47.  Meanwhile, in the U.S. Lines bankruptcy, the Club was also faced with thousands of asbestos claims, and on April 20, 1995, I wrote a letter to the Club, c/o SCB (See, PX-199) recommending that:

> In connection with the U.S. Lines bankruptcy and also those of Prudential and States Steamship [another bankrupt member], we think the Club should assert the position that asbestos claims against the bankrupts, if paid, will evoke a need for assessments, at least for the insurance years before the 1977 year when the practice of retaining $100,000 for IBNR of a disease nature started. (PX-199, p. KEY036046)

There was no firm decision by the board on this recommendation. The litigation pressure in both bankruptcies was reduced, and the final result was that, after I made an oral report to the board, at a meeting on June 8, 1995, "it was agreed that no action be taken at this time regarding the issues raised in counsel's letter dated April 20, 1995." [PX-199] (See, DX-CS, p. KEY004151.)

    48.  As of that date it is my recollection that the board had still taken no definitive position about my suggestion of reopening years to assess for asbestos claims in the bankruptcies. However, in connection with a subsequent plan to establish a contingency

fund, the subject was raised again by a letter from Mr. Gleason of January 22, 1996

(misdated 1995) in which he referred to a Kirlins opinion letter to the Club dated

February 14, 1996, authored by William Fallon (the "Fallon Letter", PX-212,

AC0051582-97), which, among other things, concluded that:

(a)  The closing of accounts of an insurance year is a "final settlement of accounts."

(b)  The final settlement of accounts could be set aside in the event of mutual mistake.

The Fallon Letter, which primarily concerned the Reserve Account, had been circulated

to the board on several occasions. (See, PX-304). I replied in some detail by letter dated

February 1, 1996, that in my view, in a year involving unknown asbestos claims for

which no assessments had been made, it was appropriate to reopen the year on the ground

of mutual mistake (See, PX-212, pp. AC0066530-4). Such a "reopening" would have

accomplished the same result as the Club's alternative (b), supra, by a different route.

49.  I never received a reply to my letter.

50.  On June 13, 1996, the Contingency Fund was approved, and the 1992

insurance year was closed. The board meeting minutes include the following statement

in relation to that action:

> … In discussing this recommendation the Directors wished to make clear that when taking action to close a year, it is their intention that such closed year cannot be reopened unless through the operation of New York statute.

PX-221, p. AC3069006.

51.  In view of the foregoing chain of events, and the delay in any definitive statement on the issue once it was raised, I think it is wrong to say that the view that a year could not be reopened was a view which had been long held, although the suggestion of "reopening" a year was unwelcome.  The statement in the board minutes was certainly not in my view a reaffirmation of some previous affirmation, at least based on my experience starting in 1982.  Instead, it was an affirmation of intention with respect to the closing of years in the future.

52.  In fact, the history of "closings" of years starting in 1942, reflects a very different intent.  A review of the board minutes shows that the board members during the 1955 and 1959 (or earlier) "closings" (which used a detailed form of resolution described supra 12, ¶ 15, consistent with the contract and the June 1942 resolution quoted supra, 7, ¶ 9) remained on the board for years.  (See, Exhibit 3 of this report, a table showing the names of the Board Members for Early Closing Years.)  Between them, the 1955 and 1959 boards closed the insurance years 1949 through 1954 (See, PX-5, PX-6).  All insurance years prior to that between 1938 and 1948 had already been closed using the same June 1942 form of resolution quoted supra 7, ¶ 9.  (See, PX-1A, PX-1, PX-2, and PX-3.)  After 1959, at board meetings, with 1955 and/or 1959 members in the majority, i.e., in 1963, 1964 and 1965, the board closed insurance years 1955 – 1958.  (See, PX-13, PX-14, PX-17.)  The detailed form of resolution was not used, but there is no evidence of any intent to change the meaning of closing which, after all, was fixed by contract, as confirmed by specifically worded closing resolutions used from no later than 1942

through 1959.  Moreover, the available records indicated "none" for "Unreported Losses" for the closed years, consistent with the long-standing understanding of the contract. (See, PX-13, p. AC3021636, PX-14, p. AC3023241, PX-17, p. AC3024820.)  In 1966 and 1968, the 1955 and/or 1959 directors, while no longer a majority, remained as a strong (by virtue of their experience) presence on the board (5 of 11 in 1966 and only 4 of 17 in 1968, which for some reason had a large influx of newcomers, most of whom did not stay long).  The remaining 1955 and/or 1959 directors present at the 1968 closing of the 1960 and 1961 insurance years (1959 had been closed in 1966), were Gibbons, C. Kurz, Knowles, and A. B. Kurz.  (See, PX-21 and PX-24.)  In 1972, when insurance years 1962 – 1965 were closed, none of them were present, but the chief executive of the Manager, SCB, C. Williamson (who had been at every board meeting since 1955) was (See, PX-27).

53.  In 1975, when insurance year 1966 was closed, A. B. Kurz was present, the only 1955 and/or 1959 board member who attended meetings then or later.  The 1966 years was closed without a specific resolution of the sort used between at least 1942 and 1959, but there is no indication of any intent to change the consequences of closing and again the records show "0" [zero] for "Losses Unreported," reflecting a continuation of the long-standing practice.  A. B. Kurz continued as a board member until 1997, although in later years he attended meetings less frequently.  However, he was present at the June 10, 1993 meeting when the 1987 and 1988 insurance years (the last of those at issue in this matter) were closed (see, PX-173).  Again, there was no expression of intent in the

undetailed board resolution inconsistent with what had been expressed in all the earlier years. The records available with the exhibit do not show the effect of the $100,000 per year allowance, but the earlier statement of March 31, 1993, shows no amount for unreported losses for 1987 and 1988, and I presume the statement after closing would reflect the $100,000 allowance for each year, as had been commenced in 1988, consistent with the early understanding of the effect of closing.

54.  I suggest that it follows from the foregoing that, based on the contract terms and the specific closing resolutions used in early years, confirmed by the consistent matching of funds with unreported losses (zero until the introduction of the $100,000 addition), there is clear evidence of the meaning of "closing" as to the American Club. That meaning cannot be changed by the unexpressed intentions of different boards at different times, particularly when not related to referenced contract terms.

55.  In addition to their assertions of intent expressed only some time after the possibility of reopening had been broached, some of the affidavits also err on points of detail.

56.  Mr. Gleason (Aff. ¶ 27) misquotes and unjustifiably truncates the Contingency Fund guidelines. The last paragraph quoted commences, "this constraint flows from a primary consideration . . .," not "the" primary consideration .... The use of "the" instead of "a" magnifies the weight of covering claims in closed years by wrongly suggesting it is the only primary consideration. This suggestion is heightened by the omission of the next sentence:

> Adequate free surplus <u>must</u> also be maintained to satisfy the
> surplus requirements of the New York Insurance Department
> including surplus based on Risk Based Capital (RBC)
> calculations …

DX-DI, p. AC0032836, emphasis added. The second sentence, using the absolute,

"must", takes precedence over the first sentence. Mr. Gleason also errs in asserting (Aff.

¶ 30) that all of the money in the reserves was funded by closed year members. Indeed, it

appears that none of the funds in the current Reserve Account are based on Defendants'

contributions, as discussed more fully in Mr. Solarino's rebuttal affidavit, paragraphs 2-8.

57. Messrs. Kurz and Kennedy in discussing my September 11, 1987 letter

captioned "Re: Asbestosis – Coverage and Deductible" (DX-AR) in identical language

(Kurz Aff. ¶ 43; Kennedy Aff. ¶ 50) reach the same conclusion, still in identical

language:

> Given the title of Mr. Brown's opinion letter, it certainly
> encompassed [artful word!] an opinion that there was
> coverage for the asbestos claims under the policies issued by
> the American Club …

I am uncertain what "encompassed" is meant to convey, but if they mean to assert that

the opinion dealt with the question of whether there was coverage under the American

Club policies, they are wrong. The letter did not deal with that issue at all. The reference

in the caption to "coverage" concerned what policy or policies, among several, would be

held to cover an asbestos disease in connection with the issue of application of one or

more deductibles.

58. To assist the Court I attach as Exhibit 4 a Correlation of Exhibits in the

Expert Rebuttal Report of Richard H. Brown, Jr., and the American Club's Trial Exhibits.


_____

Richard H. Brown, Jr.

Sworn to before me this
26th day of June, 2006

_____
Notary Public

JANE COLASURDO
Notary Public, State Of New York
No. 31-4786002
Qualified In New York County
Commission Expires April 30, 2007

Rebuttal Expert Affidavit of Richard H. Brown, Jr. –
Requesting exclusion in its entirety

Nourse & Bowles, LLP
One Exchange Plaza
New York, New York 10006
(212) 952-6200

Sullivan & Worcester LLP
1290 Avenue of the Americas
New York, New York 10104
(212) 660-3000
Attorneys for Plaintiff


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------X
                        :

AMERICAN STEAMSHIP OWNERS    :    04 Civ. 04309 (LAK)(JCF)
MUTUAL PROTECTION AND        :
INDEMNITY ASSOCIATION, INC.,    :

                        :    **REBUTTAL EXPERT AFFIDAVIT**
        Plaintiff,      :    **OF RICHARD H. BROWN, JR.**

- against -           :    **SUBMITTED BY PLAINTIFF IN**
                        :    **SUPPORT OF THE AMERICAN**
ALCOA STEAMSHIP CO., INC., et.al.,  :    **CLUB'S CASE IN CHIEF**

                        :
        Defendants.    :
-------------------------------------------------X


STATE OF NEW YORK    )
                        ) ss.:
COUNTY OF NEW YORK    )


      Richard H. Brown, Jr., being duly sworn, deposes and says:

Bases For Opinions

1.    I submit herewith, as Exhibit 1, a copy of my <u>curriculum vitae</u>, stating my education and experience.  The opinions and statements herein are based on: (a) my knowledge of and experience with American Steamship Owners Mutual Protection and Indemnity Association, Inc. ("American Club" or "Club") during twenty years of service as counsel to the Club, most of that time as a director also, between 1982 and 2002; (b) documents produced or marked as trial exhibits in this action; and (c) testimony of witnesses and fact affidavits submitted herein.  I submit this affidavit primarily in rebuttal to the affidavit of Defendants' expert witness, Terence Coghlin.  I expect to be reimbursed for my work in preparing this affidavit at the rate of $250 per hour.

2.    Under date of 21st October 2005, Terence Coghlin submitted his expert report in support of Defendants' positions (Trial Exhibit DX-IJ).  On December 30, 2005, I submitted my rebuttal expert report and exhibits (Trial Exhibits PX-307 and PX-308, respectively) stating in some detail why I thought his report was of no value in resolving the issues in this matter.  In brief, I wrote then that Mr. Coghlin had failed to adequately consider, indeed barely referred to, the American Club's mutual indemnity insurance policy and by-laws (the most significant relevant documents) and did not mention the governing New York law.  Instead, he largely relied on generalizations and his views about P&I insurance (some not accurate) and the experience of P&I clubs (chiefly English) which had developed rules and practices differing from the American Club's, all of which was irrelevant in my view.  (<u>See</u>, PX-307.)  I respectfully refer the Court to both

- 2 -

of those reports (DX-IJ and PX-307) and shall not repeat the material in PX-307 except

as necessary to respond to Mr. Coghlin's recent affidavit.

<u>The Relevant Policies And By-Laws</u>

3.    Since this is a contractual matter arising in unique circumstances, it is

necessary first to consider the documents evidencing the contract among the parties.

These include the Club's charter and by-laws and the annual mutual indemnity insurance

policies issued to members.  The most immediately relevant are the policies and by-laws.

The applicable Club policies provide:

> ASSESSABILITY:  The Assured are subject to a contingent
> liability hereunder for assessment without limit of amount for
> their proportionate share of any deficiency or impairment as
> provided by law and fixed in accordance with the by-laws of
> the Association [Club] ...

Exhibit 1 to Joint Pretrial Order, p. AC4053452.  Thus, any claim under the policy

against the Club is subject to <u>all</u> of the policy terms, including, but not limited to, the

above-quoted assessability provision.

4.    The by-laws provide, <u>inter alia</u>:

> For the purposes of declaring dividends and making
> assessments the business of the Corporation [Club] shall be
> divided into insurance years ...

PX-109, Art. VI, Sec. 3, p. BP001429.  Under that provision, members for a given

insurance year may be assessed to cover claims in that insurance year but those who were

not members for that year cannot be required to pay assessments for claims in that year.

Mr. Coghlin repeatedly acknowledged this point at his deposition (Deposition Transcript

of Terence Coghlin, dated January 12, 2006 ("Coghlin Tr." p. 198, l. 17-38; p. 203, l. 6-9 at 243-4, l. 15-21).

5.    The by-laws do not mention "closing" of insurance years. However, they provide, in Article VI, Section 4, as relevant:

> SECTION 4. From time to time after the termination of each insurance year, <u>when the manager shall determine that it is practicable to estimate with a reasonable degree of certainty the minimum, probable or final surplus or deficiency resulting from all of the Corporation's [Club's] insurances in effect during such insurance year</u>, the manager shall place before the board of directors a statement of such financial results of such insurances, segregated between assessable and non-assessable business. After receipt of any such statement, the board of directors from time to time may (a) fix and determine an amount to be declared and paid as a partial or final dividend, after retaining such sums as they may deem necessary to meet outstanding policy obligations or for the maintenance of reserves and surplus of the Corporation, or (b) order an interim or the final assessment to be made against the holders of assessable policies ... Any dividend declared or any assessment levied shall be based solely on such surplus or such deficiency, respectively, resulting from the assessable business for the insurance year. All dividends declared and all assessments levied shall be distributed or spread in the ratio that the net premiums paid by the holder of an assessable policy bear to the net premiums paid by all holders of assessable policies for the insurance year. ... In any case, however, all actions of the board of directors in respect of dividends or assessments shall conform with the Law and with the Charter and By-Laws of the Corporation.

PX-109, p. BP001430, emphasis added. The Club's board or counsel would, however, frequently use the word "closed" in referring to years as to which the board acted to declare final dividends or make final assessments.

6.     The parties dispute the effect of such actions or such "closing". Plaintiff Club has asserted that either:

(a)     the "closing" is literally complete and the Club will pay the "known" claims (i.e., those whose costs could be estimated with a reasonable degree of certainty at "closing") without further refund or assessment even if the assessments prove to be insufficient, but need not pay "unknown" claims (i.e., those whose costs could not be estimated with a reasonable degree of certainty at "closing")[1], nor, of course, would there be any assessments for such unknown claims not paid by the Club, or

(b)     there is a "closing" only with respect to known claims, and those will be paid without further assessment, but unknown claims should only be paid under the policy, subject to all policy terms, including the assured's contractual contingent liability to pay assessments.

Defendants contend that the Club must pay all claims, known and unknown, without any further assessment, i.e., the year has been "closed" only with respect to the members' contingent liability for assessment without limit, but not with respect to the Club's obligation to respond to unknown claims – a partial "one-way" closing.

---

[1] For later economy of words, in the balance of this affidavit, I will use (without quotation marks) "known" and "unknown" in the special sense that "known" refers to claims which practicably could be and were estimated for reserve/assessment purposes prior to closing and "unknown" refers to those which could not be or were not thus estimated and therefore were not included in calculating assessments for years being closed. The "unknown" claims might, for example, include such claims as complaints for ODC's filed in court which are now under administrative dismissal in the multi-district litigation in the Eastern District of Pennsylvania pending possible return to the active docket if there is adequate proof of asbestos-caused disease/injury. The existence of such claims might have been "known" in the word's ordinary sense, but their outcome could not have been practicably estimated with a reasonable degree of certainty and therefore I label them "unknown" for discussion purposes. Certainly, "unknown claims" include claims that were not reported at all, even though, for eleven of the years in question (1977 and 1979 – 1988), an arbitrary sum of $100,000 per year was added to the reserve account in the expectation that such claims might be made in the future. I understand that the members for those years have to date received more in indemnities regarding their Closed Year ODCs than the aggregate they contributed.

7.  _Analysis_.  The predicate for the Board determining a final dividend or making a final assessment is that

> the Manager shall determine that it is practicable to estimate with a reasonable degree of certainty the ... final surplus or deficiency ... [for the] ... insurance year.

The most (indeed the only) reasonable interpretation is that the Manager's determination and the board's subsequent "final" action must relate only to claims known at the time of the Manager's determination as to which it was practicable to estimate the final surplus or deficiency "with a reasonable degree of certainty," because only a final surplus or deficiency due to such _known_ claims can be estimated "with a reasonable degree of certainty." It is self-evidently impossible to estimate with a reasonable degree of certainty the final surplus or deficiency due in whole or in part to unknown claims. Otherwise expressed, it would literally be impossible to make such a determination if unknown claims are taken into account. This leads to the logical and realistic conclusion that any such "final" action by the Board and "closing" of an insurance year could be final only with respect to known claims. Such action or "closing" in the context of this "reasonable degree of certainty" requirement should have no effect on unknown claims. Since the results of such unknown claims could not practicably have been estimated with a reasonable degree of certainty, they clearly should not be included in the "closed" category, and the Club's liability for them should be determined under all of the policy's terms, including the assureds being subject to a contingent liability for assessment without limit of amount.

8.    Moreover, the foregoing interpretation is required in order to comply with the by-law provision, <u>supra</u> 3, ¶ 4, mandating that the business of the Club be divided into insurance years.  If Defendants' contention were to be accepted, the costs of the unknown claims arising in closed years would improperly fall on members for other, open years, instead of the members for the years in which the claims arose, plainly contrary to the requirement that the Club's business be divided into insurance years.  On the other hand, if this Court rules that the Club must pay indemnities on Closed Year ODCs but may assess closed year members, the Club would remain responsible for paying the known claims in closed years for which assessments had already been paid by those years' members, but as to the unknown claims, for which no such assessments had been levied, the Club would be responsible only under all the terms of the policies, which would include the assureds being subject to a contingent liability for assessment.  Under by-law Art. VI, Sec. 3, <u>supra</u> 3, the Club is entitled and required to assess the members of the relevant insurance years, and the liability of the Club in respect of each claim should not exceed the total assessments thus collected.  This would be fully in accord with the foregoing by-laws and policies.  Any other course of action would unjustifiably impose a burden on members for other years, contrary to the by-laws.

9.    The foregoing is clear simply from the terms of the above-quoted by-laws, but there is also clear evidence that such an understanding was fully recognized and more concretely expressed in the earlier resolutions of the Club's board.  At a board meeting on

June 11, 1942, the board "finally" closed four insurance years using the following resolution:

> WHEREAS, it is deemed desirable by the Board that the insurance year commencing February 20, 1938 and ending February 20, 1939; the insurance year commencing February 20, 1939 and ending February 20, 1940; the insurance commencing February 20, 1940 and ending February 20, 1941; and the insurance year commencing February 20, 1941 and ending February 20, 1942 be finally closed as between the Association and its respective members for said insurance years; and

> WHEREAS, it is impossible now to determine exactly the outstanding [i.e., unresolved or unsettled] liabilities of said insurance years, and the final settlement of all such outstanding [i.e., unresolved or unsettled] liabilities cannot be pressed to an early conclusion;

> NOW, THEREFORE, BE IT RESOLVED that the insurance year commencing February 20, 1938 and ending February 20, 1939; the insurance year commencing February 20, 1939 and ending February 20, 1940; the insurance commencing February 20, 1940 and ending February 20, 1941; and the insurance year commencing February 20, 1941 and ending February 20, 1942, be finally closed as of June 30, 1942; and be it

> FURTHER RESOLVED that all cash, securities and other assets in the possession of the Association, and credited to the aforesaid insurance years, be and they are hereby transferred to and made a part of the Reserve Fund of the Association, and that no further assessment for any of the said years be made, but that the liabilities of the Association for indemnification to the members for any outstanding [i.e., unresolved or unsettled] claims arising during said insurance years shall be charged against the Reserve Fund of the Association; and be it

> FURTHER RESOLVED that the members for said insurance years shall have no further liabilities for the unsettled claims of said years, and the Association shall have

no further liabilities to the members for any claims whatsoever, except for indemnity under the terms of the insurance protection accorded to the members by the Association; and be it

FURTHER RESOLVED that the Managers be and hereby are instructed to send copies of this resolution to the members of the Association of said insurance years.

PX-1-A, at p. AC3004255, emphasis added. The explanatory notes in brackets are inserted to make it clear that in context "outstanding" can only mean "unresolved" or "unsettled", as confirmed by the use of "unsettled" in the fifth paragraph. Webster's New Collegiate Dictionary (1981) gives "unpaid" and "unresolved" as synonyms for "outstanding". Accordingly, the "outstanding liabilities" must refer to known, but unsettled, claims, in respect of which members will have "no further liabilities" for assessments. The underscored statement in the fifth paragraph can only sensibly refer to unknown claims, as to which the Club shall have no further liability except for indemnity under the terms of the insurance protection accorded to members, i.e., under the policies, which expressly subject assured (who were members for the relevant years) to a contingent liability for assessment without limit of amount.

10. The above-described resolution of the June 1942 board is clearly fully consistent with a reasoned understanding of the terms of the contract (policies and by-laws) described supra ¶ 7, p. 6 (the "¶ 7 Analysis"), in that it gives effect to both of the salient contractual provisions in dispute here – i.e., both the members' right to indemnity and the members' contingent liability for assessment without limit of amount. The resolution and ¶ 7 Analysis are also fully consistent with the Club's alternative (b), supra

5, ¶ 6, (i.e., if the Club is liable for claims first presented after a year is closed, the Club may assess members for that year) which would also give effect to both contractual provisions. The Club's alternative (a) (i.e., once a year is closed, members from that year cannot present new claims) also is internally consistent in the sense that it would give complete effect to a literal interpretation of "closing", paying known claims without further assessment and, considering the year fully closed, neither paying nor assessing for unknown claims. The Defendants' argument that the claims presented after a year has closed are payable, but the Club has no right to assess members in that year for such claims, however, is inconsistent with the board resolutions quoted above, the Club's by-laws, and the ¶ 7 Analysis. Moreover, Defendants' position is internally inconsistent in that it would require the Club to pay for unknown claims under the policy, but absolve the members for the relevant years from their contingent liabilities for assessment without limit of amount under the same policy, i.e., an unfairly incomplete "closing", improperly giving effect to only part of the contract. The Defendants' position would unjustifiably make the Club liable for an unlimited, unknown number of unknown claims at an unpredictable and unlimited cost, with the Club arbitrarily deprived of its contractual right to subject the relevant years' members to the assessments for the costs of such unknown claims and forced to assess to impose such costs on members for different insurance years, unrelated to the relevant years, contrary to by-law Art. VI, Sec. 3, supra 3.

11. The June 1942 board meeting, at which the above resolution, <u>supra</u> ¶ 9, pp. 8-9 was approved, included a Mr. Kurz as a member who represented Keystone interests (including Chas. Kurz & Co., Inc.) and describes Marine Transport Lines, Inc., Defendants herein, as evidently among the members to whom copies of the resolution were to be sent. (<u>See,</u> PX-1A, pp. AC3004250, 52, 53.)

12. At a June 14, 1945, board meeting a resolution was adopted "finally" closing insurance years (or periods) from February 20, 1942, to December 31, 1942, using language substantially identical to that quoted in ¶ 9, pp. 8-9 above. Mr. Kurz was again listed as a board member present. (<u>See,</u> PX-1, pp. AC3005538, 45, 86.)

13. At a November 13, 1947, board meeting a resolution was adopted "finally" closing insurance years 1943, 1944, and 1945, using language substantially identical to that quoted in ¶ 9, pp. 8-9, above. The accounts for the closed years state, "none", for "Losses Unreported (Net)," indicating no reserves for unknown claims and thus confirming that such claims were to be covered under the policy terms, which include the members' contingent liability for assessments. (<u>See,</u> PX-2, pp. AC3006880, 93-97.)

14. At a board meeting of November 8, 1951, the board closed insurance years 1946, 1947, and 1948 by means of a resolution substantially identical to that quoted <u>supra</u> ¶ 9, pp. 8-9. The accounts for the years thus closed state "None" for "Losses Pending – Unreported," indicating no reserves for unknown losses, which is fully consistent with the resolution leaving unknown claims to be resolved under the policy terms, including the members' contingent liability for assessments. (<u>See,</u> PX-3, pp. AC3011196, 243-45.)

- 11 -

15.  At a board meeting on December 20, 1955, the board closed insurance years

1949, 1950, and 1951 using a resolution somewhat amended by counsel, but in substance

and effect identical to that quoted supra ¶ 9, pp. 8-9, as further liabilities for "outstanding

[unsettled] claims", were to be charged against the Reserve Fund without further

assessment and the Club was to have no further liabilities "for any claims whatsoever,

except for indemnity under the terms of such insurance policies held by such members."

Such terms include the members' contingent liability for assessment.  Mr. Kurz of

Defendant Keystone and Mr. Lewis who represented Defendant Farrell Lines

Incorporated were at the board meeting.  See, PX-5, pp. AC3010529-31.  A letter from

counsel (Kirlin, Campbell & Keating, hereinafter "Kirlins") dated December 16, 1955,

provided a draft of the amended language of the resolution which the board adopted.

(See, PX-5, pp. AC3010548-50.)  Mr. Coghlin reviewed that letter, making a note about

it in the course of annotating my expert report.  The note indicates he had read the draft

resolution.  It reads:

> KCK letter 16 Dec '55
> - 1950's surplus can be put to Reserve
> (+ Reserve to pay for any o/s claims
> + Release for member and Club, save [?] for claims

See Exhibit 2 to this affidavit, the two pages of my expert report (See, PX-307) relevant

to Mr. Coghlin's annotation which is at the bottom of page 16.  Nevertheless,

Mr. Coghlin's affidavit is silent about the letter and the draft resolution, and he repeatedly

wrongly asserts that, once a Club year is "closed", there can be no further assessments

(Coghlin Aff. pp. 18-23). More wrongly, he goes so far as to claim that the American Club never did "notify its members of the potential for further assessments after insurance years were closed." (Coghlin Aff. pp. 19-20.) On the contrary, the draft resolution he saw (which was adopted and which the manager would routinely distribute to members) was clearly such notification,[2] as had been the case with the prior resolutions starting no later than 1942. In any case, the very nature of the predicate for a final assessment or refund, i.e., requiring a determination "that it is practicable to estimate with a reasonable degree of certainty the ... final surplus or deficiency resulting from all of the [Club's] insurances in effect during such insurance year ..." (supra 4), is itself a clear indication that the action to determine a final dividend or order a final assessment (the "closing") necessarily concerns only known claims, rather than unknown claims, because, as previously mentioned, it is literally impossible to make the required determination if unknown claims are taken into account.

16.  Subsequently, three more insurance years were closed, using the same form of resolution as utilized on December 20, 1955. See, PX-6, Minutes of April 9, 1959, meeting at which C. Kurz and A. B. Kurz of Defendant Keystone and Lewis of Defendant Farrell Lines were present (AC3015892), the 1952, 1953, and 1954 years were closed (AC3015903-4), and the insurance year status sheets indicate "None" for "Unreported Losses", indicating no reserves for unreported claims, resolution of which

---

[2] As I stated in my May22, 2006 fact affidavit herein, the subject of reopening was later raised in my letters to the Board concerning the Prudential and U.S. Lines matters (Brown Aff. ¶28 – 31).

would fall under the policies and thus be subject to a contingent liability for assessment. (AC3016217-9).

17.  After 1959, the detailed "closing" year resolutions clearly providing that claims other than known unsettled claims be indemnified under terms of the policies for those "closed" years, such as in ¶ 9, pp. 8-9, <u>supra</u> or its 1955 successor, utilized at least from 1942 to 1959, were not used.  However, there was no material change in the policy or by-laws, so the above-stated reasoning that the board's "final" actions and "closings" could not reasonably concern unknown claims, still applied.  Moreover, my review of the relevant closed year statements indicates that until 1988 they all continued to show "None" in respect of "Unreported Losses", indicating no reserves for unreported claims, consistent with such claims being left to fall under the policies.  In 1988 the Club closed the 1977, 1979, and 1981 years with a $100,000 per year addition to loss reserves for IBNR ODCs.  Thereafter, all closed years records from the 1977 year on reflected that $100,000 as the figure in respect of the closed year "unreported losses," except for the 1978 year, which had been closed before 1988.

## Mr. Coghlin's Affidavit

18.  The most glaring omission in Mr. Coghlin's affidavit, as in his earlier expert report, is his failure to attempt an analysis of the contract (American Club policies, by-laws, and charter) under which the unique issues in this case must be resolved.  His affidavit refers more often to the policies and by-laws than had his expert report, but he

makes no coherent effort to consider the contractual provisions and their meaning and effect.

19.  Most of his affidavit consists of generalized statements about P&I matters and P&I clubs other than the American Club.  These are not useful, because during the relevant period (about 1940-1989) each club had its own rules and by-laws which would differ from others' and would change from time to time.[3]  Mr. Coghlin's approach stems directly from Defendants' instructions for him:  to describe the basic concepts of P&I club insurance, explain how these mutual clubs are structured and how they normally operate, describe the types of claims they cover, and give his opinion on only certain points made by the American Club in this matter (DX-IJ, 3).  This approach seems primarily designed to suggest either that the American Club was operating like the others or, if it was not, it should have been.  However, neither is true.  What other clubs were doing has no relevance.  The issues here concern the contracts between the Club and its members and the contractual obligations and rights of all the parties to the contracts.

20.  That said, I identify below the more significant shortcomings in Mr. Coghlin's assertions, and explain why they are erroneous, misleading, or of no probative value in resolving this dispute.

---

[3] I distinguish the rules and practices of the U.K. Club from those of the American Club in my expert rebuttal report (See, PX-307, p. 11 – 17).

### Significance Of Closing A Policy Year

21.  Mr. Coghlin's statement in paragraph 52 of his trial affidavit, drafted in absolute terms as to what "closing" means, is too sweeping, in light of the ¶ 7 Analysis, and, more particularly, the resolution for December 16, 1955, of which Mr. Coghlin was apparently aware, but does not mention, supra 12-13, ¶15. Both would plainly ascribe a sensible meaning for "closing," consistent with the contract and different from the one Mr. Coghlin asserts.

22.  Mr. Coghlin asserted in his expert report that there was a general understanding in the P&I industry that "closed means closed" (DX-IJ, p. 22) and testified at his deposition that "reopening years is anathema to the concept of closure" and "he had never heard of it before" (Coghlin Tr. 172). Moreover, Mr. Coghlin testified that any Club with a rule permitting reopening of closed years would lose its members. (Coghlin Tr. 173:13 – 16). At his deposition, however, Mr. Coghlin was confronted with the 1967 rule of the Britannia Club, a major English club in existence since about the mid-nineteenth century, which relieved a member of liability for calls upon closing, but provided an exception for unknown claims or known claims which could not be correctly estimated (Tr. 176). Mr. Coghlin admitted he was completely unaware of the rule (Tr. 179). Mr. Coghlin's assertion in paragraphs 55 and 56 of his trial affidavit, that the rule was never invoked and was withdrawn in 1968 (after being in the Britannia Club's rules for over 30 years) is unsupported, and misses the point. The relevance of the Britannia Club's rule does not depend on whether the rule was enforced. On the contrary, the sort of claims that could have caused the Britannia Club to enforce such a

rule, such as asbestosis, did not even first appear until the 1980's, well over ten years

after the Britannia Club revoked its rule.  Instead, the Britannia Club rule is relevant

because it demonstrates that a P&I club can, and did, have a rule permitting the reopening

of closed years, and that the presence of such a rule did not drive away membership.

Similarly, the American Club had a by-law – Article VI, section 4 – stating implicitly

what the Britannia Club rule stated expressly (See, ¶ 7 Analysis supra).  As we have seen,

the American Club's board in earlier years utilized a form of closing resolution which

expressly made clear the implicit meaning of the by-law.  Mr. Coghlin was clearly aware

of such a resolution in preparing his expert affidavit, but chose to ignore it.  See

discussion, supra ¶ 15.  Reopening closed years, therefore, is not anathema to the concept

of American Club closure, properly understood.

23.   The Britannia Club rule furthermore is relevant because it demonstrates

conclusively that, contrary to Mr. Coghlin's assertions, there was no uniform industry-

wide practice among P&I clubs about closing years in time periods relevant to this case,

and that each club was governed by its own individual rules, by-laws and practices.  This

point is reinforced by the UK P&I Club's (Mr. Coghlin's own) experience of not closing

years until 1966, after many decades of operation as both separate and amalgamated

entities, and the Liverpool & London Club's practice, described in paragraph 58 of

Mr. Coghlin's trial affidavit, which long had no rule about closure and began to close

years after 1979.  By contrast, the American Club did not pass a rule barring assessment

of members in closed years until 1997.  By its terms, the American Club rule applies only

to 1997 and subsequent years. Mr. Coghlin admitted at deposition that such rule changes are prospective only (Coghlin Tr. 291-2). These facts alone, and Mr. Coghlin's admission that rule changes are prospective only, are fatal to Mr. Coghlin's assertion of an industry-wide practice among P&I Clubs during the relevant time period.

24.     The American Club's practice of paying the Closed Year ODC's without further assessment, referred to in paragraph 59 of Mr. Coghlin's trial affidavit, was evidently the result of a mutually mistaken assumption on the part of everyone concerned, board, manager, and members, that there was a liability. That practice continued until a subsequent board, largely composed of representatives of new members, became aware of it. The board considered it was unfair and could become unduly burdensome on the Club, so that legal action should be taken to rectify the situation. The Club is not seeking to undo what has been done, which has substantially benefited the pre-1989 members.

25.     Mr. Coghlin writes in paragraphs 61 and 62 of his trial affidavit that [based on his experience with other P&I clubs, not the American Club] policy years are closed to give shipowners the assurance of finality with respect to further assessments. However, for those other clubs, in one way there is merely an appearance of finality. To the extent that closed liabilities are to be funded from open years, as was often provided in their rules, assessments (or calls) would simply be made under the "label" of the open year rather than the closed year, and the shipowner would pay the same amount unless, of course, he had moved to another club in the meantime. Thus, "open-ended uncertainty"

is essentially disguised, rather than extinguished.  In any event, this practice did not apply to the American Club in the relevant years.

26.  The American Club's by-law, Art. VI, Sec. 4, <u>supra</u> 4, properly understood, makes it sufficiently clear that Mr. Coghlin's assertions as to the effect of closing with respects to the Club's payment of indemnities and ability to assess members of the closed year (<u>See</u>, Coghlin Aff. ¶¶ 63-67) are incorrect with respect to the American Club.  The "closing" was only in respect of known claims, as confirmed by early resolutions of the Club's board, as Mr. Coghlin must be aware (<u>See</u>, ¶ 15, <u>supra</u>).

## The Management Of The P&I Clubs

27.  Mr. Coghlin's assertion that "members of a P&I club do not take any direct role in the management or operation of a club" (<u>See</u>, Coghlin Aff. ¶ 16) is incorrect as to the American Club.  Members of the American Club have a right to object to the board's decisions and on occasion have done so.

28.  Mr. Coghlin implies that the managers of a club, and not the club's board, in effect run the club, subject to the board's rubberstamp of approval (<u>See</u>, Coghlin Aff. ¶¶ 17, 18).  Mr. Coghlin, however, overstates the influence of the manager as applied to the American Club.  While the manager's role in the American Club is important, the board has the responsibility for conducting the business of the Club (by-laws, Art. II, Sec. 1) and it makes the final decisions, which well might differ from the manager's recommendation.  In my experience, the American's Club board was actively involved in the operations of the Club and did not blindly defer to the managers.

29. Mr. Coghlin's suggestion that a member's entitlement to indemnity "depends" upon whether the claim falls under a "head of cover" (Coghlin Aff. ¶ 19) again is incomplete and therefore inaccurate. An American Club policyholder's entitlement to have his claim paid depends not only on whether the claim falls under a "head of cover", as it must, but on whether any other terms of the policy and by-laws affect that "entitlement", including whether assessments were required to fund the indemnity.

### The American Club Is An Insurer And Exists To Provide Insurance, But Only In Accordance With All The Terms Of The Insurance Contracts.

30. Mr. Coghlin emphasizes the fact that a policyholder's <u>proportion</u> of total calls does not change and from this draws the conclusion that the right to insurance coverage and the obligation to pay calls "follow separate paths", evidently trying to convey that there is no connection between the right and the obligation. (Coghlin Aff. ¶ 22). Although his point is obscure, I presume that Mr. Coghlin means by "the right to insurance coverage" the policyholder's "right to payment of his claim". In any case, emphasis on <u>proportion</u> is misplaced. What matters is the quantum of assessments for the year, which should cover the quantum of claims for the year. If a policyholder fails to pay his share of assessments (calls) for the year's claims, it <u>will</u> affect his right to payment, so plainly that right and that obligation are closely linked.

31. Mr. Coghlin's analysis regarding "transfer of risk" (<u>See</u>, Coghlin Aff. ¶ 23) is flawed and inaccurate. As mentioned in my expert report (<u>See</u>, PX-307, p. 7, n.2) the

"transfer of risk" is not absolute, but contingent upon the member's meeting his contractual obligation to pay assessments.

### Club Cover Is Provided Under The Terms Of The Insurance Contract

32.  It is an over-simplification to write, as Mr. Coghlin does in paragraph 26 of his trial affidavit, that, "If a claim falls within one of the heads of basic cover, ... the insured has a contractual right to be indemnified." Other terms of the contract may affect and might even nullify such right, e.g., a failure to pay assessments.

### The Mutual Underwriting System

33.  Mr. Coghlin misinterprets the American Club's by-laws when he suggests broadly that "[c]alls are not made in response to the payment of individual claims or categories of claims; rather calls are made when the aggregate accounts show that they are or will be necessary." (See, Coghlin Aff. ¶ 40). In quoting too selectively from the by-laws, Mr. Coghlin avoids pointing out the American Club by-law Article VI, Section 4, also provides a broad and flexible procedure for assessments, including not only final assessments, but interim assessments based on the manager's determination "that it is practicable to estimate with a reasonable degree of certainty the minimum [or] probable ... deficiency," for the year.  (See, PX-109, p. BP001430, emphasis added.)  For the relevant years, all of which had been "closed" and "zeroed out" for known claims, any additional claim for an unknown claim would permit such a determination and an immediate interim assessment.

### Estimates On Claims

34.    Mr. Coghlin's generalized discussion of how P&I clubs typically estimate reserves for claims (Coghlin Aff. ¶¶ 41-45) is of no probative value in light of the significant body of evidence in this action regarding how the American Club actually estimates reserves for such claims (see, e.g., Affidavit of William Craig submitted by Plaintiff in Support of its Case in Chief, dated May 8, 2006 ("Craig Aff.")).

35.    Contrary to Mr. Coghlin's assertions in paragraph 46 of his trial affidavit, the provision of $100,000 for IBNR ODCs was *not* "[i]n order to <u>insure</u> that adequate provision would be made for payment of such claims without impairing its reserves" (emphasis added).  As discussed in more detail in paragraphs 18 – 24 of my May 22, 2006 affidavit, and in paragraphs 72 – 81 of Mr. McGowan's trial affidavit dated May 12, 2006, it was impossible to estimate what would be "adequate" (i.e., enough, but not too much); the $100,000 set-aside or "addition to loss reserves" (See, PX-127, p. AC3061173) was essentially an arbitrary figure to help cover such potential IBNR ODC's, nothing more.

36.    Mr. Coghlin's statement that "what matters in considering closure of an insurance year is . . . the aggregate figures for all claims as well as the club's general reserves and reinsurance arrangements" (Coghlin Aff. ¶ 47) is flatly wrong with respect to the Club's general reserves.  Contrary to Mr. Coghlin's generalized statement, what really matters to the American Club in considering closure of an insurance year is the aggregate amount of the reserve for all claims based on adequate evaluation of each

claim. The Club's general reserves had no effect on setting the year's reserves. At "closing" (necessarily for known claims) the accounts were "zeroed out", i.e., the amount retained by the Club matched the reserve. This procedure was consistent with the required division of the Club's business into insurance years.

37. Mr. Coghlin's characterization of the Club's decision in 1988 to set aside funds for Closed Year ODC's (Coghlin Aff. ¶ 48) errs in two respects: there is no evidence that consideration was given to reserves accumulated previously, the board setting an arbitrary figure of $100,000, lower than figures recommended by the manager; and the Club did not commence to set reserves, but continued to set aside an arbitrary $100,000 per year, which was not a true estimated reserve (it could not be, as the claims were unknown), but a decision to "allow" $100,000 for IBNR ODC's, while providing true reserves for pending (known) cases. (See, PX-127, p. AC3061179).

38. Mr. Coghlin's description of Mr. Craig's practice in dealing with ODCs (Coghlin Aff. ¶¶ 49, 50) does not accurately describe the full process. Mr. Craig's affidavit states: that the original "net reserve of zero" based on deductibles was "an arbitrary 'placeholder' reserve", i.e., not a true estimated reserve at all; when more information became available he recommended a more appropriate reserve; he described in considerable detail the steps he took to arrive at a conservative true reserve based on available information. (Craig Aff. ¶¶ 25-28.) Accordingly, Mr. Coghlin's suggestion that the Club's position is "unsustainable" (Coghlin Aff. ¶ 50) is manifestly unjustified.

39. Mr. Coghlin's characterization that the Club has denied paying indemnities based on an "absence of dedicated reserves for occupational disease (or any other) claims in closed years" (Coghlin Aff. ¶ 51) is grossly inaccurate. It is not the absence of "dedicated reserves" that is of concern to the Club. It is the absence of *any* reserve or, for 1977 and 1979 – 1988, of an adequate reserve for *any* unknown claims in the relevant years.

<u>Response to Mr. Coghlin's Comments on Certain Points Made by the American Club in this Litigation</u>

A.   To Assess One Insurance Year for Another Insurance Year's
     <u>Claims Would be Contrary to American Club By-Laws</u>

40. Mr. Coghlin's interpretation of the concepts of "mutual" and "mutuality," as well as his application of those terms to the American Club (<u>See</u>, Coghlin Aff. ¶¶ 68-72), is inaccurate. As noted <u>supra</u> at ¶ 4, the Club's by-laws expressly mandate that for purposes of dividends and assessments the Club's business shall be divided into insurance years. It would be contrary to the by-laws to assess one insurance year to pay for the cost of claims in another year and also unfair, again as Mr. Coghlin acknowledged at his deposition, <u>supra</u> 4. That a mutual insurance club's members are both insurers and insureds of each other is more than a "useful shorthand expression." The phrase accurately describes the financial realities of the situation in a mutual club: Although functioning through a corporation, each insurance year's member provides a share of the funds needed to cover claims of others and, in turn, receives the others' funds to cover his own claims – a true mutual relationship.

41. Mr. Coghlin's comments in paragraphs 73 and 74 of his trial affidavit on the purported benefits current members of the Club purportedly enjoy from monies contributed by former members, by way of reserves and contingency funds, are irrelevant. Members of the Club may have contributed, or the Club may have received from other sources, funds used towards the Club's reserves. But the members make their contributions for their own benefit as members of an ongoing organization. The reserves (including any contingency fund) become the property of the Club, to be used in the Club's ongoing business. If members decide to leave the Club voluntarily, it is with the knowledge that the remaining and new members will utilize the reserve similarly for the benefit of the ongoing Club. The departing members (who left voluntarily for their own purposes) have voluntarily relinquished their interest in the Club and any of the Club's funds, and incidentally may have acquired a benefit from the reserves and/or contingency fund of their new club(s). In any event, whatever the former members' contributions, if any, towards the Club's reserves or contingency fund might have been, they have no bearing the issues in this case.

42. Mr. Coghlin is incorrect in asserting in paragraphs 75 and 76 of his trial affidavit that Mr. Hughes' October 25, 1996 fax (See, PX-224 and DX-DX) "recognized" that current members are and always have been subject to assessments for deficiencies arising from closed year claims. What his fax actually said is described below. Mr. Coghlin's conclusion as to my inference is also wrong. Paragraph 45 of my affidavit dated May 12, 2006 states my understanding that the IG learned that the American Club

and two others had no rule requiring open year members to pay assessments to cover closed year claims and, as a result of that discovery, required the American Club to adopt such a rule. I think that is a fair inference. Mr. Coghlin's digression into the 1996 correspondence between the American Club and the IG is inaccurate as to both the inquiry by the IG and the response, which can be found at DX-DV, DX-DW, and DX-DX. As accurately summarized in DX-DX (first two sentences on p. AC0032808), the inquiry and answer were:

> You have also inquired with respect to the language in Article IV, Section 4, as to whether the clause in question precludes the possibility of funding deficiencies in closed years from calls on open years. As a matter of interpretation and practice, that language does not and has never been understood to effect such a preclusion.

The answer was true, as was the further explanatory information in the letter sent by Mr. Hughes, the material part of which I drafted and some of which Mr. Coghlin has quoted. In 1996 the Club, in order to maintain reserves and surplus, had been funding deficiencies, including some attributable to closed years, for about five years and continued for another eight years, until 2004, when it stopped because, among other things, the practice was considered inequitable (See, PX-258, p.KEY024169).

## B.    Fairness

43.    While, under a "Fairness" heading Mr. Coghlin asserts erroneously that the "bright line" should have been drawn at 1998 instead of 1989, he is oblivious to the paramount issue of "fairness" here. I have read paragraphs 8 and 16 of Mr. Hughes' rebuttal affidavit to the effect that the real unfairness here would lie in allowing

defendants, who in fact did not assess themselves in amounts adequate to cover their unknown liabilities, to cast on the current members a burden to which they never agreed and which is solely attributable to the pre-1989 years. Mr. Hughes asserts that defendants had already received the benefit of over $31 million in refunds and almost $6 million in indemnities, for which they have paid no premiums or assessments. If Mr. Hughes is correct, which I have no reason to doubt, there is no unfairness or inequity whatever to defendants.

C.   Coverage and "Closure"

44.   I think Mr. Coghlin's discussion (Aff. ¶¶ 89-96) is academic as, so far as I know, the Club makes no argument that its policy provisions concerning time and notice apply until the member is aware of the relevant "happening, occurrence, or claim". As to the effect of "closure", I have already fully discussed that, supra, and have discussed claims estimation, supra, and disagree with certain of his observations, as indicated above.

Comments on Certain Other Affidavits

45.   A number of former directors have submitted affidavits as to which a response is in order. They are Messrs. Charles Kurz, II (for Keystone), Gleason (for APL), Kennedy (for BP), and Gronda (for Farrell).[4] Their affidavits assert, in similar

---

[4] Ms. Deborah A. Weedman has also submitted an affidavit on behalf of the Apex Oil Defendants. The principal point in her affidavit concerns an Order & Stipulation dated April 4, 1991, between the Club and the two Apex Oil Defendants, Trinidad and MTI (the "Stipulation") (DX-BS). The Stipulation was agreed in order to compromise a dispute about the deductible amounts to be applied as to possible claims for reimbursement in respect to a number of allegedly asbestos-injured seamen, whose names are

language, that it was their and other directors' "understanding" that, once a year was "closed," it could not be reopened and the Club would have to pay all claims for the year, but could not make further assessments. (See, e.g. Kurz Aff. ¶¶ 22, 23, 24; Kennedy Aff. ¶¶ 11, 12, 13, 18; Gleason Aff. ¶¶ 23, 25, 26; and Gronda Aff. ¶¶ 11, 13, 15). Their assertions are not grounded in any expressed consideration of the terms of the contract (policy and by-laws), but consist solely of assertions about such things as their expectations and the effect further assessments might have on their business operations.

46.    Defendants' suggestion that they had reasonably believed that Closed Years always would remain closed is belied by the evidence. I first examined the significance of "closing" years when I raised the subject of reopening them in a November 3, 1993 letter to the Club (See, PX-177) concerning the Prudential bankruptcy in which I advised preliminarily that it should be possible to reopen a closed year for further assessments pro rata against that year's members for unknown and unfunded asbestos claims. The details of the circumstances and events thereafter are described in my affidavit of May 12, 2006, previously submitted herein at pages 15-22. In brief, in the Prudential matter after further litigation and a $66,160,000 judgment against the Club was vacated, a letter dated November 4, 1994 was sent by co-counsel Christy & Viener and Kirlins to the Prudential

---

listed in two exhibits to the Stipulation. I am informed that the Club will abide by the terms of the Stipulation, without waiver of or prejudice to its position with respect to assessments with respect to possible reimbursements, asserted in this action, a subject which was not discussed at the time or covered by the Stipulation, because the Club had not then decided to raise the issue, nor had I then thought it might. In the fifteen years since the Stipulation was executed, so far as I know, none of the seamen has pressed his claim, a circumstance which seems to be consistent with ¶106 of Ms. Weedman's affidavit. Accordingly, none of the potential future claims identified in the stipulation is ripe for judicial review at this time.

Trustee advising that, "It might be necessary to levy additional assessments for closed years in connection with asbestos claims." (See, PX-190.) A copy of that letter was sent to SCB. A short time later I was asked by Mr. Gleason to write a lawyer, Ellis Mirsky, stating the reasoning for my view. I did so by letter of December 27, 1994 (See, PX-192, 193) copies to Mr. McGowan of SCB and Mr. Gleason. I do not recall receiving any replies.

47. Meanwhile, in the U.S. Lines bankruptcy, the Club was also faced with thousands of asbestos claims, and on April 20, 1995, I wrote a letter to the Club, c/o SCB (See, PX-199) recommending that:

> In connection with the U.S. Lines bankruptcy and also those of Prudential and States Steamship [another bankrupt member], we think the Club should assert the position that asbestos claims against the bankrupts, if paid, will evoke a need for assessments, at least for the insurance years before the 1977 year when the practice of retaining $100,000 for IBNR of a disease nature started. (PX-199, p. KEY036046)

There was no firm decision by the board on this recommendation. The litigation pressure in both bankruptcies was reduced, and the final result was that, after I made an oral report to the board, at a meeting on June 8, 1995, "it was agreed that no action be taken at this time regarding the issues raised in counsel's letter dated April 20, 1995." [PX-199] (See, DX-CS, p. KEY004151.)

48. As of that date it is my recollection that the board had still taken no definitive position about my suggestion of reopening years to assess for asbestos claims in the bankruptcies. However, in connection with a subsequent plan to establish a contingency

fund, the subject was raised again by a letter from Mr. Gleason of January 22, 1996

(misdated 1995) in which he referred to a Kirlins opinion letter to the Club dated

February 14, 1996, authored by William Fallon (the "Fallon Letter", PX-212,

AC0051582-97), which, among other things, concluded that:

    (a)   The closing of accounts of an insurance year is a "final settlement of accounts."

    (b)   The final settlement of accounts could be set aside in the event of mutual mistake.

The Fallon Letter, which primarily concerned the Reserve Account, had been circulated

to the board on several occasions. (See, PX-304). I replied in some detail by letter dated

February 1, 1996, that in my view, in a year involving unknown asbestos claims for

which no assessments had been made, it was appropriate to reopen the year on the ground

of mutual mistake (See, PX-212, pp. AC0066530-4). Such a "reopening" would have

accomplished the same result as the Club's alternative (b), supra, by a different route.

    49. I never received a reply to my letter.

    50. On June 13, 1996, the Contingency Fund was approved, and the 1992

insurance year was closed. The board meeting minutes include the following statement

in relation to that action:

> ... In discussing this recommendation the Directors wished to make clear that when taking action to close a year, it is their intention that such closed year cannot be reopened unless through the operation of New York statute.

PX-221, p. AC3069006.

51. In view of the foregoing chain of events, and the delay in any definitive statement on the issue once it was raised, I think it is wrong to say that the view that a year could not be reopened was a view which had been long held, although the suggestion of "reopening" a year was unwelcome. The statement in the board minutes was certainly not in my view a reaffirmation of some previous affirmation, at least based on my experience starting in 1982. Instead, it was an affirmation of intention with respect to the closing of years in the future.

52. In fact, the history of "closings" of years starting in 1942, reflects a very different intent. A review of the board minutes shows that the board members during the 1955 and 1959 (or earlier) "closings" (which used a detailed form of resolution described supra 12, ¶ 15, consistent with the contract and the June 1942 resolution quoted supra, 7, ¶ 9) remained on the board for years. (See, Exhibit 3 of this report, a table showing the names of the Board Members for Early Closing Years.) Between them, the 1955 and 1959 boards closed the insurance years 1949 through 1954 (See, PX-5, PX-6). All insurance years prior to that between 1938 and 1948 had already been closed using the same June 1942 form of resolution quoted supra 7, ¶ 9. (See, PX-1A, PX-1, PX-2, and PX-3.) After 1959, at board meetings, with 1955 and/or 1959 members in the majority, i.e., in 1963, 1964 and 1965, the board closed insurance years 1955 – 1958. (See, PX-13, PX-14, PX-17.) The detailed form of resolution was not used, but there is no evidence of any intent to change the meaning of closing which, after all, was fixed by contract, as confirmed by specifically worded closing resolutions used from no later than 1942

through 1959. Moreover, the available records indicated "none" for "Unreported Losses" for the closed years, consistent with the long-standing understanding of the contract. (See, PX-13, p. AC3021636, PX-14, p. AC3023241, PX-17, p. AC3024820.) In 1966 and 1968, the 1955 and/or 1959 directors, while no longer a majority, remained as a strong (by virtue of their experience) presence on the board (5 of 11 in 1966 and only 4 of 17 in 1968, which for some reason had a large influx of newcomers, most of whom did not stay long). The remaining 1955 and/or 1959 directors present at the 1968 closing of the 1960 and 1961 insurance years (1959 had been closed in 1966), were Gibbons, C. Kurz, Knowles, and A. B. Kurz. (See, PX-21 and PX-24.) In 1972, when insurance years 1962 – 1965 were closed, none of them were present, but the chief executive of the Manager, SCB, C. Williamson (who had been at every board meeting since 1955) was (See, PX-27).

53. In 1975, when insurance year 1966 was closed, A. B. Kurz was present, the only 1955 and/or 1959 board member who attended meetings then or later. The 1966 years was closed without a specific resolution of the sort used between at least 1942 and 1959, but there is no indication of any intent to change the consequences of closing and again the records show "0" [zero] for "Losses Unreported," reflecting a continuation of the long-standing practice. A. B. Kurz continued as a board member until 1997, although in later years he attended meetings less frequently. However, he was present at the June 10, 1993 meeting when the 1987 and 1988 insurance years (the last of those at issue in this matter) were closed (see, PX-173). Again, there was no expression of intent in the

undetailed board resolution inconsistent with what had been expressed in all the earlier

years. The records available with the exhibit do not show the effect of the $100,000 per

year allowance, but the earlier statement of March 31, 1993, shows no amount for

unreported losses for 1987 and 1988, and I presume the statement after closing would

reflect the $100,000 allowance for each year, as had been commenced in 1988, consistent

with the early understanding of the effect of closing.

54.  I suggest that it follows from the foregoing that, based on the contract terms

and the specific closing resolutions used in early years, confirmed by the consistent

matching of funds with unreported losses (zero until the introduction of the $100,000

addition), there is clear evidence of the meaning of "closing" as to the American Club.

That meaning cannot be changed by the unexpressed intentions of different boards at

different times, particularly when not related to referenced contract terms.

55.  In addition to their assertions of intent expressed only some time after the

possibility of reopening had been broached, some of the affidavits also err on points of

detail.

56.  Mr. Gleason (Aff. ¶ 27) misquotes and unjustifiably truncates the

Contingency Fund guidelines. The last paragraph quoted commences, "this constraint

flows from a primary consideration . . .," not "the" primary consideration .... The use of

"the" instead of "a" magnifies the weight of covering claims in closed years by wrongly

suggesting it is the only primary consideration. This suggestion is heightened by the

omission of the next sentence:

> Adequate free surplus must also be maintained to satisfy the
> surplus requirements of the New York Insurance Department
> including surplus based on Risk Based Capital (RBC)
> calculations ...

DX-DI, p. AC0032836, emphasis added. The second sentence, using the absolute,

"must", takes precedence over the first sentence. Mr. Gleason also errs in asserting (Aff.

¶ 30) that all of the money in the reserves was funded by closed year members. Indeed, it

appears that none of the funds in the current Reserve Account are based on Defendants'

contributions, as discussed more fully in Mr. Solarino's rebuttal affidavit, paragraphs 2-8.

57. Messrs. Kurz and Kennedy in discussing my September 11, 1987 letter

captioned "Re: Asbestosis – Coverage and Deductible" (DX-AR) in identical language

(Kurz Aff. ¶ 43; Kennedy Aff. ¶ 50) reach the same conclusion, still in identical

language:

> Given the title of Mr. Brown's opinion letter, it certainly
> encompassed [artful word!] an opinion that there was
> coverage for the asbestos claims under the policies issued by
> the American Club ...

I am uncertain what "encompassed" is meant to convey, but if they mean to assert that

the opinion dealt with the question of whether there was coverage under the American

Club policies, they are wrong. The letter did not deal with that issue at all. The reference

in the caption to "coverage" concerned what policy or policies, among several, would be

held to cover an asbestos disease in connection with the issue of application of one or

more deductibles.

58.   To assist the Court I attach as Exhibit 4 a Correlation of Exhibits in the

Expert Rebuttal Report of Richard H. Brown, Jr., and the American Club's Trial Exhibits.

_____
Richard H. Brown, Jr.

Sworn to before me this
26th day of June, 2006

_____
Notary Public

JANE COLASURDO
Notary Public, State Of New York
No. 31-4786002
Qualified In New York County
Commission Expires April 30, 2007

Southern District of NY
AM CLUB v. ALCOA

FINAL - Richard Brown
January 31, 2006

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------

AMERICAN STEAMSHIP OWNERS
MUTUAL PROTECTION AND
INDEMNITY ASSOCIATION, INC.,
          Plaintiff,
-against-
ALCOA STEAMSHIP CO., INC., ET AL.,
          Defendants.


Civil Action 04-CIV-4309 (LAK)(FM)


-------------------------------------------



DEPOSITION OF:
Richard Brown, Jr.
January 31, 2006
New York, New York
TAKEN BY: Proskauer Rose



FINAL COPY
JANE ROSE REPORTING  1-800-825-3341

Southern District of NY
AM CLUB v. ALCOA

FINAL - Richard Brown
January 31, 2006

Page 9

1      A.    Yes.

2      Q.    Before we begin, I'd like to let

3   you know, as I've let the lawyers for the Club

4   know, that I will be invoking a trial rule

5   which would prohibit you from discussing with

6   counsel for The American Club, during the

7   breaks, any of the substantive areas of this

8   deposition whatsoever.

9      A.    I understand that.

10         MR. VELIE:  This was as agreed at

11   Mr. Coghlin's deposition.

12         MR. SCHAFLER:  That's correct.

13   BY MR. SCHAFLER:

14      Q.    Mr. Brown, what, precisely, is the

15   area of your expertise?

16      A.    With regard to this matter?

17      Q.    Correct.

18      A.    Essentially the fact that I was

19   counsel for The American Club for some 20

20   years.  And for part of that time, I was also a

21   director.

22      Q.    Do you hold yourself out as an

23   expert in customs and practices in the mutual

24   P & I industry beyond your experience with The

25   American Club?

Southern District of NY
AM CLUB v. ALCOA

FINAL - Richard Brown
January 31, 2006

Page 10

1    A.    No.

2    Q.    Do you hold yourself out as an

3    expert in New York law as applied to mutual

4    P & I associations, such as The American Club?

5    A.    No.

6    Q.    Do you intend to offer any

7    opinions in this case on the application of New

8    York law to The American Club?

9    A.    No.

10    Q.    Would you agree that, to the

11    extent that your rebuttal report contains any

12    opinions with respect to the application of New

13    York law to The American Club, that those

14    opinions can be stricken?

15    MR. VELIE:  Objection.  What is it

16    you're asking for here?  Legal opinion as to

17    what should be stricken from --

18    MR. SCHAFLER:  Well, the witness

19    has just said that he's not offering any

20    opinions on New York law, so I take it that any

21    such opinions in his report can be disregarded.

22    BY MR. SCHAFLER:

23    Q.    Is that correct, Mr. Brown?

24    MR. VELIE:  Objection, again.  You

25    may respond if you wish.

Southern District of NY
AM CLUB v. ALCOA

FINAL -- Richard Brown
January 31, 2006

Page 13

1           When — strike that, too.
2           You stepped down, according to your
3    affidavit, as Nourse & Bowles' representative
4    to The American Club in June of 2002. Is that
5    right?
6           MR. VELIE: Objection.
7    A.     I resigned as counsel and as
8    director.
9    Q.     And then you found out about this
10   current case in May of 2004?
11   A.     Yeah, that's correct. In the
12   meantime, I had, from time to time, spoken with
13   Mr. Bowles on various aspects of The American
14   Club, The American Club litigation, and, you
15   know, different — different cases. I guess,
16   primarily, Prudential Lines and the Keystone
17   case, the original Keystone case. At the time
18   the Complaint in this matter was filed, I
19   learned about that. I actually had some input
20   in certain of the pleadings. And Mr. Bowles
21   would contact me from time to time with
22   questions or seeking comments on various
23   aspects of the matter.
24   Q.     Okay. And you gave him legal
25   advice on those matters. Is that correct?

# MEMO ENDORSED



ANDREW DASH
Direct Dial: 212.209.4811
adash@brownrudnick.com



NOV 0 7 2005

Seven
Times
Square
New York
New York
10036
tel 212.209.4800
fax 212.209.4801

November 4, 2005

## VIA HAND DELIVERY

Honorable James C. Francis IV
United States Magistrate Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 1960
New York, New York  10007-1312

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/18/05
```

b
r
o
w
n
r
u
d
n
i
c
k
.
c
o
n

> **Re:    American Steamship Owners Mutual Protection
> and Indemnity Association, Inc. v. Alcoa, etc.
> 04 CV 4309 (LAK) (JCF)**

Dear Magistrate Judge Francis:

This firm represents Farrell Lines, Inc. ("Farrell"), a defendant in the above-captioned matter.  I submit this letter on behalf of Farrell and the following other defendants in this action:  Keystone Shipping Company (and related entities), BP America Inc. (and related entities), Marine Transport Lines, Inc. (and related entities), Kirby Inland Marine, LP (as successor to Hollywood Marine Inc.), American Steamship Company, The Cleveland-Cliffs Steamship Company, Ispat Inland Inc., Amerada Hess Corporation, Sabine Towing and Transportation Company, Inc., Alcoa Steamship Co. Inc. (and related entities), APL, Ltd. (as successor to American Mail Line and American President Lines, Inc.), Apex Oil Company, Inc. (and related entities), Central Gulf Lines, Inc., and Waterman Steamship Corporation.

I write Your Honor in connection with (i) the failure of plaintiff American Steamship Owners Mutual Protection and Indemnity Association, Inc. (the "Club" or "Plaintiff") to submit an expert report on October 21, 2005, as required by the pre-trial schedule and (ii) the Club's unilateral pronouncement that it intends to reserve its expert disclosure and only submit a "rebuttal" report.  Plaintiff is engaging in blatant litigation gamesmanship by ignoring a firm deadline for Rule 26(a)(2)(B) expert disclosure and by maneuvering to preclude unfairly expert rebuttal by Defendants of the expert testimony to be proffered by Plaintiff.  For the reasons set forth herein, Plaintiff should be barred from submitting expert testimony or, at a minimum, should be required to exchange a Rule 26(a)(2)(B) report, containing all opinions on the well-understood issues in this case, by a date certain.

BR

Honorable James C. Francis IV
November 4, 2005
Page 2

## Background Facts

The facts underlying the instant matter are straightforward:

- By Order dated March 22, 2005, Magistrate Judge Maas directed, among other things, that the parties were to simultaneously exchange affirmative expert reports by July 15, 2005. (A copy of the initial pre-trial schedule as set by Magistrate Judge Maas is annexed hereto as Exhibit A.)

- At a conference with Your Honor on July 6, 2005, the Club requested, and the Court granted, an extension of the fact discovery deadline to September 15, 2005. As a consequence, the parties were directed to stipulate to a revised schedule for the submission of affirmative and rebuttal expert reports and related depositions. The parties were further directed to establish a date by which the parties would disclose the subject matter of anticipated expert testimony (not including rebuttal testimony).

- At the July 6 conference, Your Honor recognized that there would be a simultaneous exchange of expert reports in this action:

    THE COURT: Well, I'm not interested in changing the order that Judge Maas set down in terms of when expert reports are exchanged. I think there may well be some value in having an exchange of views prior to the actual production of the reports of the subject matter that the parties anticipate having expert testimony on.

    I think that makes a lot of sense and would urge you folks to incorporate that into the schedule that you hopefully stipulate to, such that there would be a date by which the parties would exchange lists of subject matter for experts -- and frankly, I don't think you probably need the identity of the experts at that stage -- then a date for exchanging expert reports, then a date for exchanging rebuttal reports, and then a date for completing the depositions. That would be my suggestion for purposes of a framework.

    MR. SULLIVAN [representing the Club]: That's fine, Your Honor. Thank you."

Honorable James C. Francis IV
November 4, 2005
Page 3

(Relevant pages from the transcript of the July 6 conference are annexed hereto as Exhibit B.)

- The parties thereafter agreed to the following schedule for the completion of expert disclosure:

  - August 31, 2005 - disclosure of anticipated subject matter of expert witness testimony (not including rebuttal testimony).

  - October 14, 2005 - exchange of expert reports;

  - November 15, 2005 - exchange of rebuttal reports; and

  - December 16, 2005 - completion of expert depositions.

  (The foregoing agreement was memorialized in a letter dated August 23, 2005, a copy of which is annexed hereto as Exhibit C.)

- By subsequent agreement, at the Club's request the date, <u>inter alia</u>, for the exchange of affirmative Rule 26(a)(2)(B) reports was adjourned to October 21, 2005.

- Consistent with the agreed-upon pre-trial schedule, on August 31, 2005, Mitchell C. Stein, Esq., of Sullivan & Worcester LLP, one of two law firms representing the Club in this action, made the following disclosure as to the scope of the Club's affirmative expert discovery:

  Anticipated expert testimony on behalf of the American Club will: . . . discuss custom, practices, usages and understandings with respect to non-profit, assessable mutual marine indemnity insurance, non-assessable, non-mutual, for-profit commercial insurance, the management of mutual protection and indemnity clubs, the historical development of individual club rules, and other matters relating to the insurance policies in this civil action . . . .

(A copy of Mr. Stein's August 31, 2005 letter is annexed hereto as Exhibit D.) Defendants duly communicated to Plaintiff their expected areas of expert testimony on that date. (A copy of that disclosure is annexed as Exhibit E.)

8119213v2

BR

Honorable James C. Francis IV
November 4, 2005
Page 4

- On October 18, Lawrence Bowles, Esq., of Nourse & Bowles LLP, lead counsel for Plaintiff, requested a further extension of the time to exchange affirmative expert reports. Mr. Bowles represented that the Club was having unspecified difficulty in obtaining unspecified information for use by its expert. While the defendants were agreeable to a limited additional extension, the Club declined to accept a proposed compromise and, instead, wrote Your Honor on October 19 and 20, 2005 requesting an extension of the date by which affirmative expert reports were to be submitted from October 21 to November 7, along with concomitant extensions of the dates for the exchange of rebuttal reports and the completion of expert deposition. As set forth by the Club in its October 19 letter:

  > Plaintiff seeks this brief extension because its expert has been delayed in obtaining certain materials needed in connection with the preparation of the expert report. We have been advised that the expert should receive the materials by the middle of next week, and will be able to finalize the report by November 7.

  (Copies of these letters from Plaintiff's counsel are annexed hereto as Exhibits F and G.)

- By letter dated October 19, 2005, Seth Schafler of Proskauer Rose, counsel to a number of the defendants herein, urged the Court to deny the Club's request for a further delay in the expert disclosure process, in part because Plaintiff had some <u>seven months</u> (i.e., since the entry of Magistrate Judge Maas's March 22, 2005 scheduling order) to arrange for the preparation of the requisite expert report. (A copy of Mr. Schafler's letter to the Court is annexed hereto as Exhibit H.)

- The Club thereafter informed Defendants' counsel that Your Honor would not be available to consider its request for an extension until November 7 or thereafter.

- Despite its refusal to compromise with the defendants on the length of a further extension, and its failure to obtain any judicial relief in this regard, the Club unilaterally announced that it would not be submitting its affirmative expert report as required by the pre-trial schedule. Instead, Plaintiff stated that it would await Your Honor's return to consider its extension request. (A copy of my e-mail

**BR**

Honorable James C. Francis IV
November 4, 2005
Page 5

exchange with the Club's counsel on this issue is annexed as Exhibit I.)

- In response to Plaintiff's unilateral announcement that it would not provide its affirmative expert report on October 21, Mr. Schafler informed Plaintiff's counsel as follows:

  > Given plaintiff's position as described in your email below, and to avoid giving an undue advantage to plaintiff, defendants will withhold production of their expert report, which defendants stand ready to produce, until such time as plaintiff indicates that it will produce its report in a simultaneous exchange. Defendants reserve all of their rights and remedies with respect to plaintiff's failure to timely produce its report or timely move for extention of the deadline for doing so, including but not limited to motion to strike the report.

  (A copy of Mr. Schafler's e-mail is annexed as Exhibit J.)

- Plaintiff thereafter took a new track. In a letter to Your Honor dated November 1, 2005, Michael T. Sullivan, another lawyer representing the Club, "withd[rew]" the Club's request for an extension of time to file its expert report and announced Plaintiff's intention to submit only a rebuttal report.[1] (A copy of Mr. Sullivan's November 1 letter is annexed hereto as Exhibit K.)

- In a telephone communication between Lisa Bauer, Esq. of Proskauer, and Mr. Bowles on or about November 3, 2005, the Club adhered to its position that it would submit only a "rebuttal" report which would not allow for a rebuttal pursuant to Rule 26(a)(2)(C) by Defendants' expert.

---

[1] Mr. Sullivan's November 1 letter referred to the "failure of all parties to serve expert reports on the originally agreed date, October 21, 2005 . . . . " (Emphasis added.) This assertion borders on pure fabrication; Mr. Sullivan's letter fails to disclose to the Court, as Mr. Schafler's e-mail on October 20 made clear, that Defendants were ready, willing, and able to submit their expert report on October 21 as the pre-trial schedule required.

8119213v2



Honorable James C. Francis IV
November 4, 2005
Page 6

**The Club's Stratagem is Designed to
Obtain an Unfair Advantage in this Litigation**

In flouting the agreed upon pre-trial schedule and in asserting an intention to submit only a rebuttal expert report, the Club seeks to gain an unfair advantage in the expert discovery process. If the Club has its way, not only will it be able to rewrite unilaterally the agreed-upon pre-trial schedule, but it will also be in a position to submit its affirmative expert testimony in the guise of purported "rebuttal" that (absent further court order) will not be subject to expert rebuttal by Defendants. Such maneuvering should not be permitted. See Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., Inc., 73 F.3d 546, 571 (5th Cir. 1996) ("The purpose of rebuttal and supplementary disclosures is just that -- to rebut and to supplement. These disclosures are not intended to provide an extension of the deadline by which a party must deliver the lion's share of its expert information."); accord Spacemaker Designs, Inc. v. Weldon F. Stump and Co., 2003 WL 21805274, *3 (N.D. Tex. 2003) (striking expert opinion in part for failure to make appropriate initial disclosure).

The issues in this case are all well known. The Club had more than sufficient knowledge of those issues to frame its complaint and, in its August 31 letter, to set forth the areas in which it intended to submit affirmative expert testimony. It should not be permitted to "hang back" and address those issues in the form of a "rebuttal" report. See Atmel Corp. v. Information Storage Devices, Inc., 189 F.R.D. 410, 416-17 (N.D. Cal. 1999) (it was impermissible "gamesmanship" for expert "to sit back and wait to see what the other side came up with and then rebut that limited universe"; limiting expert to testimony on matters disclosed in initial Rule 26(a)(2)(B) report). Allowing Plaintiff to rely solely on a "rebuttal" report would work a material and unfair prejudice on Defendants. The Club would, in the form of a "rebuttal," put in its affirmative expert opinions -- all of which are plainly within its current contemplation -- and evade an expert response. This certainly is not the purpose of a Rule 26(a)(2)(C) report.

Defendants are particularly outraged by the Club's effort to suggest that Defendants failed to comply with their obligations under the pre-trial schedule to submit their affirmative expert report by October 21, as charged by Mr. Sullivan in his November 1 letter. The Court should not be mislead by this spin. As Mr. Schafler noted in his October 20 e-mail to Mitchell Stein, one of Plaintiff's lawyers, defendants were ready to exchange their report as required on October 21. (In this regard, I represent to the Court that Defendants' expert completed and signed his Rule 26(a)(2)(B) report on October 21 so that it would be available for timely exchange with the Club as required by the binding pre-trial schedule.) It was only because of the obvious and unfair prejudice that would flow to Defendants if they submitted their report before the Club was prepared to submit its affirmative report that Defendants determined to defer transmitting their report, subject to an express reservation of rights. See Exhibit J hereto.

8119213v2



Honorable James C. Francis IV
November 4, 2005
Page 7

       Simply put, the Club has played fast and loose with the Court and Defendants. As a consequence, the Club should be barred from submitting expert testimony in this matter as a sanction for its blatant failure to comply with a long-established expert disclosure deadline and its gamesmanship in determining at the last minute not to submit an affirmative report at all in a clear effort to circumvent the established submission schedule and preclude a rebuttal from Defendants' expert.[2]

Respectfully,

Andrew Dash

ASD/dl

cc:   All Counsel via e-mail (w/attachments)

*11/18/05*

*Defendants' application to bar plaintiff from offering expert testimony is denied, except that plaintiff is limited to presenting such evidence in rebuttal to defendants' expert(s). Defendants shall serve any expert report by Nov. 30, 2005; plaintiff shall serve any expert rebuttal report by Dec. 30, 2005; and all expert discovery shall be completed by January 31, 2006.*

*SO ORDERED.*

*James C. Francis IV*

*USMJ*

---

[2]   At the very least, the Club should be required to produce an affirmative expert report setting forth all of the opinions on the well-known issues in this case that it intends to present at trial for simultaneous exchange with Defendants so that, consistent with Rule 26(a)(2)(C), a fair opportunity will be available to Defendants to present rebuttal expert testimony in response thereto.